## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| National Women's Law Center<br>11 Dupont Circle, NW, #800<br>Washington, DC 20036,<br><br>Labor Council for Latin American Advancement<br>815 16th Street, NW, 3d Floor<br>Washington, DC 20006,<br><br>*Plaintiffs*,<br><br>vs.<br><br>Office of Management and Budget<br>725 17th Street, NW<br>Washington, DC 20503,<br><br>John Michael Mulvaney<br>Director, Office of Management and Budget<br>725 17th Street, NW<br>Washington, DC 20503,<br><br>Neomi Rao<br>Administrator, Office of Information<br>and Regulatory Affairs<br>725 17th Street, NW<br>Washington, DC 20503,<br><br>U.S. Equal Employment Opportunity Commission<br>131 M Street, NE<br>Washington, DC 20507,<br><br>Victoria A. Lipnic<br>Acting Chair<br>U.S. Equal Employment Opportunity Commission<br>131 M Street, NE<br>Washington, DC 20507,<br><br>*Defendants*. | Case No. |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs National Women's Law Center (NWLC) and the Labor Council for Latin

American Advancement (LCLAA) hereby sue Defendants Office of Management and Budget

(OMB), John Michael (Mick) Mulvaney, Director of OMB, and Neomi Rao, Administrator of

the Office of Information and Regulatory Affairs (OIRA), in their official capacities,

(collectively OMB Defendants), and, in order to properly execute any remedy, the U.S. Equal

Employment Opportunity Commission (EEOC) and Victoria A. Lipnic, Acting Chair of the

EEOC, in her official capacity (collectively EEOC Defendants); and allege as follows.

## Introduction

1.      This case challenges OMB Defendants' interference with the EEOC's ability to

enforce the nation's civil rights laws. OMB Defendants halted a years-long effort by the EEOC

to collect information on employee pay, and did so without legal authority or meaningful

analysis. Despite the facts that OMB had approved such a collection only one year before, and

that there was no intervening change in circumstances, OMB Defendants unilaterally stayed

employers' obligation to report pay data for their employees. OMB Defendants asserted that the

data collection lacked utility, disregarding the EEOC's conclusion that collecting pay data is

necessary to remedy persistent wage gaps correlated with sex, race, and ethnicity.

2.      Women working full time, year-round are typically paid 80 cents for every dollar

paid to their male counterparts, and comparing women of color to white, non-Hispanic men, the

pay gaps are generally even larger. Black women typically make only 63 cents, Native American

women only 57 cents, and Latinas only 54 cents for every dollar paid to white, non-Hispanic

men for full-time, year-round work.[1] The wage gap is wider still for women who are

---

[1] Nat'l Women's Law Ctr., *Workplace Justice: FAQs About the Wage Gap* (Sept. 2017), https://nwlc.org/wp-content/uploads/2017/09/FAQ-About-the-Wage-Gap-2017.pdf.

immigrants.[2] Women are paid less than men in nearly every occupation. Controlling for race, region, unionization status, education, experience, occupation, and industry still leaves 38 percent of the pay gap unexplained.[3]

3.      Men of color experience similar pay disparities compared to white, non-Hispanic men. For every dollar paid to white, non-Hispanic men, Black men are paid 72 cents and Latino men are paid 62 cents.

4.      As the U.S. Congress recently determined, "wage discrimination" is still a "reality", requiring the "robust application of the civil rights laws."[4]

5.      Yet, a dearth of comparative salary and wage information may contribute to the persistence of race and gender pay gaps, and limit attempts to remedy them.[5] Indeed the most recent survey data available indicates that about 60 percent of workers in the private sector are either prohibited or discouraged from discussing their pay with their colleagues.[6] As a result, employees face significant obstacles in gathering the information that would indicate they have experienced pay discrimination, which undermines their ability to challenge such discrimination. And given the absence of legal obligations to identify wage gaps and report employee pay data, employers lack incentives to undertake their own analysis that could proactively correct pay disparities.

---

[2] Nat'l Women's Law Ctr., Labor Council for Latin Am. Adv., *Workplace Justice: Equal Pay for Latinas* (Oct. 2016), https://nwlc.org/wp-content/uploads/2016/10/Latina-Equal-Pay-2016-English-Final.pdf.
[3] Nat'l Women's Law Ctr., *Workplace Justice: FAQs About the Wage Gap* (Sept. 2017), https://nwlc.org/wp-content/uploads/2017/09/FAQ-About-the-Wage-Gap-2017.pdf.
[4] Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5.
[5] *See Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 649-50 (2007) (Ginsburg, J., dissenting) (explaining that in contrast to "open and definitive events" like a denied promotion or termination, compensation disparities "are often hidden from sight"), *superseded by statute*, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5.
[6] Inst. For Women's Policy Research, *Pay Secrecy and Wage Discrimination* (Jan. 2014), http://www.iwpr.org/publications/pubs/pay-secrecy-and-wage-discrimination-1/at_download/file/.

6.      In 2010, the EEOC and other federal agencies began a robust administrative process to identify ways to improve enforcement of federal laws prohibiting pay discrimination. Over the next six years the EEOC commissioned a National Academy of Sciences study, performed its own pilot study, and organized a diverse work group which engaged employer representatives and human resources information system experts, among many other activities.

7.      Employers have long been required by Title VII of the Civil Rights Act of 1964 (Title VII) to make and keep records that are relevant to the determinations of whether unlawful employment practices have occurred, and to report such records to the EEOC.[7] Through the administrative process described herein, the EEOC determined that including employee pay data in this recordkeeping is necessary to fulfill its obligation to enforce Title VII and other anti-discrimination laws; and namely that the availability of such information would improve the EEOC's enforcement of federal laws prohibiting pay discrimination and would increase employers' voluntary compliance with these laws. The EEOC further concluded that, "[b]alancing utility and burden," a "pay data collection would be an effective and appropriate tool" to meet its statutory obligation to end unlawful employment discrimination.[8]

8.      Accordingly, the EEOC voted on and approved revisions to a longstanding employer survey, the "Employer Information Report EEO-1" (EEO-1), to add W-2 earnings data for employees by sex, race, ethnicity, and job category.[9] On February 1, 2016, these revisions to the EEO-1 were published in the Federal Register for a 60-day notice and comment period as required by the Paperwork Reduction Act, 44 U.S.C. §§ 3501, *et seq*. (PRA). Over the next

---

[7] 42 U.S.C. § 2000e-8(c).
[8] Agency Information Collection Activities: Notice of Submission for OMB Review, 81 Fed. Reg. 45479, 45483 (July 14, 2016).
[9] EEOC has been using iterations of the EEO-1 to collect employer-level demographic information about employment statistics since 1966.

seven months, the EEOC held a public hearing, made changes to the revised EEO-1 to reduce

employer burden in response to comments received, voted on and approved the revisions to the

EEO-1, formally submitted its revisions to the EEO-1 to OMB for approval as required by the

PRA, and sought 30 days of additional public comment. The administrative process shows that at

every step the EEOC carefully considered how to maximize the utility of this collection and

minimize its burden on employers, including through the full and effective use notice and

comment procedures.

9.      OMB Defendants approved the revisions to the EEO-1 on or about September 29,

2016. On that same day the EEOC announced that private employers with 100 or more

employees, including federal contractors and subcontractors, would be required to submit the

revised EEO-1. As such, beginning in March 2018, they would report summary pay data, which

would be held confidentially, along with their longstanding reporting of employee demographic

information by job category, to the EEOC. The EEOC also announced the availability of

technical assistance, to include free webinars, to facilitate the transition for covered employers.[10]

10.      On August 29, 2017, without notice, Neomi Rao, the Administrator of OIRA (a

component of OMB that reviews agency information collection requests for approval or

disapproval) issued a one-and-a-half-page memorandum that immediately stayed the

effectiveness of these revisions to the EEO-1 (the Rao Memorandum). Administrator Rao

provided virtually no explanation regarding the decision, with only seven sentences used to

justify the abrupt reversal of OMB's prior approval of the pay data collection less than one year

earlier.[11] OMB Defendants' decision was made in secret and without inviting public comment, in

---

[10] Press Release, EEOC, *EEOC to Collect Summary Pay Data* (Sept. 29, 2016), https://www.eeoc.gov/eeoc/newsroom/release/9-29-16.cfm.
[11] Memorandum from Neomi Rao, Adm'r, OIRA, to Victoria Lipnic, Acting Chair, EEOC (Aug. 29, 2017), https://www.reginfo.gov/public/jsp/Utilities/Review_and_Stay_Memo_for_EEOC.pdf.

contrast to the transparent, public, multi-year process utilized by the EEOC to create a well-developed and reasoned revision of the EEO-1 to collect pay data.

11.     OMB Defendants acted unlawfully in staying the pay data collection. They do not have authority to stay a collection of data required by agency rule, like the EEO-1. Even if they had such authority, the cursory explanation provided by the Rao Memorandum does not establish a legal basis for their action. The Rao Memorandum provides virtually no analysis, and simply parrots regulatory standards, while the only specific justification provided is nonsensical in light of the underlying facts.

12.     NWLC and LCLAA now sue OMB Defendants because their actions were contrary to law and arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*. (APA), and the PRA, 44 U.S.C. §§ 3501, *et seq*.

13.     Plaintiffs also sue EEOC Defendants as necessary parties for relief in this case because the EEOC acted consistently with a directive from OMB Defendants to notify employers that they were not required to submit pay data as part of their EEO-1 submissions for the current fiscal year.[12]

### Parties

14.     **Plaintiff National Women's Law Center (NWLC)** is a 45-year-old nonpartisan, nonprofit organization that advocates for the rights of women and girls at school, at work, at home, and in their communities. It is based in Washington, DC. For decades, NWLC has worked to combat sex discrimination in the workplace, with a particular focus on achieving equal pay for women.

---

[12]Stay the Effectiveness of the EEO-1 Pay Data Collection, 82 Fed. Reg. 43362, 43362 (Sept. 15, 2017).

15.     Closing the gender wage gap, and in particular the race and gender wage gaps experienced by women of color, is a key priority for NWLC. NWLC publishes evidence-based reports and fact sheets used to educate employers, members of the public, and federal and state policymakers about the reality of pay inequity as well as policies that promote equal pay. It identifies, highlights, and promotes promising employer practices to close the wage gap, and works with willing employers to assist them in implementing such practices. NWLC has worked closely with policymakers at the federal and state level to strengthen equal pay laws; and built coalitions to press for public policy reform to promote equal pay. NWLC pursues robust enforcement of laws prohibiting pay discrimination and other forms of workplace discrimination and seeks redress for victims of such discrimination, representing individual employees bringing discrimination charges to the EEOC, and referring others to attorneys willing to take on these cases through its Legal Network for Gender Equity. NWLC also appears as amicus and as counsel in the courts on behalf of victims of pay discrimination.

16.     **Plaintiff Labor Council for Latin American Advancement (LCLAA)** is a national 501(c)(3) representing the interests of approximately 2 million Latino/a trade unionists throughout the United States and Puerto Rico, as well as other non-unionized Latino workers. Its headquarters is in Washington, DC, and it has 52 chapters around the country. LCLAA was founded in 1972 by local Latino trade union committees to promote participation by Hispanic trade unionists. It dedicates its efforts to assisting workers to better advance their rights in their workplace and convince employers to take steps to improve working conditions, both through advocacy and through training and counseling workers and union members. LCLAA's dues-paying membership includes individual workers, union members, and students. LCLAA helps its

members to pursue their common goal of improving the working conditions of Latino and Latina

employees, both at individual employers and throughout the economy.

17.     Closing the pay gap has been an increasing focus of LCLAA's work in recent

years. This pay gap especially plagues Latinas, who suffer from the largest gender wage gap of

any group of working women in the United States. In 2012, LCLAA created the Trabajadoras

Initiative,[13] which specifically seeks to protect and advance the interests of Latina workers on

issues that impact them, including seeking to eradicate the persistent pay gap. In 2012, LCLAA

passed a resolution specifically calling on the AFL-CIO and its affiliates to conduct advocacy

and outreach aimed at eradicating pay discrimination. It passed subsequent resolutions related to

fair pair, along with reaffirming its commitment to protecting and defending the rights of Latina

workers in all sectors and industries across the United States. Among other things, the most

recent resolution reaffirmed this priority and LCLAA's commitment to "work in partnership with

Trabajadoras to win the full range of labor rights" from employers and governments.

18.     At the national and Chapter level, LCLAA has actively worked to educate its

members about the pay gap and how to use collective action and organizing to close this pay gap.

In addition, it has actively participated in and helped lead campaigns aimed at raising awareness

about this grave problem, as well as the solutions necessary to address it. To this end, it has

trained Chapter Presidents about this issue and the Chapter leadership has shared this

information with their membership and mobilized members to act on the ground in states around

the country. LCLAA has also hosted two summits and other events at the local and national level

for its membership and the public that have been focused on providing information, education

and solutions to closing the pay gap.

---

[13] "Trabajadoras" translates to "working women."

19.     **Defendant OMB** is a federal agency responsible for approving or disapproving agencies' information collection activities pursuant to the PRA. It is a component of the Executive Office of the President and maintains a headquarters in Washington, DC.

20.     **Defendant John Michael (Mick) Mulvaney** is the Director of OMB. He is sued in his official capacity.

21.     **Defendant Neomi Rao** is the Administrator of OIRA, a component of OMB, responsible for approving or disapproving agency information collection requests. She is sued in her official capacity.

22.     **Defendant EEOC** is a federal agency responsible for enforcing federal anti-discrimination laws.

23.     **Defendant Victoria A. Lipnic** is the Acting Chair of the EEOC. She is sued in her official capacity.

## Jurisdiction and Venue

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law, specifically the APA, 5 U.S.C. § 701, *et seq.*, and the PRA, 44 U.S.C. 3501, *et seq.*

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because at least one of Defendants is headquartered in Washington, D.C., and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here.

## Plaintiffs' Injuries

### *National Women's Law Center*

26.     NWLC brings this action on its own behalf, because the challenged conduct deprives it of valuable information that it would otherwise use in public education and advocacy

for its clients, increases the costs it bears in its pro bono representation of individuals injured by workplace discrimination, limits the efficacy of available avenues of redress, requires resource-intensive efforts that impede its daily operations, and otherwise directly conflicts with, impairs, and frustrates NWLC's organizational mission and priorities.

27.     As part of NWLC's mission to educate employers, the public, and policymakers about race and gender wage gaps, NWLC has published numerous analyses and reports about workplace pay disparities. These reports cite data on pay inequality across a number of dimensions, and reflect time-consuming analysis of Bureau of Labor Statistics and Census data undertaken by NWLC staff.

28.     The aggregate data that the EEOC intended to make publicly available from the EEO-1 pay data collection would have made available new information about the occupational categories, industries, and locations experiencing the largest race and gender wage gaps. This new data would have allowed NWLC to strengthen its reports with additional data and analysis, and to focus its resources on the jobs, industries, and regions where intervention is most urgent. The loss of that data harms NWLC's efforts to analyze these issues, educate the public, and target advocacy efforts and other interventions to the most urgent problems.

29.     The EEO-1 pay data collection also would have significantly benefited NWLC's pro bono representation of individual clients with workplace discrimination claims. NWLC is frequently asked to assist individuals with potential pay discrimination claims, and typically agrees to provide pro bono representation in one or more cases each year.

30.     In such actions, pay data is probative evidence needed to convince the EEOC to take action or to convince a court or jury of a claim's merit. But in most cases, neither NWLC nor its clients can obtain that data directly from employers prior to filing a complaint or a

lawsuit, impeding their ability to convince the EEOC to devote resources to investigating a charge or to convince a court to allow discovery to proceed. Because NWLC represents its clients pro bono, it must bear the costs of amassing evidence about internal pay inequities and comparators' pay practices to obtain any redress through the EEOC or in a court.

31.     The EEO-1 pay data collection would have substantially benefited NWLC by providing information that helps overcome these hurdles, reducing costs associated with representing individual clients and allowing access to avenues to redress that would otherwise be closed. Because aggregate sector-wide data would be available, NWLC would have a readily available benchmark against which it could compare an employer's allegedly discriminatory practices. Because the EEOC would have employer-specific data, NWLC would be able to request that the EEOC consider an employer's pay disparities at the charge stage, opening an avenue of redress to individuals who otherwise would lack the data to show discrimination and increasing the likelihood that the charge could be resolved through the EEOC investigatory and conciliation process without lengthy and expensive litigation. The stay takes away all of these benefits.

32.     In addition, because of the unlawful review and stay of the EEO-1 pay data collection, NWLC will expend additional funding and staff time to engage with employers to encourage voluntary compliance with equal pay laws, including voluntary self-audits of pay practices and internal wage gaps, in order to compensate for the self-evaluation of internal wage gaps that the EEO-1 pay data collection would have required employers to undertake. Moreover, because of the unlawful stay of the EEO-1 pay data collection, in order to meet the objective of improved enforcement of pay discrimination laws and increased self-evaluation by employers of their own pay practices, NWLC has expended and will expend funding and staff time to create

11

model state and/or local pay data collection legislation; create educational materials setting out

the need for such pay data collection and the interests it serves; build coalition and grassroots

support in targeted states and/or localities for these measures; and advocate at the state and local

level for adoption and full implementation of such legislation.

33.     As a result of these additional steps that the stay has forced NWLC to take in

order to advance its mission, NWLC staff members have diverted time away from daily

operations. Several of NWLC's personnel have focused primarily on pay data collection issues

since the stay was issued, shifting them away from activity on other issues at the core of

NWLC's day-to-day mission. For example, NWLC staff's ability to produce educational

materials and sample laws and policies addressing workplace sexual harassment—important

work for which there is currently an urgent need—has been hampered by the diversion of

resources to issues related to equal pay and pay data collection.

34.     Additionally, NWLC staff have been diverted from preparing the "know your

rights" and legal education materials addressing issues of workplace discrimination and

harassment that are key to the ultimate success of its recently launched Legal Network for

Gender Equity because of the resources absorbed by reacting to the stay.

35.     Similarly, NWLC staff have been unable to engage in significant federal

advocacy efforts in recent months in support of strengthened pregnancy discrimination

protections because of limited staff resources as a result of the stay.

### *Labor Council for Latin American Advancement*

36.     LCLAA brings this action on its own behalf, because the challenged conduct

directly conflicts with, impairs, and frustrates LCLAA's organizational mission and priorities.

The unlawful review and stay of the revised EEO-1 has caused and will continue to cause

LCLAA to divert and redirect its limited resources, impeding LCLAA's ability to carry out its daily operations. It will also cause LCLAA to spend money on external contractors to gather information that would have been unnecessary but for the stay.

37.     LCLAA periodically issues reports to educate workers, employers, and union leaders about the challenges encountered by Latinos and Latinas in the workforce. LCLAA uses these reports in advocating for policy change and enforcement, and in educating its members on ways to negotiate with employers and encourage them to follow practices that reduce workforce discrimination. To aid those efforts, the reports discuss data compiled and published by the Government on income and employment—including EEO-1 data.[14]

38.     In upcoming reports, LCLAA would have presented statistics on pay equity within industries and across the nation, based on the new pay data required by the revised EEO-1. This would have materially improved LCLAA's and its members' ability to negotiate with and educate employers and to fulfill LCLAA's mission of improving the condition of Latinos and Latinas in the workforce.

39.     OMB Defendants' stay of the revised EEO-1 renders that plan impossible, impeding LCLAA's plans for carrying out its mission. To replicate the same information LCLAA would obtain from the revised EEO-1, LCLAA would have to convince thousands of employers to voluntarily provide data and then employ statisticians to analyze the resulting raw data—efforts that would require enormous expense and *still* likely be unsuccessful, given LCLAA's inability to require employers to comply. Indeed, without the revised EEO-1 pay data collection, any attempt to compile such data would almost certainly underreport pay inequities, because employers with significant disparities would be particularly unlikely to provide data

---

[14] *See, e.g.*, *Trabajadoras: Challenges and Conditions of Latina Workers in the United States*, Labor Council for Latin American Advancement (2012) at 30.

voluntarily. Accordingly, OMB Defendants' actions render LCLAA's plan to report authoritative statistics on pay equity entirely impossible.

40.     Because this data is unavailable, LCLAA is pursuing the possibility of conducting surveys of workers on pay equity issues. It is currently working with an external consultant to get cost estimates for multiple surveys, one for both Latino and Latina workers and one specifically directed at Latina workers. Any such survey will come at considerable expense—not only for the design, implementation, and analysis of the survey, but for any interpretation or translation costs that are required to ensure that the survey is accessible to non-English-speaking Latino and Latina workers. If the revised EEO-1 remains stayed, any survey must include detailed questions on pay equity that would be unnecessary (or, at a minimum, significantly less urgent) if the annual EEO-1 reports included aggregate pay data in addition to its general aggregate demographic information. The inclusion of such questions will increase the cost to LCLAA of the design, implementation, and analysis of the surveys.

41.     As another example, prior to OMB Defendants' stay of the revised EEO-1, LCLAA had been developing a project aimed at creating model contract terms regarding pay equity for its union members to seek in contract negotiations. In light of OMB Defendants' stay of the revised EEO-1, it will be necessary for LCLAA to add terms dealing with collection of pay equity data—terms that would have been unnecessary if the revision took effect as planned, because employers would be required by law to collect such data.

42.     Similarly, once the model contract terms are complete, LCLAA intends to train its members and share this information with union leaders on the terms and on relevant aspects of negotiations. Such training will require substantial time on the part of LCLAA's staff. By forcing LCLAA to include additional model contract terms, the stay of the revised EEO-1 increases the

amount of time that training will take, further inhibiting LCLAA's ability to carry out its daily operations in a timely fashion.

43. All of the activities necessitated by OMB Defendants' stay have forced LCLAA to redeploy its limited staff resources away from their daily operations. Each of LCLAA's employees has had to spend time working on responses to the stay, from discussions related to the Latino/a worker survey and contract development discussed above to explaining the implications of the change to Chapter presidents and other members.

44. This has restricted LCLAA's ability to carry out its daily operations. For example, LCLAA recently launched a first-of-its-kind fellowship for Latina workers, the Latina Gender Equity Fellowship. The first class of Fellows began their fellowships on November 1, 2017. LCLAA has not been able to spend needed time to do necessary follow up and additional project development because the personnel it had intended to deploy to work on these matters have instead needed to engage in activity related to the EEO-1 pay data collection, including the survey, contracting, and other responses discussed above.

45. Similarly, LCLAA had intended to work on educational materials related to the NAFTA renegotiations, including its impact on women, to help its members understand its implications for Latino/a workers. This type of educational initiative is a core and common part of LCLAA's daily operations—but LCLAA has not been able to engage in these efforts because its resources have been drained by the urgent tasks described above.

## The Paperwork Reduction Act

46. The PRA was intended to "improve the quality and use of Federal information to strengthen decisionmaking, accountability, and openness in government and society" and to "ensure the greatest possible public benefit from and maximize the utility of information created,

15

collected, maintained, used, shared, and disseminated by or for the Federal Government" while minimizing the paperwork burden imposed when the federal government collects information from individuals; educational and nonprofit institutions; Federal contractors; and State, local and tribal governments.[15]

47.     The PRA was not intended to increase OMB's authority over substantive agency policies. Indeed, the PRA expressly states: "[n]othing in this chapter shall be interpreted as increasing … the authority of [OMB] with respect to … the substantive authority of any Federal agency to enforce the civil rights laws."[16]

48.     Through the PRA, Congress established a process by which agencies obtain approval from OMB to collect certain types of information from the public. The agency must first conduct its own evaluation of the plan for a proposed information collection, including the need for the information and the burden imposed by collection.[17]

49.     With limited exceptions not relevant here, the PRA requires that an agency publish a "60-day notice" in the Federal Register soliciting public comment on the agency's proposed collection.[18]

50.     After the conclusion of the 60-day comment period, the agency's internal consideration of the public's comments, and any appropriate revisions, the agency submits the collection of information to OMB and publishes a second Federal Register notice to announce the start of OMB review and a 30-day comment period.[19] The second notice informs the public

---

[15] 44 U.S.C. § 3501.
[16] 44 U.S.C. 3518(e).
[17] 44 U.S.C. § 3506(c)(1)(A).
[18] 44 U.S.C. § 3506(c)(2).
[19] 44 U.S.C. § 3507(a), (b).

about how to submit comments to OMB and that OMB may act on the agency's request only

after the 30-day comment period has closed.

51.     After these two public comment periods, OMB, through OIRA, may approve or

disapprove the proposed collection of information; or if OMB fails to act, approval is inferred for

up to one year.[20] An OMB approval of a collection of information may last for a three-year

period, after which the agency must seek an extension of OMB's approval if it wishes to

continue the collection of information.[21]

52.     Upon approval, OMB issues a control number, which serves to inform the

regulated public that the collection has been approved. The agency must append the control

number to any collection of information.[22]

53.     OMB does not have authority to stay an ongoing collection of information it

previously approved if the collection is contained in an agency rule.

54.     OMB's regulations permit it to review an ongoing and previously approved

collection of information contained in a current rule or an ongoing and previously approved

collection of information not contained in proposed rules or current rules, when "relevant

circumstances have changed or the burden estimates provided by the agency at the time of initial

submission were materially in error."[23] OMB's regulations also permit it to stay, but only for

good cause, "the effectiveness of a prior approval of any such collection of information that is

not specifically required by agency rule."[24]

### The EEO-1

---

[20] 44 U.S.C. § 3507(c).
[21] 44 U.S.C. § 3507(g), (h).
[22] 44 U.S.C. § 3506(c)(1)(B).
[23] 5 C.F.R. § 1320.10(f); 5 C.F.R. § 1320.12(h)(2)(i).
[24] 5 C.F.R. § 1320.10(g).

55.     Title VII requires employers to "make and keep records relevant to the determination of whether unlawful employment practices have been or are being committed," to preserve such records, and to produce reports as the EEOC prescribes by regulation or order.[25]

56.     Pursuant to this statutory authority, beginning in 1966, the EEOC regulations have required that employers with 100 or more employees file with the EEOC a survey known as the "Employer Information Report EEO-1" (EEO-1).[26] This requirement also applies to certain federal contractors and subcontractors with more than 50 employees, enforced by the Office of Federal Contract Compliance Programs (OFCCP) in the U.S. Department of Labor (DOL).[27]

57.     The EEO-1 has been revised from time to time by the EEOC, but prior to the revisions at issue in this matter, to add to the collection W-2 earnings data for employees by sex, race, ethnicity, and job category, the EEO-1 directed covered employers to report annually the number of individuals employed by job category and by sex, race, and ethnicity. The EEO-1 currently includes seven race and ethnicity categories and ten job categories.[28]

58.     The EEOC and OFCCP use EEO-1 data to support civil rights enforcement and to analyze and inform the public about employment patterns, such as the representation of women and minorities within companies, industries, or regions. The EEOC also uses this information to determine in which industries or companies individuals may be segregated by race or sex and

---

[25] 42 U.S.C. § 2000e-8(c).

[26] 29 C.F.R. § 1602.7. Employers who make willfully false statements in an EEO-1 may be subject to fines and imprisonment, and employers who fail or refuse to file an EEO-1 may be compelled by court order to do so. *Id.*, §§ 1602.8, 1602.9.

[27] 41 CFR §60-1.7. The OFCCP enforces the antidiscrimination and affirmative action obligations that apply to federal contractors, including those set out in Executive Order 11246, prohibiting federal contractors from discriminating on the basis of race, color, religion, sex, sexual orientation, gender identity, or national origin, and requiring them to take affirmative action to ensure employment and fair treatment without regard to these characteristics.

[28] *See* EEOC, *Equal Employment Opportunity Employer Information Report EEO-1*, https://www.eeoc.gov/employers/eeo1survey/upload/eeo1-2.pdf.

over-included in particular roles or company divisions and excluded from others. EEO-1 data
also helps to show trends regarding hiring, promotions, and employee turnover within certain
sectors.

59.     The EEOC makes aggregate EEO-1 information for major geographic areas and
industry group publicly available.[29] (Individually identifiable information is kept confidential).
In addition, the EEOC periodically publishes special reports based on aggregate data collected
from the EEO-1, such as a recent report on Diversity in High Tech.[30]

60.     OFCCP also relies upon EEO-1 data pursuant to its mission to enforce equal
employment opportunity obligations imposed on those who do business with the federal
government. OFCCP has issued regulations describing the EEO-1 as a report "promulgated
jointly" with the EEOC and requiring certain contractors to submit annual EEO-1s.[31]

61.     The specific information reported by a covered employer or contractor pursuant to
the EEO-1 must be kept confidential unless and until the EEOC initiates a Title VII action that
involves the information.[32] Private litigants may also obtain EEO-1 data via discovery as part of
a Title VII proceeding in some circumstances.

### The EEOC's Determination That Collecting Pay Data Is Necessary to Enforce Employment Non-Discrimination Laws and Would Not Impose a Significant Burden

62.     In 2010, the EEOC joined other federal agencies, including DOL, as members of
the President's National Equal Pay Task Force to identify ways to improve enforcement of
federal laws prohibiting pay discrimination.

---

[29] EEOC, *Job Patterns for Minorities and Women in Private Industry (EEO-1)*,
https://www.eeoc.gov/eeoc/statistics/employment/jobpat-eeo1/.
[30] EEOC, *Special Reports*, https://www.eeoc.gov/eeoc/statistics/reports/index.cfm.
[31] 41 C.F.R. § 60-1.7.
[32] 42 U.S.C. § 2000e-8(e).

63.     Thereafter, the EEOC commissioned a study from the National Academy of
Sciences, a Congressionally-established body that provides independent, objective advice to the
nation on science and technology matters, to assess how to collect pay data most effectively to
support its wage discrimination enforcement efforts. This study concluded that using the EEO-1
for pay data collection would be "quite manageable for both the EEOC and the respondents" and
recommended that following development of a comprehensive plan for use of earnings data, the
EEOC commission a pilot study to test data collection and the plan for its use.[33]

64.     The EEOC commissioned a pilot study, as recommended, identifying the most
efficient means to collect pay data. This study made technical recommendations about several
components of data collection, including the unit of pay to be collected, the best summary
measures of rates of pay, appropriate statistical test(s) for analyzing pay data, and the most
efficient and least costly methods for transmitting pay data from employers. It also estimated
employer burden-hour costs and the processing costs associated with data collection.[34]

65.     The EEOC's pilot study recommended that the EEOC use the IRS's W-2
definition of pay, because it offers a "comprehensive picture of earnings data and may not create
a measurable burden for most respondents."[35] Further, it recommended collecting aggregate W-2
compensation information for the ten EEO-1 occupation categories in pay bands, as well as
collecting total hours worked for each group to account for pay differences due to variations in
the number of hours worked.

---

[33] *See* Nat'l. Research Council, *Collecting Compensation Data from Employers*, 60 (2012), *https://www.nap.edu/catalog/13496/collecting-compensation-data-from-employers*.
[34] *See* Fidan Kurulus, et al., *Final Report* (Sept. 2015), https://www.eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf.
[35] *Id*. at 108.

66.     The EEOC also sought input on updating all EEO surveys, including adding pay data, in a two-day "work group" meeting in March 2012 with employer representatives, statisticians, human resources information systems experts, and information technology specialists. This work group had several recommendations regarding collection of pay data and noted the importance of confidentiality. It also concluded that for EEO-1 filers, "[t]he cost burden of reporting pay data to EEOC would be minimal."[36]

67.     An April 8, 2014, Presidential Memorandum, "Advancing Pay Equality Through Compensation Data Collection," directed the Secretary of Labor to develop a compensation data collection proposal.[37] OFCCP proposed such a collection on August 8, 2014 and provided a sample Equal Pay Report unique for OFCCP. OFCCP received comment, among other things, about the need to improve interagency coordination and decrease employer burden for reporting compensation data by using the EEO-1, rather than a new OFCCP data collection. OFCCP ultimately determined, in part in response to this stakeholder input, to coordinate its data collection with the EEOC by using the EEO-1 and the EEOC benefited from the comments OFCCP had received during its rulemaking efforts.[38]

68.     While developing the planned revision to the EEO-1, and considering their enforcement obligations, the EEOC and OFCCP also consulted with the Department of Justice to assess how EEO-1 pay data would be used to assess complaints of discrimination, focus

---

[36] *See* EEOC, *EEOC Survey System Modernization Work Group Meeting: Draft Report*, 2 (Mar. 19, 2012), https://www.eeoc.gov/employers/eeo1survey/survey-modernization.pdf.

[37] *See* Press Release, The White House, *Presidential Mem. – Advancing Pay Equity Through Compensation Data Collection* (Apr. 8, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/04/08/presidential-memorandum-advancing-pay-equality-through-compensation-data.

[38] Government Contractors Requirement to Report Summary Data on Employee Compensation, 79 Fed. Reg. 46562 (Aug. 8, 2014). In addition to the comments received on its August 8, 2014, proposal, OFCCP had previously received comments in response to its advanced notice of proposed rulemaking on a pay data collection tool and these comments also informed the EEOC's analysis. Non-Discrimination in Compensation: Compensation Data Collection Tool, 76 Fed. Reg. 49398 (Aug. 10, 2011).

investigations, and identify employers with existing pay disparities that might warrant further examination.[39]

69.     On February 1, 2016, following this robust process and after a vote to approve the proposed revisions, the EEOC published a Federal Register notice proposing a revision of the EEO-1 to include pay data and requesting public comments. This was the "60-day notice" required by the PRA.[40]

70.     In the 60-day notice, the EEOC proposed revising the EEO-1 to collect aggregate W-2 data in twelve pay bands for the ten existing EEO-1 job categories, as recommended by the pilot study. As the notice explained, "Employers will simply count and report the number of employees in each pay band. For example, a filer will report on the EEO-1 that it employs 3 African American women as professionals in the highest pay band." The notice further explained that it was using pay bands for reporting to minimize employer burden, in part because pay bands were already used in an EEOC survey that collects pay data from state and local government employers, so that software developers reasonably could be expected to be able to build upon their existing knowledge to efficiently and promptly develop human resources software to support the new data collection.[41]

71.     The 60-day notice also proposed collecting the total number of hours worked by the employees included in each EEO-1 pay band, as recommended by the EEOC's pilot study. The EEOC specifically sought employer input with respect to how to report hours for salaried employees, noting that it was "not proposing to require an employer to begin collecting

---

[39] Agency Information Collection Activities: Revision of the Employer Information Report, 81 Fed. Reg. 5113, 5115 (Feb. 1, 2016).
[40] *Id*. at 5113. *See also* 44 U.S.C. § 3506(c)(2).
[41] *Id*. at 5117.

additional data on actual hours worked for salaried workers, to the extent that the employer was not currently maintaining such information."[42]

72.     The notice included a "Paperwork Reduction Act Statement," in which the EEOC explained that it intended to submit to OMB a request for a three-year PRA approval of the revised EEO-1, which would add a component to collect data on employees' W-2 pay and hours worked. The EEOC stated that for the 2016 reporting cycle, EEO-1 filers would use the previous version of the EEO-1, and would not be required to use the proposed revised form until the 2017 reporting cycle.[43]

73.     As required by the PRA, the EEOC estimated the number of reporting hours it expected to be imposed on EEO-1 filers as part of its data collection. For the 2016 reporting year, which would use the previously existing version of the EEO-1 without the pay data requirement, it estimated that the 67,146 filers would use a total of 228,296.4 hours to report the EEO-1 information, or 3.4 hours per filer. For the 2017 and 2018 reporting years, with the pay data requirement, it estimated that the 60,886 filers that would be subject to the additional data collection requirement would use a total of 401,847.6 reporting hours, or a total of 6.6 hours per filer. In short, adding the collection of pay data was estimated to add 3.2 hours of reporting time for each filer.[44]

74.     The EEOC sought employer input on its burden calculation, and specifically sought quantitative information about the burden associated with completing the previously-approved EEO-1, as well as the estimated burden to also submit pay and hours-worked data.

---

[42] *Id.*
[43] *Id.* at 5118.
[44] *Id.* at 5119.

75.     On March 16, 2016, the EEOC held a public hearing on its proposed pay data

collection, and heard testimony from witnesses who represented the views of employers,

employees, and academics. NWLC joined in this hearing and provided testimony on the revised

collection.

76.     The EEOC received a total of 322 timely comments in response to the 60-day

notice. These were submitted by individual members of the public, employers, employer

associations, Members of Congress, civil rights groups, women's organizations, labor unions,

industry groups, law firms, and human resource organizations, and included a comment from

NWLC.[45] 119 of these submissions compiled many individual comments in support of the

proposed EEO-1 pay data collection. For example, NWLC compiled and submitted 2,393 such

supportive comments by individuals.

77.     On July 14, 2016, the EEOC published a second Federal Register notice,

announcing that it was submitting to OMB a request for a three-year PRA approval of the revised

EEO-1, and soliciting comments both to OMB and the EEOC. This was the "30-day notice"

required to obtain OMB approval of the collection of information.[46]

78.     The 30-day notice considered and responded to comments submitted in response

to the 60-day notice.[47]

79.     The 30-day notice also set forth the EEOC's conclusion that revisions to the EEO-

1 were necessary for the enforcement of Title VII, the Equal Pay Act, and Executive Order

---

[45] 81 Fed. Reg. at 45480.

[46] *Id*. at 45479.

[47] *See* OIRA, *Final EEO-1 Supporting Statement*, 5-7 (Sept. 28, 2016),
https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201610-3046-001(identifying seven specific
actions EEOC took in response to public comments on the 60-day notice). *See also* 44 U.S.C. § 3507(a)(1)(D).

11246 (which prohibits federal contractors from discriminating on the basis of sex, race or

national origin, among other bases, in employment decisions). The EEOC explained that:

> Based on federal data and a robust body of research, the Commission concludes
> that: (1) [p]ersistent pay gaps continue to exist in the U.S. workforce correlated
> with sex, race, and ethnicity; (2) workplace discrimination is an important
> contributing factor to these pay disparities; and (3) implementing the proposed
> EEO-1 pay data collection will improve the EEOC's ability to efficiently and
> effectively structure its investigation of pay discrimination charges.[48]

80.    The 30-day notice discussed the bases for these conclusions, including a survey of

persistent pay gaps in the U.S. workforce that resulted in the following findings, as of 2014:

- For women of all races and ethnicities, the median annual pay for a woman
  who held a full-time, year-round job was $39,621, while the median annual
  pay for a man who held a full-time, year-round job was $50,383.

- Latina women were paid approximately 44% less than white, non-Hispanic
  men. The average Hispanic or Latina woman would be paid approximately
  $1,007,000 less than the average white, non-Hispanic, male over a 40-year
  period.

- African-American women were paid almost 40% less than white, non-
  Hispanic men.

- Disparities also exist for other women, and for men of color.[49]

81.    As the EEOC explained, these gaps in pay cannot be fully explained by

differences in education, experience, industry, or occupation. Discrimination may play both

direct and indirect roles in creating pay disparities. For example, one study cited by the EEOC

concluded that discrimination accounts for at least one-third of the black-white wage gap.[50]

82.    The EEOC further explained that the pay data collection would "be used to

enhance and increase the efficiency of enforcement efforts while facilitating employer self-

---

[48] 81 Fed. Reg. at 45481.
[49] Id. at 45482.
[50] Id. at 45482-83.

evaluation and voluntary compliance."[51] It also noted that while voluntary compliance was an important part of the effort to improve pay equity, it has been insufficient to remedy the pay disparities that the EEOC and OFCCP are statutorily required to address. Specifically, "[t]hey now lack the employer- and establishment-specific pay data that prior to issuing a detailed request for information or a subpoena, would be extremely useful in helping enforcement staff to investigate potential pay discrimination. Balancing utility for civil rights enforcement and burden on employers, the EEOC concluded that the proposed EEO-1 pay data collection would be an effective and appropriate tool for this purpose."[52]

83.     The EEOC concluded that it would use the collection of pay data in multiple ways, including: (1) to support its enforcement efforts, by enabling its staff to use statistical analysis to assist in an early assessment of pay discrimination charges against an employer; (2) to periodically publish reports on pay disparities by race, sex, industry, occupational groupings, and Metropolitan Statistical Area; and (3) to provide training and outreach both internally and to employers and other stakeholders.[53] Data received through the revised EEO-1 would be used by OFCCP to more effectively focus agency investigations, assess complaints, and identify existing pay disparities.[54]

84.     The 30-day notice also announced adjustments to the data collection proposal in response to public comments, specifically to reduce burden to employers. The EEOC announced it would change the EEO-1 filing deadline to March 31 of the year that follows the reporting year, moving the date from September 30. This change was in response to commenter objections to a reporting period that did not align with calendar year W-2 data.

---

[51] *Id*. at 45480.
[52] *Id*. at 45483.
[53] *Id*. at 45490-91.
[54] *Id.* at 45483.

26

85.     The EEOC would also change the "workforce snapshot period," which refers to the pay period when employers count the total number of employees for the year's EEO-1. The EEOC moved the workforce snapshot period to a pay period in the final quarter of the calendar year in response to comments from the employer community that criticized the workforce snapshot approach because it would not reflect same-year promotions that have the effect of moving an employee into a different job category or pay band after the "snapshot" was taken.[55]

86.     In response to public comments, the 30-day notice also adjusted the estimates of burden imposed by the revisions to the EEO-1 upward from the first notice. The EEOC estimated that completing the revised EEO-1 would take 15.2 hours per filer for functions at a whole firm level plus an additional 1.9 hours per individual report for functions at an individual establishment level. It also estimated that there would be a onetime implementation burden of approximately 8 hours per filer.[56]

87.     In the 30-day notice, the EEOC estimated that the addition of pay data would increase the filing cost for each EEO-1 filer by $416.58.[57]

88.     The 30-day notice also stated that the EEOC would later post data file specifications to support employers and Human Resources Information Systems vendors in reporting pay data via the EEO-1 through direct data upload "as soon as OMB approves the information collection."[58]

89.     The EEOC received a total of 612 comments in response to the 30-day notice, including comments from NWLC. Many of these submissions compiled numerous individual

---

[55] *Id.* at 45484-5.
[56] *Id*. at 45496-97.
[57] *Id*. at 45493-94.
[58] *Id.* at 45487.

comments in support of the proposed EEO-1 pay data collection. For example, NWLC compiled

and submitted 5,269 such supportive comments by individuals.

90.     In the EEOC's Final Supporting Statement on EEO-1, provided to OMB on

September 28, 2016, it set forth a mechanism for future review of the utility and burden of

collecting pay data as part of the EEO-1 collection:

> [T]he EEOC will continue to evaluate the revised EEO-1 report after it is in use.
> Under the standard three-year renewal process set out by the PRA for federal data
> collection, the next renewal of the EEO-1 will occur in 2019. As part of this
> process, the EEOC will consider its experience in collecting data through the
> revised EEO-1. The EEOC will monitor and evaluate the utility and effectiveness
> of the summary pay data collected and, within six months of the approval of this
> collection, the EEOC will provide OMB a monitoring and evaluation plan. The
> plan will include effectiveness measures, baseline information, procedures for
> collecting and evaluating data, and any other pertinent information. The EEOC
> will report the results of its monitoring and evaluation activities in subsequent
> information collection request packages.
>
> The EEOC will begin collecting pay data as of March 31, 2018, and will be
> positioned to utilize pay data in its investigations in 2019, after the first pay data
> collection has been thoroughly reviewed for accuracy. As these investigations
> may still be ongoing at the time the next information collection request package
> must be submitted to OMB in late 2019, there will be limited information to
> evaluate for purposes of that PRA approval process. Consistent with the PRA
> requirements and its commitment to assess this collection, however, the agency
> will consider whether changes may be warranted to increase the practical utility of
> the data collection or to decrease the burden on EEO-1 filers. For example, the
> EEOC may consider the utility and burden of retaining the existing EEO-1 job
> categories or pay bands as compared to adopting new categories or bands.[59]

91.     OMB approved the proposed collection and issued an OMB control number for

the revised EEO-1 on or about September 29, 2016.

92.     After OMB approved the collection, EEO-1 filers' obligation to submit pay data

came into effect for the 2017 reporting period, which had a filing deadline of March 31, 2018.

---

[59] OIRA, *Final EEO-1 Supporting Statement*, 8 (Sept. 28, 2016),
https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201610-3046-001

Thereafter, the EEOC updated a website advising employers of the format for the data file by which they could directly upload pay data as part of the EEO-1, if they chose to do so.

93.     Employers submitting the EEO-1 can do so either via (1) direct data entry or (2) direct data upload using a data file specification, based on employers' preferences.[60] Only employers using direct data upload would use the data file specifications posted by the EEOC. As of 2014, the most recent date for which data is publicly available, 98 percent of employers used direct data entry. Only two percent of employers used direct data upload.[61]

94.     The data file specification provided for the revised EEO-1 is a modified version of the data file specification for the EEO-1 that has been in place for over a decade. When the EEO-1 has previously been reviewed and approved by OMB under the PRA, the details of the associated data file specification have not been included in the package provided to OMB, nor has OMB sought this information.[62]

### OMB Defendants' Review and Stay of the EEO-1 Collection

95.     Nearly one year after OMB approved the pay data collection, on August 29, 2017, Administrator Rao issued a memo to the Acting Chair of the EEOC stating that OMB was initiating a review and immediate stay of the revision to the EEO-1 to collect pay data (Rao

---

[60] *See, e.g.*, EEOC, *Instruction Booklet*, https://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm ("EEO-1 reporting is an electronic, online application. Pursuant to the Government Paperwork Elimination Act of 1998, we **strongly** recommend that EEO-1 reports be submitted via the *EEO-1 Online Filing System, or* as an electronically transmitted data file. A copy of the **prescribed** EEO-1 data file format is available at the website address in the survey mailout memorandum." (second emphasis added)).

[61] 81 Fed. Reg. at 5119 n. 55, 5120 n. 62 (in 2014, 67,146 firms filed EEO-1s, of which 1,449 firms used direct data upload).

[62] *See, e.g.*, Agency Information Collection Activities: Notice of Submission for OMB Review, 71 Fed. Reg. 71294, 71301 (Nov. 28, 2005) (Noting that the EEOC had introduced online filing in 2003, but providing no information regarding data file specifications); Agency Information Collection Activities: Proposed Collection; Submission for OMB Review, 79 Fed. Reg. 72678 (Dec. 8, 2014) (submission for renewal of approval of EEO-1, providing no information regarding data file specifications).

Memorandum). This memo, just over a page in length, provided scant explanation for the

decision.

96.     As the basis for the decision, the Rao Memorandum stated in full:

[U]nder 5 CFR 1320.10(f) and (g), OMB may review an approved collection of information if OMB determines that the relevant circumstances related to the collection have changed and/or that the burden estimates provided by EEOC at the time of initial submission were materially in error. OMB has determined that each of these conditions for review has been met. For example, since approving the revised EEO-1 form on September 29, 2016, OMB understands that EEOC has released data file specifications for employers to use in submitting EEO-1 data. These specifications were not contained in the Federal Register notices as part of the public comment process nor were they outlined in the supporting statement for the collection of information. As a result, the public did not receive an opportunity to provide comment on the method of data submission to EEOC. In addition, EEOC's burden estimates did not account for the use of these particular data file specifications, which may have changed the initial burden estimate.

OMB has also decided to stay immediately the effectiveness of the revised aspects of the EEO-1 form for good cause, as we believe that continued collection of this information is contrary to the standards of the PRA. Among other things, OMB is concerned that some aspects of the revised collection of information lack practical utility, are unnecessarily burdensome, and do not adequately address privacy and confidentiality issues.[63]

97.     The Rao Memorandum did not address the fact that the EEO-1 is required by

EEOC and OFCCP regulations[64], and that OMB Defendants therefore did not have legal

authority to stay it. The Rao Memorandum did not acknowledge that employers were not

required to use the data file specifications to provide EEO-1 data, nor did it acknowledge that the

data file specifications did not require the reporting of any information not made available for

public comment. The Memorandum also did not explain what aspects of the pay data collection

lacked practical utility, were unnecessarily burdensome, and failed to adequately address privacy

---

[63] Memorandum from Neomi Rao, Adm'r, OIRA, to Victoria Lipnic, Acting Chair, EEOC (Aug. 29, 2017), https://www.reginfo.gov/public/jsp/Utilities/Review_and_Stay_Memo_for_EEOC.pdf.
[64] 29 C.F.R. § 1602.7; 41 C.F.R. § 60-1.7.

and confidentiality issues (issues that the EEOC addressed throughout its administrative

process), nor why any purported problems with the pay data collection outweighed the benefits

identified by the EEOC and OMB in approving the revised EEO-1. The Memorandum did not set

forth any other cause to support its decision to review and stay the collection of pay data, nor did

it claim that any other circumstances related to the collection had changed or that it had

conducted any analysis showing that the burden estimate was materially in error. The

Memorandum also did not explain why the EEOC's planned mechanism for future review of the

collection was insufficient, nor did it state OMB's legal authority to review and stay only one

component of the collection of information.

98.     While the Rao Memorandum asserts that consultation with the EEOC occurred, at

least some EEOC commissioners were left "in the dark about the process."[65]

99.     Following OMB Defendants' direction, on September 15, 2017, the EEOC

published a Federal Register notice stating that EEO-1 filers should not submit pay data in their

EEO-1s due by March 31, 2018.[66]

### Count One: Violation of the APA for Agency Action
### That Exceeds OMB's Authority

100.     Plaintiffs hereby incorporate all allegations in above paragraphs 1 through 99 as if

fully set forth herein.

101.     The EEO-1 is required by EEOC regulation. 29 C.F.R. § 1602.7. OFCCP also

requires filing of the EEO-1 by regulation. 41 C.F.R. § 60-1.7.

---

[65] Danielle Paquette, *Trump's White House froze an equal-pay rule. Women are fighting to save it.*, Wash. Post, https://www.washingtonpost.com/news/wonk/wp/2017/10/02/trumps-white-house-froze-an-equal-pay-rule-women-are-fighting-to-save-it/?utm_term=.840f229b1b31.
[66] 82 Fed. Reg. at 43362.

102.    OMB Defendants do not have authority to stay an ongoing collection of information that has already been approved and that is required by regulation.

103.    OMB Defendants do not have authority to review an ongoing collection of information in a current rule unless relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error. 5 C.F.R. § 1320.12(h)(2)(i). OMB Defendants' review of the revised EEO-1 did not meet either criteria.

104.    OMB Defendants therefore acted in a manner that was in excess of legal authority in violation of the APA, 5 U.S.C. § 706(2)(C). EEOC Defendants acceded to the unlawful action.

**Count Two: Violation of the APA for Agency Action
That Is Contrary to Regulation
(*in the alternative to Count One*)**

105.    Plaintiffs hereby incorporate all allegations in above paragraphs 1 through 99 as if fully set forth herein.

106.    OMB may review previously approved collections of information not in agency rules "after consultation with the agency" and "only when relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submissions were materially in error." 5 C.F.R. § 1320.10(f).

107.    OMB may stay the effectiveness of an approval of a collection of information that is not specifically required by agency rule only "[f]or good cause, after consultation with the agency." 5 C.F.R. § 1320.10(g).

108.    OMB Defendants' review and stay of the revised EEO-1 did not meet the requirements of 5 C.F.R. §§ 1320.10(f) and (g), and therefore OMB Defendants' action was contrary to OMB's own regulations and in excess of OMB's legal authority.

109.    OMB Defendants therefore acted in a manner that was contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A). EEOC Defendants acceded to the unlawful action.

## Count Three: Violation of the PRA and the APA for Agency Action That Is Contrary to Statute

110.    Plaintiffs hereby incorporate all allegations in above paragraphs 1 through 99 as if fully set forth herein.

111.    The PRA states: "[n]othing in this chapter shall be interpreted as increasing … the authority of [OMB] with respect to … the substantive authority of any Federal agency to enforce the civil rights laws." 44 U.S.C. 3518(e).

112.    Section 709(c) of Title VII of the Civil Rights Act of 1964 requires employers to make and keep records relevant to the determination of whether unlawful employment practices have been or are being committed, to preserve such records, and to produce reports as the EEOC prescribes by regulation or order. 42 U.S.C. § 2000e-8(c).

113.    The EEOC determined that collecting pay data was reasonable, necessary and appropriate to enforce Title VII and other civil rights laws. The revised EEO-1 was also expected to strengthen OFCCP's ability to select appropriate federal contractors and subcontractors for review of their compliance with equal employment opportunity mandates.

114.    OMB Defendants stayed the EEOC's ability to collect this pay data.

115.    In so doing, OMB Defendants acted in a manner that violated the PRA, 44 U.S.C. 3518(e), and was therefore contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A). EEOC Defendants acceded to the unlawful action.

## Count Four: Violation of the APA for Agency Action That Is Arbitrary and Capricious

116.    Plaintiffs hereby incorporate all allegations in above paragraphs 1 through 99 as if fully set forth herein.

117.    OMB Defendants did not provide a reasoned basis for the decision to review and stay the revised EEO-1. As outlined above, they failed to consider the EEOC's analysis regarding the utility and burden for the pay data revisions to the EEO-1, as well as the EEOC's plan for ongoing monitoring of this utility and burden; the decision ran counter to the evidence before OMB; OMB Defendants did not provide sufficient justification for the reversal of the prior approval of the revisions to the EEO-1; and they otherwise failed to provide a plausible justification for the action.

118.    In so doing, OMB Defendants acted in a manner that was arbitrary, capricious, and otherwise contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A). EEOC Defendants acceded to the unlawful action.

## Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

1.    Declare that OMB Defendants violated the PRA and the APA and exceeded their statutory authority in reviewing and staying the collection of pay data as part of the EEO-1 and that these actions are therefore unlawful;

2.    Declare that the stay proclaimed in the Rao Memorandum and the September 15, 2017, Federal Register notice was a nullity, and that the revised EEO-1 remains in effect;

3.    Vacate the stay, and reinstate the revised EEO-1 reporting requirements;

4.    Order EEOC Defendants to publish a Federal Register notice announcing this reinstatement or to take other equivalent action necessary to immediately reinstate the pay data collection;

5.      Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements incurred in this action; and

6.      Grant such other relief as the Court may deem just and proper.

Dated: November 15, 2017                                Respectfully submitted,

                                                        /s/ *Javier M. Guzman*
                                                        Javier M. Guzman
                                                        (DC Bar No. 462679)
                                                        Robin F. Thurston (*pro hac vice motion to be filed*)*
                                                        Jeffrey B. Dubner (DC Bar No. 1013399)
                                                        Democracy Forward Foundation
                                                        P.O. Box 34553
                                                        Washington, DC 20043
                                                        (202) 448-9090
                                                        jguzman@democracyforward.org
                                                        rthurston@democracyforward.org
                                                        jdubner@democracyforward.org

                                                        *Admitted in the State of Illinois;
                                                        practicing under the supervision of
                                                        members of the DC Bar while DC Bar
                                                        application is pending.

                                                        Fatima Goss Graves (DC Bar No. 481051)
                                                        Emily J. Martin (DC Bar No. 991968)
                                                        Sunu Chandy (DC Bar No. 1026045)
                                                        Maya Raghu (DC Bar No. 1035558)
                                                        (*pro hac vice motions to be filed*)
                                                        National Women's Law Center
                                                        11 Dupont Circle, NW, Ste 800
                                                        Washington, DC 20036
                                                        (202) 588-5180
                                                        fgraves@nwlc.org
                                                        emartin@nwlc.org
                                                        schandy@nwlc.org
                                                        mraghu@nwlc.org

                                                        *Attorneys for Plaintiffs*