**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL WOMEN'S LAW CENTER, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 17-2458 (TSC) |
| OFFICE OF MANAGEMENT AND BUDGET, et al. | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ...................................................... 2

I.    The Paperwork Reduction Act ..................................................................................... 2

II.   The EEOC's Request for Re-Approval of EEO-1 Component 1 and Approval of
      EEO-1 Component 2 ..................................................................................................... 6

III.  OMB's Decision to Initiate a Review and Stay of Component 2 ................................. 7

IV.  This Litigation .............................................................................................................. 8

ARGUMENT ......................................................................................................................... 9

I.    STANDARD OF REVIEW. ......................................................................................... 9

     A.   Standard for Dismissal Under Rule 12(b)(1). ................................................. 9

     B.   Standard for Dismissal Under Rule 12(b)(6). ............................................... 10

II.   PLAINTIFFS LACK ARTICLE III STANDING. ................................................... 10

     A.   Plaintiffs Do Not Allege a Sufficiently Concrete and Particularized
          Injury ............................................................................................................. 12

          1.    Plaintiffs Do Not Allege a Sufficient Informational Injury. ................. 12

          2.    Plaintiffs Do Not Allege a Sufficient Organizational Injury. ................ 14

     B.   Plaintiffs Do Not Plausibly Allege That the Challenged Decision Caused
          Plaintiffs' Injuries Nor That Such Injuries Are Redressable By This Court. . 18

III.  THIS SUIT MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT
      CHALLENGE FINAL AGENCY ACTION. ........................................................... 20

     A.   OMB's Decision to Initiate a Review and Stay Of Component 2 Is An
          Interlocutory Decision Not Subject to Judicial Review Under the APA ........ 21

     B.   OMB's Decision to Initiate a Review and Stay of Component 2 Does Not
          Affect Any Legal Right or Obligation of Plaintiffs. ..................................... 26

CONCLUSION ..................................................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Air Brake Sys.*, Inc. *v. Mineta*,
    357 F.3d 632 (6th Cir. 2004) ..................................................................... 27

*Al-Quraan v. 4115 8th St. NW, LLC*,
    113 F. Supp. 3d 367 (D.D.C. 2015) ........................................................... 10

*Allen v. Wright*,
    468 U.S. 737 (1984) ................................................................................... 18

*Amer. Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*,
    659 F.3d 13 (D.C. Cir. 2011) ............................................................... 10, 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................... 10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................... 10

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................... 21

*Conservative Baptist Ass'n of America v. Shinseki*,
    42 F. Supp. 3d 125 (D.D.C. 2014) ..................................................... 17, 18

*CTIA-The Wireless Ass'n v. F.C.C.*,
    530 F.3d 984 (D.C. Cir. 2008) .................................................................. 26

*Ctr. for Bio. Diversity v. U.S. Dep't of Interior*,
    563 F.3d 466 (D.C. Cir. 2009) .................................................................. 20

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ..................................................................................... 9

*Devia v. Nuclear Regulatory Comm'n*,
    492 F.3d 421 (D.C. Cir. 2007) .................................................................. 29

*Dole v. United Steelworkers of Am.*,
    494 U.S. 26 (1990) ....................................................................................... 1

*DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*,
    76 F.3d 1212 (D.C. Cir. 1996) .......................................................... *passim*

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017) .................................................... 11, 14, 15

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*,
    48 F. Supp. 3d 1 (D.D.C. 2014) ............................................................... 16

*Fed. Election Comm'n v. Aikens*,
  524 U.S. 11 (1998) ............................................................................. 12

*Food & Water Watch, Inc. v. Vilsack*,
  79 F. Supp. 3d 174 (D.D.C. 2015) ...................................................... 12

*Forrester v. U.S. Parole Comm'n*,
  310 F. Supp. 2d 162 (D.D.C. 2004) ...................................................... 9

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) .................................................................... 21, 27

*Friends of Animals v. Jewell*,
  828 F.3d 989 (D.C. Cir. 2016) ...................................................... 12, 14

*FTC v. Standard Oil Co. of Cal.*,
  449 U.S. 232 (1980) ............................................................ 20, 22, 27

*Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries, Serv.*,
  730 F. Supp. 2d 157 (D.D.C. 2010) ................................................ *passim*

*Hindes v. FDIC*,
  137 F.3d 148 (3d Cir. 1998) ............................................................... 26

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004) ........................................................... 21

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
  648 F. Supp. 2d 140 (D.D.C. 2009) .................................................... 24

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................................... 18, 19

*Marquette Cty. Rd. Comm'n v. EPA*,
  188 F. Supp. 3d 641 (W.D. Mich. 2016) ........................................ 23, 25

*Nat'l Ass'n of Home Builders v. EPA*,
  667 F.3d 6 (D.D.C. 2011) .................................................................. 16

*Nat'l Taxpayers Union*, Inc. *v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) ........................................................... 16

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
  366 F.3d 930 (D.C. Cir. 2004) ........................................................... 19

*Ohio Forestry Ass'n*, Inc. *v. Sierra Club*,
  523 U.S. 726 (1998) ......................................................................... 29

*Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*,
  879 F.3d 339 (D.C. Cir. 2018) ...................................................... 12, 13

*Perry Capital LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ................................................................ 19

*Reiff v. United States*,
    107 F. Supp. 3d 83 (D.D.C. 2015) ............................................................ 9

*Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*,
    324 F.3d 726 (D.C. Cir. 2003) ........................................................... *passim*

*Renal Physicians Ass'n v. U.S. Dep't of Health and Human Serv.*,
    489 F.3d 1267 (D.C. Cir. 2007) ............................................................. 19

*Rochester Tel. Corp. v. United States*,
    307 U.S. 125 (1939) ............................................................................. 27

*Shipbuilders Council of Am., Inc. v. U.S. Dep't of Homeland Sec.*,
    481 F. Supp. 2d 550 (E.D. Va. 2007) ...................................................... 25

*United to Protect Democracy v. Presidential Advisory Comm'n on Election Integrity*,
    Civ. No. 17-2016, 2017 WL 6759097 (D.D.C. Dec. 29, 2017) ................... 3

*West v. Lynch*,
    845 F.3d 1228 (D.C. Cir. 2017) ............................................................. 10

## **Statutes**

5 U.S.C. § 704 ............................................................................................ 20

42 U.S.C. § 2000e-8 ................................................................................... 13

44 U.S.C. § 3501 ......................................................................................... 2

44 U.S.C. § 3502(3)(A)(i) ............................................................................. 3

44 U.S.C. § 3504 ...................................................................................... 3, 5

44 U.S.C. § 3507 ............................................................................... *passim*

44 U.S.C. § 3508 ......................................................................................... 3

Fed. R. Civ. P. 12(b)(6) .............................................................................. 12

## **Administrative and Executive Materials**

5 C.F.R. § 1320.10 ............................................................................ *passim*

29 C.F.R. § 1602.7 ....................................................................................... 4

47 Fed. Reg. 39,515 (Sept. 8, 1982) ............................................................. 4

48 Fed. Reg. 13,666 (Mar. 31, 1983) ....................................................... 4, 23

79 Fed. Reg. 24,498 (Apr. 13, 2014) ............................................................. 3

81 Fed. Reg. 45,479 (July 14, 2016) .......................................................... 6, 7

81 Fed. Reg. 5113 (Feb. 1, 2016) ................................................................. 6

82 Fed. Reg. 32,987 (July 19, 2017) .................................................................. 4

82 Fed. Reg. 43,362 (Sept. 15, 2017) ............................................................... 8

**Legislative Material**

S. Rep. No. 96-930 (1980) ................................................................................ 2

**Other Authorities**

Memorandum re: Guidance Implementing Executive Order 13771, Titled "Reducing
Regulation and Controlling Regulatory Costs"
    https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2017/M-17-
    21-OMB.pdf .......................................................................................... 25

## INTRODUCTION

Congress enacted the Paperwork Reduction Act ("the PRA" or "the Act") to control federal agencies' "insatiable appetite for data" and reduce the amount of paperwork the Federal Government can require of state and local governments, businesses, and individual private citizens. *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990).  Congress has tasked the Office of Management and Budget ("OMB") with establishing policies and guidelines that govern agencies' compliance with the Act and reviewing and approving agencies' particular collections of information.  Under the Act and its implementing regulations, OMB is specifically authorized not only to determine the burden imposed by, and the practical utility of, every collection of information covered under the Act, but also to monitor and oversee collections of information even after OMB approval in order to ensure ongoing compliance.  Put another way, OMB has the task of balancing the Federal Government's need for information with the burden gathering that information imposes on the public.

Plaintiffs' lawsuit claims that OMB's decision to stay a pay data collection from the United States Equal Employment Opportunity Commission ("the EEOC") pending further OMB review violates the Administrative Procedure Act ("APA"), the PRA, and the PRA's implementing regulations by depriving Plaintiffs of pay data to which they assert they are entitled.  But Plaintiffs' contentions are without merit.  The newly-created pay data collection falls squarely within OMB's monitoring and review authority under the PRA and was properly reviewed and stayed by OMB.  But even setting aside the fact that OMB's actions were entirely consistent with its statutory and regulatory authority, Plaintiffs' claims fail for threshold reasons.

As an initial matter, Plaintiffs do not have standing to bring these claims.  Plaintiffs' Complaint does not point to any statutory provision mandating the disclosure of the pay data about

which they complain.  Indeed, no such provision exists.  This is fatal to their claims of both informational injury and organizational injury, the latter of which depends entirely on the existence of the former.  Moreover, Plaintiffs' alleged organizational injuries ring particularly hollow, as the challenged action to review and stay maintains the status quo because the EEOC has never collected—let alone published—the pay data of which Plaintiffs now claim to be deprived.  Nor can Plaintiffs show that their inability to obtain pay data is caused by OMB where, as here, the EEOC is under no statutory obligation to disclose the data even if collected, and indeed, as Plaintiffs acknowledge, has discretion over whether to disclose the same.  And because no law requires the EEOC to disclose the pay data, no order of this Court could redress Plaintiffs' claimed injury.

Plaintiffs' claims also fail as a matter of law under the APA because the decision Plaintiffs challenge is not final agency action.  OMB's decision to initiate a review and stay of the challenged pay data collection is "not the consummation" of the agency's decision-making process, but rather merely the start of a multi-step reconsideration process, the completion of which will yield a final approval or disapproval decision that might be reviewable if Plaintiffs had standing.  Accordingly, the Court should dismiss Plaintiffs' Complaint.

## STATUTORY AND REGULATORY BACKGROUND

### I.    The Paperwork Reduction Act.

Congress enacted the Paperwork Reduction Act of 1995, 44 U.S.C. § 3501 (2002) *et seq*., to "minimize the paperwork burden" that federal agencies may require of private businesses, educational institutions, individuals, state and local governments, and federal contractors and to "maximize the utility of" the information "created, collected, . . . [or] maintained" by federal agencies.  44 U.S.C. § 3501(1), (3); *see also* S. Rep. No. 96-930, at 4 (1980) (the PRA "is a

response to the need to eliminate unnecessary Federal paperwork demands"). To that end, the PRA establishes "a comprehensive scheme" to reduce the burden imposed by "federal information collection and 'designate[s] [OMB] the overseer of other agencies with respect to paperwork.'" *United to Protect Democracy v. Presidential Advisory Comm'n on Election Integrity*, Civ. No. 17-2016, 2017 WL 6759097 at *1 (D.D.C. Dec. 29, 2017) (internal citation omitted).

Section 3504 of the PRA sets forth the authority and functions of OMB and grants the agency broad authority to "oversee the use of information resources to improve the efficiency and effectiveness of governmental operations . . . including burden reduction." *See generally* 44 U.S.C. § 3504(a)(1) (2002). As part of its oversight responsibilities, OMB "develop[s], coordinate[s], and oversee[s] the implementation of Federal information resources" policies, standards, and guidelines, *see id.* § 3504(a)(1)(A). As relevant here, OMB "provide[s] direction and oversee[s] . . . the review and approval of the collection of information and the reduction of the information collection burden."[1] *See id.* § 3504(a)(1)(B)(i). Under the PRA, OMB may not grant its approval of an agency's proposed collection of information without first determining "whether the collection of information by the agency is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility." *Id.* § 3508. The PRA bars federal agencies from conducting or sponsoring collections of information, including revisions to the collections of information, without first obtaining OMB approval. *See id.* § 3507(a)(1)(C).

---

[1] With limited exceptions, the PRA defines "collection of information" to include "the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for . . . answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons . . . ." 44 U.S.C. § 3502(3)(A)(i) (2002). For example, the Internal Revenue Service's Form 1040, the United States Individual Income Tax Return, is a collection of information under the PRA and its implementing regulations. *See* 79 Fed. Reg. 24498, 24498 (Apr. 13, 2014).

Section 3507 of the PRA sets forth the requirements with which an agency must comply before OMB review of a proposed collection of information.   The PRA's procedures and requirements differ depending on whether the agency's proposed collection of information is contained in a rule.   *Compare id.* § 3507(c)(1)-(3) (collections of information not contained in a rule), *with id.* § 3507(d)(1)-(6) (collections of information contained in a rule).[2]   Generally speaking, an "agency must publish notice of its proposed collection in the Federal Register, stating that it is seeking approval from the Director of OMB and soliciting comments from the public." *United to Protected Democracy*, 2017 WL at 6759097, at * 1 (citing 44 U.S.C. § 3507(a)-(b)). "After providing the public an opportunity to comment on the collection for at least 30 days, [OMB] may then decide whether to approve the proposed collection."   *Id.* (citing 44 U.S.C. § 3507(b)).

Upon completion of its review, OMB may render one of three decisions: (1) it may approve the collection of information; (2) it may disapprove the collection of information; or (3) it may

---

[2] OMB has long interpreted the PRA's reference to "collections of information contained in [a] rule" to apply to "a form specifically contained in a notice-and-comment regulation," *see* 48 Fed. Reg. 13,666, 13,676 (Mar. 31, 1983), that is, a proposed rule or final rule that expressly contains the "full specifications for the requirement." 47 Fed. Reg. 39,515, 39,520 (Sept. 8, 1982).   Thus, for example, the Temporary Labor Certification promulgated and used by the United States Department of Homeland Security and the United States Department of Labor is a "collection of information contained in [a] rule" under the PRA.   *See* 82 Fed. Reg. 32,987, 33,000 (July 19, 2017).   By contrast, the PRA's reference to a "collection of information not contained in a proposed rule" applies to "a reporting requirement authorized by a rule, but implemented by means of a form, [which] is *not* considered to be an 'information collection requirement contained in a rule.' Rather, it is considered an information request."   47 Fed. Reg. at 39,520 (emphasis in original). Under OMB's interpretation of the PRA, the collection of information contained in the EEO-1 is a "collection of information *not* contained in a rule" because the EEOC's regulation, 29 C.F.R. § 1602.7, authorizes the collection but does not itself specifically contain the EEO-1 form.   *See* 29 C.F.R. § 1602.7 (directing covered employers to "file with the Commission or its delegate executed copies of Standard Form 100, as revised (otherwise known as 'Employer Information Report EEO-1') in conformity with the directions set forth in the form and accompanying instructions").

instruct the agency to make a substantive or material change to the collection of information.[3]  *See* 44 U.S.C. §§ 3507(c)(1), 3507(e)(1).  If OMB approves the proposed collection of information, OMB issues a control number that must be displayed on the collection of information, and the agency may proceed with its collection.  *See* 44 U.S.C. § 3507(a)(2), (3).  Under the PRA, OMB "may not approve a collection of information for in excess of 3 years."  *Id.* § 3507(g).  At the expiration of the 3-year approval, an agency may seek re-approval of the collection of information under the procedures set forth in § 3507(h).

In addition, at any time prior to the expiration of the approval period, after consultation with the agency, OMB may reconsider its approval of a collection of information, and with respect to collections of information not contained in a rule, stay the effectiveness of its prior approval of the information collection pending reconsideration.  *See* 44 U.S.C. §§ 3504(a)(1)(A), 3504(a)(1)(B)(i), 3504(c)(1); *see also* 5 C.F.R. §§ 1320.10(f), (g).  OMB's regulations provide that it may initiate a review of a collection of information prior to the expiration date "when relevant circumstances have changed or the burden estimates provided by the agency at the time of its initial submission were materially in error." *See id.* § 1320.10(f).  During the reconsideration process, OMB's regulations direct the agency to submit new information to OMB for its consideration.  *See id.*  In addition, "[f]or good cause" the agency may be required to cease the collection of information pending OMB's review. *See id.* § 1320.10(g).  An agency submitting new information to OMB must comply with the procedures and requirements contained in 5 C.F.R. Part 1320.  If, at the end of its review, OMB decides to disapprove or instruct an agency to make a substantive

---

[3] If OMB does not notify the agency of its decision to approve or disapprove the proposed collection of information within 60 days of receiving notice from the agency of its request for review, the PRA instructs that OMB's "approval may be inferred" from its failure to comment and OMB must assign a control number to the collection of information.  *See* 44 U.S.C. §§ 3507(c)(3)(A)(B), 3507(d)(3).

or material change to a collection of information, OMB must make its decision "publicly available

and include an explanation of the reasons for such decision."  44 U.S.C. § 3507(e)(1).

## II.     The EEOC's Request for Re-Approval of EEO-1 Component 1 and Approval of EEO-1 Component 2.

On February 1, 2016, in accordance with its obligation under the PRA, the EEOC published

a notice in the Federal Register, announcing its intent to seek a three-year re-approval from OMB

of "a revised Employer Information Report (EEO-1) data collection."  81 Fed. Reg. 5113 (Feb. 1,

2016).  The notice explained that "the revised data collection ha[d] two components.  Component

1 collects the same data that is gathered by the currently approved EEO-1:  Specifically, data about

employees' ethnicity, race, and sex, by job category.  [And the new] Component 2 collects data on

employees' W-2 earnings and hours worked, which EEO-1 filers already maintain in the ordinary

course of business." *Id.*  The EEOC sought "public comment on the utility and burden of collecting

pay data and hours-worked data through the EEO-1 data collection process." *Id.*  The EEOC gave

interested stakeholders 60 days in which to provide their comments on the revised data collection.

*Id.*

On July 14, 2016, the EEOC published a second PRA notice ("30-day notice").  *See* 81

Fed. Reg. 45,479 (July 14, 2016).  The 30-day notice reiterated that the EEOC was seeking a three-

year approval of a revised EEO-1 data collection.  *Id.*  It explained that "[e]mployers have

submitted the EEO-1 [Component 1] report for over fifty years," but that with this request for

approval, the EEOC had revised EEO-1 to include a second component, Component 2, which

would collect pay data from employers.  *Id.*  The 30-day notice contained the EEOC's response to

"322 timely public comments" that it had received in response to its February 1, 2016 notice and

set forth the EEOC's rationale and "conclusions about the ways the proposed pay data collection

[would] be used to enhance and increase the efficiency of enforcement efforts while facilitating

employer self-evaluation and voluntary compliance." *Id.* at 45,480. The 30-day notice directed individuals and other interested stakeholders to submit comments in response to "the final proposal" to revise the EEO-1 "on or before August 15, 2016." *Id.* at 45,479. In the 30-day notice, the EEOC stated that the collection of pay data would begin with the 2017 reporting cycle, during which EEO-1 respondents would submit their reports to the EEOC by March 31, 2018. *Id.* at 45,484. On September 29, 2016, OMB approved the EEOC's revised EEO-1 data collection, including the EEOC's request to collect pay data using Component 2. Compl. ¶¶ 9, 91 ECF No. 1.

### III.    OMB's Decision to Initiate a Review and Stay of Component 2.

A little less than a year later, on August 29, 2017, Neomi Rao, the Administrator of the Office of Information and Regulatory Affairs ("OIRA"), the office within OMB responsible for implementing the PRA, issued a memorandum to Victoria Lipnic, the Acting Chair of the EEOC ("the August 29, 2017 OMB letter"), stating OMB's decision to initiate a review and stay of the EEOC's new collection of pay data under Component 2. *See* Compl. ¶¶ 95-96; *see also* Exhibit A (attached hereto).[4] The August 29, 2017 OMB letter explained that it made this decision, "[a]fter careful consideration and consultation with the [EEOC] and in accordance with the [PRA] and its regulations at 5 CFR 1320.10(f) and (g)." *Id.* The letter stated that OMB had "determined that each of the[] conditions for review [under § 1320.10(f) and (g)] ha[d] been met" and then further explained the basis for that conclusion. *Id.*

Specifically, OMB noted that after its September 29, 2016 approval, the EEOC "ha[d] released data file specifications for employers to use in submitting EEO-1 data," but that the

---

[4] Because Plaintiffs' Complaint references the August 29, 2017 OMB letter, *see, e.g.*, Compl. ¶¶ 95-96, and that letter is publicly available, the court may consider it for purposes of this motion. *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

"specifications were not contained in the Federal Register notices as part of the [PRA's] public comment process, nor were they outlined in the supporting statement for the collection of review." *Id.* OMB delineated its concern that "the public did not have an opportunity to provide comment on the method of data submission to [the] EEOC" and its additional concern that the EEOC's "burden estimates did not account for the use of these particular data file specifications which," in OMB's view, "may have changed the initial burden estimate." *Id.*

The August 29, 2017 OMB letter also explained OMB's decision to stay the effectiveness of the Component 2 pay data collection "for good cause" under § 1320.10(g), specifically noting its "concern[] that some aspects of [Component 2] lack[ed] practical utility, [we]re unnecessarily burdensome, and d[id] not adequately address privacy and confidentiality issues." *Id.* at 2. As a result of its decision to initiate a review and stay of Component 2, the letter directed the EEOC to publish a notice in the Federal Register "announcing the immediate stay of effectiveness of the" pay data collection but "confirming that businesses may use the previously approved EEO-1 form [Component 1] in order to comply with their reporting obligations for FY 2017." The August 29, 2017 OMB letter also directed the EEOC to "submit a new information collection package for [Component 2] to OMB for review." *Id.*

On September 15, 2017, in accordance with its obligations under § 1320.10(g), the EEOC published a Federal Register Notice instructing EEO-1 filers not to submit Component 2 pay data with their EEO-1 forms. *See* 82 Fed. Reg. 43,362 (Sept. 15, 2017). The EEOC's Federal Register notice explained that OMB had issued a memorandum stating its decision to "review and stay" the Component 2 pay data collection. *Id.* at 43,363. The notice stated that the "EEOC will continue to collect EEO-1 Component 1 data from all filers during OMB's review and stay." *Id.*

**IV.    This Litigation.**

On November 15, 2017, Plaintiffs, the National Women's Law Center ("NWLC") and the Labor Council for Latin American Advancement ("LCLAA"), filed this lawsuit against OMB, John Mulvaney, in his official capacity as Director of OMB, Neomi Rao, in her official capacity as Administrator of OIRA, the EEOC, and Victoria Lipnic, in her official capacity as Acting Chair of the EEOC. *See generally* Compl.  Plaintiffs allege that OMB's decision to initiate a review and stay of the Component 2 pay data (1) exceeds its authority in violation of the APA (Count 1), (2) is contrary to OMB's regulations in violation of the APA (Count 2, in the alternative to Count 1), (3) is contrary to § 3518(e) of the PRA (Count 3), and (4) is arbitrary and capricious in violation of the APA (Count 4).  *See id.* ¶¶ 100-18.  As a result of these purported violations, Plaintiffs request, among other relief, that the Court "vacate the stay and reinstate the [Component 2 pay data] [] requirements" and order the "EEOC to publish a Federal Register notice announcing this reinstatement . . . ."  *Id.* Prayer for Relief.

## ARGUMENT

**I.    STANDARD OF REVIEW.**

### A.  Standard for Dismissal Under Rule 12(b)(1).

Defendants move to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure (12)(b)(1).  It is "presume[d] that federal courts lack jurisdiction," *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (internal citation omitted), and where, as here, Plaintiffs seek to invoke this Court's jurisdiction to resolve the merits of their claims, the Court "has an affirmative obligation . . . to ensure that it is acting within the scope of its jurisdictional authority."  *Forrester v. U.S. Parole Comm'n*, 310 F. Supp. 2d 162, 167 (D.D.C. 2004).  In undertaking this inquiry, the Court "need not accept factual inferences drawn

by [P]laintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept [P]laintiffs' legal conclusions." *Reiff v. United States*, 107 F. Supp. 3d 83, 85 (D.D.C. 2015).

### B.  Standard for Dismissal Under Rule 12(b)(6).

Defendants also move to dismiss Plaintiffs' Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Although a court must accept all factual allegations as true, the court "is not bound to accept as true a legal conclusion couched as factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted).  And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).   Thus, where, as here, Plaintiffs fail to state a claim upon which relief may be granted, even assuming that the facts alleged in the Complaint are true, the Court must grant dismissal.  *Al-Quraan v. 4115 8th St. NW, LLC*, 113 F. Supp. 3d 367, 369 (D.D.C. 2015).

## II.   PLAINTIFFS LACK ARTICLE III STANDING.

This Court may not reach the merits of Plaintiffs' claims unless Plaintiffs first establish that they have standing.  *See West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017) ("there is no justiciable case or controversy unless the plaintiff has standing").  To do so, Plaintiffs must show that (1) they have suffered a concrete and particularized injury, (2) their purported injury is fairly traceable to the challenged action, and (3) their injury is likely to be redressed by a favorable decision.  *Id.*  And where, as here, Plaintiffs are two organizations seeking to sue on their own behalf, *see* Compl. ¶¶ 26, 36, Plaintiffs "must make the same showing required of individuals": that is, that they have suffered an actual or threatened injury-in-fact which is fairly traceable to the

challenged action and likely to be redressed by a favorable court decision. *Amer. Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011).

Here, Plaintiff NWLC alleges that OMB's decision to initiate a review and stay of the Component 2 pay data "deprives it of valuable information that it would otherwise use in public education and advocacy." Compl. ¶ 26. Similarly, Plaintiff LCLAA alleges that it would have used the pay data to "present[] statistics on pay equity within industries and across the nation." *Id.* ¶ 38. Plaintiffs further allege that as a result of their purported inability to obtain the Component 2 pay data, the challenged decision has required them to divert time and resources away from daily operations, *see id.* ¶¶ 32-35, 36-45, and expend additional funds attempting to "replicate the same information," *see id.* ¶ 39. In other words, Plaintiffs claim that OMB's decision to initiate a review and stay deprived them of "valuable information," *i.e.*, the Component 2 aggregate pay data, *see, e.g.*, *id.* ¶ 26, and that as a result of this informational injury, Plaintiffs are forced to divert staff time and resources, thereby adversely affecting their organizational interests. *See, e.g.*, *id.* at ¶¶ 29-35, 40-45.

As explained in detail below, however, the fatal flaw underlying Plaintiffs' purported injuries is that they do not have any right to the "aggregate pay data" that they seek. And because Plaintiffs have not alleged a plausible informational injury, their claims of organizational harm, which depend entirely on their informational injury, also cannot establish standing. *See Elec. Privacy Info. Ctr. ("EPIC") v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377-78 (D.C. Cir. 2017) (affirming dismissal of plaintiff's organizational injury theory because they "identif[y] no organizational harm unrelated to [their] alleged informational injury"). Further, in addition to the Complaint's failure to identify a "sufficiently concrete and particularized" injury, the allegations therein show neither that Plaintiffs' alleged harms were caused by the challenged

11

decision nor that their claims can be redressed by this Court.  Thus, Plaintiffs lack standing to pursue their claims.[5]

### A.     Plaintiffs Do Not Allege a Sufficiently Concrete and Particularized Injury.

### 1.     Plaintiffs Do Not Allege a Sufficient Informational Injury.

Plaintiffs allege that OMB's decision to initiate a review and stay of the Component 2 pay data "deprives [them] of valuable information that [they] would have otherwise used" to further their respective organizational missions. But informational injuries arise only in "exceedingly limited" circumstances, *see Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 197 (D.D.C. 2015), and only when Congress explicitly defines "[t]he existence and scope" of such an injury in a statute.  *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).  Thus, to allege a sufficiently concrete and particularized informational injury, Plaintiffs must satisfy two requirements.  *Id.* (citing *Fed. Election Comm'n v. Aikens*, 524 U.S. 11, 21-22 (1998)).  First, Plaintiffs must allege that they have "been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to [them]."  *Id.*  Second, Plaintiffs must allege that, by being denied access to that information, they suffer "the type of harm Congress sought to prevent by requiring disclosure." *Id.*   That a statute *requires* disclosure of information is "the *sine qua non* of informational injury." *Id.*   The D.C. Circuit has emphasized the "narrow scope of informational injuries," *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 879 F.3d 339, 344 (D.C. Cir. 2018), and requires the statute to mandate disclosure "by its terms."  *Friends of Animals*, 828 F.3d at 992.

---

[5] Plaintiffs name the EEOC as a defendant but make no allegations that the EEOC engaged in unlawful conduct.  Indeed, Plaintiffs note that the EEOC merely "acted consistently with a directive from OMB."  Compl. ¶ 13.  Because Plaintiffs have failed to state any claim for relief against the EEOC, the EEOC's dismissal from this case is appropriate.  *See* Fed. R. Civ. P. 12(b)(6).

Here, Plaintiffs are unable to satisfy either prong of the "informational injury" test because they have not identified a statute that requires the government to collect, let alone disclose the Component 2 pay data.   To this point, Plaintiffs have not identified any statute that mandates the disclosure of the Component 2 pay data (aggregated or otherwise) "by its terms."   And nowhere in Plaintiffs' Complaint do they identify a statute that requires the EEOC to publish data collected from the EEO-1, let alone from the newly-devised Component 2 pay data collection.   This is unsurprising, as no such statute exists.   Instead, Plaintiffs' purported informational injury stems from their supposition that the EEOC "intended" to make "aggregate data" collected from Component 2 "publicly available," *see* Compl. ¶ 28.

Plaintiffs' hypothesis, however, is not plausible.   The EEOC's authority to collect information through the EEO-1 derives from 42 U.S.C. § 2000e-8(c), which requires employers to "make and keep such records relevant to the determination of whether unlawful employment practices have been or are being committed" and to "make such reports therefrom as the Commission shall proscribe." But far from requiring the EEOC to publish this EEO-1 data, Title VII actually *criminalizes* the disclosure of information submitted by EEO-1 filers (*i.e.*, individual employers) "prior to the institution" of a proceeding involving the information.   *Id.* at § 2000e-8(e).   In addition, even if the EEOC has an "intent" to make aggregate Component 2 pay data publicly available at some future date, Plaintiffs cannot rely on such a future objective to manufacture a "mandated disclosure."   Whether and under what circumstances the EEOC may make aggregate Component 2 pay data available is a discretionary rather than a mandatory determination that thus falls well outside of the "narrow scope" of an informational injury defined by Congress in a statute.   *Owner-Operator Indep. Drivers Ass'n.*, 879 F.3d at 344.

And because Plaintiffs have not identified any statutory mandate requiring the publication of Component 2 pay data, it follows that they cannot satisfy the second prong of the "informational injury" test—that Plaintiffs "suffer the type of harm that Congress sought to prevent by requiring disclosure" in the first instance. *EPIC*, 878 F.3d at 378 (internal quotation marks and citation omitted); *see Friends of Animals*, 828 F.3d at 992.   In other words, whatever harm Plaintiffs purportedly suffer from "being deprived of" the newly collected Component 2 pay data, it cannot be characterized as the type of informational harm Congress sought to prevent where, as here, Plaintiffs cannot point to any statute mandating the pay data's disclosure. *See id.*   Under these circumstances, Plaintiffs' claims of informational injury fail.

## 2.     Plaintiffs Do Not Allege a Sufficient Organizational Injury.

Plaintiffs' claims of organizational injury, which depend entirely on their claim that they have been deprived of Component 2 pay data, likewise fail to establish standing.   As explained above, "an organization may establish Article III standing if it can show that the [challenged decision] cause[s] a concrete and demonstrable injury to the organization's activities that is more than a setback to the organization's abstract social interests." *EPIC*, 878 F.3d at 378 (internal quotation marks and citation omitted).   Plaintiffs' theory of organizational injury relies entirely on their claim that they have been deprived of valuable "aggregate pay data," the deprivation of which has caused each Plaintiff to suffer various organizational harms.   For example, NWLC alleges that aggregate pay data would serve as a helpful benchmark in court proceedings, and LCLAA alleges that it would use aggregate pay data to create model contract terms for its members. *See* Compl., ¶¶ 30-31, 41.   Plaintiffs also allege that they have had to expend additional funding, either to replicate or encourage employers to provide the aggregate pay data of which they allege to have been deprived. *Id.* ¶¶ 32, 39.  Each organizational Plaintiff also claims that it has and continues to

"divert" staff time and resources from its daily operations in order to mitigate various purported harms that flow from OMB's decision to initiate a review and stay of the Component 2 pay data. *Id.* ¶¶ 31-45.

But as the D.C. Circuit recently held in *EPIC v. Presidential Advisory Commission on Election Integrity*, where, as here, Plaintiffs' organizational injury depends entirely on their unsustainable informational harm, Plaintiffs cannot establish standing under either theory. *See EPIC*, 878 F.3d at 377-80.  In that case, the D.C. Circuit considered EPIC's APA challenge to the Presidential Advisory Commission on Election Integrity's failure to produce a privacy impact assessment.  878 F.3d 371.  After determining that EPIC failed to allege an informational injury, the D.C. Circuit considered whether EPIC had alleged an adequate organizational injury. *Id.* at 378-79.  The *EPIC* court answered that question in the negative, reasoning that "EPIC [could not] ground organizational injury on a non-existent interest" in the failure to produce a privacy impact assessment.  *Id.* at 379.  The D.C. Circuit next considered whether EPIC had "used its resources to counteract that harm," and concluded that the answer to that question was also "no." *Id.*  The *EPIC* court explained that "it follows" from EPIC's failure to show an informational injury, "that any resources EPIC used to counteract the lack of a privacy impact assessment—an assessment in which it has no cognizable interest—were a 'self-inflicted budgetary choice that cannot qualify as an injury in fact.'"  *Id.* (quoting *American Soc. for the Prevention of Cruelty to Animals*, 659 F.3d at 25).  So too it is here.

Because Plaintiffs are unable to establish an informational injury as a result of OMB's decision to initiate a review and stay of Component 2 pay data, it follows that any resources Plaintiffs purport to have used to counteract this alleged harm are not related to a cognizable organizational injury.  *See id.*  And it bears mentioning that despite their claims otherwise, OMB's

decision to initiate a review and stay of the newly-established Component 2 pay data collection in fact has not "cause[d] [Plaintiffs] to incur "'operational costs beyond those normally expended' to carry out [their] advocacy mission." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.D.C. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)). To that point, because the EEOC has never before collected Component 2 pay data, let alone provided aggregate pay data to the public, OMB's decision to initiate a review and stay of the same before covered employers ever submitted such data simply maintains the status quo.

It is for this reason that NWLC's claims that the challenged decision will increase the cost of representing individuals in EEOC or court proceedings by requiring it to amass its own benchmark data, forcing it to expend additional resources urging employers to comply with equal pay laws, and increasing NWLC's need to advocate for pay data collection legislation, *see* Compl. ¶¶ 30-32, ring particularly hollow given that it has presumably expended these resources and efforts as part of its daily operation *before* the EEOC decided to collect Component 2 pay data. To that point, NWLC alleges that these activities have caused its staff to divert resources from working on sexual harassment and other workplace discrimination issues. *Id.* at ¶¶ 34-35. But by its own description, NWLC is an advocacy organization that "publishes evidence-based reports and fact sheets used to educate employers, members of the public, and federal and state employers about the reality of pay inequity." *Id.* ¶ 15. NWLC also "works with employers" and "policymakers" as well as "pursues . . . enforcement of laws prohibiting pay discrimination." *Id.* In other words, NWLC already engages in all of the activities that it identifies as the foundation for new injuries caused by the challenged decision. *See Nat'l Taxpayers Union*, 68 F.3d at 1434 ("[The plaintiff organization] cannot convert its ordinary program costs into an injury in fact."); *see also Electronic Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 23 (D.D.C. 2014)

(reasoning that when an organization's mission includes "advocacy and lobbying," the expenditure of funds to "promote its legislative agenda through research, education, [and] outreach to the public and the media . . ." are "normal and critical" parts of its mission and operations).

Plaintiff LCLAA's alleged organizational injuries are similarly flawed.  LCLAA claims that OMB's decision to initiate a review and stay of the Component 2 pay data collection forced it to "pursu[e] the possibility of conducting surveys of workers" to compensate for the lack of aggregate data, consider adding terms regarding pay equity data to an existing model contract, and increase future training related to the model contract.  *See* Compl. ¶¶ 40-43.  LCLAA also claims that, as a result of the challenged decision, it has not been able to do "additional project development" on a fellowship it offers and that it has not been able to "work on educational materials related to the NAFTA renegotiations."  *Id.* at ¶¶ 44-45.  But, as explained above, OMB's decision to initiate a review and stay could not have caused these alleged injuries because LCLAA has never had access to Component 2 pay data given that this is the first time that the EEOC has sought to collect the same.

Further, it is noteworthy that in its own description of its alleged injuries, LCLAA acknowledges that it had already been considering a survey of workers "on pay equity issues." *Id.* ¶ 40.  LCLAA also acknowledges that "prior" to the challenged decision, it was "developing a project aimed at creating model contract terms" and that it "intends to train its members" on the relevant aspects of negotiation related to the contract.  *Id.* at ¶ 41.  These are insufficient to demonstrate an organizational injury sufficient to establish standing.  To that point, incremental additions to pre-existing projects will not "perceptibly impair[]" LCLAA's "core activities." *Conservative Baptist Ass'n of America v. Shinseki*, 42 F. Supp. 3d 125, 130 (D.D.C. 2014).  The very fact that LCLAA intended to create a survey and model contract prior to OMB's decision to

initiate a review and stay of Component 2 pay data and still plans to do so indicates that the challenged action has not "prevented" it from engaging in its ordinary functions. *Id.* Indeed, as explained before, because the EEOC has never before collected Component 2 pay data, OMB's decision to initiate a review and stay of the same does not change the status quo of Plaintiffs' respective daily operations or missions.

Accordingly, because Plaintiffs are unable to show any organizational injury unrelated to their alleged informational injury, Plaintiffs lack standing to pursue their claims.

### B.   Plaintiffs Do Not Plausibly Allege That the Challenged Decision Caused Plaintiffs' Injuries Nor That Such Injuries Are Redressable By This Court.

Plaintiffs' challenge is focused solely on OMB's decision to initiate a review and stay of the EEOC's newly established Component 2 pay data collection. By its own terms, therefore, Plaintiffs' complaint claims that OMB harmed the EEOC's interest. Thus, in addition to not being able to demonstrate that they have a cognizable injury, Plaintiffs have failed to demonstrate the second and third standing requirements: a causal connection between their alleged injury and the conduct complained of and that it is "likely" as opposed to "speculative" that the alleged injury will be "redressed by a favorable decision." *Id.* at 560. And when, as here, Plaintiffs are not themselves the "object of the government action" that they challenge, it is "substantially more difficult" for them to show that their alleged injuries are fairly traceable to Defendants or that their injuries are redressable by this Court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). That is because when a "plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else* . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction. . . ." *Id.* at 562 (emphasis in original). Thus, "Plaintiffs bear the burden of "adduc[ing] facts showing that those choices have been or will be

made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562.   Even at the pleading stage, the law requires "formidable evidence of causation." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 942 (D.C. Cir. 2004) (internal citation omitted) (abrogation on other grounds recognized by *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017)).  Plaintiffs cannot satisfy their "formidable" burden here.

Plaintiffs claim that OMB's decision to initiate a review and stay of Component 2 deprives them of aggregate pay data that they intended to use in advocacy efforts.  *See* Compl. ¶¶ 26-45. Setting aside the fact that Plaintiffs are not entitled to such data, in order for the challenged decision to "cause" Plaintiffs' injury, Plaintiffs would need to show that, but for the OMB's decision: (1) the EEOC would have collected the Component 2 pay data; (2) the EEOC would have published aggregate pay data for public use based on the information collected from the EEO-1; and (3) the aggregate pay data published by the EEOC would be of a nature useful to  Plaintiffs' specific advocacy efforts.  Plaintiffs' theory is untenable, however, because they have not alleged facts sufficient to show that the EEOC would have published aggregate pay data, nor that such data, if published, would in fact be useful to Plaintiffs' efforts.

As explained above, because the EEOC is not required by statute to publish aggregate pay data, Plaintiffs do not have any right or entitlement to the same.  *See supra* at 12-14.  Plaintiffs' bare allegation that the EEOC intended to "periodically publish" reports using aggregate pay data, *see* Compl. ¶ 83, is insufficient to show that the EEOC must necessarily do so.  *See Renal Physicians Ass'n v. U.S. Dep't of Health and Human Serv.*, 489 F.3d 1267, 1276 (D.C. Cir. 2007) ("[I]t is not enough simply to plead this causative link.").  And it is for this reason that Plaintiffs are unable to demonstrate that their claims are redressable by this Court.  Because the EEOC is under no statutory obligation to disclose any aggregate data derived from the Component 2 data

collection, and indeed, has the discretion to do so or not, the Court cannot compel the EEOC to make the aggregate pay data available.  Thus, any decision invalidating the challenged decision by OMB to initiate a review and stay would not redress Plaintiffs' injuries.[6]

As the foregoing demonstrates, Plaintiffs have not demonstrated that they have standing to pursue their claims.  Because Plaintiffs have not satisfied their burden, the Court should dismiss this suit for lack of subject matter jurisdiction.

## III.   THIS SUIT MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT CHALLENGE FINAL AGENCY ACTION.

Even if Plaintiffs were able to show that they have standing to bring this action, Plaintiffs' claims, *see* Compl. ¶¶ 100-18, nevertheless warrant dismissal because they do not challenge final agency action, a threshold requirement of APA review.  As relevant here, the APA limits judicial review to "final agency action for which there is no adequate remedy in a court."  5 U.S.C. § 704.  "An agency action is deemed final if it is 'definitive' and has a 'direct and immediate effect on the day-to-day business' of the party challenging the agency action."  *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (quoting *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980)).  Put another way, "[f]inal agency action 'mark[s] the consummation of the agency's decisionmaking process' and is 'one by which rights or obligations have been determined, or from which legal consequences will flow.'"  *Id.* (quoting

---

[6] For example, both Plaintiffs allege that they intended to use the Component 2 aggregate pay data to "strengthen reports" and "produce materials improving [their] members' ability to negotiate with employers." *Id.* at ¶¶ 28, 38.  But these allegations assume the form that discretionary EEOC publications would take.  Plaintiffs' speculations on the existence, content, and frequency of the aggregate pay data is simply too indefinite to support a finding of causation and redressability. *See Ctr. for Bio. Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) ("The more attenuated or indirect the chain of causation between the government's conduct and the plaintiff's injury, the less likely the plaintiff will be able to establish a causal link sufficient for standing.").

*Bennett v. Spear*, 520 U.S. 154, 178 (1997)).  Agency action that fails to satisfy either prong of the finality test is not "final" within the meaning of the APA and thus not reviewable.  *See Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries, Serv.*, 730 F. Supp. 2d 157, 173 (D.D.C. 2010) ("If the agency action is not final, a court cannot adjudicate the dispute.").

As explained in detail below, OMB's decision to "initiate a review and stay" of the Component 2 pay data collection does not satisfy either prong of the finality test.  It does not "mark the consummation" of OMB's reconsideration process, a point underscored by the fact that the agency has not issued a final (and thus potentially reviewable) approval or disapproval decision as contemplated under 44 U.S.C. § 3507(e)(1).  Nor does the challenged decision have a "direct and immediate effect" on Plaintiffs' "day-to-day business" given, *inter alia*, that Plaintiffs have not pointed to any statutory or regulatory provision that entitles them to the aggregate pay data that they seek, nor could they inasmuch as no such statutory provision exists.  *Reliable Automatic Sprinkler*, 324 F.3d at 731.  Under these circumstances, Plaintiffs' claims challenge non-final agency action, which is outside of the scope of the Court's limited review under the APA.

### A.  OMB's Decision to Initiate a Review and Stay Of Component 2 Is An Interlocutory Decision Not Subject to Judicial Review Under the APA.

The first prong of the finality test requires the Court to determine whether OMB's decision to initiate a review and stay of the Component 2 pay data collection "marks the consummation of" OMB's regulatory review process.  If the answer to that question is "no," the Court must dismiss this action.  To that point, the APA bars judicial review of agency action that is of a "'tentative or interlocutory'" nature, *see Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 426 (D.C. Cir. 2004) (internal citation omitted), and for which the agency has yet to "complete[] its decisionmaking process."  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  In this sense, the Court's role as gatekeeper under the APA serves several purposes: "It allows an agency an opportunity to apply

21

its expertise and correct its mistakes, it avoids disrupting the agency's processes, and it relieves the courts from having to engage in 'piecemeal review which is at the least inefficient and upon completion of the agency process might prove to have been unnecessary.'" *DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Standard Oil*, 449 U.S. at 242)).

But Plaintiffs' lawsuit does precisely that—it seeks to disrupt OMB's reconsideration processes and invites this Court "to engage in piecemeal review" of OMB's decision to initiate a review and stay of Component 2. Indeed, as the August 2017 OMB letter makes clear, OMB's decision to review and stay Component 2 is not "the consummation of the agency's decisionmaking process," but rather the first step in the agency's administrative reconsideration process, a process that, if the Court permits it to continue, is designed to result in a final approval or disapproval decision by OMB. *See* 44 U.S.C. §§ 3507(c)(1), 3507(e)(1); *see also* 5 C.F.R. § 1320.10(f). Indeed, the August 2017 OMB letter expressly states that OMB is "initiating" a review of Component 2 and suggests that the EEOC continue to use the previously approved EEO-1 form, *i.e.*, Component 1, "during" OMB's review of Component 2. And the August 2017 OMB letter clearly contemplates continued consultation with the EEOC by requesting that the EEOC submit "a new [Component 2] information collection package" to OMB for review under OMB's administrative procedures. Thus, far from stating OMB's "'definitive position'" either approving or disapproving the EEOC's collection of the pay data contemplated in Component 2, *see DRG Funding Corp.*, 76 F.3d at 1214, the August 2017 OMB letter simply expresses OMB's preliminary determination that Component 2 does not satisfy the requirements of the PRA as currently formulated and that further review and consultation is needed. *See, e.g.*, *Reliable Automatic Sprinkler*, 324 F.3d at 731-33 (explaining that letter stating agency's "intention to make

a preliminary determination" that plaintiffs' products "present a substantial product hazard and requests for voluntary corrective action" is not a final determination that is reviewable under the APA); *Marquette Cty. Rd. Comm'n v. EPA*, 188 F. Supp. 3d 641, 649 (W.D. Mich. 2016) ("EPA's objections are an interlocutory step in the permitting process rather than the consummation of that process.").

The non-final nature of the challenged decision is further buttressed by the statutory and regulatory structure of OMB's review authority. *See Reliable Automatic Sprinklers*, 324 F. 3d at 732 (observing that "the agency has not yet taken the steps required under the statutory and regulatory scheme for its actions to have any legal consequences"). The PRA grants OMB the authority to determine the duration of its approval of a collection of information, such as the one challenged here, up to three years. *See* 44 U.S.C. § 3507(g) ("The Director [of OMB] may not approve a collection of information for a period in excess of 3 years."). The PRA does not "obligate OMB to set a fixed and unchanging expiration date." 48 Fed. Reg. at 13,683; *see also* 44 U.S.C. § 3507(g). It is for this reason that, pursuant to its delegated authority to promulgate rules implementing the PRA, *see id.* § 3516, OMB has "expressly condition[ed] all expiration dates on [its] right to reconsider [the collection of information] at a later date." 48 Fed. Reg. 13,683; *see also* 5 C.F.R. § 1320.10(f), (g). Indeed, "[t]his has been the established practice under both the Paperwork Reduction Act and its predecessor, the Federal Reports Act. Nothing in the language or legislative history of the Paperwork Reduction Act indicates that Congress intended to cut back on OMB's well-established authority under the Federal Reports Act to reconsider approvals of collections of information in advance of the expiration date." 48 Fed. Reg. at 13,683; *see also* OMB Circular A-40, § 2(c) (1976) ("[C]learance of any plan or report form subject to

[OMB clearance requirements under the Federal Reports Act] may be withdrawn by [OMB], in which event the use of the plan or report form will be discontinued.").

Moreover, § 1320.10(f) and (g) of OMB's regulations make clear that OMB's decision to "initiate a review and stay" of a previously approved collection of information is simply the first step in the agency's "reconsideration" process.  *See* 5 C.F.R. § 1320.10(f), (g).   As explained above, § 1320.10(f) and (g) set forth the circumstances under which OMB may initiate a review and stay of a collection of information prior to the expiration date of OMB's prior approval.  And these regulations contemplate that OMB's decision to initiate a review and stay of a collection of information is an interlocutory step in OMB's reconsideration process.  Thus, for example, § 1320.10(f) directs the requesting agency to submit a revised collection of information to OMB. *See id.* § 1320.10(f) ("[u]pon notification by OMB of its decision to review the collection of information, the agency shall submit it to OMB for review under this part").  And § 1320.10(g) instructs the agency to "cease conducting or sponsoring such collection *while the submission is pending*." *Id.* § 1320.10(g) (emphasis added).

Once an agency has submitted the additional information to OMB for the latter's review, the procedures set forth in 5 C.F.R. Part 1320 govern the remaining steps in OMB's review process. It is only at the completion of these administrative processes, that OMB may approve, disapprove, or instruct the agency to make substantive or material changes to the proposed collection of information. *See id.* § 3507(e)(1).

As the foregoing demonstrates, OMB's decision to initiate a review and stay of Component 2 does not "mark the consummation of the agency's decisionmaking process," but rather its beginning. *Reliable Automatic Sprinkler*, 324 F.3d at 731; *see Jicarilla Apache Nation v. U.S. Dep't of Interior*, 648 F. Supp. 2d 140, 145 (D.D.C. 2009) ("As part of the finality analysis, the

Court must also consider whether 'the process of administrative decisionmaking has reached the stage where judicial review will not disrupt the orderly process of [] [the agency's proceedings]." The August 2017 OMB letter states that as part of OMB's review processes, OMB will consult with the EEOC to address the concerns raised in the letter. And under the processes set forth in 5 C.F.R. Part 1320, the EEOC may exercise its discretion to determine how best to respond to OMB's reconsideration request. *See* 5 C.F.R. § 1320.10(f).

The existence of these remaining administrative steps serves only to underscore the interlocutory nature of the challenged action. *See, e.g.*, *Shipbuilders Council of Am., Inc. v. U.S. Dep't of Homeland Sec.*, 481 F. Supp. 2d 550, 558 (E.D. Va. 2007) (reasoning that Coast Guard's letter stating its preliminary rebuilding determination does not "bind the Coast Guard to conclude that vessels have not been 'rebuilt' overseas," nor "does it confer any right on [plaintiff] to receive a coastwise endorsement for their vessel"); *Marquette Cty. Rd. Comm'n*, 188 F. Supp. 3d at 648 (finding that EPA's objections to permit are not final agency action where "EPA continues to work with the state and the permit applicant after issuing objections" and the agency "has the authority to modify or withdraw those objections in response to hearings or further information [provided by] *sic* the state or the applicant"). Indeed, had OMB intended the August 2017 OMB letter to represent its final determination with respect to its review of Component 2, OMB likely would have taken action under its authority to implement Executive Order 13771 ("EO 13771").[7] To

---

[7] EO 13771 establishes requirements for certain agency regulatory actions, including requiring an agency to have issued two EO 13771 deregulatory actions for each EO 13771 regulatory action it took across the year. *See* https://www.whitehouse.gov/sites/whitehouse.gov /files/omb/memoranda/2017/M-17-21-OMB.pdf. OMB assesses whether an agency's action is a deregulatory action for the purpose of this accounting, which generally include, as relevant here, "information collection requests that repeal or streamline recordkeeping, reporting, or disclosure requirements." *Id.* at 4.

date, OMB has not assigned a deregulatory credit to the EEOC, which is yet another indicia of the interlocutory nature of the challenged decision.

Given the nascent stage in OMB's review process and also the EEOC's discretion to determine how best to respond to the concerns raised in the August 2017 OMB letter, it is not possible to determine whether the outcome of OMB's administrative review of Component 2 will be to "approve, disapprove, or instruct the agency to make a substantive or material change." *See CTIA-The Wireless Ass'n v. F.C.C.*, 530 F.3d 984, 987 (D.C. Cir. 2008); *see also* 44 U.S.C. § 3507(e)(1).  Put another way, until OMB makes such a determination, OMB's decision to initiate a review and stay of Component 2 "is necessarily 'tentative, provisional, or contingent' and therefore nonfinal." *DRG Funding Corp.*, 76 F.3d at 1215 (internal citation omitted); *see also Reliable Automatic Sprinkler*, 324 F.3d at 733 ("So long as Reliable retains the opportunity to convince the agency that it lacks jurisdiction over Reliable's sprinkler heads, it makes no sense for a court to intervene.  It conserves both judicial and administrative resources to allow the required agency deliberative process to take place before judicial review is undertaken."); *Hindes v. FDIC*, 137 F.3d 148, 161-62 (3d Cir. 1998) (concluding that APA review was not available where challenged Notification was the first step in a multi-step statutory process which could lead to the termination of the institution's deposit insurance).

### B. OMB's Decision to Initiate a Review and Stay of Component 2 Does Not Affect Any Legal Right or Obligation of Plaintiffs.

Not only is the challenged decision an interlocutory (and thus non-final) determination, but it also "has not directly affected [Plaintiffs] or determined their rights or obligations." *DRG Funding Corp.*, 76 F.3d at 1215.  Under the second prong of the finality test, courts must determine whether the challenged agency action "establishes rights and obligations or creates binding legal consequences." *Gulf Restoration Network*, 730 F. Supp. 2d at 173-74 (citing, among other cases,

*DRG Funding Corp.*, 76 F.3d at 1214).  As one court of appeals has explained this inquiry, "[a]n agency's determination of 'rights or obligations' generally stems from an agency action that is directly binding on the party seeking review, such as an administrative adjudication . . . or legislative rulemaking. . . ."  *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 641 (6th Cir. 2004).  Thus, the "core question is whether . . . the result of the [] [agency's administrative] process is one that will directly affect [Plaintiffs]."  *Franklin*, 505 U.S. at 797; *see also Standard Oil*, 449 U.S. at 242 (reasoning that the filing of the Federal Trade Commission's administrative complaint did not have the legal force or practical effect on plaintiff's daily business activities indicative of a final agency determination).  In this case, the answer to this question is "no."

To be sure, the challenged decision potentially impacts the obligations of EEO-1 filers, whose obligation to submit the Component 2 pay data has been stayed during the pendency of OMB's review.  But the challenged decision has no impact on Plaintiffs, who do not purport to be EEO-1 filers and whose interest in the pay data depends entirely on the EEOC's discretionary decision to make aggregate pay data available at some point in the future.  Indeed, the D.C. Circuit has made clear that agency action is not final where it "'does not itself adversely affect the complainant but only affects his rights on the contingency of future administrative action.'"  *DRG Funding Corp.*, 76 F.3d at 1214 (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)).  And this is the flaw underlying Plaintiffs' purported loss of the ability to utilize aggregate pay data.  As explained above, Plaintiffs have not pointed to any statutory or regulatory provision that grants them a right to either the pay data that Component 2 seeks to collect, or the aggregate pay data that the EEOC may have derived from the same.  *See supra* 12-14.

Even assuming that Plaintiffs could overcome this hurdle (which they cannot), their inability to access the aggregate pay data is "contingent on future administrative actions,"

including the EEOC's discretion to determine how best to respond to OMB's review and stay notice and the result of OMB's administrative review process.  Given the early stage of the administrative process, it is not at all certain whether any "right" Plaintiffs have in the Component 2 pay data will in fact be adversely affected.  Moreover, as Plaintiffs themselves acknowledge, their ability to utilize the pay data that would have been collected with employers' Component 2 submissions depends entirely on the EEOC's discretionary decision to aggregate the pay data and make it publicly available to Plaintiffs.  *See* Compl. ¶ 28 (alleging that the EEOC "intended to make publicly available" aggregate data from Component 2).

In other words, OMB's decision to initiate a review and stay of Component 2 does not have a "'direct effect'" on Plaintiffs' "'day-to-day business.'"  *DRG Funding Corp.*, 76 F.3d at 1214. Indeed, the challenged decision likely has no effect at all on Plaintiffs' day-to-day business given that Plaintiffs have never had access to aggregate pay data provided by the EEOC because the EEOC had not attempted to collect that type of data until now.  Plaintiffs complain that as a result of OMB's decision to initiate a review and stay of Component 2, they will "expend additional funding and staff time" to encourage employers to conduct voluntary self-audits of pay practices and "replicate the same information" that they would have obtained from Component 2, *see* Compl. ¶¶ 32, 39.  Setting aside the fact that Plaintiffs presumably have had to expend funds and staff time on these activities because the EEOC has never before collected pay data, the D.C. Circuit has cautioned that "'claims of hardship 'will rarely overcome the finality and fitness problems inherent in attempts to review tentative decisions.'"  *DRG Funding Corp.*, 76 F.3d at 1215 (internal citation omitted).  If, at the conclusion of OMB's review process, the agency disapproves the EEOC's efforts to collect pay data, Plaintiffs may then challenge OMB's disapproval decision.  *See Gulf Restoration Network, Inc.*, 730 F. Supp. 2d at 172 (declining to

reach the merits of Plaintiffs' APA challenge to marine fishery decisions because "Plaintiffs can bring their suit at a later date, after 'harm is more imminent and more certain'" (internal citation omitted)).  "Deferring consideration of the dispute until that point serves important interests in both avoiding 'interference with the system that Congress specified for the agency to reach . . . decisions,' and in judicial economy."[8]  *Id.* (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 736 (1998).  It is for this reason that the Court should dismiss Plaintiffs' claims as a matter of law.  *See Reliable Automatic Sprinkler Co.*, 324 F.3d at 731-35 (affirming district court's dismissal of challenge to Consumer Product Safety Commission's "preliminary determination" that plaintiff's products present a "substantial product hazard" and "request for voluntary corrective compliance" because "[t]hese actions do not constitute final agency action within the meaning of the APA").

## CONCLUSION

As the foregoing demonstrates, Plaintiffs lack standing to bring their claims.  And even if Plaintiffs could overcome this jurisdictional obstacle, Plaintiffs' claims do not challenge final agency action and are thus unreviewable under the APA.  Either of these reasons provides a basis for this Court to dismiss Plaintiffs' Complaint.

---

[8] It is for this reason that Plaintiffs' claims are also not ripe.  *See generally Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 424-28 (D.C. Cir. 2007).  Where, as here, "an agency decision may never have 'its effect felt in a concrete way by the challenging parties'" and Plaintiffs are unable to demonstrate any hardship if they are required to wait for the completion of the agency's administrative processes, courts are unwilling to "entangl[e]" themselves in such a challenge because it is not yet fit for review.  *Id.* at 424 (internal citation omitted); *see also CTIA-The Wireless Ass'n*, 530 F.3d at 991 (holding that plaintiff association's challenge to FCC rule was not ripe "because OMB has not reached any decision regarding the rule's information gathering requirements").

Dated:  February 13, 2018                             Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JESSIE K. LIU
U.S. Attorney for the District of Columbia

CARLOTTA WELLS
Assistant Branch Director, Federal Programs Branch

_/s/ Tamra T. Moore_
Tamra T. Moore (DC Bar No. 488392)
Rachael L. Westmoreland (GA Bar No. 539498)
Trial Attorneys
Federal Programs Branch
U.S. Department of Justice, Civil Division
Telephone:  (202) 305-8628
Fax:  (202) 305-8517
Email:  Tamra.Moore@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, DC 20044

Courier Address:
20 Massachusetts Ave., NW Rm. 5375
Washington, DC 20001