**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| National Women's Law Center, *et al*., | : | |
| *Plaintiffs*, | : | |
| vs. | : | Civil Action No. 17-2458 (TSC) |
| Office of Management and Budget, *et al*., | : | |
| *Defendants*. | : | |

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Table of Contents

Introduction ............................................................................................................1

Background ............................................................................................................3

  I. The Pay Gap ....................................................................................................3

  II. The Paperwork Reduction Act .....................................................................3

  III. The EEO-1 ...................................................................................................5

  IV. The EEOC's Administrative Process Leading Up To The Revision Of The EEO-1 ...........6

  V. The OMB's Decision To Review And Stay The Revised EEO-1 Pay Data Collection .......11

Standard of Review ..............................................................................................13

Argument .............................................................................................................15

  I. Plaintiffs Have Standing To Challenge The Review And Stay Of EEO-1 Pay Data
    Collection ......................................................................................................15

    A.  The Stay Injures NWLC And LCLAA ................................................17

        1.  Plaintiffs' Education And Advocacy Efforts Are Harmed By The Loss Of
           EEOC's Publication Of Aggregate Pay Data ......................................19

        2.  Plaintiffs' Efforts To Obtain Favorable Outcomes For Their Clients And
           Members, Respectively, Are Limited By The Stay Of Pay Data Collection .......26

        3.  Plaintiffs' Injuries Are Cognizable Even Though The EEO-1 Had Not
           Previously Collected Pay Data ............................................................28

    B.  Plaintiffs' Injuries Were Caused By Defendants' Actions And Are Redressable
      By The Relief Sought .........................................................................33

  II. The Stay Is Final Agency Action Reviewable By This Court ..............................36

    A.  Staying A Regulatory Mandate Is A Final Decision, Regardless Of Whether It Is
      Part Of A "Reconsideration" Process ...................................................37

    B.  Staying The Pay Data Collection Determines Rights and Obligations, And Has
      Legal Consequences ...........................................................................40

Conclusion ...........................................................................................................42

**<u>INTRODUCTION</u>**

This case challenges the Office of Management and Budget's (OMB) decision to suddenly halt—without public process or meaningful explanation—a collection of pay data conducted by the Equal Employment Opportunity Commission (EEOC) pursuant to Title VII of the Civil Rights Act. This pay data collection was previously approved by OMB under the Paperwork Reduction Act (PRA) in September 2016 with the first scheduled collection due in March 2018. Then, under the new Administration, and without notice or reasoned explanation, OMB stayed the collection by a memo of one-and-a-half pages dated August 29, 2017.

The EEOC's decision to collect the pay data at issue came after a lengthy and robust public process and was based on the EEOC's conclusion that collecting this information is *necessary* to remedy persistent wage gaps correlated with sex, race, and ethnicity. Specifically, the stayed information collection added an inquiry regarding employee pay to the EEOC's longstanding survey of the sex, race, and ethnicity of certain private employees. The EEOC found that this collection was necessary for it to "efficiently and effectively" investigate pay discrimination charges and enforce associated civil rights laws. The EEOC also determined that this data collection would promote voluntary employer compliance with anti-discrimination laws and, as a result of EEOC publication, would make useful comparative data on pay available to the public, including to employees and their advocates.

OMB exceeded its legal authority in suddenly staying this data collection, including by failing to provide any credible explanation for its reversal in course, which contravenes the PRA's prohibition on interfering with the EEOC's enforcement of civil rights laws. Indeed, OMB gave virtually no explanation whatsoever for its stay, simply parroting the regulatory standards and providing one unfounded factual justification. Notably, Defendants' pending motion to dismiss does not defend OMB's action on the merits, relying instead on threshold

1

challenges to Plaintiffs' standing and the finality of OMB's action. Neither of these threshold arguments survives scrutiny.

First, OMB's baseless stay injures Plaintiffs, the National Women's Law Center (NWLC) and Labor Council for Latin American Advancement (LCLAA), and therefore confers Article III standing. The stay deprives both of these Plaintiffs of aggregate pay information that the EEOC had committed to publish, and which is of incomparable value to Plaintiffs' public education and advocacy efforts. OMB's stay also hampers Plaintiffs' respective abilities to obtain redress for their clients or beneficial outcomes for their members under the civil rights laws. Under settled D.C. Circuit law, including *People for the Ethical Treatment of Animals v. U.S. Department of Agriculture* ("*PETA*"), 797 F.3d 1087 (D.C. Cir. 2015), both Plaintiffs have standing to challenge the unlawful stay. Defendants' argument that Plaintiffs must demonstrate a statutory mandate for the collection of the specific information at issue is wrong because it conflates the limited doctrine of informational standing with the established principle that an organization may be cognizably injured by the loss of access to useful information. For these same reasons, Plaintiffs' harm is caused by Defendants and redressable through this suit, further supporting Article III standing.

Second, OMB's stay qualifies, under binding precedent, as final agency action which the Court may review. OMB lifted, indefinitely, the date by which covered employers were required to submit pay data to the EEOC. This action by OMB creates legal consequences now—relieving covered employers from the obligation to submit the required data and depriving the EEOC and the public of this data. Defendants' claim that final agency action is absent simply ignores that the D.C. Circuit has repeatedly concluded that staying the effective date of a rule is final agency action.

Plaintiffs respectfully request therefore that the Court deny Defendants' motion to dismiss.

## BACKGROUND

### I.   THE PAY GAP

Persistent gaps in pay exist between women, especially women of color, and white men. Women working full time, year-round are typically paid 80 cents for every dollar paid to their male counterparts. Black women typically make only 63 cents, Native American women only 57 cents, and Latinas only 54 cents for every dollar paid to white, non-Hispanic men for full-time, year-round work.[1] The wage gap is wider still for women who are immigrants.[2] Men of color experience similar pay disparities compared to white, non-Hispanic men. For every dollar paid to white, non-Hispanic men, Black men are paid 72 cents and Latino men are paid 62 cents. *See* Complaint, Dkt. No. 1 (Compl.), ¶¶ 2-3.

### II.   THE PAPERWORK REDUCTION ACT

The Paperwork Reduction Act, 44 U.S.C. §§ 3501, *et seq*., was intended to "improve the quality and use of Federal information to strengthen decisionmaking, accountability, and openness in Government and society." 44 U.S.C. § 3501. To that end, the PRA attempts to strike a balance between "ensur[ing] the greatest possible public benefit from and maximiz[ing] the utility of information created, collected, maintained, used, shared, and disseminated by or for the Federal Government" and minimizing the paperwork burden imposed when the federal

---

[1] Nat'l Women's Law Ctr., *Workplace Justice: FAQs About the Wage Gap* (Sept. 2017), https://nwlc.org/wp-content/uploads/2017/09/FAQ-About-the-Wage-Gap-2017.pdf.

[2] Nat'l Women's Law Ctr., Labor Council for Latin Am. Adv., *Workplace Justice: Equal Pay for Latinas* (Oct. 2016), https://nwlc.org/wp-content/uploads/2016/10/Latina-Equal-Pay-2016-English-Final.pdf.

government collects information from individuals, entities, and State, local and tribal governments. *Id*.

Through the PRA, Congress established a process by which agencies obtain approval from OMB to collect certain types of information from the public. The agency must first conduct its own evaluation of the plan for a proposed information collection, including the need for the information and the burden imposed by collection. 44 U.S.C. § 3506(c)(1)(A). In most cases, the PRA requires that an agency publish a "60-day notice" in the Federal Register soliciting public comment on the agency's proposed collection. 44 U.S.C. § 3506(c)(2). After the conclusion of the 60-day comment period, the agency's internal consideration of the public's comments, and any appropriate revisions, the agency then submits the proposed collection of information to OMB and publishes a second Federal Register notice to announce the start of OMB review and a 30-day comment period. 44 U.S.C. § 3507(a)-(b). The second notice informs the public about how to submit comments to OMB and that OMB may act on the agency's request only after the 30-day comment period has closed.

After these two public comment periods, OMB, through OIRA, may approve or disapprove the proposed collection of information. 44 U.S.C. § 3507(c). Approval requires a determination that collection of information "is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility." 44 U.S.C. § 3508. An OMB approval of a collection of information lasts for up to a three-year period, after which the agency must seek an extension of OMB's approval if it wishes to continue the collection of information. 44 U.S.C. § 3507(g)-(h).

Importantly, approval or disapproval under the PRA cannot interfere with an agency's enforcement of civil rights laws. Specifically, the PRA makes clear that "[n]othing in this chapter

4

shall be interpreted as increasing … the authority of [OMB] with respect to … the substantive authority of any Federal agency to enforce the civil rights laws." 44 U.S.C. § 3518(e).

OMB's regulations permit it to review an ongoing and previously approved collection of information when "relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error." 5 C.F.R. § 1320.10(f). With respect to information collections not contained in a current rule, OMB's regulations also permit it to stay the prior approval of a collection of information, but only for "good cause." 5 C.F.R. § 1320.10(g).[3]

## III.    THE EEO-1

Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et. seq.*, requires employers to "make and keep records relevant to the determination of whether unlawful employment practices have been or are being committed," to preserve such records, and to produce reports as the EEOC prescribes by regulation or order. 42 U.S.C. § 2000e-8(c). Pursuant to this statutory authority, since 1966, the EEOC has required that employers with 100 or more employees file with the EEOC a survey known as the "Employer Information Report EEO-1" (EEO-1). 29 C.F.R. § 1602.7. This requirement also applies to certain federal contractors and subcontractors with more than 50 employees, for whom it is enforced by the Office of Federal Contract Compliance Programs (OFCCP) in the U.S. Department of Labor (DOL). 41 CFR §60-1.7. The EEO-1 has been revised from time to time by the EEOC and, before the revision requiring

---

[3] For the purpose of responding to Defendants' motion to dismiss, Plaintiffs will assume the lawfulness of OMB's regulations purportedly authorizing it to re-review and stay previously approved collections, as Defendants' standing and finality arguments do not hinge on the lawfulness *vel non* of the regulations.

submission of pay data information, directed covered employers to report annually the number of individuals employed by job category and by sex, race, and ethnicity. Compl. ¶ 57. The EEO-1 currently includes seven race and ethnicity categories and ten job categories. *Id*.

The EEOC and OFCCP use EEO-1 data to support civil rights enforcement and to analyze and inform the public about employment patterns, such as the representation of women and minorities within companies, industries, or regions. Compl. ¶ 58. EEO-1 data also helps to show trends regarding hiring, promotions, and employee turnover within certain sectors. *Id*. Although the EEOC keeps individually identifiable information confidential, it makes aggregate EEO-1 information for major geographic areas and industry groups publicly available, *Id*. ¶ 59, which it has done on an annual basis for at least twenty years.[4] In addition, the EEOC periodically publishes special reports based on aggregate data collected from the EEO-1, such as *Women of Color: Their Employment in the Private Sector*, *American Experiences Versus American Expectations*, and *Diversity in High Tech*.[5]

IV.   **THE EEOC'S ADMINISTRATIVE PROCESS LEADING UP TO THE REVISION OF THE EEO-1.**

The EEOC's decision to collect pay data at issue here resulted from a years-long interagency process of careful study and robust public comment.

First, in 2010, the EEOC joined other federal agencies to identify ways to improve enforcement of federal laws prohibiting pay discrimination. Compl. ¶ 62. Thereafter the EEOC commissioned multiple studies regarding how to collect pay data most efficiently and effectively to support its pay discrimination enforcement efforts. *Id*. ¶¶ 63-64. The first study concluded that

---

[4] *See* EEOC, *Job Patterns for Minorities and Women in Private Industry (EEO-1)*, https://www.eeoc.gov/eeoc/statistics/employment/jobpat-eeo1/.

[5] EEOC, *Special Reports*, https://www.eeoc.gov/eeoc/statistics/reports/index.cfm.

using the EEO-1 for pay data collection would be "quite manageable for both the EEOC and the respondents" and recommended that following development of a comprehensive plan for use of pay data, the EEOC create a pilot study to test data collection and the plan for its use. *Id*. ¶ 63. The second study, which was the recommended pilot study, made several technical recommendations, including that the EEOC use the IRS's W-2 definition of pay, because it offers a "comprehensive picture of earnings data and may not create a measurable burden for most respondents." *Id*. ¶ 65. As part of its information gathering efforts, the EEOC also conducted a two-day "work group" meeting in March 2012 with employer representatives, statisticians, human resources information systems experts, and information technology specialists regarding pay data collection. *Id*. ¶ 66. This work group concluded that for EEO-1 filers, "[t]he cost burden of reporting pay data to EEOC would be minimal." *Id*. ¶ 66. Following its own administrative process, OFCCP determined to coordinate with the EEOC on pay data collection. *Id*. ¶ 67.

On February 1, 2016, following this interagency process, the EEOC voted to revise the EEO-1 to include a pay data collection and published a Federal Register notice to this effect requesting public comments. *See* Agency Information Collection Activities: Revision of the Employer Information Report, 81 Fed. Reg. 5113, 5115 (Feb. 1, 2016)). This was the "60-day notice" required by the PRA. 81 Fed. Reg. at 5117.

The EEOC proposed revising the EEO-1 to collect aggregate W-2 data in twelve pay bands for the ten existing EEO-1 job categories, as recommended by the pilot study. As the notice explained, "Employers will simply count and report the number of employees in each pay band. For example, a filer will report on the EEO-1 that it employs 3 African American women as professionals in the highest pay band." 81 Fed. Reg. at 5117. The notice further explained that

it was using pay bands for reporting to minimize employer burden. *Id*. It specified the exact data that employers would need to provide, so that potential commenters could evaluate the exact requirements that EEOC was proposing. *Id*. at 5117-19. The 60-day notice also proposed collecting the total number of hours worked by the employees included in each EEO-1 pay band, as recommended by the EEOC's pilot study, and specifically sought employer input on this point. *Id*. at 5117. As required by the PRA, the EEOC estimated the number of reporting hours it expected to be imposed on EEO-1 filers as part of its data collection, concluding that the pay data collection would increase the reporting time per filer by 3.2 hours, up to a total of 6.6 hours. *Id*. at 5118-19.

On March 16, 2016, the EEOC held a public hearing on its proposed pay data collection and heard testimony from witnesses who represented the views of employers, employees, and academics. Compl. ¶ 75. NWLC joined in this hearing and provided testimony on the revised collection. *Id*.

The EEOC received a total of 322 timely comments in response to the 60-day notice, many of which were compilations of supportive comments from thousands of individuals. Agency Information Collection Activities: Notice of Submission for OMB Review, 81 Fed. Reg. 45479, 45480 (July 14, 2016). NWLC submitted a comment, as did employers, employer associations, Members of Congress, civil rights groups, women's organizations, labor unions, industry groups, law firms, human resource organizations, and individual members of the public. 81 Fed. Reg. at 45479.

On July 14, 2016, the EEOC published a second Federal Register notice, announcing that it was submitting to OMB a request for a three-year PRA approval of the revised EEO-1, and soliciting comments for submission both to OMB and the EEOC. *Id*. This was the "30-day

notice" required to obtain OMB approval of the collection of information. *Id*. The 30-day notice

set forth the EEOC's conclusion that revisions to the EEO-1 were necessary for the enforcement

of equal pay laws. *Id*. The EEOC explained that:

> Based on federal data and a robust body of research, the Commission concludes
> that: (1) [p]ersistent pay gaps continue to exist in the U.S. workforce correlated
> with sex, race, and ethnicity; (2) workplace discrimination is an important
> contributing factor to these pay disparities; and (3) implementing the proposed
> EEO-1 pay data collection will improve the EEOC's ability to efficiently and
> effectively structure its investigation of pay discrimination charges.

*Id*. (contained in Section III of the notice, "Revisions to the EEO-1 Report Are Necessary for the

Enforcement of Title VII, the [Equal Pay Act], and Executive Order 11246").

The EEOC stated that it would use the collection of pay data in multiple ways, including:

(1) to support its enforcement efforts, by enabling its staff to use statistical analysis to assist in an

early assessment of pay discrimination charges against an employer; (2) to periodically publish

reports on pay disparities by race, sex, industry, occupational groupings, and Metropolitan

Statistical Area; and (3) to provide training and outreach both internally and to employers and

other stakeholders on, among other things, how to use the reports. *Id*. at 45490-91. OFCCP

would use the data in similar ways. *Id*. at 45483.

Notably, the 30-day notice announced adjustments to the EEOC's original proposal in

response to public comments, specifically to reduce burden to employers. Compl. ¶ 84. These

included moving the filing deadline back to March 31 of the year that follows the reporting year

to align with calendar year W-2 wage data. *Id*. at 45484. The EEOC also changed the "workforce

snapshot period," in response to comments from employers. *Id*. In addition, the 30-day notice

adjusted the estimates of burden imposed by the revisions to the EEO-1 upward based on

employer comments and a onetime implementation burden. *Id*. at 45483. It estimated that the

addition of pay data would increase the filing cost for each EEO-1 filer by $416.58. 81 Fed. Reg.

45493-94. The 30-day notice also stated that the EEOC would post data file specifications to support employers and Human Resources Information Systems vendors in reporting pay data via the EEO-1 through direct data upload "as soon as OMB approves the information collection." *Id.* at 45487.

The EEOC received a total of 612 comments in response to the 30-day notice, including another comment from NWLC. Again, some of the comments included compilations of thousands of submissions from individuals writing in support of these efforts to collect pay data information. Compl. ¶ 89. Thereafter, on September 28, 2016, the EEOC provided its Final Supporting Statement on EEO-1 to OMB, and therein set forth a mechanism for future review of the utility and burden of collecting pay data as part of the EEO-1 collection. *Id.* ¶ 90.

OMB approved the proposed collection and issued an OMB control number for the revised EEO-1 on or about September 29, 2016. *Id.* ¶ 91. After OMB approved the collection, EEO-1 filers had a legal obligation to submit pay data for the 2017 reporting period by March 31, 2018. *Id.* ¶ 92.

Employers submitting the EEO-1 can do so either via (1) direct data entry or (2) direct data upload using a data file specification. *Id* ¶ 93.  For the collection of pay data, the EEOC updated a website advising employers of the data file format, if they chose to directly upload pay data as part of the EEO-1. *Id.* ¶ 92. The data file for submitting pay data by optional direct upload is a modified version of the data file specification that has been in place for over a decade, simply adding fields for the data precisely specified in the Federal Register notices. *Id.* ¶ 94. Only employers using direct data upload would use the data file specifications posted by the EEOC. The EEOC "strongly" encouraged employers to use direct data entry, rather than using a

data file specification.[6] As of 2014, the most recent date for which data is publicly available, 98

percent of employers used direct data entry, whereas only *two* percent of employers submitted

data via the data file specification. 81 Fed. Reg. at 5119 n. 55, 5120 n. 62 (in 2014, 67,146 firms

filed EEO-1s, of which 1,449 firms used direct data upload).

## V.   OMB's DECISION TO REVIEW AND STAY THE REVISED EEO-1 PAY DATA COLLECTION

On August 29, 2017, nearly one year after OMB approved the pay data collection,

Administrator Rao issued a memo to the Acting Chair of the EEOC ("Rao Memorandum")

stating that OMB was reconsidering the revision to the EEO-1 to collect pay data and it was also

immediately staying that requirement. Compl. ¶ 95.

The entire basis for OMB's action was set forth in two paragraphs. With respect to

reconsideration, the Rao Memorandum stated:

> [U]nder 5 CFR 1320.10(f) and (g), OMB may review an approved collection of
> information if OMB determines that the relevant circumstances related to the
> collection have changed and/or that the burden estimates provided by EEOC at
> the time of initial submission were materially in error. OMB has determined that
> each of these conditions for review has been met. For example, since approving
> the revised EEO-1 form on September 29, 2016, OMB understands that EEOC
> has released data file specifications for employers to use in submitting EEO-1
> data. These specifications were not contained in the Federal Register notices as
> part of the public comment process nor were they outlined in the supporting
> statement for the collection of information. As a result, the public did not receive
> an opportunity to provide comment on the method of data submission to EEOC.
> In addition, EEOC's burden estimates did not account for the use of these
> particular data file specifications, which may have changed the initial burden
> estimate.

---

[6] *See, e.g.*, EEOC, *Instruction Booklet*,
https://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm ("EEO-1 reporting is an
electronic, online application. Pursuant to the Government Paperwork Elimination Act of 1998,
we strongly recommend that EEO-1 reports be submitted via the *EEO-1 Online Filing System*, *or*
as an electronically transmitted data file. A copy of the prescribed EEO-1 data file format is
available at the website address in the survey mailout memorandum." (emphasis added and
emphasis omitted)).

Memorandum from Neomi Rao, Adm'r, OIRA, to Victoria Lipnic, Acting Chair, EEOC (Aug. 29, 2017).[7] The Memorandum did not address the facts that only two percent of users typically submit data using the data file specifications or that the data file specifications had not substantively changed, aside from adding fields for pay data, from the version previously in use. It further did not prove any analysis for how it reached the conclusion that the data file specifications—or any other factor—resulted in a change in circumstance or a material error in burden estimates by the EEOC. Nor did it explain why it approved the collection originally despite knowing the data file specification had not been published.

    In explaining the grounds for a stay, the Rao Memorandum stated:

    OMB has also decided to stay immediately the effectiveness of the revised aspects
    of the EEO-1 form for good cause, as we believe that continued collection of this
    information is contrary to the standards of the PRA. Among other things, OMB is
    concerned that some aspects of the revised collection of information lack practical
    utility, are unnecessarily burdensome, and do not adequately address privacy and
    confidentiality issues.

*Id*. The Memorandum did not provide any factual explanation or analysis to support these conclusions, explain why it was reversing its prior conclusion that the collection was "necessary for the proper performance of the functions of the agency" and had "practical utility," 44 U.S.C. § 3508, or provide any additional information regarding its assessment that it had "good cause" to stay the data collection.

    Following the direction of the Rao Memorandum, on September 15, 2017, the EEOC published a Federal Register notice stating that EEO-1 filers should not submit pay data in their

---

[7] Available at
https://www.reginfo.gov/public/jsp/Utilities/Review_and_Stay_Memo_for_EEOC.pdf.

EEO-1s due by March 31, 2018. *See* Stay the Effectiveness of the EEO-1 Pay Data Collection, 82 Fed. Reg. 43362, 43362 (Sept. 15, 2017).

* * *

On November 15, 2017, Plaintiffs filed this lawsuit alleging that the review and stay of the revised EEO-1 pay data collection is unlawful under the Administrative Procedure Act, 5 U.S.C. 701, *et seq*., and the PRA. On February 13, 2018,[8] Defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiffs do not have Article III standing and that there has been no final agency action that would subject the review and stay to judicial review under the APA. *See* Def.'s Mot. to Dismiss, Dkt. No. 11 (Mot.).[9]

### STANDARD OF REIVEW

Defendants seek dismissal based on Rule 12(b)(1) for lack of subject matter jurisdiction, asserting that Plaintiffs do not have standing, and Rule 12(b)(6) for failure to state a claim.

Standing is a prerequisite to the existence of a "Case[ ]" or "Controvers[y]," which is itself a precondition to the exercise of federal judicial power. U.S. Const. art. III, §§ 1-2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To demonstrate standing, a plaintiff must show that she has suffered a past, ongoing, or threatened "injury in fact" that is "fairly traceable" to the defendant's actions and that is "likely to be redressed" by the relief she seeks. *Spokeo, Inc. v.*

---

[8] Defendants have not filed the certified list of the contents of the administrative record with the Court as required by Local Civil Rule 7(l), a step which will contribute to prompt resolution of the matter on the merits. Plaintiffs have previously raised this deadline with Defendants, and may seek judicial intervention to require compliance with the Rule if necessary.

[9] Although Defendants include a footnote discussion of whether the EEO-1 data collection should be construed as required by rule, they do not move to dismiss on this ground, and thus the Court need not consider nor resolve the issue now.

*Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560-61). At the pleading stage, plaintiffs are required only to "state a *plausible* claim" that each of the standing elements is present. *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017) (citing *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (2016)); *see also Lujan*, 504 U.S. at 561 ("[E]ach element [of standing] must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." (citations omitted)). A plaintiff's burden at the pleading stage is "not onerous," *NB ex rel. Peacock v. D.C.*, 682 F.3d 77, 82 (D.C. Cir. 2012) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011)), and "general factual allegations of injury resulting from [Defendants'] conduct may suffice," *id.* (quoting *Lujan*, 504 U.S. at 561).

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D. C. Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

# ARGUMENT

## I. PLAINTIFFS HAVE STANDING TO CHALLENGE THE REVIEW AND STAY OF EEO-1 PAY DATA COLLECTION.

An organization may establish standing either by direct impact to the organization itself—standing in its own right—or by injury to its members. "There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) (citing *Warth*, 422 U.S. at 511). In determining whether an organization has standing in its own right, a court "conduct[s] the same inquiry as in the case of an individual: Has the plaintiff alleged such a personal stake in the outcome of the controversy as to warrant his [or her] invocation of federal-court jurisdiction?" *Havens Realty Corp. v. Coleman*, 455 U.S. 377, 378-79 (1982). A "concrete and demonstrable injury to [an] organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests" and thus suffices for standing. *PETA*, 797 F.3d at 1093 (quoting *Havens Realty*, 455 U.S. at 379). To make this determination, "a court asks first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm." *PETA*, 797 F.3d at 1094 (citations omitted).

Plaintiffs, NWLC and LCLAA, have standing in their own right to challenge the unlawful stay based on injuries to their organizations. The Complaint sets forth detailed allegations demonstrating that OMB's unlawful stay impairs their ability to accomplish their educational and advocacy work and makes it more difficult to obtain redress and other beneficial outcomes for their clients and members under the civil rights laws. These are the types of

organizational harms repeatedly recognized by the D.C. Circuit as supporting standing. *See*, *e.g*.,
*PETA.*, 797 F.3d at 1094; *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*,
789 F.2d 931 (D.C. Cir. 1986). Impediments like those that OMB has inflicted on Plaintiffs are
costly, require them to divert resources in response, and deprive them of information that cannot
be recreated through other means. There can be no question, therefore that both Plaintiffs meet
the test for organizational standing.

As set forth in detail below, Defendants' arguments to the contrary are not persuasive,
particularly at this initial stage of litigation where Plaintiffs' factual allegations must be accepted
as true and all favorable inferences drawn therefrom. Defendants challenge the existence of any
injury by arguing that absent a statutory entitlement to the publication of aggregate pay data,
plaintiffs cannot be injured by the loss of the information. This argument misconstrues the
"statutory entitlement" line of cases: while courts relax the requirement that a plaintiff plead
factual allegations showing an actual injury where the plaintiff claims a statutory entitlement to
information that has been withheld, this line of cases does not apply where, as here, an
organizational plaintiff is *actually injured* by the deprivation of information. There is no
requirement for a statutory mandate upon a showing of actual injury, as Plaintiffs have shown
here. As alleged in the Complaint, the loss of publicly available aggregate pay data impairs
Plaintiffs' abilities to pursue their educational and advocacy missions. This is precisely the type
of actual harm that courts recognize as supporting Article III standing.

Separately from the loss of published pay data, and all but ignored by Defendants,
Plaintiffs are injured because neither covered employers nor the EEOC will possess the
comprehensive pay data, organized by sex, race, ethnicity, and job category, required by the
revised EEO-1. This result makes it more difficult for them obtain redress for clients and

beneficial outcomes for members and working women and people of color. As long-recognized in the D.C. Circuit, this type of injury is sufficient to establish standing.

Finally, the fact that the EEOC has not previously collected pay data does not make Plaintiffs' injuries any less real. But for the unlawful review and stay, employers would have been submitting data to the EEOC *next month*, meaning that OMB's stay impairs Plaintiffs' ability to accomplish daily activities from here on out.

Defendants' arguments on causation and redressability likewise fail. Plaintiffs' allegations that the EEOC would publish aggregate pay data information are neither speculative nor hypothetical. Rather, they are based on the EEOC's own stated purpose for the data collection, which included a promise to publish reports with information on aggregate pay data and pay disparities, and the EEOC's long history of publishing aggregate data collected by the EEO-1. A vacatur of the stay and return to the status quo, wherein covered employers are required to submit pay data as part of their EEO-1 filings, would remedy this and other injuries suffered by Plaintiffs.

### A.  The Stay Injures NWLC And LCLAA.

As alleged in the Complaint, the unlawful review and stay of the collection of EEO-1 pay data caused a "concrete and demonstrable injury" to NWLC and LCLAA's activities that is "more than simply a setback to the organization[s'] abstract social interests." *Havens Realty*, 455 U.S. at 379. Both organizations have to divert their limited resources as a result of the unlawful stay and both are deprived of information that cannot be fully recreated through other means. *Id*. These injuries are real hinderances, not "self-inflicted" budgetary choices. *Equal Rights Ctr. v. Post Properties, Inc.,* 633 F.3d 1136, 1139–40 (D. C. Cir. 2011). Both organizations, therefore, have suffered a legally cognizable injury.

NWLC has worked for decades to combat sex discrimination in the workplace, and has prioritized achieving equal pay for women, especially women of color. Compl. ¶¶ 14-15. As part of this work, it publishes evidence-based reports and fact sheets used to educate employers, members of the public, and federal and state policymakers about the reality of pay inequity as well as policies that promote equal pay. *Id*. ¶ 15. NWLC pursues robust enforcement of laws prohibiting pay discrimination and other forms of workplace discrimination and seeks redress for victims of such discrimination, representing individual employees bringing discrimination charges to the EEOC and referring others to attorneys willing to take on these cases through its Legal Network for Gender Equity. *Id.* It also appears as amicus and as counsel in the courts on behalf of victims of pay discrimination. *Id*. NWLC identifies, highlights, and promotes promising employer practices to close the wage gap, and works with willing employers to assist them in implementing such practices. *Id*. It also advocates for public policies that promote equal pay, including state and local pay data collection efforts. *Id*.

The unlawful stay makes it more difficult for NWLC to do this work. As described in additional detail below, the stay deprives it of valuable information that: (1) it would otherwise use in its public education and advocacy work; (2) makes it more difficult to encourage employer voluntary compliance with equal pay laws and to advocate for state and local pay data collection policies; (3) limits its ability to avail itself of avenues of redress, such as the bringing of discrimination charges to the EEOC; and (4) increases the costs it bears in pro bono representation of individuals injured by workplace discrimination. *See* Compl. ¶¶ 26-35.

LCLAA, for its part, represents the interests of approximately 2 million Latino/a trade unionists throughout the United States and Puerto Rico, as well as other non-unionized Latino/a workers. Compl. ¶ 16. It strives to assist workers in advancing their rights and to convince

employers to improve working conditions, both through advocacy and through training and counseling workers and union members. *See id*. Closing the pay gap, which especially plagues Latinas, has been central to LCLAA's work in recent years. *See id*. ¶ 17. At the national and Chapter level, LCLAA educates its members about the pay gap and how to use collective action and organizing to close it. *See id*. ¶ 18. It also conducts campaigns to raise awareness about the pay gap and possible solutions, including providing training to Chapter Presidents and providing information to mobilize members. *See id*.

The unlawful stay harms LCLAA by (1) depriving it of information it would have used in its ongoing education of its members, workers, employers, and union leaders; (2) eliminating information that would have materially improved its and its members' ability to negotiate with and educate employers; (3) making it likely that LCLAA will undertake its own expensive and less comprehensive and accurate survey of employee pay to attempt to replicate the data; and (4) warranting additional terms related to pay data to LCLAA's model contract, as well as accompanying training time. Compl. ¶¶ 36-45.

### 1. Plaintiffs' Education And Advocacy Efforts Are Harmed By The Loss Of EEOC's Publication Of Aggregate Pay Data.

Both NWLC and LCLAA would have used the EEOC's aggregate summaries of pay data in pursuit of their missions had OMB not stayed the EEO-1 pay data reporting. As part of its plan to collect pay data, the EEOC committed "to periodically publish reports on pay disparities by race, sex, industry, occupational groupings, and Metropolitan Statistical Area." 81 Fed. Reg. at 45490-91. This stated plan continued its long-standing practice of providing aggregate EEO-1

data on an annual basis, which it has done for at least 20 years.[10] Each year these reports are lost impairs NWLC's and LCLAA's ability to carry out their mission and drains their resources.

   As part of NWLC's mission to educate employers, the public, and policymakers about race and gender wage gaps, it publishes analysis and reports about workplace pay disparities. *See* Compl. ¶ 27. NWLC would have used aggregate EEO-1 pay data to strengthen these publications with additional data and analysis, and to enhance its public education campaign regarding race and gender wage gaps with newly available information regarding occupational categories, industries, and locations experiencing the largest gaps. *See* Compl. ¶ 28. The aggregate EEO-1 pay data would also have enabled NWLC to focus its resources on the jobs, industries and regions where intervention is most urgent. *See* Compl. ¶¶ 27-28. Without this data, NWLC's efforts to analyze race and gender wage gaps, educate the public on them, and target its advocacy efforts to the most urgent problems are hampered. *See id*. As a result of the unlawful stay, NWLC will have to continue relying on time-consuming analysis of Bureau of Labor Statistics and Census data to extrapolate pay disparities. *See id*. ¶ 27. NWLC staff have been diverted from pursuing other projects that are core to its organizational mission as a result, reducing NWLC's "ability to produce educational materials and sample laws and policies addressing workplace sexual harassment," preventing the preparation of "'know your rights' and legal education materials addressing issues of workplace discrimination and harassment," and forcing NWLC to forgo "significant federal advocacy efforts in support of strengthened pregnancy discrimination protections." *See id*. ¶¶ 33-35.

---

[10] *See* Job Patterns For Minorities And Women In Private Industry (EEO-1), data from 1996-2015 available at https://www.eeoc.gov/eeoc/statistics/employment/jobpat-eeo1/index.cfm.

Similarly, LCLAA issues reports periodically to educate workers, employers, and union leaders about the challenges encountered by Latinos and Latinas in the workforce. *See id.* ¶ 37. LCLAA uses these reports in advocating for policy change and enforcement, and in educating its members on ways to negotiate with employers and encourage them to follow practices that reduce workforce discrimination. *See id.* To aid those efforts, the reports discuss data compiled and published by the Government on income and employment—including EEO-1 data. In upcoming reports, LCLAA would have presented statistics on pay equity within industries and across the nation, based on the new pay data required by the revised EEO-1. *See id.* This would have materially improved LCLAA's and its members' ability to negotiate with and educate employers and to fulfill LCLAA's mission of improving the condition of Latinos and Latinas in the workforce. *See id.* ¶ 38. The unlawful stay makes that plan impossible—replication of the same information would be enormously burdensome, and likely unsuccessful given its necessarily voluntary nature. *See id.* ¶ 39. Even so, LCLAA is pursuing the possibility of conducting a survey to provide its members with this essential information, to include questions on pay equity, at significant expense. *See id.* ¶¶ 38-40. As a result, LCLAA has had to redeploy staff resources away from its daily operations to determine how to conduct the necessary survey, not to mention to determine how to fund the costs associated with conducting a survey of this nature.  This redeployment interferes with important projects like the management of a recently launched, first-of-its-kind fellowship for Latina workers and preventing "work on educational materials related to the NAFTA renegotiations, including its impact on women." *See id.* ¶¶ 43-45.

Plaintiffs' intended uses of the information, which Defendants' actions preclude, are the precise types of information uses that, for standing purposes, the D.C. Circuit found "concrete

and specific to the work in which [plaintiff is] engaged." *PETA*, 797 F.3d at 1094 (quoting

*Action Alliance*, 789 F.2d at 938). In *PETA*, the plaintiff had been injured by the USDA's delay

in enforcing the protections of the Animal Welfare Act (AWA) to birds in part because the

USDA publishes inspection reports based on AWA inspections, and PETA had relied on those

inspection reports to accomplish its mission of educating the public about the conditions under

which animals are held. The deprivation of information resulting from the failure to create

inspection reports regarding birds "perceptibly impaired" PETA's mission because it "deprived

PETA of key information that it relies on to educate the public." *Id*. at 1094-95. Defendants'

decision to abandon the EEOC's previously approved collection and reporting (or, at the very

least, to delay that collection and reporting) injures NWLC and LCLAA in identical fashion.

Similarly, in *Action Alliance*, the loss of access to information was found to injure an

organization. There, the plaintiffs, organizations that through a variety of services worked to

improve the lives of elderly individuals, sued the United States Department of Health and

Human Services (HHS) because HHS had promulgated HHS-specific regulations under the Age

Discrimination Act of 1975 (ADA) that the plaintiffs claimed restricted the flow of information

by not requiring self-evaluations and reducing compliance reports by recipients of Federal

financial assistance, inconsistent with the requirements of government-wide ADA regulations.

*Id.* at 935–37. The D.C. Circuit concluded that the plaintiffs had pleaded an injury sufficient to

establish standing because "the challenged regulations denied the plaintiffs access to information

and avenues of redress they wish to use in their routine information-dispensing, counseling, and

referral activities." *Id.* at 937–38; *see also, e.g.*, *Scientists' Institute for Public Information, Inc.*

*v. Atomic Energy Comm'n,*, 481 F.2d 1079, 1087 n. 29 (D.C. Cir. 1973) (plaintiff organization

had standing to challenge AEC decision not to issue an environmental impact statement because

the agency action limited the plaintiff's ability to carry out one of its major activities: informing the public); *cf. Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 921 (D.C. Cir. 2015) (denying standing where plaintiff did not "allege that the [agency's] action restricts the flow of information that [plaintiff] uses to educate its members"). NWLC's and LCLAA's injuries fit precisely in this line of cases.

Largely ignoring this settled caselaw, Defendants assert that an injury based on information loss is cognizable *only* if that information is specifically required by statute. *See* Mot. at 12. This is not the law governing the claims and standing allegations at issue in this case. Rather, Defendants' contention that a statutory mandate is required comes from cases enforcing statutory entitlements to information (*e.g.*, the Freedom of Information Act), in which "a plaintiff seeking to demonstrate that it has informational standing generally 'need not allege any additional harm beyond the one Congress has identified.'" *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (quoting *Spokeo*, 136 S. Ct. at 1549). Such cases—which *relax* the requirements for showing injury in certain circumstances not applicable here—are limited to specific statutory schemes where a plaintiff need do little more than show that it is entitled to the information and did not receive it. *See, e.g.*, *Kean for Cong. Comm. v. Fed. Election Comm'n*, 398 F. Supp. 2d 26, 36 (D.D.C. 2005) (explaining that plaintiffs need not "further establish an additional concrete and immediate harm" once they have shown a "failure to obtain information that, by statute, the plaintiffs had a right to have"). The doctrine of informational injury thus has a "narrow scope," *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 879 F.3d 339, 344 (D.C. Cir. 2018), but it is not the doctrine Plaintiffs rely on here.

Plaintiffs seek no relaxation of the standard for showing organizational standing, and thus the "statutory mandate" cases are inapposite. Relevant here, as the D.C. Circuit has held, an

organizational plaintiff pleads a cognizable injury where a defendants' actions result in the lack of access to information and the loss of access to information injures the plaintiff—regardless of whether that information was statutorily required. In *Action Alliance*, for example, the loss of information was due to a government's issuance of agency-specific regulations that substantially limited the information available under preexisting, government-wide regulations. 789 F.2d at 937. The court found that plaintiffs had standing because "[t]he government-wide regulations . . . afford interested individuals and organizations a generous flow of information" and the agency-specific regulations "significantly restrict[ed] that flow." *Id.*[11] As with PETA and the elderly assistance organizations in *Action Alliance*, so too here. Regardless of any statutory requirement to information, the loss of EEO-1 aggregate pay data deprives NWLC and LCLAA of key information supporting their educational and advocacy missions, and they have, therefore, suffered an organizational injury. *See also, e.g., PETA*, 797 F.3d at 1094, (finding an organizational injury resulting from loss of access to information without discussing any statutory entitlement to the information); *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 113-14 (D.D.C. 2009) (separately analyzing informational standing based on statutory entitlement and organizational standing based on the substantive harm from deprivation of the information).

The D.C. Circuit's decision in *Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity* (*EPIC*), 878 F.3d 371, 378 (D.C. Cir. 2017), upon which Defendants rely, reinforces this conclusion. Contrary to Defendants' suggestion, *EPIC* does not collapse the distinction between informational and organizational injuries. Rather, *EPIC*

---

[11] While the plaintiffs also argued that the agency-specific regulations violated the ADA, the court based its standing determination solely on the conflict between the agency-specific regulations and the government-wide regulations, not on any statutory entitlement.

held first that the plaintiff did not suffer an informational injury because the relevant statute was intended to protect individual privacy, rather than to provide a statutory entitlement to information; and second that the plaintiff did not suffer an organizational injury because the deprivation of information merely harmed its "abstract social interest." *Id.* at 378-79 (citing *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 24-25 (D.C. Cir. 2011). Nowhere did the *EPIC* decision suggest that a properly pleaded organizational injury resulting from the deprivation of information (as Plaintiffs have shown here)—as opposed to a pure informational injury—may be established only if the organization had a statutory entitlement to such information. Notably, the *EPIC* decision cites *PETA*, rather than purporting to overrule it, on the definition of organizational injury. *Id.* at 378.  As discussed above, *PETA*, and the cases it cites, turn on the organization's anticipated use of the desired information, not any question of statutory entitlement to it. *PETA*, 797 F.3d at 1094. As set forth in detail above, NWLC and LCLAA have concrete and cognizable interests in the publication of aggregate pay data (as well as in the maintenance of this pay data by covered employers and possession of the pay data by the EEOC, discussed in more detail below), and thus—unlike the plaintiff in *EPIC*— they have standing.[12]

---

[12] Notably, in contrast to *EPIC*, NWLC's and LCLAA's missions are entirely consistent with the purpose of Title VII and the EEOC's pay data collection. Title VII provides for employer-recordkeeping to make a "determination whether unlawful employment practices have been or are being committed." 42 U.S.C. § 2000e-8(c). The EEOC determined that collecting the pay data that would have been collected by the EEO-1 is necessary to enforce Title VII and other equal pay requirements. 81 Fed. Reg. at 45481. Consistent with these statutory and regulatory goals, NWLC and LCLAA are dedicated to eliminating unlawful pay discrimination against women and people of color and would have used the denied information to advance those ends. *See* Compl. ¶¶ 15, 17. Moreover, as discussed in the next section, one of NWLC's injuries resulting from Defendants' stay is its ability to obtain a "determination whether unlawful employment practices have been or are being committed," 42 U.S.C. § 2000e-8(c), the exact purpose of the underlying statute.

**2. Plaintiffs' Efforts To Obtain Favorable Outcomes For Their Clients And Members, Respectively, Are Limited By The Stay Of Pay Data Collection.**

Not only are NWLC and LCLAA injured by the loss of aggregate pay data for their education and advocacy purposes, but the unlawful stay also has hampered their ability to obtain favorable outcomes for their clients and members, and to otherwise do their work. These injuries result primarily from the fact that neither covered employers nor the EEOC will possess the EEO-1's comprehensive pay data as a result of the stay. (As such, Defendants' informational injury argument is irrelevant here.) A limitation on avenues of redress and obtaining beneficial outcomes for members is a "concrete and demonstrable injury to [an] organization's activities" sufficient to establish standing. *PETA,* 797 F.3d at 1093 (standing establishing in part based on inability to seek redress for bird abuse); *see also Abigail Alliance*, 469 F.3d at 132-33 (finding organizational standing where "[d]efendants' conduct [allegedly] frustrated [plaintiff's] efforts to assist its members and the public in accessing potentially life-saving drugs and its other activities, including counseling, referral, advocacy, and educational services").

NWLC routinely represents individual clients with pay discrimination claims requesting that the EEOC bring charges. *See* Compl. ¶¶ 29-30. With aggregate data, NWLC could compare a client's pay to industry benchmarks; even if the EEOC did not publish aggregate data, NWLC could point the EEOC to the employer-specific data the EEOC collected. Because the EEOC will lack that data, petitioning for redress will be more costly, with NWLC bearing the costs of amassing evidence about internal pay inequities and comparators' pay practices, and less effective, given the more comprehensive data the EEOC can collect through its compulsory power. *See id.* ¶ 30. The stay therefore impairs NWLC and its clients' ability to avail themselves of avenues for redress. *See* Compl. ¶¶ 29-31. In cases where sufficient evidence to convince the EEOC to investigate charges cannot be mustered without the data, the stay will close an avenue

for redress altogether. *See* Compl. ¶¶ 29-31. Indeed, the EEOC itself recognized that pay data would strengthen the ability of entities like NWLC to utilize its charge process, because it would "enhance and increase the efficiency of enforcement efforts." *See* 81 Fed. Reg. at 45480.[13] The restriction on these opportunities to seek redress is a blackletter cognizable injury. *PETA,* 797 F.3d at 1093.

NWLC's longstanding work with employers, *see* Compl ¶ 15, for the purpose of benefiting women employees, is also significantly diminished by the stay. Absent the federal mandate to collect the information at issue, NWLC will expend additional funding and staff time to engage with employers to strengthen compliance with equal pay laws and encourage implementation of practices to prevent wage gaps, including voluntary self-audits of pay practices and internal wage disparities, in order to compensate for the self-evaluation of internal wage gaps that the EEO-1 pay data collection would have required employers to undertake. *See id.* ¶ 32; *see also* 81 Fed. Reg. at 45480 (the revised EEO-1 would "facilitate employer self-evaluation and voluntary compliance").

The stay of EEO-1 pay data collection also hinders LCLAA's ability to support its members in obtaining beneficial results. Specifically, the publication of aggregate pay data by industry and location would have given LCLAA and its members valuable information in negotiating with employers. *See* Compl. ¶ 38. In addition, absent the EEO-1 requirement that employers maintain pay data themselves, employees will have to negotiate for such a term in their contracts. *See* Compl. ¶¶ 39, 41. Moreover, LCLAA is in the midst of a project aimed at creating model contract terms regarding pay equity, and, as a result of the stay, will have to

---

[13] The EEOC provides a detailed explanation of how EEO-1 pay data would be used to support its early assessment of discrimination charges in its 30-day Notice. *See* 81 Fed. Reg. 45479, 45490.

include terms related to the maintenance of pay data, which requires additional work, including the training of union leaders on the terms and relevant aspects of such negotiations. *See* Compl. ¶¶ 41-42. The unlawful stay has therefore made LCLAA's ability to serve its members' interests less effective and more costly, thereby establishing standing. *Abigail Alliance*, 469 F.3d at 132. Finally, both NWLC and LCLAA will be deprived of training on the use of aggregate pay data that the EEOC had promised to provide to "employees and their advocates," limiting their ability to obtain redress and favorable outcomes for their clients and members. *See* 81 Fed. Reg. at 45491.

### 3.  Plaintiffs' Injuries Are Cognizable Even Though The EEO-1 Had Not Previously Collected Pay Data.

Defendants assert that Plaintiffs have not been injured because pay data has not historically been collected by the EEO-1, and therefore the failure to collect the data does not create any additional costs for Plaintiffs. *See* Mot. at 16-18. This argument misrepresents the status quo and misunderstands how a plaintiff may show injury resulting from an agency's decision not to regulate (or here, to prevent the implementation of previously approved regulatory requirements).

Contrary to Defendants' representations, the status quo prior to OMB's review and stay of the pay data collection was that employers *would report pay data as of March 2018*. This requirement had been in effect for nearly a year by the time OMB halted it. Compl. ¶¶ 91-92, 95. Just as courts routinely find plaintiffs injured by agencies' decisions to delay or cancel implementation of regulations and rules that were final, but had not yet gone into effect, the fact that the EEOC had not collected pay data before the 2010-2016 regulatory process does not preclude a finding that the failure to collect the data injures Plaintiffs. *See, e.g.*, *Nat'l Venture*

*Capital Ass'n v. Duke*, --- F.3d ----, 2017 WL 5990122 at *4-7 (D.D.C. Dec. 1, 2017) (finding standing to challenge delay of rule that created new avenue for seeking immigration parole).

Moreover, even if the status quo did not include collection of pay data, under D.C. Circuit law, the consequences of Defendants' actions to halt the pay data collection must be assessed "not by reference to the status quo ante but instead to other actions [the agency] could have taken." *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014). Plaintiffs "need not show that the [agency action] rendered them worse off than the status quo ante. They may alternatively show that, had the [agency] taken the course of action that they claim the law required, they would have been better off." *Id*. (citing *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,* 663 F.3d 470, 475 (D.C. Cir. 2011) (noting that, in standing analysis, "the historical baseline is not the only possible measure of injury")); *see also Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 441 (D.C. Cir. 1998) ("The proper comparison for determining causation is not between what the agency did and the status quo before the agency acted. Rather, the proper comparison is between what the agency did and what the plaintiffs allege the agency should have done under the statute."). The "other action" here—EEOC's planned and approved collection—is thus the relevant benchmark even if it is not considered the status quo ante. *PETA* illustrates the inappropriateness of Defendants' approach: the D.C. Circuit did not question the validity of PETA's injuries, even though they resulted from the lack of reports that had never before been created. 797 F.3d. at 231.

Here, NWLC and LCLAA have made specific allegations as to how their activities are impeded as the result of the unlawful stay. Both must undertake expensive and less effective efforts to gather pay data to substitute for the aggregate data that the EEOC would have published. For NWLC, it will have to continue relying on time-consuming analysis of Bureau of

Labor Statistics and Census data by its staff. *See* Compl. ¶ 27. LCLAA is pursuing the possibility of conducting its own surveys of workers on pay equity issues, which will come at considerable expense to the organization. *See* Compl. ¶ 40. And no matter how herculean the Plaintiffs' efforts, their result will be an incomplete substitute for the comprehensive data EEOC would have collected, given Plaintiffs' lack of any compulsory power and many employers' strong motivation to withhold information that could reveal pay disparities. NWLC's ability to obtain redress for its clients will thus require additional effort and lack valuable data, as will LCLAA's ability to obtain beneficial outcomes for its members. *See* Compl. ¶¶ 29-31, 41-42. The fact that they may have engaged in these activities if the EEOC had never undertaken to collect pay data does not render them uninjured by the unlawful stay of the pay data collection that would have so plainly benefited them. *See, e.g.*, *PETA*, 797 F.3d at 1097 (finding standing where plaintiff "redirected its resources in response to [agency's] unlawful failure to provide the means by which [plaintiff] would otherwise advance its mission").

Defendants' arguments that Plaintiffs' alleged harms are ordinary program costs because Plaintiffs have done that work previously, Mot. at 15-18, are also misplaced. The fact that Plaintiffs have done this work in the past, and now must continue doing so, does not make the stay any less injurious, because the pay data collection would have reduced the resources required to pursue these objectives, thereby freeing limited resources for other mission-critical activities. *See* Compl. ¶¶ 33-35, 43-45. Had the pay data collection not been stayed, the types of activities in which NWLC and LCLAA must now engage—time-consuming research and analysis into pay data for education, advocacy, and representational purposes, advocacy for state and local public policies requiring pay data collection, and encouraging employers to collect and maintain pay data—would be less necessary. They therefore require work beyond what their

ordinary program costs would be had there been no stay. Unlike cases where ordinary program costs do not constitute standing, the stay of the pay data collection has perceptibly impaired Plaintiffs' work compared to a world in which the collection was not stayed. *Cf. Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (finding no standing because "[t]here is no evidence that [challenged statute] has subjected [plaintiff] to operational costs beyond those normally expended to review, challenge, and educate the public about revenue-related legislation").

Defendants also assert that Plaintiffs have alleged only incremental additions to pre-existing projects, pointing to LCLAA's allegations regarding how its potential pay equity survey and project regarding model contract terms have been made more expensive and difficult. Mot. at 17-18. Yet the case on which Defendants rely for this argument is easily distinguishable. In *Conservative Baptist Association of America, Inc. v. Shinseki* ("*CBAA*"), 42 F. Supp. 3d 125, 132 (D.D.C. 2014), the organizational plaintiff did not have standing to challenge allegedly discriminatory terminations of chaplains it had endorsed, where its only alleged injury was that its purpose in endorsing chaplains was frustrated—not that endorsing chaplains became more expensive, or had to take other actions in light of the terminations. The court stated, "CBAA has not alleged that VA has prevented it from endorsing chaplains; rather, CBAA remains accredited to endorse chaplains as it chooses. Nor has CBAA alleged that VA has prevented it from continuing to endorse Klender and Firtko in their capacities as chaplains." *Id.* Noting that the plaintiff had alleged only that "endorsing a chaplain is a time-consuming and resource-intensive endeavor," the court determined that the plaintiff had not shown any drain on its resources from the two allegedly discriminatory terminations, where it would have endorsed those chaplains in its ordinary course of business. *Id.* at 132.

In contrast, Plaintiffs have alleged specific activities and resource expenditures that they will have to take because the EEO-1 pay data collection was stayed, which they would not have had to take had it not been stayed. Unlike the plaintiff in *CBAA*, which only identified activities it would have done regardless of the allegedly unlawful activity, LCLAA's addition of pay data questions to a planned survey and its addition of a term related to pay data in a model contract result directly from the unlawful stay, and impose costs it would not otherwise have borne—increasing the cost of conducting and analyzing the survey and increasing the burden in finalizing the model contract, training its members on it, and negotiating obtaining employers' agreement to it. *See* Compl. ¶¶ 40-43. *See, e.g.*, *PETA*, 797 F.3d at 232 (finding standing to challenge non-enforcement of statute where plaintiff had to take additional steps, such as researching other applicable statutes, and "would not have needed to expend (or expend to the same extent) these resources" without the agency action).

Of course, Plaintiffs have and will continue to devote significant time and effort to eliminating the race and gender wage gap, but that does not make the unlawful stay any less injurious to them. In this vein, just last year, another court in this District rejected an argument made by a defendant insurance agency that the activities that a fair housing advocacy group took to counteract the defendant's allegedly discriminatory practices "cannot suffice for injury in fact" because they are "wholly consistent with the very type of education and outreach efforts that are part of [plaintiff's] stated mission." *Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 27–28 (D.D.C. 2017). The court observed that "in nearly all of the cases where an organization has standing to pursue a claim under the [Fair Housing Act], of course those organizations' activities are 'wholly consistent' with their mission of promoting fair housing." *Id.* (citations omitted). So too here, the activities that Plaintiffs must engage in to compensate for

the effects of the unlawful stay are "wholly consistent" with their mission of remedying pay discrimination. That consistency does not make the injuries any less cognizable.

### B. Plaintiffs' Injuries Were Caused By Defendants' Actions And Are Redressable By The Relief Sought.

There can be no doubt that had OMB not stayed the EEO-1 pay data collection and had EEOC not implemented that stay, covered employers would have been required to provide pay data to the EEOC as of next month and to maintain that data themselves. Among the other uses it anticipated for this data, the EEOC expected to publish periodic reports based on the pay data. As a result of OMB and EEOC's actions, that data collection has been indefinitely stayed. Defendants' actions thus necessarily caused Plaintiffs' injuries, and an order by the Court vacating the stay would correspondingly remedy those injuries.

Defendants assert that Plaintiffs have not adequately pled causation, but even their own statement of what Plaintiffs need to show proves the opposite. According to Defendants:

> Plaintiffs would need to show that but for OMB's decision: (1) the EEOC would have collected the Component 2 pay data; (2) the EEOC would have published aggregate pay data for public use based on the information collected from the EEO-1; and (3) the aggregate pay data published by the EEOC would be of a nature useful to Plaintiffs' specific advocacy efforts.

Mot. at 19.[14] This is exactly what Plaintiffs have done. First, the collection of pay data via the EEO-1 has been finalized and would have begun in March of 2018, but for OMB's decision to stay the collection and the EEOC's subsequent Federal Register Notice implementing the stay. *See* Compl. ¶¶ 70, 90-92, 99.

On the second point, Defendants assert that Plaintiffs have provided only a "bare allegation" that EEOC would publish aggregate pay data. Mot. at 19. On the contrary, Plaintiffs'

---

[14] As discussed above, this ignores that the stay injures Plaintiffs even if EEOC would not have published aggregate pay data had the stay never been imposed.

allegations on this point are based squarely on the EEOC's own stated purposes for the data

collection. *See* Compl. ¶ 83 (citing the EEOC's "30-day" Federal Register Notice). The EEOC

itself committed to: "periodically publish reports on pay disparities by race, sex, industry,

occupational groupings, and Metropolitan Statistical Area." *Id.* This commitment is consistent

with its historical practice of publishing annual reports based on aggregate EEO-1 data, in

addition to periodic industry specific reports.[15] Plaintiffs have not merely "plead[ed] [this]

causative link" as Defendants claim, but have provided specific factual allegations showing that

EEOC had made a stated commitment to do so, and that such publication was consistent with

EEOC's past practice. *Cf. Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012) ("We

take the government at its word and will hold it to it.").

Defendants' hypothesis that the EEOC could, in the future, decide not to make such

publications, despite its past practice and stated commitment to doing so, does not change the

fact that it certainly will not do so now as a direct result of the stay. This is sufficient to plead

causation. *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997) (rejecting the proposition that

injury only occurs if defendant's actions are "the very last step in the chain of causation"; even if

another agency "retains ultimate responsibility for determining whether and how a proposed

action shall go forward," "that does not exclude injury produced by determinative or coercive

effect upon the action of [the other agency]"); *City of Orangeburg, S.C. v. Fed. Energy*

*Regulatory Comm'n,* 862 F.3d 1071, 1080 (D.C. Cir. 2017) ("[T]he existence of, perhaps, an

equally important player in the story does not erase [defendant agency's] role."; 13A Charles

Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531.5, at

---

[15] *See, e.g.,* Compl. ¶ 59; EEOC, *Job Patterns for Minorities and Women in Private Industry (EEO-1),* https://www.eeoc.gov/eeoc/statistics/employment/jobpat-eeo1/index.cfm.

311-15 (3d ed. 2008) ("It may be enough that the defendant's conduct is one among multiple causes.")). The loss of aggregate EEO-1 data on employee pay is therefore not speculative, but a direct result of Defendants' actions.

Finally, on the third prong set forth by Defendants, the pay data would be useful to Plaintiffs' specific advocacy efforts and other organizational activities, for the reasons discussed above. And even if the Court doubted that the loss of aggregate pay data was caused by the unlawful stay (which it should not), Plaintiffs' other injuries do not turn on the *publication* of EEOC's reports. The stay also results in employers not compiling wage information and correlating it with race, ethnicity, sex, and job category, as would have been required, and deprives the EEOC itself of this information. *See* Compl. ¶ 97. As discussed in detail above, the impact on employers and the EEOC hinders Plaintiffs' ability to obtain redress and beneficial outcomes for their clients and members, harms that are caused directly by the unlawful stay.

The fact that the revised EEO-1 regulates entities other than Plaintiffs does not alter this conclusion. Plaintiffs may show that the lack of regulation of third parties have caused them injury with sufficient factual allegations. *See Lujan*, 504 U.S. at 561-62. Here, the data collection from covered employers was mandatory, and therefore the Court may assume that it would have occurred but for the stay. *Cf. Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940-41 (D.C. Cir. 2004) (explaining that courts can assume that third parties would not "violat[e] the law" when evaluating standing). Plaintiffs' injuries are therefore the direct consequence of the stay.

Should the Court determine that the stay of the pay data collection was unlawful, vacate the stay, and declare that the revised EEO-1 remains in effect, Plaintiffs' injuries would be

redressed. Covered employers would collect and report pay data. The EEOC would be able to use the data as it originally anticipated, including by publishing aggregate summaries.

The fact that the court's order might not *require* the EEOC to publish summary data does not alter the redressability analysis. A ruling in Plaintiffs' favor would return the EEOC to the pre-stay status quo wherein it had promised to make reports, and had a historic practice of publishing aggregate data. The EEOC is not an "independent actor" free to make "unfettered choices" about which a plaintiff must "speculate" *Cierco v. Mnuchin*, 857 F.3d 407, 419 (D.C. Cir. 2017), but a federal agency that has previously committed to perform certain actions. As the D.C. Circuit has noted, "Causation and redressability typically 'overlap as two sides of a causation coin.' ... After all, if a government action causes an injury, enjoining the action usually will redress that injury." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017)). *See also, e.g., PETA*, 797 F.3d at 1090 (holding that the plaintiff met all of the requirements of standing based in part on the deprivation of information in inspection reports, even though it was not seeking an order requiring the defendant agency to issue those reports).

## II.   THE STAY IS FINAL AGENCY ACTION REVIEWABLE BY THIS COURT.

OMB's decision to stay the EEOC's collection of employee pay data is final agency action reviewable by this Court under the two-prong standard of *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). The stay lifts a binding legal requirement obligating employers to submit pay data to the EEOC as part of their ongoing equal employment reporting obligations. Before the stay, employers were obligated to accurately report their pay data to EEOC on March 31, 2018, on penalty of fines or imprisonment; after the stay, they are not legally obligated to do so.[16]

---

[16] Because OMB made the stay open-ended and set no deadline for completing its review, the stay vacates the 2019 obligation as well. Notably, OMB and EEOC have yet to request public comment on the data collection, suggesting an intent to simply let the original authorization expire rather than complete the "reconsideration" supposedly justifying the stay.

There can be no doubt, therefore, that the stay decision "mark[s] the consummation of the agency's decisionmaking process" concerning whether the legal obligation should take effect and is "one by which rights or obligations have been determined, or from which legal consequences will flow" making it final for the purpose of APA review. *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (quoting *Bennett*, 520 U.S. at 177–78).

### A. Staying A Regulatory Mandate Is A Final Decision, Regardless Of Whether It Is Part Of A "Reconsideration" Process.

The D.C. Circuit has repeatedly stated, most recently in *Clean Air Council*, that staying the effective date of a rule is final agency action subject to judicial review. Defendants' attempt to portray OMB's action as an interlocutory decision midway through an agency's administrative process is foreclosed by this line of cases. Had OMB solely determined to "review" the previously approved collection of information pursuant to 5 C.F.R. § 1320.10(f), Defendants' argument may have had some merit. But in the words of the D.C. Circuit, "[t]he imposition of the stay, however, is an entirely different matter." *Clean Air Council*, 862 F.3d at 6.[17]

The stay of the pay data collection meets the first *Bennett* requirement, because it "marks the consummation of the agencies' decision-making process" regarding whether the revised

---

[17] *See also, e.g.*, *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 194 (2d Cir. 2004) ("[A]ltering the effective date of a duly promulgated standard could be, in substance, tantamount to an amendment or rescission of the standard[ ]."); *Env't Def. Fund, Inc. v. EPA*, 716 F.2d 915, 920 (D.C. Cir. 1983) ("[S]uspension or delayed implementation of a final regulation normally constitutes substantive rulemaking under APA § 553."); *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580 n.28 (D.C. Cir. 1981) (concluding that an order "deferring the requirement that coal operators supply life-saving equipment to miners, [that] had palpable effects upon the regulated industry and the public in general," is "a substantive rule"); *Nat. Res. Def. Council, Inc. v. EPA*, 683 F.2d 752, 762 (3d Cir. 1982) ("If the effective date were not part of an agency statement such that material alterations in that date would be subject to the rulemaking provisions of the APA, ... an agency could guide a future rule through the rulemaking process, promulgate a final rule, and then effectively repeal it, simply by indefinitely postponing its operative date." (internal quotation marks omitted)).

EEO-1 reporting requirements should presently be in effect. *See Bennett*, 520 U.S. at 177–78. In August 2017, OMB determined to "stay immediately the effectiveness of the revised aspects of the EEO-1 form." Rao Memorandum. EEOC then acceded to this decision, publishing the following in the Federal Register: "until further notice, filers subject to the EEO-1 reporting requirement should not submit aggregate W-2 income and hours worked data under Component 2 of the EEO-1." *See* Compl ¶ 99.[18] There was nothing tentative or interlocutory about the decision to lift the effectiveness of this requirement: Defendants decided to lift the reporting obligation and took action effectuating that decision. *See Clean Air Council*, 862 F.3d at 7 (a stay "'mark[s] the consummation of ... [the agency's] decisionmaking process' with respect to the final rule's effective date" (quoting *Bennett*, 520 U.S. at 178)). As the *Clean Air Council* court explained, suspending a rule's compliance deadlines pending reconsideration of the rule "is essentially an order delaying the rule's effective date, and this court has held that such orders are tantamount to amending or revoking a rule." *Clean Air Council*, 862 F.3d at 8. So too, the stay decision here is tantamount to revoking the pay data component of the EEO-1 reporting requirements set for March 31, 2018, regardless of OMB's reconsideration process.

By Defendants' reasoning, any stay accompanying a formal reconsideration process could not be challenged as final, regardless of whether the reconsideration process was accompanied by immediate and real consequences. The D.C. Circuit squarely foreclosed this argument in *Clean Air Council*, concluding that an agency's consummated decision to lift binding legal requirements (such as by staying the effective date of a rule) is final regardless of

---

[18] Defendants' footnoted assertion that the EEOC should be dismissed because there are no allegations that it engaged in unlawful conduct, *see* Mot. at 5 n.12, is therefore misplaced. The EEOC implemented the unlawful stay and is also a necessary party for relief.

whether it purports to be engaged in a reconsideration process.[19] *See Clean Air Council*, 862 F.3d at 7 (rejecting argument that proceedings concerning the stayed rule were ongoing because, "as we have explained, 'the applicable test is not whether there are further administrative proceedings available, but rather whether the impact of the order is sufficiently final to warrant review in the context of the particular case'") (quoting *Friedman v. FAA*, 841 F.3d 537, 542 (D.C. Cir. 2016)).

Defendants' discussion of the regulatory authority for OMB's planned reconsideration is therefore a non sequitur. Defendants are conflating the reconsideration process provided for by 5 C.F.R. § 1320.10(f), which, standing alone, likely would not have any final consequences, with the stay provision set forth in 5.C.F.R. § 1320.10(g), which has immediate and concrete legal consequences. Indeed, even if Defendants were right that a stay that was a necessary incident of a reconsideration process was somehow exempt from the long-standing rule applied in *Clean Air Council*, this would not be such a case. Nothing in the statutory or regulatory scheme requires OMB to stay a data collection during the review of a collection pursuant to 5 C.F.R. § 1320.10(f). To the contrary, the regulations provide different standards for a review compared to a stay. OMB may initiate a review "when relevant circumstances have changed or the burden estimates … were materially in error." 5 C.F.R. § 1320.10(f). In contrast, a data collection may only be stayed for "good cause." *Id*. § 1320.10(g). A decision to stay a data collection is necessarily separate from the decision to review an ongoing collection.

Moreover, the regulatory scheme and Defendants' own actions make it clear that the stay is not an interlocutory decision. Section 1320.10(g) itself contemplates such final consequences,

---

[19] The cases cited by Defendants at 24-25 are inapposite, because they involve ongoing agency proceedings unaccompanied by final action akin to a stay.

requiring that the collecting agency provide notice of the stay in the Federal Register. *See Ctr.*
*for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806–07 (D.C. Cir. 2006)
(identifying publication in the Federal Register as a relevant factor in determining finality). OMB
itself implicitly acknowledged the distinction between the review and the stay decisions in the
Rao Memorandum, which set forth separate (albeit extremely limited) analysis for each, and
explained that "OMB *has also decided* to stay immediately the effectiveness of revised aspects
of the EEO-1 form…"). *See* Rao Memorandum (emphasis added); *see also Ctr. for Auto Safety*,
452 F.3d at 806–07 (an "agency's expressed intentions" are relevant to whether agency action is
deemed final).

> **B.   Staying the Pay Data Collection Determines Rights and Obligations, and has
> Legal Consequences.**

The stay also affects the rights and obligations of regulated parties and has legal
consequences, thereby meeting the second prong of the *Bennett* test for finality. *See Bennett*, 520
U.S. at 178. Covered employers had a legally binding and enforceable obligation to submit
employee pay data to the EEOC, first due in March 2018, which Defendants' actions have
eliminated. Specifically, employers with 100 or more employees (and federal contractors and
subcontractors with 50 or more employees) are required by regulation to file the EEO-1. *See*
Compl. ¶ 56 (citing 29 C.F.R. § 1602.7; 41 C.F.R. § 60-1.7). False reporting subjects covered
employers to fines or imprisonment, and those that fail to report may be compelled by court
order to do so. *See* Compl. ¶ 56 n.26 (citing 29 C.F.R. §§ 1602.8, 1602.9). Because the stay
removes pay data from this compulsory requirement, it has legal consequences and is final *now*,
regardless of the outcome of OMB's "reconsideration" process. Indeed, Defendants admit that
EEO-1 filers' "obligation to submit the Component 2 pay data has been stayed during the
pendency of OMB's review." Mot. at 27. Just as *Clean Air Council*'s determination that the stay

of a rule's effective date affected the rights and obligations of regulated entities because it relieved those entities of a deadline by which they had to complete monitoring surveys and repair leaks, so too here, the stay "eliminates" the threat of enforcement for noncompliance "and thus relieves regulated parties of liability they would otherwise face." *Clean Air Council*, 862 F.3d at 7.

Defendants' novel argument that the stay must regulate Plaintiffs directly to be considered final, Mot. at 27, is refuted by well-established law. As the D.C. Circuit said in a case where home builders challenged a change in the Army Corps of Engineers' permitting process that impacted their ability to obtain permits and environmental groups intervened, "[b]ecause the Corps' [new permitting policies] mark the completion of the Corps' decision-making process and affect the [regulated entities'] day-to-day operations, they constitute final agency action *regardless of the fact that the Corps' action might carry different (or no) consequences for a different challenger*, such as an environmental group." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1281 (D.C. Cir. 2005) (emphasis added); *accord, e.g.*, *Clean Air Council*, 862 F.3d at 1 (finding a stay of a standard regulating emissions "by the oil and natural gas industries" to be final in a suit brought by "environmental organizations" not regulated by the stayed action).

Accepting Defendants' argument would lead to the nonsensical result that an agency action would be final with regard to certain entities that are directly regulated—here, the EEO-1 filers—but not final with regard to entities that are not directly regulated. The question of whether entities that are not directly regulated were sufficiently impacted in order to bring a claim is appropriate for the standing inquiry, which is why Defendants rehash their arguments

41

related to Plaintiffs' injuries here, but has no bearing on whether the agency action in question is final.

Defendants' case citations do not change this conclusion because none of them addressed an agency's action with *any* legal consequences. *See Reliable Automatic Sprinkler Co., Inc., v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003) ("Here, the agency has not yet taken the steps required under the statutory and regulatory scheme for its actions to have any legal consequences."); *DRG Funding Corp. v. Sec'y of Housing and Urban Dev.*, 76 F.3d 1212, 1215 (agency action was not final in part because there had been no "legal consequences" to any entity); *Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries, Serv.*, 730 F. Supp. 2d 157, 171-72 (D.D.C. 2010) (challenged action was not final because it "did not require or forbid any action"). In contrast, the stay here lifts covered employers' obligation to submit employee pay data without any further action. Just as in *Clean Air Council*, "because the stay relieves regulated parties of any obligation to meet the [regulatory] deadline … the order is sufficiently final to warrant review" regardless of whether the challenger is a regulated party or another entity injured by the agency action. 862 F.3d at 7.

## CONCLUSION

For the forgoing reasons, Plaintiffs' respectfully request that the Court deny Defendants' Motion to Dismiss in its entirety.

Dated: February 27, 2018                    Respectfully submitted,

                                            /s/ *Robin F. Thurston*
                                            Javier M. Guzman
                                            (DC Bar No. 462679)
                                            Robin F. Thurston (DC Bar No. pending)
                                            (*pro hac vice*)
                                            Jeffrey B. Dubner (DC Bar No. 1013399)
                                            Democracy Forward Foundation
                                            P.O. Box 34553
                                            Washington, DC 20043
                                            (202) 448-9090
                                            jguzman@democracyforward.org
                                            rthurston@democracyforward.org
                                            jdubner@democracyforward.org

                                            Fatima Goss Graves (DC Bar No. 481051)
                                            Emily J. Martin (DC Bar No. 991968)
                                            Sunu Chandy (DC Bar No. 1026045)
                                            Maya Raghu (DC Bar No. 1035558)
                                            National Women's Law Center
                                            11 Dupont Circle, NW, Ste 800
                                            Washington, DC 20036
                                            (202) 588-5180
                                            fgraves@nwlc.org
                                            emartin@nwlc.org
                                            schandy@nwlc.org
                                            mraghu@nwlc.org

                                            *Attorneys for Plaintiffs*