**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL WOMEN'S LAW CENTER, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 17-2458 (TSC) |
| OFFICE OF MANAGEMENT AND BUDGET, et al. | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

I.      PLAINTIFFS LACK ARTICLE III STANDING. ........................................................... 2

      A.      Plaintiffs Do Not Allege a Sufficiently Concrete and Particularized Injury. ......... 3

      B.      Plaintiffs Do Not Plausibly Allege That the Challenged Decision Caused
               Plaintiffs' Injuries Nor That Such Injuries Are Redressable By This Court. ......... 9

II.     THIS SUIT MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT
        CHALLENGE FINAL AGENCY ACTION. ................................................................. 11

      A.      OMB's Decision to Initiate a Review and Stay Of Component 2 Is An
               Interlocutory Decision Not Subject to Judicial Review Under the APA.............. 13

      B.      OMB's Decision to Initiate a Review and Stay of Component 2 Does Not
               Affect Any Legal Rights or Obligation of Plaintiffs. ........................................... 19

CONCLUSION............................................................................................................................. 20

i

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*,
 469 F.3d 129 (D.C. Cir. 2006), *aff'd judgment*, 495 F.3d 695 (D.C. Cir. 2007) ....................... 7

*Allen v. Wright*,
 468 U.S. 737 (1984) ..................................................................................................... 10

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
 659 F.3d 13 (D.C. Cir. 2011) ........................................................................................ 8

*AT&T Co. v. E.E.O.C.*,
 270 F.3d 973 (D.C. Cir. 2001) ..................................................................................... 19

*Bennett v. Spear*,
 520 U.S. 154 (1997) .................................................................................... 11, 12, 13, 19

*Catawaba Cty. v. EPA*,
 571 F.3d 20 (D.C. Cir. 2009) ....................................................................................... 19

*Clean Air Council v. Pruitt*,
 862 F.3d 1 (D.C. Cir. 2017) ............................................................................... 14, 17, 18

*Cierco v. Mnuchin*,
 857 F.3d 407 (D.C. Cir. 2017) ..................................................................................... 11

*CTIA-The Wireless Ass'n v. F.C.C.*,
 530 F.3d 984 (D.C. Cir. 2008) ..................................................................................... 19

*Dole v. United Steelworkers of America*,
 494 U.S. 26 (1990) ...................................................................................................... 13

*DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*,
 76 F.3d 1212 (D.C. Cir.  1996), *reh'g denied*, 83 F.3d 1482 (D.C. Cir. 1996) ................. 12, 19

*Electronic Privacy Information Center ("EPIC") v. Presidential Advisory
 Commission on Election Integrity*,
 878 F.3d 371 (D.C. Cir. 2017) .............................................................................. 3, 4, 5, 8

*Electronic Privacy Info. Ctr. v. U.S. Dep't of Educ.*,
 48 F. Supp. 3d 1 (D.D.C. 2014) ..................................................................................... 9

*Food & Water Watch, Inc. v. Vilsack*,
 808 F.3d 905 (D.C. Cir. 2015) .............................................................................. 3, 5, 6, 7

*Louisiana State v. U.S. Army Corps of Eng'rs*,
 834 F.3d 574 (5th Cir. 2016) ........................................................................................ 19

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................... 2, 10, 12

*Nat'l Ass'n of Home Builders v. Norton*,
    415 F.3d 8 (D.C. Cir. 2005) ................................................................ 12

*Nat'l Envtl. Dev. Ass'n Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ............................................................. 9

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ........................................................... 19

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 2015) .................................................... 3, 6, 9

*New England Anti-Vivisection Soc'y v. USFWS*,
    208 F. Supp. 3d 142 (D.D.C. 2016) ...................................................... 7

*Orangeburg v. FERC*,
    862 F.3d 1071 (D.C. Cir. 2017) ......................................................... 11

*People for the Ethical Treatment of Animals ("PETA") v. USDA*,
    797 F.3d 1087 (2015) ................................................................. 4, 5, 6, 7

*Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*,
    324 F.3d 726 (D.C. Cir. 2003) ........................................................... 19

*West v. Lynch*,
    845 F.3d 1228 (D.C. Cir. 2017) ........................................................... 2

## STATUTES

42 U.S.C. § 2000e-5 ............................................................................. 8

44 U.S.C. § 3501 ................................................................................ 20

44 U.S.C. § 3504 ........................................................................... *passim*

44 U.S.C. § 3506 ................................................................................ 13

44 U.S.C. § 3507 ......................................................................... 15, 16, 17, 20

44 U.S.C. § 3508 ................................................................................ 14

## REGULATIONS

5 C.F.R. Part 1320 ......................................................................... 12, 17

5 C.F.R. § 1320.10 ............................................................... 12, 14, 17, 18

Controlling Paperwork Burdens on the Public; Proposed Rulemaking,
 47 Fed. Reg. 39,515 (Sept. 8, 1982) ........................................................................ 15

Controlling Paperwork Burdens on the Public,
 48 Fed. Reg. 13,666 (Mar. 31, 1983)............................................................. 15, 16, 17

Agency Information Collection Activities: Revision of the Employer Information
 Report (EEO-1) and Comment Request,
 81 Fed. Reg. 5113 (Fe b. 1, 2016) ............................................................................ 8

**OTHER AUTHORITIES**

Daily Congressional Record S14689 (Nov. 19, 1980) ........................................... 15, 16

## INTRODUCTION

Plaintiffs have not shown that they have standing to challenge the decision of the Office of Management and Budget ("OMB") to "initiate a review and stay" of the Component 2 pay data collection established by the United States Equal Employment Opportunity Commission ("EEOC").  At the outset, Plaintiffs' assertion that they have standing is premised on their incorrect assumption that they are entitled to the EEOC's publication of aggregate pay data, notwithstanding the fact that they fail to identify any cognizable informational injury.  And Plaintiffs' attempt to manufacture a theory of organizational standing that would allow an organization to bring claims against a federal agency merely because the organization wishes that the agency had published the desired information miscomprehends the D.C. Circuit's precedent on this point.  But even if Plaintiffs' argument is sufficient to demonstrate an injury-in-fact for purposes of this Court's standing assessment, Plaintiffs fail to identify any causal link between OMB's decision to "initiate a review and stay" of the Component 2 pay data and the EEOC's purported failure to make Component 2 pay data available to the public, nor have Plaintiffs shown that their claims are redressable by this Court.

Equally flawed are Plaintiffs' Administrative Procedure Act ("APA") claims, which do not challenge final agency action within the meaning of the APA.  The Paperwork Reduction Act and its implementing regulations make clear that OMB's decision to "initiate a review and stay" of the Component 2 pay data is not the "consummation" of the agency's decision-making process, but rather the first step in the agency's reconsideration process.  Plaintiffs' reliance on cases that hold that an agency's decision to stay the effective date of a final rule is final agency action is inapposite.  OMB's decision to "initiate a review and stay" of the pay data collection was not rendered under

the procedures provided for in the APA, but under the PRA and its implementing regulations, which expressly authorize the reconsideration decision at issue in this case.

Nor does the challenged decision give rise to any "direct and appreciable legal effect." As Defendants explained in their opening brief, OMB's decision to "initiate a review and stay" has no impact on Plaintiffs, a point that they apparently concede by their failure to argue otherwise. And the temporary stay of EEO-1 filers' obligation to submit Component 2 pay data is a "consequence" that Congress contemplated when it enacted the PRA.  Under these circumstances, the Court should dismiss this suit.

## ARGUMENT

## I.   PLAINTIFFS LACK ARTICLE III STANDING.

"[T]here is no justiciable case or controversy unless the plaintiff has standing."  *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017).  Plaintiffs must affirmatively allege that "(1) [they] ha[ve] suffered a "concrete and particularized" injury (2) that is "fairly traceable to the challenged action of the defendant[s]" and (3) that is "likely" to be "redressed by a favorable decision."  *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  As Defendants explained in their opening brief, Plaintiffs cannot satisfy either of these three prerequisites of standing, and Plaintiffs' effort to prove otherwise is unavailing.  As an initial matter, Plaintiffs ignore the doctrine of informational injury and the fact that they have no statutory entitlement to the publication of aggregate pay data, attempting to create their own theory of injury, which would expose the Executive Branch to suit any time an organization wishes that an agency would disclose information that the organization might find useful.  And Plaintiffs' effort to demonstrate causation and redressability, which depends entirely on their speculation about a discretionary future action that the EEOC may take with respect to the Component 2 pay data, falls flat.

**A.      Plaintiffs Do Not Allege a Sufficiently Concrete and Particularized Injury.**

Plaintiffs complain that their alleged injuries flow from OMB's decision to "initiate a review and stay" of the Component 2 pay data collection.  *See* Opp'n to Defs.' Mot. to Dismiss Pls.' Compl. at 23, ECF No. 16 ("Pls.' Opp.").  Yet Plaintiffs have no entitlement, statutory or otherwise, to the disclosure of the Component 2 pay data.  In an effort to overcome this jurisdictional obstacle, Plaintiffs attempt to manufacture an organizational injury where none exists.  In doing so, Plaintiffs only reinforce that they are not entitled to the disclosure of aggregate pay data and, thus have not suffered a sufficiently concrete and particularized injury to confer Article III standing.

The parties do not dispute that for an organization to suffer an injury in its own right, "it must have suffered a concrete and demonstrable injury to its activities" rather than merely "a frustration of its purpose." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (internal citations omitted).  Otherwise, the organization has only identified "the type of abstract concern that does not impart standing." *Id.* (citing *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 2015)).  Determining whether the organization has alleged a sufficient interest is a two part inquiry. *Id.*  First, Plaintiffs must sufficiently allege that OMB's decision to "initiate a review and stay" of the Component 2 pay data injured their interest. *See id.*  Second, Plaintiffs must allege that they used their resources to counteract that harm. *See id.*  Plaintiffs cannot satisfy either prong of this two-part inquiry.

OMB's decision to "initiate a review and stay" of the pay data collection does not injure Plaintiffs' interest.  Contrary to Plaintiffs' assertions, *Electronic Privacy Information Center ("EPIC") v. Presidential Advisory Commission on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017), a recent D.C. Circuit opinion, is instructive on this point.  In that case, the D.C. Circuit held

3

that EPIC did not suffer either an informational or organizational injury.  "[W]ithout necessarily agreeing that [EPIC's alleged informational and organizational injuries] are in fact analytically separate," the D.C. Circuit held that "EPIC identifie[d] no organizational harm unrelated to its alleged informational injury."  *Id.* at 377-78.  So too it is here.  Plaintiffs have not identified any organizational harm unrelated to the fact that the EEOC's ability to collect (and should it choose to) publish pay data has been temporarily stayed as a result of OMB's decision to "initiate a review and stay" of the challenged collection.  As in *EPIC*, Plaintiffs' "sole theory of organization injury is that the defendants' failure to [publish aggregate pay data] injures [their] interest in using the information."  *Id.* at 378-79.  Inasmuch as Plaintiffs concede that they do not have a statutorily-based informational interest in the aggregate pay data, *see* Pls.' Opp. at 23, Plaintiffs "cannot ground organizational injury on a non-existent interest" by alleging that they would have used aggregate pay data to their benefit, and are injured without it.  *EPIC*, 878 F.3d at 379.  To hold otherwise would open the litigation flood gates to challenges to an agency's failure to disclose information useful to an organization's mission even when there is no statutory or other right to the information.

In response to this argument, Plaintiffs insist that it is irrelevant whether they can identify a statutory provision requiring the disclosure the aggregate pay data because they have suffered an injury to their organizations as a result of being denied information that they would have used to educate the public.  Pls.' Opp. at 19-25.  To support their argument, Plaintiffs rely heavily on the D.C. Circuit's decision in *People for the Ethical Treatment of Animals ("PETA") v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015).  But Plaintiffs' reliance on the *PETA* decision is misplaced.  In *PETA*, the D.C. Circuit considered whether PETA had standing to challenge the USDA's failure to promulgate regulations applying the Animal Welfare Act to birds.  *Id.* at 227.  PETA alleged that

4

the USDA's inaction harmed the organization by depriving it of inspection reports that it uses to educate the public.  *Id.* at 231.  These inspection reports would have been generated with respect to specific facilities that PETA complained were violating the Animal Welfare Act, and then made available online.  *Id.*  To determine whether the USDA's failure to promulgate regulations harmed PETA's interest, the D.C. Circuit looked to the organization's mission, which is to "prevent 'cruelty and inhumane treatment of animals'" through "public education, cruelty investigations, research, animal rescue, legislation, special events, celebrity involvement, and protest campaigns." *Id.* at 230.  The D.C. Circuit emphasized that the "primary way" that PETA accomplished its mission was by providing the public with "information about the conditions of animals held by particular exhibitors."  *Id.*  Reasoning that the denial of this investigatory information was "concrete and specific to the work in which [PETA] [was] engaged," the D.C. Circuit held that PETA's organizational interest was harmed sufficient to confer standing.  *Id.*

In later decisions, the D.C. Circuit has distinguished *PETA*.  *See, e.g. Food and Water Watch*, 808 F.3d 905; *EPIC*, 878 F.3d at 378-79.  As discussed above, and as applicable here, in *EPIC*, the D.C. Circuit distinguished the *PETA* decision by pointing out that the organizational injury at issue in that case was indistinguishable from PETA's informational injury.  *EPIC*, 878 F.3d at 378-79.  This is precisely the flaw in Plaintiffs' organizational injury here: Plaintiffs' purported organizational harm is indistinguishable from their claim that they are entitled to the disclosure of Component 2 pay data.

But even if this Court finds otherwise, *PETA* is still inapposite for the reasons set forth in the D.C. Circuit's decision in *Food and Water Watch*.  There, the D.C. Circuit considered whether the plaintiff organization had standing to challenge USDA regulations that the organization claimed would "result in an increase in foodborne illness from contaminated poultry."  808 F.3d

at 909.   Acknowledging its earlier decision in *PETA*, the D.C. Circuit explained that "an organization does not suffer an injury in fact where it 'expends resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Id.* at 920 (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434).   The *Food and Water Watch* court explained that as in *PETA*, one of Food and Water Watch's primary purposes is to "educate the public."   *Id.*   But the D.C. Circuit went on to reason that unlike in *PETA*, Food and Water Watch sought to undertake educational efforts that were not "'concrete and specific to the work' in which the organization was engaged."   *Id.*  (quoting *PETA*, 797 F.3d at 1095).   Instead, the organization's use of resources to educate the public about USDA's regulations and the dangers of consuming USDA poultry was "no more than an abstract injury to its interest."   *Id.*  Food and Water Watch's use of resources did not "perceptibly impair[]" the organization's activities "in any way." *Id.* at 921.

Although Plaintiffs argue that they were injured "in identical fashion" to the organization in *PETA*, their purported injuries are in fact akin to those that the D.C. Circuit held inadequate in *Food and Water Watch*.  Pls.' Opp. at 22.  For example, Plaintiff NWLC alleges that, as part of its mission to "educate employers, the public, and policymakers about race and gender wage gaps, it has published numerous analyses and reports about workplace pay disparities."  Pls.' Compl. ¶ 27. According to Plaintiff NWLC, aggregate pay data "would have allowed [it] to strengthen its report with additional data and analysis."  *Id.* at ¶ 28.  But this alleged injury is far from the concrete need to educate the public about specific animal welfare violations through the use of investigatory reports at issue in *PETA*.  To that point, Plaintiff NWLC seeks aggregate pay data from the EEOC simply to augment the information it already provides to its members.  *See id.*   And Plaintiff LCLAA fares no better because it seeks aggregate pay data for similar reasons.  *See id.* ¶¶ 37-38.

As in *Food and Water Watch*, Plaintiffs' respective core activities, including their respective ability to educate the public about disparities in pay, have not been "perceptibly impaired." Plaintiffs may still publish reports, as they have been doing, and unlike in *PETA*, Plaintiffs are not being deprived of any information that they are entitled to or have specifically caused the agency to collect. *See New England Anti-Vivisection Soc'y v. USFWS*, 208 F. Supp. 3d 142, 166 (D.D.C. 2016) ("It is clear from the [D.C.] Circuit's holdings . . . that having a concrete injury to an organization's interests means that the challenged activity must hamper the organization's ability to do what it does . . . ."). Plaintiffs' tortured informational harm theory is insufficient to overcome the fact that all of their alleged injuries stem from the underlying, incorrect assumption that they are entitled to aggregate pay data and expect that the EEOC will make that data available at some point in the future.

In tacit acknowledgement that lack of access to aggregate pay data from the EEOC has not sufficiently harmed their educational and advocacy interests, Plaintiffs attempt to bootstrap their alleged organizational harms to the effects of the challenged decision on the EEOC and third parties, such as the EEO-1 filers who are not before this Court. *See* Pls.' Opp. at 26. But the fact that "neither covered employers nor the EEOC will possess the EEO-1's comprehensive pay data as a result of the stay," *see id*., is irrelevant to the inquiry at hand, *i.e.*, whether OMB's decision to "initiate a review and stay" of the Component 2 pay data harmed *the organizations'* interest. *See Food & Water Watch*, 808 F.3d at 919.

And Plaintiffs' argument that if the EEOC and employers do not have this data, Plaintiffs and their clients' "ability to avail themselves of avenues for redress" will be "impair[ed]," *see* Pls.' Opp. at 26, does nothing to salvage their ability to show a viable organizational injury. Unlike in *PETA* where the agency's decision prevented the organization from seeking any redress from the

agency on issues of avian mistreatment, *see* 797 F.3d at 227, and unlike in *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) *aff'd judgment*, 495 F.3d 695 (D.C. Cir. 2007), where the agency's decision completely prevented the organization from accessing lifesaving drugs for its members, Plaintiffs' ability to seek redress for Title VII violations on behalf of their members is independently provided for by statute. *See* 42 U.S.C. § 2000e-5.  In other words, Plaintiffs' desire that the EEOC have aggregate pay data at its disposal does not prevent, much less hinder Plaintiffs' ability to seek redress from the EEOC, nor is this "desire" sufficient to confer an injury to Plaintiffs' respective organizational interest.

Equally unavailing is Plaintiffs' argument that they are injured because they will have to encourage employers to maintain aggregate pay data and engage in voluntary self-audits. *See* Pls.' Opp. at 18. This argument is belied by the fact that the EEO-1 collection "does not compel employers to collect new data but rather requires the reporting of pay data that employers maintain in the normal course of business."  Agency Information Collection Activities: Revision of the Employer Information Report (EEO-1) and Comment Request, 81 Fed. Reg. 5113, 5115 (Feb. 1, 2016).  Whether or not employers engage in self-auditing or share their data with Plaintiffs is unrelated to the OMB's decision to "initiate a review and stay" of the EEOC's collection of this data from EEO-1 filers.

Nor have Plaintiffs sufficiently alleged that they have diverted their resources to counteract their alleged harm, thus failing to satisfy the second prong of the organizational injury test.  That is because when an organization fails to identify a cognizable harm to its interest, "it follows that any resources [the organization] use[d] to counteract" the alleged harm "were a 'self-inflicted budgetary choice that cannot qualify as an injury in fact."  *EPIC*, 878 F.3d at 379 (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 24-25 (D.C. Cir.

2011)).  To that point, the fact that Plaintiffs were already engaging in the very activities they now

claim to be diversions of resources, *see* Pls.' Opp. at 18, 20, merely buttresses the conclusion that

their supposed injuries are actually ordinary program costs.[1]  *See Elec. Privacy Info. Ctr. v. U.S.*

*Dep't of Educ.*, 48 F. Supp. 3d 1, 23 (D.D.C. 2014) (reasoning that when an organization's mission

includes "advocacy and lobbying," the expenditure of funds to "promote its legislative agenda

through research, education, [and] outreach to the public and the media . . ." are "normal and

critical" parts of its mission and operations).

Plaintiffs' attempt to "convert its ordinary program costs into an injury in fact" is

impermissible under established D.C. Circuit precedent.  *See Nat'l Taxpayers Union*, 68 F.3d at

1434.  And inasmuch as Plaintiffs concede that "they may have engaged in [the activities that they

allege are a diversion of resources] if the EEOC had never undertaken to collect pay data," *see*

Pls.' Opp. at 30, Plaintiffs cannot show that they have "diverted" resources to counteract the

alleged harm imposed by OMB's decision to "initiate a review and stay" of the Component 2 pay

data.  Accordingly, because Plaintiffs have no legal interest in the discretionary publication of

aggregate pay data, any resources spent compensating for that data cannot possibly exceed

Plaintiffs' normal operational costs.

**B.**      **Plaintiffs Do Not Plausibly Allege That the Challenged Decision Caused**
             **Plaintiffs' Injuries Nor That Such Injuries Are Redressable By This Court.**

Plaintiffs' failure to allege a sufficient injury is a basis for dismissal of this suit.  But even

if Plaintiffs have adequately alleged an informational or organizational injury, Plaintiffs' failure to

---

[1] Plaintiffs' citation to a series of D.C. Circuit decisions analyzing the causation requirement of
standing evidences a misunderstanding of Defendants' argument.  *See* Pls.' Opp. at 28-29 (citing
*Nat'l Envtl. Dev. Ass'n Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014).
Defendants have not made a claim about the time at which an injury should be measured, but is
merely providing examples of Plaintiffs' ordinary activities to support the argument that
Plaintiffs have not redirected resources to counter the alleged harm to their interest.

sufficiently allege any causal link between the temporary stay of the challenged collection and its publication is also fatal to their ability to show that they have standing to bring their claims.  In an effort to avoid this conclusion, Plaintiffs argue that Defendants have conceded that absent the OMB's decision to "initiate a review and stay" of the Component 2 pay data, the EEOC would have *collected* such data, and that as a result of this concession, Plaintiffs have adequately demonstrated causation and redressability for purposes of standing.  *See* Pls.' Opp. at 33-36. Plaintiffs are wrong.  As explained in Defendants' opening brief and below, Plaintiffs are unable to demonstrate causation and redressability because the challenged decision did not *cause* Plaintiffs' alleged injuries, which are based on Plaintiffs' mistaken assumption that they are entitled to *disclosure* of such data.

Plaintiffs are not the "object of the government action" that they challenge, and therefore, it is "substantially more difficult" for them to show that their alleged injuries are fairly traceable to Defendants or that their injuries are redressable by this Court. *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). That is because when a "plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else* . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction. . . ." *Id.* (emphasis in original).  Thus, "Plaintiffs bear the burden of "adduc[ing] facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.*

But Plaintiffs have not satisfied their burden.  Even if OMB had decided not to "initiate a review and stay" of the Component 2 pay data, Plaintiffs have done nothing more than speculate that the EEOC not only would have published the challenged pay data, but would have published it in a form that would have relieved Plaintiffs of their alleged injuries.  *See* Defs.' Mem. in Support

of Defs.' Mot. to Dismiss Pls.' Compl. at 20 n.6, ECF No. 11-1 ("Defs.' Br.").  Nor may Plaintiffs

show causation by focusing on the purported effect that OMB's decision to "initiate a review and

stay" of the Component 2 pay data has on both the EEOC and EEO-1 filers.  *See* Pls.' Opp. at 35.

Plaintiffs next argue that "[t]he EEOC is not an 'independent actor' free to make 'unfettered

choices' about which a plaintiff must 'speculate,'" Pls.' Opp. at 36 (quoting *Cierco v. Mnuchin*,

857 F.3d 407, 419 (D.C. Cir. 2017)).  Plaintiffs rely on *Bennett v. Spear*, 520 U.S. 154 (1997) and

*Orangeburg v. FERC*, 862 F.3d 1017 (D.C. Cir. 2017), claiming that "it does not suffice if the

injury complained of is th[e] result [of] the *independent* action of some third party not before the

court that does not exclude injury produced by determinative or coercive effect upon the action of

someone else."  520 U.S. at 169 (internal citations omitted).  But Plaintiffs' reliance on these

decisions is misplaced given that the EEOC is under no statutory obligation to publish Component

2 pay data.  *See* Defs.' Br. at 12-14.   Thus, even if this Court concluded that OMB's decision to

"initiate a review and stay" of the Component 2 pay data was unlawful, the EEOC would still be

under no obligation to publish the aggregate pay data.

Moreover, Plaintiffs cannot show that EEOC would be able to publish the pay data in a

form useful to Plaintiffs.  *See id.* at 20 n.6.  This is particularly so given that the EEOC has never

before collected pay data and thus determined whether it is able to publish the data in a form that

does not implicate confidentiality or privacy concerns.  *See id.*  In the absence of "facts showing

that those choices have been or will be made," Plaintiffs have failed to satisfy the causation

requirement.  *Lujan*, 504 U.S. at 562.

## II.    THIS SUIT MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT CHALLENGE FINAL AGENCY ACTION.

To constitute final agency action within the meaning of the APA, the challenged action

must both "mark the consummation of the agency's decision-making process" and "be one [from]

11

which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78.  Failure to satisfy either one of these two prerequisites to APA review, renders the challenged action unreviewable.  *See Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005).  This is the fate of Plaintiffs' challenge to OMB's August 2017 decision to "initiate a review and stay" of the Component 2 pay data.

As Defendants explained in their opening brief and as emphasized in OMB's August 2017 letter, the decision "to initiate a review and stay" of the Component 2 pay data collection is the first step in OMB's multi-step reconsideration process, a process which includes consultation with the EEOC to address the concerns raised in the August 2017 letter and the administrative processes set forth in 5 C.F.R. Part 1320.  *See* Defs.' Br. at 5-6 (citing 44 U.S.C. §§ 3504(a)(1)(A), (a)(1)(B)(i), (c)(1) & 5 C.F.R. §§ 1320.10(f), (g)); *see also id.* at 20-26.  And this reconsideration process is designed to result in a final (and thus reviewable) approval or disapproval decision by OMB.  *See id.*  Thus, the agency's decision to "initiate a review and stay" of the challenged collection is merely an interlocutory step that does not reflect the agency's "definitive position" either approving or disapproving of the EEOC's pay data collection.  *DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir.  1996), *reh'g denied*, 83 F.3d 1482 (D.C. Cir. 1996).

Nor does the decision to "initiate a review and stay" of the Component 2 pay data give rise to "direct and appreciable legal consequences" nor "create rights or obligations."  *Bennett*, 520 U.S. at 177-78.  The challenged decision does not adversely affect EEO-1 filers, whose obligation to submit the Component 2 data has been stayed during the pendency of OMB's reconsideration process, and the decision has no impact on Plaintiffs, who were never required to submit pay data

and whose purported "interest" in the pay data could be adversely affected only if, at the end of the reconsideration process, OMB disapproves the collection of pay data in Component 2. *Id.*

And nothing in Plaintiffs' opposition brief compels a different conclusion on either score. Plaintiffs' insistence that the decision to initiate a review and stay is itself a final decision, *see* Pls.' Opp. at 37-40, is belied by the statutory and regulatory framework of the PRA, under which OMB has the authority to reconsider collections of information such as the one at issue here. Similarly unavailing is Plaintiffs' argument that OMB's decision to initiate a review and stay of the challenged collection has appreciable legal consequences sufficient to satisfy the second prong of the *Bennett* test. Because Plaintiffs do not challenge final agency action within the meaning of the APA, Plaintiffs' claims must be dismissed.

### A. OMB's Decision to Initiate a Review and Stay Of Component 2 Is An Interlocutory Decision Not Subject to Judicial Review Under the APA.

As Defendants explained in their opening brief, when Congress enacted the PRA, it "designated OMB the overseer of other agencies with respect to paperwork and set forth a comprehensive scheme designed to reduce the paperwork burden." *Dole v. United Steelworkers of America*, 494 U.S. 26, 32 (1990); *see also* 44 U.S.C. § 3504(a)(1)(B)(i). Pursuant to the PRA's statutory framework, agencies that seek to collect information from the public or regulated entities must evaluate, *inter alia*, the need for a proposed collection of information and the burden imposed by the same. *See* 44 U.S.C. § 3506(c)(1)(A)(i), (iv). But the PRA also establishes "a second layer of review by OMB." *Dole*, 494 U.S. at 33. Under this "second layer of review," OMB may not grant its approval of an agency's proposed collection of information without first determining "whether the collection of information by the agency is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility." Defs.' Br. at 3 (citing 44 U.S.C. § 3508). And as relevant here, under the PRA's "second layer of review,"

OMB is charged with monitoring collections of information for continued compliance with the Act and its regulatory requirements even after OMB approval.  *See id.* at 5 (citing 44 U.S.C. §§ 3504(a)(1)(A), (a)(1)(B)(i), (c)(1) & 5 C.F.R. §§ 1320.10(f), (g)).  As Defendants have explained, "at any time prior to the expiration of the approval period, after consultation with the agency, OMB may reconsider its approval of a collection of information, and with respect to collections of information not contained in a rule, stay the effectiveness of its prior approval of the information collection pending reconsideration."  *Id.*

Plaintiffs dismiss this statutory-required oversight, *i.e.*, OMB's authority to review an approved collection of information, as a "non sequitur," arguing that the decision to "stay[] the effective date of a final rule" is judicially reviewable.  Pls.' Opp. at 37, 39.  In support of their argument, Plaintiffs rely heavily on the D.C. Circuit's decision in *Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017), which Plaintiffs claim "squarely foreclose[s]" any argument that the decision to "initiate a review and stay" is not final agency action.  Pls.' Opp. at 38.  The flaw in Plaintiffs' argument is that OMB's reconsideration of the collection at issue here is not akin to staying the effective date of a final rule.  Congress was well aware of this distinction when it amended provisions of the bill that would become the PRA in 1980 to avoid a potential conflict with the APA's procedures governing the promulgation of rules by enacting § 3507(d), which limits OMB's otherwise broad authority with respect to collections of information "contained in" rules.

As OMB has explained, "[f]or information collection requests specifically contained in proposed rules, Section [3507(d)] of the Act establishes procedures designed to accommodate OMB's review with notice and comment procedures under the Administrative Procedure Act (5 U.S.C. Chapter 5)."  Controlling Paperwork Burdens on the Public; Proposed Rulemaking, 47 Fed.

Reg. 39,515, 39,522 (Sept. 8, 1982).  Section 3507(d) of the PRA "was crafted as a specific limitation on OMB's broad authority to review information collection requests under [§] 3507. *See* Daily Congressional Record S14689 (Nov. 19, 1980) (Sen. Kennedy)." *Id.*  Thus, under § 3507 of the PRA, "(1) OMB must comment on an information collection request contained in a proposed rule within 60 days of its publication or forfeit its right to disapprove the request; and (2) if OMB does file comments and the agency responds to those comments, OMB can disapprove the request only if the agency's response was 'unreasonable.'" *Id.*; *see also* 44 U.S.C. §§ 3507(d)(3), (4)(C).

As noted briefly above, Congress incorporated this amendment during the PRA's development.  Prior to the amendment, the Act "did not distinguish" between collections of information contained in proposed rules and their finalized versions and collections of information not contained in rules, *e.g.*, in forms.  Controlling Paperwork Burdens on the Public, 48 Fed. Reg. 13,666, 13,668-69 (Mar. 31, 1983).  Under the pre-amendment language, "OMB's authority over paperwork requirements in regulations could disrupt public participation rights under the informal rulemaking provisions of the Administrative Procedure Act."  48 Fed. Reg. at 13,667. Accordingly, Congress included § 3507(d), under which OMB may provide comment during an agency's rulemaking proceedings and limits OMB's authority to disapprove collections of information contained in proposed rules and their finalized versions to circumstances in which the agency's response to OMB's public comment is "unreasonable." 44 U.S.C. §§ 3507(d)(3), (4)(C).

There is, however, no such procedural limitation on OMB's authority to review collections of information not contained in a rule, such as the EEOC's Component 2 pay data collection.  *See* 44 U.S.C. § 3507(c).  Rather, the procedures for public comment set forth in § 3507(c) of the PRA govern collections of information *not* contained in a proposed rule.  In other words, unlike

15

collections of information contained *in a proposed rule*, which must comply with the procedural requirements of the APA, there is no such requirement for collections of information that are not contained in a proposed rule.  Implicit in Congress's decision to grant OMB broad authority with respect to collections of information not contained in a rule is its recognition that these types of collections of information do not implicate the same concerns regarding OMB's ability to "disrupt public participation rights" as do collections of information that are subject to the APA's notice-and-comment procedures.  *See* 48 Fed. Reg. at 13,667 (explaining that the purpose of the amendment to § 3507 "is to prevent OMB from undoing a collection of information requirement specifically contained in an agency rule after that requirement has gone through the administrative rulemaking process" (citing Daily Congressional Record S14689-90 (Nov. 19, 1980)).

The PRA's substantive distinction between the two types of collections of information undermines Plaintiffs' argument that OMB's decision to "initiate a stay and review" of the Component 2 pay data is akin to an agency's stay of the effective date of a regulation.  Congress expressly designed procedures to govern collections of information not contained in a proposed rule, *see* 44 U.S.C. § 3507(c), including the provisions governing OMB's authority to reconsider its approval of the same.  *See id.* §§ 3504(a)(1)(A), (a)(1)(B)(i), (c)(1).  This is further buttressed by the flexible authority the PRA grants OMB to determine the duration of its approval of a collection of information, such as the one challenged here, up to three years, *see id.* § 3507(g), and the fact that the Act does not "obligate OMB to set a fixed and unchanging expiration date."  48 Fed. Reg. at 13,683; *see also* 44 U.S.C. § 3507(g).  Thus, pursuant to its delegated rulemaking authority, OMB has "expressly condition[ed] all expiration dates on [its] right to reconsider [the collection of information] at a later date."  48 Fed. Reg. at 13683; *see also* 5 C.F.R. § 1320.10(f), (g).  As Defendants explained in their opening brief, *see* Defs.' Br. at 25, OMB's authority to

16

reconsider its approval of collections of information in advance of the expiration date "'has been the established practice under both the Paperwork Reduction Act and its predecessor, the Federal Reports Act.'" *Id.* at 23 (quoting 48 Fed. Reg. at 13,683). This "established" practice includes both OMB's authority to review and stay a previously-approved collection of information *not* contained in a rule "pending" OMB's reconsideration process.[2] 5 C.F.R. §§ 1320.10(f), (g).

As the foregoing demonstrates, OMB's reconsideration processes are indeed relevant to this Court's determination of whether OMB's decision to "initiate a review and stay" of the EEOC's Component 2 pay data "marks the consummation of the agency's decision-making process." The answer to that question is "no." The challenged decision is simply the first step in OMB's reconsideration process, which is governed by the provisions in 5 C.F.R. Part 1320. The D.C. Circuit's decision in *Clean Air Council* does not compel a different conclusion. *Clean Air Council* involved a challenge to the Environmental Protection Agency's decision to stay implementation of portions of a final rule, the latter of which the agency had promulgated pursuant to the APA's informal rulemaking proceedings. 862 F.3d at 6-7. In rejecting the EPA's argument that its decision to stay the effective date of a final rule was not reviewable under the APA, the D.C. Circuit reasoned that "'an agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked' and 'may not alter [such a rule] without notice and comment.'" *Id.* at 9.

But the EEOC's Component 2 pay data collection is not subject to the procedures for legislative rules under the APA. Rather, under OMB's regulations, the Component 2 pay data is

---

[2] In contrast, OMB's regulations do not provide any procedures for the agency to stay a collection of information contained in a rule. *Compare* 5 C.F.R. § 1320.10(i) (procedures governing OMB's review of a currently approved collection of information in a current rule), *with id.* § 1320.10(f), (g) (setting forth the procedures governing OMB's review and stay of a collection of information not contained in a proposed or currently-approved rule).

a collection of information *not* contained in a rule and was finally approved under the procedures set forth in § 3507(c) of the PRA.  In other words, Congress has determined that collections of information subject to the procedures in § 3507(c), such as the one at issue in this case, do not implicate the same concerns about potentially undoing or disrupting the public's "participation rights" attendant with an agency's informal rulemaking.  Indeed, the PRA obligates OMB to monitor and review collections of information after their approval, *see* 44 U.S.C. § 3504(a)(1)(B)(i), and establishes procedures with which the agency may reconsider its prior approval where, as here, it is concerned about the collection's continued compliance with the requirements of the PRA.  *See* 44 U.S.C. §§ 3504(a)(1)(A), (a)(1)(B)(i), (c)(1) & 5 C.F.R. §§ 1320.10(f), (g).  Thus, the D.C. Circuit's *Clean Air Council* decision holding that the stay of the effective date of a final rule is final agency action within the meaning of the APA is inapposite to facts in this case.

OMB's decision to "initiate a review and stay" under the PRA and its implementing regulations is the first step in OMB's reconsideration process, a process that is designed to result in either a final approval or disapproval of the challenged collection.  Because OMB's decision to "initiate a review and stay" pursuant to § 1310.10(f) and (g) is a preliminary determination and, at this stage, it is not possible to determine whether the outcome of OMB's reconsideration of Component 2 will be to "approve [or] disapprove" the collection, *see CTIA-The Wireless Ass'n v. F.C.C.*, 530 F.3d 984, 987 (D.C. Cir. 2008), the challenged decision does not "mark[] the consummation of the agency's decisionmaking" and therefore is not final agency action within the meaning of the APA.  *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003).  On this basis alone, the Court should dismiss Plaintiffs' suit.

**B.  OMB's Decision to Initiate a Review and Stay of Component 2 Does Not Affect Any Legal Rights or Obligation of Plaintiffs.**

As noted above, because the challenged decision does not mark the consummation of OMB's decision-making process with respect to its reconsideration of the Component 2 pay data, Plaintiffs do not challenge final agency action within the meaning of the APA, and their claims merit dismissal on this basis alone.  *See DRG Funding Corp.*, 76 F.3d at 1214.  But even if the Court finds otherwise, the challenged decision fails the second prong of the *Bennett* test:  OMB's decision to "initiate a review and stay" does not create "rights or obligations," nor do legal consequences flow from the decision.  *Id.* at 1215.  As the D.C. Circuit has expressly observed (and contrary to Plaintiffs' claims otherwise), "[t]he most important factor [with respect to this inquiry] concerns the actual legal effect (or lack thereof) of the agency action in question on *regulated entities*."  *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (citing, among other cases, *Catawaba Cty. v. EPA*, 571 F.3d 20, 33-34 (D.C. Cir. 2009)) (emphasis added).  Courts analyzing this prong of the *Bennett* test focus on whether the challenged agency action gives rise to "direct and appreciable legal consequences," *see Bennett*, 520 U.S. at 178, that, for example, "inflict injury," *see AT&T Co. v. E.E.O.C.*, 270 F.3d 973, 976 (D.C. Cir. 2001), or risk "exposure to civil or criminal liability," *see Louisiana State v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 584 (5th Cir. 2016).

OMB's decision to "initiate a review and stay" of the EEOC's Component 2 pay data does not "inflict" any of these injuries.  It simply stays some of the obligations of EEO-1 filers during the pendency of the reconsideration process.  *See* Defs.' Br. at 27.   Moreover, Congress clearly contemplated this "consequence" of OMB's decision to stay a collection of information request subject to OMB's reconsideration when it granted OMB the authority to reconsider its prior approvals under the PRA.  *See* 44 U.S.C. § 3507(g) ("The Director may not approve a collection

19

of information for a period in excess of 3 years."; *see also id.* § 3501(1) (stating that one of the purposes of the PRA is to "minimize the paperwork burden for individuals, small businesses . . . and other persons resulting from the collection of information by . . . the Federal Government"). Under these circumstances, the Court should find that OMB's decision to "initiate a review and stay" of the Component 2 pay data is not final agency action within the meaning of the APA and dismiss this suit.

<u>**CONCLUSION**</u>

For the foregoing reasons and those set forth in Defendants' opening brief, Plaintiffs lack standing to bring their claims.  Alternatively, Plaintiffs do not challenge final agency action and therefore the claims are unreviewable under the APA.  Either of these reasons provides a basis for this Court to dismiss Plaintiffs' Complaint.

Dated:  March 9, 2018

Respectfully submitted,
CHAD A. READLER
Acting Assistant Attorney General

JESSIE K. LIU
U.S. Attorney for the District of Columbia

CARLOTTA WELLS
Assistant Branch Director, Federal Programs Branch

/s/ *Tamra T. Moore*
Tamra T. Moore (DC Bar No. 488392)
Rachael L. Westmoreland (GA Bar No. 539498)
Trial Attorneys
Federal Programs Branch
U.S. Department of Justice, Civil Division
Telephone:  (202) 305-8628
Fax:  (202) 305-8517
Email:  Tamra.Moore@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, DC 20044

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that Defendants' Reply in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint was served on all counsel of record via the Court's CM/ECF system on this 9th day of March 2018.


*/s/ Tamra T. Moore*
TAMRA T. MOORE