**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL WOMEN'S LAW CENTER, *et al*., | : <br> : <br> : <br> : |
| *Plaintiffs*, | : <br> : |
| vs. | Civil Action No. 17-2458 (TSC) <br> : <br> : |
| OFFICE OF MANAGEMENT AND BUDGET, *et al*., | : <br> : <br> : <br> : |
| *Defendants*. | : <br> : |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiffs, National Women's Law Center ("NWLC") and the Labor Council for Latin American Advancement ("LCLAA") challenge the Office of Management and Budget's ("OMB") decision to halt suddenly and indefinitely a collection of pay data conducted by the Equal Employment Opportunity Commission ("EEOC") pursuant to Title VII of the Civil Rights Act of 1964. After a six year process, the EEOC had determined that this data collection was necessary to enforce pay discrimination laws, a pressing concern given the persistent pay disparities across lines of gender, race, and ethnicity. The EEOC's plan had been approved by OMB under the Paperwork Reduction Act ("PRA") in September 2016 with the first scheduled collection due in March 2018. Less than twelve months after that approval, OMB reversed course and stayed this collection without notice and via a one-and-a-half-page memorandum bereft of any reasoned explanation.

This stay was illegal. OMB claimed that it was required because the EEOC did not provide instructions for how to format the reporting spreadsheet until after OMB's initial approval. Given that the EEOC had earlier provided an example of the spreadsheet itself as part of the PRA process with OMB's approval, this explanation is not credible. And that explanation was the high-water mark of OMB's reasoning. OMB provided no other justification, aside from parroting statutory standards, for its action. Its paltry explanation failed to establish any of the requirements for a stay under its own regulations—that a relevant condition had changed, that the original burden estimates were materially in error, or that good cause existed. OMB's action was also arbitrary and capricious because it did not provide a reasoned explanation or account for or explain the abrupt reversal in position. And by staying a collection of information that the

EEOC had found necessary to enforce civil rights laws, OMB violated the PRA's requirement

that it not encroach on agencies' authority to enforce these laws.

OMB's stay therefore must be vacated.

## BACKGROUND

### I.    The Paperwork Reduction Act

The Paperwork Reduction Act, 44 U.S.C. §§ 3501, *et seq*., seeks to "improve the quality

and use of Federal information to strengthen decisionmaking, accountability, and openness in

Government and society." 44 U.S.C. § 3501(4). To that end, the PRA attempts to strike a balance

between "ensur[ing] the greatest possible public benefit from and maximiz[ing] the utility of

information" collected by the federal government and minimizing the paperwork burden

imposed on individuals, entities, and State, local and tribal governments from whom information

is collected. *Id.* § 3501(2).

The PRA establishes a process by which agencies obtain approval from OMB to collect

certain types of information from the public. The agency must first conduct its own evaluation of

the plan for a proposed information collection, including the need for the information and the

burden imposed by collection. 44 U.S.C. § 3506(c)(1)(A). In most cases, the PRA requires that

an agency publish a "sixty-day notice" in the Federal Register soliciting public comment on the

agency's proposed collection. 44 U.S.C. § 3506(c)(2)(A). After the conclusion of the sixty-day

comment period, the agency's internal consideration of the public's comments, and any

appropriate revisions, the agency then submits the proposed collection of information to OMB

and publishes a second notice in the Federal Register to announce the start of OMB review and a

thirty-day comment period (typically referred to as the "Thirty-day" notice). 44 U.S.C. §

3507(a)-(b). The second notice informs the public about how to submit comments to OMB and

that OMB may act on the agency's request only after the comment period has closed.

After these two public comment periods, OMB may approve or disapprove the proposed collection of information. 44 U.S.C. § 3507(c). Approval requires a determination by OMB that the collection of information "is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility." 44 U.S.C. § 3508. An OMB approval of a collection of information lasts for up to three years, after which the agency must seek an extension of OMB's approval if it wishes to continue the collection of information. 44 U.S.C. § 3507(g)-(h).

OMB's approval authority is cabined in two respects pertinent here. First, the PRA does not confer substantive lawmaking authority on OMB. Its approval or disapproval under the PRA cannot interfere with an agency's enforcement of civil rights laws. 44 U.S.C. § 3518(e) ("[n]othing in this subchapter shall be interpreted as increasing … the authority of [OMB] with respect to … the substantive authority of any Federal agency to enforce the civil rights laws"). Second, under its regulations, OMB may "review" (which is OMB's term of art for reconsideration) an ongoing and previously approved collection of information only when "relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error." 5 C.F.R. § 1320.10(f). In that circumstance, if the information collection is not contained in a current rule, OMB may stay the prior approval, but only for "good cause." 5 C.F.R. § 1320.10(g).

## II. The EEO-1

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.*, requires employers to "make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed," to preserve such records, and to produce reports as the EEOC prescribes by regulation or order. 42 U.S.C. § 2000e-8(c). Pursuant to this statutory authority, since 1966, the EEOC by regulation has required that employers with one hundred or

more employees file with the EEOC a survey known as the "Employer Information Report EEO-1" ("EEO-1"). 29 C.F.R. § 1602.7. This requirement also applies to certain federal contractors and subcontractors with more than fifty employees, for whom it is enforced by the Office of Federal Contract Compliance Programs ("OFCCP") in the U.S. Department of Labor. 41 CFR § 60-1.7. The EEOC has from time to time revised the information to be submitted in the EEO-1, and, before the revision requiring submission of pay data information, had long directed covered employers to report annually the number of individuals employed by job category and by sex, race, and ethnicity. *See* Agency Information Collection Activities: Revision of the Employer Information Report, 81 Fed. Reg. 5113, 5115 (Feb. 1, 2016) ("Sixty-Day Notice").[1] At all times relevant to this litigation, the EEO-1 included seven race and ethnicity categories and ten job categories. *Id*. at 5114.

The EEOC and OFCCP use EEO-1 data to support civil rights enforcement and to analyze and inform the public about employment patterns, such as the representation of women and minorities within companies, industries, or regions. *See* Agency Information Collection Activities: Notice of Submission for OMB Review, 81 Fed. Reg. 45,479, 45,481 (July 14, 2016) ("Thirty-Day Notice"). EEO-1 data also helps to show trends regarding hiring, promotions, and employee turnover within certain sectors. *Id*. at 45,491. Although the EEOC keeps individually identifiable information confidential, it makes aggregate EEO-1 information for major

---

[1] The EEOC's consistent practice as to the EEO-1 has been to release data file specifications after receiving OMB approval for its information collection. *See, e.g.*, Agency Information Collection Activities: Notice of Submission for OMB Review, 70 Fed. Reg. 71,294, 71,300-1 (Nov. 28, 2005) (noting that the EEOC had introduced online filing in 2003, but providing no information regarding data file specifications); Agency Information Collection Activities: Proposed Collection; Submission for OMB Review, 79 Fed. Reg. 72,678 (Dec. 8, 2014) (submission for renewal of approval of EEO-1, providing no information regarding data file specifications).

geographic areas and industry groups publicly available and periodically publishes special reports based on EEO-1 data.[2]

### III.    The EEOC's administrative process preceding its revision of the EEO-1

The EEOC's decision to collect pay data at issue here resulted from a years-long interagency process of careful study and robust public comment.

First, in 2010, the EEOC joined other federal agencies to identify ways to improve enforcement of federal laws prohibiting pay discrimination. Sixty-Day Notice at 5114. Thereafter, the EEOC commissioned multiple studies regarding how to collect pay data most efficiently and effectively to support its pay discrimination enforcement efforts. *Id*. The first study "recognized the potential value for [Title VII] enforcement of collecting pay data from employers by sex, race, and national origin through a survey such as the EEO-1" and recommended a pilot study "to inform the parameters for any pay data collection." *Id*. The second study, which was the recommended pilot study, made several technical recommendations, including the unit of pay to be collected, and employer burden-hour costs. *Id*. The EEOC also conducted a two-day meeting in March 2012 with employer representatives, statisticians, human resources information systems experts, and information technology specialists. *Id*. at 5115. This work group provided "feedback from participants that the burden of reporting pay data would be minimal for EEO-1 filers." *Id*. Following its own separate

---

[2] *See* EEOC, *Job Patterns for Minorities and Women in Private Industry (EEO-1)*, https://www.eeoc.gov/eeoc/statistics/employment/jobpat-eeo1/; EEOC, *Special Reports*, https://www.eeoc.gov/eeoc/statistics/reports/index.cfm.

administrative process, OFCCP determined to coordinate with the EEOC on pay data collection. *Id*.[3]

### A.  **EEOC's Sixty-Day Notice**

On February 1, 2016, following this interagency process, the EEOC determined to revise the EEO-1 to include a pay data collection and published a Federal Register notice to this effect requesting public comments. *Id*. at 5113. This was the first of the two anticipated PRA federal register notices. *Id*. This notice specified the exact data that employers would be required to provide so that potential commenters could evaluate them. *Id.* at 5117-19. Specifically, the EEOC proposed revising the EEO-1 to collect aggregate W-2 data in twelve pay bands for the ten existing EEO-1 job categories. *Id*. at 5117. The EEOC identified the precise pay bands it intended to use. *Id*. The job categories and race/ethnicity and gender designations remained the same as in prior EEO-1 reporting years. *Id*. at 5118. The EEOC also proposed collecting the total number of hours worked by the employees included in each EEO-1 pay band cell, as recommended by the EEOC's pilot study, and specifically sought employer input on this point. *Id*. at 5117.

To provide further clarity, the EEOC explained, "Employers will simply count and report the number of employees in each pay band. For example, a filer will report on the EEO-1 that it employs 3 African American women as professionals in the highest pay band." *Id*. EEOC also provided a weblink to a sample data collection form. *Id*. at 5118. *See also* Decl. of Benjamin Link in Support of Pls.' Mot. for Summary J. ("Link Decl.") ¶ 3. A copy of this illustration, a spreadsheet, is attached as Exhibit A to the Link Declaration. The EEOC explained that it

---

[3] OFCCP's public process is described in the Sixty-Day Notice, and included a Notice of Proposed Rulemaking, with opportunity for public comment, and interagency consultation. Sixty-Day Notice at 5115.

anticipated employers would provide the information either via online filing or by uploading an electronic file. Sixty-Day Notice at 5120. As required by the PRA, the EEOC estimated the number of reporting hours it would take EEO-1 filers to submit the revised data collection, concluding that the pay data collection would increase the reporting time per filer by 3.2 hours, up to a total of 6.6 hours. *Id*. at 5118-19.

The EEOC received 322 timely comments in response to the Sixty-Day Notice, many of which were compilations of supportive comments from thousands of individuals. Thirty-Day Notice at 45,480. Plaintiff NWLC submitted a comment, as did employers, employer associations, Members of Congress, civil rights groups, women's organizations, labor unions, industry groups, law firms, human resource organizations, and individual members of the public. *Id*.; *see also* Link Decl. ¶ 14, Ex. J. Several commenters commented on the EEOC's statement that it anticipated collecting the revised EEO-1 data either via an uploaded data file or by employers filling the information out online. *See*, *e.g*., Link Decl. ¶ 15, Ex. K at 11-12; ¶ 16, Ex. L at 5.

On March 16, 2016, the EEOC held a public hearing on its proposed pay data collection and heard testimony from witnesses who represented the views of employers, employees, and academics. Thirty-Day Notice at 45,480.

**B.  The EEOC's Thirty-Day Notice**

On July 14, 2016, the EEOC published a second Federal Register notice, announcing that it was submitting to OMB a request for a three-year PRA approval of the revised EEO-1, and soliciting comments for submission both to OMB and the EEOC. 30-Day Notice at 45,495. The Thirty-Day Notice set forth the EEOC's conclusion that revisions to the EEO-1 were necessary for the enforcement of equal pay laws. *Id.* at 45,481-83. The EEOC explained that:

> Based on federal data and a robust body of research, the Commission concludes that: (1) [p]ersistent pay gaps continue to exist in the U.S. workforce correlated with sex, race, and ethnicity; (2) workplace discrimination is an important contributing factor to these pay disparities; and (3) implementing the proposed EEO-1 pay data collection will improve the EEOC's ability to efficiently and effectively structure its investigation of pay discrimination charges.

*Id.* at 45,481. The EEOC stated that it would use the collection of pay data in multiple ways, including: (1) to support its enforcement efforts, by enabling its staff to use statistical analysis to assist in an early assessment of pay discrimination charges against an employer; (2) to periodically publish reports on pay disparities by race, sex, industry, occupational groupings, and Metropolitan Statistical Area; and (3) to provide training and outreach both internally and to employers and other stakeholders on, among other things, how to use the reports. *Id*. at 45,490-91. OFCCP would use the data in similar ways. *Id*. at 45,483.

The EEOC discussed the method of data collection in detail in the Thirty-Day Notice. It determined that it would maintain the proposal to collect W2 and hours worked data in twelve pay bands for the ten EEO-1 job categories. *Id*. at 45,489. It explained that, along with OFCCP, it used "an online EEO-1 portal for the confidential filing of EEO-1 reports, either by digital upload or by data entry onto a password-protected, partially pre-populated digital EEO-1." *Id*. at 45,493. It noted that while it had previously concluded that "most employers would be filing the EEO-1 with a digital file upload by the time they file their EEO-1 reports for 2017 and 2018", several commenters observed that they used data uploads less frequently than this projection. *Id*. This was consistent with past EEO-1 reporting practice showing that ninety-eight percent of employers entered data rather than uploaded it. Sixty-Day Notice at 5119 n.55, 5120 n.62. Accordingly, the EEOC adjusted "its methodology for calculating PRA annual burden." *Id.* at 45,493. This change increased the total number of burden hours that the EEOC estimated an employer would need to complete the annual EEO-1 filing. Thirty-Day Notice at 45,494.

For the small number of employers who filed via uploaded data, the EEOC stated in the Thirty-Day Notice that it would post online data file specifications "as soon as OMB approves the information collection." *Id.* at 45,487. It explained that "[t]he EEO–1 data file specifications will be for data uploads (submitting EEO–1 data in one digital file), but they also will describe the formatting of data for direct data entry onto the firm's secure EEO–1 account with the Joint Reporting Committee." *Id.* The Thirty-Day Notice also provided a website link to the then-current EEO-1 data file specifications.

Based on public comments, the Thirty-Day Notice changed several other aspects of the EEOC's proposal in order to reduce the burden to employers. *Id.* at 45,492-95. These changes included moving the filing deadline back to March 31 of the year that follows the reporting year to align with calendar year W-2 wage data and adjusting the "workforce snapshot period." *Id.* at 45,484. In addition, the Thirty-Day Notice increased the burden estimate that would result from the revisions to the EEO-1 by $416.58 for each filer. *Id.* at 45,493-94.

The EEOC received numerous comments in response to the Thirty-Day Notice, including another comment from NWLC. Link Decl. ¶ 18, Ex. M. Again, some of the comments included compilations of thousands of submissions from individuals writing in support of these efforts to collect pay data information. Thereafter, on September 28, 2016, the EEOC provided its Final Supporting Statement on EEO-1 to OMB for review. Link Decl. ¶ 12, Ex. I. On September 29, 2016, OMB approved the proposed collection and issued an OMB control number for the revised EEO-1. Link Decl. ¶ 11, Ex. H. EEO-1 filers thus had a legal obligation to submit pay data for the 2017 reporting period by March 31, 2018.

Thereafter, the EEOC released an instruction booklet for employers to report pay data as part of the revised EEO-1. Link Decl. ¶ 6, Ex. C. The EEOC also published a webpage with links

10

to information related to the revised EEO-1, including data file specifications for those employers who elected to file via data upload rather than data entry. *Id*. ¶ 5, Ex. B. The data file specifications included a "data file layout" form and a sample EEO-1 form for pay data collection. *Id*.; *see also id*. ¶¶ 7-8, Exs. D, E. The sample form matches in all substantive respects the sample form provided by the EEOC in the Sixty-Day Notice. *Compare id*. ¶ 8, Ex. E with *id*. ¶ 3-4, Ex. A. The data file layout form is a spreadsheet setting forth for employers how to format their pay data for submission to the EEOC. *Id*. ¶ 7, Ex. D. It includes information for each field of information to be included, such as the field name, type, and possible values and remarks. *Id*. It sets forth the various columns to be included in the pay data submission form, such as all of the relevant race, ethnicity, and gender combinations. *See id*. at 3. It also includes information for the rows of the form, such as each of the relevant job categories and pay bands. *See id*. at 3-4. This data file layout form matches the column and row information in the sample form and do not add reporting requirements to the sample reporting spreadsheet. *Id*.

## IV.    OMB's decision to review and stay the revised EEO-1 pay data collection

On August 29, 2017, nearly one year after having approved the pay data collection, OMB announced a review of the collection and stayed it before the first submission of pay data was due.

The entirety of the stated basis for OMB's action was set forth in two paragraphs, as follows:

> [U]nder 5 CFR 1320.10(f) and (g), OMB may review an approved collection of information if OMB determines that the relevant circumstances related to the collection have changed and/or that the burden estimates provided by EEOC at the time of initial submission were materially in error. OMB has determined that each of these conditions for review has been met. For example, since approving the revised EEO-1 form on September 29, 2016, OMB understands that EEOC has released data file specifications for employers to use in submitting EEO-1 data. These specifications were not contained in the Federal Register notices as part of the public comment process nor were they outlined in the supporting

11

statement for the collection of information. As a result, the public did not receive an opportunity to provide comment on the method of data submission to EEOC. In addition, EEOC's burden estimates did not account for the use of these particular data file specifications, which may have changed the initial burden estimate.

OMB has also decided to stay immediately the effectiveness of the revised aspects of the EEO-1 form for good cause, as we believe that continued collection of this information is contrary to the standards of the PRA. Among other things, OMB is concerned that some aspects of the revised collection of information lack practical utility, are unnecessarily burdensome, and do not adequately address privacy and confidentiality issues.

Defs.' Mot. to Dismiss, Dkt. No. 11-2, Ex. A, Mem. from Neomi Rao, Adm'r, Off. of Info. Reg.

Aff., to Victoria Lipnic, Acting Chair, EEOC (Aug. 29, 2017) ("Rao Memo").

Consequently, on September 15, 2017, the EEOC published a Federal Register notice stating that EEO-1 filers should not submit pay data in their EEO-1s due by March 31, 2018. *See* Stay the Effectiveness of the EEO-1 Pay Data Collection, 82 Fed. Reg. 43,362, 43,362 (Sept. 15, 2017). The stay has remained in place for the past year. OMB has taken no public action to suggest that it is actively engaged in a review process or that it will take any further action with respect to the stay.

V.    <u>**Procedural posture of this case**</u>

On November 15, 2017, Plaintiffs filed this lawsuit alleging that the review and stay of the revised EEO-1 pay data collection is unlawful under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*., and the PRA. On February 13, 2018, Defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiffs do not have Article III standing and that there has been no final agency action that would subject the review and stay to judicial review under the APA. *See* Defs.' Mot. to Dismiss, Dkt. No. 11 ("Mot."). That motion has been fully briefed and is pending before the Court.

Plaintiffs now move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## STANDARD OF REIVEW

A summary judgment motion can be filed "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). "In an APA action, the court's role at the summary judgment stage is to decide 'as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 210 F. Supp. 3d 1, 5-6 (D.D.C. 2016) (quoting *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007).[4] Under the APA, "[a] court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 6 (quoting 5 U.S.C. § 706(2)(A)).

## ARGUMENT[5]

OMB's review and stay of the pay data collection was unlawful. OMB provided virtually no explanation; and the only specific reason it did provide—release of revised data file specifications—cannot support OMB's action. In so doing OMB violated its own regulations—

---

[4] Defendants have, to date, refused to provide the administrative record. *See*, *e.g.*, Defs.' Opp'n to Pls.' Mot. to Compel Compliance, Dkt. No. 20. The records upon which Plaintiffs rely in this Motion for Summary Judgment—EEOC Federal Register notices regarding the pay data revision and the records to which they provide citation, public comments regarding the same available on the public docket, and OMB's decision document setting forth its reason for the stay—would necessarily all be in the administrative record. These are all public records of which the Court may take judicial notice.

[5] The Motion to Dismiss challenged whether Plaintiffs' allegations of injury were legally sufficient to plead standing. Dkt. No. 11-1 at 10. Plaintiffs addressed these arguments in their Opposition to the Motion to Dismiss. Dkt. No. 16 at 15-36. Plaintiffs attach hereto declarations providing evidentiary support for the allegations of injury made in their Complaint, consistent with their burden at this stage. *See* Decl. of Andrea Johnson, Decl. of Hector E. Sanchez. As the legal arguments have already been briefed, Plaintiffs do not reiterate their legal basis for standing, although they reserve their right to make arguments in support of standing should Defendants raise new or different challenges thereto.

reviewing and staying a previously approved collection without, among other required criteria, good cause. The review and stay, which was based on a conclusory and implausible explanation, lacked an adequate basis for reversing the agency's prior position, and ran counter to the evidence before the agency was also arbitrary and capricious in violation of the APA.

## I.    The revised data file specifications could not have materially increased the burden of reporting pay data or otherwise provided a basis to review and stay the collection.

OMB's only specific justification to review and stay the pay data collection, the release of revised data file specifications after the pay data collection had been approved, is facially insufficient. Rao Memo at 1. The content of the pay data collection, including specific pay bands, hours worked data, and W2 data, was defined, the subject of public comment, and approved through the PRA process. The subsequent data file specifications simply explain how to format a spreadsheet and provide a sample spreadsheet, something that the EEOC had explained in detail in the Federal Register Notices, including providing just such an example. Those formatting specifications have nothing to do with the content of the information to be submitted, any more than court rules specifying page margins and font size affect the content of a court filing. Finally, they only apply to the small percentage of reporters who voluntarily choose to submit information via data upload rather than through filling out an online form.

That OMB's proffered reason is little more than a fig leaf is underscored by its assertions about the data file specifications, neither of which is grounded in the record. OMB first asserts that because the "specifications were not contained in the Federal Register notices as part of the public comment process .… the public did not receive an opportunity to provide comment on the method of data submission to EEOC." Rao Memo at 1. That is flatly incorrect. In both the Sixty-Day and Thirty-Day Notices, the EEOC described exactly what data it sought to collect and proposed that employers submit that data by filling out a spreadsheet for which it provided an example and stated that it would later provide precise formatting specifications. The

14

subsequently released data file specifications were completely consistent with the EEOC's description and example spreadsheet.

In advance of OMB's original PRA approval, the EEOC consistently proposed that employers submit the number of employees and total hours-worked in twelve identified pay bands for each of the existing ten EEO-1 job categories, categorized by each race/ethnicity and gender combination. *See* Sixty-Day Notice at 5117-18. As the EEOC explained, "[f]or example, a filer will report on the EEO-1 that it employs 3 African American women as professionals in the highest pay band." *Id*. at 5117. The categories of data and method of reporting—identifying the number of employers per combination of variables—remained the same in the Thirty-Day Notice. Thirty-Day Notice at 45,489. This was the collection of information approved by OMB in September 2016. *See* Link Decl. ¶ 11, Ex. H.

The EEOC also provided a weblink to sample data collection forms—essentially the spreadsheets that the data file specifications would later describe how to format. Sixty-Day Notice at 5118. *See also* Link Decl. ¶ 8, Ex. E. The contents of the two sample spreadsheets are precisely the categories of data that the EEOC proposed to collect. For the first, the columns include each of the EEO-1 race/ethnicity categories divided by male and female. The rows include headings of the existing EEO-1 job categories, each of which has a subheading for each pay band. Employers were instructed to report the number of permanent employees for each line and column, with blank spaces denoting zeros. The second sample spreadsheet is formatted in the same manner, but employers are instructed: "[f]or each cell provide the TOTAL number of hours worked." *Id*.

The EEOC also consistently explained how it would collect the information—either by direct data entry though an online portal or by data file upload—consistent with its past practice. Sixty-Day Notice at 5120; Thirty-Day Notice at 45,493 ("The Joint Reporting Committee now utilizes an online EEO-1 portal for the confidential filing of EEO-1 reports, either by digital

upload or by data entry onto a password-protected, partially pre-populated digital EEO-1"). The EEOC stated that the formatting of the data would be similar for either direct data entry or data upload based on data file specifications. Thirty-Day Notice at 45,487. In the Thirty-Day Notice, it also alerted the public and OMB that it would post the specific data file specifications for employers to create the spreadsheets on their own after OMB approved the information collection. *Id.* Thus, there can be no question that the EEOC provided specific notice to the public about exactly how employers would submit pay data, and an opportunity for stakeholders to provide comment on the manner in which the data would be submitted.

And the public in fact commented on the EEOC's proposal. These comments reveal that EEO-1 filers were well aware of the proposed methodology, including understanding the appearance of the EEOC's proposed spreadsheet. For example, the Chamber of Commerce commented that "[w]ith the addition of W-2 data and hours data, reported in twelve different pay bands within each EEO-1 category, each EEO-1 Filer will now be required to populate as many as 3,360 separate cells of data." Link Decl. ¶ 15, Ex. K at 19. Berkshire Associates also commented on the burden imposed by filling in the anticipated number of data cells. *Id.* ¶ 16, Ex. L at 8-9. Similarly, Gaucher Associates commented on the degree to which the revised data collection would expand the scope of the existing EEO-1 form and the burden it anticipated in filing in the 3,360 data cells. *Id.* ¶ 19, Ex. N at 5-6. These comments were before both the EEOC and OMB when they finalized the revised pay data collection.[6]

OMB's second assertion concerning the data file specifications—that they might change the burden estimate upon which PRA approval was granted, Rao Memo at 1—is likewise belied

---

[6] These comments inflated the burden to employers, as noted by the EEOC, which explained that the burden would be reduced because each filer would be provided pre-populated forms that include identifying information and prior year totals and would not need to enter "zeros" in each cell for which a filer did not have data. Instead, no-data cells could be left blank. Thirty-Day Notice at 45,493.

by the record. First, the data file specifications are completely consistent with the EEOC's earlier descriptions of the pay data information to be collected and sample form. *Compare* Link Decl. ¶ 4, Ex. A with *id*. ¶ 8, Ex. E. Second, OMB did not even conclude that there was a change to the initial burden estimates or that one should have been expected; it merely speculated that an increase "may" have occurred. Nor did OMB provide any analysis about the actual data file specifications to support its unfounded hypothesis. The specifications merely explain how to format a spreadsheet. The subsequent release of technical specifications for formatting data could not have had a material impact on the burden on filers, particularly given that no filer is required to use data upload and only a small percentage of filers have historically submitted information via data upload.

OMB is also incorrect that the EEOC did not consider the burden of filling out a data file described by the data file specifications. The EEOC engaged in extensive burden analysis regarding the types of data to be collected and the relative burden of direct data entry compared to data file upload. Sixty-Day Notice at 5119-20, Thirty-Day Notice at 45,492-95. It increased its burden estimate based upon comments from employers about the frequency of data submission by direct data entry versus data file upload. Thirty-Day Notice at 45,493-94. As part of this burden analysis, the EEOC explained that it would make the data file specifications available upon final OMB approval, Thirty-Day Notice at 45,487, making clear that at the time of the Thirty-Day Notice the EEOC was considering the burden of data file specifications on employers. Tellingly, although numerous commenters made statements about the anticipated burden of methods of submitting the revised pay data collection, it does not appear that any commenter, upon being alerted that the data file specifications would not be released until after final OMB approval, objected to assessing the burden without that information. This is unsurprising, of course, as the data file specifications merely explain how to format a spreadsheet whose contents had been described in detail.

17

In sum, OMB's reliance on subsequently released data file specifications as the justification to review and stay collection of the revised EEO-1 data is factually baseless. And, as discussed in more detail below, it fails to meet either the good cause standard under OMB's regulations or the requirement of reasoned decision-making under the APA.

## II.   OMB did not meet the standard required by its own regulations to review and stay the EEO-1 data collection.

OMB must satisfy specific regulatory criteria, including "good cause," to review and stay an already approved collection of information. 5 C.F.R. §§ 1320.10(f), (g). Neither the inconsequential release of spreadsheet formatting instructions nor OMB's boilerplate citation to PRA standards fulfills that burden. Having failed to meet its own regulatory standard, OMB's decision to review and stay the pay data collection exceeded its authority and was contrary to law.

The review of already-approved agency collections of information by OMB is "not common."[7] It may occur "only when relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error." 5 C.F.R. § 1320.10(f). If those criteria are met, OMB may also stay the effectiveness of an approval of a collection of information that is not specifically required by agency rule "[f]or good cause, after consultation with the agency." 5 C.F.R. § 1320.10(g).[8] While the regulations do not define good cause, OMB has determined that it "exists when continued collection of information would be significantly contrary to the standards of the Act." Controlling Paperwork

---

[7] Controlling Paperwork Burdens on the Public; Final Rule, 48 Fed. Reg. 13,666, 13,683 (Mar. 31, 1983). Indeed, Plaintiffs are unaware of any other occasion on which OMB has exercised this authority under the current regulatory regime.

[8] This motion assumes, but does not concede, that the EEO-1 form is a collection of information not specifically required by agency rule.

Burdens on the Public; Proposed Rulemaking, 47 Fed. Reg. 39,515, 39,522 (Sept. 8, 1982).[9]
OMB has also stated that as part of a good cause finding, it "will take into consideration any
disruption such reconsideration would create in the agency's program." *Id.* OMB did not meet
these requirements.

OMB's claim that "each of the conditions" to review a collection of information pursuant
to § 1320.10(f) was met here is baseless. Rao Memo at 1. First, the only purportedly changed
circumstance OMB identified was the release of the data file specifications. As discussed above,
this cannot qualify as a change in relevant circumstances because the EEOC informed OMB and
the public that the release would be made after OMB's approval of the collection of information,
Thirty-Day Notice at 45,487, and the data file specifications simply explain how to format a
spreadsheet that the EEOC had previously described and provided to the public. Sixty-Day
Notice at 5118. The release of data file specifications was a circumstance specifically
contemplated and described in the package submitted by EEOC and approved by OMB. As to
any change in the burden estimate, OMB did not even attempt to show that the original burden
estimates by the agency were materially in error, and instead only theorized that such an error
"may" have occurred, without any specific analysis demonstrating any error. Rao Memo at 1.
This kind of speculation cannot support OMB's decision. *See Nat'l Gypsum Co. v. EPA.*, 968
F.2d 40, 43 (D.C. Cir. 1992) (an agency is not permitted to "infer" facts not in the record); *Nat.
Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 210 (D.C. Cir. 1988) (agency actions based on
"mere speculation" are arbitrary and capricious); *Water Quality Ins. Syndicate v. United States*,
225 F. Supp. 3d 41, 70 (D.D.C. 2016) ("speculation … is an inadequate replacement for the

---

[9] This definition of "good cause" for the purpose of a stay occurs in a Notice of Proposed
Rulemaking for an earlier version of current section 1320.10(g). The current regulation is
substantially similar to the regulation discussed in this NPRM.

agency's duty to undertake an examination of the relevant data and reasoned analysis") (quoting *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994)).

OMB's invocation of good cause under § 1320.10(g) to stay the pay collection is equally deficient. First, OMB got its own standard wrong. Rather than apply the heightened standard of being "significantly contrary" to the standards of the PRA, OMB stated only that it "believe[s] that continued collection of this information is contrary to the standards of the PRA." Rao Memorandum at 2. OMB's application of the wrong standard invalidates the stay. *See*, *e.g.*, *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 111 (D.D.C. 2018) (agency's application of incorrect evidentiary standard to decision was arbitrary and capricious); *Humane Soc'y of the United States v. Pritzker*, 75 F. Supp. 3d 1, 15 (D.D.C. 2014) (same).

Regardless of the standard applied, OMB did not explain how it determined that the revised EEO-1 was contrary (let alone significantly contrary) to PRA standards. OMB stated only that it "is concerned that some aspects of the revised collection of information lack practical utility, are unnecessarily burdensome, and do not adequately address privacy and confidentiality issues." Rao Memo at 2. But, the release of data file specifications had no impact on the utility of the information collection or privacy and confidentiality, and as discussed above, could only have a de minimis impact on the burden analysis. OMB provided no additional explanation regarding what aspects of pay data collection were supposedly problematic, nor the ways in which they are supposedly lacking in practical utility, burdensome, and inadequate as to privacy and confidentiality. Merely parroting statutory standards without analysis does not show that the revised EEO-1 is "significantly contrary" to the PRA, nor could it establish good cause by any other measure. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("an agency must explain 'why it chose to do what it did.' And to this end, conclusory statements will not do; an 'agency's statement must be one of *reasoning*.'") (emphasis in original) (quoting *Tourus Records v. Drug Enf't Admin.*, 259 F.3d 731, 737; *Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 194

(D.C. Cir. 2010)); *see Bauer v. DeVos*, 325 F. Supp. 3d 74, 105 (D.D.C. 2018) (internal citation omitted) (explaining that the APA "requires that agencies provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision").

The hollowness of OMB's analysis is reinforced by OMB's earlier acceptance of EEOC's robust findings as to all the PRA standards. In both of its Federal Register notices regarding the pay data collection, EEOC explained in detail why the revised EEO-1 had practical utility, was designed to minimize the burden on reporting employers, and provided adequate privacy and confidentiality protections. Sixty-Day Notice at 5118-21; Thirty-Day Notice at 45,481-83 (utility), 45,491-2 (confidentiality), 45,492-95 (burden). OMB's prior approval of the pay data collection means that it must have accepted EEOC's determinations as to each of these issues. 44 U.S.C. § 3506(c)(3). The Rao Memorandum identified no change in circumstances as to any of these aside from the insignificant release of data file specifications and no specific disagreement with any of the analysis previously provided by EEOC. OMB provided no other basis for the change in its position, which prohibits a conclusion that it had good cause for the stay. *See Bauer*, 325 F. Supp. 3d at 109 (D.D.C. 2018) ("the Department failed to acknowledge, much less to address, the inconsistency between its current view that those provisions [of the Borrower Defense Regulations] stand on legally questionable footing, and its prior conclusion that they were legally sound…[A]n unacknowledged and unexplained inconsistency is the hallmark of arbitrary and capricious decision-making.").

Second, OMB did not consider the effect of staying the pay data collection on the EEOC, even though it was clear that the stay massively disrupted the EEOC's equal pay enforcement program. The EEOC spent six years researching the most effective method for collecting data to support its pay discrimination efforts. *See* Sixty-Day Notice at 5114-15. This process included multiple studies, significant interagency consultation, a public hearing, and multiple rounds of public comment. *See id*.

OMB also failed to address the stay's impact on the EEOC's ability to carry out its mandate to enforce the nation's civil rights laws and to combat persistent pay discrimination despite the detailed findings supporting the use of this tool. The EEOC had determined that collecting pay data via the revised EEO-1 was "necessary" for the enforcement of federal anti-pay discrimination laws because it would enable EEOC staff to use statistical analysis to assist in an early assessment of pay discrimination charges against an employer. Thirty-Day Notice at 45,481. The EEOC also identified other anticipated benefits of the revised EEO-1, including "facilitating employer self-evaluating and voluntary compliance," enabling it to publish periodic reports on pay disparities, and supporting internal and external training and outreach. Thirty-Day Notice at 45,480-83, 90-91. OMB ignored completely the essential uses identified by the EEOC for the pay data, a failure that invalidates the stay.[10] *Util. Solid Waste Activities Grp. v. EPA, 901 F.3d 414, 430* (D.C. Cir. 2018) ("An agency's failure to consider an important aspect of the problem is one of the hallmarks of arbitrary and capricious reasoning.").

In sum, by failing to meet its own regulatory requirements for reviewing and staying a previously approved collection of information, OMB acted beyond the scope of its authority.

## III.    OMB's review and stay of the pay data collection was arbitrary and capricious.

OMB's decision to review and stay the pay data collection was arbitrary and capricious in violation of the APA for many of the same reasons that violated OMB regulations. Among these: OMB did not provide an adequate explanation for the reversal from its prior approval; its reliance on the data file specifications to justify the stay runs counter to the evidence before the agency and is implausible; and its explanation for the stay was conclusory rather than reasoned.

---

[10] OMB should be bound by its own articulation of the meaning of good cause. If the Court were to determine otherwise, however, any definition of good cause would include an analysis of the effect of the action.

The APA requires an agency to "examine all relevant factors and record evidence, and to articulate a reasoned explanation for its decision." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 922–23 (D.C. Cir. 2017) (citing *State Farm*, 463 U.S. at 52). An agency action is arbitrary and capricious if the agency: "(1) has relied on factors which Congress has not intended it to consider, (2) entirely failed to consider an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) offers an explanation that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 923 (internal citation omitted); *see also State Farm*, 463 U.S. at 43. Further, as here, when an agency changes its existing position, it must at least "display awareness that it is changing position" and "show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26, (2016) (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009)); *see also Kirwa v. United States Dep't of Def.*, 285 F. Supp. 3d 21, 39 (D.D.C. 2017) ("Whether DOD is taking an initial agency action or changing a longstanding policy, or practice, it still must provide a reasoned explanation for its action."). OMB's paltry explanation does not even begin to meet these requirements.

First, as discussed above, OMB's assertion that its action was justified by EEOC's post-approval release of data file specifications is implausible and not supported by the information before the agency. *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (agency action is arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before the agency") (quoting *State Farm*, 463 U.S. at 43; *Haselwander v. McHugh,* 774 F.3d 990 (D.C. Cir. 2014) (where agency decision could not be squared with the factual record it was arbitrary and capricious)). Further, OMB previously has approved EEO-1 forms for approval without the submission of data file specifications—and let

them stand following the release of data file specifications.[11] OMB neither acknowledges nor explains its departure from prior practice here, an omission that makes the reversal in position arbitrary and capricious. *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010) ("we have never approved an agency's decision to completely ignore relevant precedent"); *Water Quality*, 225 F. Supp. 3d at 79 ("Although an agency is 'not strictly bound to follow the methodology approved in the prior ... proceeding, it [i]s obligated to articulate a principled rationale for departing from that methodology.'") (quoting *Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54, 65 (D.C. Cir. 1999)); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 32 (D.D.C. 2012).

OMB also fails to acknowledge that the vast majority of filers traditionally have not used the data file specifications because they complete their EEO-1 reporting obligations by direct data entry, not data file upload.[12] While the EEOC initially speculated that the number of employers submitting reports via direct data upload would increase, based upon the initial comment period, it scaled back this assumption. Thirty-Day Notice at 45,493. OMB apparently did not consider, and certainly did not explain, what percentage of EEO-1 reports it anticipated would be affected by the submission of data file specifications, nor did it acknowledge that no filer is required to use data file uploads at all; this renders the stay arbitrary and capricious. *See United States Sugar Corp.*, 830 F.3d at 606.

---

[11] *See, e.g.*, Agency Information Collection Activities: Notice of Submission for OMB Review, 70 Fed. Reg. 71,294, 71,301 (Nov. 28, 2005); Agency Information Collection Activities: Proposed Collection; Submission for OMB Review, 79 Fed. Reg. 72,678 (Dec. 8, 2014).

[12] As of 2014, ninety-eight percent of employers used direct data entry. Only two percent of employers used direct data upload. Sixty-Day Notice at 5119 n.55, 5120 n.62 (in 2014, 67,146 firms filed EEO-1s, of which 1,449 firms used direct data upload).

OMB's remaining justifications for the stay—its concern that "that some aspects of the revised collection of information lack practical utility, are unnecessarily burdensome, and do not adequately address privacy and confidentiality issues"—only parrot PRA standards. *See* 44 U.S.C. § 3504(a)(1)(A); § 3504(c). It makes no effort to explain which aspects of the collection raise concerns or what its specific concerns are. "[S]o conclusory a statement cannot substitute for a reasoned explanation." *Am. Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 227, 241 (D.C. Cir. 2008) (citing *AT & T Corp. v. FCC*, 236 F.3d 729, 737 (D.C. Cir. 2001)); *see also Bluewater Network v. Salazar*, 721 F. Supp. 2d 7, 38 (D.D.C. 2010). As the D.C. Circuit has explained, when an agency "merely parroted the language of the standard" as the basis for its decision, it has provided "not a statement of reasoning, but of conclusion." *Amerijet Int'l, Inc.*, 753 F.3d at 1350 (quoting *Tourus Records*, 259 F.3d at 737). Doing so "is arbitrary because it says nothing about 'why' [the agency] made the determination." *Id.* at 1351 (Such a decision has "all the explanatory power of the reply of Bartleby the Scrivener to his employer: 'I would prefer not to.'"); *Bauer*, 325 F. Supp. 3d at 109 (internal citation omitted) (explaining, in finding that agency acted arbitrarily and capriciously that "[b]oilerplate language, like that the [agency] used here, . . . makes it impossible to discern [the agency's] path").

In sum, OMB has failed to provide a reasoned explanation or good reasons for its reversal in position, in violation of the APA, and its stay of the pay data collection must be set aside. *See Encino Motorcars*, 136 S. Ct. at 2127 (internal citation omitted) (agency's change in interpretation of statute was arbitrary and capricious because agency provided "almost nothing" when "explaining the good reasons for the new policy"); *see also Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 19 (D.D.C. 2009) (DOI's reversal of position to permit weapons in national parks was arbitrary and capricious because the decision was based only on federalism concerns and did not acknowledge the environmental harms previously considered and relied on by agency).

**IV.    OMB's stay of the pay data collection hampers the EEOC's ability to enforce civil rights laws in violation of the PRA.**

The authority conferred by the PRA on OMB does not include any increase in authority "with respect to the substantive authority of any federal agency to enforce the civil rights laws." 44 U.S.C. § 3518(3); *see United Steelworkers of Am. v. Pendergrass*, 855 F.2d 108, 113 (3rd Cir. 1988) (explaining that this and other PRA provisions "disaffirm[] the intention to grant substantive lawmaking authority to OMB"). OMB's review and stay of the revised EEO-1, which the EEOC explained in detailed was vital to enforcing Title VII, among other anti-discrimination protections, impermissibly intruded on the EEOC's civil rights enforcement authority.

Congress has bestowed on the EEOC the authority to both enforce Title VII and collect the information that the EEOC determines is "reasonable, necessary, or appropriate" to that mission. 42 U.S.C. § 2000e-8(c). The EEOC exercised that authority in its revision of the EEO-1 to collect pay data, explaining the legal basis for doing so: "Title VII grants the EEOC broad authority to collect data from employers regarding compliance with federal anti-discrimination laws. The EEOC has exercised this statutory authority by implementing a regulation to establish the EEO-1 reporting requirement, and now administers the EEO-1 report pursuant to the PRA." Thirty-Day Notice at 45,481. The EEOC also concluded that because persistent pay gaps exist in the U.S. workforce correlated with sex, race, and ethnicity, for which workplace discrimination is a contributing factor, "implementing the proposed EEO-1 pay data collection will improve the EEOC's ability to efficiently and effectively structure its investigation of pay discrimination charges." *Id*. The EEOC therefore plainly has authority to revise the EEO-1 to collect pay data as part of its substantive authority to enforce the civil rights laws.

In contrast to the EEOC's clear statutory authority, OMB's authority to stay a previously approved agency collection of information is far from settled. It is an authority that OMB has claimed by regulation, *see* 5 C.F.R. § 1320.10(g), but it is not established by statute, and the

bounds of it have not been sanctioned by courts. The PRA only authorizes OMB to approve or disapprove a "*proposed* collection of information," not to either reconsider or stay a collection already approved. 44 U.S.C. §§ 3507(c) (emphasis added). Further, OMB's disapproval authority is limited to situations where disapproval does not abrogate an agency's substantive authority. 44 U.S.C. § 3518(e). Indeed, when OMB conducted the rulemaking for its original review and stay regulations, "[s]everal agencies … questioned OMB's authority to reconsider approvals of collections of information in advance of their expiration dates." Controlling Paperwork Burdens on the Public; Final Rule, 48 Fed. Reg. 13,666, 13,683 (Mar. 31, 1983). OMB justified its authority as deriving:

> [I]n part, from OMB's authority to determine the duration of approval, up to a three-year maximum. The Act does not obligate OMB to set a fixed and unchanging expiration date. Rather, this rule and OMB practice expressly condition all expiration dates on OMB's right to reconsider at a later date. Such reconsiderations are not common, but have occurred in certain circumstances. This has been established practice under both the Paperwork Reduction Act and its predecessor, the Federal Reports Act.

*Id*. Even if one were to accept OMB's proffered justification, it goes only to OMB's authority to *review* previously approved collections of information, a process which requires the agency to provide additional materials and consult with OMB. It does not set forth any authority for OMB to take the far more intrusive action of staying a collection under review. Nowhere does OMB set forth the basis for its authority to disrupt an ongoing agency program with the *stay* of a previously approved collection of information. OMB has simply asserted the authority to impose a stay with its own regulation which, so far as Plaintiffs are aware, has never been tested by the courts.

Indeed, there is good reason to doubt that OMB is authorized under any circumstances to stay a previously approved collection of information required to enforce the civil rights laws. The PRA made clear that it was not expanding OMB's existing authority with respect to other agencies' enforcement of civil rights laws. 44 U.S.C. § 3518(e). In its rulemaking process, OMB

did not identify any historical decisions to stay previously approved information collections, nor any decisions to review a previously approved collection of information related to civil rights enforcement.[13]

Ultimately, the Court need not resolve the question of whether Section 1320.10(g) is invalid when applied to collections of information related to civil rights enforcement in all circumstances because its application was so plainly invalid here, for all the reasons set forth above. *See Dole v. United Steelworkers of Am.*, 494 U.S. 26, 42-43 (1990) (declining to defer to OMB regulations where PRA, as a whole, clearly expressed Congress's intention). Should the Court have any doubt, however, it should be guided by the principle that:

> "a regulation must be interpreted so as to harmonize with and further and not to conflict with the objective of the statute it implements. [Courts] must construe [regulations] in light of the statute[s they] implement [ ], keeping in mind that where there is an interpretation of an ambiguous regulation which is reasonable and consistent with the statute, that interpretation is to be preferred."

*Sec'y of Labor, Mine Safety & Health Admin. v. W. Fuels-Utah, Inc.*, 900 F.2d 318, 320 (D.C. Cir. 1990) (alterations in original). Accordingly, where OMB interferes with an agency's enforcement of the civil rights laws it is charged with administering—as here—OMB must at a minimum express an awareness of that fact and consider whether doing so would expand its substantive authority vis-a-vis the affected agency in violation of the PRA's clear prohibition against doing so. 44 U.S.C § 3518(e). In the context of a Section 1320.10(g) stay, OMB's "good cause" finding must consider the same and engage in an especially rigorous analysis to ensure no unauthorized encroachment into another agency's enforcement authority. OMB has, of course,

---

[13] Controlling Paperwork Burdens on the Public; Proposed Rulemaking, 47 Fed. Reg. 39,515 (Sept. 8, 1982); Controlling Paperwork Burdens on the Public; Final Rule 48 Fed. Reg. 13,666 (Mar. 31, 1983); Controlling Paperwork Burdens on the Public; Regulatory Changes Reflecting Recodification of the Paperwork Reduction Act, 60 Fed. Reg. 30,438 (June 8, 1995); Controlling Paperwork Burdens on the Public; Regulatory Changes Reflecting Recodification of the Paperwork Reduction Act, 60 Fed. Reg. 44,978 (Aug. 29, 1995).

done none of these things. Instead it has asserted its purported authority in a novel way to the detriment of EEOC's anti-discrimination enforcement program. That action therefore must be vacated as contrary to Section 3518(e) of the PRA. *See Bauer*, at 22-24 (explaining that agency action taken pursuant to a particular statute, in that case a stay under 5 U.S.C. § 705, must account for and explain how the action is consistent with the statute).

**V.    Vacating the stay is the appropriate remedy.**

Vacatur is the typical remedy for an agency action found unlawful under the APA. The APA provides that the reviewing court shall "*hold unlawful and set aside* agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (emphasis added); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) ("In all cases agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements."); *see also Pub. Employees for Envtl. Resp. v. United States Fish & Wildlife Serv.*, 189 F. Supp. 3d 1, 2 (D.D.C. 2016). "[U]nsupported agency action normally warrants vacatur." *Advoc. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005).

Courts do have discretion to remand without vacatur in limited cases not applicable here. As the D.C. Circuit explained, "[t]he decision whether to vacate depends on the seriousness of the order's deficiencies ... and the disruptive consequences of an interim change that may itself be changed." *Allied–Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (citation omitted). Neither factor supports remand. First, OMB's errors in analysis in issuing the stay were egregious; and, based on the record, which directly refutes the reasons proffered by OMB to review and stay the pay data collection, there is no serious possibility that it will be able to substantiate its decision. Second, vacatur is unlikely to be disruptive because the

revised pay data collection had been in place for about one year by the time it was stayed, giving reporters adequate time to begin to comply. Further, given that OMB acted only to stay this reporting obligation, employers should have been on notice that it could be reinstated at any moment. In contrast, remand without vacatur is likely to create prolonged delay, making it increasingly likely that another reporting period will pass without the pay data obligation being in effect, perpetuating Plaintiffs' injuries. As the D.C. Circuit has said, remand without vacatur "sometimes invites agency indifference." *In re Core Comm'n, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) (urging courts "to consider the alternatives to the open-ended remand without vacatur"); *see Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."); *Nat'l Ass'n for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209, 245 (D.D.C. 2018). The likelihood of prolonged delay is heightened by OMB's failure to take any action over the past year to move forward with its review of the pay data collection.

Thus, the Court should determine that vacatur is the appropriate remedy here.

## <u>CONCLUSION</u>

For the forgoing reasons, Plaintiffs respectfully request that the Court enter summary judgment in their favor and vacate the stay of the EEO-1 revised pay data collection.

Dated: October 31, 2018

Respectfully submitted,

/s/ *Robin F. Thurston*
Robin F. Thurston (DC Bar No. 1531399)
Javier M. Guzman (DC Bar No. 462679)
Jeffrey B. Dubner (DC Bar No. 1013399)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
rthurston@democracyforward.org
jguzman@democracyforward.org
jdubner@democracyforward.org

Fatima Goss Graves (DC Bar No. 481051)
Emily J. Martin (DC Bar No. 991968)
Sunu Chandy (DC Bar No. 1026045)
Maya Raghu (DC Bar No. 1035558)
National Women's Law Center
11 Dupont Circle, NW, Ste 800
Washington, DC 20036
(202) 588-5180
fgraves@nwlc.org
emartin@nwlc.org
schandy@nwlc.org
mraghu@nwlc.org

*Attorneys for Plaintiffs*