**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL WOMEN'S LAW CENTER, *et al.*, | |
| *Plaintiffs*, | |
| vs. | Civil Action No. 17-2458 (TSC) |
| OFFICE OF MANAGEMENT AND BUDGET, *et al.*, | |
| *Defendants*. | |

**DECLARATION OF BENJAMIN LINK IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

I, Benjamin Link, declare and affirm as follows:

1.      The facts contained in this declaration are based on my personal knowledge, and I can testify competently to them if called upon to do so.

2.      I am a Senior Legal Assistant at the non-profit organization, Democracy Forward Foundation.

3.      On February 1, 2016, the Equal Employment Opportunity Commission ("EEOC") published a Federal Register Notice titled "Agency Information Collection Activities: Revision of the Employer Information Report (EEO-1) and Comment Request." 81 Fed. Reg. 5113. The Notice offered a URL, http://www.eeoc.gov/employers/eeo1survey/2016_new_survey.cfm, to a webpage that provided "an illustration of the data to be collected by both Components 1 and 2 [of the revised EEO-1]" for the 2017 reporting cycle. *Id.* at 5118. That webpage is no longer active.

4.      In order to view the information previously located on the webpage, on October

31, 2018, I searched the URL in the 2016 Federal Register Notice, which took me to a webpage

indicating it was "inactive." The URL for this webpage contained a minor typographical change

from the URL found in the Federal Register Notice—the redirected URL was: https://www1.

eeoc.gov/employers/eeo1survey/2016_new_survey.cfm?redirected=1. I copied this URL,

removing from the text "?redirected=1", and pasted it into the search engine available on the

internet archive website Wayback Machine. Wayback Machine enables users to access digitally

archived versions of various websites and view webpages as they appeared on a given day. My

search indicated Wayback Machine had captured a version of the webpage referenced in the

2016 Federal Register Notice on February 19, 2016. Attached as Exhibit A is a true and correct

copy of this archived webpage as captured by Wayback Machine on February 19, 2016, available

at https://web.archive.org/web/20160219040133/https://www1.eeoc.gov/employers/eeo1survey

/2016_new_survey.cfm.

5.      On September 26, 2018, I viewed an archived EEOC webpage dated December

15, 2016 entitled "2017 EEO-1 Survey," which provides resource links to help the public

navigate changes scheduled to be featured in the 2017 EEO-1 survey. The links provided in that

archived webpage route to, *inter alia*, now-archived webpages with (1) a revised EEO-1

Instruction Booklet, (2) a data file layout for the 2017 EEO-1 survey and (3) a sample 2017

EEO-1 form (both under the heading "Data File Specifications"), (4) a questions and answers

page, (5) a fact sheet for small businesses, and (6) an instructional webinar. Attached as Exhibit

B is a true and correct copy of this "2017 EEO-1 Survey" webpage as captured by Wayback

Machine on December 15, 2016, available at https://web.archive.org/web/20161215120931/

https://www.eeoc.gov/employers/eeo1survey/2017survey.cfm?csModule=utilities/handle-link&thelink=.

6.      On September 26, 2018, following the first reference link described in the preceding paragraph, I viewed an archived EEOC webpage dated January 24, 2017, that provides the text to an EEOC EEO-1 Instruction Booklet for the March 2018 EEO-1 survey.  This webpage includes a section on submitting pay data entitled "Employment Data for Employers Completing Components 1 and 2." Attached as Exhibit C is a true and correct copy of this webpage as captured by Wayback Machine on January 24, 2017, available at https://web.archive.org/web/20170124140115/https://www.eeoc.gov/employers/eeo1survey/2017survey-instructions.cfm.

7.      On September 26, 2018, following the second link described in paragraph 5, I viewed an archived EEOC webpage dated January 24, 2017, which features a data file layout for Components 1 and 2 of the 2017 EEO-1 survey.  Attached as Exhibit D is a true and correct copy of this webpage as captured by Wayback Machine on January 24, 2017, available at https://web.archive.org/web/20170124140212/https://www.eeoc.gov/employers/eeo1survey/2017-data-file-layout.cfm.

8.      On September 26, 2018, following the third reference link described in paragraph 5, I viewed an archived EEOC webpage dated January 28, 2017 featuring a "proposed EEO-1 Form to collect pay data." Attached as Exhibit E is a true and correct copy of this webpage as captured by Wayback Machine on January 28, 2017, available at https://web.archive.org/web/20170128131223/https://www.eeoc.gov/employers/eeo1survey/upload/component-1-and-2-sample-2017-eeo1-report.pdf.

9.      On September 26, 2018, following the fourth reference link described in paragraph 5, I viewed an archived EEOC webpage dated December 1, 2016 featuring questions and answers for the revised EEO-1 and summary pay data. Attached as Exhibit F is a true and correct copy of this webpage as captured by Wayback Machine on December 1, 2016, available at https://web.archive.org/web/20161201205652/https://www.eeoc.gov/employers/eeo1 survey/2017survey-qanda.cfm.

10.     On September 26, 2018, following the fifth reference link described in paragraph 5, I viewed an archived EEOC webpage dated December 1, 2016 featuring a "Small Business Fact Sheet" for the revised EEO-1 and summary pay data. Attached as Exhibit G is a true and correct copy of this webpage as captured by Wayback Machine on December 1, 2016, available at https://web.archive.org/web/20161201205644/https://www.eeoc.gov/employers/eeo1survey/ 2017survey-fact-sheet.cfm.

11.     On October 26, 2018, I visited the website http://www.reginfo.gov and searched for information collection review data for the EEOC.  I reviewed the "OMB Control Number History" for number: 3046-0007 (the control number for the current EEO-1 approval).  This information is available at https://www.reginfo.gov/public/do/PRAOMBHistory?ombControl Number=3046-0007.  From that website, I downloaded a document dated September 29, 2016 (available at https://www.reginfo.gov/public/do/DownloadNOA?requestID=275763).  Attached as Exhibit H is a true and correct copy of that document, the Office of Management and Budget's ("OMB") approval authorizing the collection of information on employee pay data, dated September 29, 2016 and signed by Howard Shelanski, Administrator, Office of Information and Regulatory Affairs ("OIRA").

12.     Attached as Exhibit I is a true and correct copy of EEOC's Final Supporting Statement for the EEO-1 report (OMB Control No. 2046-0007) dated September 28, 2016. I accessed this document on October 26, 2018 via a link published on OIRA's "Reginfo.gov" website, available at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201610-3046-001.

13.     On October 26, 2018, I visited the website www.regulations.gov and searched for the docket folder for the EEOC's February 1, 2016 Federal Register Notice, "Agency Information Collection Activities: Revision of the Employer Information Report (EEO-1) and Comment Request," 81 Fed. Reg. 5113.  As discussed in the following paragraphs, I downloaded three of the comments available in this docket folder.

14.     First, attached as Exhibit J is a true and correct copy of an April 1, 2016 letter from the National Women's Law Center to Bernadette Wilson, Acting Executive Officer, Executive Secretariat, EEOC with the subject "Proposed Revision of the Employer Information Report (EEO-1), FR Docket Number 2016-01544, Docket ID EEOC-2016-0002," available at https://www.regulations.gov/document?D=EEOC-2016-0002-0258.

15.     Second, attached as Exhibit K is a true and correct copy of an April 1, 2016 letter (excluding attachments and exhibits) from the U.S. Chamber of Commerce to Bernadette Wilson, Acting Executive Officer, Executive Secretariat, EEOC with the subject "Equal Employment Opportunity Commission's (EEOC's or Commission's) Proposed Revisions to the Employer Information Report," available at https://www.regulations.gov/document?D=EEOC-2016-0002-0280.

16.     Third, attached as Exhibit L is a true and correct copy of an April 1, 2016 letter from Berkshire Associates, Inc., to Bernadette Wilson, Acting Executive Officer, Executive

Secretariat, EEOC, with the subject "Comment on the Equal Employment Opportunity Commission's Proposed Revision of the Employer Information Report (EEO-1) by Berkshire Associates, Inc.; ID: EEOC-2016-0002-0001/Federal Register Document Number: 2016-01544," available at https://www.regulations.gov/document?D=EEOC-2016-0002-0221.

17.    On October 26, 2018, I visited the website www.regulations.gov and searched for the docket folder for the EEOC's July 14, 2016 Federal Register Notice, "Agency Information Collection Activities: Notice of Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO-1)," 81 Fed. Reg. 45479.  As discussed in the following paragraphs, I downloaded two of the comments available in this docket folder.

18.    First, attached as Exhibit M is a true and correct copy of an August 15, 2016 letter from the National Women's Law Center to Joseph B. Nye, Policy Analyst, OIRA, with the subject "Agency Information Collection Activities; Notice of Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO-1), OMB Control Number 3046-0007, Docket ID EEOC-2016-0002-0340," available at https://www.regulations.gov/document?D=EEOC-2016-0002-0899.

19.    Second, attached as Exhibit N is a true and correct copy of an August 15, 2016 letter from Gaucher Associates to Joseph B. Nye, Policy Analyst, OIRA, available at https://www.regulations.gov/document?D=EEOC-2016-0002-0897.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 31, 2018 in Washington, DC.

Benjamin Link

# EXHIBIT A

 *U.S. Equal Employment Opportunity Commission*

This is the proposed EEO-1 Form to collect compensation data.

## SECTION A - TYPE OF REPORT

1. Indicate by marking in the appropriate box the type of repor ing unit for which this copy of the form is submitted (MARK ONLY ONE BOX).

☐ Single-establishment Employer Report

Multi-establishment Employer:

☐ Consolida ion Report (Required)

☐ Headquarters Unit Report (Required)

☐ Individual Establishment Report (submit one for each establishment with 50 or more employees)

☐ Special Report

2. Total number of reports being filed by this Company (Answer on Consolidated Report only):

## SECTION B - COMPANY IDENTIFICATION
*(To be answered by all employees)*

1. Parent Company:

a. Name of Parent Company that owns or controls establishment in item 2 below (omit if same name as above):

Address (Number and Street):

| City or Town: | State: | ZIP code: |
|---|---|---|
| | | |

Pl. MSJ 000002

2. Establishment for which this report is filed (omit if same as above):

a. Name of Establishment:

Address (Number and Street):

| City or Town: | County: | State: | ZIP code: |
|---|---|---|---|
| | | | |

Employer identification No. (IRS 9-DIGIT TAX NUMBER):

Was an EEO-1 report filed for this establishment last year?

☐ Yes ☐ No

## SECTION C - EMPLOYERS WHO ARE REQUIRED TO FILE

*(To be answered by all employees)*

1. Does the entire company have at least 100 employees in the payroll period for which you are reporting?

☐ Yes ☐ No

2. Is your company affiliated through common ownership and/or centralized management with other entities in an enterprise with a total employment of 100 or more?

☐ Yes ☐ No

3. Does the company or any of its establishments (a) have 50 or more employees AND (b) is not exempt as provided by 41 CFR 60-1.5, AND either (1) is a prime government contractor or first-tier subcontactor, and has a contract, subcontract, or purchase order amounting to $50,000 or more, or (2) serves as a depository of Government funds in any amount or is a financial institution which is an issuing and paying agent for U.S. Savings Bonds and Savings Notes?

☐ Yes ☐ No

4. If the response to the above question (C - 3) is Yes, please enter your Dun and Bradstreet identification number (if you have one):

*NOTE: If an answer to questions 1, 2 or 3 of Section C is "Yes", complete the entire form, otherwise skip to Section G.*

Save & Continue (https://web.archive.org/web/20170504053819/https://www.eeoc.gov/employers/eeo1survey/2016_new_survey_2.cfm)

PI. MSJ 000003

U.S. Equal Employment Opportunity Commission
EEO-1 Joint Reporting Center
P.O. BOX 3128 Reston, VA 20195

Pl. MSJ 000004



*U.S. Equal Employment Opportunity Commission*

This is the proposed EEO-1 Form to collect compensation data.

## SECTION D - EMPLOYMENT DATA

Employment at this establishment - Report all permanent full- and part-time employees including apprentices and on-the-job trainees unless specifically excluded as set forth in the instructions. Enter the appropriate figures on all lines and in all columns. Blank spaces will be considered as zeros.

| Job Categories | Annual Salary in Thousands | Number of Employees (Report employees in only one category) | | | | | | | | | | | | | Total Col A-N |
| | | Race/Ethnicity | | | | | | | | | | | | | |
| | | Hispanic or Latino | | Non/Hispanic or Latino | | | | | | | | | | | |
| | | | | Male | | | | | | Female | | | | | |
| | | Male | Female | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | |
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
| Executive/Senior Level Officials and Managers 1.1 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| First/ Mid-Level Officials and Managers 1.2 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |

Pl. MSJ 000005

| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Professionals 2 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Technicians 3 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |

Pl. MSJ 000006

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $163,800 - $207,999 | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | |
| Sales Workers 4 | $19,239 and under | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | |
| Adminstrative Support Workers 5 | $19,239 and under | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | |
| Craft Workers 6 | $19,239 and under | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | |

Pl. MSJ 000007

| Category | Salary | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Operatives 7 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Laborers and Helpers 8 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Service Workers 9 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |

Pl. MSJ 000008

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $24,440 - $30,679 | | | | | | | | | | | | | | | |
| $30,680 - $38,999 | | | | | | | | | | | | | | | |
| $39,000 - $49,919 | | | | | | | | | | | | | | | |
| $49,920 - $62,919 | | | | | | | | | | | | | | | |
| $62,920 - $80,079 | | | | | | | | | | | | | | | |
| $80,080 - $101,919 | | | | | | | | | | | | | | | |
| $101,920 - $128,959 | | | | | | | | | | | | | | | |
| $128,960 - $163,799 | | | | | | | | | | | | | | | |
| $163,800 - $207,999 | | | | | | | | | | | | | | | |
| $208,000 and over | | | | | | | | | | | | | | | |
| Total 121. | | | | | | | | | | | | | | | |
| Previous Year Total 122. | | | | | | | | | | | | | | | |

Save & Go Back (https://web.archive.org/web/20170506005055/https://www.eeoc.gov/employers/eeo1survey/2016_new_survey.cfm)

Save & Continue (https://web.archive.org/web/20170506005055/https://www.eeoc.gov/employers/eeo1survey/2016_new_survey_3.cfm)

U.S. Equal Employment Opportunity Commission
EEO-1 Joint Reporting Center
P.O. BOX 3128 Reston, VA 20195

PI. MSJ 000009



U.S. Equal Employment Opportunity Commission

This is the proposed EEO-1 Form to collect compensation data.

SECTION D  EMPLOYMENT DATA

Employment at this establishment - Report all permanent full- and part-time employees including apprentices and on-the-job trainees unless specifically excluded as set forth in the instructions. Enter the appropriate figures on all lines and in all columns. Blank spaces will be considered as zeros.

| Job Category | Annual Salary Thousands | Hispanic or Latino | | Non-Hispanic or Latino | | | | | | | | | | | | Col Total A-N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Male | | | | | Female | | | | | | |
| | | Male | Female | White | Black or African American | Native Hawaiian or Other Pacific Islander | Asian | Native American or Alaska Native | Two or More Races | White | Black or African American | Native Hawaiian or Other Pacific Islander | Asian | Native American or Alaska Native | Two or More Races | |
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |

(empty data rows for job categories: Executive/Senior Level Officials and Managers 1, First/Mid Level Officials and Managers 2, Professionals 3, Technicians 4, Sales Workers 5...)

Pl. MSJ 000010

Pl. MSJ 000011

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M0 620-M0 679 | | | | | | | | | | | |
| M0 680-M0 9 9 | | | | | | | | | | | |
| \$ 0 320-\$ 39 899 | | | | | | | | | | | |
| \$ 20 900-\$ 49 799 | | | | | | | | | | | |
| \$ 60 800-\$ 207 999 | | | | | | | | | | | |
| \$200 000 and over | | | | | | | | | | | |
| otal 2 | | | | | | | | | | | |
| er not ne otal 22 | | | | | | | | | | | |

Date(s) of payroll period used: (One t on the Consoli da ed Report)

## SECTION E ESTABLISHMENT INFORMATION
### (Omi t on the Consolidated Report)

What is the major activity of th s es ab lshment? (Be specif c, i.e , manufacturing steel castings, reta l grocer, who esale plumbing suppl es, t tle insurance, etc. Include the specif c type of product or type of service provided, as well as the p incipal business or industrial activity.)

## SECTION F REMARKS

Use this item to give any ident ficat on da e appearing on the last EEO-1 report wh ch d fers from that given above, explain major changes in composit on of reporting un ts and other pertinent information.

## SECTION G CERTIFICATION

Check One:
☐ 1. A l repor s are accurate and were prepared in accordance with instructions. (Check on Conso l dated Report Only.)
☐ 2. This report is accu ate and was prepared in accordance with the instruct ons.

| Name of Certifying Offic al | | Tit e | | Signature | | Da e |
| Name of Person o contact regarding th s report | | Tit e | | Address (Number and Stree ) | | Telephone No. (including Area code and Extension) |
| C ty and Sta e | | Zip Code | | Email Address | | |

Save & Go Back/Previ ew & Submit

U.S. Equal Emp oyment Opportun ty Commiss on
EEO 1 Joint Reporting Cen er
P.O. BOX 3128 Reston, VA 20195

PI. MSJ 000012

# EXHIBIT B

Pl. MSJ 000013



*U.S. Equal Employment Opportunity Commission*

## 2017 EEO-1 Survey

### THE 2017 EEO-1 SURVEY WILL BE CHANGING

The **Employer Information Report EEO-1**, otherwise known as the EEO-1 Report, will be changing.  Details on how to file are provided below.

**Reports must be submitted and certified by:**

**March 31, 2018**

**PLEASE NOTE THAT YOUR 2016 PASSWORD WILL NOT WORK FOR THE 2017 EEO-1 SURVEY**

### Final Notice and Supporting Materials

- Final Federal Register Notice
- Revised EEO-1 Instruction Booklet
- Notice of Office of Management and Budget Action
- Order

### Data File Specifications

See below for file specifications for data upload and sample EEO-1 report (Components 1 and 2).

- Data file layout
- Sample 2017 EEO-1 form: PDF | HTML

### Additional Materials

- Small Business Fact Sheet
- Questions and Answers

### Addtional Information

- Ron Edwards
  EEO1.Suggestionbox@eeoc.gov

### Technical Assistance Opportunities

- Webinar: Revisions to the 2017 EEO-1 Survey to Collect Summary Pay Data
- The Revised EEO-1 and Summary Pay Data: Que_tion_ And An_wer_ from the EEOC'_ October 2016 Employer Webinars



- 10/26/16 Webinar PowerPoint slides (PDF)

### Data Security

Pl. MSJ 000014

The EEOC maintains robust cybersecurity and privacy programs, in compliance with the Federal Information Security Modernization Act and based on NIST Special Publication 800-53, *Security and Privacy Controls for Federal Information Systems and Organizations*. The implemented security and privacy controls protect organizational operations and information system assets against a diverse set of threats, including malicious attacks, natural disasters, structural failures, and human error.

The hosting service for the EEO-1 data collection system provides a defense-in-depth security program with many layers of security utilizing different physical and software components in order to provide a high level of protection. Security monitoring - both inside and outside the network, ensures the detection and rejection of unauthorized use. These security controls and measures are monitored continuously with automated vulnerability and compliance software suites.

Pl. MSJ 000015

# EXHIBIT C

Pl. MSJ 000016

Español | Other Languages

## U.S. Equal Employment Opportunity Commission

Enter search terms...   Search

CONNECT WITH US   

Home | About EEOC | Employees & Applicants | Employers / Small Business | Federal Agencies

Contact Us

Home > Employers > EEO-1 Survey

**EEO-1 JOINT REPORTING COMMITTEE**

- Equal Employment Opportunity Commission

- Office of Federal Contract Compliance Programs

OMB No. 3046-0007
Approval Expires 9/2019

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

WASHINGTON, D.C. 20507

**EQUAL EMPLOYMENT OPPORTUNITY**
STANDARD FORM 100, REV. March 2018, EMPLOYER INFORMATION REPORT EEO-1
**INSTRUCTION BOOKLET**

The Employer Information EEO-1 report (Standard Form 100) is collected annually under the authority of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et. seq.*, as amended. All employers with 15 or more employees are covered by Title VII and are required to keep employment records as specified by Commission regulations. Based on the number of employees and federal contract activities, certain employers are required to file an EEO-1 report on an annual basis by the Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Labor Office of Federal Contract Compliance Programs (OFCCP) regulations. The type of information that employers are required to submit on the EEO-1 will depend on the employer's size. Starting in 2017, Federal contractors with 50 to 99 employees will be required to submit data about employees' ethnicity, race, and sex, by job category (Component 1) of the EEO-1. Filers with 100 or more employees (both private industry and Federal contractor) will be required to submit Component 1 and also summary pay and hours-worked data (Component 2).

See the Appendix for the applicable provisions of Title VII, Section 709(c) of Title VII, and the applicable EEOC regulations, Sections 1602.7-1602.14, Chapter XIV, Title 29 of the Code of Federal Regulations. State and local governments, public school systems and educational institutions are covered by other employment reports and are excluded from Standard Form 100, Employer Information Report EEO-1.

In the interests of consistency, uniformity and economy, Standard Form 100 has been jointly developed by the EEOC and OFCCP, as a single form which meets the statistical needs of both programs. In addition, this form should be a valuable tool for companies to use in evaluating their own internal programs for insuring equal employment opportunity.

As stated above, the filing of Standard Form 100 is required by law; *it is not voluntary*. Under section 709(c) of Title VII, the Equal Employment Opportunity Commission may compel an employer to file this form by obtaining an order from the United States District Court.

Under Section 209(a) of Executive Order 11246, the penalties for failure by a federal contractor or subcontractor to comply may include termination of the federal government contract and debarment from future federal contracts.

**1. WHO MUST FILE**

PI. MSJ 000017

(A) Standard Form 100 - Component 1 only. The following federal contractor employers must file only Component 1 of Standard Form 100: all federal contractors who (1) are not exempt as provided for by 41 CFR 60-1.5; (2) have 50 to 99 employees; (3) are prime contractors or first-tier subcontractors; and (4) have a contract, subcontract, or purchase order amounting to $50,000 or more or serve as depositories of Government funds in any amount, or are financial institutions which are issuing and paying agents for U.S. Savings Bonds and savings notes.

(B) Standard Form 100, Components 1 and 2. The following employers must file both Components 1 and 2 of Standard Form 100:

(i) All private employers who are (1) subject to Title VII of the Civil Rights Act of 1964, as amended, with 100 or more employees EXCLUDING State and local governments, public primary and secondary school systems, institutions of higher education, American Indian or Alaska Native tribes and tax-exempt private membership clubs other than labor organizations; OR (2) subject to Title VII who have fewer than 100 employees if the company is owned or affiliated with another company, or there is centralized ownership, control or management (such as central control of personnel policies and labor relations) so that the group legally constitutes a single enterprise, and the entire enterprise employs a total of 100 or more employees.

AND

(ii) All federal contractors who (1) are not exempt as provided for by 41 CFR 60-1.5; (2) have 100 or more employees; (3) are prime contractors or first-tier subcontractors; and (4) have a contract, subcontract, or purchase order amounting to $50,000 or more; or (b) serve as depositories of Government funds in any amount; or are financial institutions which are issuing or paying agents for U.S. Savings Bonds and or savings notes.

Establishments located in the District of Columbia and the 50 states are required to submit Standard Form 100. No reports should be filed for establishments in Puerto Rico, the Virgin Islands, or other American Protectorates.

## 2. HOW TO FILE

**(a) EEO-1 Electronic Filing Requirement:**

EEO-1 reporting is an electronic, online application. The EEOC **requires** that EEO-1 reports be submitted via the *EEO-1 Online Filing System*, or as an electronically transmitted data file.

Any employer who claims that the electronic submission of Standard Form 100 would create undue hardship may apply to the Commission for a special reporting procedure in accordance with the instructions set forth in paragraph 5.

**(b) Single-establishment employers,** i.e., employers doing business at only one establishment in one location must complete a single EEO-1 online data record.

**(c) Multi-establishment employers,** i.e., employers doing business at more than one establishment must complete online: (1) a report covering the principal or headquarters office; (2) a separate report for **each** establishment employing 50 or more persons; and (3) a separate report (Type 8 record) for each establishment employing fewer than 50 employees, OR an Establishment List (Type 6 record), showing the name, address, and total employment for each establishment employing fewer than 50 persons. For the EEO-1 online portal, companies using Establishment List reports (Type 6), must enter all employment data into the Consolidated report (Type 2). For the EEO-1 online application, all keyed employment data including data from the Type 8 reports will automatically transfer to populate the overall Consolidated Report.

The total number of employees indicated on the headquarters report, **PLUS** the establishment reports, **PLUS** the list of establishments employing fewer than 50 employees, **MUST** equal the total number of employees shown on the Consolidated Report.

Employment data for multi-establishment companies, including parent corporations and their subsidiary holdings, must report all employees working at each company establishment or subsidiary establishment. For purposes of this report, the term **parent corporation** refers to any corporation which owns all or the majority stock of another corporation so that the latter relates to it as a subsidiary.

## 3. WHEN TO FILE

PI. MSJ 000018

This annual report must be filed not later than March 31 following the reporting year. Employment figures from any pay period in October through December may be used (workforce snapshot).

## 4. CONFIDENTIALITY

All reports and any information from individual reports are subject to the confidentiality provisions of Section 709(e) of Title VII, and may not be made public by the EEOC prior to the institution of any proceeding under Title VII involving the EEO-1 data. Any EEOC employee who violates this prohibition may be found guilty of a criminal misdemeanor and could be fined or imprisoned. The confidentiality requirements allow the EEOC to publish only aggregated data, and only in a manner that does not reveal any particular filer's or any individual employee's personal information.

OFCCP will notify contractors of any Freedom of Information Act (FOIA) requests that are made to obtain any of the data provided on the EEO-1 report, and will protect the confidentiality of EEO-1 pay and hours-worked data to the maximum extent possible consistent with FOIA and the Trade Secrets Act. However, should OFCCP receive FOIA requests for any EEO-1 data on filers not within its jurisdiction, OFCCP will refer the requests to the EEOC for a response. The confidentiality provision of Section 709(e) of Title VII applies to all EEO-1 data submitted by filers that are not federal contractors, and the EEOC adheres to that statutory provision when reviewing all requests for EEO-1 data.

## 5. REQUESTS FOR INFORMATION AND SPECIAL PROCEDURES

Where the employer claims undue hardship due to electronic submission or otherwise, the employer must submit in writing a detailed alternative proposal for compiling, reporting, or submitting information to: EEO-1 Coordinator, EEOC Survey Division, 131 M Street, NE, Room 4SW22G, Washington, DC 20507. In cases where the Commission approves written requests to submit paper EEO-1 forms, the paper EEO-1 report must be prepared in accordance with the directions set forth in the Commission's written approval. EEOC will generate a paper EEO-1 form only in extreme cases where internet access is not available to the employer. Only those special procedures approved in writing by the Commission are authorized. Such authorizations are only in effect for one report year. Paper records may not be submitted until after March 31.

## 6. BURDEN ESTIMATE

The reporting burden for Component 1 is estimated to be eight (8) hours per filer for firm-level functions plus an additional one (1) hour per report for establishment-level functions, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed and completing and reviewing the collection of information.

The reporting burden for both Component 1 and Component 2 together is estimated to be fifteen and two tenths (15.2) hours per filer for firm-level functions plus an additional one and nine tenths (1.9) hours per report for establishment-level functions, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed and completing and reviewing the collection of information.

Comments regarding this collection of information, including suggestions for reducing burden, can be sent at any time to:

EEO-1 Coordinator
EEOC Survey Division -- Room 4SW22G
131 M Street, N.E.
Washington, D.C. 20507

AND

Paperwork Reduction Project (3046-0007)
Office of Management and Budget
Washington, D.C. 20503

The full text of the OMB regulations on the Paperwork Reduction Act may be found at 5 CFR Part 1320.

**EEO-1 Terms**

**Type of Report** (Status Code)

Single-Establishment company
1 Single-establishment company

Multi-establishment company
2 Consolidated Report (Required)
3 Headquarters Report (Required)
4 Establishment Report (50 or more employees)
6 Establishment List (Option 1)
8 Establishment Report (less than 50 employees) (Option 2)

Special Report (See 29 CFR 1602.10)

**Company Identification**

Refers to the company name and address of the headquarters office of the multi-establishment company (Report Types 2 and 3); or the establishment name and address.

**Employers Who Are Required To File**

Questions 1, 2 and 3 **MUST** be answered by all employers required to file the EEO-1. If the answer to Question C-3 is Yes, please enter the company's Dun and Bradstreet identification number if the company has one. If the answer is Yes to question 1 or 2, complete Components 1 and 2. If the answer is Yes to **only** question 3, complete Component 1 only. Otherwise skip to Section G.

**Employment Data**

***Employment Data Reported by Employers Completing Component 1***

Employment data must include **ALL** full-time and part-time employees **who were employed during the payroll period selected by the employer between October 1 and December 31 (workforce snapshot),** except those employees specifically excluded as indicated in the Appendix. Employees must be counted by sex and race, and ethnicity, for each of the ten occupational categories. See Appendix for detailed explanation of job categories and race and ethnicity identification.

Every employee must be accounted for in only one of the categories in Columns A through N.

Occupational Data - Employment data must be reported by job category. Report each employee in only one job category. In order to simplify and standardize the method of reporting, all jobs are considered as belonging in one of the broad job categories shown in the EEO-1. To assist you in determining where to place your jobs within the job categories, a description of them is in the ***EEO-1 Job Classification Guide*** or you may consult the EEO-1-Census Codes Cross Walk web site (https://www.eeoc.gov/employers/eeo1survey/jobclassguide.cfm). For further clarification, you may wish to consult the Alphabetical and Classified Indices of Industries and Occupations (2010 Census) published by the U.S. Department of Commerce, Census Bureau.

***Employment Data for Employers Completing Components 1 and 2***

Employment data must include **ALL** full-time and part-time employees **who were employed during the payroll period selected by the employer between October 1 and December 31 (workforce snapshot),** except those employees specifically excluded as indicated in the Appendix. Employees must be counted by sex, race, and ethnicity, and also by pay and hours worked. See Appendix for detailed explanation of job categories, race and ethnicity identification, and pay and hours-worked terminology. Every employee must be accounted for in only one of the categories in Columns A through N.

Section D Employee Report - Report total employees in the workforce snapshot for each job category and pay band. Every employee identified in the workforce snapshot must be accounted for in one of the twelve pay bands for an EEO-1 job category.

Section D Pay Report - Report W-2 Box 1 earnings for the year for all employees identified in the workforce snapshot. If an employee is not included in the workforce snapshot, his or her W-2 Box 1 earnings are not tallied. If an employee is included in the workforce snapshot, his or her W-2 Box 1 earnings are tallied, even if he or she is no longer employed at the end of the year. Note that income earned after the conclusion of the last full pay period in December is often paid to employees in the next calendar year. For EEO-1 purposes, that income would be counted in the next year, **when it is reported on the W-2**.

Section D Hours Worked Report - Report hours worked for all employees in the snapshot in their job category and pay band. Hours worked are reported as an aggregate value for each job category and pay band, representing the total of all hours worked

Pl. MSJ 000020

that year by all employees reported in that job category and pay band. If wages are actually paid in the next calendar year for work done in the last days of the past calendar year, these hours are counted in the next year, **because that is when the pay is reported on the W-2.**

For employees who are not exempt from the minimum wage and/or overtime provisions of the Fair Labor Standards Act (FLSA), count the "hours worked" as recorded for FLSA purposes during the reporting year.

For employees who are exempt from the minimum wage and/or overtime provisions of the FLSA, either (1) report a proxy of 40 hours per week for full-time exempt employees and 20 hours per week for part-time exempt employees, multiplied by the number of weeks the individuals were employed during the EEO-1 reporting year; or (2) provide actual hours of work by exempt employees if the employer already maintains accurate records of this information. To the extent that the use of the proxy numbers cause some deviation from an exempt employee's actual hours worked, the certification of the report as accurate would be considered appropriate. See also "6. Description of Pay-Related Terminology" in the Appendix for related information.

To standardize reporting, all jobs are considered to belong in one of the EEO-1 job categories shown in the Section D Employment Data table. To assist in determining where to place jobs within these categories, consult the description of job categories in the *EEO-1 Job Classification Guide* or the EEO-1-Census Codes Cross Walk web site (https://www.census.gov/people/eeotabulation/documentation/jobgroups.pdf). For further clarification, consult the Alphabetical and Classified Indices of Industries and Occupations (2010 Census) published by the U.S. Department of Commerce, Census Bureau.

## Establishment Information

The major activity should be sufficiently descriptive to identify the industry and product produced or service provided. If an establishment is engaged in more than one activity, describe the activity at which the **greatest** number of employees work.

**The description of the major activity indicated on the Headquarters Report (Type 3) must reflect the dominant economic activity of the company in which the greatest numbers of employees are engaged.**

## Remarks

Include in this section any remarks, explanations, or other pertinent information regarding this report.

## Certification

If all reports have been completed at headquarters, the authorized official should check Item 1 and sign the Consolidated Report only. If the reports have been completed at the individual establishments, the authorized official should check Item 2 and sign the establishment report.

## APPENDIX

### 1. DEFINITIONS APPLICABLE TO ALL EMPLOYERS

*a.* "Commission" refers to the Equal Employment Opportunity Commission.

*b.* "OFCCP" refers to the Office of Federal Contract Compliance Programs, U.S. Department of Labor, established to implement Executive Order 11246, as amended.

*c.* "Joint Reporting Committee" is the committee representing the Commission and OFCCP for the purpose of administering this reporting system.

*d.* "Employer" under Section 701(b), Title VII of the Civil Rights Act of 1964, as amended, means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include the United States, a corporation wholly owned by the government of the United States, American Indian or Alaska Native tribes, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5 of the United States Code), or a bona fide private membership club (other than a labor organization) which is exempt from taxation under Section 501(c) of the Internal Revenue Code of 1954; OR any person or entity subject to Executive Order 11246 who is a federal government prime contractor or subcontractor at any tier (including a bank or other establishment serving as a depository of

PI. MSJ 000021

federal government funds, or an issuing and paying agent of U.S. Savings Bonds and savings notes, or a holder of a federal government bill of lading) or a federally-assisted construction prime contractor or subcontractor at any tier.

e. "Employee" means any individual on the payroll of an employer who is an employee for purposes of the employers withholding of Social Security taxes except insurance sales agents who are considered to be employees for such purposes solely because of the provisions of 26 USC 3121 (d)(3)(B) (the Internal Revenue Code). Leased employees are included in this definition.

f. "Leased Employee", for EEO-1 reporting only, means a permanent employee provided by an employment agency for a fee to an outside company for which the employment agency handles all personnel tasks including payroll, staffing, benefit payments and compliance reporting. The employment agency shall include leased employees in its EEO-1 report. **For EEO-1 reporting purposes only**, the term "employee" shall not include persons who are hired on a casual basis for a specified time, or for the duration of a specified job (for example, a person at a construction site whose employment relationship is expected to terminate with the end of the employee's work at the site); persons temporarily employed in any industry other than construction, such as temporary office workers, mariners, stevedores, lumber yard workers, etc., who are hired through a hiring hall or other referral arrangement, through an employee contractor or agent, or by some individual hiring arrangement, or persons **(EXCEPT** leased employees) on the payroll of an employment agency who are referred by such agency for work to be performed on the premises of another employer under that employers direction and control. These definitions are only for purposes of clarifying who reports these individuals on the EEO-1 and do not have legal ramifications as to the analysis of whether a particular individual is an employee or an independent contractor. That is done under the factors enumerated by the Supreme Court in *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318 (1992).

f. "Commerce" means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof.

g. "Industry Affecting Commerce" means any activity, business or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry affecting commerce within the meaning of the Labor Management Reporting and Disclosure Act of 1959. Any employer of 15 or more persons is presumed to be in an industry affecting commerce.

h. "Establishment" is generally a single physical location where business is conducted or where services or industrial operations are performed (e.g., factory, mill, store, hotel, movie theater, mine, farm, airline terminal, sales office, warehouse, or central administrative office (definition adapted from the *North American Industry Classification System, 2012*).

Units at different physical locations, even though engaged in the same kind of business operation, must be reported as separate establishments. For locations involving construction, transportation, communications, electric, gas, and sanitary services, oil and gas fields, and similar types of physically dispersed industrial activities, however, it is not necessary to list separately each individual site, project, field, line, etc., unless it is treated by you as a separate legal entity. For these types of activities, list as establishments only those relatively permanent main or branch offices, terminals, stations etc., which are either: (a) directly responsible for supervising such dispersed activities (where employees work from home, they should be reported as if working at the establishment where their supervisor is reported to work); or (b) the base from which personnel and equipment operate to carry out these activities. (Where these dispersed activities cross State lines, at least one such establishment should be listed for each State involved.)

i. "Major Activity" means the major product or group of products produced or handled, or services rendered by the reporting unit (e.g., manufacturing airplane parts, retail sales of office furniture) in terms of the activity at which the greatest number of all employees work. The description includes the type of product manufactured or sold or the type of service provided. "Major Activity" is based on the industrial definitions developed by the federal government as adopted by the EEOC (For example, the *North American Industry Classification System, 2012*)**.**

It is the opinion of the Commission that Section 702 of Title VII of the Civil Rights Act of 1964, as amended, does not authorize a complete exemption of religious organizations from the coverage of the Act or of the reporting requirements of the Commission. The exemption for religious organizations applies to their employment of individuals of a particular religion to perform work connected with the organization's activities. Therefore, since the Standard Form 100 does not provide for information as to the religion of employees, religious organizations must report all information required by this report.

Pl. MSJ 000022

## 2. DEFINITIONS APPLICABLE ONLY TO GOVERNMENT CONTRACTORS SUBJECT TO EXECUTIVE ORDER 11246

*a.* "Order" means Executive Order 11246, as amended.

*b.* "Contract" means any government contract or any federally-assisted construction contract.

*c.* "Prime Contractor" means any employer having a government contract or any federally-assisted construction contract, or any employer serving as a depository of federal government funds.

*d.* "Subcontractor" means any employer having a contract with a prime contractor or another subcontractor calling for supplies or services required for the performance of a government contract or federally assisted construction contract.

*e.* "Contracting Agency" means any department, agency and establishment in the executive branch of the government, including any wholly-owned government corporation, which enters into contracts.

*f.* "Administering Agency" means any department, agency and establishment in the executive branch of the government, including any wholly-owned government corporation, which administers a program involving federally-assisted construction contracts.

## 3. RESPONSIBILITIES OF PRIME CONTRACTORS

*a.* At the time of an award of a subcontract subject to these reporting requirements, the prime contractor shall inform the subcontractor of its responsibility to submit annual EEO-1 employment data in accordance with these instructions.

*b.* If prime contractors are required by their Contracting Officer or subcontractors by their prime contractors, to submit notification of filing, they shall do so by ordinary correspondence. However, such notification is not required by and should not be sent to the Joint Reporting Committee.

## 4. RACE, ETHNIC, AND SEX IDENTIFICATION

Self-identification is the preferred method of identifying the race and ethnic information necessary for the EEO-1 report. Employers are required to attempt to allow employees to use self-identification to complete the EEO-1 report. If an employee declines to self-identify his or her race and/or ethnicity, employment records or observer identification may be used.

Where records are maintained, it is recommended that they be kept separately from the employee's basic personnel file or other records available to those responsible for personnel decisions. Self-identification is the preferred method of identifying the sex information necessary for the EEO-1 report.

Race and ethnicity designations as used by the Equal Employment Opportunity Commission for the EEO-1 do not denote scientific definitions of anthropological origins. In addition, such designations do not control who is protected by Title VII's prohibitions against employment discrimination based on race or national origin.

Definitions of the EEO-1 race and ethnicity categories are as follows:

**Hispanic or Latino** - A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.

**White (Not Hispanic or Latino)** - A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

**Black or African American (Not Hispanic or Latino)** - A person having origins in any of the black racial groups of Africa.

**Native Hawaiian or Pacific Islander (Not Hispanic or Latino)** - A person having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

**Asian (Not Hispanic or Latino)** - A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian Subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

**Native American or Alaska Native (Not Hispanic or Latino)** - A person having origins in any of the original peoples of North and South America (including Central America), and who maintain tribal affiliation or community attachment.

**Two or More Races (Not Hispanic or Latino) -** All persons who identify with more than one of the above five races.

PI. MSJ 000023

**Instructions for assigning employees into the race/ethnic categories:**

**Hispanic or Latino** - Include all employees who answer YES to the question, Are you Hispanic or Latino. Report all Hispanic males in Column A and Hispanic females in Column B.

**White (Not Hispanic or Latino)** - Include all employees who identify as White males in Column C and as White females in Column I.

**Black or African American (Not Hispanic or Latino)**- Include all employees who identify as Black males in Column D and as Black females in Column J.

**Native Hawaiian or Pacific Islander (Not Hispanic or Latino)** - Include all employees who identify as Native Hawaiian or Other Pacific Islander males in Column E and as Native Hawaiian or Other Pacific Islander females in Column K.

**Asian (Not Hispanic or Latino)** - Include all employees who identify as Asian males in Column F and as Asian females in Column L.

**Native American or Alaska Native (Not Hispanic or Latino)** - Include all employees who identify as Native American or Alaska Native males in Column G and as Native American or Alaska Native females in Column M.

**Two or More Races (Not Hispanic or Latino)** - Report all male employees who identify with more than one of the above five races in Column H and all female employees who identify with more than one of the above five races in Column N.

As to the method of collecting data, the basic principles for ethnic and racial self-identification for purposes of the EEO-1 report are:

(1) Offer employees the opportunity to self- identify

(2) Provide a statement about the voluntary nature of this inquiry for employees. For example, language such as the following may be used (employers may adapt this language):

"The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that require the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual."

## 5. DESCRIPTION OF JOB CATEGORIES

The major job categories are listed below, including a brief description of the skills and training required for occupations in that category and examples of the job titles that fit each category. The examples shown below are illustrative and not intended to be exhaustive of all job titles in a job category. These job categories are primarily based on the average skill level, knowledge, and responsibility involved in each occupation within the job category.

The Officials and Managers category as a whole is to be divided into the following two subcategories: Executive/Senior Level Officials and Managers and First/Mid Level Officials and Managers. These subcategories are intended to mirror the employers own well established hierarchy of management positions. Small employers who may not have two well-defined hierarchical steps of management should report their management employees in the appropriate categories.

*Executive/Senior Level Officials and Managers*. Individuals who plan, direct and formulate policies, set strategy and provide the overall direction of enterprises/organizations for the development and delivery of products or services, within the parameters approved by boards of directors or other governing bodies. Residing in the highest levels of organizations, these executives plan, direct or coordinate activities with the support of subordinate executives and staff managers. They include, in larger organizations, those individuals within two reporting levels of the CEO, whose responsibilities require frequent interaction with the CEO. Examples of these kinds of managers are: chief executive officers, chief operating officers, chief financial officers, line of business heads, presidents or executive vice presidents of functional areas or operating groups, chief information officers, chief human resources officers, chief marketing officers, chief legal officers, management directors and managing partners.

PI. MSJ 000024

*First/Mid Level Officials and Managers.* Individuals who serve as managers, other than those who serve as Executive/Senior Level Officials and Managers, including those who oversee and direct the delivery of products, services or functions at group, regional or divisional levels of organizations. These managers receive directions from the Executive/Senior Level management and typically lead major business units. They implement policies, programs and directives of executive/senior management through subordinate managers and within the parameters set by Executive/Senior Level management. Examples of these kinds of managers are: vice presidents and directors, group, regional or divisional controllers; treasurers; human resources, information systems, marketing, and operations managers. The First/Mid Level Officials and Managers subcategory also includes those who report directly to middle managers. These individuals serve at functional, line of business segment or branch levels and are responsible for directing and executing the day-to-day operational objectives of enterprises/organizations, conveying the directions of higher level officials and managers to subordinate personnel and, in some instances, directly supervising the activities of exempt and non-exempt personnel. Examples of these kinds of managers are: first-line managers; team managers; unit managers; operations and production mangers; branch managers; administrative services managers; purchasing and transportation managers; storage and distribution managers; call center or customer service managers; technical support managers; and brand or product managers.

*Professionals.* Most jobs in this category require bachelor and graduate degrees, and/or professional certification. In some instances, comparable experience may establish a person's qualifications. Examples of these kinds of positions include: accountants and auditors; airplane pilots and flight engineers; architects; artists; chemists; computer programmers; designers; dieticians; editors; engineers; lawyers; librarians; mathematical scientists; natural scientists; registered nurses; physical scientists; physicians and surgeons; social scientists; teachers; and surveyors.

*Technicians.* Jobs in this category include activities that require applied scientific skills, usually obtained by post-secondary education of varying lengths, depending on the particular occupation, recognizing that in some instances additional training, certification, or comparable experience is required. Examples of these types of positions include: drafters; emergency medical technicians; chemical technicians; and broadcast and sound engineering technicians.

*Sales Workers.* These jobs include non-managerial activities that wholly and primarily involve direct sales. Examples of these types of positions include: advertising sales agents; insurance sales agents; real estate brokers and sales agents; wholesale sales representatives; securities, commodities, and financial services sales agents; telemarketers; demonstrators; retail salespersons; counter and rental clerks; and cashiers.

*Administrative Support Workers.* These jobs involve non-managerial tasks providing administrative and support assistance, primarily in office settings. Examples of these types of positions include: office and administrative support workers; bookkeeping; accounting and auditing clerks; cargo and freight agents; dispatchers; couriers; data entry keyers; computer operators; shipping, receiving and traffic clerks; word processors and typists; proofreaders; desktop publishers; and general office clerks.

*Craft Workers* (formerly Craft Workers (Skilled)). Most jobs in this category include higher skilled occupations in construction (building trades craft workers and their formal apprentices) and natural resource extraction workers. Examples of these types of positions include: boilermakers; brick and stone masons; carpenters; electricians; painters (both construction and maintenance); glaziers; pipelayers, plumbers, pipefitters and steamfitters; plasterers; roofers; elevator installers; earth drillers; derrick operators; oil and gas rotary drill operators; and blasters and explosive workers. This category also includes occupations related to the installation, maintenance and part replacement of equipment, machines and tools, such as: automotive mechanics; aircraft mechanics; and electric and electronic equipment repairers. This category also includes some production occupations that are distinguished by the high degree of skill and precision required to perform them, based on clearly defined task specifications, such as: millwrights; etchers and engravers; tool and die makers; and pattern makers.

*Operatives* (formerly Operatives (Semi-skilled)). Most jobs in this category include intermediate skilled occupations and include workers who operate machines or factory-related processing equipment. Most of these occupations do not usually require more than several months of training. Examples include: textile machine workers; laundry and dry cleaning workers; photographic process workers; weaving machine operators; electrical and electronic equipment assemblers; semiconductor processors; testers, graders and sorters; bakers; and butchers and other meat, poultry and fish processing workers. This category also includes occupations of generally intermediate skill levels that are concerned with operating and controlling equipment to facilitate the movement of people or materials, such as: bridge and lock tenders; truck, bus or taxi drivers; industrial truck and tractor (forklift) operators; parking lot attendants; sailors; conveyor operators; and hand packers and packagers.

Pl. MSJ 000025

*Laborers and Helpers* (formerly Laborers (Unskilled)). Jobs in this category include workers with more limited skills who require only brief training to perform tasks that require little or no independent judgment. Examples include: production and construction worker helpers; vehicle and equipment cleaners; laborers; freight, stock and material movers; service station attendants; construction laborers; refuse and recyclable materials collectors; septic tank servicers; and sewer pipe cleaners.

*Service Workers*. Jobs in this category include food service, cleaning service, personal service, and protective service activities. Skill may be acquired through formal training, job-related training or direct experience. Examples of food service positions include: cooks; bartenders; and other food service workers. Examples of personal service positions include: medical assistants and other healthcare support positions; hairdressers; ushers; and transportation attendants. Examples of cleaning service positions include: cleaners; janitors; and porters. Examples of protective service positions include: transit and railroad police and fire fighters; guards; private detectives and investigators.

## 6. DESCRIPTION OF PAY-RELATED TERMINOLOGY

*a.* "Hours Worked" means the annual sum of hours (1) a nonexempt employee worked within the meaning of the Fair Labor Standards Act (FLSA) during the EEO-1 reporting year; or (2) an exempt employee worked during the EEO-1 reporting year based on either (a) a proxy of 40 hours per week for a full-time exempt employee, and 20 hours per week for a part-time exempt employee, multiplied by the number of weeks the individual was employed during the EEO-1 reporting year; or (2) actual hours worked by an exempt employee if the employer already maintains accurate records of this information.

*b.* "Pay" means an employee's W2 earnings, specifically those reported in Box 1 of the W2 form-Wages, tips, other compensation. IRS directions for that entry are "Show the total taxable wages, tips, and other compensation that you paid to your employee during the year. However, do not include elective deferrals (such as employee contributions to a section 401(k) or 403(b) plan) except section 501(c)(18) contributions." Employers are expected to use payroll reports for the previous four quarters to generate the necessary data. Please refer to the IRS website for specific examples (https://www.irs.gov/instructions/iw2w3/ch01.html#d0e2347).

*c.* "Pay band" means a range of salaries with a minimum and maximum value into which employee pay data is organized. There are twelve pay bands shown in the table below.

| Pay Band | Pay Band Label |
|---|---|
| 1 | $19,239 and under. |
| 2 | $19,240 - $24,439 |
| 3 | $24,440 - $30,679 |
| 4 | $30,680 - $38,999 |
| 5 | $39,000 - $49,919 |
| 6 | $49,920 - $62,919 |
| 7 | $62,920 - $80,079 |
| 8 | $80,080 - $101,919 |

PI. MSJ 000026

| 9 | $101,920 - $128,959 |
| 10 | $128,960 - $163,799 |
| 11 | $163,800 - $207,999 |
| 12 | $208,000 and over. |

## 7. LEGAL BASIS FOR REQUIREMENTS

SECTION 709(c), TITLE VII, CIVIL RIGHTS ACT OF 1964, AS AMENDED

Execution, retention, and preservation of records; reports to Commission; training program records; appropriate relief from regulation or order for undue hardship; procedure for exemption; judicial action to compel compliance

Every employer, employment agency, and labor organization subject to this subchapter shall: (1) make and keep such records relevant to the determination  of whether unlawful employment practice  have been or are being committed, (2) pre erve  uch records for such periods, and (3) make such reports therefrom as the Commission shall prescribe by regulation or order, after public hearing, as reasonable, necessary, or appropriate for the enforcement of this title or the regulations or orders thereunder. The Commission shall, by regulation, require each employer, labor organization, and joint labor-management committee subject to this subchapter which controls an apprenticeship or other training program to maintain such records as are reasonably necessary to carry out the purposes of this subchapter, including, but not limited to, a list of applicants who wish to participate in such program, including the chronological order in which applications were received, and to furnish to the Commission upon request, a detailed description of the manner in which persons are selected to participate in the apprenticeship or other training program. Any employer, employment agency, labor organization, or joint labor-management committee which believes that the application to it of any regulation or order issued under this section would result in undue hardship may apply to the Commission for an exemption from the application of such regulation or order, and, if such application for an exemption is denied, bring a civil action in the United States District Court for the district where such records are kept. If the Commission or the court, as the case may be, finds that the application of the regulation or order to the employer, employment agency, or labor organization in question would impose an undue hardship, the Commission or the court, as the case may be, may grant appropriate relief. If any person required to comply with the provisions of this subsection fails or refuses to do so, the United States District Court for the district in which such person is found, resides, or transacts business, shall, upon application of the Commission, or the Attorney General in a case involving a government, governmental agency or political subdivision, have jurisdiction to issue to such person an order requiring him to comply.

TITLE 29, CHAPTER XIV CODE OF FEDERAL REGULATIONS

*Subpart B -- Employer Information Report*

### §1602.7 Requirement for filing of report.

On or before March 31 of each year, every employer that is subject to Title VII of the Civil Rights Act of 1964, as amended, and that has 100 or more employees, shall file with the Commission or its delegate executed copies of Standard Form 100, as revised (otherwise known as "Employer Information Report EEO-1"), in conformity with the directions set forth in the form and accompanying instructions. Notwithstanding the provisions of §1602.14, every such employer shall retain at all times at each reporting unit, or at company or divisional headquarters, a copy of the most recent report filed for each such unit and shall make the same available if requested by an officer, agent, or employee of the Commission under the authority of section 710 of Title VII. Appropriate copies of Standard Form 100 in blank will be supplied to every employer known to the Commission to be subject to the reporting requirements, but it is the responsibility of all such employers to obtain necessary supplies of the form from the Commission or its delegate prior to the filing date.

PI. MSJ 000027

**§1602.8 Penalty for making of willfully false statements on report.**

The making of willfully false statements on Report EEO-1 is a violation of the United States Code, Title 18, section 1001, and is punishable by fine or imprisonment as set forth therein.

**§1602.9 Commissions remedy for employers failure to file report.**

Any employer failing or refusing to file Report EEO-1 when required to do so may be compelled to file by order of a U.S. District Court, upon application of the Commission.

**§1602.10 Employers exemption from reporting requirements.**

If an employer claims that the preparation or filing of the report would create undue hardship, the employer may apply to the Commission for an exemption from the requirements set forth in this part, according to instruction 5. If an employer is engaged in activities for which the reporting unit criteria described in section 5 of the instructions is not readily adaptable, special reporting procedures may be required. If an employer seeks to change the date for filing its Standard Form 100 or seeks to change the period for which data are reported, an alternative reporting date or period may be permitted. In such instances, the employer should so advise the Commission by submitting to the Commission or its delegate a specific written proposal for an alternative reporting system prior to the date on which the report is due.

**§1602.11 Additional reporting requirements.**

The Commission reserves the right to require reports, other than that designated as the Employer Information Report EEO-1, about the employment practices of individual employers or groups of employers whenever, in its judgment, special or supplemental reports are necessary to accomplish the purposes of Title VII, the ADA, or GINA. Any system for the requirement of such reports will be established in accordance with the procedures referred to in section 709(c) of Title VII, section 107 of the ADA, or section 207(a) of GINA and as otherwise prescribed by law.

Subpart C--Recordkeeping by Employers

**§1602.12 Records to be made or kept.**

The Commission has not adopted any requirement, generally applicable to employers, that records be made or kept. It reserves the right to impose recordkeeping requirements upon individual employers or groups of employers subject to its jurisdiction whenever, in its judgment, such records (a) are necessary for the effective operation of the EEO-1 reporting system or of any special or supplemental reporting system as described above; or (b) are further required to accomplish the purposes of title VII, the ADA, or GINA. Such record-keeping requirements will be adopted in accordance with the procedures referred to in section 709(c) of title VII, section 107 of the ADA, or section 207(a) of GINA, and otherwise prescribed by law.

**§1602.13 Records as to racial or ethnic identity of employees.**

Employers may acquire the information necessary for completion of Section D of the EEO-1 either by visual surveys of the work force, or at their option, by the maintenance of post-employment records as to the identity of employees where the same is permitted by State law. In the latter case, however, the Commission recommends the maintenance of a permanent record as to the racial or ethnic identity of an individual for purpose of completing the report form only where the employer keeps such records separately from the employees basic personnel form or other records available to those responsible for personnel decisions, e.g., as part of an automatic data processing system in the payroll department.

**§1602.14 Preservation of records made or kept.**

Any personnel or employment record made or kept by an employer (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, lay-off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later. In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of one year from the date of termination. Where a charge of discrimination has been filed, or an action brought by the Commission or the Attorney General, against an employer under title VII, the ADA, or GINA, the respondent employer shall preserve all personnel records relevant to the charge or action until final disposition of the charge or

Pl. MSJ 000028

the action. The term "personnel records relevant to the charge," for example, would include personnel or employment records relating to the aggrieved person and to all other employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring an action in a U.S. District Court or, where an action is brought against an employer either by the aggrieved person, the Commission, or by the Attorney General, the date on which such litigation is terminated.

**CONNECT WITH US**     

Privacy Policy | Disclaimer | USA.Gov

Pl. MSJ 000029

# EXHIBIT D

Pl. MSJ 000030

Español | Other Languages



U.S. Equal Employment
Opportunity Commission

Enter search terms...  [Search]

CONNECT WITH US  

| Home | About EEOC | Employees & Applicants | Employers / Small Business | Federal Agencies |

Contact Us

Home > Employers > EEO-1 Survey

  

# 2017 EEO-1 Survey
## Data File Layout Components 1 and 2

(*Download as an Excel file*)

| FIELD | FIELD NAME | POSITIONS | LNGTH | FIELD TYPE | POSSIBLE VALUES & REMARKS |
|---|---|---|---|---|---|
| 1 | COMPANY NUMBER | 1 - 7 | 7 | AN | UNIQUE IDENTIFIER FOR ENTIRE COMPANY **(REQUIRED)** |
| 2 | STATUS CODE | 8 | 1 | N | INDICATES TYPE OF REPORT AS INDICATED IN PART A OF SF 100: |
| | | | | | 1 = SINGLE-ESTAB EMPLOYER MULTI-ESTAB COMPANIES: |
| | | | | | 2 = CONSOLIDATED REPORT |
| | | | | | 3 = HEADQUARTERS REPORT |
| | | | | | 4 = ESTABLISHMENT REPORT (50+ EMPLOYEES - NOT FIRST TIME REPORTING) |
| | | | | | 5 = SPECIAL REPORTING PROCEDURE |
| | | | | | 8 = STATUS CODE 8 REPORT (LESS THAN 50 EMPLOYEES) |
| | | | | | 9 = STATUS CODE 9 REPORT (FEWER THAN 50 EMPLOYEES - FIRST TIME REPORTING) |
| | | | | | **(REQUIRED)** |
| 3 | UNIT NUMBER | 9 - 15 | 7 | AN | REQUIRED EXCEPT FOR NEW STATUS CODE 8 AND ALL STATUS CODE 9 RECORDS |
| 4 | UNIT NAME | 16 - 50 | 35 | AN | ESTABLISHMENT NAME **(REQUIRED)** |
| 5 | UNIT ADDRESS | 51 - 84 | 34 | AN | ESTABLISHMENT ADDRESS **(REQUIRED)** |
| 6 | UNIT ADDRESS-2 | 85 - 109 | 25 | AN | EXTENDED ESTABLISHMENT ADDRESS TO INCLUDE SUITE NO., PO BOX, ETC. (OPTIONAL) |

PI. MSJ 000031

| 7 | CITY NAME | 110 - 129 | 20 | A | CITY NAME **(REQUIRED)** |
|---|---|---|---|---|---|
| 8 | STATE ABBREVIATION | 130 - 131 | 2 | A | FIPS PUB 5-2(CENSUS) **(REQUIRED)** |
| 9 | ZIP CODE | 132 - 136 | 5 | N | U.S. POSTAL SERVICE **(REQUIRED)** |
| 10 | QUESTION B.2.C | 137 | 1 | N | WAS AN EEO-1 REPORT FILED FOR THIS ESTABLISHMENT LAST YEAR? 1=YES; 2=NO **(REQUIRED)** |
| 11 | QUESTION C.1 | 138 | 1 | N | DOES THE ENTIRE COMPANY HAVE AT LEAST 100 EMPLOYEES IN THE PAYROLL PERIOD FOR WHICH YOU ARE REPORTING? 1=YES; 2=NO **(REQUIRED)** |
| 12 | QUESTION C.2 | 139 | 1 | N | IS YOUR COMPANY AFFILIATED THROUGH COMMON OWNERSHIP AND/OR CENTRALIZED MANAGEMENT WITH OTHER ENTITIES IN AN ENTERPRISE WITH A TOTAL EMPLOYMENT OF 100 OR MORE? 1=YES; 2=NO **(REQUIRED)** |
| 13 | QUESTION C.3 | 140 | 1 | N | DOES THE COMPANY OR ANY OF ITS ESTABLISHMENTS (A) HAVE 50 OR MORE EMPLOYEES AND (B) IS NOT EXEMPT AS PROVIDED BY 41 CFR 60-1.5, AND EITHER (1) IS A PRIME GOVERNMENT CONTRACTOR OR FIRST-TIER SUBCONTACTOR, AND HAS A CONTRACT, SUBCONTRACT, OR PURCHASE ORDER AMOUNTING TO $50,000 OR MORE, OR (2) SERVES AS A DEPOSITORY OF GOVERNMENT FUNDS IN ANY AMOUNT OR IS A FINANCIAL INSTITUTION WHICH IS AN ISSUING AND PAYING AGENT FOR U.S. SAVINGS BONDS AND SAVINGS NOTES? 1=YES; 2=NO **(REQUIRED)** |
| 14 | DUN AND BRADSTREET IDENTIFICATION NUMBER | 141 - 149 | 9 | N | IF THE RESPONSE TO QUESTION C.3 IS YES, PLEASE ENTER YOUR DUN AND BRADSTREET IDENTIFICATION NUMBER (REQUIRED IF AVAILABLE) |
| 15 | COUNTY NAME | 150 - 167 | 18 | A | FIPS PUB 6-4 (CENSUS) **(REQUIRED)** |
| 16 | QUESTION D.1 | 168 - 183 | 16 | N | **YEAR USED FOR COMPENSATION AND HOURS DATA: MMDDYYYYMMDDYYYY. TIME FRAME MUST BE FOR ONE YEAR ENDING IN THE SURVEY YEAR (REQUIRED)** |
| 17 | NAICS CODE | 184 - 189 | 6 | N | USE NAICS CODES FROM www.eeoc.gov/eeo1survey **(REQUIRED)** |
| 18 | TITLE OF CERTIFYING OFFICIAL | 190 - 224 | 35 | A | **(REQUIRED)** |
| 19 | NAME OF CERTIFYING OFFICIAL | 225 - 259 | 35 | A | **(REQUIRED)** |

Pl. MSJ 000032

| 20 | TELEPHONE NUMBER | 260 - 269 | 10 | N | INCLUDE AREA CODE (REQUIRED) |
| 21 | EMAIL ADDRESS OF CERTIFYING OFFICIAL | 270 - 309 | 40 | AN | REQUIRED IF AVAILABLE |
| 22 | MATRIX DATA NUMBER OF EMPLOYEES | 310 - 11320 | 11011 | N | 121 LINES - 91 POSITIONS EACH |
| | JOB CATEGORY 1.1 LINES 1-12 | 310 - 1401 | 1092 | | EXECUTIVE/SENIOR LEVEL OFFICIALS AND MANAGERS (Line No. 1.1, Section D, on EEO-1 Form) |
| | JOB CATEGORY 1.1 LINE 1 | 310 - 400 | 91 | | $19,239 and under |
| | COLUMN A | 310 - 315 | 6 | | HISPANIC or LATINO MALES |
| | COLUMN B | 316 - 321 | 6 | | HISPANIC or LATINO FEMALES |
| | COLUMN C | 322 - 327 | 6 | | WHITE MALES |
| | COLUMN D | 328 - 333 | 6 | | BLACK or AFRICAN AMERICAN MALES |
| | COLUMN E | 334 - 339 | 6 | | NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER MALES |
| | COLUMN F | 340 - 345 | 6 | | ASIAN MALES |
| | COLUMN G | 346 - 351 | 6 | | NATIVE AMERICAN or ALASKA NATIVE MALES |
| | COLUMN H | 352 - 357 | 6 | | TWO or MORE RACES MALES |
| | COLUMN I | 358 - 363 | 6 | | WHITE FEMALES |
| | COLUMN J | 364 - 369 | 6 | | BLACK or AFRICAN AMERICAN FEMALES |
| | COLUMN K | 370 - 375 | 6 | | NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER FEMALES |
| | COLUMN L | 376 - 381 | 6 | | ASIAN FEMALES |
| | COLUMN M | 382 - 387 | 6 | | NATIVE AMERICAN or ALASKA NATIVE FEMALES |
| | COLUMN N | 388 - 393 | 6 | | TWO or MORE RACES FEMALES |
| | COLUMN O | 394 - 400 | 7 | | TOTAL MALE AND FEMALE |
| | JOB CATEGORY 1.1 LINE 2 | 401 - 491 | 91 | | $19,240 - $24,439 |
| | JOB CATEGORY 1.1 LINE 3 | 492 - 582 | 91 | | $24,440 - $30,679 |
| | JOB CATEGORY 1.1 LINE 4 | 583 - 673 | 91 | | $30,680 - $38,999 |

PI. MSJ 000033

| JOB CATEGORY 1.1 LINE 5 | 674 - 764 | 91 | $39,000 - $49,919 |
|---|---|---|---|
| JOB CATEGORY 1.1 LINE 6 | 765 - 855 | 91 | $49,920 - $62,919 |
| JOB CATEGORY 1.1 LINE 7 | 856 - 946 | 91 | $62,920 - $80,079 |
| JOB CATEGORY 1.1 LINE 8 | 947 - 1037 | 91 | $80,080 - $101,919 |
| JOB CATEGORY 1.1 LINE 9 | 1038 - 1128 | 91 | $101,920 - $128,959 |
| JOB CATEGORY 1.1 LINE 10 | 1129 - 1219 | 91 | $128,960 - $163,799 |
| JOB CATEGORY 1.1 LINE 11 | 1220 - 1310 | 91 | $163,800 - $207,999 |
| JOB CATEGORY 1.1 LINE 12 | 1311 - 1401 | 91 | $208,000 and over |
| JOB CATEGORY 1.2 LINES 13-24 | 1402 - 2493 | 1092 | FIRST/MID-LEVEL OFFICIALS AND MANAGERS (Line No. 1.2 , Section D, on EEO-1 Form) |
| JOB CATEGORY 2 LINES 25-36 | 2494 - 3585 | 1092 | PROFESSIONALS |
| JOB CATEGORY 3 LINES 37-48 | 3586 - 4677 | 1092 | TECHNICIANS |
| JOB CATEGORY 4 LINES 49-60 | 4678 - 5769 | 1092 | SALES WORKERS |
| JOB CATEGORY 5 LINES 61-72 | 5770 - 6861 | 1092 | ADMINISTRATIVE SUPPORT WORKERS |
| JOB CATEGORY 6 LINES 73-84 | 6862 - 7953 | 1092 | CRAFT WORKERS |
| JOB CATEGORY 7 LINES 85-96 | 7954 - 9045 | 1092 | OPERATIVES |
| JOB CATEGORY 8 LINES 97-108 | 9046 - 10137 | 1092 | LABORERS AND HELPERS |
| JOB CATEGORY 9 LINES 109-120 | 10138 - 11229 | 1092 | SERVICE WORKERS |
| LINE 121 | 11230 - 11320 | 91 | **TOTAL EMPLOYEES FOR JOB CATEGORIES 1 THRU 10 (1.1 THRU 9 ON EEO-1 FORM)** |
| 23 | MATRIX DATA NUMBER OF HOURS | 11321 - 27925 | 16605 | N | 120 LINES - 137 POSITIONS EACH 121st LINE - 165 POSITIONS |

Pl_MSJ_000034

| JOB CATEGORY 1.1 LINES 1-12 | 11321 - 12964 | 1644 | EXECUTIVE/SENIOR LEVEL OFFICIALS AND MANAGERS (Line No. 1.1, Section D, on EEO-1 Form) |
|---|---|---|---|
| JOB CATEGORY 1.1 LINE 1 | 11321 - 11457 | 137 | $19,239 and under |
| COLUMN A | 11321 - 11329 | 9 | HISPANIC or LATINO MALES |
| COLUMN B | 11330 - 11338 | 9 | HISPANIC or LATINO FEMALES |
| COLUMN C | 11339 - 11347 | 9 | WHITE MALES |
| COLUMN D | 11348 - 11356 | 9 | BLACK or AFRICAN AMERICAN MALES |
| COLUMN E | 11357 - 11365 | 9 | NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER MALES |
| COLUMN F | 11366 - 11374 | 9 | ASIAN MALES |
| COLUMN G | 11375 - 11383 | 9 | NATIVE AMERICAN or ALASKA NATIVE MALES |
| COLUMN H | 11384 - 11392 | 9 | TWO or MORE RACES MALES |
| COLUMN I | 11393 - 11401 | 9 | WHITE FEMALES |
| COLUMN J | 11402 - 11410 | 9 | BLACK or AFRICAN AMERICAN FEMALES |
| COLUMN K | 11411 - 11419 | 9 | NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER FEMALES |
| COLUMN L | 11420 - 11428 | 9 | ASIAN FEMALES |
| COLUMN M | 11429 - 11437 | 9 | NATIVE AMERICAN or ALASKA NATIVE FEMALES |
| COLUMN N | 11438 - 11446 | 9 | TWO or MORE RACES FEMALES |
| COLUMN O | 11447 - 11457 | 11 | TOTAL MALE AND FEMALE |
| JOB CATEGORY 1.1 LINE 2 | 11458 - 11594 | 137 | $19,240 - $24,439 |
| JOB CATEGORY 1.1 LINE 3 | 11595 - 11731 | 137 | $24,440 - $30,679 |

Pl. MSJ 000035

| | JOB CATEGORY 1.1 LINE 4 | 11732 - 11868 | 137 | $30,680 - $38,999 |
|---|---|---|---|---|
| | JOB CATEGORY 1.1 LINE 5 | 11869 - 12005 | 137 | $39,000 - $49,919 |
| | JOB CATEGORY 1.1 LINE 6 | 12006 - 12142 | 137 | $49,920 - $62,919 |
| | JOB CATEGORY 1.1 LINE 7 | 12143 - 12279 | 137 | $62,920 - $80,079 |
| | JOB CATEGORY 1.1 LINE 8 | 12280 - 12416 | 137 | $80,080 - $101,919 |
| | JOB CATEGORY 1.1 LINE 9 | 12417 - 12553 | 137 | $101,920 - $128,959 |
| | JOB CATEGORY 1.1 LINE 10 | 12554 - 12690 | 137 | $128,960 - $163,799 |
| | JOB CATEGORY 1.1 LINE 11 | 12691 - 12827 | 137 | $163,800 - $207,999 |
| | JOB CATEGORY 1.1 LINE 12 | 12828 - 12964 | 137 | $208,000 and over |
| | JOB CATEGORY 1.2 LINES 13-24 | 12965 - 14608 | 1644 | FIRST/MID-LEVEL OFFICIALS AND MANAGERS (Line No. 1.2 , Section D, on EEO-1 Form) |
| | JOB CATEGORY 2 LINES 25-36 | 14609 - 16252 | 1644 | PROFESSIONALS |
| | JOB CATEGORY 3 LINES 37-48 | 16253 - 17896 | 1644 | TECHNICIANS |
| | JOB CATEGORY 4 LINES 49-60 | 17897 - 19540 | 1644 | SALES WORKERS |
| | JOB CATEGORY 5 LINES 61-72 | 19541 - 21184 | 1644 | ADMINISTRATIVE SUPPORT WORKERS |
| | JOB CATEGORY 6 LINES 73-84 | 21185 - 22828 | 1644 | CRAFT WORKERS |
| | JOB CATEGORY 7 LINES 85-96 | 22829 - 24472 | 1644 | OPERATIVES |
| | JOB CATEGORY 8 LINES 97-108 | 24473 - 26116 | 1644 | LABORERS AND HELPERS |
| | JOB CATEGORY 9 LINES 109-120 | 26117 - 27760 | 1644 | SERVICE WORKERS |
| | LINE 121 | 27761 - 27925 | 165 | **TOTAL HOURS FOR JOB CATEGORIES 1 THRU 10 (1.1 THRU 9 ON EEO-1 FORM)** |

Pl. MSJ 000036

| | COLUMN A | 27761 - 27771 | 11 | | TOTAL HISPANIC or LATINO MALES |
|---|---|---|---|---|---|
| | COLUMN B | 27772 - 27782 | 11 | | TOTAL HISPANIC or LATINO FEMALES |
| | COLUMN C | 27783 - 27793 | 11 | | TOTAL WHITE MALES |
| | COLUMN D | 27794 - 27804 | 11 | | TOTAL BLACK or AFRICAN AMERICAN MALES |
| | COLUMN E | 27805 - 27815 | 11 | | TOTAL NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER MALES |
| | COLUMN F | 27816 - 27826 | 11 | | TOTAL ASIAN MALES |
| | COLUMN G | 27827 - 27837 | 11 | | TOTAL AMERICAN INDIAN or ALASKAN NATIVE MALES |
| | COLUMN H | 27838 - 27848 | 11 | | TOTAL TWO or MORE RACES MALES |
| | COLUMN I | 27849 - 27859 | 11 | | TOTAL WHITE FEMALES |
| | COLUMN J | 27860 - 27870 | 11 | | TOTAL BLACK or AFRICAN AMERICAN FEMALES |
| | COLUMN K | 27871 - 27881 | 11 | | TOTAL NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER FEMALES |
| | COLUMN L | 27882 - 27892 | 11 | | TOTAL ASIAN FEMALES |
| | COLUMN M | 27893 - 27903 | 11 | | TOTAL AMERICAN INDIAN or ALASKAN NATIVE FEMALES |
| | COLUMN N | 27904 - 27914 | 11 | | TOTAL TWO or MORE RACES FEMALES |
| | COLUMN O | 27915 - 27925 | 11 | | TOTAL MALE AND FEMALE |
| 24 | EIN | 27926 - 27934 | 9 | N | YOUR FEDERAL EIN (TAX ID) 9 DIGITS |

CONNECT WITH US      

Privacy Policy | Disclaimer | USA.Gov

PI. MSJ 000037

# EXHIBIT E

Pl. MSJ 000038

**SECTION A - TYPE OF REPORT**

1. Indicate by marking in the appropriate box the type of reporting unit for which this copy of the form is submitted (MARK ONLY ONE BOX).

☐ Single-establishment Employer Report

Multi-establishment Employer:

☐ Consolidated Report (Required)

☐ Headquarters Unit Report (Required)

☐ Individual Establishment Report (submit one for each establishment with 50 or more employees)

☐ Special Report

2. Total number of reports being filed by this Company (Answer on Consolidated Report only):

[                                                                                                    ]

**SECTION B - COMPANY IDENTIFICATION**

1. Name of parent company that owns or controls establishment in item 2  (omit if same as above).

 a. Parent Company:

[                                                                                                    ]

Address (Number and Street):

[                                                                                                    ]

City or Town:                          State:                          ZIP code:

[                      ]          [                      ]          [                      ]

2. Establishment for which this report is filed (omit if same as above)

 a. Name of Establishment:

[                                                                                                    ]

Address (Number and Street):

[                                                                                                    ]

City or Town:          County:          State:          ZIP code:

[            ]     [            ]     [            ]     [            ]

SAMPLE

b. Employer identification No. (IRS 9-DIGIT TAX NUMBER):

[                                                                                                    ]

c. Was an EEO-1 report filed for this establishment last year?
☐ Yes   ☐ No

**SECTION C - EMPLOYERS WHO ARE REQUIRED TO FILE**

1. Does the entire company have at least 100 employees in the payroll period for which you are reporting?
☐ Yes   ☐ No

2. Is your company affiliated through common ownership and/or centralized management with other entities in an enterprise with a total employment of 100 or more?
☐ Yes   ☐ No

3. Does the company or any of its establishments (a) have 50 or more employees AND (b) is not exempt as provided by 41 CFR 60-1.5, AND either (1) is a prime government contractor or first-tier subcontactor, and has a contract, subcontract, or purchase order amounting to $50,000 or more, or (2) serves as a depository of Government funds in any amount or is a financial institution which is an issuing and paying agent for U.S. Savings Bonds and Savings Notes?
☐ Yes   ☐ No

4. If the response to the above question (C - 3) is Yes, please enter your Dun and Bradstreet identification number (if you have one):

[                                                                                                    ]

Pl. MSJ 000039

*NOTE: If an answer to questions 1, 2 or 3 of Section C is "Yes", complete the entire form, otherwise skip to Section G.*

This is the proposed EEO-1 Form to collect pay data.

## SECTION D - EMPLOYMENT DATA

Employment at this establishment - Report all permanent full- and part-time employees including apprentices and on-the-job trainees unless specifically excluded as set forth in the instructions. Enter the appropriate figures on all lines and in all columns. Blank spaces will be considered as zeros.

| Job Categories | Annual Salary in Thousands | Number of Employees (Report employees in only one category) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Race/Ethnicity | | | | | | | | | | | | | | Total Col A-N |
| | | Hispanic or Latino | | Non/Hispanic or Latino | | | | | | | | | | | | |
| | | | | Male | | | | | | Female | | | | | | |
| | | Male | Female | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | |
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
| Executive/Senior Level Officials and Managers 1.1 | 1. $19,239 and under | | | | | | | | | | | | | | | |
| | 2. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 3. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 4. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 5. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 6. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 7. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 8. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 9. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 10. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 11. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 12. $208,000 and over | | | | | | | | | | | | | | | |
| First/ Mid-Level Officials and Managers 1.2 | 13. $19,239 and under | | | | | | | | | | | | | | | |
| | 14. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 15. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 16. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 17. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 18. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 19. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 20. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 21. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 22. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 23. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 24. $208,000 and over | | | | | | | | | | | | | | | |
| Professionals 2 | 25. $19,239 and under | | | | | | | | | | | | | | | |
| | 26. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 27. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 28. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 29. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 30. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 31. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 32. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 33. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 34. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 35. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 36. $208,000 and over | | | | | | | | | | | | | | | |

SAMPLE

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Technicians 3 | 37. $19,239 and under | | | | | | | | | | | | | | | | |
| | 38. $19,240 - $24,439 | | | | | | | | | | | | | | | | |
| | 39. $24,440 - $30,679 | | | | | | | | | | | | | | | | |
| | 40. $30,680 - $38,999 | | | | | | | | | | | | | | | | |
| | 41. $39,000 - $49,919 | | | | | | | | | | | | | | | | |
| | 42. $49,920 - $62,919 | | | | | | | | | | | | | | | | |
| | 43. $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| | 44. $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| | 45. $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| | 46. $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| | 47. $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| | 48. $208,000 and over | | | | | | | | | | | | | | | | |
| Sales Workers 4 | 49. $19,239 and under | | | | | | | | | | | | | | | | |
| | 50. $19,240 - $24,439 | | | | | | | | | | | | | | | | |
| | 51. $24,440 - $30,679 | | | | | | | | | | | | | | | | |
| | 52. $30,680 - $38,999 | | | | | | | | | | | | | | | | |
| | 53. $39,000 - $49,919 | | | | | | | | | | | | | | | | |
| | 54. $49,920 - $62,919 | | | | | | | | | | | | | | | | |
| | 55. $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| | 56. $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| | 57. $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| | 58. $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| | 59. $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| | 60. $208,000 and over | | | | | | | | | | | | | | | | |
| Adminstrative Support Workers 5 | 61. $19,239 and under | | | | | | | | | | | | | | | | |
| | 62. $19,240 - $24,439 | | | | | | | | | | | | | | | | |
| | 63. $24,440 - $30,679 | | | | | | | | | | | | | | | | |
| | 64. $30,680 - $38,999 | | | | | | | | | | | | | | | | |
| | 65. $39,000 - $49,919 | | | | | | | | | | | | | | | | |
| | 66. $49,920 - $62,919 | | | | | | | | | | | | | | | | |
| | 67. $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| | 68. $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| | 69. $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| | 70. $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| | 71. $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| | 72. $208,000 and over | | | | | | | | | | | | | | | | |
| Craft Workers 6 | 73. $19,239 and under | | | | | | | | | | | | | | | | |
| | 74. $19,240 - $24,439 | | | | | | | | | | | | | | | | |
| | 75. $24,440 - $30,679 | | | | | | | | | | | | | | | | |
| | 76. $30,680 - $38,999 | | | | | | | | | | | | | | | | |
| | 77. $39,000 - $49,919 | | | | | | | | | | | | | | | | |
| | 78. $49,920 - $62,919 | | | | | | | | | | | | | | | | |
| | 79. $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| | 80. $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| | 81. $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| | 82. $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| | 83. $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| | 84. $208,000 and over | | | | | | | | | | | | | | | | |

SAMPLE

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operatives 7 | 85. $19,239 and under | | | | | | | | | | | | | | | | |
| | 86. $19,240 - $24,439 | | | | | | | | | | | | | | | | |
| | 87. $24,440 - $30,679 | | | | | | | | | | | | | | | | |
| | 88. $30,680 - $38,999 | | | | | | | | | | | | | | | | |
| | 89. $39,000 - $49,919 | | | | | | | | | | | | | | | | |
| | 90. $49,920 - $62,919 | | | | | | | | | | | | | | | | |
| | 91. $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| | 92. $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| | 93. $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| | 94. $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| | 95. $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| | 96. $208,000 and over | | | | | | | | | | | | | | | | |
| Laborers and Helpers 8 | 97. $19,239 and under | | | | | | | | | | | | | | | | |
| | 98. $19,240 - $24,439 | | | | | | | | | | | | | | | | |
| | 99. $24,440 - $30,679 | | | | | | | | | | | | | | | | |
| | 100. $30,680 - $38,999 | | | | | | | | | | | | | | | | |
| | 101. $39,000 - $49,919 | | | | | | | | | | | | | | | | |
| | 102. $49,920 - $62,919 | | | | | | | | | | | | | | | | |
| | 103. $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| | 104. $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| | 105. $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| | 106. $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| | 107. $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| | 108. $208,000 and over | | | | | | | | | | | | | | | | |
| Service Workers 9 | 109. $19,239 and under | | | | | | | | | | | | | | | | |
| | 110. $19,240 - $24,439 | | | | | | | | | | | | | | | | |
| | 111. $24,440 - $30,679 | | | | | | | | | | | | | | | | |
| | 112. $30,680 - $38,999 | | | | | | | | | | | | | | | | |
| | 113. $39,000 - $49,919 | | | | | | | | | | | | | | | | |
| | 114. $49,920 - $62,919 | | | | | | | | | | | | | | | | |
| | 115. $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| | 116. $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| | 117. $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| | 118. $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| | 119. $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| | 120. $208,000 and over | | | | | | | | | | | | | | | | |
| Total 121. | | | | | | | | | | | | | | | | | |
| Previous Year Total 122. | | | | | | | | | | | | | | | | | |

SAMPLE

## SECTION D - EMPLOYMENT DATA

Employment at this establishment - Report all permanent full- and part-time employees including apprentices and on-the-job trainees unless specifically excluded as set forth in the instructions. Enter the appropriate figures on all lines and in all columns. Blank spaces will be considered as zeros.

| Job Categories | Annual Salary in Thousands | Hispanic or Latino | | Non-Hispanic or Latino | | | | | | | | | | | | | Total Col A-N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Male | | | | | | | Female | | | | | | |
| | | Male | Female | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | |
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
| Executive/Senior Level Officials and Managers 1.1 | 1. $19,239 and under | | | | | | | | | | | | | | | |
| | 2. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 3. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 4. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 5. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 6. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 7. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 8. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 9. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 10. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 11. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 12. $208,000 and over | | | | | | | | | | | | | | | |
| First/ Mid-Level Officials and Managers 1.2 | 13. $19,239 and under | | | | | | | | | | | | | | | |
| | 14. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 15. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 16. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 17. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 18. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 19. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 20. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 21. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 22. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 23. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 24. $208,000 and over | | | | | | | | | | | | | | | |
| Professionals 2 | 25. $19,239 and under | | | | | | | | | | | | | | | |
| | 26. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 27. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 28. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 29. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 30. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 31. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 32. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 33. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 34. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 35. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 36. $208,000 and over | | | | | | | | | | | | | | | |

For each cell provide the TOTAL Number of Hours worked in last year

Race/Ethnicity

SAMPLE

| Category | Income Bracket | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Technicians 3 | 37. $19,239 and under | | | | | | | | | | | | | | | | |
| | 38. $19,240 - $24,439 | | | | | | | | | | | | | | | | |
| | 39. $24,440 - $30,679 | | | | | | | | | | | | | | | | |
| | 40. $30,680 - $38,999 | | | | | | | | | | | | | | | | |
| | 41. $39,000 - $49,919 | | | | | | | | | | | | | | | | |
| | 42. $49,920 - $62,919 | | | | | | | | | | | | | | | | |
| | 43. $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| | 44. $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| | 45. $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| | 46. $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| | 47. $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| | 48. $208,000 and over | | | | | | | | | | | | | | | | |
| Sales Workers 4 | 49. $19,239 and under | | | | | | | | | | | | | | | | |
| | 50. $19,240 - $24,439 | | | | | | | | | | | | | | | | |
| | 51. $24,440 - $30,679 | | | | | | | | | | | | | | | | |
| | 52. $30,680 - $38,999 | | | | | | | | | | | | | | | | |
| | 53. $39,000 - $49,919 | | | | | | | | | | | | | | | | |
| | 54. $49,920 - $62,919 | | | | | | | | | | | | | | | | |
| | 55. $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| | 56. $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| | 57. $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| | 58. $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| | 59. $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| | 60. $208,000 and over | | | | | | | | | | | | | | | | |
| Adminstrative Support Workers 5 | 61. $19,239 and under | | | | | | | | | | | | | | | | |
| | 62. $19,240 - $24,439 | | | | | | | | | | | | | | | | |
| | 63. $24,440 - $30,679 | | | | | | | | | | | | | | | | |
| | 64. $30,680 - $38,999 | | | | | | | | | | | | | | | | |
| | 65. $39,000 - $49,919 | | | | | | | | | | | | | | | | |
| | 66. $49,920 - $62,919 | | | | | | | | | | | | | | | | |
| | 67. $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| | 68. $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| | 69. $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| | 70. $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| | 71. $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| | 72. $208,000 and over | | | | | | | | | | | | | | | | |
| Craft Workers 6 | 73. $19,239 and under | | | | | | | | | | | | | | | | |
| | 74. $19,240 - $24,439 | | | | | | | | | | | | | | | | |
| | 75. $24,440 - $30,679 | | | | | | | | | | | | | | | | |
| | 76. $30,680 - $38,999 | | | | | | | | | | | | | | | | |
| | 77. $39,000 - $49,919 | | | | | | | | | | | | | | | | |
| | 78. $49,920 - $62,919 | | | | | | | | | | | | | | | | |
| | 79. $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| | 80. $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| | 81. $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| | 82. $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| | 83. $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| | 84. $208,000 and over | | | | | | | | | | | | | | | | |

SAMPLE

| Category | Income Bracket |
|---|---|
| Operatives 7 | 85. $19,239 and under |
| | 86. $19,240 - $24,439 |
| | 87. $24,440 - $30,679 |
| | 88. $30,680 - $38,999 |
| | 89. $39,000 - $49,919 |
| | 90. $49,920 - $62,919 |
| | 91. $62,920 - $80,079 |
| | 92. $80,080 - $101,919 |
| | 93. $101,920 - $128,959 |
| | 94. $128,960 - $163,799 |
| | 95. $163,800 - $207,999 |
| | 96. $208,000 and over |
| Laborers and Helpers 8 | 97. $19,239 and under |
| | 98. $19,240 - $24,439 |
| | 99. $24,440 - $30,679 |
| | 100. $30,680 - $38,999 |
| | 101. $39,000 - $49,919 |
| | 102. $49,920 - $62,919 |
| | 103. $62,920 - $80,079 |
| | 104. $80,080 - $101,919 |
| | 105. $101,920 - $128,959 |
| | 106. $128,960 - $163,799 |
| | 107. $163,800 - $207,999 |
| | 108. $208,000 and over |
| Service Workers 9 | 109. $19,239 and under |
| | 110. $19,240 - $24,439 |
| | 111. $24,440 - $30,679 |
| | 112. $30,680 - $38,999 |
| | 113. $39,000 - $49,919 |
| | 114. $49,920 - $62,919 |
| | 115. $62,920 - $80,079 |
| | 116. $80,080 - $101,919 |
| | 117. $101,920 - $128,959 |
| | 118. $128,960 - $163,799 |
| | 119. $163,800 - $207,999 |
| | 120. $208,000 and over |
| | Total 121. |
| | Previous Year Total 122. |

SAMPLE

Date(s) of payroll period used: (Omit on the Consolidated Report)

### SECTION E -ESTABLISHMENT INFORMATION
*(Omit on the Consolidated Report)*

What is the major activity of this establishment? (Be specific, i.e., manufacturing steel castings, retail grocer, wholesale plumbing supplies, title insurance, etc. Include the specific type of product or type of service provided, as well as the principal business or industrial activity.)

### SECTION F - REMARKS

Use this item to give any identification data appearing on the last EE0-1 report which differs from that given above, explain major changes in composition of reporting units and other pertinent information.

### SECTION G - CERTIFICATION

Check One:

☐ 1. All reports are accurate and were prepared in accordance with the instructions (check on consolidated only report only.)

☐ 2. This report is accurate and was prepared in accordance with the instructions.

SAMPLE

| Name of Certifying Official | Title | Signature | Date |
|---|---|---|---|
| | | | |

| Name of Person to contact regarding this report | Title | Address (Number and Street) | |
|---|---|---|---|
| | | | |

| City and State | Zip Code | Email Address | Telephone No. (including Area code and Extension) |
|---|---|---|---|
| | | | |

**All reports and information obtained from individual reports will be kept confidential as required by Section 709(e) of Title VII.**
**WILLFULLY FALSE STATEMENTS ON THIS REPORT ARE PUNISHABLE BY LAW, U.S. CODE, TITLE 18, SECTION 1001**

# EXHIBIT F

Pl. MSJ 000047

Español | Other Languages

**U.S. Equal Employment Opportunity Commission**

Enter search terms... | Search

CONNECT WITH US 

| Home | About EEOC | Employees & Applicants | Employers / Small Business | Federal Agencies |

Contact Us

Home > Employers > EEO-1 Survey

# Questions and Answers: The Revised EEO-1 and Summary Pay Data

## Background

The U.S. Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Labor, Office of Federal Contract Compliance Programs (OFCCP) enforce federal prohibitions against employment discrimination based on race, sex, and national origin, among other bases. The EEOC enforces Title VII of the Civil Rights Act (Title VII). OFCCP enforces Executive Order 11246.

For many years, the EEOC and OFCCP have collected data from certain private employers and federal contractors and subcontractors about their employees on the "Employer Information Report" or the EEO-1. The EEO-1 collects data about the number of employees by job category and by sex and race or ethnicity. To promote efficiency, the EEOC and OFCCP coordinate their collection of this data through a "Joint Reporting Committee." The EEOC is responsible for approval of the EEO-1 every three years under the Paperwork Reduction Act.

On September 29, 2016 the EEOC announced approval of a revised EEO-1, starting with the 2017 report, to collect summary pay data from employers, including federal contractors and subcontractors, with 100 or more employees. Summary pay data for private employers subject to Title VII jurisdiction will go to the EEOC. Summary pay data only for federal contractors and subcontractors subject to Executive Order 11246 will go to OFCCP.

The EEOC and the Joint Reporting Committee are committed to working with employers to ensure a successful transition to the new report. To give employers more time to transition, and allow for alignment with the W-2 reporting cycle, the EEO-1 deadline for the 2017 report will be March 31, 2018. Employers will have a total of 18 months-from September 30, 2016 (2016 report deadline) to March 31, 2018 (2017 report deadline) to make the change. The EEOC's complete explanation of this information collection, as submitted to the Office of Management Budget, is available at https://federalregister.gov/a/2016-16692.

## The Purpose of this Information Collection

Although there has been progress in combatting pay discrimination in the last 50 years, recent studies show that discrimination plays a role in explaining the pay gaps nationwide for women and, especially, for African American and Hispanic or Latina women. Such wage disparities also persist for men of color.

For example, studies find that, after controlling for factors such as education and work experience, pay declines when women enter an occupation dominated by men but that pay increases when men enter a field dominated by women.[1] Studies also demonstrate racial bias in salary negotiations even after controlling for the applicants' objective qualifications for the position.[2]

Too often, pay discrimination goes undetected because of a lack of information about what employees are paid. The EEOC and OFCCP are charged with the responsibility of enforcing federal prohibitions on pay discrimination including Title VII, the Equal Pay Act, and Executive Order 11246, but, until now, they lacked the employer-and establishment-specific data needed to assess allegations of pay discrimination. The revised EEO-1 report will help to fill this gap. In developing this proposal, the EEOC carefully considered what kind of data would be most important and considered its benefit relative to the potential burden on employers.

Pl. MSJ 000048

## Description of the Revisions to the EEO-1

### Which employers will file the revised EEO-1 report?

Starting with the 2017 report, which will be due on March 31, 2018, private employers including federal contractors and subcontractors with 100 or more employees will submit summary pay data.

Federal contractors and subcontractors with 50-99 employees will not submit summary pay data but will continue to report demographic data (sex and race or ethnicity) on the EEO-1 as they did before.

Federal contractors and subcontractors with 49 or fewer employees, and companies without federal contracts with 99 or fewer employees, will not be required to complete the EEO-1 report.

### When will employers count their employees for purposes of the revised EEO-1 report?

Employers will count their employees during the "workforce snapshot period." For reporting years 2016 and before, the "workforce snapshot period" was July 1 to September 30. Starting with the EEO-1 report of 2017 data, however, the "workforce snapshot period" will be October 1 to December 31, 2017. Each employer may choose any pay period during this three-month "workforce snapshot period" to count its full and part-time employees for the EEO-1 report.

### What is new on the revised EEO-1 report?

The revised EEO-1 report has two new elements:

- Summary pay data: Employers report the *total number* of full and part-time employees they had during that year in each of 12 pay bands listed for each EEO-1 job category; employers do not report individual pay or salaries.

- Aggregate hours worked data: Employers tally and report the number of hours worked that year by all the employees accounted for in each pay band.

### What are the EEO-1 job categories?

The 10 EEO-1 job categories have not changed with this revision. They are:

  (1) Executive/Senior Level Officials and Managers;
  (2) First/Mid Level Officials and Managers;
  (3) Professionals;
  (4) Technicians;
  (5) Sales Workers;
  (6) Administrative Support Workers;
  (7) Craft Workers;
  (8) Operatives;
  (9) Laborers and Helpers; and
  (10) Service Workers.

 To continue to assist employers categorizing specific jobs, the EEOC provides a guide classifying hundreds of jobs into the 10 EEO-1 job categories: https://www.eeoc.gov/employers/eeo1survey/jobclassguide.cfm.

Based on their experience completing, filing, and reviewing EEO-1reports for many years, EEO-1 filers as well as government agencies understand which jobs are included in which job categories for particular industries and regions.

### What are the EEO-1 pay bands?

The EEO-1 pay bands track the 12 pay bands used by the Bureau of Labor Statistics for the Occupation Employment Statistics survey:

  (1) $19,239 and under;
  (2) $19,240 - $24,439;
  (3) $24,440 - $30,679;
  (4) $30,680 - $38,999;
  (5) $39,000 - $49,919;

Pl. MSJ 000049

(6) $49,920 - $62,919;

(7) $62,920 - $80,079;

(8) $80,080 - $101,919;

(9) $101,920 - $128,959;

(10) $128,960 - $163,799;

(11) $163,800 - $207,999; and

(12) $208,000 and over.

Employers will count the number of employees they have in each pay band for each job category. If no employees are in a job category or pay band, employers will leave the cell blank.

### What is the measure of income to reference in order to select the appropriate pay band?

To identify the pay band on the revised EEO-1 in which to count an employee, employers will rely on the pay reported for income tax purposes that year in Box 1 of the W-2 form.

Note that wages earned after the conclusion of the last full pay period in December are often paid to employees in the next calendar year. For EEO-1 purposes, these wages will be reported for the same year in which they are reported for W-2 purposes.

### How will data about employees' sex and race or ethnicity be reported on the revised EEO-1?

After tallying the total number of employees in each pay band by job category, employers will enter this data in the appropriate columns of the EEO-1 report based on the sex and ethnicity or race of the employees. For example, a financial services firm may report that it has 10 Professionals in pay band 6, which is $49,920 - $62,919, who are men and black; and that it also has 35 Professionals in pay band 6 who are men and white.

### Why are hours worked being collected? What is the measure of hours worked for the revised EEO-1?

Hours worked data is being collected so that the EEOC and the OFCCP can account for part-time and partial year employment when they analyze EEO-1 pay data.

For the EEO-1, hours worked will be counted by consulting employer records already required under the Fair Labor Standards Act (FLSA):

- For *non-exempt* employees, for whom the FLSA already requires employers to keep records of hours worked, employers will consult these records to identify the number of hours worked.

- For employees who are *exempt* from the FLSA, employers have a choice. They may either:
  - Report 20 hours per week for each part-time employee and 40 hours per week for each full-time employee; or
  - Report actual number of hours worked by exempt employees, full- or part-time, if they prefer to do so.

### How will hours worked be counted on the revised EEO-1 report?

Hours worked data will be reported on the EEO-1 by tallying the total number of hours worked by all the employees counted in each pay band, for the W-2 reporting year.

## The Process of Filing the Revised EEO-1 Report

### With whom will employers file the revised EEO-1 report and data?

Employers will continue to file the EEO-1 report with the Joint Reporting Committee of the EEOC and the OFCCP.

### How will the new EEO-1 report be filed?

Consistent with current reporting practices, employers will submit EEO-1 reports securely via the EEO-1 Online Filing System on the EEOC's website or utilize this portal to electronically transmit a data file containing the EEO-1 data.

### What are the file specifications for data uploads of revised EEO-1 data?

The Joint Reporting Committee announced the file specifications for the revised EEO-1 collection on September 29, 2016. To see these file specifications, please visit: https://www.eeoc.gov/employers/eeo1survey/2017survey.cfm.

PI. MSJ 000050

#### How will the Joint Reporting Committee and the EEOC assist employers in their transition to the revised EEO-1 report?

The Joint Reporting Committee and EEOC staff are available to answer questions from all EEO-1 stakeholders, including employers, payroll, HRIS experts, and software professionals. Individuals may submit questions or request assistance by contacting the EEO-1 Coordinator at: EEOC Survey Division -- Room 4SW22G, 131 M Street, N.E. Washington, D.C. 20507, or by email at: Suggestion Box on EEO-1 Additional Documentation or eeo1.suggestionbox@eeoc.gov.

The EEOC is committed to helping all EEO-1 filers successfully file their reports. The EEOC has provided resources to address questions on our website, and it will provide ongoing technical assistance to aid employers in their compliance efforts, including free webinars offered on October 20th and 26th.

### Confidentiality, Privacy, and Data Security

#### What protections are in place to protect the confidentiality of the summary pay data?

Title VII forbids all EEOC officers and employees from making public any information, including EEO-1 data, before a Title VII proceeding is begun involving the information. Any violations of this prohibition by EEOC officers or staff are subject to criminal penalties including imprisonment. The EEOC imposes these conditions on all of its contractors, as well as on other federal agencies that request the data for legitimate law enforcement purposes.

The EEOC will provide OFCCP with summary pay data (including hours worked) only for federal contractors and subcontractors subject to Executive Order 11246. The OFCCP will hold EEO-1 data for federal contractors and subcontractors confidential to the maximum extent possible under the Freedom of Information Act (FOIA) and the Trade Secrets Act. OFCCP will notify contractors of any FOIA request for their EEO-1 pay and hours worked data. If a contractor objects to disclosure, OFCCP will not disclose the data if OFCCP determines that the contractor's objection is valid. FOIA Exemptions 3 and 4 recognize the value of this data and provide, in combination with the Trade Secrets Act, the necessary tools to appropriately protect it from public disclosure.

#### How does the EEOC safeguard EEO-1 data in its possession?

The EEOC maintains robust security protections for EEO-1 data and consistently reviews and updates its security protocols. The EEOC's cybersecurity and privacy programs comply with the Federal Information Security Modernization Act and are based on NIST Special Publication 800-53, Security and Privacy Controls for Federal Information Systems and Organizations. The implemented security and privacy controls protect organizational operations and information system assets against a diverse set of threats, including malicious attacks, natural disasters, structural failures, and human error.

The hosting service for the EEO-1 data collection system provides a defense-in-depth security program with many layers of security utilizing different physical and software components in order to provide a high level of protection. Security monitoring-both inside and outside the network-ensures the detection and rejection of unauthorized use. These security controls and measures are monitored continuously with automated vulnerability and compliance software suites.

The EEOC has a current privacy impact assessment for the EEO-1, which is published on the EEOC website for employers that file the EEO-1 report, at: https://www.eeoc.gov/employers/eeo1survey/privacyimpact.cfm

The EEOC's information technology system will be fully compliant with recently revised Circular A-130 well before the first deadline for the new EEO-1 in March 2018. The privacy impact assessment for the EEO-1 will be updated to address these revisions.

#### How does the EEOC protect privacy and confidentiality of EEO-1 data when it issues national, state, or industry-level reports based on the data?

The EEOC only publishes large-scale aggregated EEO-1 data in a way that fully protects employer confidentiality and employee privacy. At a minimum, the EEOC does not publish data if it does not include at least three firms, or if one firm represents more than 80 percent of the data. The EEOC will ensure that any published aggregate data based on the revised EEO-1 will continue to protect the privacy and confidentiality of individual employers and employees.

For purposes of self-assessment, employers can use published aggregated data to compare or benchmark their own data with data from other employers in their industry or geographical area.

PI. MSJ 000051

---

[1] Asaf Levanon, Paula England, Paul Allison, Occupational Feminization and Pay: Assessing Casual Dynamics Using 1950-2000 U.S. Census Data, Social Forces 88(2) (Dec. 2009), http://statisticalhorizons.com/wp-content/uploads/2012/01/88.2.levanon.pdf.

[2] Moreal Hernandez and Derek R. Avery, Getting the Short End of the Stick: Racial Bias in Salary Negotiations, MIT Sloan Management Review (June 15, 2016), http://sloanreview.mit.edu/article/getting-the-short-end-of-the-stick-racial-bias-in-salary-negotiations.

**CONNECT WITH US**    

Privacy Policy | Disclaimer | USA.Gov

Pl. MSJ 000052

# EXHIBIT G

Pl. MSJ 000053

Español | Other Languages



# U.S. Equal Employment Opportunity Commission

Enter search terms...        Search

CONNECT WITH US  

| Home | About EEOC | Employees & Applicants | Employers / Small Business | Federal Agencies |

Contact Us

Home > Employers > EEO-1 Survey

  

# Small Business Fact Sheet:
# The Revised EEO-1 and Summary Pay Data

## Background

- The U.S. Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Labor, Office of Federal Contract Compliance Programs (OFCCP) enforce federal prohibitions on employment discrimination based on race, sex, and national origin, among other bases. The EEOC enforces Title VII of the Civil Rights Act and the Equal Pay Act. The OFCCP enforces Executive Order 11246.

- For many years, certain employers have reported data about their number of employees by EEO-1 job category, and then by sex and ethnicity or race, on the "Employer Information Report" or EEO-1. The EEOC and the OFCCP consolidate collection of EEO-1 data with a "Joint Reporting Committee."

- Beginning with the 2017 EEO-1, private employers and federal contractors with 100 or more employees also will report summary pay data on the EEO-1. Summary pay data for private employers will go to the EEOC. Summary pay data for federal contractors and subcontractors subject to Executive Order 11246 will go to OFCCP.

## When Is the First Deadline for Submitting the New EEO-1 Report?

- The EEO-1 report will be due for the first time with pay data on March 31, 2018, and the EEO-1 will be due every March 31 after that.

- Employers will have 18 months between the 2016 and 2017 EEO-1 deadlines-from September 30, 2016, until March 31, 2018-to prepare for this change.

- The 2016 EEO-1 deadline is still September 30, 2016.

## Preparing for the New EEO-1 Report

- The EEOC is committed to working with businesses to ensure a successful transition to the new EEO-1 report.

- To initiate the transition, the EEOC published the technical file specifications for the revised EEO-1 data on the same day as it announced the new report. See https://www.eeoc.gov/employers/eeo1survey/2017survey.cfm.

- The EEOC is offering free webinars and additional outreach and technical assistance to assist employers.

- Free webinars will be held on October 20, 2016 and October 26, 2016. Check www.eeoc.gov for details.

- The EEOC will send a notice to each EEO-1 employer describing the new EEO-1 filing requirements and deadlines.

- If your business needs assistance filing the EEO-1 now or in the future, please contact the Joint Reporting Committee by telephone at 1-877-392-4647 (toll-free) or by email at e1.techassistance@eeoc.gov. Or, you may write to the EEO-1

PI. MSJ 000054

Coordinator at: Joint Reporting Committee, EEOC Survey Division -- Room 4SW22G, 131 M Street, NE Washington, D.C. 20507.

## Which Employers Will Report Summary Pay Data?

- Private employers with 100 or more employees will report summary pay data.

- Federal contractors and subcontractors with 50 - 99 employees will not report summary pay data, but they will tally employees by job category and then by sex and ethnicity or race, as they did before. Federal contractors and subcontractors with fewer than 50 employees will not file EEO-1 reports at all.

- Employers with 1 - 99 employees that are not federal contractors or subcontractors will not file EEO-1 reports. This is a continuation of current practice.

## What Will Federal Contractors and Subcontractors with 50-99 Employees Report on the New EEO-1?

- These contractors and subcontractors will continue to report the same information as on the most recent EEO-1. They will tally and report the number of employees by EEO-1 job category and then by sex and ethnicity or race. They will not report summary pay data.

- The 10 EEO-1 job categories will be the same as on the most recent EEO-1. They are:

  (1) Executive/Senior Level Officials and Managers;
  (2) First/Mid Level Officials and Managers;
  (3) Professionals;
  (4) Technicians;
  (5) Sales Workers;
  (6) Administrative Support Workers;
  (7) Craft Workers;
  (8) Operatives;
  (9) Laborers and Helpers; and
  (10) Service Workers.

- To continue to assist employers in categorizing specific jobs, the "EEO-1 Job Classification Guide 2010," assigns hundreds of specific occupations to EEO-1 job categories.

- The sex and ethnicity or race categories are the same as in the most recent EEO-1. For an explanation, see the EEO-1 Instruction Booklet at https://www.eeoc.gov/employers/eeo1survey/2017survey.cfm.

- Employers will count their employees for the EEO-1 during the "workforce snapshot period."
  - Starting with the 2017 EEO-1, the "workforce snapshot period" for the EEO-1 will be a pay period of the employer's choice between October 1 and December 31.

## What will Private Employers and Contractors/Subcontractors with 100 or more Employees Report on the New EEO-1?

- These larger employers will start by counting and categorizing employees by EEO-1 job category and then by sex and ethnicity or race, as on the most recent EEO-1. They will count employees during the "workforce snapshot period" between October 1 and December 31.

- Then, they will count employees in one of the 12 pay bands on the new EEO-1. The pay bands are:

  (1) $19,239 and under;
  (2) $19,240 - $24,439;
  (3) $24,440 - $30,679;
  (4) $30,680 - $38,999;

PI. MSJ 000055

(5) $39,000 - $49,919;

(6) $49,920 - $62,919;

(7) $62,920 - $80,079;

(8) $80,080 - $101,919;

(9) $101,920 - $128,959;

(10) $128,960 - $163,799;

(11) $163,800 - $207,999; and

(12) $208,000 and over.

- To choose a pay band, refer to the earnings reported in the W-2 Box 1.
  - For example, for the 2017 EEO-1, employers will refer to employees' W-2, Box 1, income for the year January 1 through December 31, 2017.

- Employers will tally the number of employees in each pay band by sex and ethnicity or race. For example, an employer might report 23 Sales Workers who are non-Hispanic white women in pay band 4 ($30,680 - $38,999).

- Finally, these employers will report the total number of hours worked that year by the employees in each pay band. For example, an employer reports the total number of hours worked by 23 Sales Workers who are non-Hispanic white women in pay band 4.
  - The new EEO-1 gives employers a choice about how to count hours worked for employees who are exempt employees under the FLSA. Employers may either use 40 hours per week for full-time employees and 20 hours per week for part-time employees or, if it chooses, report the number of hours the employees actually worked. Again, this is a choice.

## Confidentiality and Privacy of EEO-1 Data

- The EEOC has strict proceduress in place to protect the confidentiality of EEO-1 data, including summary pay data. The EEOC collects EEO-1 data under Title VII of the Civil Rights Act, as amended (Title VII).

- All information that the EEOC collects under Title VII is subject to strict confidentiality requirements.
  - Title VII prohibits any EEOC officer or employee from disclosing data collected on the EEO-1 report, unless the data is the subject of litigation.
  - Title VII imposes criminal sanctions on any EEOC officer or employee who violates this prohibition.

- The EEOC reinforces this requirement with strict security and privacy controls that protect the EEOC's and the Joint Reporting Committee's operations and information systems against a range of threats. The EEOC regularly trains its employees on Title VII confidentiality and on computer security.

- The EEOC imposes these Title VII confidentiality requirements on its own contractors as a condition of their EEOC contracts.

- The EEOC publishes reports based on large-scale EEO-1 data (for example, nationwide, statewide, metropolitan area EEO-1 data) only when the EEO-1 data is aggregated in a manner that does not disclose any individual employer or employee information.

- The OFCCP holds EEO-1 data for federal contractors and subcontractors confidential to the maximum extent possible under the Freedom of Information Act (FOIA) and the Trade Secrets Act.
  - The Joint Reporting Committee will provide the OFCCP with pay data only for federal contractors and subcontractors subject to Executive Order 11246.

## How The EEO-1 Data Will Be Used

### The EEOC

- The EEOC receives thousands of Title VII charges of employment discrimination every year alleging race, national origin, or sex discrimination, including pay discrimination. The EEOC also receives close to one thousand charges under the Equal Pay Act alleging pay discrimination based on sex every year.

PI. MSJ 000056

- The EEOC does statistical analysis of EEO-1 data early in its investigations. This helps with a first assessment of the allegations made in a charge of discrimination and, as appropriate, with planning an investigation. The EEO-1 is not the only source of data used at this stage, but it certainly helps.

- In addition, the EEOC will periodically publish aggregated EEO-1 data and industry reports that may provide useful comparative data for private employers and federal contractors.
    - Small employers will especially benefit from the published reports because they will obtain comparative data that will assist them in conducting voluntary self-assessment of their pay practices.
    - Voluntary self-assessment will help small businesses remedy any pay disparities and comply with state and federal equal pay laws.

## OFCCP

- OFCCP will use the EEO-1 data to help identify federal contractors and subcontractors for compliance reviews under E.O. 11246.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

For more information, contact Ronald Edwards, Director, Program Research and Surveys Division, EEOC, 131 M Street NE, Room 4SW30F, Washington, D.C. 20507; (202) 663-4949. voice or (202) 663-7063 (TTY).

**CONNECT WITH US**     

Privacy Policy | Disclaimer | USA.Gov

Pl. MSJ 000057

# EXHIBIT H

Pl. MSJ 000058

# NOTICE OF OFFICE OF MANAGEMENT AND BUDGET ACTION

Date     09/29/2016

Equal Employment Opportunity Commission


FOR CERTIFYING OFFICIAL:     Pierrette McIntire

FOR CLEARANCE OFFICER:     Franchette Tucker


In accordance with the Paperwork Reduction Act, OMB has taken action on your request received
07/14/2016

ACTION REQUESTED:     Revision of a currently approved collection

TYPE OF REVIEW REQUESTED:     Regular

ICR REFERENCE NUMBER:     201607-3046-001

AGENCY ICR TRACKING NUMBER:

TITLE:     Employer Information Report (EEO-1)

LIST OF INFORMATION COLLECTIONS:  See next page


OMB ACTION:  Approved with change

OMB CONTROL NUMBER:     3046-0007

The agency is required to display the OMB Control Number and inform respondents of its legal significance in accordance with 5 CFR 1320.5(b).


EXPIRATION DATE:  09/30/2019                     DISCONTINUE DATE:


| BURDEN: | RESPONSES | HOURS | COSTS |
|---|---|---|---|
| Previous | 307,103 | 1,044,150 | 0 |
| New | 67,146 | 1,952,146 | 0 |
| Difference | | | |
| Change due to New Statute | 0 | 0 | 0 |
| Change due to Agency Discretion | -239,957 | 907,996 | 0 |
| Change due to Agency Adjustment | 0 | 0 | 0 |
| Change due to PRA Violation | 0 | 0 | 0 |

TERMS OF CLEARANCE:


OMB Authorizing Official:     Howard Shelanski
                              Administrator,
                              Office Of Information And Regulatory Affairs

| List of ICs | | | |
|---|---|---|---|
| IC Title | Form No. | Form Name | CFR Citation |
| Employer Information Report (EEO-1) Components 1 & 2 | SF 100 | EEO-1 Components 1 & 2 | 29 CFR 1602.7 |
| Employer Information Report (EEO-1) Component 1 Only | SF 100 | EEO-1 Component 1 | 29 CFR 1602.7 |

Pl. MSJ 000060

# EXHIBIT I

Pl. MSJ 000061

**Supporting Statement**

**Recordkeeping and Reporting Requirements for**

**Employer Information Report (EEO-1)**

**OMB Control No. 3046-0007**

**A. Justification**

The Equal Employment Opportunity Commission (EEOC) is: (1) seeking renewal of OMB approval under the Paperwork Reduction Act (PRA) of the Employer Information Report (EEO-1); and (2) seeking approval of the addition of a second component to the EEO-1 to collect summary pay data. The EEOC and the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) have separate legal authority to collect EEO-1 data, and they coordinate collection to promote efficiency through their Joint Reporting Committee. The EEOC is responsible for obtaining PRA clearance for the EEO-1.

As explained in its July 14, 2016, PRA 30-Day Notice (81 FR 45479), the EEOC concludes: that persistent pay gaps exist in the U.S. workforce correlated with sex, race, and ethnicity; that workplace discrimination is an important contributing factor to these pay disparities; and that collecting summary pay data with the EEO–1 will improve the EEOC's ability to effectively assess allegations of pay discrimination and focus investigations, as well as strengthen OFCCP's ability to select appropriate federal contractors and subcontractors for review of their compliance with equal employment opportunity mandates. This summary pay data collection also will encourage employers to voluntarily address unjustified pay disparities. The EEOC will provide extensive technical assistance during the transition period to this information collection, which has been extended to 18 months (from 12 months).

1.  Legal and administrative requirements
    The legal basis for the EEOC's EEO-1 recordkeeping and reporting requirements is found in Section 709(c) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-8(c), which imposes the requirement that "[e]very employer, employment agency, and labor organization subject to this subchapter shall (1) make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed, (2) preserve such records for such periods, and (3) make such reports therefrom as the Commission shall prescribe by regulation or order. . . ." The EEOC's regulations at 29 CFR §1602.7 set forth the recordkeeping and reporting requirements for private industry employers with 100 or more employees. OFCCP's regulations at 41 CFR §60-1.7(a), which are based on Executive Order 11246, contain the EEO-1 recordkeeping and reporting requirement for federal contractors that (1) are not exempt from the provisions of these regulations in accordance with 41 CFR §60-1.5, (2) have 50 or more employees, (3) are prime contractors or first tier subcontractors, and (4) have a contract, subcontract or purchase order amounting to $50,000 or more, or serve as depositories of Government funds in any amount, or are financial institutions which are

Pl. MSJ 000062

issuing and paying agents for U.S. savings bonds and savings notes. (The federal contractors and subcontractors under OFCCP's jurisdiction are referred to as "federal contractors" in this supporting statement.)

The EEOC is committed to working with filers to provide assistance in successfully submitting all the EEO-1 data. This support includes providing increased technical assistance focusing on the new filing requirements; offering free seminars, webinars, and other training to employers; and working with industry groups and similar organizations to facilitate attendance by EEOC personnel at meetings and conferences to provide outreach, collect feedback, and answer questions. Filers in need of direct assistance may contact the Joint Reporting Committee by telephone at 1-877-392-4647 (toll-free) or by email at e1.techassistance@eeoc.gov. The EEOC also plans to coordinate with HRIS developers to enhance their understanding of the new filing requirements and explore how those requirements may be made easier through software modification and updates. The EEOC will continue to exercise its usual discretion with respect to enforcing filing requirements. *See also* Section 5, Impact on Small Business.

2.    Use of collected information
The EEOC is requesting approval to add a second component to the EEO-1 report, which would annually collect summary pay data and corresponding hours-worked information from certain employers in addition to the data currently collected by the EEO-1.

OFCCP uses EEO-1 data as part of its process in selecting establishments neutrally for compliance reviews. OFCCP will obtain EEO-1 summary pay data only for contractors subject to its jurisdiction.

The EEOC uses data from the currently approved EEO-1 in at least three ways. EEOC staff analyzes this data using desktop EEO-1 analytics software to help focus the early stages of its investigations. The EEOC also uses EEO-1 data to develop studies of the private sector workforce in which it cites only aggregated EEO-1 data (to protect confidentiality and privacy); these studies are publicly available. Finally, when researchers request data for academic studies, the EEOC may provide data as appropriate, but only subject to Title VII confidentiality and data security requirements. (*See* Section 10 for detailed discussion of confidentiality and data security).

With the addition of summary pay data to the EEO-1, the EEOC will expand its existing desktop EEO-1 analytics software to enable staff to assess pay disparities based on sex, ethnicity, or race. In investigating potential Title VII and Equal Pay Act violations, EEOC enforcement staff will be able to retrieve and analyze an employer's EEO-1 data just as they do now with their desktop analytics tool, which will be modified to permit statistical analyses of the pay and hours-worked data. As a first step, staff will be able to see the distribution of different demographics (sex, race, and ethnicity) across job groups and across the pay bands within the job groups. Where appropriate, the enforcement staff may use the analytics tool to conduct a Kruskall-Wallis test to determine generally if there are statistically significant disparities in a job group based on race, sex, or ethnicity. In addition, using the analytical software, staff could conduct an analysis of hours-

Pl. MSJ 000063

worked data using an interval regression to determine whether pay disparities remain after data on hours worked is included in the analysis. If, for example, a charging party had alleged that she was paid less than men in the same job, the EEOC investigator may retrieve a report through the EEO-analytics software that compares the pay of women to the pay of men within a job group using a rank sums test.

In assessing a charge during an investigation, EEOC enforcement staff can consider the results of several statistical analyses together with the allegations in the charge and other evidence gathered during the investigation, and, as appropriate, could compare EEO–1 pay data to other available data, for example Census statistics regarding comparable workers. In considering this data, the EEOC's enforcement staff decides how to focus the investigation and whether to request additional information from the employer. When EEOC enforcement staff requests information from an employer, it has the opportunity to explain its practices, provide additional data, and explain any non-discriminatory reasons for its pay practices and decisions. For example, the employer has the opportunity to provide more detailed information about pay by occupation and legitimate factors that could explain any apparent pay disparities. Only after considering all of this information and data, as well as any other relevant evidence, does the EEOC make a finding as to whether discrimination was the likely cause of the pay disparities.

The EEOC also plans to publish industry reports with only aggregated data that may provide useful comparative information that private employers and federal contractors may use without cost to assess their pay practices by industry.

3.  <u>Use of information technology</u>
    The EEO-1 report is collected through an online filing system, not in hard copy, unless the EEOC approves a hardship request to file a paper EEO-1. Filers either enter data online or upload a file with their EEO-1 data. Data upload allows a filer to submit a data file directly to the Joint Reporting Committee, and results in time and cost savings for filers using the method. The EEOC is releasing technical specifications for the type of files to be used by employers for data upload when the revised EEO-1 report is finalized.

4.  <u>Description of efforts to identify duplication</u>
    EEO-1 data is collected on behalf of the EEOC and OFCCP, pursuant to the EEOC's authority under Title VII and OFCCP's authority under Executive Order 11246. The EEO-1 is administered by the Joint Reporting Committee, which is housed at the EEOC, as a single data collection to meet the statistical needs of both agencies while simultaneously avoiding duplication.

3

5.    Impact on small business

Currently, the EEO-1 report is filed by private employers with 100 or more employees and federal contractors with 50 or more employees. This information collection request contains a second component to collect summary pay data, as described in Section 2. Federal contractors with 50 to 99 employees will not be required to submit summary pay data, but will continue to submit demographic information by race, ethnicity, sex, and by job category just as they do under the current OMB approval of this information collection. Although the agency considered raising the filing threshold for collecting pay-band data to even larger employers, it concluded that exempting a subset of employers that currently file the EEO-1 from the requirement to report pay data would result in an absence of data for a large number of employers who employ millions of workers, and that this would significantly reduce the utility of the data collection.

The EEOC is committed to robust outreach and technical support efforts, especially for small employers, as previously discussed in Section 1. The EEOC is releasing technical specifications for the type of files to be used by employers for data upload at the same time the revised EEO-1 report is announced. The EEOC will offer free webinars and seminars that will cover in detail the changes to the revised EEO-1 report. EEOC staff will coordinate with industry groups and other similar organizations to organize timely outreach opportunities for their membership and stakeholders by, for example, presenting information on the revised filing requirements and discussing challenges the requirements may create with representatives of the employer community. Moreover, the Joint Reporting Committee will be available to help individual filers experiencing technical issues or who need assistance with filing. Filers in need of technical support are encouraged to contact the Joint Reporting Committee by telephone at 1-877-392-4647 (toll-free) or by email at e1.techassistance@eeoc.gov.

6.    Consequences if information were collected less frequently

The EEOC and OFCCP seek to investigate potential discrimination with the benefit of up-to-date data reflecting the most current pay and salary information possible. The EEOC considered collecting EEO-1 data every two years. This approach was rejected, however, because the agency concluded that the utility of the data would be diminished before new data became available. In the private sector, workforce changes are frequent, not only within a particular establishment's workforce, but also on a larger scale, in light of mergers and acquisitions. When employers restructure through mergers and acquisitions, employee demographics and pay structure may undergo significant changes. A delay of two years in collecting data reflecting these changes could undermine the EEOC's enforcement efforts, since the agency would be forced to rely on outdated and inaccurate data with respect to filers.

7.    Special circumstances

This information collection does not require any special circumstances.

8.    Consultation outside the agency

This proposal is the result of extensive and careful consideration of many elements, including government studies that analyze compensation in U.S. workplaces, relevant

4

academic literature on compensation practices, public comments, public hearing testimony, and the early analyses reflected in the National Academy of Sciences (NAS) study and a subsequent EEOC-contracted study.

Recognizing the challenges of collecting pay data, and following the recommendations of the President's National Equal Pay Task Force, the EEOC commissioned a study by the NAS to provide information for its decision-making process regarding a pay data collection. The NAS study assessed the feasibility of effectively collecting pay data to detect pay discrimination and support law enforcement efforts. Published in 2012, the NAS Report recommended, as one of six recommendations, that the EEOC also commission an independent Pilot Study to inform the parameters of a pay data collection.

The EEOC commissioned the Pilot Study, which made technical recommendations about several central components of a pay data collection, including: the unit of pay to be collected; the best summary measures of central tendency and dispersion for rates of pay; appropriate statistical test(s) for analyzing pay data; and the most efficient and least costly methods for transmitting pay data from employers. The Pilot Study also contemplated using the 10 established EEO-1 job categories. Consistent with Pilot Study recommendations, the EEOC elected to use the W-2 definition of income, to use pay bands that track the wage intervals used by the Bureau of Labor Statistics' OES survey, and to collect summary hours-worked information for employees. *See* Sage Computing, EEOC Pay Pilot Study (Sept. 2015), http://www.eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf (Pilot Study).

The EEOC also worked closely with OFCCP, and the two agencies together consulted with the Department of Justice, focusing on how EEO-1 pay data would be used to assess complaints of discrimination, focus investigations, and identify employers with existing pay disparities that might warrant further examination.

On March 16, 2016, the EEOC held a public hearing and heard testimony from 15 witnesses from a wide range of backgrounds. During the 60-day comment period ending April 1, 2016, the EEOC received 322 timely public comments. The EEOC carefully considered this feedback and revised the proposal for the 30-day notice and comment period in the following ways:

(a)     Adjusted the annual burden calculations:
        In response to comments questioning the EEOC's burden calculation methodology, the agency revised its burden estimates by (1) reflecting varying labor costs for the different types of staff involved with preparing the EEO-1, (2) adding labor costs for functions performed at the establishment level, and (3) increasing the total number of burden hours a firm would need to read the EEO-1 instructions and to collect, verify, and enter data on the EEO-1 online portal.

(b)     Expanded the discussion on confidentiality and protections afforded the collected information by the EEOC and OFCCP:

5

*See* Section 10 of this statement for a discussion of measures taken by the EEOC and OFCCP to preserve the confidentiality of the EEO-1 data.

(c)     Expanded the discussion of how the EEOC will use this information:

(1)  The EEOC will use the data primarily for early assessment of allegations of discrimination based on sex, ethnicity, or race.  During an investigation, EEOC staff may use statistical tools to examine whether the EEO-1 data suggests that there are significant disparities in reported pay in job groups based on race, sex, or ethnicity, and/or to examine how an employer compares to similar employers in its labor market.

(2)  The EEOC will provide additional training to its employees, including investigators and other enforcement staff, statisticians, attorneys, and intake specialists, on how to identify pay disparities that warrant closer examination and how to use the new pay data.  The EEOC will also use aggregated EEO-1 data, along with Census data and potentially other data sources, to periodically publish reports on pay disparities by race, sex, industry, occupational groupings, and Metropolitan Statistical Area (MSA).  These reports may be useful tools for employers wishing to engage in voluntary self-assessment of pay practices.

(d)     Added language to clarify the EEOC's statutory authority to collect the pay and hours worked data:

(1)  The EEOC's authority to promulgate the EEO-1 report is found in section 709(c) of Title VII, which requires employers covered by Title VII to make and keep records relevant to whether unlawful employment practices have been or are being committed, to preserve such records, and to produce reports as the Commission prescribes by regulation or order, after public hearing, "as reasonable, necessary, or appropriate for the enforcement of this subchapter or the regulations . . . thereunder."  The EEOC prescribes the EEO-1 report by regulation at 29 CFR part 1602, subpart B, which requires private employers with 100 or more employees to "file [annually] with the Commission or its delegate executed copies of [the] . . . EEO-1 [report] in conformity with the directions set forth in the form and accompanying instructions."

(2)  The EEOC administers the EEO-1 jointly with OFCCP, which enforces the employment discrimination prohibitions of Executive Order 11246, as amended, for federal contractors and subcontractors, including specific provisions regarding pay discrimination and transparency.  OFCCP's regulations require contractors to submit "complete and accurate reports on Standard Form 100 (EEO-1) . . . or such form as may hereafter be promulgated in its place."  The Joint Reporting Committee, composed of the EEOC and OFCCP and located at the EEOC, administers the EEO-

6

1 as a single data collection to meet the statistical needs of both agencies while avoiding duplication.

(e)    <u>Changed the filing deadline from September 30 to March 31 of the following year, beginning with the report of 2017 data, to give employers more time to transition to the new information collection</u>:

    (1)  The 2017 EEO-1 report that would have been due on September 30, 2017, now is due on March 31, 2018.  This extension of the filing date provides filers with six more months to adjust and allows the EEOC to engage in additional outreach and training on the revised data collection.

    (2)  The new annual filing deadline of March 31 also will eliminate the need for a special W-2 calculation solely for purposes of the EEO-1 report.  The new deadline aligns the EEO-1 with federal obligations to calculate and report W–2 earnings as of December 31.

(f)    <u>Shifted the workforce snapshot period to coordinate with the new reporting period and filing deadline</u>:

Under the revised proposal, employers may count their employees during any pay period between October 1 and December 31, and will consult W–2 (Box 1) income and hours worked for these employees for the full calendar year ending December 31.  This change in part addresses public comments that the previous "workforce snapshot" period of July – September would not capture same-year promotions that have the effect of moving the employee into a different EEO-1 job category or pay band.  Given that hours-worked data also will be collected for each job category/pay band, moving the snapshot period to the fourth quarter reduces the risk of skewed data due to mid-year promotions.

(g)    <u>Provided employers with a choice about how to report hours worked for FLSA-exempt employees</u>:

The revised proposal would give employers the choice of how to report hours worked for FLSA-exempt employees.  EEO-1 filers subject to the second component may choose to either: (1) report a proxy of 40 hours per week for full-time exempt employees and 20 hours per week for part-time exempt employees, multiplied by the number of weeks the individuals were employed during the EEO-1 reporting year; or (2) provide actual hours of work by exempt employees during the EEO-1 reporting year if the employer already maintains accurate records of this information.  This choice is entirely up to the filer/employer. Filers that elect to use the 40-hour and 20-hour proxy approach may still certify that the reports are "accurate and . . . prepared in accordance with the instructions," as the revised instructions allow filers to use the proxies.

Pl. MSJ 000068

In addition to the above-described preliminary review of the proposed EEO-1, the EEOC will continue to evaluate the revised EEO-1 report after it is in use.  Under the standard three-year renewal process set out by the PRA for federal data collection, the next renewal of the EEO-1 will occur in 2019.  As part of this process, the EEOC will consider its experience in collecting data through the revised EEO-1.  The EEOC will monitor and evaluate the utility and effectiveness of the summary pay data collected and, within six months of the approval of this collection, the EEOC will provide OMB a monitoring and evaluation plan.  The plan will include effectiveness measures, baseline information, procedures for collecting and evaluating data, and any other pertinent information.  The EEOC will report the results of its monitoring and evaluation activities in subsequent information collection request packages.

The EEOC will begin collecting pay data as of March 31, 2018, and will be positioned to utilize pay data in its investigations in 2019, after the first pay data collection has been thoroughly reviewed for accuracy.  As these investigations may still be ongoing at the time the next information collection request package must be submitted to OMB in late 2019, there will be limited information to evaluate for purposes of that PRA approval process.  Consistent with the PRA requirements and its commitment to assess this collection, however, the agency will consider whether changes may be warranted to increase the practical utility of the data collection or to decrease the burden on EEO-1 filers.  For example, the EEOC may consider the utility and burden of retaining the existing EEO-1 job categories or pay bands as compared to adopting new categories or bands.

EEOC staff will provide assistance throughout the filing process and will note information from employers about the reporting burden, among other topics.  Filers may submit comments on this collection of information, including suggestions for reducing burden, at any time to the EEOC at:

EEO-1 Coordinator
EEOC Survey Division -- Room 4SW22G
131 M Street, N.E.
Washington, D.C. 20507
or

Suggestion Box on EEO-1 Additional Documentation and eeo1.suggestionbox@eeoc.gov.

9.    Gifts or payments
      No gifts or payments will be provided to respondents in connection with this information collection.

10.   Confidentiality of information

Pl. MSJ 000069

Confidentiality

All reports and any information from individual reports are subject to the confidentiality provisions of Section 709(e) of Title VII, and may not be made public by the EEOC prior to the institution of any proceeding under Title VII involving the EEO-1 data.  Any EEOC employee who violates this prohibition may be found guilty of a criminal misdemeanor and could be fined or imprisoned.  The confidentiality requirements allow the EEOC to publish only aggregated data, and only in a manner that does not reveal any particular filer's or any individual employee's personal information.

Furthermore, the EEOC's insistence that contractors, other federal agencies, and FEPAs adhere to the Title VII confidentiality requirements ensures that no individual employee's personal information is made public.  In addition to ensuring that the agency's own employees adhere to the Title VII confidentiality requirements, the EEOC also imposes these requirements on all of its contractors as a condition of their contracts.  With respect to federal agencies other than OFCCP demonstrating a legitimate law enforcement purpose, the EEOC provides access to information collected under Title VII *only* if the agencies agree, by letter or memorandum of understanding, to comply with the confidentiality provisions of Title VII at 42 U.S.C. §2000e–8(e).  Subject to agreement to comply with this confidentiality provisions, the EEOC shares EEO-1 reports with the Department of Justice (DOJ) (to represent OFCCP in litigation), and the Federal Deposit Insurance Corporation (FDIC) and the National Credit Union Administration (NCUA)( to help analyze diversity in management, employment, and business activities pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010).

Title VII itself provides that the EEOC must provide state and local fair employment practices agencies (FEPAs) EEO-1 data upon request on the condition that they *not* make it public.   42 U.S.C. §2000e–8(d).  FEPA staff receive annual training in data protection and security.

The EEOC only shares EEO-1 data with private researchers under the Intergovernmental Personnel Act and subject to strict confidentiality agreements.  Before a researcher can be granted access to any EEO-1 data, he or she must first sign a written agreement providing that (1) the researcher agrees to be subject to the confidentiality provisions of Title VII and to be responsible for ensuring compliance with Title VII confidentiality by any of the researcher's staff who work on the project, (2) the researcher will not disclose the data to anyone other than staff working on the project, (3) prior to publication or dissemination of any dissertation, report, research, statistics or other work product based on the EEO-1 information, the researcher must submit the work product to the EEOC for its review and determination in writing that no confidential information will be released, (4) the EEO-1 data received from the government will not be used for other than the stated purpose of the research, (5) upon conclusion of the project, the researcher must return to the EEOC all original documents supplied by the agency, and must confirm in writing that any working copies of the EEO-1 information have been destroyed, and (6) any violation of the confidentiality agreement could result in penalties including criminal prosecution

9

under Title VII.  Researchers are given very clear instruction on how to preserve the
confidentiality of EEO-1 data, and in the EEOC's experience, researchers are extremely
mindful of the sensitivity of the data they receive.  Sharing data with researchers under
these agreements has never resulted in a confidentiality breach, nor has an individual's
personal information been released.

OFCCP receives EEO-1 data on federal contractors through its own legal authority under
Executive Order 11246, as amended, and the implementing regulations.  OFCCP will
obtain, through the Joint Reporting Committee, EEO-1 summary pay data *only* for those
federal contractor filers over which Executive Order 11246 gives OFCCP jurisdiction.
OFCCP will not receive EEO-1 summary pay data for companies that are not federal
contractors under OFCCP's jurisdiction.

OFCCP will notify contractors of any Freedom of Information Act (FOIA) requests that
are made to obtain any of the data provided on the EEO-1 report, and will protect the
confidentiality of EEO-1 pay and hours-worked data to the maximum extent possible
consistent with FOIA and the Trade Secrets Act.  However, should OFCCP receive FOIA
requests for any EEO-1 data on filers not within its jurisdiction, OFCCP will refer the
requests to the EEOC for a response.  The confidentiality provision of Section 709(e) of
Title VII applies to all EEO-1 data submitted by filers that are not federal contractors, and
the EEOC adheres to that statutory provision when reviewing all requests for EEO-1 data.

Security
The EEOC has a current privacy impact assessment for the EEO-1, which is published on
the EEOC website for employers that file the EEO-1 report, at:
https://www.eeoc.gov/employers/eeo1survey/privacyimpact.cfm

Before EEOC begins collecting summary pay data, the EEOC's information technology
system will be fully compliant with Circular A-130 and the privacy impact assessment
for the EEO-1 will be updated to address the revisions.

11.    Questions of a sensitive nature
       Currently, the EEO-1 report tallies data about the sex, race, and ethnicity of the
       workforce by EEO-1 job category.  The proposed addition of a second component to the
       EEO-1 report would require federal contractors and private employers with 100 or more
       employees to provide data on pay and hours worked.  All information will be reported in
       a summarized manner and no employee's personal information will be reported.

12.    Information collection burden

       2016 Overview of Information Collection – Component 1
              Number of Respondents:  67,146 firms filing 683,275 establishment reports
              Reporting Hours:   1,055,471
              Respondent Burden Hour Cost:  $30,055,086.62

       2017 and 2018 Overview of Information Collection – Components 1 and 2

10

Component 1 (Demographic and Job Category Data)
> Number of Respondents:  6,260 firms filing 9,129 establishment reports (federal contractors with 50-99 employees)
> Reporting Hours:   59,166
> Respondent Burden Hour Cost:  $1,872,792.41

Components 1 and 2 (Demographic and Job Category Data plus W-2 and Hours-Worked Data)
> Number of Respondents:  60,886 firms filing 674,146 establishment reports (all filers with 100 or more employees)
> Reporting Hours:  1,892,979.5
> Respondent Burden Hour Cost:  $53,546,359.08

Burden hours for Component 1 are estimated to be 8 hours per filer for firm-level functions and 1 hour per each additional report for establishment-level functions.  Burden hour costs are estimated at $268.82 per filer for firm-level functions.  For filers submitting their reports by data entry, each separate report filed has an estimated burden hour cost for establishment-level functions of $20.88, and for filers submitting via data upload, each separate report has an estimated burden hour cost of $14.03.

Burden hours for both Components 1 and 2 together are estimated to be 15.2 hours per filer for firm-level functions and 1.9 hours per each additional report for establishment-level functions.  Burden hour costs are estimated at $510.76 per filer for firm-level functions.  For filers submitting their reports by data entry, each separate report filed has an estimated burden hour cost for establishment-level functions of $39.66, and for filers submitting via data upload, each separate report has an estimated burden hour cost of $26.66.

For filers submitting both Component 1 and 2 data in 2017 and 2018, the EEOC estimates the addition of pay data will increase the estimated annual burden hour costs by an average of $416.58 per EEO-1 filer each year.

All burden calculation estimates include reading instructions, collecting, merging, validating, and reporting data electronically.

The EEOC estimates the one-time implementation burden hour cost associated with submitting the information required by Component 2 of the revised EEO-1 to be a total of $27,184,381.28.

The EEOC commissioned a Pilot Study, as discussed in Section 8, to help estimate the employer burden hour cost in conjunction with internal EEOC computations and collaboration with OFCCP.  The EEOC also incorporated many commenter suggestions in developing the burden estimate.

13.  Information collection cost burden
The estimated one-time implementation cost for submitting the information required by Component 2 of the revised EEO-1 Report is $27,184,381.28.  This calculation is based

Pl. MSJ 000072

on the one-time cost for developing queries related to Component 2 in an existing human resources information system (HRIS), which is estimated to take 8 hours per filer, and to be performed by a computer programmer at a wage rate of $55.81 per hour.  HRIS is used by more than 90 percent of human resource departments as of the most recent data. *See* Public Personnel Management, Volume 39, No. 3, Fall 2010.

No significant operation and maintenance costs should be associated with the systems to be used for submitting Component 2.

No additional one-time implementation cost or operation and maintenance costs are anticipated for employers continuing to submit Component 1 only.

The EEOC anticipates that the extensive technical support and training that the agency will provide to employers/filers, as described in Sections 1 and 5 above, will mitigate the one-time implementation burden.

14.    <u>Cost to federal government</u>
Estimated cost to the federal government for 2017 and 2018 will be $1,621,300.  This number reflects the increase in contract costs resulting from the addition of the pay data collection and the estimated internal staffing costs.  Specifically, this estimate includes the contract costs under the former collection regime, plus current staff costs, plus additional resources for collecting pay and hour data.

In addition to these recurring costs, there is also estimated to be a one-time cost of implementation in the amount of $318,000.

15.    <u>Program changes or burden adjustments</u>
Starting in 2017, filers with 100 or more employees (both private industry and Federal contractor) will submit data in response to both Components 1 and 2.  Contractors with 50 to 99 employees will only submit data for Component 1.  Component 1 has been collected by the EEOC for many years; it directs covered employers to report annually the number of individuals they employ by job category and by race, ethnicity, and sex. Component 2 proposes to supplement Component 1 with pay and hours worked data.

It is estimated that for those firms submitting Components 1 and 2 (versus submitting just Component 1), the estimated burden hours will increase from 8 hours per filer for firm-level functions and 1 hour per each separate report for establishment-level functions to 15.2 hours per filer for firm-level functions and 1.9 hours per each separate report for establishment-level functions (see Section 12).

As discussed in Section 2, the collection of pay and hours-worked data will help the EEOC better fulfill its mission by analyzing and developing statistical evidence as investigations proceed through the Commission's charge process.  It also will allow employers to more accurately self-assess their own pay practices.  Further, the EEOC will use aggregated EEO-1 data to develop studies of private sector workforces and to assist

12

researchers requesting data for academic studies, subject to strict confidentiality requirements (see Section 10).

16.    <u>Publication of data for statistical use</u>
The time schedule for tabulation and publication is as follows:

| | |
|---|---|
| Filing deadline | March 31 |
| First Follow-up | April 15 |
| Second Follow-up | May 15 |
| Preliminary Data | Periodic data audits |
| Final Data | December 31 |

In each survey year a publication, *Job Patterns for Minorities and Women in Private Industry*, is posted on the EEOC web site.  The publication includes non-confidential aggregations of the EEO-1 data based on various geographic and industrial criteria and can be found at <u>http://www.eeoc.gov/eeoc/statistics/employment/jobpat-eeo1/index.cfm</u>. Similar data sets are available on <u>www.data.gov</u>.  Employers and researchers may use this data for self-assessment and affirmative action purposes.

17.    <u>Approval not to display the expiration date</u>
The EEOC is not seeking approval to not display the OMB approval expiration date on the EEO-1 report.

18.    <u>Exceptions to the certification statement</u>
The EEOC is not seeking any exceptions to the certification statement under this information collection request.

**B. Statistical Methods**

This information collection does not employ statistical methods as that term is used in the Specific Instructions for Supporting Statements for PRA Submissions.

Pl. MSJ 000074

# EXHIBIT J

Pl. MSJ 000075



April 1, 2016

Bernadette Wilson, Acting Executive Officer
Executive Secretariat
Equal Employment Opportunity Commission
131 M St., N.E.
Washington, DC 20507

**Re: Proposed Revision of the Employer Information Report (EEO-1), FR Docket Number 2016-01544, Docket ID EEOC-2016-0002**

Dear Ms. Wilson:

Thank you for the opportunity to comment on the Equal Employment Opportunity Commission's (EEOC) proposal to require large employers to submit summary compensation data as part of the annual EEO-1 reporting process.  The National Women's Law Center (the Center) has worked for over 40 years to advance and protect women's equality and opportunity—with a focus on women's employment, education, income security, health, and reproductive rights—and has long worked to remove barriers to equal treatment of women in the workplace, particularly those that suppress women's wages.  Collecting compensation data through the EEO-1 will improve enforcement of pay discrimination laws and increase voluntary employer compliance with those laws, helping to close the gender pay gap.  The National Women's Law Center strongly supports this proposal.

I.      **The Proposed EEO-1 Revision Will Help Identify And Address Pay Discrimination, a Crucial Driver of the Gender Pay Gap.**

The Center strongly supports EEOC's proposal to revise the EEO-1 to add a second component enabling collection of compensation data from private employers and federal contractor workplaces with more than 100 employees.  Such a component will play an important role in uncovering and combating pay discrimination.  Women working full time, year round continue to confront a stark wage gap, typically making only 79 percent of the median annual wages made by men working full time, year round.[1]  The wage gap is even worse for women of color: African American women typically make only 60 percent, Latinas only 55 percent,[2] and Native American women only 59 percent[3] of the wages white, non-Hispanic men typically make for full-time, year-round work.  This wage gap has remained stagnant for nearly a decade.[4]  Women

---

[1] NAT'L WOMEN'S LAW CTR., THE WAGE GAP IS STAGNANT FOR NEARLY A DECADE 1 (2015), *available at* http://nwlc.org/wp-content/uploads/2015/08/wage_gap_is_stagnant_9.23.15.pdf. http://nwlc.org/resources/wage-gap-stagnant-nearly-decade/ [THE WAGE GAP IS STAGNANT]
[2] *Id.*
[3] NAT'L WOMEN'S LAW CTR., THE WAGE GAP BY STATE FOR NATIVE AMERICAN WOMEN (2015), *available at* http://nwlc.org/resources/equal-pay-for-native-american-women/.
[4] THE WAGE GAP IS STAGNANT at 1.

*With the law on your side, great things are possible.*
11 Dupont Circle ■ Suite 800 ■ Washington, DC 20036 ■ 202.588.5180 ■ 202.588.5185 Fax ■ www.nwlc.org
Pl. MSJ 000076

are still paid less than men in nearly every occupation,[5] and studies show that even controlling for race, region, unionization status, education, experience, occupation, and industry leaves 38 percent of the pay gap unexplained.[6]  Research indicates that discrimination accounts for at least part of this unexplained gap.  For example, a recent experiment revealed that compared to an identical female applicant, science professors offered a male applicant for a lab manager position a salary of nearly $4,000 more, additional career mentoring, and judged him to be significantly more competent and hireable.[7]  A range of factors contributes to the pay gap, including pay discrimination between employees of different genders who are doing the same job.[8]

Yet pay discrimination remains difficult to detect in the first instance. Because pay often is cloaked in secrecy, when a discriminatory salary decision is made, it is seldom as obvious to an affected employee as a demotion, a termination, or a denial of a promotion.[9]  Moreover, about 60 percent of workers in the private sector nationally are either forbidden or strongly discouraged from discussing their pay with their colleagues.[10] As a result, employees are discouraged from gathering information that would suggest that they have experienced pay discrimination, which undermines their ability to challenge such discrimination.  Punitive pay secrecy policies and practices allow this form of discrimination not only to persist, but to become institutionalized. Consequently, government enforcement and employer self-evaluation and self-correction are critical to combat compensation discrimination.

Collecting and making publicly available compensation data from larger private employers and federal contractors will improve the effectiveness of enforcement efforts and increase the likelihood of employer self-correction, thus targeting pay discrimination on multiple fronts. First, the revised EEO-1 will help both EEOC and the Office of Federal Contract Compliance Programs of the Department of Labor (OFCCP) tackle discrimination by private employers and large federal contractors.  This data collection will empower the agencies to target their limited enforcement resources toward more detailed oversight of those employers who are most likely to be engaging in pay discrimination, greatly enhancing the effectiveness and efficiency of EEOC's

---

[5] Hegewisch, A. & Matite, M., *The Gender Wage Gap by Occupation,*  INST. FOR WOMEN'S POLICY RESEARCH (2013), *available at* http://www.iwpr.org/publications/pubs/the-gender-wage-gap-by-occupation-2
[6] Blau, F. D. & Kahn, L.M, *The Gender Wage Gap: Extent, Trends and Explanations*, NAT'L BUREAU OF ECONOMIC RESEARCH  (Jan. 2016), *available at* http://www.nber.org/papers/w21913.pdf.
[7] Moss-Racusin, C.A. et al., *Science faculty's subtle gender biases favor male students*, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES OF AMERICA (Aug. 2012), *available at* http://www.pnas.org/content/109/41/16474.abstract#aff-1.
[8] Blau & Kahn 2016, *supra* note 6; *see* NAT'L WOMEN'S LAW CTR., FIFTY YEARS AND COUNTING: THE UNFINISHED BUSINESS OF ACHIEVING FAIR PAY (2015), *available at* http://nwlc.org/resources/50-years-counting-unfinished-business-achieving-fair-pay/.
[9] As Justice Ginsburg has noted:
> Pay disparities often occur, as they did in Ledbetter's case, in small increments; cause to suspect that discrimination is at work develops only over time. Comparative pay information, moreover, is often hidden from the employee's view. Employers may keep under wraps the pay differentials maintained among supervisors, no less the reasons for those differentials. Small initial discrepancies may not be seen as meet for a federal case, particularly when the employee, trying to succeed in a nontraditional environment, is averse to making waves. Pay disparities are thus significantly different from adverse actions "such as termination, failure to promote, …or refusal to hire," all involving fully communicated discrete acts, "easy to identify" as discriminatory.

Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007) (Ginsburg, J. dissenting).
[10] INST. FOR WOMEN'S POLICY RESEARCH, PAY SECRECY AND WAGE DISCRIMINATION (2014), *available at* http://www.iwpr.org/publications/pubs/pay-secrecy-and-wage-discrimination-1/at_download/file

Pl. MSJ 000077

and OFCCP's pay discrimination enforcement efforts.   In addition, other forms of unlawful gender and race discrimination can manifest as gaps in compensation.  For example, if hiring discrimination keeps women out of higher paying jobs in a company, or harassment systematically pushes women out of male-dominated, highly paid jobs, the result may be gender pay gaps within the firm.  If African American employees, for example, are scheduled for fewer work hours, this also would be reflected in pay gaps.  Collecting compensation data allows for more targeted enforcement of a range of antidiscrimination protections.

Second, both the process of responding to the data collection tool and the more effective and targeted approach to enforcement that the tool permits will spur more employers to proactively review and evaluate their pay practices and to address any unjustified disparities between employees. By incentivizing and facilitating such employer self-evaluation, the revised EEO-1 Report will increase voluntary employer compliance with discrimination laws.  Employees and employers alike will benefit from the elimination of discrimination in pay practices absent litigation or other formal enforcement mechanisms, which can be expensive and time-consuming.

## II.    The EEO-1 Report Is the Appropriate Vehicle for Collecting Pay Data.

The EEO-1 Report is well suited for efficiently collecting meaningful data related to pay, for multiple reasons.

First, the decision to collect this pay information through the EEO-1 Report and to share it with OFCCP minimizes the compliance burden for regulated employers in direct response to concerns previously raised by the employer community.  When OFFCP previously proposed collecting compensation data from federal contractors through a separate tool on a different reporting schedule from the EEO-1,[11] employer representatives urged in the strongest terms that instead EEOC and OFCCP coordinate their data collection through use of a single, unified instrument.[12] The proposed EEO-1 revision accomplishes this goal, avoiding duplication of effort or wasted costs for either employers or enforcement agencies.  For these reasons, the National Academy of Sciences' study regarding the collection of compensation data (NAS Study)[13] concluded that use of the EEO-1 for pay data collection would be "quite manageable for both EEOC and the respondents."[14]

---

[11] U.S. Department of Labor, Office of Federal Contract Compliance Programs, Non-Discrimination in Compensation; Compensation Data Collection Tool, Advanced Notice of Proposed Rulemaking, 76 Fed. Reg. 49398 (Aug. 10, 2011); U.S. Department of Labor, Office of Federal Contract Compliance Programs, Government Contractors, Requirement to Report Summary Data on Employee Compensation, Notice of Proposed Rulemaking, 79 Fed. Reg. 46561 (Aug. 8, 2014).

[12] *See* SAGE COMPUTING, INC., EEOC SURVEY SYSTEM MODERNIZATION WORK GROUP MEETING 2 (Mar. 2012), *available at* http://www.eeoc.gov/employers/eeo1survey/survey-modernization.pdf; *see also, e.g.*, Equal Employment Advisory Council, *Comments on the Office of Federal Contract Compliance Programs' Proposed Requirement to Report Summary Data on Employee Compensation* (Jan. 5, 2015);  Society for Human Resource Management and the College and University Professional Association for Human Resources, *Comment on Advanced Notice of Proposed Rulemaking Related to Non-Discrimination in Compensation* 3-4 (Oct. 11, 2011).

[13] NATIONAL RESEARCH COUNCIL OF THE NATIONAL ACADEMIES, COLLECTING COMPENSATION DATA FROM EMPLOYERS (2012), *available at* http://www.nap.edu/catalog/13496/collecting-compensation-data-from-employers [NAS STUDY].

[14] NAS STUDY at 60.

Pl. MSJ 000078

Second, by utilizing the long-established EEO-1 job categories, reliance on the EEO-1 Report allows employers to report pay data without requiring them to master and implement new methods of categorizing job titles within their workplace. Instead, employers can make use of the existing systems by which they associate job titles with EEO-1 job categories, thus simplifying reporting.

Third, use of the EEO-1 enables the calculation and comparison of compensation data by gender within racial/ethnic groups, and by racial/ethnic groups within genders. The substantial pay gaps experienced by women of color compared to their white, non-Hispanic male and female counterparts demonstrate that unequal pay is a problem that has both gender and racial/ethnic dimensions. Reporting pay data through the EEO-1 Report will capture these interacting impacts.

Fourth, use of the EEO-1 as a reporting tool will facilitate analysis of compensation data both company-wide and within each employer's establishment, given that a separate EEO-1 Report must be filed for each physical location in a multi-establishment company. Company-wide analysis will help to draw attention to potential systemic discrimination that can affect many workers across an organization and enable meaningful analysis of the company's pay practices even where the number of workers at each individual establishment is relatively small. On the other hand, establishment-level analysis will ensure that individual establishments that engage in pay discrimination cannot evade detection if the company as a whole has pay that is closer to equal.

Finally, and most importantly, reporting of compensation data by gender and racial/ethnic groups within each of the ten job categories from the EEO-1 (rather than by an employer's own job titles or job classification system) will facilitate the consistent comparison of pay disparities in each job category among employers in a given industry and geographic area. Specifically, it will help EEOC and OFCCP identify firms with racial or gender pay gaps within each job category that significantly diverge from their industry and regional peers for potential further detailed assessment. That is, it will allow analysis and comparison of wage data for firms employing workers in the same job class, in the same industry, in the same location, in the same year. In addition, it will help EEOC and OFCCP develop a better understanding of which industries have the most significant pay disparities, and to target enforcement resources accordingly. These data will also enable EEOC and OFCCP to better assess the extent to which sex-based compensation discrimination affects women's entry into non-traditional industries, and more generally to better understand the relationship between gender segregation in the workforce and pay discrimination.

The EEO-1 categories are relatively broad, and a single category can comprise multiple jobs in an establishment. Some have objected that as a result the pay gap measured in a particular EEO-1 job category for a particular employer will not necessarily measure disparities in pay for "equal work." This objection ignores the fact that the EEO-1 was never intended to act as an instrument precise enough to establish or prove violations of law without more investigation. Rather, what the EEO-1 has historically done, and what compensation data collection will strengthen its capacity to do, is aggregate millions of data points to establish gender and racial patterns within these job categories, thus allowing identification of firms that sharply depart from these patterns

for further analysis.[15]  For example, the EEO-1 has been used by OFCCP to aid in the selection of federal contractors for enforcement activities, by academics to study the impact of affirmative action on women and people of color, and by the U.S. Government Accountability Office to assess the effectiveness of antidiscrimination programs.[16]  The revised EEO-1 Report will provide EEOC and OFCCP a critical tool for focusing investigatory resources to identify pay discrimination within equivalent jobs, and will also flag deviations from compensation patterns that may be driven by other forms of discrimination that shut women or people of color out of higher-paying roles within a given job category.

### III.    W-2 Pay Is the Best Readily Available Measure of Compensation for Data Collection Purposes.

We support the collection of data that provides a true picture of employees' compensation, which necessarily includes pay that exceeds base salary. Indeed, for Equal Pay Act purposes, relevant compensation

> includes all payments made to [or on behalf of] an employee as remuneration for employment. The term includes all forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance, or some other name. Fringe benefits are deemed to be remuneration for employment. . . . [V]acation and holiday pay, and premium payments for work on Saturdays, Sunday, holidays, regular days of rest or other days or hours in excess or outside of the employee's regular days or hours of work are deemed remuneration for employment and therefore wage payments that must be considered in applying the EPA . . . .[17]

Requiring employers to report total W-2 earnings will provide a comprehensive picture of disparities in worker compensation, in line with EEOC's and OFCCP's enforcement mandates. Moreover, since employers already collect and report W-2 wage data pursuant to federal law, inclusion of this information in the revised EEO-1 Report will impose a minimal additional burden.

### A.    W-2 Earnings Provide a Comprehensive Picture of Compensation

The Center agrees with EEOC and the conclusions of the independent Pay Pilot Study (Pilot Study)[18] that of available compensation measures, the W-2 provides the most comprehensive picture of earnings, with a minimal associated burden for employers.  The NAS Study and the subsequent Pilot Study considered both the compensation definitions used by the Bureau of

---

[15] For instance, OFCCP has analyzed EEO-1 data to indicate the probability that a review will find a significant violation of federal requirements, and to target enforcement activities accordingly.  Public Hearing before the U.S. Equal Employment Opportunity Commission, July 18, 2012 (testimony of Dr. Marc Bendick, Jr.), *available at* http://www.eeoc.gov/eeoc/meetings/7-18-12/bendick.cfm.  EEOC itself has published public reports analyzing data from the EEO-1 and highlighting trends in particular industries. *See* U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, SPECIAL REPORTS, *available at* http://www.eeoc.gov/eeoc/statistics/reports/index.cfm.
[16] NAS STUDY at 17-25.
[17] 29 C.F.R. § 1620.10.
[18] SAGE COMPUTING, INC., FINAL REPORT (Sept. 2015), *available at* http://eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf   [PILOT STUDY].

Pl. MSJ 000080

Labor Statistics' Occupation Employment Statistics (OES) and by the W-2, among others, as a compensation measure for EEOC pay data collection, because these measures are the most widely known to employers and include various forms of compensation data.[19]  The OES compensation definition includes base rate of pay, hazardous duty pay, cost of living allowances, guaranteed pay, incentive pay, tips, commissions and production bonuses.[20]  But it does not account for certain some categories of compensation including overtime pay, severance pay, shift differentials and nonproduction, year-end and holiday bonuses.[21]  Though these categories may only account for a small portion of overall employee compensation, they are particularly relevant in certain industries.  For example, as noted in the Pilot Study, in management and business and financial operations bonuses account for more than 11 percent of cash compensation, and in healthcare shift differentials account for substantial differences in compensation.[22]

The W-2 definition includes all earned income, including supplemental pay components (such as overtime pay, shift differentials, and nonproduction bonuses) and therefore offers a more comprehensive picture of earnings than the OES.[23]  This comprehensive picture is critical because although compensation discrimination may manifest in workers' base salaries, it may also occur through discrimination in other less frequently measured forms of compensation such as bonuses,[24] commissions,[25] stock options, differential pay, and opportunities for overtime.  For instance, even when base salaries between comparable male and female workers are equal in a given company, overall compensation could be significantly disparate between the genders based on the discriminatory, discretionary allocation of compensation types such as bonuses and stock options.[26]  In fact, "female and minority employees have been virtually locked out of wealth-creating opportunities in most companies."[27]  Studies show than men receive stock options and

---

[19] The NAS Study reviewed the wage definitions in the Occupational Employment Statistics survey (OES) and the National Compensation Survey (NCS) and concluded that the OES definition should be considered for use because it was widespread, and because of a substantial overlap in the employers who report data to the OES and EEOC. NAS STUDY at 58.  The Pilot Study also recommends the use of W-2 data because such data provide the most comprehensive measure of compensation readily available to businesses.  PILOT STUDY at 108.

[20] NAS STUDY at 56.

[21] *Id.*; PILOT STUDY at 7.

[22] PILOT STUDY at 7 n.16.

[23] *Id.* at 7, 8.  While reported W-2 wages  include taxable benefits and pre-tax deductions driven by an individual employee's choices - such as mass transit and parking stipends/elections, 401(k) or retirement account contributions, and deferred compensation - these optional elements likely would not constitute a large enough part of compensation for most workers so as to create a disparity for the purposes of enforcement, nor is there reason to believe that men and women, or individuals of different races, would consistently make different choices in this regard and thus create gender or race pay disparities.

[24] *See* King v. Univ. Health Care Sys., 645 F.3d 713 (5th Cir. 2011) (upholding a jury's conclusion that the employer violated the Equal Pay Act when it failed to pay plaintiff anesthesiologist a bonus that it paid her male colleague).

[25] *See* Bence v. Detroit Health Corp., 712 F.2d 1024, 1027 (6th Cir. 1983) (finding a compensation disparity under Equal Pay Act where the employer paid higher commission rate to males than females, even though total remuneration was substantially equal).

[26] *See* MERCER, GENDER EQUITY REPORT (Nov. 2015), *available at* https://www.imercer.com/uploads/Aust/pdfs/Marketing/gender_pay_executive_summary.pdf  (survey of Australian companies finding that women receive lower variable reward/incentive pay despite receiving the same performance ratings as their male counterparts; males who only partially met their objectives received bonuses that were 35 percent larger (as a percentage of employment cost) than their female counterparts).

[27] Mehri, C. & Eardley, E., *21st Century Tools for Advancing Equal Opportunity: Recommendations for the Next Administration* 7, AMERICAN CONSTITUTION SOCIETY (2008), *available at* https://www.acslaw.org/files/Mehri%20FINAL.pdf.

bonuses at a rate twenty to thirty times than of women.[28]  Studies also indicate that compensation for men consists of 85 percent salary and 15 percent stock options, profit sharing, and other bonuses, while compensation for women consists of 91 percent salary and 9 percent stock options, profit sharing, and other bonuses.[29]

For all these reasons, the base rate of pay is not an appropriate alternative measure of compensation for the purposes of the revised EEO-1 Report.  The base rate of pay is an employee's initial rate of compensation, excluding extra compensation such as for overtime, bonuses, or an increase in the rate of pay for a shift differential.  It does not reflect the full measure of an employee's compensation.[30]  While some employers might easily be able to report base rate of pay, if it is the compensation data currently captured by their human resource information management systems (HRIS),[31] it is not a dynamic or complete picture of an employee's compensation and would not serve the purposes of the EEO-1 Report.  Data about base pay alone cannot capture instances where other types of compensation—such as stock options and bonuses—drive gender-based disparities in compensation, and would permit employers that discriminate using other forms of compensation to evade detection.  Conversely, collecting data on W-2 pay will help root out disparities across the spectrum of take-home compensation.  Accordingly, the Center supports collecting W-2 pay data, as the measure of earnings that collects as many forms of compensation as possible.

      B.     *Reporting W-2 Earnings and Hours Will Not Be Unduly Burdensome For Employers*

Requiring covered employers to report W-2 data in addition to the already-required ethnicity, race and gender of employees via the EEO-1 Report will not be unduly burdensome.  First, federal law already requires employers to maintain and generate the information in W-2 forms that will be required for the revised EEO-1.[32]  HRIS experts consulted for the Pilot Study reported that most major payroll software systems are preprogrammed to compile the data for generating W-2 forms.  This led the Pilot Study to conclude that employers using such software to manage payroll and generate W-2 forms could report the proposed data with minimal additional burden.[33]

Second, while it is true that W-2 earnings data usually are generated at the end of the calendar year and the revised EEO-1 will require W-2 data to be reported by October, earnings information for employees is available to employers on a year to date basis, as the Pilot Study noted.[34]  Employers could use payroll reports to generate the necessary data with few additional

---

[28] Alyssa Lebeau, *The New Workplace Woman: "Are We There Yet?,"* BUSINESS WOMAN, Fall 2001.
[29] *Id.*
[30] PILOT STUDY at 8.
[31] *Id.*
[32] 26 C.F.R. § 31.6051-1.
[33] PILOT STUDY at 8, 103.  The majority of employers use automated payroll systems.  Optimal Benefit Strategies, LLC, *Most Small Employers Face Low Cost to Implement Automatic IRAs*, AARP (Aug. 2009) ("97 percent of employers with 10 or more employees use automated systems and do not process payroll manually"), *available at* http://assets.aarp.org/rgcenter/econ/auto_iras.pdf.  The Pilot Study acknowledged that some companies that outsource their payroll may need to make a one-time capital investment to write a software program to import data from payroll programs into the HRIS system.
[34] PILOT STUDY at 8.

Pl. MSJ 000082

complications, especially if they have automated payroll systems, which are preprogrammed to compile data for generating W-2s on a year to date basis.[35]

## IV.  Reporting of Total Hours Worked Will Greatly Enhance the Usefulness of the Pay Data Collected.

EEOC's proposal to collect the total number of hours worked by the employees included in each EEO-1 pay band will allow the calculation and comparison of mean compensation both per person and per hour for each gender and racial/ethnic group within each job category.  As the Pilot Study recognized, collection of total hours worked by each employee in addition to wages is critical to an analysis of pay differences.[36]  Collecting this data will allow OFCCP and EEOC to account for pay differences due to variation in the number of hours worked among employees in a pay band, sharpening pay comparisons both between different groups in an employer's workforce and between different employers.  Collection of total hours worked also will permit an analysis that accounts for periods of unemployment or less than full-time work, including part-time, temporary and seasonal work.  This is especially important since women constitute two-thirds of part-time workers in the U.S,[37] and because part-time workers are often paid less, per hour, than their full-time counterparts.[38]  Additionally, women are almost half of all temporary workers.[39]

Hours worked data is also available to employers.  Employers must keep records of hours worked for all employees not exempt from the Fair Labor Standards Act.[40]  With regard to the collection of total hours worked by exempt employees, EEOC suggests use of an estimate of 40 hours per week for full-time, salaried exempt workers.  The Center supports this approach in those instances where an employer does not collect actual hours worked for exempt employees and does not have a different standard full-time workweek.  The 40-hour workweek is a widely accepted definition[41] and is a reasonable approximation of full-time work, with the understanding that not all full-time salaried exempt employees work precisely 40 hours per week.[42]  The proposal appropriately seeks to minimize the burden on employers by not requiring them to collect additional data where they do not already.

---

[35] *Id.*

[36] *See id.* at 42-43, 59.

[37] NAT'L WOMEN'S LAW CTR., PART-TIME WORKERS ARE PAID LESS, HAVE LESS ACCESS TO BENEFITS—AND TWO-THIRDS ARE WOMEN 1 (2015), *available at* http://nwlc.org/resources/part-time-workers-are-paid-less-have-less-access-benefits%E2%80%94and-two-thirds-are-women/. *See also* U.S. DEP'T OF LABOR, WOMEN'S BUREAU, *Women of Working Age*, Chart 22 (2015), http://www.dol.gov/wb/stats/latest_annual_data.htm (last visited Mar. 8, 2016).

[38] NAT'L WOMEN'S LAW CTR., PART-TIME WORKERS ARE PAID LESS, HAVE LESS ACCESS TO BENEFITS—AND TWO-THIRDS ARE WOMEN 1, 3 (2015), *available at* http://nwlc.org/resources/part-time-workers-are-paid-less-have-less-access-benefits%E2%80%94and-two-thirds-are-women/.

[39] Nicholson, J., *Issue Brief: Temporary Help Workers in the U.S. Labor Market*, U.S. DEP'T OF COMMERCE ECONOMICS AND STATISTICS ADMIN. (July 2015), *available at* http://www.esa.doc.gov/sites/default/files/temporary-help-workers-in-the-us-labor-market.pdf.

[40] 29 C.F.R. § 516.2.

[41] Although the Fair Labor Standards Act's overtime requirements do not apply to the exempt workers at issue here, the overtime rule does establish a useful benchmark of a 40-hour workweek as a standard measure of full-time work. 29 U.S.C. § 207(a).

[42] A 2014 Gallup poll of full-time, salaried workers indicated that of the workers surveyed, 37 percent worked 40 hours a week, and 59 percent worked 41 hours or more per week. The average workweek of the employees surveyed was 47 hours. GALLUP, WORK AND EDUCATION POLL (2014), *available at* http://www.gallup.com/poll/175286/hour-

Pl. MSJ 000083

On the other hand, where an employer does track exempt employees' hours, or requires some standard number of hours per of work per week for an exempt employee other than 40 hours, the employer should report that number. Indeed, the Pilot Study noted that most payroll systems maintain the total hours worked by *each* employee, so reporting such information would impose a minimal burden on employers that use those systems. In other instances, employers may not track exempt employees' hours, but may require a standard number of hours other than 40 for full-time employees (*e.g.*, 37.5 or 45) and will typically require a standard schedule for part-time employees. For example, while employers may not track actual hours worked by some exempt part-time employees, employers typically have some assumptions regarding how many hours a part-time schedule entails when they set salaries for the relevant position. Employers should report that number if they do not track actual hours worked. In the absence of either an alternative standard relied on by the employer or actual data regarding hours worked by exempt employee, employers should rely on the assumption of a full-time 40-hour workweek. This suggestion is also responsive to critiques from employers, who objected to OFCCP's 2014 proposal[43] that contractors use across-the-board estimates of hours worked by exempt employees by reporting 2080 hours annually worked for all full-time, salaried exempt employees, and 1080 hours annually worked for all part-time employees; this alternative approach would permit employers who collect more detailed data or who rely on other definitions of full-time or part-time in their workforce to report more precise calculations.

## V.    The Pay Data Collection Should Be Strengthened Further.

The compensation data collected by the proposed revised EEO-1 Report will fill an important gap in the information currently available to EEOC and OFCCP, enhancing the enforcement of discrimination prohibitions. However, we urge EEOC to strengthen the effectiveness of the pay data collection further in a few key ways:

- The Center urges EEOC to extend the requirement to submit Component 2 of the EEO-1 to federal contractors that have between 50 to 99 employees and are otherwise required to submit the EEO-1.[44] The heightened importance of ensuring that recipients of public funds do not discriminate in pay practices justifies collecting compensation data from these smaller entities, many of whom already maintain the relevant information. For instance, federal supply and service contractors and subcontractors are already required to preserve all "personnel or employment record[s]," including those involving "hiring, assignment, promotion, demotion, transfer, lay off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship," for at least one year.[45] These records for employees must be identifiable by "[t]he gender, race, and

---

workweek-actually-longer-seven-hours.aspx. *See* U.S. Dep't of Labor, Bureau of Labor Statistics, The Employment Situation – February 2016, Table B-2 (Mar. 4, 2016), *available at* http://www.bls.gov/news.release/empsit.t18.htm (average weekly hours and overtime of all employees on private nonfarm payrolls in February 2016 was 34.4 hours).

[43] U.S. Department of Labor, Office of Federal Contract Compliance Programs, Government Contractors, Requirement to Report Summary Data on Employee Compensation, Notice of Proposed Rulemaking, 79 Fed. Reg. 46561 (Aug. 8, 2014).

[44] 41 C.F.R. § 60-1.7.

[45] 41 C.F.R. § 60-1.12(a).

ethnicity of each employee."[46]  Supply and service contractors with contracts of $50,000 or more and with 50 or more employees also must keep on file copies of written affirmative action plans.[47]

- The Center urges EEOC to require employers to report their pay data using additional, narrower pay bands.  We support the decision to collect compensation data by counting and reporting the number of employees from each demographic group in each identified pay band, as a means of reporting that minimizes the burden on the employer while still capturing reliable and useful data.[48]  We also agree that in order to be useful, pay data must be collected in a larger number of bands than used by the EEO-4, as the EEO-4 includes all pay of $70,000 or more in a single band, thus rendering invisible any pay disparities experienced by employees earning $70,000 or more annually.  The OES pay bands upon which EEOC proposes to rely are a distinct improvement over the EEO-4 bands, in that the OES pay bands go up to $207,999, with the final pay band including all pay of $208,000 or above.

  However, even the OES pay bands will be unable to provide data on pay disparities for employees earning more than $208,000.  Data show that women up and down the income scale experience pay gaps compared to their male counterparts, including in highly paid roles such as attorneys, executives, and surgeons.[49]  For example, about half of physicians and surgeons make more than $194,500 annually—a profession in which women typically make only 71 cents for every dollar paid to their male counterparts.[50]  About half of lawyers make more than $121,000 annually—a profession in which women typically make only 78 cents for every dollar paid to their male counterparts.[51]  Among equity partners, generally the highest compensated individuals at law firms, the typical female equity partner earns 80 percent of what a typical male equity partner earns.[52]  In the typical state, the average wage and salary of the top 0.5 percent is nearly $360,000 a year.[53]  We therefore urge EEOC to add additional pay bands to collect pay data up to at least $360,000, to ensure that meaningful pay data is captured as to virtually all of the workforce.  We also note that the top OES pay bands cover extremely wide pay ranges of

---

[46] 41 C.F.R. § 60-1.12(c)(1).

[47] 41 C.F.R. § 60-1.40(a).

[48] The Pilot Study recommended collecting aggregate pay information for the occupational categories in pay bands. PILOT STUDY at 9, 10, 108.

[49] U.S. CENSUS BUREAU, 2014 AMERICAN COMMUNITY SURVEY, Table 1 (Full-Time, Year-Round Workers and Median Earnings in the Past 12 Months by Sex and Detailed Occupation: 2014) (2016), *available at* http://www.census.gov/people/io/publications/table_packages html?eml=gd&utm_medium=email&utm_source=gov delivery.

[50] *Id.*

[51] *Id.*

[52] NAT'L ASS'N OF WOMEN LAWYERS, NINTH ANNUAL SURVEY (2015), *available at* http://www.nawl.org/p/cm/ld/fid=506.

[53] Figures are for all individuals 16 and older. The American Community Survey top codes data for wage and salary income at the 99.5th percentile of each state.  Wages above this level all are coded at the state mean of wage and salary income.  *See* IPUMS USA, INCWAGE Codes, *available at* https://usa.ipums.org/usa-action/variables/INCWAGE_section (last visited Mar. 24, 2016).  In 2014, the median value of the state mean wage and salary income of the top 0.5 percent was $359,000 with a range between $237,000 and $642,000.  Figures include D.C. but exclude Puerto Rico. 2014 ACS and PRCS Minimum and Maximum Codes, *available at* https://usa.ipums.org/usa/volii/2014acs_topcodes.shtml (last visited Mar. 24, 2016).

$34,839 and $44,199.  In order to provide more meaningful information regarding pay disparities, reflecting the EEO-1's distinct purpose, we urge that pay data be collected in narrower pay ranges, and recommend for those pay bands whose upper limit is more than $19,329, no single pay band cover a range of more than 20 percent of the lowest pay captured by that band, thus allowing for more granular analyses.

- Whether the EEO-1 ultimately relies on OES pay bands or a modified version of the OES pay bands, it is critical that these bands be regularly adjusted (either by continuing to track the OES or by otherwise adjusting for changes in inflation and the employment distribution) in order to provide the most relevant data reflecting the distribution of pay in the economy.

- In addition to the EEO-1 Report revision, we urge EEOC to move forward in revising the EEO-5 form to collect compensation data from public elementary and secondary school districts and to update the EEO-4 form to collect compensation data from state and local governments using the same pay bands ultimately utilized for the EEO-1.  Pay discrimination is not limited to a particular sector of the economy, and neither should compensation data collection be so limited.

## IV.  EEOC and OFCCP Must Ensure That Pay Discrimination Is Not Insulated From Review Because It Is Commonplace Within An Industry.

The success of the collection of pay data in helping end pay discrimination depends on EEOC's and OFCCP's consistent incorporation of the data's predictive information into their ongoing decisions about where to target enforcement.  This focus will not only increase the effectiveness of enforcement activities in rooting out discrimination, but also enhance the incentives for employers to engage proactively in self-evaluation of their pay practices and improve their compliance with equal pay standards.  We therefore commend and strongly support the proposal to establish industry-level standards for pay disparities, use deviation from these standards to identify potential pay discrimination, and determine which employers to prioritize for investigation.  However, given the persistence of gender and racial pay gaps across the economy, being above or close to an industry standard does not demonstrate an absence of pay discrimination exists within an employer's workforce.  The Center therefore also urges the agencies to affirm that while deviation from industry standards will be incorporated into decisions about conducting and prioritizing enforcement activities, other important considerations can and will come into play.  For example, in some instances, enforcement attention appropriately may be focused on entire industries with sizeable gender pay gaps (rather than just the worst performing employers within those industries).  Such attention is critical, as research reveals industry patterns of discrimination.  For example, in the retail industry, women and people of color disproportionately fill the lowest paid positions, while white men disproportionately fill the most well-compensated jobs.[54]  Similarly, in the restaurant industry there is evidence of both racial[55] and gender discrimination[56] in hiring and pay.

---

[54] CTR. FOR POPULAR DEMOCRACY, DATA BRIEF: RETAIL JOBS TODAY (Jan. 2016), *available at* http://static1.squarespace.com/static/556496efe4b02c9d26fdf26a/t/56a0f00f3b0be3bde90e9363/1453387792311/RetailJobsToday1.pdf.
[55] RESTAURANT OPPORTUNITIES CENTERS UNITED, THE GREAT SERVICE DIVIDE (Oct. 2014), *available at* http://rocunited.org/wp-content/uploads/2014/10/REPORT_The-Great-Service-Divide1.pdf.

Pl. MSJ 000086

**V.      Making Summaries of Compensation Data Available to the Public Is an Essential Complement to the Compensation Data Collection.**

The Center strongly supports the plan to make aggregate data gathered from the revised EEO-1 Reports available to the public.  Making these data available to the public can promote employer compliance with equal pay standards in a number of important ways.  With these aggregate data in hand, workplace equality advocates can more efficiently direct their own enforcement, outreach and public education activities to industries or regions where pay disparities are most egregious.  Individual employees can find out if they are working in an industry or region where they are more at risk of experiencing pay discrimination, and be prompted to investigate further to ensure that they are being treated fairly.  They also can better understand pay trends with their region and industries, thus empowering them to seek and negotiate fair pay.  And making these aggregate data public will facilitate and incentivize voluntary employer compliance with equal pay protections, by providing benchmarks that employers can use to evaluate their own pay practices and to publicly promote their successes in achieving pay equity.

We further urge EEOC to not only provide average pay disparities by occupational category in given industries and/or regions, but also other relevant information such as the range of pay disparities.  Unequal pay is a ubiquitous phenomenon in many industries and regions, and even the average performers within a group may still have problems with pay discrimination in their workforces.  We therefore should be encouraging employers, in conducting self-evaluations of their pay practices, to strive to be even better than the average among their peers.

**VI.     The Proposed Data Collection Will Not Be Unduly Burdensome for Employers.**

As noted above, federal law already requires private employers and contractors to maintain much of the information that would be required under the revised EEO-1.  Employers must generate W-2 forms for their paid employees[57] and keep records of hours worked for all employees not exempt from the Fair Labor Standards Act.[58]  The relevant universe of employers is already required to submit EEO-1 reports that include information by gender, race/ethnicity, and job grouping categories.[59]

The burden that compiling and reporting this largely pre-existing information pursuant to the proposed rule will impose on employers would be minimal.[60]  Completing the proposed revised EEO-1 would require employer adjustments at the preparation and the collection phases. Employers would be required to link their computerized payroll system, with the necessary information about compensation and hours worked, with the demographic and occupational information on each employee in the employer's HRIS.  This would require a one-time redesign

---

[56] RESTAURANT OPPORTUNITIES CENTERS UNITED, TIPPED OVER THE EDGE (Feb. 2012), *available at* http://rocunited.org/tipped-over-the-edge-gender-inequity-in-the-restaurant-industry/.
[57] 26 C.F.R. § 31.6051–1.
[58] 29 C.F.R. § 516.2.
[59] 29 C.F.R. § 1602.7 (private employers); 41 C.F.R. § 60-1.7 (federal contractors).  *See also* nn.44-47, *supra*.
[60] The NAS Study estimated that collecting compensation data via the EEO-1 might increase the EEOC's estimated average of 3.5 employer hours annually per EEO-1 form to 6.6 hours.  However, the NAS Study also noted that the EEOC's estimate was based on the time it would take clerks to retrieve and enter data to paper records; because less than 25 percent of reporting employers now rely on paper records, the NAS Study concluded that the burden estimates may be overstated.  NAS Study at 71.

Pl. MSJ 000087

and reprogramming of software to generate the data in the new format.  However, the burden and cost should be minimal, because compensation management systems and software are designed to be updated routinely to accommodate changes in federal, state or local income tax rules, new accounting rules, and employer changes in fringe benefits or compensation practices.[61]  Once the payroll system software and HRIS system have been linked and reprogrammed to perform the required computations, collecting and reporting the new data for the revised EEO-1 would require minimal extra time or effort.

In comparison, great benefits will accrue for employees and employers because of this proposed rule.  As discussed above, these data will be crucial to enhancing the effectiveness of enforcement activities on behalf of employees that are victims of pay discrimination and other forms of discrimination reflected in compensation.  Further, the reporting requirement may actually reduce the ultimate burdens of enforcement on law-abiding employers because it will improve EEOC's and OFCCP's ability to direct their investigatory efforts toward employers most likely engaged in pay discrimination.[62]

------------------------------

In sum, the National Women's Law Center urges EEOC in the strongest possible terms to adopt the proposed revisions to the EEO-1 Report and to do so swiftly, to ensure this data collection begins in 2017.  We have not seen any significant progress in closing the gender pay gap in this country in nearly a decade.  Women cannot afford to keep waiting for change, nor can the families depending on women's earnings. The powerful enforcement tool proposed by EEOC promises to make a real difference in closing the pay gaps that have shortchanged women for far too long.

Emily Martin
General Counsel and Vice President for Workplace Justice

---

[61] For example, Intuit provides regular updates for subscribers to its Quick Books Payroll service. *See* http://payroll.intuit.com/support/kb/2000204 html; Sage provides similar software updates to its subscribers. *See* https://support na.sage.com/selfservice/microsites/msbrowse.do?UMBrowseSelection=SG_SAGE50_U_S_EDITIO N_1.
[62] Also, ensuring equal pay for female and minority workers can be good for businesses in terms of increasing consumer spending power and promoting employee satisfaction, productivity and retention. *See, e.g.*, *Access to Justice: Ensuring Equal Pay with the Paycheck Fairness Act, Hearing on S. 84 Before the S. Comm. On Health, Education, Labor & Pensions*, 113th Cong. (statement of ReShonda Young, Operations Manager and Corporate Vice President, Alpha Express, Inc. & Founder and Owner, Popcorn Heaven), *available at* http://www.help.senate.gov/imo/media/doc/Young5.pdf; Hartmann,H., Hayes, J. & Clark, J., *How Equal Pay for Working Women would Reduce Poverty and Grow the American Economy* 1, INST. FOR WOMEN'S POLICY RESEARCH (2014), *available at* http://www.iwpr.org/publications/pubs/how-equal-pay-for-working-women-would-reduce-poverty-and-grow-the-american-economy/ (finding that the U.S. economy would have produced additional income of more than $447 billion in 2012 if women received pay equal to their male counterparts); Scott, D., McMullen, T. & Royal, M., *Reward Fairness: Slippery Slope or Manageable Terrain?* 2, WORLDATWORK, (2011), *available at* http://www.worldatwork.org/waw/adimLink?id=53154.

Maya Raghu
Director of Workplace Equality

Pl. MSJ 000089

# EXHIBIT K

Pl. MSJ 000090

CHAMBER OF COMMERCE
OF THE
UNITED STATES OF AMERICA
1615 H STREET, N W
WASHINGTON, D C   20062
202/463-5522

RANDEL K. JOHNSON
SENIOR VICE PRESIDENT
LABOR, IMMIGRATION & EMPLOYEE
BENEFITS

JAMES PLUNKETT
DIRECTOR
LABOR LAW POLICY

April 1, 2016

Bernadette Wilson, Acting
Executive Officer, Executive Secretariat
Equal Employment Opportunity Commission
131 M Street NE.
Washington, DC 20507

**Re:** **Equal Employment Opportunity Commission's (EEOC's or Commission's)**
**Proposed Revisions to the Employer Information Report.**

Dear Ms. Wilson:

The U.S. Chamber of Commerce ("Chamber") submits these comments responding to the Equal Employment Opportunity Commission's ("EEOC's" or "Commission's") Proposed Revisions to the Employer Information Report (EEO-1) ("Proposed Revisions"). The Chamber is the world's largest business federation, representing more than three million businesses and organizations of every size, sector, and region, with substantial membership in all 50 states. The Chamber's mission is to advance human progress through an economic, political, and social system based on individual freedom, incentive, initiative, opportunity, and responsibility.

The Chamber is a long-standing supporter of reasonable and necessary steps designed to achieve the goal of equal employment opportunity for all -- including equal pay for equal work and non-discriminatory compensation practices.[1] It was in large part through the efforts of the Chamber and other employer organizations that the 2008 Americans with Disabilities Amendments Act was enacted with bi-partisan support, and with the active involvement of all stakeholders. That is why the Chamber is so concerned with the current attempt to revise the EEO-1 form without prior input from the employer community regarding its real costs and lack of benefit, and in a process so violative of the Paperwork Reduction Act ("PRA").

The Proposed Revisions fail to further the purposes of Title VII and the EPA, and fails to meet the PRA's requirements.  The Proposed Revisions are not reasonable, necessary, or appropriate as required by Title VII.  The PRA imposes certain mandatory requirements on the

---

[1] The Chamber and its member-employers have always been supportive of non-discrimination laws including the Equal Pay Act ("EPA"), Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), and the Americans with Disabilities Act ("ADA"). The Chamber has held many seminars and meetings in which the requirements of the laws have been explained and which afford members the latest information regarding compliance.

EEOC.  The PRA requires the EEOC to:  minimize the burden on those required to comply with government requests, maximize the utility of the information being required, and ensure information provided is subject to appropriate confidentiality and privacy protections.  The EEOC's Proposed Revisions fail to meet the statutory requirements of the PRA:

- First, the Proposed Revisions do not minimize the employer's burden.  Rather, they impose substantial additional compliance burdens on employers. And the Proposed Revisions improperly suggest that the vast increase in data collection will be accomplished with a significant *decrease* in cost and burden compared to prior years.

- Second, the Proposed Revisions do not maximize the utility of collected data. Rather, they aggregate the compensation of employees performing vastly dissimilar work, leading to both false negatives and false positives for discrimination, and not otherwise yielding any information to permit the EEOC or OFCCP to undertake an investigation.  This wastes valuable time and resources for both employers *and* EEOC.

- Third, the Proposed Revisions fail to propose a mechanism to adequately protect the confidentiality of sensitive employee compensation information.

The burden of the Proposed Revision would be substantial; both in the millions of hours that private employers would be required to spend completing the proposed EEO-1 Report and in the false results that are likely to be generated. For example, based on the 307,103 total reports filed in the most recent year (according to the EEOC), Economist Ronald Bird estimates that the actual national annual cost burden of the *current* format EEO-1 form is $427.3 million, which is about 21 times greater than the $19.8 million annual total that the EEOC estimated in its 2015 information clearance request supporting statement for the current format EEO-1 form (see Exhibit 2, p. 2, Declaration of Ronald Bird) and $421.8 million more than its current estimate of $5.5 million.  This is before factoring in the burden associated with the Proposed Revisions.

The Proposed Revisions, allegedly borne out of a laudable desire to ensure that employees are paid fairly, will not accomplish this goal. Instead, in practice, it would impose enormous burdens and risks on employers who base complex compensation decisions on various factors other than membership in a particular EEO-1 category (factors which the EEOC does not contemplate considering under the Proposed Rule's suggested use of the collected data).

As Economists DuMond and Speakman detail in their attached Declarations, based on actual results generated from tabulations run in mock tests of the Proposed Revisions to the EEO-1 Form, any resulting analyses from the data collected by the Proposed Revisions will be of *no value* in ascertaining whether there are disparities in pay between individuals performing the

2

same or substantially similar work.  See Declaration of Dr. J. Michael DuMond and Dr. Robert Speakman, Exhibits 1 and 4.  According to Dr. Speakman, "…analyses using the EEOC's proposed pay data and suggested tests will result in a high error rate – firms that pay fairly will be investigated too often and firms that underpay women or minorities will often go undetected.  <u>Simply put, the recommended tests and data will lead to many false-positive and false-negative conclusions, negating any utility from this proposal.  In fact, it appears that at best the targeting mechanisms suggested by the EEOC will do only negligibly better than selecting firms at random</u>."[2]

For all the reasons set forth below and in the attached supporting Declaration of Economist Ronald Bird (Exhibit 2), Declaration of Economist J. Michael DuMond (Exhibit 1), Declaration of Economist Robert Speakman (Exhibit 4) and Declaration of Attorney Annette Tyman (Exhibit 3), as well as the Chamber's prior testimony submitted March 9, 2016 to the EEOC, and the oral testimony and responses provided by Camille Olson on behalf of the Chamber at the EEOC Hearing on the Proposed  Revision on March 16, 2016, the Chamber asks that the EEOC withdraw the Proposed Revisions to revise the EEO-1 Employer Information Report.

<u>**Summary of Comments**</u>

On February 1, 2016, without any prior notice to the regulated community, the EEOC published a proposed revision to the EEO-1, Employer Information Report. This data request, to which every employer with 100 or more employees and every government contractor with 50 or more employees must respond annually, has been in existence for 50 years. The authorization for the EEOC to require this report is found in Title VII at 42 USC § 2000e-8(c)(3) where such reports are authorized only if they are " reasonable, necessary, or appropriate…"  However, for the first time, the EEOC is proposing that all employers with more than 100 employees submit data showing the W-2 wages and hours worked of all of their employees grouped by broad job categories and subdivided into 12 arbitrary pay bands, in addition to the demographic makeup of their employment rosters. The magnitude of the proposed revision cannot be overstated.  The existing EEO-1 report requires 140 data points. Pursuant to the changes proposed by the EEOC, covered employers will have to submit forms for each establishment, and each establishment report would consist of 3,660 data points.

Ironically, EEOC advances this brand new and burdensome data request pursuant to, of all laws, the Paperwork Reduction Act.[3]  As previously noted, the PRA requires that any request for data by a government agency meet three basic criteria: (1) the request minimizes the burden

---

[2] Ex. 4, Dr. Robert Speakman Declaration at p. 3.
[3] For underlying authority to require employers to submit the EEO-1 form, EEOC relies on the recordkeeping provisions of  42 U.S.C. § 2000-e8(c) and 29 CFR 1602.7. *See* 81 Fed. Reg. 5113. Nothing in the authorizing statute exempts the EEOC from complying with the PRA.

Pl. MSJ 000093

on responders to reply; (2) the request results in data which is meaningful to the government for policy and enforcement purposes; and (3) the data request is designed to ensure that the data is securely and confidentially obtained and retained. The OMB is charged with reviewing the data request to ensure that the requesting agency complies with the PRA and by approving the request the OMB must certify that the agency has met its requirements under the PRA and OMB directives. And of course the EEOC must also assure that the reports it is requiring a significant number of employers to collect and submit to the agency meets the standards set by Title VII.

Although the EEOC notes that it began working on this project at least four years ago, it permitted employers only five weeks to prepare comments for submission at a public hearing in which selected employer representatives were permitted five minutes each to "testify" about the proposal, and only 60 days to submit these written comments. The Chamber nevertheless retained noted labor economists identified above to review the EEOC's Proposed Revisions and two law firms, Seyfarth Shaw LLP and Crowell & Moring LLP, to further analyze the legal compliance of the EEOC with the PRA and the new requirements it is proposing to impose on employers. The conclusions of these reviewing economic experts and law firms is stunning:

**_The EEOC has cavalierly refused to comply with its obligations under Title VII and the Paperwork Reduction Act in the following ways:_**

_The EEOC has produced an "analysis" of the burden its proposal will impose which is completely lacking in any substance, has no basis in fact, and is contrary to the attached economic analyses of three economists and the results of the Chamber's survey of a significant sampling of its members._

- The EEOC suggests that a "revised form" with almost 26 times the number of data points to complete will impose _no_ additional burden and cost 50% _less_ than the previous form which was approved in 2015.

- The EEOC and its consultant admit that there was no testing of the form or the time that would take to complete it, but rather that it used "synthetic data" compiled from fictitious companies to produce an estimate of the time required to complete the new forms. While the EEOC admits it did nothing to quantify the burdens attendant to its new data requests, and certainly did nothing to minimize the burden, the Chamber, in the eight short weeks allotted to responding entities to comment on the EEOC's Proposed Revisions, conducted a survey of 35 of its members, received in excess of twenty replies to its questionnaire and in fact determined that the burdens imposed by the new requirement were excessive, costly and, in some instances, not feasible.

4

- The EEOC, apparently in an effort to show a non-existent burden reduction, arbitrarily eliminated from its analysis the burden of time and effort required to submit data relating to more than 250,000 employer establishments. Under the EEOC's proposal, employers will still be required to submit data for the 250,000 establishments that have been omitted from the Commission's burden analysis. The EEOC simply ignores this fact. The PRA did not intend that its requirement to reduce reporting burdens be addressed by an agency simply ignoring or air-brushing reporting requirements to make its burden numbers look better.[4] This failure alone requires that the agency rescind its proposal and undertake the necessary burden analysis the statute commands and meet the Title VII command that the required report be reasonable, necessary and appropriate.

- The EEOC also attempts to sustain its estimate of burden by referring to proposals by other agencies which have never been completed and which have never been published.

- As shown in the analysis of the Chamber Survey performed by Dr. Bird (Exhibit 2), employers who employ almost 4.5% of the employees who would be included in the revised EEO-1 report will experience a vast increase in the cost of implementing and completing the revised form and will encounter severe operational difficulties in even formulating their HR systems to meet the new obligations.

*The EEOC offers no rationale to support its claim that the mass collection of data will be useful for any law enforcement or policy enhancement.*

- The laws that the EEOC enforces do not permit aggregating dissimilar jobs into artificial groupings for purpose of analyzing pay. There can be no legal or enforcement-related use for this data. Indeed, the EEOC's own compliance manual and its consultant recognize that these broad aggregations of data are essentially useless. Myriad federal courts have reached the same conclusion.

- The EEOC is requiring the combining of completely dissimilar jobs into arbitrary pay bands to determine if there is pay discrimination. For instance, the proposed revised forms will require a reporting hospital to combine lawyers, doctors, nurses and dieticians - all grouped as "professionals" - to somehow determine whether

---

[4] The PRA does not recognize the concept of *Ipse Dixit*. In *National Tire Dealers & Retreaders Association, Inc. v. Brinegar*, 491 F.2d 31, 40 (D.C. Cir. 1974), Circuit Judge Wilkey considered that the Secretary of Transportation's "statement of the reasons for his conclusion that the requirements are practicable is not so inherently plausible that the court can accept it on the agency's mere ipse dixit."

Pl. MSJ 000095

there are pay disparities based on gender, race or ethnicity. No law permits comparisons of such diverse workers to prove discrimination or even to provide enough evidence to commence an investigation.

- In order to meet its own bureaucratic timetable, the EEOC will require employers to combine two distinct years of W-2 data to create a fictitious W-2 amount for employees. This combined W-2 amount over a two year period will yield completely useless information. It does not take into account job changes, promotions, annual pay adjustments, different working conditions or locations or the many other factors that go into compensation. And the components of W-2 income are so diverse that there can be no viable analysis of the reported W-2 income to ascertain disparities of treatment.

- The EEOC will also require employers to collect and report the hours worked for all employees. While the EEOC suggests that it will not require collection of new information from employers, it has not addressed the critical fact that employers do not currently collect hours information for exempt employees. The EEOC suggests that employers may use a "default" number of 40 hours for each exempt employee. In the private sector, exempt employees regularly work more than 40 hours; thus, the hours information would be inaccurate and, therefore, of limited use. A legitimate study before this proposal was published would have revealed that fact, but no such study was done.

- The EEOC's Proposed Revisions therefore again fails the Title VII requirement that it be "reasonable, necessary or appropriate" and the PRA requirement that it maximize the practical utility from the information collected.

*The EEOC offers absolutely no discussion of the threats to confidentiality or privacy of the information it is requiring employers to submit.*

- The PRA requires that the requesting agency and the OMB ensure that data collected will be treated with complete confidentiality. The EEOC did not even attempt to take this responsibility seriously. When the Office of Personnel Management (OPM) cannot even protect the personnel data of 21 million federal employees or applicants, the EEOC should at least be cognizant that confidentiality of the pay data of more than 70,000 employers – encompassing millions of employees – deserves significant consideration. It offers none.

- These data, once shared with the Department of Labor, are subject to demand for production under the Freedom of Information Act. The EEOC states that the data will be protected to the extent permitted by law. Of course, employers will have to

6

expend significant resources to assert their right under law to protect this data. And for some of the smaller employers, the identity and the compensation of individual employees will be easily ascertained; the same is true for larger employers with small establishments. The EEOC devotes only two paragraphs to discuss these privacy and confidentiality issues.

In short, the EEOC has sprung upon employers a proposal that would (1) impose significant new, costly administrative burdens; (2) yield data of no utility; and (3) fail to protect confidential information. The EEOC has proposed these revolutionary revisions without meeting any of its obligations under the PRA. For these reasons, the Chamber submits that EEOC should withdraw this proposed data collection and, if it refuses to do so, the OMB should exercise its authority and refuse to approve the revised form.

## Comments

### I.       PAPERWORK REDUCTION ACT

As previously noted, the EEO-1 Revision process is being conducted pursuant to the PRA. The PRA, which was reauthorized in 1995, was promulgated in order to bring a degree of coherence and prudence to the Government's rather voracious quest to collect data from responding employers (and other responders). *See Dole v. United Steelworkers of America*, 494 U.S. 26 (1990) (recognizing that the PRA was enacted in response to the federal government's "insatiable appetite for data."). The purposes of the PRA set forth in direct terms what the Act was designed to accomplish:

The purposes of this chapter are to--

(1) minimize the paperwork burdens for individuals, small businesses…Federal contractors…and other persons resulting from the collection of information by or for the Federal Government;

(2) ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the federal Government.

(4) improve the quality and use of Federal information to strengthen decisionmaking, accountability and openness in Government and society;

8) ensure that the creation, collection, maintenance, use, dissemination, and disposition of information by or for the Federal Government is consistent with applicable laws, including laws relating to--(A) privacy and confidentiality, including section 552a of title 5;

7

The PRA established within the Office of Management and Budget ("OMB") the Office of Information and Regulatory Affairs ("OIRA") whose Director is charged with the administration of the PRA. *Livestock Marketing Ass'n v. U.S. Dept. of Agr.*, 132 F. Supp. 2d 817, 830 (D.S.D. 2001) ("Among other things, the Act establishes the Office of Information and Regulatory Affairs within the Office of Management and Budget, with authority to" facilitate and manage the PRA). OIRA has a substantial role in the federal regulatory process. No data collection instrument which is directed to more than nine responders can be issued without first receiving the approval of OMB and OIRA. *CTIA-The Wireless Ass'n v. F.C.C.*, 530 F.3d 984, 987 (2008) ("The need for OMB approval of information collections derives from the Paperwork Reduction Act"); *Gossner Foods, Inc. v. E.P.A.*, 918 F. Supp 359, 361-62 (D. Utah 1996) ("The Act institutes a second layer of review by the OMB for new paperwork requirements.") (quoting *Dole*, 494 U.S. at 32-33). In addition to the actual review of agency data requests, the Director is charged with the responsibility to oversee the use and collection of information. In fulfilling this oversight responsibility, OMB issued Circular A-130 which directs federal agencies to establish mechanisms and procedures to meet the PRA's mandate to reduce the collection burden and insure that the information being collected has significant public utility. The EEOC does not have the discretion to ignore the PRA or Circular A-130. Nevertheless it has done so.

The Director, in turn, is mandated to review data collection requests in accordance with the direction of the PRA to (1) minimize the burden on those individuals and entities most adversely affected and (2) maximize the practical utility of and public benefit from information collected by or for the Federal Government and establish standards for the agencies to estimate the burden of data collection. *See Dole,* 494 U.S. at 32 (explaining that the PRA charges the OMB with responsibility for minimizing the burden on individuals and establishing standards to reduce federal collection of information). *See also Tozzi v. U.S. E.P.A.*, No. Civ. 98 - 0169 (TFH), 1998 WL 1661504, *1 (D.D.C. April 21, 1998). The Director is also charged with developing and promulgating standards to insure the privacy, confidentiality and security of information collected or maintained by agencies. *In re French*, 401. B.R. 295 (E.D. Tenn. 2009) (noting that, amongst other things, the PRA's purpose is to ensure that information is collected consistent with privacy and security laws) (quoting 44 U.S.C. § 3501).

It is under this specific statutory framework that the proposal to revise the EEO-1 form and collection procedures must be reviewed. There is no exemption from the mandates of the PRA and neither the agency head nor the Director of OIRA may exempt data collection efforts from the constraints and mandates of the PRA. Simply put, data collection efforts of the size and scope of the proposed EEO-1 revision must be reviewed independently to insure that the burdens placed upon responders is minimized, the information collected has the maximum utility, and that the security and confidentiality of the information is assured. *See Dole*, 494 U.S. at 32-33 (explaining that all federal agency regulations that require the collection of paperwork must be reviewed by the OMB in accordance with the goals and purpose of the PRA).

8

These are simple precepts and should be reviewed independently. In other words, the burden placed upon responders must be determined only with respect to the efforts necessary to collect and report the data. The obligation to minimize the burden should be reviewed in relevance to the purposes and utility of the data to be collected. The PRA requires each standard to be reviewed on its own terms. Similarly, the benefit to be derived from the data collection requirement is not dependent upon the degree of burden the effort creates, but rather the utility of the data collected. The government is not permitted to require the collection of data with no utility regardless of the extent of the burden imposed to collect the data. Nor is the government permitted to require an excessively burdensome collection effort in the face of a complete lack of utility of the data collected. In short, there is no license for the Government to simply collect data without a clearly articulated purpose and legitimate use. Finally, in conjunction with the type and sensitivity of the data being collected, OIRA and the requesting agency must insure that the requested data be collected and retained in a manner to insure its confidentiality and privacy.

These requirements are neither difficult nor complex. Indeed, they establish a commonsense framework by which the requesting agency in the first instance and Director of OIRA must review requests for authorization to collect data. As will be shown in this submission, the EEOC has not met any of the statutory requirements. Rather, it has proposed a data collection protocol which will place a significant burden upon responding employers and which the EEOC has remarkably understated or ignored. Indeed, the EEOC has ignored its obligation to analyze and minimize the burden its new proposal will create. The EEOC is proposing to collect extensive data heretofore never collected by the federal government without any developed framework to review the data, or use the data for any legally authorized or recognized purpose. In addition, the EEOC has totally ignored the obvious security and confidentiality issues which it is directed to consider.

## II. THE EEOC'S PRA BURDEN ESTIMATE IS INSUFFICIENT AND UNSUPPORTED

The EEOC should rescind its Proposed Revisions because its PRA burden estimate is wholly deficient in three critical ways: (1) it underestimates the employer burden associated with generating the EEO-1 Report *in its current form* and is inconsistent with prior EEOC estimates of the burden associated with generating the EEO-1 Report; (2) it underestimates the employer burden associated with compiling, analyzing, and reporting the W-2 information the Proposed Revisions would require; and (3) it vastly underestimates the burden associated with compiling, analyzing and reporting the hours information that would be required, particularly as to exempt employees.

9

**A.     The EEOC's Estimate of the Burden Associated with
Completing the _Current_ EEO-1 Report is Inconsistent with its
Prior Burden Analyses and Otherwise Lacks Factual Support**

1.     The EEOC's PRA Assumptions

The EEOC makes the following claims and assumptions in connection with its estimate of the burden associated with generating the EEO-1 Report in its current form:

- There are 67,146 employers who file EEO-1 Reports ("EEO-1 Filers"), based on 2014 filing figures. [5]

- Each EEO-1 Filer spends just 3.4 hours generating its EEO-1 Reports each year, across all establishments, with 30 minutes dedicated to reading the instructions and 2.9 hours dedicated to generating the data required to be reported and populating the cells in the Form itself.  Thus, total hourly burden incurred by employers filing the EEO-1 Report is 228,296.4 hours.

- All work done to complete the EEO-1 Report is performed by "Administrative Support" personnel who are paid, according to the Bureau of Labor Statistics ("BLS") publication "Employer Costs for Employee Compensation," on average, $24.23 per hour.

Based on these assumptions, the EEOC estimates that the total annual cost burden incurred by employers filing the current EEO-1 Report is just over _$5.5 million_.  This figure represents the number of EEO-1 Filers (67,146) multiplied by 3.4, then multiplied by $24.23.

2.     The EEOC's Unexplained Decision to Abandon  Its
Prior "Response-Based" Approach is Fatal to the
Agency's PRA Analysis

The EEOC's approach for assessing the actual _current_ burden imposed on EEO-1 Filers is deficient for several reasons.

First, and perhaps most importantly, the "EEO-1 Filer"-based approach adopted by the EEOC in its Comment Request is contrary to the approach the EEOC has used to quantify the burden associated with EEO-1 filings since at least 2009.  From at least 2009 through 2015, the EEOC, when estimating the burden associated with filing EEO-1 Reports, based its assessment on the number of _responses_ filed by the employer community, _not_ on the number of EEO-1

---

[5] This figure underestimates by 40% the number of private employers with 100 or more employees. Ex. 2, Ronald Bird Decl., Appendix A, p. 18.

10

Filers. *See* Exhibits 5 -8 (EEOC OIRA filings). The EEOC's approach over at least the last six years appropriately accounted for the fact that many EEO-1 Filers are required to generate multiple "responses" or reports: one for each physical establishment with 50 or more employees and one consolidated report. As a result, the EEOC burden estimates for the years 2009 through 2015 are significantly higher than the burden estimate identified in the Proposed Revisions. *See* Exhibits 5 - 8 (EEOC OIRA filings). For instance, in 2015, the EEOC estimated the annual employer burden associated with the EEO-1 filings as follows:

- 307,103 EEO-1 reports filed, based on actual 2013 filings.

- 3.4 hours per report, which yields 1,044,150 total burden hours.

- Average cost per hour estimated to be $19.00 per hour, based on the hourly rate paid to "Human Resources Assistants" according to the BLS publication "Occupational Employment Statistics, Occupational Employment and Wages, May 2010" – $18.22 – "rounded to $19.00 to account for instances where higher paid staff perform this work."

Based on those assumptions, the EEOC estimated in 2015 – less than one year ago – that EEO-1 Filers would incur costs of *$19.8 million* annually to generate the EEO-1 filings. That cost figure is *350% higher than the EEOC's new estimate* of what the current burden is *without* any of the proposed changes.[6]

Attempting to explain this *$14.3 million reduction* in the estimated burden, and perhaps anticipating criticism of this change, the EEOC includes only the following statement in its Proposed Revisions:

> The reporting hour burden calculations in this notice reflect a departure from the manner in which EEOC traditionally estimated reporting burden. In the past, the EEOC estimated the reporting hour burden based on the number of total cells in the report(s) that a firm had to complete. This approach viewed each report filed by a firm as a separate reporting requirement, *analogous to a paper report*. In reporting year 2014, however, the number of paper reports declined to just three. In addition, employers now rely extensively on automated HRIS to generate the information they submit on the EEO-1 report. As a result, each additional report

---

[6] In 2009, the EEOC used this approach and estimated 599,000 burden hours. Ex. 5. That figure rose to 987,394 burden hours in both 2011 and 2014. Exs. 6 and 7. Using the $19.00 per hour rate used by the EEOC in 2015, those estimates would have identified annual burdens of $11.3 million in 2009 and $18.8 million in both 2011 and 2014.

11

filed has just a marginal additional cost.  To accurately reflect the
manner in which employers now collect and submit the data for
filing, the estimated reporting burden set forth in this notice is
calculated per firm, rather than per report.  This burden calculation
is based on the time spent on the tasks involved in filing the
survey, rather than on 'key strokes' or data entry."

81 Fed. Reg. 5120 (February 1, 2016) (emphasis added).

The EEOC's explanation rings hollow, as it is contradicted by its 2015 OIRA filing and is
wholly inconsistent with the experience of EEO-1 Filers.  The burden estimate reached by the
EEOC in 2015 expressly noted that "98%" of the 70,070 respondents in 2013 "file [their EEO-1
Reports] on-line."  Ex. 8 at Paragraph 3.  Thus, the claim that the shift from a *response-based
approach* that takes into account the number of establishments on which reports are filed to an
*EEO-1 Filer-based approach* was prompted by a sudden shift from paper filings to online filings
is not supported by the EEOC's own submissions.  <u>The PRA requires that the imposed burden be
accurately computed.  It does not countenance fictitious assertions of burden bereft of factual
support or historical experience.</u>

Second, the assumption that "each additional report" for those employers with multiple
establishments "has just a marginal cost" is based on no analysis whatsoever.  The EEOC seems
to assume that the electronically fillable PDF format relieves employers of the necessity of
manually entering data when filing their EEO-1 Reports.  That assumption is contrary to fact.[7]
Even when using the EEOC's on-line system, EEO-1 Filers must manually enter the data for
each cell and for each establishment.[8]  Notably, the EEOC's Proposed Revisions acknowledge
that only 2% of EEO-1 Filers (1,449 of 67,146) submitted their data by uploading a data file in
2014 rather than manually completing the online submission. Thus, the process remains a
manual one for most employers, even if the EEO-1 Report is submitted electronically, and the
actual burden remains unchanged from recent years.[9]

3.      The EEOC's PRA Analysis of the Current
        Reporting Burden is Fundamentally Flawed in
        <u>Other Respects</u>

There are two other glaring flaws to the EEOC's PRA analysis.  First, the EEOC nowhere
explains its estimate that EEO-1 Filers spend a total of just 2.9 hours collecting, verifying,

---

[7] Ex. 3, Annette Tyman, Decl., generally describing the EEO-1 submission process.
[8] Ex. 3, Annette Tyman Decl. ¶7.a.
[9] The EEOC's suggestion that uploading a data file means that "the information goes nearly directly from an
electronic file generated by the HRIS to the survey data base" is a gross misunderstanding of the process required
for gathering and validating data for submission to the EEO-1 survey.  Ex. 3, Annette Tyman Decl. ¶11.

validating, and reporting" their current EEO-1 data.  As part of its burden under the PRA, the EEOC should identify its current basis for this estimate. [10]

Second, the EEOC bases its cost estimate on an improper assumption that EEO-1 data and the ultimate reports are developed by "Administrative Support" personnel alone, at a cost of $24.23 per hour, without any internal or external assistance, and without any consideration of overhead costs associated with those personnel.  The EEOC's assumption is flatly contradicted by employer experience.  In fact, personnel ranging from HRIS and information technology personnel to senior human resources officials and legal professionals often assist in the development of the data, the compilation of the EEO-1 Report, review of the Report, and the submission of the Report.  Because the EEO-1 Report requires certification by a company official, subject to penalties for false reporting, the EEOC's assumption that the entire EEO-1 filing process is left to clerical personnel is simply false.  Because the EEOC has not included the wage rates of senior human resources, HRIS and information technology personnel, or legal professionals in the development, compilation, review, certification, and submission of the report, the assumption that the wage rate of an Administrative Support personnel alone, is flawed.  The EEOC's additional failure to consider overhead costs only undermines further its PRA analysis.

    4.       The Chamber's Survey of Member Companies
                Contradicts the EEOC's Estimate of the Burden
                Associated with the Current EEO-1 Report

The Chamber developed[11] and issued a survey instrument ("Survey") to 35 of its members during the 60-day comment period.  Ex. 2 (Appendix B to Bird Declaration).  While the cribbed comment period and the Commission's rejection of the Chamber's request for an extension of time to file comments impacted the Chamber's ability to gather as much survey data as it would have liked, a total of 22 companies responded to the Survey by March 25, 2016.  Information gleaned from those 22 respondents is set forth below.[12]

Responses were received from employers with as few as approximately 400 employees, 90% of whom are housed in a single establishment, and from an employer with more than 200,000 employees housed in more than 2,000 EEO-1 reportable establishments.  Ex. 2, p. 2.  Respondents to the Survey filed a total of 12,982 EEO-1 reports in 2015, comprising

---

[10]  Ex. 2, Ronald Bird Decl. p. 4.
[11] Nine experienced Human Resources professionals participated in the development of the Survey. Ex. 2, p. 2 (Bird Declaration).
[12] Since March 25, 2016, the Chamber has received additional responses from the original group of 35 member employers and we anticipate all 35 recipients will respond in the coming weeks.  The Chamber is also distributing the Survey to additional employers and anticipates having a larger sample of results in time for comments to OIRA.

Pl. MSJ 000103

approximately 4.2% of the total number of reports filed annually, according to the EEOC's most recent tabulation. *Id.*

The Survey responses reveal the following deficiencies in the EEOC's estimate of the burden associated with filing the current EEO-1 Reports:

- The total costs of compiling and submitting EEO-1 data was significantly dependent upon the number of establishments covered by the report and by the number of reports filed. This finding undermines the EEOC's decision to abandon the "Response-Based" approach and invalidates the "EEO-1 Filer-Based Approach."

- The internal resource time reported to complete an EEO-1 Report for a single establishment ranged from 2.6 hours per report to 42.5 hours per report, and the average *was 8.1 hours per report*, or 2.4 times greater than the EEOC's estimate.

- Multiplying the 8.1 hours per report by the EEOC's most recent tabulation of 307,103 reports filed by 67,146 distinct companies yields a total burden of *2,479,156* hours, or 36.9 hours per employer, to complete the EEO-1 Report in its current form. This figure is more than ten times greater than the 3.4 hours the EEOC identifies as the baseline estimate for its current proposal.

- Of the 22 respondents, 20 provided their estimate of the hourly rate paid to the internal employees who would gather the information, prepare and submit the EEO-1 Reports. The average hourly rate reported from these 20 respondents was *$45.00*.

- The Chamber's expert, Dr. Bird, identified a multiplier of 3.25 for the overhead cost of internal labor used, a figure that was drawn from an examination of the fully loaded labor cost reimbursement rates paid by government agencies for administrative, professional, technical and managerial services under the GSA government-wide services contracts. Applying this overhead plus profit factor to the $45 per hour average hourly rate yields an opportunity cost value of $146 per hour. Applying this fully loaded labor cost to the average hours required per report (8.1) yields a cost per report for internal labor of *$1,175*.

- Respondents were also asked to address the extent to which they retained outside consultants and service providers to complete their EEO-1 filings. Fourteen of the 22 respondents reported they did not use such consultants or

14

service providers.  Across all 22 respondents (including $0 for the 14 who reported that all work is done internally), the average external cost was *$8,307 per respondent and $215 per report.*

- Adding the per report cost for internal labor ($1,175) to the per report cost for outside services ($215) yields a total current annual cost for completing each report of $1,391.  Based on the 307,103 total reports filed in the most recent year, the total annual cost burden of the EEO-1 Report, in its current format, is *$427.3 million*, a figure that is $421.8 million higher than the EEOC's estimate.

Exh. 2, pp.3-5 (Bird Declaration).

As these figures demonstrate, the EEOC's estimate that EEO-1 Filers will incur costs of just $5.5 million in 2016 to complete the EEO-1 Report as currently configured – representing a 350% reduction in the EEOC's *own* estimated total costs of $19.8 million incurred in 2015 – is absurd.  The actual burden, based on the Chamber's Survey, is more than $425 million.  Because the EEOC's erroneous estimate impacts the Agency's estimate of the anticipated costs of completing the proposed revised EEO-1 Report in 2017 and 2018, the EEOC's entire burden estimate associated with the Proposed Revisions is inaccurate, misleading, and inadequate under the PRA.

**B.** **The EEOC's Analysis of the Burden Associated with Completing the Proposed Revised EEO-1 Report Lacks Factual Support**

1. The EEOC's PRA Analysis

The EEOC's Comment Request includes the PRA-required estimate of both the one-time burden of complying with the proposed revisions and the annual burden of complying with those revisions.  As for the "One-Time Implementation Burden," the EEOC's analysis consists of three sentences, one of which is contained in a footnote.  The EEOC estimates a one-time burden of *$23,000,295*, which is based on the following assumptions:

- Eight (8) hours of time "per filer" to "develop[ ] queries . . . in an existing human resources information system."

- An hourly wage rate of $47.22, which is the average compensation for a Professional as identified in the BLS publication "Employer Costs for Employee Compensation," issued in 2013.

15

The EEOC's total estimate for the one-time burden is calculated by multiplying the number of EEO-1 Filers that would be required to submit W-2 and hours information (60,886) by eight hours, and multiplying that total by $47.22.

As for the recurring, annual burden employers will incur completing the proposed revised EEO-1 Report, the EEOC restates its current burden analysis for the estimated 6,260 EEO-1 Filers that have 50-99 employees. For that group of employers, the EEOC maintains its estimate that each filer will spend just 3.4 hours completing and submitting its EEO-1 Report, that those 3.4 hours will be spent by Administrative Support personnel at a cost of $24.23 per hour, and that the total cost burden to the 6,260 EEO-1 Filers who need not submit W-2 wage and hours data will be $515,711. That estimate is flawed, for the reasons identified above.

For employers with 100 or more employees, the EEOC estimates that each EEO-1 Filer will spend 30 additional minutes reviewing the instructions and _just 2.7 additional hours per year_ "collecting, verifying, validating, and reporting" the W-2 wage data and the hours data for its employees. The EEOC continues to assume that all of these tasks will be performed by Administrative Support personnel, again at a cost of $24.23 per hour. In total, the EEOC's annual burden estimate for employers with 100 or more employees is as follows:

- 6.6 hours per EEO-1 Filer to collect, verify, validate, and report both the representational data currently reported and the W-2 wage data and hours data that would be required beginning in 2017.

- An hourly rate of $24.23.

Based on these assumptions, the EEOC estimates that the total annual cost burden on EEO-1 Filers with 100 or more employees will be $9,736,767, which is the number of such filers (60,886) multiplied by 6.6, then multiplied by $24.23. When coupled with the estimated cost burden for EEO-1 Filers with 50-99 employees, the total annual estimated cost identified by the EEOC for all EEO-1 Filers in 2017 is _$10,252,478_.

### 2.     The EEOC's PRA Analysis Lacks Credibility

The EEOC's estimates of the burdens – one-time and recurring – associated with the proposed revised EEO-1 Reports are wholly unrealistic. As detailed below, absent from the EEOC's analysis of the burden associated with the Proposed Revisions is any explanation of the basis for its estimate of the hours that would be incurred by EEO-1 Filers. [13] As an initial matter, while the EEOC claims it reviewed "the public comments relating to the burden calculation for OFCCP's proposal to collect pay data and consulted with OFCCP about burden estimates," the

---

[13] Ex. 2, Ronald Bird Decl. pp. 5-6.

Pl. MSJ 000106

Ms. Bernadette Wilson, EEOC
Acting Executive Officer
April 1, 2016

EEOC fails to state how it reconciled the information supplied to the OFCCP with the EEOC's current estimates. More importantly, the EEOC failed to identify any other basis for its hours estimates, noting that its Pilot Study sought data from private employers "about the possible cost of collecting pay information but few employers responded, and the employers that did respond did not provide quantitative feedback." 81 Fed. Reg. 5120. Without more, one can only conclude that the EEOC's estimate of the hours employers will spend "collecting, verifying, validating, and reporting" W-2 wage data was "pulled out of thin air."

To make matters worse, the EEOC provides <u>no explanation</u> for its estimate of the hours burden associated with supplying hours-worked data. The EEOC does not even address this issue in its Proposed Revisions, stating simply that it is seeking input from employers as to "the anticipated estimated burden to also submit . . . hours-worked data." As detailed below, this omission should sound the death knell for the EEOC's Proposed Revisions, given that the collection of hours-worked data for exempt employees who do not currently capture their hours worked would be staggering.

a.     The EEOC's Estimate of the <u>One-Time</u> Burden Bears No Relationship to Reality

The EEOC's estimate of the one-time burden associated with the Proposed Revisions cannot withstand scrutiny. First, its assumption that employers will be able to generate W-2 and hours data after an HRIS professional spends just eight hours "developing queries . . . in an existing human resources information system" underscores how distant the EEOC's experience with employer HRIS systems is from reality.

The EEOC's underlying assumption – that a single HRIS houses all the data necessary to generate the W-2 and hours data – is plainly false. Most employers maintain gender, race, and ethnicity data in an HRIS that is different from the system that houses payroll information, including W-2 wage information. Hours data for non-exempt employees are likewise captured outside of the HRIS and hours data for exempt employees simply do not exist for most employers. In practice, once each reporting employer gathers the necessary earnings information, that data must be merged with each employee's EEO-1 occupational classification, gender, and race/ethnicity to complete the information needed for the proposed report. The number of employees in each unique combination of EEO-1 classification, gender, race/ethnicity, and membership in one of the twelve pay bands then would have to be computed and separately reported for each of the employer's establishments. Therefore, determining how to marry gender, race, and ethnicity data housed in an HRIS with W-2 wage data housed in a payroll system, often by a third party, in and of itself, will take more than eight hours.

17

Second, the EEOC's estimate is off-base because it ignores the fact that the W-2 data to be submitted is different from the W-2 data generated annually by employers for income tax reporting purposes. Because the 12-month reporting period proposed by the EEOC crosses tax years, employers cannot simply rely on the data they generate for the IRS each year. Instead, employers will be required to generate data spanning two different tax reporting years and will be required to make one-time changes to their systems in 2016 to permit such reporting.

Third, the EEOC's estimate of the one-time burden is inaccurate because the hourly rate on which it is based – $47.22 for a "Professional" – fails to account for the fact that senior information technology personnel, legal personnel, and others will be involved in any effort to develop the processes necessary to generate the required data. The identified hourly rate is not commensurate with the rates of pay provided to such individuals. [14]

Fourth, as detailed in Section II.B.3, below, the EEOC estimate fails to account for the one-time burden associated with requiring employers to develop, for the first time, a system that captures the hours worked by exempt employees and to train all exempt employees on any new system.[15] Those costs would be massive, and should be quantified by the EEOC before the Proposed Revisions are considered.

> b. The EEOC's Estimate of the Annual Burden of Compliance with the Proposed Revisions is Likewise Unrealistic

The Commission's prediction that the Proposed Revisions will require only 3.2 hours of additional work per EEO-1 Filer – 30 additional minutes to read the instructions and just 2.7 hours to "collect, verify, validate, and report" all of the required W-2 and hours data for every establishment – is ludicrous.

First, the EEOC dramatically underestimates the time it will take each EEO-1 Filer to collect, verify, validate and report on data that must be pulled from various systems and sources. As noted above, often the required data is not housed in a single HRIS and cannot be generated with the push of a button. Once generated, a combination of HRIS professionals and HR professionals will have to expend time verifying and validating the data. Legal professionals will likewise be involved in the verification process, given that the EEOC's stated purpose for the collection is to target its, and the OFCCP's, enforcement efforts, and given the requirement that a company official certify the filing, subject to penalties.

---

[14] Ex. 2, Ronald Bird Decl. pp.17-18.

[15] As noted in Section III.C.2, any approach that assumes each exempt employee works 40 hours per week is not realistic and would only further undermine the efficacy of the data collected.

Pl. MSJ 000108

Second, the EEOC bases its burden estimate for the generation and reporting of W-2 data and hours data on the wage rate of $24.23, which is – again – the BLS wage for Administrative Support personnel. As detailed above, employees other than Administrative Support personnel would be engaged in the effort to collect, verify, validate, and report the W-2 and hours data – legal professionals and others are, and will continue to be, involved in the EEO-1 filing process.[16]

Third, the EEOC's annual burden estimate for filing the Revised Reports is improperly based on the number of EEO-1 Filers, rather than the number of EEO-1 Reports filed. The "per EEO-1 Filer" approach is inappropriate, for the reasons identified above, and the approach the EEOC used between 2009 and 2015 – in which the burden estimate takes into account the fact that many EEO-1 Filers must file reports on all of their establishments individually – remains the appropriate approach. If the per response approach were applied here, the EEOC's total cost estimate would jump from *$10,252,478 to $49,111,297*, and that calculation assumes that the EEOC's hours estimates of 6.6 hours and cost estimate of $24.23 per hour are correct, which they clearly are not.

Fourth, the EEOC's assumption that filing on-line, through fillable PDFs, alleviates the burden of manual data entry is a false assumption. As detailed above, fillable PDFs still require the employer to manually enter the relevant data. With the addition of W-2 data and hours data, reported in twelve different pay bands within each EEO-1 category, each EEO-1 Filer will now be required to populate as many as 3,360 separate cells of data. The EEOC's burden estimate fails to account for this reality in any way.

Fifth, the EEOC does not account, in any way, for the costs employers will incur responding to investigations and enforcement actions that are prompted by "false positives" that flow from comparing employees within broad EEO-1 categories.[17] Because the EEOC and OFCCP intend to use the results of analyses of W-2 wages by EEO-1 categories to target their enforcement efforts and because those analyses will be fundamentally flawed, the substantial cost to employers who must respond to such investigations is not theoretical. Employers will be forced to expend resources producing additional data to the EEOC and/or OFCCP, retaining labor economists to run their own analyses of pay, and engaging legal counsel to correct the Agencies' presumption of discrimination.

---

[16] Ex. 2, Ronald Bird Decl. pp. 17-18.
[17] *See* Section III (describing lack of efficacy of any analysis that compares employee pay within broad EEO-1 categories); Ex. 1, Declaration of Dr. Michael DuMond (same).

19

c. *The EEOC Ignores the Substantial*
*Burden Associated with Collecting*
*Hours Data for Exempt Employees*

The EEOC proposes to collect "the total number of hours worked by employees" included in each of 12 pay bands within each EEO-1 category, to "allow analysis of pay differences while considering aggregate variations in hours." With respect to exempt personnel, the Commission "seeks employer input with respect to how to report hours worked for salaried employees" and states that "[o]ne approach would be for employers to use an estimate of 40 hours per week for full-time salaried workers." The Commission further states that it is "not proposing to require an employer to begin collecting additional data on actual hours worked for salaried workers," and the EEOC's "initial conclusion is that requiring employers to provide the total number of hours worked would impose a minimal burden."

As detailed in Section III.C.2, below, assuming that all full-time exempt employees work 40 hours per week is neither an accurate nor a fair assumption. Thus, to the extent the EEOC intends to consider "aggregate variations in hours," the only way for the EEOC to accurately capture hours for exempt employees would be to require employers to track hours of exempt employees. That option would be incredibly burdensome.

First, employers would be required to implement a time system to track all hours worked by exempt employees. Because there is no continuous workflow for exempt employees, and because they often work outside of normal business hours, any such system would be much more complex than the standard time-clock, punch-clock, or timesheet system currently used by employers for their non-exempt employees. The cost of developing such a system would be immense.

Second, the hours burden associated with exempt employees recording time would be substantial. Unlike non-exempt employees who may use a punch clock system or work regular hours, each exempt employee would be required to capture the "starts" and "stops" of his or her work. Even if that effort required just 15 minutes of time each day for each exempt employee, the result would be significant new burden for employers.

Finally, the EEOC has failed to abide by its obligation under the PRA, which is to propose a methodology for, and also assess the burden of, collecting hours for exempt employees. Because the EEOC has failed to do so, commenters – including the Chamber – are unable to examine the utility and burden of producing the hours report for exempt employees.

20

3.      The EEOC's One-Time and Recurring Burden Estimates
        Relating to the Collection and Submission of W-2 and
        Hours Data is Wholly Contradicted by the Chamber's
        Survey

The Survey conducted by the Chamber sheds further light on the fundamental
shortcomings of the EEOC's burden analysis under the PRA, both as to the one-time costs
associated with collecting and reporting aggregate W-2 and hours data and as to the recurring
costs associated with such efforts.

The Survey reveals the following with regard to the one-time costs that will be incurred
by the 60,886 employers (estimated by the EEOC) who will be required to furnish aggregate W-
2 and hours data:

- Ninety-five percent (21 of 22) of the respondents stated that they
  expected to incur one-time cost burdens associated with the
  proposed W-2 and hours reporting requirement.

- One respondent estimated its one-time cost of complying with the
  W-2 earnings requirement would range from $1,000 to $5,000.
  The remaining  respondents estimated those costs to range from
  $50,799 to $58,254, which equates to $253 to $406 per report filed
  by each respondent.

- Estimates of the one-time costs associated with complying with the
  hours reporting requirement (including developing an hours
  tracking system) ranged from $37,535 to $57,563 per employer
  respondent, which equates to $174 to $242 per report filed by each
  respondent.

- Adding together the one-time costs associated with both new
  reporting requirements yields a total that ranges from $88,334 to
  $115,817 per respondent, or $427 to $648 per report.

- Applying the per report one-time cost ranges ($427 to $648) to the
  307,103 reports that were filed most recently yields a lower bound

21

for the one-time cost estimate that ranges from *$118.9 million to $180.4 million*.[18]

Exh. 2, p. 5-6 (Bird Declaration).

The Survey reveals the following with regard to the <u>recurring costs</u> that will be incurred by the 60,886 employers who will be required to furnish aggregate W-2 data[19]:

- Seventy-three percent (16 of 22) of the respondents stated that they expected to incur additional, ongoing, annual costs to implement the proposed expanded data collection.

- In response to the Survey request that respondents characterize their expectations for the ongoing, recurring costs of generating and submitting the W-2 wage data as a multiple of the current hours required and current outside services costs required, the average multiple reported was *1.9*.

- Mutliplying the average cost per report for the current EEO-1 Report (*see* Section II.A.4, above) by 1.9 yields cost per report that ranges from $2,488 to $2,619. Multiplying those figures by the 307,000 annual reports filed yields a recurring annual total cost for the proposed expanded EEO-1 report that ranges from *$692.9 million to $729.4 milion.*

Exh. 2, p. 6-8 (Bird Declaration). As noted in footnote 18, this recurring cost figure of $692.9 million to $729.4 million does <u>not</u> including the recurring costs employers will incur tabulating hours worked by their employees. As a result, even these extraordinary cost figures are simply the lower bound of the costs to be expected.

---

[18] The Chamber will continue to assess this figure as additional Survey responses are received. The upper bound, which one could calculate using the high end of the cost per company range ($115,817) and the total number of filers (60,886), is as high as $7 billion. Exh. 2, p. 5 (Bird Declaration).

[19] The EEOC should note that respondents were unable to provide an estimate of the recurring costs associated with tabulating hours worked data, as would be required under the EEOC's proposal.

Pl. MSJ 000112

### III.   THE PROPOSAL WILL NOT PROVIDE A PUBLIC BENEFIT OR MAXIMIZE THE UTILITY OF THE REQUESTED DATA AS REQUIRED BY THE PAPERWORK REDUCTION ACT.

Despite the significant burden that employers with more than 100 employees will face as a result of the requirements in the Proposed Revisions, the EEOC has failed to articulate any rationale or evidence whatsoever to justify the need for the proposed EEO-1 Revisions. Nor has the agency identified the specific benefit that the collection of aggregated wage and hours data would provide to the Commission. The EEOC's wholesale failure to articulate the proposed benefit is significant given that one of the purposes of the PRA is to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the federal Government."

The Sage Report, which the EEOC used to "formulat[e] the proposal and guide the development of analytical techniques to make full use of the data to be collected," recognized the inherent limited use of the requested data. Specifically, the Sage Report recognized that "[s]**ummary data at the organization level will likely be of very limited use in EEOC practice**."[20]  The reasons for this observation are numerous, as articulated below.

To evaluate the utility of the proposed EEO-1 Revision, one must consider the legal framework that governs compensation discrimination. Since 1963, the EPA has required employers to pay men and women at the same establishment equal pay for equal work. In addition to the protections against wage discrimination based on sex afforded by the EPA, Title VII prohibits pay discrimination on the basis of race, color, national origin as well as other protected factors.[21]  Employees who work for Federal contractors and subcontractors share

---

[20] " Sage Computing Final Report: To Conduct a Pilot Study for How Compensation Earning Data Could Be Collected from Employers on EEO's Survey Collection Systems (EEO-1, EEO-4, EEO-5 Survey Reports) and Develop Burden Cost Estimates for Both EEOC and Respondents for Each of EEOC Surveys (EEO-1, EEO-4, and EEO-5), p. 57 (Sept. 2015).

[21] Against this backdrop, it is important to note that Congress and courts have explicitly rejected the notion of pay equity based on "comparable worth" theories under which employers would be required to set wages to reflect differences in the "worth" of different jobs. (In the 1960s, the Kennedy Administration proposed a ban on sex discrimination in wages "for work of comparable character on jobs the performance of which requires comparable skills," with the assumption that job evaluation systems were available to evaluate the comparative worth of different jobs. Equal Pay Act of 1963: Hearings Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 88th Cong., 1st Sess. 2 (1963) (quoting S. 882, 88th Cong., 1st Sess., 109 CONG. REC. 2770 (1963) and S. 910. 88th Cong., 1st Sess., 109 CONG. REC. 2886 (1963)). Congress resisted the proposal for the simple reason that it did not want the government or judges to invade the workplace and tell employers what to pay their employees.)  Under federal law, the value of the relative worth of one job as compared to another job is a matter to be decided within the province of the employer offering the employment opportunities to workers. For instance, the Sixth Circuit rejected the comparable worth theory stating, "Title VII is not a substitute for the free market, which historically determines labor rates." *Int'l Union v. Michigan*, 886 F.2d 766, 769 (6th Cir. 1989). Likewise, the Ninth Circuit rejected the theory on the grounds that it found "nothing in the language of Title VII or

similar protections under Executive Order 11246. Since 1978, the EEOC is the administrative agency with enforcement authority of the EPA and Title VII, while the OFCCP enforces EO 11246.

Notwithstanding these protections, both the EPA and Title VII recognize that there are legitimate reasons for differences in compensation. In this regard, the EEOC has recognized that differences in education, experience, training, shift differentials, job classification systems, temporary assignments, "red circling," revenue production, and market factors, to name a few, can legitimately explain compensation differences.[22] Thus, mere differences in pay even as between comparable employees are insufficient to infer unlawful discrimination.

### A. The EEOC's Proposed Tool Will Not Advance Investigations Under the EPA

As noted above, the EPA prohibits sex-based compensation discrimination for employees working at the same establishment if they perform "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."[23] In other words, the relevant comparators are only those employees who perform "equal work" in the "same establishment." The EEOC itself describes the *prima facie* elements of an EPA claim as follows:

- Prima Facie Case: (1) the complainant receives a lower wage than paid to an employee of the opposite sex in the same establishment; and (2) the employees perform substantially equal work (in terms of skill, effort, and responsibilities) under similar working conditions.[24]

Despite the requirement that pay comparisons can only be made between employees who perform "equal work," the proposed EEO-1 Revision would require that employers provide W-2 wage data by EEO-1 job category. Because there are only ten EEO-1 job categories or groupings of jobs,[25] employers would be forced to categorize employees who perform wildly different work into these groupings. The job groupings are exceedingly broad, and will necessarily capture a wide range of positions that are not capable of meaningful compensation comparisons.

---

its legislative history to indicate Congress intended to abrogate fundamental economic principles such the laws of supply and demand or to prevent employers from competing in the labor market." *AFSCME v. Washington*, 770 F.2d 1401, 1407 (9th Cir. 1985).
[22] EEOC Compl. Man. Ch. 10.
[23] 29 U.S.C. § 206(d).
[24] EEOC Comp. Man. Ch. 10, at p. 20, available at www.eeoc.gov/policy/docs/compensation.html
[25] The ten EEO-1 Job groups include: Executive/Senior Level Officials and Managers; First/Mid-Level Officials and Managers; Professionals; Technicians; Sales Workers; Administrative Support Workers; Craft Workers; Operatives; Laborers and Helpers; and Service Workers.

For instance, as Economist Dr. J. Michael DuMond observed, one of the most serious deficiencies with the proposed EEO-1 Revisions are the "very broad occupational group[ings]" that would "result in comparisons of employees who work in very different jobs and who may perform different work." Dr. DuMond uses the following example:

> [O]ne of the 10 EEO-1 job categories is "Professionals", which encompasses a wide range of occupations such as lawyers and registered nurses. Hospitals that employ both nurses and lawyers would nevertheless be required to include both of these occupations together in the proposed EEO-1 survey. This grouping of nurses with lawyers ignores the fact that a nursing degree does not require a post-graduate college degree whereas a lawyer will almost surely have post-graduate education. Moreover, the knowledge, skills and abilities required of a nurse differ greatly from those factors that required of a lawyer. In fact, there is actually very little in common between nurses and lawyers beyond the sharing of a common EEO-1 category. While it is undeniable that nurses and lawyers are tied to very different labor markets, the EEOC's proposal ignores this reality and assumes pay should be similar for these types of occupations simply because they are both "Professionals."[26]

Dr. DuMond is not alone in his concerns; Economist Dr. Speakman expressed similar apprehensions, stating "it is my experience [employers] don't use the EEO-1 job classification for any type of review or planning or comparison purposes, much less for compensation-related determinations, outside the scope of providing data to the government. It's an artificial and meaningless conglomeration of dissimilar workers used only for EEO-1 reports. . . It's unclear why anyone or any agency would consider it an appropriate grouping for a meaningful analysis of employees' pay."[27]

The EEOC's instruction booklet outlines other "Professional" positions that similarly cannot form a proper comparison for compensation purposes under the EPA. For instance, using the Professionals job category for positions typically found within a hospital, we would also find accountants, computer programmers, dieticians, physicians and surgeons.[28] But these jobs are simply not comparable under the EPA.

---

[26] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 9.

[27] Ex. 4, Dr. Robert Speakman Declaration at p. 11.

[28] *See* EEO-1 instruction booklet, available at http://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm. Notably, the examples provided omit the myriad other jobs that would also fall within the Professionals EEO-1 job group.

Pl. MSJ 000115

The EEOC itself must recognize the inappropriateness of such groupings under the EPA. Indeed, in investigating and analyzing the "equal work" requirement, the EEOC advises as follows:

> [A]n inquiry should first be made as to whether the jobs have the same common core of tasks, i.e., whether a significant portion of the tasks performed is the same. *If the common core of tasks is not substantially the same, no further examination is needed and no cause can be found on the EPA violation.*[29]

Common sense tells us that accountants, computer programmers, dieticians, registered nurses, lawyers, physicians and surgeons do not share the same common core of tasks. But to be more specific, the Department of Labor, Bureau of Labor Statistics makes those distinctions clear in the descriptions it assigns to these workers: [30]

> Accountants & Auditors: Examine, analyze, and interpret accounting records to prepare financial statements, give advice, or audit and evaluate statements prepared by others. Install or advise on systems of recording costs or other financial and budgetary data.

> Computer Programmers: Create, modify, and test the code, forms, and script that allow computer applications to run. Work from specifications drawn up by software developers or other individuals. May assist software developers by analyzing user needs and designing software solutions. May develop and write computer programs to store, locate, and retrieve specific documents, data, and information.

---

[29] EEOC Comp. Man. Ch. 10, at p. 22, available at www.eeoc.gov/policy/docs/compensation.html, (emphasis added) citing *Stanley v. University of S. Cal.*, 178 F.3d 1069, 1074 (9th Cir.) (EPA requires two-step analysis: first, the jobs must have a common core of tasks; second, court must determine whether any additional tasks incumbent on one of the jobs make the two jobs substantially different), cert. denied, 120 S. Ct. 533 (1999); *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998) (critical issue in determining whether two jobs are equal under the EPA is whether the two jobs involve a "common core of tasks" or whether "a significant portion of the two jobs is identical"); *Brewster v. Barnes*, 788 F.2d 985, 991 (4th Cir. 1986) (same).

[30] Standard Occupational Classification system overview, March 5, 2016, http://www.bls.gov/soc/home.htm, "The 2010 Standard Occupational Classification (SOC) system is used by Federal statistical agencies to classify workers into occupational categories for the purpose of collecting, calculating, or disseminating data. All workers are classified into one of 840 detailed occupations according to their occupational definition. To facilitate classification, detailed occupations are combined to form 461 broad occupations, 97 minor groups, and 23 major groups. Detailed occupations in the SOC with similar job duties, and in some cases skills, education, and/or training, are grouped together."

Pl. MSJ 000116

Dieticians: Plan and conduct food service or nutritional programs to assist in the promotion of health and control of disease. May supervise activities of a department providing quantity food services, counsel individuals, or conduct nutritional research.

Registered Nurses: Assess patient health problems and needs, develop and implement nursing care plans, and maintain medical records. Administer nursing care to ill, injured, convalescent, or disabled patients. May advise patients on health maintenance and disease prevention or provide case management. Licensing or registration required. Includes Clinical Nurse Specialists. Excludes "Nurse Anesthetists" (29-1151), "Nurse Midwives" (29-1161), and "Nurse Practitioners" (29-1171).

Lawyers: Represent clients in criminal and civil litigation and other legal proceedings, draw up legal documents, or manage or advise clients on legal transactions. May specialize in a single area or may practice broadly in many areas of law.

Physicians:[31] Physicians who diagnose and provide non-surgical treatment of diseases and injuries of internal organ systems. Provide care mainly for adults who have a wide range of problems associated with the internal organs. Subspecialists, such as cardiologists and gastroenterologists, are included in "Physicians and Surgeons, All Other" (29-1069).

Surgeons: Physicians who treat diseases, injuries, and deformities by invasive, minimally-invasive, or non-invasive surgical methods, such as using instruments, appliances, or by manual manipulation. Excludes "Oral and Maxillofacial Surgeons" (29-1022).

And of course, the BLS job descriptions do not take into account the many specific job descriptions and duties employers are likely to have in their own workforces.

Aside from the "same common core of tasks" analysis, assessing whether required "skills" of comparator jobs are substantially equal further demonstrates that comparisons of pay by EEO-1 job groupings can serve little utility. As the EEOC's Compliance Manual provides:

---

[31] *See* Internists, SOC 29-1063 given the multiple listings categories of "Physicians and Surgeons."

Pl. MSJ 000117

> Two jobs require equal skill for purposes of the EPA if the
> experience, ability, education and training required are
> substantially the same for each job.

Again, one need only look at the instructions the EEOC has provided to employers to see that the EEO-1 job groupings take into account a wide range of experience and educational requirements within the same job group. For instance, employers are advised that most jobs in the "Professionals" job group "require bachelor and graduate degrees, and/or professional certification." The EEOC further provides that "[i]n some instances, comparable experience may establish a person's qualifications." Thus, the explicit directions make clear that jobs that do not require the same education, experience and training will be grouped together. On its face, the EEO-1 job groupings are not capable of any meaningful analysis under the EPA. As Dr. Speakman indicated "…analyses using the EEOC's proposed pay data and suggested tests will result in a high error rate – firms that pay fairly will be investigated too often and firms that underpay women or minorities will often go undetected. Simply put, the recommended tests and data will lead to many false-positive and false-negative conclusions, negating any utility from this proposal. In fact, it appears that at best the targeting mechanisms suggested by the EEOC will do only negligibly better than selecting firms at random."[32]

### B.   The EEOC's Proposed Tool Will Not Advance Investigations Under Title VII

The proposed EEO-1 Revisions are also inconsistent with Title VII and, therefore, cannot support any meaningful analysis probative of further investigation. Specifically, providing W-2 data by EEO-1 job categories is not consistent with the requirement that compensation differences only matter if the comparators are "similarly situated." As articulated by the EEOC in its compliance manual, "similarly situated employees are those who would be expected to receive the same compensation because of the similarity of their jobs and other objective factors."[33] And when reviewing similarity of jobs, EEOC investigators are instructed that the "actual content of the jobs must be similar enough that one would expect those who hold the jobs to be paid at the same rate or level."[34]

For the reasons set forth in Section III.A above, the EEO-1 job groups are exceedingly broad and will necessarily include a wide range of positions that are not capable of meaningful compensation comparisons under Title VII. Using the same example described above, it is simply implausible to expect that accountants, computer programmers, dieticians, registered nurses, lawyers, physicians and surgeons are "paid at the same level or rate."

---

[32] Ex. 4, Dr. Robert Speakman Declaration, at p. 3.
[33] EEOC Comp. Man. Ch. 10, at p. 6, available at www.eeoc.gov/policy/docs/compensation html.
[34] *Id*. at 7.

Moreover, courts across this country have held that although similarly situated employees need not be "identical," they must be "directly comparable to the plaintiff in all material respects...."[35] Under these legal standards, any compensation analysis based upon EEO-1 job groupings would be meaningless.

We see a similar result in the EEO-1 "Sales Workers" job grouping. In that group we find advertising sales agents, insurance sales agents, real estate brokers and sales agents, securities, commodities, financial services sales agents, and telemarketers. Many of these positions could reasonably be found within a financial services organization. Yet one would not expect that these jobs would be similar enough to suggest that those who hold the positions would be paid at the same rate or level. Indeed, sales workers are often compensated based on varying levels of base salary and commission plans. Thus, unless they were truly in similar jobs, it would be impossible to conduct pay comparisons based on an overall broad-based job grouping that would include, for example, telemarketers and securities and commodities brokers.

And aside from the overly broad EEO-1 job groupings themselves, the EEOC has acknowledged that "differences in job titles, departments, or other organizational units may reflect meaningful differences in job content or other factors that *preclude direct pay comparisons* between employees."[36] But neither these factors nor the legitimate factors that explain compensation discrimination as described in Section III.C.1 below, are captured under the proposed EEO-1 Revisions.

## C.     There are Fatal Limitations with the Information Sought and the Statistical Tool Proposed to be Utilized by the EEOC to Analyze this Information

For reasons addressed in detail below, there is simply no circumstance under which broad-brush, aggregate compensation and hours data can be used effectively on a grand scale to target employers for review.[37] Every employer's compensation system is unique and numerous

---

[35] *Eskridge v. Chicago Bd. of Educ.*, 47 F. Supp. 3d 781, 790-91 (N.D. Ill. 2014). Although a similarly situated employee need not be "identical," *Caskey v. Colgate–Palmolive Co.*, 535 F.3d 585, 592 (7th Cir.2008), he must be "directly comparable to the plaintiff in all material respects...." citing *Naik v. Boehringer Ingelheim Pharm., Inc*., 627 F.3d 596, 600 (7th Cir. 2010); *Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 856-57 (S.D.Tex. 2010) ("'Similarly situated' employees are employees who are treated more favorably in 'nearly identical' circumstances; the Fifth Circuit defines 'similarly situated' narrowly. Similarly situated individuals must be 'nearly identical' and must fall outside the plaintiff's protective class. Where different decision makers or supervisors are involved, their decisions are rarely 'similarly situated' in relevant ways for establishing a prima facie case."); *Alexander v. Ohio State University College of Social Work*, 697 F.Supp.2d 831, 846-47 (S.D. Ohio 2012) (To be similarly situated, a plaintiff's purported comparators must have the same responsibilities and occupy the same level position.)

[36] EEOC Comp. Man. Ch. 10, at p. 8, available at www.eeoc.gov/policy/docs/compensation html.

[37] *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986) (noting that "some [are] regressions so incomplete as to be inadmissible as irrelevant . . . .'"); *Sheehan v. Purolator*, 839 F.2d 99, 103 (2d Cir. 1988) (affirming the district

29

factors impact compensation decisions and results. The authors of the Sage Report, commissioned by the EEOC, detailed a theoretical framework for identifying pay disparities that is consistent with standard labor economic theory.[38] More specifically, the authors demonstrated that an employee's pay is estimated as a function that includes "control variables that can have a justifiable impact on difference in pay (such as education, certification, and work experience)." The inclusion of the control variables is critical in explaining why some employees are paid more than others. As the authors correctly note: "market forces determine one's level of pay, and *variation in pay is both necessary and inevitable*."[39]

Nonetheless, the two tests that the EEOC specifically references in the Proposed Revisions are simply distributional tests that do not control for any legitimate factors that explain pay such as those identified in the Pilot Study. Besides pay band, the only other factor that a covered employer will be providing to the EEOC is the aggregate number of work hours associated with employees in each pay band and demographic group. However, the Sage Report's authors noted that simply adjusting for the number of work hours, as recommended by the EEOC, could generate misleading results:

> [W]e have to recognize the varying patterns of compensation for employees who work different hours. As a result, pooling together into a single cell the employees who may have received the same compensation from working different hours and *analyzing them with a single offset as the format of the proposed EEOC form suggests, may lead to biases that are difficult to quantify…*"[40]

As the EEOC has found with similar efforts to collect compensation data on a broad scale, compensation cannot be subjected to a normalized, one-size-fits-all method of

---

court's denial of class certification because the regression analysis relied upon was deemed to be ''flawed'' for failing to take into account non-discriminatory factors, such as "education and prior work experience."); *Griffin v. Board of Regents*, 795 F.2d 1281, 1292 (7th Cir. 1986) (holding that ''the explanatory power of a model is a factor that may legitimately be considered by the district court in deciding whether the model may be relied upon.''); EEOC Compliance Manual, Section 10: Compensation Discrimination ("[Employers often] assert[] that pay disparities are caused by nondiscriminatory factors. Such factors could include the employees' education, work experience with previous employers, seniority in the job, time in a particular salary grade, performance ratings, and others. The Commission will need accurate information about all the variables on which the employer relies, for each employee similarly situated to the charging party. The employer should be asked to provide and explain all of its reasons for a compensation differential to reduce the need for burdensome repetitive requests.")
[38] Sage Computing "Final Report: To Conduct a Pilot Study for How Compensation Earning Data Could Be Collected from Employers on EEO's Survey Collection Systems (EEO-1, EEO-4, EEO-5 Survey Reports) and Develop Burden Cost Estimates for Both EEOC and Respondents for Each of EEOC Surveys (EEO-1, EEO-4, and EEO-5), p. 16 (Sept. 2015).
[39] *Id.*, at 16, emphasis added.
[40] *Id.*, at 61, emphasis added.

Pl. MSJ 000120

interpretation. As a result, the proposed data collection will have no "meaningful value" and certainly no benefit that rises to the level required by the PRA. <u>Simply put, the EEOC cannot achieve the objectives identified in the proposal through any mechanism, and certainly not through the mechanism it has identified</u>.

1. The Pay Proposal Ignores Legitimate Reasons for
   Differences in Compensation

Employers have an inherent right to value jobs differently based on non-gender or race/ethnicity based standards.[41] The EEOC's proposal does not account for the explicitly-permitted differentiation in compensation based on factors like experience, performance, work productivity, skills, scope of responsibility, market, and education – to name just a few. This is particularly troublesome because differences in sex and race/ethnicity correlate with some of these factors. For example, the Bureau of Labor Statistics indicates that the average amounts of company-specific tenure differ between men and women and among different race/ethnic groups.[42] Notwithstanding, the statistical tests proposed by the EEOC do not account for these permitted differences.

Moreover, the EEOC's proposal ignores the role of working conditions and how that affects an employee's compensation. For example, employees who work night shifts, swing shifts and/or weekends are often paid a differential to account for less desirable work schedules.[43] For the same reason, jobs that require employees to work outside or exert atypical physical effort may also command a wage premium.[44] Nevertheless, the statistical tests proposed by the EEOC using the collected data will not and cannot account for differences in working conditions.

The concerns with the EEOC's failure to account for differences in working conditions is compounded because the Commission is proposing that employers use W-2 data, which includes not only base salary but also commissions, tips, overtime pay, shift differentials and bonus payments in the aggregate. In doing so, the EEOC is ignoring that some types of pay, specifically commissions and tips, are determined more by an employee's skill and effort than an employer's pay policies.[45] For example, Dr. DuMond notes that differences in W-2 earnings among servers at a restaurant will be based on their ability to provide quality service and earning the associated tips/gratuities, and is largely undetermined by the employer.[46]

---

[41] 29 U.S.C. 206(d) and 42 CFR 2000e-2(h).
[42] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 10.
[43] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 11.
[44] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 11.
[45] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 12.
[46] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 12.

31

     2.      The Use of W-2 Earnings Further Obscures the Relevance
           of the Data Collection

The EEOC's proposal does not specify how employers are to report W-2 earnings and does not indicate whether employers should report the W-2 federal income taxable earnings (box 1) or Medicare taxable earnings (box 5) or report in some other manner. It is possible--and indeed likely--that a difference in tax-deferred retirement contributions and savings propensities could drive a pay difference between groups of employees, creating false positives and false negatives.[47] As Dr. Speakman noted, pay differences "generated by employees' decisions" will undermine the EEOC's efforts to correctly identify firms that discriminate in pay.[48]

     3.      The EEOC's Approach to Reporting of Hours for Salaried,
           Part-Time and Terminated Employees Further Denigrates
           the Efficacy of the Data

The proposal would require employers to report hours worked as well as W-2 earnings data that span a two-year income tax period. The Commission stated that this will allow the EEOC and OFCCP to "meaningfully analyze"[49] pay differences because "collection of hours-worked data will account for the fact that some individuals are employed for less than the entire reporting year, and therefore, may work fewer hours."[50]  The proposed approach to reporting data for employees exempt from the overtime provisions of the FLSA, part-time employees, and employees who are hired or terminated mid-year, however, is fundamentally flawed.

First, as the EEOC admits in the proposal, it is unsure how to count hours worked for full-time, salaried exempt employees, noting that the Agency "*seeks employer input*" on how to report hours worked for these exempt employees.[51]  The EEOC indicated that it is "not proposing" that employers begin collecting additional data on actual hours worked for salaried workers "to the extent that the employer does not currently maintain such data," but rather is considering a standard such as estimating 40 hours per week for all full-time salaried workers in all industries. In our experience and in the experience of Dr. DuMond and Dr. Speakman, very few employers track the number of actual hours worked for their salaried workers and even HRIS systems that maintain a standardized or default value for "work hours" for salaried exempt

---

[47] Employee Benefits Security Administration Publications, *Women And Retirement Savings*, available at http://www.dol.gov/ebsa/publications/women.html ("Women are more likely to work in part-time jobs that don't qualify for a retirement plan. And working women are more likely than men to interrupt their careers to take care of family members. Therefore, they work fewer years and contribute less toward their retirement, resulting in lower lifetime savings.")
[48] Ex. 4, Dr. Robert Speakman Declaration at p. 10.
[49] EEOC's Notice of Proposed Changes to the EEO-1 to Collect Pay Data from Certain Employers, available at http://www.eeoc.gov/employers/eeo1survey/2016_eeo-1_proposed_changes_qa.cfm.
[50] 81 Fed. Reg. 5117, fn. 45 (February 1, 2016).
[51] 81 Fed. Reg. 5117-5118 (February 1, 2016) (emphasis added).

employees (such as 40 hours per week) does not reflect an employee's actual hours worked.[52] As such, the Agency will be forced to apply an across-the-board rule that does further harm to the efficacy of the data and that would be uninformative and unreliable for purposes of identifying pay disparities.[53] The impact of this data limitation is serious: according to data from the Bureau of Labor Statistics, 59% of the US workforce is paid by the hour, meaning that 41% of the US workforce is paid on a basis for which no accurate work hours may be available and for which the EEOC does not have a recommended method for measuring.[54]

Further, combining employees who work part-time or partial year with full-time and full-year employees will result in very misleading results. The variation is explained by Dr. DuMond in his example of an employee who has an annual salary of $120,000 per year but was recently hired and only worked 1 of 12 months, he or she will be placed in the lowest pay band since he/she only earned $10,000. Under the EEOC's proposal, this employee could be grouped with lower wage workers at the same company, even though the hourly rate for this employee would be much higher than the other employees in the same pay band. [55] Similarly, an employee who works a part-time schedule of 20 hours per week will be grouped and counted with full-time employees who earn half of that hourly rate but work 40 hours per week.[56] Likewise, Dr. Speakman raised similar concerns with comparing employees who worked part-time or part-year or who took leaves of absence with other employees who worked full-time, full-year without any breaks.[57]

Simply collecting the aggregate number of hours worked does not fix the bigger underlying problem with the EEOC's proposal: employees are being counted in the "wrong" pay band. However, the EEOC might again infer discrimination from differences in the imputed hourly rates for employees in the same pay band, not recognizing that those differences can just as easily arise from part time and partial year employees, and the Commission will not be able to make that distinction with the aggregated data. Additionally, the proposal does not suggest a methodology by which the EEOC will distinguish between intermixed part-time, partial year or full-time employees in the aggregate W-2 data. Moreover, since the total number of hours worked by employees in a pay band does not incorporate any of the factors known to affect pay, the data collected under this proposal will not provide any useful insight into the actual nature of employers' pay practices.

---

[52] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 13; Ex 4, Dr. Robert Speakman Declaration at p 9-10.
[53] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraphs 13-15.
[54] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 14.
[55] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 15.
[56] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 15.
[57] Ex. 4, Dr. Robert Speakman Declaration at p. 10.

Pl. MSJ 000123

4.      The EEOC's Proposed Statistical Approaches Will Not be
        Useful in Identifying Pay Differences

The EEOC's proposal suggests that they will primarily use two statistical tests to analyze the collected data: the Mann-Whitney and the Kruskal-Wallis tests.[58] The EEOC indicates that it can "compute the statistical tests within job categories and then proceeding [sic?] to more closely investigate companies and establishments with low p-values" and may also "compare a particular firm's regression coefficients for the hours worked, race and gender variables to those derived from an analysis of the relevant labor market as a whole."[59]  The use of these measures could easily lead to both "false positives" (i.e., flagging a company for further review even when all employees working in the same job are paid exactly the same) and also "false negatives" (i.e., concluding that pay disparities do not exist at a company even in the presence of unambiguous pay discrimination).[60]

The reason that the two statistical tests proposed by the EEOC are likely to lead to both false positives and false negatives is that the aggregated data collected by the EEOC will not include the most important factors that drive compensation. For example, the report will not account for one of the most critical factors that determine pay, specifically the job level/job grade of an employee.[61]  According to Dr. DuMond, it is commonly understood that all employees, regardless of their race, ethnicity or gender, will experience increases in pay as they move "up" or "higher" in an organization.[62]  He provides the example that Pharmaceutical Sales Representatives are paid less than their District Sales Managers who are paid less than their Regional Sales Directors. [63] While it would not be reasonable to assume that an inexperienced Pharmaceutical Sales Representative would be paid similarly to an experienced Regional Sales Director simply because they are in the same EEO-1 job category (Sales), the statistical measure the EEOC proposes utilizing could lead to this conclusion because the EEOC's proposal will not include any information or breakdown relating to an employee's job level/job grade. Despite this lack of consideration for an employee's job level/grade, the two statistical tests will nevertheless ascertain whether gender and racial groups are equally distributed across all the pay levels of a company without any consideration of the employee's job level/grade.

---

[58] 81 Fed. Reg. 5118, fn. 47 (February 1, 2016).
[59] 81 Fed. Reg. 5118, fn. 47 (February 1, 2016).
[60] Ex. 4, Dr. Robert Speakman Declaration, at p. 13 ("Of secondary concern is that the EEOC's proposed data collection removes within pay band earnings variation. This variation may add information and it may add uncertainty. Suppose, for example, that men are paid at the top of every pay band and women are paid at the bottom. Given the proposed data collection, they will all appear to all earn the same amount. That men earn more is masked by the pay band data, which limits the EEOC's ability to detect a pay difference.")
[61] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 17.
[62] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 17.
[63] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 17.

34

The Pilot Study commissioned by the EEOC is very clear as to what these two statistical tests assume: "Although the (Mann-Whitney) test is sensitive to pure shifts, it has the more general interpretation of a test of the differences between two or more distributions."[64] Thus, because the Mann-Whitney and Kruskal-Wallis tests are determining whether men and women, for example, are distributed similarly across all pay bands (and hence all levels of an organization), these tests do not determine whether there are improper disparities within a pay band.[65] Instead, it is a test of whether racial and gender groups of employees are similarly distributed across all pay bands, even when the employees in these groups may have very different levels of experience, may hold very different jobs (e.g., nurses and lawyers) and may be at very differently job and pay levels within an organization.[66] If the EEOC proceeds with its stated proposal to use these tests on the collected data to "detect discrimination," then the likelihood that they would lead to false positives and false negatives is greatly increased.

Dr. Speakman also had serious concerns with the use of these statistical measures. Dr. Speakman stated:

> In my twenty-four years of experience working as an expert in the areas of economics and statistics, I've only seen the Mann-Whitney test run once and I've never seen the Kruskal-Wallis test run. In the one instance that I saw the Mann-Whitney test run, the opposing expert was inexperienced and there were many other errors made in the analysis that using the wrong test was only one of many concerns.
>
> The reason these tests are never used is that the comparisons made cannot be used to assess Title VII or EPA claims as they cannot be used to make comparisons among similarly situated workers. The exception would be if the population of employees was defined so that they are similarly situated in all relevant, potentially confounding factors. This would almost always lead to comparisons among very small groups of employees and the tests would not have the ability to statistically detect pay differences even if they existed.[67]

These concerns are all too real. Dr. DuMond conducted the Mann-Whitney test on two sets of simulated employment data to illustrate the problems with the use of these measures.

---

[64] EEOC pilot study on collecting pay data, available at: http://www.eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf, at p. 27.
[65] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 19; Ex. 4, Dr. Robert Speakman Declaration at Page 12.
[66] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 19; Dr. Robert Speakman Declaration at Page 12.
[67] Ex. 4. Dr. Robert Speakman Declaration, at pp. 12-13.

PI. MSJ 000125

pairings.[72]  Using the CPS data, Dr. Speakman constructed an annual wage and salary measure[73] and annual hours.[74]  From there, Dr. Speakman selected 10 "workers" at random and matched them to a random pay rate.  Dr. Speakman performed this matching 10,000 times. In theory, the "workers" are matched randomly with predicted pay and the *expectation* is that there will not be a gender difference in the new pay amounts. Dr. Speakman indicated that labor economists would expect 5% of the trials to have statistically significant pay disparities even when controlling for hours worked, age, and census occupation code (the three pay determinants). About half of these significant outcomes will favor men (2.5%) and half will favor women (2.5%).  However, the findings using the Mann-Whitney test did not show this. They found far more significant results than would be expected. For example, for Sales Workers in the Grocery Stores industry, when it is assumed that there is no underlying gender pay disparity (0%), for employers with 10 employees in this job classification, Dr. Speakman found that 8.0% of the trials produced a statistically significant pay disparity adverse to women.  These are false positives, instances of when a firm pays employees equitably, but the statistical test is significant anyway.  The findings in Dr. Speakman's simulation were damning:

> [T]here is a high rate of false positives and the ability to detect actual pay differences is weak.  The false positive rate will be higher when workers are more dissimilar and the (omitted) factors impacting pay are correlated with gender.  Increased population size exacerbates the problem.  As population size and the underlying gender pay difference increase, the test will be better able to identify firms that actually underpay women, but at the cost of an increase in targeting firms that pay fairly.   The statistical tests and targeting mechanism suggested by the EEOC will perform poorly.[75]

These simulations call into question the usefulness of the data that would be collected under the EEOC's proposal. These examples illustrate that the proposed statistical tests may not identify actual pay differences that are consistent with discrimination when it truly exists, and

---

[72] Ex. 4, Dr. Robert Speakman Declaration, at p. 18. Dr. Speakman indicated that these will likely be the largest industry and job classifications, which means that the EEOC's targeting mechanism should be more successful here than in smaller industries and job classifications. Dr. Speakman indicated that if the targeting mechanism is not successful with these larger populations, the chance of being successful elsewhere is even smaller.

[73] Ex. 4, Dr. Robert Speakman Declaration at p. 19.  This measure does not include overtime, commissions, bonuses, tips, etc., which Dr. Speakman indicated makes the simulation more likely (not less likely) to be able to identify pay discrimination, noting "it does not have the shortcomings introduced by examining W-2 earnings."  *Id.*

[74] The CPS data includes the information necessary to derive weekly earnings for all workers, but it does not include weeks worked except for those paid an annual salary.  As such, Dr. Speakman assumed that all workers work fifty-two weeks per year.  As Dr. Speakman noted: "If there is a difference between men and women in weeks worked, the test performed here will perform better than those that would be performed by the EEOC."

[75] Ex. 4, Dr. Robert Speakman Declaration, at pp. 22-23.

Pl. MSJ 000127

may incorrectly conclude that there is evidence consistent with discrimination when employees are actually paid equivalently. But perhaps more importantly, the first simulation shows that a company with a disproportionately greater number of female or minorities at the lower grade levels is likely to "fail" the Mann-Whitney test. In fact, failing the Mann-Whitney test could occur while companies are making good-faith efforts to increase their minority and female representation. That is, many firms have worked diligently to increase the participation of workers from historically disadvantaged groups by hiring these workers as they became available. The result of this effort is that higher percentages of female, African American, and Hispanic workers are found in some of the lower job levels as they gain additional experience to be eligible for promotion.

The EEOC has also suggested it may also use interval regression to perform analyses that attempt to correct for potential differences in annual hours worked between men and women and between members of different race groups. The EEOC indicated that the use of interval regression is to remove the effect of differences in hours worked. However, based on the analysis by Dr. Speakman, it appears the EEOC's proposed approach results in the same false positives and false negatives outlined with the Mann-Whitney and Kruskal-Wallace tests.[76] To illustrate the fatal limitations of interval regression, Dr. Speakman provided two hypotheticals:

- In Hypothetical 1, Dr. Speakman assumed that there are five women and five men who work 1,560 hours per year and five women and five men who work 2,080 hours per year. Dr. Speakman set the hourly pay rate for women at $20 per hour and set the hourly pay rate for men at twice the rate as women ($40/hour). In Hypothetical 1 men and women work the same number of average hours per year (1,820) but men are paid twice the rate of women. However, the interval regression would not produce any estimates of a gender pay difference even though men are clearly paid twice as much as women.

- In Hypothetical 2, Dr. Speakman produced a dataset with 24 men and 24 women, who on average earned the same hourly rate ($27.43) but who worked different number of hours. All workers worked either 1,040 hours per year or 2,080 hours per year, but men were more likely to work full-time and women more likely to work part-time. Interval regression produced a statistically significant gender pay result favoring men, even though the hourly pay rates were exactly the same.[77]

In sum, the statistical tests that the EEOC suggests they will use will undercut the EEOC's ability to correctly identify firms that discriminate in pay. They will not allow them to make comparisons among similarly situated workers. It appears that they will not even allow

---

[76] Ex. 4, Dr. Robert Speakman Declaration at p. 13.
[77] Ex. 4, Dr. Robert Speakman Declaration at p. 14.

38

them to account for differences in the number of hours worked by gender or race.[78] <u>Accordingly, the EEOC's proposed statistical methodology provides no benefit and does not meet the standards of the PRA.</u>

**D.      The EEOC's Proposal to Compare the Pay of a Firm or Establishment to Industry or Metropolitan-Area Data Serves No Purpose Under Title VII or the EPA.**

The EEO-1 Revisions state that EEOC and OFCCP will develop a software tool that will allow its investigators to analyze "W-2 pay distribution within a single firm or establishment, and by comparing the firm's or establishment's data to aggregate industry or metropolitan-area data" which would "highlight statistics of interest."

However, neither Title VII, the EPA nor EO 11246 requires employers to pay its employees according to industry or geographical standards. Certainly, employers cannot use as a defense to claims of inequitable pay practices that others in its industry are also paying women or minorities in a particular EEO-1 category less than white men. Conversely, it is not discriminatory for an employer to decide to pay lower wages for certain positions than its competitors may choose to pay for the same positions. As such, the mere fact that a particular employer's aggregate compensation data is below the pay of the industry or metropolitan area is irrelevant to an investigation of whether an employer's pay practices are discriminatory.

Employers already have many different, much more finely-tuned, methods by which they can benchmark their compensation against others for particular jobs. Many companies, large and small alike, look to market data that is specific to the jobs in their workforce to assess their position vis-a-vis their competitors. The data that could be assembled through the proposed EEO-1 Revisions will lack the reliability of such targeted market data — data that employers can and do already access. We would note as well that the EEOC proposal dos not permit area differentials to be factored into the reported compensation data. Insofar as the federal government itself has area pay differentials for civil service pay grades, it makes absolutely no sense that the EEOC will require EEO-1 reports, either on the establishment or consolidated basis and not permit the employer to apply geographic differentials.

Moreover, the EEO-1 Revisions' suggestion that reporting pay data may "encourage self-monitoring" and "voluntary" compliance by employees if they uncover pay disparities misses the mark. As an initial matter, federal contractors and subcontractors are already required to monitor their pay practices as part of their compliance obligations.[79]  And any

[78] Ex. 4, Dr. Robert Speakman Declaration at Page 14.
[79] 41 CFR 60-2.17 (b) "Identification of problem areas. The contractor must perform in-depth analyses of its total employment process to determine whether and where impediments to equal employment opportunity exist. At a minimum the contractor must evaluate … (3) Compensation system(s) to determine whether there are gender-, race-, or ethnicity-based disparities."

Pl. MSJ 000129

contractor subject to an OFCCP compliance evaluation is required to submit employee-level detailed compensation data for the establishment under review. Thus, there would be no added utility to federal contractors and subcontractors who already self-monitor pay within their organizations.

And, generally speaking, the EEO-1 Revisions would not otherwise encourage self-monitoring efforts because, for the reasons explained above: (1) EEOC cannot effectively target its enforcement efforts based on the data; and (2) the data is too broad and generalized to be of any practical use to those employers who endeavor to establish equitable pay practices.

## IV.    CONFIDENTIALITY & PRIVACY

### A.    EEOC Should Take All Possible Actions to Protect the Confidentiality and Security of the Highly Confidential, Proprietary Data Being Requested

EEOC gives short shrift to the privacy and confidentiality issues raised by the Proposed Revisions notwithstanding the mandate of the PRA. The notice published in the Federal Register merely reiterated that Section 709(e) of Title VII, 42 USC § 2000e-8(e) prohibits disclosure of any information contained in the EEO-1 report "prior to the institution of any [Title VII] proceeding." The proposal notes that while the OFCCP is not subject to the restrictions of section 709(e), it nevertheless will hold the information contained in the EEO-1 confidential "to the extent permitted by law, in accordance with Exemption 4 of the Freedom of Information Act and the Trade Secrets Act." While these assertions state the law as codified and practiced, they understate the significant privacy and confidentiality concerns raised by the proposal.

We only have to refer to the draft report of the EEOC Survey System Modernization Work Group (Working Group) Meeting conducted on March 8-9, 2012, which was published with the Proposed Revisions to confirm these concerns. While this Working Group performed its work nearly four years prior to the publication of the Proposed Revisions and while the draft report was deficient in many respects, the sparsely published report highlighted issues raised which were not addressed in the Proposed Revisions. The Working Group noted that "the Privacy Act is a concern."[80] The report stated that: "Statistical Controls would be required to ensure the confidentiality of data to companies with smaller job categories."[81] The proposal is devoid of any discussion of data confidentiality. The draft report notes as well that if the "cell" size was lower than 5, we do not publish data for that cell."[82] There is no discussion of the implication of small cells, particularly in the upper pay bands.

---

[80] Draft Report pg 10, Question 6. Group 1
[81] Draft Report page 11 group 1
[82] Draft Report page 11, group 2.

In fact, there is no discussion at all of confidentiality issues in the proposal. In addition, the general reference to the Exemption 4 exclusion from the OFCCP releasing this information does not reference a crucial point. Unlike the section 709(e) restriction on EEOC disclosure, the OFCCP procedure requires contractors to follow the regulatory constraints found in the OFCCP and Department of Labor FOIA regulations. The Department of Labor FOIA Regulations, 29 CFR Part 70, create a complex process for employers to request that business confidential information not be disclosed. Rather than a simple prohibition of disclosure, the regulations state:

> (b) Designation of business information. A submitter of business information will use good-faith efforts to designate, by appropriate markings, either at the time of submission or at a reasonable time thereafter, any portions of its submission that it considers to be protected from disclosure under Exemption 4. These designations will expire ten years after the date of the submission unless the submitter requests, and provides justification for, a longer designation period.

> (c) Notice to submitters. A component will provide a submitter with prompt written notice of a FOIA request that seeks its business information whenever required under paragraph (d) of this section, except as provided in paragraph (g) of this section, in order to give the submitter an opportunity to object in writing to disclosure of any specified portion of that information under paragraph (e) of this section. The notice will either describe the business information requested or include copies of the requested records or record portions containing the information. When notification to a voluminous number of submitters is required, notification may be made by posting or publishing notice reasonably likely to accomplish such notification.

> (e) Opportunity to object to disclosure. A component will allow a submitter a reasonable time to respond to the notice described in paragraph (c) of this section. If a submitter has any objection to disclosure, it is required to submit a detailed written statement. The statement must show why the information is a trade secret or commercial or financial information that is privileged or confidential. In the event that a submitter fails to respond to the notice within the time specified, the submitter will be considered to have no objection to disclosure of the information. Information

41

provided by a submitter under this paragraph may itself be subject
to disclosure under the FOIA.

Thus, in every instance where the Department of Labor receives a FOIA request for the extended EEO-1 information, it must timely notify the employer submitter which in turn must submit a detailed written statement explaining why some or all of the EEO-1 information is a trade secret or commercial or financial information. The regulations then provide a process whereby the requester and the employer have to undertake a lengthy appeal process where each presents its arguments. Final determinations are subject to judicial review. Further, even if the Department of Labor applies Exemption 4, that exemption from disclosure expires 10 years after it is granted. As noted in the draft Working Group report, information contained in small cells or smaller job categories may well disclose individual pay or other personal information. Thus, the submission to the OFCCP is not resolved by the glib assertion in the proposal that the OFCCP holds this information confidential "to the extent permitted by law." In fact, there is a significant burden placed on contractors to protect the confidentiality of the new EEO-1 information.

To the extent that the OFCCP shares the EEO-1 information, disclosure concerns would be alleviated to some extent if the EEOC requests that the Director of OIRA treats all information submitted to the EEOC as covered by Section 3510 of the Paperwork Reduction Act[83] and directs the EEOC that the statutory restrictions on disclosure of EEO-1 data will apply to the OFCCP.[84] In this regard, the direct prohibition on disclosure will not be subject to regulatory considerations and determination of trade secrets or commercial or financial information by OFCCP personnel not trained in these issues or a laborious and expensive regulatory and judicial review process.

### B.    Potential Data Breaches

As noted above, the proposal to collect employee pay data through the EEO-1 reports presents significant confidentiality issues related to the potential disclosure of this data. The EEOC publishes aggregate data collected from the EEO-1 reports and also shares original EEO-1 data with other federal and state agencies and individual researchers. With regard to the aggregate data, there are concerns that those who receive it will be able to reverse-engineer the aggregate data. With regard to original data, there are concerns that those who receive it might not take appropriate steps or have appropriate procedures in place to maintain its confidentiality. Furthermore, the EEOC must be transparent about the steps that it will take as an agency to insure that its information security program is now, and will be in the future, able to protect this sensitive data from access or acquisition by unauthorized individuals.

---

[83] 44 U.S.C. 3510
[84] 44 U.S.C. 3510 (b)(1)(2)

42

Prior to issuing the proposed rule, the EEOC engaged the National Academy of Sciences (NAS) to conduct a study, which, *inter alia*, looked at confidentiality concerns raised by the EEOC's collection of employee pay data in EEO-1 reports and its subsequent disclosure of this data in aggregate and original form. As a threshold matter, the report issued by the NAS (NAS Report) recognized -- and we wish to underscore -- that "[e]mployee compensation data are generally considered to be highly sensitive; they are even considered proprietary information by many private-sector employees."[85]

The NAS Report underscored that "there will be a great demand on the part of other federal agencies, researchers, analysts, compensation-setting bodies and others for access to these powerful new data . . . and the EEOC would be well advised to start taking steps now to develop policies to provide access in a protected environment."[86]  The NAS Report went on to note that, despite the sensitive nature of employee pay data, the "EEOC provides [this] data to agencies that do not have the same level of confidentiality protections."[87]  With regard to both its routine disclosure of data from the EEO-1 reports to other federal and state agencies, as well as researchers, the NAS Report recommended that the EEOC:

> (1) consider implementing appropriate data protection techniques, such as data perturbation and the generation of synthetic data to protect the confidentiality of the data, and it should also consider supporting research for the development of these applications;  and

> (2) seek legislation that would increase the ability of the agency to protect confidential data. The legislation should specifically authorize data-sharing agreements with other agencies with legislative authority to enforce antidiscrimination laws and should extend Title VII penalties to non-agency employees.[88]

EEOC's proposal does not address these recommendations in any way.

Moreover, these is no indication in the proposal that the EEOC requires those to whom it provides the EEO-1 reports to (1) maintain the same level of confidentiality that the EEOC does with respect to this information (other than the Department of Justice) (2) demonstrate that their information security programs are sufficient to protect this data from malicious attacks targeted at such data or (3) provide notification to the EEOC in the event their data security is compromised or the entity or individual experiences a data breach. Moreover, the proposal is

---

[85] National Research Council, 2012, *Collecting Compensation Data from* Employers, Washington D.C., National Academies Press, p. 84, available at http://www.nap.edu/catalog/13496.
[86] *Id*. at 90.
[87] *Id*.
[88] *Id.* at 91.

Pl. MSJ 000133

silent as to how the data will be transferred from the EEOC to the various federal or state agencies or individuals.

Although the NAS Report did not make any specific recommendations about a review of, or improvements to, the EEOC's information security protocols in connection with requiring employers to provide pay data in the EEO-1 forms, the NAS Report did emphasize that "the consequences of a breach in the protection of data provided in confidence are, as other federal agencies have discovered, painful and of lasting consequence."[89] This has most recently been seen with the data breach experienced last year by the Office of Personnel Management. This massive data breach was one of the largest in recent memory and was specifically targeted at employee, applicant and former employee information. OPM has now had to make major changes to its personnel and its policies and procedures in an attempt to earn the trust of the American public when it comes to the information entrusted to this agency. A major source of criticism of OPM has been its decision to transfer the personally identifiable information entrusted to it to a third party vendor. The class action complaints filed against OPM and the vendor allege that OPM did not do enough to vet the security measures employed by the vendor or require the vendor to provide ongoing updates to OPM regarding its security program and any breaches.

The OPM breach holds lessons for all federal agencies and should inform how the EEOC handles the disclosure and transfer of employee pay data to third parties. The EEOC needs to assure employers that it has reviewed its information security protocols and that they can and will safeguard the pay data employers are providing. In the hands of the wrong people, the original pay data from the EEO-1 report regarding pay could cause significant harm to a company and as previously noted subject employees to potential violation of their privacy. Indeed, while the Working Group noted potential Privacy Act concerns, the EEOC apparently gave absolutely no consideration to this potential problem. And even though no information in the EEO-1 report is tied to the name of any one individual, it is not hard to imagine a scenario in which individual employees within a small group listed on the EEO-1 report could be identified. Indeed, this is why the EEOC has suppression protocols in place for aggregate data where a group has three or less employers' information in it or any one employer accounts for 80% of the group data being aggregated.

Finally, we would observe that the EEOC is apparently providing establishment EEO-1 data to researchers whom it engages under some form or another of consultancy agreement to enable the researchers to publish findings in learned journals or to enhance their academic credentials. There is absolutely no indication as to what, if any, confidentiality restrictions are imposed on these shared reports, nor is there any agency enforcement purpose from these arrangements, the sole Title VII justification for requiring these reports. And of course the PRA

---

[89] *Id.*

44

does not create an exemption from its requirements to permit agencies to share privileged data with academic researchers which has been submitted as a result of massive cost and operational burdens on employers.

## **Conclusion**

In conclusion, the Chamber has serious concerns with the proposed EEO-1 Revisions. In view of the multitude of deficiencies which we have illuminated in these comments and which will be further highlighted in our formal comments, we request that the EEOC withdraw the proposed revisions and commence a cooperative effort with all stakeholders to deal with the issues.

Sincerely,

Randel K. Johnson
Senior Vice President
Labor, Immigration and
Employee Benefits

James Plunkett
Director
Labor Law Policy

Of Counsel:

/s/ Kris D. Meade
Kris D. Meade
Rebecca L. Springer
Crowell & Moring LLP

/s/ Larry Lorber
Larry Lorber
Camille Olson
Annette Tyman
Seyfarth Shaw, LLP

45

# EXHIBIT L

Pl. MSJ 000136



| | 8924 McGaw Court | 800.882.8904 | 410.995.1195 | 410.995.1198 (f) |
| | Columbia, MD 21045 | www.berkshireassociates.com |

April 1, 2016

**VIA FEDERAL eRULEMKAING PORTAL:**  **http://www.regulations.gov**

Bernadette Wilson
Acting Executive Officer
Executive Secretariat
Equal Employment Opportunity Commission
131 M Street, NE
Washington, D.C. 20507

> Re:    **Comment on the Equal Employment Opportunity Commission's Proposed Revision of the Employer Information Report (EEO-1) by Berkshire Associates Inc.; ID: EEOC-2016-0002-0001/Federal Register Document Number: 2016-01544**

Dear Ms. Wilson:

Berkshire Associates Inc. ("Berkshire") submits the following comment in response to the proposal by the Equal Employment Opportunity Commission ("EEOC") to seek a three year approval under the Paperwork Reduction Act ("PRA") for an annual data collection tool which would require all employers with 100 or more total employees to provide summary compensation data and total hours worked for employees by job category listed in the Standard Form 100 (otherwise known as the "Employer Information Report  EEO-1" or the "EEO-1 Report") by race, ethnicity, and sex.

**BACKGROUND ON BERKSHIRE AND ITS CLIENTS**

Berkshire is a human resources consulting and technology firm specializing in affirmative action compliance and applicant data management. Berkshire's clients vary in size from small establishments with one affirmative action plan ("AAP") to nationwide employers with thousands of employees covered by multiple AAPs. These employers may file one EEO-1 Report each year or hundreds. Berkshire's services are utilized by employers in a wide range of industries, including hospitality, food services, retail, information technology, manufacturing, professional services, health care, colleges, universities, and not-for-profit organizations. One of the clients for whom we file EEO-1 Reports, Exelon Corporation, testified at the EEOC's hearing on this topic.

In business since 1983, Berkshire was one of the first companies to provide an automated way of preparing AAPs for employers. Hundreds of federal contractors and subcontractors, as well as other independent consultants, use Berkshire's proprietary software to prepare compliant

Pl. MSJ 000137

AAPs on an annual basis. A certified small business enterprise, Berkshire also provides outsourcing and consulting services to employers, including federal contractors and subcontractors. Berkshire consultants help employers prepare thousands of AAPs every year and regularly assist employers during compliance reviews by the Office of Federal Contract Compliance Programs ("OFCCP").

Berkshire also assists its clients with other reporting requirements, including the filing of thousands of EEO-1 Reports and the annual veteran employment report required by the Department of Labor's Veterans' Employment and Training Service. In 2015, Berkshire filed over 17,000 EEO-1 reports for over 120 clients. These reports covered more than 680,000 employees.

Berkshire has created a proprietary, commercial software product 'BALANCEaap' that is used to generate AAPs, EEO-1 Reports, and VETS-4212 Reports. Berkshire uses this product internally to generate EEO-1 Reports (both PDF copies for use when manually entering the data into the EEOC's online system and the TXT file for data upload) for our consulting clients. In addition, Berkshire's software clients also use our product to generate their reports. We estimate that it took over 345 hours to develop and test functionality in our software. In addition, we spent another 6 hours in September of 2015 to make updates to our software when the EEOC made unexpected changes to the requirements of the EEO-1 Report data file by requiring federal employer identification numbers ("FEIN") for each establishment. This change was not communicated by the EEOC, and was noticed only after one of our staff members attempted to test a client's data file.

Berkshire also regularly assists clients in conducting self-assessments of their compensation systems, including by performing statistical analyses of compensation practices. Berkshire prepares an average of 600 salary equity analyses each year for clients of various sizes. For example, in 2015, we completed salary equity analyses covering approximately 260,000 employees. The size of the employers we worked with ranged from 53 employees to over 25,000 employees.

On average, salary equity projects are active for 60 days. Depending on the size of the employer, the nature of the employee groups being reviewed, the issues raised by preliminary analyses, and the responsiveness of the client in investigating identified pay differences, a salary equity analysis may take Berkshire anywhere from five to over 30 hours to prepare. This time estimate does not include time spent by the client collecting the initial data to be analyzed, answering any data questions, or verifying whether there are legitimate explanations for any identified pay differences. When Berkshire performs salary equity analyses for its clients, we generally analyze the pay of employees by job title because we expect these individuals to be similarly situated in terms of the work they perform, although that is not always the case. If a client wishes to look at its pay system from a broader perspective, we may conduct analyses by pay grades. We rarely perform analyses by EEO-1 job category because the groupings are too broad to be meaningful.

In preparing these comments, Berkshire relied on its own experiences in assisting clients with affirmative action compliance, EEO-1 Report filing, and salary equity analyses for more than 20 years. Berkshire also surveyed its clients to gather additional data regarding the estimated burden of the agency's proposal. Berkshire and its clients strongly support equal

Pl. MSJ 000138

employment opportunity and the importance of pay equity. To that end, we recognize the important roles the EEOC and OFCCP play in ensuring that employees are paid in a non-discriminatory manner, without regard to their sex, race, ethnicity, or other protected basis. While we support the EEOC's and OFCCP's commitment to rooting out all forms of employment discrimination, including compensation discrimination, based on our experience in preparing and filing EEO-1 Reports and performing salary equity analyses for clients, we are concerned that the proposed data collection will have limited utility. We also believe that the new reporting requirement will impose significant costs on employers.

Our comments primarily focus on the costs of the proposed data collection. However, we share the concerns about the limited utility of any uniform compensation data collection tool which have been expressed by the many other organizations who also regularly help employers with equal employment opportunity compliance. Rather than reiterate those concerns here, we specifically incorporate herein the comments of the United States Chamber of Commerce ("Chamber") regarding the limited practical utility of the proposal. Berkshire is an active member of the Chamber and shares that organization's concerns that the data collected by the EEOC will be meaningless for identifying those employers whose pay differences are likely to be because of discriminatory behavior. While we provide some suggestions below for how the EEOC might mitigate some of the costs associated with its proposal, we urge the agency to implement a more robust pilot program using actual employer compensation data to better evaluate both the utility and costs of the proposed tool before imposing a new annual reporting obligation on employers.

## COMMENTS ON THE PROPOSAL

### I.     THE EEOC'S PROPOSAL

Under the EEOC's proposal, covered employers with 100 or more employees (50 or more employees if a federal contractor or subcontractor) would continue to file the data required by the current EEO-1 Report – gender, race, and ethnicity information for each employee in ten EEO job categories ("Component 1" of the EEOC's proposal). Beginning in 2017, employers with 100 or more employees also would file a "Component 2" report, which would include W-2 wage and total hours worked information for all workers in each of the 10 job categories by race, ethnicity, and sex within 12 proposed pay bands. The proposed data collection would be filed for the headquarters and each establishment of a covered filer by September 30 of each year, along with a consolidated report.

Although the proposal does not specify, it is our understanding that the W-2 wage information to be reported is the same as that proposed by OFCCP in its earlier compensation data collection tool: the wage figure provided on Box 1 of each employee's W-2 Wage and Tax Statement. Total hours worked is defined as the number of hours worked by all employees in the job category by race, ethnicity, and sex within each of the 12 proposed pay bands. As a result, the reported W-2 wage and total hours worked data would not be a snapshot, as are the current reporting requirements for race, ethnicity, and gender. Instead, employers would report each employee's total hours worked and W-2 wage information for the 12-month period preceding the selected payroll snapshot date, which can be any payroll period occurring in the months of July through September of the filing year. Thus, in all cases, the W-2 wage and total hours worked information to be reported would cross two calendar years.

Pl. MSJ 000139

The agency's stated goals for the data collection are to (1) "assess complaints of discrimination, focus investigations, and identify employers with existing pay disparities;" (2) develop unspecified "software tools and guidance for stakeholders to support analysis of published aggregated EEO-1 data;" and (3) "encourage employers to self-monitor and comply voluntarily if they uncover pay inequities."

## II.     THE CURRENT EEO-1 FILING PROCESS

Before commenting on the EEOC's proposal, we think it is critical that the EEOC understand the way most employers collect, verify, validate, and report data on the current EEO-1 Report. As outlined in the attached affidavit (Exhibit 1), the process—even using the EEOC's electronic filing system—is far more complicated than is reflected in the EEOC's current burden estimate of 3.4 hours per filer.

Generally speaking, the process begins with an employer's collection of race, ethnicity, and gender data from employees. Employers gather this data through a voluntary self-identification process whereby each employee is asked to voluntarily provide their race, ethnicity, and gender for reporting purposes. This data is collected from every new employee that enters the workforce in the given reporting period. Many employers also allow current employees to update this information at any time, even if previously reported. Increasingly, many more employees are declining to provide this information to their employer, particularly race information. In those cases, the employer is to use "employment records or observer identification to identify the race, ethnicity of ALL employees  . . ." for the EEO-1 Report. In such cases, the employer often has to ask a manager at the particular facility if he or she can visually identify the person's gender or race/ethnicity.

Employers also have to assign each employee to one of the ten EEO-1 job categories. Many employers use the *EEO-1 Job Classification Guide* or the EEO-1 Census Codes Cross Walk to properly assign particular jobs to the ten broad job categories. In our experience, many employers need to update this information for at least a handful of jobs every filing cycle, either because the positon is new and has not yet been classified by the employer, or because the job has changed, warranting a new classification. Like observer identification, assigning EEO-1 job category is typically a manual process, even if the data is ultimately stored electronically.

Once this information is collected, the data has to be maintained for reporting to the EEOC by September 30 of each year. Many employers use a human resource information system ("HRIS") for this purpose. Most HRIS store an employee's race, ethnicity, and gender information within each EEO-1 job category. This stored information is based on user input and is, therefore, subject to error, particularly at larger employers where multiple individuals may enter data into an HRIS. Moreover, smaller employers may not have an HRIS, and may instead simply store the self-identification information on paper forms that must be manually compiled and tabulated into the ten EEO-1 job categories each year.

Each EEO-1 Report filing cycle all covered employers must select a payroll snapshot date to begin the annual filing process. This payroll snapshot may be any payroll period between July 1 and September 30. Once a payroll period is selected, employers must gather the stored information regarding each employee's race, ethnicity, gender, and EEO-1 category. The employers Berkshire works with do this by compiling a roster of all employees who were

Pl. MSJ 000140

employed during the payroll period in question. Other employers may use a specific HRIS summary reporting function to extract the data needed to file their EEO-1 Reports. These employers also need access to the underlying detailed information for each employee in order to verify the data in the summary report (i.e. in order to identify by name the 15 Black females in EEO-1 job category 1.1). Still other employers gather this data manually by first identifying the employees employed during the relevant period, and then matching those employees with available race, ethnicity, gender, and EEO-1 job category information.

The next step is data validation. During this process, employers generally use visual observation to assign race, ethnicity, and gender to employees whose information is missing. Employers also must review and update EEO-1 job category assignments. Employers with more than one establishment must ensure that all employees are assigned to the correct establishment, and that the establishment information is complete and accurate. These employers also must update the EEOC's online system listing of establishments. In our experience, the period of time needed for thorough data verification and validation can be extensive, often requiring three to four times the estimated 3.4 hours of time.

Once these steps are complete, the employer is finally ready to submit its EEO-1 Reports. Although there are technically three filing methods, most employers tend to use one of two methods: (1) manual entry into the EEOC's online filing system or (2) batch uploading of files by email to the EEOC. Most, if not all, single establishment employers file their EEO-1 Reports using the first method. In our experience, even larger multi-establishment employers use this method. In fact, Berkshire itself uses this method whenever the number of EEO-1 Reports to be filed is less than about 20 reports per filer. If an employer has an HRIS, there is typically a standard report that they can generate to then use as a guide when manually entering their information into the online system. Importantly, even though the EEOC's online system is electronic, and a report can be generated from an HRIS, the actual entering of the required information into each cell of the current report requires manual keying.

A smaller number of clients generate a prescribed TXT or CSV file and use the "data upload" process. Berkshire generally uses this process whenever 20 or more EEO-1 Reports will be filed for a single employer. Once the TXT or CSV file is generated, it must be tested using the EEO-1 Survey site. If an employer has more than 2,000 establishments, they must break up the file and test it in batches.  This is a cumbersome and time-consuming process.

The test site reviews the data and lets the employer know if there are issues with any particular establishments.  If there are errors for existing establishments, it will report the EEO-1 Unit Number and let the employer know the reason for the error or warning. These issues then need to be researched and fixed in either the employer's HRIS or within their vendor's EEO-1 Reporting tool. Unfortunately, if the error or warning is occurring at a new location, the test system can only tell the employer the line in the text file that is returning the error or warning.  It requires the employer to then open the TXT or CSV file in a compatible program to look for the specific line of data to determine what correction needs to occur.  After fixing the error, the employer must log back into the system and test the file again.

Once the file is appropriately tested, the EEOC requires that employers email the data file along with the closed location spreadsheet. The EEOC does not provide a secure transmission site for this purpose. Once the file is emailed, employers typically receive an automatic response

Page **5** of **15**

letting them know they will be contacted once the file has been uploaded.  Our experience is that there is a 1-2 month lag between when the file is emailed to the EEOC and when it is uploaded to the EEO-1 Report online system.  After the file is uploaded, employers must log into the online system and review the results of the upload. Our experience is that although the file was tested and accepted, at least 20% of the establishments are marked as 'Incomplete' and require a manual review.

Under either filing system, once all data checks are completed, the employer must certify the EEO-1 Reports for that year. In doing so, the employer must affirm that all reports are accurate and prepared in accordance with instructions. Importantly, the EEO-1 Report itself specifically states that "WILLFULY FALSE STATEMENTS ON THIS REPORT ARE PUNISHABLE BY LAW, U.S. CODE, TITLE 18, SECTION 1001."

### III.    EEOC'S REVISED BURDEN ESTIMATE FOR THE CURRENT FILING PROCESS IS INACCURATE.

Until this proposal, the EEOC estimated the burden of filing the current EEO-1 Report on a "keystroke" basis. Accordingly, the EEOC previously estimated the burden of filing the current EEO-1 Report – which requires 180 cells of data entry per filed report – at 3.4 hours per report filed. In its current proposal, however, the EEOC dramatically revises this burden estimate to a mere 3.4 hours per filer, regardless of the number of EEO-1 Reports each filer may need to submit.

As the above summary of the steps required to file the current EEO-1 Report illustrates, it is virtually impossible for any filer to collect, verify, validate, and report data on the current EEO-1 Report in 3.4 hours. EEOC's revised estimate seems to focus solely on the reporting element, while completely ignoring the extensive collection, verification, and validation process that employers undertake to be able to file and certify their EEO-1 Reports. Underlying the EEOC's revised burden estimate is the mistaken assumption that the agency's online filing system somehow allows employers to conduct all of these tasks at the click of a button. As noted above, however, the data collection, verification, and validation process is a time-intensive manual process, requiring updates each year because the employees being reported on are not the same, nor do employees remain in the same job categories or locations. As a result, the reports do not magically become easier to file after the first year of reporting – each reporting year demands nearly the same level of data collection, verification, and validation. Moreover, for most employers, even the annual reporting element requires manual keying, since most employers do not use the batch upload method.

To illustrate the complexity of filing EEO-1 Reports, Berkshire examined its available data regarding the amount of time it took our company to file 2015 EEO-1 Reports for clients of various sizes. As noted above, in 2015, Berkshire filed over 17,000 EEO-1 reports for over 120 clients.  These reports covered more than 680,000 employees. More than 50% of the time, it took us more than 3.4 hours to file the EEO-1 Reports of a particular client. Our time varied based not only on employer size and number of reports filed, but also because of the number of HRIS systems utilized by the client, the number of workplace changes, such as acquisitions or mergers that took place, and the integrity of the initial data provided to us by the client. Accordingly, it did not take more time for just large employers. Filing the EEO-1 Reports for some small employers who filed only a handful of EEO-1 Reports also required more than 3.4 hours.

Pl. MSJ 000142

Importantly, our time estimates do not include the time it took our clients to initially collect race, ethnicity, and gender information from employees, to update EEO-1 job category information, or to answer any of our data verification and validation questions. Because many of our client's EEO-1 Reports are prepared in conjunction with affirmative action obligations, Berkshire also is able to gain data verification efficiencies through its process, since the data is used for two purposes. As a result, the above time estimates underreport the amount of time it might otherwise take for us to process this data and for our clients to verify and validate these data elements.

Berkshire also conducted an informal survey of its clients who file their own EEO-1 Reports. In terms of filing methods, 87 of those who responded indicated that they manually entered their data into EEOC's online filing system, while 17 stated that they used the batch upload system.[1] Of the 105 who provided us with information about their 2015 EEO-1 Report filing experience, more than 80% indicated that it took them more than 3.4 hours to file their EEO-1 Reports. Almost 25% of responders indicated that it took more than 4 times the amount of time EEOC estimated. All respondents who indicated it might take fewer hours manually entered data into EEOC's online system and reported a total workforce of less than 1,000 employees.

In light of the above empirical data, we urge the EEOC to revisit its burden estimate of the current EEO-1 Report requirements before it adds more requirements. To obtain a more realistic estimate of the time it takes to file the current EEO-1 Report, EEOC could implement a voluntary survey tool for the 2016 filing cycle. Each filer could be asked to complete a survey that collects relevant burden information after certifying their 2016 EEO-1 Reports. The survey could ask how long it took the employer to collect, verify, validate, and report data on the current EEO-1 Report. The survey also could ask for information about the number of employees who assisted with the process, from those who collected the data, to those who verified or reviewed the data, to those who filed the data with the EEOC. This data could then be used to build a more detailed and reliable estimate of the costs of the proposed revisions.

## IV.    THE TIME AND COST OF COMPLYING WITH THE PROPOSED REVISIONS TO THE EEO-1 REPORT

Berkshire also believes that the EEOC has significantly underestimated the costs of complying with the proposed collection of compensation and hours worked information. In its proposal, the EEOC estimates that it will take each filer 6.6 hours to file all required EEO-1 Reports. This estimate is, again, without regard to the number of reports that each filer may have to submit. The EEOC estimates that this work will be performed by an administrative employee, earning $24.23 per hour, for a total cost per filer of $159.92. The EEOC also estimates that each filer will spend 8 hours in one-time costs to develop queries related to Component 2 in existing HRIS systems. The EEOC estimates that this work will be performed by one person at a wage rate of $47.22 per hour, for a total one-time implementation burden of $377.76 per filer.

---

[1] Two stated they utilized paper filings. Because respondents were not required to answer every question, the number of respondents who answered this question is different than the number of respondents who estimated the amount of time it took them to complete their EEO-1 Reports.

Page **7** of **15**

## A.  The first year implementation costs are far greater than estimated

Requiring that employers provide W-2 wage information would require extensive research and data entry for most employers. Many employers do not maintain W-2 wage information, EEO-1 job category, and race, gender, and ethnicity information in a single, centralized system or database. In light of this, we believe that many of the small to mid-size employers we work with will have to manually compile this information on an annual basis. For larger employers, where manual tabulation is simply not possible, responding to a compensation data collection tool that requires reporting of W-2 wage information by EEO-1 job category will require a capital investment in new systems or programs. The EEOC significantly underestimated the burden associated with these tasks in its proposal.

Our informal survey of clients indicated that more than 1/3 of those who responded do not currently use the same HRIS and payroll provider. Regardless of whether the same or different vendors were used for HRIS and payroll reporting, more than 85% of respondents estimated that it would cost more than $378 to implement the proposed changes at their workplace. The costs rise exponentially for larger employers, who may have multiple different HRIS, payroll, and timekeeping systems for different employees, geographic areas, or business units. For example, it is not uncommon for companies that recently merged to utilize multiple HRIS and payroll providers. Yet many of these entities still must file their EEO-1 Reports in a consolidated fashion, thereby requiring that these employers not only integrate one to three IT systems, but many, many more.

As a vendor who will also need to revise its software if this proposal is finalized, Berkshire estimates that it will require a total of 252 hours to update our software to comport with the proposed changes. Berkshire estimates that two members of our Client Services team will need to review the EEOC's final data requirements to advise our product development team on the necessary revisions; this is likely to require a minimum total of four hours. Berkshire further estimates that at least three members of our product development team will need to be involved with reprogramming and testing our software module to comport with these revised specifications. We estimate that reprogramming will require a total of 160 hours of time. We also estimate that Client Services team members will spend an additional eight hours of time reviewing and commenting on draft programming modules before the revised product is finished. Finally, Berkshire estimates that 80 hours will be spent testing the revised software to ensure that it works as intended.

## B.  The annual burden of filing Component 1 and 2 is significantly more than estimated

The EEOC estimates that it will take each filer 6.6 hours to file both components of the EEO-1 Report. In reaching this estimate, the EEOC estimates that it will take one hour for each filer to read the instructions and 5.9 hours to collect, verify, validate, and report data on both Component 1 and Component 2. The agency provides little detail as to how it arrived at these burden estimates, but it is clear that the agency relied on the same misguided assumption that it did when recalculating the current burden costs. As noted above, electronic filing, rather than paper filing, does not eliminate the need for filers to manually key the data into each relevant cell

Pl. MSJ 000144

for each establishment, headquarters, and establishment report. Given this fact, it seems highly unlikely to us, based on our experience in filing hundreds of EEO-1 Reports each year, that an employer who files a mere 5 EEO-1 Reports will be able to collect, verify, validate, and report data in the 18,300 cells required for both Component 1 and Component 2 (3,660 cells per EEO-1 Report x 5 EEO-1 Reports) in 5.9 hours or less.

Those clients who responded to our informal survey agreed with our conclusion. Of the 91 providing a response, about 96% believe that it will take more than 6.6 hours to collect, verify, validate, and report data on both Component 1 and Component 2 of the EEO-1 Report. More than 60% of these clients estimated that it would require at least 16 hours per year to file the revised report, with many suggesting that the revised report would take more than 30 hours to file. Almost 84% of the clients who responded to questions about the cost of annual report filing estimated the cost to be greater than the $160 per filer estimated by the EEOC.

Furthermore, if the EEOC believes that the "mere reporting" of compensation data is likely to encourage employers to self-monitor and comply voluntarily if they uncover pay inequities, it cannot be the case that the EEOC also believes that a single administrative employee paid $23.24 per hour will collect, verify, validate, and report the data required by the proposed data collection. Quite simply, the agency cannot simultaneously minimize the burden of the proposed data collection by saying a low-level administrative employee will handle the reporting and then, in the same breath, maximize the benefit of the proposed data collection by asserting that the proposed reporting will encourage employers to voluntarily address any pay disparities identified through the reporting process. While working with employers to perform in-depth salary equity analyses, it is Berkshire's experience that numerous individuals are involved in compiling the required data, researching any preliminary results, evaluating the identified reasons for any pay differences, and determining whether remedial measures should be taken. These individuals may range from a data entry clerk to a human resource professional to a compensation specialist to an internal or external legal counsel. As noted above, Berkshire's salary equity projects are often active for 60 days or more, and consume many, many hours of vendor and client time.

In sum, understanding the reasons for raw wage disparities, and determining whether any part of such disparities is due to race or gender, is far more complicated than suggested by the EEOC's annual burden estimate. Because Title VII protects both men and women, and individuals of all races, employers cannot simply adjust the wages of employees because of an identified raw wage gap without fully satisfying themselves that legitimate, nondiscriminatory reasons cannot explain the difference in pay, thereby justifying remedial action. It is disingenuous of the EEOC to suggest that employers will use this reporting requirement to actively monitor their pay practices, while also estimating that an administrative employee will perform all of this work in 6.6 hours.

## V.      THE IMPORTANCE OF SECURE FILING AND CONFIDENTIALITY

Based on our experiences with the current EEO-1 Report filing process, Berkshire is concerned that the EEOC has not sufficiently evaluated how it will safely collect and appropriately use the proposed wage information. There are two reasons for our concerns: (1) the current lack of a secure transmission portal for sending the data to the government; and (2) the lack of guaranteed confidentiality once the data is submitted.

Pl. MSJ 000145

First, Berkshire believes that the EEOC has significantly underestimated the changes that might need to be made to the current report filing system before it will be ready to securely and efficiently collect the proposed data from employers. We think it is likely that many more employers will seek to use the batch upload feature if the proposed revisions are finalized, because of the sheer increase in the number of data cells that would otherwise need to be manually entered into the EEOC's electronic system. Under the current EEO-1 Report, employers manually enter 180 data cells for each establishment. Under the proposal, employers would need to manually enter more than 3,600 data cells for each establishment. Because of the magnitude of change in the number of data entry cells, we believe that many more employers will seek to use the batch upload filing method.

Currently, employers must <u>email</u> their batch upload to the EEOC without the ability to encrypt or password protect the file since there is no mechanism for providing a password to the receiver. EEOC does not provide a secure transmission site for this purpose. Berkshire respectfully submits that this approach, while perhaps adequate for the collection of employee race, ethnicity, and gender information, is wholly inadequate for the transmission of sensitive pay data. Other agencies that require the submission of W-2 wage data provide secure channels for transmission. *See, e.g.,* Internal Revenue Service website, available at https://www.irs.gov/uac/efile-with-Commercial-Software (last visited March 22, 2016) noting that electronically filed submissions that are uploaded rather than entered directly in the IRS' online system are "securely transmitted through an IRS-approved electronic channel . . . because e-mail is not as safe as our secure channels." In evaluating the feasibility of a more secure portal, the agency should keep in mind that many employers have firewalls that prohibit or severely restrict the transmission of data over the Internet, including the size of files that may be transmitted. Similarly, any electronic submission system should be designed to permit secure encryption of data and password protection for all data uploads.

The EEOC's cost estimates do not appear to include the creation of a secure transmission method for sending these batch files to the agency. The only identified costs to the government are increases to the EEOC's internal staffing costs and the cost of the current contract with EEOC's designated vendor. *See also* OFCCP's FY 2017 Congressional Budget Justification, available at http://www.dol.gov/sites/default/files/documents/general/budget/CBJ-2017-V2-10.pdf noting OFCCP's FY16 plans to establish a secure file transfer protocol site to allow federal contractors to securely submit compensation information, to the agency. We also do not believe that an employer should be responsible for encrypting its own data, as was suggested at the public hearing. In our experience, most employers do not currently have a secure transmission site of their own.  Indeed, most of Berkshire's clients use our secure transmission site for sending and receiving sensitive information to us. If the EEOC continues to maintain that data security is the responsibility of filers, EEOC should then add the cost of employer creation of a secure file transfer site for this purpose in its burden estimates.

Second, Berkshire recommends that the EEOC and the OFCCP take more concrete steps to protect the confidentiality of employee pay data from a cybersecurity attack or otherwise unauthorized disclosure. The EEOC's proposal, even after exempting employers with less than 100 total employees and accounting for the fact that the collected pay data is reported by pay band, would still gather very specific compensation information by specific establishments, including very small establishments. For many small employers, and even larger employers with

Pl. MSJ 000146

small establishments or few employees in certain EEO-1 job categories, reporting data in this manner will result in the reporting of individual, employee-level data, albeit by pay band. The EEOC's proposal also indicates that the EEOC will publish the compensation data of employers in an aggregated format, and testimony provided at the public hearing revealed that the agency regularly makes establishment-level EEO-1 data available to some unspecified group of academic researchers.

Based on our experience with helping employers provide individual employee-level compensation data to the OFCP during compliance reviews, we know that compensation data is especially sensitive and confidential – to both employees and employers. Release of an individual's compensation information – through the Freedom of Information Act ("FOIA"), by intentional misappropriation, or through a database of aggregate compensation information – poses serious concerns to the employers with whom Berkshires works. Likewise, it is not hard to imagine that many employees would not want to have their compensation information made publicly available because of a cyber security breach of the EEO-1 Report filing system. Although we understand that the EEO-1 Report online filing system has not been breached heretofore, it also did not contain such valuable data as it will going forward. For this reason, Berkshire urges the EEOC not to move forward with the implementation of any compensation data collection tool until appropriate data security safeguards are developed, tested, and perfected to ensure protection of employees' pay data.

We also urge the EEOC to develop protocols for safely transmitting this information to OFCCP, other federal civil rights agencies, and state and local fair employment practices agencies. All data should be submitted via a secure file transmission site. The receiving agency should have to certify that it will maintain the data on a secure internal site. In the case of the OFCCP, the agency should take affirmative steps to provide this data more protection than is provided under the current Freedom of Information Act process, which provides that such data will be produced unless the employer makes timely affirmative objections. For example, we are aware of instances where the OFCCP has sent an employer's EEO-1 data to a different employer during a compliance review. We also are aware of instances where the agency has "lost" personnel activity information because it was stored on an individual computer of a former employee, on a laptop taken home by employees who work remotely, or for other reasons. If the OFCCP does not believe it has the authority to offer employers and employees the same confidentiality protections afforded by Title VII of the Civil Rights Act of 1964, as amended, we suggest that the OFCCP seek an amendment to Executive Order 11246 in order to ensure such protection.

## VI.    SUGGESTIONS FOR MINIMIZING THE FILING BURDEN

Although we question whether a uniform compensation data collection tool of any kind will be useful because of the complexity of pay decisions, we do believe there are some steps the EEOC could take to minimize the burden of an annual data collection tool.

### A.  Change the wage unit to be reported

Under the EEOC's current proposal, employers would be required to report W-2 wage information for employees. The agency's proposed collection of W-2 wage information is misplaced for several reasons. First, the proposal will not allow the government to compare

Pl. MSJ 000147

comparable compensation data points, and is inconsistent with the manner in which most employers currently evaluate salary equity issues. Second, the proposal does not appropriately minimize the burden on employers, when other more readily available data points would allow the EEOC an adequate window into employer's pay decisions.

W-2 wages are defined broadly by the IRS to include payments by an employer to an employee for parking and mass transit stipends, military stipends, relocation and travel stipends, expense reimbursements, 401(k) contributions, severance payments, deferred compensation, and profit sharing, in addition to any wages. The 2016 General Instructions for Forms W-2 and W-3, are available online at https://www.irs.gov/pub/irs-pdf/iw2w3.pdf (website last visited March 22, 2016). As a result, the W-2 wage information reported in Box 1 includes payments to employees that are driven by reasons other than the employer's decision as to how much total compensation an employee has the potential to earn. Because of this, collecting W-2 wage data will not allow the EEOC or OFCCP to evaluate comparable compensation data points – a key issue if the agencies want to use the data to identify pay disparities that may be based on race or sex.

In helping employers conduct salary equity analyses, Berkshire has never once used W-2 wage information as the basis for analysis, nor has a client ever asked us to analyze employee pay using that unit of analysis. This fact seriously undermines one of the EEOC's stated objectives for the proposed data collection, which was to encourage employers to use the collection process as an opportunity to proactively examine their own pay practices. When conducting salary equity analyses, Berkshire generally begins each salary equity analyses by first looking at base pay because this allows clients to analyze more comparable data points. Another reason W-2 wage information is not used is because W-2 earnings data may not align with an employer's AAP year or the employee's performance review process, which is when most of our clients typically perform large-scale salary equity analyses. Although Berkshire has helped clients evaluate other pay components, such as bonuses or commissions, or the availability of overtime, we often conduct these analyses after first analyzing base pay.

The primary challenge with using a wage unit other than base pay is that the pay can be heavily influenced by employee choice, rather than the wage opportunity offered by the employer. For example, two Professional employees, one male and one female, may earn the exact same base pay, bonus and other compensation, but if the female contributes fully to her 401(k) account and the male employee does not, it will appear that the male employee is earning almost $20,000 more. Providing hours worked for these two employees will shed no light on the legitimate, nondiscriminatory reason for the raw difference in pay. Likewise, while shift differential pay would be included in the W-2 wage amount, the proposed data collection does not include a way for employers to indicate which shift each employee worked, even though employee shift selection may be an important reason for any raw pay differences between men and women. Accounting for these decisions in a robust salary equity analyses would require coding of these employee choices – an impossible task for employers.

Providing W-2 wage information is also problematic because the EEO-1 report is intended to be a "snapshot" of an employer's workforce – what the workforce looks like in a given payroll period. Unlike employee race and gender information, which generally does not change, an employee's pay is fluid and changes regularly. An employee's pay can change within a single 12 month period for a myriad of reasons, such as promotions, other career changes, merit or cost of living increases, or excused leaves of absence. These types of changes will

Pl. MSJ 000148

greatly impact the W-2 wage information reported for that employee in a particular 12 month period, even where a snapshot approach would show that he or she is earning the same as employees of different races and genders performing the same or similar work during the relevant payroll period.

There are a myriad of examples that illustrate these challenges. For example, if a female is promoted into a higher role mid-year, her W-2 wage information will necessarily be lower than others who have been working in the same position the full 12 months, even if she is being paid the same total compensation. Similarly, two employees may have the same stock options available to them, but may choose to cash them out in two different reporting years. Using W-2 wages would make it appear that one employee received significantly more compensation than the other, even though both had the same benefits. Likewise, two sales employees may report different W-2 wage information in a calendar year if one of the sales employees receives a $25,000 signing bonus that year. This will be the result even if the other employee received the same $25,000 signing bonus when he or she began employment in a different calendar year. In each of these examples, providing hours worked information will not account for the legitimate, nondiscriminatory reason for the difference in pay.

Given these limitations, Berkshire believes that annualized base salary or wage rate is a more meaningful data point to collect, if a compensation reporting obligation is implemented. Importantly, taking this approach removes the significant tension between the current "snapshot" approach of the EEO-1 Report and the agency's current proposal. This approach also significantly minimizes the burden on filers because annualized base salary information is regularly maintained in most employers' HRIS systems, where race, ethnicity, gender, and EEO-1 job category information is already stored. Thus, using annualized base salary or wage rate information eliminates the employer time required to gather W-2 wage information spanning two calendar years from a separate payroll system. It also eliminates the need for employers to integrate their existing payroll, timekeeping and HRIS systems, of which there may be many different ones at larger employers. Indeed, collecting annualized base salary eliminates the need to collect hours worked information altogether, which reduces the number of cells to be completed per establishment by half. Eliminating the requirement to report total hours worked also allows employers to more comfortably certify the accuracy of their reports because most employers do not collect actual hours worked information for their exempt employers.

**B. Change the reporting period**

If the EEOC decides to continue to require W-2 wage information, then Berkshire recommends that the EEOC change the reporting period to a calendar year reporting system. Doing so would better harmonize the reporting requirements with reporting of W-2 wage information already provided to other federal agencies, such as the IRS. Under this approach, all employers would use the same snapshot date – December 31 of each year. Employers would then report the data for each employee on the payroll on December 31 sometime in the next calendar year. This would be significantly less burdensome than the current proposal because employers would not need to aggregate W-2 wage and hours worked information over two calendar years before reporting it to the EEOC. This approach also is consistent with the manner in which most

Pl. MSJ 000149

payroll systems store W-2 wage information, which is generally used to prepare W-2 Wage and Tax Statements for the IRS.[2]

### C.  Exempt additional small establishments from reporting Component 2 data

To further minimize confidentiality and burden concerns, Berkshire recommends that the EEOC exempt small establishments of larger employers from having to file Component 2 data. For example, EEOC could exempt larger employers from having to provide Component 2 data on the establishment-level report of those locations with less than 50 employees (those that are filed as Type 6 or 8 reports). Berkshire encourages the EEOC to consider eliminating the requirement to provide establishment-level Component 2 data for any establishment of 100 or less employees. For larger employers, this data could be reported on the employer's consolidated report, much like race, ethnicity, and gender are now. Taking one of these approaches better addresses the confidentiality concerns of employees and employers, which are more pronounced in small data samples. These approaches also lower the burden on filers by significantly reducing the number of cells to be completed. We also believe these approaches are consistent with the reasons underlying EEOC's decisions to exempt employers with less than 100 total employees from the requirement altogether.

### D.  Develop a different reporting cycle for Component 2

Berkshire also recommends that the EEOC consider adopting a less frequent reporting cycle for Component 2 data. For example, the agency could create a rotating reporting cycle such that only a certain percentage of filers are required to file Component 2 information each year. After filing Component 2 data in any given year, that filer would not file Component 2 data again until the full rotation of filers had done so. The EEOC also could require that Component 2 be filed less frequently by all filers, such as every other year or every three to four years. Either of these approaches would better minimize the burden on filers, while still providing the EEOC with some access to compensation information.

### E.  Delay reporting of Component 2 data until 2018

As discussed above, the EEOC's proposal will require that some employers and all vendors make Information Technology system changes in order to collect, maintain, and report the proposed W-2 wage and hours worked information with existing EEO job category, race, ethnicity, and gender data. We believe that most employers will need at least twelve months between the date of any finalized data collection reporting requirement and the first required data collection in order to prepare for this new reporting requirement. While the agency's proposal currently provides that Component 2 will not be required any sooner than the 2017 filing cycle, the agency must recognize that the data that needs to be gathered for that report may cover W-2 wage and hours worked information for a period of time beginning as early as July 2016. To provide employers with a full implementation year to begin collecting, maintaining, and reporting the proposed data, data reporting on Component 2 should not begin until 2018. Taking this approach ensures that employers have a full year between the date the proposal is finalized and collection (not reporting) of the first required data elements. In addition, it allows employers

---

[2] Of course, this approach has limitations too. The most obvious one is that it would limit the EEOC's ability to compare workforce trends from prior year reports with those filed under the new reporting system.

Pl. MSJ 000150

adequate time to budget for these required compliance upgrades. Delaying implementation also allows employers sufficient time to confirm that they have made appropriate changes to their IT systems and that the changes will allow the employer to report the data in the format required by the EEOC.

**CONCLUSION**

Berkshire appreciates the opportunity to submit these comments to the EEOC. We would be happy to answer any questions you may have about the current EEO-1 Report filing process.

Respectfully submitted,

*Beth Ronnenburg*

Beth A. Ronnenburg
President
Berkshire Associates Inc.
8924 McGaw Court
Columbia, MD 21045
410.995.1195 ext. 1202

Prepared With Assistance From:
Lynn A. Clements
Director, Regulatory Affairs
Berkshire Associates Inc.
8924 McGaw Court
Columbia, MD 21045
410.995.1195, Ext. 1246

Pl. MSJ 000151

### Declaration of Beth A. Ronnenburg, SPHR, SHRM-SCP

I, Beth Ronnenburg, do hereby declare as follows:

### Qualifications

1. I am over age of 18. I declare that the statements in this declaration are correct, of my own personal knowledge, and I am competent to testify concerning them.

2. My name is Beth Ronnenburg. I am President of Berkshire Associates Inc. Berkshire is a human resources consulting and technology firm that specializes in affirmative action. We prepare Affirmative Action Plans and EEO-1 Reports for federal contractors throughout the country. In 2015, we filed over 17,000 EEO-1 reports for over 120 clients. These reports covered more than 680,000 employees.

### Description of the EEO-1 Report Process (Collecting, Verifying, and Validating Data)

3. Employers are required to collect ethnicity/race and gender for all of their employees. This process typically starts with an invitation for employees to self-identify once they are hired. According to the EEO-1 instructions, "if an employee declines to self-identify, employment records or observer identification may be used." The instructions also indicate that "Employment data must include ALL full-time and part-time employees who were employed during the selected payroll period..."

4. Employers also have to assign each employee to one of the ten EEO-1 job categories. Many employers use the *EEO-1 Job Classification Guide* or the EEO-1 Census Codes Cross Walk to properly assign particular jobs to the ten broad job categories. In our experience, many employers need to update this information for at least a handful of jobs every filing cycle, either because the positon is new and has not yet been classified by the employer, or because the job has changed, warranting a new classification. Like observer identification, assigning EEO-1 job category is typically a manual process, even if stored electronically.

5. Once an employer chooses a payroll period for their annual EEO-1 Report submission, they must prepare the data by generating a roster that includes employee name/ID, race, gender, job code/title, EEO-1 category, and establishment identifier (if applicable).  If the employer has multiple establishments, they must also collect establishment information, which includes establishment name, address, city, state, zip code, NAICS code, Federal Employer Identification Number (FEIN), EEO-1 Unit number, and DUNS number.

6. The next step is data validation.  During this process the following checks must be completed:

- Employers must confirm that all employees in the roster have a valid ethnicity and/or race and gender.  If employees did not self-identify, employers undertake a variety of time-consuming efforts to appropriately identify their race, ethnicity, and gender. In most cases, this requires multiple follow-up inquiries for each employee with unknown race, ethnicity, and/or gender.

- All job codes should be reviewed to ensure the EEO-1 category assignments are correct.  Any new job codes must be assigned an appropriate EEO-1 category. Because this classification is often initially determined at the establishment level, many large employers confirm that all locations are using the same EEO-1 category for each job code as part of the data verification process.

- Employers with multiple locations must also undertake the following specific tasks:

  - Ensure all employees in the roster have a valid establishment ID.  Oftentimes employees who work from home (telework) need to be re-coded to a valid establishment and/or reviewed;

  - Ensure the establishment list includes all required information; and

  - Download the prior year location list from the EEO-1 survey website and update the establishment table with the new Unit ID #s for new locations that were filed in the prior year.

- Review all establishments with the same address to verify unique NAICS codes.

**Submission of EEO-1 Reports**

6.  Multi-establishment employers must decide how they will file the reports for their locations that have less than 50 employees.  They can choose to file either a 'Type 6' or Type '8' report.  The Type 6 report just lists the establishment information and the total number of employees at the establishment.  A Type 8 report is the same as the Type 4 report, which requires the completion of the detailed grid by EEO-1 category.

7.  Employers next need to decide how they want to file the report.  There are two primary options:

    - Manually enter the required information into the EEOC's online system.  Most, if not all, single establishment employers file using this methodology.  If an employer has an HRIS, there is typically a standard report that they can generate to then use as a guide when manually entering their information into the online system.  It is our experience that a large number of multi-establishment employers also use this methodology.
    - Generate a prescribed TXT or CSV file and use the "data upload" process.

**Submission Using the Manual Entry into the Online System**

8.  Employers log into the online system and review their list of establishments.  New locations need to be added, and locations that have closed need to be marked as such.

9.  Employers must then enter the employment details for each of their establishments.  Separate reports are filed for the headquarters establishment (Type 3), establishments with 50 or more employees (Type 4), and establishments with less than 50 employees (Type 6 or Type 8).  If the employer choses the use Type 6 report for their establishments with less than 50 people, then they also need to manually enter the employment details for the consolidated report (Type 2).

10. Once all of the data is entered into the EEO-1 online system for all establishments, the employer is then prompted to 'certify' the reports.

**Submission Using the Data Upload Option**

11. According to Footnote 62 of the proposed EEO-1 Revision, the EEOC indicates that 2% of all filers use the data upload option.  This option allows employers to generate a prescribed TXT or CSV file for a 'data upload.'  Those files are typically created from their HRIS or EEO-1 vendor.

12. It has been our experience that files created from an employer's HRIS typically require customization to ensure that they are pulling the correct data.  Also, it has been our experience that some HRIS do not provide the employer with the option to file Type 6 reports for establishments with less than 50 employees.  The file defaults to the Type 8 format.

13. Berkshire has created a proprietary, commercial software product 'BALANCEaap' that is used to generate Affirmative Action Plans, EEO-1 Reports, and VETS-4212 Reports.  We use this product internally to generate EEO-1 Reports (both PDF copies for use when manually entering the data into the online system, and the TXT file for data upload) for our consulting clients. In addition, software clients also use our product to generate their reports.  We estimate that it took us over 345 hours to develop and test this functionality in our software.  In addition, we spent another six hours in September of 2015 to make updates when the EEOC made unexpected changes to the requirements of the data file by requiring FEIN for each establishment.  This change was not communicated to filers by the EEOC. One of our staff members noticed this new requirement when she attempted to test a client's data file.  Berkshire had to notify the EEOC that the document on its website was not updated to reflect this change in the requirements.

14. Once the file is generated, it must be tested using the EEO-1 Survey site.  Employers are required to log into the EEO-1 test system and have to enter their Login ID, password, company name, contact name, contact email, and contact phone number each time they need to test a file. If an employer

has more than 2,000 establishments, they must break up the file and test it in batches. This is a cumbersome and time-consuming process.

15. The test site reviews the data and lets the employer know if there are issues with any particular establishments. If there are errors for existing establishments, it will report the EEO-1 Unit Number and let the employer know the reason for the error or warning. These issues then need to be researched and fixed in either the employer's HRIS or within their vendor's EEO-1 Reporting tool. Unfortunately if the error or warning is occurring at a new location, the test system can only tell the employer the line in the text file that is returning the error or warning. It requires the employer to then open the TXT file in a compatible program to look for the specific line of data to determine what correction needs to occur.

16. Again, the process of resolving establishment-level errors was quite problematic in 2015. Without notice, the EEOC announced in August 2015 that it would not allow employers to file separate EEO-1 reports for establishments with the same address and NAICS code, even if the establishments had different FEINs. This caused many errors for employers and required numerous changes to ensure the submitted data fit these new requirements. The lack of notice by the EEOC prevented HRIS and other vendors from updating their systems in advance to ensure a smooth transition for employers.

17. In addition to the TXT file, employers are also required to create a 'Closed Location' file. They must compare the establishment list from the prior year submission to the current year submission and identify which establishments have closed. This list must include the EEO-1 Unit Number for these establishments.

18. Once the file no longer has errors, it is ready to be sent to the EEOC. EEOC requires that employers email the data file along with the closed location spreadsheet. EEOC does not use a secure file transfer site for this purpose nor is there a method for encrypting or password-protecting a file sent

to EEOC. Once the file is emailed, employers typically receive an automatic response acknowledging the receipt of the file and letting them know they will be contacted once the file has been uploaded.

19. In 2015, our experience is that there was a 1-2 month lag between when the file was emailed to the EEOC and when it was uploaded to the EEO-1 Report online system.  For the 2015 reporting period, some files that were submitted prior to the deadline were not loaded until early 2016, and only after employers received a delinquent notice.

20. Once notification has been received that the file was uploaded, employers must log into the online system and review the results of the upload.  Our experience is that, although the file was tested and accepted, at least 20% of the establishments are still marked as 'Incomplete' and require a manual review.  A sampling of reasons why an establishment might be marked as "Incomplete" are as follows:

- Although a closed location file was submitted at the same time as the data file, in many cases, the EEOC failed to mark those locations as closed.  This required the employer to manually click through those reports with no employees and mark them as closed.

- An establishment report also is marked as "Incomplete" whenever the employment count at the location was 35% greater or less than the count for the prior year.  It again requires the employer to click through the report to verify that the employment count for that establishment is correct.

- An establishment report also is marked as "Incomplete" when the city name used in the address does not match the zip code, such as when the city name used was "St. Louis" versus "Saint Louis." Other instances flag if city/state/zip code do not match the current Unites States Postal Service zip code system, and this requires a manual correction.

21. Once all of the reports are marked as 'complete,' the employer is then able to certify the reports.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this  31  st day of March, 2016 at Columbia, MD.


*Beth Ronnenburg*

Beth Ronnenburg
President, Berkshire Associates Inc.

# EXHIBIT M

Pl. MSJ 000159



August 15, 2016

Joseph B. Nye, Policy Analyst
Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th St., N.W.
Washington, D.C. 20503

**Re: Agency Information Collection Activities; Notice of Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO-1), OMB Control Number 3046-0007, Docket ID EEOC-2016-0002-0340**

Dear Mr. Nye:

Thank you for the opportunity to comment on the Equal Employment Opportunity Commission's (EEOC) proposal to require large employers to submit summary compensation data as part of the annual EEO-1 reporting process. The National Women's Law Center (the Center) has worked for over 40 years to advance and protect women's equality and opportunity—with a focus on women's employment, education, income security, health, and reproductive rights—and has long worked to remove barriers to equal treatment of women in the workplace, particularly those that suppress women's wages. The proposed collection of pay data will be critically important in helping to identify compensation discrimination and improving enforcement of pay discrimination laws, and will benefit businesses, individual workers, and the economy. Collecting pay data as part of an existing instrument such as the EEO-1 will also reduce the burden on employers and avoid duplicative or unnecessary efforts and costs, particularly in light of the changes proposed in the Notice of Submission for OMB Review, Final Comment Request ("30-Day Notice"). We commend EEOC for its efforts to address employer concerns and urge the swift approval and implementation of the proposed revisions.

I.    **The Proposed EEO-1 Revision Will Help Identify and Address Pay Discrimination, a Crucial Driver of the Gender Pay Gap.**

The Center strongly supports EEOC's proposal to revise the EEO-1 to collect compensation data from private employers and federal contractor workplaces with more than 100 employees. This data collection will play an important role in uncovering and combating pay discrimination. Women working full time, year round continue to confront a stark wage gap, typically making only 79 percent of the median annual wages made by men working full time, year round.[1] The wage gap is even worse when we look specifically at women of color: African American women typically are paid only 60 percent, Latinas only 55 percent, and Native American women only 59 percent of the wages typically paid to white, non-Hispanic men for full-time, year-round work.[2]

---

[1] Nat'l Women's Law Ctr., The Wage Gap Is Stagnant for Nearly a Decade 1 (2015), *available at* http://nwlc.org/resources/wage-gap-stagnant-nearly-decade/ [The Wage Gap Is Stagnant].

[2] Nat'l Women's Law Ctr., The Wage Gap: The Who, How, Why, and What To Do (Apr. 2016), *available at* https://nwlc.org/resources/the-wage-gap-the-who-how-why-and-what-to-do/ [The Wage Gap: The Who].

*With the law on your side, great things are possible.*
11 Dupont Circle ■ Suite 800 ■ Washington, DC 20036 ■ 202.588.5180 ■ 202.588.5185 Fax ■ www.nwlc.org
Pl. MSJ 000160

This wage gap has remained stagnant for nearly a decade,[3] and translates into $10,762 less in median annual earnings for women and the families they support.[4] The result is that a woman working full time, year round stands to lose $430,480 over a 40-year period due to the wage gap.[5] To make up this lifetime wage gap, a woman would have to work more than eleven years longer than her male counterpart.[6]

A range of factors contributes to the pay gap, including pay discrimination between employees of different genders who are doing the same job.[7] Women are still paid less than men in nearly every occupation,[8] and studies show that even controlling for race, region, unionization status, education, experience, occupation, and industry leaves 38 percent of the pay gap unexplained.[9] Conscious and unconscious stereotypes about working women remain a driver of this unexplained gap. For example, a recent experiment revealed that compared to an identical female applicant, science professors offered a male applicant for a lab manager position a salary of nearly $4,000 more as well as additional career mentoring, and judged him to be significantly more competent and hireable.[10]

Yet pay discrimination remains difficult to detect in the first instance. Because pay often is cloaked in secrecy, when a discriminatory salary decision is made, it is seldom as obvious to an affected employee as a demotion, a termination, or a denial of a promotion.[11] Moreover, about

---

[3] THE WAGE GAP IS STAGNANT, *supra* note 1.

[4] THE WAGE GAP: THE WHO, *supra* note 2.

[5] *Id.* Lifetime wage gaps for women of color are significantly larger: African American women lose $877,480, Native American women $883,040; and Latinas $1,007,080. NAT'L WOMEN'S LAW CTR., THE LIFETIME WAGE GAP, STATE BY STATE (Apr. 2016), *available at* https://nwlc.org/resources/the-lifetime-wage-gap-state-by-state/; NAT'L WOMEN'S LAW CTR., THE LIFETIME WAGE GAP BY STATE FOR NATIVE AMERICAN WOMEN (2014) (Apr. 20160), *available at* https://nwlc.org/resources/the-lifetime-wage-gap-by-state-for-native-american-women/.

[6] THE WAGE GAP: THE WHO, *supra* note 2.

[7] Blau, F. D. & Kahn, L.M, *The Gender Wage Gap: Extent, Trends and Explanations*, NAT'L BUREAU OF ECONOMIC RESEARCH (Jan. 2016), *available at* http://www.nber.org/papers/w21913.pdf; *see* NAT'L WOMEN'S LAW CTR., FIFTY YEARS AND COUNTING: THE UNFINISHED BUSINESS OF ACHIEVING FAIR PAY (2015), *available at* http://nwlc.org/resources/50-years-counting-unfinished-business-achieving-fair-pay/.

[8] Hegewisch, A. & Matite, M., *The Gender Wage Gap by Occupation*, INST. FOR WOMEN'S POLICY RESEARCH (Apr. 2013), *available at* http://www.iwpr.org/publications/pubs/the-gender-wage-gap-by-occupation-2; Schieder, S. & Gould, E., *"Women's work" and the gender pay gap* 3, ECONOMIC POLICY INST. (July 2016), *available at* http://www.epi.org/publication/womens-work-and-the-gender-pay-gap-how-discrimination-societal-norms-and-other-forces-affect-womens-occupational-choices-and-their-pay/.

[9] Blau & Kahn, *supra* note 7.

[10] Moss-Racusin, C.A. et al., *Science faculty's subtle gender biases favor male students*, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES OF AMERICA (Aug. 2012), *available at* http://www.pnas.org/content/109/41/16474.abstract#aff-1.

[11] As Justice Ginsburg has noted:

> Pay disparities often occur, as they did in Ledbetter's case, in small increments; cause to suspect that discrimination is at work develops only over time. Comparative pay information, moreover, is often hidden from the employee's view. Employers may keep under wraps the pay differentials maintained among supervisors, no less the reasons for those differentials. Small initial discrepancies may not be seen as meet for a federal case, particularly when the employee, trying to succeed in a nontraditional environment, is averse to making waves. Pay disparities are thus significantly different from adverse actions "such as termination, failure to promote, …or refusal to hire," all involving fully communicated discrete acts, "easy to identify" as discriminatory.

Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007) (Ginsburg, J. dissenting).

Pl. MSJ 000161

60 percent of workers in the private sector nationally are either forbidden or strongly discouraged from discussing their pay with their colleagues.[12]  As a result, employees face significant obstacles in gathering the information that would suggest that they have experienced pay discrimination, which undermines their ability to challenge such discrimination.  Punitive pay secrecy policies and practices allow this form of discrimination not only to persist, but to become institutionalized.  Consequently, government enforcement and employer self-evaluation and self-correction are critical to combat compensation discrimination.

Collecting and making publicly available compensation data from larger private employers and federal contractors will improve the effectiveness of enforcement efforts and increase the likelihood of employer self-correction, thus targeting pay discrimination on multiple fronts.  First, the revised EEO-1 will help both EEOC and the Office of Federal Contract Compliance Programs of the Department of Labor (OFCCP) tackle discrimination by private employers and large federal contractors.  This data collection will empower the agencies to target their limited enforcement resources toward more detailed oversight of those employers who are most likely to be engaging in pay discrimination, greatly enhancing the effectiveness and efficiency of EEOC's and OFCCP's pay discrimination enforcement efforts.

The proposed pay data collection also will help uncover other forms of gender and racial discrimination beyond pay-setting practices that can contribute to compensation disparities.  Bias and discrimination, whether overt or implicit, can impact employer decisions at critical points – recruitment, hiring, performance evaluations and promotions, allocation of assignments and opportunities, and opportunities for advancement and leadership development – which not only create pay disparities, but perpetuate and magnify them over time.  Stereotypes about the needs, abilities and priorities of women, particularly those with families and caregiving responsibilities, or assumptions that only men are family breadwinners, contribute to women being denied promotions, or assignments or opportunities that would lead to career-track, high-paying jobs.  Hiring discrimination that keeps women out of higher paying jobs in a company, or harassment that systematically pushes women out of male-dominated, highly paid jobs may result in race or gender pay gaps within the firm.  If African American employees, for example, are scheduled for fewer work hours, or Asian-American women are not promoted to senior level positions, this also would be reflected in pay gaps.  Collecting compensation data allows for more targeted enforcement of a range of antidiscrimination protections.

In addition, both the process of responding to the data collection tool and the more effective and targeted approach to enforcement that the tool permits will spur more employers to proactively review and evaluate their pay practices and to address any unjustified disparities between employees.  By incentivizing and facilitating such employer self-evaluation, the revised EEO-1 Report will increase voluntary employer compliance with discrimination laws.  Employees and employers alike will benefit from the elimination of discrimination in pay practices absent litigation or other formal enforcement mechanisms, which can be expensive and time-consuming.

---

[12] INST. FOR WOMEN'S POLICY RESEARCH, PAY SECRECY AND WAGE DISCRIMINATION (Jan. 2014), *available at* http://www.iwpr.org/publications/pubs/pay-secrecy-and-wage-discrimination-1/at_download/file.

Pl. MSJ 000162

## II.     The Proposed Pay Data Collection Will Benefit Businesses, Individual Workers and the Economy.

As further discussed in Part IX, below, EEOC has taken significant steps to ensure that employers will face a minimal burden in compiling and reporting largely pre-existing information about compensation and hours worked pursuant to the proposed EEO-1 revision.  At the same time, business, workers and the economy will accrue important benefits from the proposed data collection.

Self-evaluation engendered by the proposed pay data collection is likely to encourage employers to proactively implement practices to help prevent pay disparities in the first instance and to develop a diverse workforce, both of which are good for business.  A diverse workforce and equitable employment practices can confer a wide array of benefits on a company, including decreased risk of liability, access to the best talent, increased employee satisfaction and productivity, increased innovation, an expanded consumer base, and stronger financial performance.[13]  Competitive -- and thus equal -- pay is critical for recruiting and retaining a diverse workforce and high performers, particularly for younger women workers.[14]  And when workers are confident they are being paid fairly, they are more likely to be engaged and productive.[15]  Significantly, shareholders and potential investors are recognizing these benefits and are increasingly interested in companies' commitment to diversity and equal employment opportunity.  They see compliance with antidiscrimination laws -- particularly with regard to equal pay -- as an important factor impacting risk and profitability, and therefore relevant to investment decisions.[16]

Furthermore, addressing discrimination and closing the gender wage gap would have a significant positive impact on the economy.  A recent study found that if women received the same compensation as their comparable male co-workers, the poverty rate for all working

---

[13] Hunt, V., Layton, D. & Prince, S., *Diversity Matters* 9-13, MCKINSEY & CO. (Feb. 2015) (finding diverse workforces correlate with better financial performance, because diversity helps to recruit the best talent, enhance the company's image, increase employee satisfaction, and improve decision making, including fostering innovation); Hewlitt, S.A., Marshall, M. & Sherbin, L., *How Diversity Can Drive Innovation*, HARVARD BUS. REV. (Dec. 2013), *available at* https://hbr.org/2013/12/how-diversity-can-drive-innovation.  Conversely, companies that fail to address gender wage disparities and discriminatory employment practices could damage their reputation and brand among consumers, leading to a loss of profits and shareholder value. Lamb, N. & Klein, W., *A Proactive Approach to Wage Equality is Good for Business*, EMPLOYMENT RELATIONS TODAY (Summer 2015), *available at* http://arjuna-capital.com/news/a-proactive-approach-to-wage-equality-is-good-for-business/ [*Proactive Approach*].

[14] A recent study found that "pay and financial benefits drive Millennials' choice of organization more than anything else." THE 2016 DELOITTE MILLENNIAL SURVEY: WINNING OVER THE NEXT GENERATION OF LEADERS 19 (2016), *available at* https://www2.deloitte.com/content/dam/Deloitte/global/Documents/About-Deloitte/gx-millenial-survey-2016-exec-summary.pdf; Noel, L. & Hunter Arscott, C., *Millennial Women: What Executives Need to Know About Millennial Women* 4, ICEDR (2015), *available at* http://www.icedr.org/research/documents/14_millennial_snapshot.pdf (Millennial women leave jobs primarily for more compensation).

[15] Courtney Seiter, "The Counterintuitive Science of Why Transparent Pay Works," *Fastcompany.com*, Feb. 26, 2016, *available at* http://www.fastcompany.com/3056975/the-future-of-work/the-transparent-pay-revolution-inside-the-science-and-psychology-of-open-.

[16] *Proactive Approach, supra* note 13; Natasha Lamb, "Closing the pay gap: Silicon Valley's gender problem," *Ethical Boardroom*, June 7, 2016, *available at* http://ethicalboardroom.com/leadership/diversity/close-the-pay-gap/; Trillium Asset Mgm't, *Letter to Citigroup Shareholders,* Apr. 16, 2016, *available at* https://www.sec.gov/Archives/edgar/data/831001/000121465916010905/j415160px14a6g.htm.

Pl. MSJ 000163

women would be reduced by half, from 8.1 percent to 3.9 percent.[17]  Moreover, nearly 60% of women would earn more if working women were paid the same as men of the same age with similar education and hours of work.[18]  Increased wages would augment these workers' consumer spending power and benefit businesses and the economy.[19]  Another recent study estimates that by closing the wage gap entirely, women's labor force participation would increase and $4.3 trillion in additional gross domestic product could be added in 2025, about 19 percent more than would otherwise be generated in 2025.[20]

## III.    The EEO-1 Report Is the Appropriate Vehicle for Collecting Pay Data.

The EEO-1 Report is well suited for efficiently collecting meaningful data related to pay, for multiple reasons.

First, the decision to collect this pay information through the EEO-1 Report and to share it with OFCCP minimizes the compliance burden for regulated employers, in direct response to concerns previously raised by the employer community.  When OFFCP previously proposed collecting compensation data from federal contractors through a separate tool on a different reporting schedule from the EEO-1,[21] employer representatives urged in the strongest terms that instead EEOC and OFCCP coordinate their data collection through use of a single, unified instrument.[22]  The proposed EEO-1 revision accomplishes this goal, avoiding duplication of effort or wasted costs for either employers or enforcement agencies.  For these reasons, the National Academy of Sciences' study regarding the collection of compensation data (NAS Study)[23] concluded that use of the EEO-1 for pay data collection would be "quite manageable for both EEOC and the respondents."[24]

---

[17] Hartmann, H., Hayes, J. & Clark, J., *How Equal Pay for Working Women Would Reduce Poverty and Grow the American Economy* 1, INST. FOR WOMEN'S POLICY RESEARCH (2014), *available at* http://www.iwpr.org/publications/pubs/how-equal-pay-for-working-women-would-reduce-poverty-and-grow-the-american-economy/

[18] *Id.*

[19] *See id.* (finding that the U.S. economy would have produced additional income of more than $447 billion in 2012 if women received pay equal to their male counterparts).

[20] Ellingrud, K., et al., *The power of parity: Advancing women's equality in the United States* 1-2, MCKINSEY GLOBAL INST. (Apr. 2016), *available at* http://www.mckinsey.com/global-themes/employment-and-growth/the-power-of-parity-advancing-womens-equality-in-the-united-states.  The same study estimates that even if the wage gap was only partially closed, $2.1 trillion in additional GDP could be added in 2025.

[21] U.S. Department of Labor, Office of Federal Contract Compliance Programs, Non-Discrimination in Compensation; Compensation Data Collection Tool, Advanced Notice of Proposed Rulemaking, 76 Fed. Reg. 49398 (Aug. 10, 2011); U.S. Department of Labor, Office of Federal Contract Compliance Programs, Government Contractors, Requirement to Report Summary Data on Employee Compensation, Notice of Proposed Rulemaking, 79 Fed. Reg. 46561 (Aug. 8, 2014).

[22] *See* SAGE COMPUTING, INC., EEOC SURVEY SYSTEM MODERNIZATION WORK GROUP MEETING 2 (Mar. 2012), *available at* http://www.eeoc.gov/employers/eeo1survey/survey-modernization.pdf;  *see also, e.g.*, Equal Employment Advisory Council, *Comments on the Office of Federal Contract Compliance Programs' Proposed Requirement to Report Summary Data on Employee Compensation* (Jan. 5, 2015);  Society for Human Resource Management and the College and University Professional Association for Human Resources, *Comment on Advanced Notice of Proposed Rulemaking Related to Non-Discrimination in Compensation* 3-4 (Oct. 11, 2011).

[23] NATIONAL RESEARCH COUNCIL OF THE NATIONAL ACADEMIES, COLLECTING COMPENSATION DATA FROM EMPLOYERS (2012), *available at* http://www.nap.edu/catalog/13496/collecting-compensation-data-from-employers [NAS STUDY].

[24] NAS STUDY, *supra* note 23 at 60.

Pl. MSJ 000164

Second, by utilizing the long-established EEO-1 job categories, reliance on the EEO-1 Report allows employers to report pay data without requiring them to master and implement new methods of categorizing job titles within their workplace. Instead, employers can make use of the existing systems by which they associate job titles with EEO-1 job categories, thus simplifying reporting.

Third, use of the EEO-1 enables the calculation and comparison of compensation data by gender within racial/ethnic groups, and by racial/ethnic groups within genders. The substantial pay gaps experienced by women of color compared to their white, non-Hispanic male and female counterparts demonstrate that unequal pay is a problem that has both gender and racial/ethnic dimensions. Reporting pay data through the EEO-1 Report will capture these interacting impacts.

Fourth, use of the EEO-1 as a reporting tool will facilitate analysis of compensation data both company-wide and within each employer's establishment, given that a separate EEO-1 Report must be filed for each physical location in a multi-establishment company. Company-wide analysis will help to draw attention to potential systemic discrimination that can affect many workers across an organization and enable meaningful analysis of the company's pay practices even where the number of workers at each individual establishment is relatively small. On the other hand, establishment-level analysis will ensure that individual establishments that engage in pay discrimination cannot evade detection if the company as a whole has pay that is closer to equal.

Finally, and most importantly, reporting of compensation data by gender and racial/ethnic groups within each of the ten job categories from the EEO-1 (rather than by an employer's own job titles or job classification system) will facilitate the consistent comparison of pay disparities in each job category among employers in a given industry and geographic area. Specifically, it will help EEOC and OFCCP identify firms with racial or gender pay gaps within each job category that significantly diverge from their regional industry peers for potential further detailed assessment. That is, it will allow analysis and comparison of wage data for firms employing workers in the same job class, in the same industry, in the same location, in the same year. In addition, it will help EEOC and OFCCP develop a better understanding of which industries have the most significant pay disparities, and to target enforcement resources accordingly. These data will also enable EEOC and OFCCP to better assess the extent to which sex-based compensation discrimination affects women's entry into non-traditional industries, and more generally to better understand the relationship between gender segregation in the workforce and pay discrimination.

The EEO-1 categories are relatively broad, and a single category can comprise multiple jobs in an establishment. Some have objected that as a result the pay gap measured in a particular EEO-1 job category for a particular employer will not necessarily measure disparities in pay for "equal work." This objection ignores the fact that the EEO-1 was never intended to act as an instrument precise enough to establish or prove violations of law without more investigation. Rather, what the EEO-1 has historically done, and what compensation data collection will strengthen its capacity to do, is aggregate millions of data points to establish gender and racial patterns within these job categories, thus allowing identification of firms that sharply depart from these patterns

Pl. MSJ 000165

for further analysis.[25]  For example, the EEO-1 has been used by OFCCP to aid in the selection of federal contractors for enforcement activities, by academics to study the impact of affirmative action on women and people of color, and by the U.S. Government Accountability Office to assess the effectiveness of antidiscrimination programs.[26]  The revised EEO-1 Report will provide EEOC and OFCCP a critical tool for focusing investigatory resources to identify pay discrimination within equivalent jobs, and will also flag deviations from compensation patterns that may be driven by other forms of discrimination that shut women or people of color out of higher-paying roles within a given job category.

**IV.    W-2 Pay Is the Best Readily Available Measure of Compensation for Data Collection Purposes.**

We support the collection of data that provides a true picture of employees' compensation, which necessarily includes pay that exceeds base salary. Indeed, for Equal Pay Act purposes, relevant compensation

> includes all payments made to [or on behalf of] an employee as remuneration for employment. The term includes all forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance, or some other name. Fringe benefits are deemed to be remuneration for employment. . . . [V]acation and holiday pay, and premium payments for work on Saturdays, Sunday, holidays, regular days of rest or other days or hours in excess or outside of the employee's regular days or hours of work are deemed remuneration for employment and therefore wage payments that must be considered in applying the EPA . . . .[27]

Requiring employers to report W-2 earnings from Box 1[28] will provide a comprehensive picture of compensation, in line with EEOC's and OFCCP's enforcement mandates.  Moreover, since employers already collect and report W-2 wage data pursuant to federal law, inclusion of this information in the revised EEO-1 Report will impose a minimal additional burden.

A.    *W-2 Earnings Provide a Comprehensive Picture of Compensation*

The Center agrees with EEOC and the conclusions of the independent Pay Pilot Study (Pilot Study)[29] that among readily available compensation measures, the W-2 provides the most comprehensive picture of earnings, with a minimal associated burden for employers.  The NAS

---

[25] For instance, OFCCP has analyzed EEO-1 data to indicate the probability that a review will find a significant violation of federal requirements, and to target enforcement activities accordingly.  Public Hearing before the U.S. Equal Employment Opportunity Commission, July 18, 2012 (testimony of Dr. Marc Bendick, Jr.), *available at* http://www.eeoc.gov/eeoc/meetings/7-18-12/bendick.cfm.  EEOC itself has published public reports analyzing data from the EEO-1 and highlighting trends in particular industries. *See* U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, SPECIAL REPORTS, *available at* http://www.eeoc.gov/eeoc/statistics/reports/index.cfm.

[26] NAS STUDY, *supra* note 23 at 17-25.

[27] 29 C.F.R. § 1620.10.

[28] The 30-Day Notice clarifies that the revised EEO-1 would use the measure of compensation reported in Box 1, wages, tips and other compensation.  81 Fed. Reg. 45479, 45486 (July 14, 2016).

[29] SAGE COMPUTING, INC., FINAL REPORT (Sept. 2015), *available at* http://eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf   [PILOT STUDY].

Pl. MSJ 000166

Study and the subsequent Pilot Study considered both the compensation definitions used by the Bureau of Labor Statistics' Occupation Employment Statistics (OES) and by the W-2, among others, as a compensation measure for EEOC pay data collection, because these measures are the most widely known to employers and include various forms of compensation data.[30]  The OES compensation definition includes base rate of pay, hazardous duty pay, cost of living allowances, guaranteed pay, incentive pay, tips, commissions and production bonuses.[31]  But it does not account for certain some categories of compensation including overtime pay, severance pay, shift differentials and nonproduction, year-end and holiday bonuses.[32]  Though these categories may only account for a small portion of overall employee compensation, they are particularly relevant in certain industries.  For example, as noted in the Pilot Study, in management and business and financial operations bonuses account for more than 11 percent of cash compensation, and in healthcare shift differentials account for substantial differences in compensation.[33]

The W-2 definition includes all earned income, including supplemental pay components (such as overtime pay, shift differentials, and nonproduction bonuses) and therefore offers a more comprehensive picture of earnings than the OES.[34]  This comprehensive picture is critical because although compensation discrimination may manifest in workers' base salaries, it may also occur through discrimination in other less frequently measured forms of compensation such as bonuses,[35] commissions,[36] stock options, differential pay, and opportunities for overtime.  For instance, even when base salaries between comparable male and female workers are equal in a given company, overall compensation could be significantly disparate between the genders based on the discriminatory, discretionary allocation of compensation types such as bonuses and stock options.[37]  In fact, "female and minority employees have been virtually locked out of wealth-

---

[30] The NAS Study reviewed the wage definitions in the Occupational Employment Statistics survey (OES) and the National Compensation Survey (NCS) and concluded that the OES definition should be considered for use because it was widespread, and because of a substantial overlap in the employers who report data to the OES and EEOC. NAS STUDY, *supra* note 23 at 58.  The Pilot Study also recommends the use of W-2 data because such data provide the most comprehensive measure of compensation readily available to businesses.  PILOT STUDY, *supra* note 29 at 108.

[31] NAS STUDY, *supra* note 23 at 56.

[32] *Id*.; PILOT STUDY, *supra* note 29 at 7.

[33] PILOT STUDY, *supra* note 29 at 7 & n.16.

[34] *Id*. at 7, 8.  While reported W-2 wages include taxable benefits and pre-tax deductions driven by an individual employee's choices - such as mass transit and parking stipends/elections, 401(k) or retirement account contributions, and deferred compensation - these optional elements likely would not constitute a large enough part of compensation for most workers so as to create a disparity for the purposes of enforcement, nor is there reason to believe that men and women, or individuals of different races, would consistently make different choices in this regard and thus create gender or race pay disparities.

[35] *See* King v. Univ. Health Care Sys., 645 F.3d 713 (5th Cir. 2011) (upholding a jury's conclusion that the employer violated the Equal Pay Act when it failed to pay plaintiff anesthesiologist a bonus that it paid her male colleague).

[36] *See* Bence v. Detroit Health Corp., 712 F.2d 1024, 1027 (6th Cir. 1983) (finding a compensation disparity under Equal Pay Act where the employer paid higher commission rate to males than females, even though total remuneration was substantially equal).

[37] *See* MERCER, GENDER EQUITY REPORT (Nov. 2015), *available at* https://www.imercer.com/uploads/Aust/pdfs/Marketing/gender_pay_executive_summary.pdf (survey of Australian companies finding that women receive lower variable reward/incentive pay despite receiving the same performance ratings as their male counterparts; males who only partially met their objectives received bonuses that were 35 percent larger (as a percentage of employment cost) than their female counterparts).

creating opportunities in most companies."[38]  Studies show than men receive stock options and bonuses at a rate twenty to thirty times than women.[39]  Studies also indicate that compensation for men consists of 85 percent salary and 15 percent stock options, profit sharing, and other bonuses, while compensation for women consists of 91 percent salary and 9 percent stock options, profit sharing, and other bonuses.[40]

For all these reasons, the base rate of pay is not an appropriate alternative measure of compensation for the purposes of the revised EEO-1 Report.  The base rate of pay is an employee's initial rate of compensation, excluding extra compensation such as for overtime, bonuses, or an increase in the rate of pay for a shift differential.  It does not reflect the full measure of an employee's compensation.[41]  While some employers might easily be able to report base rate of pay, if it is the compensation data currently captured by their human resource information management systems (HRIS),[42] it is not a dynamic or complete picture of an employee's compensation and would not serve the purposes of the EEO-1 Report.  Data about base pay alone cannot capture instances where other types of compensation -- such as stock options and bonuses -- drive gender-based disparities in compensation, and would permit employers that discriminate using other forms of compensation to evade detection.  Conversely, collecting data on W-2 pay will help root out disparities across the spectrum of take-home compensation.  Accordingly, the Center supports collecting W-2 pay data, as the measure of earnings that collects as many forms of compensation as possible.

B.    *Reporting W-2 Earnings Will Not Be Unduly Burdensome for Employers*

Requiring covered employers to report W-2 data in addition to the already-required ethnicity, race and gender of employees via the EEO-1 Report will not be unduly burdensome.  First, federal law already requires employers to maintain and generate the information in W-2 forms that will be required for the revised EEO-1.[43]  HRIS experts consulted for the Pilot Study reported that most major payroll software systems are preprogrammed to compile the data for generating W-2 forms.  This led the Pilot Study to conclude that employers using such software to manage payroll and generate W-2 forms could report the proposed data with minimal additional burden.[44]

Second, EEOC's proposal in the 30-Day Notice to move the 2017 report's filing deadline from September 2017 to March 31, 2018, addresses a key concern raised by employers.  Employers argued that because W-2 earnings data usually are generated at the end of the calendar year, the EEO-1's September deadline would require employers to generate an additional, noncalendar

---

[38] Mehri, C. & Eardley, E., *21st Century Tools for Advancing Equal Opportunity: Recommendations for the Next Administration* 7, AMERICAN CONSTITUTION SOCIETY (2008), *available at* https://www.acslaw.org/files/Mehri%20FINAL.pdf.

[39] Alyssa Lebeau, *The New Workplace Woman: "Are We There Yet?,"* BUSINESS WOMAN, Fall 2001.

[40] *Id.*

[41] PILOT STUDY, *supra* note 29 at 8.

[42] *Id.*

[43] 26 C.F.R. § 31.6051-1.

[44] PILOT STUDY, *supra* note 29 at 8, 103.  The majority of employers use automated payroll systems.  Optimal Benefit Strategies, LLC, *Most Small Employers Face Low Cost to Implement Automatic IRAs*, AARP (Aug. 2009) ("97 percent of employers with 10 or more employees use automated systems and do not process payroll manually"), *available at* http://assets.aarp.org/rgcenter/econ/auto_iras.pdf.  The Pilot Study acknowledged that some companies that outsource their payroll may need to make a one-time capital investment to write a software program to import data from payroll programs into the HRIS system.

Pl. MSJ 000168

year W-2 that would not fully reflect annual compensation. EEOC's proposal will allow employers to utilize, for the purposes of the EEO-1, the calculation and reporting of W-2 data for the calendar year that is already required by federal law. The proposed change would also allow employers more time to adapt their payroll and HRIS systems to prepare for the new data collection.

## V.    Reporting of Total Hours Worked Will Greatly Enhance the Usefulness of the Pay Data Collected and Will Not Be Unduly Burdensome for Employers.

EEOC's proposal to collect the total number of hours worked[45] by the employees included in each EEO-1 pay band will allow the calculation and comparison of mean compensation both per person and per hour for each gender and racial/ethnic group within each job category. As the Pilot Study recognized, collection of total hours worked by each employee in addition to wages is critical to an analysis of pay differences.[46] Collecting this data will allow OFCCP and EEOC to account for pay differences due to variation in the number of hours worked among employees in a pay band, sharpening pay comparisons both between different groups in an employer's workforce and between different employers. Collection of total hours worked also will permit an analysis that accounts for periods of unemployment or less than full-time work, including part-time, temporary and seasonal work. This is especially important because women constitute two-thirds of part-time workers in the U.S,[47] and because part-time workers are often paid less, per hour, than their full-time counterparts.[48] Additionally, women are almost half of all temporary workers.[49]

Hours worked data is also readily available to employers. Employers must keep records of hours worked for all employees not exempt from the overtime provisions of the Fair Labor Standards Act.[50] Accordingly, reporting actual hours worked for each nonexempt employee, as the 30-Day Notice proposes, will not create an additional burden for employers. With regard to the collection of total hours worked by exempt employees, the 30-Day Notice suggests employers report either hours actually worked, or report 40 hours per week for full-time employees and 20 hours per week for part-time employees as a standardized substitute to reduce the reporting burden. The Center supports this approach, which permits an employer to select the reporting option that is consistent with its current recordkeeping.

---

[45] We support EEOC's proposal in the 30-Day Notice to adopt the definition of "hours worked" in the Fair Labor Standards Act (FLSA). 81 Fed. Reg. at 45488. It provides a clear definition of the relevant hours, and employers covered by the proposal are already familiar with the FLSA and its requirements.

[46] See PILOT STUDY, supra note 29 at 42-43, 59.

[47] NAT'L WOMEN'S LAW CTR., PART-TIME WORKERS ARE PAID LESS, HAVE LESS ACCESS TO BENEFITS—AND TWO-THIRDS ARE WOMEN 1 (2015), available at http://nwlc.org/resources/part-time-workers-are-paid-less-have-less-access-benefits%E2%80%94and-two-thirds-are-women/. See also U.S. DEP'T OF LABOR, WOMEN'S BUREAU, Women of Working Age, Chart 22 (2015), http://www.dol.gov/wb/stats/latest_annual_data.htm (last visited Aug. 10, 2016).

[48] NAT'L WOMEN'S LAW CTR., PART-TIME WORKERS ARE PAID LESS, HAVE LESS ACCESS TO BENEFITS—AND TWO-THIRDS ARE WOMEN 1, 3 (2015), available at http://nwlc.org/resources/part-time-workers-are-paid-less-have-less-access-benefits%E2%80%94and-two-thirds-are-women/.

[49] Nicholson, J., Issue Brief: Temporary Help Workers in the U.S. Labor Market, U.S. DEP'T OF COMMERCE ECONOMICS AND STATISTICS ADMIN. (July 2015), available at http://www.esa.doc.gov/sites/default/files/temporary-help-workers-in-the-us-labor-market.pdf.

[50] 29 C.F.R. § 516.2.

Where an employer does track exempt employees' hours, the employer can report that number. Indeed, the Pilot Study noted that most payroll systems maintain the total hours worked by *each* employee, so reporting such information would impose a minimal burden on employers that use those systems.  In the absence of actual data regarding hours worked by exempt employees, employers can rely on the EEOC-sanctioned assumption of a full-time 40-hour workweek.  The 40-hour workweek is a widely accepted definition[51] and is a reasonable approximation of full-time work, with the understanding that not all full-time salaried exempt employees work precisely 40 hours per week.[52]  The proposal appropriately seeks to minimize the burden on employers by not requiring them to collect additional data where they do not already.

EEOC's suggestion is responsive to critiques from employers, who objected to OFCCP's 2014 proposal[53] that contractors use across-the-board estimates of hours worked by exempt employees by reporting 2080 hours annually worked for all full-time, salaried exempt employees, and 1080 hours annually worked for all part-time employees.  This option would permit employers who collect more detailed data, or who wish to begin to collect more detailed data, to report more precise calculations.

## VI.    The Pay Data Collection Should Be Strengthened Further.

The compensation data collected by the proposed revised EEO-1 Report will fill an important gap in the information currently available to EEOC and OFCCP, enhancing the enforcement of discrimination prohibitions.  However, we urge further strengthening of the pay data collection in a few key ways:

- Extension of the requirement to submit Component 2 of the EEO-1 to federal contractors that have between 50 to 99 employees and are otherwise required to submit the EEO-1.[54] Although EEOC indicated in the 30-Day Notice that it would retain the same employee thresholds, we urge reconsideration of this position given the heightened importance of ensuring that recipients of public funds do not discriminate in pay practices.  Many of these smaller entities already maintain the relevant information.  For instance, federal supply and service contractors and subcontractors are already required to preserve all "personnel or employment record[s]," including those involving "hiring, assignment, promotion, demotion, transfer, lay off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship," for at least one year.[55]  These

---

[51] Although the FLSA's overtime requirements do not apply to the exempt workers at issue here, the overtime rule does establish a useful benchmark of a 40-hour workweek as a standard measure of full-time work. 29 U.S.C. § 207(a).

[52] A 2014 Gallup poll of full-time, salaried workers indicated that of the workers surveyed, 37 percent worked 40 hours a week, and 59 percent worked 41 hours or more per week. The average workweek of the employees surveyed was 47 hours. GALLUP, WORK AND EDUCATION POLL (2014), *available at* http://www.gallup.com/poll/175286/hour-workweek-actually-longer-seven-hours.aspx. *See* U.S. DEP'T OF LABOR, BUREAU OF LABOR STATISTICS, THE EMPLOYMENT SITUATION – JULY 2016, Table B-2 (Aug. 5, 2016), *available at* http://www.bls.gov/news.release/empsit.t18 htm (average weekly hours and overtime of all employees on private nonfarm payrolls in July 2016 was 34.5 hours).

[53] U.S. Department of Labor, Office of Federal Contract Compliance Programs, Government Contractors, Requirement to Report Summary Data on Employee Compensation, Notice of Proposed Rulemaking, 79 Fed. Reg. 46561 (Aug. 8, 2014).

[54] 41 C.F.R. § 60-1.7.

[55] 41 C.F.R. § 60-1.12(a).

Pl. MSJ 000170

records for employees must be identifiable by "[t]he gender, race, and ethnicity of each employee."[56]  Supply and service contractors with contracts of $50,000 or more and with 50 or more employees also must keep on file copies of written affirmative action plans.[57]

- Revision of the proposed EEO-1 Report to require employers to report their pay data using additional, narrower pay bands.  We support the decision to collect compensation data by counting and reporting the number of employees from each demographic group in each identified pay band, as a means of reporting that minimizes the burden on the employer while still capturing reliable and useful data.[58]  We also agree that in order to be useful, pay data must be collected in a larger number of bands than used by the EEO-4, as the EEO-4 includes all pay of $70,000 or more in a single band, thus rendering invisible any pay disparities experienced by employees earning $70,000 or more annually.  The OES pay bands upon which EEOC proposes to rely are a distinct improvement over the EEO-4 bands, in that the OES pay bands go up to $207,999, with the final pay band including all pay of $208,000 or above.

  However, even the OES pay bands will be unable to provide data on pay disparities for employees earning more than $208,000.  In the 30-Day Notice, EEOC declined to adopt narrower pay bands or additional pay bands at the top end of the wage scale, stating that the proposed pay bands would maximize the collection of data since the majority of wages in the United States are well below $208,000.  But data show that women up and down the income scale experience pay gaps compared to their male counterparts, including in highly paid roles such as attorneys, executives, and surgeons.[59]  For example, about half of physicians and surgeons make more than $194,500 annually—a profession in which women typically make only 71 cents for every dollar paid to their male counterparts.[60]  About half of lawyers make more than $121,000 annually—a profession in which women typically make only 78 cents for every dollar paid to their male counterparts.[61]  Among equity partners, generally the highest compensated individuals at law firms, the typical female equity partner earns 80 percent of what a typical male equity partner earns.[62]  In the typical state, the average wage and salary of the top 0.5 percent is nearly $360,000 a year.[63]  We therefore urge the inclusion of

---

[56] 41 C.F.R. § 60-1.12(c)(1).

[57] 41 C.F.R. § 60-1.40(a).

[58] The Pilot Study recommended collecting aggregate pay information for the occupational categories in pay bands. PILOT STUDY, *supra* note 29 at 9, 10, 108.

[59] U.S. CENSUS BUREAU, 2014 AMERICAN COMMUNITY SURVEY, Table 1 (Full-Time, Year-Round Workers and Median Earnings in the Past 12 Months by Sex and Detailed Occupation: 2014), *available at* http://www.census.gov/people/io/publications/table_packages html [ACS]; Schieder & Gould, *supra* note 8 at 6 ("Women in the top 95th percentile of the wage distribution experience a much larger gender pay gap than lower-paid women).

[60] ACS, *supra* note 59.

[61] *Id.*

[62] NAT'L ASS'N OF WOMEN LAWYERS, NINTH ANNUAL SURVEY (2015), *available at* http://www.nawl.org/p/cm/ld/fid=506.

[63] Figures are for all individuals 16 and older. The American Community Survey top codes data for wage and salary income at the 99.5th percentile of each state.  Wages above this level all are coded at the state mean of wage and salary income.  *See* IPUMS USA, INCWAGE Codes, *available at* https://usa.ipums.org/usa-action/variables/INCWAGE#codes_section (last visited Aug. 10, 2016).  In 2014, the median value of the state mean wage and salary income of the top 0.5 percent was $359,000 with a range between $237,000 and $642,000.

Pl. MSJ 000171

additional pay bands to collect pay data up to at least $360,000, to ensure that meaningful pay data is captured as to virtually all of the workforce. We also note that the top OES pay bands cover extremely wide pay ranges of $34,839 and $44,199. In order to provide more meaningful information regarding pay disparities, reflecting the EEO-1's distinct purpose, we urge that pay data be collected in narrower pay ranges, and recommend for those pay bands whose upper limit is more than $19,329, no single pay band cover a range of more than 20 percent of the lowest pay captured by that band, thus allowing for more granular analyses.

- Whether the EEO-1 ultimately relies on OES pay bands or a modified version of the OES pay bands, it is critical that these bands be regularly adjusted by continuing to track the OES, in order to provide the most relevant data reflecting the distribution of pay in the economy.

## VII.    EEOC and OFCCP Must Ensure That Pay Discrimination Is Not Insulated From Review Because it Is Commonplace Within an Industry.

The success of the collection of pay data in helping end pay discrimination depends on EEOC's and OFCCP's consistent incorporation of the data's predictive information into their ongoing decisions about where to target enforcement. This focus will not only increase the effectiveness of enforcement activities in rooting out discrimination, but also enhance the incentives for employers to engage proactively in self-evaluation of their pay practices and improve their compliance with equal pay standards. We therefore commend and strongly support the proposal to establish industry-level standards for pay disparities, use deviation from these standards to identify potential pay discrimination, and determine which employers to prioritize for investigation. However, given the persistence of gender and racial pay gaps across the economy, being above or close to an industry standard does not demonstrate an absence of pay discrimination exists within an employer's workforce. The promulgation of the final pay data collection instrument should recognize that while deviation from industry standards will be incorporated into decisions about conducting and prioritizing enforcement activities, other important considerations can and will come into play. For example, in some instances, enforcement attention appropriately may be focused on entire industries with sizeable gender pay gaps (rather than just the worst performing employers within those industries). Such attention is critical, as research reveals industry patterns of discrimination. For example, in the retail industry, women and people of color disproportionately fill the lowest paid positions, while white men disproportionately fill the most well-compensated jobs.[64] Similarly, in the restaurant industry there is evidence of both racial[65] and gender discrimination[66] in hiring and pay.

---

Figures include D.C. but exclude Puerto Rico. 2014 ACS and PRCS Minimum and Maximum Codes, *available at* https://usa.ipums.org/usa/volii/2014acs_topcodes.shtml (last visited Aug. 10, 2016).

[64] CTR. FOR POPULAR DEMOCRACY, DATA BRIEF: RETAIL JOBS TODAY (Jan. 2016), *available at* http://static1.squarespace.com/static/556496efe4b02c9d26fdf26a/t/56a0f00f3b0be3bde90e9363/1453387792311/RetailJobsToday1.pdf.

[65] RESTAURANT OPPORTUNITIES CENTERS UNITED, THE GREAT SERVICE DIVIDE (Oct. 2014), *available at* http://rocunited.org/the-great-service-divide-national/.

[66] RESTAURANT OPPORTUNITIES CENTERS UNITED, TIPPED OVER THE EDGE (Feb. 2012), *available at* http://rocunited.org/tipped-over-the-edge-gender-inequity-in-the-restaurant-industry/.

VIII.  **Making Summaries of Compensation Data Available to the Public Is an Essential Complement to the Compensation Data Collection.**

The Center strongly supports the plan to make aggregate data gathered from the revised EEO-1 Reports available to the public.  Making these data available to the public can promote employer compliance with equal pay standards in a number of important ways.  With these aggregate data in hand, workplace equality advocates can more efficiently direct their own enforcement, outreach and public education activities to industries or regions where pay disparities are most egregious.  Individual employees can find out if they are working in an industry or region where they are more at risk of experiencing pay discrimination, and be prompted to investigate further to ensure that they are being treated fairly.  They also can better understand pay trends with their region and industries, thus empowering them to seek and negotiate fair pay.  And making these aggregate data public will facilitate and incentivize voluntary employer compliance with equal pay protections, by providing benchmarks that employers can use to evaluate their own pay practices and to publicly promote their successes in achieving pay equity.

We further urge EEOC to not only provide average pay disparities by occupational category in given industries and/or regions, but also other relevant information such as the range of pay disparities.  Unequal pay is a ubiquitous phenomenon in many industries and regions, and even the average performers within a group may still have problems with pay discrimination in their workforces.  We therefore should be encouraging employers, in conducting self-evaluations of their pay practices, to strive to be even better than the average among their peers.

IX.  **The Proposed Data Collection Will Not Be Unduly Burdensome for Employers and the Revisions Proposed by the 30-Day Notice Further Minimize the Reporting Burden.**

We commend EEOC for constructively addressing the concerns expressed by employers regarding the burden of the proposed pay data collection, and support its suggested changes.  The proposal to collect pay information through the EEO-1 and to share it across agencies reduces a significant amount of the reporting burden for employers, and avoids duplication of effort or wasted costs in several ways.  The relevant universe of employers is already required to submit EEO-1 reports that include information by gender, race/ethnicity, and job grouping categories.[67] These employers are familiar with the form, the job categories and the reporting requirements.

As noted above, federal law already requires private employers and contractors to maintain much of the information that would be required under the revised EEO-1, such as W-2 earnings as the measure of compensation.  Likewise, federal law already requires employers to keep records of hours worked for nonexempt employees.[68]  Accordingly, reporting actual hours worked for each nonexempt employee, or actual hours worked or a standard approximation for each exempt employee, as the 30-Day Notice proposes, will not create an additional burden for employers.

Compensation and total hours worked information is readily available to most employers in their computerized payroll systems, so the burden that compiling and reporting this largely pre-

---

[67] 29 C.F.R. § 1602.7 (private employers); 41 C.F.R. § 60-1.7 (federal contractors).  *See also* nn.54-57, *supra*.
[68] 29 C.F.R. § 516.2.

existing information pursuant to the proposed rule will impose on employers would be minimal.[69] Completing the proposed revised EEO-1 would require employer adjustments at the preparation and the collection phases. Employers would be required to link their computerized payroll system, with the necessary information about compensation and hours worked, with the demographic and occupational information on each employee in the employer's HRIS. This would require a one-time redesign and reprogramming of software to generate the data in the new format. However, the burden and cost should be minimal, because compensation management systems and software are designed to be updated routinely to accommodate changes in federal, state or local income tax rules, new accounting rules, and employer changes in fringe benefits or compensation practices.[70] Once the payroll system software and HRIS system have been linked and reprogrammed to perform the required computations, collecting and reporting the new data for the revised EEO-1 would require minimal extra time or effort.

The additional revisions proposed in the 30-Day Notice will further diminish employers' reporting burden. As noted above, EEOC's proposal to move the 2017 report's filing deadline to March 31, 2018, would eliminate the need for employers to generate a separate, noncalendar year W-2. This change, which directly responds to employers' concerns, allows the use of the same calendar year W-2 data for the purposes of both the EEO-1 and federal law. In the 30-Day Notice EEOC also proposes moving the "workforce snapshot" period from the third quarter (July-September) to the fourth quarter (October-December) to address employer concerns. By counting and reporting its total number of employees in the fourth quarter, an employer can fully account for promotions that result in job category or pay band changes for employees during that calendar year. The proposed change, which would take effect for the 2017 reporting cycle, thus aligns the workforce snapshot period with the federally required W-2 reporting timeline as well, and should result in more accurate and less burdensome reporting.

Particularly given EEOC's responsive changes, the proposed collection and reporting of pay data will require minimal additional time and effort by employers. In comparison, great benefits will accrue for employees and employers because of this proposed rule. As discussed above, these data will be crucial to enhancing the effectiveness of enforcement activities on behalf of employees that are victims of pay discrimination and other forms of discrimination reflected in compensation. Further, the reporting requirement may actually reduce the ultimate burdens of enforcement on law-abiding employers because it will improve EEOC's and OFCCP's ability to direct their investigatory efforts toward employers most likely engaged in pay discrimination.

-------------------------------

In sum, the National Women's Law Center strongly urges swift finalization of the proposed revisions to the EEO-1 Report in order to ensure this data collection begins with the 2017

---

[69] In response to employer comments, EEOC revised its methodology for calculating the estimated annual reporting burden to account for the time spent annually on EEO-1 reporting by all the relevant employees at the firm and establishment level, and the fact that some employers may collect and enter EEO-1 data manually and do not use centralized data uploads. 81 Fed. Reg. at 45494. Accordingly, EEOC increased the burden estimate.
[70] For example, Intuit provides regular updates for subscribers to its Quick Books Payroll service. *See* http://payroll.intuit.com/support/kb/2000204.html; Sage provides similar software updates to its subscribers. *See* https://support.na.sage.com/selfservice/microsites/msbrowse.do?UMBrowseSelection=SG_SAGE50_U_S_EDITIO N_1.

reporting year. We have not seen any significant progress in closing the gender pay gap in this country in nearly a decade. Women cannot afford to keep waiting for change, nor can the families depending on women's earnings. The powerful enforcement tool proposed by EEOC promises to make a real difference in closing the pay gaps that have shortchanged women for far too long.

Emily Martin
General Counsel and Vice President for Workplace Justice

Maya Raghu
Director of Workplace Equality

# EXHIBIT N

Pl. MSJ 000176



# GAUCHER ASSOCIATES

## Human Resource Compliance Specialists
### 50 Oliver Street, Suite 212
### North Easton, MA  02356
### Tel:  (781) 341-9477          Fax:  (781) 341-6091

August 15, 2016

Joseph B. Nye
Policy Analyst
Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th Street, NW
Washington, DC 20503.

Dear Mr. Nye:

Gaucher Associates appreciates the opportunity to review and submit comments on the EEOC's proposed revision of the EEO-1 report to add a "Component 2" to collect "W-2 earnings and hours worked".   Gaucher Associates, Inc. is a Human Resources consulting firm specializing in employment law compliance matters, including EEO and Affirmative Action, with offices in Massachusetts and California.  Founded in 1994 by Richard A. Gaucher, Gaucher Associates has provided EEO/AA consulting services to, written AA programs for, or represented, primarily before the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), but also in EEOC and state and local Fair Employment Practices agency matters, over 250 clients for over twenty years.

For the record, I was employed by the OFCCP for 17 years, eight as a field compliance officer, working out of the Milwaukee District Office, and the remaining nine as the Director of Operations in the OFCCP's Boston Regional Office.  I also served as a member of the OFCCP's Task Force on Directives and the Manual, which eliminated a number of outdated or redundant directives and wrote the current Federal Contract Compliance Manual.  I also prepared the regulations segment of a training course for new compliance officers, and was a member of the agency's Reinventing Government committee for Administrative Issues.
I left the government in November of 1996, and joined Gaucher Associates, where I am currently Senior Vice President.

**Is This Trip Necessary?**

In our response to the EEOC's initial proposal, we questioned whether or not this change to the EEO-1 report is even necessary.  As we pointed out, over the years there has been little evidence to show that pay discrimination against women is widespread and systemic in business.  Little evidence supports such a massive effort to collect pay data from employers.

Pl. MSJ 000177

EEOC Final Comment Request: Revision of the Employer -1 Report (EEO-1)

Our colleague John Fox (Fox, Wang and Morgan) has described this proposal as a solution in search of a problem, a sentiment with which I am in full agreement. We pointed out that the OFCCP, the EEOC's "sister" agency, formerly utilized a tool to collect compensation data from Federal contractors and subcontractors, as part of the Equal Opportunity Survey. Unfortunately, the compensation information provided by that instrument failed to provide useful indicators for identifying Federal contractors that might be potential discriminators, despite the best efforts of a private consulting firm to assist the agency in improving its analysis (see Abt Report on EO Survey, attached), but found the task to be impossible.

We also noted that this regulatory proposal is a substitute for the OFCCP's withdrawn proposal to gather pay data from Federal contractors, generated by a Presidential Memorandum of April 8, 2014, which directed the Department of Labor "…to propose…a rule that would require Federal contractors and subcontractors to submit to DOL summary data on the compensation paid their employees, including data by sex and race".

The President's memorandum begins by asserting that…

> "[w]hile working women have made extraordinary progress over the past five decades since enactment of the Equal Pay Act of 1963, they still earn only 77 cents for every dollar that a man earns. For African-American women and Latinas, the pay gap is even greater. This pay differential shortchanges women and their families by thousands of dollars a year, and potentially hundreds of thousands of dollars over a lifetime. Moreover, given the connected impact on benefits and retirement savings, the loss and the accompanying threat to economic security are even greater.

But there is little evidence that this difference, in what is actually median pay, is based largely, or substantially, on systemic, unlawful discrimination based on gender or race? Evidence for such discrimination is lacking. Moreover, the EEOC is an independent Federal agency, so we are not certain why it has chosen, on its own, to carry water for the President.

Our response to the EEOC's proposal referenced a report by the CONSAD Research Corporation (see CONSAD Report, attached) analyzing differences in pay based on gender that was commissioned by the OFCCP in the previous administration. This study, "An Analysis of Reasons for the Disparity in Wages Between Men and Women", published January 12, 2009, contained these conclusions:

> "In this study, an attempt has been made to use data from a large cross-sectional database, the Outgoing Rotation Group files of the 2007 CPS, to construct variables that satisfactorily characterize factors whose effects have previously been estimated only using longitudinal data, so that reliable estimates of those effects can be derived in an analysis of the cross-sectional data. Specifically, variables have been developed to represent career interruption among workers with specific gender, age, and number of children. Statistical analysis that includes those variables has produced results that collectively account for between 65.1 and 76.4 percent of a raw

Pl. MSJ 000178

gender wage gap of 20.4 percent, and thereby leave an adjusted gender wage gap that is between 4.8 and 7.1 percent.

\* \* \*

As a result, it is not possible now, and doubtless will never be possible, to determine reliably whether any portion of the observed gender wage gap is not attributable to factors that compensate women and men differently on socially acceptable bases, and hence can confidently be attributed to overt discrimination against women. In addition, at a practical level, the complex combination of factors that collectively determine the wages paid to different individuals makes the formulation of policy that will reliably redress any overt discrimination that does exist a task that is, at least, daunting and, more likely, unachievable."

We also cited a report by the American Association of University Women, "Graduating to a Pay Gap" (copy attached), which examined the earnings of women and men one year after college graduation. The report, prepared by Christianne Corbett, M.A., and Catherine Hill, PhD, and published in 2012, came to the following conclusion:

"Overall, the regression analysis of earnings one year after graduation suggests that a 6.6 percent difference in annual earnings remains between women and men after accounting for all variables known to affect earnings. This is referred to in the text as the "unexplained" wage gap between men and women."

Whether it's a 4.1 and 7.8 percent "pay gap", or a 6.6 percent difference, the "wage gap" is unexplained, meaning that it is not statistically significant.

We pointed out that although the Equal Pay Act has been in effect for over 50 years, the record of the EEOC, which enforces the Act, does not seem to indicate a significant problem. As an example, in Fiscal Year 2013, only 1,019 of 93,727 total charges (1.1%), were filed under the Equal Pay Act. And of that number, 851 (83.5%) were either administratively closed or resulted in a finding of "no reasonable cause". Not exactly evidence of rampant pay discrimination on the basis of gender. In addition, the OFCCP has also been investigating pay differences over the years. Attached is a sample of one set of instructions, from an OFCCP Regional Directors meeting which took place in Atlanta, Georgia, on October 24-25, 1994. Thus, both the EEOC and the OFCCP have been tilling in these fields for years, with little to show for it.

And we also referenced a 2009 study by the General Accounting Office of <u>Federal</u> pay, "Gender Pay Gap in Federal Workforce Narrows as Differences in Occupation, Education, and Experience Diminish" (copy attached), which came to these conclusions:

"Our analysis of the federal workforce shows that:

•     From 1988 to 2007, the gender pay gap—the difference between men's and women's average pay before controlling for other factors—narrowed from 28 cents to 11 cents on the dollar.
•     For each year we analyzed, all but about 7 cents of the gap was accounted for by differences in measurable factors—predominantly the

Pl. MSJ 000179

occupations of men and women and, to a lesser extent, other factors such as experience and education.
• Factors that we could not measure may have accounted for some or all of the unexplained 7 cent gap."

The EEOC"s response essentially dismisses all of these findings, choosing instead to cite favorably the work of social scientists Francine D. Blau and Lawrence M. Kahn, of Cornell University.   In their paper "The Gender Wage Gap:  Extent, Trends, and Explanations", they arrive at a number of conclusions regarding sources of a gender wage gap, among them:

1.  Work force interruptions and shorter hours
2.  Wage penalties for temporal flexibility
3.  Labor force interruptions and hours differences
4.  Gender differences in location in the labor market
5.  Gender differences in employment by industry and occupation, as well as by firm,
6.  Differences in gender roles and the gender division of labor.
7.  A motherhood penalty for women and of a marriage premium for men.
8.  The greater tendency of men to determine the geographic location of the family.

Although their paper represents a thorough and comprehensive review of research into the bases for gender differences in pay, they do not, in fact, conclude that discrimination is a demonstrated or major factor.   In the paper's abstract they say only that "…research based on experimental evidence strongly suggests that discrimination cannot be discounted."   "Strongly suggests" and "cannot be discounted" are hardly phrases to justify placing such an enormous burden on employers in the United States as the EEOC is proposing.

The EEOC had asked the National Academy of Sciences (NAS) to review their proposal, which convened a group to study the issue.  Based on the information provided to them, this group outlined six tasks that it felt the EEOC should address before proceeding further with any proposal to collect pay data.  What were the six recommendations?

1.  Prepare a comprehensive plan for using any data that might be gathered, before the data is collected.
2.  After preparing a comprehensive plan for use of the data, commission a pilot study "…to test the collection instrument and the plan for use of the data."
3.  The EEOC should "enhance its capacity to summarize, analyze, and protect earnings data."
4.  The NAS specifically recommended that the EEOC collect data on rates of pay, not pay bands.  In addition, as part of this recommendation, the NAS noted that because "...employee compensation data are generally considered to be sensitive, even proprietary information, by most employers" the EEOC needs to develop "more sophisticated techniques for protecting data…"
5.  The NAS recommended that the EEOC "…consider appropriate data protection techniques…and consider supporting research for the development of these applications.
6.  The EEOC "…should seek legislation that would increase the ability of the agency to protect confidential data."

Pl. MSJ 000180

EEOC Final Comment Request: Revision of the Employer -1 Report (EEO-1)

The EEOC asserts that it has met those conditions. The EEOC asserts that the data will be same. If states that it requires that all agencies that use the data sign confidentiality agreements. Except, apparently, for one—the Office of Federal Contract Compliance Programs, which will rely on the provisions of the Freedom of Information Act, to the best of its ability. Perhaps they've forgotten when Robert Reich was Secretary of Labor, and released all the EEO-1 data in the OFCCP's possession to the Wall Street Journal? We do not believe that the EEOC has met the NAS's six conditions. Congress, for its part, seems inclined to deny the EEOC the budget to implement its proposal.

The EEOC has moved the filing date for the report to March 1st, beginning in 2018. The data gathering period has also been moved, from October 1st to December 31st. Since the EEOC is asking for W-2 earnings, it seems clear that almost all of the reports will be based on data from as close to December 31st as possible.

**Burden**

This is where the rubber hits the road. The EEOC initially asserted that there were 67,146 "EEO-1 filers". We weren't sure exactly what this meant, since each "filer" must submit individual EEO-1 reports for its headquarters, each of its establishments with 50 or more employees, and optionally either an EEO-1 report for each establishment with fewer than 50 employees, or (assuming the employer hasn't already submitted a Type 8 report) a list of those establishments.

In this proposal, the EEOC notes that individual estimates for how long it takes to complete the EEO-1 report as it currently exists varied from commenter to commenter. The EEOC also seemed to distinguish between reports filed by individual establishments and reports filed from a corporate headquarters.

We're not sure why such a distinction was made, since the EEO-1 instructions make clear that reports are required for both a headquarters location (type 3), every other establishment with 50 or more employees (type 4), and all of the remaining establishments, using either the same grid format (type 8), or a list, in Excel, of establishments with fewer than 50 employees (type 6). Unfortunately, the type 6 report is not well known, and once an employer selects a type 8 report, it is impossible to change it back to a type 6.

There are two ways in which EEO-1 employment data can be provided "electronically": through an on-line data entry system, one cell at a time, one establishment report at a time, or through computerized data uploads. We understand from other sources that there are about as many employers who use the upload option as those who provide paper reports. However, as the EEOC well knows very few employers file using paper reports. The vast majority use the laborious, time-consuming, and potentially error-prone online data entry system. That is consistent with our experience preparing and submitting EEO-1 reports on behalf of some of our clients.

How laborious is this? To give an example, last year our firm completed an EEO-1 report for client with just under 200 employees, but with a headquarters location and twelve other establishments. The total process, setting up the data, and doing the data entry, took a total of 3.5 hours, about 15 minutes per form. That's just for the

Pl. MSJ 000181

"Component 1" report.   Seven racial/ethnic categories multiplied by two genders multiplied by ten EEO categories.

Now imagine setting up the same data, but adding twelve pay levels to each of those ten EEO categories, seven racial/ethnic categories, and two genders.   And then repeating the process, only this time, instead of reporting the number of people at each salary level by race/ethnicity, gender, and EEO category, you report total hours worked by salary level, race/ethnicity, gender, and EEO category.

Attached are separate reports for an organization employing 610 persons, with one headquarters location and 52 non-headquarters locations.   Since the layout of type 4 and type 8 reports are the same, it doesn't matter whether a location employs 50 or more persons, or fewer than that.

I invite the OMB to sit down at a computer monitor, log into an account at the EEOC, and begin data entry using the attached sample data, just to get an idea of how time-consuming and onerous a task this is.   And the EEOC proposes to increase the number of cells to 3,360 individual cells.   Yes, not every cell requires an entry, but you have to move from cell to cell to get to those that will contain data. And once a report is completed, the data-entry person has to cycle back and affirm certain identifying characteristics for that establishment, and then cycle back again to the listing of previously-filed reports, selecting the next report to edit, in order to update each of them with the current year's data.

The Census Bureau's 2013 statistics on business reported that there were 1,584,549 establishments with 100 or more employees in the United States.   The EEOC has already noted that all such employers are required to submit annual EEO-1 reports for each establishment.   Since the EEO-1 report is completed by establishment, it would thus seem more accurate to use the Census figure.   As we said before, assuming that the EEOC's original estimate of 6.6 hours was applicable for each establishment report, at $24 per hour, that would be a total annual cost (or "burden") of $250,992,561.69. Almost fifty times the EEOC's estimated cost.   Before the OMB approves this request under the provisions of the Paperwork Reduction Act, it needs to confirm that the EEOC has met its burden of demonstrating that the purported benefits of this proposal outweigh its enormous and burdensome cost.

The EEOC blithely asserts that employers need only purchase some sort of software to prepare and submit the reports electronically.   Unfortunately, the cost of this sort of software, which interfaces with both a company's HRIS system and its payroll system, is likely to be expensive, too expensive for many small businesses to have to shoulder. But since such software does not yet exist, the EEOC has no basis for its assertions.   At the moment, what we know is that most companies utilize the EEOC's online data entry system.   Even a Cortez Peters would have difficulty performing data entry with any speed.

**Conclusion**

Review of studies of pay differences between men and women suggest that there is no evidence of systemic pay discrimination on the basis of gender.   The EEOC's own statistics would appear to bear this out, and the OFCCPs record for identifying pay

EEOC Final Comment Request: Revision of the Employer -1 Report (EEO-1)

discrimination also underscores this point.  While these studies, both outside and inside the Federal government appear to show a fairly consistent six cent difference in pay between men and women, it cannot be attributed to gender discrimination.  As a result, there is no reason for collecting aggregate pay data from employers with over 100 employees, other than that the President of the United States has decreed that it be so.

It is our view that the revised Notice of Proposed Changes to the EEO-1 report should be rejected.  Not only is it not necessary, but it is extremely burdensome, costly, and would not provide any useful information to the EEOC that would assist in in determining whether or not systemic pay discrimination on the basis of race/ethnicity or gender is occurring in any employer's workforce.

Sincerely,

*J. Stanley Koper*
J Stanley Koper
Senior Vice President
Gaucher Associates

cc:    Richard A Gaucher
       Robert A. Anzalone

Attachments

Pl. MSJ 000183