**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL WOMEN'S LAW CENTER,
*et al.*,

        *Plaintiffs*,

      v.

OFFICE OF MANAGEMENT AND
BUDGET, *et al.*,

        *Defendants*.

No. 1:17-cv-02458 (TSC)

**<ins>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT</ins>**

## <u>INTRODUCTION</u>

When Congress amended the Paperwork Reduction Act in 1980, it granted the Office of Management and Budget's ("OMB") broad authority to oversee the review and approval of the Federal Government's collection of information to ensure that collections of information comport with the Act's statutory and regulatory requirements. The Act establishes a comprehensive administrative scheme that imposes compliance obligations on federal agencies that seek to propose collections of information and grants OMB oversight authority. As part of its oversight authority, OMB reviews proposed collections of information and upon completion of its review may render one of three decisions: approval, disapproval, or instruct the agency to make a substantive or material change.

As relevant here, the Paperwork Reduction Act also requires OMB to monitor previously-approved collections of information to ensure continued compliance with the Act's statutory and regulatory requirements. To that end, OMB has promulgated regulations that establish the agency's reconsideration processes, including the standards that govern reconsideration. It is a determination that OMB made in its reconsideration process that is the focus of this lawsuit.

Plaintiffs, the National Women's Law Center and the Labor Council for Latin American Advancement (collectively, "Plaintiffs"), filed this lawsuit because they object to OMB's determination that a collection of pay data information developed by the United States Equal Employment Opportunity Commission should be reconsidered. But Plaintiffs' lawsuit is misguided for several reasons. First, Plaintiffs lack standing for the reasons that Defendants explained in their Motion to Dismiss and for the additional reason that they do not have standing to challenge OMB's interim determination rendered in the connection with its reconsideration process.

Plaintiffs' claims also fail on the merits. OMB's determination to reconsider the EEOC's collection of information applies the agency's interpretation of its ambiguous regulations—an interpretation that is entitled to deference. Moreover, the record demonstrates that OMB had sound reasons for its determination that the challenged collection of information should be reconsidered.

Finally, Plaintiffs' statutory claim is based on a flawed interpretation of the statute. Accordingly, for these reasons and those set forth below, Plaintiffs' motion for summary judgment should be denied and Defendants' cross motion for summary judgment granted.

## BACKGROUND

I.    **The Office of Information and Regulatory Affairs within the Office of Management and Budget**

The Office of Management and Budget ("OMB") is an office within the Executive Office of the President of the United States. OMB's "mission is to assist the President in meeting his policy, budget, management, and regulatory objectives and to fulfill the agency's statutory responsibilities." *Office of Management and Budget*, https://www.whitehouse.gov/omb/ (last visited Dec. 21, 2018). In fulfilling its mission, every day OMB oversees the actions of nearly every agency within the Executive Branch. The Office of Information and Regulatory Affairs ("OIRA"), a statutory office within OMB, 44 U.S.C. § 3503(a), carries out that daily oversight and management in numerous areas.

OIRA reviews and manage the interagency consultation process for every significant rulemaking the Federal Government intends to issue. *See* Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) (establishing OIRA review of significant regulatory actions).

OIRA's responsibilities extend far beyond consultation and review in connection with proposed regulatory actions. The agency is responsible for overseeing the "implementation of Government-wide policies in the areas of information policy, privacy, and statistical policy";

"coordinating implementation of the Information Quality Act"; "coordinat[ing] the Administration's efforts to improve regulatory cooperation with [the United States'] key trading partners," https://www.whitehouse.gov/omb/information-regulatory-affairs/; providing guidance and oversight about the Privacy Act, 5 U.S.C. § 552a(v); making determinations under the Congressional Review Act, 5 U.S.C. § 804(2); and implementing numerous government-wide Executive orders. Exec. Order No. 13,771, 82 Fed. Reg. 9339 (Jan. 30, 2017) (implementing two-for-one regulatory offset and regulatory budget); Exec. Order No. 13,610 77 Fed. Reg. 28467 (May 10, 2012) (implementing regulatory retrospective review). Along with its many other responsibilities, OIRA also is responsible for administering the Paperwork Reduction Act, 44 U.S.C. §§ 3503(b), 3504, 3507, a statute that constrains how and when the Federal government may collect information from the public. *See generally* 44 U.S.C. §§ 3501 *et seq.*

## II.      The Paperwork Reduction Act

In 1980, "outcries from small businesses, individuals, and state and local government that they were being buried under [Federal government] demands for paperwork" led Congress to enact the Paperwork Reduction Act ("the PRA" or "the Act"). *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990); *see* H.R. Rep. No. 96-835, at 3 (1980) (explaining that then-prevalent Federal information practices were "drowning our citizens in a sea of forms, questionnaires, and reports"). The PRA established a "comprehensive scheme" to manage Federal agencies' "insatiable appetite for data." *Dole* at 32. The Congressionally mandated scheme has two fundamental prongs: the compliance obligations placed on agencies and the oversight authority granted to OMB.

First, the PRA obligates nearly every Federal agency to perform significant analysis of and provide public notification about collections of information[1] months in advance of when the

---

[1] With limited exceptions, the PRA defines "collection of information" to include "the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency,

agency seeks to begin gathering that information from the public. *See* 44 U.S.C. §§ 3502(1), (3) (defining "agency" and "collection of information" broadly). The PRA's core analytic provisions require the agency to develop a "specific, objectively supported estimate of [the collection's] burden," 44 U.S.C. § 3506(c)(1)(A)(iv), and to determine whether the collection "shall have practical utility." 44 U.S.C. § 3506(c)(2)(A)(i). As part of the process, the agency is required to issue Federal Register notices seeking public comment on the burden and utility anticipated due to the collection of information, 44 U.S.C. §§ 3506(c)(2)(A)(i)-(iv) and 44 U.S.C. § 3507(c)(2)(B), and evaluate those comments. 44 U.S.C. § 3507(a)(1)(B).

Second, OMB, through OIRA, plays an important role in overseeing agency implementation of the PRA.[2] The PRA grants OMB broad authority to "oversee the use of information resources to improve the efficiency and effectiveness of governmental operations . . . including burden reduction." *See* 44 U.S.C. § 3504(a)(1). Unless otherwise provided in the PRA, "the authority of an agency under *any other law* to prescribe policies, rules, regulations and procedures for Federal information resources management activities is subject to the authority of the Director under [the PRA]." *Id.* § 3518(a). As relevant here, OMB "provide[s] direction and oversee[s] . . . the review and approval of the [Federal government's] collection of information and the reduction of the information collection burden." *Id.* § 3504(a)(1)(B)(i). Thus, before Federal agencies impose collection of information burdens on the public, they submit those collections of information to OMB for review. *See id.* Absent OMB's review and approval, the PRA bars federal agencies from conducting or sponsoring collections of information from more

---

regardless of form or format, calling for . . . answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons." 44 U.S.C. § 3502(3)(A)(i). For example, the Internal Revenue Service's Form 1040, the United States Individual Income Tax Return, is a collection of information under the PRA and its implementing regulations. *See* 79 Fed. Reg. 24498, 24498 (Apr. 13, 2014).

[2] The PRA directs the Director of OMB to delegate to the Administrator of OIRA "the authority to administer all functions under [the Act]." 44 U.S.C. § 3503(b).

than nine respondents, including making any revisions to the collections of information. *See* 44 U.S.C. § 3507(a)(1)(C). During OMB's review, it must assess "whether the collection of information by the agency is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility." *Id.* § 3508. "To the extent, if any, that the Director determines that the collection of information by an agency is unnecessary *for any reason*, the agency may not engage in the collection of information." *Id.* (emphasis added).

Upon completion of its review, OMB may render one of three decisions: (1) approve the collection of information; (2) disapprove the collection of information; or (3) instruct the agency to make a substantive or material change to the collection of information. *See* 44 U.S.C. § 3507(c)(1), (e)(1). OMB may not approve a collection of information for "a period in excess of three years." *Id.* § 3507(g). As a result, repeated OMB review of individual agency collections of information is standard. *See, e.g., OMB Control Number History: 3046-0007*, https://www.reginfo.gov/public/do/PRAOMBHistory?ombControlNumber=3046-0007 (last visited Dec. 21, 2018) (identifying 47 OMB reviews of the EEO-1 form since 1978).

After OMB approves a collection of information, the agency "may not make a substantive or material modification . . . unless the modification has been submitted to the Director for review and approval." 44 U.S.C. § 3507(h)(3). In addition, after OMB has approved a collection of information, the PRA's public petition provision permits any person to "request the Director to review any collection of information . . . to determine[] if . . . a person shall maintain, provide, or disclose the information." *Id.* § 3517(b). Unless the request is frivolous, the Director may "take appropriate remedial action, if necessary." *Id.* § 3517(b)(2).

Furthermore, at any time prior to the expiration of the approval period, after consultation with the agency, OMB may reconsider its approval of a collection of information, and with respect

to collections of information not contained in a rule, stay the effectiveness of its prior approval of the information collection pending reconsideration.  5 C.F.R. § 1320.10(f), (g); *see* 44 U.S.C. §§ 3517(b), 3504(a)(1)(A), (a)(1)(B)(i), (c)(1).  OMB's regulations provide that it may initiate a review of a collection of information prior to the expiration date "when relevant circumstances have changed or the burden estimates provided by the agency at the time of its initial submission were materially in error." 5 C.F.R. § 1320.10(f).  During the reconsideration process, OMB's regulations direct the agency to submit a revised collection of information to OMB for its consideration.  *See id.*  In addition, "[f]or good cause" OMB may direct the agency to cease the collection of information pending OMB's review.  *Id.* § 1320.10(g).  An agency submitting new information to OMB must comply with the procedures and requirements contained in 5 C.F.R. Part 1320.  If, at the end of its review, OMB decides to disapprove or instruct an agency to make a substantive or material change to a collection of information, OMB must make its decision "publicly available and include an explanation of the reasons for such decision."  44 U.S.C. § 3507(e)(1).

### III.    The 2016 EEO-1 Form Revision

The component of the Employer Information Report (EEO-1) form at issue in this case is a newly-developed pay data component to a longstanding collection of information that the EEOC has used for over fifty years to collect employee demographic information. Since 1966, the EEOC (and the Office of Federal Contract Compliance Programs) has used EEO-1 data to "support civil rights enforcement and to analyze employment patterns, such as the representation of women and minorities within companies, industries or regions."   Equal Employment Opportunity Commission, *EEO-1: Answers to Filing Questions Often Asked by Employers*, https://www.eeoc.gov/employers/eeo1survey/faq.cfm (last visited Dec. 21, 2018). The form

collects employer data about employees' "ethnicity, race, and sex by job category." 81 Fed. Reg. 45479 (July 14, 2016). The ten job categories into which employers are required to divide their employees for purposes of EEO-1 reporting are fairly broad. *See* Equal Employment Opportunity Commission, *EEO-1 Instruction Booklet*, https://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm (last visited Dec. 21, 2018). For example, the "Professionals" reporting category included fields as disparate as artists, airline pilots, dieticians, nurses, lawyers, physicians, and teachers. *Id.* By 2011, the standard EEO-1 form had become so commonplace that the agency only received one comment when it sought to renew the collection. *See* 76 Fed. Reg. 22897, 22897 (Apr. 25, 2011) ("Only one comment was received and it supported EEOC's intent to request a three-year extension.").

In 2016, the EEOC decided to change the form. Component 1 of the form would mirror what EEOC had in place before by "collect[ing] the same data that [was] gathered by the [then] approved EEO-1" form. 81 Fed. Reg. 5113, 5113 (Feb. 1, 2016). Component 2, however, would work a significant change. For the first time, the EEO-1 form would begin to "collect summary data on employees' W-2 earnings and hours worked." Senator Alexander, the Chairman of the Senate Committee on Health, Education, Labor, and Pensions (one of the committees that oversees the EEOC) recognized that the revision would "increase[] the data collection 20-fold from 180 [data points per establishment] to 3,660 [data points per establishment] for reach report . . ." OMB_0001022. On February 1, 2016, the EEOC published a 60-day notice in the Federal Register, announcing its intent to seek a three-year approval from OMB of "a revised Employer Information Report (EEO-1) data collection." 81 Fed. Reg. at 5113. The EEOC also sought "public comment on the utility and burden of collecting pay data and hours-worked data through the EEO-1 data collection process." *Id.* In compliance with OMB's PRA regulations, the EEOC gave interested

stakeholders 60 days in which to provide their comments on the proposed revised data collection. *Id.*

Unlike the 2011 PRA renewal notice, , the 2016 PRA notice received extensive stakeholder interest, including "322 timely public comments" from a broad range of groups: "individual members of the public, employers, employer associations, Members of Congress, civil rights groups, women's organizations, labor unions, industry groups, law firms, and human resources organizations." 81 Fed. Reg. 45479, 45480 (July 14, 2016). The EEOC's second public notice dated July 14, 2016 went into detail about the range of views. *Id.* There were mass mail campaigns both supporting and opposing the collection. *Id.* Some stakeholders supported the collection's issuance, including supporting collecting W-2 income data, *see id.* at 45485, but others raised concerns about that very point. *Id.* at 45486-87. The latter group of commenters noted that W-2 income could not distinguish between discrimination and employee discretion, such as when an employee elected to participate in overtime or simply worked faster and received commission for his or her work. *Id.* There were other concerns about burden, *e.g.*, *id.* at 45486, practical utility due to the overly broad pay bands, *e.g.*, *id.* at 45489, and privacy. *E.g.*, *id.* at 45491-92. A March 16, 2016 hearing further emphasized the absence of consensus about whether the OMB should approve the revision. Equal Employment Opportunity Commission, *Hearing of March 16, 2016 – Public Hearing: Proposed Revisions to the EEO-1 Report*, https://www.eeoc.gov/eeoc/meetings/3-16-16/index.cfm (last visited Dec. 21, 2018); *compare* Equal Employment Opportunity Commission, *Statement of Ariane Hegewisch*, https://www.eeoc.gov/eeoc/meetings/3-16-16/hegewisch.cfm (last visited Dec. 21, 2018) ("The aggregated occupation and pay data will provide valuable new information to the enforcement agencies on occupation and industry patterns and on patterns of employment and earnings inequality by gender, race and ethnicity."), *with* Equal Employment

Opportunity Commission, *Statement of Camille Olson*, https://www.eeoc.gov/eeoc/meetings/3-16-16/olson.cfm (last visited Dec. 21, 2018) ("[W]e are . . . concerned with the current attempt to revise the EEO-1 form without any input from the employer community and in a process so violative of the Paperwork Reduction Act.").

After receiving and carefully assessing this conflicting information, the EEOC made a judgment call. "Balancing utility and burden, the EEOC has concluded that the proposed EEO-1 pay data collection would be an effective and appropriate tool for this purpose . . . ." 81 Fed. Reg. at 45483. On September 29, 2016, OMB approved the EEOC's revised EEO-1 data collection, including the EEOC's request to collect summary pay data using Component 2.  Compl. ¶¶ 9, 91 ECF No. 1.

### IV.    Circumstances Leading to the August 2017 Review and Stay of Component 2

Concerns about Component 2 strengthened and expanded. With OMB's September 2016 approval, stakeholders had a new means of redress under the PRA. On February 27, 2017, soon after the start of the new administration, the U.S. Chamber of Commerce submitted a petition to OMB under § 3517. OMB_0000332–40. The nine-page petition requested that OMB review and stay Component 2. It reiterated previous Chamber comments that EEOC's $53.5 million burden estimate was in tension with the Chamber's own analysis, based on an actual survey of employers, that the expanded form would impose $400.8 million of burdens. OMB_0000336. The petition explained that after the approval "the Chamber continue[d] to receive information from members indicating that the EEOC materially underestimated the burden that the revised form would impose." *Id.* A similar § 3517 petition from a constellation of 27 trade associations followed on March 20, 2017, and explained that "[w]hile the [associations] support[ed] the overall goal of

combatting compensation discrimination, [they did] not support the final changes to the EEO-1 report." OMB_0000968.

The Equal Employment Advisory Council ("EEAC") also sent a petition on March 20, 2017, and highlighted additional concerns. The EEAC explained it was "dismay[ed] that the EEOC for all intents and purposes chose to ignore the recommendations made in a 2012 report that the agency commissioned from the National Academy of Sciences." OMB_0000307. The EEAC also highlighted a new concern. It explained that after the second notice, the EEOC published a data file specification that employers could use to submit data to the EEOC. OMB_0000308. Instead of using other methods, a number of respondents "file[d] by uploading a data file so that the information goes nearly directly . . . to the survey database." 81 Fed. Reg. 5113, 5120 n.62. In 2014, 1,449 firms filed the EEO-1 form using the data file specifications, which accounted for 704,654 of the EEO-1 reports filed that year. *Id.* The EEAC explained that nowhere in "the EEOC's 60-day notice, 30-day notice, or relevant supporting materials [did the] EEOC describe how employers are to create this [data file] spreadsheet or the burdens that will be imposed in doing so other than the general burden estimate . . . ." OMB_0000310. The EEAC listed seven questions that the agency should have considered related to the data file specification spreadsheet and file uploading process and explained that the issues with the data file specifications alone should provide sufficient independent grounds for OMB to reconsider its decision to approve the collection. OMB_0000310–11. An April 2017 letter from the HR Policy Association, which represented "the most senior human resources executives in more than 380 of the largest companies in the United States," reiterated the EEAC's concerns about the procedurally suspect data file specifications, noting that "[t]he new data file specifications look nothing like what OMB approved." OMB_0000365–66.

Other groups sent materials to OMB supporting the ongoing collection of information. OMB_0001041–51, OMB_000356–63, OMB_0000977–81. As these varied petitions arrived and continued to arrive, OMB determined that the petitions identifying concerns with the Component 2 data collection raised legitimate issues that needed to be resolved. These concerns led OIRA to assess whether the agency should initiate a review and immediate stay of the effectiveness of the EEO-1 pay data collection, OIRA initiated a dialogue with the EEOC about how to understand and address the issue. In April 2017, Deputy Administrator of OIRA, Dominic Mancini, emailed the EEOC's Acting Chair, Victoria Lipnic, about OMB's proposed review and stay and the need to consult with EEOC. *See* Declaration of Dominic Mancini ("Mancini Decl.") ¶ 3, ECF No. 25-1; Declaration of Victoria Lipnic ("Lipnic Decl.") ¶ 4.b, ECF No. 25-1. Deputy Administrator Mancini also spoke on the phone with EEOC Chief of Staff James Paretti about the materials that OMB needed for consultation. *See* Mancini Decl. ¶ 3. In person discussions followed in May 2017, when Mancini, Lipnic, Paretti, and others met in person to discuss the revised EEO-1. *Id.*; Lipnic Decl. ¶ 4.c.

Congress confirmed Administrator Rao on July 10, 2017. At that point, OMB and the EEOC had consulted across several months and received a number of petitions. Shortly after the Administrator's confirmation, Acting Chair Lipnic sent Administrator Rao a memorandum regarding EEO-1, and Mancini and Paretti continued to confer about the collection. Mancini Decl. ¶ 3; Lipnic Decl. ¶ 4.d. Two more petitions arrived, renewing previous petitions. OMB_0000982–92; OMB_0000312–28. On August 28, 2017, Lipnic and Rao had a phone call to discuss the EEO-1. Mancini Decl. ¶ 3; Lipnic Decl. ¶ 4.e.

After this series of petitions and back and forth between the agencies, on August 29, 2017, Administrator Rao sent a memorandum to Acting Chair Lipnic, stating OMB's decision to initiate

a review and stay of the EEOC's new collection of pay data under Component 2. *See* Compl. ¶¶ 95–96; *see also* Exhibit A (attached hereto). The August 29, 2017 OMB letter explained that it made this decision, "[a]fter careful consideration and consultation with the [EEOC] and in accordance with the [PRA] and its regulations at 5 CFR 1320.10(f) and (g)." OMB_0000299. The letter stated that OMB had "determined that each of the[] conditions for review [under § 1320.10(f) and (g)] ha[d] been met" and then further explained the basis for that conclusion. *Id.*

Specifically, OMB noted that after its September 29, 2016 approval, the EEOC "ha[d] released data file specifications for employers to use in submitting EEO-1 data," but that the "specifications were not contained in the Federal Register notices as part of the [PRA's] public comment process, nor were they outlined in the supporting statement for the collection of review." *Id.* OMB delineated its concern that "the public did not have an opportunity to provide comment on the method of data submission to [the] EEOC" and its additional concern that the EEOC's "burden estimates did not account for the use of these particular data file specifications which," in OMB's view, "may have changed the initial burden estimate." *Id.*

The August 29, 2017 OMB letter also explained OMB's decision to stay the effectiveness of the Component 2 pay data collection "for good cause" under § 1320.10(g), specifically noting its "concern[] that some aspects of [Component 2] lack[ed] practical utility, [we]re unnecessarily burdensome, and d[id] not adequately address privacy and confidentiality issues." OMB_0000299-300. As a result of its decision to initiate a review and stay of Component 2, the letter directed the EEOC to publish a notice in the Federal Register "announcing the immediate stay of effectiveness of the" pay data collection but "confirming that businesses may use the previously approved EEO-1 form [Component 1] in order to comply with their reporting obligations for FY 2017." *Id.*

On September 15, 2017, in accordance with its obligations under § 1320.10(g), the EEOC published a Federal Register Notice instructing EEO-1 filers not to submit Component 2 pay data with their EEO-1 forms. *See* 82 Fed. Reg. 43,362 (Sept. 15, 2017). The EEOC's Federal Register notice explained that OMB had issued a memorandum stating its decision to "review and stay" the Component 2 pay data collection. *Id.* at 43,363. The notice stated that the "EEOC will continue to collect EEO-1 Component 1 data from all filers during OMB's review and stay." *Id.* Finally, the August 29, 2017 letter had also explained the next step in the process: OMB's regulations "require[d] [the] EEOC to submit a new information collection package for the EEO-1 form to OMB for review." OMB_0000300.

## STANDARD OF REVIEW

Plaintiffs continue to "bear the burden of demonstrating they have standing to pursue their claims" on summary judgment. *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 239 (D.C. Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). However, at summary judgment, the court "will not presume the missing facts necessary to establish an element of standing." *Id.* at 240 (internal quotation marks omitted). Rather, Plaintiffs must "set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." *Id.* (internal quotation marks omitted); *see also Sharp v. Capitol City Brewing Co., LLC*, 680 F. Supp. 2d 51, 57 (D.D.C. 2010) ("[T]o survive a motion for summary judgment, the plaintiff must present to the Court 'specific facts' that demonstrate injury *to the plaintiff*."). Where, as here, the Plaintiffs' affidavits present only "a series of speculative assumptions," the Court must deny Plaintiffs' motion for summary judgement and dismiss Plaintiffs' claims. *San Juan Audubon Soc'y v. Wildlife Servs., Animal & Plant Health Inspection Serv.*, 257 F. Supp. 2d 133, 142 (D.D.C. 2003).

On the merits of Plaintiffs' claims, in APA challenges, "the typical summary judgment standards set forth in Federal Rule of Civil Procedure 56 are not applicable." *Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 77 (D.D.C. 2013). Rather, "when a party seeks review of agency action under the APA, the district court sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote omitted). If, as here, "the agency action is supported by the administrative record and otherwise consistent with the APA standard of review," the Court must grant summary judgment in the agency's favor. *Lubow v. U.S. Dep't of State*, 923 F. Supp. 2d 28, 34 (D.D.C. 2013) (internal quotation marks and citation omitted).

## STANDARD OF REVIEW

Plaintiffs continue to "bear the burden of demonstrating they have standing to pursue their claims" on summary judgment. *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 239 (D.C. Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). However, at summary judgment, the court "will not presume the missing facts necessary to establish an element of standing. *Id.* at 240. Rather, Plaintiffs must "set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." *San Juan Audubon Soc'y v. Wildlife Servs., Animal & Plant Inspection Serv.*, 257 F. Supp. 2d 133, 138 (D.D.C. 2003) (internal citations and quotations omitted); *see also Sharp v. Capitol City Brewing Co., LLC*, 680 F. Supp. 2d 51, 57 (D.D.C. 2010) ("[T]o survive a motion for summary judgment, the plaintiff must present to the Court specific facts that demonstrate injury *to the plaintiff*.") (emphasis in original). Where, as here, the Plaintiffs' affidavits present only "a series of speculative assumptions," the Court must deny Plaintiffs' motion for summary judgement and dismiss Plaintiffs' claims. *San Juan Audubon Soc'y*, 257 F. Supp. 2d at 142.

On the merits of Plaintiffs' claims, in APA challenges, "the typical . . . standards set forth in Federal Rule of Civil Procedure 56 are not applicable." *Styrene Info. & Research Ctr., Inc. v. Sebelius*, 994 F. Supp. 2d 71, 77 (D.D.C. 2013). Rather, "when a party seeks review of agency action under the APA, the district court sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). If, as here, "the agency action is supported by the administrative record and otherwise consistent with the APA standard of review," the Court must grant summary judgment in the agency's favor. *Lubrow v. United States Dep't of State*, 923 F. Supp. 3d 28, 34 (D.D.C. 2013) (internal quotation marks and citation omitted).

## ARGUMENT

I.  **PLAINTIFFS LACK STANDING TO CHALLENGE OMB'S DECISION TO INITIATE A REVIEW AND STAY OF COMPONENT 2.**

As set forth in detail in Defendants' Motion to Dismiss briefing, Plaintiffs have not shown that they have standing to challenge OMB's decision to initiate a review and stay of the Component 2 pay data collection. Plaintiffs do not dispute that there is no statutory provision requiring the disclosure of the Component 2 pay data and, thus, that they have no entitlement (statutory or otherwise), a concession that is fatal to their claim of informational injury. *See* Defs.' Mot. to Dismiss, ECF No. 11-1. The same is true of Plaintiffs' claims of organizational injury, which are premised on the use of aggregate pay data that has never before existed and, for this reason, the absence of which cannot be the basis of any purported harm to Plaintiffs' organizational interests. *See id.*

There is an additional basis for which this suit merits dismissal. Under settled D.C. Circuit precedent, Plaintiffs lack standing to challenge a decision rendered in the context of an informal adjudication to which they are not a party. *See, e.g.*, *Conference Grp., LLC v. FCC*, 720 F.3d 957,

963 (D.C. Cir. 2013) (internal citation omitted); *Goodman v. FCC*, 182 F.3d 987, 992, 994-95

(D.C. Cir. 1999).  Plaintiffs are not a "party" to the discussions between OMB and the EEOC

regarding OMB's concerns about Component 2's compliance with PRA requirements.  Plaintiffs'

attempt to insert themselves as stakeholders into a regulatory process designed to afford the two

agencies an opportunity to address concerns whether the EEOC's collection of Component 2 pay

data complies with the requirements of the PRA is misguided.  Indeed, the D.C. Circuit has

expressly "rejected the view that 'the mere potential precedential effect of an agency action affords

a bystander to that action a basis for complaint.'"  *Conference Grp.*, 720 F.3d at 963 (internal

citation omitted).

This Article III principle applies with full force here.  Plaintiffs are "bystanders" to the

administrative proceedings between the EEOC and OMB, *see Conference Grp.*, 720 F.3d at 964,

even though they argue that they have a strong interest in using the Component 2 pay data and thus

on that basis object to OMB's decision to initiate a review and stay of Component 2.  But "a

'sincere, vigorous interest in the action challenged, or in the provision of law violated, will not do

to establish standing."  *Id.* at 964 (quoting *Capital Legal Found. v. Commodity Credit Corp.*, 711

F.2d 253, 258 (D.C. Cir. 1983)).  Accordingly, because Plaintiffs are not a party to the underlying

administrative proceedings, they lack standing to challenge OMB's decision to initiate a review

and stay of the collection of pay data under Component 2.  *See id.* at 966 (dismissing plaintiff's

challenge to the FCC's order because plaintiff "was not a party to th[e] adjudication and fails to

show standing to object to the merits of the adjudication").

## II.    THE CHALLENGED DETERMINATION FALLS WELL WITHIN OMB'S AUTHORITY UNDER THE PRA AND ITS INTERPRETATION OF ITS OWN REGULATIONS IS ENTITLED TO DEFERENCE.

This suit seeks to challenge OMB's determination to initiate a review and stay of the Component 2 pay data, which is the first step in OMB's multi-step reconsideration process. *See* Defs.' MTD, Reply at 12, ECF No. 18. This process includes consultation with the EEOC to address the concerns raised in the challenged August 2017 memorandum, *see* 44 U.S.C. §§ 3504(a)(1)(A), (a)(1)(B)(i), (c)(1); *see also* Mancini Decl.; Lipnic Decl., and the administrative processes set forth in 5 C.F.R. Part 1320. As Defendant previously explained, OMB's administrative process is designed to culminate in a final (and thus reviewable) approval or disapproval decision by OMB. *See* Defs.' MTD, Reply at 20-26 (explaining that the decision to initiate a review and stay is not "final agency action" under the APA). In other words, OMB's decision "to 'initiate a review and stay' of the challenged collection" is merely a preliminary step, to be followed by several interlocutory steps in the  administrative process set forth in the regulation, leading up to  "the agency's 'definitive position' either approving or disapproving of the EEOC's pay data collection."  Defs.' Reply at 12 (quoting *DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996), *reh'g denied*, 83 F.3d 1482 (D.C. Cir. 1996)).

Plaintiffs wholly ignore the preliminary nature of the challenged determination and the attendant administrative steps to be completed as the EEOC and OMB work to resolve the concerns addressed in the August 2017 Rao Memorandum.  Instead, Plaintiffs accuse OMB of (1) "violating its own regulations" by initiating a review and stay of Component 2 without satisfying the standard set forth in the agency's regulations; (2) providing a "conclusory and implausible explanation" as the basis for its decision; and (3) impermissibly intruding on the EEOC's civil rights enforcement authority in violation of § 3518(e) of the PR.  *See* Pls.' Mem. at 13-14, 26-29.  These arguments fall wide of their intended mark and are without merit.

First, OMB's interpretation of its "review and stay" regulations is entitled to deference, and its application of this standard with respect to Component 2's pay data collection is well-supported by the record.  Second, the August 2017 Rao Memorandum's explanation for the basis of its determination to initiate a "review and stay" more than satisfies the minimal procedural standards applicable to agency determinations, such as this one, rendered at an interlocutory step in connection with an informal administrative process.  Finally, OMB's assessment to initiate a review and stay of Component 2 falls well within the scope of its broad authority under the PRA, and Plaintiffs' argument otherwise is based on a flawed interpretation of § 3518(e) of the Act.

### A. OMB's Determination to Initiate a Review and Stay Of Component 2 Is a Reasonable Interpretation Of The Agency's Regulations And Supported By the Record.

OMB promulgated regulations set forth in 5 C.F.R Part 1320, which delineate the procedures and requirements that govern the agency's review of collections of information  As relevant here, § 1320.10 establishes the procedures and requirements that govern collections of information not contained in a rule, such as the Component 2 pay data collection at issue here.[3] Section 1320.10 also establishes OMB's authority to review and stay a previously-approved collection of information not contained in a rule "pending" OMB's reconsideration process and the standards applicable to OMB's reconsideration authority.  *See* 5 C.F.R. § 1320.10(f), (g).

For example, § 1320.10(f) states that:

> Prior to the expiration of OMB's approval of a collection of information, OMB may decide on its own initiative, after consultation with the agency, to review the collection of information. Such decisions will be made only when relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error. Upon notification by OMB of its decision to review the collection of information, the agency shall submit it to OMB for review under this part.

---

[3] Under OMB's interpretation of the PRA, the collection of information contained in the EEO-1 is a "collection of information *not* contained in a rule" because the EEOC's regulation, 29 C.F.R. § 1602.7, authorizes the collection but does not itself specifically contain the EEO-1 form.  *See* Defs.' Br. at 4 n.2, ECF No. 11-1 (Feb. 13, 2018).

*Id.* § 1320.10(f).  And § 1320.10(g) provides that:

> For good cause, after consultation with the agency, OMB may stay the effectiveness of its prior approval of any collection of information that is not specifically required by agency rule; in such case, the agency shall cease conducting or sponsoring such collection of information while the submission is pending, and shall publish a notice in the Federal Register to that effect.

*Id.* at § 1320.10(g).

Plaintiffs do not challenge OMB's authority to "review and stay" a previously-approved collection of information not contained in a rule, nor could they given that the agency promulgated these two regulatory provisions pursuant to an express delegation of rulemaking authority under the PRA.  *See* 44 U.S.C. § 3516.   Instead, Plaintiffs challenge OMB's application of these two regulations in connection with its decision to initiate a review and stay of Component 2, arguing first that the record does not support OMB's conclusion that "relevant circumstances have changed" and/or that "the burden estimates given by [the EEOC] were materially in error."  Pls.' Mem. at 14-18.  They next assert that OMB did not have "good cause" as required under § 1320.10(g) to stay Component 2.

The flaw underlying Plaintiffs' arguments is that, as Plaintiffs tacitly acknowledge, *see* Pls.' Mem. at 18-19, neither the PRA nor OMB's regulations define when "relevant circumstances have changed," what constitutes a "material error" in the burden estimates initially provided, or when "good cause exists" warranting OMB's decision to initiate a review and stay of a previously-approved collection of information.   *See* 5 C.F.R. § 1320.10(f), (g).  And, under well-established principles of administrative law, OMB's interpretation of its ambiguous regulations is entitled to "defer[ence]" unless it is "'plainly erroneous or inconsistent with the regulation.'"  *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 613 (2013) (internal citation omitted); *see Otsuka Pharm. Co., Ltd.*

*v. Burwell,* 302 F. Supp. 3d 375, 390 (D.D.C. 2016) (internal quotation marks and citation omitted).[4]

Deference to OMB's interpretation is particularly warranted here given Congress's decision to "designate[] OMB the overseer of other agencies with respect to paperwork" and establish "a comprehensive regulatory scheme designed to reduce the paperwork burden." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990); *see also* 44 U.S.C. § 3504(a)(1)(B)(i).  To be sure, under the PRA, agencies that seek to collect information from the public or regulated entities must evaluate, *inter alia*, the need for a proposed collection of information and the burden imposed by the same.  *See* 44 U.S.C. § 3506(c)(1)(A)(i), (iv).  But Congress also established "a second layer of review by OMB," *see Dole*, 494 U.S. at 3, pursuant to which OMB may not approve an agency's proposed collection of information without first determining whether the collection of information by the agency is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility.  *See* 44 U.S.C. § 3508.

As relevant to this case, the PRA's "second layer of review" also requires OMB to monitor collections of information for continued compliance with the Act and its regulatory requirements even after OMB approval.  *See id.* §§ 3504(a)(1)(A), (a)(1)(B)(i), (c)(1) & 5 C.F.R. §§ 1320.10(f), (g).  It is pursuant to this authority that OMB, after consultation with the EEOC, initiated a review and stay of Component 2 pending reconsideration.  *See id.*

---

[4] Plaintiffs accuse OMB of failing to apply the "good cause" standard set forth in the preambles to both the agency's 1982 Notice of Proposed Rulemaking and the 1983 Final Rule. *See* Pls.' Mem. at 18.  This argument has no merit.  "Generally speaking, preambles to rules are not binding on agency actions." *Nat. Res. Def. Council v. EPA*, 599 F.3d 561, 564-65 (D.C. Cir. 2009).  Even if there is a basis for concluding otherwise, Plaintiffs' argument still fails because the factual bases underpinning OMB's decision to initiate a review and stay of Component 2 show that the pay data collection as is "significantly contrary to the standards of the Act." 47 FR 39515, 39521-22.

As set forth in the August 2017 Rao Memorandum, OMB decided to initiate a review and stay of Component 2 based on its concern that "relevant circumstances had changed and/or the burden estimates provided by the EEOC at the time of submission were materially in error" such that the challenged collection did not meet the standards of the PRA. *See* OMB_0000299. The August 2017 Memorandum explains that in OMB's view, because the EEOC "had not released the data file specifications for employers to use in submitting" the Component 2 pay data during the public comment process, "the public did not receive an opportunity to comment on the method of data submission to [the] EEOC" as required under the PRA. *Id.* And because the particular data specifications were released *after* the public comment period *and* the agency's approval of Component 2, OMB opined that the release of this information "changed the initial burden estimates." *Id.* In addition to these stated concerns, OMB noted that "some aspects of the revised collection of information lack practical utility, are unnecessarily burdensome, and do not adequately address privacy and confidentiality concerns." *Id.* at OMB_0000300.

For example, in the early months of 2017, OMB received several letters from interested stakeholders expressing concern about the released data specification files. *See, e.g.*, OMB_0000305-0000311; OMB_0000321-0000328; OMB_0000332-0000340; OMB_0000367-370. These letters expressed concern that Component 2 was approved without providing the public an opportunity to comment on the data specification files for Component 2, including the formatting changes attendant with this new collection. *See id.*

To this point, filers understood that the total amount of data fields under Component 2 would grow from 180 to 3,660. *See, e.g.* OMB_0000306. However, when the EEOC released the data file specifications for Component 2, OMB became aware that these 3,660 fields would require nearly 28,000 characters of information. *Id.* As the record shows (and contrary to Plaintiffs'

claims otherwise), interested stakeholders had been unaware of the magnitude of the formatting changes required by Component 2 prior to seeing the data file specifications. *See* OMB_0000305; OMB_0000368; OMB_0000327.

Plaintiffs pay short shrift to these concerns, insisting that the 30-day and 60-day PRA notices published by the EEOC sufficiently "described" the content of the data specification files (even if they were not actually provided until after OMB approval), and minimizing OMB's response to concerns about the magnitude of the formatting changes about which the public had been unaware until the release of the data specification files. *See* Pls.' Mem. at 14-15. In their view, the release of the data specification files is not a "relevant change in circumstances" sufficient to trigger a "review and stay under § 1320.10(f) and (g). Plaintiffs are wrong on both scores.

Given the number of interested stakeholder letters the agency received in early 2017 complaining about Component 2's data file specifications, as well as the articulated bases for the concerns, it was reasonable for OMB to find that Component 2 was likely not in compliance with the requirements of the PRA's notice and comment requirements. This record evidence also underscores OMB's valid concern that the significant formatting changes required by Component 2 could impose a burden on regulated entities. The PRA expressly directs OMB to assess and monitor the burden imposed by a collection of information. *See* 44 U.S.C. 3506(c)(1)(A)(iv). In OMB's experience reviewing proposed collections of information, the formatting required to submit a collection of information can, under certain circumstances, impose a burden on regulated entities. As a former Administrator has explained, "[i]f poorly designed or unduly complex, [collections of information] can prove difficult and confusing, especially for individuals and small businesses." Cass Sunstein, Testing and Simplifying Federal Forms, OMB (Aug. 9, 2012),

*available at* https://obamawhitehouse.archives.gov/sites/default/files/omb/inforeg/memos/testing-and-simplifying-federal-forms.pdf .  Given the fact that interested stakeholders and regulated entities had not been provided an opportunity to comment on the data specification files prior to approval of the Component 2 data collection, it was not unreasonable for OMB to find that "relevant circumstances had changed" as a result of the burden imposed by the formatting changes required by Component 2.

Equally unavailing is Plaintiffs' contention that there is no support for OMB's decision to initiate a review and stay of Component 2 based on its concern that the burden estimates for Component 2 that were initially supplied by the EEOC were likely in material error.  Although the EEOC's 60-day PRA notices "encourage[d] employers, in their comments" to provide "data regarding the estimated time that staff w[ould] spend to report the employer's pay and hours-worked data and the corresponding wage rates for that staff," *see* 81 Fed. Reg. at 5121, because the data file specifications for Component 2 were not available until *after* the time of public comment employers could not conceivably "evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information," especially given that Component 2 was the first of its kind and magnitude. [5]  *See* 44 U.S.C. § 3506(c)(2)(A)(ii).

Nor are OMB's burden concerns overstated.  As the record shows, both during the public comment period and after Component 2 was approved, interested stakeholders opined that the

---

[5] Plaintiffs argue that because 1,449 firms constitute only two percent of filers that the absence of any burden estimate in EEOC's notices is too small to constitute a material error in the burden estimate. Pl. MSJ at 24 n.12. First, the PRA itself identifies how many respondents are important. And the PRA sets the threshold for clearance of "collections of information" at ten respondents, *see* 44 U.S.C. 3502(3), well below the 1,449 submitting through data files. Second, firms file on average three or four EEO-1 reports per year. *See* 76 Fed. Reg. 6468, 6469 (identifying average reporting statistics in a 2011 PRA Federal Register notice). In 2014, firms using the data file specification at issue, however, filed 704,654 / 1,449 = 486.3 reports per firm—a hundred times the amount of information the average firm provides. *See* 81 Fed. Reg. 5113, 5120 n.62. Thus, the two percent statistics plaintiffs cite is, at best, a misunderstanding of reporting obligations under the EEO-1 form. Even if the PRA's express statutory language does not end the inquiry for some reason, it is clear that the 1,449 firms using data file uploads to comply with their obligations constitute a significant portion of the reporting universe.

methodology that the EEOC used to derive its initial burden estimate was flawed and underestimated the time and cost that it would take employers to develop programs and systems for reporting the Component 2 pay data. *See* OMB_0000325-327; OMB_0000335-336. Indeed, as set forth in the March 2017 Chamber of Commerce letter, the initial burden estimates for Component 2 were "absurdly low," and the organization continued to receive complaints from its employer members about the burden imposed by Component 2's filing requirements. OMB_0000336.

Plaintiffs belittle these concerns, instead pointing to the conclusions from the EEOC's pilot study and 2-day working group meeting of statisticians, human resources information systems experts, and information technology specialists who reviewed the proposed pay data collection in 2010 and provided "feedback . . . that the burden of reporting pay data would be minimal" for employers. *See* Pls.' Mem. at 6. However, because the study and working group participants did not *review* and *study* the actual data file specifications, OMB concluded that the participants' "feedback" was not probative of the burden estimates associated with Component 2. Accordingly, OMB reasonably determined that based on the comments expressing concern in *anticipation* of the potential burden imposed by the new collection, and the many interested stakeholders and employers that wrote to OMB to complain about the burden imposed by Component 2 *after* the released data file specifications, *see* OMB_0000305; OMB_0000368; OMB_0000327,, the initial estimates of the burden imposed by the Component 2 pay data collection were likely (as opposed to speculatively, *see* Pls.' Mem. at 19)"materially in error."

Plaintiffs' remaining argument about the purported deficiencies in OMB's decision to initiate a review and stay of Component 2 are easily dispensed with. Plaintiffs take aim at the Rao Memorandum's statement about OMB's "concern[] that some aspects of the [Component 2 pay

data collection] lack practical utility, are unnecessarily burdensome, and do not adequately address privacy and confidentiality issues," arguing that OMB provided no explanation for its conclusion and that the record on which the EEOC relied when it proposed the new collection adequately addresses these concerns.  Pls.' Mem. at 19-20.

As an initial matter, Plaintiffs ignore the context in which OMB issued the August 2017 Rao Memorandum.  As the record shows, the August 2017 Memorandum was written after five months of meetings, telephonic conferences, and email and other written communications between the agency heads of the EEOC and OMB and their respective staff.  *See, e.g.*, Mancini Decl. ¶¶; *see also* Lipnic Decl. ¶¶.  The August 2017 Memorandum simply summarizes the issues and concerns which were the focus of the two agencies' deliberations in the prior five-month period.  The Memorandum's "brief statement of the grounds" for the decision is more than sufficient under these circumstances.  *See, e.g.*, *City of Colorado Springs v. Solis*, 589 F.3d 1121, 1134 (10th Cir. 2009) (quoting 5 U.S.C. § 555(e)).

More fundamentally, OMB's concerns regarding the practical utility of, and the burdens imposed by Component 2, including the referenced "privacy and confidentiality issues" is well-supported by the record before the agency.  During the proposed collection's public notice period, the EEOC received comments questioning the practical utility of collecting pay data in the manner required by Component 2.  *See* OMB_0000336; OMB_0000338-339.  For example, an EEOC commissioned report recommended that the EEOC collect data on "rates of pay, not actual earnings or pay bands."  *Id.* at OMB_0000102.  The EEOC   Yet, the EEOC decided to collect aggregate yearly earnings in pay bands and then give employers the option of using a "proxy" of 20 or 40 hours per week for salaried workers.  *See* 81 Fed. Reg. 45479, 45488-89.  If, in reality,

salaried employees often work more than 40 hours a week, use of this proxy could affect the accuracy of data calculations estimating the rate of hourly pay.

Still other commenters cautioned the EEOC against requiring employers to report pay data based on W-2 wages. *See* OMB_0000368. These commenters explained that to obtain a statistically meaningful pay dataset, the EEOC should require employers to report annualized rates of compensation or base rates of pay. *Id.* To that point, the comment submitted by Society for Human Resources Management carefully articulated the reasons that reporting pay based on information derived from a W-2 is an unreliable indicator of discrimination. *Id.* These concerns about the validity of the dataset derived from the Component 2 aggregate pay data is further underscored by the 2012 National Academy of Sciences report, which recommended that EEOC first develop a comprehensive plan for using pay data and then conduct a pilot study to test the utility of the proposed pay collection. OMB_0000101. The EEOC did not adopt this recommendation and instead relied on the feedback provided during a series of focus groups in which employers participated.

In addition to OMB's concerns about the practical utility of Component 2, it also opined that there were no adequate procedures to safeguard the confidentiality and privacy interest of employees whose salary and pay information would be reported to the EEOC. The PRA requires federal agencies to ensure that the "collection . . . of information by or for the Federal government is consistent with applicable laws, including laws relating to . . . privacy and confidentiality . . . [and] security of information." 44 U.S.C. § 3501(8)(A)-(B). To be sure, the EEOC has stated that it will not release data identified as submitted from a single employer and also noted that the Freedom of Information Act provides a statutory exemption for the release of individual employer

data. 81 Fed. Reg. at 45492.  But the EEOC also stated that it intends to release the submitted pay

data in aggregate form and to private researchers who submit a qualified request.  *Id.* at 45491.

OMB observed a possible concern about the ability to obtain an employer's aggregate pay

data and "reverse engineer" the dataset to identify the pay and salary information for individual

employees.  In addition to this concern, OMB also observed a possible mosaic effect of obtaining

Component 2 aggregate pay data and using publicly available information to extrapolate the pay

data derives from particular employees of a single employer.   Based on a review of the 30 and 60-

day PRA notices that the EEOC issued, OMB concluded that the EEOC did not directly address

these concern.   Thus, given the absence of any adequate safeguards to address this issue,

particularly given the highly-sensitive and personal nature of the information sought, OMB

decided that this is another basis sufficient to merit a "review and stay" of the Component 2 data.

And as the record shows, OMB did not reach this decision lightly.   OMB initiated the

review and stay process only after months of meetings, telephonic conference calls, and email and

other written communications between agency heads at OMB and the EEOC and their respective

staff in which the two agencies discussed each of the concerns referenced in the August 2017 Rao

Memorandum.  *See, e.g.*, Lipnic Decl. ¶¶ 4(a)-(f), ECF No. 25-1 (Dec. 6, 2018); Mancini Decl. ¶¶

4-5.

Under these circumstances, there is no basis to Plaintiffs' claims that OMB's decision

violates the agency's regulations nor that the challenged decision is arbitrary and capricious.  To

the contrary, OMB's decision to initiate a review and stay of Component 2 is well-grounded and

supported on the basis of the record here.   OMB reasonably found that (1) the EEOC's post-

approval release of the data file specification and the significant formatting changes it impose on

employers  constitutes a "relevant change in circumstances"; (2) that, as a result of the subsequent

release of the data file specifications, the Component 2 burden estimates initially provided by the EEOC were "materially in error"—a fact supported by, *inter alia*, the number of stakeholder letters that OMB received in early 2017 objecting to the burden imposed by the collection; and (3) that Component 2 lacked public utility as currently devised and did not adequately address confidentiality and privacy issues. These bases also serve as sufficient basis for OMB's conclusion that "good cause existed" to review and stay the Component.

At bottom, Plaintiffs question OMB's application of § 1320.10(f) and § 1320.10 (g) to Component 2. But Plaintiffs have not, and cannot, establish that OMB's interpretation of its own ambiguous rule is erroneous or inconsistent with the regulations and, therefore, is entitled to deference. *See Neustar, Inc. v. FCC*, 857 F.3d 886, 896 (D.C. Cir. 2017) ("courts will defer to the [agency's] reading of its own interpretation unless that reading is plainly erroneous or inconsistent with the regulations"). And where, as here, the factual basis for OMB's decision to initiate its review and stay processes is "supported by substantial evidence," the Court should uphold the challenged decision. *See id.*

### B. The RAO Memorandum Adequately Explains the Bases for the Agency's Decision to Initiate A Review and Stay of Component 2.

Plaintiffs make much of the fact that OMB's stated grounds for initiating a review and stay of Component 2 are memorialized in a 2-page Memorandum. They describe the agency's written rationale for the challenged decision as "[m]erely parroting statutory language," lacking "analysis" and containing "conclusory statements." *See* Pls.' Mem. at 20-21. However, Plaintiffs fail to consider the administrative context in which the August 2017 Memorandum was issued. *See Neustar*, 857 F.3d at 893 ("[A]gencies may use informal adjudications when they are not statutorily required "to engage in the notice and comment process" or to "hold proceedings on the record).

As explained above, five months of interagency deliberations between the EEOC and OMB preceded the August 2017 Rao Memorandum.   The Memorandum simply summarizes the four months of meetings, emails, and conference calls between OMB and EEOC during which each issue underlying the Administrator's decision to review and stay was discussed.  *See* Mancini Decl.; Lipnic Decl.  In such circumstances, "a brief statement of the grounds" for an agency's decision is sufficient.  *See City of Colorado Springs v. Solis*, 589 F.3d 1121, 1134 (10th Cir. 2009) (quoting 5 U.S.C. § 555(e)) (applying *Overton Park* to Department of Labor's informal adjudication of grant application); *see also PBGC v. LTV Corp.*, 496 U.S. 633, 654 (1990) ("[T]he APA establishes the maximum procedural requirements a reviewing court may impose on agencies.").  The Rao Memorandum more than satisfies these minimum requirements, particularly given that the Memorandum merely memorializes the concerns that the EEOC and OMB had already raised and discussed and, as discussed above, does not constitute a final agency decision.

### C. OMB's Actions Fall Well within the Agency's Authority Under the PRA And Its Implementing Regulations.

In a last effort to salvage their claims, Plaintiffs argue that OMB's decision to initiate a review and stay of Component 2 violates § 3518(e) of the PRA by "impermissibly intrud[ing] on the EEOC's civil rights enforcement authority [under Title VII of the Civil Rights Act]."  Section 3518(e) states in relevant part that:

> Nothing in this subchapter [of the PRA] shall be interpreted as increasing *or decreasing* the authority of . . . the Office of Management and Budget or the Director thereof, under the laws of the United States, with respect to the substantive policies and programs of departments, agencies and offices, including the substantive authority of any Federal agency to enforce the civil rights laws.

44 U.S.C. § 3518(e) (emphasis added).  Relying on § 3518(e)'s instruction that the PRA should not be interpreted to "increase" the authority of OMB "with respect to . . . the substantive authority of [federal agencies] to enforce the civil rights laws, Plaintiffs argue that OMB's decision to initiate

a review and stay of Component 2 is not supported by "good cause" because the agency purportedly has not "expressed an awareness" of the substantive affect the challenged decision has on the EEOC's authority to enforce civil rights laws.  Pls.' Mem. at 27-28. There are several reasons to reject Plaintiffs' argument.

As an initial matter, Plaintiffs entirely ignore § 3518(e)'s directive that the PRA should not be interpreted to "*decrease*" the authority of OMB "with respect to . . . the substantive authority of [federal agencies] to enforce the civil rights laws."  *See* 44 U.S.C. § 3518(e).  When Congress enacted the amendments to the PRA in 1980 (repealing and replacing the PRA's predecessor statute, the Federal Records Act), it included § 3518(e) to address any "concern that the authority of this Act might be used to increase the power of OMB over substantive policy."  Sen. Report No. 96-930 at 56 (Sept. 8, 1980).  As Congress explained at that time of the 1980 amendments, "there ha[d] been problems along that line *in the past* . . . under the [now-repealed] Federal Records Act[,]" but the amendments to the PRA now "guard[s] against that."  *Id.* (emphasis added).  Those "guards" are set forth in § 3518(c)(1) of the PRA, which expressly exempts from OMB review collections of information in connection with the specific statutorily-delineated enforcement activities, including federal criminal investigations, compulsory process under the Antitrust Civil Process Act, and the conduct of certain intelligence activities as defined by Executive Order.  *See generally* 44 U.S.C. § 3518(c)(1)(A)-(D).

Importantly, when Congress amended the PRA and included § 3518(e) to "draw an important distinction between paperwork management and substantive decisions."  Sen. Rep. No. 96-930 at 56.  Put another way, § 3518(e) simply affirms that no provision of the PRA shall be interpreted as either "increasing or decreasing" OMB's [paperwork management] authority with respect substantive policies and programs of other federal agencies, including, as relevant here,

"the substantive authority of any Federal agency to enforce the civil rights laws." *Id.*; *see also* 44 U.S.C. § 3518(e). And OMB's decision to initiate a review and stay of Component 2 is consistent with this statutory direction and the legislative history of the PRA, which make clear that OMB is charged with ensuring that collections of information comply with the statutory and regulatory requirements of the PRA and continue to do so after OMB approval.

As Defendants have previously explained, the challenged decision is merely an interlocutory step in OMB's reconsideration process. Indeed, the Rao Memorandum explicitly states that EEOC should "submit a new information collection package for [Component 2] to OMB for review." OMB_0000300. Thus, contrary to Plaintiffs' claims otherwise, OMB has not "impermissibly intruded" on the EEOC's civil rights enforcement authority. The EEOC remains free to propose a collection of pay data and OMB will approve it so long as the PRA statutory and regulatory requirements are met.

## III. THE PROPER REMEDY IN THIS CASE, IF ANY, IS TO REMAND TO THE AGENCY FOR FURTHER EXPLANATION, WITHOUT VACATUR.

"Where . . . the district court cannot evaluate the challenged agency action on the basis of the record presented, and the agency may be able to cure any defects through further action, the proper course is to remand to the agency for additional investigation or explanation. *CS-360 LLC v. VA*, 846 F. Supp. 2d 171, 192 (D.D.C. 2012) (citing *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.,* 637 F.3d 408, 416 (D.C. Cir. 2011)). But, when a court remands a decision to the agency, the decision "'need not necessarily be vacated.'" *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 451 (D.C. Cir. 2017) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993)). This is particularly true in the context of informal adjudications, where there may be a less developed record. *See LTV Corp.*, 496 U.S. at 2690 (recognizing that "one

recourse for the District Court might be a remand to the agency for a fuller explanation of the agency's reasoning at the time of the agency action.").

"In deciding whether to vacate a flawed agency action, the district court should be guided by two principal factors: (1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009) (internal citations and quotations omitted). The first factor counsels remand without vacatur "when an agency may be able readily to cure a defect in its explanation of a decision." *Heartland*, 566 F.3d at 198. Here, OMB did not consider its review and stay to be final agency action, *see* Defs. Mot. to Dismiss at 20-26, and thus viewed the Rao Memorandum as starting an iterative inter-agency process, not a comprehensive statement of its reasoning. To require such a statement of OMB at this stage would require OMB to have completed its "review" before the "review" even began. But, should the Court determine that a decision to review and stay is final agency action and determines that OMB's analysis was insufficient, OMB could easily cure the defects in its memorandum by further explanation of its reasoning. As here, when there is a "non-trivial likelihood" that the agency "had authority for its decision," the first factor counsels in favor of remand without vacatur. *See WorldCom, Inc. v. FCC*, 288 F.3d 429, 434 (D.C. Cir. 2002) (remanding without vacatur when there was a "non-trivial likelihood that the [agency] had authority for its decision"); *see also Bauer v. DeVos*, 332 F. Supp. 3d 181, 186 (D.D.C. 2018).

Moreover, vacatur of OMB's decision will cause a disruption to the administrative process contemplated by the PRA and OMB's regulations. At present, no aggregate pay data has ever been collected or available to the public. Thus, OMB's stay preserved the status quo before OMB's original approval. Meanwhile, OMB is considering the propriety of its initial approval and

whether collection of aggregate pay data is contrary to the standards of the PRA by consulting with the EEOC and engaging in the review process set forth in 5 C.F.R. §1320.10(f). If the Court vacated OMB's decision, OMB would be required to halt the administrative process and the EEOC would have to begin the complex process of collecting aggregate pay data. OMB could then undertake to review and stay this collection again, creating inefficiency for OMB, the EEOC, and interested parties who are waiting for a final determination on the propriety of this collection.

For these reasons, Defendants argue that, if the Court determine that OMB's decision is unlawful, it remand the decision without vacatur to the agency for further explanation of the decision maker's reasoning at the time of the decision.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motions for Summary Judgment should be denied, Defendants' Motion for Summary Judgment should be granted, and Judgment should be entered for Defendants.


Dated: December 21, 2018                    Respectfully submitted,

                                            JOSEPH H. HUNT
                                            Assistant Attorney General

                                            CARLOTTA WELLS
                                            Assistant Branch Director, Federal Programs

                                            */s/ Tamra T. Moore*
                                            Tamra T. Moore
                                            Rachael L. Westmoreland
                                            Trial Attorneys
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            P.O. Box 883, Ben Franklin Station
                                            Washington, DC  20044
                                            Tel.:  (202) 305-8628
                                            Fax:  (202) 616-8460
                                            Email:  Tamra.Moore@usdoj.gov