**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL WOMEN'S LAW CENTER, *et al.*, | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| vs. | : | Civil Action No. 17-2458 (TSC) |
| | : | |
| OFFICE OF MANAGEMENT AND BUDGET, *et al.*, | : | |
| | : | |
| *Defendants*. | : | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

Introduction ............................................................................................................ 1

Argument ............................................................................................................... 2

I. Plaintiffs Have Standing To Challenge The Stay ........................................... 2

II. The Review And Stay Violates The Administrative Procedure Act ................... 5

    A.  OMB Did Not Meet The Regulatory Requirements To Stay The
    Pay Data Collection ............................................................................. 7

        1.  OMB Is Not Entitled To Deference ................................................. 7

            a.   OMB Is Not Entitled To Deference Regarding
            The Meaning Of Its Regulations When It Has
            Not Provided An Interpretation Of Them. ...................................... 8

            b.   OMB's Conclusory Assertions Are Not Entitled
            To Deference. ........................................................................... 11

        2.  Even If OMB's Conclusions Were Not Conclusory
        And Were Supported By The Record, They Do Not
        Meet The Requirements of Section 1320.10 ...................................... 13

    B.  The Administrative Record Does Not Justify OMB's Decision
    To Review And Stay The Pay Data Collection .................................... 14

        1.  The Record Does Not Support OMB's Assertions
        Regarding Data File Specifications .................................................. 15

        2.  Defendants' Reliance On Concerns That Were
        Addressed In The Original PRA Approval Is
        Unsupported By The Record And Is Arbitrary
        And Capricious .......................................................................... 20

    C.  The Court May Grant Plaintiffs' Motion For Summary Judgment
    Without Resolving The Motion To Complete The Record, But It
    May Not Do The Same For Defendants ............................................. 24

III. The Stay Violates 44 U.S.C. § 3518(e) ...................................................... 26

IV. The Appropriate Remedy Is Vacatur ......................................................... 29

    A.  The Deficiencies In The Stay Are Serious .......................................... 29

    B.  Vacatur Would Not Have Disruptive Consequences ............................. 31

Conclusion .......................................................................................................... 33

## INTRODUCTION

Over the course of seven years, the Equal Employment Opportunity Commission ("EEOC") developed a pay data collection requirement that it determined was necessary to enforce anti-discrimination laws. Following a carefully crafted statutory process, EEOC submitted its proposal for public comment, modified its proposal in response to those comments, and then applied to the Office of Management and Budget ("OMB") for approval. OMB granted that approval.

Then, with two paragraphs, OMB reversed that approval. Those two paragraphs—the only written documentation of OMB's analysis, as the newly produced Administrative Record confirms—consist solely of parroting regulatory standards and unreasoned speculation that the formatting of a data file constituted a meaningful change in circumstances. This does not come close to satisfying the regulatory standard for staying a previously approved collection under the Paperwork Reduction Act and impermissibly overrules EEOC's substantive authority to implement the civil rights laws, as explained in Plaintiffs' opening brief.

Defendants' response and the Administrative Record confirm what was clear from the face of OMB's decision memorandum: the review and stay of the pay data collection is not supported by any reasoned analysis, rests on specious grounds, is an unexplained departure from Defendants' previous conclusions, and is contrary to the Record before the agencies. It cannot pass muster under any interpretation of the governing standard.

Defendants oppose this conclusion with several wholly meritless arguments. They argue that the OMB stay was actually an "informal adjudication," even though it has exclusively prospective effect. They argue that an agency's unreasoned decision is justified because industry comments supported it, despite the lack of any actual evaluation by the agency, and even though the comments themselves do not provide a meaningful basis on which to take the drastic action of staying a previously approved collection. And they argue that the Court should defer to

1

Defendants' interpretation of the governing standard, even though they have never proposed any interpretation and reject the only explications of the standard OMB has ever issued. These arguments only confirm that judgment should be granted in Plaintiffs' favor. Because neither Defendants' brief nor the Record provides any reason to believe that Defendants could fix the manifest flaws on remand, the Court should therefore vacate the stay of the revised data collection.

## ARGUMENT[1]

### I.     Plaintiffs Have Standing To Challenge The Stay.

Defendants do not repeat their principal arguments against standing, merely adverting to their previously filed Motion to Dismiss as a whole. Mem. of Points & Authorities in Supp. of Defs.' Opp'n to Pls.' Mot. for Summ. J. & Defs.' Cross-Mot. for Summ. J., Dkt. No. 27-1 ("Defs.' Mem."), at 16. As explained at length in the Motion to Dismiss briefing, which Plaintiffs incorporate here, these arguments are wholly meritless, relying on a misreading of controlling caselaw and a failure to acknowledge the undisputed facts of Plaintiffs' operations and their import for standing purposes. *See* Pls.' Opp'n to Defs.' Mot. to Dismiss, Dkt. No. 16, ("Pls.' MTD Opp'n"), at 15-36. Plaintiffs further substantiated their standing allegations with sworn declarations attached to their Motion for Summary Judgment, Dkt. No. 22. *See* Decl. of Andrea Johnson, Dkt. No. 22-3; Decl. of Hector E. Sanchez, Dkt. No. 22-4. Defendants do not even *acknowledge* these declarations, let alone dispute that they demonstrate concrete harms

---

[1] Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, Dkt. No. 22-1, ("Pls.' Mem.") sets forth the relevant legal and factual background regarding the Paperwork Reduction Act, 44 U.S.C. §§ 3501, *et seq.* ("PRA"), approval, the EEOC's administrative process leading up to the September 2016 approval of the EEO-1 pay data collection (also referred to as "Component 2"), and OMB's decision to review and stay the pay data collection. Pls.' Mem. at 3-13.

caused by the challenged stay. Because Defendants add nothing to their motion and merely incorporate their previous arguments by reference, Plaintiffs need not rehash their flaws here.

Defendants now also concoct a new argument: that OMB's decision to reconsider its previous approval and stay the reporting requirement for employers is an "informal adjudication" to which Plaintiffs are not a party, and that Plaintiffs are merely challenging that adjudication's "potential precedential effect." Defs.' Mem. at 16-17 (quoting *Conference Grp., LLC v. FCC*, 720 F.3d 957, 963 (D.C. Cir. 2013)). This unsupported argument is wholly meritless.

As an initial matter, Defendants' labeling of its action as an "adjudication" is not entitled to any deference. *See, e.g.*, *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017) (rejecting agency argument that its action was an adjudication); *Nat'l Ass'n of Home Builders v. U.S. Army Cops of Eng'rs*, 417 F.3d 1272, 1284-85 (D.C. Cir. 2005) (same). Defendants provide no precedent for construing OMB determinations under the PRA (or, indeed, *any* interagency process) to be adjudications, and, as far as Plaintiffs have found, none exists.

This is for good reason: the label plainly does not fit here. In the context of agency action, adjudications are "retroactive, determining whether a party violated legal policy." *Ameren Servs. Co. v. FERC*, 880 F.3d 571, 584 (D.C. Cir. 2018); *see also, e.g.*, *Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 922 (D.C. Cir. 2013) ("[A]n adjudication *must* have retroactive effect, or else it would be considered a rulemaking."). Action that "is of only future effect" is "rulemaking," not adjudication. *Ameren*, 880 F.3d at 584. Defendants do not and cannot defend their unexplained characterization of the stay as an "adjudication" under this blackletter law. The Rao Memorandum solely seeks to relieve employers of burdens associated with future collections. *See* Memorandum from Neomi Rao, Adm'r, OIRA, to Victoria Lipnic, Acting Chair, EEOC (Aug. 29, 2017) ("Rao Memo."), OMB_0000299-300; *also available at*

Dkt. No. 11, Ex. A. The stay published by EEOC to implement the Rao Memorandum prospectively informs filers that they "should not submit aggregate data" going forward. Stay the Effectiveness of the EEO-1 Pay Data Collection, 82 Fed. Reg. 43,362, 43,363 (Sept. 15, 2017). These are prospective rules, not retrospective adjudications, Defendants' terminological games notwithstanding.

Even if the stay were somehow an adjudication, that would not bar Plaintiffs' challenge—as Defendants' principal case confirms. Defendants rely almost exclusively on *Conference Group*, which held that "the mere potential precedential effect" of an adjudication does not confer standing on non-parties seeking "a declaration that a line of agency rulings should henceforth have no precedential effect." 720 F.3d at 963 (quoting *Shipbuilders Council of Am. v. United States*, 868 F.2d 452, 456-57 (D.C. Cir. 1989)). But Defendants ignore the next two paragraphs of *Conference Group*, which make clear that this rule does not apply when the non-party can "point[] to a particular imminent application of the disputed agency policy …, the firmness of which is not in dispute, on a fast-arriving date certain." *Id.* at 963-64 (alterations in original) (quoting *Teva Pharm. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1313 (D.C. Cir. 2010)). Whether or not the interagency process is an adjudication, *Conference Group's* exception is clearly the case here: Defendants' actions have had and continue to have the immediate effect of relieving employers from their obligation to provide pay data, an application of policy that has already missed one cycle of data collection and is just months away from missing a second.

More generally, the authority Defendants cite is intended for a completely different context. *Conference Group* and its line of cases deal with plaintiffs challenging agency adjudications that have no effect on anyone aside from the parties to the adjudication, other than creating the possibility of an identical decision in a future case. *See id.* at 963. In such a case, the

4

plaintiff "has the option to raise its substantive arguments in its own adjudication," *id.* at 964; it suffers no cognizable, concrete injury from the mere existence of a different party's failed adjudication. This context is inapposite to this case, where Plaintiffs have no other opportunity to challenge Defendants' decision and their harm stems from the deprivation of information that otherwise would have been created and disseminated. *See* Pls.' MTD Opp'n at 19-21, 26-28.

Under Defendants' view of the law, OMB's application of the PRA could *never* be challenged. Defendants do not suggest anything that distinguishes the supposed adjudicative, unchallengeable character of this reconsideration from other applications of the PRA; indeed, Defendants go to great lengths to claim (incorrectly, *see infra* at 11 n.5) that this is a perfectly ordinary exercise of OMB's authority. *See, e.g.*, Defs.' Mem. at 6 ("[R]epeated OMB review of individual agency collections of information is standard."). But non-governmental entities are never "parties" to the supposed adjudication between OMB and other agencies, and therefore, under OMB's rationale, would never have standing to bring an APA challenge to an unlawful implementation of the PRA. This would come as a surprise to, among others, the Supreme Court, which has heard and affirmed a challenge to OMB's conduct in the interagency PRA process. *See Dole v. United Steelworkers of Am.*, 494 U.S. 26 (1990). By contrast, under Defendants' theory, the only entities that would ever have standing to bring a claim against OMB would be other federal agencies, an absurd proposition.

Accordingly, Defendants' late-discovered, novel argument is wholly meritless and should be rejected.

## II.    The Review And Stay Violates The Administrative Procedure Act.

The APA empowers a reviewing court to hold unlawful and set aside an agency's action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "That standard obligates the agency to examine all relevant factors and

record evidence, and to articulate a reasoned explanation for its decision." *Am. Wild Horse Pres.*
*Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) (citing *Motor Vehicle Mfrs. Ass'n v.*
*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). As Plaintiffs' opening brief
demonstrated and the Administrative Record confirms, OMB's review and stay of the EEO-1
pay data collection violates this basic APA requirement for numerous reasons:

First, the explanation for the stay in the Rao Memorandum is almost entirely conclusory,
parroting regulatory language. It fails the requirement that an agency's explanation for its action
be "a statement of reasoning" and not simply a restatement of applicable legal standards.
*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014). The lack of reasoning also
invalidates Defendants' claim to deference. *See Nat'l Shooting Sports Found., Inc. v. Jones*, 716
F.3d 200, 214 (D.C. Cir. 2013).

Second, OMB did not even apply the correct regulatory standards. It both abandoned
without explanation its previously articulated definition of "good cause," which is required to
stay a previously approved collection of information, and also stated only that newly released
data file specifications "may have changed the initial burden estimate", Rao Memo. at 1, rather
than identifying a "material" error in earlier burden estimates. 5 C.F.R. § 1320.10(f) and (g).
Application of the incorrect standard makes an agency decision invalid. *See Buffalo Field*
*Campaign v. Zinke*, 289 F. Supp. 3d 103, 111 (D.D.C. 2018). Defendants' claim to deference in
regulatory interpretation also fails where OMB did not provide any reasoning for how it
interpreted its supposedly ambiguous regulations. *See Level the Playing Field v. Fed. Election*
*Comm'n*, 232 F. Supp. 3d 130, 140 (D.D.C. 2017).

Third, the Administrative Record that Defendants now provide reveals that OMB
conducted no independent analysis of the effect of the data file specifications that it claims
justify its decision. Defendants' attempt to rely instead on unrevealed interagency
communications is entirely impermissible. *See Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257,

269 (D.D.C. 2018) (a Court may not uphold an agency action based on declarations that provide no reasoning). Further, Defendants' reliance on importing wholesale analysis provided in industry comments, while ignoring comments to the contrary, also fails. *Nat'l Ass'n of Regulatory Util. Comm'rs v. F.C.C.*, 737 F.2d 1095, 1125 (D.C. Cir. 1984) (while an agency may rely on comments in the record to support its decision, it may not accept them "uncritically" and must apply its "expert evaluation").

Fourth, even considering the industry comments that Defendants claim support its decision to stay the pay data collection, the only two that address the data file specifications do not provide any analysis demonstrating that this document-formatting information increases the burden on any EEO-1 filers, providing instead only speculation. Unfounded speculation cannot, of course, provide the basis for an agency action. *See Nat'l Shooting Sports Found., Inc.*, 716 F.3d at 214.

Finally, having failed to justify the review and stay with information before OMB at the time of its decision, Defendants instead rely on concerns about the revised EEO-1 that were addressed during the original PRA approval notice and comment process. These are invalid *post hoc* rationalizations unsupported by the Record. *See id.* OMB's failure to explain why these issues would justify its reversal from its prior approval is also a failure of the basic requirement that an agency explain why it changed its mind. *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923 (citing *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)) (when an agency reverses course from a prior decision or official policy, "the agency must at a minimum acknowledge the change and offer a reasoned explanation for it").

### A. OMB Did Not Meet The Regulatory Requirements To Stay The Pay Data Collection.

#### 1. OMB Is Not Entitled To Deference.

Defendants assert that OMB's decision regarding the application of its own regulations is entitled to deference, although it is not clear to which portion of the decision they would have the

Court defer. Defs.' Mem. at 17-21. OMB is not entitled to deference, however, regarding the meaning of the regulations when it has not articulated an interpretation of them, nor is it entitled to deference regarding conclusory assertions.

> a. **OMB Is Not Entitled To Deference Regarding The Meaning Of Its Regulations When It Has Not Provided An Interpretation Of Them.**

Sections 1320.10(f) and (g) provide the regulatory standards for the review and stay of the previously approved pay data collection. These regulations impose a heightened standard on OMB compared to its original authority to approve or disapprove a collection of information under the PRA, a decision over which it has broad discretion. 44 U.S.C. § 3507(d)(4). In contrast, a review requires "relevant circumstances [to] have changed" or a finding that the collecting agency's burden estimates were "materially in error," 5 C.F.R. § 1320.10(f), and a stay requires "good cause," *id*. § 1320.10(g). While a decision to review a collection of information does not necessarily halt that collection, a stay does.[2] Neither a review nor stay is permitted at OMB's whim or because its policy preferences have changed; both require that the factual basis for its earlier approval have changed. *See id*. § 1320.10(f), (g).

OMB set forth its *only* articulated definition of good cause in the preamble to the regulation: good cause "exists when continued collection of information would be significantly contrary to the standards of the Act." Controlling Paperwork Burdens on the Public; Proposed Rulemaking, 47 Fed. Reg. 39,515, 39,522 (Sept. 8, 1982).[3] OMB also stated that as part of a

---

[2] For this reason, and as set forth in Plaintiffs' Opposition to Defendants' Motion to Dismiss, the stay is final agency action. Pls.' MTD Opp'n at 36-43. Although only the stay, and not the review, is final agency action, Plaintiffs have addressed both regulatory standards together because the Rao Memorandum's brief explanation for the decision mingles the two. Plaintiffs seek only to have the stay vacated, however.

[3] As discussed below, OMB's current abandonment of this definition should not be credited. That conclusion would be further bolstered if the Court were to grant Plaintiffs' Motion to Compel Completion of the Administrative Record, filed herewith. Among the documents that Plaintiffs seek to add is an April 14, 2017 EEOC Memorandum that relies on the preamble

good cause finding, it "will take into consideration any disruption such reconsideration would create in the agency's program." *Id.* The terms have otherwise been undefined by OMB.

Defendants' claim they are entitled to deference in their interpretation of these regulations is unwarranted.[4] The terms at issue—"materially in error," "relevant change" in circumstances, and "good cause"—have commonly understood and easily applicable meanings, giving little merit to Defendants' unsupported argument that they are ambiguous. Even if they were ambiguous, Defendants do not identify a reasoned interpretation from OMB to which the Court could defer (aside from the prior definition of good cause, which Defendants reject without explanation). OMB did not advance any interpretation in the Rao Memorandum, nor do Defendants provide a *post hoc* interpretation in their briefing. Without stating what it thinks Sections 1320.10(f) and (g) mean, much less an explanation of the basis for that interpretation, OMB has no claim to deference of any kind. As this Court previously has held, when considering whether an agency's interpretation of its own regulation is entitled to deference, "[t]he court must defer to the [agency] unless the agency fails to meet the 'minimal burden of showing a coherent and reasonable explanation [for] its exercise of discretion.'" *Level the Playing Field*, 232 F. Supp. 3d at 140 (quoting *Carter/Mondale Presidential Comm., Inc. v. FEC*, 775 F.2d 1182, 1185 (D.C. Cir. 1985)). As is the case here, an agency is not entitled to deference in

---

definition of good cause for its analysis of whether complaints about the pay data collection raised after OMB's September 2016 approval meet the standard required to stay an ongoing collection of information. *See* Pls.' Mot. to Compel, Declaration of Lenora M. Lapidus, Ex. A at 2 ("This suggests that OMB did not intend to step in whenever there was a change in circumstances surrounding an approved information collection, but expected to reserve the remedy for cases in which a change had a significant impact.").

[4] Contrary to Defendants' argument, Defs'. Mem. at 21, OMB's administration of the PRA does not entitle it to additional deference beyond that to which any agency would be entitled in interpreting its own regulations. *See Pub. Citizen, Inc. v. Lew*, 127 F. Supp. 2d 1, 7 (D.D.C. 2000) (according OMB's interpretation of PRA regulation the same as is accorded agencies in interpreting their own regulations); *see also Dole*, 494 U.S. at 43 (declining to defer to OMB's interpretation of PRA because the statutory language was clear and to the contrary).

interpretation of its regulation when it may have "applied no analytical standard at all, given that it articulated none." *Id.*; *see also Christopher v. SmithKline Beecham Corp*, 567 U.S. 142, 155 (2012) ("[D]eference is … unwarranted when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'") (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)).

Even if the Court were able to devise an interpretation of the regulatory terms at issue from OMB's litigation position, it should be rejected as a *post hoc* justification. While agency interpretations of their regulations stated for the first time in litigation may be accorded deference, that deference is not warranted if the court "discern[s] some reason to believe that [the interpretation] is not fair and considered." *Drake v. FAA*, 291 F.3d 59, 69 (D.C. Cir. 2002). Ample indicia support that conclusion here. First, OMB's abandonment of its earlier definition of "good cause," Defs.' Mem. at 21 n. 4, counsels against any deference to its current position. *See Drake*, 291 F.3d at 69 ("In conducting this inquiry, we consider whether the agency has 'ever adopted a different interpretation of the regulation[.]'"); *Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 212 F.3d 1301, 1304–05 (D.C. Cir. 2000) (concluding that the "flip-flops here mark the Secretary's position as the sort of '*post hoc* rationalizations' to which courts will not defer" (citation omitted)). Further, OMB's current interpretation, whatever it is, is not consistent with any prior practice, because OMB's exercise of its review and stay authority is novel.[5] *See Nat'l Wildlife Fed'n v. Browner*, 127 F.3d 1126, 1129 (D.C. Cir. 1997) (according

---

[5] The decision to stay a collection is so drastic that Plaintiffs have been unable to identify a prior stay since the passage of the PRA, nor have Defendants identified an example of OMB asserting its authority in this manner. While Defendants point to 47 prior instances in which OMB considered earlier iterations of EEO-1 to suggest that "repeated OMB review of individual agency collections is standard," Defs.' Mem. at 6, *none* of the prior reviews came in remotely comparable circumstances. Every one of them concerned an extension, revision, or nonmaterial change requested by EEOC; there is no evidence of OMB ever reopening a prior approval on its own initiative. *See OMB Control Number History: 3046-0007*,

agency interpretation deference where agency had implicitly followed the same interpretation in practice). There is no basis to defer to OMB's unstated and unexplained interpretation of its regulations.

### b. OMB's Conclusory Assertions Are Not Entitled To Deference.

OMB's claim for deference to its decision is similarly unmerited because the agency's substantive determinations are wholly conclusory. *See* Rao Memo. at 1-2.

OMB's discussion of the good cause requirement simply recites various PRA standards. Rao Memo. at 2 (references to "concern" that "some [unidentified] aspects of the revised collection" "lack practical utility," "are unnecessarily burdensome," and "privacy and confidentiality issues"); *compare* 44 U.S.C. § 3507(c)(3) (requiring consideration of practical utility and burden at approval stage) and (g) (privacy). It does not provide any explanation as to why these standards are satisfied or why its prior conclusions changed. These statements could not be more conclusory and are not entitled to deference. *Nat'l Shooting Sports Found.*, 716 F.3d at 214; *Amerijet Int'l, Inc.*, 753 F.3d at 1350 ("[A]n agency must explain 'why it chose to do what it did.' And to this end, conclusory statements will not do; an 'agency's statement must be one of *reasoning.*'") (emphasis in original) (internal citation omitted)). OMB provides no non-conclusory explanation for the stay, meaning the decision cannot survive APA review.

OMB's justification for the review does not fare much better. After repeating the standards of section 1320.10(f), the Rao Memorandum makes brief assertions about the data file specifications, which, as discussed in Plaintiffs' opening brief, Pls.' Mem., at 14-18, and below are not supported by the Record. The Memo does not explain why the (incorrect) assertion that the public was unable to comment on the method of data submission means that there was a change in relevant circumstances or why the data file specifications would have changed

---

https://www.reginfo.gov/public/do/PRAOMBHistory?ombControlNumber=3046-0007 (last visited Jan. 11, 2019).

EEOC's burden estimates. Rao Memo. at 1-2. These conclusory statements are not entitled to deference.

Defendants' attempt to salvage these conclusory assertions by arguing that they summarized months of interagency communications is unpersuasive. Defs'. Mem. at 30. The APA does not permit an agency to point to internal discussions not described in the decision document or otherwise provided in the Record as the basis for its decision. *See, e.g.*, *Kirwa*, 285 F. Supp. 3d at 270 (APA review "involves more than a court rubberstamping action based on bare declarations from the agency amounting to 'trust us, we had good … reasons for what we did'"); *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017) ("[T]he dispute here arises from a problem that has become all too common among administrative decisions challenged in this court—a problem decision makers could avoid by following the admonition they have no doubt heard since their grade-school math classes: Show your work.").

Neither Defendants' assertion that the stay is an informal adjudication nor their citation to a lone out-of-Circuit case, Defs'. Mem. at 29-30, change the inadequacy of Defendants' conclusory assertions. As discussed above, the review and stay was not an informal adjudication. *See supra* at 4-6. In any event, actions under 5 U.S.C. § 555(e), the APA provision underpinning Defendants' assertion, still require that the agency "set forth its reasons" for decision in a non-conclusory fashion. *Tourus Records, Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) (citation omitted). *City of Colorado Springs v. Solis*, 589 F.3d 1121 (10th Cir. 2009), cited by Defendants, does not save OMB's conclusory reasoning. First, it does not impact the well-developed caselaw in this Circuit setting forth the requirements for agencies' explanations of their actions. Regardless, unlike OMB's explanation, the agency there appeared to have at least provided "an additional explanation of the reasons underlying its decision" beyond the relevant legal criteria, along with additional explanatory extra-record documents. *Id.* at 1134.

>    **2.    Even If OMB's Conclusions Were Not Conclusory And Were Supported
>           By The Record, They Do Not Meet The Requirements of Section 1320.10.**

OMB's stated reasons for the review and stay—even if they were supported by the

Record, which they are not—do not meet the legal requirements of sections 1320.10(f) and (g).

*NAACP v. Trump*, 298 F. Supp. 3d 209, 237 (D.D.C. 2018) ("'[A] reviewing court ... must judge

the propriety of [agency] action solely by the grounds invoked by the agency,' *post hoc*

explanations that the agency did not articulate when it acted are insufficient.") (quoting *SEC v.

Chenery Corp.*, 332 U.S. 194, 196 (1947)).

In support of both the review and the stay, OMB relies on the single factual (rather than

conclusory) statement in the Rao Memorandum—that the data file specifications were released

after OMB's earlier approval of the pay data collection. Defs'. Mem. at 24. But OMB did not

provide any reasoned analysis or reach any conclusions, either in the Rao Memorandum or in

earlier analysis revealed by the Record, about how the release of these data file specifications

actually impacted filers. That the data file specifications *themselves* were not before the public

during the original comment period, Rao Memo. at 1, does not support the conclusion that their

release is a change in "relevant circumstances" necessitating review, 5 C.F.R. § 1320.10(f),

without some explanation of how they differed from the information on which the public was

able to comment. OMB does not provide this explanation. While Defendants now assert that

OMB concluded that "Component 2 was likely not in compliance with the requirements of

PRA's notice and comment requirements" and that Component 2 required "significant

formatting changes" that could impose a burden on regulated entities, Defs'. Mem. at 23, the Rao

Memorandum did not make these conclusions, nor is there any other independent analysis by

OMB in the Record to that effect. *Point Park Univ. v. NLRB*, 457 F.3d 42, 50 (D.C. Cir. 2006)

("Nor can our Court fill in critical gaps in an agency's reasoning. We can only look to the

agency's stated rationale. We cannot sustain its action on some other basis the agency did not mention.").

Further, nowhere did OMB reach the conclusion that EEOC's earlier burden estimates "were materially in error" as required to review the pay data collection. 5 C.F.R. § 1320.10(f). The Rao Memorandum states only that the data file specifications "may have changed" the initial burden estimate, a far cry from material error, and indeed not a conclusion at all. Rao Memo. at 2. And the Record does not reveal any independent analysis or conclusions by OMB as to how the earlier burden estimate was erroneous.

Equally inadequate is OMB's justification for a stay under the good cause standard of 5 C.F.R. § 1320.10(g). Aside from failing to apply the only definition it has articulated for this standard, the Rao Memorandum provides no non-conclusory explanation to support the determination that good cause exists. Similarly, the Record does not reveal any additional analysis or conclusions by OMB. Further, having failed to justify its conclusion that the stay was necessary, OMB also failed to consider any burden imposed by the stay. OMB did not address the impact of staying the pay data collection on EEOC's programs, as required by its own definition of good cause, Pls.' Mem. at 22, and by the standards of the PRA itself, which require OMB to consider in the first instance whether the collection is "necessary for the proper performance of the functions of the agency." 44 U.S.C. § 3508.

In short, under no measure could OMB's analysis be determined to show a change in relevant circumstances or "good cause." Thus, the review and stay violates the APA.

**B. The Administrative Record Does Not Justify OMB's Decision To Review And Stay The Pay Data Collection.**

While OMB has now provided the Administrative Record, this Record does not save the inadequate reasoning evident from the face of its decision. To the contrary, the Record reveals

that OMB did not reach any independent, reasoned conclusions about the data file specifications

on which it claims to rely—and apparently did not examine them at all. Defendants' attempt to

rely on various submissions after the fact does not meet basic APA requirements, and even if it

did, these submissions do not support the conclusion that the data file specifications justify a

review and stay. Nor do Defendants offer any explanation—reasoned or otherwise—for siding

with submissions adverse to the data collection over the many submissions that were supportive

of the collection. Defendants' attempt to rehash other issues raised and considered in the original

PRA approval fares no better, as the Record reveals that no new issues were raised, OMB does

not explain why it changed from its prior approval, and Defendants' arguments are *post hoc*

justifications.

### 1. The Record Does Not Support OMB's Assertions Regarding Data File Specifications.

The Record now before the Court does not support the conclusion that the post-approval

release of the data file specifications justifies the review and stay of the pay data collection. As

Plaintiffs previously set forth, the release of the data file specifications (use of which is wholly

optional) could not have created surprise in the regulated community nor could they have

materially increased the burden on filers. EEOC provided extensive information to the public in

advance of the comment periods for the original PRA approval regarding the data it sought to

collect and the formatting requirements for submission, including a sample spreadsheet, all of

which was fundamentally unchanged by the release of data file specifications. *See* Pls.' Mem. at

15-16. EEOC's Sixty Day Notice directed the public to a document on EEOC's website laying

out the exact information that would be required by the subsequently released data file

specifications precisely. *Id*. at 15; *see also* Link Decl. ¶ 4, Ex. A (archived version of the

webpage referenced in 81 Fed. Reg. 5113, 5118 (Feb. 1, 2016) ("Sixty-Day Notice")).[6] As

Plaintiffs explained, there is no meaningful difference between the data file specifications and

the previously provided description of the spreadsheet and information to be submitted. Pls.'

Mem. at 16-17. Moreover, the public had the opportunity to comment on the spreadsheet and the

information to be collected, and took advantage of that opportunity. *Id.* at 16.

There is nothing in the Record that contradicts Plaintiffs' analysis, nor do Defendants

make any substantive arguments to the contrary. Indeed, based on Defendants' brief and the

Record Defendants provided to the Court, which does not specifically identify the data file

specifications, there is no evidence that OMB *ever* actually looked at the data file specifications

on which it claims to justify its stay or compared them to the information previously provided by

EEOC to the public. *See generally* AR Index. That a former Administrator commented generally

on the possibility that poorly designed or complex collections of information could be

problematic has no bearing on the current matter, because OMB did not reach such a conclusion

---

[6] Defendants identify the Sixty-Day Notice as part of the Record in a summary of "[m]aterials related to OMB's 2016 approval of the EEO-1 form," Administrative Record ("AR") Index, Dkt. No. 25-1, at 3, although the materials are not identified with specificity. Such materials would reasonably include an EEOC webpage identified in the text of the Sixty-Day Notice—the link to the sample data collection form—although Defendants did not include copies of the linked websites in the Record. Plaintiffs provided an archived copy of this website with their opening brief, Link Decl. ¶ 4, Ex. A, and Defendants do not challenge its authenticity. Nor do Defendants challenge Plaintiffs' argument that exhibits to the Link Declaration such as this webpage are part of the Administrative Record. Pls.' Mem. at 13 n.4. The Court may deem the sample data collection form to be part of the current Administrative Record. *Cf.* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed … ."). For the same reasons, it may deem the actual data file specifications released by EEOC to be part of the current Administrative Record. *See* Link Decl. ¶ 7, Ex. D. These data file specifications were obtained from an archived government webpage, their authenticity has not been challenged, and they are central to the agency decision at issue. In the alternative, it may grant the concurrently filed Plaintiffs' Motion to Compel Completion of the Administrative Record as to these documents.

as to the pay data collection, much less that the design harmed small businesses or individuals (the context of the prior Administrator's statement). Defs.' Mem. at 23.

Defendants instead rely on the statements of various commenters (submitted outside of any formal notice and comment period), although they point to no OMB analysis of these comments. *See*, *e.g.*, Defs.' Mem. at 22-23. Even if the arguments in these comments justified the stay, which they do not, OMB cannot rely on them without having "examine[d] [them] critically." *Am. Great Lakes Ports Ass'n v. Zukunft*, 296 F. Supp. 3d 27, 39 (D.D.C. 2017) (quoting *Chamber of Commerce of U.S.. v. Nat'l Labor Relations Bd.*, 118 F. Supp. 3d 171, 183 (D.D.C. 2015)). While an agency may rely on comments in the Record to support its decision, it may not accept them "uncritically" and must apply its "expert evaluation" to them. *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d at 1125 (D.C. Cir. 1984). Neither the Rao Memorandum nor any documents in the Record reveal OMB consideration, much less analysis of the comments on which it now claims, in litigation, to have relied.

Even if it were sufficient for OMB to rely uncritically on the comments, they are inadequate to support the review and stay. OMB asserts that it received "several letters from interested stakeholders expressing concern about the released data specification files." Defs'. Mem. at 22. It cites (1) a March 20, 2017 letter from the Equal Employment Advisory Council ("EEAC"), OMB_0000305-311; (2) a July 21, 2017 email from the renamed EEAC forwarding the March 20, 2017 letter, OMB_0000321-328; (3) a February 27, 2017 Chamber of Commerce letter, OMB_0000332-400; and (4) an April 13, 2017 letter from the HR Policy Association, OMB_0000367-370. The first two citations are two submissions of the same comment, and the Chamber of Commerce letter does not mention the data file specifications. OMB_0000332-400.

Contrary to Defendants' representation, therefore, they received only two comments discussing the post-approval release of data file specifications.

The comments themselves, even if they could supplement OMB's conclusory statement, cannot carry the weight OMB places on them. EEAC's comment asserts that the data file specifications require that all establishment data be included in a single row of 27,934 characters. OMB_0000310. It asserts that this "raise[s] several questions" regarding the software to use, the size of the data files, creation of the spreadsheet and likelihood of errors. *Id*. It does not purport to answer these questions, state whether it has attempted to create the data file described by the specification, state whether using direct data entry instead of the data file specification would resolve its concerns, or state whether it has sought consultation with the EEOC regarding its questions. *Id*. The HR Policy Association also states that the data file specifications require a single row of 27,934 characters and asserts that this alone is a relevant change in circumstance. OMB_0000368. Defendants point to no other basis in the Record for reviewing and staying the pay data collection based on the data file specifications. The Record therefore reveals *no* actual conclusions about any meaningful change or burden imposed by the data file specifications. Instead there are two commenters that seek to exploit the fact that the data file specifications organize the data to be submitted into a form they suggest is unusual, and one of which speculates that this result could be problematic. Under no standard does this Record provide good cause.[7]

---

[7] As would be evident if the Court were to grant Plaintiffs' Motion to Compel Completion of the Administrative Record, the only documentary evidence of agency analysis, an April 14, 2017 EEOC Memorandum, shows Defendants *rejecting* the arguments about the data file specifications:

> The EEOC's published filed specifications are not a new requirement but rather simply a familiar tool to make it easier for employers to submit EEO-1 data to the EEOC. The EEOC provided this tool to employers for use with the 2016 EEO-1,

That conclusion is buttressed by the facts that no filer is compelled to use data file specifications for submission and most do not, and that filers need not populate cells for which they have not data. Pls.' Mem. at -16-17 & n.6.[8] Moreover, OMB had a ready alternative if a filer for some reason had to use the data file specifications and faced an unusual burden in doing so: the statutory exemption created by Congress in Section 3517(b). OMB's failure to explain why this obvious alternative was insufficient to address its supposed concerns regarding the data file specifications provides an independent ground for finding its actions arbitrary and capricious. *See, e.g.*, *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) ("The failure of an agency to consider obvious alternatives has led uniformly to reversal.").

---

as evident on the EEOC website where the file specifications for the 2016 EEO-1 were published … Like those later published for the EEO-1 pay data collection, the 2016 specifications were in comma-separated values format ("csv"), a format that enables employers to convert tabular data (like that in the EEO-1) for importation and exportation to a database. Employers that used data upload technology for their 2016 EEO-1 reports used these csv specifications.

Publication of the file specifications after OMB's approval of the pay data collection is not a "significant" change that warrants OMB's reconsideration. As noted above, EEOC indicated in the 30-day notice its intent to post updated specifications, and stated that it would provide support to employers and HRIS vendors as they transitioned to the new reporting requirements. EEAC had notice of these data specifications, was probably familiar with the 2016 version, and had ample opportunity to raise questions or concerns before OMB's approval of the revised EEO-1, but did not do so."

Mot. to Compel, Declaration of Lenora A. M. Lapidus, Ex. A at 2-3.

[8] Defendants' assert that those employers that do use the data file specifications submit a higher than average proportion of EEO-1 reports. Defs'. Mem. at 24 n.5. Notwithstanding that this is *post hoc* reasoning not addressed by OMB in its decision materials, it also indicates that the firms that opt to use data file specifications are likely large employers with more sophisticated information technology capacity, making it more likely that they could address the questions posed by EEAC in its letter.

The conclusion that the review and stay was unjustified is compounded by OMB's failure to acknowledge, or apparently to consider, input that it received *in support* of the pay data collection. *See*, *e.g.* OMB_0000977; OMB_0001027; OMB_0001033; OMB_0001041 (letters supporting the pay data collection received after OMB's PRA approval). Of these, NWLC's April 12, 2017 submission, which had 82 additional organizational signatories, responds directly to the assertions made by the EEAC and the Chamber of Commerce regarding the burden imposed by the pay data collection. OMB_0001041 at 1043-1046. This letter also explains why the release of the data file specifications is not a change in relevant circumstances:

> EEOC noted in its 30-Day Notice that it would be posting data file specifications to support employers and HRIS collection vendors to accommodate Component 2 of the EEO-1 Form. OMB approved the data collection with the knowledge that these data file specifications would be posted thereafter. Moreover, no employer is required to utilize these data file specifications to submit the EEO-1 Form. This is one option to submit data offered for employer convenience. It provides no basis for reopening review of the data collection.

*Id*. at 1047. The Rao Memorandum does not explain how it evaluated these comments, let alone why it relied on the assertions of those who opposed the pay data collection rather than on the analysis presented by NWLC and others. Consequently, it has not provided a reasoned explanation for its decision. *See AARP v. EEOC*, 267 F. Supp. 3d 14, 32 (D.D.C. 2017) (finding that agency did not offer reasoned explanation because "the agency must explain *why* it chose to rely on certain comments rather than others, and it did not do so here.").

### 2. Defendants' Reliance On Concerns That Were Addressed In The Original PRA Approval Is Unsupported By The Record And Is Arbitrary And Capricious.

Having failed to justify the review and stay based on the data file specifications, Defendants seek to revisit the utility and burden analysis upon which OMB's original approval rested. *See*, *e.g*., Defs'. Mem. at 24-28. Defendants' arguments fail APA muster because (1) the Record does not support the conclusions that there were any changes in this regard; (2)

Defendants proffered reasons are *post hoc* justifications; and (3) OMB did not acknowledge and explain its reversal regarding these issues. *See Am. Wild Horse Pres. Campaign*, 873 F.3d at 923.

Defendants continually characterize the review and stay of the pay data collection as a continuation of the statutory PRA approval process provided for in 44 U.S.C. § 3507. *See*, *e.g.*, Defs'. Mem. at 10 (characterizing the approval as providing a "new means" of redress for stakeholders);[9] at 21 (referring to a "second layer of review"); and at 24-25 (relying on comments submitted during notice and comment period for original approval). This characterization is incorrect and seeks to obscure both the appropriate scope of the Court's review and the unusual nature of OMB's nonstatutory re-review. OMB's September 2016 approval of the pay data collection was its *final* decision on whether EEOC's proposed collection of information met the requirements of the PRA, based on EEOC's submissions, public comments, and the entire record then before it. *See*, *e.g.*, 44 U.S.C. § 3507 (setting forth process for OMB to approve a proposed collection of information). Based on this record, including both favorable and unfavorable comments, OMB determined that the pay data collection met PRA requirements and approved it. *See* OMB Approval, AR Index at VI.a., attached to Pls.' Mem. as Link Decl. ¶ 11, Ex. H. Yet Defendants seek to introduce issues considered and resolved during this completed administrative process, even though the record does not reveal any change in factual circumstances regarding those issues or any explanation by OMB as to why it reversed its prior determination.

---

[9] Defendants refer to the petition process under 44 U.S.C. § 3517, which is not relevant here. That statute and its implementing regulation address OMB's consideration of an individual filer's request to be exempted from an agency collection of information. 44 U.S.C. § 3517(b); 5 C.F.R. § 1320.14(c). They do not address reviews or stays of collections as a whole.

In this regard, Defendants assert that "the initial estimates of the burden imposed by the Component 2 pay data collection were likely materially in error." Defs'. Mem. at 25.[10] They provide no citation for this purported OMB "determination," making it an impermissible *post hoc* assertion. *Nat'l Shooting Sports Found.*, 716 F.3d at 214. Once again, Defendants rely on uncritical acceptance of various comments, not OMB's own analysis, its evaluation of the comments received, or its own conclusion as to the accuracy of the original burden estimates. Absent application of OMB's independent judgment, it has not provided a reasoned explanation for its decision. *Am. Great Lakes Ports Ass'n*, 296 F. Supp. 3d at 39.

In addition, OMB's proffered concerns about accuracy of the original burden estimates, as expressed in the comments, were resolved in the prior administrative process. For example, Defendants repeat complaints from the Chamber of Commerce that EEOC's burden estimates regarding the pay data collection were too low. Defs.' Mem. at 24-25. But the Chamber of Commerce letter cited by Defendants rehashes the same complaints about burden that it made prior to the original PRA approval of the pay data collection. Compare OMB_0000332-338 (February 2, 2017 Chamber of Commerce letter) with Link Decl. ¶ 15, Ex. K (Apr. 1, 2016 Chamber of Commerce Letter) (also in AR Index at VI.a.). EEOC considered such burden arguments in the original public comment process—and indeed increased its estimate of burden as a result. *See* Pls.' Mem. at 9, 21. OMB ratified this analysis with its original approval. Defendants do not and cannot dispute that these were legitimate, reasoned exercises of both EEOC's and OMB's authority, nor identify any fault in the extensive procedures they followed.

---

[10] Defendants' assertion that Plaintiffs base their argument on conclusions from the EEOC's pilot study and working group, Defs.' Mem. at 25, is incorrect. The sole reference to the study in Plaintiffs' memorandum, which Defendants cite as support for this assertion, is merely a citation to the factual description of the administrative history of the pay data collection. *See* Pls.' Mem. at 6.

Nowhere does OMB provide a reasoned explanation for its reversal of its earlier conclusions, meaning Defendants cannot justify OMB's reversal in position. *Encino Motorcars*, 136 S. Ct. at 2127; *Brady Campaign to Prevent Gun Violence v. Salazar*, 61 F. Supp. 2d 1, 19 (D.D.C. 2009).

The other justifications regarding practical utility and privacy proffered in Defendants' brief are also *post hoc* reasons that cannot be credited and are unsupported in the Record. First, Defendants assert that OMB was concerned that the use of a proxy for hours worked for salaried employees could affect the accuracy of data calculations estimating the rate of hourly pay. Defs'. Mem. at 27. Defendants also raise a concern from a commenter that reporting pay based on W-2 information is unreliable. *Id*. Not only is there is no basis in the Record to conclude that these concerns informed OMB's decision, but EEOC had *already addressed* both issues in the Thirty-Day Notice. *See* Agency Information Collection Activities; Notice of Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO-1), 81 Fed. Reg. 45,479, 45,485-87 (July 14, 2016) (merits of using W2 income); *id.* at 45,487-88 (addressing how to report hours worked and merit of using a proxy measure). OMB's approval ratified these conclusions. *See also* 44 U.S.C. § 3508 (OMB's obligation to determine "practical utility" of collection *prior* to approval). Here again, Defendants are simply parroting arguments made in post-approval comments without any reasoned analysis, much less a pre-decisional analysis or an explanation of its change from its prior, reasoned conclusions.

Defendants also raise purported concerns about privacy and confidentiality without any citation to the Record. Defs.' Mem. at 27-28. These arguments too are *post hoc* justifications which do not support OMB's decision. Nor are they new concerns. EEOC considered comments akin to the "reverse engineering" concern now raised by Defendants in the Thirty-Day Notice and determined that the proposed pay data collection provided sufficient privacy protections. 81

Fed. Reg. at 45,491-92. Again, OMB ratified this conclusion with its approval of the pay data collection. Absent any explanation as to a changed circumstance or explanation for the reversal in position, Defendants' attempt to rehash issues that have already been considered and resolved is inadequate. *Encino Motorcars, LLC,* 136 S. Ct. at 2126 ("[A]n '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice[.]'"); *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923–24 (same).

The Record does not support Defendants' action, and the stay should be vacated.

### C. The Court May Grant Plaintiffs' Motion For Summary Judgment Without Resolving The Motion To Complete The Record, But It May Not Do The Same For Defendants.

As the Court is aware, Plaintiffs filed a motion to compel completion of the Administrative Record along with the present filing. That motion seeks to complete the Administrative Record by adding the following documents:

1.      Exhibits A-G to the Declaration of Benjamin Link. These are archived EEOC webpages that are directly related to OMB's 2016 approval of the EEO-1 form and the data file specifications (and include a copy of the data file specifications). Exhibit A is the EEOC's sample data collection form, to which the Sixty-Day Notice linked. Link Decl. ¶ 4, Ex. A. Exhibit B is a webpage that EEOC published after OMB's approval of the pay data collection titled "2017 EEO-1 Survey." Link Decl. ¶ 5, Ex. B. That webpage, the 2017 EEO-1 Survey landing page, provides weblinks to other webpages, including: (1) a revised EEO-1 Instruction Booklet, (2) a data file layout for the 2017 EEO-1 survey, (3) a sample 2017 EEO-1 form (both under the heading "Data File Specifications"), (4) a questions and answers page, and (5) a fact sheet for small businesses. Archived versions of the webpages to which these five weblinks direct are Exhibits C-G to the Link Declaration. Link Decl. ¶ 6-10, Exs. C-G.

Based on Defendants' inclusion of all materials related to the 2016 approval in the Administrative Record, *see* AR Index at 3, these materials are already part of the Administrative

24

Record. *See supra* at 17 n.6. This conclusion is especially true with regard to Exhibit A, a webpage to which the Sixty-Day Notice in the Federal Register linked. While Exhibits B-G are webpages published after OMB's approval of the pay data collection, they include the revised EEO-1's "data file specifications" upon which OMB relied to stay the pay data collection—e.g., a data file layout (Ex. D) and a sample pay data collection form (Ex. E)—and other instructional information for employers.

        2.      An April 14, 2014 memorandum from Peggy Mastroianni to Acting Chair Lipnic re: EEOC's Response to EEAC's Argument that Relevant Circumstances Have Changed After OMB's Approval of the EEO-1 Report. This memorandum is referenced above in footnotes 3 and 7.

        3.      The correspondence referenced in the Declarations of Dominic Mancini and Acting Chair Lipnic provided along with Defendants' Cross-Motion for Summary Judgment.

        As set forth in Plaintiffs' opening brief and this memorandum, the Court need not rely on any of these materials to determine that OMB's decision to review and stay the pay data collection violated the APA because OMB did not meet its own regulatory requirements, provide a reasoned explanation for its action, or connect its conclusions to facts in the Record, among other reasons.

        If the Court decides to deny Plaintiffs' Motion for Summary Judgment, however, it should resolve the scope of the Administrative Record before ruling on Defendants' Cross-Motion for Summary Judgment. The records at issue further reveal the arbitrariness and capriciousness of the review and stay. *Pharm. Research & Mfrs. of Am. v. F.T.C.*, 790 F.3d 198, 209 (D.C. Cir. 2015) ("The touchstone of arbitrary and capricious review is reasoned decisionmaking.") (alteration adopted) (citation omitted)). First, Defendants' failure to explicitly identify the data file specifications themselves and the sample data form that EEOC provided during the PRA notice and comment process in the Administrative Record strongly implies that

OMB never considered them when reaching the review and stay decision, making its stated justification for its action (the release of the data file specifications) arbitrary and capricious.

Second, the April 14, 2017 Memorandum provides analysis that directly counters the EEAC Memorandum upon which Defendants now rely and which was before EEOC decisionmakers and apparently provided to OMB. *See supra* at 19-20, n.7. It is the *only* written evidence of any reasoned analysis of the purported data file specifications concern—and it reaches the opposite conclusion from OMB. OMB's failure to consider or counter it renders the review and stay arbitrary and capricious.

Finally, Defendants seek to rely on the communications between OMB and EEOC set forth in the Declarations of Dominic Mancini and Acting Chair Lipnic to justify the conclusory statements in the Rao Memorandum. The APA does not permit them to do so, and it certainly should not be allowed without providing more information about the substance of those communications. *See Kirwa,* 285 F. Supp. 3d at 270 (APA review "involves more than a court rubberstamping action based on bare declarations from the agency amounting to 'trust us, we had good … reasons for what we did'").

## III.    The Stay Violates 44 U.S.C. § 3518(e).

The Civil Rights Act of 1964 authorizes EEOC to require employers to make "such reports … as the Commission shall prescribe by regulation or order, after public hearing, as reasonable, necessary, or appropriate for the enforcement of" Title VII of that Act. 42 U.S.C. § 2000e-8(c). That is what EEOC did here, explicitly concluding that "revisions to the EEO-1 report are necessary for the enforcement of Title VII." 81 Fed. Reg. at 45,481 (capitalization altered). In the Rao Memorandum, OMB disagreed with EEOC's assessment of its own needs in carrying out its substantive statutory authority, stating conclusorily that "some aspects of the revised collection of information lack practical utility [and] are unnecessarily burdensome." Rao Memo. at 2. As explained in Plaintiffs' opening brief, this exceeds OMB's authority under the

PRA, which explicitly declined to increase OMB's authority "with respect to … the substantive authority of any Federal agency to enforce the civil rights laws." 44 U.S.C. § 3518(e); *see* Pls.' Mem. at 26-29.

Defendants do not dispute that the challenged stay overrode EEOC's exercise of its substantive authority, nor could they. Congress tasked EEOC, not OMB, with determining what reports are "reasonable, necessary, or appropriate for the enforcement of" Title VII. 42 U.S.C. § 3000e-8(c). OMB nevertheless concluded that the EEO-1 revision was "unnecessarily burdensome," Rao Memo, a conclusion that inherently entails a determination about what is and is not necessary. And it did so without even considering the impact that staying the data collection would have on EEOC's antidiscrimination work. By arrogating to itself the authority to evaluate what is necessary, OMB has plainly come into conflict with EEOC's substantive authority, and Defendants do not argue otherwise.

Instead, Defendants focus on the non sequitur that the PRA was intended neither to increase nor decrease OMB's authority over the enforcement of the civil rights laws. Defs.' Mem. at 31. This would be relevant only if Defendants had shown that OMB had the authority prior to the PRA to overrule EEOC's Title VII reporting determinations. Defendants do not even attempt to press this argument. They simply assert that because section 3518(e) neither increases nor decreases OMB's authority over enforcement of the civil rights laws, it must have plenary authority over it—rendering section 3518(e) a complete nullity.

Defendants' citation to legislative history is no more availing. As a preliminary matter, section 3518(e) is unambiguous, and "resort to legislative history is inappropriate when the statute is unambiguous." *Performance Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 642 F.3d 234, 238 (D.C. Cir. 2011). But even if Defendants had attempted to identify some

ambiguity, they misrepresent the snippet that they cite. Defendants quote a passage in the Senate

Report that expressly discusses section 3518(e), and then state without explanation that it refers

not to section 3518(e) but to the investigative and litigation exemptions in section 3518(c). Defs.'

Mem. at 31. This is an implausible reading of the Senate Report. The language Defendants quote

comes entirely from a three-paragraph passage about section 3518(e). The passage

acknowledged "concern[s] that the authority of this act might be used to increase the power of

OMB over substantive policy" and that OMB should not "interfere with regulatory policy under

the guise of clearing information requests," then explained that Congress drafted the PRA so that

"[t]he bill has provisions to guard against that." S. Rep. 96-930 at 56 (Sept. 8, 1980). The very

next sentence explains that *section 3518(e)* provides those guards, and never mentions section

3518(c). *See id.*[11] The Senate Report discusses Section 3518(c) earlier, and never connects it to

the language Defendants quote. *Compare* S. Rep. 96-930 at 55-56 (discussing section 3518(c))

*with id.* at 56 (discussing section 3518(e)).

      Far from supporting Defendants' argument, the legislative history refutes it. The Senate

Report merely confirms what the text provides: OMB is not empowered to reverse substantive

decisions that EEOC makes regarding its statutory authority. Congress expressly tasked EEOC

with determining what reports are "necessary" to enforce Title VII, and EEOC explicitly found

that the EEO-1 revisions were "necessary" to that end. *See* 42 U.S.C. § 3000e-8(c); 81 Fed. Reg.

at 45,481. Nothing in the PRA authorizes OMB to independently determine what is necessary to

enforce Title VII in a non-statutory, discretionary re-review, and thus OMB's finding that the

---

[11] In full: "The bill has provisions to guard against that. Section 3518(e) provides that the bill
does not affect in any way the powers of the President or OMB respecting the substance of
agency policies. Thus S. 1411 draws an important distinction between paperwork management
and substantive decisions." S. Rep. 96-930 at 56.

EEO-1 revisions were more burdensome than necessary is contrary to section 3518(e) and must be vacated.

## IV.    The Appropriate Remedy Is Vacatur.

When a court finds that an agency violated the APA, the plaintiff "is entitled to relief under that statute, which normally will be a vacatur of the agency's order." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001); *see also, e.g.*, *Allina v. Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) ("[V]acatur is the normal remedy … ."); *Advocates for Hwy. & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) ("[U]nsupported agency action normally warrants vacatur … ."); 5 U.S.C. § 706(2)(A) ("The reviewing court *shall* hold unlawful and set aside agency action … found to be … arbitrary and capricious … ." (emphasis added)).

As discussed in Plaintiffs' opening brief, courts may make exceptions to this rule if an order's deficiencies are not serious and vacatur would be disruptive. *See* Pls.' Mem. at 29-30; *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Where, however, there is "substantial doubt whether the [government] chose correctly … [,] [t]hat makes vacatur appropriate." *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 614-15 (D.C. Cir. 2017) (citation omitted). The government bears the burden of dispelling this doubt. *See, e.g.*, *Am. Great Lakes Ports Ass'n*, 301 F. Supp. 3d at 103 (D.D.C. 2018).

Defendants seek the exception to the general rule requiring vacatur without even acknowledging the rule's existence. Their attempt to fit their unlawful conduct into the exception does not come close to satisfying the D.C. Circuit's test for remand without vacatur.

### A.  The Deficiencies In The Stay Are Serious

As to the first factor, Defendants' assertion that OMB could "easily cure the defects in its memorandum by further explanation," Defs.' Mem. at 33, ignores the fact that the core of its

explanation was *wholly specious*—not merely unexplained. *See supra* at 15-25, 27-30; Pls.'
Mem. at 14-18. Indeed, the *only* written Record evidence assessing the data file claim rejected it
outright. *See supra* at 19-20, n.7. The claim that the data file specifications represented a material
change in circumstances—let alone a significant one—thus cannot be saved through further
explanation. Even if it could, this alone would not warrant remand; "the Administrative
Procedure Act itself contemplates vacatur as the usual remedy when an agency fails to provide a
reasoned explanation." *AARP v. EEOC*, 292 F. Supp. 3d 238, 242 (D.D.C. 2017).

Moreover, Defendants' many other errors make it impossible to conclude with any
confidence that the agency will "likely … be able to justify its decision on remand." *Heartland
Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009). There is no basis for assuming
that Defendants' utter failure to address the strong reasons EEOC found (and OMB accepted) for
revising the EEO-1 in the first place can be adequately corrected; indeed, Defendants do not
address them even in their briefing before this Court, and have demonstrated no sign of
explaining them away in the "review" that purportedly has occupied the sixteen months since the
stay. This alone requires vacatur. *See, e.g.*, *SecurityPoint Holdings, Inc. v. TSA*, 867 F.3d 180,
185 (D.C. Cir. 2017) ("[T]he court must vacate a decision that 'entirely failed to consider an
important aspect of the problem.'" (quoting *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43
); *Stewart v. Azar*, 313 F. Supp. 3d 237, 273 (D.D.C. 2018) ("The D.C. Circuit recently affirmed
that 'fail[ure] to address' an important aspect of the problem is a 'major shortcoming.' It has thus
repeatedly vacated agency actions with that flaw." (citation omitted)). Defendants' failure to
acknowledge and explain the departures from their previous determinations, their conclusions
contrary to the evidence and EEOC's own analysis, and their conclusory, unreasoned analysis
are not mere technical errors but "major shortcomings that go to the heart of [Defendants']

decision, and create 'substantial doubt whether [Defendants] chose correctly.'" *Humane Society*, 865 F.3d at 614-15 (quoting *Sugar Cane Growers Co-Op of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002)).

Defendants make two other arguments that require little response. The first is that remand is more appropriate "in the context of informal adjudications." Defs.' Mem. at 32. As explained above, Defendants' actions were not an informal adjudication. *See supra* at 4-6. In any event, this proposition is not found anywhere in the sole case Defendants cite, which was not about vacatur but about whether a court may insist on procedures not required by the APA or the Due Process Clause. *See PBGC v. LTV Corp.*, 496 U.S. 633, 653-55 (1990).

Defendants also suggest that remand is appropriate because "OMB did not consider its review and stay to be final agency action." Defs.' Mem. at 33. This argument, too, is not supported by any precedent. An agency cannot escape the normal remedy of vacatur merely by professing ignorance of the basics of administrative law. *See* Pls.' Opp'n to Mot. to Dismiss at 36-42 (demonstrating that the stay is final agency action under blackletter law).

### B.  Vacatur Would Not Have Disruptive Consequences.

Defendants also make a one-paragraph argument claiming, without citation to any factual evidence or precedent, that vacatur would have disruptive consequences. This does not come close to carrying Defendants' burden. Defendants claim that remand without vacatur would preserve "the status quo before OMB's original approval," Defs.' Mem. at 33, but the relevant question is what the status quo was before the unlawful action—namely that the revised EEO-1, including the pay data collection, was in effect. *See, e.g.*, *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 21 (D.D.C. 2017) (vacating unlawful stay where "vacating the [stay] would simply allow the [stayed rule] to take effect, as the agency originally intended"). They similarly claim that "OMB would be required to halt the administrative process" of reconsidering the data

collection approval, Defs.' Mem. at 34, but this too is wrong, as Plaintiffs seek only to vacate the stay. While Defendants have provided no indication that an active reconsideration process is actually underway, nothing would prevent them from engaging in a reconsideration should it otherwise be warranted.

Moreover, adjustments to the agency's re-review are insufficient to merit an exception to the ordinary rule of vacatur. "Disruptive consequences" are typically found in exceptional circumstances, where, for example, the successful challenger argues that the challenged rule "does not go far enough." *Advocates for Hwy. & Auto Safety*, 429 F.3d at 1151. "[T]he rare exceptions to vacatur involve irreparable and severe disruptive consequences" such as "the extinction of an already endangered species" or "rolling blackouts affecting thousands, if not millions of people." *California v. BLM*, 277 F. Supp. 3d 1106, 1125 (N.D. Cal. 2017). Defendants do not and cannot suggest that the consequences of vacatur rise anywhere near this level.[12]

If anything, it is remand without vacatur that would have disruptive consequences. One year of lawfully approved data collection has already been lost, and a second year is in jeopardy as long as the unlawful stay remains in effect. Defendants' arguments would create a perverse precedent: an agency could rush to stay an action it wished to, but could not, reverse that action, and the agency would achieve the outcome it desired even after a court found it unlawful— potentially years, given the pace of the appeals process and the administrative reconsideration process. This is therefore an inappropriate case for remanding without vacatur.

---

[12] Defendants correctly do not argue that harm to entities that will collect and report pay data required by the EEO-1 revision constitutes a sufficiently disruptive consequence, which it plainly would not. *See, e.g.*, *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 35-36 (vacating stay even though "thousands of facilities across multiple, diverse industries will need to begin to make major compliance investments").

## <u>CONCLUSION</u>

For the forgoing reasons, Plaintiffs respectfully request that the Court enter summary judgment in their favor and vacate the stay of the revised EEO-1 pay data collection.

Dated: January 15, 2019                                          Respectfully submitted,

/s/ *Robin F. Thurston*____
Robin F. Thurston (DC Bar No. 1531399)
Javier M. Guzman (DC Bar No. 462679)
Jeffrey B. Dubner (DC Bar No. 1013399)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
rthurston@democracyforward.org
jguzman@democracyforward.org
jdubner@democracyforward.org

Fatima Goss Graves (DC Bar No. 481051)
Emily J. Martin (DC Bar No. 991968)
Sunu Chandy (DC Bar No. 1026045)
Maya Raghu (DC Bar No. 1035558)
National Women's Law Center
11 Dupont Circle, NW, Ste 800
Washington, DC 20036
(202) 588-5180
fgraves@nwlc.org
emartin@nwlc.org
schandy@nwlc.org
mraghu@nwlc.org

*Attorneys for Plaintiffs*