This PDF is available from The National Academies Press at http://www.nap.edu/catalog.php?record_id=13496



# Collecting Compensation Data from Employers

ISBN
978-0-309-26408-2

140 pages
6 x 9
PAPERBACK (2012)

Panel on Measuring and Collecting Pay Information from U.S. Employers by Gender, Race, and National Origin; Committee on National Statistics; Division on Behavioral and Social Sciences and Education; National Research Council

      

---

## Visit the National Academies Press online and register for...

✔ Instant access to free PDF downloads of titles from the

  ■ NATIONAL ACADEMY OF SCIENCES

  ■ NATIONAL ACADEMY OF ENGINEERING

  ■ INSTITUTE OF MEDICINE

  ■ NATIONAL RESEARCH COUNCIL

✔ 10% off print titles

✔ Custom notification of new releases in your field of interest

✔ Special offers and discounts

---

Distribution, posting, or copying of this PDF is strictly prohibited without written permission of the National Academies Press. Unless otherwise indicated, all materials in this PDF are copyrighted by the National Academy of Sciences.
Request reprint permission for this book

Copyright © National Academy of Sciences. All rights reserved.

THE NATIONAL ACADEMIES
*Advisers to the Nation on Science, Engineering, and Medicine*

Collecting Compensation Data from Employers

# COLLECTING COMPENSATION DATA FROM EMPLOYERS

Panel on Measuring and Collecting Pay Information from
U.S. Employers by Gender, Race, and National Origin

Committee on National Statistics

Division of Behavioral and Social Sciences and Education

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

Copyright © National Academy of Sciences. All rights reserved.

Collecting Compensation Data from Employers

# Summary

For identifying the possibility of discriminatory practices, the U.S. agencies with responsibilities for enforcing equal employment opportunity (EEO) laws have long relied, along with other sources, on detailed information that is obtained from employers on employment in job groups by gender and race/ethnicity. The U.S. Equal Employment Opportunity Commission (EEOC), the Office of Federal Contract Compliance Programs (OFCCP) of the U.S. Department of Labor, and the Civil Rights Division of the U.S. Department of Justice (DOJ) have developed processes that use these employment data as well as other sources of information to target employers for further investigation and to perform statistical analysis that is used in enforcing the antidiscrimination laws. The limited data from employers do not include (with a few exceptions) ongoing measurement of possible discrimination in compensation.

The proposed Paycheck Fairness Act of 2009 (H.R. 12) would have required EEOC to issue regulations mandating that employers provide the EEOC with information on pay by the race, gender, and national origin of employees. The legislation was not enacted. If the legislation had become law, the EEOC would have been required to confront issues regarding currently available and potential data sources, methodological requirements, and appropriate statistical techniques for the measurement and collection of employer pay data.

At the suggestion of a White House Task Force, EEOC asked the National Research Council through its Committee on National Statistics to convene a panel to review methods for measuring and collecting pay information by gender, race, and national origin from U.S. employers. The

Copyright © National Academy of Sciences. All rights reserved.

OMB_0000014

*2*                     *COLLECTING COMPENSATION DATA FROM EMPLOYERS*

Panel on Measuring and Collecting Pay Information from U.S. Employers by Gender, Race and National Origin considered suitable data collection instruments, procedures for reducing reporting burdens on employers, and issues of confidentiality protection and data access.

The panel concludes that the collection of earnings data would be a significant undertaking for the EEOC and that there might well be an increased reporting burden on some employers. The panel also concludes that there is, at present, no clearly articulated vision of how the data on wages could be used in the conduct of the enforcement responsibilities of the relevant agencies. The main purpose for which the wage data would be collected, as articulated to the panel by EEOC and OFCCP representatives, is for targeting employers for investigation regarding their compliance with antidiscrimination laws But beyond this general statement of purpose, the specific mechanisms by which the data would be assembled, assessed, compared, and used in a targeting operation are not well developed by either agency. An Advance Notice of Proposed Rulemaking (ANPRM), issued in August 2011 by OFCCP, posed relevant questions in seeking public comment on the development and implementation of a new compensation data collection tool. The ANPRM contained a set of 15 questions encompassing all aspects of the new tool. Questions put forth included which type of wage data to collect, appropriate job categories, the possibility of submitting data on an establishment basis, electronic data submission, etc.[1]

Nonetheless, the panel found no evidence of a clearly articulated plan for using the earnings data if they are collected. The fundamental question that would need to be answered is how the earnings data should be integrated into the compliance programs, for which the triggers for the EEOC and DOJ have primarily been a complaint process that has generated relatively few complaints about pay matters.

Furthermore, the panel concludes that existing studies of the cost-effectiveness of an instrument for collecting wage data and the resulting burden are inadequate to assess any new program. Unless the agencies have a comprehensive plan that includes the form of the data collection, it will not be possible to determine, with precision, the actual burden on employers and the probable costs and benefits of the collection. Therefore, the first recommendation is to develop such a plan.

> **Recommendation 1: In conjunction with the Office of Federal Contract Compliance Programs of the U.S. Department of Labor and the Civil Rights Division of the U.S. Department of Justice, the U.S. Equal Employment Opportunity Commission should prepare a comprehensive plan for use of earnings data before initiating any data collection.**

---

[1] For the full set of questions in the ANPRM, see 76 FR 49398–49401.

Copyright © National Academy of Sciences. All rights reserved.

OMB_0000015

Collecting Compensation Data from Employers

The second recommendation stems from the panel's conclusion that existing evidence does not provide an adequate basis for determining the costs and benefits of the collection of wage data. Based on the data use plan, the panel recommends that a pilot study be conducted by an independent organization to provide much more reliable information about the costs and benefits of the proposed collection.

> **Recommendation 2: After the U.S. Equal Employment Opportunity Commission, the Office of Federal Contract Compliance Programs, and the U.S. Department of Justice complete the comprehensive plan for use of earnings data, the agencies should initiate a pilot study to test the collection instrument and the plan for the use of the data. The pilot study should be conducted by an independent contractor charged with measuring the resulting data quality, fitness for use in the comprehensive plan, cost, and respondent burden.**

The panel offers two approaches to the recommended pilot study. The first pilot test—a microdata pilot approach—proposes collecting a number of core demographic variables (using the categories on the EEO-1 form) and adding an annual wage measure in order to test targeting firms for enforcement purposes. In addition, the pilot would test the collection of additional variables that are relevant to a firm's practices. For example, age and years-on-the-job variables could assist in controlling for the legitimate effect of these characteristics on wages.

The second approach—a simplified aggregated-data pilot—would develop and test an enhanced EEO-1 report that would include all the summary data required for the computation of test statistics comparing wage data within existing EEO-1 occupations. This pilot would use grouped data techniques that would produce standardized wage rates and other measures of interest. The end product would be a prototyped method for providing screening information about pay that is based on standardized information and audited test statistic formulas.

Both approaches to the pilot studies could also test various earnings definitions, such as those used in the Bureau of Labor Statistics' Occupational Employment Survey. The tests would assess the possibility of reducing employer response burden by using commercial electronic record-keeping systems in use in the larger companies. The quality of the data collected in the pilots would be independently verified by record checks or by comparison of aggregated results with administrative databases.

More needs to be done administratively to prepare the ground prior to commencing any data collection. EEOC has a small and lightly resourced data collection and analytical program that has traditionally been focused nearly exclusively on collecting employment data, developing summary

Copyright © National Academy of Sciences. All rights reserved.

*4*                              *COLLECTING COMPENSATION DATA FROM EMPLOYERS*

statistics, and assessing individual employer compliance through the means of rather straightforward statistical tests. If data on compensation are added to an existing form, or collected in a new instrument, it is likely that the resources for both collection and analysis in the agency would be severely strained. Thus, it is important that EEOC (and its partner antidiscrimination agencies) assess their capacity to undertake any new data collection and, when necessary, enhance their capacities to take full advantage of new opportunities for analytics and compliance, using the more sophisticated measures that will be possible.

> **Recommendation 3: The U.S. Equal Employment Opportunity Commission should enhance its capacity to summarize, analyze, and protect earnings data.**

There are several possible means of collecting earnings information, ranging from pay bands (the clustering of pay levels method now used in the EEO-4 reports) to rates of pay. Pay band data are attractive in that they align with the way that human resource managers tend to look at compensation, but the best data are collected from payroll records, and those are most likely to be rates of pay or average earnings as computed with information on total wages and hours. Data on rates of pay have the advantage of being more likely to provide valid measures of central tendency and dispersion, thereby affording an important quality check and analytical capability. Rates of pay collection would add rigor to the collection process.

> **Recommendation 4: The U.S. Equal Employment Opportunity Commission should collect data on rates of pay, not actual earnings or pay bands, in a manner that permits the calculation of measures of both central tendency and dispersion.**

It is important to use a definition of compensation that is measurable, collectable, and, in the end, meaningful. There are a number of definitions that are currently in use, ranging from comprehensive measures of total compensation to simple straight-time hourly pay. The panel concludes that a measure such as that used in the Occupational Employment Survey would best illuminate earnings levels. This measure has the added benefit of being generally available because earnings data by occupation are now collected with use of this definition from more than 1.2 million establishments.

Most of the firms that fall within the scope of the EEO statutes and are now required to complete an annual EEO-1 report have the ability to provide these data from their existing payroll and human resource systems. The growing penetration of highly sophisticated software-as-a-service applications into the marketplace will further enhance the ability of establishments

Copyright © National Academy of Sciences. All rights reserved.

OMB_0000017

Collecting Compensation Data from Employers

to provide earnings data by job group and gender, race, and national origin in the future.

Finally, the sensitivity of the data that employers provide to EEOC will be heightened if earnings data are added to EEO data records, since employee compensation data are generally considered to be highly sensitive, even proprietary information, by most employers. Therefore, it will be important for EEOC to develop more sophisticated techniques for protecting data that are provided in tabular and microdata form to the public.

> **Recommendation 5: In anticipation of increased user demand for microdata on pay information by demographic detail for research and analytical purposes if such data are collected by the U.S. Employment Opportunity Commission, the agency should consider implementing appropriate data protection techniques, such as data perturbation and the generation of synthetic data to protect the confidentiality of the data, and it should also consider supporting research for the development of these applications.**

In order to assure reporting employers that their data are indeed protected from disclosure, it will be important to establish clear and legally enforceable protections for sharing the data that employers provide in confidence. The agencies should consider whether the protections, now insured through the mechanism of interagency memoranda-of-understanding, should be incorporated in legislation.

> **Recommendation 6: The U.S. Equal Employment Opportunity Commission should seek legislation that would increase the ability of the agency to protect confidential data. The legislation should specifically authorize data-sharing agreements with other agencies with legislative authority to enforce antidiscrimination laws and should extend Title VII penalties to nonagency employees.**

Copyright © National Academy of Sciences. All rights reserved.

OMB_0000018

*SURVEY DESIGN AND STATISTICAL METHODOLOGY*                    *71*

this equation is 0.47, and the residual variance is 0.26. As can be seen in Figure 4-1, 545 employees are required for a power of 0.50 in this case, while about the same sample size (551 employees) yields a power of 0.90. The power curve for this model is flat because there are 496 degrees of freedom for the detailed occupation controls. Once there are adequate data to fit this model, about 50 additional observations are needed to achieve the target power for the EEO race and gender test.

## MINIMIZATION OF REPORTING BURDEN

### Estimation of Burden

One reason for the outcry on the part of the business community when the Paycheck Fairness Act was under consideration in Congress was the perception that the legislation would impose a significant new reporting burden on employers, particularly on small employers. The Paperwork Reduction Act of 1995 specifically requires agencies to demonstrate the practical utility of the information that they propose to collect and to balance this against the burden imposed on the public.

EEOC currently calculates the cost and burden of its data collections in its submissions of Information Collection Requests to the U.S. Office of Management and Budget (OMB). The number of respondents (including multi-establishment respondents), responses (usually at the establishment level), estimated burden hours, costs, and mode of collection for the four major EEO data collections in the most recent reports of EEOC to OMB are shown in Table 4-4.

The estimates of burden costs and hours in Table 4-4 are based on the EEOC's best estimates of the amount of time it takes for clerks to retrieve and enter the data to paper records. However, because less than one-fourth of employers who report now file paper records, the burden estimates may be overstated.

### Options for Minimizing Response Burden

To the extent that the current burdens data are representative, the addition of earnings data to the existing EEOC data collection forms that do not now collect the data, in much the same manner in which earnings data are collected in the EEO-4 form, could be expected to nearly double the current burden on employers. In the case of the largest collection, the current average of 3.5 hours per EE0-1 form might increase to somewhere near the average of 6.6 hours now reported for the EE0-4 form. This is not an inconsequential increase in response burden. It would behoove EEOC to consider taking steps to reduce the increase in response burden.

Copyright © National Academy of Sciences. All rights reserved.

JA008

OMB_0000084

Copyright © National Academy of Sciences. All rights reserved.

Collecting Compensation Data from Employers

72

**TABLE 4-4**  Estimated Cost and Burden of EEOC Data Collections

| Form | Frequency | Respondents | Responses | Estimated Burden Hours | Estimated Cost | Percent Electronic Reported |
|------|-----------|-------------|-----------|------------------------|----------------|------------------------------|
| EEO-1 | Annual | 45,000 | 170,000 | 599,000 | $11,400,000 | 80 |
| EEO-3 | Biannual | 1,399 | 1,399 | 2,098 | 85,000 | 79 |
| EEO-4 | Biannual | 6,018 | 6,018 | 40,000 | 700,000 | 76 |
| EEO-5 | Biannual | 1,135 | 1,135 | 10,000 | 190,000 | 58 |

SOURCE: Data from EEOC Form 83-I submissions to OMB.

OMB_0000085

JA009

Collecting Compensation Data from Employers

Several options are available for reducing the burden on reporters. Three are discussed in this section—less frequent data collection, use of a rotating scheme for certain employer size classes, and raising the size cutoff so that fewer employers would be in the scope of the collection.

## Less Frequent Collection

The EEO-1 report is now collected annually, while the other forms are collected on a biannual basis. The main issue is with the EEO-1 form. The law does not require the annual collection of EEO-1 data. The timing of collection is an administratively imposed requirement. By administratively reducing the frequency of data collection, the burden might also be reduced, though the extent to which it might be reduced is not entirely clear.

On the negative side, the less frequent availability of the reports would mean that the information that supports EEOC enforcement functions would be less current, by a year or so. This lag could be an important issue during economic turning points, when hiring or layoffs could significantly influence the employment and earnings profiles of covered firms. The time lag for EEOC's investigations of potential discrimination would increase, and the ability of the agency to be responsive to complaints in a timely manner would be negatively affected.

## Rotating Sample

It might be possible to continue to collect data annually but from only a part of the current reporting population and to permit firms with certain characteristics, such as not meeting a threshold size or in a selected industry group, to report less frequently. The selection of annual versus biannual reporters could, for example, be based on an analysis by EEOC of the probability of discrimination based, in turn, on the experience of the agency with enforcement. This tailored approach to selection of those firms that could report less frequently, however, would be hard to administer and could well be difficult to implement fairly in practice.

Moreover, this nuanced approach might actually complicate matters for employers. Because so many firms automate their reporting, it is now a routine matter, and rotating the reporting requirement might actually increase the administrative burdens. Employers would need to figure out when they needed to report, and the task of developing a database to capture the reports might be much more burdensome for EEOC.

Copyright © National Academy of Sciences. All rights reserved.

OMB_0000086

74                    *COLLECTING COMPENSATION DATA FROM EMPLOYERS*

*Raising the Size Cutoff*

The current employment cutoff for the annual requirement to submit an EEO-1 form is 100 employees (50 employees if the firm is a federal government contractor). This cutoff limits the overall potential response burden significantly. By raising the size cutoff to, say, 200 employees (based on the statistical power analysis presented above), the number of firms that would have to report earnings would be reduced by half, but the employment coverage would be reduced by less than 10 percent (see Table 1-1, in Chapter 1). One consequence of raising the cutoff size would be a relative reduction in coverage of the earnings of females and minorities. The firms in the size classes for which the reporting requirement would be eliminated are those in which women and minorities are more heavily represented. Experiments with different cutoff sizes to better determine the tradeoffs between burden and coverage could be useful to include in the pilot study that the panel recommends (see Chapter 6).

## HUMAN RESOURCE AND PAYROLL SYSTEMS

Most companies of the size covered by EEO regulations have at least somewhat automated payroll and human resource management systems. Today, larger companies are more able to comply with a potential requirement for compensation data by gender, race, and national origin because they can gather compensation information from automated payroll systems and demographic data from automated human resource systems.

The panel reviewed the state of automation of company payroll systems from the perspective of three service providers—a large payroll-providing service firm, a firm that specializes in the emerging software-as-a-service (SaaS) market, and a firm that specializes in using companies' own internal data to analyze EEO status and prepare Affirmative Action Plans for those companies. In summary, we found that automated systems were expanding rapidly among U.S. employers, but that there are differences in the extent of implementing these applications by size of firm.

Currently, larger firms are likely to have human resource and payroll management systems, and they are likely to have an easier time in complying with a new requirement to provide compensation data by demographic characteristics than would smaller firms. Over time, one would expect that the use of such systems will grow and spread among smaller firms. In the long term, these automated systems may well serve as the basis for EEOC employment and wage data collection. As discussed in Chapter 6, the panel recommends a pilot test to collect information on the extent of penetration of these human resource and automated systems: see Appendix C.

Copyright © National Academy of Sciences. All rights reserved.

Collecting Compensation Data from Employers

### Payroll and Human Resource Providers

The industry of payroll and human resource providers is character-ized by a growth in services beyond the usual provision of timekeeping and payroll functions. Most recently, the industry has expanded to include human resource management. As a result, one provider can bring together information on hours, earnings, and the demographics and work histories of the workforce. These data are captured directly from a client's data sys-tems, often without client intervention.

The panel interviewed a large payroll-providing company to determine the influence of the growth of this sector on the reporting of earnings data to EEOC. This company lists 600,000 clients, representing, in the com-pany's estimation, one of every six U.S. employees. The clients employ as few as 1 and as many as 1 million employees.

The company has a line of business that focuses on smaller employers—those with fewer than 100 employees—to provide a total source of payroll and human resource services. The company estimates that about 40 percent of these smaller employers use human resource services as well as payroll services. One product for the clients who use human resource services and who have an OFCCP or EEOC requirement is to produce EEO-1 reports.

### Growth of Software-as-a-Service Applications

The workshop presentation by Karen Minicozzi of Workday, Inc., representing an enterprise software solution, highlighted the unified human capital management solutions offered by the enterprise software and ser-vices provider, Workday, Inc. The company is one of a growing number of firms that provide turnkey payroll and human resource management solu-tions to businesses under the general label of SaaS. The solutions provide a new, global core system of record to replace legacy systems that have been maintained by the establishments themselves. The approach taken by these service providers is through a multitenant architecture: that is, one version of the application with common hardware, networking, and operating sys-tems is used for all customers ("tenants"). The applications are often sup-ported in the "cloud," that is, through Internet connectivity. The fact that these new service approaches have so much in common allows the genera-tion of common reports (such as EEO reports) across the system, drawing on data from both the human resource and payroll functions of the serviced companies. Most of the companies that use this service are mid-size, large, and very large companies. Workday, Inc. has 246 customers.

These SaaS providers have been enjoying remarkable growth. An annual survey of employing establishments by the consulting firm CedarCrestone,

Copyright © National Academy of Sciences. All rights reserved.

OMB_0000088

Collecting Compensation Data from Employers

to ascertain the penetration of human resource applications in business, found them to be widespread, and it forecast SaaS as a deployment option will likely continue that growth as organizations move from licensed on-premise solutions to the cloud. The source of this information is the *CedarCrestone 2010–2011 HR Systems Survey*. The survey is based on 1,289 responses, representing employers of over 20 million employees (CedarCrestone, 2011). The survey also found that there were measurable differences in the penetration of these administrative applications by size of firm. In the most recent survey, 94 percent of employers with 10,000 or more employees had such systems, compared with 87 percent for employers with 250 to 2,499 employees. The CedarCrestone survey found that most of the applications were still licensed software, but the subscription-based SaaS applications and outsourcing solutions were growing in use.

### Analysis of Salary and Related Data for Pay Equity Purposes

In order to ensure that their firms are in compliance with the Equal Pay Act, Title VII, and Executive Order 11246 provisions, many employers use firms that perform compensation analysis and, in many cases, actually prepare automated Affirmative Action Plans. Other firms use software to support this analysis internally.

The panel heard testimony from Liz Balconi and Michele Whitehead, representatives of Berkshire Associates, a company that is very active in the compensation analysis business. This company obtains the following information from its client firms: employee identifier; job code; race; gender; date of hire; annualized base salary or hourly rate; grade, band, or classification (if applicable); time in current position, or date of last title change; date of last degree earned, or date of birth; full time or part time status; exempt or nonexempt status; title; employee location; years of relevant experience (or date of birth); factors that may legitimately impact pay in an organization, such as performance rating; education; date in grade; professional certifications; division; job group; starting salary; and annualized total compensation (including bonuses, commissions, cost of living allowances, and overtime).

The firm uses these data (which are generally available from their clients) to conduct two kinds of analyses: cohort analysis, which is a nonstatistical comparison of similarly situated incumbents within a group based on factors such as time in the company, educational background, and performance assessment; and statistical (regression) analysis to study the combined effect of factors on pay between comparator groups. Although not all of these data elements may be necessary to identify potentially discriminatory practices, prudent employers can be expected to have these types of data available and to use them to evaluate their own practices, using algorithms developed by specialty firms such as Berkshire Associates.

Copyright © National Academy of Sciences. All rights reserved.

# 6

# Conclusions and Recommendations

The panel was invited to make recommendations to assist the U.S. Equal Employment Opportunity Commission (EEOC) in formulating regulations on methods for measuring and collecting pay information by gender, race, and national origin from U.S. employers for the purpose of administering Section 709 of the Civil Rights Act of 1964 as amended, if a decision is made to proceed with such a data collection. We have considered currently available and potential data sources, as well as methodologies and statistical techniques for the measurement and collection of such employer pay data. The panel's recommendations are made with an appreciation that such a new data collection would be a significant undertaking for EEOC and that it could well generate an increased reporting burden on some employers, and so any new data collection would have to be fully justified.

## PURPOSE OF A NEW DATA COLLECTION

Based on the literature we reviewed and the papers and presentations made to us by the staff of EEOC, the Office of Federal Contract Compliance Programs (OFCCP) in the U.S. Department of Labor, and the U.S. Department of Justice, the panel finds that there is no clearly articulated vision of how data on wages would be used in the conduct of the enforcement responsibilities of these agencies. As discussed in Chapter 1, the use of the employment data from the EEO-1 reports for the purpose of targeting potentially noncompliant firms was highlighted by EEOC and OFCCP leadership as an objective of the collection of earnings data by gender, race, and national origin. Thus, targeting is broadly given as the objective

*86*

Copyright © National Academy of Sciences. All rights reserved.

Collecting Compensation Data from Employers

of collection of earnings data by both OFCCP and EEOC, but the specific mechanisms by which the data would be assembled, assessed, compared, and used in a targeting operation are not well developed by either agency. The panel found no evidence of a clearly articulated plan for using the earnings data if they are collected: the fundamental question that would need to be answered is how earnings data should be integrated into the compliance programs that have to date been triggered mainly by a complaint process, which, in their absence, includes relatively few complaints about pay matters.

With regard to existing studies of the cost-effectiveness of an instrument for collecting wage data, the panel concludes that they are inadequate to assess any new survey program. For example, unless the agencies have a comprehensive plan that includes the form of the data collection, it will not be possible to reliably determine the actual burden on employers and the costs and benefits of the collection.

As discussed in Chapter 3, it is important to clearly understand the requirement and potential uses of data as a first step in determining their fitness for use, that is, the quality of the data. Although it is assumed that, if these data are collected, they could greatly enhance the enforcement process, until EEOC and its cooperating agencies gain experience with collecting, processing, and using earnings data in field investigations and in litigation, it will not be known if the data are of sufficient reliability to support enforcement.

Other potential benefits of the possible collection of pay data remain to be fully articulated but are of interest. In addition to targeting, the collection of earnings data could well be used in research on discrimination and pay equity. Analysts would be able to associate pay differentials by type of establishment, location, job category (occupation), and demographic detail, which cannot currently be done with existing data. For such use, however, systems for maintaining, retrieving, archiving, and processing the data in a protected environment would have to be developed.

> **Recommendation 1: In conjunction with the Office of Federal Contract Compliance Programs of the U.S. Department of Labor and the Civil Rights Division of the U.S. Department of Justice, the U.S. Equal Employment Opportunity Commission should prepare a comprehensive plan for use of earnings data before initiating any data collection.**

## PILOT STUDY

With a comprehensive plan in hand, the next logical step would be to test it. Because of the current paucity of evidence about such a data collection, the panel concludes that reliable information about the costs and

Copyright © National Academy of Sciences. All rights reserved.

OMB_0000100

Collecting Compensation Data from Employers

benefits of the proposed collection would best be provided by an independent pilot study. The panel's two-pronged approach to conducting a pilot study (to be done by an independent contractor) is outlined below and detailed in Appendix C.

The first approach—a microdata pilot test—would collect a number of core demographic variables—using the categories on the Equal Employment Opportunity (EEO)-1 form and adding an annual wage measure for individual employees. This approach would test targeting firms for enforcement purposes, as well as testing the collection of additional variables that could illuminate the relevant characteristics of targeted firms. For example, age and years-on-the-job variables could assist in controlling for the legitimate effect of these characteristics on wages. In developing the test, the public responses to the OFCCP ANPRM could well be instructive.

The second approach—a simplified aggregated-data pilot test—would develop and test an enhanced EEO-1 report that would include all the summary data required for the computation of test statistics comparing wage data in existing EEO-1 occupations. This pilot would use grouped data techniques that would produce standardized wage rates and other measures of interest.

Both approaches to the pilot study could test various earnings definitions. On the basis of our analysis, we conclude that the definition used in the Occupational Employment Statistics (OES) survey is the most feasible (see under heading Definition of Compensation). The tests could also assess the possibility of reducing employers' response burden through building in compatibility with the electronic record-keeping systems that are now in use in larger companies.

The quality of the data from the pilot tests would have to be assessed in light of the analysis plan that results from Recommendation 1. It would also be desirable for the quality of the data collected in the pilot to be verified by independent record checks of reporting establishments or by comparison of aggregated results with administrative databases (see Chapter 2), again using the criteria developed as part of the analysis plan in Recommendation 1.

> **Recommendation 2: After the U.S. Equal Employment Opportunity Commission, the Office of Federal Contract Compliance Programs, and the U.S. Department of Justice complete the comprehensive plan for use of earnings data, the agencies should initiate a pilot study to test the collection instrument and the plan for the use of the data. The pilot study should be conducted by an independent contractor charged with measuring the resulting data quality, fitness for use in the comprehensive plan, cost, and respondent burden.**

Copyright © National Academy of Sciences. All rights reserved.

OMB_0000101

Collecting Compensation Data from Employers

## AGENCY CAPACITY AND BURDEN

It is important to consider the administrative capacity for the collection, analysis, and protection of pay data. The EEOC has a small data collection and analytical program, which has traditionally been focused nearly exclusively on collecting employment data and assessing employer compliance through the means of rather straightforward statistical tests.

If EEOC undertakes a major new activity, it is not clear that it could administratively handle the work given available resources. If data on compensation is added to an existing form, or collected in a new instrument, the agency's resources for both collection and analysis are likely to be severely strained. Thus, EEOC needs to consider its capacity to undertake any new collection. To take full advantage of new opportunities for analytics and compliance using more sophisticated measures enabled by the availability of detailed earnings data will surely require an enhancement of EEOC's analytical and data processing capacity, as well as its capability to protect the confidentiality of the information.

> **Recommendation 3: The U.S. Equal Employment Opportunity Commission should enhance its capacity to summarize, analyze, and protect earnings data.**

## MEASURES FOR COLLECTION OF PAY INFORMATION

Several possible measures of pay information could be used for the possible new data collection, ranging from pay bands (the measure now used on the EEO-4 form) to rates of pay (e.g., annual salaries, hourly wages, etc.). Though pay band collection is attractive in that it aligns with the way that human resource managers tend to look at compensation, the best data are collected from payroll records, and those data are most likely to be rates of pay or average annual earnings as computed using total wage and hours information. Rates of pay as a measure have the advantage of being more likely to provide valid measures of both central tendency and dispersion, important quality checks and analytical capabilities that pay band data cannot provide. Rates of pay collection would add rigor to the collection process and subsequent analysis.

> **Recommendation 4: The U.S. Equal Employment Opportunity Commission should collect data on rates of pay, not actual earnings or pay bands, in a manner that permits the calculation of measures of both central tendency and dispersion.**

Copyright © National Academy of Sciences. All rights reserved.

OMB_0000102

Collecting Compensation Data from Employers

## DEFINITION OF COMPENSATION

A number of definitions of compensation are currently in use, ranging from comprehensive measures of total compensation to simple straight-time hourly pay. As noted above and in Chapter 3, we conclude that the best definition is that in the OES survey, and we urge that a test of collection of data from employers by gender, race and national origin be conducted as part of the pilot test program.

As noted in Chapter 3, earnings in the OES survey are defined as straight-time, gross pay, exclusive of premium pay. The definition includes a base rate of pay, cost-of-living allowances, guaranteed pay, hazardous-duty pay, incentive pay (including commissions and production bonuses), and tips. The definition excludes overtime pay, severance pay, shift differentials, nonproduction bonuses, employer cost for supplementary benefits, and tuition reimbursements.

Earnings data by occupation are collected in the OES survey with use of this definition from more than 1.2 million establishments in the United States with response rates of nearly 80 percent. Clearly, most of the firms that fall within the scope of the EEO statutes and are now required to complete an annual EEO-1 report have the ability to provide these data from their existing payroll and human resource systems.

With the growth of highly sophisticated electronic systems, such as those represented in software-as-a-service applications, the ability to transfer data efficiently between the payroll and human resource systems is expected to expand in the future. By monitoring these quickly changing software developments and continuing its work with reporting employers, EEOC could capitalize on advances in electronic reporting.

## ACCESS TO PAY INFORMATION IN A PROTECTED ENVIRONMENT

If the pilot tests and other developmental activities recommended in this report bear fruit and if EEOC begins collection of pay data from employers, the data will comprise an important new source of information for research and analytical purposes, in addition to their intended use in enforcement. We expect that there will be great demand on the part of other federal agencies, researchers, analysts, compensation-setting bodies, and others for access to these powerful new data. EEOC would be well advised to start taking steps now to develop policies to provide access in a protected environment.

**Recommendation 5: In anticipation of increased user demand for microdata on pay information by demographic detail for research and**

Copyright © National Academy of Sciences. All rights reserved.

OMB_0000103

*CONCLUSIONS AND RECOMMENDATIONS*                                     *91*

analytical purposes if such data are collected by the U.S. Equal Employment Opportunity Commission, the agency should consider implementing appropriate data protection techniques, such as data perturbation and the generation of synthetic data, to protect the confidentiality of the data, and it should also consider supporting research for the development of these applications.

Though there have been no known breaches of the EEOC's ability to protect EEO data, the consequences of a breach in the protection of data provided in confidence are, as other federal agencies have discovered, painful and of lasting consequence. Thus, EEOC should consider providing the same protections to the organizations and individuals that become parties to data-sharing agreements as it now has with its own employees.

**Recommendation 6: The U.S. Equal Employment Opportunity Commission should seek legislation that would increase the ability of the agency to protect confidential data. The legislation should specifically authorize data-sharing agreements with other agencies with legislative authority to enforce antidiscrimination laws and should extend Title VII penalties to nonagency employees.**

Copyright © National Academy of Sciences. All rights reserved.

OMB_0000104



EXECUTIVE OFFICE OF THE
PRESIDENT

OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

ADMINISTRATOR
OFFICE OF
INFORMATION AND
REGULATORY
AFFAIRS

MEMORANDUM

TO:         Acting Chair Victoria Lipnic, Equal Employment Opportunity Commission

FROM:    Neomi Rao, Administrator, Office of Information and Regulatory Affairs

DATE:    August 29, 2017

SUBJECT:    EEO-1 Form; Review and Stay

---

After careful consideration and consultation with the Equal Employment Opportunity Commission (EEOC), and in accordance with the Paperwork Reduction Act (PRA) and its regulations at 5 CFR 1320.10(f) and (g), the Office of Management and Budget (OMB) is initiating a review and immediate stay of the effectiveness of those aspects of the EEO-1 form that were revised on September 29, 2016. These revisions include new requests for data on wages and hours worked from employers with 100 or more employees, and federal contractors with 50 or more employees. EEOC may continue to use the previously approved EEO-1 form to collect data on race/ethnicity and gender during the review and stay.

The PRA authorizes the Director of OMB to determine the length of approvals of collections of information and to determine whether collections of information initially meet and continue to meet the standards of the PRA. In this context, under 5 CFR 1320.10(f) and (g), OMB may review an approved collection of information if OMB determines that the relevant circumstances related to the collection have changed and/or that the burden estimates provided by EEOC at the time of initial submission were materially in error. OMB has determined that each of these conditions for review has been met. For example, since approving the revised EEO-1 form on September 29, 2016, OMB understands that EEOC has released data file specifications for employers to use in submitting EEO-1 data. These specifications were not contained in the Federal Register notices as part of the public comment process nor were they outlined in the supporting statement for the collection of information. As a result, the public did not receive an opportunity to provide comment on the method of data submission to EEOC. In addition, EEOC's burden estimates did not account for the use of these particular data file specifications, which may have changed the initial burden estimate.

OMB_0000299

OMB has also decided to stay immediately the effectiveness of the revised aspects of the EEO-1 form for good cause, as we believe that continued collection of this information is contrary to the standards of the PRA. Among other things, OMB is concerned that some aspects of the revised collection of information lack practical utility, are unnecessarily burdensome, and do not adequately address privacy and confidentiality issues.

In these circumstances, the regulations at 5 CFR 1320.10(f) and (g) require EEOC to submit a new information collection package for the EEO-1 form to OMB for review. In addition, the regulations require EEOC to publish a notice in the Federal Register announcing the immediate stay of effectiveness of the wages and hours worked reporting requirements contained in the EEO-1 form and confirming that businesses may use the previously approved EEO-1 form in order to comply with their reporting obligations for FY 2017.

Thank you for your attention to these matters. Please feel free to contact me with any questions.

2

JA021

OMB_0000300

**EQUAL EMPLOYMENT ADVISORY COUNCIL**

SUITE 400
1501 M STREET, NW
WASHINGTON, DC  20005

TEL 202/629-5650
FAX 202/629-5651

March 20, 2017

Hon. Mick Mulvaney
Director, Office of Management and Budget
725 17th Street NW
Washington, DC 20503

      **Re: Review of the Equal Employment Opportunity Commission's Employer Information (EEO-1) Report (OMB Control Number 3046-0007)**

Dear Director Mulvaney:

      On behalf of the Equal Employment Advisory Council, I am writing to urge the Office of Management and Budget (OMB) to exercise its authority under the Paperwork Reduction Act (PRA) to review the Equal Employment Opportunity Commission's (EEOC's) previously approved collection of information commonly known as the Employer Information (EEO-1) Report (OMB Control Number 3046-0007). As explained in more detail below, we respectfully urge OMB to immediately sunset approval of the form because the EEOC's underlying PRA justification was in material error and because new information disclosed after the form was approved has generated significant compliance questions.

**Statement of Interest**

      The Equal Employment Advisory Council (EEAC) is the nation's largest nonprofit association of employers dedicated to the advancement of practical and effective programs to eliminate employment discrimination. Formed in 1976, EEAC's membership includes approximately 260 of the nation's leading and largest employers, all of which are firmly committed to the principles and practice of workplace nondiscrimination. All of our members are employers subject to the compliance, recordkeeping, and reporting requirements imposed by federal statutes and regulations prohibiting workplace discrimination. In addition, nearly all of our members are federal contractors subject to the additional recordkeeping, reporting, and compliance requirements imposed by Executive Order 11246, the Rehabilitation Act of 1973, and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, and their implementing regulations.

      EEAC has a long track record of working closely with the EEOC to ensure that the EEO-1 Report maintains its relevance and utility to both the Commission and the employers who file it. Over the years, EEAC frequently has been the only organization to submit public comments in response to the EEOC's invitations for stakeholder input on the burdens and utility of the EEO-1

OMB_0000305

Hon. Mick Mulvaney
March 20, 2017
Page 2

Report under the PRA.[1] And for more than four decades, we have worked and communicated less formally with Commission staff to resolve practical concerns regarding the EEO-1 reporting process in ways that benefitted both the Commission and employers.

EEAC also has a long history of researching and providing feedback on other federal agency initiatives to collect compensation data from employers on a broader scale, including those implemented or proposed by the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP). These include OFCCP's Equal Opportunity Survey, which collected summary compensation data from a sample of federal contractors during a five-year period between 2000 and 2004,[2] as well as OFCCP's more recent proposed Equal Pay Report.[3]

EEAC was actively engaged with both the EEOC and OMB as the EEOC sought to revise the EEO-1 Report in 2016. EEAC testified at a public hearing held by the EEOC and submitted formal comments with both the EEOC and OMB during the review process called for under the PRA. EEAC staff and members also met with OMB to express the practical concerns of our member companies about the EEOC's then-proposed revisions.

**Summary of 2016 Revisions and Employer Concerns**

Last year, the EEOC proposed, and the Obama Administration's OMB subsequently approved, significant and expansive revisions to the EEO-1 Report. Under the current version of the EEO-1, employers are required to report establishment headcount on a data grid of 180 data fields. These data fields include 10 job categories, two gender categories, and seven race and ethnicity categories, along with various subtotal and total columns. The revised EEO-1 significantly expands the report in an effort to capture summary data regarding compensation. The revised form also seeks data regarding hours worked, which the EEOC argued were necessary to make the headcount and compensation data more meaningful.

The EEOC's revisions to the EEO-1 now increase the total number of data fields for each establishment from 180 to 3,660. This is the result of: (1) adding 12 pay bands within each job category, requiring employers to report establishment headcount by pay band, job category, gender, and race/ethnicity (a total of 1,830 data fields); and (2) adding a section requiring hours worked data to be reported on a similar "grid" (a total of an additional 1,830 data fields).

Using conservative estimates on the total number of employer establishments subject to the EEO-1 Report requirement, and as detailed in our prior comments to OMB, the revised EEO-

---

[1] See, for example, the supporting documents maintained by the Office of Management and Budget related to EEOC's 2014, 2011, and 2009 information collection requests for approval of the EEO-1 Report, available at http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201412-3046-001, http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201104-3046-003, and http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=200901-3046-001.
[2] OFCCP formally repealed the EO survey in 2006. Office of Federal Contract Compliance Programs, Final Rule, Affirmative Action and Nondiscrimination Obligations of Federal Contractors and Subcontractors, Equal Opportunity Survey, 71 Fed. Reg. 53,032 (Sept. 8, 2006).
[3] Office of Federal Contract Compliance Programs, Notice of Proposed Rulemaking, Government Contractors, Requirement to Report Summary Data on Employee Classification, 79 Fed. Reg. 46,561 (Aug. 8, 2014).

OMB_0000306

Hon. Mick Mulvaney
March 20, 2017
Page 3

1 Report will require covered employers to annually report to the EEOC nearly *3 billion* data fields to describe a covered private-sector workforce of only approximately 76 million employees

Moreover, through the EEOC's public hearing and comment process under the PRA, EEAC, and many other employer groups, raised serious concerns about the EEOC's proposed revisions beyond simply the sheer size of the new reporting burden. These concerns were based on prior experience with the government's collection of compensation data and the actual, firsthand experience of employers in conducting self-critical compensation analyses. These concerns can be very generally summarized as falling within three categories. First, we respectfully submit the data would be of low utility, meaning that it is highly unlikely to be of real help in identifying unlawful or improper pay practices. Second, the revisions will be tremendously burdensome to implement, and these burdens simply cannot be justified by any potential benefit. Finally, confidentiality concerns regarding the disclosure of potentially sensitive compensation data have not been properly addressed. We also expressed dismay that the EEOC for all intents and purposes chose to ignore the recommendations made in a 2012 report that the agency commissioned from the National Academy of Sciences, titled "Collecting Compensation Data From Employers" (NAS Report).[4]

EEAC's detailed concerns with the EEOC's expansive changes to the EEO-1 are expressed in our testimony and public comments on the revisions.[5]

## OMB's Authority Under the Paperwork Reduction Act

Among other things, the PRA's paperwork clearance process is designed to minimize the burdens and maximize the utility of information collected by the federal government.[6] OMB, and in particular, the Office of Information and Regulatory Affairs (OIRA), are charged with ensuring that agency information collection requests comply with these goals. While there is considerable attention paid to the role of agencies in developing information collection requests, and that of OIRA in reviewing and approving requests, the approval of an information collection request and assignment of an OMB control number is not the end of the process.

This is explicitly recognized in OMB's regulations implementing the PRA. These rules allow OMB, on its own initiative, to review a previously approved collection of information before the expiration of its control number.[7] These regulations permit such a review "when

---

[4] The NAS Report is available at: https://www.nap.edu/catalog/13496/collecting-compensation-data-from-employers.
[5] EEAC's March 16, 2016 testimony as prepared for delivery before the EEOC is available at: http://www.eeac.org/public/EEO-1%20Testimony%203-16-16.pdf. Note that the EEOC has not made the transcript of the hearing or the video recording publicly available. EEAC's comments made in response to the EEOC's 60-day notice are available at: http://www.eeac.org/public/Proposed%20EEO-1%20Revisions.pdf. EEAC's comments made in response to the 30-day notice are available at: http://www.eeac.org/public/EEAC_EEO-1_Comments.pdf.
[6] See, for example, the House Committee on Government Reform and Oversight's report accompanying the Paperwork Reduction Act, H.R..Rep. No. 37, 104th Cong., 1st Sess., 24 (1995).
[7] These regulations are codified at 5 CFR § 1320.10(f) for clearances other than those in proposed rules or current rules and at 5 CFR § 1320.12(i) for clearances in current rules.

OMB_0000307

Hon. Mick Mulvaney
March 20, 2017
Page 4

relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error."

OMB elaborated on this authority in the preamble to its regulations implementing the PRA:

> Several agencies have questioned the authority of OMB to reconsider approval of collections of information in advance of the expiration date. This authority derives, in part, from OMB's authority to determine the duration of approval, up to a three year maximum. OMB is not obligated to set a fixed and unchanging date for expiration of approval. Rather, as a result of this rule and OMB practice, all expiration dates are expressly conditioned upon OMB's right to reconsider at a later date. Such reconsiderations are not common, but have occurred as the occasion has arisen. This has been the established practice both under the Act and under its predecessor, the Federal Reports Act. Nothing in the language or legislative history of the Paperwork Reduction Act indicates that Congress intended to cut back on OMB's well-established authority under the Federal Reports Act to reconsider approvals of collections of information in advance of the expiration date.[8]

For the reasons described below, EEAC respectfully urges OMB to exercise this authority and initiate a new review of the EEOC's expanded EEO-1 Report. OMB's regulations speak directly to OMB initiating a review in two circumstances: where the burden estimates submitted by the agency were in material error or where circumstances have changed. Both apply in this case.[9]

**The Burden Estimates Provided by the EEOC Were in Material Error**

The EEOC's burden estimate for the revisions to the EEO-1 Report were made in material error in several important respects. As summarized below, the estimates were based on a new and highly inaccurate methodology for calculating then-existing EEO-1 reporting burdens. The inaccuracies were relied upon, and multiplied, as the EEOC calculated burdens under its proposed revisions. In addition, the EEOC significantly underestimated the time that would be needed to develop or program systems for reporting. Finally, the EEOC's estimates did not appropriately consider the input from affected employers about the likely true cost of compliance.

<u>The EEOC's Estimates Were Based on Faulty Assessment of Prior EEO-1 Reporting Burdens</u>

The EEOC's burden estimates for its revisions were primarily based on burden estimates of compliance with the then-current EEO-1 Report. While Component 1 of the revised report

---

[8] Office of Management and Budget, *Controlling Paperwork Burdens on the Public, Notice of Proposed Rulemaking,* 47 Fed. Reg. 39,515, 39,522 (Sept. 8, 1982).
[9] This letter summarizes concerns regarding EEOC's burden estimates that were in material error and on changed circumstances because those conditions are directly referenced in OMB's regulations. Our concerns regarding low utility and confidentiality are equally valid today as when we commented on the EEOC's proposal last year.

OMB_0000308

Hon. Mick Mulvaney
March 20, 2017
Page 5

includes the same data grid as the old report, the EEOC did not use the same methodology as it had in the past. Instead, it changed the methodology in a way that dramatically understates the cost of compliance.

More specifically, in prior years, the EEOC estimated that employers would take an average of 3.4 hours per establishment to complete each report, an estimate that we believe was too low based on feedback from our member companies. EEAC's members reported that completing the old EEO-1 Report takes between 3.8 and 10.2 hours per establishment. Another association—that had surveyed 50 of its member companies—commented on the burdens of the old report and estimated an average of 6.6 hours per establishment. Rather than adjust its estimate upward, the EEOC instead concluded that completing the old report, and Component 1 of the new report, takes less time—just one hour per establishment (plus eight hours per company regardless of the number of reports filed). The EEOC largely gave no credence to the numerous comments made by employers about EEO-1 reporting burdens, and instead relied heavily on "its own experience" and untested assumptions about compliance costs.

<u>The Inaccuracies Were Multiplied, and Relied Upon, in Determining Burdens Imposed by the Revisions</u>

Component 2 of the new EEO-1 Report is the component that includes the new data collection of summary compensation data and hours worked data. The EEOC estimates that the reporting burden for completing Component 2 of the new report will increase reporting burdens by 90 percent. Like a house of cards, the EEOC's estimates regarding Component 2 fail for no other reason than its estimates of Component 1 are without sufficient foundation. However, even if the agency's Component 1 estimates are somehow considered adequate, EEOC provided no basis for its  calculation that the burden of submitting the revised data would be "90 percent more" other than to say it was "[b]ased on information received during the comment period."[10] This cursory explanation is simply insufficient to meet the standards of the PRA.

<u>The EEOC Dramatically Underestimated the Time To Develop or Program Systems for Reporting</u>

The EEOC did not account for necessary changes that must be made to employer systems and programs in order to comply with the revisions other than including a one-time implementation burden of eight hours per employer. EEOC described this estimate as a "one-time cost for developing queries related to Component 2 in an existing HRIS."[11] The EEOC did not consider any other programming changes that may be necessary (such as queries to payroll systems for W-2 data and the ability to link that data with employee lists generated from the separate HRIS) and disregarded employer comments detailing the considerable time, processes, and people that are involved in making even relatively minor changes in data systems maintained by large employers.

---

[10] 81 Fed. Reg. at 45,494.
[11] 81 Fed. Reg. at 45,497.

OMB_0000309

Hon. Mick Mulvaney
March 20, 2017
Page 6

In sum, the EEOC's PRA burden estimates submitted to OMB are based on inaccurate assumptions rather than a careful and objective attempt to measure actual compliance costs. They also inappropriately ignore the comments of stakeholders with more experience at making systems changes. We believe it is incumbent upon OMB to reconsider its approval of the EEO-1 Report to address these material errors.

**Relevant Circumstances Have Changed**

In addition to the EEOC's grossly inaccurate and arbitrary assessment of the burdens imposed by its revisions, the agency has now provided additional information since OMB approved the revised EEO-1 that warrant OMB review. In particular, the EEOC has now published the data file specifications that employers are to use if they utilize the data file option.[12]

The EEOC's data file specifications indicate that the agency expects that employers will create a spreadsheet looking nothing like the approved EEO-1 Report. Instead of two grids of 1,830 data fields to be filed per establishment, the EEOC's data file specifications indicate that the EEOC expects employers to create a spreadsheet where all establishment data are included in a single row of 27,934 characters. Employers with multiple establishments are to include each establishment as a separate row of 27,934 characters. After creating this spreadsheet, employers are required to convert the file to a CSV (comma separated value) file for upload.

Nowhere in the EEOC's 60-day notice, 30-day notice, or relevant supporting materials does EEOC describe how employers are to create this spreadsheet or the burdens that will be imposed in doing so other than the general burden estimates described above. As a result, the EEOC's partial data file specifications raise several questions that have not been adequately addressed and warrant further review by OMB. These include the following.

- What software is capable of creating the file required by the EEOC?
- What software has the EEOC tested its data file specifications on?
- What are the limitations of the software? Is it expensive? Is it easy to manipulate and control for errors? What type of expertise or training is needed to use it? Is it easy to integrate with existing payroll and HRIS systems?
- How large will data files be?
- Will there be challenges in transmitting the data due to large file size or for other reasons?
- How does the EEOC envision that employers will create the required spreadsheet? Does the EEOC expect that employers will first create two data grids of 1,830 data fields for each establishment that are then converted to the required format or do they anticipate that software will pull data directly from HRIS and payroll systems into the required format?

---

[12] The data file specifications are available on the EEOC's website at:
https://www.eeoc.gov/employers/eeo1survey/2017-data-file-layout.cfm.

OMB_0000310

Hon. Mick Mulvaney
March 20, 2017
Page 7

- How difficult will it be for employers to control errors when working with a spreadsheet that contains one row of 27,934 characters of data for every one of their covered locations?

The questions generated by the EEOC's release of partial data file specifications, which occurred after OMB approved the revisions to the EEO-1 Report, by themselves provide sufficient independent grounds for OMB to reconsider its approval of the revised form.

**OMB Review Will Permit Needed Consideration of Better Alternatives and Reduce Compliance Burdens**

In addition to the reasons presented above, we also respectfully submit that OMB's reconsideration of the revisions to the EEO-1 Report will permit the EEOC and OMB to take a fresh look at alternatives that the EEOC did not seriously consider in drafting its revisions. We strongly recommend that any review of alternatives begin with the 2012 recommendations made by the National Academy of Sciences and summarized at length in our earlier comments on this matter. In addition, we strongly urge any new revisions to be subject to a pilot test among a representative sample of actual employers so that the EEOC's assumptions about burden collection and data utility, among others, can be tested.

As to the timing of review, it should be noted that employers have already begun assessing what changes must be made in order to comply with the EEOC's revisions before the March 2018 reporting deadline. While the EEOC may choose to take a fresh look at the EEO-1 revisions after the president makes two additional nominations later this year, it will likely be several months before the agency is in a position to undertake such a review. OMB has the ability to start that review today and by doing so will mitigate the burdens imposed on employers who have already begun to develop plans to modify appropriate systems.

**Conclusion**

For the compelling reasons presented in these comments, EEAC urges OMB to reconsider its prior approval of the 2016 revisions to the EEO-1 Report and immediately initiate a new review of the information collection request. Please do not hesitate to contact me if EEAC can be of further assistance as you consider this request. Thank you for your consideration of this important matter.

Sincerely,

Michael J. Eastman
Vice President, Public Policy

| | |
|---|---|
| **From:** | Nye, Joseph B. EOP/OMB |
| **Sent:** | Friday, July 21, 2017 3:00 PM |
| **To:** | Campau, Anthony P. EOP/OMB; Mancini, Dominic J. EOP/OMB; Theroux, Rich P. EOP/OMB |
| **Subject:** | FW: CWC letter requesting reconsideration of EEO-1 Report |
| **Attachments:** | CWC ltr to OIRA re EEO-1 7-21-17 FINAL.pdf |

FYI, we had previously seen this letter when it was sent to Mick.

**From:** Michael Eastman - EEAC [mailto:meastman@eeac.org]
**Sent:** Friday, July 21, 2017 2:46 PM
**To:** Rao, Neomi J. EOP/OMB
**Cc:** Nye, Joseph B. EOP/OMB
**Subject:** CWC letter requesting reconsideration of EEO-1 Report

Administrator Rao:

Attached please find a letter from the Center for Workplace Compliance (formerly the Equal Employment Advisory Council) requesting reconsideration of the Equal Employment Opportunity Commission's Employer Information (EEO-1) Report (OMB Control Number 3046-0007).

Please do not hesitate to contact me if we can be of assistance in this matter.

Michael J. Eastman
Vice President, Policy and Assistant General Counsel
Center for Workplace Compliance
1501 M Street NW | Suite 400
Washington, DC 20005
202.629.5650 (p) | 202.629.5651 (f)
>www.cwc.org<

1



1501 M Street, NW | Suite 1000 | Washington, DC 20005      TEL: (202) 629-5650      FAX: (202) 629-5651      www.cwc.org

VIA ELECTRONIC MAIL

July 21, 2017

Hon. Neomi Rao
Administrator, Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th Street NW
Washington, DC 20503

Re:    Review of the Equal Employment Opportunity Commission's Employer Information (EEO-1) Report
       (OMB Control Number 3046-0007)

Dear Administrator Rao:

On behalf of the Center for Workplace Compliance (CWC), I am writing to urge the Office of Management and Budget (OMB) to exercise its authority under the Paperwork Reduction Act to review the Equal Employment Opportunity Commission's (EEOC) previously approved collection of information commonly known as the Employer Information (EEO-1) Report. As explained in the attached letter, we respectfully request that OMB immediately sunset approval of the form because the EEOC's underlying PRA justification was in material error and because new information disclosed after the form was approved has generated significant compliance questions.

The Center for Workplace Compliance, which recently changed its name from the Equal Employment Advisory Council (EEAC), has a long history of working with the EEOC and OMB to ensure that the EEO-1 Report maintains its relevance and utility to both the EEOC and the employers who file it. We look forward to continuing this work with you.

Please do not hesitate to contact me if CWC can be of further assistance as you consider this request. Thank you for your consideration of this important matter.

Sincerely,

Michael J. Eastman
Vice President, Policy and Assistant General Counsel

JA030

EQUAL EMPLOYMENT
ADVISORY COUNCIL

SUITE 400
1501 M STREET, NW
WASHINGTON, DC 20005

TEL 202/629-5650
FAX 202/629-5651

March 20, 2017

Hon. Mick Mulvaney
Director, Office of Management and Budget
725 17th Street NW
Washington, DC 20503

>    **Re: Review of the Equal Employment Opportunity Commission's Employer
>    Information (EEO-1) Report (OMB Control Number 3046-0007)**

Dear Director Mulvaney:

On behalf of the Equal Employment Advisory Council, I am writing to urge the Office of
Management and Budget (OMB) to exercise its authority under the Paperwork Reduction Act
(PRA) to review the Equal Employment Opportunity Commission's (EEOC's) previously
approved collection of information commonly known as the Employer Information (EEO-1)
Report (OMB Control Number 3046-0007). As explained in more detail below, we respectfully
urge OMB to immediately sunset approval of the form because the EEOC's underlying PRA
justification was in material error and because new information disclosed after the form was
approved has generated significant compliance questions.

**Statement of Interest**

The Equal Employment Advisory Council (EEAC) is the nation's largest nonprofit
association of employers dedicated to the advancement of practical and effective programs to
eliminate employment discrimination. Formed in 1976, EEAC's membership includes
approximately 260 of the nation's leading and largest employers, all of which are firmly
committed to the principles and practice of workplace nondiscrimination. All of our members are
employers subject to the compliance, recordkeeping, and reporting requirements imposed by
federal statutes and regulations prohibiting workplace discrimination. In addition, nearly all of
our members are federal contractors subject to the additional recordkeeping, reporting, and
compliance requirements imposed by Executive Order 11246, the Rehabilitation Act of 1973,
and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, and their implementing
regulations.

EEAC has a long track record of working closely with the EEOC to ensure that the EEO-
1 Report maintains its relevance and utility to both the Commission and the employers who file
it. Over the years, EEAC frequently has been the only organization to submit public comments in
response to the EEOC's invitations for stakeholder input on the burdens and utility of the EEO-1

OMB_0000314

Hon. Mick Mulvaney
March 20, 2017
Page 2

Report under the PRA.[1] And for more than four decades, we have worked and communicated less formally with Commission staff to resolve practical concerns regarding the EEO-1 reporting process in ways that benefitted both the Commission and employers.

EEAC also has a long history of researching and providing feedback on other federal agency initiatives to collect compensation data from employers on a broader scale, including those implemented or proposed by the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP). These include OFCCP's Equal Opportunity Survey, which collected summary compensation data from a sample of federal contractors during a five-year period between 2000 and 2004,[2] as well as OFCCP's more recent proposed Equal Pay Report.[3]

EEAC was actively engaged with both the EEOC and OMB as the EEOC sought to revise the EEO-1 Report in 2016. EEAC testified at a public hearing held by the EEOC and submitted formal comments with both the EEOC and OMB during the review process called for under the PRA. EEAC staff and members also met with OMB to express the practical concerns of our member companies about the EEOC's then-proposed revisions.

**Summary of 2016 Revisions and Employer Concerns**

Last year, the EEOC proposed, and the Obama Administration's OMB subsequently approved, significant and expansive revisions to the EEO-1 Report. Under the current version of the EEO-1, employers are required to report establishment headcount on a data grid of 180 data fields. These data fields include 10 job categories, two gender categories, and seven race and ethnicity categories, along with various subtotal and total columns. The revised EEO-1 significantly expands the report in an effort to capture summary data regarding compensation. The revised form also seeks data regarding hours worked, which the EEOC argued were necessary to make the headcount and compensation data more meaningful.

The EEOC's revisions to the EEO-1 now increase the total number of data fields for each establishment from 180 to 3,660. This is the result of: (1) adding 12 pay bands within each job category, requiring employers to report establishment headcount by pay band, job category, gender, and race/ethnicity (a total of 1,830 data fields); and (2) adding a section requiring hours worked data to be reported on a similar "grid" (a total of an additional 1,830 data fields).

Using conservative estimates on the total number of employer establishments subject to the EEO-1 Report requirement, and as detailed in our prior comments to OMB, the revised EEO-

---

[1] See, for example, the supporting documents maintained by the Office of Management and Budget related to EEOC's 2014, 2011, and 2009 information collection requests for approval of the EEO-1 Report, available at http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201412-3046-001, http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201104-3046-003, and http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=200901-3046-001.
[2] OFCCP formally repealed the EO survey in 2006. Office of Federal Contract Compliance Programs, Final Rule, Affirmative Action and Nondiscrimination Obligations of Federal Contractors and Subcontractors, Equal Opportunity Survey, 71 Fed. Reg. 53,032 (Sept. 8, 2006).
[3] Office of Federal Contract Compliance Programs, Notice of Proposed Rulemaking, Government Contractors, Requirement to Report Summary Data on Employee Classification, 79 Fed. Reg. 46,561 (Aug. 8, 2014).

OMB_0000315

Hon. Mick Mulvaney
March 20, 2017
Page 3

1 Report will require covered employers to annually report to the EEOC nearly *3 billion* data fields to describe a covered private-sector workforce of only approximately 76 million employees

Moreover, through the EEOC's public hearing and comment process under the PRA, EEAC, and many other employer groups, raised serious concerns about the EEOC's proposed revisions beyond simply the sheer size of the new reporting burden. These concerns were based on prior experience with the government's collection of compensation data and the actual, firsthand experience of employers in conducting self-critical compensation analyses. These concerns can be very generally summarized as falling within three categories. First, we respectfully submit the data would be of low utility, meaning that it is highly unlikely to be of real help in identifying unlawful or improper pay practices. Second, the revisions will be tremendously burdensome to implement, and these burdens simply cannot be justified by any potential benefit. Finally, confidentiality concerns regarding the disclosure of potentially sensitive compensation data have not been properly addressed. We also expressed dismay that the EEOC for all intents and purposes chose to ignore the recommendations made in a 2012 report that the agency commissioned from the National Academy of Sciences, titled "Collecting Compensation Data From Employers" (NAS Report).[4]

EEAC's detailed concerns with the EEOC's expansive changes to the EEO-1 are expressed in our testimony and public comments on the revisions.[5]

## OMB's Authority Under the Paperwork Reduction Act

Among other things, the PRA's paperwork clearance process is designed to minimize the burdens and maximize the utility of information collected by the federal government.[6] OMB, and in particular, the Office of Information and Regulatory Affairs (OIRA), are charged with ensuring that agency information collection requests comply with these goals. While there is considerable attention paid to the role of agencies in developing information collection requests, and that of OIRA in reviewing and approving requests, the approval of an information collection request and assignment of an OMB control number is not the end of the process.

This is explicitly recognized in OMB's regulations implementing the PRA. These rules allow OMB, on its own initiative, to review a previously approved collection of information before the expiration of its control number.[7] These regulations permit such a review "when

---

[4] The NAS Report is available at: https://www.nap.edu/catalog/13496/collecting-compensation-data-from-employers.
[5] EEAC's March 16, 2016 testimony as prepared for delivery before the EEOC is available at: http://www.eeac.org/public/EEO-1%20Testimony%203-16-16.pdf. Note that the EEOC has not made the transcript of the hearing or the video recording publicly available. EEAC's comments made in response to the EEOC's 60-day notice are available at: http://www.eeac.org/public/Proposed%20EEO-1%20Revisions.pdf. EEAC's comments made in response to the 30-day notice are available at: http://www.eeac.org/public/EEAC_EEO-1_Comments.pdf.
[6] See, for example, the House Committee on Government Reform and Oversight's report accompanying the Paperwork Reduction Act, H.R..Rep. No. 37, 104th Cong., 1st Sess., 24 (1995).
[7] These regulations are codified at 5 CFR § 1320.10(f) for clearances other than those in proposed rules or current rules and at 5 CFR § 1320.12(i) for clearances in current rules.

OMB_0000316

Hon. Mick Mulvaney
March 20, 2017
Page 4

relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error."

OMB elaborated on this authority in the preamble to its regulations implementing the PRA:

> Several agencies have questioned the authority of OMB to reconsider approval of collections of information in advance of the expiration date. This authority derives, in part, from OMB's authority to determine the duration of approval, up to a three year maximum. OMB is not obligated to set a fixed and unchanging date for expiration of approval. Rather, as a result of this rule and OMB practice, all expiration dates are expressly conditioned upon OMB's right to reconsider at a later date. Such reconsiderations are not common, but have occurred as the occasion has arisen. This has been the established practice both under the Act and under its predecessor, the Federal Reports Act. Nothing in the language or legislative history of the Paperwork Reduction Act indicates that Congress intended to cut back on OMB's well-established authority under the Federal Reports Act to reconsider approvals of collections of information in advance of the expiration date.[8]

For the reasons described below, EEAC respectfully urges OMB to exercise this authority and initiate a new review of the EEOC's expanded EEO-1 Report. OMB's regulations speak directly to OMB initiating a review in two circumstances: where the burden estimates submitted by the agency were in material error or where circumstances have changed. Both apply in this case.[9]

**The Burden Estimates Provided by the EEOC Were in Material Error**

The EEOC's burden estimate for the revisions to the EEO-1 Report were made in material error in several important respects. As summarized below, the estimates were based on a new and highly inaccurate methodology for calculating then-existing EEO-1 reporting burdens. The inaccuracies were relied upon, and multiplied, as the EEOC calculated burdens under its proposed revisions. In addition, the EEOC significantly underestimated the time that would be needed to develop or program systems for reporting. Finally, the EEOC's estimates did not appropriately consider the input from affected employers about the likely true cost of compliance.

<u>The EEOC's Estimates Were Based on Faulty Assessment of Prior EEO-1 Reporting Burdens</u>

The EEOC's burden estimates for its revisions were primarily based on burden estimates of compliance with the then-current EEO-1 Report. While Component 1 of the revised report

---

[8] Office of Management and Budget, *Controlling Paperwork Burdens on the Public, Notice of Proposed Rulemaking*, 47 Fed. Reg. 39,515, 39,522 (Sept. 8, 1982).

[9] This letter summarizes concerns regarding EEOC's burden estimates that were in material error and on changed circumstances because those conditions are directly referenced in OMB's regulations. Our concerns regarding low utility and confidentiality are equally valid today as when we commented on the EEOC's proposal last year.

OMB_0000317

Hon. Mick Mulvaney
March 20, 2017
Page 5

includes the same data grid as the old report, the EEOC did not use the same methodology as it had in the past. Instead, it changed the methodology in a way that dramatically understates the cost of compliance.

More specifically, in prior years, the EEOC estimated that employers would take an average of 3.4 hours per establishment to complete each report, an estimate that we believe was too low based on feedback from our member companies. EEAC's members reported that completing the old EEO-1 Report takes between 3.8 and 10.2 hours per establishment. Another association—that had surveyed 50 of its member companies—commented on the burdens of the old report and estimated an average of 6.6 hours per establishment. Rather than adjust its estimate upward, the EEOC instead concluded that completing the old report, and Component 1 of the new report, takes less time—just one hour per establishment (plus eight hours per company regardless of the number of reports filed). The EEOC largely gave no credence to the numerous comments made by employers about EEO-1 reporting burdens, and instead relied heavily on "its own experience" and untested assumptions about compliance costs.

The Inaccuracies Were Multiplied, and Relied Upon, in Determining Burdens Imposed by the Revisions

Component 2 of the new EEO-1 Report is the component that includes the new data collection of summary compensation data and hours worked data. The EEOC estimates that the reporting burden for completing Component 2 of the new report will increase reporting burdens by 90 percent. Like a house of cards, the EEOC's estimates regarding Component 2 fail for no other reason than its estimates of Component 1 are without sufficient foundation. However, even if the agency's Component 1 estimates are somehow considered adequate, EEOC provided no basis for its  calculation that the burden of submitting the revised data would be "90 percent more" other than to say it was "[b]ased on information received during the comment period."[10] This cursory explanation is simply insufficient to meet the standards of the PRA.

The EEOC Dramatically Underestimated the Time To Develop or Program Systems for Reporting

The EEOC did not account for necessary changes that must be made to employer systems and programs in order to comply with the revisions other than including a one-time implementation burden of eight hours per employer. EEOC described this estimate as a "one-time cost for developing queries related to Component 2 in an existing HRIS."[11] The EEOC did not consider any other programming changes that may be necessary (such as queries to payroll systems for W-2 data and the ability to link that data with employee lists generated from the separate HRIS) and disregarded employer comments detailing the considerable time, processes, and people that are involved in making even relatively minor changes in data systems maintained by large employers.

---

[10] 81 Fed. Reg. at 45,494.
[11] 81 Fed. Reg. at 45,497.

OMB_0000318

Hon. Mick Mulvaney
March 20, 2017
Page 6

In sum, the EEOC's PRA burden estimates submitted to OMB are based on inaccurate assumptions rather than a careful and objective attempt to measure actual compliance costs. They also inappropriately ignore the comments of stakeholders with more experience at making systems changes. We believe it is incumbent upon OMB to reconsider its approval of the EEO-1 Report to address these material errors.

**Relevant Circumstances Have Changed**

In addition to the EEOC's grossly inaccurate and arbitrary assessment of the burdens imposed by its revisions, the agency has now provided additional information since OMB approved the revised EEO-1 that warrant OMB review.  In particular, the EEOC has now published the data file specifications that employers are to use if they utilize the data file option.[12]

The EEOC's data file specifications indicate that the agency expects that employers will create a spreadsheet looking nothing like the approved EEO-1 Report. Instead of two grids of 1,830 data fields to be filed per establishment, the EEOC's data file specifications indicate that the EEOC expects employers to create a spreadsheet where all establishment data are included in a single row of 27,934 characters. Employers with multiple establishments are to include each establishment as a separate row of 27,934 characters. After creating this spreadsheet, employers are required to convert the file to a CSV (comma separated value) file for upload.

Nowhere in the EEOC's 60-day notice, 30-day notice, or relevant supporting materials does EEOC describe how employers are to create this spreadsheet or the burdens that will be imposed in doing so other than the general burden estimates described above. As a result, the EEOC's partial data file specifications raise several questions that have not been adequately addressed and warrant further review by OMB. These include the following.

- What software is capable of creating the file required by the EEOC?
- What software has the EEOC tested its data file specifications on?
- What are the limitations of the software? Is it expensive? Is it easy to manipulate and control for errors? What type of expertise or training is needed to use it? Is it easy to integrate with existing payroll and HRIS systems?
- How large will data files be?
- Will there be challenges in transmitting the data due to large file size or for other reasons?
- How does the EEOC envision that employers will create the required spreadsheet? Does the EEOC expect that employers will first create two data grids of 1,830 data fields for each establishment that are then converted to the required format or do they anticipate that software will pull data directly from HRIS and payroll systems into the required format?

---

[12] The data file specifications are available on the EEOC's website at:
https://www.eeoc.gov/employers/eeo1survey/2017-data-file-layout.cfm.

OMB_0000319

Hon. Mick Mulvaney
March 20, 2017
Page 7

- How difficult will it be for employers to control errors when working with a spreadsheet that contains one row of 27,934 characters of data for every one of their covered locations?

The questions generated by the EEOC's release of partial data file specifications, which occurred after OMB approved the revisions to the EEO-1 Report, by themselves provide sufficient independent grounds for OMB to reconsider its approval of the revised form.

**OMB Review Will Permit Needed Consideration of Better Alternatives and Reduce Compliance Burdens**

In addition to the reasons presented above, we also respectfully submit that OMB's reconsideration of the revisions to the EEO-1 Report will permit the EEOC and OMB to take a fresh look at alternatives that the EEOC did not seriously consider in drafting its revisions. We strongly recommend that any review of alternatives begin with the 2012 recommendations made by the National Academy of Sciences and summarized at length in our earlier comments on this matter. In addition, we strongly urge any new revisions to be subject to a pilot test among a representative sample of actual employers so that the EEOC's assumptions about burden collection and data utility, among others, can be tested.

As to the timing of review, it should be noted that employers have already begun assessing what changes must be made in order to comply with the EEOC's revisions before the March 2018 reporting deadline. While the EEOC may choose to take a fresh look at the EEO-1 revisions after the president makes two additional nominations later this year, it will likely be several months before the agency is in a position to undertake such a review. OMB has the ability to start that review today and by doing so will mitigate the burdens imposed on employers who have already begun to develop plans to modify appropriate systems.

**Conclusion**

For the compelling reasons presented in these comments, EEAC urges OMB to reconsider its prior approval of the 2016 revisions to the EEO-1 Report and immediately initiate a new review of the information collection request. Please do not hesitate to contact me if EEAC can be of further assistance as you consider this request. Thank you for your consideration of this important matter.

Sincerely,

Michael J. Eastman
Vice President, Public Policy

OMB_0000320



CENTER FOR
**WORKPLACE**
COMPLIANCE

---

1501 M Street, NW | Suite 1000 | Washington, DC 20005      TEL: (202) 629-5650      FAX: (202) 629-5651      www.cwc.org

VIA ELECTRONIC MAIL

July 21, 2017

Hon. Neomi Rao
Administrator, Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th Street NW
Washington, DC 20503

Re:    Review of the Equal Employment Opportunity Commission's Employer Information (EEO-1) Report
       (OMB Control Number 3046-0007)

Dear Administrator Rao:

On behalf of the Center for Workplace Compliance (CWC), I am writing to urge the Office of Management and Budget (OMB) to exercise its authority under the Paperwork Reduction Act to review the Equal Employment Opportunity Commission's (EEOC) previously approved collection of information commonly known as the Employer Information (EEO-1) Report. As explained in the attached letter, we respectfully request that OMB immediately sunset approval of the form because the EEOC's underlying PRA justification was in material error and because new information disclosed after the form was approved has generated significant compliance questions.

The Center for Workplace Compliance, which recently changed its name from the Equal Employment Advisory Council (EEAC), has a long history of working with the EEOC and OMB to ensure that the EEO-1 Report maintains its relevance and utility to both the EEOC and the employers who file it. We look forward to continuing this work with you.

Please do not hesitate to contact me if CWC can be of further assistance as you consider this request. Thank you for your consideration of this important matter.

Sincerely,

Michael J. Eastman
Vice President, Policy and Assistant General Counsel

JA038

OMB_0000321

EQUAL EMPLOYMENT
ADVISORY COUNCIL

SUITE 400
1501 M STREET, NW
WASHINGTON, DC  20005

TEL 202/629-5650
FAX 202/629-5651

March 20, 2017

Hon. Mick Mulvaney
Director, Office of Management and Budget
725 17th Street NW
Washington, DC 20503

**Re: Review of the Equal Employment Opportunity Commission's Employer Information (EEO-1) Report (OMB Control Number 3046-0007)**

Dear Director Mulvaney:

On behalf of the Equal Employment Advisory Council, I am writing to urge the Office of Management and Budget (OMB) to exercise its authority under the Paperwork Reduction Act (PRA) to review the Equal Employment Opportunity Commission's (EEOC's) previously approved collection of information commonly known as the Employer Information (EEO-1) Report (OMB Control Number 3046-0007). As explained in more detail below, we respectfully urge OMB to immediately sunset approval of the form because the EEOC's underlying PRA justification was in material error and because new information disclosed after the form was approved has generated significant compliance questions.

**Statement of Interest**

The Equal Employment Advisory Council (EEAC) is the nation's largest nonprofit association of employers dedicated to the advancement of practical and effective programs to eliminate employment discrimination. Formed in 1976, EEAC's membership includes approximately 260 of the nation's leading and largest employers, all of which are firmly committed to the principles and practice of workplace nondiscrimination. All of our members are employers subject to the compliance, recordkeeping, and reporting requirements imposed by federal statutes and regulations prohibiting workplace discrimination. In addition, nearly all of our members are federal contractors subject to the additional recordkeeping, reporting, and compliance requirements imposed by Executive Order 11246, the Rehabilitation Act of 1973, and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, and their implementing regulations.

EEAC has a long track record of working closely with the EEOC to ensure that the EEO-1 Report maintains its relevance and utility to both the Commission and the employers who file it. Over the years, EEAC frequently has been the only organization to submit public comments in response to the EEOC's invitations for stakeholder input on the burdens and utility of the EEO-1

OMB_0000322

Hon. Mick Mulvaney
March 20, 2017
Page 2

Report under the PRA.[1] And for more than four decades, we have worked and communicated less formally with Commission staff to resolve practical concerns regarding the EEO-1 reporting process in ways that benefitted both the Commission and employers.

EEAC also has a long history of researching and providing feedback on other federal agency initiatives to collect compensation data from employers on a broader scale, including those implemented or proposed by the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP). These include OFCCP's Equal Opportunity Survey, which collected summary compensation data from a sample of federal contractors during a five-year period between 2000 and 2004,[2] as well as OFCCP's more recent proposed Equal Pay Report.[3]

EEAC was actively engaged with both the EEOC and OMB as the EEOC sought to revise the EEO-1 Report in 2016. EEAC testified at a public hearing held by the EEOC and submitted formal comments with both the EEOC and OMB during the review process called for under the PRA. EEAC staff and members also met with OMB to express the practical concerns of our member companies about the EEOC's then-proposed revisions.

**Summary of 2016 Revisions and Employer Concerns**

Last year, the EEOC proposed, and the Obama Administration's OMB subsequently approved, significant and expansive revisions to the EEO-1 Report. Under the current version of the EEO-1, employers are required to report establishment headcount on a data grid of 180 data fields. These data fields include 10 job categories, two gender categories, and seven race and ethnicity categories, along with various subtotal and total columns. The revised EEO-1 significantly expands the report in an effort to capture summary data regarding compensation. The revised form also seeks data regarding hours worked, which the EEOC argued were necessary to make the headcount and compensation data more meaningful.

The EEOC's revisions to the EEO-1 now increase the total number of data fields for each establishment from 180 to 3,660. This is the result of: (1) adding 12 pay bands within each job category, requiring employers to report establishment headcount by pay band, job category, gender, and race/ethnicity (a total of 1,830 data fields); and (2) adding a section requiring hours worked data to be reported on a similar "grid" (a total of an additional 1,830 data fields).

Using conservative estimates on the total number of employer establishments subject to the EEO-1 Report requirement, and as detailed in our prior comments to OMB, the revised EEO-

---

[1] See, for example, the supporting documents maintained by the Office of Management and Budget related to EEOC's 2014, 2011, and 2009 information collection requests for approval of the EEO-1 Report, available at http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201412-3046-001, http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201104-3046-003, and http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=200901-3046-001.
[2] OFCCP formally repealed the EO survey in 2006. Office of Federal Contract Compliance Programs, Final Rule, Affirmative Action and Nondiscrimination Obligations of Federal Contractors and Subcontractors, Equal Opportunity Survey, 71 Fed. Reg. 53,032 (Sept. 8, 2006).
[3] Office of Federal Contract Compliance Programs, Notice of Proposed Rulemaking, Government Contractors, Requirement to Report Summary Data on Employee Classification, 79 Fed. Reg. 46,561 (Aug. 8, 2014).

OMB_0000323

Hon. Mick Mulvaney
March 20, 2017
Page 3

1 Report will require covered employers to annually report to the EEOC nearly *3 billion* data fields to describe a covered private-sector workforce of only approximately 76 million employees

Moreover, through the EEOC's public hearing and comment process under the PRA, EEAC, and many other employer groups, raised serious concerns about the EEOC's proposed revisions beyond simply the sheer size of the new reporting burden. These concerns were based on prior experience with the government's collection of compensation data and the actual, firsthand experience of employers in conducting self-critical compensation analyses. These concerns can be very generally summarized as falling within three categories. First, we respectfully submit the data would be of low utility, meaning that it is highly unlikely to be of real help in identifying unlawful or improper pay practices. Second, the revisions will be tremendously burdensome to implement, and these burdens simply cannot be justified by any potential benefit. Finally, confidentiality concerns regarding the disclosure of potentially sensitive compensation data have not been properly addressed. We also expressed dismay that the EEOC for all intents and purposes chose to ignore the recommendations made in a 2012 report that the agency commissioned from the National Academy of Sciences, titled "Collecting Compensation Data From Employers" (NAS Report).[4]

EEAC's detailed concerns with the EEOC's expansive changes to the EEO-1 are expressed in our testimony and public comments on the revisions.[5]

**OMB's Authority Under the Paperwork Reduction Act**

Among other things, the PRA's paperwork clearance process is designed to minimize the burdens and maximize the utility of information collected by the federal government.[6] OMB, and in particular, the Office of Information and Regulatory Affairs (OIRA), are charged with ensuring that agency information collection requests comply with these goals. While there is considerable attention paid to the role of agencies in developing information collection requests, and that of OIRA in reviewing and approving requests, the approval of an information collection request and assignment of an OMB control number is not the end of the process.

This is explicitly recognized in OMB's regulations implementing the PRA. These rules allow OMB, on its own initiative, to review a previously approved collection of information before the expiration of its control number.[7] These regulations permit such a review "when

---

[4] The NAS Report is available at: https://www.nap.edu/catalog/13496/collecting-compensation-data-from-employers.

[5] EEAC's March 16, 2016 testimony as prepared for delivery before the EEOC is available at: http://www.eeac.org/public/EEO-1%20Testimony%203-16-16.pdf. Note that the EEOC has not made the transcript of the hearing or the video recording publicly available. EEAC's comments made in response to the EEOC's 60-day notice are available at: http://www.eeac.org/public/Proposed%20EEO-1%20Revisions.pdf. EEAC's comments made in response to the 30-day notice are available at: http://www.eeac.org/public/EEAC_EEO-1_Comments.pdf.

[6] See, for example, the House Committee on Government Reform and Oversight's report accompanying the Paperwork Reduction Act, H.R..Rep. No. 37, 104th Cong., 1st Sess., 24 (1995).

[7] These regulations are codified at 5 CFR § 1320.10(f) for clearances other than those in proposed rules or current rules and at 5 CFR § 1320.12(i) for clearances in current rules.

OMB_0000324

Hon. Mick Mulvaney
March 20, 2017
Page 4

relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error."

OMB elaborated on this authority in the preamble to its regulations implementing the PRA:

> Several agencies have questioned the authority of OMB to reconsider approval of collections of information in advance of the expiration date. This authority derives, in part, from OMB's authority to determine the duration of approval, up to a three year maximum. OMB is not obligated to set a fixed and unchanging date for expiration of approval. Rather, as a result of this rule and OMB practice, all expiration dates are expressly conditioned upon OMB's right to reconsider at a later date. Such reconsiderations are not common, but have occurred as the occasion has arisen. This has been the established practice both under the Act and under its predecessor, the Federal Reports Act. Nothing in the language or legislative history of the Paperwork Reduction Act indicates that Congress intended to cut back on OMB's well-established authority under the Federal Reports Act to reconsider approvals of collections of information in advance of the expiration date.[8]

For the reasons described below, EEAC respectfully urges OMB to exercise this authority and initiate a new review of the EEOC's expanded EEO-1 Report. OMB's regulations speak directly to OMB initiating a review in two circumstances: where the burden estimates submitted by the agency were in material error or where circumstances have changed. Both apply in this case.[9]

## The Burden Estimates Provided by the EEOC Were in Material Error

The EEOC's burden estimate for the revisions to the EEO-1 Report were made in material error in several important respects. As summarized below, the estimates were based on a new and highly inaccurate methodology for calculating then-existing EEO-1 reporting burdens. The inaccuracies were relied upon, and multiplied, as the EEOC calculated burdens under its proposed revisions. In addition, the EEOC significantly underestimated the time that would be needed to develop or program systems for reporting. Finally, the EEOC's estimates did not appropriately consider the input from affected employers about the likely true cost of compliance.

### The EEOC's Estimates Were Based on Faulty Assessment of Prior EEO-1 Reporting Burdens

The EEOC's burden estimates for its revisions were primarily based on burden estimates of compliance with the then-current EEO-1 Report. While Component 1 of the revised report

---

[8] Office of Management and Budget, *Controlling Paperwork Burdens on the Public, Notice of Proposed Rulemaking*, 47 Fed. Reg. 39,515, 39,522 (Sept. 8, 1982).

[9] This letter summarizes concerns regarding EEOC's burden estimates that were in material error and on changed circumstances because those conditions are directly referenced in OMB's regulations. Our concerns regarding low utility and confidentiality are equally valid today as when we commented on the EEOC's proposal last year.

OMB_0000325

Hon. Mick Mulvaney
March 20, 2017
Page 5

includes the same data grid as the old report, the EEOC did not use the same methodology as it had in the past. Instead, it changed the methodology in a way that dramatically understates the cost of compliance.

More specifically, in prior years, the EEOC estimated that employers would take an average of 3.4 hours per establishment to complete each report, an estimate that we believe was too low based on feedback from our member companies. EEAC's members reported that completing the old EEO-1 Report takes between 3.8 and 10.2 hours per establishment. Another association—that had surveyed 50 of its member companies—commented on the burdens of the old report and estimated an average of 6.6 hours per establishment. Rather than adjust its estimate upward, the EEOC instead concluded that completing the old report, and Component 1 of the new report, takes less time—just one hour per establishment (plus eight hours per company regardless of the number of reports filed). The EEOC largely gave no credence to the numerous comments made by employers about EEO-1 reporting burdens, and instead relied heavily on "its own experience" and untested assumptions about compliance costs.

<u>The Inaccuracies Were Multiplied, and Relied Upon, in Determining Burdens Imposed by the Revisions</u>

Component 2 of the new EEO-1 Report is the component that includes the new data collection of summary compensation data and hours worked data. The EEOC estimates that the reporting burden for completing Component 2 of the new report will increase reporting burdens by 90 percent. Like a house of cards, the EEOC's estimates regarding Component 2 fail for no other reason than its estimates of Component 1 are without sufficient foundation. However, even if the agency's Component 1 estimates are somehow considered adequate, EEOC provided no basis for its  calculation that the burden of submitting the revised data would be "90 percent more" other than to say it was "[b]ased on information received during the comment period."[10] This cursory explanation is simply insufficient to meet the standards of the PRA.

<u>The EEOC Dramatically Underestimated the Time To Develop or Program Systems for Reporting</u>

The EEOC did not account for necessary changes that must be made to employer systems and programs in order to comply with the revisions other than including a one-time implementation burden of eight hours per employer. EEOC described this estimate as a "one-time cost for developing queries related to Component 2 in an existing HRIS."[11] The EEOC did not consider any other programming changes that may be necessary (such as queries to payroll systems for W-2 data and the ability to link that data with employee lists generated from the separate HRIS) and disregarded employer comments detailing the considerable time, processes, and people that are involved in making even relatively minor changes in data systems maintained by large employers.

---

[10] 81 Fed. Reg. at 45,494.
[11] 81 Fed. Reg. at 45,497.

OMB_0000326

Hon. Mick Mulvaney
March 20, 2017
Page 6

In sum, the EEOC's PRA burden estimates submitted to OMB are based on inaccurate assumptions rather than a careful and objective attempt to measure actual compliance costs. They also inappropriately ignore the comments of stakeholders with more experience at making systems changes. We believe it is incumbent upon OMB to reconsider its approval of the EEO-1 Report to address these material errors.

**Relevant Circumstances Have Changed**

In addition to the EEOC's grossly inaccurate and arbitrary assessment of the burdens imposed by its revisions, the agency has now provided additional information since OMB approved the revised EEO-1 that warrant OMB review. In particular, the EEOC has now published the data file specifications that employers are to use if they utilize the data file option.[12]

The EEOC's data file specifications indicate that the agency expects that employers will create a spreadsheet looking nothing like the approved EEO-1 Report. Instead of two grids of 1,830 data fields to be filed per establishment, the EEOC's data file specifications indicate that the EEOC expects employers to create a spreadsheet where all establishment data are included in a single row of 27,934 characters. Employers with multiple establishments are to include each establishment as a separate row of 27,934 characters. After creating this spreadsheet, employers are required to convert the file to a CSV (comma separated value) file for upload.

Nowhere in the EEOC's 60-day notice, 30-day notice, or relevant supporting materials does EEOC describe how employers are to create this spreadsheet or the burdens that will be imposed in doing so other than the general burden estimates described above. As a result, the EEOC's partial data file specifications raise several questions that have not been adequately addressed and warrant further review by OMB. These include the following.

- What software is capable of creating the file required by the EEOC?
- What software has the EEOC tested its data file specifications on?
- What are the limitations of the software? Is it expensive? Is it easy to manipulate and control for errors? What type of expertise or training is needed to use it? Is it easy to integrate with existing payroll and HRIS systems?
- How large will data files be?
- Will there be challenges in transmitting the data due to large file size or for other reasons?
- How does the EEOC envision that employers will create the required spreadsheet? Does the EEOC expect that employers will first create two data grids of 1,830 data fields for each establishment that are then converted to the required format or do they anticipate that software will pull data directly from HRIS and payroll systems into the required format?

---

[12] The data file specifications are available on the EEOC's website at:
https://www.eeoc.gov/employers/eeo1survey/2017-data-file-layout.cfm.

OMB_0000327

Hon. Mick Mulvaney
March 20, 2017
Page 7

- How difficult will it be for employers to control errors when working with a spreadsheet that contains one row of 27,934 characters of data for every one of their covered locations?

The questions generated by the EEOC's release of partial data file specifications, which occurred after OMB approved the revisions to the EEO-1 Report, by themselves provide sufficient independent grounds for OMB to reconsider its approval of the revised form.

**OMB Review Will Permit Needed Consideration of Better Alternatives and Reduce Compliance Burdens**

In addition to the reasons presented above, we also respectfully submit that OMB's reconsideration of the revisions to the EEO-1 Report will permit the EEOC and OMB to take a fresh look at alternatives that the EEOC did not seriously consider in drafting its revisions. We strongly recommend that any review of alternatives begin with the 2012 recommendations made by the National Academy of Sciences and summarized at length in our earlier comments on this matter. In addition, we strongly urge any new revisions to be subject to a pilot test among a representative sample of actual employers so that the EEOC's assumptions about burden collection and data utility, among others, can be tested.

As to the timing of review, it should be noted that employers have already begun assessing what changes must be made in order to comply with the EEOC's revisions before the March 2018 reporting deadline. While the EEOC may choose to take a fresh look at the EEO-1 revisions after the president makes two additional nominations later this year, it will likely be several months before the agency is in a position to undertake such a review. OMB has the ability to start that review today and by doing so will mitigate the burdens imposed on employers who have already begun to develop plans to modify appropriate systems.

**Conclusion**

For the compelling reasons presented in these comments, EEAC urges OMB to reconsider its prior approval of the 2016 revisions to the EEO-1 Report and immediately initiate a new review of the information collection request. Please do not hesitate to contact me if EEAC can be of further assistance as you consider this request. Thank you for your consideration of this important matter.

Sincerely,

Michael J. Eastman
Vice President, Public Policy

OMB_0000328

CHAMBER OF COMMERCE
OF THE
UNITED STATES OF AMERICA
1615 H STREET, N.W.
WASHINGTON, D.C. 20062
202/463-5522

RANDEL K. JOHNSON
SENIOR VICE PRESIDENT
LABOR, IMMIGRATION & EMPLOYEE
BENEFITS

JAMES PLUNKETT
DIRECTOR
LABOR LAW POLICY

February 27, 2017

**Via Email,** ████████████████████

John M. Mulvaney
Director
Office of Management and Budget
725 17th Street NW
Washington, D.C. 20503

RE:    **Request for Review; EEOC's Revision of the Employer Information Report**

Dear Director Mulvaney:

On behalf of the U.S. Chamber of Commerce (Chamber), the world's largest business federation, representing the interests of more than three million businesses and organizations of every size, sector, and region, we are writing to request your review under Section 3517 of the Paperwork Reduction Act (PRA) and the PRA's implementing regulations (5 CFR 1320.10(f)) of the Equal Employment Opportunity Commission's (EEOC or Commission) revisions to the EEO-1 Form, as proposed at 81 Fed. Reg. 5113 (February 1, 2016) and 81 Fed Reg. 45479 (July 14, 2016), and approved by OMB's Office of Information and Regulatory Affairs (OIRA) on October 18, 2016 (ICR number 201610-3046-001).[1]

In short, the Chamber requests OMB to review and reject the EEOC's revisions to the EEO-1 Form because they do not comply with the PRA as detailed below and in the Chamber's prior submissions to both EEOC and OMB. The EEOC has not met its requirement to satisfy the burden, benefit, or confidentiality prerequisites of the PRA.  For example, the EEOC has grossly understated the

---

[1] The U.S. Chamber of Commerce is also an employer which must file the revised EEO-1 Report.

1

JA046

OMB_0000332

burden based on conjecture, as opposed to data, at $53.5 million per year.  In contrast, the Chamber's 2016 survey of over 50 companies with 100 or more employees demonstrates that that cost of the EEOC's revised EEO-1 is in excess of $400 million in pure labor costs alone, and carries a total burden of 1.3 billion per year for all businesses employing 100 or more employees.  This is a huge additional cost for companies of all sizes, yet has no accompanying benefit, or protections for the confidentiality of the information to be gathered under the revised government form.

Although reporting of the new information does not begin for approximately one year, employers are already making the necessary investments in software upgrades, internal reporting processes, and staffing needs in order to comply.  Therefore, as discussed in greater detail below, pursuant to Section 3517 of the PRA and 5 CFR 1320.10(f) and (g), the Chamber requests that OMB review and stay the effectiveness of, or rescind, the EEOC's revised EEO-1 as quickly as possible, as businesses are already incurring unnecessary expenses to compile 2017 data solely as a result of the requirements of the revised EEO-1.

## I.      Circumstances Leading to the EEO-1 Changes

Lawmakers on Capitol Hill and regulators in federal agencies such as the Department of Labor have long sought to force employers to report on their compensation practices.[2]  These efforts have been largely unsuccessful because none have been shown to result in the production of data relevant to the current practices in the workplace and have been shown to place a tremendous and unnecessary burden on employers.  As part of the most recent attempt during the Obama administration to collect employee salary information from employers, in 2014 the Office of Federal Contract Compliance Programs (OFCCP) issued a proposed regulation known as the compensation data collection tool.[3]  The comment period for OFCCP's proposal closed in early 2015 and the rulemaking process stalled – the proposal is currently listed as a "Long-Term Action" on the Fall 2016 regulatory agenda.

When OFCCP's effort failed – likely because the agency recognized its uselessness or otherwise knew its proposal could not pass muster under the

---

[2] For example, OFCCP's Equal Opportunity survey instrument, which began in 2000, similarly collected pay data from federal contractors.  This survey was scrapped six years later due to ineffectiveness.  Additionally, an often-forgotten component of the failed Paycheck Fairness Act would have resuscitated the fruitless EO survey.

[3] 79 Fed. Reg. 46562 (August 8, 2014).

OMB_0000333

Administrative Procedure Act ("APA") – the administration turned elsewhere to meet its quest for employee compensation data. This time, EEOC assumed the mission and proposed revising its existing EEO-1 form to include data on employee compensation and hours worked.[4] In order to avoid the more complex obligations under the APA, the EEOC determined that the revisions to the EEO-1 would be examined under the PRA. Importantly, the PRA process does not provide the public with rulemaking protections as under the APA, such as a right to petition a federal court to review the agency's action. The lack of judicial review under the PRA is a primary reason why OMB review of EEOC's changes to its EEO-1 form is so vital.

## II.    EEOC's Changes to the EEO-1 Reporting Form

The EEO-1 form requires employers and certain federal contractors to report on the demographics of their workforce. From time to time the form has been updated to reflect the changing demographics in our country. On February 1, 2016, the EEOC published a proposed revision to its EEO-1 reporting form. The changes would require every employer with 100 employees or more to submit not just demographic information, but also the W-2 wages and hours worked for all of their employees grouped in broad EEO-1 job categories, subdivided into twelve pay bands.

After a public hearing at EEOC as well as a public comment period, on July 14, 2016, the EEOC submitted its final proposal for revisions to the EEO-1 Form to OMB.[5] Aside from changing the yearly reporting date to more closely align with the W-2 year and extending the initial reporting due date by six months, little substantive changes were made. After the PRA-required 30-day comment period at OMB, EEOC announced these changes as final on September 29, 2016, though the completed Notice of Action was not authorized by former OIRA Administrator Howard Shelanski until October 18, 2016. No EEO-1 filing will be required for 2017, but covered employers will have to file the new EEO-1 reports by the end of March 2018.

---

[4] 81 Fed. Reg. 5113 (February 1, 2016).
[5] Camille Olson, partner at Seyfarth Shaw and chair of the Chamber's Equal Employment Opportunity Subcommittee, presented testimony on behalf of the Chamber at this hearing. Additionally, the Chamber submitted comprehensive and substantive comments to the EEOC on April 1, 2016 noting that the EEOC's proposal failed to satisfy the PRA. The Chamber also presented critical comments to OMB on August 15, 2016.

OMB_0000334

### III.    The PRA Permits Rescission of Previously Approved Collections

Section 3517(b) of the PRA allows OMB to "review any collection of information conducted by or for an agency to determine, if . . . a person shall maintain, provide or disclose the information to or for the agency."  In turn, Section 3517(b)(2) permits OMB to "take appropriate remedial action, if necessary." Further, in the regulations promulgated pursuant to the PRA, 5 CFR Part 1320, OMB is required to review its approval in the case of changed circumstances or when the burden estimates provided by the agency at the time of initial submission were materially in error.  *See* 5 CFR 1320.10(f).  If such circumstances are present, OMB may stay the effectiveness of its prior approval.

As demonstrated in further detail below, EEOC's burden estimates for compliance with the revised EEO-1 report were materially in error and OMB therefore erred in approving EEOC's revisions to its EEO-1 form.  Given the broad remedial powers under Section 3517(b)(2) and 5 CFR 1320.10(g), the proper remedy in this situation is for OMB to either stay the effectiveness of its prior approval of the information collection, or otherwise rescind the OMB Control Number (3046-0007) until EEOC demonstrates that its proposal satisfies the burden, benefit, and confidentiality standards of the PRA.

### IV.    The EEOC Never Satisfied the Requirements of the PRA

When the federal government seeks to collect information from the public, the PRA requires the issuing agency to: (1) minimize the burden on those required to comply with government requests; (2) maximize the utility of the information being sought; and (3) ensure that the information provided is subject to appropriate confidentiality and privacy protections.  EEOC failed to meet *all* of these standards throughout the entirety of the process that resulted in the changes to the EEO-1 form.

- Burden.  EEOC failed to accurately or adequately address the burden being placed on filers by the revised EEO-1 report, thereby ignoring the PRA statutory requirement that it minimize the burden.  Throughout the revision process, EEOC continually shifted its burden analysis and steadfastly refused to base its analysis on anything other than conjecture and speculation.  In contrast, the Chamber performed an empirical survey of over 50 companies who file approximately 20,000 EEO-1 reports each year.  The results are telling.  As set forth in more detail in the attached Appendix A, EEOC speculated that it would require

4

OMB_0000335

1,892,980 hours per year at a cost **$53.5 million** for 60,866 respondent companies to file an estimated 674,146 reports covering employment in their establishments using the "Components 1 and 2" expanded format EEO-1 form for the 2017 reporting year. The Chamber's survey feedback estimated that in reality, employers would actually spend 8,056,045 hours complying with the reporting requirements at a cost of **$400.8 million**.[6]

Along with other submissions during the comment period which showed that the EEOC's burden estimates were absurdly low, the Chamber continues to receive information from members indicating that the EEOC materially underestimated the burden that the revised form would impose. Under these circumstances and pursuant to Section 3517(b) of the PRA and 5 CFR 1320.10(f) and (g), the OMB must either rescind its approval of the EEOC submission or stay the effectiveness of its approval until the EEOC acknowledges the actual burden and justifies its imposition pursuant to the requirements of law.

- Benefit. EEOC failed to identify any significant or tangible benefit the revised EEO-1 report would generate, thereby failing the requirement that it maximize the benefit to be derived from the report. Indeed, the EEOC did not demonstrate that its revisions to the EEO-1 form would be of any utility in helping the Commission carry out its statutory mission to combat discrimination. The new EEO-1 form categorizes employees in broad occupational groups that inevitably results in comparison of employees in very different jobs, performing very different tasks, with very different skills. This data will be of no utility to the EEOC because courts upholding federal employment laws do not permit the aggregation of dissimilar individuals into artificial job groupings in order to prove pay discrimination. EEOC itself even admitted that the information sought will not "establish pay discrimination as a legal matter."[7] Moreover, as the Chamber demonstrated in both its comments to the EEOC as well as its comments to OMB, the significant potential for statistical false positives and false negatives further undermines the utility of the data

---

[6] This is the Chamber cost estimate based on direct labor cost only. Adding allowance for indirect overhead costs could result in an annual economic cost burden of $1.3 billion. Furthermore, as reflected in Appendix A, EEOC's burden estimate of the then-existing EEO-1 Form – referred to as Component 1 – was also materially in error.

[7] 81 Fed. Reg. at 45489 (July 14, 2016).

OMB_0000336

and even prevents the data from being used as an early warning system, of sorts.

While OMB apparently chose to disregard these submissions in its prior review of the EEO-1 submission, the Chamber submits that the failure to show any tangible benefit with the new data collection requirement, let alone that the new requirement maximizes the benefit to be derived from the massive data collection to be compelled by the revised EEO-1, requires that the OMB rescind or stay its approval of the revised EEO-1 data collection. Further, upon a stay or rescission of the prior approval of the EEO-1 data request, the OMB should impose the stringent cost saving requirements required by the Executive Order issued by the President on January 30 regarding Reducing Regulation and Controlling Regulation Costs, to any resubmission by EEOC of its proposal to collect employee compensation data via the EEO-1 form.

- Confidentiality. EEOC ignored the significant privacy and confidentiality concerns raised in the review process and thereby failed to ensure that the privacy and confidentiality of the revised EEO-1 data would be protected. The EEOC is proposing to collect highly sensitive personal data regarding compensation at thousands of U.S. companies in a format which will not serve any of its statutory purposes but which will certainly be of great use to any hacker who is interested in the compensation practices of employers. In the hands of the wrong people, the original pay data from the EEO-1 report could cause significant harm to EEO-1 responders and subject employees to potential violation of their privacy. By letter dated September 23, 2016 we called to the attention of former Administrator Shelanski the GAO report of September 19, 2016 which criticized the government's response to cyber attacks, and noting that "[c]yber incidents affecting federal agencies have continued to grow, increasing about 1,300 percent from fiscal year 2006 to fiscal year 2015."[8] Unfortunately, EEOC appears to be completely unaware of the enormity of this potential issue, and although it is statutorily required to do so, has failed to set forth appropriate steps or protocols to ensure the privacy and confidentiality of EEO-1 data.

---

[8] GAO 16-885-T: "Federal Information Security: Actions Needed to Address Challenges" (September 19, 2016), available at http://www.gao.gov/assets/680/679877.pdf.

JA051

OMB_0000337

In addition, the EEOC has failed to address the problem that it disseminates information collected under the current EEO-1 to other federal agencies, state and local agencies and even private researchers without the protection required of this data by Section 709(d)(e) of Title VII. It has completely ignored the additional risk of disclosure of the significantly more sensitive information to be generated by the revised EEO-1 report. In the previous review process for the proposed EEO-1, the Chamber asked that OMB, at the very least, exercise its authority to impose the sanctions set forth in Section 709(e) of Title VII on every recipient of EEO-1 data. OMB did not respond to that request.

Despite EEOC's failure to satisfy the burden, benefit and confidentiality standards of the PRA, OMB nevertheless approved the information collection. We believe that OMB erred in this decision. Given the enormous costs associated with compliance – costs which the Chamber demonstrated through an empirical survey and which have been confirmed through recent member communications – it is imperative that OMB review the information collection and either issue a stay in the effectiveness of its prior approval or rescind its prior approval altogether; or undertake any other remedial action pursuant to Section 3517(b)(2) of the PRA, as appropriate.

## V.     Stay or Rescission of the EEO-1 Approval is Consistent with Current Regulatory Policy

In his Presidential Executive Order on Reducing Regulation and Controlling Regulatory Costs (January 30, 2017), President Trump noted that "it is essential to manage the costs associated with the governmental imposition of private expenditures required to comply with Federal regulations." As noted above, the Commission's new EEO-1 form will place an incredible economic burden on employers to produce information that will not advance EEOC's mission. Therefore, rescission of this extraordinarily expensive and useless requirement comports with the President's efforts to ease regulatory burdens on employers and the American public in general.

## VI.    Conclusion

We respectfully request that pursuant to Section 3517, you rescind OMB's prior approval of the EEOC's changes to its EEO-1 form, or alternatively, grant a stay of OMB's prior approval pursuant to 5 CFR 1320.10(g), until the Commission demonstrates that its revisions satisfy the PRA.

JA052

OMB_0000338

Thank you for your attention to this matter.  Please contact us if you have any questions.

Sincerely,

Randel K. Johnson
Senior Vice President
Labor, Immigration & Employee Benefits

James Plunkett
Director
Labor Law Policy

8

# Appendix A

# Comparison of EEOC and U.S. Chamber Parameters and Calculations

**Current EEO-1 Form Occupation, Gender & Race/Ethnicity Counts- "Component 1 only"**

|   |                                   | EEOC        | U.S. Chamber  |
|---|-----------------------------------|-------------|---------------|
| 1 | Number of Respondent Firms        | 67,146      | 67,146        |
| 2 | Number of Reports Filed           | 683,275     | 683,275       |
| 3 | Reports per Firm (calculated 2/1) | 10.2        | 10.2          |
| 4 | Total Hours per Firm              | 15.7        | 66.8          |
| 5 | Total Hours per Report            | 1.5         | 6.6           |
| 6 | Total National Burden Hours       | 1,055,471   | 4,485,392     |
| 7 | Cost per Burden Hour              | $28.48      | $49.75        |
| 8 | **Estimated Annual Cost**         | $30,055,087 | $223,148,252  |

**Proposed Expanded EEO-1 Form Occupation, Gender, Race/Ethnicity, Earnings, counts and Hours "Components 1 and 2"**

|   |                                   | EEOC        | U.S. Chamber  |
|---|-----------------------------------|-------------|---------------|
| 1 | Number of Respondent Firms        | 60,866      | 60,866        |
| 2 | Number of Reports Filed           | 674,146     | 674,146       |
| 3 | Reports per Firm (calculated 2/1) | 11.1        | 11.1          |
| 4 | Total Hours per Firm              | 31.1        | 132.4         |
| 5 | Total Hours per Report            | 2.8         | 12.0          |
| 6 | Total National Burden Hours       | 1,892,980   | 8,056,045     |
| 7 | Cost per Burden Hour              | $28.29      | $49.75        |
| 8 | **Estimated Annual Cost**         | $53,546,359 | $400,788,224  |

JA054

OMB_0000340

| | |
|---|---|
| **From:** | Doyle, Emma K. EOP/OMB |
| **Sent:** | Tuesday, November 27, 2018 6:17 PM |
| **To:** | Bigley, Mark C. EOP/OMB |
| **Subject:** | FW: Review of the Equal Employment Opportunity Commission's Employment Information (EEO-1) Report, OMB Control No. 3046-0007 |
| **Attachments:** | OMB letter.05.17.17.doc; ATT00001.htm |

#7 – a letter Mick received

**From:** Mulvaney, Mick M. EOP/OMB
**Sent:** Thursday, May 18, 2017 7:46 AM
**To:** Doyle, Emma K. EOP/OMB ███████████████████
**Subject:** Fwd: Review of the Equal Employment Opportunity Commission's Employment Information (EEO-1) Report, OMB Control No. 3046-0007

Who is handling this for us?

Sent from my iPhone

Begin forwarded message:

> **From:** Patrick Patterson ████████████████
> **Date:** May 17, 2017 at 7:44:40 PM EDT
> **To:** ███████████████████
> **Cc:** ██████████████   ███████████
> **Subject: Review of the Equal Employment Opportunity Commission's Employment Information (EEO-1) Report, OMB Control No. 3046-0007**
>
> Dear Director Mulvaney:
>
> Please see the attached letter discussing why OMB should decline to rescind or stay its prior approval of EEOC's revised EEO-1 report.
>
> Thank you for your attention to this matter.
>
> Sincerely,
>
> Patricia A. Shiu, Former Director, Office of Federal Contract Compliance Programs, U.S. Department of Labor
>
> Patrick O. Patterson, Former Deputy Director, Office of Federal Contract Compliance Programs, U.S. Department of Labor

1

OMB_0000356

Patricia A. Shiu                                          Patrick O. Patterson
patshiu13@gmail.com                              popatterson@gmail.com

May 17, 2017

John M. Mulvaney, Director
Office of Management and Budget
725 17th Street NW
Washington, D.C. 20503

John.M.Mulvaney@omb.eop.gov

Re: **Review of the Equal Employment Opportunity Commission's Employment Information (EEO-1) Report (OMB Control Number 3046-0007)**

Dear Director Mulvaney:

The undersigned, the former Director and Deputy Director of the Department of Labor's Office of Federal Contract Compliance Programs, respectfully request that the Office of Management and Budget decline to rescind or stay OMB's prior approval of the Equal Employment Opportunity Commission's revision of its Employer Information (EEO-1) report.

<u>**Introduction**</u>

On September 29, 2016, OMB approved EEOC's request to revise its existing EEO-1 report to collect summary pay data by sex, race, and ethnicity from employers (including covered federal contractors) with 100 or more employees. The pay data will be added to employment data that employers have been collecting and reporting for decades on the existing EEO-1 report. The revised EEO-1 report, which is currently in effect for a term of three years with an initial filing due by March 31, 2018, will provide EEOC and OFCCP with data to identify and combat pay discrimination. Data collected from the revised EEO-1 will help EEOC and OFCCP better understand the scope of the pay gap and focus enforcement resources on employers that are more likely to be out of compliance with federal laws.

Moreover, this data will be valuable to covered employers who wish to self-evaluate and ensure their voluntary compliance with the requirements of Title VII of the Civil Rights Act of 1964 and Executive Order 11246, and with their own nondiscrimination policies. Under regulations implementing Executive Order 11246, covered federal contractors with 50 or more employees have long been required to examine their pay practices with respect to sex, race, and ethnicity, and to determine whether there are gender-, race-, or ethnicity-based disparities.

The OFCCP uncovers discrimination that most often is undetected by applicants and employees. Unlike the EEOC, which is primarily a complaint-driven enforcement agency, the OFCCP analyzes data that contractors agree to compile within 120 days of becoming a covered contractor. OFCCP has identified, investigated, and remedied untold numbers of cases of widespread violations within and across contractor establishments involving hiring, pay, and promotion discrimination on the basis of race, sex, and national origin. The revised EEO-1 report will help ensure that federal contractors do not engage in pay discrimination using taxpayer dollars.

JA056

OMB_0000357

As explained in the letter submitted by the National Women's Law Center and many other organizations on April 12, 2017, there is no adequate justification for rescinding or delaying the ongoing implementation of the revised EEO-1 reporting requirements. Since OMB's approval, relevant circumstances have not changed, EEOC's burden estimates have not been shown to be materially in error, and, to the best of our knowledge, OMB has not consulted with EEOC regarding a potential review.

The revised EEO-1 report, in accordance with recommendations of the White House National Equal Pay Task Force, will provide data that will help EEOC, OFCCP, and employers address the wage gaps that weaken our economy. Women working full-time, year-round are typically paid 80 cents for every dollar paid to their male counterparts, and both men and women of color are typically paid less than white, non-Hispanic men. As the EEOC has found, "(1) [p]ersistent pay gaps continue to exist in the U.S. workforce correlated with sex, race, and ethnicity; (2) workplace discrimination is an important contributing factor to these pay disparities; and (3) implementing the proposed EEO-1 pay data collection will improve the EEOC's [and OFCCP's] ability to efficiently and effectively structure its investigation of pay discrimination charges."[1]

### The Pay Gap Stubbornly Persists and Its Impact Is Both Devastating and Enduring

Regardless of how the pay gap is measured, over time, the significant differences in compensation for women and men become increasingly evident. And although occupational segregation is an important contributing factor to the gender pay gap, women earn less than men even within occupations.[2] If the earnings gap is not corrected, by age 65 the average female employee will have lost nearly $400,000 by the end of her career.[3] At the current rate of progress, the Institute for Women's Policy Research (IWPR) estimates that it will take until 2059 to close the gender pay gap.[4]

President John F. Kennedy signed the Equal Pay Act into law more than fifty years ago, yet the pay gap persists, hurting families across this country. Women and their families continue to grapple with difficult and seemingly insurmountable challenges caused by pay disparities. Imagine how the nearly $400,000 lost by the average woman over the course of her working life might have been spent for a family's basic essentials, such as food, housing, and important educational opportunities. Now multiply those lost opportunities across the country—in every region—for all American families.

---

[1] EEOC, Agency Information Collection Activities; Notice of Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO-1), 81 Fed. Reg. 45479, 45481 (July 14, 2016).
[2] White House Equal Pay Task Force, *Fifty Years After the Equal Pay Act* (June 2013), https://obamawhitehouse.archives.gov/sites/default/files/equalpay/equal_pay_task_force_progress_report_june_2013_new.pdf.
[3] The White House Equal Pay Task Force Accomplishments Report (April 2012), https://obamawhitehouse.archives.gov/sites/default/files/equal_pay_task_force.pdf.
[4] IWPR Briefing Paper # C455, Jessica Milli, Yixuan Huang, Heidi Hartmann, and Jeff Hayes, *The Impact of Equal Pay on Poverty and the Economy (*April 5, 2017), https://iwpr.org/publications/impact-equal-pay-poverty-economy/.

JA057

OMB_0000358

**Lower Pay for Women Is Linked to Increased Rates of Poverty for American Workers and Their Families**

Fewer dollars for workers and their families mean a real loss of economic security, at a time when no family can afford to be earning less. Historically, data shows that women are generally poorer than men. The poverty rates for unmarried female heads of household with children are significantly higher than most other poverty rates.

According to one report, average annual earnings for women between 2009 and 2011 could have increased from $36,129 to $42,380 (or by 17 percent) annually if the wage gap had been closed.[5] This increase, in turn, could have reduced the poverty rate for working women by almost 50 percent.[6] Examining mean annual earnings, mean family income, and poverty rates from 2009 through 2011, the data on poverty rates for working single mothers, working single women living alone, and working married women demonstrates that closing the pay gap for these groups could also reduce their poverty rates. After pay adjustments, the poverty rate for working single mothers would have decreased by 13.7 percent, the rate for working single women living alone would have dropped by 6.4 percent, and the rate for working married women would have decreased by 1.3 percent.[7] As research suggests, because discrimination is one of the factors contributing to the pay gap, improving the ability of Federal civil rights enforcement agencies such as EEOC and OFCCP to identify and remedy pay discrimination is a critical element of a broader strategy for closing that gap—particularly in light of its substantial social cost.

**Closing the Pay Gap Will Increase Annual Revenue by More Than $500 Billion and Is Critical to Creating Good Jobs That Pay Fairly**

According to a recent study by the Institute for Women's Policy Research, the United States economy would have produced additional income in 2016 of $512.6 billion if women received equal pay; this represents 2.8 percent of the entire 2016 gross domestic product (GDP).[8] In addition, the study found that:

- Nearly 60 percent of women would earn more if working women were paid the same as men of the same age with similar education and hours of work. Nearly two-thirds (65.9 percent) of working single mothers would receive a pay increase.

---

[5]IWPR Briefing Paper # C411, Heidi Hartman, Jeff Hayes, and Jennifer Clark, *How Equal Pay for Working Women Would Reduce Poverty and Grow the American Economy,* (January 13, 2014), https://iwpr.org/publications/how-equal-pay-for-working-women-would-reduce-poverty-and-grow-the-american-economy/. The calculations are based on Current Population Survey Annual Social and Economic supplements, 2010–2012, for calendar years 2009–2011. The dollar valuations are in 2012 dollars.
[6]*Id.*
[7]*Id.*
[8] IWPR Briefing Paper # C455,  Jessica Milli, Yixuan Huang, Heidi Hartmann, and Jeff Hayes, *The Impact of Equal Pay on Poverty and the Economy* (April 5, 2017),  https://iwpr.org/publications/impact-equal-pay-poverty-economy/. The IWPR noted that, according to  the U.S. Department of Commerce Bureau of Economic Analysis (February 28, 2017) Current-Dollar GDP, the United States GDP in 2016 was $18,565.6 billion.

JA058

OMB_0000359

- Providing equal pay to women would have a dramatic impact on their families. The poverty rate for all working women would be cut in half, falling from 8.0 percent to 3.8 percent. The very high poverty rate for working single mothers would fall by nearly half, from 28.9 percent to 14.5 percent.
- For the 15.3 million single women—divorced, widowed, separated, and never married women living on their own—equal pay would mean a significant drop in poverty rates from 10.8 percent to 4.4 percent.
- Approximately 25.8 million children would benefit from the increased earnings of their mothers if these women received equal pay.
- The number of children with working mothers living in poverty would be nearly cut in half, dropping from 5.6 million to 3.1 million.

## Covered Federal Contractors With at Least 50 Employees Are Already Required To Examine and Address Compensation Disparities Based on Sex, Race, and Ethnicity Under Executive Order 11246

Signed into law by President Lyndon B. Johnson more than 50 years ago, Executive Order 11246, as amended, prohibits discrimination by covered federal contractors on the basis of race, color, religion, sex, sexual orientation, gender identity, and national origin. The Executive Order also prohibits pay discrimination.[9] It is noteworthy that federal contractors with 100 or more employees—those subject to this compensation tool—have already agreed to refrain from pay discrimination and examine their own compensation policies in exchange for providing services to the federal government funded by taxpayer dollars. To comply with their ongoing duty to ensure equal employment opportunity and address impediments to it, federal contractors have long been required to address pay disparities based on sex, race, and ethnicity under the Executive Order.[10]

## The Revised EEO-1 Report Will Enable Both EEOC and OFCCP To More Efficiently Identify and Investigate Potential Discrimination in Compensation While Minimizing the Burden on Employers and Contractors

Contrary to the assertions of some critics,[11] the revised EEO-1 report will be of substantial utility to EEOC and OFCCP in identifying and investigating potential discrimination in compensation.

---

[9] Indeed, the Secretary of Labor has broad authority under Section 203 of Executive Order 11246 to require contractors to provide compliance reports that contain information regarding their employment practices, policies, programs, and statistics. The applicable regulations require contractors to preserve employment and other records, including records of rates of pay and other terms of compensation, by sex, race, and ethnicity, and contractors must supply this information to OFCCP upon request. 41 CFR 60-1.12(a) and (c).

[10] *See* 41 CFR 60-2.10(a)(2); 60-2.17(b)(3).

[11] *See* U.S. Chamber of Commerce letter to John M. Mulvaney dated February 27, 2017; Letter of Business Associations to John M. Mulvaney dated March 20, 2017 (identical in substance to the U.S. Chamber of Commerce letter); Equal Employment Advisory Council letter to John M. Mulvaney dated March 20, 2017.

OMB_0000360

The Chamber of Commerce and related business associations argue that the compensation data required by the revised EEO-1 report will be "of no utility" to the EEOC—or, presumably, to the OFCCP—on the theory that courts "do not permit the aggregation of dissimilar individuals into artificial job groupings in order to prove pay discrimination."[12] This argument misses the point that the agencies do not intend or expect to use EEO-1 compensation data, standing alone, to prove pay discrimination as a legal matter. Rather, OFCCP will use the data in selecting contractors for compliance evaluations, and both OFCCP and EEOC will use the data to focus evaluations and investigations in their early stages and to make more efficient decisions regarding the allocation of their investigative and enforcement resources.

Moreover, the Chamber's underlying legal argument—for which, understandably, it fails to cite any supporting cases or other authorities—is misleading at best. In order to establish compensation discrimination in violation of Title VII or Executive Order 11246 (which is interpreted in accordance with Title VII principles), it is not necessary to prove that female employees are paid less than male employees for doing precisely the same work. Instead, as the Supreme Court held in *County of Washington v. Gunther*, 452 U.S. 161 (1981), Title VII's prohibition of sex-based pay discrimination is not restricted to claims for equal pay for "equal work," but instead covers all forms of intentional discrimination in compensation, even where no members of the opposite sex hold an equal but higher paying job. 452 U.S. at 166-68. As the Court stated, Congress surely did not intend to "insulate … blatantly discriminatory hiring practices from judicial redress" in such circumstances. *Id.* at 179. Thus, it is clear that, under Title VII, "discrimination may be established based on jobs that are only 'comparable,' as opposed to the [Equal Pay Act's] requirement that jobs be 'substantially equal.'" B. Lindemann, P. Grossman, and C.G. Weirich, *Employment Discrimination Law*, Ch. 10.V, at p. 10-44 (5th ed. 2012 (footnote omitted). Both the EEOC[13] and the OFCCP[14] recognize the principle that disparities in pay between "similarly situ-

---

[12] U.S. Chamber of Commerce letter to John M. Mulvaney dated Feb. 27, 2017, at 5; Business Associations letter to John M. Mulvaney dated March 20, 2017, at 4-5.

[13] *See* EEOC Compliance Manual, Sec. 10-V (2005), https://www.eeoc.gov/policy/docs/compensation.html ("Title VII compensation discrimination claims are not limited to claims of unequal pay for equal work. Compensation discrimination in violation of Title VII can be established even if no member of the opposite class holds an equal, higher paying job. Comparisons can be made under Title VII between the compensation rates of 'similarly situated' employees, which is a more relaxed standard than the equal work requirement under the EPA. Furthermore, a Title VII claim can be brought based on an employer's segregating or classifying protected class workers in lower paying jobs and limiting their opportunities to secure higher paying jobs.").

[14] *See* OFCCP Directive 2013-03, at 3 (2013), https://www.dol.gov/ofccp/regs/compliance/directives/Dir307_508c.pdf (OFCCP examines "pay analysis groups," which are "group[s] of employees (potentially from multiple job titles, units, categories and/or job groups) who are comparable for purposes of the contractor's pay practices. … A pay analysis group may be limited to a single job or title, or may include multiple distinct units or categories of workers. A pay analysis group may combine employees in different jobs or groups, with statistical controls to ensure that workers are similarly situated." The determination of which employees are similarly situated is case specific. "Relevant factors in determining similarity may include tasks performed, skills, effort, level of responsibility, working conditions, job difficulty, minimum qualifications, and other objective factors.

JA060

OMB_0000361

ated" employees may constitute unlawful discrimination; even if employees do not perform substantially equal work, they may nonetheless be comparable for purposes of analyzing employers' pay practices under Title VII and the Executive Order.

The utility of the revised EEO-1 report to *both* agencies and employers cannot be overstated. Clearly, it will reduce significant time spent not only by the agencies conducting compliance evaluations and investigations where there is little likelihood of pay discrimination, but also by the contractors who are subject to such evaluations and investigations. For example, OFCCP schedules its compliance evaluations based on a neutral selection system, and every contractor that appears on the scheduling list can be subject to a thorough evaluation of its compliance with Executive Order 11246, Section 503 of the Rehabilitation Act of 1973, and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, including their record-keeping requirements. The revised EEO-1 report will benefit the federal contractor community *and* OFCCP by allowing the agency to focus on establishments where there is a greater likelihood of discrimination in compensation. Previously, federal contractors were all subject to a thorough evaluation, including an in-depth analysis of potential pay discrimination, often requiring several layers of compliance review, particularly with respect to those federal contractors—close to 85 percent in 2015—who have unlawfully failed to produce their Affirmative Action Plans within 30 days of OFCCP's request.[15] The revised EEO-1 report will enable OFCCP to deploy its limited resources more efficiently by fully evaluating cases where there is a greater likelihood that pay discrimination may exist, saving everyone precious time and resources.

Both EEOC and OFCCP have made every effort to minimize the burden on employers. For example, in 2014, OFCCP published a proposed rule that would have required the collection of federal contractor pay data by sex, race, and ethnicity outside of the EEO-1 process. Meanwhile, EEOC was developing its own pay data collection proposal. After reviewing hundreds of comments on OFCCP's proposed rule, including many from the employer community urging OFCCP and EEOC to work together to develop a joint proposal, OFCCP collaborated with the EEOC in the interest of efficiency and good government.

**Conclusion**

For the foregoing reasons, as well as the reasons set forth in the letter submitted by the National Women's Law Center and other organizations on April 12, 2017, we submit that there is no adequate justification for taking the extraordinary step of reopening OMB's review and prior approval of the revised EEO-1 report. We respectfully request that you decline to take that step, and that you instead permit the continued implementation of this important tool that will assist the EEOC, OFCCP, and employers themselves in uncovering and eliminating unlawful discrimination in compensation.

---

Employees are similarly situated where they are comparable on the factors relevant to the investigation, even if they are not comparable on others ...").

[15] GAO 16-750, *Equal Employment Opportunity: Strengthening Oversight Could Improve Federal Contractor Non-Discrimination Compliance*, at 18 (September 22, 2016),
https://www.gao.gov/assets/680/679960.pdf.

OMB_0000362

Sincerely,


/s/

Patricia A. Shiu, Former Director,
Office of Federal Contract Compliance Programs,
U.S. Department of Labor


/s/

Patrick O. Patterson, Former Deputy Director,
Office of Federal Contract Compliance Programs,
U.S. Department of Labor

JA062

OMB_0000363

| | |
|---|---|
| **From:** | Doyle, Emma K. EOP/OMB |
| **Sent:** | Tuesday, November 27, 2018 6:21 PM |
| **To:** | Bigley, Mark C. EOP/OMB |
| **Subject:** | FW: Revised EEO-1 Form |
| **Attachments:** | 17-11 EEO-1 Letter to OMB.pdf; ATT00001.htm |

**From:** Mulvaney, John EOP/OMB
**Sent:** Monday, April 17, 2017 1:28 PM
**To:** Doyle, Emma K. EOP/OMB ███████████████
**Subject:** Fwd: Revised EEO-1 Form

???

Sent from my iPhone

Begin forwarded message:

> **From:** Mark Wilson <mwilson@hrpolicy.org>
> **Date:** April 17, 2017 at 12:30:22 PM EDT
> **To:** ████████████████████████████
> **Cc:** Mark Wilson <mwilson@hrpolicy.org>
> **Subject: Revised EEO-1 Form**
>
> Dear Director Mulvaney:
>
> The HR Policy Association respectfully requests the Office of Management and Budget to exercise its authority under Section 3517(b) of the Paperwork Reduction Act (PRA) and its implementing regulations (5 CFR 1320.10(f)) to review its approval of the Equal Employment Opportunity Commission's (EEOC) revisions to the EEO-1 Form. Consistent with the PRA, "relevant circumstances have changed" when President Trump issued Executive Order (EO) 13771, and under the EO your review "is essential to manage the costs associated with the governmental imposition of private expenditures required to comply with Federal regulations." The pay data collection in the EEO-1 Form is utterly without utility as it will likely generate significant numbers of false positives that will waste EEOC resources and inappropriately target non-discriminating employers, who will then need to spend significant time, money, and resources defending themselves against meritless allegations.
>
> The HR Policy Association represents the most senior human resource executives in more than 380 of the largest companies in the United States. Collectively, these companies employ more than 10 million employees in the United States, nearly nine percent of the private sector

1

OMB_0000365

workforce, and 20 million employees worldwide.  All of the Association's member companies are required to file the EEO-1 Form.

Attached is our complete letter.  If the Association can be of further assistance, please contact Mark Wilson at 202-315-5575 or mwilson@hrpolicy.org

JA064

OMB_0000366


The Association of Chief Human Resource Officers

April 13, 2017

Hon. Mick Mulvaney
Director, Office of Management and Budget
725 17th Street, NW
Washington, DC 20503

Dear Director Mulvaney:

The HR Policy Association ("HR Policy" or the "Association") respectfully requests the Office of Management and Budget (OMB) to exercise its authority under Section 3517(b) of the Paperwork Reduction Act (PRA) and its implementing regulations (5 CFR 1320.10(f)) to review its approval of the Equal Employment Opportunity Commission's (EEOC or Commission) revisions to the EEO-1 Form.[1]  Consistent with the PRA, "relevant circumstances have changed"[2] when President Trump issued Executive Order (EO) 13771, and under the EO your review "is essential to manage the costs associated with the governmental imposition of private expenditures required to comply with Federal regulations."[3]  The pay data collection in the EEO-1 Form is utterly without utility as it will likely generate significant numbers of false positives that will waste EEOC resources and inappropriately target non-discriminating employers, who will then need to spend significant time, money, and resources defending themselves against meritless allegations.

The HR Policy Association represents the most senior human resource executives in more than 380 of the largest companies in the United States.  Collectively, these companies employ more than 10 million employees in the United States, nearly nine percent of the private sector workforce, and 20 million employees worldwide.  All of the Association's member companies are required to file the EEO-1 Form.

The Association's member companies have a long-standing commitment to eliminating unlawful compensation discrimination in the workplace and recognize that it is the responsibility of all employers to compensate their employees in a nondiscriminatory manner.  However, the Association strongly urges OMB to rescind its prior approval of the EEOC's changes to the EEO-1 Form for the following reasons:

- Relevant circumstances under the PRA have changed; and

- The revised EEO-1 will misdirect and waste agency and employer resources.

---

[1] Proposed at 81 Fed. Reg. 5113 and 81 Fed Reg. 45479 and approved by OMB's Office of Information and Regulatory Affairs on October 18, 2016 (ICR number 201610-3046-001).

[2] 5 CFR 3517(f).

[3] EO 13771, Section 1.

OMB_0000367

**Relevant Circumstances Under the PRA Have Changed**

Consistent with the PRA, "relevant circumstances"[4] changed when President Trump issued Executive Order (EO) 13771 on January 30, 2017, three months after OMB's approval of the revised EEO-1 Form on October 18, 2016.  Under EO 13771, your review "is essential to manage the costs associated with the governmental imposition of private expenditures required to comply with Federal regulations."[5]

In addition to EO 13771, after OMB's approval of the revised EEO-1 Form, the Commission published the data file specifications that employers are to use if they utilize the data file option for submitting their EEO-1 Forms.  The new data file specifications look nothing like what OMB approved.[6]

Instead of two grids of 1,830 data fields to be filed per establishment, the EEOC's data file specifications indicate that the Commission expects employers to create a spreadsheet where all establishment data are included in a single row of 27,934 characters.  Employers with multiple establishments are to include each establishment as a separate row of 27,934 characters.  After creating this spreadsheet, employers are required to convert the file to a comma separated value file for upload.

Nowhere in the EEOC's *Federal Register* notices or relevant supporting materials did the Commission describe how employers are to create this spreadsheet or the burdens and costs that will be imposed.  Clearly, relevant circumstances have changed that warrant further review and provide sufficient independent grounds for OMB to reconsider its approval of the revised form.

**Revised EEO-1 Form Will Misdirect and Waste Agency and Employer Resources**

The EEOC's revised EEO-1 Form is meaningless and misleading because it's based on aggregate pay data that blurs legitimate variances and distinctions in pay.  For example, employees who work night shifts, swing shifts, and/or weekends are often paid a differential to account for less desirable work schedules.  The use of W-2 data, which includes not only base salary but also commissions, tips, overtime pay, shift differentials, and bonus payments ignores the fact that some types of pay are determined more by an employee's skill and effort than an employer's pay policies.  Further, combining employees who work part-time or partial year with full-time and full-year employees will result in very misleading results.  The pay band approach simply does not account for legitimate variables that affect employee pay (*i.e.*, differing responsibilities, education, skill level, length of service, experience, and performance).

Moreover, the EEO-1 job categories are too broad to evaluate compensation data for similarly-situated employees as they may lump aerospace engineers and lawyers with teachers and human resource specialists, and salaried employees who are exempt from the Fair Labor Standards Act with those employees who are not.

---

[4] 5 CFR 3517(f).

[5] EO 13771, Section 1.

[6] The data file specifications are available at: https://www.eeoc.gov/employers/eeo1survey/ 2017-data-file-layout.cfm.

The pay data collection in the revised EEO-1 Form is likely to generate significant numbers of "false positives" that will waste the EEOC's enforcement resources and inappropriately target non-discriminating employers, who will then need to spend significant time, money, and resources defending themselves against meritless allegations. The revised EEO-1 Form is also likely to generate significant numbers of "false negatives" where true discriminators would be identified as non-discriminators and the EEOC and OFCCP thus would fail to target them for investigation.

Notably, in 2006 the Office of Federal Contract Compliance Programs (OFCCP) rescinded a similar reporting requirement, the Equal Opportunity Survey, that was rushed through in the final year of the Clinton Administration after an analysis of actual federal contractor data by a reputable statistical firm found the survey's usefulness "to be only slightly better than chance."[7] The study also found "of 637 establishments that would be classified by the EO Survey results as suspected of having systemic discrimination, 93% would be false positives.… Furthermore, the EO Survey model wrongly classifies a significant portion of true discriminators as non-discriminators, and thus would not target them for compliance evaluations."[8]

Like OFCCP's rescinded EO Survey, the broadly aggregated data in the revised EEO-1 Form will likely mislead and misdirect EEOC and employer resources at great cost. There is simply no circumstance under which broad, aggregate compensation and hours data can be used to effectively target employers for review.

The Commission's revised EEO-1 Form will place an incredible economic burden on employers to produce information that will not advance EEOC's mission, and will likely waste the EEOC's limited enforcement resources. Therefore, a new review of this extraordinarily expensive and useless requirement is consistent with the EO 13771, the PRA, and with the President's efforts to ease regulatory burdens on employers and the American public.

*       *       *

For the reasons outlined above, the Association strongly urges OMB to review and rescind its prior approval of the EEOC's revisions to the EEO-1 Form. If the Association can be of further assistance, please contact Mark Wilson at 202-315-5575 or mwilson@hrpolicy.org.

Sincerely,

Mark Wilson
Vice President, Health & Employment Policy
HR Policy Association

---

[7] 71 Fed. Reg. 53033.

[8] *Id.*

*The U.S. Equal Employment Opportunity Commission*

## Commission Meeting of November 16, 2005

### Transcript

The Commission convened at 10:10 a.m., Cari M. Dominguez, Chair, presiding.

PRESENT:

CARI M. DOMINGUEZ, Chair
NAOMI C. EARP, Vice Chair
LESLIE. SILVERMAN, Commissioner
STUART J. ISHIMARU, Commissioner

## INDEX

Announcement of Notation Votes

Motion and Vote to Close a Portion of the Next Commission Meeting

REPORT ON COMMISSION OPERATIONS: EEOC ACTIONS IN THE AFTERMATH OF HURRICANE KATRINA:

John Schmelzer

Veronica Villalobos

REVISIONS TO THE EMPLOYER INFORMATION REPORT (EEO-1):

Deidre Flippen

Carol Miaskoff

Cynthia Pierre

James Lee

Motion and Vote to Approve Revisions to the Employer Information Report (EEO-1)

## PROCEEDINGS

10:10 a.m.

CHAIR DOMINGUEZ: Good morning and welcome. We're so glad you're here today. We really appreciate your taking the time to join us this morning. In accordance with the Sunshine Act, today's meeting is open to public observation of the Commission's deliberations and voting.

At this time, I'm going to ask Bernadette Wilson to announce any notation votes that have taken place since the last Commission meeting. Ms. Wilson?

MS. WILSON: Good morning, Madam Chair, Madam Vice Chair, Commissioners. I'm Bernadette Wilson from the Executive Secretariat. We'd like to remind our audience that questions and comments from the audience are not permitted during the meeting, and we ask that you carry on any conversations outside the meeting room, departing and re-entering as quietly as possible. Also, please take this opportunity to turn your cell phones off or to vibrate mode.

During the period October 22nd, 2005 through November 14th, 2005, the Commission acted on one item by notation vote: approving the training facility for the 2006 EXCEL Conference. Madam Chair, it's appropriate at this time to have a motion to close a portion of the next Commission meeting in case there are any closed meeting agenda items.

CHAIR DOMINGUEZ: Thank you, Ms. Wilson. Do I hear a motion?

OMB_0000371

VICE CHAIR EARP: So moved.

CHAIR DOMINGUEZ: Is there a second?

COMMISSIONER SILVERMAN: Second.

CHAIR DOMINGUEZ: Any discussion? Hearing no discussion, all those in favor, please say aye.

(Chorus of ayes.)

CHAIR DOMINGUEZ: Opposed?

(No response.)

CHAIR DOMINGUEZ: The ayes have it, and the motion is carried. Can everybody hear me okay? I have a little bit of, still have some laryngitis. Okay. Today, we have two items on the agenda. The first item is EEOC's actions in the aftermath of Hurricane Katrina. At our last Commission meeting in October, we discussed emergency preparedness in the workplace. This is an opportune time to continue the important discussion by hearing a report on our operations in the New Orleans District Office and Gulf region in the last two and a half months, as well as the many extraordinary efforts that the EEOC staff has made both in the field and in headquarters to respond to this unexpected disaster.

We will hear an update of the progress we have made in reopening our office and serving the public in the Gulf states. I'm delighted to welcome, first, John Schmelzer, who is the Acting Director of Field Coordination Programs. Our second presenter is Veronica Villalobos, an attorney in the Office of Federal Operations. She's just returned from the Gulf region, where she's served on detail to FEMA.

Let me also note that, although we had planned to have Keith Hill with us today, Keith is our Acting Director in the New Orleans District Office; he very much regrets that he's unable to be with us today. He has, however, sent a statement, a very short statement, which Mr. Schmelzer will read on his behalf. So without further ado, Mr. Schmelzer and Ms. Villalobos, please come up and make your presentations. Thank you. John, you can begin.

MR. SCHMELZER: Good morning, Madam Chair, Madam Vice Chair, Commissioners. The Commission went 36 years before we ever had an office destroyed. And in the last four years, we've had two offices destroyed. Yesterday, I was in our Indianapolis District Office, and I was discussing with them the COOP plan, and they pointed out to me just one week ago, about 120 miles away, there was a tornado in Evansville, Indiana within this district's jurisdiction that killed 23 people.

We talked about the importance of the COOP plan and for the employees to continually update their contact emergency information. This was about 1:00 yesterday afternoon.

I had a speech on the 40th anniversary of the Commission opening its doors, at 7:00 at night in a church. My speech was delayed a few minutes because there were sirens going on. I didn't know what the sirens were. Afterwards, I found out it was because there was a tornado watch, and they were thinking whether we should all move to the basement. So we live in a different era, and we better be prepared for it. What was unthinkable now seems to happen with some frequency.

Let me begin by reading Keith's statement:

"As you all are aware, on August 29[th], New Orleans and the Gulf Coast community was devastated by the effects of Hurricane Katrina. One day after Katrina hit, the levy system in New Orleans gave way, and the city of New Orleans was inundated with flood waters which poured in from Lake Pontchartrain. For almost two weeks, water as high as 10 feet remained in the city.

In preparation of the hurricane's landfall, the New Orleans District Office was closed, and the City of New Orleans was evacuated. Just within the last few weeks, people in the hardest hit areas of New Orleans and the Gulf Coast region have started to return home.

Before proceeding, however, I want to take this opportunity to thank the Commission, the Katrina Taskforce, district area and local offices across the country for the prayers and outpouring of support we have received. We have been embraced in the arms of a very caring EEOC family. For all this, we all will be forever grateful.

JA069

OMB_0000372

I want to report to you that we anticipate reopening the New Orleans District Office on November 29th. The office will be located at 1555 Poydras Street in the city's central business district. The location is roughly three to four blocks from the district office's previous location. It is located very close to City Hall, Louisiana Superdome, a Louisiana state office building that houses vital records and provides services to the public. The district office will occupy approximately 8,000 square feet on the 19th floor of this 22-story office building. The district office will share part of the 19th floor with the Veterans Administration. There is available in the area parking, restaurants, hotels, banks, and other businesses.

The agency has executed a contract to begin moving file cabinets, files, and other items on November 28th from the old office building into the new location. The agency will rent furniture because it is inadvisable to use the old system furniture due to mold and mildew concerns."

-- So if I may interject, the office survived, but it is inaccessible because windows were blown in, there was tremendous water damage to the physical structure of the building. They're not quite sure about the extent of the structural damage, and there are tremendous mildew problems throughout this office. --

"New Orleans staff that I have spoken with have told me of their eagerness to get back to work and contribute to the mission of the agency. Currently, there are 31 employees, including myself, who have returned to the New Orleans or the Baton Rouge area. The Department of Energy has given us access to one of its facilities located about seven miles west of downtown New Orleans. New Orleans employees have access to a conference room with ten computers and a telephone. There is one available cubicle with two more computers and a phone. Employees can conduct by phone some limited business, such as charging party interviews, as well as contacting witnesses and respondents.

We have just recently issued phone cards to our employees for use in agency business. Some investigative files, mainly A1 files and litigation files, have been retrieved from our old office building at 701 Loyola Avenue and distributed to the investigators and attorneys who are in New Orleans. Charges taken by our Houston and Dallas offices have been retrieved from these offices and given to New Orleans staff.

Eighteen employees are not within commuting distance of New Orleans. Of the 18, 12 are reporting to work in other EEOC offices. One of the 12 employees requested and received a permanent transfer. Five employees are located at least two or more hours from a district area or local office. One employee transferred to another agency.

Twenty-three New Orleans employees lived in areas hardest hit by Katrina. Most, if not all, of these employees lost their homes. In order to provide a place for these employees to live so that they could return to work, our agency sought the assistance of the FEMA.

A list of the effected New Orleans employees was provided to FEMA, whose representatives then contacted each employee and made arrangements to place each employee and their families in available FEMA housing. FEMA is utilizing cruise ships and hotels for this purpose.

The EEOC Cares Program. Trying to find a way to uniquely respond to each EEOC family who felt the effects of Hurricane Katrina, the Katrina Taskforce created the EEOC Cares: Co-workers Aiding Recovery through Encouragement and Support Program. Many hours of creative thought went into developing this program. Offices and headquarters from around the country have adopted New Orleans employees, contacted them, and have assisted employees in ways particular to each employee. Offices have had receptions, picnics for our employees, and have had bake sales, auctions, and other fundraising events for us. They have made personal contact with New Orleans employees, invited them to their offices, as well as their homes, and made them feel welcome wherever they were.

This outpouring of care has had an immeasurable impact and effect on each New Orleans employee. New Orleans employees have conveyed deeply-felt appreciation for the gifts, cards, and expressions of care they have received. We have felt the warm embrace of our EEOC family.

Some insights: the New Orleans District Office has now been closed for ten weeks. Employees evacuated to many cities across the southeastern United States. From this experience, there are at least three areas of importance that I would like to address.

First, employees must be given the responsibility to report their whereabouts to the agency immediately but no later than 24 to 48 hours of an evacuation or a disaster. Each employee should have a number to call or could use the agency's web site for checking in. Being able to account for the safety of each

JA070

OMB_0000373

and every employee and any family member of that employee is a critical first step in responding to the needs of employees in time of an emergency. Communication is extremely difficult in disaster areas as phone lines and cell lines, as we learned, may be inoperable.

Second, in time of a disaster, employees are going to need reassurance regarding their ability to support themselves and their families. The response by the agency in the aftermath of Katrina was extraordinary. Employees were immediately placed on administrative leave and provided per diem.

I would recommend that information regarding the evacuation support be placed on our web site, on our brochure, outlining for employees the benefits they can expect in times of disaster. In this way, employees will know what to expect in terms of benefits and pay when they encounter a situation like Katrina.

Third, annually update the continuation of operation plans, commonly referred to as the COOP plans. If possible, senior staff should meet in the district or city designated in the plan. From there, they can begin immediately to conduct agency business. Notification must be given to our stakeholders concerning the treatment of charges, litigation, mediations, and contracts.

Thank you again for this opportunity to address these issues. I sincerely hope that I have served the Commission well as Acting Director during these past ten weeks."

That was Keith's statement, and I think I'll just transition to the points I wanted to make. And then you will have Veronica Villalobos, who was one of our FEMA volunteers, talk about her experiences.

We convened -- the hurricane hit Monday, the levies broke Tuesday, we convened Wednesday morning in the Chair's office, and we had a broad cross-section of the agency because one of the items we learned from New York is that the problems and the issues cut across all office lines. So in the beginning, it's very important to have the broadest representation as possible.

Offhand, I remember we had the Office of Field Programs, the Office of Federal Operations, the General Counsel's Office, the Office of Human Services, the Office of the Chief Financial Officer, Administrative Services. The Office of Information Technology played a very key role. And I think I'm leaving out one office.

We then began assigning tasks. One of the tasks is a number of programming offices operational issues arise that the office that is no longer functioning cannot deal with. And we need to think about what those issues are since they're not able to respond to our stakeholders.

The issues that we identified and are working on are the following: potential charging parties. New Orleans office has been closed ten weeks. During that time, 300-day period may have run. People didn't have phones. There was no office to contact. They may have been dislodged from their residences.

In the state of Mississippi, the Jackson Office, there is no FEPA, so they only have 180 days. So instructions are going to the field to take what would otherwise would possibly untimely charges and bring them into the system, validate that the reason they could not file through affidavits was because of the timeframe. And then we'll work from there. That is the first issue.

Second, parties to an open charge, both the charging party and the employer: when we send out requests for information, we have pretty strict time deadlines. Particularly the employer community is very aware of them, and, in the case of New Orleans, they were very concerned, "Well, who do we send the information to if there's no office?" Well, we didn't have the files at that point, and so, through the use of technology on the web site and through the call center when people call, we were able to tell parties to open charges that all deadlines were suspended until further notice. We are in the process of modifying that to take out until further notice, until further notice or unless contacted by an investigator. So that will be the intervening event.

Third, programmatic issue: this is perhaps the most delicate. And that is charging parties who received right to sue notices prior to Katrina hitting the Gulf and their 90 days had begun to run. There are no attorneys left. Law offices were wiped out. Courts were closed. There is no office. Again, on the web site and through the contact center, we're sending out guidance that charging parties should contact us, and we will reissue right to sue notices so that their 90-day period will not expire, and attempt to put in as favorable a position as many of those charging parties who were unable to move due to circumstances caused by the hurricane.

Fourth operational issue: we insist that charging parties continually contact us if they move. Well, in this event, it may be difficult to contact us if you're in a shelter or so. We have no way of knowing where these

JA071

OMB_0000374

individuals are. And one of the things we don't want to do, as people are coming now to work, is to prematurely close out charges. So we're indicating - that we're going - to the field that they must make repeated attempts and no charge now is to be closed, at least until the end of this year as we review each of them and the circumstances as to why we haven't heard the charging party. We'll make repeated attempts to contact them through their relatives and whatever information will be gleaned from the files we're taking out of our New Orleans office.

I apologize. I see my time has stopped, so let me turn this over to Veronica.

CHAIR DOMINGUEZ: Excuse me. Did you add Keith time to John's, or is that his independent time? I thought we had combined the two? Twenty minutes.

MS. Mastroianni: I had a different -- go ahead.

CHAIR DOMINGUEZ: Go ahead, John. You probably have what? About five minutes left?

MR. SCHMELZER: Yes.

CHAIR DOMINGUEZ: Okay.

MR. SCHMELZER: There are a number of other operational issues. In summary fashion, again, using the web and the contact center, all issues relating to litigation where the Commission had already filed suit, these employers and their representatives were directed to contact the regional attorney in the Houston office since that is where operations are being conducted.

As for federal sector complaints, motions pending before administrative judges and hearings that had been set before the administrative judges in the New Orleans District Office - again posted on the web that everything was postponed and suspended until further notice until they heard from the AJ.

Let me now move to a different area. We have sent 21 employees to FEMA. Ten at a time we sent for a 30-day detail. This came about because an employee at headquarters approached FEMA. FEMA indicated an interest in tapping this individual's services. The individual from FEMA was referred to me and, gradually, we worked up the chain so that I was talking to their Director of Equal Rights it's called there. We have made an arrangement to send ten employees at a time. They go to Orlando for three or four days' orientation as to FEMA services, and then they are sent around the impacted area everywhere around the Gulf.

We have generally, we have sent -- the criteria was that you volunteer. We've tried to spread this across the board. That is no office is sent more than one employee. We have investigators. We have mediators. We have administrative judges going. We have people from headquarters going. All field -- I'm sorry. As many field offices as you can imagine.

I have received a one-sentence feedback from FEMA, and I apologize that I did not bring it with me. The feedback was, "Your employees are terrific. Send us all you have. They are making a great contribution." It was words to that effect. So we can be extraordinarily proud of Veronica and her peers and the agency's efforts.

Last is lessons I learned, which parallel a little bit of what Keith learned. The most important item that the agency needs in anticipating these disasters as part of the COOP plan is an employee roster, and that is the employee, their home phone, their cell phone, and their address. This must be in electronic form. It also needs to be in paper form kept at home. There should be redundant, just like in the military, redundant copies everywhere. It needs to be updated, Keith said annually. I would think almost quarterly. It is the only way we can get a hold of people in these types of disasters.

Second, technology is your friend. In this case, in the first three days after Katrina, we had all these employees spread throughout the southeastern part of the United States. Everybody who lived in New Orleans could not have phone service because it was 504, they had a 504 cell phone, and you couldn't get through. The phones weren't working. But they checked the agency's web site once they got to a place that had electricity just to see what was going on, possibly out of curiosity; they didn't know beforehand. And there, they saw information for employees. And it told them contact us, and it gave them basic information. We would continue their salary, etcetera. And more importantly, it told them if you contact anyone else, let us know.

In the course of about two days, we began with three employees, it was eight employees, and then it was 30 employees. This, in conjunction with the call center; some employees called the call center. And the

OMB_0000375

information, rather than trying to contact the 50 employees, we could just put it up on the web site that you had your salary, we would provide employee assistance, that you would get per diem. It was all done at once.

Interesting about technology, I mentioned the 504 cell phones did not work. That's not particularly accurate. The voice didn't work, but text messaging did, which I don't know how to do, but other people in OFP did. And so even though there was a delay of about 12 hours, initially the messages could get out through cell phones to tell people to check the web site.

Third, technology is a false friend. That is, in the case of New York, as I recall, all the phones were down, not just cell phones but you couldn't call into Manhattan. And so for a few people, in order to assure that they were safe, though we knew, we believed everyone had evacuated the building, people, because we had the addresses, people could get on the subway and check other employees. So it was sort of manually. Rather than using telecommunication, it was having the addresses at home and checking to see if people were home.

Fifth is the initial meeting or phone conversation with the impacted office should be as broad as possible. We talked about that. Also, with Keith, reassurance to staff in the impacted office. In New York, we said we'd give employee assistance. I don't think it was by design, but we just made the offer. We didn't say we'll get the person on a particular day and they'll show up in this office. The New York employees did not want to have an employee assistance program for their first meeting in a building. It was held outside in a park. That is something we at headquarters would not have thought about. So you want to give support as broadly as possible. Let the office where the employees are sort of dictate.

As for New Orleans, we provided the following: we found and confirmed the safety of all our employees. We talked about that. We had salary continuation. We had per diem. For certain employees, their direct deposits went to local banks. The local banks were down. They had no cash. We gave them advances. It comes back out of their salary, but we actually sent advances to rural places in Alabama where a UPS truck could deliver, but that's where they were. We provided employee assistance.

Initially, we got volunteers, EEOC volunteers to offer housing to employees who were located near other EEOC offices. We began EEOC Cares and, if I had more time, I would read to you some of the e-mails, what some of the people said. It was like Christmas. Their kids and this employee were crying when they received these packages of clothes and games and just support and cards supporting them. This was one of the best things we did. It was fully consistent or an extension of the EEOC model workplace because, if we say employees are our most important asset, this was a wonderful example, both institutionally, how the agency acted, and individually, how our employees acted, of walking the talk.

And last, we are now working with FEMA. One of the benefits of volunteering is we have an inside track to try and get housing for our employees. Thank you.

CHAIR DOMINGUEZ: Thank you, John, very much. Ms. Villalobos?

MS. VILLALOBOS: Yes, Madam Chair, Vice Chair Earp, Commissioner Silverman, and Commission Ishimaru. Thank you so much for the opportunity to speak with you today about my experience with FEMA.

I, along with ten other individuals, flew out to Orlando in mid-October. We had two and a half days' worth of training where they gave us a crash course on FEMA programs, and they discussed with us the way the Equal Rights Office works. The Equal Rights Office at FEMA is very different from what we're used to. It has two components. There's an internal component and an external component.

The internal component, of course, is their EEO office. They ensure that employees are not discriminated against, and that's FEMA employees as well as contract employees who work with Shaw.

The external component is their civil rights program, and they try to ensure that evacuees, that is the survivors, are not experiencing any discrimination in the receipt of the services or in the community in terms of housing or businesses.

Our focus is varied depending on which office you went to. We went to Louisiana, Alabama, Mississippi, Florida, and Texas. I ended up in the Houston area field office and, from there, not only did we work at the super DRC that everyone sees on the news with the long lines, but we also went out to east Texas, which would have been Beaumont, Port Arthur, Galveston, Crystal Beach, Vidor, Orange, Livingston. And these were just some of the DRCs, driving back and forth making sure that the DRCs or disaster recovery centers were accessible to individuals with disabilities, making sure that if there were special needs or reasonable accommodation issues that we would be there to ensure that those were being met.

JA073

OMB_0000376

In terms of outreach, something that FEMA constantly does is going into the community talking to organizations, working with the mayor's office, making sure that all the communities are being reached. One specific problem that we were encountering was in the Hispanic communities, specifically those people from Latin America, were somewhat fearful to come forward to get their, I guess we should say the FEMA services. They were afraid to register. They weren't comfortable coming into the DRCs because they'd see all the law enforcement. And while some people would be qualified because of their status, other individuals and their families were maybe in the country illegally, and so they feared coming into the DRCs.

So we worked very hard with churches, made sure all our literature was in Spanish, as well as English of course, and also in Vietnamese. There was a large Vietnamese community that was affected by Katrina. And so there were many efforts to go out into the community to hook up with churches, organizations, and ensure that those individuals were receiving the FEMA services and were registering.

Even as late as now, we're still finding that there are many people who haven't registered. Some people think the numbers are exaggerated. It's anywhere from, you know, maybe ten to twenty thousand to upwards of forty or fifty. It just depends on who you ask. The different organizations have a different read on it, of course.

We also worked closely with the disabled community in east Texas. They would identify specific special needs. Examples would be an elderly woman who used a wheelchair. The ramp was completely blown away from her mobile home, so she had no way of getting into her home, although the home itself wasn't damaged. So they came to us and said, "Is it possible for you to quickly have an inspector come out, so we can get this fixed and have this woman be, have her home accessible?" So those were the kinds of things we were dealing with. We would call the organizations, and they would always give us contact information and phone numbers to reach these individuals.

It was interesting because when people met me, they'd always say, "Oh, how long have you been with FEMA?" and I would tell them I'm an EEOC employee, and I'm on detail. And they were always very open to me. They were happy to have me there. And they believed in EEOC's mission. Clearly, they believed that we were carrying out our mission because they found me credible from the very get-go. Very helpful for me but also gave me an added measure of responsibility towards these individuals who wanted something more than just a standard answer.

When we worked with the disaster recovery centers throughout Texas, what we would do is develop close relationships with the DRC managers, who then again would put us in contact with individuals who had had problems with the FEMA services or, if there had been housing issues in the area, if there had been issues with the hotels, they would tell us about those and we would be able to look into them further from there.

We also would conduct training for the FEMA employees on their equal rights and on diversity and sexual harassment training. This was difficult because they're trying to see people and respond to individuals' needs, applicants' needs and, at the same time, we're trying to train them. So that could get very complicated, but we wanted to make sure everyone was aware of their rights.

While crowds of applicants were no longer coming into the disaster recovery centers, they were seeing repeat visits from applicants. What became very clear is that after going through what people had seen, they wanted to speak to a person. They didn't want to be on the telephone, waiting on a 1-800 number. They didn't want to go on the Internet. They wanted to see a person, and they wanted to feel an assurance from another human being that things were going to be okay.

It was very difficult because one of my favorite things to do would be to speak to the applicants. I didn't think I'd cry. And they all had very touching stories. And sometimes something as simple as asking them, "How are you doing today? Are your needs being met? Is there anything we can do for you?" meant so much to them.

The discrimination that you encounter during these disasters, it's remarkable because, while the disaster brings out the absolute best in people, it also brings out the absolute worst. People were afraid of losing their homes. Even though their homes had not been demolished by the storms or by the hurricanes, people had no homes. Others had absolutely nothing. I sat in the Urban League in Houston one day and spoke with a woman, and she couldn't stop crying. The tears just kept flowing down her face because she said, "I've lost absolutely everything, and I don't know what I'm going to do," and she said, "The worst part is I'm one of the lucky ones because I had insurance and I have the wherewithal and the money that I need to get back on my feet, but it has been absolutely devastating."

JA074

OMB_0000377

And story after story like this would come up, and situations that clearly were discriminatory would be presented to us, and we would do our best and, oftentimes, the best we could do was to just be the presence of FEMA because when certain businesses would see that we were present or housing businesses would know that we were involved, their attitudes would change towards the applicants, towards the evacuees.

The one lesson I came away with is that the burden falls on each of us to make any difference that we possibly can, be it even as small as asking how someone is doing, be it as small as sending clothing that we have because, you know, you sit in a room while people were being registered, and someone would say, "Do you know where we can find a size ten, a pair of size ten shoes for men?" You know, it was this kind of thing where it was just a question of, "Do they even have my shoe size?"

Furniture was even an issue. People were in hotels, but they needed to move into apartments, but they didn't have furniture in their apartments, so they needed to work with the city or with FEMA to get the resources to have a bed to sleep on. So that's something that's going on, and, as we approach the December 1st deadline to move out of the hotels, this is a continued concern. And these are the kinds of things that, in the Equal Rights Office, we actually concerned ourselves with and we worked with the community to try and make sure that these needs were met.

The Katrina and Rita evacuees need our continued support. Although the survivor stories are no longer on the front page of the news, the needs remain in all of these states. I saw a lot of people with FEMA who were working diligently to meet these needs, but there just aren't enough people, and they just don't have enough hours in the day. It's my hope that EEOC employees were able to lighten the load for these other employees who've been working so hard and tirelessly on a continuous basis with the Katrina and Rita survivors.

I thank the Commission for the opportunity to allow EEOC employees to go out to the Gulf region and assist FEMA in these efforts. It has been the absolute best and most rewarding experience I've had in the federal government, and I'm truly appreciative for it. Thank you.

CHAIR DOMINGUEZ: Thank you very, very much, Ms. Villalobos, not only for your extraordinary personal account, very moving, but thank you on behalf of all of the individuals that you represent for just the extraordinary efforts that are going on beyond your immediate responsibilities which has to do with employment. Obviously, you looked at the basic needs of the employees.

And I wanted to take the time for this Commission meeting to really showcase. All of the Commissioners have been briefed. I've certainly been intimately involved, as have my fellow Commissioners, in all of the issues. But I think it's important for all of us to learn from every one of these situations. No two disasters are the same. 9/11 quite different from Katrina, quite different from Oklahoma bombing, quite different from the tornadoes, John, that you escaped just recently.

But I think it's important. It behooves the Commission to have lessons learned shared in the public. And I just wanted to take this time to personally commend John and the OFP team and all of the Commission employees who have volunteered and who have participated in dealing with just very basic human needs. Sometimes, I tell people the Challenger was brought down by the O-ring. It's the little things that are most important in life. You have to deal with the basics.

And so on behalf of the Commission, I just wanted to first publicly applaud your contributions and your efforts to bringing our staff back on its feet and not only to doing that but to feeling cared about and loved. And so thank you very much.

And with that, I'll open it up for comments to my fellow Commissioners, starting with the Vice Chair.

VICE CHAIR EARP: Thank you, Madam Chair. I just want to attach myself to the Chair's comments and say thank you also. It's perfectly okay to cry. In fact, I was going to compliment John. I think you've done such an outstanding job. I am in awe of your steadfastness because I know the first time you briefed me I was weeping all over the place, and John was steely, steely in his determination to not let my tears affect the job that he had to do. So I just want to thank you, both of you. Well done.

CHAIR DOMINGUEZ: Thank you, Madam Vice Chair. Commissioner Silverman?

COMMISSIONER SILVERMAN: I just wanted to publicly extend my sympathy to the victims of Katrina and the other hurricane because I haven't had a chance to do that. I want to thank you both. I mean, John,

JA075

OMB_0000378

you are a blessing to this agency and so well suited, and we're so lucky to have you, such a caring, practical person, and thank you.

To Veronica, when I read that e-mail that Nick originally sent out looking for people to help, I thought, "Who in the world would respond to this?" I mean, the conditions were, you know, the descriptions, it just sounded so hard and difficult, and I was so heartened when we had so many people, a wait list I was told, and the incredible job you did and the experience. We're just so proud that you and other employees have stepped in, and it means so much to us. So often we hear about what went wrong and what people didn't do. And it's just always great to hear what went right and what we did do. And, obviously it's going to take a lot more work. But I just want to say thank you so much for everything you've done.

CHAIR DOMINGUEZ: Thank you, Commissioner. Commissioner Ishimaru?

COMMISSIONER ISHIMARU: Thank you, Madam Chair. I, too, join Commissioner Silverman in expressing sympathy to the victims of the hurricanes. I was always stunned by the steadfastness that people showed in light of the adversity, losing everything in many cases, and people have gone on with their lives, trying to make the best of it.

For our colleagues in New Orleans, we look forward to getting you back to work. I'm glad to hear from Keith's statement that the office will be re-opening. That's excellent news.

I especially want to thank the Chair. I think the efforts that were shown in the aftermath of Katrina hitting on that Monday and the fact that the Chair and her staff took immediate actions to deal with this was outstanding. It was generous support of our employees. It really embodied the model workplace as part of the Chair's five-point plan.

And I was also struck because this wasn't -- it would be easy to say, "Okay, we'll do this for a week," or, "We'll do it for a couple of days." But we've gone out of our way to make sure that our employees know that we are going to stand with them for the long run. And the office has been closed now for ten weeks, and people have been on the payroll, have been able to get a chance to get their life together. This was the right thing to do, and I am very proud, Madam Chair, that you stepped up and took the lead and did this. I think it's really outstanding. I think, frankly, it's a proper role of government when disasters hit. You have to step up. No one can plan for these things. These are literally acts of God that happen, and I think we've done the right thing here, and I was very proud to be associated with the agency because of that.

You know, I recall hearing on the radio right after it hit that companies in the private sector, some were doing some things, and then they stopped paying their employees. Part of it, it was for financial reasons; part of it was for policy reasons. But I think we did the right thing by sticking with our employees.

I'm also, you know, the stories about the FEMA details are very touching, and I think knowing what you went through and what your colleagues went through working for FEMA on detail are very important and go beyond just the e-mail that we get from John or Nick from time to time talking about what our people are doing. I'm glad to hear that a number of our employees have gone and come back. More are going. I'm glad we're able to help.

I also think that it shows the value of having face-to-face contact. I think that is invaluable, and I'm glad we were able to help there.

Could you answer a question for me about the role of FEMA and undocumented persons? I assume that people were not asked for their immigration status when they showed up for help. They may have been fearful, as you pointed out, but I would assume that people were in need, FEMA was there to help.

MS. VILLALOBOS: What would happen is you could register with FEMA if you had a certain documentation, and it varied, but Social Security number showing that you were a documented worker, that type of thing. There's a whole range of things. If they could not help you, they would send you to the Red Cross or to the Salvation Army, and they were always able, they didn't have to find out any information about that. In different states, I think it was the Red Cross was responsible for handing out housing vouchers.

In Texas, because of the way it was set up, some of that was the state government or the local government. And so it was a question of how they handled it. That actually did turn into almost a political question because of the way it was written up, so I would say that what always would happen is someone would be sent to the Red Cross if they could not register for FEMA services. That was the situation.

JA076

OMB_0000379

COMMISSIONER ISHIMARU: Madam Chair, can I ask John a couple of quick questions?

CHAIR DOMINGUEZ: Certainly, certainly, yes.

COMMISSIONER ISHIMARU: John, we talked about this during our briefings. Has there been any analysis done of where our charging parties who had filed with us before Katrina were and how many we may have lost touch with because they aren't living there anymore, they don't have phone service? Have we been able to do that? Have we been able to look to see where they say the lower 9th Ward has been more adversely impacted than other places, or are we basically handling this on a case-by-case basis?

MR. SCHMELZER: We will handle it on a case-by-case basis, but we did look to see where the charges were filed from when we went looking for a new or a temporary office. And so that played a major role in our determination.

Now, I think the data we used was not necessarily current but may be fiscal 2004 data and earlier because it just didn't have access to the 2005 data. So I can answer your question just partially.

COMMISSIONER ISHIMARU: Although I guess the problem now is, for many parts of the city, it no longer exists as a residential area. So I guess --

MR. SCHMELZER: That's correct. It will be difficult tracking down lots of charging parties, but I assume, as the office comes up, there are private services that we can contract with that somehow can do more sophisticated computer searches than we can to figure out where people are.

COMMISSIONER ISHIMARU: I know a lot of people dispersed, obviously, after the hurricanes hit and went to various parts of the country, were evacuated to various parts of the country. Have we made any systematic efforts through our other offices to outreach to people who were affected by Katrina and Rita to let them know what their rights are? I was always struck by people moving to places where there weren't minorities in large number and, if they were planning to stay there for the future, I often wondered what sort of future they would face. Have we done anything through our other offices in other parts of the country to reach out?

MR. SCHMELZER: I think we've just used our regular outreach programs to contact and alert those people as to their rights but nothing over and above, beyond that.

COMMISSIONER ISHIMARU: Okay. And the last question I have, there obviously will be a large effort made to rebuild the city and tremendous amounts of resources going on. Are we monitoring that situation to make sure that the anti-discrimination laws are still in effect, that they won't be waived, that contractors, companies doing business in New Orleans will be held to the same standards that they would in other parts of the country?

MR. SCHMELZER: Well, the New Orleans office is a veteran labor force, and they have deep roots in the community, and so they will know what's going on as far as contractors and employment profiles, etcetera. And if need be, they will take appropriate action. But right now, it's just too early.

COMMISSIONER ISHIMARU: Great. Thanks to both of you. Thank you, Madam Chair.

CHAIR DOMINGUEZ: Thank you, Commissioner. I am going to step out of role here for a second because I think I don't want to speak as a member of this body but as a member of the EEOC family, and I think I'd like to give everyone here and everyone listening in around an opportunity to give the wonderful efforts that our team has put together a round of applause and appreciation.

[APPLAUSE]

Thank you very, very much.

Okay. The next item on today's agenda is the revisions to the Employer Information Report, EEO-1 as we know it. And that will be presented first by Deidre Flippen, our Director of the Office of Research, Information and Planning.

We're also going to hear from Carol Miaskoff, the Director of the Coordination Division, the Office of Legal Counsel. She will be followed by Cynthia Pierre, Director of Field management Programs. And last, but certainly not least, our Deputy General Counsel, Jim Lee.

The EEO-1 report is an annual survey that has not been significantly revised since it was instituted by the Commission back in 1966. Now, this report must be cleared by OMB under the Paperwork Reduction Act every three years, I believe that's the time. As we know, this act is designed to minimize reporting burdens and taxpayer expenses by ensuring that whatever data the government collects is essential to the discharge of its responsibilities and cannot be obtained in any other manner.

We're here today to complete our work on a project that began long before I arrived at the Commission, and we want to deliberate and vote on a final proposal to revise the EEO-1 report. We've sought to devise a workable new form that collects data that will be useful, we believe will be useful to the Commission's mission. We recognize that, for the last several years, we've had extensive discussions, primarily with our sister agencies who also use this report, so there's been a lot of ongoing discussion back and forth.

So before turning to our presenters who are going to explain the revisions to this form and also will talk about the public comments that have been received during this rulemaking process, I particularly want to express my appreciation to the staff members who have worked so diligently on this proposal for several years now. From the Office of Research, Information and Planning, Deidre Flippen; from the Office of Legal Counsel, Carol Miaskoff; and their staffs. You really have done an exceptional job just trying to keep this very complex, very difficult issue explored and continued, and you've done it with great professionalism, thoroughness, thoughtfulness, and objectivity. So thank you for that.

And at this point, let me ask the first presenters to please come up. We'll start with Ms. Flippen.

MS. FLIPPEN: Good morning, Madam Chair, Madam Vice Chair, and Commissioners. My name is Deidre Flippen. I am the Director of the Office of Research, Information and Planning. I'm here to summarize the final proposed changes to the EEO-1 Employer Information Report that are before you for approval.

After consultation with the Office of Federal Contract Compliance Programs, OFCCP, on June 11th, 2003, EEOC published proposed changes to the EEO-1 Employer Information Report. These changes were required in order to comply with government wide revised standards on race and ethnicity issued by the Office of Management and Budget in October 1997, and revision of the EEO-1 job category definitions to comply with the revised OMB standards on standard occupational classification of 1999 and the 2000 Census occupational categories.

Consequently, EEOC proposed changes to the ethnic and racial categories on the EEO-1 report and also to the job categories. The Commission held a public hearing on October 29th, 2003 to give the public an opportunity to comment on the proposed changes.

The revisions proposed in the June 2003 notice are as follows: added a new racial category titled "Two or More Races not Hispanic or Latino;" by gender; separated Asians from Pacific Islanders; added a new category titled "Asians not Hispanic or Latino;" added a new category titled "Native Hawaiian or other Pacific Islander not Hispanic or Latino;" changed American Indian or Alaskan native to American Indian or Alaska native not Hispanic or Latino;" renamed Black as Black or African-American not Hispanic or Latino; renamed Hispanic as Hispanic or Latino; strongly encouraged employers to use self-reporting rather than visual identification; extended the EEO-1 data collection by race and ethnicity to the state of Hawaii; and changed the EEO-1 job categories by expanding the current single officials and managers category into three subcategories: executive senior level officials and managers, mid-level officials and managers, and, three, lower-level officials and managers.

The proposed revised EEO-1 report form seeks to balance several competing interests. These are to obtain data to support the EEOC and OFCCP in enforcing Title VII and Executive Order 11246, address changing United States demographics, comply with new OMB standards, and minimize the reporting burden on employers.

The changes from the June 2003 notice and the final proposed notice before the Commission are as follows: change the proposed officials and managers three subcategories of executive senior level officials and managers, mid-level officials and managers, and lower-level officials and managers to two subcategories titled "Executive Senior Level Officials and Managers," and, two, "First/Mid-Level Officials and Managers;" revise the EEO-1 instruction booklet which provides guidance to employers on completing the EEO-1 form by removing non-managerial business and financial occupations from the officials and managers job category and adding them to the professional job category; remove the "2000 Census Occupational Codes", which each EEO-1 job category grouping, and the EEO-1 instruction booklet. However, the proposal makes it clear that the EEOC will continue its past practice of producing a job classification guide for employers with guidance about the range of

JA078

OMB_0000381

Census occupational codes for each broad EEO-1 job category and the Census EEO-1 crosswalk. Keep the order in which the EEO-1 job categories appear on the EEO-1 form the same as on the current form; eliminate the suggested questionnaire for re-surveying employer workforces; reduce the annual reporting burden hours from 644,320 to 599,000 or by seven percent; and change the effective date for use of the EEO-1 form from 2005 to 2007.

The EEO-1 report is a valuable tool in the Commission's enforcement activities and in conducting research. Other panel members will describe how EEO-1 data and information is used in our enforcement activities. Both internally and in academic settings, the EEO-1 is used to conduct various types of research.

The Office of Research, Information and Planning has published a number of research reports by various industries and occupational categories that have been well received by employers and the public. For example, "Women of Color: Their Employment Status in the Private Sector," "Diversity in Law Firms," "Retail Distribution Centers: How New Business Processes Impact Minority Labor Markets;" "High-End Department Stores: Their Access to and Use of Diverse Labor Markets;" and "Glass Ceilings: The Status of Women as Officials and Managers in the Private Sector."

In addition, we publish and distribute annually job patterns for minorities and women which provides aggregate EEO-1 data by industry and geographic areas and the biannual indicators of equal employment opportunity status and trends, which provides trends by job category, gender, race, ethnicity, industry, and geographic area.

With the exception of the indicators report, these reports are available to the public on our external web site at www.eeoc.gov. The indicators report is distributed and available upon request.

EEO-1 data is also provided to the Office of Federal Contract Compliance Programs and approximately 80 state and local fair employment practices agencies. Requests are also received from employer groups, the media, and the Government Accountability Office for articles and studies. Thank you.

CHAIR DOMINGUEZ: Thank you very much, Ms. Flippen. Now let's turn to Ms. Miaskoff. Carol.

MS. MIASKOFF: Thank you. Good morning, Madam Chair, Madam Vice-Chair, Commissioners. My name is Carol Miaskoff. I am the Assistant Legal Counsel for Coordination, and I'm here today to summarize the chronology and the circumstances leading to the proposed revised EEO-1 package that is before you today. As Ms. Flippen stated, the Commission published its initial Paperwork Reduction Act notice on June 11th, 2003, proposing changes to the EEO-1 report, and requesting public comments. During the 60-day comment period, 32 interested parties submitted comments, including civil rights organizations, employers, human resources and information technology professionals, and individuals.

The Commission held a public hearing about the proposal on October 29th, 2003, at which nine witnesses testified. Several parties submitted supplemental written comments after the public hearing.

The Office of Legal Counsel analyzed all of the comments and the testimony. A public meeting and Commission vote was scheduled for June 4th, 2004, on a proposed final EEO-1, but this meeting was postponed after the Chair met with civil rights groups to hear their concerns.

Subsequently, the Office of Legal Counsel Staff reviewed the entire record giving full consideration to all points of view. Additionally, coordination with OMB and OFCCP continued in the period between June, 2004 and the present. The purpose of today's meeting is to deliberate and vote on a proposed final EEO-1 package. The next step, after the Commission approves a final revised EEO-1 will be to publish it in the *Federal Register* for a 30-day comment period. There will be this additional comment period because this process is under the Paperwork Reduction Act. Comments will go directly to OMB, and OMB will then decide whether to approve or disapprove the revised EEO-1.

Now my primary role here today is to summarize the major themes in the public comments, and the responses to those comments that are presented in the final package that is before you. There are four major issues. The first one was the Commission's strong endorsement of self-identification of race and ethnicity rather than visual identification by the employer. The second was the Commission's adoption of a new racial category two or more races. The third was the Commission's decision to retain the current EEO-1 practice of reporting Hispanic or Latino employees only by ethnicity and not by race. And the final was the Commission's decision to divide the job category for officials and managers into three hierarchical subcategories. I'll discuss each issue, and then summarize the response in the EEO-1 package.

JA079

OMB_0000382

On self-identification, the original 2003 EEO-1 proposal stated a strong preference for employers to collect race and ethnic data by asking their employees to specify the ethnicity and the race they considered themselves to be. This preference was based on OMB's 1997 Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity, which I will call the 1997 revised standards.

Public comments objecting to this preference came from employers that expressed discomfort about potential employee reaction. Some employers also said that it would be burdensome to collect information in this way. One employer group requested an exemption from self-identification if doing so would prove unduly burdensome or otherwise not practical or feasible.

OMB's 1997 revised standards call for self-identification as the preferred method to collect data about ethnicity and race. This preference is linked to the guidance about giving individuals the opportunity to report more than one racial category. It is difficult to imagine how a continuation of visual identification by employers could be used to obtain accurate information about whether someone identifies with one race or more than one race. In the EEO-1 materials before you now, there is only one exception to this preference for self-identification, when employees decline to self-identify.

I will now turn to the central question here which is ethnicity and race, for ethnicity and race, which was whether to have a single category for everyone who self-identifies with more than one race, titled "Two or More Races". Clearly, there was extensive public comment on this issue. At the hearing, witnesses discussed the pros and cons of having a single category for all employees who chose to self-identify with two or more races, and also discussed the pros and cons of having categories for the four most common racial combinations, plus a residual, as drawn from OMB's 2000 guidance.

Civil rights organizations stated in strong terms that more detailed racial reporting was necessary in the interest of civil rights enforcement and full compliance with OMB guidance. Employer groups testified to the burden in both time and money that a detailed race and ethnic reporting scheme would impose. Finally, OFCCP said that adoption of the two or more races category would be consistent with their current use of EEO-1 data.

In weighing these different points of view, we turned to a consideration about what data would be most useful for EEOC's enforcement program. As Ms. Flippen did and Ms. Pierre and Mr. Lee will explain, staff uses EEOC data in two major ways. First, we use it to analyze broad trends in female and minority employment on an industry, regional, or national basis. These are the studies to which Ms. Flippen referred.

Second, we use it to help make early assessments of the strength of charges, and later to compare racial, ethnic, and gender make-up of employees at a particular organization with that of employees of similar organizations in the investigation process.

In both of these instances, Commission staff uses EEO-1 data to find statistically significant disparities or trends between a particular employer and other employers, or among larger groups of employers. EEO-1 data is not intended and cannot provide information about how a specific employer's work force came to look as it does, because the EEO-1 is a snapshot of the payroll of the employer at one point in time, and it does not provide any information about individual employment decisions, such as hirings, firings, or promotions.

For the same basic reason, the EEO-1 also does not provide EEOC with the information to determine if a specific charge is with or without merit. EEO staff obtains that kind of detailed information from the employer during the investigation.

Of importance to this decision-making process was also the fact that in the 2000 census, only 2.4 percent of individuals reported that they were in a category that would fall under two or more races. The Census Bureau's modified numbers for the 2000 census restated that number as actually down to 1.4 percent of the population, with the largest subgroup being those under 13 who were at 2.4 percent. These percentages themselves included an array of unique racial combinations. In this context, where the total for all people in two or more races was small, but where the data was ultimately used to analyze broad trends or comparisons, the decision was made to retain the single category for two or more races.

The second important question concerning race and ethnicity was whether to change the EEO-1 to require employers to report racial information about employees who self-identified as Hispanic or Latino ethnicity. Employers have never been asked to report race data for Hispanic or Latino employees on the EEO-1. This became the subject for debate because OMB's 1997 revised standards advised the collection and maintenance of such data when the two-question format was used. The phrase "two-question format" means that when race and ethnicity, i.e., Hispanic or Latino, information are collected separately, the first question should be about ethnicity, and the second question should be about race.

JA080

OMB_0000383

In public comments on this issue, civil rights groups focused on the importance of having complete racial data available in order to combat all workplace discrimination. Most employer groups focused on the burden of collecting, maintaining, and reporting race data for Hispanic or Latino employees. Some employers stated that they might choose to collect racial data for Hispanic or Latino employees for research or statistical purposes, or to defend against potential EEO claims.

The 2000 census suggests that a small percentage of the population reported as Hispanic or Latino, and also as part of a racial category other than White or some other race. According to the 2000 census, a total of 3.6 percent of the Hispanic or Latino population reported their race as Black or American Indian, Alaskan Native, or Asian, or Native Hawaiian Pacific Islander. 42.2 percent of the Hispanic or Latino population reported their race as some other race, and 6.3 percent of the population reported their race as two or more races.

The Census Bureau itself is working to identify ways to collect more accurate data about race from individuals who report as Hispanic or Latino. Additionally, media reports in the last few years cited debate in society at-large about Hispanic or Latino individuals identifying with American racial groups. OFCCP also asserted that changing the EEO-1 to report the race of Hispanic or Latino employees would complicate its use of EEO-1 data.

Given these considerations, the final proposal reaffirms the initial decision not to require employers to report the race of employees who identify as Hispanic or Latino. The preamble to the final EEO-1 report, however, commends employers who choose to collect more detailed race information than is needed to complete the actual EEO-1 report.

Finally on race and ethnicity, the final EEO-1 package does not include the suggested questionnaire which was included in the 2003 proposal for employers to use when collecting race and ethnic information from employees. The preamble to the final EEO-1 report, however, sets forth two basic principles for employers to follow in collecting this information. First, to offer the employees the opportunity to self-identify; and two, to provide a statement to employees about the voluntary nature of the inquiry. A sample statement making these two points is included in the preamble. The preamble also adopts, as proposed in 2003, a two-question format, meaning that employees are first asked to report their Hispanic or Latino status, and second, to report the race or races they consider themselves to be.

The next major topic concerns job categories on the EEO-1, and specifically dividing officials and managers into subgroups. As Ms. Flippen said, the Commission originally proposed expanding the current category for officials and managers into three subcategories; executive senior level, mid-level, and first or lower level. In public comments and testimonies, employers raised concerns about how to divide officials and managers into the three categories, in particular, about the likelihood of inconsistent categorization of the middle level managers who perform the same functions but at different companies, and perhaps with different job titles.

We recognize that it would be difficult to consistently place the middle managers. We also, however, recognize that a single category for all officials and managers is no longer acceptable. Accordingly, the final EEO-1 package proposes two subcategories of officials and managers, executive senior level, and first/mid-level.

With respect to job categories, some commentors strenuously objected to the use of census job codes as a mandatory basis for sub-dividing officials and managers into these different subgroups. The final revised EEO-1 does not use census codes to define the subcategories. Instead, the final package explains that jobs should be assigned to each subcategory based on the job's level of responsibility and influence in the organizational hierarchy. There are detailed descriptions in the instruction booklet and in the preamble.

The proposed revised EEO-1 also moves business and financial occupations from officials and managers to professionals. This change will improve data for analyzing trends and mobility of minorities and women within the upper reaches of organizations.

Finally, there are two miscellaneous but significant issues. First, in terms of establishments in Hawaii; under the current EEO-1 report, i.e., the one employers would have completed this year, establishments located in Hawaii are not required to report the race and ethnicity of employees, but only reported employment data by gender. This exemption was spelled out in the current instruction booklet. The proposed final EEO-1 before you today does not exempt establishments in Hawaii from the reporting requirements. Employers will need to complete the revised EEO-1 reporting the gender, race, and ethnicity of employees for their establishments that are located in Hawaii.

JA081

OMB_0000384

The final issue I'll present is re-surveying. The EEO-1 package does not mandate that employers re-survey their entire workforce before submitting the first EEO-1 report in the new format. The goal is to minimize burden for employers while they are transitioning to the revised EEO-1 report. The preamble does, however, urge employers to use every opportunity to re-survey that arises in the normal course of business. The preamble also reminds employers to seek self-identification of all new employees under the new race and ethnic categories.

That concludes my presentation. Thank you very much.

CHAIR DOMINGUEZ: Thank you very much, Ms. Miaskoff. Ms. Pierre.

MS. PIERRE: Good morning, Madam Chair, Madam Vice-Chair, Commissioner Silverman, Commissioner Ishimaru, colleagues and guests. My name is Cynthia Pierre, and I am the Director of Field Management Programs in the Office of Field Programs. I was asked to give a brief statement today on how the EEO-1 is used in investigations, how its use has changed over the years, and what other tools investigators use in investigating systemic, class, and individual discrimination.

Having served most of my career in the field, including as a systemic investigator at one point in time, and most recently as a District Director, I would like to share my views on the topic by describing what approaches an investigator typically takes in conducting a systemic, a class, and an individual harm case. In particular, an individual harm case that has potential for expansion into a class case.

Systemic and class cases most often grow out of ongoing investigations of individual charges. Although outreach efforts and information provided by interested and knowledgeable third-parties also lead to systemic investigations, or investigations of pattern or practice, and other class cases. For example, in launching the investigation of a hiring or promotion case, we generally start with a request for the position statement and a request for information that would include request for copies of workforce profiles that would be annotated with the race, gender, and job title of all employees in the relevant facility or facilities. We would also ask for copies of applicant flow logs, if the employer is a federal contractor. If the employer is required to file an EEO-1 report, copies of the most recently available EEO-1 reports are accessible on the investigator's desktop.

This is a change from the past when investigators would have to request copies of the reports from the employer or from EEOC Headquarters. I can remember when I was a systemic investigator, the reports were kept in headquarters and we would have to have them faxed to us. And if we wanted to have a report run, the data was actually kept on a mainframe computer at NIH, and you had to have the number of a tape, and they had to carry the tape to the mainframe room to run the tape, and maybe overnight or a couple of days later you can get the report run, so we've come a long way since then to having this data on our desktop.

We would also employ on-site visits as investigator tools. We can schedule an on-site visit to the employer's facility that would allow a visual survey of the employee population. We would review applications on hand and interview witnesses. The investigator may also review the agency's charge database for similar allegations against the same employer. We may use the EEO Desktop software and the EEO census to conduct labor market analyses, compare the employer's profile with that of comparable employers in the relevant labor market in order to determine the existence of statistically significant disparities. We often would seek information or assistance from Headquarters Office of Research and Information Planning, if needed, as every investigator is not expert in this, but if you're not expert, we make sure that they know where they can call for assistance.

At the most, the investigator can only obtain a broad brush analysis of a company's workforce from EEO-1 data, but it is a starting point. Analyses by census occupational codes are needed to pinpoint particular job hiring or promotion patterns over time. Many hiring and promotion cases involve small employers who are not required to file EEO-1s. Also, many employers in the construction and agricultural industries do a lot of hiring, but often are too small to file EEO-1s. Depending on the type of employer, the investigator may obtain information on staffing from other sources, such as financial databases, annual reports, company newsletters, news articles and trade press articles, employer and industry websites, voluntary affirmative action plans, and other government records.

Of course, a key and sometimes overlooked source of information about an employer's workforce is the charging party and/or the charging party's witnesses. Charging party and witness information on employer policies or practices sometimes provide leads that compel expansion of an investigation from a single facility to a regional or nationwide scope. As you can see, it is usually more effective to take a multi-pronged approach to gathering data on an employer in order to get the most refined picture possible of its operations and its practices.

OMB_0000385

In the 1970s and the 1980s, there were several largely unsuccessful attempts at EEOC to use EEO-1 reports to identify employers with low representation of women and minorities. We found that the EEO-1 analyses alone often provided results that could not be sustained by field investigations, and did not justify the amount of time devoted to conducting the analyses. However, combined with other data sources and conducted at an appropriate stage in an investigation, the EEO-1 is a useful investigative tool.

CHAIR DOMINGUEZ: Thank you very much, Ms. Pierre. Mr. Lee.

MR. LEE: Thank you, Madam Chair, Vice-Chair, Commissioners. Some comments today regarding the Office of General Counsel's uses of EEO-1 data during the litigation of Commission cases. OGC recognizes that the EEO-1 report can help attorneys and investigators identify, in conjunction with other available evidence, employers that may be significantly under-employing women or minorities. It was, in fact, an OGC employee that created the Commission's internal EEO-1 Desktop software tool, and we support continuing efforts to improve staff access to EEO-1 data.

However, our enforcement litigation targets particular employment decisions for a particular actionable period. For example, hiring into management from say March 2001 to the present, in contrast, EEO-1 report categorizes current employees by sex, race, ethnicity, and job group at a single point in time. It's a snapshot that reflects an amalgam of employment decisions, hiring, transfers, promotions, discharges, voluntary resignations, et cetera, over time. Many of these employment decisions may be so old that they're not longer actionable. This problem with snapshot data was recognized almost as soon as statistical evidence was starting to be used in employment litigation going all the way back to the Supreme Court's decision in Hazelwood in 1977.

In addition to the temporal problem of using snapshots, frequently EEO-1 job groups are too broad to be useful in litigation. Professionals include doctors and lawyers, two positions clearly not in the same labor market, service workers include police, detectives, and janitors. In preparing for trial, we obtain personnel records often in electronic form that identify who is hired for what jobs, when they were hired, if possible, who else applied for those jobs. If applications do exist, we rely on census data to estimate -- if they don't exist, we rely on census to estimate availability. In addition, we frequently need information on the qualifications these people to prepare sound statistical analyses. In conclusion, while the EEO-1 report is useful in identifying cases where an employer is employing women or minorities in numbers markedly different than their availability in the labor market, it is just one tool in our arsenal. We find that relying on actual employment data produced by the employer during discovery proves most effective. Thank you very much.

CHAIR DOMINGUEZ: Thank you. Thank you, Jim. And let me just take a moment because we just received, I just received not too long ago the litigation results for FY 2005 and I just wanted to publicly commend the Office of General Counsel for another just banner year in its enforcement activities. Three hundred and eighty-three new lawsuits filed on the merits and thirty-three subpoena enforcement and other actions were taken during FY 2005.

Monetary recovery was $106,577,067, and I just think it's just a commendable, commendable --

MR. LEE: Counting every penny.

CHAIR DOMINGUEZ: I don't know how many cents, but that's just commendable, and I just wanted to take a moment to recognize that contribution. I also wanted to say that I have been working very closely with ORIP - Deidre's office - because I am a big advocate of the use of EEO-1 report for trending data, for issuing reports, and I don't know how I compare to other Chairs, but we've issued quite a number of them under my tenure and will continue. I think we have two or three more in the hopper, right, Deidre?

MS. FLIPPEN: Yes, we do.

CHAIR DOMINGUEZ: So I really think that EEO-1 report has tremendous value. I also have a very unique perspective that I bring to the EEO-1 report because, you see, I've used the EEO-1 report in very different venues: as a compliance officer in my earlier professional career; as Director of the OFCCP; as Director of EEO at Bank America Corporation where I had to compile hundreds and hundreds of these reports and also to collect the actual data in how people were being categorized; and, certainly, the last three years or so, four years now, at EEOC looking at how we use it. I wish I could say we use it uniformly and consistently. I think we're working towards that end, and Cynthia and I have talked about that, you know. Some offices use it more than others and so on.

JA083

OMB_0000386

And I have to say that EEO-1 report, without question, has just unquestionable historical value. There's no question about it. It began in 1966. It's almost as long as the whole history of the civil rights enforcement time period has been. Just a year after the Commission opened its doors, we put out that report.

Its early contributions to the development of EEO case law also is without doubt. I think early on we really relied on this tool significantly to identify opportunities for intervening in what could have been potential discriminatory actions.

But I believe that, today, we're here and we really have an unenviable task because we're trying to modernize a report that in many ways has been marginalized by changing environments, by the shifts in demographics, by improved technologies, and by the dramatic societal changes that we have all witnessed.

As Director of the Office of Federal Contract Compliance Programs, we relied on this report to schedule federal contractors for compliance reviews. We're told by our colleagues at OFCCP that they have far more refined tools that they use these days and, therefore, it's not a significant factor in their scheduling process.

As EEO director at Bank of America, I witnessed up-front and personal the difficulty in completing this report. It is not a science, it is an art. Lots and lots, particularly in the state of California, when you see a lot of individuals who are multi-racial who refuse to self identify, then the task falls on the employer to have to do the guesswork. And, of course, we know what guesswork leads to. Oftentimes, people are miscategorized. Whether you're a Hispanic, whether you're Arab-American, you could be categorized in a Hispanic category. If you're bi-racial, you could be miscategorized in a different category.

And, unfortunately, there's no other alternative. We have to, the law requires that we have 100 percent accounting, and so it's not a precise science that we're dealing with here. It is an art. It is an inaccurate art, I would say, because it doesn't really capture the facts as they truly are.

And, of course, we talk about the blending, the racial and the ethnic blendings, that makes up of our nation today, and what we've transpired over the last 40 years. We're also experiencing some generational resistance. You know, we're finding that Generations X and Y don't seem to have the same perspective on this document.

I was just completing the ACT form for my son, and there's all kinds of questions. There's like seven different categories. One is, "I don't know," the other one is, "I don't care. I'm not going to report it." My son looked at me and said, "What do I do? What do I do?" So I had to do a little coaching on him. And it would be important if everyone took the time to do that coaching, but the realities of our society are that that doesn't happen very often.

So we'll have a lot of issues: people wanting to be categorized in one or two or three boxes, people extending the hyphenated component of the American, so something-something-something American. I think that brings a concern that many people share and, certainly, I know this body does.

So I think that the question before us is what kind of a report, having heard all of the comments and how we use it and the value that this information provides. I think the question that was before the Commission really has to do with, well, how do you put together a report that continues to have some value, while recognizing its limitations? And a report that continues to balance the interests of the government to obtain data that it needs for its enforcement responsibilities, while recognizing that our responsibilities under the Paperwork Reduction Act really involve minimizing the burden, as well as the taxpayers' expenses, and making sure that this report doesn't overlap or isn't redundant in its value, in light of the other tools that we have available.

So it really is an unenviable task to modernize the report that's so valuable and so useful in many fronts but one that doesn't truly capture the realities of our times. If I had my druthers, I really would focus on collecting data for people with disabilities. Seventy-percent of the severely disabled are still unemployed. We can't capture that. The fastest-growing segment of discrimination is age and disability. We don't capture age data and, yet, we're seeing that many of our systemic cases involve age discrimination.

So there are lots of things that, if we had our druthers, we would contemplate if we could come up with an attainable realistic and economic way of doing it. But with those comments and observations, I will now turn to the Vice Chair for comments.

VICE CHAIR EARP: Thank you, Madam Chair. Thank you, Ms. Pierre, Ms. Miaskoff, and Ms. Flippen. You've answered in your statement most of the concerns that I had. I have a couple of questions, but, first, Ms.

Flippen, I want to relate an incident that happened yesterday.

I was at TAPS in Cincinnati and a similar occurrence has happened about three or four times. Young reporter comes out to grill me about the Administration's commitment to equal opportunity. And at the end of the interview, I asked them do they cover beats other than diversity and EEO, and the conversation kind of goes from there. And in all cases, including the one yesterday, they asked me whether or not we've studied diversity and the media, and I say, "No, not yet, but if I hear that one more time I'll be suggesting it to our office that conducts such studies."

So I think, in light of all the Chair said and in light of what the panel has said about the ability to use EEO-1 for long-term forecasting and for trending, I certainly want to suggest a look at diversity in terms of the media broadly: newspapers, radios, television. Because at least on three or four occasions, the minority reporters who have come out to talk to me end up telling me how their beats are assigned, how they don't move forward.

A couple of questions --

MS. PIERRE: We did do a study on diversity in the media, and I think we did it in conjunction with the presentation that the Chair did.

VICE CHAIR EARP: At the minority --

MS. PIERRE: Yes.

VICE CHAIR EARP: Last year?

MS. PIERRE: Maybe two years ago. So we have taken a look at that. I'm not sure if it's on our web site. I think it is on our web site.

VICE CHAIR EARP: Okay.

MS. PIERRE: But we have taken a look at that because there's been a lot of interest in that.

VICE CHAIR EARP: A lot of interest. And, in fact, for two of the reporters whose cards I can immediately put my hands on, I want to make sure they get copies of the reports.

CHAIR DOMINGUEZ: And if I just might interject, I have had a couple of conversations with Anna Lopez, who is the Executive Director of Unity, which is the journalists of color, and she's expressed some concern, and she'll be meeting with us. We're contemplating holding a Commission meeting to discuss these same issues.

VICE CHAIR EARP: Excellent, excellent.

CHAIR DOMINGUEZ: Hopefully in not too distant future.

COMMISSIONER ISHIMARU: You've actually spoke to them a couple of years ago, didn't you? Yes.

VICE CHAIR EARP: Yes. I mentioned that and suggested that this reporter could probably go back to her national and get copies of the remarks from last year that you gave.

CHAIR DOMINGUEZ: It was on C-SPAN.

VICE CHAIR EARP: Well, that's great.

My question has to do with the intersection of process and timing, so I would ask either of the panelists, but I think, Ms. Miaskoff, you might be most familiar, to share with us a little bit more about what happened since last year when our meeting was postponed and where we are today and, having lost a year, continuing to look at this, why are we postponing implementation yet another year?

MS. MIASKOFF: Good question. Our meeting on June 4th, 2004 was postponed because representatives of various civil rights groups met with the Chair I think just a day or two before the scheduled meeting and, at that time, presented comments in person, as well as perhaps additional written material.

After the meeting, the Chair instructed staff to go back to the record, to obviously look carefully at what was presented at that point in time, but then also to go back and look at the complete set of comments

and testimony that we had gotten throughout the process, which we did. So we went back and we looked at it, we analyzed it, we summarized it, we thought about it. And we also continued to coordinate on these issues and have conversations with our sister agencies: OMB primarily, as well as OFCCP.

And this process, you know, took over - obviously did take some time. These things always do. But it culminated in today's meeting.

And on your second question, in terms of delaying the implementation date to 2007, unfortunately, although we would like to say that it was delayed so long that, gee, couldn't we sort of cut short that delay, you, the reality remains that employers will have to implement the changes. They'll have to budget. They'll have to do it.

Additionally, with this vote today, there's not going to be a final read necessarily on what the EEO-1 report will be. You know, because this is a Paperwork Reduction Act process, there will be another round of comments that will go to OMB, and we will obviously get copies and review them.

And we don't know when this will become final, actually. So given that fact, we thought that 2007 was a reasonable date to say.

VICE CHAIR EARP: Okay, thank you.

CHAIR DOMINGUEZ: Commissioner Silverman?

COMMISSIONER SILVERMAN: Good morning. I first wanted to thank Cynthia, Carol, Deidre, and Jim for your comments today. I think it's really beneficial to hear from those who have been extensively involved in bringing this project to fruition and from those whose programs make use of the EEO-1 report.

As the speakers noted, the Commission uses the EEO-1 report to identify trends in employment, to help assess the overall strength of a particular charge and, lastly, to identify possible systemic discrimination. It is that last category that's of special interest to me. As many, if not all, of you know, I have been heading the Commission's taskforce on systemic discrimination. There are 16 members of the taskforce, and they were drawn from both the field and headquarters, including Cynthia Pierre who is on the panel today.

The taskforce has talked to people in headquarters. We've talked to people in the field, to stakeholders, and to members of the public to determine how to best attack systemic discrimination in the workplace. One of the issues that this taskforce is examining is how the Commission can better identify cases of systemic discrimination. Of course, the EEO-1 report is currently one of the tools that we use.

Now, let me speak for one moment as to what I've observed throughout all of this, and that is that there appears to me to be a debate raging both within our agency and among our staff and among our many stakeholders out there about the utility of the EEO-1 report. And I've noted that the opinions, and there are many and many people want to share them, seem to run the full gamut from marginal use at best to essential. And I think the answer lies somewhere in the middle.

While the EEO-1 report is a tool in the fight against discrimination in our workplace, it is a limited tool because, as other people have said here, it is a mere snapshot in time and because it does not necessarily divulge the entire story, and I don't think it can. Therefore, I believe that in its efforts to eradicate all types of discrimination, including systemic, the Commission should be using the EEO-1 in conjunction with the other tools at our disposal.

And I believe that there is more that this agency could do to make the EEO-1 data that we receive more accessible and useful for our staff. And that is an issue that my taskforce is working on.

So I believe that when we consider the proposed revisions to the EEO-1 form, we must carefully balance the relative usefulness of the information we are seeking with the burden that we are placing on employers. And I trust that we can and will strike a proper balance.

I want to again thank the panelists for their presentations today. And now I'd like to proceed to a few questions. And I'll start with one of my taskforce members, Cynthia.

Can you talk about whether the proposed revisions to the EEO-1 report will affect our ability to identify systemic discrimination?

JA086

OMB_0000389

MS. PIERRE: Looking at the proposed changes, I do not believe that they will have a significant impact. As Carol said in her remarks, the number of people who self-identifies two or more races right now in the Census is very small. And when we use the EEO-1 for statistical analyses, we are looking for statistically-significant disparities. In order to have those, we have to have sufficient numbers in a pool. So when the numbers are very small, we're not going to get results that will tell us anything. So as long as the two or more races numbers are very, very small, I've heard from 1.4 percent to 2.6 percent in the Census right now, that's not going to make a difference in the results we're looking at.

The other thing is that when we're looking at race data from the EEO-1 report, we're looking at them in conjunction usually with Census data to fill in the gaps. So I think that, keeping in mind that it's never going to be used alone but with other sources, it's not going to have a significantly negative impact, and we'll be able to work with it quite well.

COMMISSIONER SILVERMAN: Okay. My second question is again for you and also for Jim Lee. To what extent did plaintiffs' counsels use the EEO-1 and how will the change in the form impact them?

MS. FLIPPEN: Do you want me to start?

COMMISSIONER SILVERMAN: Sure.

MS. FLIPPEN: Okay. To my knowledge, plaintiffs' counsel can only get access to EEO-1 reports if they're in a case file. When we do a file disclosure, if an EEO-1 is in a case file, plaintiffs' attorneys will get access to it then. And they get access to the case files after we issue a notice of right to sue. There's a 90-day period that they can ask for copies of the file.

If they request separately copies of EEO-1 reports, I believe they're not discloseable, but they can FOIA those reports. And that would go to Office of Legal Counsel. I guess Carol could explain what happens then. Aggregated data from EEO-1 reports are available, I guess, through the FOIA process. Do you want to add to that, Carol?

MS. MIASKOFF: Well, what I can add is that we inquired with our FOIA appeals staff here at headquarters who hear the appeal of FOIA decisions that are made in the field offices, and they indicated that what they see, they don't see many appeals seeking EEO-1 reports.

VICE CHAIR EARP: I just want to understand. Even the FOIA request is for aggregated data and not an individual company or no?

MS. MASTROIANNI: I don't know which hat I'm wearing, Madam Vice Chair. But let's assume that the EEO-1 form is not in the file. The charging party can FOIA, can submit a FOIA request for the particular EEO-1 form for the employer after they file suit. It's also possible to make a FOIA request for aggregate data.

VICE CHAIR EARP: Okay.

COMMISSIONER ISHIMARU: Peggy, could I follow up on that? But if the charging party makes a FOIA request, it is routinely granted that they provide it, or is it on a case-by-case basis, or is it never?

MS. MASTROIANNI: Well, they're very, as I said before and I guess Carol mentioned, too, we have been able to find very few examples of FOIA requests from charging parties. But if a charging party, having filed suit, makes a FOIA request for the EEO-1 of the defendant, then that request is typically granted.

COMMISSIONER ISHIMARU: Thank you.

CHAIR DOMINGUEZ: Jim?

MR. LEE: Well, I don't think, as far as plaintiffs' counsel is concerned, that the approach and methodology to employment litigation differs from ours. You're still having to define the relevant labor market. You're having to use statistical methods that drill down to the job positions and questions rather than broad categories. So those steps are still necessary in order to make out a case whether it's our litigation or a private litigation.

COMMISSIONER SILVERMAN: Thank you. I have one other question. It's for Carol. OMB has issued guidance that you've talked about recommending the use of the five single race classifications, along with four highest dual race from the 2000 Census, and then a catch-all category. Can you talk a little bit more about

JA087

OMB_0000390

what considerations went into the decision to include the catch-all category but not the four highest dual race groups?

MS. MIASKOFF: Well, the considerations that went into that, you know, have, I think, been spoken about before this morning, but they basically boil down to the fact that, for our enforcement program, we use the data in the larger categories and that, even were we to collect it in the 5-4-1 format, we would end up rolling it back together either into two or more or into the individual groups to use it. So the bottom line is that, for us, it would not have tremendous utility.

We also noted that in the 2000 OMB document, well, I guess actually in the '97 document, there's ongoing discussion about the treatment of multi-data involving individuals who report as multi-racial when the reports are aggregate data, like the EEO-1 report is. And in the 2000 guidance, it says that OMB will continue to work with individual agencies as they implement the guidance, and that is exactly what we did, is work with OMB.

COMMISSIONER SILVERMAN: So it's because we would have rolled the back-up when we talk to the sister agencies, and the purpose of the EEO-1 form is, for us and our enforcement?

MS. MIASKOFF: Yes, it is.

COMMISSIONER SILVERMAN: Thank you.

MS. MIASKOFF: You're welcome.

CHAIR DOMINGUEZ: And just to add, they too would have to roll it up, for example, OFCCP. MS. MIASKOFF: Right.

COMMISSIONER SILVERMAN: Thank you.

CHAIR DOMINGUEZ: All right. Thank you, Commissioner Silverman. Commissioner Ishimaru?

COMMISSIONER ISHIMARU: Thank you, Madam Chair. I have a written statement for the record that I ask be put in the record and be placed on the web site, as is our usual course. I note that my statement from July 8th was not posted due to a clerical error, and I thank the staff for posting it at the appropriate point on the web site. But I would ask that my written statement be made a part of the record, so I can not have to read the whole thing.

CHAIR DOMINGUEZ: Yes.

COMMISSIONER ISHIMARU: I appreciate that. The decision that faces us today is a test of our commitment, we have, as an agency and as a government, to finding employment discrimination and eradicating it. Sadly, when faced with an opportunity to enhance our enforcement tools, enlarge our knowledge about the increasing diversity of our workforce, improve our ability and private counsels' ability to examine employers' practices, the agency has chosen instead a reporting scheme that will hide data and the diversity that makes this country unique, all while putting employers in a state of uncertainty.

The agency's proposed changes to the EEO-1 reporting form, which collects data from employers about the demographic makeup of their workforces should not be approved. The EEOC, it is said, is the premier federal civil rights enforcement agency. I heard that when I came two years ago, and, after being here and meeting with our colleagues around the country, I truly believe that, especially today.

What we do here at the EEOC is looked at as the bellwether for civil rights enforcement. Other federal agencies will look at what we do and will follow along our path.

The Vice Chair talked about being accosted by members of the media during her visit to Cincinnati yesterday talking about the Administration's civil rights record. This is not a unique occurrence. In Sunday's paper, the lead story was talking about the occurrences at the Department of Justice, which has been under heavy criticism for its lax enforcement of civil rights laws. According to the Washington Post article, the employment litigation section of the Justice Department has filed only a handful of cases in recent years dealing with employment discrimination or discrimination based on the statistical impact on women or minority groups.

The weekends' newspapers also highlighted the Department of Justice's decision to challenge a university's fellowship program for minorities and women in Illinois and to approve a Georgia voter

JA088

OMB_0000391

identification law that a federal judge found to be tantamount to a poll tax.

The EEOC has not been identified as one of these agencies on a similar path and, indeed, our numbers, as the Chair pointed out, of case filings has been vigorous and at historical levels. But I fear that the proposed changes to the EEO-1 form are disturbingly similar to the actions of other federal civil rights agencies in which they appear to be backing away from using strong enforcement tools to enforce our civil rights laws.

As I've tried to persuade my colleagues on this issue and in other conversations, it has become clear to me that there are some persistent myths that exist about the EEO-1. I believe it's imperative that these myths be laid to rest.

Myth One: EEO-1 data is not useful. EEO-1 data is a crucial civil rights enforcement tool. As the Equal Employment Advisory Council put it, the EEO-1 report is the most fundamental and wide-ranging of all the federal EEO and affirmative action reporting requirements impacting both those employers that are federal contractors and those that are not.

We've already heard today some of the ways that the EEOC uses this data. I would like to point out that there are several more. The EEOC dictates the baseline of data that employers will collect. It is used in litigation for pattern or practice cases, including the currently ongoing case against Wal-Mart. It is used in research by academics and the EEOC to track segregation in the workforce. It is used by Commissioners in targeting to develop Commissioners charges. I know that I've used it myself. It is used by EEOC investigators to help analyze charging parties' allegations.

Before I go to myth number two, let me tell you what is the most egregious thing about this proposal. The proposal in front of us contains a new racial category, two or more races, that hides race and pretends that there are no differences between races. Lumping all the different people who identify as having more than one racial background together does not comport with the reality of employment discrimination and does not assist with civil rights enforcement.

As is clear from our own agency panels on the realities and opportunities in the workplace and the work this agency does everyday, someone who is African-American and White will have different issues and face different biases than someone who is Asian-American and White, yet on the EEO-1 they will be treated the same.

Placing these disparate individuals in the same group ignores the obvious distinction. To pretend that Asians, Blacks, native Hawaiians and Pacific Islanders, and American Indians face the same type of discrimination is to ignore the unique history of each group and the history of discrimination in our nation. It is a path, unfortunately, reminiscent of Ward Connerly's Racial Privacy Initiative in California, which sought to ban all data on race collection with the theory that not seeing the data would somehow improve race relations. People of California rejected that initiative.

Back in the 1980s, when I started doing civil rights work, opponents of civil rights said, "We should not collect this data at all. We should just be color blind and move forward," and we fought them because data is important for enforcement of our civil rights laws.

Ignoring to which two or more races a person belongs will not increase racial tolerance. It will ensure that a person will not be counted.

Myth Two: the data this proposal hides does not matter for civil rights enforcement. If this proposal is implemented, the EEOC will lose a significant amount of data regarding minority populations. According to the Census, the population of those identifying with more than one race is approximately 54 percent of native Hawaiian and Pacific Islanders; 40 percent of American Indians; 14 percent of Asians; and 5 percent of Blacks.

And the loss of data will only increase. Four percent of those under 18 identify as two or more races, which is twice the percentage in the 18 and over category. Twenty-four percent of Asians under the age of 18 identify as two or more races.

The data loss varies depending on the location. For example, two or more races is 21 percent of the population of Hawaii; 5 percent of the population of California; 4.5 percent of the population of Oklahoma; 15 percent of Honolulu; 5 percent of New York City; and 5 percent of Los Angeles.

As a parent of children who can choose two or more race boxes, I thoroughly understand and appreciate that allowing my children to check all the boxes that represent them is an important aspect of

JA089

OMB_0000392

allowing them to acknowledge their unique heritage. The price of my children acknowledging their full racial heritage, however, should not be as this proposal would have it, and they are hidden from our analysis.

Myth Number Three: our proposal comports with federal guidance on race data collection. I started working on this issue in the mid-90's, when I was at the Department of Justice. It is one of the most difficult issues I have dealt with during my career. In 1997, as Carol has stated, and in 2000, the Office of Management and Budget issued documents that govern race collection data by the federal government for civil rights purposes. All three of these documents are, I believe, continuing Administration policy and continue to be on the White House OMB web site.

Certainly, the Administration could have rescinded this data if it did not reflect Administration policy. But I have to assume that the policy that was issued in 1997 and in 2000 continues to be Administration policy today. It may be clear, however, from the content of the proposal before us that the principles articulated in 1997 and 2000 may be flaunted at will.

OMB's established policy on the issue of multi-race individuals and civil rights could not be clearer. Multi-racial individuals are allowed to select the racial group that represents them and are not to be consolidated into an undefined multi-racial group. OMB's guidance on its policy specifically mentions civil rights enforcement. It also set forth how individuals in the dual race groups should be allocated for civil rights enforcement purposes.

This allocation procedure requires knowing to which dual race group the individual belongs. Following this allocation guidance is impossible for the EEOC if we use the proposed two or more race group, and nowhere in the guidance does OMB contemplate or condone a two or more race group.

OMB's December 2000 guidance contains an entire chapter on EEO data collection. It provides, "Individuals will be permitted to report one or more races on applications and other forms pertaining to their employment." It states, "In redesigning EEO forms to comply with the 1997 standards, the following categories will be recommended for EEO data collection and record-keeping: American Indian and Alaskan native; Asian; Black or African-American; native Hawaiian or Pacific Islander; White; American Indian or Alaska native and White; Asian and White; Black or African-American and White; American Indian or Alaska native and Black or African-American. And, finally, a balance of individuals reporting more than one race.

Similarly, our current proposal does not require employers to report the race of their Hispanic employees, leading, of course, to employers failing to collect this information. Again, OMB's guidance is clear. "Under the 1997 standards, Hispanic or Latino is clearly designed - clearly designated - as an ethnicity and not as a race. Whether or not an individual is Hispanic or Latino, every effort should be made to ascertain the race or races to which an individual identifies." While there are exceptions to this requirement, they should not apply when self-identification and the two-part question are used. And our form claims to use both.

Nothing in the proposal in front of us today explains why OMB's policy is not being followed or how those in the two or more race group will be allocated for enforcement purposes. This glaring lack of information is even more troubling because the proposal today does not tell employers to follow OMB's guidance either, effectively hiding this data that OMB, officially anyway, wants preserved.

Myth Number Four: uncertainty helps employers. What employers want is a clear system that will give them useful data and will not change. This proposal delivers neither. The data we are asking them to collect, as the employers' own comments show, is of questionable value. According to Bank One, two or more is so ambiguous that it is not a valid tool for employers who are trying to ascertain workforce under-utilization and adverse impact. Accurate race data is an essential element to the implementation of successful affirmative action plans.

According to the Society for Human Resources Management, simply stated, "The proposed form will be an unreliable and inconsistent data collection tool." And we leave open the possibility of further change, depending on an internal EEOC review of our own charge data and, presumably, the results of the 2010 Census.

Myth Number Five: our attention should be only on the glass ceiling. The proposal today splits the highest-level managers off from other managers, a move that will help us analyze glass ceiling discrimination, which I think is good. But despite suggestions from the civil rights community, we do nothing for the other end of the spectrum, what I call the sticky floor. Currently, service workers are one of the fastest-growing segments of the workforce, but within the large category of service workers are some who are much better paid and

JA090

OMB_0000393

more likely to be White. We should have looked at this category to stratify it more so our enforcement efforts could have been more helpful.

I'd like to address for a minute, which is in my written statement, the cost estimates that are in the proposal. I'm not going to go into the math here because, as my staff pointed out, people don't have calculators, don't have calculators in front of them. But the current cost estimate, which works out to $45 a form, $171 per employer, the proposed form has a projected annual cost of $11.4 million, which works out to $67 a form or $253 an employer.

By my calculations, using the assumptions in the preamble, collecting race data in the 5-4-1 method prescribed by OMB would have cost $15.4 million or $91 a form and $341 an employer. Twenty-four dollars, the difference between the proposed cost in our proposal and the 5-4-1 cost that we estimate for full race information is a bargain. I think my kids are worth the twenty-four bucks.

Before I conclude, let me note that, for the record, Senator Kennedy, the Leadership Conference on Civil Rights, the Mexican-American Legal Defense Fund, and the Asian-American Justice Center have sent in letters opposing this, which I believe will be placed in the file that covers comments that we get on this rule.

Finally, with this new EEO-1 form, I fear we are sending the clear message that we will follow in the footsteps of the agencies that are backing away from strong enforcement of our civil rights laws. We are watering down our own enforcement tools and signaling that measuring race and job segregation is simply not that important to us. I am, frankly, surprised that my colleagues are willing to support this issue because, while we may strenuously disagree on certain policy matters and on spending and access to information, I found that all of us frequently agree on our enforcement matters. For the good of civil rights enforcement and our nation, I urge my colleagues to vote no.

I have a number of questions, Madam Chair. Could I ask --

CHAIR DOMINGUEZ: Certainly.

COMMISSIONER ISHIMARU: -- just a few? Thank you. Under this proposal -- probably Carol is the right person to ask. Under this proposal, are employers permitted to collect race and ethnicity data from their employees by handing them a piece of paper that says mark one and lists American-Indian, Asian, Black, Hispanic, Native American, or other Pacific Islander, or White?

MS. MIASKOFF: I think the accurate answer is that they're not prohibited from doing so. However, we encourage them to use the two-question format in everything that means, which means two questions, please answer, first, ethnicity; and then, second, for everyone to please answer race.

COMMISSIONER ISHIMARU: But there's no prohibition on asking the question the way that I styled?

MS. MIASKOFF: That's correct.

COMMISSIONER ISHIMARU: What will employers get? Will they get both the preamble or the instruction book?

MS. MIASKOFF: They will get both the preamble and the instruction booklet.

COMMISSIONER ISHIMARU: You had mentioned, too, Carol, for the first time private employers in Hawaii will be asked to collect race and ethnicity data from their employees. Until now, they've only been required to report gender data. Why was this change made?

MS. MIASKOFF: It was changed because it was time to bring the survey in Hawaii up to the point where the survey was being done in the rest of the country. I mean, when you look at it and think about it, the fact that Hawaii, one of the states, was only being surveyed by gender. That was something that needed to be changed.

COMMISSIONER ISHIMARU: But I talked earlier in my statement about the high number of multi-racial people who live in Hawaii and now, if we collect it in one group, what sort of value will this data provide this agency? Is this a useful exercise?

MS. MIASKOFF: It will provide added incremental value. I realize totally, and I think we all do, the fact that the high multi-racial population, the crossovers in Hawaii, will not be reported in their detail on the current form. However, it's an incremental process. This is bringing them from virtually nothing up to at least where

everyone else is. And additionally, the other options were clearly considered but not adopted, which would be more detail universally, you know, across the whole rubric.

COMMISSIONER ISHIMARU: Right. And you had mentioned earlier that we would look at comments that would go to OMB, assuming that the Commission votes to approve this final rule.

MS. MIASKOFF: Absolutely.

COMMISSIONER ISHIMARU: Do we further comment to OMB about those comments? Do we have a formal role in that process?

MS. MIASKOFF: We don't have a formal role in that process, no.

COMMISSIONER ISHIMARU: But we're free to comment either way to OMB, to weigh in, knowing what these public comments that are part of the public record are saying?

MS. MIASKOFF: Well, we don't weigh, I don't think that we would weigh in as a, you know, a Commission in terms of the Commission voting on a position on the comments. Probably, the kind of staff level back and forth that, you know, the coordination that has gone on all along with OMB would continue to go on.

COMMISSIONER ISHIMARU: Well, thank you very much. I thank the panel, including Mr. Lee. And Madam Chair, I thank you for allowing me to make a longer statement than normal. I appreciate the courtesy.

CHAIR DOMINGUEZ: Thank you for your comments. Okay. There being no further business today, is there a motion to approve the revisions to the EEO-1 report?

VICE CHAIR EARP: So moved.

COMMISSIONER ISHIMARU: I was going to move that we adjourn.

CHAIR DOMINGUEZ: Is there a second?

COMMISSIONER SILVERMAN: Second.

CHAIR DOMINGUEZ: Okay. Is there any discussion? Hearing none, all those in favor, please -- let's do a roll call. Not a recall, a roll call. Madam Vice Chair?

VICE CHAIR EARP: I vote yes, with the understanding that this is not a perfect form, and I don't think any of us think that it is, and with the understanding that it is not the be-all and end-all to enforcement but with the caveat that it is another step, it is another step. I vote yes.

CHAIR DOMINGUEZ: Thank you. Commissioner Silverman?

COMMISSIONER SILVERMAN: I vote yes. Since we're adding comments, I would just say I don't think anyone is going to think we're watering down tools when my systemic taskforce finishes.

CHAIR DOMINGUEZ: Okay. I, too, vote yes, and I echo the Vice Chair's comments. I think you just wait until next year and the year after that, and I think whatever concerns may exist out there about any kind of diminution of our enforcement will be put to rest very shortly. So I vote yes.

COMMISSIONER ISHIMARU: And I vote no without caveat or reservation.

CHAIR DOMINGUEZ: All right. So the ayes have it. Three in favor, one opposed.

COMMISSIONER ISHIMARU: Madam Chair, could I ask that, now that we've voted to approve this, that the statements and transcript be made available and posted as quickly as possible? I don't know when the clock starts for this OMB review, but I would imagine that there's a lot of interest out there in people knowing what was said at this meeting.

CHAIR DOMINGUEZ: Yes.

COMMISSIONER ISHIMARU: And I would hope that we quickly could do this so everyone knows what happened here because, obviously, this does not represent the interest in the country about this issue. It's a

JA092

OMB_0000395

very important issue that raises great passions, and I think the more we can do to facilitate people's knowledge of what went on here today the better.

CHAIR DOMINGUEZ: That's a good -- I have no objections. We'd like to see it posted as soon as possible.

COMMISSIONER ISHIMARU: I thank you, Madam Chair.

CHAIR DOMINGUEZ: Well, thank you, everyone, for joining us today. Again, I think we've had a very full and complete discussion. There being no further business, do I hear a motion to adjourn the meeting?

COMMISSIONER ISHIMARU: So moved.

CHAIR DOMINGUEZ: Is there a second?

VICE CHAIR EARP: Second.

CHAIR DOMINGUEZ: All in favor?

(Chorus of ayes.)

CHAIR DOMINGUEZ: Opposed?

(No response.)

CHAIR DOMINGUEZ: The ayes have it. Thank you all very much.

(Whereupon, the foregoing matter was concluded at 12:29 p.m.)

---

*This page was last modified on December 5, 2005.*

 [Return to Home Page](#)