# RE: EEO-1

| | |
|---|---|
| **To:** | "VICTORIA A. LIPNIC" <victoria.lipnic@eeoc.gov> |
| **Cc:** | JIM PARETTI <jim.paretti@eeoc.gov> |
| **Date:** | Fri, 14 Apr 2017 14:51:10 -0400 |

Hello Vicki,

Thank you very much for your quick reply.   The team and I will definitely endeavor to provide you with more thoughts regarding the type of information helpful for this consultation.   As Jim and I discuss the specifics of the meeting, we will also figure out how to make it a success.

Looking forward to this discussion.   Take care, and have a great weekend.

Dom

**From:** VICTORIA A. LIPNIC [mailto:VICTORIA.LIPNIC@eeoc.gov]
**Sent:** Friday, April 14, 2017 2:38 PM
**To:** Mancini, Dominic J. EOP/OMB <Dominic_J._Mancini@omb.eop.gov>
**Cc:** JIM PARETTI <JIM.PARETTI@eeoc.gov>
**Subject:** RE: EEO-1

Dominic,
Thank you for your message.

Yes, we would like to consult with you about the revised EEO-1.  Jim Paretti, my Chief of Staff and Chief Counsel is copied on this email – he will work out the meeting time with you.  Please let us know if there is any information you would like us to provide.

Thank you.

Best regards,
Vicki Lipnic

VICTORIA A. LIPNIC
Acting Chair
U.S. Equal Employment Opportunity Commission
Washington, D.C. 20507
202-663-4005 – (direct)

JA093a
OMB_AR 0000518

**From:** Dominic J. EOP/OMB Mancini [mailto:Dominic_J._Mancini@omb.eop.gov]
**Sent:** Friday, April 14, 2017 2:20 PM
**To:** VICTORIA A. LIPNIC <VICTORIA.LIPNIC@EEOC.GOV>
**Cc:** JIM PARETTI <JIM.PARETTI@EEOC.GOV>
**Subject:** EEO-1

Dear Acting Chair Lipnic,

Under 5 CFR 1320.10(f), OMB has the authority to, on its own initiative, review a collection of information prior to the expiration of OMB's approval for that collection of information. Before such a review, the regulations contemplate a period for consultation with the agency.

To better understand certain aspects of the EEO-1 form that was approved on September 29th 2016 (OMB Control # 3046-0007), in particular the revisions that were made to the form, we are requesting a consultation with EEOC. OMB believes that relevant circumstances may have changed since the approval. In addition, OMB believes that the burden estimates provided by the agency when it submitted the information collection request may be materially different from the burdens that the information collection, as implemented, entails. Those circumstances motivated OMB's request for this consultation.

Please let us know by **Monday, April 24th**, if EEOC would be interested in affirmatively consulting with OMB about the current version of the EEO-1 form. This notice constitutes an opportunity for the EEOC to consult with OMB about our views described above, and possible future actions related to this EEO-1 form, including a re-review and/or stay of some or all of the current version of the EEO-1 form pursuant to 5 CFR 1320.10(f) and (g).

Thank you, and please let me know if you have any questions.

Best Regards,
Dom

Dominic J Mancini
Deputy and Acting Administrator
Office of Information and Regulatory Affairs
Office of Management and Budget
202-395-5897

JA093b
OMB_AR 0000519

# Coalition Letter on EEO-1 Form Concerns

| | |
|---|---|
| **From:** | "Johnson, Randel" <rjohnson@uschamber.com> |
| **To:** | "Mulvaney, John M. EOP/OMB" ███████████████ |
| **Cc:** | "Mancini, Dominic J. EOP/OMB" ████████████████ "Pickitt, Kailey M. EOP/OMB" ████████████████, "Peacock, Marcus C. EOP/OMB" ████████████████ |
| **Date:** | Mon, 20 Mar 2017 12:19:40 -0400 |
| **Attachments:** | EEO-1 Coalition Request for Review.pdf (213.12 kB); US Chamber EEO-1 Request for Review.pdf (314.43 kB) |

Director Mulvaney,

Attached is a letter from numerous trade associations expressing serious concerns with EEOC's radical revisions to the EEO-1 form. The attached letter makes arguments similar to that made by the U.S. Chamber which we sent earlier and demonstrates the wide breadth of concern over the requirements of the new form. I have also reattached the earlier letter sent by the U.S. Chamber for your convenience. We would very much appreciate your attention to this matter as companies are now being forced to change internal procedures to meet compliance deadlines.

Thank you for your consideration of this request.

*Randel K. Johnson*
*Senior Vice President*
*Labor, Immigration and Employee Benefits*
*U.S. Chamber of Commerce*
*1615 H Street, NW*
*Washington, DC 20062*
*(P) 202-463-5448*
*(F) 202-463-3194*

OMB_0000967

March 20, 2017

**Via Email,** ██████████████████

John M. Mulvaney
Director
Office of Management and Budget
725 17th Street NW
Washington, D.C. 20503

RE:    **Request for Review; EEOC's Revision of the Employer Information Report**

Dear Director Mulvaney:

The undersigned associations (together "the Associations") respectfully request your review under Section 3517 of the Paperwork Reduction Act (PRA) and the PRA's implementing regulations (5 CFR 1320.10(f) and (g)) of the Equal Employment Opportunity Commission's (EEOC or Commission) revisions to the EEO-1 Form, as proposed at 81 Fed. Reg. 5113 (February 1, 2016) and 81 Fed Reg. 45479 (July 14, 2016), and approved by OMB's Office of Information and Regulatory Affairs (OIRA) on October 18, 2016 (ICR number 201610-3046-001).[1]

The Associations request OMB to review and reject the EEOC's revisions to the EEO-1 Form because they do not comply with the PRA as detailed below and in the administrative record. Simply put, the EEOC has not met its requirement to satisfy the burden, benefit, or confidentiality prerequisites of the PRA. For example, as a result of EEOC's changes, the EEO-1 form has been expanded from <u>180 to 3660 data cells</u>. By itself, this exponential increase in the amount of solicited data speaks volumes with regard to the burdensome nature of the new EEO-1 form. This expansion means huge additional costs for companies of all sizes, yet has no accompanying benefit, or protections for the confidentiality of the information to be gathered under the revised government form.

---

[1] The Associations' members are committed to maintaining workplaces which are free from discrimination, and in particular discrimination relating to compensation. But while the Associations support the overall goal of combating compensation discrimination, we do not support the final changes to the EEO-1 report.

OMB_0000968

Although reporting of the new information does not begin for approximately one year, employers are already making the necessary investments in software upgrades, internal reporting processes, and staffing needs in order to comply. Therefore, as discussed in greater detail below, pursuant to Section 3517 of the PRA and 5 CFR 1320.10(f) and (g), the Associations request that OMB review and stay the effectiveness of, or rescind, the EEOC's revised EEO-1 as quickly as possible, as businesses are already incurring unnecessary expenses to compile 2017 data solely as a result of the requirements of the revised EEO-1.

## I.    Circumstances Leading to the EEO-1 Changes

Lawmakers on Capitol Hill and regulators in federal agencies such as the Department of Labor have long sought to force employers to report on their compensation practices. These efforts have been largely unsuccessful because none have been shown to result in the production of data relevant to the current practices in the workplace and have been shown to place a tremendous and unnecessary burden on employers. As part of the most recent attempt during the Obama administration to collect employee salary information from employers, the EEOC has revised its existing EEO-1 form to include data on employee compensation and hours worked.[2] In order to avoid the more complex obligations under the Administrative Procedure Act (APA), the EEOC determined that the revisions to the EEO-1 would be examined under the PRA. Importantly, the PRA process does not provide the public with rulemaking protections as under the APA, such as a right to petition a federal court to review the agency's action. The lack of judicial review under the PRA is a primary reason why OMB review of EEOC's changes to its EEO-1 form is so vital.

## II.    EEOC's Changes to the EEO-1 Reporting Form

The EEO-1 form requires employers and certain federal contractors to report on the demographics of their workforce. From time to time the form has been updated to reflect the changing demographics in our country. On February 1, 2016, the EEOC published a proposed revision to its EEO-1 reporting form. The changes would require every employer with 100 employees or more to submit not just demographic information, but also the W-2 wages and hours worked for all of their employees grouped in broad EEO-1 job categories, subdivided into twelve pay bands.

After a public hearing at EEOC as well as a public comment period, on July 14, 2016, the EEOC submitted its final proposal for revisions to the EEO-1 Form to

---

[2] 81 Fed. Reg. 5113 (February 1, 2016).

OMB.  Aside from changing the yearly reporting date to more closely align with the W-2 year and extending the initial reporting due date by six months, little substantive changes were made.  After the PRA-required 30-day comment period at OMB, EEOC announced these changes as final on September 29, 2016, though the completed Notice of Action was not authorized by former OIRA Administrator Howard Shelanski until October 18, 2016.  No EEO-1 filing will be required for 2017, but covered employers will have to file the new EEO-1 reports by the end of March 2018.

## III.    The PRA Permits Rescission of Previously Approved Collections

Section 3517(b) of the PRA allows OMB to "review any collection of information conducted by or for an agency to determine, if . . . a person shall maintain, provide or disclose the information to or for the agency."  In turn, Section 3517(b)(2) permits OMB to "take appropriate remedial action, if necessary." Further, in the regulations promulgated pursuant to the PRA, 5 CFR Part 1320, OMB is required to review its approval in the case of changed circumstances or when the burden estimates provided by the agency at the time of initial submission were materially in error.  *See* 5 CFR 1320.10(f).  If such circumstances are present, OMB may stay the effectiveness of its prior approval.

As demonstrated in further detail below, EEOC's burden estimates for compliance with the revised EEO-1 report were materially in error and OMB therefore erred in approving EEOC's revisions to its EEO-1 form.  Given the broad remedial powers under Section 3517(b)(2) and 5 CFR 1320.10(g), the proper remedy in this situation is for OMB to either stay the effectiveness of its prior approval of the information collection, or otherwise rescind the OMB Control Number (3046-0007) until EEOC demonstrates that its proposal satisfies the burden, benefit, and confidentiality standards of the PRA.

## IV.    The EEOC Never Satisfied the Requirements of the PRA

When the federal government seeks to collect information from the public, the PRA requires the issuing agency to: (1) minimize the burden on those required to comply with government requests; (2) maximize the utility of the information being sought; and (3) ensure that the information provided is subject to appropriate confidentiality and privacy protections.  EEOC failed to meet *all* of these standards throughout the entirety of the process that resulted in the changes to the EEO-1 form.

OMB_0000970

- <u>Burden</u>.  EEOC failed to accurately or adequately address the burden being placed on filers by the revised EEO-1 report, thereby ignoring the PRA statutory requirement that it minimize the burden.  Throughout the revision process, EEOC continually shifted its burden analysis and steadfastly refused to base its analysis on anything other than conjecture and speculation.  The EEOC should have based its burden calculations on surveys of actual companies who submit EEO-1 forms, pilot studies, or other reliable experiments.  Instead, the EEOC bases its estimate on *assumptions* about employers' processes for submitting EEO-1 data, who is involved in these processes, their wages/salaries and the time needed to complete the processes.

  EEOC did not bother to address how much it might cost employers to upgrade their HRIS systems or how long this may take.  Moreover, EEOC failed to consider costs associated with integrating time management systems into the reporting process as well as the burden on employers who must compile the varied and multiple data sources that arise as a result of mergers and acquisitions.  This guesswork approach resulted in an overall inaccurate and artificially low burden estimate that was materially in error.  *See* 5 CFR 1320.10(f).

  Such conclusory and erroneous explanations are insufficient to meet the standards of the PRA. Under these circumstances and pursuant to Section 3517(b) of the PRA and 5 CFR 1320.10(f) and (g), the OMB must either rescind its approval of the EEOC submission or stay the effectiveness of its approval until the EEOC acknowledges the actual burden and justifies its imposition pursuant to the requirements of law.

- <u>Benefit</u>.  EEOC failed to identify any significant or tangible benefit the revised EEO-1 report would generate, thereby failing the requirement that it maximize the benefit to be derived from the report.  Indeed, the EEOC did not demonstrate that its revisions to the EEO-1 form would be of any utility in helping the Commission carry out its statutory mission to combat discrimination.  The new EEO-1 form categorizes employees in broad occupational groups that inevitably results in comparison of employees in very different jobs, performing very different tasks, with very different skills.  This data will be of no utility to the EEOC because courts upholding federal employment laws do not permit the aggregation of dissimilar individuals into artificial job groupings in order to prove pay discrimination.  EEOC itself even admitted that the information sought will not "establish

OMB_0000971

pay discrimination as a legal matter."[3]  The failure to show any tangible benefit with the new data collection requirement, let alone that the new requirement maximizes the benefit to be derived from the massive data collection to be compelled by the revised EEO-1, requires that the OMB rescind or stay its approval of the revised EEO-1 data collection.

- Confidentiality.  EEOC ignored the significant privacy and confidentiality concerns raised in the review process and thereby failed to ensure that the privacy and confidentiality of the revised EEO-1 data would be protected. The EEOC is proposing to collect highly sensitive personal data regarding compensation at thousands of U.S. companies in a format which will not serve any of its statutory purposes but which will certainly be of great use to any hacker who is interested in the compensation practices of employers. In the hands of the wrong people, the original pay data from the EEO-1 report could cause significant harm to EEO-1 responders and subject employees to potential violation of their privacy.  Unfortunately, EEOC appears to be completely unaware of the enormity of this potential issue, and although it is statutorily required to do so, has failed to set forth appropriate steps or protocols to ensure the privacy and confidentiality of EEO-1 data, as required by the PRA.

Despite EEOC's failure to satisfy the burden, benefit and confidentiality standards of the PRA, OMB nevertheless approved the information collection.  The Associations believe that OMB erred in this decision.  Given the enormous costs associated with compliance, it is imperative that OMB review the information collection and either issue a stay in the effectiveness of its prior approval or rescind its prior approval altogether; or undertake any other remedial action pursuant to Section 3517(b)(2) of the PRA, as appropriate.

## V.    Stay or Rescission of the EEO-1 Approval is Consistent with Current Regulatory Policy

In his Presidential Executive Order on Reducing Regulation and Controlling Regulatory Costs (January 30, 2017), President Trump noted that "it is essential to manage the costs associated with the governmental imposition of private expenditures required to comply with Federal regulations."  As noted above, the Commission's new EEO-1 form will place an incredible burden on employers to produce information that will not advance EEOC's mission.  Therefore, rescission of this extraordinarily

---

[3] 81 Fed. Reg. at 45489 (July 14, 2016).

OMB_0000972

expensive and useless requirement comports with the President's efforts to ease regulatory burdens on employers and the American public in general.

## VI.    Conclusion

The Associations respectfully request that pursuant to Section 3517, you rescind OMB's prior approval of the EEOC's changes to its EEO-1 form, or alternatively, grant a stay of OMB's prior approval pursuant to 5 CFR 1320.10(g), until the Commission demonstrates that its revisions satisfy the PRA.

Thank you for your attention to this matter.

Sincerely,

American Benefits Council
American Gaming Association
American Institute of CPAs
American Road & Transportation Builders Association
American Trucking Associations
Associated Builders and Contractors
Associated General Contractors
The ERISA Industry Committee
Food Marketing Institute
HR Policy Association
International Franchise Association
National Association of Home Builders
National Association of Manufacturers
National Association of Professional Employer Organizations
National Automobile Dealers Association
National Council of Chain Restaurants
National Federation of Independent Business
National Industry Liaison Group
National Restaurant Association
National Retail Federation
News Media Alliance
Retail Industry Leaders Association
Securities Industry and Financial Markets Association
Society for Human Resource Management
Truck Renting and Leasing Association
U.S. Chamber of Commerce
WorldatWork

OMB_0000973

LAMAR ALEXANDER, TENNESSEE, CHAIRMAN

MICHAEL B. ENZI, WYOMING          PATTY MURRAY, WASHINGTON
RICHARD BURR, NORTH CAROLINA      BERNARD SANDERS (I), VERMONT
JOHNNY ISAKSON, GEORGIA           ROBERT P. CASEY, JR., PENNSYLVANIA
RAND PAUL, KENTUCKY               AL FRANKEN, MINNESOTA
SUSAN M. COLLINS, MAINE           MICHAEL F. BENNET, COLORADO
BILL CASSIDY, M.D., LOUISIANA     SHELDON WHITEHOUSE, RHODE ISLAND
TODD YOUNG, INDIANA               TAMMY BALDWIN, WISCONSIN
ORRIN HATCH, UTAH                 CHRISTOPHER S. MURPHY, CONNECTICUT
PAT ROBERTS, KANSAS               ELIZABETH WARREN, MASSACHUSETTS
LISA MURKOWSKI, ALASKA            TIM KAINE, VIRGINIA
TIM SCOTT, SOUTH CAROLINA         MARGARET WOOD HASSAN, NEW HAMPSHIRE

DAVID P. CLEARY, STAFF DIRECTOR
EVAN SCHATZ, DEMOCRATIC STAFF DIRECTOR

http://help.senate.gov

# United States Senate

COMMITTEE ON HEALTH, EDUCATION,
LABOR, AND PENSIONS

WASHINGTON, DC 20510–6300

April 12, 2017

Hon. John M. Mulvaney
Director
Office of Management and Budget
725 17th Street NW
Washington, DC 20503

Dear Director Mulvaney:

We write today to request that you use your statutory authority to rescind approval of the Equal Employment Opportunity Commission's (EEOC) misguided revisions to the EEO-1 Form. These revisions will increase by 20 times the employment data the commission currently collects from 61,000 private employers on their 63 million employees. These revisions will place significant paperwork, reporting burdens, and new costs on American businesses, and will result in fewer jobs created and higher prices for American consumers.

EEOC's previous EEO-1 required 61,000 employers with 100 or more employees to annually submit data to EEOC about its workforce—categorized by race/ethnicity, gender, and job category—for a total of 180 pieces of information about those employees each year. The revised form increases this data collection 20-fold from 180 to 3,660 for each report, even though the revision was submitted for review under the Paperwork Reduction Act before it was finalized during the previous administration. In total, EEOC will be collecting up to nearly three billion data fields according to one estimate[1]— in no way would this reduce paperwork for Americans.

We are also concerned about the considerable discrepancies between the EEOC's submitted burden estimate for compliance with the revised EEO-1 Form and an independent burden estimate from the U.S. Chamber of Commerce (Chamber). An empirical survey from the Chamber included more than 50 companies that file approximately 20,000 EEO-1 Forms each

---

[1] Equal Employment Advisory Council, Comment Letter on Proposed Revisions of the Employer Information (EEO-1) Report (Apr. 1, 2016), *available at* https://www.regulations.gov/document?D=EEOC-2016-0002-0273.

JA101

year.[2]  The Chamber concurred with the EEOC's estimates that 60,866 respondent companies would file an estimated 674,146 revised EEO-1 Reports for the 2017 reporting year.  However, while the EEOC projected compliance to cost $53.5 million and 1,892,980 hours, the Chamber survey revealed that American employers and federal contractors would spend $400.8 million and expend 8,056,045 hours.[3]  The Chamber's $400.8 million compliance price tag is limited to direct labor costs.[4]  By factoring in indirect overhead costs, the revised EEO-1 Form may result in costing American employers and federal contractors $1.3 billion annually.[5]

The revised EEO-1 Form also raises significant data security and privacy concerns.  As highlighted in a letter sent to OMB last month by a diverse coalition of more than 25 business associations, the revised EEO-1 Form will collect vast amounts of sensitive employee compensation information from thousands of employers—information which in the hands of bad actors could cause irreparable harm to American workers and employers.[6]

We respectfully request that you take all appropriate action to rescind OMB approval of the EEOC's misguided EEO-1 Form revisions.  Congress vested the OMB Director with broad statutory authority to review collections of information such as the revised EEO-1 Form and to take action if warranted, and this would be an appropriate use of that authority.

Thank you for your attention to this issue and continued efforts on behalf of the American workforce and job creators.  If you have any questions, please have your staff contact Kyle Fortson on Senator Alexander's staff at ██████████.

Sincerely,

Lamar Alexander
Chairman
Committee on Health, Education,
Labor and Pensions

Pat Roberts
United States Senator

---

[2] *See* Letter from Randel K. Johnson, Senior Vice President, Labor, Immigration & Emp. Benefits, U.S. Chamber of Commerce & James Plunkett, Dir., Labor Law Policy, U.S. Chamber of Commerce, to Hon. John M. Mulvaney, Dir., Office of Mgmt. & Budget 4 (Feb. 27, 2017).
[3] *See id.* at 5.
[4] *See id.*
[5] *See id.*
[6] Letter from Associations, to Hon. John M. Mulvaney, Dir., Office of Mgmt. & Budget 5 (Mar. 20, 2017).

OMB_0001023

# Congress of the United States
## Washington, DC 20515

May 8, 2017

John M. Mulvaney
Director
Office of Management and Budget
725 17th St NW
Washington DC 20503

Dear Director Mulvaney:

Last year, President Obama directed the Equal Employment and Opportunity Commission (EEOC) to collect pay data from large companies by sex, race and ethnicity. These data are vital to helping the EEOC detect patterns of pay discrimination and enforce equal pay laws. The EEOC went through a transparent process to revise its data collection form – the EEO-1 – to include this information starting in 2018. We write today to urge you to maintain the EEOC's authority to collect pay data by sex, race and ethnicity.

Equal pay is an issue of economic fairness. Many women are the sole or co-breadwinners in their families, yet in 2015 made $10,470 less on average than men, a difference that directly impacts their lives and families. Women of color experience even larger losses. A recent study found that closing the gender wage gap between comparable workers would cut poverty in half among working women, and benefit more than 25 million children.

Pay decisions are often cloaked in secrecy. Over 60 percent of private sector workers report that discussing pay is discouraged or prohibited in their office. Workers cannot all depend on anonymous notes to discover pay inequities. Data from large companies on pay practices by sex, race and ethnicity will allow the EEOC to better detect patterns of discrimination.

This is key since as much as 38 percent of the gender wage gap cannot be explained by differences in occupation, industry, experience, education, race, union status, and region— pointing to discrimination as a potential factor. Requiring companies to report pay data will also encourage them to proactively evaluate and correct any unjustified disparities.

Collecting this data would bring us one step closer to fulfilling the promise of equal pay for equal work. We respectfully request that you allow the EEOC to protect American workers from pay discrimination.

Sincerely,

Lois Frankel
Member of Congress

Rosa L. DeLauro
Member of Congress

PRINTED ON RECYCLED PAPER

JA103

Jackie Speier
Member of Congress

Brenda L. Lawrence
Member of Congress

Eleanor Holmes Norton
Member of Congress

Luis V. Gutiérrez
Member of Congress

Alcee Hastings
Member of Congress

Carolyn B. Maloney
Member of Congress

Lucille Roybal-Allard
Member of Congress

Nydia M. Velázquez
Member of Congress

Sheila Jackson Lee
Member of Congress

Earl Blumenauer
Member of Congress

Danny K. Davis
Member of Congress

Diana DeGette
Member of Congress

Barbara Lee
Member of Congress

Grace F. Napolitano
Member of Congress

OMB 0001028

Jan Schakowsky
Member of Congress

Susan A. Davis
Member of Congress

Betty McCollum
Member of Congress

Madeleine Z. Bordallo
Member of Congress

Gwen S. Moore
Member of Congress

Debbie Wasserman Schultz
Member of Congress

Doris Matsui
Member of Congress

Kathy Castor
Member of Congress

Keith Ellison
Member of Congress

Niki Tsongas
Member of Congress

Chellie Pingree
Member of Congress

Bill Foster
Member of Congress

Frederica S. Wilson
Member of Congress

Suzanne Bonamici
Member of Congress

JA105

OMB 0001029

Suzan DelBene
Member of Congress

Colleen Hanabusa
Member of Congress

Joyce Beatty
Member of Congress

Matt Cartwright
Member of Congress

Ann McLane Kuster
Member of Congress

Grace Meng
Member of Congress

Katherine Clark
Member of Congress

Dina Titus
Member of Congress

Carol Shea-Porter
Member of Congress

Julia Brownley
Member of Congress

Elizabeth Esty
Member of Congress

Michelle Lujan Grisham
Member of Congress

Robin L. Kelly
Member of Congress

Debbie Dingell
Member of Congress

JA106

OMB 0001030

Ted W. Lieu
Member of Congress

Bonnie Watson Coleman
Member of Congress

Lisa Blunt Rochester
Member of Congress

Charlie Crist
Member of Congress

Val Demings
Member of Congress

Adriano Espaillat
Member of Congress

Pramila Jayapal
Member of Congress

Jamie Raskin
Member of Congress

Jacky Rosen
Member of Congress

JA107

## White, Arnette C. EOP/OMB

| | |
|---|---|
| **From:** | Freeland, Jeff K. EOP/OMB |
| **Sent:** | Monday, May 15, 2017 11:17 AM |
| **To:** | White, Arnette C. EOP/OMB |
| **Cc:** | Carr, Kerrie L. EOP/OMB |
| **Subject:** | FW: Letter to OMB Director Mulvaney from Members of Congress |
| **Attachments:** | Letter OMB Director Mulvaney Regarding EEOC Pay Data.pdf |

New letter...

**From:** Mayayeva, Yana [mailto ██████████████]
**Sent:** Monday, May 15, 2017 11:08 AM
**To:** Freeland, Jeff K. EOP/OMB < ██████████████ >
**Cc:** OMB Legislative Affairs < ██████████████ >; Moran, Kelsey < ██████████████ >
**Subject:** Letter to OMB Director Mulvaney from Members of Congress

Hi Jeffrey,

Please find attached a letter to OMB Director Mulvaney from Congresswoman Frankel and other Members of Congress urging the Director to maintain the EEOC's authority to collect pay data by sex, race and ethnicity.

Thank you,

Yana Mayayeva
Policy Advisor for Women's Issues/Legislative Assistant
Congresswoman Lois Frankel, FL-21
1037 Longworth HOB
Washington, DC 20515
████████████

    

1

# United States Senate

**WASHINGTON, DC 20510**

May 1, 2017

The Honorable John M. Mulvaney
Director
Office of Management and Budget
725 17th Street NW
Washington, DC 20503

Dear Director Mulvaney:

In recent weeks, a collection of business groups and several of our Congressional colleagues have called on your office to reverse or modify a critical data collection meant to provide new transparency and understanding regarding the unacceptable and persistent gap between what men and women in our country are paid for the same work.

We write to make clear that any effort to re-open and revisit those data collection requirements will be seen as an affront to the effort to address the fact that women in our country are paid just 80 cents on the dollar on average compared to men in comparable positions.

As you know, six months ago the Equal Employment Opportunity Commission (EEOC) and the Office of Management and Budget (OMB) completed a revision to the EEO-1 Form pursuant to the Paperwork Reduction Act. For the first time, the EEO-1 Form will collect information about employees' pay. There has been no change in circumstances in the intervening six-month period and no demonstration that there was any material error in the substantial data and analysis provided by the EEOC to your office. Thus, it would appear that there is no basis to reopen or revise the data collection requirements.

The EEO-1 Form has long served as a useful tool for the EEOC to gather data to help safeguard workers' federally protected right to work free of discrimination based on race, ethnicity, or gender. The addition of compensation data to the EEO-1 Form was long overdue, and the data offers real potential to help large employers understand and address the pay gap within their individual workforce. Transparent pay data will advantage all stakeholders. Employers can leverage data to benchmark their performance versus their competition, and inform human resources departments to make data-driven changes to address existing pay gaps. Employees will benefit because the existence of pay data will enable them to gather information that could indicate they have experienced pay discrimination. The compensation data will also strengthen the EEOC's ability to investigate allegations of pay discrimination and better enforce existing law.

Transparency is a critical tool that has the potential to make a difference for women across professions and salary levels. Transparency can also address the fact that the pay gap is even wider when broken down by race, with African American women making only 63 cents and Latina women making only 58 cents for every dollar that white non-Hispanic men are paid.

OMB_0001033

Addressing the pay gap has the potential to cut the poverty rate amongst working women in half and would have tremendous benefit to the overall economy. By collecting more and better data, the Federal Government can better uphold our collective ideal that all hard-working Americans enjoy a fair and level playing field at work.

As you are likely aware, rigorous assessment and consultation has made clear the revised EEO-1 Form would not unduly burden employers. OMB previously approved the EEO-1 Form revision on September 29, 2016 for a term of three years after an extensive and transparent process that involved two rounds of notice and public comment, including significant engagement with the employer community. A 2012 National Academy of Sciences' study regarding the collection of compensation data concluded that use of the EEO-1 Form for pay data collection would be "quite manageable for both the EEOC and the respondents." The EEOC additionally undertook its own study to determine the most efficient way to collect this data, and took steps to minimize any burden of the EEO-1 Form revisions on employers, including moving the EEO-1 Form filing deadline from September to March, using W-2 income as a measure of compensation, and coordinating data collection between the EEOC and the Department of Labor's Office of Federal Contract Compliance Programs. Moreover, suggestions that requiring employers to disclose how many employees fall within particular pay categories pose risks to employee privacy—when employers face criminal penalties for disclosure and other strong safeguards have been put in place—can only be regarded as an effort to oppose any type of pay transparency.

We strongly support the changes made to the EEO-1 Form and believe that no additional changes are warranted or can be supported under the Paperwork Reduction Act at this time. We look forward to working together to make the existing revisions to the EEO-1 data collection a success for employers and employees after the thorough and careful process undertaken by the EEOC and OMB. With new transparency from large employers, we can all expect to see progress in our shared goal of ensuring equal pay for equal work.

The light this information would shine on the persistent pay gap in this country will help to ensure that equal pay for equal work is finally made a reality.

Sincerely,

Cory A. Booker
United States Senator

Kirsten Gillibrand
United States Senator

Patty Murray
United States Senator

Sherrod Brown
United States Senator

OMB 0001034

Christopher A. Coons
United States Senator

Richard J. Durbin
United States Senator

Patrick Leahy
United States Senator

Richard Blumenthal
United States Senator

Maria Cantwell
United States Senator

Elizabeth Warren
United States Senator

Catherine Cortez Masto
United States Senator

Robert P. Casey, Jr.
United States Senator

Margaret Wood Hassan
United States Senator

Tammy Baldwin
United States Senator

Jeffrey A. Merkley
United States Senator

Brian Schatz
United States Senator

Robert Menendez
United States Senator

Jack Reed
United States Senator

OMB_0001035

Chris Van Hollen
United States Senator

Al Franken
United States Senator

Edward J. Markey
United States Senator

Sheldon Whitehouse
United States Senator

Kamala Harris
United States Senator

Mazie K. Hirono
United States Senator

Bernard Sanders
United States Senator

Charles E. Schumer
United States Senator

Ron Wyden
United States Senator

OMB_0001036

## White, Arnette C. EOP/OMB

| | |
|---|---|
| **From:** | OMB Legislative Affairs |
| **Sent:** | Monday, May 1, 2017 4:40 PM |
| **To:** | White, Arnette C. EOP/OMB |
| **Cc:** | Slemrod, Jonathan A. EOP/OMB; Carr, Kerrie L. EOP/OMB |
| **Subject:** | FW: Senator Booker, Murray, Gillibrand EEO-1 Letter to Director Mulvaney |
| **Attachments:** | Signed Booker Murray Gillibrand EEO-1 Letter 5.1.17.pdf |

Neal A. Patel
Deputy Associate Director | Legislative Affairs
Office of Management and Budget
Eisenhower Executive Office Building
O

-----Original Message-----
From: Cantor, Corey (Booker) [mailto
Sent: Monday, May 1, 2017 4:15 PM
To: OMB Legislative Affairs <                    >; Patel, Neal A. EOP/OMB <                    >
Cc: Maisel, Chad (Booker) <                    >; Slevin, Chris (Booker) <                    >
Subject: Senator Booker, Murray, Gillibrand EEO-1 Letter to Director Mulvaney

Good Evening,

Earlier today, Senators Booker, Murray and Gillibrand, and 25 others mailed a letter to Director Mulvaney regarding the
new EEO-1 form. Please see the attached digital copy for your convenience.

Please confirm receipt, and thank you for your assistance.

Sincerely,

Corey

Corey Cantor

Legislative Correspondent

Office of U.S. Senator Cory A. Booker

1

359 Dirksen Senate Office Building

Washington, DC 20510

2



**NATIONAL
WOMEN'S
LAW CENTER**

EXPANDING THE POSSIBILITIES

April 12, 2017

John M. Mulvaney, Director
Office of Management and Budget
725 17th Street, N.W.
Washington, D.C. 20503

Re:     **Opposition to Reopening Review of the Equal Employment Opportunity
Commission's Employment Information (EEO-1) Report (OMB Control Number
3046-0007)**

Dear Director Mulvaney:

The National Women's Law Center (the Center) has worked for 45 years to advance
and protect women's equality and opportunity—with a focus on women's employment,
education, income security, health, and reproductive rights—and has long sought to remove
barriers to equal treatment of women in the workplace, particularly those that suppress
women's wages.  The Center and the 82 undersigned organizations committed to workplace
equality write in strong opposition to the recent requests by the U.S. Chamber of Commerce
(Chamber) and the Equal Employment Advisory Council (EEAC) that the Office of
Management and Budget (OMB) revoke approval of the previously approved Equal
Employment Opportunity Commission (EEOC) data collection by means of the Employer
Information Report (EEO-1 Form). This collection of pay data by sex, race, and ethnicity will
be critically important in helping to identify compensation discrimination and improving
enforcement of pay discrimination laws, and will benefit businesses, individual workers, and
the economy.

Neither the Chamber nor the EEAC provides an adequate basis for reopening review
of this data collection. Current federal rules require the collection of information by means of
the EEO-1 Form.[1] OMB previously approved the EEO-1 Form revision on September 29,
2016, for a term of three years.[2] Because the EEO-1 Form is a previously approved data
collection pursuant to federal rules, under the Paperwork Reduction Act, OMB may only
review this collection of information after consultation with the EEOC, when relevant
circumstances have changed or if the burden estimates provided by the EEOC at the time of
its initial submission to OMB were materially in error.[3] This standard has not been met. No
change in circumstances justifies reopening review of the EEO-1 Form, no material error has

---

[1] 29 C.F.R. § 1602.7.
[2] U.S. Office of Mgm't and Budget, *Notice of Office of Management and Budget Action* (Sept. 29, 2016),
*available at* https://www.reginfo.gov/public/do/DownloadNOA?requestID=275763.
[3] 5 C.F.R. § 1320.12(i). In arguing that OMB has the authority to rescind the revised EEO-1 Form under the
Paperwork Reduction Act, the Chamber cites the "broad remedial powers" under 5 C.F.R. § 1320.10(g), which
states that "[g]or good cause, after consultation with the agency, OMB may stay the effectiveness of its prior
approval of any collection of information that is not specifically required by agency rule." But the EEO-1 Form
is specifically required by agency rule, 29 C.F.R. § 1602.7, rendering § 1320.10(g) inapplicable.

*With the law on your side, great things are possible.*

been shown in the burden estimates previously provided by the EEOC in support of the revision, and OMB has not consulted with the EEOC about this matter.

## I.    The Pay Data Collection Pursuant to the Revised EEO-1 Revisions Addresses a Serious Pay Discrimination Problem.

Women working full time, year round are typically paid 80 cents for every dollar paid by their male counterparts, and when we compare women of color to white, non-Hispanic men, the wage gaps are even larger. African American women and Latinas typically make only 63 cents and 54 cents, respectively, and Native American women make only 58 cents for every dollar paid to white, non-Hispanic men for full-time, year-round work. While Asian American and Pacific Islander (AAPI) women are cited as making 85 cents for every dollar paid to white, non-Hispanic men, AAPI subgroups experience drastically wider pay gaps. For instance, Southeast Asian and Pacific Islander women have some of the widest wage gaps compared to other communities of color, with Bhutanese women making as little as 38 cents for every dollar paid to white, non-Hispanic men.[4]

Women are still paid less than men in nearly every occupation,[5] and studies show that even controlling for race, region, unionization status, education, experience, occupation, and industry leaves 38 percent of the pay gap unexplained.[6] Stereotypes about working women remain a driver of this unexplained gap. For example, a 2012 experiment revealed that compared to an identical female applicant, science professors offered a male applicant for a lab manager position a salary of nearly $4,000 more, as well as additional career mentoring, and judged him to be significantly more competent and hirable.[7]

Men of color experience similar dynamics compared to white, non-Hispanic men. For every dollar earned by White men, African American men earn 72 cents and Hispanic men earn 62 cents.

When employees are paid less because of their sex, race, or ethnicity, they often have no idea they are being discriminated against. Because pay often is cloaked in secrecy, when a discriminatory salary decision is made, it is seldom as obvious to an affected employee as a demotion, a termination, or a denial of a promotion.[8] Moreover, the most recent survey data

---

[4] NAT'L ASIAN PACIFIC AMERICAN WOMEN'S FORUM, FIGHTING INVISIBILITY: CLOSING THE WAGE GAP 10 (Mar. 2017), *available at* https://napawf.org/wp-content/uploads/2017/03/FIGHTING-INVISIBILITY_FINAL-3.29.17.pdf.

[5] Hegewisch, A. & Matite, M., *The Gender Wage Gap by Occupation,* INST. FOR WOMEN'S POLICY RESEARCH (2013), *available at* http://www.iwpr.org/publications/pubs/the-gender-wage-gap-by-occupation-2

[6] Blau, F. D. & Kahn, L.M, *The Gender Wage Gap: Extent, Trends and Explanations*, NAT'L BUREAU OF ECONOMIC RESEARCH  (Jan. 2016), *available at* http://www.nber.org/papers/w21913.pdf.

[7] Moss-Racusin, C.A. et al., *Science faculty's subtle gender biases favor male students*, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES OF AMERICA (Aug. 2012), *available at* http://www.pnas.org/content/109/41/16474.abstract#aff-1.

[8] As Justice Ginsburg has noted:

> Comparative pay information . . . is often hidden from the employee's view. Employers may keep under wraps the pay differentials maintained among supervisors, no less the reasons for those differentials.

JA116

OMB_0001042

available indicates about 60 percent of workers in the private sector are either forbidden or strongly discouraged from discussing their pay with their colleagues.[9] As a result, employees face significant obstacles in gathering the information that would indicate they have experienced pay discrimination, which undermines their ability to challenge such discrimination. Consequently, government enforcement and employer self-evaluation and self-correction are critical to combat compensation discrimination. The EEO-1 Form revisions were properly designed to facilitate both, as set out in greater detail in the Center's previous comments to the EEOC and to OMB in support of the EEO-1 Form Revision.[10]

## II.    The EEO-1 Burden Estimates Were Based on Careful, Rigorous, and Transparent Analysis.

The EEOC calculates that to complete the revised EEO-1 Form, 60,886 firms will file 674,146 establishment reports, taking 15.2 burden hours per firm and 1.9 burden hours per establishment, for a total 1,892,979.5 hours--approximately 31 hours per firm.[11] Neither the Chamber nor the EEAC demonstrates material error in the EEOC's estimate.

The revised EEO-1 Form was adopted after an extensive and transparent process, including a public hearing, a vote by the EEOC Commissioners, and two rounds of notice and public comment ("60-Day Notice" and "30-Day Notice"). As that process made clear, in estimating burden and concluding that the revised EEO-1 Form would not unduly burden employers, the EEOC collected data from multiple sources. As set out in its 30-Day Notice,[12] the EEOC's proposal was informed by the 2012 National Academy of Sciences' study regarding the collection of compensation data (NAS Study), which concluded that use of the EEO-1 for pay data collection would be "quite manageable for both the EEOC and the respondents."[13] The EEOC then commissioned an independent Pay Pilot Study (Pilot Study) to identify the most efficient means of collecting pay data, with a specific focus on the most

---

Small initial discrepancies may not be seen as meet for a federal case, particularly when the employee, trying to succeed in a nontraditional environment, is averse to making waves. Pay disparities are thus significantly different from adverse actions "such as termination, failure to promote, …or refusal to hire," all involving fully communicated discrete acts, "easy to identify" as discriminatory.

Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007) (Ginsburg, J. dissenting).
[9] INST. FOR WOMEN'S POLICY RESEARCH, PAY SECRECY AND WAGE DISCRIMINATION (2014), *available at* http://www.iwpr.org/publications/pubs/pay-secrecy-and-wage-discrimination-1/at_download/file
[10] *See* Nat'l Women's Law Ctr., *Comment Re: Proposed Revision of the Employer Information Report (EEO-1), FR Docket Number 2016-01544, Docket ID EEOC-2016-0002* (Apr. 1, 2016); Nat'l Women's Law Ctr., *Comment Re: Agency Information Collection Activities; Notice of Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO-1), OMB Control Number 3046-0007, Docket ID EEOC-2016-0002-0340* (Aug. 15, 2016).
[11] U.S. Equal Employment Opportunity Comm'n, *Agency Information Collection Activities, Notice of Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO-1),* 81 Fed. Reg. 45479 (July 14, 2016) ("30-Day Notice").
[12] *Id.* at 45480.
[13] NAT'L RESEARCH COUNCIL OF THE NAT'L ACADEMIES, COLLECTING COMPENSATION DATA FROM EMPLOYERS 60 (2012), *available at* http://www.nap.edu/catalog/13496/collecting-compensation-data-from-employers.

*With the law on your side, great things are possible.*

JA117

OMB_0001043

efficient and least costly methods for employers to transmit pay data.[14] This Pilot Study was completed in 2015 and also informed the EEOC's analysis.[15] In addition, the EEOC held a two-day meeting in March 2012 on data collection procedures with employer representatives, statisticians, human resources information systems experts, and information technology specialists, which included a discussion of pay data collection and estimated burdens; the recommendations provided in that meeting included a recommendation that reporting requirements be aligned with other agencies but concluded that the cost burden of reporting pay data to the EEOC would be minimal.[16]

The EEOC also reviewed the burden analysis the Office of Federal Contract Compliance Programs (OFCCP) of the Department of Labor had previously conducted on a compensation data collection tool focused narrowly on federal contractors in 2014, and the public comments submitted to OFCCP regarding burden estimates based on that proposal.[17] In March 2016, the EEOC held a public hearing on the proposed revisions where it heard testimony from employer representatives, among others.[18]

The EEOC also received and considered hundreds of public comments on its 60-Day Notice, including numerous comments from the employer community. Based on its consideration of these comments, the EEOC made multiple revisions to the burden analysis between the 60-Day Notice and 30-Day Notice. For example, based on comments, the EEOC lowered its estimate of the level of automation typical for employer completion of the EEO-1 Form. While the 60-Day Notice assumed that EEO-1 forms would all be submitted in one data upload filed by a firm on behalf of all of the firm's establishments, in the 30-Day Notice, the EEOC based its estimate of the number of firms who would rely on an automated data upload on the number of firms using this method in 2014[19]—a conservative estimate given that from year to year, more firms automate this process. It also increased its estimate of the number and variety of professional staff who would spend time gathering the relevant data and submitting the report at both the firm and the establishment level, based on employer input.[20]

Further, as the EEOC observed in its 30-Day Notice, the employer community offered widely discrepant estimates of the time necessary to complete the revised EEO-1 Form.[21] For example, the Society for Human Resources Management (SHRM) reported that in its survey

---

[14] SAGE COMPUTING, INC., FINAL REPORT 8, 101 (Sept. 2015), *available at* http://eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf [PILOT STUDY].
[15] 30-Day Notice, 81 Fed. Reg. at 45480.
[16] *See* SAGE COMPUTING, INC., EEOC SURVEY SYSTEM MODERNIZATION WORK GROUP MEETING 2 (Mar. 2012), *available at* https://www.eeoc.gov/employers/eeo1survey/survey-modernization.pdf.
[17] U.S. Equal Employment Opportunity Comm'n, *Agency Information Collection Activities: Revision of the Employer Information Report (EEO-1)*, 81 Fed. Reg. 5113 (Feb.1, 2016) ("60-Day Notice").
[18] Public Hearing before the U.S. Equal Employment Opportunity Commission, Public Input into the Proposed Revisions to the EEO-1 Report, Mar. 16, 2016, *available at* https://www.eeoc.gov/eeoc/meetings/3-16-16/index.cfm.
[19] 30-Day Notice, 81 Fed. Reg. at 45493-5.
[20] *Id.* at 45493.
[21] *Id.*

of members, 80 percent estimated that the revised EEO-1 Form would require 30 hours of time or less to file.[22] This survey of the employer community actually suggests a lighter burden than does the final EEOC conclusion that on average a firm would be able to complete the revised EEO-1 Form in 31 hours. SHRM surveyed 262 of its members in reaching this conclusion.[23] By contrast, the Chamber's assertion in its February 27, 2017, letter to OMB that completing the revised EEO-1 Form will take 132 hours per firm is based on a survey of only 50 employers. The EEOC's conclusion, consistent with SHRM estimates, was further informed by its own experience working with EEO-1 stakeholders over many years.[24]

The EEOC also undertook its own analysis regarding the burden of bridging HRIS and payroll systems for reporting pay data on the EEO-1 Form in the face of a broad variety of employer estimates of the cost and burden of providing such data. As it stated in the 30-Day notice, it determined that major HRIS vendors already allow for the collection of EEO-1 demographic data and offer the capacity to record year-to-date gross and paid earnings. The EEOC thus reasonably concluded that "creating software solutions for the EEO-1, components 1 and 2, may not be as complex or novel as some comments suggested."[25] Indeed, compensation management systems and software are specifically designed to be updated routinely to accommodate changes in federal, state or local income tax rules, new accounting rules, and employer changes in fringe benefits or compensation practices and can be expected to provide off-the-shelf solutions to allow this bridging of systems.[26]

Moreover, throughout the design and review of the revised EEO-1 Form, the EEOC has carefully analyzed and taken steps to minimize any burden imposed on employers by this data collection. For example, in initially proposing the revision to the EEO-1 Form in February 2016, the EEOC was guided by the 2011 and 2014 rounds of public comments to OFCCP on its proposed compensation data collection tool.[27] When OFCCP proposed collecting compensation data from federal contractors through a separate tool on a different reporting schedule from the EEO-1, employer representatives, including the EEAC, urged in the strongest terms that instead EEOC and OFCCP coordinate their data collection through

---

[22] Society for Human Resource Mgm't, *Comment on the Equal Employment Opportunity Commission's Proposed Revision of the Employer Information Report (EEO-1); ID: EEOC-2016-0002-0001, 81 Fed. Reg. 5113 (Feb. 1, 2016)* 22 (Apr. 1, 2016).
[23] *Id.* at 8.
[24] 30-Day Notice, 81 Fed. Reg. at 45493.
[25] *Id.* at 45487.
[26] For example, Intuit provides regular updates for subscribers to its Quick Books Payroll service. *See* http://payroll.intuit.com/support/kb/2000204.html; Sage provides similar software updates to its subscribers. *See* https://support.na.sage.com/selfservice/microsites/msbrowse.do?UMBrowseSelection=SG_SAGE50_U_S_EDIT ION_1.
[27] U.S. Dep't of Labor, Office of Federal Contract Compliance Programs, *Non-Discrimination in Compensation; Compensation Data Collection Tool, Advanced Notice of Proposed Rulemaking*, 76 Fed. Reg. 49398 (Aug. 10, 2011); U.S. Dep't of Labor, Office of Federal Contract Compliance Programs, *Government Contractors, Requirement to Report Summary Data on Employee Compensation, Notice of Proposed Rulemaking*, 79 Fed. Reg. 46561 (Aug. 8, 2014). While the Chamber attempts to characterize this OFFCP proposal as a failed and abandoned effort, in fact, the comments and analysis undertaken led to the decision to broaden the reach of the pay data collection through the revised EEO-1 Form, which includes both federal contractors and other private employers with more than 100 employees.

JA119

OMB_0001045

use of a single, unified instrument.[28]  The EEO-1 Form revision proposed by the EEOC accomplished this goal, avoiding duplication of effort or wasted costs for either employers or enforcement agencies.

The selection of W-2 income as the proper measure of compensation was also designed to minimize employer burden, while capturing the relevant range of employee compensation.  Federal law already requires employers to maintain and generate the information in W-2 forms that will be required for the revised EEO-1.[29] HRIS experts consulted for the Pilot Study reported that most major payroll software systems are preprogrammed to compile the data for generating W-2 forms. This led the Pilot Study to conclude that employers using such software to generate W-2 forms could report the proposed data with relatively little additional burden.[30] The EEOC properly relied on this analysis in its burden estimates.

The EEOC also minimized employer burden by moving the EEO-1 Form filing deadline from September to March, to align with employers' annual W-2 calculations, eliminating the need for employers to generate a separate, non-calendar year W-2 calculation. This change, which directly responded to employers' concerns, allows the use of the same calendar year W-2 data for the purposes of both the EEO-1 Form and federal tax law. Similarly, in response to employer concerns, the EEOC moved the "workforce snapshot" period from the third quarter (July-September) to the fourth quarter (October-December).[31]

Finally, it is important to note that various elements of the description of the revised EEO-1 Form by the Chamber and the EEAC are misleading at best. For example, the EEAC emphasizes that the revisions to the EEO-1 "increase the total number of data fields for each establishment from 180 to 3,660," implying that employers' burden in completing the EEO-1 Form has increased by a similar factor. But this emphasis on number of data fields is misleading, given the automation of the process. As noted by the EEOC, the online portal for submitting the EEO-1 Form does not require that "zeros" be entered in cells for which employers do not have data: "No EEO-1 filers enter data in every cell, so basing the annual PRA burden on the total number of cells on the EEO-1 form would be inaccurate."[32]

---

[28] *See* SAGE COMPUTING, INC., EEOC SURVEY SYSTEM MODERNIZATION WORK GROUP MEETING 2 (Mar. 2012), *available at* http://www.eeoc.gov/employers/eeo1survey/survey-modernization.pdf;  *see also, e.g.*, Equal Employment Advisory Council, *Comments on the Office of Federal Contract Compliance Programs' Proposed Requirement to Report Summary Data on Employee Compensation* (Jan. 5, 2015);  Society for Human Resource Management and the College and University Professional Association for Human Resources, *Comment on Advanced Notice of Proposed Rulemaking Related to Non-Discrimination in Compensation* 3-4 (Oct. 11, 2011).

[29] 26 C.F.R. § 31.6051-1.

[30] PILOT STUDY, *supra* note 14 at 8, 101. The Pilot Study acknowledged that some companies may need to make a one-time capital investment to write a software program to import data from payroll programs into the HRIS system. PILOT STUDY at 8.

[31] 30-Day Notice, 81 Fed. Reg. at 45484-5.

[32] *Id.* at 45493.

*With the law on your side, great things are possible.*

11 Dupont Circle # Suite 800 # Washington, DC 20036 # 202.588.5180 # 202.588.5185 Fax # www.nwlc.org

JA120

OMB_0001046

## III.     No Relevant Circumstances Have Changed.

In the six months since the revised EEO-1 Form was approved, no relevant circumstances have changed, and the Chamber does not attempt to argue otherwise. The EEAC, however, asserts that the data file specifications published by the EEOC this fall constitute a change in circumstances. This ignores that fact that the EEOC noted in its 30-Day Notice that it would be posting data file specifications to support employers and HRIS vendors to accommodate Component 2 of the EEO-1 Form.[33] OMB approved the data collection with the knowledge that these data file specifications would be posted thereafter. Moreover, no employer is required to utilize these data file specifications to submit the EEO-1 Form. This is one option to submit data offered for employer convenience. It provides no basis for reopening review of the data collection.

## IV.     The Revised EEO-1 Form Will Generate Substantial Benefit.

OMB may only reopen review of a previously approved collection when the burden estimates by the agency are shown to be in material error or when circumstances have changed.  The applicable standard does not permit revocation of approval based on disagreement regarding benefits generated by the information collection. Nevertheless, it is important to note that the Chamber is wrong when it states that the EEOC failed to identify any benefit from the revised EEO-1 report. In its 30-Day Notice, the EEOC describes in detail the ways in which the data will aid EEOC investigations and the ways in which the EEOC has tested the utility of its planned analyses though the use of comparable databases.[34]

The revised EEO-1 Report will provide the EEOC with a critical tool for focusing investigatory resources to identify pay discrimination. It will allow the EEOC to see which employers have racial, ethnic, or gender pay gaps that differ significantly from the pay patterns from other employers in their industry and region. By comparing wage data for firms employing workers in the same job categories, in the same industry, in the same location, in the same year, the EEOC will be able to tell which employers' pay practices depart from the norm and to investigate possible pay discrimination more efficiently. While the EEO-1 Form will never be the basis of a finding of discrimination standing alone, it provides important information to the EEOC to direct its resources. Again, this is particularly important for enforcement of pay discrimination laws, given that so many victims of pay discrimination have no idea they are being paid less than their counterparts, limiting their ability to challenge discrimination without the assistance of the EEOC.

In addition, both the process of responding to the data collection tool and the more effective enforcement that the tool permits will spur more employers to proactively review and evaluate their pay practices and to address any unjustified disparities between employees. Reporting pay data by gender and race within job categories ensures that employers are collecting and evaluating it. By incentivizing and facilitating such employer self-evaluation, the revised EEO-1 Report will increase voluntary employer compliance with discrimination

---

[33] *Id.* at 45487.
[34] *Id.* at 45490.

*With the law on your side, great things are possible.*

11 Dupont Circle # Suite 800 # Washington, DC 20036 # 202.588.5180 # 202.588.5185 Fax # www.nwlc.org

JA121

OMB_0001047

laws. Employees and employers alike will benefit from the elimination of discrimination in pay practices absent litigation or other formal enforcement mechanisms, which can be expensive and time-consuming.

The revised EEO-1 Report encourages employers to proactively implement practices to help prevent pay disparities in the first instance and to develop a diverse workforce, both of which are good for business. A diverse workforce and equitable employment practices can confer a wide array of benefits on a company beyond decreased risk of liability, including access to the best talent, increased employee satisfaction and productivity, increased innovation, an expanded consumer base, and stronger financial performance.[35] Competitive— and thus equal—pay is critical for recruiting and retaining a diverse workforce and high performers, particularly for younger women workers.[36] And when employees are confident they are being paid fairly, they are more likely to be engaged and productive.[37] Significantly, shareholders and potential investors are recognizing these benefits and increasingly are interested in companies' commitment to diversity and equal employment opportunity, and see compliance with antidiscrimination laws—particularly with regard to equal pay—as an important factor impacting risk and profitability, and therefore relevant to investment decisions.[38]

Furthermore, addressing discrimination and closing the gender wage gap would have a significant positive impact on the economy. A recent study found that if women received the same compensation as their comparable male co-workers, the poverty rate for all working women would be reduced by half, from 8.0 percent to 3.8 percent.[39] Moreover, nearly 60

[35] Hunt, V., Layton, D. & Prince, S., *Diversity Matters* 9-13, MCKINSEY & CO. (Feb. 2015) (finding diverse workforces correlate with better financial performance, because diversity helps to recruit the best talent, enhance the company's image, increase employee satisfaction, and improve decision making, including fostering innovation); Hewlitt, S.A., Marshall, M. & Sherbin, L., *How Diversity Can Drive Innovation*, HARVARD BUS. REV. (Dec. 2013), *available at* https://hbr.org/2013/12/how-diversity-can-drive-innovation. Conversely, companies that fail to address gender disparities and discriminatory employment practices could damage their reputation and brand among consumers, leading to a loss of profits and shareholder value. Lamb, N. & Klein, W., *A Proactive Approach to Wage Equality is Good for Business*, EMPLOYMENT RELATIONS TODAY (Summer 2015), *available at* http://arjuna-capital.com/news/a-proactive-approach-to-wage-equality-is-good-for-business/ [*Proactive Approach*].
[36] A recent study found that "pay and financial benefits drive Millennials' choice of organization more than anything else." THE 2016 DELOITTE MILLENNIAL SURVEY: WINNING OVER THE NEXT GENERATION OF LEADERS 19 (2016), *available at* https://www2.deloitte.com/content/dam/Deloitte/global/Documents/About-Deloitte/gx-millenial-survey-2016-exec-summary.pdf. Noel, L. & Hunter Arscott, C., *Millennial Women: What Executives Need to Know About Millennial Women* 4, ICEDR (2015), *available at* http://www.icedr.org/research/documents/14_millennial_snapshot.pdf (Millennial women leave jobs primarily for more compensation).
[37] Courtney Seiter, "The Counterintuitive Science of Why Transparent Pay Works," *Fastcompany.com*, Feb. 26, 2016, *available at* http://www.fastcompany.com/3056971/the-future-of-work/the-transparent-pay-revolution-inside-the-science-and-psychology-of-open-.
[38] *Proactive Approach, supra* note 35; Natasha Lamb, "Closing the pay gap: Silicon Valley's gender problem," *Ethical Boardroom*, June 7, 2016, *available at* http://ethicalboardroom.com/leadership/diversity/close-the-pay-gap/; Trillium Asset Mgm't, *Letter to Citigroup Shareholders*, Apr. 16, 2016, *available at* https://www.sec.gov/Archives/edgar/data/831001/000121465916010905/j415160px14a6g.htm.
[39] Milli, J., et al., *The Impact of Equal Pay on Poverty and the Economy* 1, INST. FOR WOMEN'S POLICY RESEARCH (Apr. 2017), *available at* https://iwpr.org/publications/impact-equal-pay-poverty-economy/.

*With the law on your side, great things are possible.*

JA122

OMB_0001048

percent of women would earn more if working women were paid the same as men of the same age with similar education and hours of work.[40] Increased wages would augment these workers' consumer spending power and benefit businesses and the economy.[41] Another recent study estimates that by closing the wage gap entirely, women's labor force participation would increase and $4.3 trillion in additional gross domestic product could be added in 2025, about 19 percent more than would otherwise be generated in 2025.[42]

## V.    The EEOC Has Fully Addressed How It Will Ensure Confidentiality of Data.

The Chamber, again ignoring the standard that applies to OMB in reopening review of a data collection required by a final rule, asserts that review should be reopened because the EEOC has ignored privacy and confidentiality concerns in its revision of the EEO-1 Form. This is not only an inappropriate basis for OMB to reopen review of the data collection, it is flatly untrue. As the EEOC stated in its 30-Day Notice, its employees are bound to keep EEO-1 Form data confidential on threat of criminal penalties.[43] Contactors, other federal agencies, and state and local agencies are provided access to this information only upon submitting to the same strict confidentiality requirements. As the EEOC also explained, in considerable detail, it maintains "a robust cyber security and privacy program, in compliance with the Federal Information Security and Modernization Act of 2014."[44] The Chamber fails to offer any support at all for its bare assertions to the contrary.

\*\*\*\*\*\*\*\*

For all these reasons, there is no basis for OMB to reopen its review of the revised EEO-1 Form. The pay data collection is a critical equal pay initiative to address an ongoing problem of discrimination on the basis of sex, race, and ethnicity in compensation that shortchanges working people across the country. It was adopted after an open, vigorous, thoughtful process that invited and considered the participation of all stakeholders and was based on careful and thorough analysis. It aligns with this Administration's expressed commitment to ensuring equal pay for equal work. There is no basis for revisiting this important and much needed measure. Please do not hesitate to contact Emily Martin, General Counsel and Vice President for Workplace Justice at the National Women's Law Center, at (202) 588-5180, if we can be of further assistance as you consider this important matter.

Sincerely,

National Women's Law Center

---

[40] *Id.*

[41] *See id.* at 2 (finding that the U.S. economy would have produced additional income of more than $512.6 billion in 2016 if women received pay equal to their male counterparts).

[42] Ellingrud, K., *et al.*, *The power of parity: Advancing women's equality in the United States* 1-2, MCKINSEY GLOBAL INST. (Apr. 2016), *available at* http://www.mckinsey.com/global-themes/employment-and-growth/the-power-of-parity-advancing-womens-equality-in-the-united-states. The same study estimates that even if the wage gap was only partially closed, $2.1 trillion in additional GDP could be added in 2025.

[43] 30-Day Notice, 81 Fed. Reg. at 45491-92.

[44] *Id.* at 45492.

*With the law on your side, great things are possible.*

JA123

OMB_0001049

9to5, National Association of Working Women
American Association of University Women (AAUW)
     Jacksonville, FL, Branch of AAUW
American Civil Liberties Union
Americans for Democratic Action (ADA)
Atlanta Women for Equality
Bazelon Center for Mental Health Law
California Employment Lawyers Association
Cashdan & Kane PLLC
Center for Biological Diversity
Center for Law and Social Policy (CLASP)
Center for Media and Democracy
Center on Budget and Policy Priorities
Colorado Center on Law and Policy
Deeds Not Words
Economic Opportunity Institute
Economic Policy Institute
Economic Progress Institute (RI)
Equal Pay Today!
Equal Rights Advocates
Equality California
Fair Work Center
Family Equality Council
Family Values @ Work
Feminist Majority
Fiscal Policy Institute
Food & Water Watch
FORGE, Inc.
Futures Without Violence
Indiana Institute for Working Families
Institute for Science and Human Values
Interfaith Worker Justice
International Union, United Automobile, Aerospace &
Agricultural Implement Workers of America, UAW
JOBS NOW Coalition
Jobs With Justice
Keystone Research Center
Labor Council for Latin American Advancement
Labor Project for Working Families
Lambda Legal
Lawyers' Committee for Civil Rights Under Law
The Leadership Conference on Civil and Human Rights
Legal Aid at Work
Los Angeles Alliance for a New Economy
Los Angeles Black Worker Center

*With the law on your side, great things are possible.*

11 Dupont Circle # Suite 800 # Washington, DC 20036 # 202.588.5180 # 202.588.5185 Fax # www.nwlc.org

JA124

OMB_0001050

Make it Work
Massachusetts Law Reform Institute
NAACP
National Asian Pacific American Women's Forum
National Black Justice Coalition
National Center for Lesbian Rights
National Center for Transgender Equality
National Coalition Against Domestic Violence
National Committee on Pay Equity
National Council of Jewish Women
National Domestic Workers Alliance
National Employment Law Project
National Employment Lawyers Association
National Latina Institute for Reproductive Health
National Organization for Women
      Southwest PA National Organization for Women
National Partnership for Women & Families
Network Lobby for Catholic Social Teaching
North Carolina Justice Center
People Demanding Action
Policy Matters Ohio
PowHer New York
Progressive Democrats of America
Protect All Children's Environment
Public Citizen
Santa Clara County Wage Theft Coalition
Sargent Shriver National Center on Poverty Law
Sisters of Our Lady of Charity of the Good Shepherd
Chapters
      Mid-North America Province
      National Advocacy Center of the Sisters of the
      Good Shepherd
      New York/Toronto Province
      US Central South Province
South Florida AFL-CIO
UltraViolet
The United State of Women
Women Employed
Women's Law Project
Women's Rights and Empowerment Network (WREN)

OMB_0001051

## DONALD MCINTOSH

| | |
|---|---|
| **From:** | VICTORIA A. LIPNIC |
| **Sent:** | Thursday, May 25, 2017 10:43 AM |
| **To:** | DONALD MCINTOSH; KIMBERLY ESSARY |
| **Subject:** | FW: Responses to the Chamber and EEAC Critiques of the EEO-1 Pay Data Collection |
| **Attachments:** | Chamber v. EEOC Burden AnalysistoOCH041417.doc; Attachment Chamber Survey.pdf; EEACOMBletter toOCH041417.docx |

Donald – This is all I have. I just searched my inbox for an email from Ron or from Peggy.

**From:** PEGGY MASTROIANNI
**Sent:** Friday, April 14, 2017 4:58 PM
**To:** VICTORIA A. LIPNIC
**Cc:** JIM PARETTI ; DONALD MCINTOSH ; RONALD EDWARDS ; CAROL MIASKOFF ; BRIA GILLUM ; MUSLIMA LEWIS ; ERIN NORRIS
**Subject:** Responses to the Chamber and EEAC Critiques of the EEO-1 Pay Data Collection

Dear Madam Chair -

OLC has prepared memos that respond to the letters the U.S. Chamber of Commerce and EEAC sent to the OMB Director urging reconsideration of OMB's PRA approval of the EEO-1 pay survey.

- The first attachment is OLC's response to the Chamber's arguments regarding the burden calculations; it identifies the major reasons for the discrepancies between the Chamber's and ours.
- For your convenience, we have also attached the Chamber's survey (second attachment).
- The third attachment is OLC's response to EEAC's argument that release of the software data file specifications was a substantial change in the EEO-1.

If you have any questions, please contact Carol Miaskoff, Ron Edwards, Bria Gillum, Erin Norris, Muslima Lewis, or me.

Peggy R. Mastroianni
Legal Counsel
U.S. Equal Employment Opportunity Commission
131 M St. NE
Washington, DC 20507
202.663.4609
peggy.mastroianni@eeoc.gov

1



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C. 20507**

Office of
Legal Counsel

April 14, 2017

**MEMORANDUM**

**TO:**       Victoria A. Lipnic
              Acting Chair

**FROM:**   Peggy R. Mastroianni  /s/
              Legal Counsel

**SUBJECT:**  EEOC's Response to EEAC's Argument that Relevant Circumstances Have
              Changed After OMB's Approval of the EEO-1 Report

### I.    Introduction

On March 20, 2017, the Equal Employment Advisory Council (EEAC) sent a letter to
John M. Mulvaney, the Director of the Office of Management and Budget (OMB), urging him to
review, reconsider, and reject the September 29, 2016, approval of a revised EEO-1 report to
collect pay band and hours-worked data starting March 31, 2018. This memorandum addresses
EEAC's argument[1] that EEOC's release of "partial" data file specifications, which were
referenced in EEOC's 30-day Federal Register notice and disclosed after OMB approved the
revisions to the EEO-1 report, provides sufficient justification for OMB to reconsider its
approval of the revised form.

### II.    The EEAC Argues That "Relevant Circumstances Have Changed" Because the
          EEOC Released File Specifications for Data Upload Files That Were Not
          Submitted to OMB

OMB may *sua sponte* decide to reconsider its approval of an information collection prior
to the expiration of the current approval of that information collection under certain

---

[1]   The EEAC also argued in its letter that EEOC's burden estimates for the revised EEO-1 were in material error
and urged OMB to reconsider its prior approval of the pay data collection for that reason. The memorandum
responding to the Chamber's letter addresses burden issues in detail. The EEAC's only other burden issue was
whether burden should be calculated on a per-cell basis. In light of reliance on information technology, and the fact
that EEO-1 cells can and are left blank in the absence of data, the EEOC moved away from this methodology for
calculating burden in 2016. Finally, the EEAC recommended that OMB consider alternatives to the currently
approved collection and suggested that any new revisions to the EEO-1 be subject to a pilot study that includes a
representative sample of actual employers to test the burden and utility.

circumstances.  One of those "circumstances" is that "relevant circumstances have changed" since the time of OMB's approval.[2]

### A.    The EEAC Argument

EEAC argues that the EEOC's file specifications, which were published after OMB approved the EEO-1 pay data collection on September 29, 2016, are an indication that relevant circumstances have changed and provide an independent basis for OMB to reconsider its approval of the collection.  EEAC contends that the published file specifications will impose an additional burden on employers because employers will be required to create a spreadsheet that does not resemble the approved EEO-1 and that the EEOC did not provide further guidance or instructions that discuss the new file specifications.

### B.    The EEOC Response

#### 1.  Defining when "Relevant Circumstances have Changed"

The regulations implementing the Paperwork Reduction Act (PRA) of 1980 do not define what constitutes a change in relevant circumstances, and OLC's research of the law did not yield a more detailed definition.  The preamble of the 1982 NPRM proposing OMB's regulations to implement the PRA, which EEAC cites in its letter, does provide some evidence of OMB's intent in creating the reconsideration process.  While the EEAC cites to a paragraph from the preamble affirming OMB's authority to conduct a review, the immediately preceding paragraph makes clear that OMB should reconsider an approval of a collection of information only "when circumstances have **significantly** changed . . . . " (emphasis added).[3]  This suggests that OMB did not intend to step in whenever there was a change in circumstances surrounding an approved information collection, but expected to reserve this remedy for cases in which a change had a significant impact.

#### 2.  EEOC's File Specifications

The EEOC's published file specifications are not a new requirement but rather simply a familiar tool to make it easier for employers to submit EEO-1 data to the EEOC.  The EEOC provided this tool to employers for use with the 2016 EEO-1, as evident on the EEOC website, where the file specifications for the 2016 EEO-1 were published at https://www.eeoc.gov/employers/eeo1survey/eeo1_cvs_specifications.cfm.  Like those later published for the EEO-1 pay data collection, the 2016 specifications were in comma-separated values format ("csv"), a format that enables employers to convert tabular data (like that in the EEO-1) for importation and exportation to a database.  Employers that used data upload technology for their 2016 EEO-1 reports used these csv specifications.

---

[2]    *See* 5 C.F.R. §1320.12(h)(2)(i) (*sua sponte* reconsideration of clearance of collections of information in current rules).

[3]    Office of Management and Budget, Controlling Paperwork Burdens on the Public, Notice of Proposed Rulemaking, 47 Fed. Reg. 39,515, 39,522 (Sept. 8, 1982).

2

Publication of the file specifications after OMB's approval of the pay data collection is not a "significant" change that warrants OMB's reconsideration. As noted above, EEOC indicated in the 30-day notice its intent to post updated specifications, and stated that it would provide support to employers and HRIS vendors as they transitioned to the new reporting requirements. EEAC had notice of these data specifications, was probably familiar with the 2016 version, and had ample opportunity to raise questions or concerns before OMB's approval of the revised EEO-1, but it did not do so.

3

# RE: EEO-1/Memo for OIRA

**From:**     JIM PARETTI <jim.paretti@eeoc.gov>

**To:**      "Mancini, Dominic J. EOP/OMB" <dominic_j._mancini@omb.eop.gov>

**Date:**     Fri, 14 Jul 2017 17:53:37 -0400

Around and fairly free most the day -- let me know when works best for you. Thanks man. Have a great weekend.

-----Original Message-----
From: Mancini, Dominic J. EOP/OMB [mailto:Dominic_J._Mancini@omb.eop.gov]
Sent: Friday, July 14, 2017 5:53 PM
To: JIM PARETTI <JIM.PARETTI@EEOC.GOV>
Subject: Re: EEO-1/Memo for OIRA

Jim,

Thanks for this memo.  I think it's a good idea for us to talk about next steps on this on Monday.  Let me know if you are around, thanks!

Dom

On Jul 14, 2017, at 5:48 PM, JIM PARETTI
<JIM.PARETTI@EEOC.GOV<mailto:JIM.PARETTI@EEOC.GOV>> wrote:

Dom:

Hope this finds you well.  Please see the attached memorandum regarding the petition asking OMB to rescind its approval of EEOC's revisions to Form EEO-1.

If you can direct this memo and its attachments to OIRA Administrator Rao, as well as the appropriate members of your staff, I would be most appreciative.  Thank you.

Have a great weekend,

JAP

================================
James A. Paretti, Jr., Esq.
Chief of Staff & Senior Counsel
Office of Acting Chair Victoria A. Lipnic U.S. Equal Opportunity Employment Commission
131 M Street, NE
Washington, DC 20507
(202) 663-4058
================================

<EEO-1 Memo Rao 07.2017.docx>
<Attach1USC.doc>
<Attach2EEAC.docx>

JA129a
OMB_AR 0000520

can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Adobe Portable Document Format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov*. Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

Dated: January 26, 2016.

**Lynn B. Mahaffie,**

*Deputy Assistant Secretary for Policy, Planning, and Innovation Delegated the Duties of the Assistant Secretary for Postsecondary Education.*

[FR Doc. 2016–01746 Filed 1–29–16; 8:45 am]

**BILLING CODE 4000–01–P**

---

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

[3046–0007]

## Agency Information Collection Activities: Revision of the Employer Information Report (EEO–1) and Comment Request

**AGENCY:** Equal Employment Opportunity Commission.

**ACTION:** Proposed revision of the employer information report (EEO–1) and comment request.

**SUMMARY:** In accordance with the Paperwork Reduction Act (PRA), the Equal Employment Opportunity Commission (EEOC or Commission) announces that it intends to submit to the Office of Management and Budget (OMB) a request for a three-year PRA approval of a revised Employer Information Report (EEO–1) data collection. This revised data collection has two components. Component 1 collects the same data that is gathered by the currently approved EEO–1: Specifically, data about employees' ethnicity, race, and sex, by job category. Component 2 collects data on employees' W–2 earnings and hours worked, which EEO–1 filers already maintain in the ordinary course of business. For the 2016 reporting cycle, all EEO–1 filers would submit the data under Component 1. Starting in 2017, filers with 100 or more employees (both private industry and Federal contractor) would submit data in response to both Components 1 and 2. Contractors with 50 to 99 employees would only submit data for Component 1. In this notice, the

EEOC solicits public comment on the utility and burden of collecting pay and hours-worked data through the EEO–1 data collection process.

**DATES:** Written comments on this notice must be submitted on or before April 1, 2016.

Pursuant to 42 U.S.C. 2000e–8(c), a public hearing concerning the proposed changes to the EEO–1 will be held at a place and time to be announced. To request an opportunity to present your views orally at the hearing, please submit a written request to the EEOC's Executive Secretariat (street address below) no later than February 22, 2016 to be assured of consideration. Please include your contact information.

**ADDRESSES:** Comments on this notice may be submitted to the EEOC in three ways; please use only one.

Comments and attachments may be submitted online at *http:// www.regulations.gov*, which is the Federal eRulemaking Portal. Follow the instructions on the Web site for submitting comments. Comments received here will be posted publicly on the same portal without change, including any personal information you provide. However, the EEOC reserves the right to refrain from posting comments, including those that contain obscene, indecent, or profane language; that contain threats or defamatory statements; that contain hate speech directed at race, color, sex, sexual orientation, national origin, ethnicity, age, religion, or disability; or that promote or endorse services or products.

Hard copy comments and all requests to participate in the hearing may be submitted to Bernadette Wilson, Acting Executive Officer, Executive Secretariat, Equal Employment Opportunity Commission, 131 M Street NE., Washington, DC 20507.

The Executive Secretariat also will accept documents totaling six or fewer pages by facsimile ("fax") machine. This limitation is necessary to assure access to the equipment. The telephone number of the fax receiver is (202) 663–4114. (This is not a toll-free number.) Receipt of fax transmittals will not be acknowledged, except that the sender may request confirmation of receipt by calling the Executive Secretariat staff at (202) 663–4070 (voice) or (202) 663–4074 (TTY). (These are not toll-free telephone numbers.)

Subject to the conditions noted above, the EEOC will post online at *http:// www.regulations.gov* all comments submitted in hard copy or by fax with the Executive Secretariat. The EEOC Headquarters' library also will make

available hard copies of all comments, by advance appointment only, between the hours of 9 a.m. and 5 p.m. Eastern Time. To schedule an appointment to inspect the comments at the EEOC's library, contact the library staff at (202) 663–4630 (voice) or (202) 663–4641 (TTY). (These are not toll-free numbers.)

For reference when commenting on this notice, the current EEO–1 (and proposed Component 1) can be found at *http://www.eeoc.gov/employers/ eeo1survey/upload/eeo1-2.pdf*. An illustration of the data to be collected by both Components 1 and 2 can be found at *http://www.eeoc.gov/employers/ eeo1survey/2016_new_survey.cfm*.

**FOR FURTHER INFORMATION CONTACT:** Ronald Edwards, Director, Program Research and Surveys Division, Equal Employment Opportunity Commission, 131 M Street NE., Room 4SW30F, Washington, DC 20507; (202) 663–4949 (voice) or (202) 663–7063 (TTY). Requests for this notice in an alternative format should be made to the Office of Communications and Legislative Affairs at (202) 663–4191 (voice) or (202) 663–4494 (TTY).

**SUPPLEMENTARY INFORMATION:**

## The EEO–1 Survey and Its Legal Authority

Section 709(c) of Title VII of the Civil Rights Act of 1964 (Title VII) requires employers to make and keep records relevant to the determination of whether unlawful employment practices have been or are being committed, to preserve such records, and to produce reports as the Commission prescribes by regulation or order.[1] Pursuant to this statutory authority, the EEOC in 1966 issued a regulation requiring certain employers to file executed copies of the EEO–1 survey in conformity with the directions and instructions on the form, which called for reporting employee data by job category, ethnicity, race, and sex.[2] Pursuant to Executive Order 11246,[3] the Office of Federal Contract Compliance Programs (OFCCP), U.S. Department of Labor (DOL), in 1978 issued its regulation describing the EEO–1 as a report "promulgated jointly with the Equal Employment Opportunity Commission" and requiring certain contractors to submit "complete and accurate reports" annually.[4] Through the EEO–1 Joint Reporting Committee housed at the

---

[1] 42 U.S.C. 2000e–8(c).

[2] The EEOC's EEO–1 regulation is at 29 part 1602 Subpart B. The EEOC is responsible for obtaining OMB's PRA approval for the EEO–1 report.

[3] Exec. Order No. 11,246, 30 FR 12,319 (Sept. 24, 1965).

[4] 41 CFR 60–1.7(a).

EEOC, the EEO–1 is administered as a single data collection to meet the statistical needs of both agencies.[5] Currently, the EEO–1 directs certain covered employers with more than 50 employees (contractors) or 100 employees (private industry)[6] to report annually the number of individuals they employ by job category and by race, ethnicity, and sex.[7] The data include seven race and ethnicity categories[8] and ten job categories,[9] by sex. A sample copy of the currently approved EEO–1 can be found at *http://www.eeoc.gov/employers/eeo1survey/upload/eeo1-2.pdf.*

---

[5] The EEOC shares EEO–1 data with state and local Fair Employment Practices Agencies under the authority of section 709(d) of Title VII. Subject to their agreement to comply with the confidentiality provisions of 42 U.S.C. 2000e–8(e), the EEOC shares EEO–1 reports with the Department of Justice (DOJ), the Federal Deposit Insurance Corporation (FDIC), and the National Credit Union Administration (NCUA). The FDIC and the NCUA use EEO–1 data pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 to help analyze diversity in management, employment, and business activities. DOJ uses the EEO–1 data when it defends OFCCP in litigation, in the event a federal contractor sues OFCCP to prevent debarment.

[6] Unless otherwise noted, the term "contractor" refers to federal contractors and first-tier subcontractors that satisfy the employee and contract size coverage criteria that subject them to the EEO–1 reporting obligations. The term "private industry" refers to all other entities required to file the EEO–1 that are not included in the "contractor" designation. The term "employer" or "filer" refers collectively to all entities that file EEO–1 data.

[7] The EEO–1 uses federal race and ethnic categories, which were adopted by the Commission in 2005 and implemented in 2007, pursuant to the PRA.

[8] *Hispanic or Latino*—A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.

*White (Not Hispanic or Latino)*—A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

*Black or African American (Not Hispanic or Latino)*—A person having origins in any of the black racial groups of Africa.

*Native Hawaiian or Other Pacific Islander (Not Hispanic or Latino)*—A person having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

*Asian (Not Hispanic or Latino)*—A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian Subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

*American Indian or Alaska Native (Not Hispanic or Latino)*—A person having origins in any of the original peoples of North and South America (including Central America), and who maintain tribal affiliation or community attachment.

*Two or More Races (Not Hispanic or Latino)*—All persons who identify with more than one of the above five races.

[9] The ten job groups are: Executive/Senior Level Officials and Managers; First/Mid Level Officials and Managers; Professionals; Technicians; Sales Workers; Administrative Support Workers; Craft Workers; Operatives; Laborers and Helpers; Service Workers.

**Adding Pay Data to the EEO–1**

In 1964, Congress enacted Title VII of the Civil Rights Act, as amended, 42 U.S.C. 2000e, *et seq.,* (Title VII), which makes unlawful a wide range of discriminatory employment practices, including pay discrimination, because of race, color, religion, national origin, or sex. The EEOC is responsible for enforcing Title VII and other federal laws prohibiting employment discrimination, including the Equal Pay Act of 1963.[10] The Equal Pay Act prohibits sex-based wage discrimination between men and women if they work in the same establishment and perform jobs that require substantially equal skill, effort, and responsibility under similar working conditions.[11] OFCCP enforces Executive Order 11246, as amended, which prohibits discrimination, including compensation discrimination, based on race, color, religion, sex, sexual orientation, gender identity, or religion.[12]

In 2010, the EEOC joined other federal agencies, including the DOL, as members of the President's National Equal Pay Task Force to identify ways to improve enforcement of federal laws prohibiting pay discrimination. The Task Force recommended, among other things, that the EEOC engage the National Academy of Sciences (NAS) to conduct a study assessing how to most effectively collect pay data to support its wage discrimination law enforcement efforts. The EEOC accordingly commissioned a study, and the NAS convened a Panel on *Measuring and Collecting Pay Information from U.S. Employers by Gender, Race, and National Origin.* This Panel's August 15, 2012, report (NAS Report)[13] recognized the potential value for enforcement of collecting pay data from employers by sex, race, and national origin through a survey such as the EEO–1, and emphasized the importance of a definitive plan for how the data would be used in coordination with other equal employment opportunity (EEO) enforcement agencies. The NAS Report also recommended that the EEOC conduct a pilot to inform the parameters for any pay data collection.[14]

---

[10] 29 U.S.C. 206(d).

[11] *Id.* Enforcement of the Equal Pay Act was transferred from the DOL to the EEOC in 1978. 5 USCA APP. 1 REORG. PLAN 1 1978.

[12] *See* Department of Labor, Office of Federal Contractor Compliance Programs, Exec. Order 11246 as amended, *http://www.dol.gov/ofccp/regs/statutes/eo11246.htm.*

[13] National Research Council. 2012. *Collecting Compensation Data From Employers.* Washington, DC: National Academies Press, 8. Available at *http://www.nap.edu/openbook.php?record_id=13496.*

[14] *Id.* at 87–88.

Following the NAS Report recommendation, the EEOC commissioned an independent Pilot Study to identify the most efficient means to collect pay data. The Pilot Study, completed in September 2015, assisted the EEOC in formulating this proposal and will guide the development of analytic techniques to make full use of the data to be collected.[15] The Pilot Study considered a variety of statistical approaches that could be used to detect pay differences between groups and then tested these approaches by applying them to synthetic pay data[16] in order to identify their strengths and weaknesses.[17] Ultimately, the Pilot Study made technical recommendations about several central components of a data collection, including: The unit of pay to be collected; the best summary measures of central tendency and dispersion for rates of pay; appropriate statistical test(s) for analyzing pay data; and the most efficient and least costly methods for transmitting pay data from employers. The Pilot Study also estimated employer burden-hour costs and the processing costs associated with the recommended method of collection.

Separately, the EEOC sought input about updating all the EEO surveys, including adding pay data, when its staff held a two-day meeting in March 2012 with employer representatives, statisticians, human resources information systems (HRIS) experts, and information technology specialists

---

[15] "EEOC Pay Pilot Study," September, 2015, Sage Computing. Available at: *http://www.eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf.*

[16] Two "synthetic" data bases were used. The first synthetic data base used data from the auto parts manufacturing industry and the Occupation Employment Statistics (OES) as well as EEO–1 data to construct a hypothetical firm in the auto parts manufacturing industry. To do so, the number of employees by EEO–1 job groups in an average sized firm was estimated. EEO–1 job groups were then mapped to the Standard Occupational Classification (SOC) categories in the OES data. Using OES statistics on the distribution of annual wages within SOC categories, the likely wages for EEO–1 job groups in an average firm were generated. These samples represent typical or representative wages, not actual wages, for auto parts employees. See Pilot Study, page 79. The second data base used data extracts from Current Population Survey (CPS) data (downloaded from *http://cps.ipums.org.* March CPS Annual Social and Economic Supplement). The data were downloaded from the International Public Use Microdata Series Web site for the 2010 to 2014 period. (King, M., S. Ruggles, J.T. Alexander, S. Flood, K. Genadek, M.B. Schroeder, B. Trampe, and R. Vick. 2010. Integrated Public Use Microdata Series, Current Population Survey: Version 3.0. [Machine-readable database]. Minneapolis: University of Minnesota.) See Pilot Study, page 56.

[17] Synthetic pay data was used because conducting a test survey of nine or more companies would require PRA approval. 44 U.S.C. 3502(3)(A)(i).

(work group). The work group reviewed the current data collection procedures, provided feedback on future modernization of the EEO surveys, and engaged in brainstorming that led to ideas submitted individually by group participants on a number of topics, including collecting pay data as well as multiple-race category data on the EEO–1. Employer stakeholders expressed concern about the importance of maintaining the confidentiality of any individual filer's pay data even if pay data were only published in aggregated form.[18] The work group report [19] reflects feedback from participants that the burden of reporting pay data would be minimal for EEO–1 filers.

On April 8, 2014, the Presidential Memorandum, ''Advancing Pay Equality Through Compensation Data Collection'' was issued. It directed the Secretary of Labor to develop a compensation data collection proposal.[20] OFCCP issued a Notice of Proposed Rulemaking (NPRM) on August 8, 2014, proposing to amend one of its implementing regulations for Executive Order 11246 to add a requirement that certain federal contractors submit compensation data reports to OFCCP.[21] Under the NPRM, OFCCP also proposed a sample of an Equal Pay Report for collecting this data.[22]

Public comments submitted to OFCCP about the proposed Equal Pay Report and rule argued for, among other things, the need to improve interagency coordination and decrease employer burden for reporting compensation data by using the EEO–1, rather than a new OFCCP data collection, as well as the need to protect privacy and data confidentiality. The instant proposal responds to these concerns.[23] Similarly, the NAS Report recommended that the federal EEO enforcement agencies develop a coordinated plan for using compensation data. In the course of developing this EEO–1 proposal, the EEOC and OFCCP together consulted with the Department of Justice, focusing on how EEO–1 pay data would be used to assess complaints of discrimination, focus investigations, and identify employers with existing pay disparities that might warrant further examination. The EEOC and OFCCP plan to develop statistical tools that would be available to staff on their computers, to utilize the EEO–1 pay data for these purposes. They also anticipate developing software tools and guidance for stakeholders to support analysis of aggregated EEO–1 data. Finally, the EEOC and OFCCP anticipate that the process of reporting pay data may encourage employers to self-monitor and comply voluntarily if they uncover pay inequities.

The following discussion explains the justification for each component of the proposed EEO–1 pay data collection. As stated above, this proposal does not compel employers to collect new data but rather requires the reporting of pay data that employers maintain in the normal course of business. This notice proposes a collection that will maximize the utility of the pay data while balancing respondent concerns about confidentiality and the burden of the collection.

*Proposal To Add Pay Data to the EEO–1*

Who Will Report Pay Data and When This Reporting Requirement Will Start

For the 2016 EEO–1 reporting cycle, to ease the transition, all employers will submit information that is identical to the information collected by the currently approved EEO–1 (Component 1). Starting in 2017, employers that are subject to the EEO–1 reporting requirement *and that have 100 or more employees* will submit the EEO–1 with pay and related information (Components 1 and 2). By contrast, contractors that are subject to the EEO–1 reporting requirement *and that have between 50 and 99 employees* will continue to submit the same information that is collected by the current EEO–1 report (Component 1). They will not be required to submit pay and hours-worked data. A sample copy of the currently approved EEO–1 report provides an illustration of the data to be collected by Component 1. It can be found at *http://www.eeoc.gov/ employers/eeo1survey/upload/eeo1-2.pdf*. An illustration of the data to be collected by both Components 1 and 2 can be found at *http://www.eeoc.gov/ employers/eeo1survey/2016_new_ survey.cfm*.

When Annual EEO–1 Reports Will Be Due and How Employers Will Submit Data

Currently, employers must collect EEO–1 data from any pay period occurring in the months of July through September of the current survey year. The EEO–1 must be filed by September 30th of the same year. These deadlines would continue after the addition of pay data, to minimize employers' burden by folding the new collection into long-established deadlines. As explained below regarding the utility and burden of using W–2 data to describe pay, requiring filers to report W–2 data as of a pay period occurring in the months of July through September should not be burdensome given the capabilities of HRIS software.

Beginning in 2017, all filers will be required to submit the proposed EEO–1 report electronically. Automated electronic data collection promotes the utility of the EEO–1 survey by reducing the number of inadvertent human errors in the data. Electronic data collection also is less burdensome for employers than assigning staff to complete the survey. As of 2014, all but three of the 67,146 EEO–1 filers already used electronic data submission.[24] Any EEO–1 filer seeking an exemption from this electronic requirement may use the existing EEO–1 process for seeking special reporting procedures.[25]

---

[18] For example, reporting the average pay for Hispanic or Latino women who were Executive/Senior Level Officials and Managers, if there are few Hispanic or Latino women in that job group, may effectively reveal the pay of individual employees. To allay these concerns, the EEOC intends to re-examine the rules for testing statistical confidentiality for publishing aggregate data to make certain that tables with small cell-counts are not made public.

[19] ''EEOC Survey System Modernization Work Group Meeting, Draft Report,'' March 19, 2012, Sage Computing. Available at: *http://www.eeoc.gov/ employers/eeo1survey/survey-modernization.pdf*.

[20] Presidential Documents, Memorandum of April 8, 2014, ''Advancing Pay Equality Through Compensation Data Collection,'' Memorandum for the Secretary of Labor, April 11, 2014 (79 FR 20751).

[21] Government Contractors, Requirement to Report Summary Data on Employee Compensation, 79 FR 46563 (August 8, 2014). This NPRM provided detailed explanations for the design of the Equal Pay Survey, which utilized W–2 information as a measure of wages and reported cumulative wages. It did not use pay bands like Component 2 of the currently proposed EEO–1. In 2011, OFCCP had issued an Advance Notice of Proposed Rulemaking (ANPRM). Nondiscrimination in Compensation: Compensation Data Collection Tool, 79 FR 49398 (August 10, 2011), in response to which stakeholders provided extensive input and information.

[22] Office of Information and Regulatory Affairs and Office of Management and Budget, Equal Pay Report, *http://www.reginfo.gov/public/do/PRAViewICr?ref_nbr=201407-1250-0018icID=212555*.

[23] OFCCP plans to utilize EEO–1 pay data for federal contractors with 100 or more employees instead of implementing a separate compensation data survey as outlined in its August 8, 2014, NPRM.

[24] The remaining three filers submitted hard copy reports.

[25] The EEO–1 instructions provide that ''[a]n employer who claims that preparation or the filing of Standard Form 100 would create undue hardship may apply to the Commission for a special reporting procedure. In such cases, the employer must submit in writing a detailed alternative proposal for compiling and reporting information to: The EEO–1 Coordinator, EEOC-Survey Division, 131 M Street NE., Washington, DC 20507. Only those special procedures approved in writing by the Commission are authorized. Such authorizations remain in effect until notification of cancellation is given. All requests for information should be sent

Continued

**5116**    **Federal Register** / Vol. 81, No. 20 / Monday, February 1, 2016 / Notices

Component 2 of the revised EEO–1 includes a request for data on the amount of employer staff time used to collect and report pay data on the EEO–1. This will better enable the EEOC to quantify the burden of this aspect of the survey.

**What Pay Data Will Be Collected**

**Measure: Total W–2 Earnings**

In selecting total W–2 earnings as the measure of pay, the focus was on maximizing utility of the EEO–1 pay data while minimizing the burden on employers to collect and report it. With respect to maximizing utility, the goal was to identify a measure of compensation that encompasses as much employer-paid income earned by individuals as possible. With respect to minimizing burden, the focus was on finding a measure that is well-defined and compatible with the data elements in employers' existing human resources and pay systems. Consideration also was given to the sample Equal Pay Report proposed in OFCCP's 2014 Notice of Proposed Rulemaking, which used W–2 earnings.[26]

Five different measures of earnings now used by federal data collection systems were considered. The first three were from the U.S. Bureau of Labor Statistics (BLS): The Occupation Employment Statistics (OES);[27] the National Compensation Survey (NCS);[28]

and the Current Employment Statistics (CES) survey program.[29] The remaining options were from the Social Security Administration (SSA)[30] and the Internal Revenue Service (IRS).[31]

Of these five options, the focus was on the relative strengths and weaknesses of the OES and the W–2 definitions because they are best known to employers. The NAS Study recommended the use of OES' wage definition because it is based on widespread surveys,[32] but the EEOC ultimately decided not to use the OES definition because it excludes widely-used elements of compensation such as overtime pay, severance pay, shift differentials, nonproduction bonuses, year-end bonuses, holiday bonuses, and tuition reimbursement.[33] These elements of pay, however, are

increasingly important. According to a 2014 survey of 1,064 U.S. companies, "91 percent of organizations offer a variable pay program and expect to spend 12.7 percent of payroll on variable pay for salaried exempt employees in 2015."[34] Another recent survey of companies' bonus practices found that 74 percent of respondents used a sign-on bonus program and 61 percent used a retention bonus program in 2014.[35]

By contrast, the W–2 definition provides a more comprehensive report of earnings at the employee level than the OES definition. W–2 gross income includes wages, salaries, fees, commissions, tips, taxable fringe benefits, and elective deferrals. Amounts withheld for taxes, including but not limited to income tax, Social Security, and Medicare taxes, are considered "received" and are included as gross income of the given year they are withheld.[36] The W–2 encompasses all earned income, including supplemental pay components such as overtime pay, shift differentials, and nonproduction bonuses (e.g., year-end bonuses, hiring and referral bonuses, and profit-sharing cash bonuses).[37] Nonproduction bonuses account for over 11 percent of cash compensation for management, business, and financial operations occupations, while shift differentials are a significant component of compensation for healthcare workers.[38] A panel of HRIS experts convened for the Pilot Study agreed that the trend is toward paying higher-level executives in bonuses, which are

to the address above." *See http://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm.* Any requests would be considered by the EEO–1 Coordinator, who is also responsible for issuing any written approvals.

[26] In the NPRM, OFCCP stated that it chose the W–2 definition of compensation because it accounts for a broad range of pay elements and because collection of W–2 data would result in minimal burden on contractors. 79 FR 46562 at 46576 (August 8, 2014). Public comments on the NPRM were split on using the W–2, but EEOC and OFCCP conclude that it remains the best option for the reasons stated in this section.

[27] The *Occupation Employment Statistics* (OES) survey defines earnings to include base rate pay, cost-of-living allowances, guaranteed pay, hazardous-duty pay, incentive pay such as commissions and production bonuses, tips, and on-call pay. The OES measure *excludes* back pay, jury duty pay, overtime pay, severance pay, shift differentials, nonproduction bonuses, employer costs for supplementary benefits, and tuition reimbursements. *See U.S. Bureau of Labor Statistics, Occupation Employment Statistics. http://www.bls.gov/oes/current/oes_tec.htm.* See page 4 of *http://www.bls.gov/oes/current/methods_statement.pdf* for the 12 wage intervals.

[28] The *National Compensation Survey* (NCS) is a BLS establishment survey of employee salaries, wages, and benefits. In this survey, "[e]arnings are defined as regular payments from employers to their employees as compensation for straight-time (not overtime) hourly wages or for any salaried work performed." The NCS does not include premium pay for overtime, holidays, and weekends; shift differentials such as night work; nonproduction bonuses; tips; and uniform and tool allowances. *See U.S. Bureau of Labor Statistics,*

*Overview on BLS Statistics on Pay and Benefits, http://www.bls.gov/bls/wages.htm http://www.bls.gov/ncs/ncswage2010.pdf,* at pp 8–9. However, this definition does include incentive pay such as commissions, piece-rate payments, production bonuses, cost-of-living adjustments, hazard pay, payments for income deferred due to participation in a salary reduction plan, and deadhead pay (which is paid to a driver who is driving an empty vehicle, typically when the driver is traveling to pick up a delivery or after completion of a delivery).

[29] The *Current Employment Statistics* (CES) survey program is a BLS and state cooperative program that produces data on earnings but not wages. Average hourly earnings exclude items such as employee benefits, irregular bonuses and commissions, retroactive payments, and the employers' share of payroll taxes and therefore, do not represent employers' total compensation costs (as calculated by the National Compensation Survey). *See National Research Council. Collecting Compensation Data from Employers. National Academic Press 2013. http://www.nap.edu/openbook.php?record_id=13496,* at p. 8.

[30] The *Social Security Administration* defines income as any payment received during a calendar month that can be used to meet needs for food or shelter. It may be in cash or in kind (*i.e.*, payment in the form of the use of a good or service, such as free rent). It includes earned income and unearned income. Examples of unearned income include social security, interest and dividends, retirement income, unemployment benefits, alimony, child support, and pay received for work while an inmate in a penal institution. *See http://www.ssa.gov/OP_Home/ssact/title16b/1612.htm.*

[31] The *Internal Revenue Service*'s W–2 definition of gross income includes wages, salaries, fees, commissions, tips, taxable fringe benefits, and elective deferrals. Amounts withheld for taxes, including but not limited to income tax, Social Security, and Medicare taxes, are considered "received" and must be included in gross income of the given year they are withheld. *See http://www.irs.gov/publications/p17/ch05.html;* see also *http://www.irs.gov/Individuals/What-is-Earned-Income%3F.*

[32] National Research Council, 2012, *Collecting Compensation Data From Employers.* Washington, DC: National Academies Press, 8. Available at *http://www.nap.edu/openbook.php?record_id=13496,* at p.58.

[33] United States Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics-Frequently Asked Questions, *http://www.bls.gov/oes/oes_ques.htm*

[34] *See* Press Release, Aon Hewitt, 2014 U.S. Salary Increase Survey, (Aug. 27, 2014), *http://aon.mediaroom.com/New-Aon-Hewitt-Survey-Shows-2014-Variable-Pay-Spending-Spikes-to-Record-High-Level.*

[35] WorldatWork. "Bonus Programs and Practices." Available at *http://www.worldatwork.org/adimLink?id=75444,* at p.10.

[36] Internal Revenue Service. 2014. "Wages, Salaries, and Other Earnings." In: Internal Revenue Service. Your Federal Income Tax (Individuals). Available at *http://www.irs.gov/publications/p17/ch05.html;* and Internal Revenue Service. 2015. "What Is Earned Income?" Available at *http://www.irs.gov/Individuals/What-is-Earned-Income%3F.*

[37] U.S. Dept. of Labor, Bureau of Labor Statistics. "Fact Sheet for the June 2000 Employment Cost Index Release." Available at *http://www.bls.gov/ncs/ect/sp/ecrp0003.pdf.*

[38] John L. Bishow, U.S. Dept. of Labor, Bureau of Labor Statistics. "A Look at Supplemental Pay: Overtime Pay, Bonuses, and Shift Differentials." Available at *http://www.bls.gov/opub/mlr/cwc/a-look-at-supplemental-pay-overtime-pay-bonuses-and-shift-differentials.pdf* at pp 5–7. "Analysis is limited to jobs that receive positive payments—that is, those jobs that actually receive supplemental pay, as opposed to the average for all jobs—the percentage for each type of supplemental pay is higher."

counted as W–2 income but are not included in the OES definition.[39]

Using the W–2 definition is less likely to be burdensome for most respondents than using the OES wage definition. Federal law requires all employers to generate W–2s for each of their employees. Although W–2 data may not be routinely compiled until the end of the calendar year, and EEO–1 reports are due on September 30th, several approaches are possible. First, because payroll records are cumulative, generating reports at any given point in time should not be complicated for employers with automated payroll systems. The W–2 data can be imported into a HRIS, and a data field can be established to accumulate W–2 data for the EEO–1. Alternatively, employers could obtain this pay information by utilizing quarterly payroll reports for the previous four quarters. Employers that do their payroll in-house will be able to report this data utilizing most major payroll software systems or by using off-the-shelf payroll software that is preprogrammed to compile data for generating W–2s. For employers that outsource their payroll, there would be a one-time burden of writing custom programs to import the data from their payroll companies into their HRIS systems.

Organizing and Reporting W–2 Data

In determining how employers would be required to organize and report their employees' W–2 data, the focus was on collectability, burden, confidentiality, and data utility.[40] The NAS Report and the Pilot Study reviewed various alternative approaches for reporting compensation, which ranged from highly detailed to general. Of these alternatives, the most comprehensive collection proposals required collecting data at the individual employee level and would have included human capital qualifications data as well as pay data. Although these options would reduce ambiguity and help assess the existence of potential discrimination, they also raise significant confidentiality and burden concerns.[41]

Options for collecting aggregate pay data include using pay rates (calculated by employer), range of pay with a maximum and minimum provided by employer, total pay, and average or median pay. There are disadvantages to each of these approaches. Total pay

could be impractical and would be dependent on the number of employees. Average pay by occupation would provide limited information about variation. Collecting the range of pay or average pay could produce biased estimates as pay is often distributed in a manner where a few individuals are paid much more than others. This might create misleading data when ranges or means are used as a measure. Simply gathering rates of pay, without standard deviation measures, would not assist in parity/disparity analysis, and asking employers to calculate standard deviations would not only be burdensome but also would risk a higher rate of inaccuracy.

Using pay bands appears to be more likely to generate reliable data while being less burdensome for employers than other reporting alternatives. Therefore, Component 2 of the revised EEO–1 will collect aggregate W–2 data in 12 pay bands for the 10 EEO–1 job categories. Employers will simply count and report the number of employees in each pay band. For example, a filer will report on the EEO–1 that it employs 3 African American women as professionals in the highest pay band. As to data utility, pay bands will allow the EEOC to compute within-job-category variation, across-job-category variation, and overall variation, which would support the EEOC's ability to discern potential discrimination while preserving confidentiality.[42] At the same time, pay bands would not require the computation of mean earnings or a measure of variance as alternative approaches might, thus avoiding a source of employer burden. Finally, as distinguished from mean earnings, pay bands can effectively use statistical tests that do not rely on an assumption that pay is normally distributed.

By choosing to use pay bands, the EEOC also is adopting a methodology that will limit employer burden. HRIS software developers already are familiar with using pay bands on the EEO–4 survey, which collects pay data from state and local government employers.[43] By choosing to use pay bands for the EEO–1, the EEOC and OFCCP will allow HRIS software developers to build on their existing experience with the EEO–4. Consistent with the recommendations of the Pilot Study, however, the EEO–1 pay bands (Table 2) will track the 12

"wage intervals" used by the Bureau of Labor Statistics in the OES survey.[44]

TABLE 1—EEO–4 PAY BANDS

| Pay bands | Pay bands label |
| --- | --- |
| 1 ................................ | $100–$15,999. |
| 2 ................................ | $16,000–$19,999. |
| 3 ................................ | $20,000–$24,999. |
| 4 ................................ | $25,000–$32,999. |
| 5 ................................ | $33,000–$42,999. |
| 6 ................................ | $43,000–$54,999. |
| 7 ................................ | $55,000–$69,999. |
| 8 ................................ | $70,000 and over. |

TABLE 2—PROPOSED EEO—1 PAY BANDS

| Pay bands | Pay bands label |
| --- | --- |
| 1 ................................ | $19,239 and under. |
| 2 ................................ | $19,240–$24,439. |
| 3 ................................ | $24,440–$30,679. |
| 4 ................................ | $30,680–$38,999. |
| 5 ................................ | $39,000–$49,919. |
| 6 ................................ | $49,920–$62,919. |
| 7 ................................ | $62,920–$80,079. |
| 8 ................................ | $80,080–$101,919. |
| 9 ................................ | $101,920–$128,959. |
| 10 .............................. | $128,960–$163,799. |
| 11 .............................. | $163,800–$207,999. |
| 12 .............................. | $208,000 and over. |

Hours Worked

Consistent with the recommendations of the Pilot Study, Component 2 of the revised EEO–1 will collect the total number of hours worked by the employees included in each EEO–1 pay band cell. This data will allow analysis of pay differences while considering aggregate variations in hours. The total hours worked also will permit an analysis that accounts for periods when the employees were not employed, thus reflecting part-time work.[45]

The EEOC seeks employer input with respect to how to report hours worked for salaried employees. One approach would be for employers to use an estimate of 40 hours per week for full-time salaried workers. The EEOC is not proposing to require an employer to begin collecting additional data on actual hours worked for salaried workers, to the extent that the employer does not currently maintain such

---

[39] The panel included individuals with expertise in HRIS and SAP, and in compensation, payroll, and benefits.

[40] Collecting Compensation Data from Employers, National Academies of Science *http://de.nlx.org/ pdfs/20140825_nrc-report-august2012.pdf.*

[41] See supra note 19, at 2.

[42] See also Micklewright, John and Schnepf, Sylke V., How Reliable are Income Data Collected with a Single Question? (November 2007). See also IZA Discussion Paper No. 3177, *http://ftp.iza.org/ dp3177.pdf.*

[43] See U.S. Equal Employment Opportunity Commission, EEO–4 Survey, *https://egov.eeoc.gov/ eeo4/.*

[44] See Survey Methods and Reliability Statement for the May 2014 Occupational Employment Statistics Survey. *http://www.bls.gov/oes/current/ methods_statement.pdf.*

[45] Collection of the hours-worked data will account for the fact that some individuals are employed for less than the entire reporting year, and therefore, may work fewer hours. For example, if a large number of women are hired part way into a reporting year, their W–2 compensation will be lower than the compensation of men who worked for the entire reporting year.

information. Employers are encouraged to comment on this issue.[46]

Generally, however, the initial conclusion is that requiring employers to provide the total number of hours worked would impose a minimal burden. Employers will report only data that they already maintain. The panel of HRIS experts convened for the Pilot Study reported that ''total hours worked'' data is maintained by almost all payroll systems. The information is available for the previous quarter, the previous four quarters, and the calendar year. For employers that outsource payroll, this variable could be added to the one-time reporting query that is written to download income data.

Analysis of W–2 Pay Data

Statistical tests will be used as an initial check of the W–2 data to be collected on the EEO–1, specifically, statistical significance tests that do not rely on an assumption of a normal distribution. The Pilot Study recommended several statistical techniques to test within-job categories and then suggested further examining companies and establishments with low probabilities that the differences between examined groups, such as men and women, occurred by chance.[47] The Pilot Study also noted that the issue of calibrating error rates (power vs. significance level) needed to be addressed to detect discrimination without suffering too many false positives. This process would include recognition of how sample sizes may influence results and also of judicial precedents regarding definitions of statistical probabilities.[48]

The EEOC and OFCCP plan to develop a software tool that will allow their investigators to conduct an initial analysis by looking at W–2 pay distribution within a single firm or establishment, and by comparing the firm's or establishment's data to aggregate industry or metropolitan-area data.[49] This application would highlight statistics of interest.

Confidentiality

The EEOC and OFCCP jointly collect the data on the EEO–1 report through their Joint Reporting Committee, which has represented the two agencies for the purpose of administering the EEO–1 since the reporting requirement began. All data is initially submitted to the Joint Reporting Committee housed at the EEOC and then provided to OFCCP. EEOC is required to hold its EEO–1 data confidential under Section 709(e) of Title VII, which forbids ''any [EEOC] officer or employee'' from making ''public in any manner whatever any information obtained by the Commission . . . prior to the institution of any [Title VII] proceeding . . . involving such information.'' 42 U.S.C. 2000e–8(e). Any EEOC officer or employee who violates this prohibition is guilty of a misdemeanor. *Id.*

The EEOC publishes aggregate EEO–1 data in a manner that does not reveal any particular employer's data, consistent with Section 709(e). For example, the EEOC has published aggregate EEO–1 data at the national, regional, and industry levels.[50] The EEOC also publishes reports analyzing aggregate EEO–1 data based on industry (*e.g.,* finance, media, and law firms) or

particular groups of people (*e.g.,* women of color).[51]

After collecting and reconciling EEO–1 data, the Joint Reporting Committee at the EEOC provides a database to OFCCP. OFCCP holds confidential the data for contractor filers to the maximum extent permitted by law, in accordance with Exemption 4 of the Freedom of Information Act and the Trade Secrets Act.[52] With respect to EEO–1 data for companies that are not under OFCCP's jurisdiction, the confidentiality provisions of Section 709(e) apply.[53] Accordingly, OFCCP refers all requests for such data to the EEOC for a response.

*Paperwork Reduction Act Statement*

The EEOC intends to submit to OMB a request for a three-year PRA approval of a revised EEO–1. The revised EEO–1 data collection has two components. The first component (Component 1) will collect information identical to that collected by the currently approved EEO–1. The second component (Component 2) will collect data on employees' W–2 pay and hours worked. Component 1 can be found at *http://www.eeoc.gov/employers/eeo1survey/upload/eeo1-2.pdf.* An illustration of the data to be collected by both Components 1 and 2 can be found at *http://www.eeoc.gov/employers/eeo1survey/2016_new_survey.cfm.*

For the 2016 reporting cycle, EEO–1 filers would only submit the Component 1 data. Beginning with the 2017 reporting cycle, the EEOC proposes to

---

[46] Some commentators on OFCCP's proposed data collection suggested that hours-worked data should not be collected based, in part, on their concerns that the collection would be burdensome and that some employers do not collect this data for exempt employees. For this reason, the EEOC encourages employers to provide specific, detailed input on this aspect of its proposed data collection.

[47] For example, the Pilot Study recommends using the Mann-Whitney test for grouped data and comparison of two groups (for example, gender (men versus women) or race (African Americans versus Whites)), and the Kruskal-Wallis test for comparison of more than two groups (*e.g.,* race). These tests are the most appropriate for an initial review of establishments as a whole. Analyses can be conducted by computing the statistical tests within job categories and then proceeding to more closely investigate companies and establishments with low *p*-values. Interval regressions can be used to examine the impact of hours worked, race and gender on distributions within pay bands. It may also be appropriate to compare a particular firm's regression coefficients for the hours worked, race and gender variables to those derived from an analysis of the relevant labor market as a whole.

[48] The EEOC's statistical analysis techniques are consistent with judicially recognized statistical standards for identifying meaningful discrepancies. *Hazelwood Sch. Dist.* v. *United States,* 433 U.S. 299,

311 n.17 (1977) (''a fluctuation of more than two or three standard deviations would undercut the hypothesis that decisions were being made randomly with respect to [a protected trait]);'' *see also, Wright* v. *Stern,* 450 F.Supp.2d 335, 363 (S.D.N.Y. 2006) (court denied employer's motion for summary judgment, concluding that the plaintiffs presented sufficient statistical and other evidence for a jury to conclude that the employer engaged in widespread discrimination against African-American and Hispanic employees, in terms of promotions and compensation. The court noted that, ''[t]hough not dispositive, statistics demonstrating a disparity of two standard deviations outside of the norm are generally considered statistically significant.'')

[49] Operationally, this application, or dashboard, could relate the nominal results of statistical tests (that is, test statistics or their *p*-values) to those encountered in the location and the labor market based on the relevant industry and geography. On such a dashboard, the EEOC investigator would see technical information such as the values of the main statistics used to describe the establishment, and its relation to the same statistic encountered in other comparable establishments.

[50] *See* U.S. Equal Employment Opportunity Commission, ''Job Patterns for Minorities and Women in Private Industry (EEO–1), *http://www.eeoc.gov/eeoc/statistics/employment/jobpat-eeo1/index.cfm.*

[51] *See* U.S. Equal Employment Opportunity Commission, Special Reports, *http://www.eeoc.gov/eeoc/statistics/reports/index.cfm.*

[52] *See* 5 U.S.C. 552 (b)(4). FOIA does not apply to ''trade secrets and commercial or financial information obtained from a person and privileged or confidential''; 18 U.S.C. 1905. Under the Trade Secrets Act, criminal penalties may apply to an officer or employee of the United States who ''publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law . . . confidential statistical data. . . .'' See also 79 FR 46562 at 46583 (August 8, 2014).

[53] *See* relevant Paperwork Reduction Act provision, 44 U.S.C. 3510. ''(a) The Director may direct an agency to make available to another agency, or an agency may make available to another agency, information obtained by a collection of information if the disclosure is not inconsistent with applicable law. (b)(1) If information obtained by an agency is released by that agency to another agency, all the provisions of law (including penalties) that relate to the unlawful disclosure of information apply to the officers and employees of the agency to which information is released to the same extent and in the same manner as the provisions apply to the officers and employees of the agency which originally obtained the information. (2) The officers and employees of the agency to which the information is released, in addition, shall be subject to the same provisions of law, including penalties, relating to the unlawful disclosure of information as if the information had been collected directly by that agency.''

require EEO–1 filers with 100 or more employees to submit Component 2 data in addition to Component 1 data. However, contractor filers with 50 to 99 employees will only submit Component 1 data.

*2016 Overview of Information Collection—Component 1*

*Collection Title:* Employer Information Report (EEO–1).
*OMB Control Number:* 3046–0007.
*Frequency of Report:* Annual.
*Description of Affected Public:* Private industry filers with 100 or more employees and federal government contractor filers with 50 or more employees.
*Number of Respondents:* 67,146.
*Reporting Hours:* 228,296.4.
*Respondent Burden Hour Cost:* $5,531,621.77.
*Federal Cost:* $1,330,821.
*Number of Forms:* 1.
*Form Number:* EEOC Form 100.

*2017 and 2018 Overview of Information Collection—Components 1 and 2*

*Collection Title:* Employer Information Report (EEO–1).
*OMB Control Number:* 3046–0007.
*Frequency of Report:* Annual.
*Number of Forms:* 1.
*Form Number:* EEOC Form 100.
*Federal Cost:* $318,000 for one-time costs and $1,621,300 [54] for recurring staffing costs.

Component 1 (Demographic and Job Category Data)

*Description of Affected Public:* In 2017 and 2018, contractor filers with 50 to 99 employees will submit only the demographic and job category data collected by Component 1.
*Number of Respondents:* 6,260.
*Reporting Hours:* 21,284.
*Respondent Burden Hour Cost:* $515,711.32.

Components 1 and 2 (Demographic and Job Category Data Plus Pay and Hours-Worked Data)

*Description of Affected Public:* In 2017 and 2018, EEO–1 filers with 100 or more employees will submit pay and hours-worked data under Component 2 in addition to the demographic and job category data under Component 1.
*Number of Respondents:* 60,886.
*Reporting Hours:* 401,847.6.
*Respondent Burden Hour Cost:* $9,736,767.35.

*PRA Burden Statement*

2016: Component 1

*Burden Statement:* In 2016, all EEO–1 filers will submit only Component 1, which includes the data collected by the currently approved EEO–1. The estimated number of respondents required to submit the annual EEO–1 survey is 67,146.[55] This data collection is estimated to impose 228,296.4 burden hours in 2016 or 3.4 hours per filer.[56] See Table 3. The estimated burden is based on electronic, rather than paper filing, which significantly reduces the survey burden.

### TABLE 3—ANNUAL BURDEN—2016 (COMPONENT 1)

[All EEO–1 filers: Private industry employers with 100 or more employees and Federal Government contractors and first-tier subcontractors with 50 or more employees]

| | Annual burden hours | Filers | Total annual burden hours | Wage rate | Total burden hour cost |
|---|---|---|---|---|---|
| Reading instructions ........................................... | 0.5 | 67,146 | 33,573 | $24.23 | $813,473.79 |
| Collecting, verifying, validating and reporting data ........... | 2.9 | 67,146 | 194,723.4 | 24.23 | 4,718,147.98 |
| Total ................................................................ | 3.4 | 67,146 | 228,296.4 | ........................ | 5,531,621.77 |

2017 and 2018: Components 1 and 2

*Burden Statement—Component 1 Only:* Starting in 2017, the estimated number of annual respondents who are contractor filers with 50 to 99 employees is 6,260.[57]

The burden on these contractor filers is estimated as follows:

• *Annual Burden Calculation:* The estimated total annual burden hours required to complete Component 1 of the EEO–1 data collection in 2017 and 2018 is 21,284, with an associated total annual burden hour cost of $515,711.32.[58] See Table 4.

*Burden Statement—Components 1 and 2:* Starting in 2017, the estimated number of annual respondents that will submit Components 1 and 2 is 60,886 private industry and contractor filers. Filers required to complete both Components 1 and 2 are estimated to incur 401,847.6 burden hours annually or 6.6 hours per filer. The estimated burden is based on electronic, rather than paper, filing, which significantly reduces the survey burden.

The burden imposed on all private industry employer filers and contractor filers with 100 or more employees as a result of the proposed collection of W–2 pay data is estimated as follows:

• *Annual Burden Calculation:* The estimated total annual burden hours needed for filers to report demographic and W–2 pay data via Components 1 and 2 of the revised EEO–1 Report is 401,847.6, with an associated total annual burden hour cost of $9,736,767.35. This burden estimate includes reading instructions and collecting, merging, validating, and reporting the data electronically.[59] See Table 4.

---

[54] The addition of W–2 pay data to the EEO–1 is expected to increase EEOC's internal staffing costs by approximately $290,478. The annual federal cost figure of $1,621,300 includes both the increase in contract costs resulting from the addition of the pay data collection and the estimated internal staffing costs. It reflects an increase of more than $290,478 compared to the estimated federal costs provided in previously published **Federal Register** notices seeking PRA approval of this information collection because past estimates reflected the cost of the contract with the vendor whose services the EEOC

procures to assist with administration and processing of the EEO–1 but did not include EEOC's internal staffing costs associated with processing the EEO–1.

[55] In 2014, 67,146 firms filed EEO–1 reports.

[56] In 2014, all but three reporting firms submitted electronic, rather than paper survey responses. These burden estimates assume that virtually all respondents will continue to file electronically.

[57] Of the 67,146 firms that filed EEO–1 reports in 2014, 6,260 were federal contractor filers with fewer than 100 employees.

[58] This estimate is calculated as follows: 3.4 hours per respondent × 6,260 respondents = 21,284 hours × $24.23 per hour = $515,711.32. See Bureau of Labor Statistics in the publication "Employer Costs for Employee Compensation" (December 2013), which lists total compensation for administrative support as $24.23 per hour, *http://www.bls.gov/news.release/archives/ecec_03122014.htm* (last accessed September 23, 2014).

[59] This estimate is calculated as follows: 6.6 hours per respondent × 60,886 respondents = 401,847.6 hours × $24.23 per hour = $9,736,767.35. See
Continued

• *One-Time Implementation Burden:* The estimated one-time implementation burden hour cost for submitting the information required by Component 2 of the revised EEO–1 Report is $23,000,295.[60] This calculation is based on the one-time cost for developing queries related to Component 2 in an existing human resources information system, which is estimated to take 8 hours per filer at a wage rate of $47.22 per hour.

Further, the EEOC estimates that the addition of W–2 pay data to the EEO–1 will raise its internal staffing cost by $290,478 due to the increased staff time needed to process the additional data.

TABLE 4—ANNUAL BURDENS—2017 AND 2018

[Revised EEO–1 Data Collection—Components 1 and 2]

| Annual burden | Annual burden hours | Filers | Total annual burden hours | Wage rate | Total annual burden hour cost |
|---|---|---|---|---|---|
| **Component 1 Only** Contractor filers with 50 to 99 employees | | | | | |
| Reading instructions ........................................... | 0.5 | 6,260 | 3130 | $24.23 | $75,839.90 |
| Collecting, verifying, validating and reporting data ........ | 2.9 | 6,260 | 18,154 | 24.23 | 439,871.42 |
| Total Annual Burden for Filers Submitting Component 1 ................................................................. | 3.4 | 6,260 | 21,284 | ...................... | 515,711.32 |
| **Components 1 and 2** All private industry employer filers, as well as contractor filers with 100 or more employees | | | | | |
| Reading instructions ........................................... | 1 | 60,886 | 60,886 | 24.23 | 1,475,268 |
| Collecting, verifying, validating and reporting data ........ | 5.6 | 60,886 | 340,961.6 | 24.23 | 8,261,499.35 |
| Total Annual Burden for Filers Submitting Components 1 and 2 ......................................................... | 6.6 | 60,886 | 401,847.6 | ...................... | 9,736,767.35 |
| **Total Annual Burden—All Filers** | | | | | |
| Total for Revised EEO–1 ........................................ | ...................... | 67,146 | 423,131.6 | ...................... | 10,252,478.67 |

The reporting hour burden calculations in this notice reflect a departure from the manner in which the EEOC traditionally has estimated reporting burden. In the past, the EEOC estimated the reporting hour burden based on the number of total cells in the report(s) that a firm had to complete. This approach viewed each report filed by a firm as a separate reporting requirement, analogous to a paper report. In reporting year 2014, however, the number of paper reports declined to just three. In addition, employers now rely extensively on automated HRIS to generate the information they submit on the EEO–1 report.[61] As a result, each additional report filed has just a marginal additional cost.[62] To accurately reflect the manner in which employers now collect and submit the data for filing, the estimated reporting burden set forth in this notice is calculated per firm, rather than per

report. This burden calculation is based on the time spent on the tasks involved in filing the survey, rather than on "key strokes" or data entry. As such, it more accurately reflects how virtually all employers actually complete the EEO–1 and the EEOC's practice of providing filers alternative methods for filing their reports such as data uploads using various formats and online filing.

The EEOC seeks employer input on this burden calculation. The EEOC reviewed OFCCP's ANPRM and NPRM and the public comments relating to the burden calculation for OFCCP's proposal to collect pay data and consulted with OFCCP about burden estimates.[63] The Pilot Study approached some private employers to seek data about the possible cost of collecting pay information but few employers responded, and the employers that did respond did not provide quantitative feedback. The EEOC encourages

employers, in their comments responding to paragraph 2 in the "Solicitation of Public Comment" section below, to provide: (1) Quantitative information about the burden associated with completing the currently approved EEO–1, as well as the anticipated estimated burden to also submit pay and hours-worked data, and (2) data regarding the estimated time that staff will spend to report the employer's pay and hours-worked data and the corresponding wage rates for that staff.

Solicitation of Public Comment: Pursuant to the Paperwork Reduction Act of 1995, 44 U.S.C. Chapter 35, and OMB regulation 5 CFR 1320.8(d)(1), the Commission solicits public comment to enable it to:

1. Evaluate whether the proposed collection of information is necessary for the proper performance of the Commission's functions, including

Bureau of Labor Statistics in the publication "Employer Costs for Employee Compensation" (December 2013), which lists total compensation for administrative support at $24.23 per hour, *http://www.bls.gov/news.release/archives/ecec_03122014.htm* (last accessed September 23, 2014).

[60] This is estimate is calculated as follows: 8 hours per respondent × 60,886 employers = 487,088 × $47.22 per hour = $23,000,295. See Bureau of Labor Statistics in the publication "Employer Costs

for Employee Compensation" (December 2013), which lists total compensation for a professional at $47.22 per hour, *http://www.bls.gov/news.release/archives/ecec_03122014.htm* (last accessed September 23, 2014).

[61] Surveys have shown that more than 90 percent of human resource departments operate with some form of computerized HRIS. *See Public Personnel Management*, Volume 39, No. 3, Fall 2010.

[62] In fact, a number of firms file by uploading a data file so that the information goes nearly directly

from an electronic file generated by the HRIS to the survey data base. In 2014, 1,449 firms filed EEO–1 reports by uploading a data file, accounting for 704,654 of the EEO–1 reports filed in that year.

[63] OFCCP plans to utilize EEO–1 pay data for federal contractors with 100 or more employees instead of implementing a separate compensation data survey as outlined in its August 8, 2014, NPRM.

whether the information will have practical utility;

2. Improve the accuracy of the Commission's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

3. Enhance the quality, utility, and clarity of the information to be collected; and

4. Minimize the burden of the collection of information on those who are required to respond, including the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

**Conclusion**

This notice summarizes the EEOC's proposal to submit a revised EEO–1 to OMB for 3-year PRA approval to require private employer filers, as well as most federal government contractor filers, to submit data on employee pay starting with the 2017 reporting cycle. This data collection would meet the statistical needs of both the EEOC and OFCCP. It would also enable employers to self-assess their pay practices and policies and thereby support voluntary compliance. In developing this PRA proposal, the EEOC has balanced enforcement objectives with the burden and confidentiality concerns of respondents.

Dated: January 21, 2016.

For the Commission.

**Jenny R. Yang,**

*Chair.*

[FR Doc. 2016–01544 Filed 1–29–16; 8:45 am]

**BILLING CODE 6570–01–P**

# FEDERAL COMMUNICATIONS COMMISSION

## Sunshine Act Meeting

January 21, 2016.

The Federal Communications Commission will hold an Open Meeting on the subjects listed below on Thursday, January 28, 2016, which is scheduled to commence at 10:30 a.m. in Room TW–C305, at 445 12th Street SW., Washington, DC.

| Item No. | Bureau | Subject |
|---|---|---|
| 1 .................. | MEDIA ..................................................... | TITLE: Expansion of Online Public File Obligations to Cable and Satellite TV Operators and Broadcast and Satellite Radio Licensees (MB Docket No. 14–127). SUMMARY: The Commission will consider a Report and Order which modernizes the public inspection file rules by requiring cable and satellite TV operators and broadcast and satellite radio companies to post public inspection files on the FCC's online database. |
| 2 .................. | PUBLIC SAFETY & HOMELAND SECURITY. | TITLE: Amendment of Commission's Rules Regarding the Emergency Alert System (PS Docket No. 15–94) and Wireless Emergency Alerts (PS Docket No. 15–91). SUMMARY: The Commission plans to discuss strengthening the Emergency Alert System (EAS) by promoting participation on the state and local levels, supporting greater testing and awareness of EAS, leveraging technological advances, and bolstering EAS security. |
| 3 .................. | WIRELINE COMPETITION AND WIRELESS TELE-COMMUNICATIONS. | TITLE: Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion, and Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996, as Amended by the Broadband Data Improvement Act (GN Docket No. 15–191). SUMMARY: The Commission will consider the 2016 Broadband Progress Report examining whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion, pursuant to Section 706 of the Telecommunications Act of 1996. |

\*    \*    \*    \*    \*

**Consent Agenda**

The Commission will consider the following subjects listed below as a consent agenda and these items will not be presented individually:

| | | |
|---|---|---|
| 1 .................. | GENERAL COUNSEL ............................... | TITLE: Mitchell F. Brecher Request for Inspection of Records (FOIA Control No. 2014–338). SUMMARY: The Commission will consider a Memorandum Opinion and Order concerning the Application for Review filed by Mitchell F. Brecher regarding the denial of his request for inspection of records under the Freedom of Information Act. |
| 2 .................. | GENERAL COUNSEL ............................... | TITLE: SMS/800 Inc. Request for Inspection of Records (FOIA Control No. 2015–044). SUMMARY: The Commission will consider a Memorandum Opinion and Order concerning the Application for Review filed by SMS/800 Inc. regarding the release of records pertaining to SMS/800 Inc. in response to a request for inspection of records under the Freedom of Information Act filed by Mark Lewyn. |
| 3 .................. | GENERAL COUNSEL ............................... | TITLE: Rachel A. Avan Request for Inspection of Records (FOIA Control No. 2014–572). SUMMARY: The Commission will consider a Memorandum Opinion and Order concerning the Application for Review filed by Rachel A. Avan regarding the denial of her request for inspection of records under the Freedom of Information Act. |
| 4 .................. | GENERAL COUNSEL ............................... | TITLE: Russell Carollo Request for Inspection of Records (FOIA Control No. 2015–553). SUMMARY: The Commission will consider a Memorandum Opinion and Order concerning the Application for Review filed by Russell Carollo regarding the partial denial of his request for inspection of records under the Freedom of Information Act. |



NATIONAL
WOMEN'S
Law CENTER

EXPANDING THE POSSIBILITIES

April 1, 2016

Bernadette Wilson, Acting Executive Officer
Executive Secretariat
Equal Employment Opportunity Commission
131 M St., N.E.
Washington, DC 20507

**Re: Proposed Revision of the Employer Information Report (EEO-1), FR Docket Number 2016-01544, Docket ID EEOC-2016-0002**

Dear Ms. Wilson:

Thank you for the opportunity to comment on the Equal Employment Opportunity Commission's (EEOC) proposal to require large employers to submit summary compensation data as part of the annual EEO-1 reporting process. The National Women's Law Center (the Center) has worked for over 40 years to advance and protect women's equality and opportunity—with a focus on women's employment, education, income security, health, and reproductive rights—and has long worked to remove barriers to equal treatment of women in the workplace, particularly those that suppress women's wages. Collecting compensation data through the EEO-1 will improve enforcement of pay discrimination laws and increase voluntary employer compliance with those laws, helping to close the gender pay gap. The National Women's Law Center strongly supports this proposal.

I.      **The Proposed EEO-1 Revision Will Help Identify And Address Pay Discrimination, a Crucial Driver of the Gender Pay Gap.**

The Center strongly supports EEOC's proposal to revise the EEO-1 to add a second component enabling collection of compensation data from private employers and federal contractor workplaces with more than 100 employees. Such a component will play an important role in uncovering and combating pay discrimination. Women working full time, year round continue to confront a stark wage gap, typically making only 79 percent of the median annual wages made by men working full time, year round.[1] The wage gap is even worse for women of color: African American women typically make only 60 percent, Latinas only 55 percent,[2] and Native American women only 59 percent[3] of the wages white, non-Hispanic men typically make for full-time, year-round work. This wage gap has remained stagnant for nearly a decade.[4] Women

---

[1] NAT'L WOMEN'S LAW CTR., THE WAGE GAP IS STAGNANT FOR NEARLY A DECADE 1 (2015), *available at* http://nwlc.org/wp-content/uploads/2015/08/wage_gap_is_stagnant_9.23.15.pdf. http://nwlc.org/resources/wage-gap-stagnant-nearly-decade/ [THE WAGE GAP IS STAGNANT]
[2] *Id.*
[3] NAT'L WOMEN'S LAW CTR., THE WAGE GAP BY STATE FOR NATIVE AMERICAN WOMEN (2015), *available at* http://nwlc.org/resources/equal-pay-for-native-american-women/.
[4] THE WAGE GAP IS STAGNANT at 1.

*With the law on your side, great things are possible.*
11 Dupont Circle ■ Suite 800 ■ Washington, DC 20036 ■ 202.588.5180 ■ 202.588.5185 Fax ■ www.nwlc.org

JA139

are still paid less than men in nearly every occupation,[5] and studies show that even controlling for race, region, unionization status, education, experience, occupation, and industry leaves 38 percent of the pay gap unexplained.[6] Research indicates that discrimination accounts for at least part of this unexplained gap. For example, a recent experiment revealed that compared to an identical female applicant, science professors offered a male applicant for a lab manager position a salary of nearly $4,000 more, additional career mentoring, and judged him to be significantly more competent and hireable.[7] A range of factors contributes to the pay gap, including pay discrimination between employees of different genders who are doing the same job.[8]

Yet pay discrimination remains difficult to detect in the first instance. Because pay often is cloaked in secrecy, when a discriminatory salary decision is made, it is seldom as obvious to an affected employee as a demotion, a termination, or a denial of a promotion.[9] Moreover, about 60 percent of workers in the private sector nationally are either forbidden or strongly discouraged from discussing their pay with their colleagues.[10] As a result, employees are discouraged from gathering information that would suggest that they have experienced pay discrimination, which undermines their ability to challenge such discrimination. Punitive pay secrecy policies and practices allow this form of discrimination not only to persist, but to become institutionalized. Consequently, government enforcement and employer self-evaluation and self-correction are critical to combat compensation discrimination.

Collecting and making publicly available compensation data from larger private employers and federal contractors will improve the effectiveness of enforcement efforts and increase the likelihood of employer self-correction, thus targeting pay discrimination on multiple fronts. First, the revised EEO-1 will help both EEOC and the Office of Federal Contract Compliance Programs of the Department of Labor (OFCCP) tackle discrimination by private employers and large federal contractors. This data collection will empower the agencies to target their limited enforcement resources toward more detailed oversight of those employers who are most likely to be engaging in pay discrimination, greatly enhancing the effectiveness and efficiency of EEOC's

---

[5] Hegewisch, A. & Matite, M., *The Gender Wage Gap by Occupation,* INST. FOR WOMEN'S POLICY RESEARCH (2013), *available at* http://www.iwpr.org/publications/pubs/the-gender-wage-gap-by-occupation-2

[6] Blau, F. D. & Kahn, L.M, *The Gender Wage Gap: Extent, Trends and Explanations*, NAT'L BUREAU OF ECONOMIC RESEARCH (Jan. 2016), *available at* http://www.nber.org/papers/w21913.pdf.

[7] Moss-Racusin, C.A. et al., *Science faculty's subtle gender biases favor male students*, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES OF AMERICA (Aug. 2012), *available at* http://www.pnas.org/content/109/41/16474.abstract#aff-1.

[8] Blau & Kahn 2016, *supra* note 6; *see* NAT'L WOMEN'S LAW CTR., FIFTY YEARS AND COUNTING: THE UNFINISHED BUSINESS OF ACHIEVING FAIR PAY (2015), *available at* http://nwlc.org/resources/50-years-counting-unfinished-business-achieving-fair-pay/.

[9] As Justice Ginsburg has noted:

> Pay disparities often occur, as they did in Ledbetter's case, in small increments; cause to suspect that discrimination is at work develops only over time. Comparative pay information, moreover, is often hidden from the employee's view. Employers may keep under wraps the pay differentials maintained among supervisors, no less the reasons for those differentials. Small initial discrepancies may not be seen as meet for a federal case, particularly when the employee, trying to succeed in a nontraditional environment, is averse to making waves. Pay disparities are thus significantly different from adverse actions "such as termination, failure to promote, …or refusal to hire," all involving fully communicated discrete acts, "easy to identify" as discriminatory.

Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007) (Ginsburg, J. dissenting).

[10] INST. FOR WOMEN'S POLICY RESEARCH, PAY SECRECY AND WAGE DISCRIMINATION (2014), *available at* http://www.iwpr.org/publications/pubs/pay-secrecy-and-wage-discrimination-1/at_download/file

and OFCCP's pay discrimination enforcement efforts.   In addition, other forms of unlawful gender and race discrimination can manifest as gaps in compensation.  For example, if hiring discrimination keeps women out of higher paying jobs in a company, or harassment systematically pushes women out of male-dominated, highly paid jobs, the result may be gender pay gaps within the firm.  If African American employees, for example, are scheduled for fewer work hours, this also would be reflected in pay gaps.  Collecting compensation data allows for more targeted enforcement of a range of antidiscrimination protections.

Second, both the process of responding to the data collection tool and the more effective and targeted approach to enforcement that the tool permits will spur more employers to proactively review and evaluate their pay practices and to address any unjustified disparities between employees. By incentivizing and facilitating such employer self-evaluation, the revised EEO-1 Report will increase voluntary employer compliance with discrimination laws.  Employees and employers alike will benefit from the elimination of discrimination in pay practices absent litigation or other formal enforcement mechanisms, which can be expensive and time-consuming.

## II.      The EEO-1 Report Is the Appropriate Vehicle for Collecting Pay Data.

The EEO-1 Report is well suited for efficiently collecting meaningful data related to pay, for multiple reasons.

First, the decision to collect this pay information through the EEO-1 Report and to share it with OFCCP minimizes the compliance burden for regulated employers in direct response to concerns previously raised by the employer community.  When OFFCP previously proposed collecting compensation data from federal contractors through a separate tool on a different reporting schedule from the EEO-1,[11] employer representatives urged in the strongest terms that instead EEOC and OFCCP coordinate their data collection through use of a single, unified instrument.[12] The proposed EEO-1 revision accomplishes this goal, avoiding duplication of effort or wasted costs for either employers or enforcement agencies.  For these reasons, the National Academy of Sciences' study regarding the collection of compensation data (NAS Study)[13] concluded that use of the EEO-1 for pay data collection would be "quite manageable for both EEOC and the respondents."[14]

---

[11] U.S. Department of Labor, Office of Federal Contract Compliance Programs, Non-Discrimination in Compensation; Compensation Data Collection Tool, Advanced Notice of Proposed Rulemaking, 76 Fed. Reg. 49398 (Aug. 10, 2011); U.S. Department of Labor, Office of Federal Contract Compliance Programs, Government Contractors, Requirement to Report Summary Data on Employee Compensation, Notice of Proposed Rulemaking, 79 Fed. Reg. 46561 (Aug. 8, 2014).

[12] *See* SAGE COMPUTING, INC., EEOC SURVEY SYSTEM MODERNIZATION WORK GROUP MEETING 2 (Mar. 2012), *available at* http://www.eeoc.gov/employers/eeo1survey/survey-modernization.pdf; *see also, e.g.*, Equal Employment Advisory Council, *Comments on the Office of Federal Contract Compliance Programs' Proposed Requirement to Report Summary Data on Employee Compensation* (Jan. 5, 2015);  Society for Human Resource Management and the College and University Professional Association for Human Resources, *Comment on Advanced Notice of Proposed Rulemaking Related to Non-Discrimination in Compensation* 3-4 (Oct. 11, 2011).

[13] NATIONAL RESEARCH COUNCIL OF THE NATIONAL ACADEMIES, COLLECTING COMPENSATION DATA FROM EMPLOYERS (2012), *available at* http://www.nap.edu/catalog/13496/collecting-compensation-data-from-employers [NAS STUDY].

[14] NAS STUDY at 60.

Second, by utilizing the long-established EEO-1 job categories, reliance on the EEO-1 Report allows employers to report pay data without requiring them to master and implement new methods of categorizing job titles within their workplace. Instead, employers can make use of the existing systems by which they associate job titles with EEO-1 job categories, thus simplifying reporting.

Third, use of the EEO-1 enables the calculation and comparison of compensation data by gender within racial/ethnic groups, and by racial/ethnic groups within genders. The substantial pay gaps experienced by women of color compared to their white, non-Hispanic male and female counterparts demonstrate that unequal pay is a problem that has both gender and racial/ethnic dimensions. Reporting pay data through the EEO-1 Report will capture these interacting impacts.

Fourth, use of the EEO-1 as a reporting tool will facilitate analysis of compensation data both company-wide and within each employer's establishment, given that a separate EEO-1 Report must be filed for each physical location in a multi-establishment company. Company-wide analysis will help to draw attention to potential systemic discrimination that can affect many workers across an organization and enable meaningful analysis of the company's pay practices even where the number of workers at each individual establishment is relatively small. On the other hand, establishment-level analysis will ensure that individual establishments that engage in pay discrimination cannot evade detection if the company as a whole has pay that is closer to equal.

Finally, and most importantly, reporting of compensation data by gender and racial/ethnic groups within each of the ten job categories from the EEO-1 (rather than by an employer's own job titles or job classification system) will facilitate the consistent comparison of pay disparities in each job category among employers in a given industry and geographic area. Specifically, it will help EEOC and OFCCP identify firms with racial or gender pay gaps within each job category that significantly diverge from their industry and regional peers for potential further detailed assessment. That is, it will allow analysis and comparison of wage data for firms employing workers in the same job class, in the same industry, in the same location, in the same year. In addition, it will help EEOC and OFCCP develop a better understanding of which industries have the most significant pay disparities, and to target enforcement resources accordingly. These data will also enable EEOC and OFCCP to better assess the extent to which sex-based compensation discrimination affects women's entry into non-traditional industries, and more generally to better understand the relationship between gender segregation in the workforce and pay discrimination.

The EEO-1 categories are relatively broad, and a single category can comprise multiple jobs in an establishment. Some have objected that as a result the pay gap measured in a particular EEO-1 job category for a particular employer will not necessarily measure disparities in pay for "equal work." This objection ignores the fact that the EEO-1 was never intended to act as an instrument precise enough to establish or prove violations of law without more investigation. Rather, what the EEO-1 has historically done, and what compensation data collection will strengthen its capacity to do, is aggregate millions of data points to establish gender and racial patterns within these job categories, thus allowing identification of firms that sharply depart from these patterns

for further analysis.[15]  For example, the EEO-1 has been used by OFCCP to aid in the selection of federal contractors for enforcement activities, by academics to study the impact of affirmative action on women and people of color, and by the U.S. Government Accountability Office to assess the effectiveness of antidiscrimination programs.[16]  The revised EEO-1 Report will provide EEOC and OFCCP a critical tool for focusing investigatory resources to identify pay discrimination within equivalent jobs, and will also flag deviations from compensation patterns that may be driven by other forms of discrimination that shut women or people of color out of higher-paying roles within a given job category.

### III.  W-2 Pay Is the Best Readily Available Measure of Compensation for Data Collection Purposes.

We support the collection of data that provides a true picture of employees' compensation, which necessarily includes pay that exceeds base salary. Indeed, for Equal Pay Act purposes, relevant compensation

> includes all payments made to [or on behalf of] an employee as remuneration for employment. The term includes all forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance, or some other name. Fringe benefits are deemed to be remuneration for employment. . . . [V]acation and holiday pay, and premium payments for work on Saturdays, Sunday, holidays, regular days of rest or other days or hours in excess or outside of the employee's regular days or hours of work are deemed remuneration for employment and therefore wage payments that must be considered in applying the EPA . . . .[17]

Requiring employers to report total W-2 earnings will provide a comprehensive picture of disparities in worker compensation, in line with EEOC's and OFCCP's enforcement mandates. Moreover, since employers already collect and report W-2 wage data pursuant to federal law, inclusion of this information in the revised EEO-1 Report will impose a minimal additional burden.

### A.  *W-2 Earnings Provide a Comprehensive Picture of Compensation*

The Center agrees with EEOC and the conclusions of the independent Pay Pilot Study (Pilot Study)[18] that of available compensation measures, the W-2 provides the most comprehensive picture of earnings, with a minimal associated burden for employers.  The NAS Study and the subsequent Pilot Study considered both the compensation definitions used by the Bureau of

---

[15] For instance, OFCCP has analyzed EEO-1 data to indicate the probability that a review will find a significant violation of federal requirements, and to target enforcement activities accordingly.  Public Hearing before the U.S. Equal Employment Opportunity Commission, July 18, 2012 (testimony of Dr. Marc Bendick, Jr.), *available at* http://www.eeoc.gov/eeoc/meetings/7-18-12/bendick.cfm.   EEOC itself has published public reports analyzing data from the EEO-1 and highlighting trends in particular industries. *See* U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, SPECIAL REPORTS, *available at* http://www.eeoc.gov/eeoc/statistics/reports/index.cfm.
[16] NAS STUDY at 17-25.
[17] 29 C.F.R. § 1620.10.
[18] SAGE COMPUTING, INC., FINAL REPORT (Sept. 2015), *available at* http://eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf   [PILOT STUDY].

JA143

Labor Statistics' Occupation Employment Statistics (OES) and by the W-2, among others, as a compensation measure for EEOC pay data collection, because these measures are the most widely known to employers and include various forms of compensation data.[19]  The OES compensation definition includes base rate of pay, hazardous duty pay, cost of living allowances, guaranteed pay, incentive pay, tips, commissions and production bonuses.[20]  But it does not account for certain some categories of compensation including overtime pay, severance pay, shift differentials and nonproduction, year-end and holiday bonuses.[21]  Though these categories may only account for a small portion of overall employee compensation, they are particularly relevant in certain industries.  For example, as noted in the Pilot Study, in management and business and financial operations bonuses account for more than 11 percent of cash compensation, and in healthcare shift differentials account for substantial differences in compensation.[22]

The W-2 definition includes all earned income, including supplemental pay components (such as overtime pay, shift differentials, and nonproduction bonuses) and therefore offers a more comprehensive picture of earnings than the OES.[23]  This comprehensive picture is critical because although compensation discrimination may manifest in workers' base salaries, it may also occur through discrimination in other less frequently measured forms of compensation such as bonuses,[24] commissions,[25] stock options, differential pay, and opportunities for overtime.  For instance, even when base salaries between comparable male and female workers are equal in a given company, overall compensation could be significantly disparate between the genders based on the discriminatory, discretionary allocation of compensation types such as bonuses and stock options.[26]  In fact, "female and minority employees have been virtually locked out of wealth-creating opportunities in most companies."[27]  Studies show than men receive stock options and

---

[19] The NAS Study reviewed the wage definitions in the Occupational Employment Statistics survey (OES) and the National Compensation Survey (NCS) and concluded that the OES definition should be considered for use because it was widespread, and because of a substantial overlap in the employers who report data to the OES and EEOC. NAS STUDY at 58.  The Pilot Study also recommends the use of W-2 data because such data provide the most comprehensive measure of compensation readily available to businesses.  PILOT STUDY at 108.

[20] NAS STUDY at 56.

[21] *Id.*; PILOT STUDY at 7.

[22] PILOT STUDY at 7 n.16.

[23] *Id.* at 7, 8.  While reported W-2 wages  include taxable benefits and pre-tax deductions driven by an individual employee's choices - such as mass transit and parking stipends/elections, 401(k) or retirement account contributions, and deferred compensation - these optional elements likely would not constitute a large enough part of compensation for most workers so as to create a disparity for the purposes of enforcement, nor is there reason to believe that men and women, or individuals of different races, would consistently make different choices in this regard and thus create gender or race pay disparities.

[24] *See* King v. Univ. Health Care Sys., 645 F.3d 713 (5th Cir. 2011) (upholding a jury's conclusion that the employer violated the Equal Pay Act when it failed to pay plaintiff anesthesiologist a bonus that it paid her male colleague).

[25] *See* Bence v. Detroit Health Corp., 712 F.2d 1024, 1027 (6th Cir. 1983) (finding a compensation disparity under Equal Pay Act where the employer paid higher commission rate to males than females, even though total remuneration was substantially equal).

[26] *See* MERCER, GENDER EQUITY REPORT (Nov. 2015), *available at* https://www.imercer.com/uploads/Aust/pdfs/Marketing/gender_pay_executive_summary.pdf  (survey of Australian companies finding that women receive lower variable reward/incentive pay despite receiving the same performance ratings as their male counterparts; males who only partially met their objectives received bonuses that were 35 percent larger (as a percentage of employment cost) than their female counterparts).

[27] Mehri, C. & Eardley, E., *21st Century Tools for Advancing Equal Opportunity: Recommendations for the Next Administration* 7, AMERICAN CONSTITUTION SOCIETY (2008), *available at* https://www.acslaw.org/files/Mehri%20FINAL.pdf.

bonuses at a rate twenty to thirty times than of women.[28]  Studies also indicate that compensation for men consists of 85 percent salary and 15 percent stock options, profit sharing, and other bonuses, while compensation for women consists of 91 percent salary and 9 percent stock options, profit sharing, and other bonuses.[29]

For all these reasons, the base rate of pay is not an appropriate alternative measure of compensation for the purposes of the revised EEO-1 Report.  The base rate of pay is an employee's initial rate of compensation, excluding extra compensation such as for overtime, bonuses, or an increase in the rate of pay for a shift differential.  It does not reflect the full measure of an employee's compensation.[30]  While some employers might easily be able to report base rate of pay, if it is the compensation data currently captured by their human resource information management systems (HRIS),[31] it is not a dynamic or complete picture of an employee's compensation and would not serve the purposes of the EEO-1 Report.  Data about base pay alone cannot capture instances where other types of compensation—such as stock options and bonuses—drive gender-based disparities in compensation, and would permit employers that discriminate using other forms of compensation to evade detection.  Conversely, collecting data on W-2 pay will help root out disparities across the spectrum of take-home compensation.  Accordingly, the Center supports collecting W-2 pay data, as the measure of earnings that collects as many forms of compensation as possible.

> B.    *Reporting W-2 Earnings and Hours Will Not Be Unduly Burdensome For Employers*

Requiring covered employers to report W-2 data in addition to the already-required ethnicity, race and gender of employees via the EEO-1 Report will not be unduly burdensome.  First, federal law already requires employers to maintain and generate the information in W-2 forms that will be required for the revised EEO-1.[32]  HRIS experts consulted for the Pilot Study reported that most major payroll software systems are preprogrammed to compile the data for generating W-2 forms.  This led the Pilot Study to conclude that employers using such software to manage payroll and generate W-2 forms could report the proposed data with minimal additional burden.[33]

Second, while it is true that W-2 earnings data usually are generated at the end of the calendar year and the revised EEO-1 will require W-2 data to be reported by October, earnings information for employees is available to employers on a year to date basis, as the Pilot Study noted.[34]  Employers could use payroll reports to generate the necessary data with few additional

---

[28] Alyssa Lebeau, *The New Workplace Woman: "Are We There Yet?,"* BUSINESS WOMAN, Fall 2001.
[29] *Id*.
[30] PILOT STUDY at 8.
[31] *Id*.
[32] 26 C.F.R. § 31.6051-1.
[33] PILOT STUDY at 8, 103.  The majority of employers use automated payroll systems.  Optimal Benefit Strategies, LLC, *Most Small Employers Face Low Cost to Implement Automatic IRAs*, AARP (Aug. 2009) ("97 percent of employers with 10 or more employees use automated systems and do not process payroll manually"), *available at* http://assets.aarp.org/rgcenter/econ/auto_iras.pdf.  The Pilot Study acknowledged that some companies that outsource their payroll may need to make a one-time capital investment to write a software program to import data from payroll programs into the HRIS system.
[34] PILOT STUDY at 8.

complications, especially if they have automated payroll systems, which are preprogrammed to compile data for generating W-2s on a year to date basis.[35]

## IV.  Reporting of Total Hours Worked Will Greatly Enhance the Usefulness of the Pay Data Collected.

EEOC's proposal to collect the total number of hours worked by the employees included in each EEO-1 pay band will allow the calculation and comparison of mean compensation both per person and per hour for each gender and racial/ethnic group within each job category.  As the Pilot Study recognized, collection of total hours worked by each employee in addition to wages is critical to an analysis of pay differences.[36]  Collecting this data will allow OFCCP and EEOC to account for pay differences due to variation in the number of hours worked among employees in a pay band, sharpening pay comparisons both between different groups in an employer's workforce and between different employers.  Collection of total hours worked also will permit an analysis that accounts for periods of unemployment or less than full-time work, including part-time, temporary and seasonal work.  This is especially important since women constitute two-thirds of part-time workers in the U.S,[37] and because part-time workers are often paid less, per hour, than their full-time counterparts.[38]  Additionally, women are almost half of all temporary workers.[39]

Hours worked data is also available to employers.  Employers must keep records of hours worked for all employees not exempt from the Fair Labor Standards Act.[40]  With regard to the collection of total hours worked by exempt employees, EEOC suggests use of an estimate of 40 hours per week for full-time, salaried exempt workers.  The Center supports this approach in those instances where an employer does not collect actual hours worked for exempt employees and does not have a different standard full-time workweek.  The 40-hour workweek is a widely accepted definition[41] and is a reasonable approximation of full-time work, with the understanding that not all full-time salaried exempt employees work precisely 40 hours per week.[42]  The proposal appropriately seeks to minimize the burden on employers by not requiring them to collect additional data where they do not already.

---

[35] *Id.*

[36] *See id.* at 42-43, 59.

[37] NAT'L WOMEN'S LAW CTR., PART-TIME WORKERS ARE PAID LESS, HAVE LESS ACCESS TO BENEFITS—AND TWO-THIRDS ARE WOMEN 1 (2015), *available at* http://nwlc.org/resources/part-time-workers-are-paid-less-have-less-access-benefits%E2%80%94and-two-thirds-are-women/. *See also* U.S. DEP'T OF LABOR, WOMEN'S BUREAU, *Women of Working Age*, Chart 22 (2015), http://www.dol.gov/wb/stats/latest_annual_data.htm (last visited Mar. 8, 2016).

[38] NAT'L WOMEN'S LAW CTR., PART-TIME WORKERS ARE PAID LESS, HAVE LESS ACCESS TO BENEFITS—AND TWO-THIRDS ARE WOMEN 1, 3 (2015), *available at* http://nwlc.org/resources/part-time-workers-are-paid-less-have-less-access-benefits%E2%80%94and-two-thirds-are-women/.

[39] Nicholson, J., *Issue Brief: Temporary Help Workers in the U.S. Labor Market*, U.S. DEP'T OF COMMERCE ECONOMICS AND STATISTICS ADMIN. (July 2015), *available at* http://www.esa.doc.gov/sites/default/files/temporary-help-workers-in-the-us-labor-market.pdf.

[40] 29 C.F.R. § 516.2.

[41] Although the Fair Labor Standards Act's overtime requirements do not apply to the exempt workers at issue here, the overtime rule does establish a useful benchmark of a 40-hour workweek as a standard measure of full-time work. 29 U.S.C. § 207(a).

[42] A 2014 Gallup poll of full-time, salaried workers indicated that of the workers surveyed, 37 percent worked 40 hours a week, and 59 percent worked 41 hours or more per week. The average workweek of the employees surveyed was 47 hours. GALLUP, WORK AND EDUCATION POLL (2014), *available at* http://www.gallup.com/poll/175286/hour-

On the other hand, where an employer does track exempt employees' hours, or requires some standard number of hours per of work per week for an exempt employee other than 40 hours, the employer should report that number. Indeed, the Pilot Study noted that most payroll systems maintain the total hours worked by *each* employee, so reporting such information would impose a minimal burden on employers that use those systems. In other instances, employers may not track exempt employees' hours, but may require a standard number of hours other than 40 for full-time employees (*e.g.*, 37.5 or 45) and will typically require a standard schedule for part-time employees. For example, while employers may not track actual hours worked by some exempt part-time employees, employers typically have some assumptions regarding how many hours a part-time schedule entails when they set salaries for the relevant position. Employers should report that number if they do not track actual hours worked. In the absence of either an alternative standard relied on by the employer or actual data regarding hours worked by exempt employee, employers should rely on the assumption of a full-time 40-hour workweek. This suggestion is also responsive to critiques from employers, who objected to OFCCP's 2014 proposal[43] that contractors use across-the-board estimates of hours worked by exempt employees by reporting 2080 hours annually worked for all full-time, salaried exempt employees, and 1080 hours annually worked for all part-time employees; this alternative approach would permit employers who collect more detailed data or who rely on other definitions of full-time or part-time in their workforce to report more precise calculations.

## V.    The Pay Data Collection Should Be Strengthened Further.

The compensation data collected by the proposed revised EEO-1 Report will fill an important gap in the information currently available to EEOC and OFCCP, enhancing the enforcement of discrimination prohibitions. However, we urge EEOC to strengthen the effectiveness of the pay data collection further in a few key ways:

- The Center urges EEOC to extend the requirement to submit Component 2 of the EEO-1 to federal contractors that have between 50 to 99 employees and are otherwise required to submit the EEO-1.[44] The heightened importance of ensuring that recipients of public funds do not discriminate in pay practices justifies collecting compensation data from these smaller entities, many of whom already maintain the relevant information. For instance, federal supply and service contractors and subcontractors are already required to preserve all "personnel or employment record[s]," including those involving "hiring, assignment, promotion, demotion, transfer, lay off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship," for at least one year.[45] These records for employees must be identifiable by "[t]he gender, race, and

---

workweek-actually-longer-seven-hours.aspx. *See* U.S. DEP'T OF LABOR, BUREAU OF LABOR STATISTICS, THE EMPLOYMENT SITUATION – FEBRUARY 2016, Table B-2 (Mar. 4, 2016), *available at* http://www.bls.gov/news.release/empsit.t18.htm (average weekly hours and overtime of all employees on private nonfarm payrolls in February 2016 was 34.4 hours).
[43] U.S. Department of Labor, Office of Federal Contract Compliance Programs, Government Contractors, Requirement to Report Summary Data on Employee Compensation, Notice of Proposed Rulemaking, 79 Fed. Reg. 46561 (Aug. 8, 2014).
[44] 41 C.F.R. § 60-1.7.
[45] 41 C.F.R. § 60-1.12(a).

ethnicity of each employee."[46]  Supply and service contractors with contracts of $50,000 or more and with 50 or more employees also must keep on file copies of written affirmative action plans.[47]

- The Center urges EEOC to require employers to report their pay data using additional, narrower pay bands.  We support the decision to collect compensation data by counting and reporting the number of employees from each demographic group in each identified pay band, as a means of reporting that minimizes the burden on the employer while still capturing reliable and useful data.[48]  We also agree that in order to be useful, pay data must be collected in a larger number of bands than used by the EEO-4, as the EEO-4 includes all pay of $70,000 or more in a single band, thus rendering invisible any pay disparities experienced by employees earning $70,000 or more annually.  The OES pay bands upon which EEOC proposes to rely are a distinct improvement over the EEO-4 bands, in that the OES pay bands go up to $207,999, with the final pay band including all pay of $208,000 or above.

  However, even the OES pay bands will be unable to provide data on pay disparities for employees earning more than $208,000.  Data show that women up and down the income scale experience pay gaps compared to their male counterparts, including in highly paid roles such as attorneys, executives, and surgeons.[49]  For example, about half of physicians and surgeons make more than $194,500 annually—a profession in which women typically make only 71 cents for every dollar paid to their male counterparts.[50]  About half of lawyers make more than $121,000 annually—a profession in which women typically make only 78 cents for every dollar paid to their male counterparts.[51]  Among equity partners, generally the highest compensated individuals at law firms, the typical female equity partner earns 80 percent of what a typical male equity partner earns.[52]  In the typical state, the average wage and salary of the top 0.5 percent is nearly $360,000 a year.[53]  We therefore urge EEOC to add additional pay bands to collect pay data up to at least $360,000, to ensure that meaningful pay data is captured as to virtually all of the workforce.  We also note that the top OES pay bands cover extremely wide pay ranges of

---

[46] 41 C.F.R. § 60-1.12(c)(1).

[47] 41 C.F.R. § 60-1.40(a).

[48] The Pilot Study recommended collecting aggregate pay information for the occupational categories in pay bands. PILOT STUDY at 9, 10, 108.

[49] U.S. CENSUS BUREAU, 2014 AMERICAN COMMUNITY SURVEY, Table 1 (Full-Time, Year-Round Workers and Median Earnings in the Past 12 Months by Sex and Detailed Occupation: 2014) (2016), *available at* http://www.census.gov/people/io/publications/table_packages.html?eml=gd&utm_medium=email&utm_source=gov delivery.

[50] *Id.*

[51] *Id.*

[52] NAT'L ASS'N OF WOMEN LAWYERS, NINTH ANNUAL SURVEY (2015), *available at* http://www.nawl.org/p/cm/ld/fid=506.

[53] Figures are for all individuals 16 and older. The American Community Survey top codes data for wage and salary income at the 99.5th percentile of each state.  Wages above this level all are coded at the state mean of wage and salary income.  *See* IPUMS USA, INCWAGE Codes, *available at* https://usa.ipums.org/usa-action/variables/INCWAGE_section (last visited Mar. 24, 2016).  In 2014, the median value of the state mean wage and salary income of the top 0.5 percent was $359,000 with a range between $237,000 and $642,000.  Figures include D.C. but exclude Puerto Rico. 2014 ACS and PRCS Minimum and Maximum Codes, *available at* https://usa.ipums.org/usa/volii/2014acs_topcodes.shtml (last visited Mar. 24, 2016).

$34,839 and $44,199. In order to provide more meaningful information regarding pay disparities, reflecting the EEO-1's distinct purpose, we urge that pay data be collected in narrower pay ranges, and recommend for those pay bands whose upper limit is more than $19,329, no single pay band cover a range of more than 20 percent of the lowest pay captured by that band, thus allowing for more granular analyses.

- Whether the EEO-1 ultimately relies on OES pay bands or a modified version of the OES pay bands, it is critical that these bands be regularly adjusted (either by continuing to track the OES or by otherwise adjusting for changes in inflation and the employment distribution) in order to provide the most relevant data reflecting the distribution of pay in the economy.

- In addition to the EEO-1 Report revision, we urge EEOC to move forward in revising the EEO-5 form to collect compensation data from public elementary and secondary school districts and to update the EEO-4 form to collect compensation data from state and local governments using the same pay bands ultimately utilized for the EEO-1. Pay discrimination is not limited to a particular sector of the economy, and neither should compensation data collection be so limited.

## IV.    EEOC and OFCCP Must Ensure That Pay Discrimination Is Not Insulated From Review Because It Is Commonplace Within An Industry.

The success of the collection of pay data in helping end pay discrimination depends on EEOC's and OFCCP's consistent incorporation of the data's predictive information into their ongoing decisions about where to target enforcement. This focus will not only increase the effectiveness of enforcement activities in rooting out discrimination, but also enhance the incentives for employers to engage proactively in self-evaluation of their pay practices and improve their compliance with equal pay standards. We therefore commend and strongly support the proposal to establish industry-level standards for pay disparities, use deviation from these standards to identify potential pay discrimination, and determine which employers to prioritize for investigation. However, given the persistence of gender and racial pay gaps across the economy, being above or close to an industry standard does not demonstrate an absence of pay discrimination exists within an employer's workforce. The Center therefore also urges the agencies to affirm that while deviation from industry standards will be incorporated into decisions about conducting and prioritizing enforcement activities, other important considerations can and will come into play. For example, in some instances, enforcement attention appropriately may be focused on entire industries with sizeable gender pay gaps (rather than just the worst performing employers within those industries). Such attention is critical, as research reveals industry patterns of discrimination. For example, in the retail industry, women and people of color disproportionately fill the lowest paid positions, while white men disproportionately fill the most well-compensated jobs.[54]  Similarly, in the restaurant industry there is evidence of both racial[55] and gender discrimination[56] in hiring and pay.

---

[54] CTR. FOR POPULAR DEMOCRACY, DATA BRIEF: RETAIL JOBS TODAY (Jan. 2016), *available at* http://static1.squarespace.com/static/556496efe4b02c9d26fdf26a/t/56a0f00f3b0be3bde90e9363/1453387792311/RetailJobsToday1.pdf.
[55] RESTAURANT OPPORTUNITIES CENTERS UNITED, THE GREAT SERVICE DIVIDE (Oct. 2014), *available at* http://rocunited.org/wp-content/uploads/2014/10/REPORT_The-Great-Service-Divide1.pdf.

V.     **Making Summaries of Compensation Data Available to the Public Is an Essential Complement to the Compensation Data Collection.**

The Center strongly supports the plan to make aggregate data gathered from the revised EEO-1 Reports available to the public.  Making these data available to the public can promote employer compliance with equal pay standards in a number of important ways.  With these aggregate data in hand, workplace equality advocates can more efficiently direct their own enforcement, outreach and public education activities to industries or regions where pay disparities are most egregious.  Individual employees can find out if they are working in an industry or region where they are more at risk of experiencing pay discrimination, and be prompted to investigate further to ensure that they are being treated fairly.  They also can better understand pay trends with their region and industries, thus empowering them to seek and negotiate fair pay.  And making these aggregate data public will facilitate and incentivize voluntary employer compliance with equal pay protections, by providing benchmarks that employers can use to evaluate their own pay practices and to publicly promote their successes in achieving pay equity.

We further urge EEOC to not only provide average pay disparities by occupational category in given industries and/or regions, but also other relevant information such as the range of pay disparities.  Unequal pay is a ubiquitous phenomenon in many industries and regions, and even the average performers within a group may still have problems with pay discrimination in their workforces.  We therefore should be encouraging employers, in conducting self-evaluations of their pay practices, to strive to be even better than the average among their peers.

VI.    **The Proposed Data Collection Will Not Be Unduly Burdensome for Employers.**

As noted above, federal law already requires private employers and contractors to maintain much of the information that would be required under the revised EEO-1.  Employers must generate W-2 forms for their paid employees[57] and keep records of hours worked for all employees not exempt from the Fair Labor Standards Act.[58]  The relevant universe of employers is already required to submit EEO-1 reports that include information by gender, race/ethnicity, and job grouping categories.[59]

The burden that compiling and reporting this largely pre-existing information pursuant to the proposed rule will impose on employers would be minimal.[60]  Completing the proposed revised EEO-1 would require employer adjustments at the preparation and the collection phases.  Employers would be required to link their computerized payroll system, with the necessary information about compensation and hours worked, with the demographic and occupational information on each employee in the employer's HRIS.  This would require a one-time redesign

---

[56] RESTAURANT OPPORTUNITIES CENTERS UNITED, TIPPED OVER THE EDGE (Feb. 2012), *available at* http://rocunited.org/tipped-over-the-edge-gender-inequity-in-the-restaurant-industry/.
[57] 26 C.F.R. § 31.6051–1.
[58] 29 C.F.R. § 516.2.
[59] 29 C.F.R. § 1602.7 (private employers); 41 C.F.R. § 60-1.7 (federal contractors).  *See also* nn.44-47, *supra*.
[60] The NAS Study estimated that collecting compensation data via the EEO-1 might increase the EEOC's estimated average of 3.5 employer hours annually per EEO-1 form to 6.6 hours.  However, the NAS Study also noted that the EEOC's estimate was based on the time it would take clerks to retrieve and enter data to paper records; because less than 25 percent of reporting employers now rely on paper records, the NAS Study concluded that the burden estimates may be overstated.  NAS Study at 71.

and reprogramming of software to generate the data in the new format.  However, the burden and cost should be minimal, because compensation management systems and software are designed to be updated routinely to accommodate changes in federal, state or local income tax rules, new accounting rules, and employer changes in fringe benefits or compensation practices.[61]  Once the payroll system software and HRIS system have been linked and reprogrammed to perform the required computations, collecting and reporting the new data for the revised EEO-1 would require minimal extra time or effort.

In comparison, great benefits will accrue for employees and employers because of this proposed rule.  As discussed above, these data will be crucial to enhancing the effectiveness of enforcement activities on behalf of employees that are victims of pay discrimination and other forms of discrimination reflected in compensation.  Further, the reporting requirement may actually reduce the ultimate burdens of enforcement on law-abiding employers because it will improve EEOC's and OFCCP's ability to direct their investigatory efforts toward employers most likely engaged in pay discrimination.[62]

-------------------------------

In sum, the National Women's Law Center urges EEOC in the strongest possible terms to adopt the proposed revisions to the EEO-1 Report and to do so swiftly, to ensure this data collection begins in 2017.  We have not seen any significant progress in closing the gender pay gap in this country in nearly a decade.  Women cannot afford to keep waiting for change, nor can the families depending on women's earnings. The powerful enforcement tool proposed by EEOC promises to make a real difference in closing the pay gaps that have shortchanged women for far too long.

Emily Martin
General Counsel and Vice President for Workplace Justice

---

[61] For example, Intuit provides regular updates for subscribers to its Quick Books Payroll service. *See* http://payroll.intuit.com/support/kb/2000204.html; Sage provides similar software updates to its subscribers.  *See* https://support.na.sage.com/selfservice/microsites/msbrowse.do?UMBrowseSelection=SG_SAGE50_U_S_EDITIO N_1.

[62] Also, ensuring equal pay for female and minority workers can be good for businesses in terms of increasing consumer spending power and promoting employee satisfaction, productivity and retention.  *See, e.g.*, *Access to Justice: Ensuring Equal Pay with the Paycheck Fairness Act, Hearing on S. 84 Before the S. Comm. On Health, Education, Labor & Pensions*, 113th Cong. (statement of ReShonda Young, Operations Manager and Corporate Vice President, Alpha Express, Inc. & Founder and Owner, Popcorn Heaven), *available at* http://www.help.senate.gov/imo/media/doc/Young5.pdf; Hartmann,H., Hayes, J. & Clark, J., *How Equal Pay for Working Women would Reduce Poverty and Grow the American Economy* 1, INST. FOR WOMEN'S POLICY RESEARCH (2014), *available at* http://www.iwpr.org/publications/pubs/how-equal-pay-for-working-women-would-reduce-poverty-and-grow-the-american-economy/ (finding that the U.S. economy would have produced additional income of more than $447 billion in 2012 if women received pay equal to their male counterparts); Scott, D., McMullen, T. & Royal, M., *Reward Fairness: Slippery Slope or Manageable Terrain?* 2, WORLDATWORK, (2011), *available at* http://www.worldatwork.org/waw/adimLink?id=53154.

Maya Raghu
Director of Workplace Equality

CHAMBER OF COMMERCE
OF THE
UNITED STATES OF AMERICA
1615 H STREET, N.W.
WASHINGTON, D.C. 20062
202/463-5522

RANDEL K. JOHNSON
SENIOR VICE PRESIDENT
LABOR, IMMIGRATION & EMPLOYEE
BENEFITS

JAMES PLUNKETT
DIRECTOR
LABOR LAW POLICY

April 1, 2016

Bernadette Wilson, Acting
Executive Officer, Executive Secretariat
Equal Employment Opportunity Commission
131 M Street NE.
Washington, DC 20507

> **Re: Equal Employment Opportunity Commission's (EEOC's or Commission's) Proposed Revisions to the Employer Information Report.**

Dear Ms. Wilson:

The U.S. Chamber of Commerce ("Chamber") submits these comments responding to the Equal Employment Opportunity Commission's ("EEOC's" or "Commission's") Proposed Revisions to the Employer Information Report (EEO-1) ("Proposed Revisions"). The Chamber is the world's largest business federation, representing more than three million businesses and organizations of every size, sector, and region, with substantial membership in all 50 states. The Chamber's mission is to advance human progress through an economic, political, and social system based on individual freedom, incentive, initiative, opportunity, and responsibility.

The Chamber is a long-standing supporter of reasonable and necessary steps designed to achieve the goal of equal employment opportunity for all -- including equal pay for equal work and non-discriminatory compensation practices.[1] It was in large part through the efforts of the Chamber and other employer organizations that the 2008 Americans with Disabilities Amendments Act was enacted with bi-partisan support, and with the active involvement of all stakeholders. That is why the Chamber is so concerned with the current attempt to revise the EEO-1 form without prior input from the employer community regarding its real costs and lack of benefit, and in a process so violative of the Paperwork Reduction Act ("PRA").

The Proposed Revisions fail to further the purposes of Title VII and the EPA, and fails to meet the PRA's requirements. The Proposed Revisions are not reasonable, necessary, or appropriate as required by Title VII. The PRA imposes certain mandatory requirements on the

---

[1] The Chamber and its member-employers have always been supportive of non-discrimination laws including the Equal Pay Act ("EPA"), Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), and the Americans with Disabilities Act ("ADA"). The Chamber has held many seminars and meetings in which the requirements of the laws have been explained and which afford members the latest information regarding compliance.

EEOC.  The PRA requires the EEOC to:  minimize the burden on those required to comply with government requests, maximize the utility of the information being required, and ensure information provided is subject to appropriate confidentiality and privacy protections.  The EEOC's Proposed Revisions fail to meet the statutory requirements of the PRA:

- First, the Proposed Revisions do not minimize the employer's burden.  Rather, they impose substantial additional compliance burdens on employers. And the Proposed Revisions improperly suggest that the vast increase in data collection will be accomplished with a significant *decrease* in cost and burden compared to prior years.

- Second, the Proposed Revisions do not maximize the utility of collected data. Rather, they aggregate the compensation of employees performing vastly dissimilar work, leading to both false negatives and false positives for discrimination, and not otherwise yielding any information to permit the EEOC or OFCCP to undertake an investigation.  This wastes valuable time and resources for both employers *and* EEOC.

- Third, the Proposed Revisions fail to propose a mechanism to adequately protect the confidentiality of sensitive employee compensation information.

The burden of the Proposed Revision would be substantial; both in the millions of hours that private employers would be required to spend completing the proposed EEO-1 Report and in the false results that are likely to be generated. For example, based on the 307,103 total reports filed in the most recent year (according to the EEOC), Economist Ronald Bird estimates that the actual national annual cost burden of the *current* format EEO-1 form is $427.3 million, which is about 21 times greater than the $19.8 million annual total that the EEOC estimated in its 2015 information clearance request supporting statement for the current format EEO-1 form (see Exhibit 2, p. 2, Declaration of Ronald Bird) and $421.8 million more than its current estimate of $5.5 million.  This is before factoring in the burden associated with the Proposed Revisions.

The Proposed Revisions, allegedly borne out of a laudable desire to ensure that employees are paid fairly, will not accomplish this goal. Instead, in practice, it would impose enormous burdens and risks on employers who base complex compensation decisions on various factors other than membership in a particular EEO-1 category (factors which the EEOC does not contemplate considering under the Proposed Rule's suggested use of the collected data).

As Economists DuMond and Speakman detail in their attached Declarations, based on actual results generated from tabulations run in mock tests of the Proposed Revisions to the EEO-1 Form, any resulting analyses from the data collected by the Proposed Revisions will be of *no value* in ascertaining whether there are disparities in pay between individuals performing the

2

same or substantially similar work.  See Declaration of Dr. J. Michael DuMond and Dr. Robert Speakman, Exhibits 1 and 4.  According to Dr. Speakman, "…analyses using the EEOC's proposed pay data and suggested tests will result in a high error rate – firms that pay fairly will be investigated too often and firms that underpay women or minorities will often go undetected.  <u>Simply put, the recommended tests and data will lead to many false-positive and false-negative conclusions, negating any utility from this proposal.  In fact, it appears that at best the targeting mechanisms suggested by the EEOC will do only negligibly better than selecting firms at random.</u>"[2]

For all the reasons set forth below and in the attached supporting Declaration of Economist Ronald Bird (Exhibit 2), Declaration of Economist J. Michael DuMond (Exhibit 1), Declaration of Economist Robert Speakman (Exhibit 4) and Declaration of Attorney Annette Tyman (Exhibit 3), as well as the Chamber's prior testimony submitted March 9, 2016 to the EEOC, and the oral testimony and responses provided by Camille Olson on behalf of the Chamber at the EEOC Hearing on the Proposed  Revision on March 16, 2016, the Chamber asks that the EEOC withdraw the Proposed Revisions to revise the EEO-1 Employer Information Report.

## <u>Summary of Comments</u>

On February 1, 2016, without any prior notice to the regulated community, the EEOC published a proposed revision to the EEO-1, Employer Information Report. This data request, to which every employer with 100 or more employees and every government contractor with 50 or more employees must respond annually, has been in existence for 50 years. The authorization for the EEOC to require this report is found in Title VII at 42 USC § 2000e-8(c)(3) where such reports are authorized only if they are " reasonable, necessary, or appropriate…"  However, for the first time, the EEOC is proposing that all employers with more than 100 employees submit data showing the W-2 wages and hours worked of all of their employees grouped by broad job categories and subdivided into 12 arbitrary pay bands, in addition to the demographic makeup of their employment rosters. The magnitude of the proposed revision cannot be overstated.  The existing EEO-1 report requires 140 data points. Pursuant to the changes proposed by the EEOC, covered employers will have to submit forms for each establishment, and each establishment report would consist of 3,660 data points.

Ironically, EEOC advances this brand new and burdensome data request pursuant to, of all laws, the Paperwork Reduction Act.[3]  As previously noted, the PRA requires that any request for data by a government agency meet three basic criteria: (1) the request minimizes the burden

---

[2] Ex. 4, Dr. Robert Speakman Declaration at p. 3.
[3] For underlying authority to require employers to submit the EEO-1 form, EEOC relies on the recordkeeping provisions of  42 U.S.C. § 2000-e8(c) and 29 CFR 1602.7. *See* 81 Fed. Reg. 5113. Nothing in the authorizing statute exempts the EEOC from complying with the PRA.

3

on responders to reply; (2) the request results in data which is meaningful to the government for policy and enforcement purposes; and (3) the data request is designed to ensure that the data is securely and confidentially obtained and retained. The OMB is charged with reviewing the data request to ensure that the requesting agency complies with the PRA and by approving the request the OMB must certify that the agency has met its requirements under the PRA and OMB directives. And of course the EEOC must also assure that the reports it is requiring a significant number of employers to collect and submit to the agency meets the standards set by Title VII.

Although the EEOC notes that it began working on this project at least four years ago, it permitted employers only five weeks to prepare comments for submission at a public hearing in which selected employer representatives were permitted five minutes each to "testify" about the proposal, and only 60 days to submit these written comments. The Chamber nevertheless retained noted labor economists identified above to review the EEOC's Proposed Revisions and two law firms, Seyfarth Shaw LLP and Crowell & Moring LLP, to further analyze the legal compliance of the EEOC with the PRA and the new requirements it is proposing to impose on employers. The conclusions of these reviewing economic experts and law firms is stunning:

***The EEOC has cavalierly refused to comply with its obligations under Title VII and the Paperwork Reduction Act in the following ways:***

*<u>The EEOC has produced an "analysis" of the burden its proposal will impose which is completely lacking in any substance, has no basis in fact, and is contrary to the attached economic analyses of three economists and the results of the Chamber's survey of a significant sampling of its members.</u>*

- The EEOC suggests that a "revised form" with almost 26 times the number of data points to complete will impose *no* additional burden and cost 50% *less* than the previous form which was approved in 2015.

- The EEOC and its consultant admit that there was no testing of the form or the time that would take to complete it, but rather that it used "synthetic data" compiled from fictitious companies to produce an estimate of the time required to complete the new forms. While the EEOC admits it did nothing to quantify the burdens attendant to its new data requests, and certainly did nothing to minimize the burden, the Chamber, in the eight short weeks allotted to responding entities to comment on the EEOC's Proposed Revisions, conducted a survey of 35 of its members, received in excess of twenty replies to its questionnaire and in fact determined that the burdens imposed by the new requirement were excessive, costly and, in some instances, not feasible.

4

- The EEOC, apparently in an effort to show a non-existent burden reduction, arbitrarily eliminated from its analysis the burden of time and effort required to submit data relating to more than 250,000 employer establishments. Under the EEOC's proposal, employers will still be required to submit data for the 250,000 establishments that have been omitted from the Commission's burden analysis. The EEOC simply ignores this fact. The PRA did not intend that its requirement to reduce reporting burdens be addressed by an agency simply ignoring or air-brushing reporting requirements to make its burden numbers look better.[4] This failure alone requires that the agency rescind its proposal and undertake the necessary burden analysis the statute commands and meet the Title VII command that the required report be reasonable, necessary and appropriate.

- The EEOC also attempts to sustain its estimate of burden by referring to proposals by other agencies which have never been completed and which have never been published.

- As shown in the analysis of the Chamber Survey performed by Dr. Bird (Exhibit 2), employers who employ almost 4.5% of the employees who would be included in the revised EEO-1 report will experience a vast increase in the cost of implementing and completing the revised form and will encounter severe operational difficulties in even formulating their HR systems to meet the new obligations.

*The EEOC offers no rationale to support its claim that the mass collection of data will be useful for any law enforcement or policy enhancement.*

- The laws that the EEOC enforces do not permit aggregating dissimilar jobs into artificial groupings for purpose of analyzing pay. There can be no legal or enforcement-related use for this data. Indeed, the EEOC's own compliance manual and its consultant recognize that these broad aggregations of data are essentially useless. Myriad federal courts have reached the same conclusion.

- The EEOC is requiring the combining of completely dissimilar jobs into arbitrary pay bands to determine if there is pay discrimination. For instance, the proposed revised forms will require a reporting hospital to combine lawyers, doctors, nurses and dieticians - all grouped as "professionals" - to somehow determine whether

---

[4]  The PRA does not recognize the concept of *Ipse Dixit*. In *National Tire Dealers & Retreaders Association, Inc. v. Brinegar*, 491 F.2d 31, 40 (D.C. Cir. 1974), Circuit Judge Wilkey considered that the Secretary of Transportation's "statement of the reasons for his conclusion that the requirements are practicable is not so inherently plausible that the court can accept it on the agency's mere ipse dixit."

there are pay disparities based on gender, race or ethnicity.  No law permits comparisons of such diverse workers to prove discrimination or even to provide enough evidence to commence an investigation.

- In order to meet its own bureaucratic timetable, the EEOC will require employers to combine two distinct years of W-2 data to create a fictitious W-2 amount for employees. This combined W-2 amount over a two year period will yield completely useless information. It does not take into account job changes, promotions, annual pay adjustments, different working conditions or locations or the many other factors that go into compensation. And the components of W-2 income are so diverse that there can be no viable analysis of the reported W-2 income to ascertain disparities of treatment.

- The EEOC will also require employers to collect and report the hours worked for all employees. While the EEOC suggests that it will not require collection of new information from employers, it has not addressed the critical fact that employers do not currently collect hours information for exempt employees. The EEOC suggests that employers may use a "default" number of 40 hours for each exempt employee. In the private sector, exempt employees regularly work more than 40 hours; thus, the hours information would be inaccurate and, therefore, of limited use. A legitimate study before this proposal was published would have revealed that fact, but no such study was done.

- The EEOC's Proposed Revisions therefore again fails the Title VII requirement that it be "reasonable, necessary or appropriate" and the PRA requirement that it maximize the practical utility from the information collected.

*The EEOC offers absolutely no discussion of the threats to confidentiality or privacy of the information it is requiring employers to submit.*

- The PRA requires that the requesting agency and the OMB ensure that data collected will be treated with complete confidentiality. The EEOC did not even attempt to take this responsibility seriously. When the Office of Personnel Management (OPM) cannot even protect the personnel data of 21 million federal employees or applicants, the EEOC should at least be cognizant that confidentiality of the pay data of more than 70,000 employers – encompassing millions of employees – deserves significant consideration. It offers none.

- These data, once shared with the Department of Labor, are subject to demand for production under the Freedom of Information Act. The EEOC states that the data will be protected to the extent permitted by law. Of course, employers will have to

6

expend significant resources to assert their right under law to protect this data. And for some of the smaller employers, the identity and the compensation of individual employees will be easily ascertained; the same is true for larger employers with small establishments. The EEOC devotes only two paragraphs to discuss these privacy and confidentiality issues.

<u>In short, the EEOC has sprung upon employers a proposal that would (1) impose significant new, costly administrative burdens; (2) yield data of no utility; and (3) fail to protect confidential information. The EEOC has proposed these revolutionary revisions without meeting any of its obligations under the PRA.  For these reasons, the Chamber submits that EEOC should withdraw this proposed data collection and, if it refuses to do so, the OMB should exercise its authority and refuse to approve the revised form.</u>

## **Comments**

### I.    **PAPERWORK REDUCTION ACT**

As previously noted, the EEO-1 Revision process is being conducted pursuant to the PRA. The PRA, which was reauthorized in 1995, was promulgated in order to bring a degree of coherence and prudence to the Government's rather voracious quest to collect data from responding employers (and other responders). *See Dole v. United Steelworkers of America*, 494 U.S. 26 (1990) (recognizing that the PRA was enacted in response to the federal government's "insatiable appetite for data."). The purposes of the PRA set forth in direct terms what the Act was designed to accomplish:

The purposes of this chapter are to--

(1) minimize the paperwork burdens for individuals, small businesses…Federal contractors…and other persons resulting from the collection of information by or for the Federal Government;

(2) ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the federal Government.

(4) improve the quality and use of Federal information to strengthen decisionmaking, accountability and openness in Government and society;

8) ensure that the creation, collection, maintenance, use, dissemination, and disposition of information by or for the Federal Government is consistent with applicable laws, including laws relating to--(A) privacy and confidentiality, including section 552a of title 5;

7

The PRA established within the Office of Management and Budget ("OMB") the Office of Information and Regulatory Affairs ("OIRA") whose Director is charged with the administration of the PRA. *Livestock Marketing Ass'n v. U.S. Dept. of Agr.*, 132 F. Supp. 2d 817, 830 (D.S.D. 2001) ("Among other things, the Act establishes the Office of Information and Regulatory Affairs within the Office of Management and Budget, with authority to" facilitate and manage the PRA). OIRA has a substantial role in the federal regulatory process. No data collection instrument which is directed to more than nine responders can be issued without first receiving the approval of OMB and OIRA. *CTIA-The Wireless Ass'n v. F.C.C.*, 530 F.3d 984, 987 (2008) ("The need for OMB approval of information collections derives from the Paperwork Reduction Act"); *Gossner Foods, Inc. v. E.P.A.*, 918 F. Supp 359, 361-62 (D. Utah 1996) ("The Act institutes a second layer of review by the OMB for new paperwork requirements.") (quoting *Dole*, 494 U.S. at 32-33). In addition to the actual review of agency data requests, the Director is charged with the responsibility to oversee the use and collection of information. In fulfilling this oversight responsibility, OMB issued Circular A-130 which directs federal agencies to establish mechanisms and procedures to meet the PRA's mandate to reduce the collection burden and insure that the information being collected has significant public utility. The EEOC does not have the discretion to ignore the PRA or Circular A-130. Nevertheless it has done so.

The Director, in turn, is mandated to review data collection requests in accordance with the direction of the PRA to (1) minimize the burden on those individuals and entities most adversely affected and (2) maximize the practical utility of and public benefit from information collected by or for the Federal Government and establish standards for the agencies to estimate the burden of data collection. *See Dole,* 494 U.S. at 32 (explaining that the PRA charges the OMB with responsibility for minimizing the burden on individuals and establishing standards to reduce federal collection of information). *See also Tozzi v. U.S. E.P.A.*, No. Civ. 98 - 0169 (TFH), 1998 WL 1661504, *1 (D.D.C. April 21, 1998). The Director is also charged with developing and promulgating standards to insure the privacy, confidentiality and security of information collected or maintained by agencies. *In re French*, 401. B.R. 295 (E.D. Tenn. 2009) (noting that, amongst other things, the PRA's purpose is to ensure that information is collected consistent with privacy and security laws) (quoting 44 U.S.C. § 3501).

It is under this specific statutory framework that the proposal to revise the EEO-1 form and collection procedures must be reviewed. There is no exemption from the mandates of the PRA and neither the agency head nor the Director of OIRA may exempt data collection efforts from the constraints and mandates of the PRA. Simply put, data collection efforts of the size and scope of the proposed EEO-1 revision must be reviewed independently to insure that the burdens placed upon responders is minimized, the information collected has the maximum utility, and that the security and confidentiality of the information is assured. *See Dole*, 494 U.S. at 32-33 (explaining that all federal agency regulations that require the collection of paperwork must be reviewed by the OMB in accordance with the goals and purpose of the PRA).

8

These are simple precepts and should be reviewed independently. In other words, the burden placed upon responders must be determined only with respect to the efforts necessary to collect and report the data. The obligation to minimize the burden should be reviewed in relevance to the purposes and utility of the data to be collected. The PRA requires each standard to be reviewed on its own terms. Similarly, the benefit to be derived from the data collection requirement is not dependent upon the degree of burden the effort creates, but rather the utility of the data collected. The government is not permitted to require the collection of data with no utility regardless of the extent of the burden imposed to collect the data. Nor is the government permitted to require an excessively burdensome collection effort in the face of a complete lack of utility of the data collected. In short, there is no license for the Government to simply collect data without a clearly articulated purpose and legitimate use. Finally, in conjunction with the type and sensitivity of the data being collected, OIRA and the requesting agency must insure that the requested data be collected and retained in a manner to insure its confidentiality and privacy.

These requirements are neither difficult nor complex. Indeed, they establish a commonsense framework by which the requesting agency in the first instance and Director of OIRA must review requests for authorization to collect data. As will be shown in this submission, the EEOC has not met any of the statutory requirements. Rather, it has proposed a data collection protocol which will place a significant burden upon responding employers and which the EEOC has remarkably understated or ignored. Indeed, the EEOC has ignored its obligation to analyze and minimize the burden its new proposal will create. The EEOC is proposing to collect extensive data heretofore never collected by the federal government without any developed framework to review the data, or use the data for any legally authorized or recognized purpose. In addition, the EEOC has totally ignored the obvious security and confidentiality issues which it is directed to consider.

## II.      THE EEOC'S PRA BURDEN ESTIMATE IS INSUFFICIENT AND UNSUPPORTED

The EEOC should rescind its Proposed Revisions because its PRA burden estimate is wholly deficient in three critical ways: (1) it underestimates the employer burden associated with generating the EEO-1 Report *in its current form* and is inconsistent with prior EEOC estimates of the burden associated with generating the EEO-1 Report; (2) it underestimates the employer burden associated with compiling, analyzing, and reporting the W-2 information the Proposed Revisions would require; and (3) it vastly underestimates the burden associated with compiling, analyzing and reporting the hours information that would be required, particularly as to exempt employees.

9

**A.     The EEOC's Estimate of the Burden Associated with Completing the _Current_ EEO-1 Report is Inconsistent with its Prior Burden Analyses and Otherwise Lacks Factual Support**

1.     The EEOC's PRA Assumptions

The EEOC makes the following claims and assumptions in connection with its estimate of the burden associated with generating the EEO-1 Report in its current form:

- There are 67,146 employers who file EEO-1 Reports ("EEO-1 Filers"), based on 2014 filing figures. [5]

- Each EEO-1 Filer spends just 3.4 hours generating its EEO-1 Reports each year, across all establishments, with 30 minutes dedicated to reading the instructions and 2.9 hours dedicated to generating the data required to be reported and populating the cells in the Form itself. Thus, total hourly burden incurred by employers filing the EEO-1 Report is 228,296.4 hours.

- All work done to complete the EEO-1 Report is performed by "Administrative Support" personnel who are paid, according to the Bureau of Labor Statistics ("BLS") publication "Employer Costs for Employee Compensation," on average, $24.23 per hour.

Based on these assumptions, the EEOC estimates that the total annual cost burden incurred by employers filing the current EEO-1 Report is just over _$5.5 million_. This figure represents the number of EEO-1 Filers (67,146) multiplied by 3.4, then multiplied by $24.23.

2.     The EEOC's Unexplained Decision to Abandon Its Prior "Response-Based" Approach is Fatal to the Agency's PRA Analysis

The EEOC's approach for assessing the actual _current_ burden imposed on EEO-1 Filers is deficient for several reasons.

First, and perhaps most importantly, the "EEO-1 Filer"-based approach adopted by the EEOC in its Comment Request is contrary to the approach the EEOC has used to quantify the burden associated with EEO-1 filings since at least 2009. From at least 2009 through 2015, the EEOC, when estimating the burden associated with filing EEO-1 Reports, based its assessment on the number of _responses_ filed by the employer community, _not_ on the number of EEO-1

---

[5] This figure underestimates by 40% the number of private employers with 100 or more employees. Ex. 2, Ronald Bird Decl., Appendix A, p. 18.

Filers.  *See* Exhibits 5 -8 (EEOC OIRA filings).  The EEOC's approach over at least the last six years appropriately accounted for the fact that many EEO-1 Filers are required to generate multiple "responses" or reports: one for each physical establishment with 50 or more employees and one consolidated report.  As a result, the EEOC burden estimates for the years 2009 through 2015 are significantly higher than the burden estimate identified in the Proposed Revisions.  *See* Exhibits 5 - 8 (EEOC OIRA filings).  For instance, in 2015, the EEOC estimated the annual employer burden associated with the EEO-1 filings as follows:

- 307,103 EEO-1 reports filed, based on actual 2013 filings.

- 3.4 hours per report, which yields 1,044,150 total burden hours.

- Average cost per hour estimated to be $19.00 per hour, based on the hourly rate paid to "Human Resources Assistants" according to the BLS publication "Occupational Employment Statistics, Occupational Employment and Wages, May 2010" – $18.22 – "rounded to $19.00 to account for instances where higher paid staff perform this work."

Based on those assumptions, the EEOC estimated in 2015 – less than one year ago – that EEO-1 Filers would incur costs of *$19.8 million* annually to generate the EEO-1 filings.  That cost figure is *350% higher than the EEOC's new estimate* of what the current burden is *without* any of the proposed changes.[6]

Attempting to explain this *$14.3 million reduction* in the estimated burden, and perhaps anticipating criticism of this change, the EEOC includes only the following statement in its Proposed Revisions:

> The reporting hour burden calculations in this notice reflect a departure from the manner in which EEOC traditionally estimated reporting burden.  In the past, the EEOC estimated the reporting hour burden based on the number of total cells in the report(s) that a firm had to complete.  This approach viewed each report filed by a firm as a separate reporting requirement, *analogous to a paper report*.  In reporting year 2014, however, the number of paper reports declined to just three.  In addition, employers now rely extensively on automated HRIS to generate the information they submit on the EEO-1 report.  As a result, each additional report

---

[6] In 2009, the EEOC used this approach and estimated 599,000 burden hours.  Ex. 5.  That figure rose to 987,394 burden hours in both 2011 and 2014.  Exs. 6 and 7.  Using the $19.00 per hour rate used by the EEOC in 2015, those estimates would have identified annual burdens of $11.3 million in 2009 and $18.8 million in both 2011 and 2014.

11

filed has just a marginal additional cost. To accurately reflect the
manner in which employers now collect and submit the data for
filing, the estimated reporting burden set forth in this notice is
calculated per firm, rather than per report. This burden calculation
is based on the time spent on the tasks involved in filing the
survey, rather than on 'key strokes' or data entry."

81 Fed. Reg. 5120 (February 1, 2016) (emphasis added).

The EEOC's explanation rings hollow, as it is contradicted by its 2015 OIRA filing and is
wholly inconsistent with the experience of EEO-1 Filers. The burden estimate reached by the
EEOC in 2015 expressly noted that "98%" of the 70,070 respondents in 2013 "file [their EEO-1
Reports] on-line." Ex. 8 at Paragraph 3. Thus, the claim that the shift from a *response-based
approach* that takes into account the number of establishments on which reports are filed to an
*EEO-1 Filer-based approach* was prompted by a sudden shift from paper filings to online filings
is not supported by the EEOC's own submissions. <u>The PRA requires that the imposed burden be
accurately computed. It does not countenance fictitious assertions of burden bereft of factual
support or historical experience.</u>

Second, the assumption that "each additional report" for those employers with multiple
establishments "has just a marginal cost" is based on no analysis whatsoever. The EEOC seems
to assume that the electronically fillable PDF format relieves employers of the necessity of
manually entering data when filing their EEO-1 Reports. That assumption is contrary to fact.[7]
Even when using the EEOC's on-line system, EEO-1 Filers must manually enter the data for
each cell and for each establishment.[8] Notably, the EEOC's Proposed Revisions acknowledge
that only 2% of EEO-1 Filers (1,449 of 67,146) submitted their data by uploading a data file in
2014 rather than manually completing the online submission. Thus, the process remains a
manual one for most employers, even if the EEO-1 Report is submitted electronically, and the
actual burden remains unchanged from recent years.[9]

     3.     The EEOC's PRA Analysis of the Current
                Reporting Burden is Fundamentally Flawed in
                <u>Other Respects</u>

There are two other glaring flaws to the EEOC's PRA analysis. First, the EEOC nowhere
explains its estimate that EEO-1 Filers spend a total of just 2.9 hours collecting, verifying,

---

[7] Ex. 3, Annette Tyman, Decl., generally describing the EEO-1 submission process.
[8] Ex. 3, Annette Tyman Decl. ¶7.a.
[9] The EEOC's suggestion that uploading a data file means that "the information goes nearly directly from an
electronic file generated by the HRIS to the survey data base" is a gross misunderstanding of the process required
for gathering and validating data for submission to the EEO-1 survey. Ex. 3, Annette Tyman Decl. ¶11.

validating, and reporting" their current EEO-1 data.  As part of its burden under the PRA, the EEOC should identify its current basis for this estimate. [10]

Second, the EEOC bases its cost estimate on an improper assumption that EEO-1 data and the ultimate reports are developed by "Administrative Support" personnel alone, at a cost of $24.23 per hour, without any internal or external assistance, and without any consideration of overhead costs associated with those personnel.  The EEOC's assumption is flatly contradicted by employer experience.  In fact, personnel ranging from HRIS and information technology personnel to senior human resources officials and legal professionals often assist in the development of the data, the compilation of the EEO-1 Report, review of the Report, and the submission of the Report.  Because the EEO-1 Report requires certification by a company official, subject to penalties for false reporting, the EEOC's assumption that the entire EEO-1 filing process is left to clerical personnel is simply false.  Because the EEOC has not included the wage rates of senior human resources, HRIS and information technology personnel, or legal professionals in the development, compilation, review, certification, and submission of the report, the assumption that the wage rate of an Administrative Support personnel alone, is flawed.  The EEOC's additional failure to consider overhead costs only undermines further its PRA analysis.

      4.      The Chamber's Survey of Member Companies
                   Contradicts the EEOC's Estimate of the Burden
                   Associated with the Current EEO-1 Report

The Chamber developed[11] and issued a survey instrument ("Survey") to 35 of its members during the 60-day comment period.  Ex. 2 (Appendix B to Bird Declaration).  While the cribbed comment period and the Commission's rejection of the Chamber's request for an extension of time to file comments impacted the Chamber's ability to gather as much survey data as it would have liked, a total of 22 companies responded to the Survey by March 25, 2016.  Information gleaned from those 22 respondents is set forth below.[12]

Responses were received from employers with as few as approximately 400 employees, 90% of whom are housed in a single establishment, and from an employer with more than 200,000 employees housed in more than 2,000 EEO-1 reportable establishments.  Ex. 2, p. 2.  Respondents to the Survey filed a total of 12,982 EEO-1 reports in 2015, comprising

---

[10]  Ex. 2, Ronald Bird Decl. p. 4.
[11]  Nine experienced Human Resources professionals participated in the development of the Survey.  Ex. 2, p. 2 (Bird Declaration).
[12]  Since March 25, 2016, the Chamber has received additional responses from the original group of 35 member employers and we anticipate all 35 recipients will respond in the coming weeks.  The Chamber is also distributing the Survey to additional employers and anticipates having a larger sample of results in time for comments to OIRA.

approximately 4.2% of the total number of reports filed annually, according to the EEOC's most recent tabulation. *Id.*

The Survey responses reveal the following deficiencies in the EEOC's estimate of the burden associated with filing the current EEO-1 Reports:

- The total costs of compiling and submitting EEO-1 data was significantly dependent upon the number of establishments covered by the report and by the number of reports filed. This finding undermines the EEOC's decision to abandon the "Response-Based" approach and invalidates the "EEO-1 Filer-Based Approach."

- The internal resource time reported to complete an EEO-1 Report for a single establishment ranged from 2.6 hours per report to 42.5 hours per report, and the average *was 8.1 hours per report*, or 2.4 times greater than the EEOC's estimate.

- Multiplying the 8.1 hours per report by the EEOC's most recent tabulation of 307,103 reports filed by 67,146 distinct companies yields a total burden of *2,479,156* hours, or 36.9 hours per employer, to complete the EEO-1 form in its current form. This figure is more than ten times greater than the 3.4 hours the EEOC identifies as the baseline estimate for its current proposal.

- Of the 22 respondents, 20 provided their estimate of the hourly rate paid to the internal employees who would gather the information, prepare and submit the EEO-1 Reports. The average hourly rate reported from these 20 respondents was *$45.00*.

- The Chamber's expert, Dr. Bird, identified a multiplier of 3.25 for the overhead cost of internal labor used, a figure that was drawn from an examination of the fully loaded labor cost reimbursement rates paid by government agencies for administrative, professional, technical and managerial services under the GSA government-wide services contracts. Applying this overhead plus profit factor to the $45 per hour average hourly rate yields an opportunity cost value of $146 per hour. Applying this fully loaded labor cost to the average hours required per report (8.1) yields a cost per report for internal labor of *$1,175*.

- Respondents were also asked to address the extent to which they retained outside consultants and service providers to complete their EEO-1 filings. Fourteen of the 22 respondents reported they did not use such consultants or

14

service providers. Across all 22 respondents (including $0 for the 14 who reported that all work is done internally), the average external cost was *$8,307 per respondent and $215 per report.*

- Adding the per report cost for internal labor ($1,175) to the per report cost for outside services ($215) yields a total current annual cost for completing each report of $1,391. Based on the 307,103 total reports filed in the most recent year, the total annual cost burden of the EEO-1 Report, in its current format, is *$427.3 million*, a figure that is $421.8 million higher than the EEOC's estimate.

Exh. 2, pp.3-5 (Bird Declaration).

As these figures demonstrate, the EEOC's estimate that EEO-1 Filers will incur costs of just $5.5 million in 2016 to complete the EEO-1 Report as currently configured – representing a 350% reduction in the EEOC's *own* estimated total costs of $19.8 million incurred in 2015 – is absurd. The actual burden, based on the Chamber's Survey, is more than $425 million. Because the EEOC's erroneous estimate impacts the Agency's estimate of the anticipated costs of completing the proposed revised EEO-1 Report in 2017 and 2018, the EEOC's entire burden estimate associated with the Proposed Revisions is inaccurate, misleading, and inadequate under the PRA.

### B. The EEOC's Analysis of the Burden Associated with Completing the Proposed Revised EEO-1 Report Lacks Factual Support

#### 1. The EEOC's PRA Analysis

The EEOC's Comment Request includes the PRA-required estimate of both the one-time burden of complying with the proposed revisions and the annual burden of complying with those revisions. As for the "One-Time Implementation Burden," the EEOC's analysis consists of three sentences, one of which is contained in a footnote. The EEOC estimates a one-time burden of *$23,000,295*, which is based on the following assumptions:

- Eight (8) hours of time "per filer" to "develop[ ] queries . . . in an existing human resources information system."

- An hourly wage rate of $47.22, which is the average compensation for a Professional as identified in the BLS publication "Employer Costs for Employee Compensation," issued in 2013.

15

The EEOC's total estimate for the one-time burden is calculated by multiplying the number of EEO-1 Filers that would be required to submit W-2 and hours information (60,886) by eight hours, and multiplying that total by $47.22.

As for the recurring, annual burden employers will incur completing the proposed revised EEO-1 Report, the EEOC restates its current burden analysis for the estimated 6,260 EEO-1 Filers that have 50-99 employees. For that group of employers, the EEOC maintains its estimate that each filer will spend just 3.4 hours completing and submitting its EEO-1 Report, that those 3.4 hours will be spent by Administrative Support personnel at a cost of $24.23 per hour, and that the total cost burden to the 6,260 EEO-1 Filers who need not submit W-2 wage and hours data will be $515,711. That estimate is flawed, for the reasons identified above.

For employers with 100 or more employees, the EEOC estimates that each EEO-1 Filer will spend 30 additional minutes reviewing the instructions and *just 2.7 additional hours per year* "collecting, verifying, validating, and reporting" the W-2 wage data and the hours data for its employees. The EEOC continues to assume that all of these tasks will be performed by Administrative Support personnel, again at a cost of $24.23 per hour. In total, the EEOC's annual burden estimate for employers with 100 or more employees is as follows:

- 6.6 hours per EEO-1 Filer to collect, verify, validate, and report both the representational data currently reported and the W-2 wage data and hours data that would be required beginning in 2017.

- An hourly rate of $24.23.

Based on these assumptions, the EEOC estimates that the total annual cost burden on EEO-1 Filers with 100 or more employees will be $9,736,767, which is the number of such filers (60,886) multiplied by 6.6, then multiplied by $24.23. When coupled with the estimated cost burden for EEO-1 Filers with 50-99 employees, the total annual estimated cost identified by the EEOC for all EEO-1 Filers in 2017 is *$10,252,478*.

## 2. The EEOC's PRA Analysis Lacks Credibility

The EEOC's estimates of the burdens – one-time and recurring – associated with the proposed revised EEO-1 Reports are wholly unrealistic. As detailed below, absent from the EEOC's analysis of the burden associated with the Proposed Revisions is any explanation of the basis for its estimate of the hours that would be incurred by EEO-1 Filers. [13] As an initial matter, while the EEOC claims it reviewed "the public comments relating to the burden calculation for OFCCP's proposal to collect pay data and consulted with OFCCP about burden estimates," the

---

[13] Ex. 2, Ronald Bird Decl. pp. 5-6.

EEOC fails to state how it reconciled the information supplied to the OFCCP with the EEOC's current estimates. More importantly, the EEOC failed to identify any other basis for its hours estimates, noting that its Pilot Study sought data from private employers "about the possible cost of collecting pay information but few employers responded, and the employers that did respond did not provide quantitative feedback." 81 Fed. Reg. 5120. Without more, one can only conclude that the EEOC's estimate of the hours employers will spend "collecting, verifying, validating, and reporting" W-2 wage data was "pulled out of thin air."

To make matters worse, the EEOC provides no explanation for its estimate of the hours burden associated with supplying hours-worked data. The EEOC does not even address this issue in its Proposed Revisions, stating simply that it is seeking input from employers as to "the anticipated estimated burden to also submit . . . hours-worked data." As detailed below, this omission should sound the death knell for the EEOC's Proposed Revisions, given that the collection of hours-worked data for exempt employees who do not currently capture their hours worked would be staggering.

> a. *The EEOC's Estimate of the* <u>One-Time</u> *Burden Bears No Relationship to Reality*

The EEOC's estimate of the one-time burden associated with the Proposed Revisions cannot withstand scrutiny. First, its assumption that employers will be able to generate W-2 and hours data after an HRIS professional spends just eight hours "developing queries . . . in an existing human resources information system" underscores how distant the EEOC's experience with employer HRIS systems is from reality.

The EEOC's underlying assumption – that a single HRIS houses all the data necessary to generate the W-2 and hours data – is plainly false. Most employers maintain gender, race, and ethnicity data in an HRIS that is different from the system that houses payroll information, including W-2 wage information. Hours data for non-exempt employees are likewise captured outside of the HRIS and hours data for exempt employees simply do not exist for most employers. In practice, once each reporting employer gathers the necessary earnings information, that data must be merged with each employee's EEO-1 occupational classification, gender, and race/ethnicity to complete the information needed for the proposed report. The number of employees in each unique combination of EEO-1 classification, gender, race/ethnicity, and membership in one of the twelve pay bands then would have to be computed and separately reported for each of the employer's establishments. Therefore, determining how to marry gender, race, and ethnicity data housed in an HRIS with W-2 wage data housed in a payroll system, often by a third party, in and of itself, will take more than eight hours.

17

Second, the EEOC's estimate is off-base because it ignores the fact that the W-2 data to be submitted is different from the W-2 data generated annually by employers for income tax reporting purposes. Because the 12-month reporting period proposed by the EEOC crosses tax years, employers cannot simply rely on the data they generate for the IRS each year. Instead, employers will be required to generate data spanning two different tax reporting years and will be required to make one-time changes to their systems in 2016 to permit such reporting.

Third, the EEOC's estimate of the one-time burden is inaccurate because the hourly rate on which it is based – $47.22 for a "Professional" – fails to account for the fact that senior information technology personnel, legal personnel, and others will be involved in any effort to develop the processes necessary to generate the required data. The identified hourly rate is not commensurate with the rates of pay provided to such individuals. [14]

Fourth, as detailed in Section II.B.3, below, the EEOC estimate fails to account for the one-time burden associated with requiring employers to develop, for the first time, a system that captures the hours worked by exempt employees and to train all exempt employees on any new system.[15] Those costs would be massive, and should be quantified by the EEOC before the Proposed Revisions are considered.

> b.     The EEOC's Estimate of the Annual
>        Burden of Compliance with the
>        Proposed Revisions is Likewise
>        Unrealistic

The Commission's prediction that the Proposed Revisions will require only 3.2 hours of additional work per EEO-1 Filer – 30 additional minutes to read the instructions and just 2.7 hours to "collect, verify, validate, and report" all of the required W-2 and hours data for every establishment – is ludicrous.

First, the EEOC dramatically underestimates the time it will take each EEO-1 Filer to collect, verify, validate and report on data that must be pulled from various systems and sources. As noted above, often the required data is not housed in a single HRIS and cannot be generated with the push of a button. Once generated, a combination of HRIS professionals and HR professionals will have to expend time verifying and validating the data. Legal professionals will likewise be involved in the verification process, given that the EEOC's stated purpose for the collection is to target its, and the OFCCP's, enforcement efforts, and given the requirement that a company official certify the filing, subject to penalties.

---

[14] Ex. 2, Ronald Bird Decl. pp.17-18.
[15] As noted in Section III.C.2, any approach that assumes each exempt employee works 40 hours per week is not realistic and would only further undermine the efficacy of the data collected.

Second, the EEOC bases its burden estimate for the generation and reporting of W-2 data and hours data on the wage rate of $24.23, which is – again – the BLS wage for Administrative Support personnel.  As detailed above, employees other than Administrative Support personnel would be engaged in the effort to collect, verify, validate, and report the W-2 and hours data – legal professionals and others are, and will continue to be, involved in the EEO-1 filing process.[16]

Third, the EEOC's annual burden estimate for filing the Revised Reports is improperly based on the number of EEO-1 Filers, rather than the number of EEO-1 Reports filed.  The "per EEO-1 Filer" approach is inappropriate, for the reasons identified above, and the approach the EEOC used between 2009 and 2015 – in which the burden estimate takes into account the fact that many EEO-1 Filers must file reports on all of their establishments individually – remains the appropriate approach.  If the per response approach were applied here, the EEOC's total cost estimate would jump from *$10,252,478 to $49,111,297*, and that calculation assumes that the EEOC's hours estimates of 6.6 hours and cost estimate of $24.23 per hour are correct, which they clearly are not.

Fourth, the EEOC's assumption that filing on-line, through fillable PDFs, alleviates the burden of manual data entry is a false assumption.  As detailed above, fillable PDFs still require the employer to manually enter the relevant data.  With the addition of W-2 data and hours data, reported in twelve different pay bands within each EEO-1 category, each EEO-1 Filer will now be required to populate as many as 3,360 separate cells of data.  The EEOC's burden estimate fails to account for this reality in any way.

Fifth, the EEOC does not account, in any way, for the costs employers will incur responding to investigations and enforcement actions that are prompted by "false positives" that flow from comparing employees within broad EEO-1 categories.[17]  Because the EEOC and OFCCP intend to use the results of analyses of W-2 wages by EEO-1 categories to target their enforcement efforts and because those analyses will be fundamentally flawed, the substantial cost to employers who must respond to such investigations is not theoretical.  Employers will be forced to expend resources producing additional data to the EEOC and/or OFCCP, retaining labor economists to run their own analyses of pay, and engaging legal counsel to correct the Agencies' presumption of discrimination.

---

[16] Ex. 2, Ronald Bird Decl. pp. 17-18.
[17] *See* Section III (describing lack of efficacy of any analysis that compares employee pay within broad EEO-1 categories); Ex. 1, Declaration of Dr. Michael DuMond (same).

19

c.    *The EEOC Ignores the Substantial*
      *Burden Associated with Collecting*
      *Hours Data for Exempt Employees*

The EEOC proposes to collect "the total number of hours worked by employees" included in each of 12 pay bands within each EEO-1 category, to "allow analysis of pay differences while considering aggregate variations in hours." With respect to exempt personnel, the Commission "seeks employer input with respect to how to report hours worked for salaried employees" and states that "[o]ne approach would be for employers to use an estimate of 40 hours per week for full-time salaried workers." The Commission further states that it is "not proposing to require an employer to begin collecting additional data on actual hours worked for salaried workers," and the EEOC's "initial conclusion is that requiring employers to provide the total number of hours worked would impose a minimal burden."

As detailed in Section III.C.2, below, assuming that all full-time exempt employees work 40 hours per week is neither an accurate nor a fair assumption. Thus, to the extent the EEOC intends to consider "aggregate variations in hours," the only way for the EEOC to accurately capture hours for exempt employees would be to require employers to track hours of exempt employees. That option would be incredibly burdensome.

First, employers would be required to implement a time system to track all hours worked by exempt employees. Because there is no continuous workflow for exempt employees, and because they often work outside of normal business hours, any such system would be much more complex than the standard time-clock, punch-clock, or timesheet system currently used by employers for their non-exempt employees. The cost of developing such a system would be immense.

Second, the hours burden associated with exempt employees recording time would be substantial. Unlike non-exempt employees who may use a punch clock system or work regular hours, each exempt employee would be required to capture the "starts" and "stops" of his or her work. Even if that effort required just 15 minutes of time each day for each exempt employee, the result would be significant new burden for employers.

Finally, the EEOC has failed to abide by its obligation under the PRA, which is to propose a methodology for, and also assess the burden of, collecting hours for exempt employees. Because the EEOC has failed to do so, commenters – including the Chamber – are unable to examine the utility and burden of producing the hours report for exempt employees.

JA172

3.      The EEOC's One-Time and Recurring Burden Estimates
        Relating to the Collection and Submission of W-2 and
        Hours Data is Wholly Contradicted by the Chamber's
        Survey

The Survey conducted by the Chamber sheds further light on the fundamental shortcomings of the EEOC's burden analysis under the PRA, both as to the one-time costs associated with collecting and reporting aggregate W-2 and hours data and as to the recurring costs associated with such efforts.

The Survey reveals the following with regard to the <u>one-time costs</u> that will be incurred by the 60,886 employers (estimated by the EEOC) who will be required to furnish aggregate W-2 and hours data:

- Ninety-five percent (21 of 22) of the respondents stated that they expected to incur one-time cost burdens associated with the proposed W-2 and hours reporting requirement.

- One respondent estimated its one-time cost of complying with the W-2 earnings requirement would range from $1,000 to $5,000. The remaining  respondents estimated those costs to range from $50,799 to $58,254, which equates to $253 to $406 per report filed by each respondent.

- Estimates of the one-time costs associated with complying with the hours reporting requirement (including developing an hours tracking system) ranged from $37,535 to $57,563 per employer respondent, which equates to $174 to $242 per report filed by each respondent.

- Adding together the one-time costs associated with both new reporting requirements yields a total that ranges from $88,334 to $115,817 per respondent, or $427 to $648 per report.

- Applying the per report one-time cost ranges ($427 to $648) to the 307,103 reports that were filed most recently yields a lower bound

21

for the one-time cost estimate that ranges from *$118.9 million to $180.4 million*.[18]

Exh. 2, p. 5-6 (Bird Declaration).

The Survey reveals the following with regard to the <u>recurring costs</u> that will be incurred by the 60,886 employers who will be required to furnish aggregate W-2 data[19]:

- Seventy-three percent (16 of 22) of the respondents stated that they expected to incur additional, ongoing, annual costs to implement the proposed expanded data collection.

- In response to the Survey request that respondents characterize their expectations for the ongoing, recurring costs of generating and submitting the W-2 wage data as a multiple of the current hours required and current outside services costs required, the average multiple reported was *1.9*.

- Mutliplying the average cost per report for the current EEO-1 Report (*see* Section II.A.4, above) by 1.9 yields cost per report that ranges from $2,488 to $2,619. Multiplying those figures by the 307,000 annual reports filed yields a recurring annual total cost for the proposed expanded EEO-1 report that ranges from *$692.9 million to $729.4 milion.*

Exh. 2, p. 6-8 (Bird Declaration). As noted in footnote 18, this recurring cost figure of $692.9 million to $729.4 million does <u>not</u> including the recurring costs employers will incur tabulating hours worked by their employees. As a result, even these extraordinary cost figures are simply the lower bound of the costs to be expected.

---

[18] The Chamber will continue to assess this figure as additional Survey responses are received. The upper bound, which one could calculate using the high end of the cost per company range ($115,817) and the total number of filers (60,886), is as high as $7 billion. Exh. 2, p. 5 (Bird Declaration).

[19] The EEOC should note that respondents were unable to provide an estimate of the recurring costs associated with tabulating hours worked data, as would be required under the EEOC's proposal.

**III.    THE PROPOSAL WILL NOT PROVIDE A PUBLIC BENEFIT OR
MAXIMIZE THE UTILITY OF THE REQUESTED DATA AS
REQUIRED BY THE PAPERWORK REDUCTION ACT.**

Despite the significant burden that employers with more than 100 employees will face as a result of the requirements in the Proposed Revisions, the EEOC has failed to articulate any rationale or evidence whatsoever to justify the need for the proposed EEO-1 Revisions. Nor has the agency identified the specific benefit that the collection of aggregated wage and hours data would provide to the Commission. The EEOC's wholesale failure to articulate the proposed benefit is significant given that one of the purposes of the PRA is to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the federal Government."

The Sage Report, which the EEOC used to "formulat[e] the proposal and guide the development of analytical techniques to make full use of the data to be collected," recognized the inherent limited use of the requested data. Specifically, the Sage Report recognized that "[s]**ummary data at the organization level will likely be of very limited use in EEOC practice**."[20]  The reasons for this observation are numerous, as articulated below.

To evaluate the utility of the proposed EEO-1 Revision, one must consider the legal framework that governs compensation discrimination. Since 1963, the EPA has required employers to pay men and women at the same establishment equal pay for equal work. In addition to the protections against wage discrimination based on sex afforded by the EPA, Title VII prohibits pay discrimination on the basis of race, color, national origin as well as other protected factors.[21]  Employees who work for Federal contractors and subcontractors share

---

[20] " Sage Computing Final Report: To Conduct a Pilot Study for How Compensation Earning Data Could Be Collected from Employers on EEO's Survey Collection Systems (EEO-1, EEO-4, EEO-5 Survey Reports) and Develop Burden Cost Estimates for Both EEOC and Respondents for Each of EEOC Surveys (EEO-1, EEO-4, and EEO-5), p. 57 (Sept. 2015).

[21] Against this backdrop, it is important to note that Congress and courts have explicitly rejected the notion of pay equity based on "comparable worth" theories under which employers would be required to set wages to reflect differences in the "worth" of different jobs. (In the 1960s, the Kennedy Administration proposed a ban on sex discrimination in wages "for work of comparable character on jobs the performance of which requires comparable skills," with the assumption that job evaluation systems were available to evaluate the comparative worth of different jobs. Equal Pay Act of 1963: Hearings Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 88th Cong., 1st Sess. 2 (1963) (quoting S. 882, 88th Cong., 1st Sess., 109 CONG. REC. 2770 (1963) and S. 910. 88th Cong., 1st Sess., 109 CONG. REC. 2886 (1963)). Congress resisted the proposal for the simple reason that it did not want the government or judges to invade the workplace and tell employers what to pay their employees.)  Under federal law, the value of the relative worth of one job as compared to another job is a matter to be decided within the province of the employer offering the employment opportunities to workers. For instance, the Sixth Circuit rejected the comparable worth theory stating, "Title VII is not a substitute for the free market, which historically determines labor rates." *Int'l Union v. Michigan*, 886 F.2d 766, 769 (6th Cir. 1989). Likewise, the Ninth Circuit rejected the theory on the grounds that it found "nothing in the language of Title VII or

23

similar protections under Executive Order 11246. Since 1978, the EEOC is the administrative agency with enforcement authority of the EPA and Title VII, while the OFCCP enforces EO 11246.

Notwithstanding these protections, both the EPA and Title VII recognize that there are legitimate reasons for differences in compensation. In this regard, the EEOC has recognized that differences in education, experience, training, shift differentials, job classification systems, temporary assignments, "red circling," revenue production, and market factors, to name a few, can legitimately explain compensation differences.[22] Thus, mere differences in pay even as between comparable employees are insufficient to infer unlawful discrimination.

### A. The EEOC's Proposed Tool Will Not Advance Investigations Under the EPA

As noted above, the EPA prohibits sex-based compensation discrimination for employees working at the same establishment if they perform "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."[23] In other words, the relevant comparators are only those employees who perform "equal work" in the "same establishment." The EEOC itself describes the *prima facie* elements of an EPA claim as follows:

- Prima Facie Case: (1) the complainant receives a lower wage than paid to an employee of the opposite sex in the same establishment; and (2) the employees perform substantially equal work (in terms of skill, effort, and responsibilities) under similar working conditions.[24]

Despite the requirement that pay comparisons can only be made between employees who perform "equal work," the proposed EEO-1 Revision would require that employers provide W-2 wage data by EEO-1 job category. Because there are only ten EEO-1 job categories or groupings of jobs,[25] employers would be forced to categorize employees who perform wildly different work into these groupings. The job groupings are exceedingly broad, and will necessarily capture a wide range of positions that are not capable of meaningful compensation comparisons.

---

its legislative history to indicate Congress intended to abrogate fundamental economic principles such the laws of supply and demand or to prevent employers from competing in the labor market." *AFSCME v. Washington*, 770 F.2d 1401, 1407 (9th Cir. 1985).
[22] EEOC Compl. Man. Ch. 10.
[23] 29 U.S.C. § 206(d).
[24] EEOC Comp. Man. Ch. 10, at p. 20, available at www.eeoc.gov/policy/docs/compensation.html
[25] The ten EEO-1 Job groups include: Executive/Senior Level Officials and Managers; First/Mid-Level Officials and Managers; Professionals; Technicians; Sales Workers; Administrative Support Workers; Craft Workers; Operatives; Laborers and Helpers; and Service Workers.

For instance, as Economist Dr. J. Michael DuMond observed, one of the most serious deficiencies with the proposed EEO-1 Revisions are the "very broad occupational group[ings]" that would "result in comparisons of employees who work in very different jobs and who may perform different work."  Dr. DuMond uses the following example:

> [O]ne of the 10 EEO-1 job categories is "Professionals", which encompasses a wide range of occupations such as lawyers and registered nurses. Hospitals that employ both nurses and lawyers would nevertheless be required to include both of these occupations together in the proposed EEO-1 survey. This grouping of nurses with lawyers ignores the fact that a nursing degree does not require a post-graduate college degree whereas a lawyer will almost surely have post-graduate education. Moreover, the knowledge, skills and abilities required of a nurse differ greatly from those factors that required of a lawyer. In fact, there is actually very little in common between nurses and lawyers beyond the sharing of a common EEO-1 category. While it is undeniable that nurses and lawyers are tied to very different labor markets, the EEOC's proposal ignores this reality and assumes pay should be similar for these types of occupations simply because they are both "Professionals."[26]

Dr. DuMond is not alone in his concerns; Economist Dr. Speakman expressed similar apprehensions, stating "it is my experience [employers] don't use the EEO-1 job classification for any type of review or planning or comparison purposes, much less for compensation-related determinations, outside the scope of providing data to the government. It's an artificial and meaningless conglomeration of dissimilar workers used only for EEO-1 reports. . . It's unclear why anyone or any agency would consider it an appropriate grouping for a meaningful analysis of employees' pay."[27]

The EEOC's instruction booklet outlines other "Professional" positions that similarly cannot form a proper comparison for compensation purposes under the EPA. For instance, using the Professionals job category for positions typically found within a hospital, we would also find accountants, computer programmers, dieticians, physicians and surgeons.[28]  But these jobs are simply not comparable under the EPA.

---

[26] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 9.
[27] Ex. 4, Dr. Robert Speakman Declaration at p. 11.
[28] *See* EEO-1 instruction booklet, available at http://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm. Notably, the examples provided omit the myriad other jobs that would also fall within the Professionals EEO-1 job group.

The EEOC itself must recognize the inappropriateness of such groupings under the EPA. Indeed, in investigating and analyzing the "equal work" requirement, the EEOC advises as follows:

> [A]n inquiry should first be made as to whether the jobs have the same common core of tasks, i.e., whether a significant portion of the tasks performed is the same. *If the common core of tasks is not substantially the same, no further examination is needed and no cause can be found on the EPA violation.*[29]

Common sense tells us that accountants, computer programmers, dieticians, registered nurses, lawyers, physicians and surgeons do not share the same common core of tasks. But to be more specific, the Department of Labor, Bureau of Labor Statistics makes those distinctions clear in the descriptions it assigns to these workers: [30]

> Accountants & Auditors: Examine, analyze, and interpret accounting records to prepare financial statements, give advice, or audit and evaluate statements prepared by others. Install or advise on systems of recording costs or other financial and budgetary data.

> Computer Programmers: Create, modify, and test the code, forms, and script that allow computer applications to run. Work from specifications drawn up by software developers or other individuals. May assist software developers by analyzing user needs and designing software solutions. May develop and write computer programs to store, locate, and retrieve specific documents, data, and information.

[29] EEOC Comp. Man. Ch. 10, at p. 22, available at www.eeoc.gov/policy/docs/compensation.html, (emphasis added) citing *Stanley v. University of S. Cal.*, 178 F.3d 1069, 1074 (9th Cir.) (EPA requires two-step analysis: first, the jobs must have a common core of tasks; second, court must determine whether any additional tasks incumbent on one of the jobs make the two jobs substantially different), cert. denied, 120 S. Ct. 533 (1999); *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998) (critical issue in determining whether two jobs are equal under the EPA is whether the two jobs involve a "common core of tasks" or whether "a significant portion of the two jobs is identical"); *Brewster v. Barnes*, 788 F.2d 985, 991 (4th Cir. 1986) (same).
[30] Standard Occupational Classification system overview, March 5, 2016, http://www.bls.gov/soc/home.htm, "The 2010 Standard Occupational Classification (SOC) system is used by Federal statistical agencies to classify workers into occupational categories for the purpose of collecting, calculating, or disseminating data. All workers are classified into one of 840 detailed occupations according to their occupational definition. To facilitate classification, detailed occupations are combined to form 461 broad occupations, 97 minor groups, and 23 major groups. Detailed occupations in the SOC with similar job duties, and in some cases skills, education, and/or training, are grouped together."

Dieticians: Plan and conduct food service or nutritional programs to assist in the promotion of health and control of disease. May supervise activities of a department providing quantity food services, counsel individuals, or conduct nutritional research.

Registered Nurses: Assess patient health problems and needs, develop and implement nursing care plans, and maintain medical records. Administer nursing care to ill, injured, convalescent, or disabled patients. May advise patients on health maintenance and disease prevention or provide case management. Licensing or registration required. Includes Clinical Nurse Specialists. Excludes "Nurse Anesthetists" (29-1151), "Nurse Midwives" (29-1161), and "Nurse Practitioners" (29-1171).

Lawyers: Represent clients in criminal and civil litigation and other legal proceedings, draw up legal documents, or manage or advise clients on legal transactions. May specialize in a single area or may practice broadly in many areas of law.

Physicians:[31] Physicians who diagnose and provide non-surgical treatment of diseases and injuries of internal organ systems. Provide care mainly for adults who have a wide range of problems associated with the internal organs. Subspecialists, such as cardiologists and gastroenterologists, are included in "Physicians and Surgeons, All Other" (29-1069).

Surgeons: Physicians who treat diseases, injuries, and deformities by invasive, minimally-invasive, or non-invasive surgical methods, such as using instruments, appliances, or by manual manipulation. Excludes "Oral and Maxillofacial Surgeons" (29-1022).

And of course, the BLS job descriptions do not take into account the many specific job descriptions and duties employers are likely to have in their own workforces.

Aside from the "same common core of tasks" analysis, assessing whether required "skills" of comparator jobs are substantially equal further demonstrates that comparisons of pay by EEO-1 job groupings can serve little utility. As the EEOC's Compliance Manual provides:

---

[31] *See* Internists, SOC 29-1063 given the multiple listings categories of "Physicians and Surgeons."

> Two jobs require equal skill for purposes of the EPA if the
> experience, ability, education and training required are
> substantially the same for each job.

Again, one need only look at the instructions the EEOC has provided to employers to see that the EEO-1 job groupings take into account a wide range of experience and educational requirements within the same job group. For instance, employers are advised that most jobs in the "Professionals" job group "require bachelor and graduate degrees, and/or professional certification." The EEOC further provides that "[i]n some instances, comparable experience may establish a person's qualifications." Thus, the explicit directions make clear that jobs that do not require the same education, experience and training will be grouped together. On its face, the EEO-1 job groupings are not capable of any meaningful analysis under the EPA. As Dr. Speakman indicated "…analyses using the EEOC's proposed pay data and suggested tests will result in a high error rate – firms that pay fairly will be investigated too often and firms that underpay women or minorities will often go undetected. Simply put, the recommended tests and data will lead to many false-positive and false-negative conclusions, negating any utility from this proposal. In fact, it appears that at best the targeting mechanisms suggested by the EEOC will do only negligibly better than selecting firms at random."[32]

### B. The EEOC's Proposed Tool Will Not Advance Investigations Under Title VII

The proposed EEO-1 Revisions are also inconsistent with Title VII and, therefore, cannot support any meaningful analysis probative of further investigation. Specifically, providing W-2 data by EEO-1 job categories is not consistent with the requirement that compensation differences only matter if the comparators are "similarly situated." As articulated by the EEOC in its compliance manual, "similarly situated employees are those who would be expected to receive the same compensation because of the similarity of their jobs and other objective factors."[33] And when reviewing similarity of jobs, EEOC investigators are instructed that the "actual content of the jobs must be similar enough that one would expect those who hold the jobs to be paid at the same rate or level."[34]

For the reasons set forth in Section III.A above, the EEO-1 job groups are exceedingly broad and will necessarily include a wide range of positions that are not capable of meaningful compensation comparisons under Title VII. Using the same example described above, it is simply implausible to expect that accountants, computer programmers, dieticians, registered nurses, lawyers, physicians and surgeons are "paid at the same level or rate."

---

[32] Ex. 4, Dr. Robert Speakman Declaration, at p. 3.
[33] EEOC Comp. Man. Ch. 10, at p. 6, available at www.eeoc.gov/policy/docs/compensation.html.
[34] Id. at 7.

Moreover, courts across this country have held that although similarly situated employees need not be "identical," they must be "directly comparable to the plaintiff in all material respects...."[35] Under these legal standards, any compensation analysis based upon EEO-1 job groupings would be meaningless.

We see a similar result in the EEO-1 "Sales Workers" job grouping. In that group we find advertising sales agents, insurance sales agents, real estate brokers and sales agents, securities, commodities, financial services sales agents, and telemarketers. Many of these positions could reasonably be found within a financial services organization. Yet one would not expect that these jobs would be similar enough to suggest that those who hold the positions would be paid at the same rate or level. Indeed, sales workers are often compensated based on varying levels of base salary and commission plans. Thus, unless they were truly in similar jobs, it would be impossible to conduct pay comparisons based on an overall broad-based job grouping that would include, for example, telemarketers and securities and commodities brokers.

And aside from the overly broad EEO-1 job groupings themselves, the EEOC has acknowledged that "differences in job titles, departments, or other organizational units may reflect meaningful differences in job content or other factors that *preclude direct pay comparisons* between employees."[36] But neither these factors nor the legitimate factors that explain compensation discrimination as described in Section III.C.1 below, are captured under the proposed EEO-1 Revisions.

C.  **There are Fatal Limitations with the Information Sought and the Statistical Tool Proposed to be Utilized by the EEOC to Analyze this Information**

For reasons addressed in detail below, there is simply no circumstance under which broad-brush, aggregate compensation and hours data can be used effectively on a grand scale to target employers for review.[37] Every employer's compensation system is unique and numerous

---

[35] *Eskridge v. Chicago Bd. of Educ.*, 47 F. Supp. 3d 781, 790-91 (N.D. Ill. 2014). Although a similarly situated employee need not be "identical," *Caskey v. Colgate–Palmolive Co.*, 535 F.3d 585, 592 (7th Cir.2008), he must be "directly comparable to the plaintiff in all material respects...." citing *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010); *Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 856-57 (S.D.Tex. 2010) ("'Similarly situated' employees are employees who are treated more favorably in 'nearly identical' circumstances; the Fifth Circuit defines 'similarly situated' narrowly. Similarly situated individuals must be 'nearly identical' and must fall outside the plaintiff's protective class. Where different decision makers or supervisors are involved, their decisions are rarely 'similarly situated' in relevant ways for establishing a prima facie case."); *Alexander v. Ohio State University College of Social Work*, 697 F.Supp.2d 831, 846-47 (S.D. Ohio 2012) (To be similarly situated, a plaintiff's purported comparators must have the same responsibilities and occupy the same level position.)
[36] EEOC Comp. Man. Ch. 10, at p. 8, available at www.eeoc.gov/policy/docs/compensation.html.
[37] *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986) (noting that "some [are] regressions so incomplete as to be inadmissible as irrelevant . . . .'"); *Sheehan v. Purolator*, 839 F.2d 99, 103 (2d Cir. 1988) (affirming the district

factors impact compensation decisions and results. The authors of the Sage Report, commissioned by the EEOC, detailed a theoretical framework for identifying pay disparities that is consistent with standard labor economic theory.[38] More specifically, the authors demonstrated that an employee's pay is estimated as a function that includes "control variables that can have a justifiable impact on difference in pay (such as education, certification, and work experience)." The inclusion of the control variables is critical in explaining why some employees are paid more than others. As the authors correctly note: "market forces determine one's level of pay, and *variation in pay is both necessary and inevitable*."[39]

Nonetheless, the two tests that the EEOC specifically references in the Proposed Revisions are simply distributional tests that do not control for any legitimate factors that explain pay such as those identified in the Pilot Study. Besides pay band, the only other factor that a covered employer will be providing to the EEOC is the aggregate number of work hours associated with employees in each pay band and demographic group. However, the Sage Report's authors noted that simply adjusting for the number of work hours, as recommended by the EEOC, could generate misleading results:

> [W]e have to recognize the varying patterns of compensation for employees who work different hours. As a result, pooling together into a single cell the employees who may have received the same compensation from working different hours and *analyzing them with a single offset as the format of the proposed EEOC form suggests, may lead to biases that are difficult to quantify…*"[40]

As the EEOC has found with similar efforts to collect compensation data on a broad scale, compensation cannot be subjected to a normalized, one-size-fits-all method of

---

court's denial of class certification because the regression analysis relied upon was deemed to be "flawed" for failing to take into account non-discriminatory factors, such as "education and prior work experience."); *Griffin v. Board of Regents*, 795 F.2d 1281, 1292 (7th Cir. 1986) (holding that "the explanatory power of a model is a factor that may legitimately be considered by the district court in deciding whether the model may be relied upon."); EEOC Compliance Manual, Section 10: Compensation Discrimination ("[Employers often] assert[] that pay disparities are caused by nondiscriminatory factors. Such factors could include the employees' education, work experience with previous employers, seniority in the job, time in a particular salary grade, performance ratings, and others. The Commission will need accurate information about all the variables on which the employer relies, for each employee similarly situated to the charging party. The employer should be asked to provide and explain all of its reasons for a compensation differential to reduce the need for burdensome repetitive requests.")
[38] Sage Computing "Final Report: To Conduct a Pilot Study for How Compensation Earning Data Could Be Collected from Employers on EEO's Survey Collection Systems (EEO-1, EEO-4, EEO-5 Survey Reports) and Develop Burden Cost Estimates for Both EEOC and Respondents for Each of EEOC Surveys (EEO-1, EEO-4, and EEO-5), p. 16 (Sept. 2015).
[39] *Id.*, at 16, emphasis added.
[40] *Id.*, at 61, emphasis added.

interpretation. As a result, the proposed data collection will have no "meaningful value" and certainly no benefit that rises to the level required by the PRA. <u>Simply put, the EEOC cannot achieve the objectives identified in the proposal through any mechanism, and certainly not through the mechanism it has identified</u>.

        1.      The Pay Proposal Ignores Legitimate Reasons for
                    Differences in Compensation

Employers have an inherent right to value jobs differently based on non-gender or race/ethnicity based standards.[41] The EEOC's proposal does not account for the explicitly-permitted differentiation in compensation based on factors like experience, performance, work productivity, skills, scope of responsibility, market, and education – to name just a few. This is particularly troublesome because differences in sex and race/ethnicity correlate with some of these factors. For example, the Bureau of Labor Statistics indicates that the average amounts of company-specific tenure differ between men and women and among different race/ethnic groups.[42] Notwithstanding, the statistical tests proposed by the EEOC do not account for these permitted differences.

Moreover, the EEOC's proposal ignores the role of working conditions and how that affects an employee's compensation. For example, employees who work night shifts, swing shifts and/or weekends are often paid a differential to account for less desirable work schedules.[43] For the same reason, jobs that require employees to work outside or exert atypical physical effort may also command a wage premium.[44] Nevertheless, the statistical tests proposed by the EEOC using the collected data will not and cannot account for differences in working conditions.

The concerns with the EEOC's failure to account for differences in working conditions is compounded because the Commission is proposing that employers use W-2 data, which includes not only base salary but also commissions, tips, overtime pay, shift differentials and bonus payments in the aggregate. In doing so, the EEOC is ignoring that some types of pay, specifically commissions and tips, are determined more by an employee's skill and effort than an employer's pay policies.[45] For example, Dr. DuMond notes that differences in W-2 earnings among servers at a restaurant will be based on their ability to provide quality service and earning the associated tips/gratuities, and is largely undetermined by the employer.[46]

---

[41] 29 U.S.C. 206(d) and 42 CFR 2000e-2(h).
[42] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 10.
[43] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 11.
[44] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 11.
[45] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 12.
[46] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 12.

2.  The Use of W-2 Earnings Further Obscures the Relevance
    of the Data Collection

The EEOC's proposal does not specify how employers are to report W-2 earnings and does not indicate whether employers should report the W-2 federal income taxable earnings (box 1) or Medicare taxable earnings (box 5) or report in some other manner. It is possible--and indeed likely--that a difference in tax-deferred retirement contributions and savings propensities could drive a pay difference between groups of employees, creating false positives and false negatives.[47] As Dr. Speakman noted, pay differences "generated by employees' decisions" will undermine the EEOC's efforts to correctly identify firms that discriminate in pay.[48]

3.  The EEOC's Approach to Reporting of Hours for Salaried,
    Part-Time and Terminated Employees Further Denigrates
    the Efficacy of the Data

The proposal would require employers to report hours worked as well as W-2 earnings data that span a two-year income tax period. The Commission stated that this will allow the EEOC and OFCCP to "meaningfully analyze"[49] pay differences because "collection of hours-worked data will account for the fact that some individuals are employed for less than the entire reporting year, and therefore, may work fewer hours."[50] The proposed approach to reporting data for employees exempt from the overtime provisions of the FLSA, part-time employees, and employees who are hired or terminated mid-year, however, is fundamentally flawed.

First, as the EEOC admits in the proposal, it is unsure how to count hours worked for full-time, salaried exempt employees, noting that the Agency "*seeks employer input*" on how to report hours worked for these exempt employees.[51] The EEOC indicated that it is "not proposing" that employers begin collecting additional data on actual hours worked for salaried workers "to the extent that the employer does not currently maintain such data," but rather is considering a standard such as estimating 40 hours per week for all full-time salaried workers in all industries. In our experience and in the experience of Dr. DuMond and Dr. Speakman, very few employers track the number of actual hours worked for their salaried workers and even HRIS systems that maintain a standardized or default value for "work hours" for salaried exempt

---

[47] Employee Benefits Security Administration Publications, *Women And Retirement Savings*, available at http://www.dol.gov/ebsa/publications/women.html ("Women are more likely to work in part-time jobs that don't qualify for a retirement plan. And working women are more likely than men to interrupt their careers to take care of family members. Therefore, they work fewer years and contribute less toward their retirement, resulting in lower lifetime savings.")
[48] Ex. 4, Dr. Robert Speakman Declaration at p. 10.
[49] EEOC's Notice of Proposed Changes to the EEO-1 to Collect Pay Data from Certain Employers, available at http://www.eeoc.gov/employers/eeo1survey/2016_eeo-1_proposed_changes_qa.cfm.
[50] 81 Fed. Reg. 5117, fn. 45 (February 1, 2016).
[51] 81 Fed. Reg. 5117-5118 (February 1, 2016) (emphasis added).

32

employees (such as 40 hours per week) does not reflect an employee's actual hours worked.[52] As such, the Agency will be forced to apply an across-the-board rule that does further harm to the efficacy of the data and that would be uninformative and unreliable for purposes of identifying pay disparities.[53] The impact of this data limitation is serious: according to data from the Bureau of Labor Statistics, 59% of the US workforce is paid by the hour, meaning that 41% of the US workforce is paid on a basis for which no accurate work hours may be available and for which the EEOC does not have a recommended method for measuring.[54]

Further, combining employees who work part-time or partial year with full-time and full-year employees will result in very misleading results. The variation is explained by Dr. DuMond in his example of an employee who has an annual salary of $120,000 per year but was recently hired and only worked 1 of 12 months, he or she will be placed in the lowest pay band since he/she only earned $10,000. Under the EEOC's proposal, this employee could be grouped with lower wage workers at the same company, even though the hourly rate for this employee would be much higher than the other employees in the same pay band. [55] Similarly, an employee who works a part-time schedule of 20 hours per week will be grouped and counted with full-time employees who earn half of that hourly rate but work 40 hours per week.[56] Likewise, Dr. Speakman raised similar concerns with comparing employees who worked part-time or part-year or who took leaves of absence with other employees who worked full-time, full-year without any breaks.[57]

Simply collecting the aggregate number of hours worked does not fix the bigger underlying problem with the EEOC's proposal: employees are being counted in the "wrong" pay band. However, the EEOC might again infer discrimination from differences in the imputed hourly rates for employees in the same pay band, not recognizing that those differences can just as easily arise from part time and partial year employees, and the Commission will not be able to make that distinction with the aggregated data. Additionally, the proposal does not suggest a methodology by which the EEOC will distinguish between intermixed part-time, partial year or full-time employees in the aggregate W-2 data. Moreover, since the total number of hours worked by employees in a pay band does not incorporate any of the factors known to affect pay, the data collected under this proposal will not provide any useful insight into the actual nature of employers' pay practices.

---

[52] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 13; Ex 4, Dr. Robert Speakman Declaration at p 9-10.
[53] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraphs 13-15.
[54] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 14.
[55] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 15.
[56] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 15.
[57] Ex. 4, Dr. Robert Speakman Declaration at p. 10.

33

4.      The EEOC's Proposed Statistical Approaches Will Not be
        Useful in Identifying Pay Differences

The EEOC's proposal suggests that they will primarily use two statistical tests to analyze the collected data: the Mann-Whitney and the Kruskal-Wallis tests.[58] The EEOC indicates that it can "compute the statistical tests within job categories and then proceeding [sic?] to more closely investigate companies and establishments with low p-values" and may also "compare a particular firm's regression coefficients for the hours worked, race and gender variables to those derived from an analysis of the relevant labor market as a whole."[59] The use of these measures could easily lead to both "false positives" (i.e., flagging a company for further review even when all employees working in the same job are paid exactly the same) and also "false negatives" (i.e., concluding that pay disparities do not exist at a company even in the presence of unambiguous pay discrimination).[60]

The reason that the two statistical tests proposed by the EEOC are likely to lead to both false positives and false negatives is that the aggregated data collected by the EEOC will not include the most important factors that drive compensation. For example, the report will not account for one of the most critical factors that determine pay, specifically the job level/job grade of an employee.[61] According to Dr. DuMond, it is commonly understood that all employees, regardless of their race, ethnicity or gender, will experience increases in pay as they move "up" or "higher" in an organization.[62] He provides the example that Pharmaceutical Sales Representatives are paid less than their District Sales Managers who are paid less than their Regional Sales Directors. [63] While it would not be reasonable to assume that an inexperienced Pharmaceutical Sales Representative would be paid similarly to an experienced Regional Sales Director simply because they are in the same EEO-1 job category (Sales), the statistical measure the EEOC proposes utilizing could lead to this conclusion because the EEOC's proposal will not include any information or breakdown relating to an employee's job level/job grade. Despite this lack of consideration for an employee's job level/grade, the two statistical tests will nevertheless ascertain whether gender and racial groups are equally distributed across all the pay levels of a company without any consideration of the employee's job level/grade.

---

[58] 81 Fed. Reg. 5118, fn. 47 (February 1, 2016).
[59] 81 Fed. Reg. 5118, fn. 47 (February 1, 2016).
[60] Ex. 4, Dr. Robert Speakman Declaration, at p. 13 ("Of secondary concern is that the EEOC's proposed data collection removes within pay band earnings variation. This variation may add information and it may add uncertainty. Suppose, for example, that men are paid at the top of every pay band and women are paid at the bottom. Given the proposed data collection, they will all appear to all earn the same amount. That men earn more is masked by the pay band data, which limits the EEOC's ability to detect a pay difference.")
[61] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 17.
[62] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 17.
[63] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 17.

34

The Pilot Study commissioned by the EEOC is very clear as to what these two statistical tests assume: "Although the (Mann-Whitney) test is sensitive to pure shifts, it has the more general interpretation of a test of the differences between two or more distributions."[64] Thus, because the Mann-Whitney and Kruskal-Wallis tests are determining whether men and women, for example, are distributed similarly across all pay bands (and hence all levels of an organization), these tests do not determine whether there are improper disparities within a pay band.[65] Instead, it is a test of whether racial and gender groups of employees are similarly distributed across all pay bands, even when the employees in these groups may have very different levels of experience, may hold very different jobs (e.g., nurses and lawyers) and may be at very differently job and pay levels within an organization.[66] If the EEOC proceeds with its stated proposal to use these tests on the collected data to "detect discrimination," then the likelihood that they would lead to false positives and false negatives is greatly increased.

Dr. Speakman also had serious concerns with the use of these statistical measures. Dr. Speakman stated:

> In my twenty-four years of experience working as an expert in the areas of economics and statistics, I've only seen the Mann-Whitney test run once and I've never seen the Kruskal-Wallis test run. In the one instance that I saw the Mann-Whitney test run, the opposing expert was inexperienced and there were many other errors made in the analysis that using the wrong test was only one of many concerns.

> The reason these tests are never used is that the comparisons made cannot be used to assess Title VII or EPA claims as they cannot be used to make comparisons among similarly situated workers. The exception would be if the population of employees was defined so that they are similarly situated in all relevant, potentially confounding factors. This would almost always lead to comparisons among very small groups of employees and the tests would not have the ability to statistically detect pay differences even if they existed.[67]

These concerns are all too real. Dr. DuMond conducted the Mann-Whitney test on two sets of simulated employment data to illustrate the problems with the use of these measures.

---

[64] EEOC pilot study on collecting pay data, available at: http://www.eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf, at p. 27.
[65] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 19; Ex. 4, Dr. Robert Speakman Declaration at Page 12.
[66] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 19; Dr. Robert Speakman Declaration at Page 12.
[67] Ex. 4. Dr. Robert Speakman Declaration, at pp. 12-13.

In the first simulation, an employee's pay is completely determined by two factors: his or her job grade/level and the number of years he or she has worked at that level.[68] For example, an employee entering the first job grade receives a starting annual salary of $30,000 and is awarded a raise of $1,000 each year he or she remains in that position. Similarly, an employee hired into the next grade level receives a starting salary of $40,000 and receives a raise of $2,000 each year he/she or she remains in their job. A similar method of pay determination exists for the next three job grades at this fictitious company, though the starting pay and annual pay adjustments are naturally greater in the higher-level grades. In this simulation, it is clearly impossible for a pay disparity to exist between women and men in the same job grade, after taking into account any differences in job tenure. A standard multiple regression analysis of this simulated data confirmed this obvious conclusion. Using the Mann-Whitney test on these simulated data, however, yielded a statistically significant result, which the EEOC may incorrectly interpret as an indication of pay disparities that are adverse to women.[69] That is, even in a simulation in which an employee's pay is 100% determined by a formula that allows no room for discrimination, the test that the EEOC is proposing to use still yielded a statistically significant difference. Put simply, the EEOC's proposal won't be able to test whether or not similarly situated men and women are paid equally.

This point is further illustrated in the second simulation. At this second fictitious company, there is an explicit, racially discriminatory policy that all African-American employees in grade level 1 receive a starting salary of $30,000 and all white employees in grade level 1 receive a higher starting salary of $30,500. Both employees receive a pay adjustment of $1,000 for each year worked. This blatantly discriminatory policy is found at all other job grades as well: white employees in grade level 2 receive a starting pay of $40,500 compared to $40,000 for African-Americans. At the highest job grade in this hypothetical company, the starting pay gap is even more pronounced: African-Americans have a starting salary of $100,000 compared to $105,000 for white employees.[70] As would be expected, the existence of such an overt policy of pay discrimination was readily detectible through a standard multivariate regression analysis, which indicated that African-American employees were paid statistically significantly less than their white counterparts. On the other hand, applying the EEOC's proposed Mann-Whitney test to these same data did not reveal any statistically significant differences between white and African-American employees.

Dr. Speakman conducted a different simulation using the 2013 and 2014 earner study population of the Current Population Survey (CPS) and reached the exact same conclusion.[71] Dr. Speakman produced simulated employer data in thirteen industry and EEO-1 job category

---

[68] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 20.
[69] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 20.
[70] Ex. 1, Dr. J. Michael DuMond Declaration at Paragraph 23.
[71] Ex. 4, Dr. Robert Speakman Declaration, at p. 18.

36

pairings.[72]  Using the CPS data, Dr. Speakman constructed an annual wage and salary measure[73] and annual hours.[74]  From there, Dr. Speakman selected 10 "workers" at random and matched them to a random pay rate.  Dr. Speakman performed this matching 10,000 times. In theory, the "workers" are matched randomly with predicted pay and the *expectation* is that there will not be a gender difference in the new pay amounts. Dr. Speakman indicated that labor economists would expect 5% of the trials to have statistically significant pay disparities even when controlling for hours worked, age, and census occupation code (the three pay determinants). About half of these significant outcomes will favor men (2.5%) and half will favor women (2.5%).  However, the findings using the Mann-Whitney test did not show this. They found far more significant results than would be expected. For example, for Sales Workers in the Grocery Stores industry, when it is assumed that there is no underlying gender pay disparity (0%), for employers with 10 employees in this job classification, Dr. Speakman found that 8.0% of the trials produced a statistically significant pay disparity adverse to women.  These are false positives, instances of when a firm pays employees equitably, but the statistical test is significant anyway.  The findings in Dr. Speakman's simulation were damning:

> [T]here is a high rate of false positives and the ability to detect actual pay differences is weak.  The false positive rate will be higher when workers are more dissimilar and the (omitted) factors impacting pay are correlated with gender.  Increased population size exacerbates the problem.  As population size and the underlying gender pay difference increase, the test will be better able to identify firms that actually underpay women, but at the cost of an increase in targeting firms that pay fairly.   The statistical tests and targeting mechanism suggested by the EEOC will perform poorly.[75]

These simulations call into question the usefulness of the data that would be collected under the EEOC's proposal. These examples illustrate that the proposed statistical tests may not identify actual pay differences that are consistent with discrimination when it truly exists, and

[72] Ex. 4, Dr. Robert Speakman Declaration, at p. 18. Dr. Speakman indicated that these will likely be the largest industry and job classifications, which means that the EEOC's targeting mechanism should be more successful here than in smaller industries and job classifications. Dr. Speakman indicated that if the targeting mechanism is not successful with these larger populations, the chance of being successful elsewhere is even smaller.
[73] Ex. 4, Dr. Robert Speakman Declaration at p. 19.  This measure does not include overtime, commissions, bonuses, tips, etc., which Dr. Speakman indicated makes the simulation more likely (not less likely) to be able to identify pay discrimination, noting "it does not have the shortcomings introduced by examining W-2 earnings."  *Id.*
[74] The CPS data includes the information necessary to derive weekly earnings for all workers, but it does not include weeks worked except for those paid an annual salary.  As such, Dr. Speakman assumed that all workers work fifty-two weeks per year.  As Dr. Speakman noted: "If there is a difference between men and women in weeks worked, the test performed here will perform better than those that would be performed by the EEOC."
[75] Ex. 4, Dr. Robert Speakman Declaration, at pp. 22-23.

may incorrectly conclude that there is evidence consistent with discrimination when employees are actually paid equivalently. But perhaps more importantly, the first simulation shows that a company with a disproportionately greater number of female or minorities at the lower grade levels is likely to "fail" the Mann-Whitney test. In fact, failing the Mann-Whitney test could occur while companies are making good-faith efforts to increase their minority and female representation. That is, many firms have worked diligently to increase the participation of workers from historically disadvantaged groups by hiring these workers as they became available. The result of this effort is that higher percentages of female, African American, and Hispanic workers are found in some of the lower job levels as they gain additional experience to be eligible for promotion.

The EEOC has also suggested it may also use interval regression to perform analyses that attempt to correct for potential differences in annual hours worked between men and women and between members of different race groups. The EEOC indicated that the use of interval regression is to remove the effect of differences in hours worked. However, based on the analysis by Dr. Speakman, it appears the EEOC's proposed approach results in the same false positives and false negatives outlined with the Mann-Whitney and Kruskal-Wallace tests.[76] To illustrate the fatal limitations of interval regression, Dr. Speakman provided two hypotheticals:

- In Hypothetical 1, Dr. Speakman assumed that there are five women and five men who work 1,560 hours per year and five women and five men who work 2,080 hours per year. Dr. Speakman set the hourly pay rate for women at $20 per hour and set the hourly pay rate for men at <u>twice the rate</u> as women ($40/hour). In Hypothetical 1 men and women work the <u>same</u> number of average hours per year (1,820) but men are paid <u>twice the rate of women</u>. However, the interval regression would not produce <u>any</u> estimates of a gender pay difference even though men are clearly paid twice as much as women.

- In Hypothetical 2, Dr. Speakman produced a dataset with 24 men and 24 women, who on average earned the same hourly rate ($27.43) but who worked different number of hours. All workers worked either 1,040 hours per year or 2,080 hours per year, but men were more likely to work full-time and women more likely to work part-time. Interval regression produced a statistically significant gender pay result favoring men, even though <u>the hourly pay rates were exactly the same</u>.[77]

In sum, the statistical tests that the EEOC suggests they will use will undercut the EEOC's ability to correctly identify firms that discriminate in pay. They will not allow them to make comparisons among similarly situated workers. It appears that they will not even allow

---

[76] Ex. 4, Dr. Robert Speakman Declaration at p. 13.
[77] Ex. 4, Dr. Robert Speakman Declaration at p. 14.

them to account for differences in the number of hours worked by gender or race.[78] <u>Accordingly, the EEOC's proposed statistical methodology provides no benefit and does not meet the standards of the PRA.</u>

### D.   The EEOC's Proposal to Compare the Pay of a Firm or Establishment to Industry or Metropolitan-Area Data Serves No Purpose Under Title VII or the EPA.

The EEO-1 Revisions state that EEOC and OFCCP will develop a software tool that will allow its investigators to analyze "W-2 pay distribution within a single firm or establishment, and by comparing the firm's or establishment's data to aggregate industry or metropolitan-area data" which would "highlight statistics of interest."

However, neither Title VII, the EPA nor EO 11246 requires employers to pay its employees according to industry or geographical standards. Certainly, employers cannot use as a defense to claims of inequitable pay practices that others in its industry are also paying women or minorities in a particular EEO-1 category less than white men. Conversely, it is not discriminatory for an employer to decide to pay lower wages for certain positions than its competitors may choose to pay for the same positions. As such, the mere fact that a particular employer's aggregate compensation data is below the pay of the industry or metropolitan area is irrelevant to an investigation of whether an employer's pay practices are discriminatory.

Employers already have many different, much more finely-tuned, methods by which they can benchmark their compensation against others for particular jobs. Many companies, large and small alike, look to market data that is specific to the jobs in their workforce to assess their position vis-a-vis their competitors. The data that could be assembled through the proposed EEO-1 Revisions will lack the reliability of such targeted market data — data that employers can and do already access. We would note as well that the EEOC proposal dos not permit area differentials to be factored into the reported compensation data. Insofar as the federal government itself has area pay differentials for civil service pay grades, it makes absolutely no sense that the EEOC will require EEO-1 reports, either on the establishment or consolidated basis and not permit the employer to apply geographic differentials.

Moreover, the EEO-1 Revisions' suggestion that reporting pay data may "encourage self-monitoring" and "voluntary" compliance by employees if they uncover pay disparities misses the mark. As an initial matter, federal contractors and subcontractors are already required to monitor their pay practices as part of their compliance obligations.[79] And any

---

[78] Ex. 4, Dr. Robert Speakman Declaration at Page 14.
[79] 41 CFR 60-2.17 (b) "Identification of problem areas. The contractor must perform in-depth analyses of its total employment process to determine whether and where impediments to equal employment opportunity exist. At a minimum the contractor must evaluate … (3) Compensation system(s) to determine whether there are gender-, race-, or ethnicity-based disparities."

contractor subject to an OFCCP compliance evaluation is required to submit employee-level detailed compensation data for the establishment under review. Thus, there would be no added utility to federal contractors and subcontractors who already self-monitor pay within their organizations.

And, generally speaking, the EEO-1 Revisions would not otherwise encourage self-monitoring efforts because, for the reasons explained above: (1) EEOC cannot effectively target its enforcement efforts based on the data; and (2) the data is too broad and generalized to be of any practical use to those employers who endeavor to establish equitable pay practices.

## IV.    CONFIDENTIALITY & PRIVACY

### A.    EEOC Should Take All Possible Actions to Protect the Confidentiality and Security of the Highly Confidential, Proprietary Data Being Requested

EEOC gives short shrift to the privacy and confidentiality issues raised by the Proposed Revisions notwithstanding the mandate of the PRA. The notice published in the Federal Register merely reiterated that Section 709(e) of Title VII, 42 USC § 2000e-8(e) prohibits disclosure of any information contained in the EEO-1 report "prior to the institution of any [Title VII] proceeding." The proposal notes that while the OFCCP is not subject to the restrictions of section 709(e), it nevertheless will hold the information contained in the EEO-1 confidential "to the extent permitted by law, in accordance with Exemption 4 of the Freedom of Information Act and the Trade Secrets Act." While these assertions state the law as codified and practiced, they understate the significant privacy and confidentiality concerns raised by the proposal.

We only have to refer to the draft report of the EEOC Survey System Modernization Work Group (Working Group) Meeting conducted on March 8-9, 2012, which was published with the Proposed Revisions to confirm these concerns. While this Working Group performed its work nearly four years prior to the publication of the Proposed Revisions and while the draft report was deficient in many respects, the sparsely published report highlighted issues raised which were not addressed in the Proposed Revisions. The Working Group noted that "the Privacy Act is a concern."[80] The report stated that: "Statistical Controls would be required to ensure the confidentiality of data to companies with smaller job categories."[81] The proposal is devoid of any discussion of data confidentiality. The draft report notes as well that if the "cell" size was lower than 5, we do not publish data for that cell."[82] There is no discussion of the implication of small cells, particularly in the upper pay bands.

---

[80] Draft Report pg 10, Question 6. Group 1
[81] Draft Report page 11 group 1
[82] Draft Report page 11, group 2.

In fact, there is no discussion at all of confidentiality issues in the proposal. In addition, the general reference to the Exemption 4 exclusion from the OFCCP releasing this information does not reference a crucial point. Unlike the section 709(e) restriction on EEOC disclosure, the OFCCP procedure requires contractors to follow the regulatory constraints found in the OFCCP and Department of Labor FOIA regulations. The Department of Labor FOIA Regulations, 29 CFR Part 70, create a complex process for employers to request that business confidential information not be disclosed. Rather than a simple prohibition of disclosure, the regulations state:

> (b) Designation of business information. A submitter of business information will use good-faith efforts to designate, by appropriate markings, either at the time of submission or at a reasonable time thereafter, any portions of its submission that it considers to be protected from disclosure under Exemption 4. These designations will expire ten years after the date of the submission unless the submitter requests, and provides justification for, a longer designation period.

> (c) Notice to submitters. A component will provide a submitter with prompt written notice of a FOIA request that seeks its business information whenever required under paragraph (d) of this section, except as provided in paragraph (g) of this section, in order to give the submitter an opportunity to object in writing to disclosure of any specified portion of that information under paragraph (e) of this section. The notice will either describe the business information requested or include copies of the requested records or record portions containing the information. When notification to a voluminous number of submitters is required, notification may be made by posting or publishing notice reasonably likely to accomplish such notification.

> (e) Opportunity to object to disclosure. A component will allow a submitter a reasonable time to respond to the notice described in paragraph (c) of this section. If a submitter has any objection to disclosure, it is required to submit a detailed written statement. The statement must show why the information is a trade secret or commercial or financial information that is privileged or confidential. In the event that a submitter fails to respond to the notice within the time specified, the submitter will be considered to have no objection to disclosure of the information. Information

41

provided by a submitter under this paragraph may itself be subject
to disclosure under the FOIA.

Thus, in every instance where the Department of Labor receives a FOIA request for the extended EEO-1 information, it must timely notify the employer submitter which in turn must submit a detailed written statement explaining why some or all of the EEO-1 information is a trade secret or commercial or financial information. The regulations then provide a process whereby the requester and the employer have to undertake a lengthy appeal process where each presents its arguments. Final determinations are subject to judicial review. Further, even if the Department of Labor applies Exemption 4, that exemption from disclosure expires 10 years after it is granted. As noted in the draft Working Group report, information contained in small cells or smaller job categories may well disclose individual pay or other personal information. Thus, the submission to the OFCCP is not resolved by the glib assertion in the proposal that the OFCCP holds this information confidential "to the extent permitted by law." In fact, there is a significant burden placed on contractors to protect the confidentiality of the new EEO-1 information.

To the extent that the OFCCP shares the EEO-1 information, disclosure concerns would be alleviated to some extent if the EEOC requests that the Director of OIRA treats all information submitted to the EEOC as covered by Section 3510 of the Paperwork Reduction Act[83] and directs the EEOC that the statutory restrictions on disclosure of EEO-1 data will apply to the OFCCP.[84] In this regard, the direct prohibition on disclosure will not be subject to regulatory considerations and determination of trade secrets or commercial or financial information by OFCCP personnel not trained in these issues or a laborious and expensive regulatory and judicial review process.

B.      Potential Data Breaches

As noted above, the proposal to collect employee pay data through the EEO-1 reports presents significant confidentiality issues related to the potential disclosure of this data. The EEOC publishes aggregate data collected from the EEO-1 reports and also shares original EEO-1 data with other federal and state agencies and individual researchers. With regard to the aggregate data, there are concerns that those who receive it will be able to reverse-engineer the aggregate data. With regard to original data, there are concerns that those who receive it might not take appropriate steps or have appropriate procedures in place to maintain its confidentiality. Furthermore, the EEOC must be transparent about the steps that it will take as an agency to insure that its information security program is now, and will be in the future, able to protect this sensitive data from access or acquisition by unauthorized individuals.

---

[83] 44 U.S.C. 3510
[84] 44 U.S.C. 3510 (b)(1)(2)

Prior to issuing the proposed rule, the EEOC engaged the National Academy of Sciences (NAS) to conduct a study, which, *inter alia*, looked at confidentiality concerns raised by the EEOC's collection of employee pay data in EEO-1 reports and its subsequent disclosure of this data in aggregate and original form. As a threshold matter, the report issued by the NAS (NAS Report) recognized -- and we wish to underscore -- that "[e]mployee compensation data are generally considered to be highly sensitive; they are even considered proprietary information by many private-sector employees."[85]

The NAS Report underscored that "there will be a great demand on the part of other federal agencies, researchers, analysts, compensation-setting bodies and others for access to these powerful new data . . . and the EEOC would be well advised to start taking steps now to develop policies to provide access in a protected environment."[86]  The NAS Report went on to note that, despite the sensitive nature of employee pay data, the "EEOC provides [this] data to agencies that do not have the same level of confidentiality protections."[87]  With regard to both its routine disclosure of data from the EEO-1 reports to other federal and state agencies, as well as researchers, the NAS Report recommended that the EEOC:

> (1) consider implementing appropriate data protection techniques, such as data perturbation and the generation of synthetic data to protect the confidentiality of the data, and it should also consider supporting research for the development of these applications;  and

> (2) seek legislation that would increase the ability of the agency to protect confidential data. The legislation should specifically authorize data-sharing agreements with other agencies with legislative authority to enforce antidiscrimination laws and should extend Title VII penalties to non-agency employees.[88]

EEOC's proposal does not address these recommendations in any way.

Moreover, these is no indication in the proposal that the EEOC requires those to whom it provides the EEO-1 reports to (1) maintain the same level of confidentiality that the EEOC does with respect to this information (other than the Department of Justice) (2) demonstrate that their information security programs are sufficient to protect this data from malicious attacks targeted at such data or (3) provide notification to the EEOC in the event their data security is compromised or the entity or individual experiences a data breach. Moreover, the proposal is

---

[85] National Research Council, 2012, *Collecting Compensation Data from* Employers, Washington D.C., National Academies Press, p. 84, available at http://www.nap.edu/catalog/13496.
[86] *Id*. at 90.
[87] *Id*.
[88] *Id.* at 91.

43

silent as to how the data will be transferred from the EEOC to the various federal or state agencies or individuals.

Although the NAS Report did not make any specific recommendations about a review of, or improvements to, the EEOC's information security protocols in connection with requiring employers to provide pay data in the EEO-1 forms, the NAS Report did emphasize that "the consequences of a breach in the protection of data provided in confidence are, as other federal agencies have discovered, painful and of lasting consequence."[89] This has most recently been seen with the data breach experienced last year by the Office of Personnel Management. This massive data breach was one of the largest in recent memory and was specifically targeted at employee, applicant and former employee information. OPM has now had to make major changes to its personnel and its policies and procedures in an attempt to earn the trust of the American public when it comes to the information entrusted to this agency. A major source of criticism of OPM has been its decision to transfer the personally identifiable information entrusted to it to a third party vendor. The class action complaints filed against OPM and the vendor allege that OPM did not do enough to vet the security measures employed by the vendor or require the vendor to provide ongoing updates to OPM regarding its security program and any breaches.

The OPM breach holds lessons for all federal agencies and should inform how the EEOC handles the disclosure and transfer of employee pay data to third parties. The EEOC needs to assure employers that it has reviewed its information security protocols and that they can and will safeguard the pay data employers are providing. In the hands of the wrong people, the original pay data from the EEO-1 report regarding pay could cause significant harm to a company and as previously noted subject employees to potential violation of their privacy. Indeed, while the Working Group noted potential Privacy Act concerns, the EEOC apparently gave absolutely no consideration to this potential problem. And even though no information in the EEO-1 report is tied to the name of any one individual, it is not hard to imagine a scenario in which individual employees within a small group listed on the EEO-1 report could be identified. Indeed, this is why the EEOC has suppression protocols in place for aggregate data where a group has three or less employers' information in it or any one employer accounts for 80% of the group data being aggregated.

Finally, we would observe that the EEOC is apparently providing establishment EEO-1 data to researchers whom it engages under some form or another of consultancy agreement to enable the researchers to publish findings in learned journals or to enhance their academic credentials. There is absolutely no indication as to what, if any, confidentiality restrictions are imposed on these shared reports, nor is there any agency enforcement purpose from these arrangements, the sole Title VII justification for requiring these reports. And of course the PRA

[89] *Id.*

44

does not create an exemption from its requirements to permit agencies to share privileged data with academic researchers which has been submitted as a result of massive cost and operational burdens on employers.

## **Conclusion**

In conclusion, the Chamber has serious concerns with the proposed EEO-1 Revisions. In view of the multitude of deficiencies which we have illuminated in these comments and which will be further highlighted in our formal comments, we request that the EEOC withdraw the proposed revisions and commence a cooperative effort with all stakeholders to deal with the issues.

Sincerely,

Randel K. Johnson
Senior Vice President
Labor, Immigration and
Employee Benefits

James Plunkett
Director
Labor Law Policy

Of Counsel:


/s/ Kris D. Meade
Kris D. Meade
Rebecca L. Springer
Crowell & Moring LLP


/s/ Larry Lorber
Larry Lorber
Camille Olson
Annette Tyman
Seyfarth Shaw, LLP

45



**BERKSHIRE ASSOCIATES INC.**
*Your Partner in Human Resources and Affirmative Action*

8924 McGaw Court
Columbia, MD 21045

800.882.8904 | 410.995.1195 | 410.995.1198 (f)
www.berkshireassociates.com

April 1, 2016

**VIA FEDERAL eRULEMKAING PORTAL:**  http://www.regulations.gov

Bernadette Wilson
Acting Executive Officer
Executive Secretariat
Equal Employment Opportunity Commission
131 M Street, NE
Washington, D.C. 20507

Re:    **Comment on the Equal Employment Opportunity Commission's Proposed Revision of the Employer Information Report (EEO-1) by Berkshire Associates Inc.; ID: EEOC-2016-0002-0001/Federal Register Document Number: 2016-01544**

Dear Ms. Wilson:

Berkshire Associates Inc. ("Berkshire") submits the following comment in response to the proposal by the Equal Employment Opportunity Commission ("EEOC") to seek a three year approval under the Paperwork Reduction Act ("PRA") for an annual data collection tool which would require all employers with 100 or more total employees to provide summary compensation data and total hours worked for employees by job category listed in the Standard Form 100 (otherwise known as the "Employer Information Report EEO-1" or the "EEO-1 Report") by race, ethnicity, and sex.

**BACKGROUND ON BERKSHIRE AND ITS CLIENTS**

Berkshire is a human resources consulting and technology firm specializing in affirmative action compliance and applicant data management. Berkshire's clients vary in size from small establishments with one affirmative action plan ("AAP") to nationwide employers with thousands of employees covered by multiple AAPs. These employers may file one EEO-1 Report each year or hundreds. Berkshire's services are utilized by employers in a wide range of industries, including hospitality, food services, retail, information technology, manufacturing, professional services, health care, colleges, universities, and not-for-profit organizations. One of the clients for whom we file EEO-1 Reports, Exelon Corporation, testified at the EEOC's hearing on this topic.

In business since 1983, Berkshire was one of the first companies to provide an automated way of preparing AAPs for employers. Hundreds of federal contractors and subcontractors, as well as other independent consultants, use Berkshire's proprietary software to prepare compliant

AAPs on an annual basis. A certified small business enterprise, Berkshire also provides outsourcing and consulting services to employers, including federal contractors and subcontractors. Berkshire consultants help employers prepare thousands of AAPs every year and regularly assist employers during compliance reviews by the Office of Federal Contract Compliance Programs ("OFCCP").

Berkshire also assists its clients with other reporting requirements, including the filing of thousands of EEO-1 Reports and the annual veteran employment report required by the Department of Labor's Veterans' Employment and Training Service. In 2015, Berkshire filed over 17,000 EEO-1 reports for over 120 clients. These reports covered more than 680,000 employees.

Berkshire has created a proprietary, commercial software product 'BALANCEaap' that is used to generate AAPs, EEO-1 Reports, and VETS-4212 Reports. Berkshire uses this product internally to generate EEO-1 Reports (both PDF copies for use when manually entering the data into the EEOC's online system and the TXT file for data upload) for our consulting clients. In addition, Berkshire's software clients also use our product to generate their reports. We estimate that it took over 345 hours to develop and test functionality in our software. In addition, we spent another 6 hours in September of 2015 to make updates to our software when the EEOC made unexpected changes to the requirements of the EEO-1 Report data file by requiring federal employer identification numbers ("FEIN") for each establishment. This change was not communicated by the EEOC, and was noticed only after one of our staff members attempted to test a client's data file.

Berkshire also regularly assists clients in conducting self-assessments of their compensation systems, including by performing statistical analyses of compensation practices. Berkshire prepares an average of 600 salary equity analyses each year for clients of various sizes. For example, in 2015, we completed salary equity analyses covering approximately 260,000 employees. The size of the employers we worked with ranged from 53 employees to over 25,000 employees.

On average, salary equity projects are active for 60 days. Depending on the size of the employer, the nature of the employee groups being reviewed, the issues raised by preliminary analyses, and the responsiveness of the client in investigating identified pay differences, a salary equity analysis may take Berkshire anywhere from five to over 30 hours to prepare. This time estimate does not include time spent by the client collecting the initial data to be analyzed, answering any data questions, or verifying whether there are legitimate explanations for any identified pay differences. When Berkshire performs salary equity analyses for its clients, we generally analyze the pay of employees by job title because we expect these individuals to be similarly situated in terms of the work they perform, although that is not always the case. If a client wishes to look at its pay system from a broader perspective, we may conduct analyses by pay grades. We rarely perform analyses by EEO-1 job category because the groupings are too broad to be meaningful.

In preparing these comments, Berkshire relied on its own experiences in assisting clients with affirmative action compliance, EEO-1 Report filing, and salary equity analyses for more than 20 years. Berkshire also surveyed its clients to gather additional data regarding the estimated burden of the agency's proposal. Berkshire and its clients strongly support equal

employment opportunity and the importance of pay equity. To that end, we recognize the important roles the EEOC and OFCCP play in ensuring that employees are paid in a non-discriminatory manner, without regard to their sex, race, ethnicity, or other protected basis. While we support the EEOC's and OFCCP's commitment to rooting out all forms of employment discrimination, including compensation discrimination, based on our experience in preparing and filing EEO-1 Reports and performing salary equity analyses for clients, we are concerned that the proposed data collection will have limited utility. We also believe that the new reporting requirement will impose significant costs on employers.

Our comments primarily focus on the costs of the proposed data collection. However, we share the concerns about the limited utility of any uniform compensation data collection tool which have been expressed by the many other organizations who also regularly help employers with equal employment opportunity compliance. Rather than reiterate those concerns here, we specifically incorporate herein the comments of the United States Chamber of Commerce ("Chamber") regarding the limited practical utility of the proposal. Berkshire is an active member of the Chamber and shares that organization's concerns that the data collected by the EEOC will be meaningless for identifying those employers whose pay differences are likely to be because of discriminatory behavior. While we provide some suggestions below for how the EEOC might mitigate some of the costs associated with its proposal, we urge the agency to implement a more robust pilot program using actual employer compensation data to better evaluate both the utility and costs of the proposed tool before imposing a new annual reporting obligation on employers.

## COMMENTS ON THE PROPOSAL

### I.    THE EEOC'S PROPOSAL

Under the EEOC's proposal, covered employers with 100 or more employees (50 or more employees if a federal contractor or subcontractor) would continue to file the data required by the current EEO-1 Report – gender, race, and ethnicity information for each employee in ten EEO job categories ("Component 1" of the EEOC's proposal). Beginning in 2017, employers with 100 or more employees also would file a "Component 2" report, which would include W-2 wage and total hours worked information for all workers in each of the 10 job categories by race, ethnicity, and sex within 12 proposed pay bands. The proposed data collection would be filed for the headquarters and each establishment of a covered filer by September 30 of each year, along with a consolidated report.

Although the proposal does not specify, it is our understanding that the W-2 wage information to be reported is the same as that proposed by OFCCP in its earlier compensation data collection tool: the wage figure provided on Box 1 of each employee's W-2 Wage and Tax Statement. Total hours worked is defined as the number of hours worked by all employees in the job category by race, ethnicity, and sex within each of the 12 proposed pay bands. As a result, the reported W-2 wage and total hours worked data would not be a snapshot, as are the current reporting requirements for race, ethnicity, and gender. Instead, employers would report each employee's total hours worked and W-2 wage information for the 12-month period preceding the selected payroll snapshot date, which can be any payroll period occurring in the months of July through September of the filing year. Thus, in all cases, the W-2 wage and total hours worked information to be reported would cross two calendar years.

The agency's stated goals for the data collection are to (1) "assess complaints of discrimination, focus investigations, and identify employers with existing pay disparities;" (2) develop unspecified "software tools and guidance for stakeholders to support analysis of published aggregated EEO-1 data;" and (3) "encourage employers to self-monitor and comply voluntarily if they uncover pay inequities."

## II.     THE CURRENT EEO-1 FILING PROCESS

Before commenting on the EEOC's proposal, we think it is critical that the EEOC understand the way most employers collect, verify, validate, and report data on the current EEO-1 Report. As outlined in the attached affidavit (Exhibit 1), the process—even using the EEOC's electronic filing system—is far more complicated than is reflected in the EEOC's current burden estimate of 3.4 hours per filer.

Generally speaking, the process begins with an employer's collection of race, ethnicity, and gender data from employees. Employers gather this data through a voluntary self-identification process whereby each employee is asked to voluntarily provide their race, ethnicity, and gender for reporting purposes. This data is collected from every new employee that enters the workforce in the given reporting period. Many employers also allow current employees to update this information at any time, even if previously reported. Increasingly, many more employees are declining to provide this information to their employer, particularly race information. In those cases, the employer is to use "employment records or observer identification to identify the race, ethnicity of ALL employees . . ." for the EEO-1 Report. In such cases, the employer often has to ask a manager at the particular facility if he or she can visually identify the person's gender or race/ethnicity.

Employers also have to assign each employee to one of the ten EEO-1 job categories. Many employers use the *EEO-1 Job Classification Guide* or the EEO-1 Census Codes Cross Walk to properly assign particular jobs to the ten broad job categories. In our experience, many employers need to update this information for at least a handful of jobs every filing cycle, either because the positon is new and has not yet been classified by the employer, or because the job has changed, warranting a new classification. Like observer identification, assigning EEO-1 job category is typically a manual process, even if the data is ultimately stored electronically.

Once this information is collected, the data has to be maintained for reporting to the EEOC by September 30 of each year. Many employers use a human resource information system ("HRIS") for this purpose. Most HRIS store an employee's race, ethnicity, and gender information within each EEO-1 job category. This stored information is based on user input and is, therefore, subject to error, particularly at larger employers where multiple individuals may enter data into an HRIS. Moreover, smaller employers may not have an HRIS, and may instead simply store the self-identification information on paper forms that must be manually compiled and tabulated into the ten EEO-1 job categories each year.

Each EEO-1 Report filing cycle all covered employers must select a payroll snapshot date to begin the annual filing process. This payroll snapshot may be any payroll period between July 1 and September 30. Once a payroll period is selected, employers must gather the stored information regarding each employee's race, ethnicity, gender, and EEO-1 category. The employers Berkshire works with do this by compiling a roster of all employees who were

employed during the payroll period in question. Other employers may use a specific HRIS summary reporting function to extract the data needed to file their EEO-1 Reports. These employers also need access to the underlying detailed information for each employee in order to verify the data in the summary report (i.e. in order to identify by name the 15 Black females in EEO-1 job category 1.1). Still other employers gather this data manually by first identifying the employees employed during the relevant period, and then matching those employees with available race, ethnicity, gender, and EEO-1 job category information.

The next step is data validation. During this process, employers generally use visual observation to assign race, ethnicity, and gender to employees whose information is missing. Employers also must review and update EEO-1 job category assignments. Employers with more than one establishment must ensure that all employees are assigned to the correct establishment, and that the establishment information is complete and accurate. These employers also must update the EEOC's online system listing of establishments. In our experience, the period of time needed for thorough data verification and validation can be extensive, often requiring three to four times the estimated 3.4 hours of time.

Once these steps are complete, the employer is finally ready to submit its EEO-1 Reports. Although there are technically three filing methods, most employers tend to use one of two methods: (1) manual entry into the EEOC's online filing system or (2) batch uploading of files by email to the EEOC. Most, if not all, single establishment employers file their EEO-1 Reports using the first method. In our experience, even larger multi-establishment employers use this method. In fact, Berkshire itself uses this method whenever the number of EEO-1 Reports to be filed is less than about 20 reports per filer. If an employer has an HRIS, there is typically a standard report that they can generate to then use as a guide when manually entering their information into the online system. Importantly, even though the EEOC's online system is electronic, and a report can be generated from an HRIS, the actual entering of the required information into each cell of the current report requires manual keying.

A smaller number of clients generate a prescribed TXT or CSV file and use the "data upload" process. Berkshire generally uses this process whenever 20 or more EEO-1 Reports will be filed for a single employer. Once the TXT or CSV file is generated, it must be tested using the EEO-1 Survey site. If an employer has more than 2,000 establishments, they must break up the file and test it in batches. This is a cumbersome and time-consuming process.

The test site reviews the data and lets the employer know if there are issues with any particular establishments. If there are errors for existing establishments, it will report the EEO-1 Unit Number and let the employer know the reason for the error or warning. These issues then need to be researched and fixed in either the employer's HRIS or within their vendor's EEO-1 Reporting tool. Unfortunately, if the error or warning is occurring at a new location, the test system can only tell the employer the line in the text file that is returning the error or warning. It requires the employer to then open the TXT or CSV file in a compatible program to look for the specific line of data to determine what correction needs to occur. After fixing the error, the employer must log back into the system and test the file again.

Once the file is appropriately tested, the EEOC requires that employers email the data file along with the closed location spreadsheet. The EEOC does not provide a secure transmission site for this purpose. Once the file is emailed, employers typically receive an automatic response

Page **5** of **15**

letting them know they will be contacted once the file has been uploaded.   Our experience is that there is a 1-2 month lag between when the file is emailed to the EEOC and when it is uploaded to the EEO-1 Report online system.  After the file is uploaded, employers must log into the online system and review the results of the upload. Our experience is that although the file was tested and accepted, at least 20% of the establishments are marked as 'Incomplete' and require a manual review.

Under either filing system, once all data checks are completed, the employer must certify the EEO-1 Reports for that year. In doing so, the employer must affirm that all reports are accurate and prepared in accordance with instructions. Importantly, the EEO-1 Report itself specifically states that "WILLFULY FALSE STATEMENTS ON THIS REPORT ARE PUNISHABLE BY LAW, U.S. CODE, TITLE 18, SECTION 1001."

### III.    EEOC'S REVISED BURDEN ESTIMATE FOR THE CURRENT FILING PROCESS IS INACCURATE.

Until this proposal, the EEOC estimated the burden of filing the current EEO-1 Report on a "keystroke" basis. Accordingly, the EEOC previously estimated the burden of filing the current EEO-1 Report – which requires 180 cells of data entry per filed report – at 3.4 hours per report filed. In its current proposal, however, the EEOC dramatically revises this burden estimate to a mere 3.4 hours per filer, regardless of the number of EEO-1 Reports each filer may need to submit.

As the above summary of the steps required to file the current EEO-1 Report illustrates, it is virtually impossible for any filer to collect, verify, validate, and report data on the current EEO-1 Report in 3.4 hours. EEOC's revised estimate seems to focus solely on the reporting element, while completely ignoring the extensive collection, verification, and validation process that employers undertake to be able to file and certify their EEO-1 Reports. Underlying the EEOC's revised burden estimate is the mistaken assumption that the agency's online filing system somehow allows employers to conduct all of these tasks at the click of a button. As noted above, however, the data collection, verification, and validation process is a time-intensive manual process, requiring updates each year because the employees being reported on are not the same, nor do employees remain in the same job categories or locations. As a result, the reports do not magically become easier to file after the first year of reporting – each reporting year demands nearly the same level of data collection, verification, and validation. Moreover, for most employers, even the annual reporting element requires manual keying, since most employers do not use the batch upload method.

To illustrate the complexity of filing EEO-1 Reports, Berkshire examined its available data regarding the amount of time it took our company to file 2015 EEO-1 Reports for clients of various sizes. As noted above, in 2015, Berkshire filed over 17,000 EEO-1 reports for over 120 clients.  These reports covered more than 680,000 employees. More than 50% of the time, it took us more than 3.4 hours to file the EEO-1 Reports of a particular client. Our time varied based not only on employer size and number of reports filed, but also because of the number of HRIS systems utilized by the client, the number of workplace changes, such as acquisitions or mergers that took place, and the integrity of the initial data provided to us by the client. Accordingly, it did not take more time for just large employers. Filing the EEO-1 Reports for some small employers who filed only a handful of EEO-1 Reports also required more than 3.4 hours.

Importantly, our time estimates do not include the time it took our clients to initially collect race, ethnicity, and gender information from employees, to update EEO-1 job category information, or to answer any of our data verification and validation questions. Because many of our client's EEO-1 Reports are prepared in conjunction with affirmative action obligations, Berkshire also is able to gain data verification efficiencies through its process, since the data is used for two purposes. As a result, the above time estimates <u>underreport</u> the amount of time it might otherwise take for us to process this data and for our clients to verify and validate these data elements.

Berkshire also conducted an informal survey of its clients who file their own EEO-1 Reports. In terms of filing methods, 87 of those who responded indicated that they manually entered their data into EEOC's online filing system, while 17 stated that they used the batch upload system.[1] Of the 105 who provided us with information about their 2015 EEO-1 Report filing experience, more than 80% indicated that it took them more than 3.4 hours to file their EEO-1 Reports. Almost 25% of responders indicated that it took more than 4 times the amount of time EEOC estimated. All respondents who indicated it might take fewer hours manually entered data into EEOC's online system and reported a total workforce of less than 1,000 employees.

In light of the above empirical data, we urge the EEOC to revisit its burden estimate of the current EEO-1 Report requirements before it adds more requirements. To obtain a more realistic estimate of the time it takes to file the current EEO-1 Report, EEOC could implement a voluntary survey tool for the 2016 filing cycle. Each filer could be asked to complete a survey that collects relevant burden information after certifying their 2016 EEO-1 Reports. The survey could ask how long it took the employer to collect, verify, validate, and report data on the current EEO-1 Report. The survey also could ask for information about the number of employees who assisted with the process, from those who collected the data, to those who verified or reviewed the data, to those who filed the data with the EEOC. This data could then be used to build a more detailed and reliable estimate of the costs of the proposed revisions.

## IV.    THE TIME AND COST OF COMPLYING WITH THE PROPOSED REVISIONS TO THE EEO-1 REPORT

Berkshire also believes that the EEOC has significantly underestimated the costs of complying with the proposed collection of compensation and hours worked information. In its proposal, the EEOC estimates that it will take each filer 6.6 hours to file all required EEO-1 Reports. This estimate is, again, without regard to the number of reports that each filer may have to submit. The EEOC estimates that this work will be performed by an administrative employee, earning $24.23 per hour, for a total cost per filer of $159.92. The EEOC also estimates that each filer will spend 8 hours in one-time costs to develop queries related to Component 2 in existing HRIS systems. The EEOC estimates that this work will be performed by one person at a wage rate of $47.22 per hour, for a total one-time implementation burden of $377.76 per filer.

---

[1] Two stated they utilized paper filings. Because respondents were not required to answer every question, the number of respondents who answered this question is different than the number of respondents who estimated the amount of time it took them to complete their EEO-1 Reports.

### A.  The first year implementation costs are far greater than estimated

Requiring that employers provide W-2 wage information would require extensive research and data entry for most employers. Many employers do not maintain W-2 wage information, EEO-1 job category, and race, gender, and ethnicity information in a single, centralized system or database. In light of this, we believe that many of the small to mid-size employers we work with will have to manually compile this information on an annual basis. For larger employers, where manual tabulation is simply not possible, responding to a compensation data collection tool that requires reporting of W-2 wage information by EEO-1 job category will require a capital investment in new systems or programs. The EEOC significantly underestimated the burden associated with these tasks in its proposal.

Our informal survey of clients indicated that more than 1/3 of those who responded do not currently use the same HRIS and payroll provider. Regardless of whether the same or different vendors were used for HRIS and payroll reporting, more than 85% of respondents estimated that it would cost more than $378 to implement the proposed changes at their workplace. The costs rise exponentially for larger employers, who may have multiple different HRIS, payroll, and timekeeping systems for different employees, geographic areas, or business units. For example, it is not uncommon for companies that recently merged to utilize multiple HRIS and payroll providers. Yet many of these entities still must file their EEO-1 Reports in a consolidated fashion, thereby requiring that these employers not only integrate one to three IT systems, but many, many more.

As a vendor who will also need to revise its software if this proposal is finalized, Berkshire estimates that it will require a total of 252 hours to update our software to comport with the proposed changes. Berkshire estimates that two members of our Client Services team will need to review the EEOC's final data requirements to advise our product development team on the necessary revisions; this is likely to require a minimum total of four hours. Berkshire further estimates that at least three members of our product development team will need to be involved with reprogramming and testing our software module to comport with these revised specifications. We estimate that reprogramming will require a total of 160 hours of time. We also estimate that Client Services team members will spend an additional eight hours of time reviewing and commenting on draft programming modules before the revised product is finished. Finally, Berkshire estimates that 80 hours will be spent testing the revised software to ensure that it works as intended.

### B.  The annual burden of filing Component 1 and 2 is significantly more than estimated

The EEOC estimates that it will take each filer 6.6 hours to file both components of the EEO-1 Report. In reaching this estimate, the EEOC estimates that it will take one hour for each filer to read the instructions and 5.9 hours to collect, verify, validate, and report data on both Component 1 and Component 2. The agency provides little detail as to how it arrived at these burden estimates, but it is clear that the agency relied on the same misguided assumption that it did when recalculating the current burden costs. As noted above, electronic filing, rather than paper filing, does not eliminate the need for filers to manually key the data into each relevant cell

for each establishment, headquarters, and establishment report. Given this fact, it seems highly unlikely to us, based on our experience in filing hundreds of EEO-1 Reports each year, that an employer who files a mere 5 EEO-1 Reports will be able to collect, verify, validate, and report data in the 18,300 cells required for both Component 1 and Component 2 (3,660 cells per EEO-1 Report x 5 EEO-1 Reports) in 5.9 hours or less.

Those clients who responded to our informal survey agreed with our conclusion. Of the 91 providing a response, about 96% believe that it will take more than 6.6 hours to collect, verify, validate, and report data on both Component 1 and Component 2 of the EEO-1 Report. More than 60% of these clients estimated that it would require at least 16 hours per year to file the revised report, with many suggesting that the revised report would take more than 30 hours to file. Almost 84% of the clients who responded to questions about the cost of annual report filing estimated the cost to be greater than the $160 per filer estimated by the EEOC.

Furthermore, if the EEOC believes that the "mere reporting" of compensation data is likely to encourage employers to self-monitor and comply voluntarily if they uncover pay inequities, it cannot be the case that the EEOC also believes that a single administrative employee paid $23.24 per hour will collect, verify, validate, and report the data required by the proposed data collection. Quite simply, the agency cannot simultaneously minimize the burden of the proposed data collection by saying a low-level administrative employee will handle the reporting and then, in the same breath, maximize the benefit of the proposed data collection by asserting that the proposed reporting will encourage employers to voluntarily address any pay disparities identified through the reporting process. While working with employers to perform in-depth salary equity analyses, it is Berkshire's experience that numerous individuals are involved in compiling the required data, researching any preliminary results, evaluating the identified reasons for any pay differences, and determining whether remedial measures should be taken. These individuals may range from a data entry clerk to a human resource professional to a compensation specialist to an internal or external legal counsel. As noted above, Berkshire's salary equity projects are often active for 60 days or more, and consume many, many hours of vendor and client time.

In sum, understanding the reasons for raw wage disparities, and determining whether any part of such disparities is due to race or gender, is far more complicated than suggested by the EEOC's annual burden estimate. Because Title VII protects both men and women, and individuals of all races, employers cannot simply adjust the wages of employees because of an identified raw wage gap without fully satisfying themselves that legitimate, nondiscriminatory reasons cannot explain the difference in pay, thereby justifying remedial action. It is disingenuous of the EEOC to suggest that employers will use this reporting requirement to actively monitor their pay practices, while also estimating that an administrative employee will perform all of this work in 6.6 hours.

## V.    THE IMPORTANCE OF SECURE FILING AND CONFIDENTIALITY

Based on our experiences with the current EEO-1 Report filing process, Berkshire is concerned that the EEOC has not sufficiently evaluated how it will safely collect and appropriately use the proposed wage information.  There are two reasons for our concerns: (1) the current lack of a secure transmission portal for sending the data to the government; and (2) the lack of guaranteed confidentiality once the data is submitted.

First, Berkshire believes that the EEOC has significantly underestimated the changes that might need to be made to the current report filing system before it will be ready to securely and efficiently collect the proposed data from employers. We think it is likely that many more employers will seek to use the batch upload feature if the proposed revisions are finalized, because of the sheer increase in the number of data cells that would otherwise need to be manually entered into the EEOC's electronic system. Under the current EEO-1 Report, employers manually enter 180 data cells for each establishment. Under the proposal, employers would need to manually enter more than 3,600 data cells for each establishment. Because of the magnitude of change in the number of data entry cells, we believe that many more employers will seek to use the batch upload filing method.

Currently, employers must <u>email</u> their batch upload to the EEOC without the ability to encrypt or password protect the file since there is no mechanism for providing a password to the receiver. EEOC does not provide a secure transmission site for this purpose. Berkshire respectfully submits that this approach, while perhaps adequate for the collection of employee race, ethnicity, and gender information, is wholly inadequate for the transmission of sensitive pay data. Other agencies that require the submission of W-2 wage data provide secure channels for transmission. *See, e.g.,* Internal Revenue Service website, available at https://www.irs.gov/uac/efile-with-Commercial-Software (last visited March 22, 2016) noting that electronically filed submissions that are uploaded rather than entered directly in the IRS' online system are "securely transmitted through an IRS-approved electronic channel . . . because e-mail is not as safe as our secure channels." In evaluating the feasibility of a more secure portal, the agency should keep in mind that many employers have firewalls that prohibit or severely restrict the transmission of data over the Internet, including the size of files that may be transmitted. Similarly, any electronic submission system should be designed to permit secure encryption of data and password protection for all data uploads.

The EEOC's cost estimates do not appear to include the creation of a secure transmission method for sending these batch files to the agency. The only identified costs to the government are increases to the EEOC's internal staffing costs and the cost of the current contract with EEOC's designated vendor. *See also* OFCCP's FY 2017 Congressional Budget Justification, available at http://www.dol.gov/sites/default/files/documents/general/budget/CBJ-2017-V2-10.pdf noting OFCCP's FY16 plans to establish a secure file transfer protocol site to allow federal contractors to securely submit compensation information, to the agency. We also do not believe that an employer should be responsible for encrypting its own data, as was suggested at the public hearing. In our experience, most employers do not currently have a secure transmission site of their own.  Indeed, most of Berkshire's clients use our secure transmission site for sending and receiving sensitive information to us. If the EEOC continues to maintain that data security is the responsibility of filers, EEOC should then add the cost of employer creation of a secure file transfer site for this purpose in its burden estimates.

Second, Berkshire recommends that the EEOC and the OFCCP take more concrete steps to protect the confidentiality of employee pay data from a cybersecurity attack or otherwise unauthorized disclosure. The EEOC's proposal, even after exempting employers with less than 100 total employees and accounting for the fact that the collected pay data is reported by pay band, would still gather very specific compensation information by specific establishments, including very small establishments. For many small employers, and even larger employers with

small establishments or few employees in certain EEO-1 job categories, reporting data in this manner will result in the reporting of individual, employee-level data, albeit by pay band. The EEOC's proposal also indicates that the EEOC will publish the compensation data of employers in an aggregated format, and testimony provided at the public hearing revealed that the agency regularly makes establishment-level EEO-1 data available to some unspecified group of academic researchers.

Based on our experience with helping employers provide individual employee-level compensation data to the OFCP during compliance reviews, we know that compensation data is especially sensitive and confidential – to both employees and employers. Release of an individual's compensation information – through the Freedom of Information Act ("FOIA"), by intentional misappropriation, or through a database of aggregate compensation information – poses serious concerns to the employers with whom Berkshires works. Likewise, it is not hard to imagine that many employees would not want to have their compensation information made publicly available because of a cyber security breach of the EEO-1 Report filing system. Although we understand that the EEO-1 Report online filing system has not been breached heretofore, it also did not contain such valuable data as it will going forward. For this reason, Berkshire urges the EEOC not to move forward with the implementation of any compensation data collection tool until appropriate data security safeguards are developed, tested, and perfected to ensure protection of employees' pay data.

We also urge the EEOC to develop protocols for safely transmitting this information to OFCCP, other federal civil rights agencies, and state and local fair employment practices agencies. All data should be submitted via a secure file transmission site. The receiving agency should have to certify that it will maintain the data on a secure internal site. In the case of the OFCCP, the agency should take affirmative steps to provide this data more protection than is provided under the current Freedom of Information Act process, which provides that such data will be produced unless the employer makes timely affirmative objections. For example, we are aware of instances where the OFCCP has sent an employer's EEO-1 data to a different employer during a compliance review. We also are aware of instances where the agency has "lost" personnel activity information because it was stored on an individual computer of a former employee, on a laptop taken home by employees who work remotely, or for other reasons. If the OFCCP does not believe it has the authority to offer employers and employees the same confidentiality protections afforded by Title VII of the Civil Rights Act of 1964, as amended, we suggest that the OFCCP seek an amendment to Executive Order 11246 in order to ensure such protection.

## VI.    SUGGESTIONS FOR MINIMIZING THE FILING BURDEN

Although we question whether a uniform compensation data collection tool of any kind will be useful because of the complexity of pay decisions, we do believe there are some steps the EEOC could take to minimize the burden of an annual data collection tool.

### A.  Change the wage unit to be reported

Under the EEOC's current proposal, employers would be required to report W-2 wage information for employees. The agency's proposed collection of W-2 wage information is misplaced for several reasons. First, the proposal will not allow the government to compare

comparable compensation data points, and is inconsistent with the manner in which most employers currently evaluate salary equity issues. Second, the proposal does not appropriately minimize the burden on employers, when other more readily available data points would allow the EEOC an adequate window into employer's pay decisions.

W-2 wages are defined broadly by the IRS to include payments by an employer to an employee for parking and mass transit stipends, military stipends, relocation and travel stipends, expense reimbursements, 401(k) contributions, severance payments, deferred compensation, and profit sharing, in addition to any wages. The 2016 General Instructions for Forms W-2 and W-3, are available online at https://www.irs.gov/pub/irs-pdf/iw2w3.pdf (website last visited March 22, 2016). As a result, the W-2 wage information reported in Box 1 includes payments to employees that are driven by reasons other than the employer's decision as to how much total compensation an employee has the potential to earn. Because of this, collecting W-2 wage data will not allow the EEOC or OFCCP to evaluate comparable compensation data points – a key issue if the agencies want to use the data to identify pay disparities that may be based on race or sex.

In helping employers conduct salary equity analyses, Berkshire has never once used W-2 wage information as the basis for analysis, nor has a client ever asked us to analyze employee pay using that unit of analysis. This fact seriously undermines one of the EEOC's stated objectives for the proposed data collection, which was to encourage employers to use the collection process as an opportunity to proactively examine their own pay practices. When conducting salary equity analyses, Berkshire generally begins each salary equity analyses by first looking at base pay because this allows clients to analyze more comparable data points. Another reason W-2 wage information is not used is because W-2 earnings data may not align with an employer's AAP year or the employee's performance review process, which is when most of our clients typically perform large-scale salary equity analyses. Although Berkshire has helped clients evaluate other pay components, such as bonuses or commissions, or the availability of overtime, we often conduct these analyses after first analyzing base pay.

The primary challenge with using a wage unit other than base pay is that the pay can be heavily influenced by employee choice, rather than the wage opportunity offered by the employer. For example, two Professional employees, one male and one female, may earn the exact same base pay, bonus and other compensation, but if the female contributes fully to her 401(k) account and the male employee does not, it will appear that the male employee is earning almost $20,000 more. Providing hours worked for these two employees will shed no light on the legitimate, nondiscriminatory reason for the raw difference in pay. Likewise, while shift differential pay would be included in the W-2 wage amount, the proposed data collection does not include a way for employers to indicate which shift each employee worked, even though employee shift selection may be an important reason for any raw pay differences between men and women. Accounting for these decisions in a robust salary equity analyses would require coding of these employee choices – an impossible task for employers.

Providing W-2 wage information is also problematic because the EEO-1 report is intended to be a "snapshot" of an employer's workforce – what the workforce looks like in a given payroll period. Unlike employee race and gender information, which generally does not change, an employee's pay is fluid and changes regularly. An employee's pay can change within a single 12 month period for a myriad of reasons, such as promotions, other career changes, merit or cost of living increases, or excused leaves of absence. These types of changes will

greatly impact the W-2 wage information reported for that employee in a particular 12 month period, even where a snapshot approach would show that he or she is earning the same as employees of different races and genders performing the same or similar work during the relevant payroll period.

There are a myriad of examples that illustrate these challenges. For example, if a female is promoted into a higher role mid-year, her W-2 wage information will necessarily be lower than others who have been working in the same position the full 12 months, even if she is being paid the same total compensation. Similarly, two employees may have the same stock options available to them, but may choose to cash them out in two different reporting years. Using W-2 wages would make it appear that one employee received significantly more compensation than the other, even though both had the same benefits. Likewise, two sales employees may report different W-2 wage information in a calendar year if one of the sales employees receives a $25,000 signing bonus that year. This will be the result even if the other employee received the same $25,000 signing bonus when he or she began employment in a different calendar year. In each of these examples, providing hours worked information will not account for the legitimate, nondiscriminatory reason for the difference in pay.

Given these limitations, Berkshire believes that annualized base salary or wage rate is a more meaningful data point to collect, if a compensation reporting obligation is implemented. Importantly, taking this approach removes the significant tension between the current "snapshot" approach of the EEO-1 Report and the agency's current proposal. This approach also significantly minimizes the burden on filers because annualized base salary information is regularly maintained in most employers' HRIS systems, where race, ethnicity, gender, and EEO-1 job category information is already stored. Thus, using annualized base salary or wage rate information eliminates the employer time required to gather W-2 wage information spanning two calendar years from a separate payroll system. It also eliminates the need for employers to integrate their existing payroll, timekeeping and HRIS systems, of which there may be many different ones at larger employers. Indeed, collecting annualized base salary eliminates the need to collect hours worked information altogether, which reduces the number of cells to be completed per establishment by half. Eliminating the requirement to report total hours worked also allows employers to more comfortably certify the accuracy of their reports because most employers do not collect actual hours worked information for their exempt employers.

**B. Change the reporting period**

If the EEOC decides to continue to require W-2 wage information, then Berkshire recommends that the EEOC change the reporting period to a calendar year reporting system. Doing so would better harmonize the reporting requirements with reporting of W-2 wage information already provided to other federal agencies, such as the IRS. Under this approach, all employers would use the same snapshot date – December 31 of each year. Employers would then report the data for each employee on the payroll on December 31 sometime in the next calendar year. This would be significantly less burdensome than the current proposal because employers would not need to aggregate W-2 wage and hours worked information over two calendar years before reporting it to the EEOC. This approach also is consistent with the manner in which most

payroll systems store W-2 wage information, which is generally used to prepare W-2 Wage and Tax Statements for the IRS.[2]

### C. Exempt additional small establishments from reporting Component 2 data

To further minimize confidentiality and burden concerns, Berkshire recommends that the EEOC exempt small establishments of larger employers from having to file Component 2 data. For example, EEOC could exempt larger employers from having to provide Component 2 data on the establishment-level report of those locations with less than 50 employees (those that are filed as Type 6 or 8 reports). Berkshire encourages the EEOC to consider eliminating the requirement to provide establishment-level Component 2 data for any establishment of 100 or less employees. For larger employers, this data could be reported on the employer's consolidated report, much like race, ethnicity, and gender are now. Taking one of these approaches better addresses the confidentiality concerns of employees and employers, which are more pronounced in small data samples. These approaches also lower the burden on filers by significantly reducing the number of cells to be completed. We also believe these approaches are consistent with the reasons underlying EEOC's decisions to exempt employers with less than 100 total employees from the requirement altogether.

### D. Develop a different reporting cycle for Component 2

Berkshire also recommends that the EEOC consider adopting a less frequent reporting cycle for Component 2 data. For example, the agency could create a rotating reporting cycle such that only a certain percentage of filers are required to file Component 2 information each year. After filing Component 2 data in any given year, that filer would not file Component 2 data again until the full rotation of filers had done so. The EEOC also could require that Component 2 be filed less frequently by all filers, such as every other year or every three to four years. Either of these approaches would better minimize the burden on filers, while still providing the EEOC with some access to compensation information.

### E. Delay reporting of Component 2 data until 2018

As discussed above, the EEOC's proposal will require that some employers and all vendors make Information Technology system changes in order to collect, maintain, and report the proposed W-2 wage and hours worked information with existing EEO job category, race, ethnicity, and gender data. We believe that most employers will need at least twelve months between the date of any finalized data collection reporting requirement and the first required data collection in order to prepare for this new reporting requirement. While the agency's proposal currently provides that Component 2 will not be required any sooner than the 2017 filing cycle, the agency must recognize that the data that needs to be gathered for that report may cover W-2 wage and hours worked information for a period of time beginning as early as July 2016. To provide employers with a full implementation year to begin collecting, maintaining, and reporting the proposed data, data reporting on Component 2 should not begin until 2018. Taking this approach ensures that employers have a full year between the date the proposal is finalized and collection (not reporting) of the first required data elements. In addition, it allows employers

---

[2] Of course, this approach has limitations too. The most obvious one is that it would limit the EEOC's ability to compare workforce trends from prior year reports with those filed under the new reporting system.

adequate time to budget for these required compliance upgrades. Delaying implementation also allows employers sufficient time to confirm that they have made appropriate changes to their IT systems and that the changes will allow the employer to report the data in the format required by the EEOC.

## <u>CONCLUSION</u>

Berkshire appreciates the opportunity to submit these comments to the EEOC. We would be happy to answer any questions you may have about the current EEO-1 Report filing process.

Respectfully submitted,

Beth A. Ronnenburg
President
Berkshire Associates Inc.
8924 McGaw Court
Columbia, MD 21045
410.995.1195 ext. 1202

Prepared With Assistance From:
Lynn A. Clements
Director, Regulatory Affairs
Berkshire Associates Inc.
8924 McGaw Court
Columbia, MD 21045
410.995.1195, Ext. 1246

JA212

**Declaration of Beth A. Ronnenburg, SPHR, SHRM-SCP**

I, Beth Ronnenburg, do hereby declare as follows:

**Qualifications**

1.  I am over age of 18.  I declare that the statements in this declaration are correct, of my own
    personal knowledge, and I am competent to testify concerning them.

2.  My name is Beth Ronnenburg.  I am President of Berkshire Associates Inc.  Berkshire is a human
    resources consulting and technology firm that specializes in affirmative action.  We prepare
    Affirmative Action Plans and EEO-1 Reports for federal contractors throughout the country.  In 2015,
    we filed over 17,000 EEO-1 reports for over 120 clients.  These reports covered more than 680,000
    employees.

**Description of the EEO-1 Report Process (Collecting, Verifying, and Validating Data)**

3.  Employers are required to collect ethnicity/race and gender for all of their employees.  This process
    typically starts with an invitation for employees to self-identify once they are hired.  According to
    the EEO-1 instructions, "if an employee declines to self-identify, employment records or observer
    identification may be used."  The instructions also indicate that "Employment data must include ALL
    full-time and part-time employees who were employed during the selected payroll period..."

4.  Employers also have to assign each employee to one of the ten EEO-1 job categories. Many
    employers use the *EEO-1 Job Classification Guide* or the EEO-1 Census Codes Cross Walk to properly
    assign particular jobs to the ten broad job categories. In our experience, many employers need to
    update this information for at least a handful of jobs every filing cycle, either because the positon is
    new and has not yet been classified by the employer, or because the job has changed, warranting a
    new classification. Like observer identification, assigning EEO-1 job category is typically a manual
    process, even if stored electronically.

5.  Once an employer chooses a payroll period for their annual EEO-1 Report submission, they must prepare the data by generating a roster that includes employee name/ID, race, gender, job code/title, EEO-1 category, and establishment identifier (if applicable).  If the employer has multiple establishments, they must also collect establishment information, which includes establishment name, address, city, state, zip code, NAICS code, Federal Employer Identification Number (FEIN), EEO-1 Unit number, and DUNS number.

6.  The next step is data validation.  During this process the following checks must be completed:

   - Employers must confirm that all employees in the roster have a valid ethnicity and/or race and gender.  If employees did not self-identify, employers undertake a variety of time-consuming efforts to appropriately identify their race, ethnicity, and gender. In most cases, this requires multiple follow-up inquiries for each employee with unknown race, ethnicity, and/or gender.

   - All job codes should be reviewed to ensure the EEO-1 category assignments are correct.  Any new job codes must be assigned an appropriate EEO-1 category. Because this classification is often initially determined at the establishment level, many large employers confirm that all locations are using the same EEO-1 category for each job code as part of the data verification process.

   - Employers with multiple locations must also undertake the following specific tasks:

      - Ensure all employees in the roster have a valid establishment ID.  Oftentimes employees who work from home (telework) need to be re-coded to a valid establishment and/or reviewed;

      - Ensure the establishment list includes all required information; and

      - Download the prior year location list from the EEO-1 survey website and update the establishment table with the new Unit ID #s for new locations that were filed in the prior year.

- Review all establishments with the same address to verify unique NAICS codes.

**Submission of EEO-1 Reports**

6. Multi-establishment employers must decide how they will file the reports for their locations that have less than 50 employees. They can choose to file either a 'Type 6' or Type '8' report. The Type 6 report just lists the establishment information and the total number of employees at the establishment. A Type 8 report is the same as the Type 4 report, which requires the completion of the detailed grid by EEO-1 category.

7. Employers next need to decide how they want to file the report. There are two primary options:

- Manually enter the required information into the EEOC's online system. Most, if not all, single establishment employers file using this methodology. If an employer has an HRIS, there is typically a standard report that they can generate to then use as a guide when manually entering their information into the online system. It is our experience that a large number of multi-establishment employers also use this methodology.
- Generate a prescribed TXT or CSV file and use the "data upload" process.

**Submission Using the Manual Entry into the Online System**

8. Employers log into the online system and review their list of establishments. New locations need to be added, and locations that have closed need to be marked as such.

9. Employers must then enter the employment details for each of their establishments. Separate reports are filed for the headquarters establishment (Type 3), establishments with 50 or more employees (Type 4), and establishments with less than 50 employees (Type 6 or Type 8). If the employer choses the use Type 6 report for their establishments with less than 50 people, then they also need to manually enter the employment details for the consolidated report (Type 2).

10. Once all of the data is entered into the EEO-1 online system for all establishments, the employer is then prompted to 'certify' the reports.

### Submission Using the Data Upload Option

11. According to Footnote 62 of the proposed EEO-1 Revision, the EEOC indicates that 2% of all filers use the data upload option.  This option allows employers to generate a prescribed TXT or CSV file for a 'data upload.'  Those files are typically created from their HRIS or EEO-1 vendor.

12. It has been our experience that files created from an employer's HRIS typically require customization to ensure that they are pulling the correct data.  Also, it has been our experience that some HRIS do not provide the employer with the option to file Type 6 reports for establishments with less than 50 employees.  The file defaults to the Type 8 format.

13. Berkshire has created a proprietary, commercial software product 'BALANCEaap' that is used to generate Affirmative Action Plans, EEO-1 Reports, and VETS-4212 Reports.  We use this product internally to generate EEO-1 Reports (both PDF copies for use when manually entering the data into the online system, and the TXT file for data upload) for our consulting clients. In addition, software clients also use our product to generate their reports.  We estimate that it took us over 345 hours to develop and test this functionality in our software.  In addition, we spent another six hours in September of 2015 to make updates when the EEOC made unexpected changes to the requirements of the data file by requiring FEIN for each establishment.  This change was not communicated to filers by the EEOC. One of our staff members noticed this new requirement when she attempted to test a client's data file.  Berkshire had to notify the EEOC that the document on its website was not updated to reflect this change in the requirements.

14. Once the file is generated, it must be tested using the EEO-1 Survey site.  Employers are required to log into the EEO-1 test system and have to enter their Login ID, password, company name, contact name, contact email, and contact phone number each time they need to test a file. If an employer

has more than 2,000 establishments, they must break up the file and test it in batches.  This is a

cumbersome and time-consuming process.

15. The test site reviews the data and lets the employer know if there are issues with any particular

establishments.  If there are errors for existing establishments, it will report the EEO-1 Unit Number

and let the employer know the reason for the error or warning.  These issues then need to be

researched and fixed in either the employer's HRIS or within their vendor's EEO-1 Reporting tool.

Unfortunately if the error or warning is occurring at a new location, the test system can only tell the

employer the line in the text file that is returning the error or warning.  It requires the employer to

then open the TXT file in a compatible program to look for the specific line of data to determine

what correction needs to occur.

16. Again, the process of resolving establishment-level errors was quite problematic in 2015.  Without

notice, the EEOC announced in August 2015 that it would not allow employers to file separate EEO-1

reports for establishments with the same address and NAICS code, even if the establishments had

different FEINs.  This caused many errors for employers and required numerous changes to ensure

the submitted data fit these new requirements.  The lack of notice by the EEOC prevented HRIS and

other vendors from updating their systems in advance to ensure a smooth transition for employers.

17. In addition to the TXT file, employers are also required to create a 'Closed Location' file.  They must

compare the establishment list from the prior year submission to the current year submission and

identify which establishments have closed.  This list must include the EEO-1 Unit Number for these

establishments.

18. Once the file no longer has errors, it is ready to be sent to the EEOC.  EEOC requires that employers

email the data file along with the closed location spreadsheet.  EEOC does not use a secure file

transfer site for this purpose nor is there a method for encrypting or password-protecting a file sent

to EEOC. Once the file is emailed, employers typically receive an automatic response acknowledging

the receipt of the file and letting them know they will be contacted once the file has been uploaded.

19. In 2015, our experience is that there was a 1-2 month lag between when the file was emailed to the

EEOC and when it was uploaded to the EEO-1 Report online system.  For the 2015 reporting period,

some files that were submitted prior to the deadline were not loaded until early 2016, and only after

employers received a delinquent notice.

20. Once notification has been received that the file was uploaded, employers must log into the online

system and review the results of the upload.  Our experience is that, although the file was tested

and accepted, at least 20% of the establishments are still marked as 'Incomplete' and require a

manual review.  A sampling of reasons why an establishment might be marked as "Incomplete" are

as follows:

- Although a closed location file was submitted at the same time as the data file, in many cases,

  the EEOC failed to mark those locations as closed.  This required the employer to manually click

  through those reports with no employees and mark them as closed.

- An establishment report also is marked as "Incomplete" whenever the employment count at the

  location was 35% greater or less than the count for the prior year.  It again requires the

  employer to click through the report to verify that the employment count for that establishment

  is correct.

- An establishment report also is marked as "Incomplete" when the city name used in the address

  does not match the zip code, such as when the city name used was "St. Louis" versus "Saint

  Louis." Other instances flag if city/state/zip code do not match the current Unites States Postal

  Service zip code system, and this requires a manual correction.

21. Once all of the reports are marked as 'complete,' the employer is then able to certify the reports.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this  31  st day of March, 2016 at Columbia, MD.


_Beth Ronnenburg_
_____

Beth Ronnenburg
President, Berkshire Associates Inc.

**Federal Register** / Vol. 81, No. 135 / Thursday, July 14, 2016 / Notices    **45479**

supported by the rationales included in those documents.

Following public comment, the Agency will issue interim or final registration review decisions for the pesticides listed in the tables in Unit II.

The registration review program is being conducted under congressionally mandated time frames, and EPA recognizes the need both to make timely decisions and to involve the public. Section 3(g) of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 U.S.C. 136a(g)) required EPA to establish by regulation procedures for reviewing pesticide registrations, originally with a goal of reviewing each pesticide's registration every 15 years to ensure that a pesticide continues to meet the FIFRA standard for registration. The Agency's final rule to implement this program was issued in August 2006 and became effective in October 2006, and appears at 40 CFR part 155, subpart C. The Pesticide Registration Improvement Act of 2003 (PRIA) was amended and extended in September 2007. FIFRA, as amended by PRIA in 2007, requires EPA to complete registration review decisions by October 1, 2022, for all pesticides registered as of October 1, 2007.

The registration review final rule at 40 CFR 155.58(a) provides for a minimum 60-day public comment period on all proposed interim registration review decisions. This comment period is intended to provide an opportunity for public input and a mechanism for initiating any necessary amendments to the proposed interim decision. All comments should be submitted using the methods in **ADDRESSES**, and must be received by EPA on or before the closing date. These comments will become part of the docket for the pesticides included in the tables in Unit II. Comments received after the close of the comment period will be marked ''late.'' EPA is not required to consider these late comments.

The Agency will carefully consider all comments received by the closing date and may provide a ''Response to Comments Memorandum'' in the docket. The interim registration review decision will explain the effect that any comments had on the interim decision and provide the Agency's response to significant comments.

Background on the registration review program is provided at: *http://www2.epa.gov/pesticide-reevaluation.*

**Authority:** 7 U.S.C. 136 *et seq.*

Dated: July 6, 2016.
**Michael Goodis,**
*Acting Director, Pesticide Re-Evaluation Division, Office of Pesticide Programs.*
[FR Doc. 2016–16709 Filed 7–13–16; 8:45 am]
**BILLING CODE 6560–50–P**

---

# EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## [3046–007]

## Agency Information Collection Activities; Notice of Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO–1)

**AGENCY:** Equal Employment Opportunity Commission.

**ACTION:** Notice.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995 (PRA), the Equal Employment Opportunity Commission (EEOC or Commission) announces that it is submitting to the Office of Management and Budget (OMB) a request for a three-year PRA approval of a revised Employer Information Report (EEO–1) data collection. Employers have submitted the EEO–1 report for over fifty years. The Commission is responsible for PRA compliance for the EEO–1, although it is a joint data collection to meet the statistical needs of both the EEOC and the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP). This PRA submission has two components. Component 1 describes the data now collected by the currently approved EEO–1, which is data about employees' ethnicity, race, and sex by job category (demographic data). Component 2 describes the W–2 (Box 1) and hours-worked data that will be added to the EEO–1 with OMB's approval under this PRA request (pay data). EEO–1 respondents must comply with the 2016 filing requirement for the currently approved EEO–1.

**DATES:** Submit comments on or before August 15, 2016.

**ADDRESSES:** Comments on this notice must be submitted to Joseph B. Nye, Policy Analyst, Office of Information and Regulatory Affairs, Office of Management and Budget, 725 17th Street NW., Washington, DC 20503, email *oira_submission@omb.eop.gov.* Commenters are also encouraged to send comments to the EEOC online at *http://www.regulations.gov,* which is the Federal eRulemaking Portal. Follow the instructions on the Web site for submitting comments. In addition, the

EEOC's Executive Secretariat will accept comments in hard copy by delivery by COB on August 15, 2016. Hard copy comments should be sent to Bernadette Wilson, Acting Executive Officer, EEOC, 131 M Street NE., Washington, DC 20507. Finally, the Executive Secretariat will accept comments totaling six or fewer pages by facsimile (''fax'') machine before the same deadline at (202) 663–4114. (This is not a toll-free number.) Receipt of fax transmittals will not be acknowledged, except that the sender may request confirmation of receipt by calling the Executive Secretariat staff at (202) 663–4070 (voice) or (202) 663–4074 (TTY). (These are not toll-free telephone numbers.) The EEOC will post online at *http://www.regulations.gov* all comments submitted via this Web site, in hard copy, or by fax to the Executive Secretariat. These comments will be posted without change, including any personal information you provide. However, the EEOC reserves the right to refrain from posting libelous or otherwise inappropriate comments including those that contain obscene, indecent, or profane language; that contain threats or defamatory statements; that contain hate speech directed at race, color, sex, national origin, age, religion, disability, or genetic information; or that promote or endorse services or products. All comments received, including any personal information provided, also will be available for public inspection during normal business hours by appointment only at the EEOC Headquarters' Library, 131 M Street NE., Washington, DC 20507. Upon request, individuals who require assistance viewing comments will be provided appropriate aids such as readers or print magnifiers. To schedule an appointment, contact EEOC Library staff at (202) 663–4630 (voice) or (202) 663–4641 (TTY). (These are not toll-free numbers.)

**FOR FURTHER INFORMATION CONTACT:** Ronald Edwards, Director, Program Research and Surveys Division, Equal Employment Opportunity Commission, 131 M Street NE., Room 4SW30F, Washington, DC 20507; (202) 663–4949 (voice) or (202) 663–7063 (TTY). Requests for this notice in an alternative format should be made to the Office of Communications and Legislative Affairs at (202) 663–4191 (voice) or (202) 663–4494 (TTY).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Background
II. The EEOC's Legal Authority To Propose This EEO–1 Report
   A. Title VII of the Civil Rights Act of 1964

B. The Paperwork Reduction Act of 1995
III. Revisions to the EEO–1 Report Are Necessary for the Enforcement of Title VII, the EPA, and Executive Order 11246
IV. Who Will Report Pay Data on the Revised EEO–1
  A. Employers That Currently File the EEO–1
  B. 60-Day Notice: Which Employers Would File Pay Data
  C. Public Comments
  D. 30-Day Notice: Employers With 100 or More Employees Will File Components 1 & 2
V. When To File: Filing Deadline and Workforce Snapshot Period
  A. 60-Day Notice
  B. Public Comments
  C. 30-Day Notice
  1. Deadline for Filing the EEO–1
  2. "Workforce Snapshot" Period
VI. What Pay Data To Report: Measure of Pay for the EEO–1
  A. 60-Day Notice: Options for Measuring Pay
  B. Public Comments
  1. Supporting the Use of W–2 Income
  2. Opposing the Use of W–2 Income
  C. 30-Day Notice: W–2 (Box 1) Income Is the Measure of Pay
  1. W–2 Income and Employee Choice
  2. Supplemental Income Is Important and May Be Linked to Discrimination
  3. Bridging HRIS and Payroll
VII. What Data To Report: Hours Worked
  A. 60-Day Notice
  B. Public Comments
  C. 30-Day Notice
  1. The Importance of Collecting Hours Worked
  2. Defining "Hours Worked"
  3. Reporting Hours Worked for Nonexempt Employees
  4. Reporting Hours Worked for Exempt Employees
VIII. How To Report Data in Component 2: Pay Bands and Job Categories
  A. 60-Day Notice
  B. Public Comments
  C. 30-Day Notice
IX. How the EEOC Will Use W–2 and Hours-Worked Data
  A. 60-Day Notice
  B. Public Comments
  C. 30-Day Notice
  1. Early Assessment of Charges of Discrimination
  2. EEOC Publications Analyzing Aggregate EEO–1 Data
  3. EEOC Training on the Pay Data Collection
X. Confidentiality of EEO–1 Data
  A. 60-Day Notice
  B. Public Comments
  C. 30-Day Notice
  1. Legal Confidentiality
  a. EEOC
  b. OFCCP
  2. Data Protection and Security
XI. Paperwork Reduction Act Burden Estimates
  A. Background
  B. 60-Day Notice
  C. 30-Day Notice
  1. Annual Burden Hours
  2. Hourly Wage Rates
XII. Formal Paperwork Reduction Act Statement
  A. Overview of Information Collection
  1. 2016 Overview of Information Collection—Component 1
  2. 2017 and 2018 Overview of Information Collection—Components 1 and 2
  a. Component 1 (Demographic and Job Category Data)
  b. Components 1 and 2 (Demographic and Job Category Data Plus W–2 and Hours Worked Data)
  B. 30-Day Notice PRA Burden Statement

## I. Background

This final proposal to supplement the longstanding EEO–1 employer information report (currently approved by OMB under Control Number 3046–0007) is intended to support the EEOC's pay discrimination investigations by collecting employer- and gender-, race-, and ethnicity-specific pay data to identify pay disparities that may result from discriminatory practices or policies. This Notice provides stakeholders with their second opportunity to comment on this proposal.

The EEOC published the first notice of this proposed revision in the **Federal Register** on February 1, 2016, for a 60-day comment period (the "60-Day Notice").[1] It announced which employers would be required to file pay data, what data would be collected, when the due date would be, how the data would be analyzed, and how the proposed collection and analysis would protect confidentiality and privacy. As required, the 60-Day Notice estimated the cost to employers of completing the current EEO–1 (Component 1) and the proposed revision of the EEO–1 (Components 1 and 2).

The EEOC received 322 timely public comments in response to the 60-Day Notice. The comments were submitted by individual members of the public, employers, employer associations, Members of Congress, civil rights groups, women's organizations, labor unions, industry groups, law firms, and human resources organizations. Over 120 of the 322 comments were part of mass mail campaigns mostly supporting the proposal, although one mass mail campaign opposed the proposal. The mass mail campaigns included submissions from organizations that collected up to thousands of signatures from their members or supporters.

The Commission also held a public hearing on March 16, 2016, and heard from 15 witnesses representing a range of stakeholders including employers, employees, and academics. The Commission reviewed their detailed written submissions, heard them discuss their different perspectives on the proposal, and asked them questions.[2]

Pursuant to the required procedures under the PRA, the Commission now publishes its final proposal to supplement the EEO–1 for a second round of public comments, to last 30 days (hence the "30-Day Notice"). The EEOC also is formally submitting the proposed EEO–1 revisions to OMB for consideration and decision.

This 30-Day Notice summarizes the 60-Day Notice, describes the public comments, and explains the Commission's decisions. In making these decisions, the Commission took into account all of the hearing testimony and public comments. The Commission also assessed government data regarding components of compensation in United States workplaces, relevant academic literature on compensation practices and on discrimination, and the conclusions of two studies commissioned by the EEOC to examine how and whether to implement a pay data collection.[3] This 30-Day Notice sets forth the EEOC's conclusions about the ways the proposed pay data collection will be used to enhance and increase the efficiency of enforcement efforts while facilitating employer self-evaluation and voluntary compliance.

## II. The EEOC's Legal Authority To Propose This EEO–1 Report

In written comments in response to the 60-Day Notice, several interested parties questioned whether the EEOC has legal authority to collect pay data and whether the agency should have conducted a formal rulemaking to impose a pay data reporting requirement. As explained in more

---

[1] 81 FR 5113 (Feb. 1, 2016).

[2] The press release on the hearing is available at EEOC, *EEOC Hears Wide Range of Views at Public Hearing on Proposed Changes to EEO–1 Form* (Mar. 16, 2016), *https://www.eeoc.gov/eeoc/newsroom/release/3-16-16.cfm.* The statements and biographies of the witnesses are available at EEOC, *Hearing of March 16, 2016—Public Input into the Proposed Revisions to the EEO–1 Report, http://www.eeoc.gov/eeoc/meetings/3-16-16/.*

[3] The first EEOC-commissioned study, resulting in a 2012 report from the National Research Council, National Academy of Sciences (NAS Report), outlined the potential value for EEOC enforcement of collecting pay data from employers by sex, race, and national origin through a report such as the EEO–1. National Research Council, 2012. *Collecting Compensation Data from Employers.* Washington, DC: National Academies Press, *http://www.nap.edu/read/13496/chapter/1#ii.* The second study, reported by an EEOC contractor in 2015, provided detailed analysis of different approaches to implementing the report and included assessments of different statistical analyses for employer data. Sage Computing, *EEOC Pay Pilot Study* (September, 2015), *http://www.eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf.*

JA221

detail below, the EEOC has the legal authority to collect pay data under Title VII of the Civil Rights Act of 1964, as amended (Title VII),[4] without conducting a formal rulemaking because the EEOC is responsible for enforcing federal laws that prohibit wage discrimination on the basis of sex, race and national origin, and Title VII grants the EEOC broad authority to collect data from employers regarding compliance with federal anti-discrimination laws. The EEOC has exercised this statutory authority by implementing a regulation to establish the EEO–1 reporting requirement, and now administers the EEO–1 report pursuant to the PRA.

### A. Title VII of the Civil Rights Act of 1964

The EEOC is responsible for enforcing Title VII, which prohibits all employment discrimination, including pay discrimination, based on race, color, religion, national origin, or sex.[5] The EEOC also enforces other federal laws prohibiting employment discrimination, including the Equal Pay Act of 1963 (EPA), which prohibits certain gender-based pay discrimination.[6]

The EEOC's authority to promulgate the EEO–1 report is found in section 709(c) of Title VII, which requires employers covered by Title VII to make and keep records relevant to whether unlawful employment practices have been or are being committed, to preserve such records, and to produce reports as the Commission prescribes by regulation or order, after public hearing, "as reasonable, necessary, or appropriate for the enforcement of this subchapter or the regulations . . . thereunder." [7] The Commission prescribes the EEO–1 report by regulation at 29 CFR part 1602, subpart B, which requires private employers with 100 or more employees to "file [annually] with the Commission or its delegate executed copies of [the] . . . EEO–1 [report] in conformity with the directions set forth in the form and accompanying instructions." The EEOC administers the EEO–1 jointly with OFCCP, which enforces the employment discrimination prohibitions of Executive Order 11246, as amended, for federal contractors and subcontractors (contractors), including specific provisions regarding pay discrimination and transparency.[8] OFCCP's regulations

require contractors to submit "complete and accurate reports on Standard Form 100 (EEO–1) . . . or such form as may hereafter be promulgated in its place." [9] The Joint Reporting Committee, composed of the EEOC and OFCCP and located at the EEOC, administers the EEO–1 as a single data collection to meet the statistical needs of both agencies while avoiding duplication.

### B. The Paperwork Reduction Act of 1995

Since 1995, the EEO–1 report also has been governed by the Paperwork Reduction Act of 1995 (PRA), which provides standards for federal data collections and requires periodic Office of Management and Budget (OMB) review and renewal.[10] The EEOC is responsible for maintaining PRA approval of the EEO–1.

The EEOC, like other federal agencies subject to the PRA, generally follows a multi-step process for maintaining OMB approval of an information collection, which culminates in OMB deciding if the proposed collection "strikes a balance between collecting information necessary to fulfill [the agency's] statutory mission[ ] and guarding against unnecessary or duplicative information that imposes unjustified costs on the American public." [11] The first step is for the agency to publish a proposed information collection for a 60-day public comment period, which ran from February 1 to April 1, 2016 for this EEO–1 revision.[12] Then, in light of the public comments and its statutory mission, the agency formulates a final

data collection, which it publishes in the **Federal Register** and submits to OMB for approval, subject to a 30-day public comment period.[13] The current document, which has been approved by a majority of the Commission, is the EEOC's 30-Day Notice for the revised EEO–1.

The EEOC has consistently used the PRA renewal process to change the EEO–1. Most recently, in 2006, the PRA process was used to significantly revise the EEO–1 by adding a new race category, requiring employers to ask employees to self-identify by race and ethnicity, and requiring employers to ask about ethnicity (Hispanic or Latino) in a separate question.[14] The 2006 EEO–1 revision also added a new job category.[15]

### III. Revisions to the EEO–1 Report Are Necessary for the Enforcement of Title VII, the EPA, and Executive Order 11246

Some public comments opposing the EEOC's proposal in the 60-Day Notice questioned whether there are still pay disparities that are caused by discrimination linked to gender, race, or ethnicity and, accordingly, whether there is actually a need for more effective enforcement of the prohibitions on pay discrimination in Title VII, the EPA, and E.O. 11246.

Based on federal data and a robust body of research, the Commission concludes that: (1) Persistent pay gaps continue to exist in the U.S. workforce correlated with sex, race, and ethnicity; (2) workplace discrimination is an important contributing factor to these pay disparities; and (3) implementing the proposed EEO–1 pay data collection will improve the EEOC's ability to efficiently and effectively structure its investigation of pay discrimination charges.

First, persistent pay gaps exist in the U.S. workforce correlated with sex, race, and ethnicity. As of 2014, for women of all races and ethnicities, the median annual pay for a woman who held a full-time, year-round job was $39,621, while the median annual pay for a man who held a full-time, year-round job was $50,383.[16]

---

[4] 42 U.S.C. 2000e, *et seq.*

[5] *Id.*

[6] 29 U.S.C. 206(d).

[7] 42 U.S.C. 2000e–8(c).

[8] E.O. 11246, as amended, 30 FR 12319, 41 CFR 60–1.7(a). Executive Order 13665 amends E.O. 11246 to promote pay transparency for federal contractors, protect employees and job applicants,

and make it possible for employees and job applicants to share information about their pay without fear of discrimination. E.O. 13665, 79 FR 20749, available at: *https://www.gpo.gov/fdsys/pkg/DCPD-201400250/pdf/DCPD-201400250.pdf*. OFCCP's recently adopted final rule on sex discrimination (OFCCP Rule on Discrimination on the Basis of Sex) addresses a number of sex-based barriers to equal employment and fair pay. The rule requires contractors to provide equal opportunities "without regard to sex." 41 CFR part 60–20. *See also* 81 FR 39108, 39125–39129 (June 15, 2016).

[9] 41 CFR 60–1.7(a).

[10] According to the OMB, "collection of information" may include: (1) Requests for information to be sent to the government, such as forms (*e.g.*, the IRS 1040), written reports (*e.g.*, grantee performance reports), and surveys (*e.g.*, the Census); (2) recordkeeping requirements (*e.g.*, OSHA requirements that employers maintain records of workplace accidents); and third-party or public disclosures (*e.g.*, nutrition labeling requirements for food).

Office of Information and Regulatory Affairs, OMB, Memorandum for the Heads of Executive Departments and Agencies and Independent Regulatory Agencies, *Information Collection under the Paperwork Reduction Act* (Apr. 7, 2010), *https://www.whitehouse.gov/sites/default/files/omb/assets/inforeg/PRAPrimer_04072010.pdf*; *See also* 5 CFR 1320.3(c).

[11] *Id.*

[12] 81 FR 5113 (Feb. 1, 2016).

[13] 44 U.S.C. 3507(a)(1).

[14] EEOC, *EEOC Implements Finals Revisions to EEO–1 Report* (Jan. 27, 2006), *https://www.eeoc.gov/eeoc/newsroom/release/archive/1-27-06.html*; *See also* 70 FR 71294 (Nov. 28, 2005); OMB approved these changes on January 25, 2006, Office of Information and Regulatory Affairs, *http://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=200511-3046-001#*.

[15] *Id.*

[16] Carmen DeNavas-Walt and Bernadette Proctor, U.S. Census Bureau, *Income and Poverty in the*
Continued

**45482**    **Federal Register** / Vol. 81, No. 135 / Thursday, July 14, 2016 / Notices

African American and Hispanic or Latina women nationwide now experience the largest pay disparities. As of 2014, African American women were paid almost 40% less than white, non-Hispanic, men and approximately 20% less than white, non-Hispanic women.[17] At a national level, African American women were paid 18% less than African American men.[18]

Similarly, Latina women were paid approximately 44% less than white, non-Hispanic men, and 27% less than white, non-Hispanic, women in 2014.[19] The result of the wage gap is that the average Hispanic or Latina woman would be paid approximately $1,007,000 less than the average white, non-Hispanic, male over a 40-year period.[20]

A similar pattern exists for Native Hawaiian and Pacific Islander women and Native American women who were paid approximately 38% and 41% less than white, non-Hispanic men, respectively.[21] Asian American women were paid 10% less than white, non-Hispanic men.[22]

Wage disparities also exist for men of color. In 2014, African American men who worked full time in wage and salary jobs had median weekly earnings of $680, which represented approximately 76% of white men's median weekly earnings ($897).[23]

Hispanic men earned $616, or approximately 69%, of white men's median weekly earnings.[24]

Employment discrimination may play both direct and indirect roles in creating these pay disparities. Economists Francine Blau and Lawrence Khan found that 64.6% of the wage gap between men and women can be explained by three factors: Experience (14.1%), industry (17.6%), and occupation (32.9%).[25] Men are more likely to work in blue collar jobs that are higher paying, including construction, production, or transportation occupations, whereas women are more concentrated in lower paying professions, such as office and administrative support positions.[26] Most of the remaining 35.4% of the gender gap cannot be explained by differences in education, experience, industry, or occupation.[27] Blau and Khan argue that discrimination—intentional or unintentional, systematic or at the individual level—plays a role in explaining the gap.[28]

Gender bias may become more obvious when occupations have a greater proportion of women. One study found that, in an occupation dominated by men, pay declines when women enter that occupation in large numbers, even after controlling for factors such as education and work experience.[29] The

opposite effect occurred when a larger proportion of men entered a profession previously dominated by women, *i.e.,* pay increased.[30]

One way that gender discrimination may influence pay is through implicit or unconscious bias during hiring, promotion decisions, or job assignments.[31] A study by McKinsey & Company found that women are almost three times more likely than men to have missed out on an assignment, promotion, or increase in wages because of their gender.[32] Another study shows that women who engage in pay negotiations are more likely than men to face backlash due to gender stereotypes.[33]

Similar to gender discrimination, racial discrimination may influence pay through implicit or unconscious bias. A series of studies by MIT Sloan found racial bias in salary negotiations even after controlling for the applicants' objective qualifications.[34] Research by

*United States: 2014,* Current Population, 6 (2015), Table 1: Income and Earnings Summary Measures by Selected Characteristics: 2013 and 2014, *https://www.census.gov/content/dam/Census/library/publications/2015/demo/p60-252.pdf.*

[17] Joan Farrelly-Harrigan, U.S. Dep't. of Labor, Women's Bureau, *Black Women in the Labor Force* (Feb. 2016), *https://www.dol.gov/wb/media/Black_Women_in_the_Labor_Force.pdf* (reporting that African American women's median annual earnings in 2014 was $33,533, $41,822 for white, non-Hispanic women, and $55,470 for white, non-Hispanic men).

[18] *Id.*

[19] Michelle Vaca, U.S. Dep't. of Labor Blog, *Celebrating Hispanic Women in the Labor Force* (Oct. 6, 2015). *http://blog.dol.gov/2015/10/06/celebrating-hispanic-women-in-the-labor-force/* (reporting that the 2013 median annual earnings for Latinas was $30,209).

[20] Joint Economic Committee, United States Congress, *Gender Pay Inequality,* 3 (April 2016) *http://www.jec.senate.gov/public/_cache/files/0779dc2f-4a4e-4386-b847-9ae919735acc/gender-pay-inequality----us-congress-joint-economic-committee.pdf.*

[21] American Association of University Women, *The Simple Truth About the Gender Pay Gap,* 10 (Spring 2016), *http://www.aauw.org/files/2016/02/SimpleTruth_Spring2016.pdf* (reporting that the median annual earnings for Native Hawaiian and Pacific Islander women was $32,893 and $31,191 for Native American women).

[22] *Id.* (reporting that Asian American women's median earnings in 2014 was $47,776).

[23] U.S. Dept. of Labor, Bureau of Labor Statistics, *Women in the labor force; a databook,* BLS Reports, 60–61 (Dec. 2015), Table 16: Median usual weekly earnings of full-time wage and salary workers, in current dollars, by race, Hispanic, or Latino

ethnicity, and gender, 1979–2014 annual averages, *http://www.bls.gov/opub/reports/womens-databook/archive/women-in-the-labor-force-a-databook-2015.pdf.*

[24] *Id.*

[25] Francine Blau and Lawrence Kahn, *The Gender Wage Gap: Extent, Trends, and Explanations,* Institute for the Study of Labor, 73 (Jan. 2016), Table 4: Decomposition of Gender Wage Gap, 1980 and 2010 (PSID), *http://ftp.iza.org/dp9656.pdf* (the authors reported that the gender wage gap for purposes of the study was approximately 79 cents on the dollar in 2010).

[26] DeNavas-Walt and Proctor, *supra* note 16 at 5; *see also* PayScale, *Inside the Gender Pay Gap,* (2016), *http://www.payscale.com/data-packages/gender-pay-gap* (reporting that across the United States women are more likely to be overrepresented in lower paying jobs (jobs that pay less than $60,000 per year) and underrepresented in higher paying jobs compared to men. In addition, female pay levels off at $49,000 between the ages of 35–40 whereas men's pay levels off at $75,000 for the ages of 50–55).

[27] Blau & Kahn, *supra* note 25 at 73, Table 4.

[28] *Id.* A smaller portion of the gap (approximately 5%) can be attributed to geographic region (0.3%) and race (4.3%). The authors do not provide an explanation about why only 4% of the pay gap is attributed to race despite federal data suggesting that the wage gap between and within minorities is much larger. However, women's gains in education helped to narrow the gender wage gap by almost 6% as women now exceed men in educational attainment.

[29] Asaf Levanon, Paula England, Paul Allison, *Occupational Feminization and Pay: Assessing Casual Dynamics Using 1950–2000 U.S. Census Data,* Social Forces 88(2) (Dec. 2009), *http://statisticalhorizons.com/wp-content/uploads/2012/01/88.2.levanon.pdf.*

[30] Claire Cain Miller, *As Women Take Over a Male Dominated Field, the Pay Drops,* NY Times (Mar. 18, 2016), *http://www.nytimes.com/2016/03/20/upshot/as-women-take-over-a-male-dominated-field-the-pay-drops.html?_r=0* (reporting that when more women became designers, for example, wages fell by 34 percentage points. When male computer programmers outnumbered women computer programmers, the job began to pay more and earned more prestige).

[31] Nancy Lockwood, *The Glass Ceiling: Domestic and International Perspectives,* 3 Society for Human Resource Management Quarterly 2004, *https://www.shrm.org/Research/Articles/Articles/Documents/040329Quarterly.pdf* (reporting that signs of the glass ceiling in the workplace can be based on gender-based barriers that may be invisible, covert, and overt).

[32] Lean In & McKinsey & Company, *Women in the Workplace 2015,* 13 (2015), *http://womenintheworkplace.com/ui/pdfs/Women_in_the_Workplace_2015.pdf?v=5.*

[33] Hannah Riley Bowles & Linda Babcock, *How Can Women Escape the Compensation Negotiation Dilemma? Relational Accounts Are One Answer,* Psychology of Women Quarterly, 37.1, 81 (2013), *http://pwq.sagepub.com/content/37/1/80.full.pdf+html* (finding that "[n]egotiating for higher compensation is socially costly for women because it violates prescriptive gender stereotypes derived from the gendered division of labor . . ., and its resulting social hierarchy of men in charge and women in caregiving and support roles").

[34] Moreal Hernandez and Derek R. Avery, *Getting the Short End of the Stick: Racial Bias in Salary Negotiations,* MIT Sloan Management Review (June 15, 2016), *http://sloanreview.mit.edu/article/getting-the-short-end-of-the-stick-racial-bias-in-salary-negotiations/* (MIT conducted three studies focused on racial bias in salary negotiations. In the first study, evaluators reviewed resumes from white and black job applicants. The evaluators were asked to evaluate each job applicant and rate the likelihood that the job applicant would negotiate their salary if offered the job. After controlling for each job applicant's objective qualifications, the evaluators identified the black job applicants as less likely to negotiate compared to the white job applicants. The second study tested whether the evaluators had a racially-biased mindset, which was defined as a person who believes one or a few races were superior to others. The study found that the evaluators had different role expectations of the

Roland Fryer, Devah Pager, and Jörg L. Spenkuch found that discrimination accounts for at least one-third of the black-white wage gap.[35] The authors concluded that, compared to whites with comparable resumes, black job seekers were offered lower compensation by potential new employees and were more likely to accept the lower compensation. The researchers found that, although the wage gaps narrow over time as black workers stay at the same job, an unexplained gap nonetheless persists.[36]

Voluntary compliance is an important part of the effort to prevent discrimination and improve pay equity, and many employers are taking steps to ensure equal pay for equal work. For example, more than 25 companies have signed a White House Equal Pay Pledge to take action to reduce wage disparities in the workplace.[37] These employers committed to conducting an annual company-wide gender pay analysis across occupations, reviewing hiring and promotion processes and procedures to reduce unconscious bias and structural barriers, and embedding equal pay efforts into broader enterprise-wide equity initiatives.[38]

There is also evidence that pay equity is good for business. For example, a McKinsey & Company study found that gender parity in the United States could lead to $4.3 trillion of additional GDP by 2025, which is 19% higher than if current trends in pay inequity continue.[39] Another recent study found

that, on average, companies with greater gender diversity outperformed their peers with less diversity over the previous five years, and had a higher return on equity.[40] The study measured gender diversity according to the following factors: (1) Equality in pay; (2) empowerment (defined as number of women at the highest levels of the corporation and on key committees); (3) representation of women at different levels (including as members of the board of directors, senior executives, and regular employees); (4) work life balance programs; and (5) diversity policies. Pay parity and empowerment were weighted more than the other factors.[41]

Despite voluntary compliance and the strong business case for fair pay, pay discrimination persists as a serious problem that EEOC and OFCCP are statutorily required to address. The EEOC's mission is to stop and remedy unlawful employment discrimination. The OFCCP's purpose is to enforce, for the benefit of job seekers and wage earners, the contractual promise of affirmative action and equal employment opportunity required of those who do business with the federal government. To fulfill these goals, the EEOC and OFCCP need to be as effective and efficient as possible in their investigations of alleged discrimination. They now lack the employer- and establishment-specific pay data that, prior to issuing a detailed request for information or a subpoena, would be extremely useful in helping enforcement staff to investigate potential pay discrimination. Balancing utility and burden, the EEOC has concluded that the proposed EEO–1 pay data collection would be an effective and appropriate tool for this purpose, for all of the reasons explained below.[42]

## IV. Who Will Report Pay Data on the Revised EEO–1

### A. Employers That Currently File the EEO–1

All private employers that are covered by Title VII and have 100 or more employees now file an EEO–1 report about the sex, race, and ethnicity of their employees, which is designated here as Component 1 (demographic data).[43] Federal contractors with 50 or more employees also file the EEO–1 if they are not exempt as provided for by 41 CFR 60–1.5. Single establishment employers file one EEO–1, and multi-establishment employers file EEO–1 reports or data for each establishment.[44] Federal contractors with 1 to 49 employees and other private employers with 1 to 99 employees do not file EEO–1 reports.

### B. 60-Day Notice: Which Employers Would File Pay Data

In the 60-Day Notice, the EEOC proposed that EEO–1 private employers and federal contractors with 100 or more employees would submit the EEO–1 with pay and hours-worked data (Component 2) in addition to Component 1 data. The 60-Day Notice also stated that federal contractors with between 50 and 99 employees would continue to submit Component 1 data but would not submit Component 2 data.

### C. Public Comments

The EEOC received comments urging it to remove employers with fewer than

---

black applicants compared to the white applicants and they also identified the black job applicants as less likely to negotiate. For the third study, the evaluators and job applicants were required to simulate a job negotiation. Although the black job applicants reported that they negotiated comparably (in terms of the number of offers and counteroffers made) to their white counterparts, their evaluators reported that the black job applicants had negotiated more than the white job applicants. The MIT professors concluded that because the evaluators expected the black job applicants to negotiate less, they had an exaggerated view of their behavior during the job negotiation. In addition, the professors found that the black job applicants received lower starting salaries based on the evaluators perception that the black job applicants were more aggressive.

[35] Roland Fryer, Devah Pager, and Jörg L. Spenkuch, *Racial Disparities in Job Findings and Offered Wages,* Journal of Law and Economics, University of Chicago Press, vol. 56(3), 22–23, (Sept. 2011), *http://scholar.harvard.edu/files/fryer/files/racial_disparities_in_job_finding_and_offered_wages.pdf.*

[36] *Id.*

[37] The White House, *White House Equal Pay Pledge, https://www.whitehouse.gov/webform/white-house-equal-pay-pledge. See also,* Natalia Merluzzi, *These Businesses are Taking the Equal Pay Pledge,* White House Blog (June 14, 2016), *https://www.whitehouse.gov/blog/2016/06/14/businesses-taking-equal-pay-pledge.*

[38] *Id.*

[39] McKinsey & Company, *The Power of Parity: Advancing Women's Equality in the United States,*

(April 2016) *http://www.mckinsey.com/global-themes/employment-and-growth/the-power-of-parity-advancing-womens-equality-in-the-united-states.*

[40] Morgan Stanley, *Gender Diversity is a Competitive Advantage* (May 12, 2016), *http://www.morganstanley.com/blog/women/gender-diversity-work; See also* Morgan Stanley, *Why it Pays to Invest in Gender Diversity* (May 11, 2016), *http://www.morganstanley.com/ideas/gender-diversity-investment-framework.html.*

[41] *Id.*

[42] States also are addressing gender pay inequities, including proposing to establish pay transparency, prohibit retaliation against workers who discuss their wages, and request state agencies to examine their pay practices and develop best practices. For a summary of state equal pay laws, see National Conference of State Legislatures, *State Equal Pay Laws—July 2015, http://www.ncsl.org/research/labor-and-employment/equal-pay-laws.aspx.* For a summary of state equal pay legislation, see Kate Nielsen, American Association of University Women, *2015 State Equal Pay Legislation by the Numbers* (August 20, 2015),

*http://www.aauw.org/2015/08/20/equal-pay-by-state/.*

[43] Private employers also must file the EEO–1 if they have fewer than 100 employees *but* are owned or affiliated with another company or have centralized ownership, control or management so that the group legally constitutes a single enterprise and the entire enterprise employs a total of 100 or more employees. EEOC, *EEO–1: Who Must File, https://www.eeoc.gov/employers/eeo1survey/whomustfile.cfm.*

[44] Employers and contractors file different types of EEO–1 reports depending on whether they are single-establishment or multi-establishment filers. Single-establishment filers only file one report, the Type 1 report. Multi-establishment filers submit several reports. These are: The Type 2—Consolidated Report, which must include data on all employees of the company; the Type 3—Headquarters Report, which must include the employees working at the main office site of the company and those who work from home and report to the corporate office; the Type 4—Establishment Report, for each physical location with *50 or more* employees, which provides full employment data categorized by race, gender and job category. For sites with fewer than 50 employees, filers submit either: Type 6—Establishment List, which provides only the establishment name, complete address and total number of employees; or Type 8—Establishment Report, which is a full report for each establishment employing *fewer than 50 employees.*

200, or fewer than 500, employees from the requirement to report pay and hours-worked data on the EEO–1 (Component 2), in order to avoid imposing a burden on them. Some comments also encouraged the EEOC to eliminate the requirement to provide establishment-level pay data for establishments with fewer than 50 or 100 employees. These comments also expressed concern that reporting pay data for small employers, or small employer establishments, could reveal employee-level pay information. Conversely, other comments urged the EEOC to collect data from smaller employers by lowering the reporting threshold for pay data to 50 or more employees for federal contractors.

### D. 30-Day Notice: Employers With 100 or More Employees Will File Components 1 and 2

The Commission has considered the arguments for increasing the size of those employers subject to Components 1 and 2 and has decided to retain the same employee thresholds as in the 60-Day Notice. Exempting employers with fewer than 500 employees, or even fewer than 250, from Component 2 would result in losing data for a large number of employers who employ millions of workers, and thus would significantly reduce the utility of the pay data collection. In addition, the EEOC and OFCCP have decided not to exempt federal contractors with 50–99 employees from filing Component 1 of the EEO–1. The Commission's proposal reduces employer burden by changing other aspects of the EEO–1, such as the reporting deadline. *See* section V.

In sum, all employers with 100 or more employees will be subject to Components 1 and 2 of the EEO–1 starting with reporting year 2017. Federal contractors with 50–99 employees will not experience a change in their EEO–1 reporting requirements as a result of this proposal; they will not file Component 2 and will continue to file only Component 1. Consistent with current practice, federal contractors with 1 to 49 employees and other private employers with 1 to 99 employees will be exempt from filing the EEO–1; they will file neither Component 1 nor Component 2.

## V. When To File: Filing Deadline and Workforce Snapshot Period

This 30-Day Notice proposes to change the EEO–1 filing deadline to March 31st· of the year that follows the reporting year. This Notice also proposes to change the "workforce snapshot" to a pay period between October 1st and December 31st of the

reporting year, starting with the EEO–1 report for 2017.

Note that the reporting schedule for 2016 data remains unchanged; EEO–1 respondents must comply with the September 30, 2016, filing requirement for the currently-approved EEO–1, and must continue to use the July 1st through September 30th workforce snapshot period for that report. Under the proposed changes to the reporting schedule, EEO–1 reports for 2017 data would be due on March 31, 2018.

### A. 60-Day Notice

In the 60-Day Notice, the EEOC proposed to retain the current September 30th EEO–1 filing deadline. The EEOC explained that, starting in 2017, employers with 100 or more employees would document their employees' W–2 earnings for a 12-month period starting October 1st and ending the next September 30th. The 60-Day Notice reasoned that W–2 earnings are generally recorded in 3-month periods (calendar year quarters) and that, because the third quarter ends on September 30th, employers could calculate the 12-month W–2 wages without significant difficulty.[45] The 60-Day Notice also retained the current "workforce snapshot" approach of allowing each employer to choose a pay period between July 1st and September 30th during which it would count its employees to be reported on the EEO–1.[46] The employees counted during this pay period would be the ones reported on the EEO–1.

### B. Public Comments

Employers and other groups objected vigorously to the burden of reporting non-calendar year W–2 data (*i.e.*, October 1st to September 30th). These parties argued that the EEOC, by choosing to impose this unique 12-month reporting period, would significantly increase their costs by compelling them to recalculate W–2 earnings for the sole purpose of completing the EEO–1.

On a related point, employers reliant on human resource information systems (HRIS)[47] and payroll software said that they would have insufficient time to budget, develop, and implement new reporting systems if the 2017 EEO–1 report were to be due on September 30, 2017. Employers lacking HRIS and payroll software said they would have a variety of implementation challenges,

depending on how they organized their records.

Many commenters suggested changing the 12-month EEO–1 reporting period to be the same as the W–2 reporting period (a calendar year) and moving the EEO–1 filing deadline into the subsequent year, preferably after W–2s are due. A few stakeholders suggested that the EEOC conduct the pay data collection every two years.

### C. 30-Day Notice

#### 1. Deadline for Filing the EEO–1

For the upcoming 2016 EEO–1 report, the filing deadline will remain September 30, 2016. However, beginning with the 2017 report, the reporting deadline for all EEO–1 filers will be March 31st of the year following the EEO–1 report year. Thus, the 2017 EEO–1 report will be due on March 31, 2018. Changing the filing deadline will give employers subject to Component 2 six more months to prepare their recordkeeping systems for the 2017 report, and it will give them 1.5 years without filing an EEO–1 report (September 30, 2016 to March 31, 2018). At the same time, this change will align the EEO–1 with federal obligations to calculate and report W–2 earnings as of December 31st; the EEOC will not require a special W–2 calculation for the EEO–1.[48] These changes will reduce the burden on employers of gathering Component 2 data.

The Commission declines to adopt an alternate-year schedule for filing the EEO–1 report. If collected only in alternate years, the utility of EEO–1 data would be diminished because it would become stale before the new data became available.

#### 2. "Workforce Snapshot" Period

The "workforce snapshot" period refers to the pay period when employers count the total number of employees for that year's EEO–1 report. The EEO–1 has always used this "workforce snapshot" approach, which gives employers a choice but freezes EEO–1 employment numbers as of the chosen pay period. Some employers criticized the "workforce snapshot" approach because it would not reflect same-year promotions that have the effect of moving the employee into a different EEO–1 job category or pay band after the "snapshot" was taken. The Commission

---

[45] 81 FR 5113 (Feb. 1, 2016).

[46] EEOC, *EEO–1: When to File, https://www.eeoc.gov/employers/eeo1survey/whentofile.cfm.*

[47] These systems are also sometimes called "human resource management systems" or HRMS.

[48] Employers must send the W–2 to the Social Security Administration by the last day of February, although special due dates apply if the employer terminated its business or is filing electronically. Employers must furnish the W–2 to employees by February 1. IRS, *Topic 752—Filing Forms W–2 and W–3* (Dec. 30, 2015), *https://www.irs.gov/taxtopics/tc752.html.*

addresses this concern in part by moving the "workforce snapshot" period to the fourth quarter, October 1st to December 31st, so that there are fewer opportunities for unreported changes after the "snapshot." This will preserve employer choice as to the "workforce snapshot," while at the same time accommodating the established federal schedule for preparing W–2's. In sum, while employers will count their employees during a pay period between October 1st and December 31st, they will report W–2 income and hours-worked data *for these employees* for the *entire year* ending December 31st.[49]

This change will not affect the 2016 EEO–1, for which the July 1st to September 30th "workforce snapshot" period remains effective.

## VI. What Pay Data To Report: Measure of Pay for the EEO–1

This 30-Day Notice proposes that employers use Box 1 of Form W–2 (hereafter "W–2 income") as the measure of pay for Component 2 of the EEO–1.[50] By definition, W–2, Box 1

includes income that is received between January 1st and December 31st of the relevant calendar year. In reaching this decision, the Commission considered government studies that analyze compensation in U.S. workplaces, relevant academic literature on compensation practices, the public comments and public testimony, and the analyses reflected in the EEOC's NAS study[51] and its own Pilot Study.[52]

### A. 60-Day Notice: Options for Measuring Pay

The EEOC's 60-Day Notice described five different measures of individual compensation that are used by the federal government.[53] After narrowing

its consideration to two of these—the Bureau of Labor Statistics' Occupational Employment Statistics (OES) measure of pay[54] and the Internal Revenue Service's W–2 definition[55] —the EEOC proposed to use W–2 income because it is already calculated by employers, therefore limiting burden, and because it is a comprehensive measure of pay that would be more likely to capture the effect of employment discrimination on different kinds of compensation.[56] In the 60-Day Notice, the EEOC did not specify which box on the W–2 it would use, but the Commission now specifies that employers will report on income provided in Box 1 of the W–2 form.

### B. Public Comments

#### 1. Supporting the Use of W–2 Income

Comments in support of using W–2 income emphasized that it is a comprehensive measure of pay that encompasses overtime, shift differentials, and production and non-production bonuses, which are increasingly important elements of pay. These parties stated that employment discrimination can be manifested when employers decide which employees get opportunities to earn shift differentials or overtime pay, or get large bonuses or awards. Using a measure of pay that excludes so much pay that could be influenced by discrimination would radically reduce the utility of this data collection for the EEOC and OFCCP.

#### 2. Opposing the Use of W–2 Income

Comments in opposition to using W–2 income fell into three categories.

---

[49] By changing the EEO–1 "workforce snapshot" to the last quarter of each calendar year, EEO–1 contractor filers that also file annual employee reports under the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (VEVRAA), 38 U.S.C. 4212(d), will be in a position to align their VEVRAA data collections with the new EEO–1. Under regulations implementing VEVRAA, certain federal contractors must report annually on form VETS–4212 the number of employees and new hires protected under VEVRAA. 41 CFR 61–300.10(d)(1). Form VETS–4212 collects information for veterans protected by VEVRAA using the EEO–1's 10 job categories. For each reporting year, the federal contractor must report covered employees for the 12-month period preceding a date it selects between July 1st and August 31st that falls at the end of a payroll period. Significantly, the regulations allow contractors to select December 31st as the basis for reporting the number of employees and as the ending date of the twelve-month covered period, if the federal contractor has "previous written approval from the Equal Employment Opportunity Commission to do so for purposes of submitting the Employer Information Report EEO–1, Standard Form 100 (EEO–1 Report)." 41 CFR 61–300.10(d)(2). The implementation notice for the revised EEO–1 will serve as "previous written approval" from the EEOC pursuant to this Department of Labor VEVRAA rule.

[50] The IRS instructions for Form W–2 list the following categories of Box 1 taxable income: "(1) Total wages, bonuses (including signing bonuses), prizes, and awards paid to employees during the year; (2) Total noncash payments, including certain fringe benefits; (3) Total tips reported by the employee to the employer; (4) Certain employee business expense reimbursements; (5) The cost of accident and health insurance premiums for 2%-or-more shareholder-employees paid by an S corporation: (6) Taxable benefits from a section 125 (cafeteria) plan if the employee chooses cash; (7) Employee contributions to an Archer MSA (medical savings account); (8) Employer contributions to an Archer MSA if includible in the income of the employee; (9) Employer contributions for qualified long-term care services to the extent that such coverage is provided through a flexible spending or

similar arrangement; (10) Taxable cost of group-term life insurance in excess of $50,000; (11) Unless excludable under Educational assistance programs, payments for non-job-related education expenses or for payments under a nonaccountable plan; (12) The amount includible as wages because you paid your employee's share of social security and Medicare taxes for railroad retirement taxes, if applicable). If employer also paid the employee's income tax withholding, the employer treats the grossed-up amount of that withholding as supplemental wages and reports those wages in boxes 1, 3, 5, and 7. (Employer uses box 14 if railroad retirement taxes apply.) No exceptions to this treatment apply to household or agricultural wages; (13) Designated Roth contributions made under a section 401(k) plan, a section 403(b) salary reduction agreement, or a governmental section 457(b) plan; (14) Distributions to an employee or former employee from an NQDC plan (including a rabbi trust) or a nongovernmental section 457(b) plan; (15) Amounts includible in income under section 457(f) because the amounts are no longer subject to a substantial risk of forfeiture; (16) Payments to statutory employees who are subject to social security and Medicare taxes but not subject to federal income tax withholding must be shown in box 1 as other compensation; (17) Cost of current insurance protection under a compensatory split-dollar life insurance arrangement; (18) Employee contributions to a health savings account (HSA); (19) Employer contributions to an HSA if includible in the income of the employee; (20) Amounts includible in income under an NQDC plan because of section 409A; (21) Payments made to former employees while they are on active duty in the Armed Forces or other uniformed services; and (22) All other compensation, including certain scholarship and fellowship grants." IRS, *2016 General Instructions for Forms W–2 and W–3*, (Jan. 5, 2016), *http://www.irs.gov/pub/irs-pdf/iw2w3.pdf*.

[51] NAS Report, *supra* note 3.

[52] Sage Computing, *supra* note 3. This EEOC Pilot Study compared the OES definition of compensation to the W–2 and concluded that "[t]he W–2 definition of income . . . offers a more comprehensive picture of earnings data and therefore is more appropriate for identifying discriminatory practices." In contrast to the OES definition of pay, the W–2 definition includes all the elements of compensation that are captured by the OES definition, but also includes forms of compensation such as overtime wages, shift differentials, fees, commissions, fringe benefits, and bonuses. Box 1 on the W–2 excludes certain elective deferrals or pre-tax deductions such as employer-sponsored retirement plan (401(k) or 403(b)) contributions, flexible spending account contributions for health and dependent care, and medical contributions.

[53] NAS Report, *supra* notes 3 and 51 at 32–34, 41–45, *http://www.nap.edu/read/13496/chapter/4#32*.

[54] The Occupational Employment Statistics (OES) survey defines earnings to include base rate pay, cost-of-living allowances, guaranteed pay, hazardous-duty pay, incentive pay such as commissions and production bonuses, tips, and on-call pay. The OES measure *excludes* back pay, jury duty pay, overtime pay, severance pay, shift differentials, nonproduction bonuses, employer costs for supplementary benefits, and tuition reimbursements. U.S. Dept. of Labor, Bureau of Labor Statistics, *Occupational Employment Statistics*, *http://www.bls.gov/oes/current/oes_tec.htm*. OES survey uses twelve wage intervals. U.S. Dept. of Labor, Bureau of Labor Statistics, *Survey Methods and Reliability Statement for the 2015 Occupational Employment Statistics Survey*, 4, *http://www.bls.gov/oes/current/methods_statement.pdf*.

[55] 81 FR 5113, 5116 (Feb. 1, 2016). The EEOC initially considered five measures of pay. Three of those measures are used by the U.S. Bureau of Labor and Statistics (BLS) when it reports national employment data: the Occupation Employment Statistics (OES); the National Compensation Survey (NCS); and the Current Employment Statistics (CES) survey programs. One measure was from the Social Security Administration (SSA) and the final measure was from the Internal Revenue Service (IRS) (W–2).

[56] Sage Computing, *supra* notes 3 and 52.

**Objection 1: W–2 Income Reflects Employee Choice and Is Not a Reliable Measure of Employer Discrimination**

The most widely articulated objection to using W–2 income was that it was not indicative of discrimination because it may reflect employee choice more than employer discretion and that the EEOC cannot differentiate the two in an aggregate pay data collection. Commenters making this argument identified elective participation in overtime, working shifts that provide pay differentials, and working faster or better than another employee (*e.g.*, payments for piecework, commissions, or production), as governed by employee choice. Some of these comments argued that using W–2 income will in fact cause the EEOC to find "false-positives" indicating discrimination because the agency will assume that pay disparities are caused by discrimination rather than employee choice.

Some of these parties urged the EEOC to use "base pay" rather than W–2 income because "base pay" is controlled entirely by employers and therefore is better suited to documenting potential discrimination. Another advantage to using "base pay," they maintained, is that it would be significantly less expensive and easier for them to report on the EEO–1 because their HRIS now include records of base pay but not W–2 income. These stakeholders did not define "base pay," apart from noting that it does not include supplemental pay such as overtime, shift differentials, and bonuses, and that it can be stated as an hourly rate or as an annual salary.

**Objection 2: Collection of W–2 Data Burdens Employers by Requiring the Integration of HRIS and Payroll Systems**

Employers argued that reporting W–2 income would impose an inordinate burden and expense because they store W–2 income data in computerized payroll systems that are entirely separate from the HRIS where they maintain EEO–1 demographic data. They asserted that procuring or developing new software to bridge these two systems would be time-consuming and extremely costly.

**Objection 3: Collection of W–2 Income Data for October 1st to September 30th Is Burdensome**

Finally, employers argued that reporting W–2 income for October 1st to September 30th of every year would be burdensome because employers' payroll systems collect and report W–2 income on a calendar-year basis for tax purposes. By proposing to change the filing date for the revised EEO–1 from September 30th to March 31st, the EEOC has addressed this objection.

*C. 30-Day Notice: W–2 (Box 1) Income Is the Measure of Pay*

1. W–2 Income and Employee Choice

The Commission is not persuaded by the argument that W–2 income is an unsuitable measure for a pay data collection by an agency that enforces anti-discrimination laws because it may reflect employee choice as well as employer policy or decisions. As the White House Council of Economic Advisers notes, "In many situations, the delineations between discrimination and preferences are ambiguous." [57] For example, higher commission income may, as some public comments noted, reflect an employee's higher performance, but it may also reflect an employer's discriminatory assignment of more lucrative sales opportunities to employees based on race, ethnicity, and/or sex. As another example, a statistically significant difference in overtime pay between men and women in the same job may result from an employer's gender-biased assumptions that lead to more overtime opportunities being offered to men than to women, whom they may assume have competing family responsibilities. Pay discrimination is complex, and it would be an oversimplification to conclude that only those measures of pay that are shown to be exclusively dependent on an employer's decision or policy can be relevant to assessing allegations of pay discrimination.

2. Supplemental Income Is Important and May Be Linked to Discrimination

Based on its consideration of public comments and government and private sector research, the Commission concludes that supplemental pay is a critical component of compensation and it can be influenced by discrimination, so any measure of income for purposes of enforcing the pay discrimination laws should include supplemental pay. W–2 income incorporates different kinds of supplemental pay that would not be available for analysis if the EEOC were to collect only "base pay" or another basic measure of pay that ignored major sources of compensation. [58] For employers, W–2 income is a well-defined, familiar, and universally-available measure of pay; for the EEOC and OFCCP, it is useful data for exploring potential pay discrimination.

Supplemental pay is becoming more and more prevalent in the United States. As noted by the Bureau of Labor Statistics, Department of Labor (BLS), "For many occupations in the U.S. labor market supplemental pay—including overtime, bonuses, and shift differentials—is an important component of overall cash compensation. Overtime pay is especially important in production occupations and other blue-collar jobs; bonus pay is mostly a feature of high-wage managerial and sales occupations; and shift differentials play a prominent role in . . . healthcare [] and technical occupations." [59] This pattern also is apparent in some of America's highest paying professions. In the legal profession, for example, bonuses at law firms can account for a significant portion of an associate's total compensation, beyond base salary. [60]

The human resources consulting firm Aon Hewitt's 2014 U.S. Salary Increase Survey of 1,064 organizations found that variable pay (such as performance-based bonuses) for exempt employees comprised 12.7% of payroll that year. [61] This represented the highest ratio companies have paid out of their budgets toward bonuses since the consulting firm started keeping records 35 years ago and is an increase from 2008 when 10.8% of their total compensation budgets were devoted to variable pay for exempt employees. [62] Ken Abosch, leader of Aon Hewitt's compensation practice, stated that companies prefer to give performance-based pay because this practice "keeps employees focused on good performance rather than just showing up, and it allows companies to reward and retain their really valuable employees." [63] In addition, Abosch

---

[57] Council of Economic Advisers Issue Brief, *The Gender Pay Gap on the Anniversary of the Lilly Ledbetter Fair Pay Act* (Jan. 2016), *https://www.whitehouse.gov/sites/default/files/page/files/20160128_cea_gender_pay_gap_issue_brief.pdf.*

[58] For example, although the FLSA requires employers to maintain pay rates, those pay rates do not include important sources of supplemental income that the EEOC has determined is important

[59] John L. Bishow, U.S. Dept. of Labor, Bureau of Labor Statistics, *A Look at Supplemental Pay: Overtime Pay, Bonuses, and Shift Differentials* (March 25, 2009), *http://www.bls.gov/opub/mlr/cwc/a-look-at-supplemental-pay-overtime-pay-bonuses-and-shift-differentials.pdf.*

[60] National Association of Law Placement (NALP), *2014 Associate Salary Survey*, NALP, 67–77 (September, 2014), Associate Bonuses.

[61] Aon Hewitt, *New Aon Hewitt Survey Shows 2014 Variable Pay Spending Spikes to Record-High Level* (Aug. 27, 2014), *http://aon.mediaroom.com/New-Aon-Hewitt-Survey-Shows-2014-Variable-Pay-Spending-Spikes-to-Record-High-Level.*

[62] *Id.*

[63] Jenna McGregor, *Bonuses are making up a bigger and bigger percentage of companies' payrolls*, Washington Post, (Aug. 27, 2014), *https://*

JA227

noted that performance-based pay allows companies to keep their base salaries lower and that companies will only allocate bonuses "if [the company] has good or great results." [64]

In some industries, shift differentials [65] and overtime pay [66] are important aspects of income. Eighty-three percent of manufacturing and production companies, 59% of customer service and support entities, and 51% of transportation and distribution companies surveyed in 2010 offered shift differentials.[67] Hospitals and health care service organizations also pay shift differentials for holiday and weekend shifts more than other industries.[68] Overtime is particularly important in production, transportation, and material moving industries, with workers earning 2% of their income in overtime pay in December 2015.[69] Employers can control who gets the opportunity for assignments to lucrative shifts that pay premium wages or overtime pay, and withholding such assignments because of a protected basis such as race, ethnicity, or sex would violate Title VII.

Incentive pay for top executives also may be subject to discrimination. For example, at the five highest executive level positions (chief executive officer, vice chair, president, chief financial officer, and chief operating officer), research based on data from 1992–2005 shows that women received a lower share of incentive pay (including bonuses and stock option grants) than their male counterparts, accounting for 93% of the gender pay gap at that

level.[70] This difference remained even after taking into account differences of age, tenure, and titles.[71]

### 3. Bridging HRIS and Payroll

In light of employers' argument that bridging employers' HRIS and payroll software for the new EEO–1 will be so burdensome that it outweighs the utility of W–2 income, the EEOC examined three of the HRIS tools that it sees most often in systemic investigations: ADP Enterprise, PeopleSoft, and UltiPro. All three HRIS allow for the collection of EEO–1 demographic data, and all three offer the capacity to record year-to-date gross and paid earnings.[72] The EEOC recognizes that many employers may not choose to use this capacity, but its existence suggests that creating software solutions for the EEO–1, Components 1 and 2, may not be as complex or novel as some comments suggested.

The EEOC intends to support employers and HRIS vendors as appropriate to accommodate Component 2 of the proposed EEO–1. For example, the EEO–1 Joint Reporting Committee plans to post online its new Data File Specifications for Components 1 and 2 of the modified EEO–1 as soon as OMB approves the information collection. The EEO–1 data file specifications will be for data uploads (submitting EEO–1 data in one digital file), but they also will describe the formatting of data for direct data entry onto the firm's secure EEO–1 account with the Joint Reporting Committee. For reference, the current EEO–1 data file specifications can be found at *https://www.eeoc.gov/employers/eeo1survey/ee1_datafile_2013.cfm*.

### VII. What Data To Report: Hours Worked

#### A. 60-Day Notice

The Commission proposed collecting the number of "hours worked" for non-exempt employees by job category, subdivided into pay band cells, to account for periods when employees were not employed or were engaged in part-time work. With regard to exempt employees, the EEOC suggested that "[o]ne approach would be for employers to use an estimate of 40 hours per week for full-time salaried workers. The EEOC [was] not proposing to require an employer to begin collecting additional data on actual hours worked for salaried workers, to the extent that the employer does not currently maintain such information." [73]

#### B. Public Comments

Public comments from many employers objected to collecting hours worked data due to the cost of creating new systems to collate and report data about hours worked with W–2 income, and EEO–1 Component 1 data. Some employers inquired how the EEOC would define "hours worked," so they would know what to report. These employers focused on two alternatives: (1) The FLSA definition of hours worked; and (2) the Affordable Care Act (ACA) approach.

The question of how to count hours worked for employees exempt from overtime received a lot of attention, especially the EEOC's proposal to count 40 hours per week for full time, exempt workers. Supporters of the revised EEO–1 said it was reasonable to use a proxy of 40 hours per week for full-time exempt employees. Those who objected to using the 40-hours per week proxy observed that it simply would not reflect the reality of the hours worked by many full-time exempt employees, who may work substantially more than 40 hours in any given week and may work less than 40 hours in another week. Some comments argued that, since the 40-hour estimate would be incorrect in many instances, reporting 40 hours per week would require them to submit and certify inaccurate information to the federal government.

#### C. 30-Day Notice

##### 1. The Importance of Collecting Hours Worked

Collecting hours worked is of central importance because this data will enable the EEOC and OFCCP to account for part-time and partial-year work and to assess potential pay disparities in the

---

*www.washingtonpost.com/news/on-leadership/wp/2014/08/27/bonuses-are-making-up-a-bigger-and-bigger-percentage-of-companies-payrolls/*.

[64] *Id.*

[65] Shift differentials are paid to compensate employees for working shifts other than regular weekday hours.

[66] Employees who are nonexempt under the Fair Labor Standards Act are entitled to receive overtime pay for hours worked over 40 in a workweek. 29 CFR 778.10. The overtime rate is not less than time and one-half their regular pay rate. U.S. Dept. of Labor, Wage and Hour Division, *Overtime Pay*, *https://www.dol.gov/whd/overtime_pay.htm. See also* U.S. Dept. of Labor, Wage and Hour Division, *Final Rule: Overtime*, *https://www.dol.gov/whd/overtime/final2016/*, and, U.S. Dept. of Labor, Wage and Hour Division, *Fact Sheet: Final Rule to Update the Regulations Defining and Delimiting the Exemption for Executive, Administrative, and Professional Employees* (May 2016), *https://www.dol.gov/whd/overtime/final2016/overtime-factsheet.htm*.

[67] SHRM, *Shift Differentials: Compensation for Working Undesirable Hours* (Dec. 3, 2010), *https://www.shrm.org/hrdisciplines/compensation/articles/pages/shiftdifferentials.aspx*.

[68] *Id.*

[69] U.S. Dept. of Labor, Bureau of Labor Statistics, *News Release-Employer Costs for Employee Compensation* (June 9, 2016), *http://www.bls.gov/news.release/pdf/ecec.pdf*.

[70] Stefania Albanesi, Claudia Olivetti, Maria José Prados, *Liberty Street Economics: Incentive Pay and Gender Compensation Gaps for Top Executives*, Federal Reserve Bank of New York, (Aug. 25, 2015), *http://libertystreeteconomics.newyorkfed.org/2015/08/incentive-pay-and-gender-compensation-gaps-for-top-executives.html#.VzovwP5JlR0*.

[71] Stefania Albanesi, *How performance pay schemes make the gender gap worse*, World Economic Forum, (Dec.23, 2015), *https://www.weforum.org/agenda/2015/12/how-performance-pay-schemes-make-the-gender-gap-worse/*.

[72] The ADP HRIS software allows for the collection of year-to-date gross pay and pay earnings. It includes paycheck year-to-date totals and provides fields for year-to-date tax amount, overtime hourly earnings, overtime hours, total overtime earnings, and total overtime hours. Further, it appears to provide fields for year-to-date taxable income, taxable gross income year-to-date, and year-to-date taxable amounts. Ultipro allows collection of weekly pay rate, hourly pay rate, and year-to-date taxable gross income, in addition to other measure of pay, hours, and bonus. Finally, PeopleSoft allows collection of hourly rate, minimum hourly rate, maximum hourly rate, and Last 26 Pay Period gross income.

[73] 81 FR 5113, 5117 (Feb. 1, 2016).

context of this information. The importance of "hours worked" data can be illustrated by example. If two men and two women in the same job category are paid comparable wage rates, but the men are employed full-time and the women are employed part-time, it would initially appear on Component 2 of the EEO–1—without any data on their hours worked—that the employer was paying the women significantly less than the men (the women would be counted in a lower pay band). On the other hand, if it was known that the men worked 40 hours per week and the women worked 20 hours per week, then their different hours worked provide a potential explanation of what initially appears to be a gender-based pay disparity. Of course, explaining a pay disparity in this way would not rule out the possibility that it was also caused by a discriminatory practice or policy that may be identified through further investigation.

In addition to helping to assess pay disparities, hours-worked data may be useful in its own right. The EEOC receives charges of discrimination alleging that an employer gave the charging party fewer hours than other employees, or denied overtime or premium pay hours based on race, ethnicity, sex, or another statutorily-protected basis. Collecting "hours worked" data on the EEO–1 would be useful in the initial stages of such an investigation, as the EEOC seeks to assess how the employer assigns work hours.

## 2. Defining "Hours Worked"

The Commission adopts the FLSA definition for "hours worked" because it is familiar to employers, designed in conjunction with pay, and applies to all employers subject to the EEO–1.[74] By contrast, the ACA approach to "service hours" gives employers a range of choices about how to count hours,

which would not provide clarity for the EEO–1.[75]

Under the FLSA, the term "hours worked" includes "all time an employee must be on duty, or on the employer's premises or at any other prescribed place of work, from the beginning of the first principal activity of the workday to the end of the last principal activity of the workday." [76] Numerous court decisions have also helped shape this definition. The FLSA and its regulations require employers to maintain certain records for nonexempt employees, including hours the employee worked each day and the total hours the employee worked each workweek.[77] Payroll records are to be preserved for at least three years and records upon which wage computations were made (e.g., time cards) should be maintained for at least two years.[78]

Federal contractors that file the EEO–1 also are subject to the 2014 Fair Pay and Safe Workplaces Executive Order, which, once implemented by regulation, will require them to supply employees with a document each pay period showing the employee's hours worked, overtime hours, pay, and any additions made to, or deductions made from, pay as recorded for purposes of the FLSA.[79]

Adopting the FLSA definition of "hours worked" for the EEO–1 promotes consistency for contractors subject to both requirements.

## 3. Reporting Hours Worked for Nonexempt Employees

The Commission will require private employers and contractors to report the "hours worked" as recorded for FLSA purposes for nonexempt employees in Component 2 of the proposed EEO–1. "Hours worked" will be reported for the total number of employees in each pay band by ethnicity, race, and gender, for the entire calendar year. For example, assume an employer reports on the EEO–1 that it employs four African American women as administrative support workers in the sixth pay band. The employer would report their total "hours worked" for the entire year in the appropriate pay band cell under "Hours Worked" (for example, 8,160 hours). If one of the workers resigned after the employer took its "workforce snapshot" but before December 31st, the employer would report only the total number of hours she actually worked that year prior to her resignation, which would account for her partial-year employment (for example, rather than 2,040 hours, it might report 1,900 hours).

## 4. Reporting Hours Worked for Exempt Employees

Although the Commission seeks to minimize employer burden, the importance of hours-worked data necessitates its collection on the EEO–1. The EEO–1 Instructions will give employers the option to: (1) Report a proxy of 40 hours per week for full-time exempt employees, and 20 hours per week for part-time exempt employees, multiplied by the number of weeks the individuals were employed during the EEO–1 reporting year; or (2) provide actual hours of work by exempt employees during the EEO–1 reporting year if the employer already maintains accurate records of this information.

---

[74] Under the Fair Labor Standards Act, employers must keep certain records for employees who are subject to the minimum wage provisions alone, or to both the minimum wage and overtime provisions, including records of hours worked each workday and total hours worked each workweek. 29 CFR 516.2(a)(7). Employers are not required to maintain hours worked records for employees who are exempt from minimum wage or minimum wage and overtime requirements. 29 CFR 516.3. "Hours worked" under the FLSA includes "(a) [a]ll time during which an employee is required to be on duty or on the employer's premises or at a prescribed workplace and (b) all time during which an employee is suffered or permitted to work whether or not he is required to do so." 29 CFR 778.223. Unlike the ACA definition, it does not include paid days off.

[75] Under the Affordable Care Act (ACA), all employers with 50 or more full-time employees or equivalents are considered applicable large employers (ALEs) subject to ACA's shared responsibility provisions for providing health insurance. For this purpose, a full-time employee is, for a calendar month, an employee employed on average at least 30 hours of service per week, or 130 hours of service per month. The ACA provides employers the flexibility to use different measurements of hours worked, or "service hours," for different categories of exempt employees, provided the measures are reasonable and consistently applied. 26 CFR 54.4980H–3(b)(3)(i).

[76] U.S. Dept. of Labor, Wage and Hour Division, Handy Reference Guide to the Fair Labor Standards Act (November, 2014), https://www.dol.gov/whd/regs/compliance/hrg.htm.

[77] Additional FLSA recordkeeping requirements include (1) the employee's sex and occupation, (2) time and day of the week when employer's workweek begins, (3) basis on which employee's wages are paid, (4) employee's regular hourly rate, (5) employee's total daily or weekly straight-time earnings, (6) employee's total overtime earnings for the workweek, (7) employee's total wages each pay period, (8) date of payment to employee and pay period covered by payment, and much more. 29 CFR 516. See also United States Department of Labor, Wage and Hour Division, Fact Sheet #21: Recordkeeping Requirements under the Fair Labor Standards Act (FLSA) (July, 2008), https://www.dol.gov/whd/regs/compliance/whdfs21.htm.

[78] Id.

[79] E.O. 13673, section 5, 79 FR 45309 (Aug. 5, 2014). The Paycheck Transparency provision of the Executive Order on Fair Pay Safe Workplaces provides: "(a) Agencies shall ensure that, for contracts subject to section 2 of this order, provisions in solicitations and clauses in contracts shall provide that, in each pay period, contractors provide all individuals performing work under the contract for whom they are required to maintain wage records under the Fair Labor Standards Act;

[40] U.S.C. chapter 31, subchapter IV (also known as the Davis-Bacon Act); 41 U.S.C. chapter 67 (also known as the Service Contract Act); or equivalent State laws, with a document with information concerning that individual's hours worked, overtime hours, pay, and any additions made to or deductions made from pay. Agencies shall also require that contractors incorporate this same requirement into subcontracts covered by section 2 of this order. The document provided to individuals exempt from the overtime compensation requirements of the Fair Labor Standards Act need not include a record of hours worked if the contractor informs the individuals of their overtime exempt status. These requirements shall be deemed to be fulfilled if the contractor is complying with State or local requirements that the Secretary of Labor has determined are substantially similar to those required by this subsection."

JA229

**Federal Register** / Vol. 81, No. 135 / Thursday, July 14, 2016 / Notices     **45489**

With this approach, the company official who certifies the firm's EEO–1 report would certify that the reports are "accurate and . . . . prepared in accordance with the instructions." Since the new EEO–1 instructions will give employers the option to record 40 hours per week for full-time exempt employees and 20 hours per week for part-time exempt employees, or to report actual hours-worked data for exempt employees, employers using the proxies can certify with confidence that they completed their EEO–1 reports accurately and in accordance with the instructions.

## VIII. How To Report Data in Component 2: Pay Bands and Job Categories

This 30-Day Notice does not change the proposal to collect W–2 income and hours-worked data in the twelve pay bands used by the Department of Labor's Bureau of Labor Statistics (BLS) Occupational Employment Statistics (OES),[80] for each of the 10 EEO–1 job categories. Such data will support the EEOC's ability to discern significant pay disparities in the early stages of its investigations and, in conjunction with other information, to make more efficient decisions about how to plan the investigations going forward.

### A. 60-Day Notice

The 60-Day Notice proposed that Component 2 of the EEO–1 report would collect W–2 income and hours-worked data within twelve distinct pay bands for each job category. These pay bands were based on the twelve wage intervals used by the BLS for the OES survey, which is a semi-annual survey designed to measure employment and wage estimates[81] for over 800 occupations.[82] These OES pay bands are different from the pay bands used on the

EEO–4 report now completed by state and local government employers.

#### TABLE 1—EEO–4 PAY BANDS

| Pay bands | Pay bands label |
|---|---|
| 1 .................. | $100–$15,999. |
| 2 .................. | $16,000–$19,999. |
| 3 .................. | $20,000–$24,999. |
| 4 .................. | $25,000–$32,999. |
| 5 .................. | $33,000–$42,999. |
| 6 .................. | $43,000–$54,999. |
| 7 .................. | $55,000–$69,999. |
| 8 .................. | $70,000 and over. |

#### TABLE 2—PROPOSED EEO–1 PAY BANDS

| Pay bands | Pay bands label |
|---|---|
| 1 .................. | $19,239 and under. |
| 2 .................. | $19,240–$24,439. |
| 3 .................. | $24,440–$30,679. |
| 4 .................. | $30,680–$38,999. |
| 5 .................. | $39,000–$49,919. |
| 6 .................. | $49,920–$62,919. |
| 7 .................. | $62,920–$80,079. |
| 8 .................. | $80,080–$101,919. |
| 9 .................. | $101,920–$128,959. |
| 10 .................. | $128,960–$163,799. |
| 11 .................. | $163,800–$207,999. |
| 12 .................. | $208,000 and over. |

### B. Public Comments

Many stakeholders argued that the twelve OES pay bands are overly broad, particularly for the highest pay band ($208,000 and over) and also for the lower or middle income pay bands ($30,000 to $80,000). Opponents of the proposal argued that broad pay bands would not produce reliable data because the employees within each pay band may have different levels of experience or hold different jobs within an organization. Some comments advocated for additional and narrower pay bands to better capture pay disparities.

### C. 30-Day Notice

Collecting W–2 income and hours-worked data in the twelve OES pay bands will enable the EEOC to gather pay data about most employees and EEO–1 filers, as the majority of wages in the United States are well below the highest OES pay band ($208,000 and over), even after including some types of supplemental income. According to the U.S. Census Bureau, the estimated median earnings for full-time, year round civilian workers 16 years of age and over were $43,545 in 2014. For management occupations, the median earnings were $71,112.[83]

In Component 2 of the EEO–1, employers will report the number of employees whose annual W–2 income falls in each of the job category's twelve pay bands. For example, an employer may report that it has twelve employees in pay band 3 for Professionals, and that four are white men, four are Asian men, and four are white women.

The EEOC is not convinced that using twelve pay bands in conjunction with the EEO–1 job categories will undermine the utility of W–2 income and hours-worked data. The EEOC does not intend or expect that this data will identify specific, similarly situated comparators or that it will establish pay discrimination as a legal matter. Therefore, it is not critical that each EEO–1 pay band include only the same or similar occupations. The data will be useful for identifying patterns or correlations that can inform the early stages of the investigative process, as explained in more detail in section IX.

In addition, many EEO–1 firms and establishments do not report widely divergent occupations in each EEO–1 job category. It also is likely that similar firms and establishments in the same geographic area will have similar distributions of occupations within the job groups and pay bands, thus making statistical comparisons between EEO–1 reports a reasonable approach to using this data.

## IX. How the EEOC Will Use W–2 and Hours-Worked Data

### A. 60-Day Notice

As explained in the 60-Day Notice, Component 2 data would support EEOC data analysis at the early stages of an investigation, using statistical tests to identify significant disparities in reported pay. EEOC enforcement staff who conduct these analyses would use them, in the larger context of other available economic data and information, to evaluate whether and how to investigate the allegations of discrimination in more depth. Moreover, the 60-Day Notice also explained how employers would be able to use the summary pay data that the EEOC intends to publish to generally assess their own pay practices.

### B. Public Comments

Employers opposing the proposal expressed concern that the EEOC would make unfounded inferences of discrimination based on its statistical analysis of the EEO–1 Component 2 pay data which, in turn, would result in

---

[80] U.S. Dept. of Labor, Bureau of Labor Statistics, *Survey Methods and Reliability Statement for the May 2015 Occupational Employment Statistics Survey, supra* note 54 at 3, (stating that "employment refers to the number of workers who can be classified as full-or-part-time employees, including workers on paid vacations or other types of paid leave; exempt officers, executives, and staff members of incorporated firms; employees temporarily assigned to other units; and noncontract employees for whom the reporting unit is their permanent duty station regardless of whether that unit prepares their paychecks.")

[81] U.S. Dept. of Labor, Bureau of Labor Statistics, *Occupational Employment Statistics Frequently Asked Questions, http://www.bls.gov/oes/oes_ques.htm.*

[82] *Id.* The OES survey produces estimates of wages or salary paid to employees in non-farm occupations in the United States, in a particular State, or in a particular industry. The occupational wage estimates can be estimates of mean wages or percentiles, such as the median wage.

[83] U.S. Census Bureau, *Table Packages,* Full-Time, Year-Round Workers and Median Earnings in the Past 12 Months by Sex and Detailed Occupation: 2014, *http://www.census.gov/people/io/publications/table_packages.html.*

**45490**    **Federal Register** / Vol. 81, No. 135 / Thursday, July 14, 2016 / Notices

unwarranted and burdensome EEOC investigations. Some interested parties criticized the particular statistical analyses that the EEOC described in the 60-Day Notice, arguing that these tests would not yield meaningful results when applied to data reported in pay bands and broad EEO–1 job categories. These commenters also raised concerns about the dangers of Type I or Type II errors in analyzing Component 2 data: In statistics, "Type I" errors are referred to as "false positives" and "Type II" errors are "false negatives." [84]

Finally, employers expressed skepticism that the EEOC's reports based on aggregated EEO–1 pay data would be useful for evaluating their own pay practices and promoting voluntary compliance. Several employers explained that they do not use W–2 data to analyze their own compensation practices, but rather rely on more complete compensation data that they have at their disposal.

*C. 30-Day Notice*

This 30-Day Notice expands on the discussion in the 60-Day Notice and explains in more detail how the data collected with this information collection will support enforcement of, and compliance with, Title VII, the EPA, and E.O. 11246.

1. Early Assessment of Charges of Discrimination

Currently, the EEOC enforcement staff can retrieve a respondent's EEO–1 report using existing EEO–1 analytics software to assess the distribution of different demographics (sex, race, and ethnicity) in an employer's job groups. When W–2 income and hours-worked data is added to the EEO–1 report, the EEOC's EEO–1 analytic software tool will be expanded to allow for the examination of pay disparities based on job category, pay bands, and gender, ethnicity, or race. For example, if a charging party alleges that she was paid less than her male colleagues in a similar job, the EEOC's enforcement staff might use the expanded EEO–1 analytics tool to generate a report comparing the distribution of the pay of women to that of men in the same EEO–1 job category.[85] They also might use statistical tools to determine generally whether there are significant disparities in reported pay in job groups based on race, gender, or ethnicity.

EEOC enforcement staff could then examine how the employer compares to similar employers in its labor market [86] by using a statistical test to compare the distribution of women's pay in the respondent's EEO–1 report to the distribution of women's pay among the respondent's competitors in the same labor market. With the proposed addition of hours-worked data to the EEO–1, statistical tests could be used to determine whether pay disparities remain among relevant groups such as men and women, controlling for hours worked. More specifically, statistical tests could determine whether factors such as race, ethnicity, gender, and hours worked impact the distribution of individuals in pay bands. The EEOC envisions that any statistical test would be accompanied by an indication of the practical significance of pay differences.

After considering the results of several statistical analyses in conjunction with allegations in the charge, and sometimes also assessing how the EEO–1 pay data compares to statistics for comparable workers using Census data, EEOC enforcement staff would decide how to focus the investigation and what information to request from the employer. When EEOC enforcement staff requests information from an employer, the employer has the opportunity to explain its practices, provide additional data, and explain the non-discriminatory reasons for its pay practices and decisions. Only after considering all of this information, and possibly additional information, would the EEOC reach a conclusion about whether discrimination was the likely cause of the pay disparities.

The EEOC has tested whether statistical tests, and the EEO–1 pay data, would be useful tools in the investigation of charges of discrimination and has found them to be effective.[87] The EEOC used two databases to test the utility of the planned analyses. The first was the EEO–4 database that the EEOC currently uses to collect and analyze pay data from state and local governments. Since the EEO–4 has fewer and different pay bands than the EEOC proposes for the EEO–1 pay data collection, the EEOC also used a synthetic database. The term "synthetic" does not mean that the data was not real. Rather, the EEOC created a large confidential database from HRIS data obtained in actual EEOC investigations that contained certain variables of interest, in particular pay rate history and job titles for all employees, and the statistical tests referenced above were run. Other important variables such as "race," "gender," and "EEO–1" job codes were randomly generated for databases that lacked this information. The results supported the EEOC's conclusion that these statistical tests provide insights that are useful in developing a request for information or deciding whether an investigation of a charge should have a more limited scope.[88]

As noted above, some critics disputed the EEOC's choice of statistical tests, arguing that they would not be useful for data reported in broad pay bands and job categories. The EEOC's Pilot Study reported on a 2007 study finding that, even if collecting income data in bands results in a loss of information, that loss would likely be small and of little concern to many researchers, and would be balanced by reduced cost and burden.[89] Other researchers have identified the value of banded pay data even to the point of being useful in estimating mean incomes within an accuracy of 1–3 percent.[90] This research suggests that critics who argue that one cannot detect mean differences that are smaller than the pay bands, or bins, are incorrect.[91]

In addition, the EEOC is confident that the risk of Type I (false positive) or Type II (false negative) errors will not undermine its statistical analyses of Component 2 data. The chances of incurring Type I errors (false positives) are related to the probability level used

---

[84] Type I errors represent the possibility of rejecting a null hypothesis when it is correct. For example, a null hypothesis might be that the earnings of African Americans and whites are the same and a Type I error would be rejecting it as false when it is true. Type II errors represent the opposite: The possibility of accepting the null hypothesis (for example, that the earnings of African Americans and whites are the same) as true when in fact it is false. Type I errors in this context could suggest a need for an investigation where it may not be needed; Type II errors in this context could result in victims of pay discrimination not receiving relief for discrimination.

[85] Enforcement staff could choose to compare men and women in one particular EEO–1 job category, for multiple job categories, or even all job categories.

[86] EEO–1 reports are identified by location and by each establishment's 5-digit NAICS industry codes. The U.S. Census Bureau maintains only one NAICS code for each establishment based on its primary business activity. The Census Bureau states: "[i]deally, the primary business activity of an establishment is determined by relative share of production costs and/or capital investment. In practice, other variables, such as revenue, value of shipments, or employment, are used as proxies. The Census Bureau generally uses revenue or value of shipments to determine an establishment's primary business activity." U.S. Census Bureau, *"North American Industry Classification System—Frequently Asked Questions,"* https://www.census.gov/eos/www/naics/faqs/faqs.html.

[87] Sage Computing, *supra* notes 3, 52, and 56.

[88] *Id.*

[89] *Id.* citing Micklewright, John and Schnepf, Sylke V., *How Reliable are Income Data Collected with a Single Question?* (Nov., 2007), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1047981.

[90] Paul T. von Hippel, Samuel V. Scarpino and Igor Holas, *Robust estimation of inequality from binned incomes,* Sociological Methodology (Jun. 6, 2016), http://arxiv.org/abs/1402.4061.

[91] *Id.*

in the statistical significance test. The EEOC follows judicially recognized statistical standards for identifying meaningful discrepancies,[92] and therefore is confident that the probability level it uses is effective at minimizing the risk of Type I (false positive) errors. By contrast, the risk of Type II (false negative) error is inversely related to the sample size: The smaller the sample size, the more likely a Type II error. If a sample size is so small that the EEOC enforcement staff is concerned about Type II errors, it will consider analyzing a differently configured, larger sample. Even if it forgoes such analysis due to an elevated risk of Type II errors, enforcement staff will study the EEO–1 for other relevant information and analyze additional data from other sources. In fact, EEOC enforcement staff expects to analyze data from other sources regardless of the risk of error.

2. EEOC Publications Analyzing Aggregate EEO–1 Data

Using aggregated EEO–1 data, Census data, and potentially other data sources, the EEOC expects to periodically publish reports on pay disparities by race, sex, industry, occupational groupings, and Metropolitan Statistical Area (MSA). Particularly after a few years of data collection, these reports will provide useful comparative data. For smaller employers and others that do not hire consultants to analyze their compensation structures, these reports will be especially informative in light of the business case for equal pay and the need to comply with state equal pay laws.

The EEOC's publication of aggregated pay data, in conjunction with the employer's preparation of the EEO–1 report itself, may be useful tools for employers to engage in voluntary self-assessment of pay practices. For contractors, such self-assessment is encouraged by the OFCCP Rule on Discrimination on the Basis of Sex.[93] OFCCP states that ''[e]ach contractor may continue to choose the assessment method that best fits with its workforce and compensation practices.'' [94] Although the OFCCP rule does not create new obligations with respect to a covered contractor's self-assessment of its compensation practices, it does provide additional guidance about the kinds of compensation practices the contractors should evaluate to ensure their compliance with E.O. 11246.

3. EEOC Training on the Pay Data Collection

The EEOC will ensure its internal capacity to use the EEO–1 pay data effectively by supplementing existing training for EEOC statisticians, investigators, and attorneys about how EEO–1 pay data and the updated EEO–1 analytics tool can be used to improve the agency's enforcement work. EEOC enforcement staff will receive periodic training on how to use the expanded EEO–1 analytics software tool to examine pay data and identify any disparities. EEOC personnel who conduct intake also would receive periodic training to help them ''issue spot'' potential pay discrimination and ask appropriate questions to collect relevant anecdotal evidence of possible discrimination and information about employer policies and practices. Further, the agency would provide specialized training to its lead systemic investigators. Finally, as discussed more fully below, the EEOC would continue to ensure that staff is trained with regard to confidentiality obligations with respect to pay data.

The EEOC also would provide enhanced technical assistance and support to employers with seminars or webinars, training, and outreach and education materials. Such materials may include best practice guides and self-assessment tools to promote voluntary compliance and assist employers in identifying and correcting discriminatory pay policies and practices. They may also identify practices that could lead to pay discrimination, such as subjective pay decision-making practices, establishing salary by relying heavily on prior salary, and setting salary based in large part on negotiations.

Finally, the EEOC would conduct outreach to other stakeholders, including employees and their advocates, and academic researchers. Outreach to employees and their advocates would focus on ''know your rights'' trainings with respect to equal pay for equal work and also include training about how to use the EEOC's planned aggregated pay data reports for research and informational purposes.

## X. Confidentiality of EEO–1 Data

This 30-Day Notice expands on the discussion in the 60-Day Notice regarding the privacy and confidentiality protections for Component 2 data. The EEOC has successfully protected the confidentiality of EEO–1 data for over 50 years, since this data was first collected. Recognizing that employers are concerned both about the confidentiality of their business data and the privacy of employees' pay information, the EEOC and OFCCP have committed to vigorously guarding its privacy and confidentiality, as explained below.

### A. 60-Day Notice

The 60-Day Notice emphasized that Title VII subjects the EEOC to strict confidentiality requirements, subject to criminal penalties; that OFCCP defers to the EEOC on disclosure of all non-contractor data; and that the OFCCP ensures the confidentiality of contractor data to the maximum extent permissible by law. In the 60-Day Notice, the EEOC explained that EEO–1 Component 2 would not include any employee personally identifiable information and, since EEO–1 pay and hours-worked data would be anonymous and aggregated, personally identifying information would not be readily apparent.

### B. Public Comments

Employers expressed concern that the addition of sensitive pay data to the EEO–1 would make it more valuable to their competitors and that any breach in confidentiality would be significantly more costly than with the current EEO–1. They also expressed concern about the privacy of the data, because an individual's pay could be disclosed if, for example, the employee was one of only a few employees matching a particular race/ethnicity background and gender in a cell on the EEO–1 and the EEO–1 report were disclosed. Some employers expressed concern that federal and state agencies may not be bound by Title VII's confidentiality requirements, and some employers urged the EEOC to prevail on Congress to amend Title VII to expressly extend the statute's confidentiality provisions to other federal and state agencies that might get EEO–1 data.

### C. 30-Day Notice

1. Legal Confidentiality

a. EEOC

As recognized by employers and explained in the 60-Day Notice, Title VII forbids the EEOC or any EEOC officer or employee from making public any

---

[92] *Hazelwood Sch. Dist.* v. *United States*, 433 U.S. 299, 311 n.17 (1977) (explaining that ''a fluctuation of more than two or three standard deviations would undercut the hypothesis that decisions were being made randomly with respect to [a protected trait]''); *Wright* v. *Stern*, 450 F.Supp.2d 335, 363 (S.D.N.Y. 2006) (denying motion for summary judgment in case alleging discrimination against African-American and Hispanic employees in promotions and compensation, the court noted that, ''[t]hough not dispositive, statistics demonstrating a disparity of two standard deviations outside of the norm are generally considered statistically significant.'').

[93] 41 CFR 60–20. *See also* 81 FR 39109 (June 15, 2016).

[94] *Id.*

information, including EEO–1 data, before a Title VII proceeding is instituted that involves that information.[95] EEOC staff who violate this prohibition are guilty of a criminal misdemeanor and can be imprisoned.

The EEOC directly imposes this Title VII confidentiality requirement on all of its contractors, including contract workers and contractor companies, as a condition of their contracts. With respect to other federal agencies with a legitimate law enforcement purpose, the EEOC gives access to information collected under Title VII *only* if the agencies agree, by letter or memorandum of understanding, to comply with the confidentiality provisions of Title VII.

Finally, the text of Title VII itself states that the EEOC may only give state and local fair employment practices agencies (FEPAs) information (including EEO–1 data) about employers in their jurisdiction on the condition that they *not* make it public.[96]

For the EEOC, its agents and contractors, and the FEPAs, Title VII only permits disclosure of information after suit is filed on the issues that were investigated at the administrative level.

### b. OFCCP

Even though OFCCP obtains EEO–1 reports for federal contractors and subcontractors (contractors) through the Joint Reporting Committee with the EEOC, OFCCP obtains this information pursuant to its own legal authority under E.O. 11246 and its implementing regulations.[97]

OFCCP will notify contractors of any FOIA request for their EEO–1 pay and hours-worked data. If a contractor objects to disclosure, OFCCP will not disclose the data if OFCCP determines that the contractor's objection is valid. FOIA Exemptions 3 and 4 recognize the value of this data and provide, in combination with the Trade Secrets Act, the necessary tools to appropriately protect it from public disclosure. OFCCP will protect the confidentiality of EEO–1 pay and hours-worked data to the maximum extent possible consistent with FOIA.

With respect to companies that are not federal contractors or subcontractors under OFCCP's jurisdiction, the confidentiality provision of Section 709(e) applies. OFCCP will refer all such FOIA requests for EEO–1 data to the EEOC for a response. The EEOC, in turn, is subject to Title VII confidentiality and cannot disclose any of its EEO–1 data to the public, except in an aggregated format that protects the confidentiality of each employer's information. Any FOIA request by a member of the public for such disaggregated EEO–1 data will be denied by the EEOC under Exemption 3 of the FOIA.

### 2. Data Protection and Security

The EEOC takes extensive measures to protect the confidentiality and integrity of EEO–1 data in its possession. First, all EEOC and FEPA staff[98] receive annual training in data protection and security. The EEOC maintains a robust cyber security and privacy program, in compliance with the Federal Information Security Modernization Act of 2014.[99]

The EEOC also complies with a comprehensive set of security and privacy controls to protect organizational operations and information system assets against a diverse set of threats, including hostile cyber-attacks, natural disasters, structural failures, and human errors. The EEOC's systems are monitored on an ongoing basis to assure compliance with an extensive set of security and privacy requirements derived from legislation, Executive Orders, policies, directives, and standards.[100] Agency information technology systems are subjected to weekly security scans by the Department of Homeland Security, annual internal audits performed by the EEOC's Office of Inspector General, and expert third-party audits for best practices and compliance with cyber-security standards. Current protections include regular internal and external vulnerability scanning and penetration testing, comprehensive real-time anti-virus scanning and protection on all desktops and servers, Internet and email filtering for malware and spam, strong firewall protections and intrusion detection systems, compliance with security benchmark configuration settings, deep discovery advanced network security analysis and monitoring, secure domain name server configurations, automatic server/firewall monitoring and logging, security awareness training, and comprehensive disaster recovery planning and testing.

The online EEO–1 portal of the Joint Reporting Committee allows firms that currently upload EEO–1 data files to encrypt their data or even create a file transfer site for EEOC to download the data. After collecting and reconciling EEO–1 data through a process that may involve input from the employer or contractor, the Joint Reporting Committee at the EEOC provides the database to OFCCP on an encrypted storage device.

### XI. Paperwork Reduction Act Burden Estimates

#### A. Background

The revised EEO–1 data collection has two components. The first component (Component 1) will collect information identical to that collected by the currently approved EEO–1, through which employers report data on employees' ethnicity, race, and sex by job category. The second component (Component 2) will collect data on employees' W–2 (Box 1) income and hours worked. Because of the complexity of this PRA burden calculation, the EEOC is providing the following background information to explain the rationale behind its methodologies for calculating the annual and one-time burden of filing EEO–1 reports.

The OMB's PRA guidance prescribes the factors for agencies to consider in calculating annual reporting and one-time implementation costs. The prescribed PRA calculation is focused on the time it takes filers to complete the tasks required for the proposed information collection and the hourly rates of the employees who spend that time. For this reason, the following discussion of the costs of transitioning and annually filing Components 1 and 2 of the EEO–1 must be formulated through the PRA analysis of hours spent and hourly rates.

OMB's PRA regulations also require consideration of how to reduce the burden of a data collection through the use of technology and automation.[101]

---

[95] 42 U.S.C. 2000e–8(e).

[96] 42 U.S.C. 2000e–8(d). *See also* EEOC, *EEO–1 Survey System Privacy Impact Assessment, https://www.eeoc.gov/employers/eeo1survey/privacyimpact.cfm.*

[97] 41 CFR 60–1.7(a)(1).

[98] As noted in text above, all FEPAs sign a contractual agreement with the EEOC that requires them to follow the confidentiality provisions set forth in Title VII.

[99] 44 U.S.C. 3551; *see also* relevant provision 44 U.S.C. 3554 discussing federal agency responsibilities for protecting federal information and information systems.

[100] 40 U.S.C. 1401 *et seq.,* Information Technology Management Reform Act, identifying standards and guidelines developed by the National Institute of Standards and Technology (NIST) for federal computing systems. NIST, NIST Special Publication 800–53, Rev 4, *Security and Privacy Controls for Federal Information Systems and Organizations* (April 2013), *http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r4.pdf* (explaining specific security controls required by the Federal Information Security Management Act of 2002 and thereafter the Federal Information Security Modernization Act of 2014).

[101] Agencies must "evaluat[e] . . . whether (and if so, to what extent) the burden on respondents can be reduced by use of automated, electronic, mechanical, or other technological collection techniques or other forms of information

This consideration is particularly relevant to EEO–1 reporting. In the years since the EEOC first estimated the PRA burden of the EEO–1 based only on the time to fill in the cells on a paper EEO–1 report, there have been major advances in technology both for employers and the Joint Reporting Committee. Many employers now rely on HRIS and automated payroll systems.[102] The Joint Reporting Committee now utilizes an online EEO–1 portal for the confidential filing of EEO–1 reports, either by digital upload or by data entry onto a password-protected, partially pre-populated digital EEO–1.

Throughout the Joint Reporting Committee's transition to this new system, the EEOC continued to calculate the PRA burden based on its original method of counting all the cells on a paper report and calculating the time needed to enter data into each of them. However, with the 60-Day Notice, the EEOC concluded that both digital recordkeeping and digital filing were sufficiently well-established to transition to a new PRA methodology more suited to the new technology and the time-savings it generated.[103] The EEOC's new PRA methodology—necessarily expressed in the PRA's terms of hours and hourly labor rates—focuses on the time needed by the employer's staff to complete tasks such as reading the EEO–1 instructions, collecting, verifying, validating, certifying, and submitting the report. Therefore, in the 60-Day Notice, the EEOC considered for the first time the time savings generated by this task-based approach stemming from technology.[104] This is the reason that the burden of filing the EEO–1 actually declined with the PRA calculations in 60-Day Notice, relative to the paper-based calculation method previously used.

In the 60-Day Notice, the EEOC concluded that most employers would be filing the EEO–1 with a digital file upload by the time they file their EEO–1 reports for 2017 and 2018. Therefore, in the 60-Day Notice, the EEOC reasoned that "each additional report filed [would have] just a marginal additional cost."[105] Accordingly, the burden calculation in the 60-Day Notice was based on the number of firms filing one or more EEO–1 reports, not on the number of reports submitted or the number of separate establishments submitting reports. The EEOC's PRA burden calculations also assumed that all employees working on the EEO–1 would be administrative staff paid an hourly rate of $24.23 per hour.

The EEOC's intent in calculating respondent burden for the 60-Day Notice was to recognize the cost and time savings associated with the accelerating trend toward greater automation. However, employers' public comments indicated that the EEOC's estimates reflected a level of automation that was unlikely to be attained imminently. Some of these comments included estimates about the annual time and costs of completing the EEO–1. While some firms stated that they spent less time each year on the EEO–1 than the EEOC estimated in the 60-Day Notice, many firms reported that they spent more time and used more varied professional staff. These same commenters observed that they used data uploads less frequently than the EEOC had projected.

The EEOC carefully considered employers' input, yet, their comments as a whole reflected widely discrepant estimates of the time needed, jobs involved, and HRIS and software costs associated with digital EEO–1 reporting. Although the EEOC recognizes that the EEO–1 may involve more time than it estimated in the 60-Day Notice, the EEOC also concludes that the amount of time a filer spends each year completing this report varies, because each employer is different in terms of number of establishments, number of employees involved in producing the report, time spent by those employees and their rates of pay, and sophistication of HRIS. Due to the wide range of estimates provided about annual reporting costs, the EEOC also relied on its own experience collecting the EEO–1 reports and working with EEO–1 stakeholders over the years.

In conclusion, the EEOC adjusted its methodology for calculating PRA annual burden in this 30-Day Notice. First, the EEOC took into account the time and pay rates for a range of employees at both the firm- and establishment- levels who are responsible for preparing and filing the EEO–1. The EEOC now accounts for time to be spent annually on EEO–1 reporting by everyone from the executive who certifies it, to the lawyer who reviews it and the human resource professionals who prepare it with the support of information technology professionals and clericals.

Second, the EEOC no longer assumes that all the EEO–1 reports for 2017 and 2018 will be submitted by one data upload filed by the firm on behalf of all the establishments. While still reflecting that the bulk of the tasks performed in completing the EEO–1 report will be completed at the firm level due to the centrality of automation, the EEOC's 30-Day Notice recognizes that there are certain tasks that will be performed at the establishment level for employers who enter their EEO–1 data directly onto the Joint Reporting Committee's secure portal. Therefore, the 30-Day Notice burden calculations are based on the number of hours needed to complete the tasks at the firm level and also at the establishment level for the proportion of EEO–1 filers who do not now use centralized, secure data uploads. To make these calculations, the EEOC distinguished the time spent at the firm and establishment levels on the different types of EEO–1 reports, such as single-establishment Type 1 reports, Type 2 consolidated reports for employers with multiple establishments, and Type 6 or 8 reports for small establishments (under 50 employees).

For those employers who have staff enter EEO–1 data online, which is closest digital equivalent to completing a paper form by hand, the Joint Reporting Committee's password-protected, individualized portal prompts the employer with pre-populated EEO–1 forms that already include identifying information and the prior year totals. Moreover, the Joint Reporting Committee's online portal does not compel these employers to enter "zeros" in the cells for which they do not submit data. No EEO–1 filers enter data in every cell, so basing the annual PRA burden on the total number of cells on the EEO–1 form would be inaccurate.

Therefore, as explained in detail below, the total estimated annual burden hour cost in 2017 and 2018 for those contractors that will complete and submit only Component 1 (contractors with 50–99 employees) will be $1,872,792.41. The total estimated annual burden hour cost in 2017 and 2018 for employers and contractors that will complete both Components 1 and 2 will be $53,546,359.08.

The EEOC estimates that for these filers submitting both Component 1 and 2 data in 2017 and 2018, the addition of pay data will increase the estimated annual burden hour costs by a total of $25,364,064.80 or an average of $416.58 per EEO–1 filer each year, using the 30-Day PRA analysis. This is an average

technology, e.g., permitting electronic submission of responses." 5 CFR 1320.8(a)(5).

[102] International Public Management Association for Human Resources, Public Personnel Management, Volume 39, No. 3, Fall 2010, http://ipma-hr.org/files/pdf/ppm/ppmfall2010.pdf (reporting that 90% of human resources departments used some form of HRIS).

[103] 81 FR 5113, 5120 (Feb. 1, 2016).

[104] Id.

[105] Id.

estimate per filer, and actual costs will vary, as explained in this Notice.

*B. 60-Day Notice*

In the 60-Day Notice, the EEOC estimated burden based on centralized electronic, rather than paper, filing of the EEO–1. Costs were calculated assuming that all tasks were performed at the firm level.

*Burden Statement—2016:* For reporting year 2016, when all filers will continue to submit only Component 1 demographic data, the EEOC estimated the total annual burden hours required to complete the EEO–1 as 228,296.4 hours, with an associated total annual burden hour cost of $5,531,621.77.

*Burden Statement—Component 1 Only:* The 60-Day Notice stated that starting in 2017, the estimated number of annual respondents (contractor filers) who will submit Component 1 only would be 6,260.[106] The 60-Day Notice estimated the burden in 2017 on contractor filers with 50 to 99 employees as follows:

• *Annual Burden Calculation:* The total annual burden hours required to complete Component 1 of the EEO–1 data collection in 2017 and 2018 was estimated to be 21,284 hours each year, with an associated total annual burden hour cost of $515,711.32. This figure used an average wage rate of $24.23 for employees working on the EEO–1, based on the conclusion that administrative support staff would perform the work in completing an EEO–1 report.

*Burden Statement—Components 1 and 2:* The 60-Day Notice estimated the number of annual respondents that would submit both Components 1 and 2 starting with the 2017 reporting cycle at 60,886 private industry and contractor filers. Filers required to complete both Components 1 and 2 were estimated to incur 401,847.6 burden hours annually or 6.6 hours per filer.

• *Annual Burden Calculation:* The estimated total annual burden hours needed for filers to report demographic and W–2 income and hours-worked data via Components 1 and 2 of the revised EEO–1 was estimated at 401,847.6, with an associated total annual burden hour cost of $9,736,767.35. This burden estimate includes reading instructions and collecting, merging, validating, and reporting the data electronically.[107]

• *One-Time Implementation Burden:* The estimated one-time implementation burden hour cost for submitting the information required by Component 2 of the revised EEO–1 Report was estimated at $23,000,295.[108] This calculation was based on the one-time cost for developing queries related to Component 2 in an existing human resources information system, which was estimated to take 8 hours per filer at a wage rate of $47.22 per hour.

The 60-Day Notice also estimated that the addition of W–2 income data to the EEO–1 would result in the EEOC incurring $318,000 in one-time costs and would raise the EEOC's recurring internal staffing cost by $290,478 due to the increased staff time needed to process the additional data.

*C. 30-Day Notice*

In response to concerns raised in the public comments to the 60-Day Notice, this 30-Day Notice reflects an increased burden estimate by: (1) Reflecting varying labor costs for the different types of staff involved with preparing the EEO–1, (2) adding labor costs for report-level functions, and (3) increasing the total number of burden hours a firm would need to read the EEO–1 instructions and to collect, verify, and enter EEO–1 data on the EEO–1 online portal. This methodology increases the total number of hours spent annually, even though the 30-Day Notice reduced overall burden by no longer requiring employers to make special W–2 income calculations for the EEO–1. This reflects employers' feedback about the annual EEO–1 reporting burden.

1. Annual Burden Hours

The 30-Day Notice revises the annual burden hour estimates to add the estimated time spent on firm-level functions by several different types of employees. These estimates are informed by the comments on the 60-Day Notice, based on the EEOC's experiences in providing technical assistance to employers, and within the range of time suggested by public comments.

To submit a report containing EEO–1 Component 1 data, the EEOC now

assumes that, at the firm level, computer specialists would need to spend 4 hours, senior human resource managers, corporate legal counsel, and chief executive officers would each spend 1 hour, and data entry clerks and clerical staff would each spend 0.5 hours, for a total of 8 hours to complete firm-level functions.

Based on information received during the comment period, the addition of Component 2 data would increase the total time spent by each of these employees by a factor of 1.9. Therefore, the EEOC estimates that beginning with the 2017 EEO–1, each firm reporting both Component 1 and Component 2 data would require 7.6 hours by computer specialists, 1.9 hours each by senior human resource managers, corporate legal counsel, and chief executive officers, and 0.95 hours each by data entry clerks and clerical staff, for a total of 15.2 hours per firm for firm-level functions.

In order to analyze annual reporting burden as accurately as possible, the EEOC now also considers the time and effort associated with completing the different types of EEO–1 reports. There are six types of EEO–1 reports, as detailed in the footnote.[109] All reports except the Type 6 report include the requested EEO–1 workforce data; the Type 6 report includes only the employer's name, address, and the number of employees in each establishment with fewer than 50 employees. An employer having establishments with fewer than 50 employees chooses between filing one Type 6 report or multiple Type 8 reports (a full EEO–1 report for the establishment). If it chooses to file separate Type 8 reports for each establishment with fewer than 50 employees, the Joint Reporting Committee does not require it to complete a consolidated EEO–1 for the entire firm; rather, the Joint Reporting Committee's software generates a Type 2 report for the employer. However, if the employer chooses to submit a Type 6 report, it must also complete a full consolidated report. Accordingly, firms that have establishments with fewer than 50 employees either submit Type 8 reports (one for each establishment) or a Type 6 report (a list covering all establishments) plus a Type 2 report.

Finally, based on the EEOC's experience, most firms complete all the

---

[106] 81 FR 5113 (Feb. 1, 2016). Of the 67,146 firms that filed EEO–1 reports in 2014, 6,260 were federal contractor filers with fewer than 100 employees.

[107] 81 FR 5113 (Feb. 1, 2016). This estimate was calculated as follows: 6.6 hours per respondent × 60,886 respondents = 401,847.6 hours × $24.23 per hour = $9,736,767.35. *See also* U.S. Dept. of Labor Bureau of Labor Statistics, *Employer Costs for*

*Employee Compensation—December 2013* (March 2014), *http://www.bls.gov/news.release/archives/ecec_03122014.htm* (listing total compensation for administrative support as $24.23 per hour).

[108] 81 FR 5113 (Feb. 1, 2016). This estimate was calculated as follows: 8 hours per respondent × 60,886 employers = 487,088 × $47.22 per hour = $23,000,295. *See also* U.S. Dept. of Labor, Bureau of Labor Statistics, *Employer Costs for Employee Compensation—December 2013, supra* note 108 (listing total compensation for a professional as $47.22 per hour).

[109] Type 1 (single establishment firm); Type 2 (consolidated report for headquarters and multi-establishment firm); Type 3 (headquarters report); Type 4 (report for establishments with over 50 employees); Type 6 (list of establishments with under 50 employees); and Type 8 (detailed report for establishments with under 50 employees).

tasks associated with filing EEO–1 Type 1, 2, and 6 reports at the firm level. By contrast, for Type 3, 4 and 8 reports, some of the tasks are performed at the firm level, but others are performed at the establishment level. The EEOC's 30-Day Notice annual burden estimates therefore reflect time spent on establishment-level tasks associated with Type 3, 4, and 8 reports, while time spent on tasks associated with Type 1, 2, and 6 reports (and the firm-level functions associated with Types 3, 4, and 8) are included in the firm-level estimates.[110]

The EEOC assumes that human resource specialists and data entry clerks will perform all establishment-level functions. For firms filing only Component 1 of the EEO–1, the EEOC estimates that for each establishment report submitted, a human resource specialist and a data entry clerk would each spend 0.5 hours on establishment-level functions, for a total of 1 hour per report. Beginning in 2017, firms filing both Component 1 and Component 2 of the EEO–1 would require 0.95 hours each from the human resource specialist and the data entry clerk on establishment-level functions, for a total of 1.9 hours per report.

In 2014, 1,449 firms submitted their EEO–1 reports via data upload, but they submitted 329,944 Type 3, 4, and 8 reports.[111] The EEOC estimates that firms using data upload will need to spend less time at the establishment level than firms submitting their reports by data entry. For firms using data upload, the EEOC estimates that data entry clerks will not need to perform any establishment-level tasks.

### 2. Hourly Wage Rates

Using figures reflecting median pay obtained from the Bureau of Labor Statistics,[112] the EEOC's 30-Day Notice uses hourly wage rates as follows: Computer specialist $24.75, senior human resource manager $50.21, corporate legal counsel $55.69, chief executive officer $49.37, data entry clerk $13.69, clerical staff $15.41, and human resource specialist $28.06. See Table 3 for an illustration of the jobs, hours, and wage rates described in this Notice. Based on the EEOC's experience, the bulk of the work is now performed by computer specialists and senior human resource managers. At the establishment level, the EEOC concluded that EEO–1 reporting work is more likely to be performed by data entry clerks and human resource specialists, resulting in a lower average wage rate for establishment-level functions.

TABLE 3—EEO–1 JOBS, HOURS, AND WAGES

| Job title | Hours spent on EEO–1 Component 1 only | Hours spent on EEO–1 Components 1 & 2 | Hourly wage rates |
|---|---|---|---|
| **Firm-Level Functions** | | | |
| Computer Specialist | 4 | 7.6 | $24.75 |
| Senior Human Resource Manager | 1 | 1.9 | 50.21 |
| Corporate Legal Counsel | 1 | 1.9 | 55.69 |
| Chief Executive Officer | 1 | 1.9 | 49.37 |
| Data Entry Clerk | 0.5 | 0.95 | 13.69 |
| Clerical Staff | 0.5 | 0.95 | 15.41 |
| **Report-Level Functions** | | | |
| Human Resource Specialist | 0.5 | 0.95 | 28.06 |
| Data Entry Clerk | 0.5 | 0.95 | 13.69 |

### XII. Formal Paperwork Reduction Act Statement

*A. Overview of Information Collection*

The EEOC has submitted to OMB a request for a three-year PRA approval of a revised EEO–1. The revised EEO–1 data collection has two components. The first component (Component 1) will collect information identical to that collected by the currently approved EEO–1. The second component (Component 2) will collect data on employees' W–2 pay and hours worked. Component 1 can be found at *http://www.eeoc.gov/employers/eeo1survey/upload/eeo1-2.pdf*. An illustration of the data to be collected by both Components 1 and 2 can be found at *http://10.5.0.211/employers/eeo1survey/2016_new_survey.cfm*.

For the 2016 reporting cycle, there will be no change to the EEO–1 reporting requirement. All EEO–1 filers will continue to submit the data on race, ethnicity, sex, and job category that is currently collected by the EEO–1 report. The EEOC refers to this demographic and job category data as Component 1 data. Beginning with the 2017 reporting cycle, the EEOC proposes to require EEO–1 filers with 100 or more employees to submit data on pay and hours worked (Component 2 data) in addition to Component 1 data. However, federal contractor filers with 50 to 99 employees will only submit Component 1 data.

### 1. 2016 Overview of Information Collection—Component 1

*Collection Title:* Employer Information Report (EEO–1).
*OMB Control Number:* 3046–0007.
*Frequency of Report:* Annual.
*Description of Affected Public:* Private industry filers with 100 or more employees and federal government contractor filers with 50 or more employees.
*Number of Respondents:* 67,146 firms filing 683,275 establishment reports.
*Reporting Hours:* 1,055,471.
*Respondent Burden Hour Cost:* $30,055,086.62.
*Federal Cost:* $1,330,821.
*Number of Forms:* 1.
*Form Number:* EEOC Form 100.

---

[110] Because of this, the EEOC's burden estimates for firm-level tasks are inflated for those firms electing to file Type 8 reports, because the firm-level estimates include time spent completing a Type 2 and a Type 6 report, even though firms that opt to complete Type 8 reports do not also submit a Type 2 or Type 6 report.

[111] In 2014, contractor filers with 50–99 employees submitted 86 Type 3, 4, and 8 reports via data upload.

[112] U.S. Dept. of Labor, Bureau of Labor Statistics, *Occupational Outlook Handbook, http://www.bls.gov/ooh/*.

2. 2017 and 2018 Overview of Information Collection—Components 1 and 2

*Collection Title:* Employer Information Report (EEO–1).
*OMB Control Number:* 3046–0007.
*Frequency of Report:* Annual.
*Number of Forms:* 1.
*Form Number:* EEOC Form 100.
*Federal Cost:* $318,000 for one-time costs and $1,621,300 [113] for recurring staffing costs.

a. Component 1 (Demographic and Job Category Data)

*Description of Affected Public:* In 2017 and 2018, contractor filers with 50 to 99 employees will submit only the demographic and job category data collected by Component 1.
*Number of Respondents:* 6,260 firms filing 9,129 establishment reports.
*Reporting Hours:* 59,166.
*Respondent Burden Hour Cost:* $1,872,792.41.

b. Components 1 and 2 (Demographic and Job Category Data Plus W–2 and Hours Worked Data)

*Description of Affected Public:* In 2017 and 2018, EEO–1 filers with 100 or more employees will submit pay and hours worked data under Component 2 in addition to demographic and job category data under Component 1.
*Number of Respondents:* 60,886 firms filing 674,146 establishment reports.
*Reporting Hours:* 1,892,979.5.
*Respondent Burden Hour Cost:* $53,546,359.08.

*B. 30-Day Notice PRA Burden Statement*

2016: Component 1

*Burden Statement:* In 2016, all EEO–1 filers will submit Component 1, which only includes the data collected by the currently approved EEO–1. No filer will be required to submit the Component 2 data during the 2016 reporting cycle. The estimated number of respondents required to submit the annual EEO–1 report is 67,146.[114] This data collection is estimated to impose 1,055,471 burden

hours in 2016 or 8 hours per filer for firm-level functions plus an additional one hour per report for establishment-level functions.[115] The associated burden hour cost for the 2016 reporting cycle is $30,055,086.62.[116] This estimate assumes electronic filing through the EEO–1 online portal either by data entry or data upload, and accounts for time and cost savings now associated with submission of the EEO–1 via data upload.

2017 and 2018: Components 1 and 2

With respect to the EEO–1 reporting cycles for 2017 and 2018, this Notice will discuss the burden estimates associated with two distinct groups of filers. The first group consists of contractor filers with 50 to 99 employees. This group of filers will continue to submit only the Component 1 data, just as they have done in previous years. The second group of filers includes all EEO–1 filers with 100 or more employees, whether private industry or contractor filers. This larger group will continue to submit Component 1 data as they have always done, but will also submit the newly-added W–2 and hours-worked data of Component 2.

*Burden Statement—Component 1 Only:* Starting in 2017, the estimated number of annual respondents who are contractor filers with 50 to 99 employees is 6,260.[117] Again, this calculation assumes 8 hours per filer for firm-level functions plus an additional one hour per individual report for report-level functions. The burden on

these contractor filers is estimated as follows:

• *Annual Burden Calculation:* The estimated total annual burden hours required to complete Component 1 of the EEO–1 data collection in 2017 and 2018 is 59,166,[118] with an associated total annual burden hour cost of $1,872,792.41.[119]

*Burden Statement—Components 1 and 2:* Starting in 2017, the estimated number of annual respondents that will submit Components 1 and 2 is 60,886 private industry and contractor filers. Filers required to complete both Components 1 and 2 are estimated annually to incur a total of 15.2 hours per filer for firm-level functions plus an additional 1.9 hours per individual report for establishment-level functions. The estimated burden is based on electronic filing.

The burden imposed on all private industry employer filers and contractor filers with 100 or more employees as a result of the proposed collection of Component 1 and 2 data is estimated as follows:

• *Annual Burden Calculation:* The estimated total annual burden hours needed for all filers required to report Components 1 and 2 data is 1,892,979.5 hours,[120] with an associated total annual burden hour cost of $53,546,359.08.[121] The EEOC estimates

---

[113] The addition of W–2 pay data to the EEO–1 is expected to increase EEOC's internal staffing costs by approximately $290,478. The annual federal cost figure of $1,621,300 includes both the increase in contract costs resulting from the addition of the pay data collection and the estimated internal staffing costs. It reflects an increase of more than $290,478 compared to the estimated federal costs provided in previously published **Federal Register** notices seeking PRA approval of this information collection because past estimates reflected the cost of the contract with the vendor whose services the EEOC procures to assist with administration and processing of the EEO–1 but did not include EEOC's internal staffing costs associated with processing the EEO–1.

[114] In 2014, 67,146 firms filed EEO–1 reports.

[115] This estimate calculates total time spent by firms assuming no data upload, then subtracts the estimated time saved by firms using data upload, as follows: 8 hours per firm for firm-level functions × 67,146 firms = 537,168 hours; 1 hour per report for establishment-level functions × 683,275 reports = 683,275 hours; 537,168 + 683,275 = 1,220,443 total hours; 0.5 hours per report of data entry clerk time saved by data upload × 329,944 reports filed by data upload = 164,972; 1,220,443 − 164,972 = 1,055,471.

[116] To reach this estimate, the EEOC multiplied the hourly wage rates for each job by the estimated hours spent by each job in completing the EEO–1 to arrive at a per-firm cost for firm-level functions of $268.82 and a per-report cost for establishment-level functions of approximately $20.88 (rounded). The total burden hour cost for firm-level functions is $18,050,187.7 and the total burden hour cost for establishment-level functions is $14,263,365.6. Firms using data upload are estimated to save $2,258,466.68 (data entry clerk hourly wage rate of $13.69 × 0.5 hours × 329,944 reports filed by data upload). Total firm-level burden hour cost of $18,050,187.7 + total establishment-level burden hour cost of $14,263,365.6 − cost savings from data upload of $2,258,466.68 = a total annual burden hour cost of $30,055,086.62.

[117] Of the 67,146 firms that filed EEO–1 reports in 2014, 6,260 were federal contractor filers with fewer than 100 employees.

[118] This estimate calculates total time spent by firms assuming no data upload, then subtracts the estimated time saved by firms using data upload, as follows: 8 hours per firm for firm-level functions × 6,260 firms = 50,080 hours; 1 hour per report for establishment-level functions × 9,129 reports = 9,129 hours; 50,080 + 9,129 = 59,209 total hours; 0.5 hours per report of data entry clerk time saved by data upload × 86 reports filed by data upload = 43; 59,209 − 43 = 59,166.

[119] To reach this estimate, the EEOC multiplied the adjusted hourly rates for each job by the estimated hours spent by each job in completing the report to arrive at a per-firm cost for firm-level functions of $268.82 and a per-report cost for establishment-level functions of approximately $20.88 (rounded). The burden hour cost for firm-level functions is $1,682,813.2 and the burden hour cost for establishment-level functions is $190,567.875. Firms using data upload are estimated to save $588.67 (data entry clerk hourly wage rate of $13.69 × 0.5 hours × 86 reports filed by data upload). Total firm-level burden hour cost of $1,682,813.2 + total establishment-level burden hour cost of $190,567.875 − cost savings from data upload of $588.67 = a total annual burden hour cost of $1,872,792.41.

[120] This estimate calculates total time spent by firms assuming no data upload, then subtracts the estimated time saved by firms using data upload, as follows: 15.2 hours per firm for firm-level functions × 60,886 firms = 925,467.2 hours; 1.9 hours per report for establishment-level functions × 674,146 reports = 1,280,877.4 hours; 925,467.2 + 1,280,877.4 = 2,206,344.6 total hours; 0.95 hours per report of data entry clerk time saved by data upload × 329,858 reports filed by data upload = 313,365.1; 2,206,344.6 − 313,365.1 = 1,892,979.5.

[121] To reach this estimate, the EEOC multiplied the adjusted hourly rates for each job by the

that for these filers submitting both Component 1 and 2 data in 2017 and 2018, the *addition* of pay data will increase the estimated annual burden hour costs by a total of $25,364,064.80 or an average of $416.58 per EEO–1 filer each year. This burden estimate includes reading instructions and collecting, merging, validating, and reporting the data electronically.

• *One-Time Implementation Burden:* The 60-Day Notice estimated the one-time implementation burden hour cost associated with submitting the information required by Component 2 of the revised EEO–1 Report to be $23,000,295. This was based on the one-time cost for developing queries related to Component 2 in an existing HRIS, which was estimated to take 8 hours per filer at a wage rate of $47.22 per hour.

Employers filing public comments stated that bridging pay and HRIS systems, or purchasing software updates from vendors, would be extremely expensive. Some of these employers estimated the one-time implementation cost of bridging HRIS and payroll records to report Component 2 data estimated costs could range from $5,000 per firm to $20,000, $30,000, or $40,000 per firm. Although the estimates did not provide details explaining how *they* were calculated, the EEOC has considered this feedback and increased the one-time implementation burden. It has done so by reflecting that specialized computer software experts with a higher wage rate will be required to do the work necessary to implement the one-time changes required for this proposal.

Using an hourly wage rate for a computer programmer of $55.81, the EEOC now estimates one-time burden hour cost of $27,184,381.28.[122]

Dated: July 11, 2016.
For the Commission.

**Jenny R. Yang,**
*Chair.*
[FR Doc. 2016–16692 Filed 7–13–16; 8:45 am]
**BILLING CODE P**

## FEDERAL COMMUNICATIONS COMMISSION

### Open Commission Meeting, Thursday, July 14, 2016

July 7, 2016.

The Federal Communications Commission will hold an Open Meeting on the subjects listed below on Thursday, July 14, 2016 which is scheduled to commence at 10:30 a.m. in Room TW–C305, at 445 12th Street SW., Washington, DC.

| Item No. | Bureau | Subject |
|---|---|---|
| 1 ..................... | Wireless Tele-Commucations, International And Office Of Engineering & Technology. | Title: Use of Spectrum Bands Above 24 GHz For Mobile Radio Services (GN Docket No. 14–177); Establishing a More Flexible Framework to Facilitate Satellite Operations in the 27.5–28.35 GHz and 37.5–40 GHz Bands (IB Docket No. 15–256); Petition document of the Fixed Wireless Communications Coalition to Create Service Rules for the 42–43.5 GHz Band (RM–11664); Amendment of Parts 1, 22, 24, 27, 74, 80, 90, 95, and 101 To Establish Uniform License Renewal, Discontinuance of Operation, and Geographic Partitioning and Spectrum Disaggregation Rules and Policies for Certain Wireless Radio Services (WT Docket No. 10–112); Allocation and Designation of Spectrum for Fixed-Satellite Services in the 37.5–38.5 GHz, 40.5–41.5 GHz and 48.2–50.2 GHz Frequency Bands; Allocation of Spectrum to Upgrade Fixed and Mobile Allocations in the 40.5–42.5 GHz Frequency Band; Allocation of Spectrum in the 46.9–47.0 GHz Frequency Band for Wireless Services; and Allocation of Spectrum in the 37.0–38.0 GHz and 40.0–40.5 GHz for Government Operations (IB Docket No. 97–95).<br>Summary: The Commission will consider a document that would make spectrum in bands above 24 GHz available for flexible use wireless services, including for next-generation, or 5G, networks and technologies. |
| 2 ..................... | Wireline Competition ............................... | Title: Technology Transitions (GN Docket No. 13–5); USTelecom Petition for Declaratory Ruling that Incumbent Local Exchange Carriers Are Non-Dominant in the Provision of Switched Access Services (WC Docket No. 13–3); Policies and Rules Governing Retirement of Copper Loops by Incumbent Local Exchange Carriers (RM–11358).<br>Summary: The Commission will consider a document that adopts a framework to guide transitions to next-generation communications technologies while protecting the interests of consumers and competition. |

---

estimated hours spent by each job in completing the report to arrive at a per-firm cost for firm-level functions of approximately $510.76 and a per-report cost for establishment-level functions of approximately $39.66 (these figures are rounded). The burden hour cost for firm-level functions is $31,098,011.6 and the burden hour cost for establishment-level functions is $26,738,315.7. Firms using data upload are estimated to save $4,289,968.22 (data entry clerk hourly wage rate of $13.69 × 0.95 hours × 329,858 reports filed by data upload). Total firm-level burden hour cost of

$31,098,011.6 + total establishment-level burden hour cost of $26,738,315.7 − cost savings from data upload of $4,289,968.22 = a total annual burden hour cost of $53,546,359.08.

[122] This estimate is calculated as follows: 8 hours per respondent × 60,886 employers = 487,088 × $55.81 per hour = $27,184,381.28. The higher one-time implementation burden estimate in this Notice as compared to the one-time implementation burden estimate in the 60-Day Notice is due to the higher wage rate for the computer programmer, multiplied by 1.46, which is the employer

contribution for "management, professional, related." U.S. Dept. of Labor, Bureau of Labor Statistics, *Occupational Outlook Handbook: Computer Programmers, http://www.bls.gov/ooh/ computer-and-information-technology/computer-programmers.htm; see also* U.S. Dept. of Labor, Bureau of Labor Statistics, *Employer Costs for Employee Compensation—Dec. 2015* (Mar. 2016), *http://www.bls.gov/news.release/archives/ecec_ 03102016.htm* (computing the rate of employer contribution by dividing total compensation by total salary).



August 15, 2016

Joseph B. Nye, Policy Analyst
Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th St., N.W.
Washington, D.C. 20503

**Re: Agency Information Collection Activities; Notice of Submission for OMB Review, Final Comment Request: Revision of the Employer Information Report (EEO-1), OMB Control Number 3046-0007, Docket ID EEOC-2016-0002-0340**

Dear Mr. Nye:

Thank you for the opportunity to comment on the Equal Employment Opportunity Commission's (EEOC) proposal to require large employers to submit summary compensation data as part of the annual EEO-1 reporting process. The National Women's Law Center (the Center) has worked for over 40 years to advance and protect women's equality and opportunity—with a focus on women's employment, education, income security, health, and reproductive rights—and has long worked to remove barriers to equal treatment of women in the workplace, particularly those that suppress women's wages. The proposed collection of pay data will be critically important in helping to identify compensation discrimination and improving enforcement of pay discrimination laws, and will benefit businesses, individual workers, and the economy. Collecting pay data as part of an existing instrument such as the EEO-1 will also reduce the burden on employers and avoid duplicative or unnecessary efforts and costs, particularly in light of the changes proposed in the Notice of Submission for OMB Review, Final Comment Request ("30-Day Notice"). We commend EEOC for its efforts to address employer concerns and urge the swift approval and implementation of the proposed revisions.

**I.     The Proposed EEO-1 Revision Will Help Identify and Address Pay Discrimination, a Crucial Driver of the Gender Pay Gap.**

The Center strongly supports EEOC's proposal to revise the EEO-1 to collect compensation data from private employers and federal contractor workplaces with more than 100 employees. This data collection will play an important role in uncovering and combating pay discrimination. Women working full time, year round continue to confront a stark wage gap, typically making only 79 percent of the median annual wages made by men working full time, year round.[1] The wage gap is even worse when we look specifically at women of color: African American women typically are paid only 60 percent, Latinas only 55 percent, and Native American women only 59 percent of the wages typically paid to white, non-Hispanic men for full-time, year-round work.[2]

---

[1] NAT'L WOMEN'S LAW CTR., THE WAGE GAP IS STAGNANT FOR NEARLY A DECADE 1 (2015), *available at* http://nwlc.org/resources/wage-gap-stagnant-nearly-decade/ [THE WAGE GAP IS STAGNANT].
[2] NAT'L WOMEN'S LAW CTR., THE WAGE GAP: THE WHO, HOW, WHY, AND WHAT TO DO (Apr. 2016), *available at* https://nwlc.org/resources/the-wage-gap-the-who-how-why-and-what-to-do/ [THE WAGE GAP: THE WHO].

*With the law on your side, great things are possible.*
11 Dupont Circle ▪ Suite 800 ▪ Washington, DC 20036 ▪ 202.588.5180 ▪ 202.588.5185 Fax ▪ www.nwlc.org
JA239

This wage gap has remained stagnant for nearly a decade,[3] and translates into $10,762 less in median annual earnings for women and the families they support.[4]  The result is that a woman working full time, year round stands to lose $430,480 over a 40-year period due to the wage gap.[5]  To make up this lifetime wage gap, a woman would have to work more than eleven years longer than her male counterpart.[6]

A range of factors contributes to the pay gap, including pay discrimination between employees of different genders who are doing the same job.[7]  Women are still paid less than men in nearly every occupation,[8] and studies show that even controlling for race, region, unionization status, education, experience, occupation, and industry leaves 38 percent of the pay gap unexplained.[9]  Conscious and unconscious stereotypes about working women remain a driver of this unexplained gap.  For example, a recent experiment revealed that compared to an identical female applicant, science professors offered a male applicant for a lab manager position a salary of nearly $4,000 more as well as additional career mentoring, and judged him to be significantly more competent and hireable.[10]

Yet pay discrimination remains difficult to detect in the first instance. Because pay often is cloaked in secrecy, when a discriminatory salary decision is made, it is seldom as obvious to an affected employee as a demotion, a termination, or a denial of a promotion.[11]  Moreover, about

---

[3] THE WAGE GAP IS STAGNANT, *supra* note 1.

[4] THE WAGE GAP: THE WHO, *supra* note 2.

[5] *Id.*  Lifetime wage gaps for women of color are significantly larger: African American women lose $877,480, Native American women $883,040; and Latinas $1,007,080.  NAT'L WOMEN'S LAW CTR., THE LIFETIME WAGE GAP, STATE BY STATE (Apr. 2016), *available at* https://nwlc.org/resources/the-lifetime-wage-gap-state-by-state/; NAT'L WOMEN'S LAW CTR., THE LIFETIME WAGE GAP BY STATE FOR NATIVE AMERICAN WOMEN (2014) (Apr. 20160), *available at* https://nwlc.org/resources/the-lifetime-wage-gap-by-state-for-native-american-women/.

[6] THE WAGE GAP: THE WHO, *supra* note 2.

[7] Blau, F. D. & Kahn, L.M, *The Gender Wage Gap: Extent, Trends and Explanations*, NAT'L BUREAU OF ECONOMIC RESEARCH  (Jan. 2016), *available at* http://www.nber.org/papers/w21913.pdf; *see* NAT'L WOMEN'S LAW CTR., FIFTY YEARS AND COUNTING: THE UNFINISHED BUSINESS OF ACHIEVING FAIR PAY (2015), *available at* http://nwlc.org/resources/50-years-counting-unfinished-business-achieving-fair-pay/.

[8] Hegewisch, A. & Matite, M., *The Gender Wage Gap by Occupation,* INST. FOR WOMEN'S POLICY RESEARCH (Apr. 2013), *available at* http://www.iwpr.org/publications/pubs/the-gender-wage-gap-by-occupation-2; Schieder, S. & Gould, E., *"Women's work" and the gender pay gap* 3, ECONOMIC POLICY INST. (July 2016), *available at* http://www.epi.org/publication/womens-work-and-the-gender-pay-gap-how-discrimination-societal-norms-and-other-forces-affect-womens-occupational-choices-and-their-pay/.

[9] Blau & Kahn, *supra* note 7.

[10] Moss-Racusin, C.A. et al., *Science faculty's subtle gender biases favor male students*, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES OF AMERICA (Aug. 2012), *available at* http://www.pnas.org/content/109/41/16474.abstract#aff-1.

[11] As Justice Ginsburg has noted:

> Pay disparities often occur, as they did in Ledbetter's case, in small increments; cause to suspect that discrimination is at work develops only over time. Comparative pay information, moreover, is often hidden from the employee's view. Employers may keep under wraps the pay differentials maintained among supervisors, no less the reasons for those differentials. Small initial discrepancies may not be seen as meet for a federal case, particularly when the employee, trying to succeed in a nontraditional environment, is averse to making waves. Pay disparities are thus significantly different from adverse actions "such as termination, failure to promote, …or refusal to hire," all involving fully communicated discrete acts, "easy to identify" as discriminatory.

Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007) (Ginsburg, J. dissenting).

JA240

60 percent of workers in the private sector nationally are either forbidden or strongly discouraged from discussing their pay with their colleagues.[12]  As a result, employees face significant obstacles in gathering the information that would suggest that they have experienced pay discrimination, which undermines their ability to challenge such discrimination.  Punitive pay secrecy policies and practices allow this form of discrimination not only to persist, but to become institutionalized.  Consequently, government enforcement and employer self-evaluation and self-correction are critical to combat compensation discrimination.

Collecting and making publicly available compensation data from larger private employers and federal contractors will improve the effectiveness of enforcement efforts and increase the likelihood of employer self-correction, thus targeting pay discrimination on multiple fronts.  First, the revised EEO-1 will help both EEOC and the Office of Federal Contract Compliance Programs of the Department of Labor (OFCCP) tackle discrimination by private employers and large federal contractors.  This data collection will empower the agencies to target their limited enforcement resources toward more detailed oversight of those employers who are most likely to be engaging in pay discrimination, greatly enhancing the effectiveness and efficiency of EEOC's and OFCCP's pay discrimination enforcement efforts.

The proposed pay data collection also will help uncover other forms of gender and racial discrimination beyond pay-setting practices that can contribute to compensation disparities.  Bias and discrimination, whether overt or implicit, can impact employer decisions at critical points – recruitment, hiring, performance evaluations and promotions, allocation of assignments and opportunities, and opportunities for advancement and leadership development – which not only create pay disparities, but perpetuate and magnify them over time.  Stereotypes about the needs, abilities and priorities of women, particularly those with families and caregiving responsibilities, or assumptions that only men are family breadwinners, contribute to women being denied promotions, or assignments or opportunities that would lead to career-track, high-paying jobs.  Hiring discrimination that keeps women out of higher paying jobs in a company, or harassment that systematically pushes women out of male-dominated, highly paid jobs may result in race or gender pay gaps within the firm.  If African American employees, for example, are scheduled for fewer work hours, or Asian-American women are not promoted to senior level positions, this also would be reflected in pay gaps.  Collecting compensation data allows for more targeted enforcement of a range of antidiscrimination protections.

In addition, both the process of responding to the data collection tool and the more effective and targeted approach to enforcement that the tool permits will spur more employers to proactively review and evaluate their pay practices and to address any unjustified disparities between employees.  By incentivizing and facilitating such employer self-evaluation, the revised EEO-1 Report will increase voluntary employer compliance with discrimination laws.  Employees and employers alike will benefit from the elimination of discrimination in pay practices absent litigation or other formal enforcement mechanisms, which can be expensive and time-consuming.

---

[12] INST. FOR WOMEN'S POLICY RESEARCH, PAY SECRECY AND WAGE DISCRIMINATION (Jan. 2014), *available at* http://www.iwpr.org/publications/pubs/pay-secrecy-and-wage-discrimination-1/at_download/file.

## II.     The Proposed Pay Data Collection Will Benefit Businesses, Individual Workers and the Economy.

As further discussed in Part IX, below, EEOC has taken significant steps to ensure that employers will face a minimal burden in compiling and reporting largely pre-existing information about compensation and hours worked pursuant to the proposed EEO-1 revision.  At the same time, business, workers and the economy will accrue important benefits from the proposed data collection.

Self-evaluation engendered by the proposed pay data collection is likely to encourage employers to proactively implement practices to help prevent pay disparities in the first instance and to develop a diverse workforce, both of which are good for business.  A diverse workforce and equitable employment practices can confer a wide array of benefits on a company, including decreased risk of liability, access to the best talent, increased employee satisfaction and productivity, increased innovation, an expanded consumer base, and stronger financial performance.[13]  Competitive -- and thus equal -- pay is critical for recruiting and retaining a diverse workforce and high performers, particularly for younger women workers.[14]  And when workers are confident they are being paid fairly, they are more likely to be engaged and productive.[15]  Significantly, shareholders and potential investors are recognizing these benefits and are increasingly interested in companies' commitment to diversity and equal employment opportunity.  They see compliance with antidiscrimination laws -- particularly with regard to equal pay -- as an important factor impacting risk and profitability, and therefore relevant to investment decisions.[16]

Furthermore, addressing discrimination and closing the gender wage gap would have a significant positive impact on the economy.  A recent study found that if women received the same compensation as their comparable male co-workers, the poverty rate for all working

---

[13] Hunt, V., Layton, D. & Prince, S., *Diversity Matters* 9-13, MCKINSEY & CO. (Feb. 2015) (finding diverse workforces correlate with better financial performance, because diversity helps to recruit the best talent, enhance the company's image, increase employee satisfaction, and improve decision making, including fostering innovation); Hewlitt, S.A., Marshall, M. & Sherbin, L., *How Diversity Can Drive Innovation,* HARVARD BUS. REV. (Dec. 2013), *available at* https://hbr.org/2013/12/how-diversity-can-drive-innovation.  Conversely, companies that fail to address gender wage disparities and discriminatory employment practices could damage their reputation and brand among consumers, leading to a loss of profits and shareholder value. Lamb, N. & Klein, W., *A Proactive Approach to Wage Equality is Good for Business*, EMPLOYMENT RELATIONS TODAY (Summer 2015), *available at* http://arjuna-capital.com/news/a-proactive-approach-to-wage-equality-is-good-for-business/ [*Proactive Approach*].

[14] A recent study found that "pay and financial benefits drive Millennials' choice of organization more than anything else." THE 2016 DELOITTE MILLENNIAL SURVEY: WINNING OVER THE NEXT GENERATION OF LEADERS 19 (2016), *available at* https://www2.deloitte.com/content/dam/Deloitte/global/Documents/About-Deloitte/gx-millenial-survey-2016-exec-summary.pdf; Noel, L. & Hunter Arscott, C., *Millennial Women: What Executives Need to Know About Millennial Women* 4, ICEDR (2015), *available at* http://www.icedr.org/research/documents/14_millennial_snapshot.pdf (Millennial women leave jobs primarily for more compensation).

[15] Courtney Seiter, "The Counterintuitive Science of Why Transparent Pay Works," *Fastcompany.com*, Feb. 26, 2016, *available at* http://www.fastcompany.com/3056975/the-future-of-work/the-transparent-pay-revolution-inside-the-science-and-psychology-of-open-.

[16] *Proactive Approach, supra* note 13; Natasha Lamb, "Closing the pay gap: Silicon Valley's gender problem," *Ethical Boardroom*, June 7, 2016, *available at* http://ethicalboardroom.com/leadership/diversity/close-the-pay-gap/; Trillium Asset Mgm't, *Letter to Citigroup Shareholders,* Apr. 16, 2016, *available at* https://www.sec.gov/Archives/edgar/data/831001/000121465916010905/j415160px14a6g.htm.

women would be reduced by half, from 8.1 percent to 3.9 percent.[17]  Moreover, nearly 60% of women would earn more if working women were paid the same as men of the same age with similar education and hours of work.[18]  Increased wages would augment these workers' consumer spending power and benefit businesses and the economy.[19]  Another recent study estimates that by closing the wage gap entirely, women's labor force participation would increase and $4.3 trillion in additional gross domestic product could be added in 2025, about 19 percent more than would otherwise be generated in 2025.[20]

## III.     The EEO-1 Report Is the Appropriate Vehicle for Collecting Pay Data.

The EEO-1 Report is well suited for efficiently collecting meaningful data related to pay, for multiple reasons.

First, the decision to collect this pay information through the EEO-1 Report and to share it with OFCCP minimizes the compliance burden for regulated employers, in direct response to concerns previously raised by the employer community.  When OFFCP previously proposed collecting compensation data from federal contractors through a separate tool on a different reporting schedule from the EEO-1,[21] employer representatives urged in the strongest terms that instead EEOC and OFCCP coordinate their data collection through use of a single, unified instrument.[22]  The proposed EEO-1 revision accomplishes this goal, avoiding duplication of effort or wasted costs for either employers or enforcement agencies.  For these reasons, the National Academy of Sciences' study regarding the collection of compensation data (NAS Study)[23] concluded that use of the EEO-1 for pay data collection would be "quite manageable for both EEOC and the respondents."[24]

---

[17] Hartmann, H., Hayes, J. & Clark, J., *How Equal Pay for Working Women Would Reduce Poverty and Grow the American Economy* 1, INST. FOR WOMEN'S POLICY RESEARCH (2014), *available at* http://www.iwpr.org/publications/pubs/how-equal-pay-for-working-women-would-reduce-poverty-and-grow-the-american-economy/

[18] *Id.*

[19] *See id.* (finding that the U.S. economy would have produced additional income of more than $447 billion in 2012 if women received pay equal to their male counterparts).

[20] Ellingrud, K., et al., *The power of parity: Advancing women's equality in the United States* 1-2, MCKINSEY GLOBAL INST. (Apr. 2016), *available at* http://www.mckinsey.com/global-themes/employment-and-growth/the-power-of-parity-advancing-womens-equality-in-the-united-states.  The same study estimates that even if the wage gap was only partially closed, $2.1 trillion in additional GDP could be added in 2025.

[21] U.S. Department of Labor, Office of Federal Contract Compliance Programs, Non-Discrimination in Compensation; Compensation Data Collection Tool, Advanced Notice of Proposed Rulemaking, 76 Fed. Reg. 49398 (Aug. 10, 2011); U.S. Department of Labor, Office of Federal Contract Compliance Programs, Government Contractors, Requirement to Report Summary Data on Employee Compensation, Notice of Proposed Rulemaking, 79 Fed. Reg. 46561 (Aug. 8, 2014).

[22] *See* SAGE COMPUTING, INC., EEOC SURVEY SYSTEM MODERNIZATION WORK GROUP MEETING 2 (Mar. 2012), *available at* http://www.eeoc.gov/employers/eeo1survey/survey-modernization.pdf;  *see also, e.g.*, Equal Employment Advisory Council, *Comments on the Office of Federal Contract Compliance Programs' Proposed Requirement to Report Summary Data on Employee Compensation* (Jan. 5, 2015);  Society for Human Resource Management and the College and University Professional Association for Human Resources, *Comment on Advanced Notice of Proposed Rulemaking Related to Non-Discrimination in Compensation* 3-4 (Oct. 11, 2011).

[23] NATIONAL RESEARCH COUNCIL OF THE NATIONAL ACADEMIES, COLLECTING COMPENSATION DATA FROM EMPLOYERS (2012), *available at* http://www.nap.edu/catalog/13496/collecting-compensation-data-from-employers [NAS STUDY].

[24] NAS STUDY, *supra* note 23 at 60.

Second, by utilizing the long-established EEO-1 job categories, reliance on the EEO-1 Report allows employers to report pay data without requiring them to master and implement new methods of categorizing job titles within their workplace. Instead, employers can make use of the existing systems by which they associate job titles with EEO-1 job categories, thus simplifying reporting.

Third, use of the EEO-1 enables the calculation and comparison of compensation data by gender within racial/ethnic groups, and by racial/ethnic groups within genders. The substantial pay gaps experienced by women of color compared to their white, non-Hispanic male and female counterparts demonstrate that unequal pay is a problem that has both gender and racial/ethnic dimensions. Reporting pay data through the EEO-1 Report will capture these interacting impacts.

Fourth, use of the EEO-1 as a reporting tool will facilitate analysis of compensation data both company-wide and within each employer's establishment, given that a separate EEO-1 Report must be filed for each physical location in a multi-establishment company. Company-wide analysis will help to draw attention to potential systemic discrimination that can affect many workers across an organization and enable meaningful analysis of the company's pay practices even where the number of workers at each individual establishment is relatively small. On the other hand, establishment-level analysis will ensure that individual establishments that engage in pay discrimination cannot evade detection if the company as a whole has pay that is closer to equal.

Finally, and most importantly, reporting of compensation data by gender and racial/ethnic groups within each of the ten job categories from the EEO-1 (rather than by an employer's own job titles or job classification system) will facilitate the consistent comparison of pay disparities in each job category among employers in a given industry and geographic area. Specifically, it will help EEOC and OFCCP identify firms with racial or gender pay gaps within each job category that significantly diverge from their regional industry peers for potential further detailed assessment. That is, it will allow analysis and comparison of wage data for firms employing workers in the same job class, in the same industry, in the same location, in the same year. In addition, it will help EEOC and OFCCP develop a better understanding of which industries have the most significant pay disparities, and to target enforcement resources accordingly. These data will also enable EEOC and OFCCP to better assess the extent to which sex-based compensation discrimination affects women's entry into non-traditional industries, and more generally to better understand the relationship between gender segregation in the workforce and pay discrimination.

The EEO-1 categories are relatively broad, and a single category can comprise multiple jobs in an establishment. Some have objected that as a result the pay gap measured in a particular EEO-1 job category for a particular employer will not necessarily measure disparities in pay for "equal work." This objection ignores the fact that the EEO-1 was never intended to act as an instrument precise enough to establish or prove violations of law without more investigation. Rather, what the EEO-1 has historically done, and what compensation data collection will strengthen its capacity to do, is aggregate millions of data points to establish gender and racial patterns within these job categories, thus allowing identification of firms that sharply depart from these patterns

for further analysis.[25]  For example, the EEO-1 has been used by OFCCP to aid in the selection of federal contractors for enforcement activities, by academics to study the impact of affirmative action on women and people of color, and by the U.S. Government Accountability Office to assess the effectiveness of antidiscrimination programs.[26]  The revised EEO-1 Report will provide EEOC and OFCCP a critical tool for focusing investigatory resources to identify pay discrimination within equivalent jobs, and will also flag deviations from compensation patterns that may be driven by other forms of discrimination that shut women or people of color out of higher-paying roles within a given job category.

## IV.     W-2 Pay Is the Best Readily Available Measure of Compensation for Data Collection Purposes.

We support the collection of data that provides a true picture of employees' compensation, which necessarily includes pay that exceeds base salary. Indeed, for Equal Pay Act purposes, relevant compensation

> includes all payments made to [or on behalf of] an employee as remuneration for employment. The term includes all forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance, or some other name. Fringe benefits are deemed to be remuneration for employment. . . . [V]acation and holiday pay, and premium payments for work on Saturdays, Sunday, holidays, regular days of rest or other days or hours in excess or outside of the employee's regular days or hours of work are deemed remuneration for employment and therefore wage payments that must be considered in applying the EPA . . . .[27]

Requiring employers to report W-2 earnings from Box 1[28] will provide a comprehensive picture of compensation, in line with EEOC's and OFCCP's enforcement mandates.  Moreover, since employers already collect and report W-2 wage data pursuant to federal law, inclusion of this information in the revised EEO-1 Report will impose a minimal additional burden.

### A.     W-2 Earnings Provide a Comprehensive Picture of Compensation

The Center agrees with EEOC and the conclusions of the independent Pay Pilot Study (Pilot Study)[29] that among readily available compensation measures, the W-2 provides the most comprehensive picture of earnings, with a minimal associated burden for employers.  The NAS

---

[25] For instance, OFCCP has analyzed EEO-1 data to indicate the probability that a review will find a significant violation of federal requirements, and to target enforcement activities accordingly.  Public Hearing before the U.S. Equal Employment Opportunity Commission, July 18, 2012 (testimony of Dr. Marc Bendick, Jr.), *available at* http://www.eeoc.gov/eeoc/meetings/7-18-12/bendick.cfm.  EEOC itself has published public reports analyzing data from the EEO-1 and highlighting trends in particular industries. *See* U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, SPECIAL REPORTS, *available at* http://www.eeoc.gov/eeoc/statistics/reports/index.cfm.

[26] NAS STUDY, *supra* note 23 at 17-25.

[27] 29 C.F.R. § 1620.10.

[28] The 30-Day Notice clarifies that the revised EEO-1 would use the measure of compensation reported in Box 1, wages, tips and other compensation.  81 Fed. Reg. 45479, 45486 (July 14, 2016).

[29] SAGE COMPUTING, INC., FINAL REPORT (Sept. 2015), *available at* http://eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf   [PILOT STUDY].

Study and the subsequent Pilot Study considered both the compensation definitions used by the Bureau of Labor Statistics' Occupation Employment Statistics (OES) and by the W-2, among others, as a compensation measure for EEOC pay data collection, because these measures are the most widely known to employers and include various forms of compensation data.[30]  The OES compensation definition includes base rate of pay, hazardous duty pay, cost of living allowances, guaranteed pay, incentive pay, tips, commissions and production bonuses.[31]  But it does not account for certain some categories of compensation including overtime pay, severance pay, shift differentials and nonproduction, year-end and holiday bonuses.[32]  Though these categories may only account for a small portion of overall employee compensation, they are particularly relevant in certain industries.  For example, as noted in the Pilot Study, in management and business and financial operations bonuses account for more than 11 percent of cash compensation, and in healthcare shift differentials account for substantial differences in compensation.[33]

The W-2 definition includes all earned income, including supplemental pay components (such as overtime pay, shift differentials, and nonproduction bonuses) and therefore offers a more comprehensive picture of earnings than the OES.[34]  This comprehensive picture is critical because although compensation discrimination may manifest in workers' base salaries, it may also occur through discrimination in other less frequently measured forms of compensation such as bonuses,[35] commissions,[36] stock options, differential pay, and opportunities for overtime.  For instance, even when base salaries between comparable male and female workers are equal in a given company, overall compensation could be significantly disparate between the genders based on the discriminatory, discretionary allocation of compensation types such as bonuses and stock options.[37]  In fact, "female and minority employees have been virtually locked out of wealth-

---

[30] The NAS Study reviewed the wage definitions in the Occupational Employment Statistics survey (OES) and the National Compensation Survey (NCS) and concluded that the OES definition should be considered for use because it was widespread, and because of a substantial overlap in the employers who report data to the OES and EEOC. NAS STUDY, *supra* note 23 at 58.  The Pilot Study also recommends the use of W-2 data because such data provide the most comprehensive measure of compensation readily available to businesses.  PILOT STUDY, *supra* note 29 at 108.

[31] NAS STUDY, *supra* note 23 at 56.

[32] *Id.*; PILOT STUDY, *supra* note 29 at 7.

[33] PILOT STUDY, *supra* note 29 at 7 & n.16.

[34] *Id.* at 7, 8.  While reported W-2 wages include taxable benefits and pre-tax deductions driven by an individual employee's choices - such as mass transit and parking stipends/elections, 401(k) or retirement account contributions, and deferred compensation - these optional elements likely would not constitute a large enough part of compensation for most workers so as to create a disparity for the purposes of enforcement, nor is there reason to believe that men and women, or individuals of different races, would consistently make different choices in this regard and thus create gender or race pay disparities.

[35] *See* King v. Univ. Health Care Sys., 645 F.3d 713 (5th Cir. 2011) (upholding a jury's conclusion that the employer violated the Equal Pay Act when it failed to pay plaintiff anesthesiologist a bonus that it paid her male colleague).

[36] *See* Bence v. Detroit Health Corp., 712 F.2d 1024, 1027 (6th Cir. 1983) (finding a compensation disparity under Equal Pay Act where the employer paid higher commission rate to males than females, even though total remuneration was substantially equal).

[37] *See* MERCER, GENDER EQUITY REPORT (Nov. 2015), *available at* https://www.imercer.com/uploads/Aust/pdfs/Marketing/gender_pay_executive_summary.pdf  (survey of Australian companies finding that women receive lower variable reward/incentive pay despite receiving the same performance ratings as their male counterparts; males who only partially met their objectives received bonuses that were 35 percent larger (as a percentage of employment cost) than their female counterparts).

creating opportunities in most companies."[38]  Studies show than men receive stock options and bonuses at a rate twenty to thirty times than of women.[39]  Studies also indicate that compensation for men consists of 85 percent salary and 15 percent stock options, profit sharing, and other bonuses, while compensation for women consists of 91 percent salary and 9 percent stock options, profit sharing, and other bonuses.[40]

For all these reasons, the base rate of pay is not an appropriate alternative measure of compensation for the purposes of the revised EEO-1 Report.  The base rate of pay is an employee's initial rate of compensation, excluding extra compensation such as for overtime, bonuses, or an increase in the rate of pay for a shift differential.  It does not reflect the full measure of an employee's compensation.[41]  While some employers might easily be able to report base rate of pay, if it is the compensation data currently captured by their human resource information management systems (HRIS),[42] it is not a dynamic or complete picture of an employee's compensation and would not serve the purposes of the EEO-1 Report.  Data about base pay alone cannot capture instances where other types of compensation -- such as stock options and bonuses -- drive gender-based disparities in compensation, and would permit employers that discriminate using other forms of compensation to evade detection.  Conversely, collecting data on W-2 pay will help root out disparities across the spectrum of take-home compensation.  Accordingly, the Center supports collecting W-2 pay data, as the measure of earnings that collects as many forms of compensation as possible.

> B.    *Reporting W-2 Earnings Will Not Be Unduly Burdensome for Employers*

Requiring covered employers to report W-2 data in addition to the already-required ethnicity, race and gender of employees via the EEO-1 Report will not be unduly burdensome.  First, federal law already requires employers to maintain and generate the information in W-2 forms that will be required for the revised EEO-1.[43]  HRIS experts consulted for the Pilot Study reported that most major payroll software systems are preprogrammed to compile the data for generating W-2 forms.  This led the Pilot Study to conclude that employers using such software to manage payroll and generate W-2 forms could report the proposed data with minimal additional burden.[44]

Second, EEOC's proposal in the 30-Day Notice to move the 2017 report's filing deadline from September 2017 to March 31, 2018, addresses a key concern raised by employers.  Employers argued that because W-2 earnings data usually are generated at the end of the calendar year, the EEO-1's September deadline would require employers to generate an additional, noncalendar

---

[38] Mehri, C. & Eardley, E., *21st Century Tools for Advancing Equal Opportunity: Recommendations for the Next Administration* 7, AMERICAN CONSTITUTION SOCIETY (2008), *available at* https://www.acslaw.org/files/Mehri%20FINAL.pdf.

[39] Alyssa Lebeau, *The New Workplace Woman: "Are We There Yet?,"* BUSINESS WOMAN, Fall 2001.

[40] *Id.*

[41] PILOT STUDY, *supra* note 29 at 8.

[42] *Id.*

[43] 26 C.F.R. § 31.6051-1.

[44] PILOT STUDY, *supra* note 29 at 8, 103.  The majority of employers use automated payroll systems.  Optimal Benefit Strategies, LLC, *Most Small Employers Face Low Cost to Implement Automatic IRAs*, AARP (Aug. 2009) ("97 percent of employers with 10 or more employees use automated systems and do not process payroll manually"), *available at* http://assets.aarp.org/rgcenter/econ/auto_iras.pdf.  The Pilot Study acknowledged that some companies that outsource their payroll may need to make a one-time capital investment to write a software program to import data from payroll programs into the HRIS system.

year W-2 that would not fully reflect annual compensation. EEOC's proposal will allow employers to utilize, for the purposes of the EEO-1, the calculation and reporting of W-2 data for the calendar year that is already required by federal law. The proposed change would also allow employers more time to adapt their payroll and HRIS systems to prepare for the new data collection.

## V.    Reporting of Total Hours Worked Will Greatly Enhance the Usefulness of the Pay Data Collected and Will Not Be Unduly Burdensome for Employers.

EEOC's proposal to collect the total number of hours worked[45] by the employees included in each EEO-1 pay band will allow the calculation and comparison of mean compensation both per person and per hour for each gender and racial/ethnic group within each job category. As the Pilot Study recognized, collection of total hours worked by each employee in addition to wages is critical to an analysis of pay differences.[46] Collecting this data will allow OFCCP and EEOC to account for pay differences due to variation in the number of hours worked among employees in a pay band, sharpening pay comparisons both between different groups in an employer's workforce and between different employers. Collection of total hours worked also will permit an analysis that accounts for periods of unemployment or less than full-time work, including part-time, temporary and seasonal work. This is especially important because women constitute two-thirds of part-time workers in the U.S,[47] and because part-time workers are often paid less, per hour, than their full-time counterparts.[48] Additionally, women are almost half of all temporary workers.[49]

Hours worked data is also readily available to employers. Employers must keep records of hours worked for all employees not exempt from the overtime provisions of the Fair Labor Standards Act.[50] Accordingly, reporting actual hours worked for each nonexempt employee, as the 30-Day Notice proposes, will not create an additional burden for employers. With regard to the collection of total hours worked by exempt employees, the 30-Day Notice suggests employers report either hours actually worked, or report 40 hours per week for full-time employees and 20 hours per week for part-time employees as a standardized substitute to reduce the reporting burden. The Center supports this approach, which permits an employer to select the reporting option that is consistent with its current recordkeeping.

---

[45] We support EEOC's proposal in the 30-Day Notice to adopt the definition of "hours worked" in the Fair Labor Standards Act (FLSA). 81 Fed. Reg. at 45488. It provides a clear definition of the relevant hours, and employers covered by the proposal are already familiar with the FLSA and its requirements.
[46] *See* PILOT STUDY, *supra* note 29 at 42-43, 59.
[47] NAT'L WOMEN'S LAW CTR., PART-TIME WORKERS ARE PAID LESS, HAVE LESS ACCESS TO BENEFITS—AND TWO-THIRDS ARE WOMEN 1 (2015), *available at* http://nwlc.org/resources/part-time-workers-are-paid-less-have-less-access-benefits%E2%80%94and-two-thirds-are-women/. *See also* U.S. DEP'T OF LABOR, WOMEN'S BUREAU, *Women of Working Age*, Chart 22 (2015), http://www.dol.gov/wb/stats/latest_annual_data.htm (last visited Aug. 10, 2016).
[48] NAT'L WOMEN'S LAW CTR., PART-TIME WORKERS ARE PAID LESS, HAVE LESS ACCESS TO BENEFITS—AND TWO-THIRDS ARE WOMEN 1, 3 (2015), *available at* http://nwlc.org/resources/part-time-workers-are-paid-less-have-less-access-benefits%E2%80%94and-two-thirds-are-women/.
[49] Nicholson, J., *Issue Brief: Temporary Help Workers in the U.S. Labor Market*, U.S. DEP'T OF COMMERCE ECONOMICS AND STATISTICS ADMIN. (July 2015), *available at* http://www.esa.doc.gov/sites/default/files/temporary-help-workers-in-the-us-labor-market.pdf.
[50] 29 C.F.R. § 516.2.

Where an employer does track exempt employees' hours, the employer can report that number. Indeed, the Pilot Study noted that most payroll systems maintain the total hours worked by *each* employee, so reporting such information would impose a minimal burden on employers that use those systems. In the absence of actual data regarding hours worked by exempt employees, employers can rely on the EEOC-sanctioned assumption of a full-time 40-hour workweek. The 40-hour workweek is a widely accepted definition[51] and is a reasonable approximation of full-time work, with the understanding that not all full-time salaried exempt employees work precisely 40 hours per week.[52] The proposal appropriately seeks to minimize the burden on employers by not requiring them to collect additional data where they do not already.

EEOC's suggestion is responsive to critiques from employers, who objected to OFCCP's 2014 proposal[53] that contractors use across-the-board estimates of hours worked by exempt employees by reporting 2080 hours annually worked for all full-time, salaried exempt employees, and 1080 hours annually worked for all part-time employees. This option would permit employers who collect more detailed data, or who wish to begin to collect more detailed data, to report more precise calculations.

## VI.    The Pay Data Collection Should Be Strengthened Further.

The compensation data collected by the proposed revised EEO-1 Report will fill an important gap in the information currently available to EEOC and OFCCP, enhancing the enforcement of discrimination prohibitions. However, we urge further strengthening of the pay data collection in a few key ways:

- Extension of the requirement to submit Component 2 of the EEO-1 to federal contractors that have between 50 to 99 employees and are otherwise required to submit the EEO-1.[54] Although EEOC indicated in the 30-Day Notice that it would retain the same employee thresholds, we urge reconsideration of this position given the heightened importance of ensuring that recipients of public funds do not discriminate in pay practices. Many of these smaller entities already maintain the relevant information. For instance, federal supply and service contractors and subcontractors are already required to preserve all "personnel or employment record[s]," including those involving "hiring, assignment, promotion, demotion, transfer, lay off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship," for at least one year.[55] These

---

[51] Although the FLSA's overtime requirements do not apply to the exempt workers at issue here, the overtime rule does establish a useful benchmark of a 40-hour workweek as a standard measure of full-time work. 29 U.S.C. § 207(a).

[52] A 2014 Gallup poll of full-time, salaried workers indicated that of the workers surveyed, 37 percent worked 40 hours a week, and 59 percent worked 41 hours or more per week. The average workweek of the employees surveyed was 47 hours. GALLUP, WORK AND EDUCATION POLL (2014), *available at* http://www.gallup.com/poll/175286/hour-workweek-actually-longer-seven-hours.aspx. *See* U.S. DEP'T OF LABOR, BUREAU OF LABOR STATISTICS, THE EMPLOYMENT SITUATION – JULY 2016, Table B-2 (Aug. 5, 2016), *available at* http://www.bls.gov/news.release/empsit.t18.htm (average weekly hours and overtime of all employees on private nonfarm payrolls in July 2016 was 34.5 hours).

[53] U.S. Department of Labor, Office of Federal Contract Compliance Programs, Government Contractors, Requirement to Report Summary Data on Employee Compensation, Notice of Proposed Rulemaking, 79 Fed. Reg. 46561 (Aug. 8, 2014).

[54] 41 C.F.R. § 60-1.7.

[55] 41 C.F.R. § 60-1.12(a).

JA249

records for employees must be identifiable by "[t]he gender, race, and ethnicity of each employee."[56]  Supply and service contractors with contracts of $50,000 or more and with 50 or more employees also must keep on file copies of written affirmative action plans.[57]

- Revision of the proposed EEO-1 Report to require employers to report their pay data using additional, narrower pay bands.  We support the decision to collect compensation data by counting and reporting the number of employees from each demographic group in each identified pay band, as a means of reporting that minimizes the burden on the employer while still capturing reliable and useful data.[58]  We also agree that in order to be useful, pay data must be collected in a larger number of bands than used by the EEO-4, as the EEO-4 includes all pay of $70,000 or more in a single band, thus rendering invisible any pay disparities experienced by employees earning $70,000 or more annually.  The OES pay bands upon which EEOC proposes to rely are a distinct improvement over the EEO-4 bands, in that the OES pay bands go up to $207,999, with the final pay band including all pay of $208,000 or above.

  However, even the OES pay bands will be unable to provide data on pay disparities for employees earning more than $208,000.  In the 30-Day Notice, EEOC declined to adopt narrower pay bands or additional pay bands at the top end of the wage scale, stating that the proposed pay bands would maximize the collection of data since the majority of wages in the United States are well below $208,000.  But data show that women up and down the income scale experience pay gaps compared to their male counterparts, including in highly paid roles such as attorneys, executives, and surgeons.[59]  For example, about half of physicians and surgeons make more than $194,500 annually—a profession in which women typically make only 71 cents for every dollar paid to their male counterparts.[60]  About half of lawyers make more than $121,000 annually—a profession in which women typically make only 78 cents for every dollar paid to their male counterparts.[61]  Among equity partners, generally the highest compensated individuals at law firms, the typical female equity partner earns 80 percent of what a typical male equity partner earns.[62]  In the typical state, the average wage and salary of the top 0.5 percent is nearly $360,000 a year.[63]  We therefore urge the inclusion of

---

[56] 41 C.F.R. § 60-1.12(c)(1).

[57] 41 C.F.R. § 60-1.40(a).

[58] The Pilot Study recommended collecting aggregate pay information for the occupational categories in pay bands. PILOT STUDY, *supra* note 29 at 9, 10, 108.

[59] U.S. CENSUS BUREAU, 2014 AMERICAN COMMUNITY SURVEY, Table 1 (Full-Time, Year-Round Workers and Median Earnings in the Past 12 Months by Sex and Detailed Occupation: 2014), *available at* http://www.census.gov/people/io/publications/table_packages.html [ACS]; Schieder & Gould, *supra* note 8 at 6 ("Women in the top 95th percentile of the wage distribution experience a much larger gender pay gap than lower-paid women).

[60] ACS, *supra* note 59.

[61] *Id.*

[62] NAT'L ASS'N OF WOMEN LAWYERS, NINTH ANNUAL SURVEY (2015), *available at* http://www.nawl.org/p/cm/ld/fid=506.

[63] Figures are for all individuals 16 and older. The American Community Survey top codes data for wage and salary income at the 99.5th percentile of each state.  Wages above this level all are coded at the state mean of wage and salary income.  *See* IPUMS USA, INCWAGE Codes, *available at* https://usa.ipums.org/usa-action/variables/INCWAGE#codes_section (last visited Aug. 10, 2016).  In 2014, the median value of the state mean wage and salary income of the top 0.5 percent was $359,000 with a range between $237,000 and $642,000.

additional pay bands to collect pay data up to at least $360,000, to ensure that meaningful pay data is captured as to virtually all of the workforce.  We also note that the top OES pay bands cover extremely wide pay ranges of $34,839 and $44,199.  In order to provide more meaningful information regarding pay disparities, reflecting the EEO-1's distinct purpose, we urge that pay data be collected in narrower pay ranges, and recommend for those pay bands whose upper limit is more than $19,329, no single pay band cover a range of more than 20 percent of the lowest pay captured by that band, thus allowing for more granular analyses.

- Whether the EEO-1 ultimately relies on OES pay bands or a modified version of the OES pay bands, it is critical that these bands be regularly adjusted by continuing to track the OES, in order to provide the most relevant data reflecting the distribution of pay in the economy.

## VII.    EEOC and OFCCP Must Ensure That Pay Discrimination Is Not Insulated From Review Because it Is Commonplace Within an Industry.

The success of the collection of pay data in helping end pay discrimination depends on EEOC's and OFCCP's consistent incorporation of the data's predictive information into their ongoing decisions about where to target enforcement.  This focus will not only increase the effectiveness of enforcement activities in rooting out discrimination, but also enhance the incentives for employers to engage proactively in self-evaluation of their pay practices and improve their compliance with equal pay standards.  We therefore commend and strongly support the proposal to establish industry-level standards for pay disparities, use deviation from these standards to identify potential pay discrimination, and determine which employers to prioritize for investigation.  However, given the persistence of gender and racial pay gaps across the economy, being above or close to an industry standard does not demonstrate an absence of pay discrimination exists within an employer's workforce.  The promulgation of the final pay data collection instrument should recognize that while deviation from industry standards will be incorporated into decisions about conducting and prioritizing enforcement activities, other important considerations can and will come into play.  For example, in some instances, enforcement attention appropriately may be focused on entire industries with sizeable gender pay gaps (rather than just the worst performing employers within those industries).  Such attention is critical, as research reveals industry patterns of discrimination.  For example, in the retail industry, women and people of color disproportionately fill the lowest paid positions, while white men disproportionately fill the most well-compensated jobs.[64]  Similarly, in the restaurant industry there is evidence of both racial[65] and gender discrimination[66] in hiring and pay.

---

Figures include D.C. but exclude Puerto Rico. 2014 ACS and PRCS Minimum and Maximum Codes, *available at* https://usa.ipums.org/usa/volii/2014acs_topcodes.shtml (last visited Aug. 10, 2016).

[64] CTR. FOR POPULAR DEMOCRACY, DATA BRIEF: RETAIL JOBS TODAY (Jan. 2016), *available at* http://static1.squarespace.com/static/556496efe4b02c9d26fdf26a/t/56a0f00f3b0be3bde90e9363/1453387792311/RetailJobsToday1.pdf.

[65] RESTAURANT OPPORTUNITIES CENTERS UNITED, THE GREAT SERVICE DIVIDE (Oct. 2014), *available at* http://rocunited.org/the-great-service-divide-national/.

[66] RESTAURANT OPPORTUNITIES CENTERS UNITED, TIPPED OVER THE EDGE (Feb. 2012), *available at* http://rocunited.org/tipped-over-the-edge-gender-inequity-in-the-restaurant-industry/.

VIII.    **Making Summaries of Compensation Data Available to the Public Is an Essential Complement to the Compensation Data Collection.**

The Center strongly supports the plan to make aggregate data gathered from the revised EEO-1 Reports available to the public.  Making these data available to the public can promote employer compliance with equal pay standards in a number of important ways.  With these aggregate data in hand, workplace equality advocates can more efficiently direct their own enforcement, outreach and public education activities to industries or regions where pay disparities are most egregious.  Individual employees can find out if they are working in an industry or region where they are more at risk of experiencing pay discrimination, and be prompted to investigate further to ensure that they are being treated fairly.  They also can better understand pay trends with their region and industries, thus empowering them to seek and negotiate fair pay.  And making these aggregate data public will facilitate and incentivize voluntary employer compliance with equal pay protections, by providing benchmarks that employers can use to evaluate their own pay practices and to publicly promote their successes in achieving pay equity.

We further urge EEOC to not only provide average pay disparities by occupational category in given industries and/or regions, but also other relevant information such as the range of pay disparities.  Unequal pay is a ubiquitous phenomenon in many industries and regions, and even the average performers within a group may still have problems with pay discrimination in their workforces.  We therefore should be encouraging employers, in conducting self-evaluations of their pay practices, to strive to be even better than the average among their peers.

IX.    **The Proposed Data Collection Will Not Be Unduly Burdensome for Employers and the Revisions Proposed by the 30-Day Notice Further Minimize the Reporting Burden.**

We commend EEOC for constructively addressing the concerns expressed by employers regarding the burden of the proposed pay data collection, and support its suggested changes.  The proposal to collect pay information through the EEO-1 and to share it across agencies reduces a significant amount of the reporting burden for employers, and avoids duplication of effort or wasted costs in several ways.  The relevant universe of employers is already required to submit EEO-1 reports that include information by gender, race/ethnicity, and job grouping categories.[67]  These employers are familiar with the form, the job categories and the reporting requirements.

As noted above, federal law already requires private employers and contractors to maintain much of the information that would be required under the revised EEO-1, such as W-2 earnings as the measure of compensation.  Likewise, federal law already requires employers to keep records of hours worked for nonexempt employees.[68]  Accordingly, reporting actual hours worked for each nonexempt employee, or actual hours worked or a standard approximation for each exempt employee, as the 30-Day Notice proposes, will not create an additional burden for employers.

Compensation and total hours worked information is readily available to most employers in their computerized payroll systems, so the burden that compiling and reporting this largely pre-

---

[67] 29 C.F.R. § 1602.7 (private employers); 41 C.F.R. § 60-1.7 (federal contractors).  *See also* nn.54-57, *supra*.
[68] 29 C.F.R. § 516.2.

existing information pursuant to the proposed rule will impose on employers would be minimal.[69] Completing the proposed revised EEO-1 would require employer adjustments at the preparation and the collection phases. Employers would be required to link their computerized payroll system, with the necessary information about compensation and hours worked, with the demographic and occupational information on each employee in the employer's HRIS. This would require a one-time redesign and reprogramming of software to generate the data in the new format. However, the burden and cost should be minimal, because compensation management systems and software are designed to be updated routinely to accommodate changes in federal, state or local income tax rules, new accounting rules, and employer changes in fringe benefits or compensation practices.[70] Once the payroll system software and HRIS system have been linked and reprogrammed to perform the required computations, collecting and reporting the new data for the revised EEO-1 would require minimal extra time or effort.

The additional revisions proposed in the 30-Day Notice will further diminish employers' reporting burden. As noted above, EEOC's proposal to move the 2017 report's filing deadline to March 31, 2018, would eliminate the need for employers to generate a separate, noncalendar year W-2. This change, which directly responds to employers' concerns, allows the use of the same calendar year W-2 data for the purposes of both the EEO-1 and federal law. In the 30-Day Notice EEOC also proposes moving the "workforce snapshot" period from the third quarter (July-September) to the fourth quarter (October-December) to address employer concerns. By counting and reporting its total number of employees in the fourth quarter, an employer can fully account for promotions that result in job category or pay band changes for employees during that calendar year. The proposed change, which would take effect for the 2017 reporting cycle, thus aligns the workforce snapshot period with the federally required W-2 reporting timeline as well, and should result in more accurate and less burdensome reporting.

Particularly given EEOC's responsive changes, the proposed collection and reporting of pay data will require minimal additional time and effort by employers. In comparison, great benefits will accrue for employees and employers because of this proposed rule. As discussed above, these data will be crucial to enhancing the effectiveness of enforcement activities on behalf of employees that are victims of pay discrimination and other forms of discrimination reflected in compensation. Further, the reporting requirement may actually reduce the ultimate burdens of enforcement on law-abiding employers because it will improve EEOC's and OFCCP's ability to direct their investigatory efforts toward employers most likely engaged in pay discrimination.

-------------------------------

In sum, the National Women's Law Center strongly urges swift finalization of the proposed revisions to the EEO-1 Report in order to ensure this data collection begins with the 2017

---

[69] In response to employer comments, EEOC revised its methodology for calculating the estimated annual reporting burden to account for the time spent annually on EEO-1 reporting by all the relevant employees at the firm and establishment level, and the fact that some employers may collect and enter EEO-1 data manually and do not use centralized data uploads. 81 Fed. Reg. at 45494. Accordingly, EEOC increased the burden estimate.
[70] For example, Intuit provides regular updates for subscribers to its Quick Books Payroll service. *See* http://payroll.intuit.com/support/kb/2000204.html; Sage provides similar software updates to its subscribers. *See* https://support.na.sage.com/selfservice/microsites/msbrowse.do?UMBrowseSelection=SG_SAGE50_U_S_EDITIO N_1.

reporting year.  We have not seen any significant progress in closing the gender pay gap in this country in nearly a decade.  Women cannot afford to keep waiting for change, nor can the families depending on women's earnings. The powerful enforcement tool proposed by EEOC promises to make a real difference in closing the pay gaps that have shortchanged women for far too long.

Emily Martin
General Counsel and Vice President for Workplace Justice

Maya Raghu
Director of Workplace Equality



# GAUCHER ASSOCIATES

## Human Resource Compliance Specialists
### 50 Oliver Street, Suite 212
### North Easton, MA  02356
### Tel:  (781) 341-9477          Fax:  (781) 341-6091

August 15, 2016

Joseph B. Nye
Policy Analyst
Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th Street, NW
Washington, DC 20503.


Dear Mr. Nye:

Gaucher Associates appreciates the opportunity to review and submit comments on the EEOC's proposed revision of the EEO-1 report to add a "Component 2" to collect "W-2 earnings and hours worked".   Gaucher Associates, Inc. is a Human Resources consulting firm specializing in employment law compliance matters, including EEO and Affirmative Action, with offices in Massachusetts and California.  Founded in 1994 by Richard A. Gaucher, Gaucher Associates has provided EEO/AA consulting services to, written AA programs for, or represented, primarily before the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), but also in EEOC and state and local Fair Employment Practices agency matters, over 250 clients for over twenty years.

For the record, I was employed by the OFCCP for 17 years, eight as a field compliance officer, working out of the Milwaukee District Office, and the remaining nine as the Director of Operations in the OFCCP's Boston Regional Office.  I also served as a member of the OFCCP's Task Force on Directives and the Manual, which eliminated a number of outdated or redundant directives and wrote the current Federal Contract Compliance Manual.  I also prepared the regulations segment of a training course for new compliance officers, and was a member of the agency's Reinventing Government committee for Administrative Issues.
I left the government in November of 1996, and joined Gaucher Associates, where I am currently Senior Vice President.

**Is This Trip Necessary?**

In our response to the EEOC's initial proposal, we questioned whether or not this change to the EEO-1 report is even necessary.  As we pointed out, over the years there has been little evidence to show that pay discrimination against women is widespread and systemic in business.  Little evidence supports such a massive effort to collect pay data from employers.

EEOC Final Comment Request: Revision of the Employer -1 Report (EEO-1)

Our colleague John Fox (Fox, Wang and Morgan) has described this proposal as a solution in search of a problem, a sentiment with which I am in full agreement. We pointed out that the OFCCP, the EEOC's "sister" agency, formerly utilized a tool to collect compensation data from Federal contractors and subcontractors, as part of the Equal Opportunity Survey. Unfortunately, the compensation information provided by that instrument failed to provide useful indicators for identifying Federal contractors that might be potential discriminators, despite the best efforts of a private consulting firm to assist the agency in improving its analysis (see Abt Report on EO Survey, attached), but found the task to be impossible.

We also noted that this regulatory proposal is a substitute for the OFCCP's withdrawn proposal to gather pay data from Federal contractors, generated by a Presidential Memorandum of April 8, 2014, which directed the Department of Labor "…to propose…a rule that would require Federal contractors and subcontractors to submit to DOL summary data on the compensation paid their employees, including data by sex and race".

The President's memorandum begins by asserting that…

> "[w]hile working women have made extraordinary progress over the past five decades since enactment of the Equal Pay Act of 1963, they still earn only 77 cents for every dollar that a man earns. For African-American women and Latinas, the pay gap is even greater. This pay differential shortchanges women and their families by thousands of dollars a year, and potentially hundreds of thousands of dollars over a lifetime. Moreover, given the connected impact on benefits and retirement savings, the loss and the accompanying threat to economic security are even greater.

But there is little evidence that this difference, in what is actually median pay, is based largely, or substantially, on systemic, unlawful discrimination based on gender or race? Evidence for such discrimination is lacking. Moreover, the EEOC is an independent Federal agency, so we are not certain why it has chosen, on its own, to carry water for the President.

Our response to the EEOC's proposal referenced a report by the CONSAD Research Corporation (see CONSAD Report, attached) analyzing differences in pay based on gender that was commissioned by the OFCCP in the previous administration. This study, "An Analysis of Reasons for the Disparity in Wages Between Men and Women", published January 12, 2009, contained these conclusions:

> "In this study, an attempt has been made to use data from a large cross-sectional database, the Outgoing Rotation Group files of the 2007 CPS, to construct variables that satisfactorily characterize factors whose effects have previously been estimated only using longitudinal data, so that reliable estimates of those effects can be derived in an analysis of the cross-sectional data. Specifically, variables have been developed to represent career interruption among workers with specific gender, age, and number of children. Statistical analysis that includes those variables has produced results that collectively account for between 65.1 and 76.4 percent of a raw

gender wage gap of 20.4 percent, and thereby leave an adjusted gender wage gap that is between 4.8 and 7.1 percent.

* * *

As a result, it is not possible now, and doubtless will never be possible, to determine reliably whether any portion of the observed gender wage gap is not attributable to factors that compensate women and men differently on socially acceptable bases, and hence can confidently be attributed to overt discrimination against women. In addition, at a practical level, the complex combination of factors that collectively determine the wages paid to different individuals makes the formulation of policy that will reliably redress any overt discrimination that does exist a task that is, at least, daunting and, more likely, unachievable."

We also cited a report by the American Association of University Women, "Graduating to a Pay Gap" (copy attached), which examined the earnings of women and men one year after college graduation.    The report, prepared by Christianne Corbett, M.A., and Catherine Hill, PhD, and published in 2012, came to the following conclusion:

"Overall, the regression analysis of earnings one year after graduation suggests that a 6.6 percent difference in annual earnings remains between women and men after accounting for all variables known to affect earnings. This is referred to in the text as the "unexplained" wage gap between men and women."

Whether it's a 4.1 and 7.8 percent "pay gap", or a 6.6 percent difference, the "wage gap" is unexplained, meaning that it is not statistically significant.

We pointed out that although the Equal Pay Act has been in effect for over 50 years, the record of the EEOC, which enforces the Act, does not seem to indicate a significant problem.    As an example, in Fiscal Year 2013, only 1,019 of 93,727 total charges (1.1%), were filed under the Equal Pay Act.    And of that number, 851 (83.5%) were either administratively closed or resulted in a finding of "no reasonable cause".    Not exactly evidence of rampant pay discrimination on the basis of gender.    In addition, the OFCCP has also been investigating pay differences over the years.    Attached is a sample of one set of instructions, from an OFCCP Regional Directors meeting which took place in Atlanta, Georgia, on October 24-25, 1994.    Thus, both the EEOC and the OFCCP have been tilling in these fields for years, with little to show for it.

And we also referenced a 2009 study by the General Accounting Office of <u>Federal</u> pay, "Gender Pay Gap in Federal Workforce Narrows as Differences in Occupation, Education, and Experience Diminish" (copy attached), which came to these conclusions:

"Our analysis of the federal workforce shows that:

•    From 1988 to 2007, the gender pay gap—the difference between men's and women's average pay before controlling for other factors—narrowed from 28 cents to 11 cents on the dollar.
•    For each year we analyzed, all but about 7 cents of the gap was accounted for by differences in measurable factors—predominantly the

occupations of men and women and, to a lesser extent, other factors such as experience and education.
• Factors that we could not measure may have accounted for some or all of the unexplained 7 cent gap."

The EEOC"s response essentially dismisses all of these findings, choosing instead to cite favorably the work of social scientists Francine D. Blau and Lawrence M. Kahn, of Cornell University.    In their paper "The Gender Wage Gap:  Extent, Trends, and Explanations", they arrive at a number of conclusions regarding sources of a gender wage gap, among them:

1.  Work force interruptions and shorter hours
2.  Wage penalties for temporal flexibility
3.  Labor force interruptions and hours differences
4.  Gender differences in location in the labor market
5.  Gender differences in employment by industry and occupation, as well as by firm,
6.  Differences in gender roles and the gender division of labor.
7.  A motherhood penalty for women and of a marriage premium for men.
8.  The greater tendency of men to determine the geographic location of the family.

Although their paper represents a thorough and comprehensive review of research into the bases for gender differences in pay, they do not, in fact, conclude that discrimination is a demonstrated or major factor.   In the paper's abstract they say only that "…research based on experimental evidence strongly suggests that discrimination cannot be discounted."   "Strongly suggests" and "cannot be discounted" are hardly phrases to justify placing such an enormous burden on employers in the United States as the EEOC is proposing.

The EEOC had asked the National Academy of Sciences (NAS) to review their proposal, which convened a group to study the issue.  Based on the information provided to them, this group outlined six tasks that it felt the EEOC should address before proceeding further with any proposal to collect pay data.  What were the six recommendations?

1.  Prepare a comprehensive plan for using any data that might be gathered, before the data is collected.
2.  After preparing a comprehensive plan for use of the data, commission a pilot study "…to test the collection instrument and the plan for use of the data."
3.  The EEOC should "enhance its capacity to summarize, analyze, and protect earnings data."
4.  The NAS specifically recommended that the EEOC collect data on rates of pay, not pay bands.  In addition, as part of this recommendation, the NAS noted that because "...employee compensation data are generally considered to be sensitive, even proprietary information, by most employers" the EEOC needs to develop "more sophisticated techniques for protecting data…"
5.  The NAS recommended that the EEOC "…consider appropriate data protection techniques…and consider supporting research for the development of these applications.
6.  The EEOC "…should seek legislation that would increase the ability of the agency to protect confidential data."

EEOC Final Comment Request: Revision of the Employer -1 Report (EEO-1)

The EEOC asserts that it has met those conditions.  The EEOC asserts that the data will be same.  If states that it requires that all agencies that use the data sign confidentiality agreements.  Except, apparently, for one—the Office of Federal Contract Compliance Programs, which will rely on the provisions of the Freedom of Information Act, to the best of its ability.  Perhaps they've forgotten when Robert Reich was Secretary of Labor, and released all the EEO-1 data in the OFCCP's possession to the Wall Street Journal? We do not believe that the EEOC has met the NAS's six conditions.  Congress, for its part, seems inclined to deny the EEOC the budget to implement its proposal.

The EEOC has moved the filing date for the report to March 1st, beginning in 2018.  The data gathering period has also been moved, from October 1st to December 31st.  Since the EEOC is asking for W-2 earnings, it seems clear that almost all of the reports will be based on data from as close to December 31st as possible.

**Burden**

This is where the rubber hits the road.  The EEOC initially asserted that there were 67,146 "EEO-1 filers".  We weren't sure exactly what this meant, since each "filer" must submit individual EEO-1 reports for its headquarters, each of its establishments with 50 or more employees, and optionally either an  EEO-1 report for each establishment with fewer than 50 employees, or (assuming the employer hasn't already submitted a Type 8 report) a list of those establishments.

In this proposal, the EEOC notes that individual estimates for how long it takes to complete the EEO-1 report as it currently exists varied from commenter to commenter.  The EEOC also seemed to distinguish between reports filed by individual establishments and reports filed from a corporate headquarters.

We're not sure why such a distinction was made, since the EEO-1 instructions make clear that reports are required for both a headquarters location (type 3), every other establishment with 50 or more employees (type 4), and all of the remaining establishments, using either the same grid format (type 8), or a list, in Excel, of establishments with fewer than 50 employees (type 6).  Unfortunately, the type 6 report is not well known, and once an employer selects a type 8 report, it is impossible to change it back to a type 6.

There are two ways in which EEO-1 employment data can be provided "electronically": through an on-line data entry system, one cell at a time, one establishment report at a time, or through computerized data uploads.  We understand from other sources that there are about as many employers who use the upload option as those who provide paper reports.  However, as the EEOC well knows very few employers file using paper reports.  The vast majority use the laborious, time-consuming, and potentially error-prone online data entry system.  That is consistent with our experience preparing and submitting EEO-1 reports on behalf of some of our clients.

How laborious is this?  To give an example, last year our firm completed an EEO-1 report for client with just under 200 employees, but with a headquarters location and twelve other establishments.  The total process, setting up the data, and doing the data entry, took a total of 3.5 hours, about 15 minutes per form.  That's just for the

"Component 1" report.  Seven racial/ethnic categories multiplied by two genders multiplied by ten EEO categories.

Now imagine setting up the same data, but adding twelve pay levels to each of those ten EEO categories, seven racial/ethnic categories, and two genders.  And then repeating the process, only this time, instead of reporting the number of people at each salary level by race/ethnicity, gender, and EEO category, you report total hours worked by salary level, race/ethnicity, gender, and EEO category.

Attached are separate reports for an organization employing 610 persons, with one headquarters location and 52 non-headquarters locations.  Since the layout of type 4 and type 8 reports are the same, it doesn't matter whether a location employs 50 or more persons, or fewer than that.

I invite the OMB to sit down at a computer monitor, log into an account at the EEOC, and begin data entry using the attached sample data, just to get an idea of how time-consuming and onerous a task this is.  And the EEOC proposes to increase the number of cells to 3,360 individual cells.  Yes, not every cell requires an entry, but you have to move from cell to cell to get to those that will contain data. And once a report is completed, the data-entry person has to cycle back and affirm certain identifying characteristics for that establishment, and then cycle back again to the listing of previously-filed reports, selecting the next report to edit, in order to update each of them with the current year's data.

The Census Bureau's 2013 statistics on business reported that there were 1,584,549 establishments with 100 or more employees in the United States.  The EEOC has already noted that all such employers are required to submit annual EEO-1 reports for each establishment.  Since the EEO-1 report is completed by establishment, it would thus seem more accurate to use the Census figure.  As we said before, assuming that the EEOC's original estimate of 6.6 hours was applicable for each establishment report, at $24 per hour, that would be a total annual cost (or "burden") of $250,992,561.69. Almost fifty times the EEOC's estimated cost.  Before the OMB approves this request under the provisions of the Paperwork Reduction Act, it needs to confirm that the EEOC has met its burden of demonstrating that the purported benefits of this proposal outweigh its enormous and burdensome cost.

The EEOC blithely asserts that employers need only purchase some sort of software to prepare and submit the reports electronically.  Unfortunately, the cost of this sort of software, which interfaces with both a company's HRIS system and its payroll system, is likely to be expensive, too expensive for many small businesses to have to shoulder. But since such software does not yet exist, the EEOC has no basis for its assertions.  At the moment, what we know is that most companies utilize the EEOC's online data entry system.  Even a Cortez Peters would have difficulty performing data entry with any speed.

**Conclusion**

Review of studies of pay differences between men and women suggest that there is no evidence of systemic pay discrimination on the basis of gender.  The EEOC's own statistics would appear to bear this out, and the OFCCPs record for identifying pay

discrimination also underscores this point.  While these studies, both outside and inside the Federal government appear to show a fairly consistent six cent difference in pay between men and women, it cannot be attributed to gender discrimination.  As a result, there is no reason for collecting aggregate pay data from employers with over 100 employees, other than that the President of the United States has decreed that it be so.

It is our view that the revised Notice of Proposed Changes to the EEO-1 report should be rejected.  Not only is it not necessary, but it is extremely burdensome, costly, and would not provide any useful information to the EEOC that would assist in in determining whether or not systemic pay discrimination on the basis of race/ethnicity or gender is occurring in any employer's workforce.

Sincerely,

*J. Stanley Koper*
J Stanley Koper
Senior Vice President
Gaucher Associates

cc:      Richard A Gaucher
         Robert A. Anzalone

Attachments

# NOTICE OF OFFICE OF MANAGEMENT AND BUDGET ACTION

Date     09/29/2016

Equal Employment Opportunity Commission


FOR CERTIFYING OFFICIAL:     Pierrette McIntire

FOR CLEARANCE OFFICER:     Franchette Tucker


In accordance with the Paperwork Reduction Act, OMB has taken action on your request received
07/14/2016

ACTION REQUESTED:    Revision of a currently approved collection

TYPE OF REVIEW REQUESTED:     Regular

ICR REFERENCE NUMBER:     201607-3046-001

AGENCY ICR TRACKING NUMBER:

TITLE:    Employer Information Report (EEO-1)

LIST OF INFORMATION COLLECTIONS:  See next page


OMB ACTION:  Approved with change

OMB CONTROL NUMBER:     3046-0007

The agency is required to display the OMB Control Number and inform respondents of its legal significance in accordance with 5 CFR 1320.5(b).


EXPIRATION DATE:  09/30/2019                    DISCONTINUE DATE:


| BURDEN: | RESPONSES | HOURS | COSTS |
|---|---|---|---|
| Previous | 307,103 | 1,044,150 | 0 |
| New | 67,146 | 1,952,146 | 0 |
| Difference | | | |
| Change due to New Statute | 0 | 0 | 0 |
| Change due to Agency Discretion | -239,957 | 907,996 | 0 |
| Change due to Agency Adjustment | 0 | 0 | 0 |
| Change due to PRA Violation | 0 | 0 | 0 |

 TERMS OF CLEARANCE:


 OMB Authorizing Official:     Howard Shelanski

Administrator,

Office Of Information And Regulatory Affairs


JA262

| List of ICs | | | |
|---|---|---|---|
| IC Title | Form No. | Form Name | CFR Citation |
| Employer Information Report (EEO-1) Components 1 & 2 | SF 100 | EEO-1 Components 1 & 2 | 29 CFR 1602.7 |
| Employer Information Report (EEO-1) Component 1 Only | SF 100 | EEO-1 Component 1 | 29 CFR 1602.7 |

**Supporting Statement**

**Recordkeeping and Reporting Requirements for**

**Employer Information Report (EEO-1)**

**OMB Control No. 3046-0007**

**A. Justification**

The Equal Employment Opportunity Commission (EEOC) is: (1) seeking renewal of OMB approval under the Paperwork Reduction Act (PRA) of the Employer Information Report (EEO-1); and (2) seeking approval of the addition of a second component to the EEO-1 to collect summary pay data. The EEOC and the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) have separate legal authority to collect EEO-1 data, and they coordinate collection to promote efficiency through their Joint Reporting Committee. The EEOC is responsible for obtaining PRA clearance for the EEO-1.

As explained in its July 14, 2016, PRA 30-Day Notice (81 FR 45479), the EEOC concludes: that persistent pay gaps exist in the U.S. workforce correlated with sex, race, and ethnicity; that workplace discrimination is an important contributing factor to these pay disparities; and that collecting summary pay data with the EEO–1 will improve the EEOC's ability to effectively assess allegations of pay discrimination and focus investigations, as well as strengthen OFCCP's ability to select appropriate federal contractors and subcontractors for review of their compliance with equal employment opportunity mandates. This summary pay data collection also will encourage employers to voluntarily address unjustified pay disparities. The EEOC will provide extensive technical assistance during the transition period to this information collection, which has been extended to 18 months (from 12 months).

1.    Legal and administrative requirements
      The legal basis for the EEOC's EEO-1 recordkeeping and reporting requirements is found in Section 709(c) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-8(c), which imposes the requirement that "[e]very employer, employment agency, and labor organization subject to this subchapter shall (1) make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed, (2) preserve such records for such periods, and (3) make such reports therefrom as the Commission shall prescribe by regulation or order. . . ." The EEOC's regulations at 29 CFR §1602.7 set forth the recordkeeping and reporting requirements for private industry employers with 100 or more employees. OFCCP's regulations at 41 CFR §60-1.7(a), which are based on Executive Order 11246, contain the EEO-1 recordkeeping and reporting requirement for federal contractors that (1) are not exempt from the provisions of these regulations in accordance with 41 CFR §60-1.5, (2) have 50 or more employees, (3) are prime contractors or first tier subcontractors, and (4) have a contract, subcontract or purchase order amounting to $50,000 or more, or serve as depositories of Government funds in any amount, or are financial institutions which are

1

issuing and paying agents for U.S. savings bonds and savings notes. (The federal contractors and subcontractors under OFCCP's jurisdiction are referred to as "federal contractors" in this supporting statement.)

The EEOC is committed to working with filers to provide assistance in successfully submitting all the EEO-1 data. This support includes providing increased technical assistance focusing on the new filing requirements; offering free seminars, webinars, and other training to employers; and working with industry groups and similar organizations to facilitate attendance by EEOC personnel at meetings and conferences to provide outreach, collect feedback, and answer questions. Filers in need of direct assistance may contact the Joint Reporting Committee by telephone at 1-877-392-4647 (toll-free) or by email at e1.techassistance@eeoc.gov. The EEOC also plans to coordinate with HRIS developers to enhance their understanding of the new filing requirements and explore how those requirements may be made easier through software modification and updates. The EEOC will continue to exercise its usual discretion with respect to enforcing filing requirements. *See also* Section 5, Impact on Small Business.

2.  Use of collected information

The EEOC is requesting approval to add a second component to the EEO-1 report, which would annually collect summary pay data and corresponding hours-worked information from certain employers in addition to the data currently collected by the EEO-1.

OFCCP uses EEO-1 data as part of its process in selecting establishments neutrally for compliance reviews. OFCCP will obtain EEO-1 summary pay data only for contractors subject to its jurisdiction.

The EEOC uses data from the currently approved EEO-1 in at least three ways. EEOC staff analyzes this data using desktop EEO-1 analytics software to help focus the early stages of its investigations. The EEOC also uses EEO-1 data to develop studies of the private sector workforce in which it cites only aggregated EEO-1 data (to protect confidentiality and privacy); these studies are publicly available. Finally, when researchers request data for academic studies, the EEOC may provide data as appropriate, but only subject to Title VII confidentiality and data security requirements. (*See* Section 10 for detailed discussion of confidentiality and data security).

With the addition of summary pay data to the EEO-1, the EEOC will expand its existing desktop EEO-1 analytics software to enable staff to assess pay disparities based on sex, ethnicity, or race. In investigating potential Title VII and Equal Pay Act violations, EEOC enforcement staff will be able to retrieve and analyze an employer's EEO-1 data just as they do now with their desktop analytics tool, which will be modified to permit statistical analyses of the pay and hours-worked data. As a first step, staff will be able to see the distribution of different demographics (sex, race, and ethnicity) across job groups and across the pay bands within the job groups. Where appropriate, the enforcement staff may use the analytics tool to conduct a Kruskall-Wallis test to determine generally if there are statistically significant disparities in a job group based on race, sex, or ethnicity. In addition, using the analytical software, staff could conduct an analysis of hours-

2

worked data using an interval regression to determine whether pay disparities remain after data on hours worked is included in the analysis.  If, for example, a charging party had alleged that she was paid less than men in the same job, the EEOC investigator may retrieve a report through the EEO-analytics software that compares the pay of women to the pay of men within a job group using a rank sums test.

In assessing a charge during an investigation, EEOC enforcement staff can consider the results of several statistical analyses together with the allegations in the charge and other evidence gathered during the investigation, and, as appropriate, could compare EEO–1 pay data to other available data, for example Census statistics regarding comparable workers.  In considering this data, the EEOC's enforcement staff decides how to focus the investigation and whether to request additional information from the employer. When EEOC enforcement staff requests information from an employer, it has the opportunity to explain its practices, provide additional data, and explain any non-discriminatory reasons for its pay practices and decisions.  For example, the employer has the opportunity to provide more detailed information about pay by occupation and legitimate factors that could explain any apparent pay disparities.  Only after considering all of this information and data, as well as any other relevant evidence, does the EEOC make a finding as to whether discrimination was the likely cause of the pay disparities.

The EEOC also plans to publish industry reports with only aggregated data that may provide useful comparative information that private employers and federal contractors may use without cost to assess their pay practices by industry.

3.  <u>Use of information technology</u>
The EEO-1 report is collected through an online filing system, not in hard copy, unless the EEOC approves a hardship request to file a paper EEO-1.  Filers either enter data online or upload a file with their EEO-1 data.  Data upload allows a filer to submit a data file directly to the Joint Reporting Committee, and results in time and cost savings for filers using the method.  The EEOC is releasing technical specifications for the type of files to be used by employers for data upload when the revised EEO-1 report is finalized.

4.  <u>Description of efforts to identify duplication</u>
EEO-1 data is collected on behalf of the EEOC and OFCCP, pursuant to the EEOC's authority under Title VII and OFCCP's authority under Executive Order 11246.  The EEO-1 is administered by the Joint Reporting Committee, which is housed at the EEOC, as a single data collection to meet the statistical needs of both agencies while simultaneously avoiding duplication.

5.    <u>Impact on small business</u>
Currently, the EEO-1 report is filed by private employers with 100 or more employees and federal contractors with 50 or more employees. This information collection request contains a second component to collect summary pay data, as described in Section 2. Federal contractors with 50 to 99 employees will not be required to submit summary pay data, but will continue to submit demographic information by race, ethnicity, sex, and by job category just as they do under the current OMB approval of this information collection. Although the agency considered raising the filing threshold for collecting pay-band data to even larger employers, it concluded that exempting a subset of employers that currently file the EEO-1 from the requirement to report pay data would result in an absence of data for a large number of employers who employ millions of workers, and that this would significantly reduce the utility of the data collection.

The EEOC is committed to robust outreach and technical support efforts, especially for small employers, as previously discussed in Section 1. The EEOC is releasing technical specifications for the type of files to be used by employers for data upload at the same time the revised EEO-1 report is announced. The EEOC will offer free webinars and seminars that will cover in detail the changes to the revised EEO-1 report. EEOC staff will coordinate with industry groups and other similar organizations to organize timely outreach opportunities for their membership and stakeholders by, for example, presenting information on the revised filing requirements and discussing challenges the requirements may create with representatives of the employer community. Moreover, the Joint Reporting Committee will be available to help individual filers experiencing technical issues or who need assistance with filing. Filers in need of technical support are encouraged to contact the Joint Reporting Committee by telephone at 1-877-392-4647 (toll-free) or by email at e1.techassistance@eeoc.gov.

6.    <u>Consequences if information were collected less frequently</u>
The EEOC and OFCCP seek to investigate potential discrimination with the benefit of up-to-date data reflecting the most current pay and salary information possible. The EEOC considered collecting EEO-1 data every two years. This approach was rejected, however, because the agency concluded that the utility of the data would be diminished before new data became available. In the private sector, workforce changes are frequent, not only within a particular establishment's workforce, but also on a larger scale, in light of mergers and acquisitions. When employers restructure through mergers and acquisitions, employee demographics and pay structure may undergo significant changes. A delay of two years in collecting data reflecting these changes could undermine the EEOC's enforcement efforts, since the agency would be forced to rely on outdated and inaccurate data with respect to filers.

7.    <u>Special circumstances</u>
This information collection does not require any special circumstances.

8.    <u>Consultation outside the agency</u>
This proposal is the result of extensive and careful consideration of many elements, including government studies that analyze compensation in U.S. workplaces, relevant

JA267

academic literature on compensation practices, public comments, public hearing testimony, and the early analyses reflected in the National Academy of Sciences (NAS) study and a subsequent EEOC-contracted study.

Recognizing the challenges of collecting pay data, and following the recommendations of the President's National Equal Pay Task Force, the EEOC commissioned a study by the NAS to provide information for its decision-making process regarding a pay data collection. The NAS study assessed the feasibility of effectively collecting pay data to detect pay discrimination and support law enforcement efforts. Published in 2012, the NAS Report recommended, as one of six recommendations, that the EEOC also commission an independent Pilot Study to inform the parameters of a pay data collection.

The EEOC commissioned the Pilot Study, which made technical recommendations about several central components of a pay data collection, including: the unit of pay to be collected; the best summary measures of central tendency and dispersion for rates of pay; appropriate statistical test(s) for analyzing pay data; and the most efficient and least costly methods for transmitting pay data from employers. The Pilot Study also contemplated using the 10 established EEO-1 job categories. Consistent with Pilot Study recommendations, the EEOC elected to use the W-2 definition of income, to use pay bands that track the wage intervals used by the Bureau of Labor Statistics' OES survey, and to collect summary hours-worked information for employees. *See* Sage Computing, EEOC Pay Pilot Study (Sept. 2015), http://www.eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf (Pilot Study).

The EEOC also worked closely with OFCCP, and the two agencies together consulted with the Department of Justice, focusing on how EEO-1 pay data would be used to assess complaints of discrimination, focus investigations, and identify employers with existing pay disparities that might warrant further examination.

On March 16, 2016, the EEOC held a public hearing and heard testimony from 15 witnesses from a wide range of backgrounds. During the 60-day comment period ending April 1, 2016, the EEOC received 322 timely public comments. The EEOC carefully considered this feedback and revised the proposal for the 30-day notice and comment period in the following ways:

(a)     Adjusted the annual burden calculations:
        In response to comments questioning the EEOC's burden calculation methodology, the agency revised its burden estimates by (1) reflecting varying labor costs for the different types of staff involved with preparing the EEO-1, (2) adding labor costs for functions performed at the establishment level, and (3) increasing the total number of burden hours a firm would need to read the EEO-1 instructions and to collect, verify, and enter data on the EEO-1 online portal.

(b)     Expanded the discussion on confidentiality and protections afforded the collected information by the EEOC and OFCCP:

*See* Section 10 of this statement for a discussion of measures taken by the EEOC and OFCCP to preserve the confidentiality of the EEO-1 data.

(c)    Expanded the discussion of how the EEOC will use this information:

(1)  The EEOC will use the data primarily for early assessment of allegations of discrimination based on sex, ethnicity, or race.  During an investigation, EEOC staff may use statistical tools to examine whether the EEO-1 data suggests that there are significant disparities in reported pay in job groups based on race, sex, or ethnicity, and/or to examine how an employer compares to similar employers in its labor market.

(2)  The EEOC will provide additional training to its employees, including investigators and other enforcement staff, statisticians, attorneys, and intake specialists, on how to identify pay disparities that warrant closer examination and how to use the new pay data.  The EEOC will also use aggregated EEO-1 data, along with Census data and potentially other data sources, to periodically publish reports on pay disparities by race, sex, industry, occupational groupings, and Metropolitan Statistical Area (MSA).  These reports may be useful tools for employers wishing to engage in voluntary self-assessment of pay practices.

(d)    Added language to clarify the EEOC's statutory authority to collect the pay and hours worked data:

(1)  The EEOC's authority to promulgate the EEO-1 report is found in section 709(c) of Title VII, which requires employers covered by Title VII to make and keep records relevant to whether unlawful employment practices have been or are being committed, to preserve such records, and to produce reports as the Commission prescribes by regulation or order, after public hearing, "as reasonable, necessary, or appropriate for the enforcement of this subchapter or the regulations . . . thereunder."  The EEOC prescribes the EEO-1 report by regulation at 29 CFR part 1602, subpart B, which requires private employers with 100 or more employees to "file [annually] with the Commission or its delegate executed copies of [the] . . . EEO-1 [report] in conformity with the directions set forth in the form and accompanying instructions."

(2)  The EEOC administers the EEO-1 jointly with OFCCP, which enforces the employment discrimination prohibitions of Executive Order 11246, as amended, for federal contractors and subcontractors, including specific provisions regarding pay discrimination and transparency.  OFCCP's regulations require contractors to submit "complete and accurate reports on Standard Form 100 (EEO-1) . . . or such form as may hereafter be promulgated in its place."  The Joint Reporting Committee, composed of the EEOC and OFCCP and located at the EEOC, administers the EEO-

6

1 as a single data collection to meet the statistical needs of both agencies while avoiding duplication.

(e)   <u>Changed the filing deadline from September 30 to March 31 of the following year, beginning with the report of 2017 data, to give employers more time to transition to the new information collection</u>:

      (1) The 2017 EEO-1 report that would have been due on September 30, 2017, now is due on March 31, 2018. This extension of the filing date provides filers with six more months to adjust and allows the EEOC to engage in additional outreach and training on the revised data collection.

      (2) The new annual filing deadline of March 31 also will eliminate the need for a special W-2 calculation solely for purposes of the EEO-1 report. The new deadline aligns the EEO-1 with federal obligations to calculate and report W–2 earnings as of December 31.

(f)   <u>Shifted the workforce snapshot period to coordinate with the new reporting period and filing deadline</u>:

Under the revised proposal, employers may count their employees during any pay period between October 1 and December 31, and will consult W–2 (Box 1) income and hours worked for these employees for the full calendar year ending December 31. This change in part addresses public comments that the previous "workforce snapshot" period of July – September would not capture same-year promotions that have the effect of moving the employee into a different EEO-1 job category or pay band. Given that hours-worked data also will be collected for each job category/pay band, moving the snapshot period to the fourth quarter reduces the risk of skewed data due to mid-year promotions.

(g)   <u>Provided employers with a choice about how to report hours worked for FLSA-exempt employees</u>:

The revised proposal would give employers the choice of how to report hours worked for FLSA-exempt employees. EEO-1 filers subject to the second component may choose to either: (1) report a proxy of 40 hours per week for full-time exempt employees and 20 hours per week for part-time exempt employees, multiplied by the number of weeks the individuals were employed during the EEO-1 reporting year; or (2) provide actual hours of work by exempt employees during the EEO-1 reporting year if the employer already maintains accurate records of this information. This choice is entirely up to the filer/employer. Filers that elect to use the 40-hour and 20-hour proxy approach may still certify that the reports are "accurate and . . . prepared in accordance with the instructions," as the revised instructions allow filers to use the proxies.

7

In addition to the above-described preliminary review of the proposed EEO-1, the EEOC will continue to evaluate the revised EEO-1 report after it is in use. Under the standard three-year renewal process set out by the PRA for federal data collection, the next renewal of the EEO-1 will occur in 2019. As part of this process, the EEOC will consider its experience in collecting data through the revised EEO-1. The EEOC will monitor and evaluate the utility and effectiveness of the summary pay data collected and, within six months of the approval of this collection, the EEOC will provide OMB a monitoring and evaluation plan. The plan will include effectiveness measures, baseline information, procedures for collecting and evaluating data, and any other pertinent information. The EEOC will report the results of its monitoring and evaluation activities in subsequent information collection request packages.

The EEOC will begin collecting pay data as of March 31, 2018, and will be positioned to utilize pay data in its investigations in 2019, after the first pay data collection has been thoroughly reviewed for accuracy. As these investigations may still be ongoing at the time the next information collection request package must be submitted to OMB in late 2019, there will be limited information to evaluate for purposes of that PRA approval process. Consistent with the PRA requirements and its commitment to assess this collection, however, the agency will consider whether changes may be warranted to increase the practical utility of the data collection or to decrease the burden on EEO-1 filers. For example, the EEOC may consider the utility and burden of retaining the existing EEO-1 job categories or pay bands as compared to adopting new categories or bands.

EEOC staff will provide assistance throughout the filing process and will note information from employers about the reporting burden, among other topics. Filers may submit comments on this collection of information, including suggestions for reducing burden, at any time to the EEOC at:

EEO-1 Coordinator
EEOC Survey Division -- Room 4SW22G
131 M Street, N.E.
Washington, D.C. 20507
or

Suggestion Box on EEO-1 Additional Documentation and
eeo1.suggestionbox@eeoc.gov.

9.  <u>Gifts or payments</u>
    No gifts or payments will be provided to respondents in connection with this information collection.

10.  <u>Confidentiality of information</u>

8

Confidentiality

All reports and any information from individual reports are subject to the confidentiality provisions of Section 709(e) of Title VII, and may not be made public by the EEOC prior to the institution of any proceeding under Title VII involving the EEO-1 data. Any EEOC employee who violates this prohibition may be found guilty of a criminal misdemeanor and could be fined or imprisoned. The confidentiality requirements allow the EEOC to publish only aggregated data, and only in a manner that does not reveal any particular filer's or any individual employee's personal information.

Furthermore, the EEOC's insistence that contractors, other federal agencies, and FEPAs adhere to the Title VII confidentiality requirements ensures that no individual employee's personal information is made public. In addition to ensuring that the agency's own employees adhere to the Title VII confidentiality requirements, the EEOC also imposes these requirements on all of its contractors as a condition of their contracts. With respect to federal agencies other than OFCCP demonstrating a legitimate law enforcement purpose, the EEOC provides access to information collected under Title VII *only* if the agencies agree, by letter or memorandum of understanding, to comply with the confidentiality provisions of Title VII at 42 U.S.C. §2000e–8(e). Subject to agreement to comply with this confidentiality provisions, the EEOC shares EEO-1 reports with the Department of Justice (DOJ) (to represent OFCCP in litigation), and the Federal Deposit Insurance Corporation (FDIC) and the National Credit Union Administration (NCUA)( to help analyze diversity in management, employment, and business activities pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010).

Title VII itself provides that the EEOC must provide state and local fair employment practices agencies (FEPAs) EEO-1 data upon request on the condition that they *not* make it public. 42 U.S.C. §2000e–8(d). FEPA staff receive annual training in data protection and security.

The EEOC only shares EEO-1 data with private researchers under the Intergovernmental Personnel Act and subject to strict confidentiality agreements. Before a researcher can be granted access to any EEO-1 data, he or she must first sign a written agreement providing that (1) the researcher agrees to be subject to the confidentiality provisions of Title VII and to be responsible for ensuring compliance with Title VII confidentiality by any of the researcher's staff who work on the project, (2) the researcher will not disclose the data to anyone other than staff working on the project, (3) prior to publication or dissemination of any dissertation, report, research, statistics or other work product based on the EEO-1 information, the researcher must submit the work product to the EEOC for its review and determination in writing that no confidential information will be released, (4) the EEO-1 data received from the government will not be used for other than the stated purpose of the research, (5) upon conclusion of the project, the researcher must return to the EEOC all original documents supplied by the agency, and must confirm in writing that any working copies of the EEO-1 information have been destroyed, and (6) any violation of the confidentiality agreement could result in penalties including criminal prosecution

9

under Title VII.  Researchers are given very clear instruction on how to preserve the confidentiality of EEO-1 data, and in the EEOC's experience, researchers are extremely mindful of the sensitivity of the data they receive.  Sharing data with researchers under these agreements has never resulted in a confidentiality breach, nor has an individual's personal information been released.

OFCCP receives EEO-1 data on federal contractors through its own legal authority under Executive Order 11246, as amended, and the implementing regulations.  OFCCP will obtain, through the Joint Reporting Committee, EEO-1 summary pay data *only* for those federal contractor filers over which Executive Order 11246 gives OFCCP jurisdiction.  OFCCP will not receive EEO-1 summary pay data for companies that are not federal contractors under OFCCP's jurisdiction.

OFCCP will notify contractors of any Freedom of Information Act (FOIA) requests that are made to obtain any of the data provided on the EEO-1 report, and will protect the confidentiality of EEO-1 pay and hours-worked data to the maximum extent possible consistent with FOIA and the Trade Secrets Act.  However, should OFCCP receive FOIA requests for any EEO-1 data on filers not within its jurisdiction, OFCCP will refer the requests to the EEOC for a response.  The confidentiality provision of Section 709(e) of Title VII applies to all EEO-1 data submitted by filers that are not federal contractors, and the EEOC adheres to that statutory provision when reviewing all requests for EEO-1 data.

Security
The EEOC has a current privacy impact assessment for the EEO-1, which is published on the EEOC website for employers that file the EEO-1 report, at:
https://www.eeoc.gov/employers/eeo1survey/privacyimpact.cfm

Before EEOC begins collecting summary pay data, the EEOC's information technology system will be fully compliant with Circular A-130 and the privacy impact assessment for the EEO-1 will be updated to address the revisions.

11.    Questions of a sensitive nature
Currently, the EEO-1 report tallies data about the sex, race, and ethnicity of the workforce by EEO-1 job category.  The proposed addition of a second component to the EEO-1 report would require federal contractors and private employers with 100 or more employees to provide data on pay and hours worked.  All information will be reported in a summarized manner and no employee's personal information will be reported.

12.    Information collection burden

2016 Overview of Information Collection – Component 1
        Number of Respondents:  67,146 firms filing 683,275 establishment reports
        Reporting Hours:   1,055,471
        Respondent Burden Hour Cost:  $30,055,086.62

2017 and 2018 Overview of Information Collection – Components 1 and 2

10

Component 1 (Demographic and Job Category Data)
    Number of Respondents:  6,260 firms filing 9,129 establishment reports
    (federal contractors with 50-99 employees)
    Reporting Hours:   59,166
    Respondent Burden Hour Cost:  $1,872,792.41
Components 1 and 2 (Demographic and Job Category Data plus W-2 and
Hours-Worked Data)
    Number of Respondents:  60,886 firms filing 674,146 establishment
    reports (all filers with 100 or more employees)
    Reporting Hours:  1,892,979.5
    Respondent Burden Hour Cost:  $53,546,359.08

Burden hours for Component 1 are estimated to be 8 hours per filer for firm-level functions and 1 hour per each additional report for establishment-level functions.  Burden hour costs are estimated at $268.82 per filer for firm-level functions.  For filers submitting their reports by data entry, each separate report filed has an estimated burden hour cost for establishment-level functions of $20.88, and for filers submitting via data upload, each separate report has an estimated burden hour cost of $14.03.

Burden hours for both Components 1 and 2 together are estimated to be 15.2 hours per filer for firm-level functions and 1.9 hours per each additional report for establishment-level functions.  Burden hour costs are estimated at $510.76 per filer for firm-level functions.  For filers submitting their reports by data entry, each separate report filed has an estimated burden hour cost for establishment-level functions of $39.66, and for filers submitting via data upload, each separate report has an estimated burden hour cost of $26.66.

For filers submitting both Component 1 and 2 data in 2017 and 2018, the EEOC estimates the addition of pay data will increase the estimated annual burden hour costs by an average of $416.58 per EEO-1 filer each year.

All burden calculation estimates include reading instructions, collecting, merging, validating, and reporting data electronically.

The EEOC estimates the one-time implementation burden hour cost associated with submitting the information required by Component 2 of the revised EEO-1 to be a total of $27,184,381.28.

The EEOC commissioned a Pilot Study, as discussed in Section 8, to help estimate the employer burden hour cost in conjunction with internal EEOC computations and collaboration with OFCCP.  The EEOC also incorporated many commenter suggestions in developing the burden estimate.

13.    <u>Information collection cost burden</u>
    The estimated one-time implementation cost for submitting the information required by Component 2 of the revised EEO-1 Report is $27,184,381.28.  This calculation is based

on the one-time cost for developing queries related to Component 2 in an existing human resources information system (HRIS), which is estimated to take 8 hours per filer, and to be performed by a computer programmer at a wage rate of $55.81 per hour.  HRIS is used by more than 90 percent of human resource departments as of the most recent data. *See* Public Personnel Management, Volume 39, No. 3, Fall 2010.

No significant operation and maintenance costs should be associated with the systems to be used for submitting Component 2.

No additional one-time implementation cost or operation and maintenance costs are anticipated for employers continuing to submit Component 1 only.

The EEOC anticipates that the extensive technical support and training that the agency will provide to employers/filers, as described in Sections 1 and 5 above, will mitigate the one-time implementation burden.

14.    Cost to federal government
Estimated cost to the federal government for 2017 and 2018 will be $1,621,300.  This number reflects the increase in contract costs resulting from the addition of the pay data collection and the estimated internal staffing costs.  Specifically, this estimate includes the contract costs under the former collection regime, plus current staff costs, plus additional resources for collecting pay and hour data.

In addition to these recurring costs, there is also estimated to be a one-time cost of implementation in the amount of $318,000.

15.    Program changes or burden adjustments
Starting in 2017, filers with 100 or more employees (both private industry and Federal contractor) will submit data in response to both Components 1 and 2.  Contractors with 50 to 99 employees will only submit data for Component 1.  Component 1 has been collected by the EEOC for many years; it directs covered employers to report annually the number of individuals they employ by job category and by race, ethnicity, and sex. Component 2 proposes to supplement Component 1 with pay and hours worked data.

It is estimated that for those firms submitting Components 1 and 2 (versus submitting just Component 1), the estimated burden hours will increase from 8 hours per filer for firm-level functions and 1 hour per each separate report for establishment-level functions to 15.2 hours per filer for firm-level functions and 1.9 hours per each separate report for establishment-level functions (see Section 12).

As discussed in Section 2, the collection of pay and hours-worked data will help the EEOC better fulfill its mission by analyzing and developing statistical evidence as investigations proceed through the Commission's charge process.  It also will allow employers to more accurately self-assess their own pay practices.  Further, the EEOC will use aggregated EEO-1 data to develop studies of private sector workforces and to assist

researchers requesting data for academic studies, subject to strict confidentiality requirements (see Section 10).

16.   Publication of data for statistical use
The time schedule for tabulation and publication is as follows:

Filing deadline                    March 31

First Follow-up                    April 15

Second Follow-up                   May 15

Preliminary Data                   Periodic data audits

Final Data                         December 31

In each survey year a publication, *Job Patterns for Minorities and Women in Private Industry*, is posted on the EEOC web site.  The publication includes non-confidential aggregations of the EEO-1 data based on various geographic and industrial criteria and can be found at http://www.eeoc.gov/eeoc/statistics/employment/jobpat-eeo1/index.cfm. Similar data sets are available on www.data.gov.  Employers and researchers may use this data for self-assessment and affirmative action purposes.

17.   Approval not to display the expiration date
The EEOC is not seeking approval to not display the OMB approval expiration date on the EEO-1 report.

18.   Exceptions to the certification statement
The EEOC is not seeking any exceptions to the certification statement under this information collection request.

**B. Statistical Methods**

This information collection does not employ statistical methods as that term is used in the Specific Instructions for Supporting Statements for PRA Submissions.

13

more of the following areas of human health risk assessment: (1) An understanding of thyroid function (preferably in the sensitive life stages of interest), (2) the importance of maternal thyroid hormone homeostasis in each stage of gestation, (3) hypothyroxinemia, (4) neurodevelopmental assessment indices for young children including the Bayley's Scale, (5) the toxicity of perchlorate, (6) epidemiological assessment techniques, and (7) statistics.

Versar, Inc., considered the nominated peer review candidates and also conducted an independent search for scientific experts to augment the list of publically-nominated candidates.

*Selection Process:* Versar, Inc., considered and screened all candidates against the selection criteria described in the March 1, 2016, and June 3, 2016, **Federal Register** notices (81 FR 10617 and 81 FR 35760, respectively), which included the candidates being free of any conflict of interest and being available to participate in-person in a two-day, public, peer review meeting in the Washington, DC, area. Versar, Inc., narrowed the list of potential reviewers for the second panel to 12 candidates. EPA is now soliciting comments on the interim list of 12 candidates.

EPA requests that the public provide relevant information or documentation on the experts that the contractor should consider in evaluating these candidates. Once the public comments on the interim list of candidates have been reviewed and considered, the contractor will select the final list of peer reviewers.

*Responsibilities of Peer Reviewers:* Peer reviewers will be charged with evaluating and preparing written comments on EPA's draft MCLG Approaches Report. Versar, Inc., will provide reviewers with a summary and compilation of public comments on the draft MCLG Approaches Report submitted to EPA's docket (ID number EPA–HQ–OW–2016–0438) during the 45-day public comment period, for their consideration. Reviewers will participate in a two-day meeting expected to be held in the Washington, DC, metro area, projected to occur in late fall of 2017 (exact date to be determined), to discuss the scientific basis supporting these materials. Following the meeting, Versar, Inc., will provide a report to EPA, summarizing the peer reviewers' evaluation of the scientific and technical merit of the draft MCLG Approaches Report and the peer reviewers' full responses to the charge questions. EPA will make the final peer review report available to the public (exact date to be determined). In

preparing the final MCLG Approaches Report, EPA will consider the peer review report as well as the written public comments submitted to the docket.

## II. Interim List of Peer Reviewers

Versar, Inc., is considering the following candidates for the peer review panel. Biosketches are available through the EPA docket at *http:// www.regulations.gov* (Docket ID No. EPA–HQ–OW–2016–0439). After review and consideration of public comments and consultation with EPA's Scientific Integrity Official, Versar, Inc., will select from this list, the final list of peer reviewers, who will, collectively, best provide expertise spanning the previously mentioned areas of knowledge and experience and, to the extent feasible, best provide a balance of perspectives. EPA will announce the peer review panel meeting date, location and registration details, along with the final list of peer reviewers selected by Versar, Inc., at least 30 days prior to the meeting.

*Name of Nominee, Degree, Place of Employment*

1. Hugh A. Barton, Ph.D., Pfizer, Inc.
2. Nancy Carrasco, M.D., Yale School of Medicine
3. Jonathan Chevrier, Ph.D., McGill University Faculty of Medicine
4. Claude Emond, Ph.D., University of Montreal
5. Dale Hattis, Ph.D., George Perkins Marsh Institute, Clark University
6. Judy S. LaKind, Ph.D., LaKind Associates, LLC
7. Angela M. Leung, M.D., M.Sc., UCLA David Geffen School of Medicine
8. Paul H. Lipkin, M.D., Johns Hopkins University School of Medicine
9. Elizabeth N. Pearce, M.D., M.Sc., Boston Medical Center/Boston University School of Medicine
10. Stephen M. Roberts, Ph.D., University of Florida
11. Joanne F. Rovet, Ph.D., The Hospital for Sick Children (Toronto)
12. Craig Steinmaus, M.D., M.P.H., University of California, Berkeley

## III. Draft Peer Review Charge Questions

The draft peer review charge questions are available through the EPA docket at *http://www.regulations.gov* (Docket ID No. EPA–HQ–OW–2016– 0439).

Dated: September 6, 2017.

**Michael H. Shapiro,**

*Acting Assistant Administrator, Office of Water.*

[FR Doc. 2017–19702 Filed 9–14–17; 8:45 am]

**BILLING CODE 6560–50–P**

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

[3046–0007]

### Stay the Effectiveness of the EEO–1 Pay Data Collection

**AGENCY:** Equal Employment Opportunity Commission.

**ACTION:** Notice.

**SUMMARY:** The U.S. Equal Employment Opportunity Commission (EEOC) announces that, until further notice, filers subject to the EEO–1 reporting requirement should not submit aggregate data about W–2 (Box 1) income and hours worked, which is the information required by "Component 2" of the EEO–1 report as approved on September 29, 2016. However, filers should continue to submit data on the ethnicity, race, and sex of workers by job category ("Component 1" of the EEO–1 report). This is the same type of EEO–1 data that filers have submitted in the past.

**DATES:** All EEO–1 filers should submit and certify their 2017 EEO–1 reports (Component 1 data only) by March 31, 2018. They should count employees for purposes of this EEO–1 report during a "workforce snapshot period" between October 1 and December 31, 2017.

**FOR FURTHER INFORMATION CONTACT:** Ronald Edwards, Director, Program Research and Surveys Division, Equal Employment Opportunity Commission, 131 M Street NE., Room 4SW30F, Washington, DC 20507 (202) 663–4949 (voice) or (202) 663–7063 (TTY). Requests for this notice in an alternative format should be made to the Office of Communications and Legislative Affairs at (202) 663–4191 (voice) or (202) 663–4494 (TTY).

**SUPPLEMENTARY INFORMATION:** On August 29, 2017, the Office of Management and Budget (OMB) issued a memorandum [1] informing the EEOC that OMB was initiating a review and immediate stay of the effectiveness of a portion of the EEO–1 report that was initially approved on September 29, 2016.[2] Specifically, OMB initiated a review and immediate stay of the portion of the EEO–1 report that required the reporting of aggregate W–2 (Box 1) income and hours-worked data by employers (including federal contractors) with 100 or more employees. (This is called EEO–

---

[1] OMB's memorandum is available at *https:// www.reginfo.gov/public/jsp/Utilities/Review_and_ Stay_Memo_for_EEOC.pdf.*

[2] The September 29, 2016 Notice of OMB Action was reissued on October 18, 2016. *https:// www.reginfo.gov/public/do/PRAViewICR?ref_ nbr=201610-3046-001#*

1 "Component 2".) OMB did not stay the portion of the EEO–1 report that requires filers to submit data on the race, ethnicity, and sex of their workers, by job category. (EEO–1 "Component 1") The EEOC will continue to collect EEO–1 Component 1 data from all filers during OMB's review and stay.

Thus, pursuant to 5 CFR 1320.10(g), the EEOC hereby announces that, until further notice, filers subject to the EEO–1 reporting requirement should not submit aggregate W–2 income and hours worked data under Component 2 of the EEO–1, but that they should submit data about race, ethnicity, and sex, by job category, as required by Component 1 of the EEO–1. Filers should follow the EEO–1's new reporting schedule. The 2017 EEO–1 report should be submitted and certified by March 31, 2018. Filers should use a "workforce snapshot period" between October 1 and December 31, 2017.

Dated: August 31, 2017.

For the Commission.

**Victoria A. Lipnic,**

*Acting Chair.*

[FR Doc. 2017–19489 Filed 9–14–17; 8:45 am]

**BILLING CODE 6570–01–P**

---

## FARM CREDIT SYSTEM INSURANCE CORPORATION

### Regular Meeting; Farm Credit System Insurance Corporation Board

**AGENCY:** Farm Credit System Insurance Corporation.

**ACTION:** Notice, regular meeting.

**SUMMARY:** Notice is hereby given of the regular meeting of the Farm Credit System Insurance Corporation Board (Board).

**DATES:** The meeting of the Board will be held at the offices of the Farm Credit Administration in McLean, Virginia, on September 21, 2017, from 2:00 p.m. until such time as the Board concludes its business.

**FOR FURTHER INFORMATION CONTACT:** Dale L. Aultman, Secretary to the Farm Credit System Insurance Corporation Board, (703) 883–4009, TTY (703) 883–4056.

**ADDRESSES:** Farm Credit System Insurance Corporation, 1501 Farm Credit Drive, McLean, Virginia 22102. Submit attendance requests via email to *VisitorRequest@FCA.gov.* See **SUPPLEMENTARY INFORMATION** for further information about attendance requests.

**FOR FURTHER INFORMATION CONTACT:** Dale L. Aultman, Secretary to the Farm Credit Administration Board, (703) 883–4009, TTY (703) 883–4056.

**SUPPLEMENTARY INFORMATION:** Parts of this meeting of the Board will be open to the public (limited space available), and parts will be closed to the public. Please send an email to *VisitorRequest@FCA.gov* at least 24 hours before the meeting. In your email include: Name, postal address, entity you are representing (if applicable), and telephone number. You will receive an email confirmation from us. Please be prepared to show a photo identification when you arrive. If you need assistance for accessibility reasons, or if you have any questions, contact Dale L. Aultman, Secretary to the Farm Credit System Insurance Corporation Board, at (703) 883–4009. The matters to be considered at the meeting are:

**Closed Session**

• Confidential Report on System Performance

**Open Session**

A. *Approval of Minutes*
  • June 8, 2017
B. *Business Reports*
  • Quarterly Financial Reports
  • Report on Insured and Other Obligations
  • Quarterly Report on Annual Performance Plan
C. *New Business*
  • Annual Performance Plan FY 2018–2019
  • Proposed 2018 and 2019 Budgets
  • Insurance Fund Progress Review and Setting of Premium Range Guidance for 2018

Dated: September 12, 2017.

**Dale L. Aultman,**

*Secretary, Farm Credit System Insurance Corporation Board.*

[FR Doc. 2017–19622 Filed 9–14–17; 8:45 am]

**BILLING CODE 6710–01–P**

---

## FEDERAL COMMUNICATIONS COMMISSION

[OMB 3060–0573]

### Information Collection Being Reviewed by the Federal Communications Commission

**AGENCY:** Federal Communications Commission.

**ACTION:** Notice and request for comments.

**SUMMARY:** As part of its continuing effort to reduce paperwork burdens, and as required by the Paperwork Reduction Act (PRA), the Federal Communications Commission (FCC or Commission) invites the general public and other Federal agencies to take this opportunity to comment on the following information collections. Comments are requested concerning: Whether the proposed collection of information is necessary for the proper performance of the functions of the Commission, including whether the information shall have practical utility; the accuracy of the Commission's burden estimate; ways to enhance the quality, utility, and clarity of the information collected; ways to minimize the burden of the collection of information on the respondents, including the use of automated collection techniques or other forms of information technology; and ways to further reduce the information collection burden on small business concerns with fewer than 25 employees.

The FCC may not conduct or sponsor a collection of information unless it displays a currently valid Office of Management and Budget (OMB) control number. No person shall be subject to any penalty for failing to comply with a collection of information subject to the PRA that does not display a valid OMB control number.

**DATES:** Written comments should be submitted on or before November 14, 2017. If you anticipate that you will be submitting comments, but find it difficult to do so within the period of time allowed by this notice, you should advise the contacts below as soon as possible.

**ADDRESSES:** Direct all PRA comments to Cathy Williams, FCC, via email *PRA@fcc.gov* and to *Cathy.Williams@fcc.gov.*

**FOR FURTHER INFORMATION CONTACT:** For additional information about the information collection, contact Cathy Williams at (202) 418–2918.

**SUPPLEMENTARY INFORMATION:** As part of its continuing effort to reduce paperwork burdens, and as required by the PRA of 1995 (44 U.S.C. 3501–3520), the FCC invites the general public and other Federal agencies to take this opportunity to comment on the following information collections. Comments are requested concerning: Whether the proposed collection of information is necessary for the proper performance of the functions of the Commission, including whether the information shall have practical utility; the accuracy of the Commission's burden estimate; ways to enhance the quality, utility, and clarity of the information collected; ways to minimize the burden of the collection of information on the respondents, including the use of automated collection techniques or other forms of information technology; and ways to further reduce the information

 *U.S. Equal Employment Opportunity Commission*

This is the proposed EEO-1 Form to collect compensation data.

## SECTION A - TYPE OF REPORT

1. Indicate by marking in the appropriate box the type of reporting unit for which this copy of the form is submitted (MARK ONLY ONE BOX).

☐ Single-establishment Employer Report

Multi-establishment Employer:

☐ Consolidation Report (Required)

☐ Headquarters Unit Report (Required)

☐ Individual Establishment Report (submit one for each establishment with 50 or more employees)

☐ Special Report

2. Total number of reports being filed by this Company (Answer on Consolidated Report only):

[                                                                                    ]

## SECTION B - COMPANY IDENTIFICATION
*(To be answered by all employees)*

1. Parent Company:

[                                                                                    ]

    a. Name of Parent Company that owns or controls establishment in item 2 below (omit if same name as above):

[                                                                                    ]

Address (Number and Street):

[                                                                                    ]

City or Town:            State:            ZIP code:

[                              ]   [                              ]   [                              ]

JA279

2. Establishment for which this report is filed (omit if same as above):

a. Name of Establishment:

Address (Number and Street):

City or Town:

County:

State:

ZIP code:

Employer identification No. (IRS 9-DIGIT TAX NUMBER):

Was an EEO-1 report filed for this establishment last year?

☐ Yes  ☐ No

## SECTION C - EMPLOYERS WHO ARE REQUIRED TO FILE
*(To be answered by all employees)*

1. Does the entire company have at least 100 employees in the payroll period for which you are reporting?

☐ Yes  ☐ No

2. Is your company affiliated through common ownership and/or centralized management with other entities in an enterprise with a total employment of 100 or more?

☐ Yes  ☐ No

3. Does the company or any of its establishments (a) have 50 or more employees AND (b) is not exempt as provided by 41 CFR 60-1.5, AND either (1) is a prime government contractor or first-tier subcontactor, and has a contract, subcontract, or purchase order amounting to $50,000 or more, or (2) serves as a depository of Government funds in any amount or is a financial institution which is an issuing and paying agent for U.S. Savings Bonds and Savings Notes?

☐ Yes  ☐ No

4. If the response to the above question (C - 3) is Yes, please enter your Dun and Bradstreet identification number (if you have one):

***NOTE: If an answer to questions 1, 2 or 3 of Section C is "Yes", complete the entire form, otherwise skip to Section G.***

Save & Continue (https://web.archive.org/web/20170504053819/https://www.eeoc.gov/employers/eeo1survey/2016_new_survey_2.cfm)

JA280

U.S. Equal Employment Opportunity Commission
EEO-1 Joint Reporting Center
P.O. BOX 3128 Reston, VA 20195



*U.S. Equal Employment Opportunity Commission*

This is the proposed EEO-1 Form to collect compensation data.

### SECTION D - EMPLOYMENT DATA

Employment at this establishment - Report all permanent full- and part-time employees including apprentices and on-the-job trainees unless specifically excluded as set forth in the instructions. Enter the appropriate figures on all lines and in all columns. Blank spaces will be considered as zeros.

| Job Categories | Annual Salary in Thousands | Number of Employees (Report employees in only one category) | | | | | | | | | | | | | Total Col A-N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Race/Ethnicity | | | | | | | | | | | | | |
| | | Hispanic or Latino | | Non/Hispanic or Latino | | | | | | | | | | | |
| | | | | Male | | | | | | Female | | | | | |
| | | Male | Female | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | |
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
| Executive/Senior Level Officials and Managers 1.1 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| First/ Mid-Level Officials and Managers 1.2 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |

JA282

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $24,440 - $30,679 | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | |
| Professionals 2 | $19,239 and under | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | |
| Technicians 3 | $19,239 and under | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | |

JA283

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Sales Workers 4 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Adminstrative Support Workers 5 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Craft Workers 6 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |

JA284

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | | |
| Operatives 7 | $19,239 and under | | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | | |
| Laborers and Helpers 8 | $19,239 and under | | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | | |
| Service Workers 9 | $19,239 and under | | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $24,440 - $30,679 | | | | | | | | | | | | | | | |
| $30,680 - $38,999 | | | | | | | | | | | | | | | |
| $39,000 - $49,919 | | | | | | | | | | | | | | | |
| $49,920 - $62,919 | | | | | | | | | | | | | | | |
| $62,920 - $80,079 | | | | | | | | | | | | | | | |
| $80,080 - $101,919 | | | | | | | | | | | | | | | |
| $101,920 - $128,959 | | | | | | | | | | | | | | | |
| $128,960 - $163,799 | | | | | | | | | | | | | | | |
| $163,800 - $207,999 | | | | | | | | | | | | | | | |
| $208,000 and over | | | | | | | | | | | | | | | |
| Total 121. | | | | | | | | | | | | | | | |
| Previous Year Total 122. | | | | | | | | | | | | | | | |

Save & Go Back (https://web.archive.org/web/20170506005055/https://www.eeoc.gov/employers/eeo1survey/2016_new_survey.cfm)

Save & Continue (https://web.archive.org/web/20170506005055/https://www.eeoc.gov/employers/eeo1survey/2016_new_survey_3.cfm)

U.S. Equal Employment Opportunity Commission
EEO-1 Joint Reporting Center
P.O. BOX 3128 Reston, VA 20195

 U.S. Equal Employment Opportunity Commission

This is the proposed EEO-1 Form to collect compensation data.

**SECTION D - EMPLOYMENT DATA**

Employment at this establishment - Report all permanent full- and part-time employees including apprentices and on-the-job trainees unless specifically excluded as set forth in the instructions. Enter the appropriate figures on all lines and in all columns. Blank spaces will be considered as zeros.

For each cell provide the TOTAL Number of Hours worked in last year

| Job Categories | Annual Salary in Thousands | Hispanic or Latino | | Not-Hispanic or Latino | | | | | | | | | | | | Total Col A-N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Male | Female | Male | | | | | | Female | | | | | | |
| | | | | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | |
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |

JA287

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Adminstrative Support Workers 5 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Craft Workers 6 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Operatives 7 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Laborers and Helpers 8 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | $208,000 and over | | | | | | | | | | | | | | | |
| Service Workers 9 | $19,239 and under | | | | | | | | | | | | | | | |
| | $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | $49,920 - $62,919 | | | | | | | | | | | | | | | |

JA288

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| $60,500 - $80,579 | | | | | | | | | | |
| $80,080 - $101,919 | | | | | | | | | | |
| $101,920 - $128,959 | | | | | | | | | | |
| $128,960 - $163,799 | | | | | | | | | | |
| $163,800 - $207,999 | | | | | | | | | | |
| $208,000 and over | | | | | | | | | | |
| Total 121 | | | | | | | | | | |
| Previous Year Total 122 | | | | | | | | | | |

Date(s) of payroll period used: (Omit on the Consolidated Report) _____

### SECTION E - ESTABLISHMENT INFORMATION
*(Omit on the Consolidated Report)*

What is the major activity of this establishment? (Be specific, i.e., manufacturing steel castings, retail grocer, wholesale plumbing supplies, title insurance, etc. Include the specific type of product or type of service provided, as well as the principal business or industrial activity.)

### SECTION F - REMARKS

Use this item to give any identification data appearing on the last EEO-1 report which differs from that given above, explain major changes in composition of reporting units and other pertinent information.

### SECTION G - CERTIFICATION

Check One:
- ☐ 1. All reports are accurate and were prepared in accordance with instructions. (Check on Consolidated Report Only.)
- ☑ 2. This report is accurate and was prepared in accordance with the instructions.

Name of Certifying Official _____

Name of Person to contact regarding this report _____

City and State _____

Title _____

Title _____

Zip Code _____

Signature _____

Address (Number and Street) _____

Email Address _____

Date _____

Telephone No. (including Area code and Extension) _____

Save & Go Back Finalize & Submit

U.S. Equal Employment Opportunity Commission
EEO-1 Joint Reporting Center
P.O. BOX 3128 Reston, VA 20195

JA289



*U.S. Equal Employment Opportunity Commission*

## 2017 EEO-1 Survey

### THE 2017 EEO-1 SURVEY WILL BE CHANGING

The **Employer Information Report EEO-1**, otherwise known as the EEO-1 Report, will be changing.  Details on how to file are provided below.

**Reports must be submitted and certified by:**

**March 31, 2018**

**PLEASE NOTE THAT YOUR 2016 PASSWORD WILL NOT WORK FOR THE 2017 EEO-1 SURVEY**

### Final Notice and Supporting Materials

- Final Federal Register Notice
- Revised EEO-1 Instruction Booklet
- Notice of Office of Management and Budget Action
- Order

### Data File Specifications

See below for file specifications for data upload and sample EEO-1 report (Components 1 and 2).

- Data file layout
- Sample 2017 EEO-1 form: PDF | HTML

### Additional Materials

- Small Business Fact Sheet
- Questions and Answers

### Addtional Information

- Ron Edwards
  EEO1.Suggestionbox@eeoc.gov

### Technical Assistance Opportunities

- Webinar: Revisions to the 2017 EEO-1 Survey to Collect Summary Pay Data
- The Revised EEO-1 and Summary Pay Data: Questions And Answers from the EEOC's October 2016 Employer Webinars



- 10/26/16 Webinar PowerPoint slides (PDF)

### Data Security

JA290

The EEOC maintains robust cybersecurity and privacy programs, in compliance with the Federal Information Security Modernization Act and based on NIST Special Publication 800-53, *Security and Privacy Controls for Federal Information Systems and Organizations*.  The implemented security and privacy controls protect organizational operations and information system assets against a diverse set of threats, including malicious attacks, natural disasters, structural failures, and human error.

The hosting service for the EEO-1 data collection system provides a defense-in-depth security program with many layers of security utilizing different physical and software components in order to provide a high level of protection. Security monitoring - both inside and outside the network, ensures the detection and rejection of unauthorized use. These security controls and measures are monitored continuously with automated vulnerability and compliance software suites.

Español | Other Languages

**U.S. Equal Employment Opportunity Commission**

Enter search terms...  Search

CONNECT WITH US  

| Home | About EEOC | Employees & Applicants | Employers / Small Business | Federal Agencies |

Contact Us

Home > Employers > EEO-1 Survey

  

**EEO-1 JOINT REPORTING COMMITTEE**

- Equal Employment Opportunity Commission

- Office of Federal Contract Compliance Programs

OMB No. 3046-0007
Approval Expires 9/2019

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

WASHINGTON, D.C. 20507

**EQUAL EMPLOYMENT OPPORTUNITY**
STANDARD FORM 100, REV. March 2018, EMPLOYER INFORMATION REPORT EEO-1
**INSTRUCTION BOOKLET**

The Employer Information EEO-1 report (Standard Form 100) is collected annually under the authority of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et. seq.*, as amended. All employers with 15 or more employees are covered by Title VII and are required to keep employment records as specified by Commission regulations. Based on the number of employees and federal contract activities, certain employers are required to file an EEO-1 report on an annual basis by the Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Labor Office of Federal Contract Compliance Programs (OFCCP) regulations. The type of information that employers are required to submit on the EEO-1 will depend on the employer's size. Starting in 2017, Federal contractors with 50 to 99 employees will be required to submit data about employees' ethnicity, race, and sex, by job category (Component 1) of the EEO-1. Filers with 100 or more employees (both private industry and Federal contractor) will be required to submit Component 1 and also summary pay and hours-worked data (Component 2).

See the Appendix for the applicable provisions of Title VII, Section 709(c) of Title VII, and the applicable EEOC regulations, Sections 1602.7-1602.14, Chapter XIV, Title 29 of the Code of Federal Regulations. State and local governments, public school systems and educational institutions are covered by other employment reports and are excluded from Standard Form 100, Employer Information Report EEO-1.

In the interests of consistency, uniformity and economy, Standard Form 100 has been jointly developed by the EEOC and OFCCP, as a single form which meets the statistical needs of both programs. In addition, this form should be a valuable tool for companies to use in evaluating their own internal programs for insuring equal employment opportunity.

As stated above, the filing of Standard Form 100 is required by law; *it is not voluntary*. Under section 709(c) of Title VII, the Equal Employment Opportunity Commission may compel an employer to file this form by obtaining an order from the United States District Court.

Under Section 209(a) of Executive Order 11246, the penalties for failure by a federal contractor or subcontractor to comply may include termination of the federal government contract and debarment from future federal contracts.

**1. WHO MUST FILE**

JA292

(A) Standard Form 100 - Component 1 only. The following federal contractor employers must file only Component 1 of Standard Form 100: all federal contractors who (1) are not exempt as provided for by 41 CFR 60-1.5; (2) have 50 to 99 employees; (3) are prime contractors or first-tier subcontractors; and (4) have a contract, subcontract, or purchase order amounting to $50,000 or more or serve as depositories of Government funds in any amount, or are financial institutions which are issuing and paying agents for U.S. Savings Bonds and savings notes.

(B) Standard Form 100, Components 1 and 2. The following employers must file both Components 1 and 2 of Standard Form 100:

(i) All private employers who are (1) subject to Title VII of the Civil Rights Act of 1964, as amended, with 100 or more employees EXCLUDING State and local governments, public primary and secondary school systems, institutions of higher education, American Indian or Alaska Native tribes and tax-exempt private membership clubs other than labor organizations; OR (2) subject to Title VII who have fewer than 100 employees if the company is owned or affiliated with another company, or there is centralized ownership, control or management (such as central control of personnel policies and labor relations) so that the group legally constitutes a single enterprise, and the entire enterprise employs a total of 100 or more employees.

AND

(ii) All federal contractors who (1) are not exempt as provided for by 41 CFR 60-1.5; (2) have 100 or more employees; (3) are prime contractors or first-tier subcontractors; and (4) have a contract, subcontract, or purchase order amounting to $50,000 or more; or (b) serve as depositories of Government funds in any amount; or are financial institutions which are issuing or paying agents for U.S. Savings Bonds and or savings notes.

Establishments located in the District of Columbia and the 50 states are required to submit Standard Form 100. No reports should be filed for establishments in Puerto Rico, the Virgin Islands, or other American Protectorates.

## 2. HOW TO FILE

**(a) EEO-1 Electronic Filing Requirement:**

EEO-1 reporting is an electronic, online application. The EEOC **requires** that EEO-1 reports be submitted via the *EEO-1 Online Filing System*, or as an electronically transmitted data file.

Any employer who claims that the electronic submission of Standard Form 100 would create undue hardship may apply to the Commission for a special reporting procedure in accordance with the instructions set forth in paragraph 5.

**(b) Single-establishment employers,** i.e., employers doing business at only one establishment in one location must complete a single EEO-1 online data record.

**(c) Multi-establishment employers,** i.e., employers doing business at more than one establishment must complete online: (1) a report covering the principal or headquarters office; (2) a separate report for **each** establishment employing 50 or more persons; and (3) a separate report (Type 8 record) for each establishment employing fewer than 50 employees, OR an Establishment List (Type 6 record), showing the name, address, and total employment for each establishment employing fewer than 50 persons. For the EEO-1 online portal, companies using Establishment List reports (Type 6), must enter all employment data into the Consolidated report (Type 2). For the EEO-1 online application, all keyed employment data including data from the Type 8 reports will automatically transfer to populate the overall Consolidated Report.

The total number of employees indicated on the headquarters report, **PLUS** the establishment reports, **PLUS** the list of establishments employing fewer than 50 employees, **MUST** equal the total number of employees shown on the Consolidated Report.

Employment data for multi-establishment companies, including parent corporations and their subsidiary holdings, must report all employees working at each company establishment or subsidiary establishment. For purposes of this report, the term **parent corporation** refers to any corporation which owns all or the majority stock of another corporation so that the latter relates to it as a subsidiary.

## 3. WHEN TO FILE

JA293

This annual report must be filed not later than March 31 following the reporting year. Employment figures from any pay period in October through December may be used (workforce snapshot).

## 4. CONFIDENTIALITY

All reports and any information from individual reports are subject to the confidentiality provisions of Section 709(e) of Title VII, and may not be made public by the EEOC prior to the institution of any proceeding under Title VII involving the EEO-1 data. Any EEOC employee who violates this prohibition may be found guilty of a criminal misdemeanor and could be fined or imprisoned. The confidentiality requirements allow the EEOC to publish only aggregated data, and only in a manner that does not reveal any particular filer's or any individual employee's personal information.

OFCCP will notify contractors of any Freedom of Information Act (FOIA) requests that are made to obtain any of the data provided on the EEO-1 report, and will protect the confidentiality of EEO-1 pay and hours-worked data to the maximum extent possible consistent with FOIA and the Trade Secrets Act. However, should OFCCP receive FOIA requests for any EEO-1 data on filers not within its jurisdiction, OFCCP will refer the requests to the EEOC for a response. The confidentiality provision of Section 709(e) of Title VII applies to all EEO-1 data submitted by filers that are not federal contractors, and the EEOC adheres to that statutory provision when reviewing all requests for EEO-1 data.

## 5. REQUESTS FOR INFORMATION AND SPECIAL PROCEDURES

Where the employer claims undue hardship due to electronic submission or otherwise, the employer must submit in writing a detailed alternative proposal for compiling, reporting, or submitting information to: EEO-1 Coordinator, EEOC Survey Division, 131 M Street, NE, Room 4SW22G, Washington, DC 20507. In cases where the Commission approves written requests to submit paper EEO-1 forms, the paper EEO-1 report must be prepared in accordance with the directions set forth in the Commission's written approval. EEOC will generate a paper EEO-1 form only in extreme cases where internet access is not available to the employer. Only those special procedures approved in writing by the Commission are authorized. Such authorizations are only in effect for one report year. Paper records may not be submitted until after March 31.

## 6. BURDEN ESTIMATE

The reporting burden for Component 1 is estimated to be eight (8) hours per filer for firm-level functions plus an additional one (1) hour per report for establishment-level functions, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed and completing and reviewing the collection of information.

The reporting burden for both Component 1 and Component 2 together is estimated to be fifteen and two tenths (15.2) hours per filer for firm-level functions plus an additional one and nine tenths (1.9) hours per report for establishment-level functions, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed and completing and reviewing the collection of information.

Comments regarding this collection of information, including suggestions for reducing burden, can be sent at any time to:

EEO-1 Coordinator
EEOC Survey Division -- Room 4SW22G
131 M Street, N.E.
Washington, D.C. 20507

<div align="center">AND</div>

Paperwork Reduction Project (3046-0007)
Office of Management and Budget
Washington, D.C. 20503

The full text of the OMB regulations on the Paperwork Reduction Act may be found at 5 CFR Part 1320.

<div align="center">**EEO-1 Terms**</div>

**Type of Report** (Status Code)

Single-Establishment company
1 Single-establishment company

Multi-establishment company
2 Consolidated Report (Required)
3 Headquarters Report (Required)
4 Establishment Report (50 or more employees)
6 Establishment List (Option 1)
8 Establishment Report (less than 50 employees) (Option 2)

Special Report (See 29 CFR 1602.10)

**Company Identification**

Refers to the company name and address of the headquarters office of the multi-establishment company (Report Types 2 and 3);
or the establishment name and address.

**Employers Who Are Required To File**

Questions 1, 2 and 3 **MUST** be answered by all employers required to file the EEO-1. If the answer to Question C-3 is Yes, please
enter the company's Dun and Bradstreet identification number if the company has one. If the answer is Yes to question 1 or 2,
complete Components 1 and 2. If the answer is Yes to **only** question 3, complete Component 1 only. Otherwise skip to Section G.

**Employment Data**

*Employment Data Reported by Employers Completing Component 1*

Employment data must include **ALL** full-time and part-time employees **who were employed during the payroll period selected
by the employer between October 1 and December 31 (workforce snapshot),** except those employees specifically excluded
as indicated in the Appendix. Employees must be counted by sex and race, and ethnicity, for each of the ten occupational
categories. See Appendix for detailed explanation of job categories and race and ethnicity identification.

Every employee must be accounted for in only one of the categories in Columns A through N.

Occupational Data - Employment data must be reported by job category. Report each employee in only one job category. In order
to simplify and standardize the method of reporting, all jobs are considered as belonging in one of the broad job categories shown
in the EEO-1. To assist you in determining where to place your jobs within the job categories, a description of them is in the *EEO-
1 Job Classification Guide* or you may consult the EEO-1-Census Codes Cross Walk web site
(https://www.eeoc.gov/employers/eeo1survey/jobclassguide.cfm). For further clarification, you may wish to consult the
Alphabetical and Classified Indices of Industries and Occupations (2010 Census) published by the U.S. Department of
Commerce, Census Bureau.

*Employment Data for Employers Completing Components 1 and 2*

Employment data must include **ALL** full-time and part-time employees **who were employed during the payroll period selected
by the employer between October 1 and December 31 (workforce snapshot)**, except those employees specifically excluded
as indicated in the Appendix. Employees must be counted by sex, race, and ethnicity, and also by pay and hours worked. See
Appendix for detailed explanation of job categories, race and ethnicity identification, and pay and hours-worked terminology.
Every employee must be accounted for in only one of the categories in Columns A through N.

Section D Employee Report - Report total employees in the workforce snapshot for each job category and pay band. Every
employee identified in the workforce snapshot must be accounted for in one of the twelve pay bands for an EEO-1 job category.

Section D Pay Report - Report W-2 Box 1 earnings for the year for all employees identified in the workforce snapshot. If an
employee is not included in the workforce snapshot, his or her W-2 Box 1 earnings are not tallied. If an employee is included in
the workforce snapshot, his or her W-2 Box 1 earnings are tallied, even if he or she is no longer employed at the end of the year.
Note that income earned after the conclusion of the last full pay period in December is often paid to employees in the next
calendar year. For EEO-1 purposes, that income would be counted in the next year, **when it is reported on the W-2**.

Section D Hours Worked Report - Report hours worked for all employees in the snapshot in their job category and pay band.
Hours worked are reported as an aggregate value for each job category and pay band, representing the total of all hours worked

JA295

that year by all employees reported in that job category and pay band. If wages are actually paid in the next calendar year for work done in the last days of the past calendar year, these hours are counted in the next year, **because that is when the pay is reported on the W-2.**

For employees who are not exempt from the minimum wage and/or overtime provisions of the Fair Labor Standards Act (FLSA), count the "hours worked" as recorded for FLSA purposes during the reporting year.

For employees who are exempt from the minimum wage and/or overtime provisions of the FLSA, either (1) report a proxy of 40 hours per week for full-time exempt employees and 20 hours per week for part-time exempt employees, multiplied by the number of weeks the individuals were employed during the EEO-1 reporting year; or (2) provide actual hours of work by exempt employees if the employer already maintains accurate records of this information. To the extent that the use of the proxy numbers cause some deviation from an exempt employee's actual hours worked, the certification of the report as accurate would be considered appropriate. See also "6. Description of Pay-Related Terminology" in the Appendix for related information.

To standardize reporting, all jobs are considered to belong in one of the EEO-1 job categories shown in the Section D Employment Data table. To assist in determining where to place jobs within these categories, consult the description of job categories in the **EEO-1 Job Classification Guide** or the EEO-1-Census Codes Cross Walk web site (https://www.census.gov/people/eeotabulation/documentation/jobgroups.pdf). For further clarification, consult the Alphabetical and Classified Indices of Industries and Occupations (2010 Census) published by the U.S. Department of Commerce, Census Bureau.

## Establishment Information

The major activity should be sufficiently descriptive to identify the industry and product produced or service provided. If an establishment is engaged in more than one activity, describe the activity at which the **greatest** number of employees work.

**The description of the major activity indicated on the Headquarters Report (Type 3) must reflect the dominant economic activity of the company in which the greatest numbers of employees are engaged.**

## Remarks

Include in this section any remarks, explanations, or other pertinent information regarding this report.

## Certification

If all reports have been completed at headquarters, the authorized official should check Item 1 and sign the Consolidated Report only. If the reports have been completed at the individual establishments, the authorized official should check Item 2 and sign the establishment report.

### APPENDIX

## 1. DEFINITIONS APPLICABLE TO ALL EMPLOYERS

*a.* "Commission" refers to the Equal Employment Opportunity Commission.

*b.* "OFCCP" refers to the Office of Federal Contract Compliance Programs, U.S. Department of Labor, established to implement Executive Order 11246, as amended.

*c.* "Joint Reporting Committee" is the committee representing the Commission and OFCCP for the purpose of administering this reporting system.

*d.* "Employer" under Section 701(b), Title VII of the Civil Rights Act of 1964, as amended, means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include the United States, a corporation wholly owned by the government of the United States, American Indian or Alaska Native tribes, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5 of the United States Code), or a bona fide private membership club (other than a labor organization) which is exempt from taxation under Section 501(c) of the Internal Revenue Code of 1954; OR any person or entity subject to Executive Order 11246 who is a federal government prime contractor or subcontractor at any tier (including a bank or other establishment serving as a depository of

JA296

federal government funds, or an issuing and paying agent of U.S. Savings Bonds and savings notes, or a holder of a federal government bill of lading) or a federally-assisted construction prime contractor or subcontractor at any tier.

*e.* "Employee" means any individual on the payroll of an employer who is an employee for purposes of the employers withholding of Social Security taxes except insurance sales agents who are considered to be employees for such purposes solely because of the provisions of 26 USC 3121 (d)(3)(B) (the Internal Revenue Code). Leased employees are included in this definition.

f. "Leased Employee", for EEO-1 reporting only, means a permanent employee provided by an employment agency for a fee to an outside company for which the employment agency handles all personnel tasks including payroll, staffing, benefit payments and compliance reporting. The employment agency shall include leased employees in its EEO-1 report. **For EEO-1 reporting purposes only**, the term "employee" shall not include persons who are hired on a casual basis for a specified time, or for the duration of a specified job (for example, a person at a construction site whose employment relationship is expected to terminate with the end of the employee's work at the site); persons temporarily employed in any industry other than construction, such as temporary office workers, mariners, stevedores, lumber yard workers, etc., who are hired through a hiring hall or other referral arrangement, through an employee contractor or agent, or by some individual hiring arrangement, or persons **(EXCEPT** leased employees) on the payroll of an employment agency who are referred by such agency for work to be performed on the premises of another employer under that employers direction and control. These definitions are only for purposes of clarifying who reports these individuals on the EEO-1 and do not have legal ramifications as to the analysis of whether a particular individual is an employee or an independent contractor. That is done under the factors enumerated by the Supreme Court in *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318 (1992).

*f.* "Commerce" means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof.

*g.* "Industry Affecting Commerce" means any activity, business or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry affecting commerce within the meaning of the Labor Management Reporting and Disclosure Act of 1959. Any employer of 15 or more persons is presumed to be in an industry affecting commerce.

*h.* "Establishment" is generally a single physical location where business is conducted or where services or industrial operations are performed (e.g., factory, mill, store, hotel, movie theater, mine, farm, airline terminal, sales office, warehouse, or central administrative office (definition adapted from the *North American Industry Classification System, 2012*).

Units at different physical locations, even though engaged in the same kind of business operation, must be reported as separate establishments. For locations involving construction, transportation, communications, electric, gas, and sanitary services, oil and gas fields, and similar types of physically dispersed industrial activities, however, it is not necessary to list separately each individual site, project, field, line, etc., unless it is treated by you as a separate legal entity. For these types of activities, list as establishments only those relatively permanent main or branch offices, terminals, stations etc., which are either: (a) directly responsible for supervising such dispersed activities (where employees work from home, they should be reported as if working at the establishment where their supervisor is reported to work); or (b) the base from which personnel and equipment operate to carry out these activities. (Where these dispersed activities cross State lines, at least one such establishment should be listed for each State involved.)

*i.* "Major Activity" means the major product or group of products produced or handled, or services rendered by the reporting unit (e.g., manufacturing airplane parts, retail sales of office furniture) in terms of the activity at which the greatest number of all employees work. The description includes the type of product manufactured or sold or the type of service provided. "Major Activity" is based on the industrial definitions developed by the federal government as adopted by the EEOC (For example, the *North American Industry Classification System, 2012***).**

It is the opinion of the Commission that Section 702 of Title VII of the Civil Rights Act of 1964, as amended, does not authorize a complete exemption of religious organizations from the coverage of the Act or of the reporting requirements of the Commission. The exemption for religious organizations applies to their employment of individuals of a particular religion to perform work connected with the organization's activities. Therefore, since the Standard Form 100 does not provide for information as to the religion of employees, religious organizations must report all information required by this report.

JA297

**2. DEFINITIONS APPLICABLE ONLY TO GOVERNMENT CONTRACTORS SUBJECT TO EXECUTIVE ORDER 11246**

*a.* "Order" means Executive Order 11246, as amended.

*b.* "Contract" means any government contract or any federally-assisted construction contract.

*c.* "Prime Contractor" means any employer having a government contract or any federally-assisted construction contract, or any employer serving as a depository of federal government funds.

*d.* "Subcontractor" means any employer having a contract with a prime contractor or another subcontractor calling for supplies or services required for the performance of a government contract or federally assisted construction contract.

*e.* "Contracting Agency" means any department, agency and establishment in the executive branch of the government, including any wholly-owned government corporation, which enters into contracts.

*f.* "Administering Agency" means any department, agency and establishment in the executive branch of the government, including any wholly-owned government corporation, which administers a program involving federally-assisted construction contracts.

**3. RESPONSIBILITIES OF PRIME CONTRACTORS**

*a.* At the time of an award of a subcontract subject to these reporting requirements, the prime contractor shall inform the subcontractor of its responsibility to submit annual EEO-1 employment data in accordance with these instructions.

*b.* If prime contractors are required by their Contracting Officer or subcontractors by their prime contractors, to submit notification of filing, they shall do so by ordinary correspondence. However, such notification is not required by and should not be sent to the Joint Reporting Committee.

**4. RACE, ETHNIC, AND SEX IDENTIFICATION**

Self-identification is the preferred method of identifying the race and ethnic information necessary for the EEO-1 report. Employers are required to attempt to allow employees to use self-identification to complete the EEO-1 report. If an employee declines to self-identify his or her race and/or ethnicity, employment records or observer identification may be used.

Where records are maintained, it is recommended that they be kept separately from the employee's basic personnel file or other records available to those responsible for personnel decisions. Self-identification is the preferred method of identifying the sex information necessary for the EEO-1 report.

Race and ethnicity designations as used by the Equal Employment Opportunity Commission for the EEO-1 do not denote scientific definitions of anthropological origins. In addition, such designations do not control who is protected by Title VII's prohibitions against employment discrimination based on race or national origin.

Definitions of the EEO-1 race and ethnicity categories are as follows:

**Hispanic or Latino** - A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.

**White (Not Hispanic or Latino)** - A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

**Black or African American (Not Hispanic or Latino)** - A person having origins in any of the black racial groups of Africa.

**Native Hawaiian or Pacific Islander (Not Hispanic or Latino)** - A person having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

**Asian (Not Hispanic or Latino)** - A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian Subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

**Native American or Alaska Native (Not Hispanic or Latino)** - A person having origins in any of the original peoples of North and South America (including Central America), and who maintain tribal affiliation or community attachment.

**Two or More Races (Not Hispanic or Latino) -** All persons who identify with more than one of the above five races.

JA298

**Instructions for assigning employees into the race/ethnic categories**:

**Hispanic or Latino** - Include all employees who answer YES to the question, Are you Hispanic or Latino. Report all Hispanic males in Column A and Hispanic females in Column B.

**White (Not Hispanic or Latino)** - Include all employees who identify as White males in Column C and as White females in Column I.

**Black or African American (Not Hispanic or Latino)**- Include all employees who identify as Black males in Column D and as Black females in Column J.

**Native Hawaiian or Pacific Islander (Not Hispanic or Latino)** - Include all employees who identify as Native Hawaiian or Other Pacific Islander males in Column E and as Native Hawaiian or Other Pacific Islander females in Column K.

**Asian (Not Hispanic or Latino)** - Include all employees who identify as Asian males in Column F and as Asian females in Column L.

**Native American or Alaska Native (Not Hispanic or Latino)** - Include all employees who identify as Native American or Alaska Native males in Column G and as Native American or Alaska Native females in Column M.

**Two or More Races (Not Hispanic or Latino)** - Report all male employees who identify with more than one of the above five races in Column H and all female employees who identify with more than one of the above five races in Column N.

As to the method of collecting data, the basic principles for ethnic and racial self-identification for purposes of the EEO-1 report are:

(1) Offer employees the opportunity to self- identify

(2) Provide a statement about the voluntary nature of this inquiry for employees. For example, language such as the following may be used (employers may adapt this language):

"The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that require the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual."

## 5. DESCRIPTION OF JOB CATEGORIES

The major job categories are listed below, including a brief description of the skills and training required for occupations in that category and examples of the job titles that fit each category. The examples shown below are illustrative and not intended to be exhaustive of all job titles in a job category. These job categories are primarily based on the average skill level, knowledge, and responsibility involved in each occupation within the job category.

The Officials and Managers category as a whole is to be divided into the following two subcategories: Executive/Senior Level Officials and Managers and First/Mid Level Officials and Managers. These subcategories are intended to mirror the employers own well established hierarchy of management positions. Small employers who may not have two well-defined hierarchical steps of management should report their management employees in the appropriate categories.

*Executive/Senior Level Officials and Managers*. Individuals who plan, direct and formulate policies, set strategy and provide the overall direction of enterprises/organizations for the development and delivery of products or services, within the parameters approved by boards of directors or other governing bodies. Residing in the highest levels of organizations, these executives plan, direct or coordinate activities with the support of subordinate executives and staff managers. They include, in larger organizations, those individuals within two reporting levels of the CEO, whose responsibilities require frequent interaction with the CEO. Examples of these kinds of managers are: chief executive officers, chief operating officers, chief financial officers, line of business heads, presidents or executive vice presidents of functional areas or operating groups, chief information officers, chief human resources officers, chief marketing officers, chief legal officers, management directors and managing partners.

JA299

*First/Mid Level Officials and Managers.* Individuals who serve as managers, other than those who serve as Executive/Senior Level Officials and Managers, including those who oversee and direct the delivery of products, services or functions at group, regional or divisional levels of organizations. These managers receive directions from the Executive/Senior Level management and typically lead major business units. They implement policies, programs and directives of executive/senior management through subordinate managers and within the parameters set by Executive/Senior Level management. Examples of these kinds of managers are: vice presidents and directors, group, regional or divisional controllers; treasurers; human resources, information systems, marketing, and operations managers. The First/Mid Level Officials and Managers subcategory also includes those who report directly to middle managers. These individuals serve at functional, line of business segment or branch levels and are responsible for directing and executing the day-to-day operational objectives of enterprises/organizations, conveying the directions of higher level officials and managers to subordinate personnel and, in some instances, directly supervising the activities of exempt and non-exempt personnel. Examples of these kinds of managers are: first-line managers; team managers; unit managers; operations and production mangers; branch managers; administrative services managers; purchasing and transportation managers; storage and distribution managers; call center or customer service managers; technical support managers; and brand or product managers.

*Professionals.* Most jobs in this category require bachelor and graduate degrees, and/or professional certification. In some instances, comparable experience may establish a person's qualifications. Examples of these kinds of positions include: accountants and auditors; airplane pilots and flight engineers; architects; artists; chemists; computer programmers; designers; dieticians; editors; engineers; lawyers; librarians; mathematical scientists; natural scientists; registered nurses; physical scientists; physicians and surgeons; social scientists; teachers; and surveyors.

*Technicians.* Jobs in this category include activities that require applied scientific skills, usually obtained by post-secondary education of varying lengths, depending on the particular occupation, recognizing that in some instances additional training, certification, or comparable experience is required. Examples of these types of positions include: drafters; emergency medical technicians; chemical technicians; and broadcast and sound engineering technicians.

*Sales Workers.* These jobs include non-managerial activities that wholly and primarily involve direct sales. Examples of these types of positions include: advertising sales agents; insurance sales agents; real estate brokers and sales agents; wholesale sales representatives; securities, commodities, and financial services sales agents; telemarketers; demonstrators; retail salespersons; counter and rental clerks; and cashiers.

*Administrative Support Workers.* These jobs involve non-managerial tasks providing administrative and support assistance, primarily in office settings. Examples of these types of positions include: office and administrative support workers; bookkeeping; accounting and auditing clerks; cargo and freight agents; dispatchers; couriers; data entry keyers; computer operators; shipping, receiving and traffic clerks; word processors and typists; proofreaders; desktop publishers; and general office clerks.

*Craft Workers* (formerly Craft Workers (Skilled)). Most jobs in this category include higher skilled occupations in construction (building trades craft workers and their formal apprentices) and natural resource extraction workers. Examples of these types of positions include: boilermakers; brick and stone masons; carpenters; electricians; painters (both construction and maintenance); glaziers; pipelayers, plumbers, pipefitters and steamfitters; plasterers; roofers; elevator installers; earth drillers; derrick operators; oil and gas rotary drill operators; and blasters and explosive workers. This category also includes occupations related to the installation, maintenance and part replacement of equipment, machines and tools, such as: automotive mechanics; aircraft mechanics; and electric and electronic equipment repairers. This category also includes some production occupations that are distinguished by the high degree of skill and precision required to perform them, based on clearly defined task specifications, such as: millwrights; etchers and engravers; tool and die makers; and pattern makers.

*Operatives* (formerly Operatives (Semi-skilled)). Most jobs in this category include intermediate skilled occupations and include workers who operate machines or factory-related processing equipment. Most of these occupations do not usually require more than several months of training. Examples include: textile machine workers; laundry and dry cleaning workers; photographic process workers; weaving machine operators; electrical and electronic equipment assemblers; semiconductor processors; testers, graders and sorters; bakers; and butchers and other meat, poultry and fish processing workers. This category also includes occupations of generally intermediate skill levels that are concerned with operating and controlling equipment to facilitate the movement of people or materials, such as: bridge and lock tenders; truck, bus or taxi drivers; industrial truck and tractor (forklift) operators; parking lot attendants; sailors; conveyor operators; and hand packers and packagers.

JA300

*Laborers and Helpers* (formerly Laborers (Unskilled)). Jobs in this category include workers with more limited skills who require only brief training to perform tasks that require little or no independent judgment. Examples include: production and construction worker helpers; vehicle and equipment cleaners; laborers; freight, stock and material movers; service station attendants; construction laborers; refuse and recyclable materials collectors; septic tank servicers; and sewer pipe cleaners.

*Service Workers*. Jobs in this category include food service, cleaning service, personal service, and protective service activities. Skill may be acquired through formal training, job-related training or direct experience. Examples of food service positions include: cooks; bartenders; and other food service workers. Examples of personal service positions include: medical assistants and other healthcare support positions; hairdressers; ushers; and transportation attendants. Examples of cleaning service positions include: cleaners; janitors; and porters. Examples of protective service positions include: transit and railroad police and fire fighters; guards; private detectives and investigators.

## 6. DESCRIPTION OF PAY-RELATED TERMINOLOGY

*a.* "Hours Worked" means the annual sum of hours (1) a nonexempt employee worked within the meaning of the Fair Labor Standards Act (FLSA) during the EEO-1 reporting year; or (2) an exempt employee worked during the EEO-1 reporting year based on either (a) a proxy of 40 hours per week for a full-time exempt employee, and 20 hours per week for a part-time exempt employee, multiplied by the number of weeks the individual was employed during the EEO-1 reporting year; or (2) actual hours worked by an exempt employee if the employer already maintains accurate records of this information.

*b.* "Pay" means an employee's W2 earnings, specifically those reported in Box 1 of the W2 form-Wages, tips, other compensation. IRS directions for that entry are "Show the total taxable wages, tips, and other compensation that you paid to your employee during the year. However, do not include elective deferrals (such as employee contributions to a section 401(k) or 403(b) plan) except section 501(c)(18) contributions." Employers are expected to use payroll reports for the previous four quarters to generate the necessary data. Please refer to the IRS website for specific examples (https://www.irs.gov/instructions/iw2w3/ch01.html#d0e2347).

*c.* "Pay band" means a range of salaries with a minimum and maximum value into which employee pay data is organized. There are twelve pay bands shown in the table below.

| Pay Band | Pay Band Label |
|---|---|
| 1 | $19,239 and under. |
| 2 | $19,240 - $24,439 |
| 3 | $24,440 - $30,679 |
| 4 | $30,680 - $38,999 |
| 5 | $39,000 - $49,919 |
| 6 | $49,920 - $62,919 |
| 7 | $62,920 - $80,079 |
| 8 | $80,080 - $101,919 |

JA301

| 9 | $101,920 - $128,959 |
| 10 | $128,960 - $163,799 |
| 11 | $163,800 - $207,999 |
| 12 | $208,000 and over. |

## 7. LEGAL BASIS FOR REQUIREMENTS

SECTION 709(c), TITLE VII, CIVIL RIGHTS ACT OF 1964, AS AMENDED

Execution, retention, and preservation of records; reports to Commission; training program records; appropriate relief from regulation or order for undue hardship; procedure for exemption; judicial action to compel compliance

Every employer, employment agency, and labor organization subject to this subchapter shall: (1) make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed, (2) preserve such records for such periods, and (3) make such reports therefrom as the Commission shall prescribe by regulation or order, after public hearing, as reasonable, necessary, or appropriate for the enforcement of this title or the regulations or orders thereunder. The Commission shall, by regulation, require each employer, labor organization, and joint labor-management committee subject to this subchapter which controls an apprenticeship or other training program to maintain such records as are reasonably necessary to carry out the purposes of this subchapter, including, but not limited to, a list of applicants who wish to participate in such program, including the chronological order in which applications were received, and to furnish to the Commission upon request, a detailed description of the manner in which persons are selected to participate in the apprenticeship or other training program. Any employer, employment agency, labor organization, or joint labor-management committee which believes that the application to it of any regulation or order issued under this section would result in undue hardship may apply to the Commission for an exemption from the application of such regulation or order, and, if such application for an exemption is denied, bring a civil action in the United States District Court for the district where such records are kept. If the Commission or the court, as the case may be, finds that the application of the regulation or order to the employer, employment agency, or labor organization in question would impose an undue hardship, the Commission or the court, as the case may be, may grant appropriate relief. If any person required to comply with the provisions of this subsection fails or refuses to do so, the United States District Court for the district in which such person is found, resides, or transacts business, shall, upon application of the Commission, or the Attorney General in a case involving a government, governmental agency or political subdivision, have jurisdiction to issue to such person an order requiring him to comply.

TITLE 29, CHAPTER XIV CODE OF FEDERAL REGULATIONS

*Subpart B -- Employer Information Report*

## §1602.7 Requirement for filing of report.

On or before March 31 of each year, every employer that is subject to Title VII of the Civil Rights Act of 1964, as amended, and that has 100 or more employees, shall file with the Commission or its delegate executed copies of Standard Form 100, as revised (otherwise known as "Employer Information Report EEO-1"), in conformity with the directions set forth in the form and accompanying instructions. Notwithstanding the provisions of §1602.14, every such employer shall retain at all times at each reporting unit, or at company or divisional headquarters, a copy of the most recent report filed for each such unit and shall make the same available if requested by an officer, agent, or employee of the Commission under the authority of section 710 of Title VII. Appropriate copies of Standard Form 100 in blank will be supplied to every employer known to the Commission to be subject to the reporting requirements, but it is the responsibility of all such employers to obtain necessary supplies of the form from the Commission or its delegate prior to the filing date.

JA302

**§1602.8 Penalty for making of willfully false statements on report.**

The making of willfully false statements on Report EEO-1 is a violation of the United States Code, Title 18, section 1001, and is punishable by fine or imprisonment as set forth therein.

**§1602.9 Commissions remedy for employers failure to file report.**

Any employer failing or refusing to file Report EEO-1 when required to do so may be compelled to file by order of a U.S. District Court, upon application of the Commission.

**§1602.10 Employers exemption from reporting requirements.**

If an employer claims that the preparation or filing of the report would create undue hardship, the employer may apply to the Commission for an exemption from the requirements set forth in this part, according to instruction 5. If an employer is engaged in activities for which the reporting unit criteria described in section 5 of the instructions is not readily adaptable, special reporting procedures may be required. If an employer seeks to change the date for filing its Standard Form 100 or seeks to change the period for which data are reported, an alternative reporting date or period may be permitted. In such instances, the employer should so advise the Commission by submitting to the Commission or its delegate a specific written proposal for an alternative reporting system prior to the date on which the report is due.

**§1602.11 Additional reporting requirements.**

The Commission reserves the right to require reports, other than that designated as the Employer Information Report EEO-1, about the employment practices of individual employers or groups of employers whenever, in its judgment, special or supplemental reports are necessary to accomplish the purposes of Title VII, the ADA, or GINA. Any system for the requirement of such reports will be established in accordance with the procedures referred to in section 709(c) of Title VII, section 107 of the ADA, or section 207(a) of GINA and as otherwise prescribed by law.

Subpart C--Recordkeeping by Employers

**§1602.12 Records to be made or kept.**

The Commission has not adopted any requirement, generally applicable to employers, that records be made or kept. It reserves the right to impose recordkeeping requirements upon individual employers or groups of employers subject to its jurisdiction whenever, in its judgment, such records (a) are necessary for the effective operation of the EEO-1 reporting system or of any special or supplemental reporting system as described above; or (b) are further required to accomplish the purposes of title VII, the ADA, or GINA. Such record-keeping requirements will be adopted in accordance with the procedures referred to in section 709(c) of title VII, section 107 of the ADA, or section 207(a) of GINA, and otherwise prescribed by law.

**§1602.13 Records as to racial or ethnic identity of employees.**

Employers may acquire the information necessary for completion of Section D of the EEO-1 either by visual surveys of the work force, or at their option, by the maintenance of post-employment records as to the identity of employees where the same is permitted by State law. In the latter case, however, the Commission recommends the maintenance of a permanent record as to the racial or ethnic identity of an individual for purpose of completing the report form only where the employer keeps such records separately from the employees basic personnel form or other records available to those responsible for personnel decisions, e.g., as part of an automatic data processing system in the payroll department.

**§1602.14 Preservation of records made or kept.**

Any personnel or employment record made or kept by an employer (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, lay-off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later. In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of one year from the date of termination. Where a charge of discrimination has been filed, or an action brought by the Commission or the Attorney General, against an employer under title VII, the ADA, or GINA, the respondent employer shall preserve all personnel records relevant to the charge or action until final disposition of the charge or

JA303

the action. The term "personnel records relevant to the charge," for example, would include personnel or employment records relating to the aggrieved person and to all other employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring an action in a U.S. District Court or, where an action is brought against an employer either by the aggrieved person, the Commission, or by the Attorney General, the date on which such litigation is terminated.

**CONNECT WITH US**    

Privacy Policy | Disclaimer | USA.Gov

JA304



U.S. Equal Employment
Opportunity Commission

Español | Other Languages

| Enter search terms... | Search |

CONNECT WITH US   

| Home | About EEOC | Employees & Applicants | Employers / Small Business | Federal Agencies |

| Contact Us |

Home > Employers > EEO-1 Survey

  

# 2017 EEO-1 Survey
# Data File Layout Components 1 and 2

(*Download as an Excel file*)

| FIELD | FIELD NAME | POSITIONS | LNGTH | FIELD TYPE | POSSIBLE VALUES & REMARKS |
|-------|-----------|-----------|-------|------------|----------------------------|
| 1 | COMPANY NUMBER | 1 - 7 | 7 | AN | UNIQUE IDENTIFIER FOR ENTIRE COMPANY **(REQUIRED)** |
| 2 | STATUS CODE | 8 | 1 | N | INDICATES TYPE OF REPORT AS INDICATED IN PART A OF SF 100: |
| | | | | | 1 = SINGLE-ESTAB EMPLOYER MULTI-ESTAB COMPANIES: |
| | | | | | 2 = CONSOLIDATED REPORT |
| | | | | | 3 = HEADQUARTERS REPORT |
| | | | | | 4 = ESTABLISHMENT REPORT (50+ EMPLOYEES - NOT FIRST TIME REPORTING) |
| | | | | | 5 = SPECIAL REPORTING PROCEDURE |
| | | | | | 8 = STATUS CODE 8 REPORT (LESS THAN 50 EMPLOYEES) |
| | | | | | 9 = STATUS CODE 9 REPORT (FEWER THAN 50 EMPLOYEES - FIRST TIME REPORTING) |
| | | | | | **(REQUIRED)** |
| 3 | UNIT NUMBER | 9 - 15 | 7 | AN | REQUIRED EXCEPT FOR NEW STATUS CODE 8 AND ALL STATUS CODE 9 RECORDS |
| 4 | UNIT NAME | 16 - 50 | 35 | AN | ESTABLISHMENT NAME **(REQUIRED)** |
| 5 | UNIT ADDRESS | 51 - 84 | 34 | AN | ESTABLISHMENT ADDRESS **(REQUIRED)** |
| 6 | UNIT ADDRESS-2 | 85 - 109 | 25 | AN | EXTENDED ESTABLISHMENT ADDRESS TO INCLUDE SUITE NO., PO BOX, ETC. (OPTIONAL) |

JA305

| 7 | CITY NAME | 110 - 129 | 20 | A | CITY NAME **(REQUIRED)** |
|---|---|---|---|---|---|
| 8 | STATE ABBREVIATION | 130 - 131 | 2 | A | FIPS PUB 5-2(CENSUS) **(REQUIRED)** |
| 9 | ZIP CODE | 132 - 136 | 5 | N | U.S. POSTAL SERVICE **(REQUIRED)** |
| 10 | QUESTION B.2.C | 137 | 1 | N | WAS AN EEO-1 REPORT FILED FOR THIS ESTABLISHMENT LAST YEAR? 1=YES; 2=NO **(REQUIRED)** |
| 11 | QUESTION C.1 | 138 | 1 | N | DOES THE ENTIRE COMPANY HAVE AT LEAST 100 EMPLOYEES IN THE PAYROLL PERIOD FOR WHICH YOU ARE REPORTING? 1=YES; 2=NO **(REQUIRED)** |
| 12 | QUESTION C.2 | 139 | 1 | N | IS YOUR COMPANY AFFILIATED THROUGH COMMON OWNERSHIP AND/OR CENTRALIZED MANAGEMENT WITH OTHER ENTITIES IN AN ENTERPRISE WITH A TOTAL EMPLOYMENT OF 100 OR MORE? 1=YES; 2=NO **(REQUIRED)** |
| 13 | QUESTION C.3 | 140 | 1 | N | DOES THE COMPANY OR ANY OF ITS ESTABLISHMENTS (A) HAVE 50 OR MORE EMPLOYEES AND (B) IS NOT EXEMPT AS PROVIDED BY 41 CFR 60-1.5, AND EITHER (1) IS A PRIME GOVERNMENT CONTRACTOR OR FIRST-TIER SUBCONTACTOR, AND HAS A CONTRACT, SUBCONTRACT, OR PURCHASE ORDER AMOUNTING TO $50,000 OR MORE, OR (2) SERVES AS A DEPOSITORY OF GOVERNMENT FUNDS IN ANY AMOUNT OR IS A FINANCIAL INSTITUTION WHICH IS AN ISSUING AND PAYING AGENT FOR U.S. SAVINGS BONDS AND SAVINGS NOTES? 1=YES; 2=NO **(REQUIRED)** |
| 14 | DUN AND BRADSTREET IDENTIFICATION NUMBER | 141 - 149 | 9 | N | IF THE RESPONSE TO QUESTION C.3 IS YES, PLEASE ENTER YOUR DUN AND BRADSTREET IDENTIFICATION NUMBER (REQUIRED IF AVAILABLE) |
| 15 | COUNTY NAME | 150 - 167 | 18 | A | FIPS PUB 6-4 (CENSUS) **(REQUIRED)** |
| 16 | QUESTION D.1 | 168 - 183 | 16 | N | **YEAR USED FOR COMPENSATION AND HOURS DATA: MMDDYYYYMMDDYYYY. TIME FRAME MUST BE FOR ONE YEAR ENDING IN THE SURVEY YEAR (REQUIRED)** |
| 17 | NAICS CODE | 184 - 189 | 6 | N | USE NAICS CODES FROM www.eeoc.gov/eeo1survey **(REQUIRED)** |
| 18 | TITLE OF CERTIFYING OFFICIAL | 190 - 224 | 35 | A | **(REQUIRED)** |
| 19 | NAME OF CERTIFYING OFFICIAL | 225 - 259 | 35 | A | **(REQUIRED)** |

JA306

| 20 | TELEPHONE NUMBER | 260 - 269 | 10 | N | INCLUDE AREA CODE **(REQUIRED)** |
|----|------------------|-----------|------|------|---------------------------------|
| 21 | EMAIL ADDRESS OF CERTIFYING OFFICIAL | 270 - 309 | 40 | AN | REQUIRED IF AVAILABLE |
| 22 | MATRIX DATA NUMBER OF EMPLOYEES | 310 - 11320 | 11011 | N | 121 LINES - 91 POSITIONS EACH |
|    | JOB CATEGORY 1.1 LINES 1-12 | 310 - 1401 | 1092 | | EXECUTIVE/SENIOR LEVEL OFFICIALS AND MANAGERS (Line No. 1.1, Section D, on EEO-1 Form) |
|    | JOB CATEGORY 1.1 LINE 1 | 310 - 400 | 91 | | $19,239 and under |
|    | COLUMN A | 310 - 315 | 6 | | HISPANIC or LATINO MALES |
|    | COLUMN B | 316 - 321 | 6 | | HISPANIC or LATINO FEMALES |
|    | COLUMN C | 322 - 327 | 6 | | WHITE MALES |
|    | COLUMN D | 328 - 333 | 6 | | BLACK or AFRICAN AMERICAN MALES |
|    | COLUMN E | 334 - 339 | 6 | | NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER MALES |
|    | COLUMN F | 340 - 345 | 6 | | ASIAN MALES |
|    | COLUMN G | 346 - 351 | 6 | | NATIVE AMERICAN or ALASKA NATIVE MALES |
|    | COLUMN H | 352 - 357 | 6 | | TWO or MORE RACES MALES |
|    | COLUMN I | 358 - 363 | 6 | | WHITE FEMALES |
|    | COLUMN J | 364 - 369 | 6 | | BLACK or AFRICAN AMERICAN FEMALES |
|    | COLUMN K | 370 - 375 | 6 | | NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER FEMALES |
|    | COLUMN L | 376 - 381 | 6 | | ASIAN FEMALES |
|    | COLUMN M | 382 - 387 | 6 | | NATIVE AMERICAN or ALASKA NATIVE FEMALES |
|    | COLUMN N | 388 - 393 | 6 | | TWO or MORE RACES FEMALES |
|    | COLUMN O | 394 - 400 | 7 | | TOTAL MALE AND FEMALE |
|    | JOB CATEGORY 1.1 LINE 2 | 401 - 491 | 91 | | $19,240 - $24,439 |
|    | JOB CATEGORY 1.1 LINE 3 | 492 - 582 | 91 | | $24,440 - $30,679 |
|    | JOB CATEGORY 1.1 LINE 4 | 583 - 673 | 91 | | $30,680 - $38,999 |

JA307

| | | | | |
|---|---|---|---|---|
| | JOB CATEGORY 1.1 LINE 5 | 674 - 764 | 91 | $39,000 - $49,919 |
| | JOB CATEGORY 1.1 LINE 6 | 765 - 855 | 91 | $49,920 - $62,919 |
| | JOB CATEGORY 1.1 LINE 7 | 856 - 946 | 91 | $62,920 - $80,079 |
| | JOB CATEGORY 1.1 LINE 8 | 947 - 1037 | 91 | $80,080 - $101,919 |
| | JOB CATEGORY 1.1 LINE 9 | 1038 - 1128 | 91 | $101,920 - $128,959 |
| | JOB CATEGORY 1.1 LINE 10 | 1129 - 1219 | 91 | $128,960 - $163,799 |
| | JOB CATEGORY 1.1 LINE 11 | 1220 - 1310 | 91 | $163,800 - $207,999 |
| | JOB CATEGORY 1.1 LINE 12 | 1311 - 1401 | 91 | $208,000 and over |
| | JOB CATEGORY 1.2 LINES 13-24 | 1402 - 2493 | 1092 | FIRST/MID-LEVEL OFFICIALS AND MANAGERS (Line No. 1.2 , Section D, on EEO-1 Form) |
| | JOB CATEGORY 2 LINES 25-36 | 2494 - 3585 | 1092 | PROFESSIONALS |
| | JOB CATEGORY 3 LINES 37-48 | 3586 - 4677 | 1092 | TECHNICIANS |
| | JOB CATEGORY 4 LINES 49-60 | 4678 - 5769 | 1092 | SALES WORKERS |
| | JOB CATEGORY 5 LINES 61-72 | 5770 - 6861 | 1092 | ADMINISTRATIVE SUPPORT WORKERS |
| | JOB CATEGORY 6 LINES 73-84 | 6862 - 7953 | 1092 | CRAFT WORKERS |
| | JOB CATEGORY 7 LINES 85-96 | 7954 - 9045 | 1092 | OPERATIVES |
| | JOB CATEGORY 8 LINES 97-108 | 9046 - 10137 | 1092 | LABORERS AND HELPERS |
| | JOB CATEGORY 9 LINES 109-120 | 10138 - 11229 | 1092 | SERVICE WORKERS |
| | LINE 121 | 11230 - 11320 | 91 | **TOTAL EMPLOYEES FOR JOB CATEGORIES 1 THRU 10 (1.1 THRU 9 ON EEO-1 FORM)** |
| 23 | MATRIX DATA NUMBER OF HOURS | 11321 - 27925 | 16605 | N | 120 LINES - 137 POSITIONS EACH 121st LINE - 165 POSITIONS |

JA308

| JOB CATEGORY 1.1 LINES 1-12 | 11321 - 12964 | 1644 | EXECUTIVE/SENIOR LEVEL OFFICIALS AND MANAGERS (Line No. 1.1, Section D, on EEO-1 Form) |
|---|---|---|---|
| JOB CATEGORY 1.1 LINE 1 | 11321 - 11457 | 137 | $19,239 and under |
| COLUMN A | 11321 - 11329 | 9 | HISPANIC or LATINO MALES |
| COLUMN B | 11330 - 11338 | 9 | HISPANIC or LATINO FEMALES |
| COLUMN C | 11339 - 11347 | 9 | WHITE MALES |
| COLUMN D | 11348 - 11356 | 9 | BLACK or AFRICAN AMERICAN MALES |
| COLUMN E | 11357 - 11365 | 9 | NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER MALES |
| COLUMN F | 11366 - 11374 | 9 | ASIAN MALES |
| COLUMN G | 11375 - 11383 | 9 | NATIVE AMERICAN or ALASKA NATIVE MALES |
| COLUMN H | 11384 - 11392 | 9 | TWO or MORE RACES MALES |
| COLUMN I | 11393 - 11401 | 9 | WHITE FEMALES |
| COLUMN J | 11402 - 11410 | 9 | BLACK or AFRICAN AMERICAN FEMALES |
| COLUMN K | 11411 - 11419 | 9 | NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER FEMALES |
| COLUMN L | 11420 - 11428 | 9 | ASIAN FEMALES |
| COLUMN M | 11429 - 11437 | 9 | NATIVE AMERICAN or ALASKA NATIVE FEMALES |
| COLUMN N | 11438 - 11446 | 9 | TWO or MORE RACES FEMALES |
| COLUMN O | 11447 - 11457 | 11 | TOTAL MALE AND FEMALE |
| JOB CATEGORY 1.1 LINE 2 | 11458 - 11594 | 137 | $19,240 - $24,439 |
| JOB CATEGORY 1.1 LINE 3 | 11595 - 11731 | 137 | $24,440 - $30,679 |

JA309

| JOB CATEGORY 1.1 LINE 4 | 11732 - 11868 | 137 | $30,680 - $38,999 |
| JOB CATEGORY 1.1 LINE 5 | 11869 - 12005 | 137 | $39,000 - $49,919 |
| JOB CATEGORY 1.1 LINE 6 | 12006 - 12142 | 137 | $49,920 - $62,919 |
| JOB CATEGORY 1.1 LINE 7 | 12143 - 12279 | 137 | $62,920 - $80,079 |
| JOB CATEGORY 1.1 LINE 8 | 12280 - 12416 | 137 | $80,080 - $101,919 |
| JOB CATEGORY 1.1 LINE 9 | 12417 - 12553 | 137 | $101,920 - $128,959 |
| JOB CATEGORY 1.1 LINE 10 | 12554 - 12690 | 137 | $128,960 - $163,799 |
| JOB CATEGORY 1.1 LINE 11 | 12691 - 12827 | 137 | $163,800 - $207,999 |
| JOB CATEGORY 1.1 LINE 12 | 12828 - 12964 | 137 | $208,000 and over |
| JOB CATEGORY 1.2 LINES 13-24 | 12965 - 14608 | 1644 | FIRST/MID-LEVEL OFFICIALS AND MANAGERS (Line No. 1.2 , Section D, on EEO-1 Form) |
| JOB CATEGORY 2 LINES 25-36 | 14609 - 16252 | 1644 | PROFESSIONALS |
| JOB CATEGORY 3 LINES 37-48 | 16253 - 17896 | 1644 | TECHNICIANS |
| JOB CATEGORY 4 LINES 49-60 | 17897 - 19540 | 1644 | SALES WORKERS |
| JOB CATEGORY 5 LINES 61-72 | 19541 - 21184 | 1644 | ADMINISTRATIVE SUPPORT WORKERS |
| JOB CATEGORY 6 LINES 73-84 | 21185 - 22828 | 1644 | CRAFT WORKERS |
| JOB CATEGORY 7 LINES 85-96 | 22829 - 24472 | 1644 | OPERATIVES |
| JOB CATEGORY 8 LINES 97-108 | 24473 - 26116 | 1644 | LABORERS AND HELPERS |
| JOB CATEGORY 9 LINES 109-120 | 26117 - 27760 | 1644 | SERVICE WORKERS |
| LINE 121 | 27761 - 27925 | 165 | **TOTAL HOURS FOR JOB CATEGORIES 1 THRU 10 (1.1 THRU 9 ON EEO-1 FORM)** |

JA310

|  | COLUMN A | 27761 - 27771 | 11 |  | TOTAL HISPANIC or LATINO MALES |
|  | COLUMN B | 27772 - 27782 | 11 |  | TOTAL HISPANIC or LATINO FEMALES |
|  | COLUMN C | 27783 - 27793 | 11 |  | TOTAL WHITE MALES |
|  | COLUMN D | 27794 - 27804 | 11 |  | TOTAL BLACK or AFRICAN AMERICAN MALES |
|  | COLUMN E | 27805 - 27815 | 11 |  | TOTAL NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER MALES |
|  | COLUMN F | 27816 - 27826 | 11 |  | TOTAL ASIAN MALES |
|  | COLUMN G | 27827 - 27837 | 11 |  | TOTAL AMERICAN INDIAN or ALASKAN NATIVE MALES |
|  | COLUMN H | 27838 - 27848 | 11 |  | TOTAL TWO or MORE RACES MALES |
|  | COLUMN I | 27849 - 27859 | 11 |  | TOTAL WHITE FEMALES |
|  | COLUMN J | 27860 - 27870 | 11 |  | TOTAL BLACK or AFRICAN AMERICAN FEMALES |
|  | COLUMN K | 27871 - 27881 | 11 |  | TOTAL NATIVE HAWAIIAN or OTHER PACIFIC ISLANDER FEMALES |
|  | COLUMN L | 27882 - 27892 | 11 |  | TOTAL ASIAN FEMALES |
|  | COLUMN M | 27893 - 27903 | 11 |  | TOTAL AMERICAN INDIAN or ALASKAN NATIVE FEMALES |
|  | COLUMN N | 27904 - 27914 | 11 |  | TOTAL TWO or MORE RACES FEMALES |
|  | COLUMN O | 27915 - 27925 | 11 |  | TOTAL MALE AND FEMALE |
| 24 | EIN | 27926 - 27934 | 9 | N | YOUR FEDERAL EIN (TAX ID) 9 DIGITS |

**CONNECT WITH US** 

**SECTION A - TYPE OF REPORT**

1. Indicate by marking in the appropriate box the type of reporting unit for which this copy of the form is submitted (MARK ONLY ONE BOX).

☐ Single-establishment Employer Report

Multi-establishment Employer:

☐ Consolidated  Report (Required)

☐ Headquarters Unit Report (Required)

☐ Individual Establishment Report (submit one for each establishment with 50 or more employees)

☐ Special Report

2. Total number of reports being filed by this Company (Answer on Consolidated Report only):

[                                                                                    ]

**SECTION B - COMPANY IDENTIFICATION**

1. Name of parent company that owns or controls establishment in item 2  (omit if same as above).

a. Parent Company:

[                                                                                    ]

Address (Number and Street):

[                                                                                    ]

City or Town:                          State:                          ZIP code:

[                    ]        [                    ]        [                    ]

2. Establishment for which this report is filed (omit if same as above)

a. Name of Establishment:

[                                                                                    ]

Address (Number and Street):

[                                                                                    ]

City or Town:          County:          State:          ZIP code:

[          ]    [          ]    [          ]    [          ]

SAMPLE

b. Employer identification No. (IRS 9-DIGIT TAX NUMBER):

[                                                                                    ]

c. Was an EEO-1 report filed for this establishment last year?
☐ Yes   ☐ No

**SECTION C - EMPLOYERS WHO ARE REQUIRED TO FILE**

1. Does the entire company have at least 100 employees in the payroll period for which you are reporting?
☐ Yes   ☐ No

2. Is your company affiliated through common ownership and/or centralized management with other entities in an enterprise with a total employment of 100 or more?
☐ Yes   ☐ No

3. Does the company or any of its establishments (a) have 50 or more employees AND (b) is not exempt as provided by 41 CFR 60-1.5, AND either (1) is a prime government contractor or first-tier subcontactor, and has a contract, subcontract, or purchase order amounting to $50,000 or more, or (2) serves as a depository of Government funds in any amount or is a financial institution which is an issuing and paying agent for U.S. Savings Bonds and Savings Notes?
☐ Yes   ☐ No

4. If the response to the above question (C - 3) is Yes, please enter your Dun and Bradstreet identification number (if you have one):

[                                                                                    ]

JA312

*NOTE: If an answer to questions 1, 2 or 3 of Section C is "Yes", complete the entire form, otherwise skip to Section G.*

This is the proposed EEO-1 Form to collect pay data.

**SECTION D - EMPLOYMENT DATA**

Employment at this establishment - Report all permanent full- and part-time employees including apprentices and on-the-job trainees unless specifically excluded as set forth in the instructions. Enter the appropriate figures on all lines and in all columns. Blank spaces will be considered as zeros.

| Job Categories | Annual Salary in Thousands | Hispanic or Latino Male | Hispanic or Latino Female | Non-Hispanic or Latino Male White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | Non-Hispanic or Latino Female White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | Total Col A-N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
| Executive/Senior Level Officials and Managers 1.1 | 1. $19,239 and under | | | | | | | | | | | | | | | |
| | 2. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 3. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 4. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 5. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 6. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 7. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 8. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 9. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 10. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 11. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 12. $208,000 and over | | | | | | | | | | | | | | | |
| First/ Mid-Level Officials and Managers 1.2 | 13. $19,239 and under | | | | | | | | | | | | | | | |
| | 14. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 15. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 16. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 17. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 18. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 19. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 20. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 21. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 22. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 23. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 24. $208,000 and over | | | | | | | | | | | | | | | |
| Professionals 2 | 25. $19,239 and under | | | | | | | | | | | | | | | |
| | 26. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 27. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 28. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 29. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 30. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 31. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 32. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 33. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 34. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 35. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 36. $208,000 and over | | | | | | | | | | | | | | | |

SAMPLE

SAMPLE

| Category | Salary Range |
|---|---|
| Technicians 3 | 37. $19,239 and under |
| | 38. $19,240 - $24,439 |
| | 39. $24,440 - $30,679 |
| | 40. $30,680 - $38,999 |
| | 41. $39,000 - $49,919 |
| | 42. $49,920 - $62,919 |
| | 43. $62,920 - $80,079 |
| | 44. $80,080 - $101,919 |
| | 45. $101,920 - $128,959 |
| | 46. $128,960 - $163,799 |
| | 47. $163,800 - $207,999 |
| | 48. $208,000 and over |
| Sales Workers 4 | 49. $19,239 and under |
| | 50. $19,240 - $24,439 |
| | 51. $24,440 - $30,679 |
| | 52. $30,680 - $38,999 |
| | 53. $39,000 - $49,919 |
| | 54. $49,920 - $62,919 |
| | 55. $62,920 - $80,079 |
| | 56. $80,080 - $101,919 |
| | 57. $101,920 - $128,959 |
| | 58. $128,960 - $163,799 |
| | 59. $163,800 - $207,999 |
| | 60. $208,000 and over |
| Adminstrative Support Workers 5 | 61. $19,239 and under |
| | 62. $19,240 - $24,439 |
| | 63. $24,440 - $30,679 |
| | 64. $30,680 - $38,999 |
| | 65. $39,000 - $49,919 |
| | 66. $49,920 - $62,919 |
| | 67. $62,920 - $80,079 |
| | 68. $80,080 - $101,919 |
| | 69. $101,920 - $128,959 |
| | 70. $128,960 - $163,799 |
| | 71. $163,800 - $207,999 |
| | 72. $208,000 and over |
| Craft Workers 6 | 73. $19,239 and under |
| | 74. $19,240 - $24,439 |
| | 75. $24,440 - $30,679 |
| | 76. $30,680 - $38,999 |
| | 77. $39,000 - $49,919 |
| | 78. $49,920 - $62,919 |
| | 79. $62,920 - $80,079 |
| | 80. $80,080 - $101,919 |
| | 81. $101,920 - $128,959 |
| | 82. $128,960 - $163,799 |
| | 83. $163,800 - $207,999 |
| | 84. $208,000 and over |

| Category | Income Bracket | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operatives 7 | 85. $19,239 and under | | | | | | | | | | | | |
| | 86. $19,240 - $24,439 | | | | | | | | | | | | |
| | 87. $24,440 - $30,679 | | | | | | | | | | | | |
| | 88. $30,680 - $38,999 | | | | | | | | | | | | |
| | 89. $39,000 - $49,919 | | | | | | | | | | | | |
| | 90. $49,920 - $62,919 | | | | | | | | | | | | |
| | 91. $62,920 - $80,079 | | | | | | | | | | | | |
| | 92. $80,080 - $101,919 | | | | | | | | | | | | |
| | 93. $101,920 - $128,959 | | | | | | | | | | | | |
| | 94. $128,960 - $163,799 | | | | | | | | | | | | |
| | 95. $163,800 - $207,999 | | | | | | | | | | | | |
| | 96. $208,000 and over | | | | | | | | | | | | |
| Laborers and Helpers 8 | 97. $19,239 and under | | | | | | | | | | | | |
| | 98. $19,240 - $24,439 | | | | | | | | | | | | |
| | 99. $24,440 - $30,679 | | | | | | | | | | | | |
| | 100. $30,680 - $38,999 | | | | | | | | | | | | |
| | 101. $39,000 - $49,919 | | | | | | | | | | | | |
| | 102. $49,920 - $62,919 | | | | | | | | | | | | |
| | 103. $62,920 - $80,079 | | | | | | | | | | | | |
| | 104. $80,080 - $101,919 | | | | | | | | | | | | |
| | 105. $101,920 - $128,959 | | | | | | | | | | | | |
| | 106. $128,960 - $163,799 | | | | | | | | | | | | |
| | 107. $163,800 - $207,999 | | | | | | | | | | | | |
| | 108. $208,000 and over | | | | | | | | | | | | |
| Service Workers 9 | 109. $19,239 and under | | | | | | | | | | | | |
| | 110. $19,240 - $24,439 | | | | | | | | | | | | |
| | 111. $24,440 - $30,679 | | | | | | | | | | | | |
| | 112. $30,680 - $38,999 | | | | | | | | | | | | |
| | 113. $39,000 - $49,919 | | | | | | | | | | | | |
| | 114. $49,920 - $62,919 | | | | | | | | | | | | |
| | 115. $62,920 - $80,079 | | | | | | | | | | | | |
| | 116. $80,080 - $101,919 | | | | | | | | | | | | |
| | 117. $101,920 - $128,959 | | | | | | | | | | | | |
| | 118. $128,960 - $163,799 | | | | | | | | | | | | |
| | 119. $163,800 - $207,999 | | | | | | | | | | | | |
| | 120. $208,000 and over | | | | | | | | | | | | |
| Total 121. | | | | | | | | | | | | | |
| Previous Year Total 122. | | | | | | | | | | | | | |

SAMPLE

JA315

**SECTION D - EMPLOYMENT DATA**

Employment at this establishment - Report all permanent full- and part-time employees including apprentices and on-the-job trainees unless specifically excluded as set forth in the instructions. Enter the appropriate figures on all lines and in all columns. Blank spaces will be considered as zeros.

| Job Categories | Annual Salary in Thousands | For each cell provide the TOTAL Number of Hours worked in last year | | | | | | | | | | | | | | Total Col A-N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Race/Ethnicity | | | | | | | | | | | | | | |
| | | Hispanic or Latino | | Non/Hispanic or Latino | | | | | | | | | | | | |
| | | | | Male | | | | | | | Female | | | | | |
| | | Male | Female | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | White | Black or African American | Native Hawaiian or Pacific Islander | Asian | Native American or Alaska Native | Two or More races | |
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
| Executive/Senior Level Officials and Managers 1.1 | 1. $19,239 and under | | | | | | | | | | | | | | | |
| | 2. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 3. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 4. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 5. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 6. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 7. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 8. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 9. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 10. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 11. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 12. $208,000 and over | | | | | | | | | | | | | | | |
| First/ Mid-Level Officials and Managers 1.2 | 13. $19,239 and under | | | | | | | | | | | | | | | |
| | 14. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 15. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 16. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 17. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 18. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 19. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 20. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 21. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 22. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 23. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 24. $208,000 and over | | | | | | | | | | | | | | | |
| Professionals 2 | 25. $19,239 and under | | | | | | | | | | | | | | | |
| | 26. $19,240 - $24,439 | | | | | | | | | | | | | | | |
| | 27. $24,440 - $30,679 | | | | | | | | | | | | | | | |
| | 28. $30,680 - $38,999 | | | | | | | | | | | | | | | |
| | 29. $39,000 - $49,919 | | | | | | | | | | | | | | | |
| | 30. $49,920 - $62,919 | | | | | | | | | | | | | | | |
| | 31. $62,920 - $80,079 | | | | | | | | | | | | | | | |
| | 32. $80,080 - $101,919 | | | | | | | | | | | | | | | |
| | 33. $101,920 - $128,959 | | | | | | | | | | | | | | | |
| | 34. $128,960 - $163,799 | | | | | | | | | | | | | | | |
| | 35. $163,800 - $207,999 | | | | | | | | | | | | | | | |
| | 36. $208,000 and over | | | | | | | | | | | | | | | |

SAMPLE

JA316

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Technicians 3 | 37. $19,239 and under | | | | | | | | | | | | | | |
| | 38. $19,240 - $24,439 | | | | | | | | | | | | | | |
| | 39. $24,440 - $30,679 | | | | | | | | | | | | | | |
| | 40. $30,680 - $38,999 | | | | | | | | | | | | | | |
| | 41. $39,000 - $49,919 | | | | | | | | | | | | | | |
| | 42. $49,920 - $62,919 | | | | | | | | | | | | | | |
| | 43. $62,920 - $80,079 | | | | | | | | | | | | | | |
| | 44. $80,080 - $101,919 | | | | | | | | | | | | | | |
| | 45. $101,920 - $128,959 | | | | | | | | | | | | | | |
| | 46. $128,960 - $163,799 | | | | | | | | | | | | | | |
| | 47. $163,800 - $207,999 | | | | | | | | | | | | | | |
| | 48. $208,000 and over | | | | | | | | | | | | | | |
| Sales Workers 4 | 49. $19,239 and under | | | | | | | | | | | | | | |
| | 50. $19,240 - $24,439 | | | | | | | | | | | | | | |
| | 51. $24,440 - $30,679 | | | | | | | | | | | | | | |
| | 52. $30,680 - $38,999 | | | | | | | | | | | | | | |
| | 53. $39,000 - $49,919 | | | | | | | | | | | | | | |
| | 54. $49,920 - $62,919 | | | | | | | | | | | | | | |
| | 55. $62,920 - $80,079 | | | | | | | | | | | | | | |
| | 56. $80,080 - $101,919 | | | | | | | | | | | | | | |
| | 57. $101,920 - $128,959 | | | | | | | | | | | | | | |
| | 58. $128,960 - $163,799 | | | | | | | | | | | | | | |
| | 59. $163,800 - $207,999 | | | | | | | | | | | | | | |
| | 60. $208,000 and over | | | | | | | | | | | | | | |
| Adminstrative Support Workers 5 | 61. $19,239 and under | | | | | | | | | | | | | | |
| | 62. $19,240 - $24,439 | | | | | | | | | | | | | | |
| | 63. $24,440 - $30,679 | | | | | | | | | | | | | | |
| | 64. $30,680 - $38,999 | | | | | | | | | | | | | | |
| | 65. $39,000 - $49,919 | | | | | | | | | | | | | | |
| | 66. $49,920 - $62,919 | | | | | | | | | | | | | | |
| | 67. $62,920 - $80,079 | | | | | | | | | | | | | | |
| | 68. $80,080 - $101,919 | | | | | | | | | | | | | | |
| | 69. $101,920 - $128,959 | | | | | | | | | | | | | | |
| | 70. $128,960 - $163,799 | | | | | | | | | | | | | | |
| | 71. $163,800 - $207,999 | | | | | | | | | | | | | | |
| | 72. $208,000 and over | | | | | | | | | | | | | | |
| Craft Workers 6 | 73. $19,239 and under | | | | | | | | | | | | | | |
| | 74. $19,240 - $24,439 | | | | | | | | | | | | | | |
| | 75. $24,440 - $30,679 | | | | | | | | | | | | | | |
| | 76. $30,680 - $38,999 | | | | | | | | | | | | | | |
| | 77. $39,000 - $49,919 | | | | | | | | | | | | | | |
| | 78. $49,920 - $62,919 | | | | | | | | | | | | | | |
| | 79. $62,920 - $80,079 | | | | | | | | | | | | | | |
| | 80. $80,080 - $101,919 | | | | | | | | | | | | | | |
| | 81. $101,920 - $128,959 | | | | | | | | | | | | | | |
| | 82. $128,960 - $163,799 | | | | | | | | | | | | | | |
| | 83. $163,800 - $207,999 | | | | | | | | | | | | | | |
| | 84. $208,000 and over | | | | | | | | | | | | | | |

SAMPLE

JA317

| Category | Income Bracket | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operatives 7 | 85. $19,239 and under | | | | | | | | | | | | | | |
| | 86. $19,240 - $24,439 | | | | | | | | | | | | | | |
| | 87. $24,440 - $30,679 | | | | | | | | | | | | | | |
| | 88. $30,680 - $38,999 | | | | | | | | | | | | | | |
| | 89. $39,000 - $49,919 | | | | | | | | | | | | | | |
| | 90. $49,920 - $62,919 | | | | | | | | | | | | | | |
| | 91. $62,920 - $80,079 | | | | | | | | | | | | | | |
| | 92. $80,080 - $101,919 | | | | | | | | | | | | | | |
| | 93. $101,920 - $128,959 | | | | | | | | | | | | | | |
| | 94. $128,960 - $163,799 | | | | | | | | | | | | | | |
| | 95. $163,800 - $207,999 | | | | | | | | | | | | | | |
| | 96. $208,000 and over | | | | | | | | | | | | | | |
| Laborers and Helpers 8 | 97. $19,239 and under | | | | | | | | | | | | | | |
| | 98. $19,240 - $24,439 | | | | | | | | | | | | | | |
| | 99. $24,440 - $30,679 | | | | | | | | | | | | | | |
| | 100. $30,680 - $38,999 | | | | | | | | | | | | | | |
| | 101. $39,000 - $49,919 | | | | | | | | | | | | | | |
| | 102. $49,920 - $62,919 | | | | | | | | | | | | | | |
| | 103. $62,920 - $80,079 | | | | | | | | | | | | | | |
| | 104. $80,080 - $101,919 | | | | | | | | | | | | | | |
| | 105. $101,920 - $128,959 | | | | | | | | | | | | | | |
| | 106. $128,960 - $163,799 | | | | | | | | | | | | | | |
| | 107. $163,800 - $207,999 | | | | | | | | | | | | | | |
| | 108. $208,000 and over | | | | | | | | | | | | | | |
| Service Workers 9 | 109. $19,239 and under | | | | | | | | | | | | | | |
| | 110. $19,240 - $24,439 | | | | | | | | | | | | | | |
| | 111. $24,440 - $30,679 | | | | | | | | | | | | | | |
| | 112. $30,680 - $38,999 | | | | | | | | | | | | | | |
| | 113. $39,000 - $49,919 | | | | | | | | | | | | | | |
| | 114. $49,920 - $62,919 | | | | | | | | | | | | | | |
| | 115. $62,920 - $80,079 | | | | | | | | | | | | | | |
| | 116. $80,080 - $101,919 | | | | | | | | | | | | | | |
| | 117. $101,920 - $128,959 | | | | | | | | | | | | | | |
| | 118. $128,960 - $163,799 | | | | | | | | | | | | | | |
| | 119. $163,800 - $207,999 | | | | | | | | | | | | | | |
| | 120. $208,000 and over | | | | | | | | | | | | | | |
| Total 121. | | | | | | | | | | | | | | | |
| Previous Year Total 122. | | | | | | | | | | | | | | | |

SAMPLE

Date(s) of payroll period used: (Omit on the Consolidated Report)

---

### SECTION E - ESTABLISHMENT INFORMATION
*(Omit on the Consolidated Report)*

What is the major activity of this establishment? (Be specific, i.e., manufacturing steel castings, retail grocer, wholesale plumbing supplies, title insurance, etc. Include the specific type of product or type of service provided, as well as the principal business or industrial activity.)

---

### SECTION F - REMARKS

Use this item to give any identification data appearing on the last EE0-1 report which differs from that given above, explain major changes in composition of reporting units and other pertinent information.

---

### SECTION G - CERTIFICATION

Check One:

☐ 1. All reports are accurate and were prepared in accordance with the instructions. (Check on Consolidated Report Only.)

☐ 2. This report is accurate and was prepared in accordance with the instructions.

SAMPLE

| Name of Certifying Official | Title | Signature | Date |
|---|---|---|---|
| | | | |

| Name of Person to contact regarding this report | Title | Address (Number and Street) |
|---|---|---|
| | | |

| City and State | Zip Code | Email Address | Telephone No. (including Area code and Extension) |
|---|---|---|---|
| | | | |

**All reports and information obtained from individual reports will be kept confidential as required by Section 709(e) of Title VII.**
**WILLFULLY FALSE STATEMENTS ON THIS REPORT ARE PUNISHABLE BY LAW, U.S. CODE, TITLE 18, SECTION 1001**

JA319

# U.S. Equal Employment Opportunity Commission

Enter search terms...  [Search]

CONNECT WITH US 

| Home | About EEOC | Employees & Applicants | Employers / Small Business | Federal Agencies |

Contact Us

Home > Employers > EEO-1 Survey

## Questions and Answers: The Revised EEO-1 and Summary Pay Data

### Background

The U.S. Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Labor, Office of Federal Contract Compliance Programs (OFCCP) enforce federal prohibitions against employment discrimination based on race, sex, and national origin, among other bases. The EEOC enforces Title VII of the Civil Rights Act (Title VII). OFCCP enforces Executive Order 11246.

For many years, the EEOC and OFCCP have collected data from certain private employers and federal contractors and subcontractors about their employees on the "Employer Information Report" or the EEO-1. The EEO-1 collects data about the number of employees by job category and by sex and race or ethnicity. To promote efficiency, the EEOC and OFCCP coordinate their collection of this data through a "Joint Reporting Committee." The EEOC is responsible for approval of the EEO-1 every three years under the Paperwork Reduction Act.

On September 29, 2016 the EEOC announced approval of a revised EEO-1, starting with the 2017 report, to collect summary pay data from employers, including federal contractors and subcontractors, with 100 or more employees. Summary pay data for private employers subject to Title VII jurisdiction will go to the EEOC. Summary pay data only for federal contractors and subcontractors subject to Executive Order 11246 will go to OFCCP.

The EEOC and the Joint Reporting Committee are committed to working with employers to ensure a successful transition to the new report. To give employers more time to transition, and allow for alignment with the W-2 reporting cycle, the EEO-1 deadline for the 2017 report will be March 31, 2018. Employers will have a total of 18 months-from September 30, 2016 (2016 report deadline) to March 31, 2018 (2017 report deadline) to make the change. The EEOC's complete explanation of this information collection, as submitted to the Office of Management and Budget, is available at https://federalregister.gov/a/2016-16692.

### The Purpose of this Information Collection

Although there has been progress in combatting pay discrimination in the last 50 years, recent studies show that discrimination plays a role in explaining the pay gaps nationwide for women and, especially, for African American and Hispanic or Latina women. Such wage disparities also persist for men of color.

For example, studies find that, after controlling for factors such as education and work experience, pay declines when women enter an occupation dominated by men but that pay increases when men enter a field dominated by women.[1] Studies also demonstrate racial bias in salary negotiations even after controlling for the applicants' objective qualifications for the position.[2]

Too often, pay discrimination goes undetected because of a lack of information about what employees are paid. The EEOC and OFCCP are charged with the responsibility of enforcing federal prohibitions on pay discrimination including Title VII, the Equal Pay Act, and Executive Order 11246, but, until now, they lacked the employer-and establishment-specific data needed to assess allegations of pay discrimination. The revised EEO-1 report will help to fill this gap. In developing this proposal, the EEOC carefully considered what kind of data would be most important and considered its benefit relative to the potential burden on employers.

JA320

## Description of the Revisions to the EEO-1

### Which employers will file the revised EEO-1 report?

Starting with the 2017 report, which will be due on March 31, 2018, private employers including federal contractors and subcontractors with 100 or more employees will submit summary pay data.

Federal contractors and subcontractors with 50-99 employees will not submit summary pay data but will continue to report demographic data (sex and race or ethnicity) on the EEO-1 as they did before.

Federal contractors and subcontractors with 49 or fewer employees, and companies without federal contracts with 99 or fewer employees, will not be required to complete the EEO-1 report.

### When will employers count their employees for purposes of the revised EEO-1 report?

Employers will count their employees during the "workforce snapshot period." For reporting years 2016 and before, the "workforce snapshot period" was July 1 to September 30. Starting with the EEO-1 report of 2017 data, however, the "workforce snapshot period" will be October 1 to December 31, 2017. Each employer may choose any pay period during this three-month "workforce snapshot period" to count its full and part-time employees for the EEO-1 report.

### What is new on the revised EEO-1 report?

The revised EEO-1 report has two new elements:

- Summary pay data: Employers report the *total number* of full and part-time employees they had during that year in each of 12 pay bands listed for each EEO-1 job category; employers do not report individual pay or salaries.

- Aggregate hours worked data: Employers tally and report the number of hours worked that year by all the employees accounted for in each pay band.

### What are the EEO-1 job categories?

The 10 EEO-1 job categories have not changed with this revision. They are:

     (1) Executive/Senior Level Officials and Managers;
     (2) First/Mid Level Officials and Managers;
     (3) Professionals;
     (4) Technicians;
     (5) Sales Workers;
     (6) Administrative Support Workers;
     (7) Craft Workers;
     (8) Operatives;
     (9) Laborers and Helpers; and
     (10) Service Workers.

To continue to assist employers categorizing specific jobs, the EEOC provides a guide classifying hundreds of jobs into the 10 EEO-1 job categories: https://www.eeoc.gov/employers/eeo1survey/jobclassguide.cfm.

Based on their experience completing, filing, and reviewing EEO-1reports for many years, EEO-1 filers as well as government agencies understand which jobs are included in which job categories for particular industries and regions.

### What are the EEO-1 pay bands?

The EEO-1 pay bands track the 12 pay bands used by the Bureau of Labor Statistics for the Occupation Employment Statistics survey:

     (1) $19,239 and under;
     (2) $19,240 - $24,439;
     (3) $24,440 - $30,679;
     (4) $30,680 - $38,999;
     (5) $39,000 - $49,919;

JA321

    (6) $49,920 - $62,919;

    (7) $62,920 - $80,079;

    (8) $80,080 - $101,919;

    (9) $101,920 - $128,959;

    (10) $128,960 - $163,799;

    (11) $163,800 - $207,999; and

    (12) $208,000 and over.

Employers will count the number of employees they have in each pay band for each job category. If no employees are in a job category or pay band, employers will leave the cell blank.

### What is the measure of income to reference in order to select the appropriate pay band?

To identify the pay band on the revised EEO-1 in which to count an employee, employers will rely on the pay reported for income tax purposes that year in Box 1 of the W-2 form.

Note that wages earned after the conclusion of the last full pay period in December are often paid to employees in the next calendar year. For EEO-1 purposes, these wages will be reported for the same year in which they are reported for W-2 purposes.

### How will data about employees' sex and race or ethnicity be reported on the revised EEO-1?

After tallying the total number of employees in each pay band by job category, employers will enter this data in the appropriate columns of the EEO-1 report based on the sex and ethnicity or race of the employees. For example, a financial services firm may report that it has 10 Professionals in pay band 6, which is $49,920 - $62,919, who are men and black; and that it also has 35 Professionals in pay band 6 who are men and white.

### Why are hours worked being collected? What is the measure of hours worked for the revised EEO-1?

Hours worked data is being collected so that the EEOC and the OFCCP can account for part-time and partial year employment when they analyze EEO-1 pay data.

For the EEO-1, hours worked will be counted by consulting employer records already required under the Fair Labor Standards Act (FLSA):

- For *non-exempt* employees, for whom the FLSA already requires employers to keep records of hours worked, employers will consult these records to identify the number of hours worked.

- For employees who are *exempt* from the FLSA, employers have a choice. They may either:
  - Report 20 hours per week for each part-time employee and 40 hours per week for each full-time employee; or
  - Report actual number of hours worked by exempt employees, full- or part-time, if they prefer to do so.

### How will hours worked be counted on the revised EEO-1 report?

Hours worked data will be reported on the EEO-1 by tallying the total number of hours worked by all the employees counted in each pay band, for the W-2 reporting year.

## The Process of Filing the Revised EEO-1 Report

### With whom will employers file the revised EEO-1 report and data?

Employers will continue to file the EEO-1 report with the Joint Reporting Committee of the EEOC and the OFCCP.

### How will the new EEO-1 report be filed?

Consistent with current reporting practices, employers will submit EEO-1 reports securely via the EEO-1 Online Filing System on the EEOC's website or utilize this portal to electronically transmit a data file containing the EEO-1 data.

### What are the file specifications for data uploads of revised EEO-1 data?

The Joint Reporting Committee announced the file specifications for the revised EEO-1 collection on September 29, 2016. To see these file specifications, please visit: https://www.eeoc.gov/employers/eeo1survey/2017survey.cfm.

JA322

How will the Joint Reporting Committee and the EEOC assist employers in their transition to the revised EEO-1 report?

The Joint Reporting Committee and EEOC staff are available to answer questions from all EEO-1 stakeholders, including employers, payroll, HRIS experts, and software professionals. Individuals may submit questions or request assistance by contacting the EEO-1 Coordinator at: EEOC Survey Division -- Room 4SW22G, 131 M Street, N.E. Washington, D.C. 20507, or by email at: Suggestion Box on EEO-1 Additional Documentation or eeo1.suggestionbox@eeoc.gov.

The EEOC is committed to helping all EEO-1 filers successfully file their reports. The EEOC has provided resources to address questions on our website, and it will provide ongoing technical assistance to aid employers in their compliance efforts, including free webinars offered on October 20th and 26th.

## Confidentiality, Privacy, and Data Security

### What protections are in place to protect the confidentiality of the summary pay data?

Title VII forbids all EEOC officers and employees from making public any information, including EEO-1 data, before a Title VII proceeding is begun involving the information. Any violations of this prohibition by EEOC officers or staff are subject to criminal penalties including imprisonment. The EEOC imposes these conditions on all of its contractors, as well as on other federal agencies that request the data for legitimate law enforcement purposes.

The EEOC will provide OFCCP with summary pay data (including hours worked) only for federal contractors and subcontractors subject to Executive Order 11246. The OFCCP will hold EEO-1 data for federal contractors and subcontractors confidential to the maximum extent possible under the Freedom of Information Act (FOIA) and the Trade Secrets Act. OFCCP will notify contractors of any FOIA request for their EEO-1 pay and hours worked data. If a contractor objects to disclosure, OFCCP will not disclose the data if OFCCP determines that the contractor's objection is valid. FOIA Exemptions 3 and 4 recognize the value of this data and provide, in combination with the Trade Secrets Act, the necessary tools to appropriately protect it from public disclosure.

### How does the EEOC safeguard EEO-1 data in its possession?

The EEOC maintains robust security protections for EEO-1 data and consistently reviews and updates its security protocols. The EEOC's cybersecurity and privacy programs comply with the Federal Information Security Modernization Act and are based on NIST Special Publication 800-53, Security and Privacy Controls for Federal Information Systems and Organizations. The implemented security and privacy controls protect organizational operations and information system assets against a diverse set of threats, including malicious attacks, natural disasters, structural failures, and human error.

The hosting service for the EEO-1 data collection system provides a defense-in-depth security program with many layers of security utilizing different physical and software components in order to provide a high level of protection. Security monitoring-both inside and outside the network-ensures the detection and rejection of unauthorized use. These security controls and measures are monitored continuously with automated vulnerability and compliance software suites.

The EEOC has a current privacy impact assessment for the EEO-1, which is published on the EEOC website for employers that file the EEO-1 report, at: https://www.eeoc.gov/employers/eeo1survey/privacyimpact.cfm

The EEOC's information technology system will be fully compliant with recently revised Circular A-130 well before the first deadline for the new EEO-1 in March 2018. The privacy impact assessment for the EEO-1 will be updated to address these revisions.

### How does the EEOC protect privacy and confidentiality of EEO-1 data when it issues national, state, or industry-level reports based on the data?

The EEOC only publishes large-scale aggregated EEO-1 data in a way that fully protects employer confidentiality and employee privacy. At a minimum, the EEOC does not publish data if it does not include at least three firms, or if one firm represents more than 80 percent of the data. The EEOC will ensure that any published aggregate data based on the revised EEO-1 will continue to protect the privacy and confidentiality of individual employers and employees.

For purposes of self-assessment, employers can use published aggregated data to compare or benchmark their own data with data from other employers in their industry or geographical area.

JA323

[1] Asaf Levanon, Paula England, Paul Allison, Occupational Feminization and Pay: Assessing Casual Dynamics Using 1950-2000 U.S. Census Data, Social Forces 88(2) (Dec. 2009), http://statisticalhorizons.com/wp-content/uploads/2012/01/88.2.levanon.pdf.

[2] Moreal Hernandez and Derek R. Avery, Getting the Short End of the Stick: Racial Bias in Salary Negotiations, MIT Sloan Management Review (June 15, 2016), http://sloanreview.mit.edu/article/getting-the-short-end-of-the-stick-racial-bias-in-salary-negotiations.

**CONNECT WITH US** 

Privacy Policy | Disclaimer | USA.Gov

Español | Other Languages



**U.S. Equal Employment Opportunity Commission**

Enter search terms...   Search

CONNECT WITH US    

| Home | About EEOC | Employees & Applicants | Employers / Small Business | Federal Agencies |
| --- | --- | --- | --- | --- |
| Contact Us | | | | |

Home > Employers > EEO-1 Survey

  

# Small Business Fact Sheet:
# The Revised EEO-1 and Summary Pay Data

## Background

- The U.S. Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Labor, Office of Federal Contract Compliance Programs (OFCCP) enforce federal prohibitions on employment discrimination based on race, sex, and national origin, among other bases. The EEOC enforces Title VII of the Civil Rights Act and the Equal Pay Act. The OFCCP enforces Executive Order 11246.

- For many years, certain employers have reported data about their number of employees by EEO-1 job category, and then by sex and ethnicity or race, on the "Employer Information Report" or EEO-1. The EEOC and the OFCCP consolidate collection of EEO-1 data with a "Joint Reporting Committee."

- Beginning with the 2017 EEO-1, private employers and federal contractors with 100 or more employees also will report summary pay data on the EEO-1. Summary pay data for private employers will go to the EEOC. Summary pay data for federal contractors and subcontractors subject to Executive Order 11246 will go to OFCCP.

## When Is the First Deadline for Submitting the New EEO-1 Report?

- The EEO-1 report will be due for the first time with pay data on March 31, 2018, and the EEO-1 will be due every March 31 after that.

- Employers will have 18 months between the 2016 and 2017 EEO-1 deadlines-from September 30, 2016, until March 31, 2018-to prepare for this change.

- The 2016 EEO-1 deadline is still September 30, 2016.

## Preparing for the New EEO-1 Report

- The EEOC is committed to working with businesses to ensure a successful transition to the new EEO-1 report.

- To initiate the transition, the EEOC published the technical file specifications for the revised EEO-1 data on the same day as it announced the new report. See https://www.eeoc.gov/employers/eeo1survey/2017survey.cfm.

- The EEOC is offering free webinars and additional outreach and technical assistance to assist employers.

- Free webinars will be held on October 20, 2016 and October 26, 2016. Check www.eeoc.gov for details.

- The EEOC will send a notice to each EEO-1 employer describing the new EEO-1 filing requirements and deadlines.

- If your business needs assistance filing the EEO-1 now or in the future, please contact the Joint Reporting Committee by telephone at 1-877-392-4647 (toll-free) or by email at e1.techassistance@eeoc.gov. Or, you may write to the EEO-1

JA325

Coordinator at: Joint Reporting Committee, EEOC Survey Division -- Room 4SW22G, 131 M Street, NE Washington, D.C. 20507.

## Which Employers Will Report Summary Pay Data?

- Private employers with 100 or more employees will report summary pay data.

- Federal contractors and subcontractors with 50 - 99 employees will not report summary pay data, but they will tally employees by job category and then by sex and ethnicity or race, as they did before. Federal contractors and subcontractors with fewer than 50 employees will not file EEO-1 reports at all.

- Employers with 1 - 99 employees that are not federal contractors or subcontractors will not file EEO-1 reports. This is a continuation of current practice.

## What Will Federal Contractors and Subcontractors with 50-99 Employees Report on the New EEO-1?

- These contractors and subcontractors will continue to report the same information as on the most recent EEO-1. They will tally and report the number of employees by EEO-1 job category and then by sex and ethnicity or race. They will not report summary pay data.

- The 10 EEO-1 job categories will be the same as on the most recent EEO-1. They are:

  (1) Executive/Senior Level Officials and Managers;
  (2) First/Mid Level Officials and Managers;
  (3) Professionals;
  (4) Technicians;
  (5) Sales Workers;
  (6) Administrative Support Workers;
  (7) Craft Workers;
  (8) Operatives;
  (9) Laborers and Helpers; and
  (10) Service Workers.

- To continue to assist employers in categorizing specific jobs, the "EEO-1 Job Classification Guide 2010," assigns hundreds of specific occupations to EEO-1 job categories.

- The sex and ethnicity or race categories are the same as in the most recent EEO-1. For an explanation, see the EEO-1 Instruction Booklet at https://www.eeoc.gov/employers/eeo1survey/2017survey.cfm.

- Employers will count their employees for the EEO-1 during the "workforce snapshot period."
  - Starting with the 2017 EEO-1, the "workforce snapshot period" for the EEO-1 will be a pay period of the employer's choice between October 1 and December 31.

## What will Private Employers and Contractors/Subcontractors with 100 or more Employees Report on the New EEO-1?

- These larger employers will start by counting and categorizing employees by EEO-1 job category and then by sex and ethnicity or race, as on the most recent EEO-1. They will count employees during the "workforce snapshot period" between October 1 and December 31.

- Then, they will count employees in one of the 12 pay bands on the new EEO-1. The pay bands are:

  (1) $19,239 and under;
  (2) $19,240 - $24,439;
  (3) $24,440 - $30,679;
  (4) $30,680 - $38,999;

JA326

(5) $39,000 - $49,919;

(6) $49,920 - $62,919;

(7) $62,920 - $80,079;

(8) $80,080 - $101,919;

(9) $101,920 - $128,959;

(10) $128,960 - $163,799;

(11) $163,800 - $207,999; and

(12) $208,000 and over.

- To choose a pay band, refer to the earnings reported in the W-2 Box 1.
  - For example, for the 2017 EEO-1, employers will refer to employees' W-2, Box 1, income for the year January 1 through December 31, 2017.

- Employers will tally the number of employees in each pay band by sex and ethnicity or race. For example, an employer might report 23 Sales Workers who are non-Hispanic white women in pay band 4 ($30,680 - $38,999).

- Finally, these employers will report the total number of hours worked that year by the employees in each pay band. For example, an employer reports the total number of hours worked by 23 Sales Workers who are non-Hispanic white women in pay band 4.
  - The new EEO-1 gives employers a choice about how to count hours worked for employees who are exempt employees under the FLSA. Employers may either use 40 hours per week for full-time employees and 20 hours per week for part-time employees or, if it chooses, report the number of hours the employees actually worked. Again, this is a choice.

## Confidentiality and Privacy of EEO-1 Data

- The EEOC has strict proceduress in place to protect the confidentiality of EEO-1 data, including summary pay data. The EEOC collects EEO-1 data under Title VII of the Civil Rights Act, as amended (Title VII).

- All information that the EEOC collects under Title VII is subject to strict confidentiality requirements.
  - Title VII prohibits any EEOC officer or employee from disclosing data collected on the EEO-1 report, unless the data is the subject of litigation.

  - Title VII imposes criminal sanctions on any EEOC officer or employee who violates this prohibition.

- The EEOC reinforces this requirement with strict security and privacy controls that protect the EEOC's and the Joint Reporting Committee's operations and information systems against a range of threats. The EEOC regularly trains its employees on Title VII confidentiality and on computer security.

- The EEOC imposes these Title VII confidentiality requirements on its own contractors as a condition of their EEOC contracts.

- The EEOC publishes reports based on large-scale EEO-1 data (for example, nationwide, statewide, metropolitan area EEO-1 data) only when the EEO-1 data is aggregated in a manner that does not disclose any individual employer or employee information.

- The OFCCP holds EEO-1 data for federal contractors and subcontractors confidential to the maximum extent possible under the Freedom of Information Act (FOIA) and the Trade Secrets Act.
  - The Joint Reporting Committee will provide the OFCCP with pay data only for federal contractors and subcontractors subject to Executive Order 11246.

## How The EEO-1 Data Will Be Used

### The EEOC

- The EEOC receives thousands of Title VII charges of employment discrimination every year alleging race, national origin, or sex discrimination, including pay discrimination. The EEOC also receives close to one thousand charges under the Equal Pay Act alleging pay discrimination based on sex every year.

JA327

- The EEOC does statistical analysis of EEO-1 data early in its investigations. This helps with a first assessment of the allegations made in a charge of discrimination and, as appropriate, with planning an investigation. The EEO-1 is not the only source of data used at this stage, but it certainly helps.

- In addition, the EEOC will periodically publish aggregated EEO-1 data and industry reports that may provide useful comparative data for private employers and federal contractors.
  - Small employers will especially benefit from the published reports because they will obtain comparative data that will assist them in conducting voluntary self-assessment of their pay practices.

  - Voluntary self-assessment will help small businesses remedy any pay disparities and comply with state and federal equal pay laws.

## OFCCP

- OFCCP will use the EEO-1 data to help identify federal contractors and subcontractors for compliance reviews under E.O. 11246.

* * * * * * * * * * * * * *

For more information, contact Ronald Edwards, Director, Program Research and Surveys Division, EEOC, 131 M Street NE, Room 4SW30F, Washington, D.C. 20507; (202) 663-4949. voice or (202) 663-7063 (TTY).

**CONNECT WITH US**

Privacy Policy | Disclaimer | USA.Gov

JA328