**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NATIONAL WOMEN'S LAW CENTER, *et al*., | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| vs. | : | Civil Action No. 17-2458 (TSC) |
| | : | |
| OFFICE OF MANAGEMENT AND BUDGET, *et al*., | : | |
| | : | |
| *Defendants*. | : | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' SUBMISSION RE: THE COURT'S QUESTIONS RAISED DURING THE MARCH 19, 2019 STATUS CONFERENCE**

Plaintiffs hereby respond to Defendants' submission regarding the Court's questions about Defendants' failure to comply with its summary judgment Order raised at the March 19, 2019 status conference. Dkt. No. 54 (hereafter "Submission"). In their filing, Defendants provide various purported reasons for their non-compliance and, for the first time, basic information regarding their plan to attempt to come into compliance. Yet Defendants' filing raises as many questions as it answers—especially as to the basis for their prolonged timeframe—and fails to substantiate the concerns it sets out. Defendants' proposed plan leaves Plaintiffs without complete relief or indeed any assurance that Defendants will ultimately provide any of the relief to which Plaintiffs are entitled. Plaintiffs, therefore, respectfully request that the Court reject Defendants' proposed compliance plan; and for the reasons explained below, request that the Court impose certain conditions on Defendants' prolonged failure to comply with the Order, including that Defendants: (1) inform relevant employers by April 12, 2019 that they should be prepared to submit Component 2 pay data during the current EEO-1 reporting period, and (2)

1

require the EEOC to develop a plan to open the Component 2 data collection sufficiently in advance of the current May 31, 2019 deadline such that employers may submit both Component 1 and Component 2 data simultaneously.

As the Court is aware, on March 4, 2019, it granted summary judgment for Plaintiffs, requiring that OMB's "previous approval" of the EEOC's collection of Component 2 pay data "shall be in effect." Mem. Op., Dkt. No. 45 at 41. When the EEOC opened the collection period for 2018 EEO-1 data on March 18, 2019, without including Component 2 pay data in the required collection,[1] Plaintiffs requested a status conference in order to "obtain information regarding Defendants' plan for compliance with the Court's Order and to provide guidance regarding the Court's expectations for compliance." Pls.' Req. for Status Conf., Dkt. No. 47 at 3-4. The Court convened a status conference on the following day, at which the Court expressed concern that Defendants were "ignoring a very real time constraint here, [] the May 31st deadline" for EEO-1 reports, Hr'g. Tr. at 8, and requested information about Defendants' plans to come into compliance with the Court's Order, Hr'g. Tr. at 15. Further, if Defendants determined not to collect Component 2 data within the same period as Component 1 data (March 18 through May 31), the Court ordered Defendants to explain "why not." Hr'g. Tr. at 15. The Court also directed Defendants to provide their position on whether or not OMB's stay had tolled the three-year period of its original approval. Hr'g. Tr. at 16.

Defendants now state explicitly that the EEOC is not planning to collect Component 2 data by May 31, 2019. Instead they propose that the EEOC not complete collection of the Component 2 pay data for the 2018 reporting period until September 30, 2019 (such a collection

---

[1] EEOC, Press Release, EEO-1 Survey for 2018 Will Open Early March 2019 (Feb. 1, 2019), https://www.eeoc.gov/eeoc/newsroom/release/2-1-19.cfm.

would open on July 15, 2019). Submission at 3-4; Haffer Decl., Dkt. No. 54-1 at 11. Defendants

rely upon a declaration provided by the EEOC's Chief Data Officer, Dr. Samuel C. Haffer in

support of their proposal.

Defendants state, for the first time, that there are "significant practical challenges" to

complying with the Court Order, Submission at 3, and that it is not possible for the EEOC to

begin the Component 2 data collection immediately. Haffer Decl. at 9. Defendants make these

assertions without regard to the fact that Defendant OMB previously represented to Plaintiffs

that it would take only one day to "get Component 2 'live' for employer filing purposes" should

Plaintiffs prevail in the litigation. Pls.' Req. for Status Conf., Dkt. No. 47 at 3. EEOC never

provided information to the contrary, nor suggested OMB's view was mistaken or needed

revision. *Id*.[2] Nor did Defendants identify any of the issues that they now assert prevent them

from timely complying with the Court's Order during the parties' prior briefing on the

appropriate remedy in this matter. This silence is especially glaring given Plaintiffs' consistent

expressions of concern about resolving the case in time for the 2019 collection period, not to

mention Defendants' repeated efforts to delay resolution of the case. *See* Pls.' Opp. Ex. of Time

to Respond to Compl., Dkt. No. 9 at 2-3 (Defendants refused to consolidate briefing on motion to

dismiss with briefing on motion for summary judgment); *id.* at 4-5 & Pls.' Mot. to Compel

Compliance, Dkt. No. 19 at 1 n.1 (Defendants refused to produce administrative record to

facilitate summary judgment briefing); Defs.' Mot. for Stay, Dkt. No. 29 (instead of responding

---

[2] This failure to provide information is especially troubling because Dr. Haffer now states that he identified his concerns with the Component 2 data collection when implementing the collection for 2017 Component 1 data, *i.e.* before the spring 2018 data collection and before Defendants' representations to Plaintiffs. Haffer Decl. ¶ 13.

to Plaintiffs' summary judgment motion, requesting a stay of summary judgment briefing on the day a response was due).[3]

Defendants' belated assertions regarding the impossibility of complying with the Court's Order, and their silence with respect to whether OMB's stay tolled the three-year approval to collect Component 2 data, would leave Plaintiffs at risk for not obtaining the very remedy that was ordered by this Court. Further, as discussed in more detail below, Defendants' assertions are unsubstantiated and thus do not warrant the prolonged delay in compliance they demand.

### 1.   Defendants' Submission does not justify their current non-compliance with the Court's Order or the need for any further delay.

The Haffer Declaration, on which Defendants rely, does not justify Defendants' proposed extended timeframe for compliance. While Dr. Haffer makes general statements about his view of the EEOC's data collection and management capabilities, his explanation of plans for the Component 2 data collection itself and the obstacles he identifies to its timely completion do not establish that the Component 2 data collection could not be completed more quickly with sufficient reliability.

First, Dr. Haffer's Declaration ignores the actions taken by the EEOC to prepare for the Component 2 data collection during the eleven months between its September 2016 approval and OMB's August 2017 stay. At the time of the stay, the EEO-1 reporting period was scheduled to open within a few months, for a collection period that closed March 31, 2018. 30-Day Notice, 81 Fed. Reg. 45,479, 45,484. Some of the agency's implementation efforts were public, including

---

[3] In addition, Defendants sought extensions of nearly every briefing deadline in the case. *See* Defs.' Mot. Ex. of Time to Respond to Compl., Dkt. No. 8; Consent Mot. Ex. of Time to File Resp. to Mot. to Dismiss, Dkt. No. 17; Consent Mot. Ex. of Time to File Resp. to Mot. Summ. J., Dkt. Nos. 24 & 26. On many of these instances, Plaintiffs expressed their concern for timely resolution in negotiations over an appropriate extension.

the provision of a webinar for employers and other information available on the agency's

website.[4] The existence of this publicly available information regarding efforts to prepare for the

pay data collection, including advising employers of that process, calls into question the

completeness of Dr. Haffer's statement that the EEOC "had not revised its EEO-1 instruction

manuals and training materials to reflect the 2017 data collection requirements and methods for

data submission." Haffer Decl. ¶ 10. Similarly, Dr. Haffer does not explain his statement that

upon his arrival at the EEOC, "the EEOC had not yet supplemented its current system to collect

Component 2 data[.]" *Id.* ¶ 13. This could mean that the EEOC was on track to complete a timely

supplementation of the EEOC's system at that time, or it could mean that EEOC always planned

to rely on outside contracting assistance, as it now plans to do. It does not necessarily mean that

the EEOC was not on track to timely open the Component 2 data collection.

Second, the Declaration fails to discuss what actions, if any, the EEOC took during

OMB's stay and this litigation to be prepared to conduct an orderly pay data collection should

the stay be lifted, either by OMB's completion of its "review" or by Court Order. This omission

is glaring because Dr. Haffer states that shortly after his arrival, in the fall of 2017, he identified

ways in which he intended to reassess the Component 2 data collection. Haffer Decl. ¶ 13. He

---

[4] EEOC, Press Release, EEOC Posts Webinar Recording on New EEO-1 Report (Nov. 3, 2016), https://www.eeoc.gov/eeoc/newsroom/release/11-3-16b.cfm (providing a link to a recording of a webinar, presentation slides, the then-new EEO-1 form, a Fact Sheet for Small Business and a questions and answers document). Defendants subsequently deleted all of the documents to which this press release linked from the Internet, affirmatively depriving the public of guidance for complying in the event this Court ruled in favor of Plaintiffs—and still have not restored that information. Fortunately, copies of most of the information were archived by the Internet Archive website, which the parties previously agreed were part of the Administrative Record. *See* Link Decl. ¶¶ 5-10; Order, Dkt. No. 40 at 1.

does not discuss whether he or the agency took any action as a result of his determination. Nor does he explain why the agency failed to take action, if that was, in fact, the case.[5]

Third, the Declaration does not provide a specific basis for the timeframe it recommends.[6] Dr. Haffer states that the EEOC plans to use an existing contract with NORC at the University of Chicago to conduct the Component 2 data collection. Haffer Decl. ¶ 24. Relying on external contracting support is an appropriate and not uncommon mechanism for agencies to supplement their internal data collection and processing capabilities.[7] The Declaration proposes a timeline for the Component 2 data collection, but does not explain the basis for this estimate. Haffer Decl. ¶ 26. Specifically, the Declaration does not state who developed the proposed timeline (*i.e.*, the EEOC, NORC, or OMB), what specific constraints

---

[5] Similarly, one would expect these issues to have been raised in the "review" that OMB was purportedly conducting of the Component 2 data collection. *See, e.g.*, Defs.' Opp. & Cross-Mot. for Summ. J., Dkt. No. 27-1 at 33 (claiming that the Rao Memorandum staying the collection was intended to "start[] an iterative inter-agency process"); *but see* Pls.' Mot. to Compel Compliance, Dkt. No. 19 at 5 (in February 2018 congressional testimony, OMB Director Mick Mulvaney testified he "ha[d] not looked at" the data collection since its stay). There is no sign that any technical issues (or any others) were considered in that "review."

[6] Dr. Haffer's Declaration raises the number of data fields implicated by Component 2 in relation to his proposed time frame. Haffer Decl. ¶ 20. But the EEOC currently collects data on employee demographic information aggregated by pay band and job category in its EEO-4 survey of state and local governments, making this a method and scope of data collection with which the agency has experience. *See* EEOC, Welcome to the EEO-4 Survey, https://egov.eeoc.gov/eeo4/index.jsp.

[7] Indeed, while Defendants imply that the decision to do so is burdensome to the EEOC and imposes a significant expense, Defendants' Submission at 3-4, Dr. Haffer's Declaration does not state whether relying on a contractor to support the introduction of a new data collection is in fact unusual for the EEOC. *Cf.* EEOC, FY 2013 Service Contract Inventory, https://www.eeoc.gov/eeoc/doingbusiness/contract-inventory2013-standard.cfm (identifying Sage Computing as providing contracting support to "process the EEO-1, EEO-3, EEO-4, and EEO-5 Surveys"). And while his Declaration asserts that this "will be the first time that EEOC utilizes the contractor to perform a collection of information on an expedited basis," *id*. at 4, he does not deny that it has used other contractors to collect or process information on an expedited basis or this contractor to collect information on a non-expedited basis.

6

required the extended timeframe for data collection, how many person-hours the task is expected

to take (as to either the EEOC or NORC), whether NORC could conduct the collection more

quickly if it staffed the collection with additional individuals, or whether EEOC even inquired as

to whether doing so was possible.

Nor does the existence of the EEOC's Data and Analytics Modernization Program,

discussed by Dr. Haffer, justify prolonged delay in collecting Component 2 data. This is a multi-

year modernization program, during which other data collection efforts remain ongoing. Haffer

Decl. ¶ 18.[8] And the EEOC, which asked for a budget reduction in Fiscal Year 2020 compared to

Fiscal Year 2019, apparently has had more than enough funding for its perceived need to

improve upon its existing data collection methods.[9]

Fourth, Dr. Haffer relies on the stated concerns of some employers as a basis for the

proposed timeframe. Haffer Decl. ¶¶ 22. Employer complaints about the burden of Component 2

data collection were, of course, thoroughly aired, considered, and addressed in the multiple

rounds of stakeholder engagement and notice and comment prior to the 2016 approval of the data

collection. Yet Dr. Haffer appears to accept the general assertion of employer burden without

question and without providing his opinion on whether any of their complaints are valid. Nor

does he appear to consider the EEOC's earlier conclusion that the addition of the Component 2

data collection would impose a one-time implementation burden of approximately 8 person-

---

[8] EEOC, Fiscal Year 2020 Congressional Budget Justification (March 2019),
https://www.eeoc.gov/eeoc/plan/2020budget.cfm#_Toc2686357, at App'x. B.1.c.2 ("Over the
next few years, a full review of the EEOC's current methods of data collection and reporting will
be conducted with an eye toward identifying innovations and efficiencies that will ease the
submission process and streamline reporting while also examining potential enhancements in
content.").

[9] *Id*. at I.A.

hours per firm in addition to the estimated annual reporting burden for both components of 15.2 hours per filer for firm-level functions plus an additional 1.9 hours per individual report for establishment-level functions. 30-Day Notice, 81 Fed. Reg. 45,479, 45,496-97.

Fifth, Dr. Haffer's Declaration asserts that data validity and reliability concerns should delay the Component 2 data collection. Haffer Decl. ¶ 28. As he describes them, these metrics relate to whether the collection actually measures the concept that one is interested in measuring (data validity) and whether the collection reveals consistent results each time it is applied (data reliability). *Id*. Yet aside from discussing his perceived need for a pilot study, Dr. Haffer provides no specific explanation for why the EEOC's previous work was inadequate to ensure data validity and reliability—factors Defendants considered in approving the pay data collection in the first instance. For example, the EEOC selected both the measure of pay and the measure of "hours worked"—the two primary new reporting measures introduced by Component 2—in order to ensure that it receive reliable, *e.g.*, easily replicable, data.[10] As the EEOC explained its decision to use W-2 income as the measure of pay, "[f]or employers, W–2 income is a well-defined, familiar, and universally-available measure of pay." 30-Day Notice, 81 Fed. Reg. at 45,486. Similarly, EEOC selected the Fair Labor Standards Act definition for "hours worked" "because it is familiar to employers, designed in conjunction with pay, and applies to all employers subject to the EEO-1." *Id*. at 45,488. There can be little doubt, therefore, that employers would understand how to report both the total pay or hours worked for any given employee, a conclusion buttressed by the EEOC's extensive provision of explanatory materials to employers before the stay. As EEOC explained in the guidance it has since inexplicably

[10] The other information needed to complete Component 2—demographic information and job category—is the same information collected for Component 1.

deleted from the Internet, "hours worked will be counted by consulting employer records *already required* under the Fair Labor Standards Act[.]" Link Decl., Ex. F at 3 (emphasis added). Dr. Haffer's Declaration does not discuss any of this.

Instead, Dr. Haffer's Declaration focuses on his stated need for an additional pilot study, based on his conclusion that the pilot study conducted by the EEOC was inadequate. *See* Haffer Decl. ¶¶ 30-31. Had the EEOC determined that conducting such a pilot study was appropriate, it could have conducted such a study previously, or raised the issue with the Court in a timely fashion. Further, the Declaration's assertions are not consistent with the record. As part of the basis for the argument about the pilot study, the Declaration states that the National Academy of Sciences Report ("NAS Report") referenced in the EEOC's federal register notices on the pay data collection recommended a "true pilot study collecting real data." *Id*. ¶ 29. On the contrary, the NAS Report does not purport to require the use of "real data" derived from a "subset of respondents," Haffer Decl. ¶ 31, but instead provides multiple options to the EEOC for the recommended pilot study, so long as the study was conducted "by an independent contractor charged with measuring the resulting data quality, fitness for use in the comprehensive plan, cost, and respondent burden."[11] This is exactly what the EEOC did,[12] and previously concluded

---

[11] The Nat'l Academies Press, Collecting Compensation Data From Employers 88-89 (2012), https://www.nap.edu/read/13496/chapter/8#88.

[12] Fidan Kurulus et al., *Final Report* 4 (Sept. 2015), https://www.eeoc.gov/employers/eeo1survey/pay-pilot-study.pdf at 4 ("[T]he [NAS] panel suggested conducting a pilot study to estimate the costs and benefits of the proposed data collection, the burden on respondents, and the fitness of the data collected. This report presents the findings of the independent pilot study that EEOC commissioned. In addition to an overview of existing definitions of pay, the report recommends the most appropriate definition and unit of pay to be collected and the most appropriate statistical tests to analyze compensation data.").

was adequate to proceed with a data collection plan that had utility. 60-Day Notice, 81 Fed. Reg. 5113, 5114.[13]

Finally, Dr. Haffer's Declaration also suggests that secure collection and storage of the Component 2 data is one factor contributing to the proposed extended timeframe for compliance. Haffer Decl. ¶ 21. Yet, as described in the 30-Day Notice, the EEOC has in place "a comprehensive set of security and privacy controls to protect organizational operations and information system assets against a diverse set of threats." 81 Fed. Reg. at 45,492. So far as Plaintiffs are aware, and as the absence of public reporting to the contrary would seem to confirm, during its fifty-year collection of EEO-1 data, the EEOC has not succumbed to any data breach compromising the privacy of the data it collects. Nor is there anything inherent in the *storage* of aggregate pay-related data that would make EEOC's robust data security measures less effective. Further, the plan to use a contractor to collect the Component 2 data appears to resolve any data security concerns related to the *collection* of the data implied by Dr. Haffer in paragraph 21 of his Declaration.[14]

---

[13] As the EEOC noted at the time, it used two synthetic databases for the pilot study "because conducting a test survey of nine or more companies would require PRA approval. 44 U.S.C. 3502(3)(A)(i)." 81 Fed. Reg. at 5114 n.17. Dr. Haffer does not address how a pilot study as he defines it could be conducted *without* first collecting Component 2 data or seeking another round of PRA approval.

[14] Putative *amici*'s unfounded speculation to the contrary is unpersuasive. *Amicus Curiae* Brief of Chamber of Commerce et al., Dkt. No. 57-1 at 16-17. Putative *amici* also inaccurately describe the privacy interests implicated in the pay data collection. Employers would not submit and EEOC would not collect *any* individual employee information; all data is provided anonymously in the aggregate in pay bands. Further, in publishing its aggregated summaries of EEO-1 data, EEOC has historically excluded information aggregated from a small number of employees, eliminating the concern that this aggregated information could be used to identify particular employees or employers based on unusual combinations of demographic information, job category, and pay band. *See, e.g.*, EEOC, *2016 Job Patterns for Minorities and Women in Private Industry (EEO-1)*, https://www1.eeoc.gov/eeoc/statistics/employment/jobpat-eeo1/2016/index.cfm#select_label ("Due to small cell sizes, a minimum threshold of 50,000 total

**2.      Defendants' Submission does not provide an adequate assurance that Defendants will eventually comply with the Court's Order.**

As discussed above, Defendants' arguments that they cannot timely comply with the Court Order should have been raised previously—for example, during the parties' briefing on remedy or when Plaintiffs inquired about the timeframe for compliance while setting the summary judgment briefing schedule. Further, Defendants appear to have delayed implementation of the Court's Order from the outset, providing no notice to EEO-1 reporters about their renewed pay data reporting obligations. Hr'g. Tr. at 9-10. Even though more than a month has passed from the date of the Court's Order, the EEOC still has not done so. Nor have Defendants restored the guidance EEOC previously deleted from its website or even lifted the stay EEOC entered in the Federal Register. *See* 82 Fed. Reg. 43,362.[15] Defendants' Submission does not provide adequate assurance to the Court or Plaintiffs that they are now taking their compliance obligation seriously.

Defendants' proposed timeframe does not include any buffer for completing the Component 2 data collection before the original Paperwork Reduction Act (PRA) approval expiration of September 30, 2019. Hr'g. Tr. at 16. Delays in a project's implementation timeline

---

employees is applied to all levels of our summary tables and some values have been suppressed.").

[15] Indeed, putative *amici* rely on the EEOC's delinquency in providing such notice in asserting that the Component 2 data collection should be delayed. Dkt. No. 57-1 at 12. Similarly, one of the putative *amici*, the Society for Human Resource Management, has published advice for the employer community stating that "[u]ntil the EEOC officially announces anything to the contrary, employers should continue to move ahead on the 2018 EEO-1 filings without pay data and working towards the May 31 deadline." SHRM, EEOC Proposes Sept. 30 Due Date for Pay Data Reports (April 4, 2019), https://www.shrm.org/resourcesandtools/legal-and-compliance/employment-law/pages/eeo-1-pay-data-reports-due-sept.-30.aspx. Defendants provide no explanation for this delay, nor do they explain why they could not at least alert employers that Component 2 data collection for the 2018 reporting period will resume imminently, even if they could not immediately provide all information regarding the details of collection.

are always possible and Defendants' delays to date increase the likelihood of future delays. As Defendants themselves point out, past EEOC data collections have been extended beyond their original deadlines. Haffer Decl. ¶ 12.[16] Indeed, the EEOC provides an automatic 30-day extension to any employer that requests it.[17] Absent either an earlier deadline for completing the pay data collection or certainty regarding Defendants' commitment and authority to collect Component 2 pay data after September 30, 2019, Plaintiffs' remedy is imperiled.

Compounding this problem, Defendants are silent as to whether the September 30, 2019 Paperwork Reduction Act ("PRA") approval expiration was tolled during the period of the unlawful stay, despite the Court's request that they address it. Hr'g. Tr. at 16-17. While Plaintiffs believe the stay plainly tolls the approval period—indeed, any other result would allow the exact kind of run-out-the-clock strategy suggested by Defendants' actions—Defendants have refused to say whether they agree. Absent resolution of this legal question, and unless the Court deems this issue conceded, the September 30, 2019 collection deadline creates the risk that Plaintiffs will lose their remedy as the result of piecemeal delays by Defendants running out the PRA clock.[18]

---

[16] While Dr. Haffer portrays these extensions as an indication that prior collections have been poorly executed or difficult to implement, such extensions are frequently necessary to obtain compliance from employers who failed to meet their obligation or attempted to comply but did so incorrectly.

[17] EEOC, 2018 EEO-1 Survey, https://www.eeoc.gov/employers/eeo1survey/index.cfm ("TO REQUEST A ONE-TIME 30-DAY EXTENSION PLEASE SEND AN EMAIL TO: E1.EXTENSIONS@EEOC.GOV. A one-time 30-DAY extension will be granted after the email has been sent. There is no need to wait for a response from the Employer Data Team.").

[18] One alternative to deeming the PRA expiration date tolled would be for OMB to be required to use its emergency extension power to allow for Component 2 data collection to be completed after September 30, 2019, if necessary. OMB has relied on these powers to extend the PRA approval for the EEO-1 collection frequently in the past. *See* Office of Info. & Regulatory Affairs, *OMB Control Number History*, https://www.reginfo.gov/public/do/PRAOMBHistory?ombControlNumber=3046-0007#. Using

Finally, Defendants implicitly concede that the vacatur of OMB's stay of the data collection requires the collection of two years' worth of pay data. Submission at 2 ("but for OMB's decision to stay the collection of this data" employers would have provided 2017 and 2018 pay data during the respective reporting period for those years). Yet they simply refuse to do so. The only justification provided is that "[t]he risk of poor quality would be compounded if calendar year 2017 EEO-1 Component 2 data were also collected" as part of the current reporting period. *Id*. at 4. The Submission overstates Dr. Haffer's statements. His declaration states only that "he is aware that"—not a conclusion—requiring the 2017 pay data along with the 2018 data "*could* decrease response rates and increase errors in the entire data collection process to a greater extent than might be experienced in collecting 2018 Component 2 data alone." Haffer Decl. ¶ 23 (emphasis added). Nor does Dr. Haffer provide any basis for this speculation. *Id*. The Court should reject Defendants' baseless attempt to avoid collecting an entire year's worth of required data.[19]

### 3.   Plaintiffs request that the Court impose specific guidelines and parameters to ensure Defendant's compliance with the Court Order going forward.

Plaintiffs appreciate that the Court "is not trying to get in the business of running the EEOC." Hr'g. Tr. at 12. The Court does, however, have broad equitable authority to order appropriate relief and to enforce its orders. *See*, *e.g.*, *U.S. Bank Nat'l Ass'n v. Poblete*, No. CV 15-00312 (BAH), 2017 WL 4736712, at *4 (D.D.C. Oct. 19, 2017); *Kramer v. Sec'y of Def.*, 39

---

the emergency extension power would be a routine mechanism to ensure Plaintiffs obtain complete relief, despite the September 30, 2019 expiration of PRA approval, in contrast to the legally appropriate, but novel, determination that the unlawful stay tolled the expiration date.

[19] Alternatively, if the stay tolled the approval period (or the approval period were extended), then the 2017 reporting cycle could simply be replaced by 2019 data collected in 2020. While there has been no credible reason provided that 2017 data could not be timely collected, this alternative may provide a reasonable compromise of the two sides' conflicting views.

F. Supp. 2d 54, 60 (D.D.C. 1999) ("The court has broad power to order appropriate equitable relief.") (citing *Franklin v. Gwinnett Cty. Pub. Schools*, 503 U.S. 60, 69 (1992))

Given that Defendants appear not to have taken seriously plans for compliance to date—based on their earlier failures to alert Plaintiffs and the Court to the issues that they now assert require delay, their failure to act promptly following the March 4, 2019 Order, and their ongoing failure even now to alert the employer community to the renewed requirement to gather and submit Component 2 data—Plaintiffs respectfully request that the Court reject Defendants' proposed compliance plan, and impose the following conditions on Defendants' prolonged failure to comply with the summary judgment Order:

- Require Defendants to provide notice to covered employers by April 12, 2019, that their EEO-1 reporting obligations for the current reporting period will include Component 2 pay data.

- Require the EEOC to develop a plan to *open* the Component 2 data collection sufficiently in advance of the current May 31, 2019 deadline such that employers may submit both Component 1 and Component 2 data simultaneously; or, by April 19, 2019, show cause why doing so is not possible. Such a show cause filing should include a declaration from the EEOC or NORC stating what the cost, including person hours, would be for a compliance plan that opens before May 31, 2019, and for any alternate proposed date, thereafter. Under such a timeframe, it may be appropriate for the EEOC to leave the Component 2 reporting period open for a reasonable period after May 31, 2019 to facilitate employer compliance.

- Require Defendants to provide status reports to Plaintiffs and the Court every 30 days, beginning on April 30, 2019. Such reports should describe the status of the following: the contract with and work performed by NORC; the development of automated systems for

14

collecting Component 2 data; all employer outreach efforts; any interagency outreach efforts, the development of internal systems to analyze Component 2 data; and internal training sessions for enforcement staff on the use of data and for survey processing staff on the collection of data.

- Require Defendants to invoke OMB's emergency PRA extension authority to complete the data collection after September 30, 2019, if Defendants do not complete the collection of 2017 and 2018 Component 2 data by September 30, 2019, including efforts to ensure compliance by any non-reporting employers. The failure to complete this data collection by September 30, 2019 shall be considered sufficient cause to permit use of OMB's emergency extension authority.

- Require EEOC by April 19, 2019 to develop a plan to collect the calendar year 2017 pay data missed during the unlawful stay, either contemporaneously with the collection of calendar year 2018 pay data or at another time as permitted by the current, tolled, or extended PRA approval timeframe. In the alternative, EEOC could commit to collecting calendar year 2019 pay data during the anticipated EEO-1 collection in the spring of 2020, during which period the expiration of the current PRA approval would be deemed tolled or extended.

- Finally, Plaintiffs request that all such commitments referenced above be memorialized by Court order.

Dated: April 8, 2019                    Respectfully submitted,


                                        /s/ *Robin F. Thurston*___

                                        Robin F. Thurston (DC Bar No. 1531399)
                                        Javier M. Guzman (DC Bar No. 462679)
                                        Jeffrey B. Dubner (DC Bar No. 1013399)
                                        Democracy Forward Foundation
                                        P.O. Box 34553
                                        Washington, DC 20043

(202) 448-9090
rthurston@democracyforward.org
jguzman@democracyforward.org
jdubner@democracyforward.org

Fatima Goss Graves (DC Bar No. 481051)
Emily J. Martin (DC Bar No. 991968)
Sunu Chandy (DC Bar No. 1026045)
Maya Raghu (DC Bar No. 1035558)
National Women's Law Center
11 Dupont Circle, NW, Ste 800
Washington, DC 20036
(202) 588-5180
fgraves@nwlc.org
emartin@nwlc.org
schandy@nwlc.org
mraghu@nwlc.org

*Attorneys for Plaintiffs*