```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2      - - - - - - - - - - - - - - - x
       NATIONAL WOMEN'S LAW CENTER,
3      et al.,                          CA No:  1:17-cv-02458-TSC
                      Plaintiffs,
4                                       Washington, D.C.
                                        Tuesday, April 16, 2019
5      vs.                              2:17 p.m.

6      OFFICE OF MANAGEMENT AND BUDGET,
       et al.,
7
                      Defendants.
8      - - - - - - - - - - - - - - - x

9      _____

10             TRANSCRIPT OF HEARING ON SUBMISSIONS
          HELD BEFORE THE HONORABLE TANYA S. CHUTKAN
11                 UNITED STATES DISTRICT JUDGE
       _____
       APPEARANCES:
12     For the Plaintiffs:     ROBIN FRANCES THURSTON, ESQ.
                               JEFFREY B. DUBNER, ESQ.
13                             DEMOCRACY FORWARD FOUNDATION
                               P.O. Box 34553
14                             Washington, DC 20043
                               (202) 448-9090
15
                               EMILY J. MARTIN, ESQ.
16                             NATIONAL WOMEN'S LAW CENTER
                               11 Dupont Circle, #800
17                             Washington, DC 20036
                               202-588-5180
18
       For the Defendants:     TAMRA TYREE MOORE, ESQ.
19                             CARLOTTA WELLS, ESQ.
                               U.S. DEPARTMENT OF JUSTICE
20                             Civil Division, Federal Programs
                               1100 L Street, NW
21                             Washington, DC 20005
                               (202) 305-8628
22
       Court Reporter:         Lisa A. Moreira, RDR, CRR
23                             Official Court Reporter
                               U.S. Courthouse, Room 6718
24                             333 Constitution Avenue, NW
                               Washington, DC  20001
25                             202-354-3187
```

```
 1                         I N D E X

 2

 3   WITNESS                                          PAGE
       HAFFER
 4         (By the Court)................................. 28
           (By Ms. Thurston)............................. 56
 5         (By Ms. Wells)................................ 71

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2            THE COURTROOM DEPUTY:  Your Honor, we have Civil

 3     Action 17-2458, National Women's Law Center, et al. vs. The

 4     Office of Management and Budget, et al.

 5            I would ask that lead counsel approach the lectern

 6     and identify yourself and those at your respective tables

 7     starting with the plaintiff.

 8            MS. THURSTON:  Robin Thurston for the plaintiffs,

 9     along with Jeffrey Dubner; and Emily Martin from the

10     National Women's Law Center.

11            THE COURT:  Good afternoon.  I want to apologize,

12     first of all, for the delay.  We were without a courtroom

13     deputy, and that's why we're late.  Sorry about that.

14            MS. MOORE:  Good afternoon, Your Honor; Tamra

15     Moore on behalf of defendants, and with me at counsel's

16     table is Carly Wells.

17            THE COURT:  All right.  Good afternoon.  I'm

18     sorry, you said Harley Wells?

19            MS. MOORE:  Wells.

20            THE COURT:  Okay.

21            And Ms. Moore, Ms. Thurston, you'll be speaking on

22     behalf of each side; is that correct?

23            All right.  Good afternoon.

24            All right.  We are here because we had a -- after

25     the last status conference, I ordered the parties to file
```

1    submissions in response to certain questions that I had.

2    Specifically I requested information about the government's

3    plans to come into compliance with this Court's order

4    granting summary judgment in favor of plaintiffs.  I also

5    ordered the government to provide its position on whether or

6    not OMB's stay had tolled the three-year period of its

7    original approval.

8          The government filed its submission on April 3rd

9    and included a declaration from EEO chief's data officer,

10   Dr. Samuel -- is it "Haf-fer"?

11         MS. MOORE:  "Hay-fer."

12         THE COURT:  "Hay-fer," thank you.

13         The government, among other things, stated that it

14   needed until September 30, 2019, to collect the Component 2

15   pay data with an opening to be on July 15, 2019.

16         Plaintiffs filed their response on April 8th and

17   asked this Court to, among other things, reject the

18   government's proposed compliance plan and to impose

19   plaintiffs' proposed deadlines on the government.

20         The government filed its reply on April 9th and

21   stated that the acting chair's decisions to delay the

22   Component 2 pay data collection until September 30th and to

23   forgo collecting the 2017 Component 2 pay data are

24   consistent with the acting chair's administrative authority

25   under Title VII.

1          So there are several factual disputes that are

2     apparent in the parties' pleadings, and the pleadings

3     themselves raise certain additional questions; therefore,

4     I've scheduled this hearing so that I can make factual

5     findings and to allow the parties and the Court to ask

6     limited further questions.  I'm not turning this into a

7     full-blown evidentiary hearing, but I do think that the

8     record is not complete in order for me to formulate some

9     kind of -- or approve or disapprove the government's

10    proposed plan.

11         But before we get to the collection of the data,

12    as I had mentioned earlier just now, I ordered the

13    government to give its position on whether or not OMB's stay

14    had tolled the three-year period of its original approval,

15    and Ms. Moore, I asked you twice at the last hearing.  If

16    you look at Page 16 and Pages 19 and 20 of the transcript, I

17    specifically asked you to address this.

18         From Page 16 at the last hearing, which was on

19    March 19th, I said:  "Ms. Moore, if you could address that

20    issue."

21         Let me start on Page 16, Line 15, of the

22    transcript where Ms. Thurston is speaking.  She says, "We

23    are concerned that approaching the expiration of the

24    three-year period there could be a dispute about whether the

25    EEOC is still bound by the Court's order, or other legal

1    issues.  It would be much -- Your Honor may have to resolve

2    those at some point.  It would be simpler if we could be

3    assured that the collection would occur, at least for the

4    2018 data, before that period expired."

5              I responded, "Yes.  Ms. Moore, if you could

6    address that issue.  Because if your position is that it

7    might not, then I'm going to need briefing as to whether

8    that running has been tolled.  I'm not anxious to delve into

9    that issue unless I have to right away."

10             Then on Pages 19 to 20 I stated, Line 25,

11   "Ms. Moore, can you address, again, the issue of -- the

12   tolling issue, whether you -- in other words, whether you

13   are going to be complying within the timeline.  And, if not,

14   what your position is regarding the plaintiffs' tolling

15   argument.  You might as well tee that one up."

16             And you said, "Yes, Your Honor."

17             Now, the government ignored that request in its

18   submission because it did not address it at all.

19             Plaintiffs pointed out that omission in its

20   response.  Yet again the government did not address this

21   question in its reply.

22             So, Ms. Moore, I have to ask you, why was my order

23   ignored?  Or my request.

24             MS. MOORE:  Good afternoon, Your Honor.

25             THE COURT:  Good afternoon.

1          MS. MOORE:  I will address -- I'll address that

2    question first, and then I have a preliminary matter that I

3    would like to also address.

4          THE COURT:  Sure.

5          MS. MOORE:  With respect to that question, Your

6    Honor, my understanding was -- based on the transcript, was

7    that if -- I believe that counsel for plaintiffs raised the

8    issue of tolling, but as you specifically noted, it would be

9    much simpler if we could be assured if the collection could

10   occur, at least for the 2018 data, before the three-year

11   approval period ended.

12          In response to that issue -- in response to that

13   statement, Your Honor requested that defendants address the

14   issue if our position is it might not, and that Your Honor

15   was not anxious to --

16          THE COURT:  I don't want to have to rule on this

17   issue if I don't have to, but I asked you to tee it up.  You

18   didn't even mention it at all.

19          MS. MOORE:  Your Honor -- and I apologize.  That

20   would be on me, if Your Honor wanted us to address it.  If I

21   might -- I understood that the question was if the agency

22   cannot comply within the three-year approval period, you

23   would like to know what its position is with respect to

24   tolling.

25          THE COURT:  So by the absence of that issue in

1    your briefing, you are representing that the government will

2    comply within the three-year period?  Is that what you're

3    saying?

4          MS. MOORE:  Your Honor, we -- as the submissions

5    that we submitted expressly state, the EEOC has proposed to

6    collect 2018 pay data by September 30, 2019, which is the

7    end of the prior approval period, and for the reasons --

8          THE COURT:  Then why didn't you say that in your

9    reply?  Because the government -- I mean, the plaintiff

10   specifically pointed out that you hadn't addressed the

11   issue, and in your reply you didn't respond to that.

12         MS. MOORE:  Your Honor, I apologize.  I apologize

13   for -- I'm sorry.  I apologize for not addressing that

14   explicitly.  I understood the instruction was if the -- if

15   the EEOC had determined that it could not comply within the

16   three-year approval period or before it expires, that the

17   Court wanted the agencies to address whether tolling applied

18   because the response that the EEOC was providing was that it

19   would be going forward with responding to the Court's order

20   and collecting the pay data before the end of the --

21         THE COURT:  Right.  I'm going to take the

22   government's failure to address the issue based on their

23   representation that they can collect the pay data within the

24   schedule to mean that should the government not be able to,

25   that you have conceded the tolling argument.

1              MS. MOORE:  Your Honor, I would -- Your Honor,

2      I --

3              THE COURT:  Because the time to address that

4      argument would be in the pleadings.

5              MS. MOORE:  Your Honor, I understand your

6      position, and our -- I believe that our position is set

7      forth in the declaration of Dr. Haffer, that the agency

8      has determined that it will be able to process pay data

9      that employers collect, the 2018 pay data.  And for the

10     reasons that are set forth in Dr. Haffer's declaration, the

11     agency has determined, through its administrative authority,

12     that --

13             THE COURT:  I understand what the agency position

14     is.  My position is that agency predictions and reality

15     sometimes don't always -- aren't always the same, and if the

16     EEOC or OMB comes before me again and hasn't been able to

17     meet their deadline, I'm going to consider -- based on the

18     record before me, I don't see how the government hasn't

19     conceded the issue of tolling because I requested that you

20     address the issue, and your position is it's not going to

21     happen so we don't need to address it.

22             Maybe.

23             Ms. Thurston, do you have a response to that?

24             You have another preliminary matter to get to

25     before --

```
 1              MS. MOORE:  Yes.

 2              THE COURT:  Okay.

 3              MS. MOORE:  I would like to, if --

 4              THE COURT:  Go ahead.

 5              MS. MOORE:  Okay.  Sorry.  Before we get started,

 6    Your Honor -- well, after addressing that issue, I would

 7    like the opportunity to clarify one issue, and that's

 8    plaintiffs' assertion that they were misled about the EEOC's

 9    ability to respond to an adverse decision and that the EEOC

10    did not timely provide this information.

11              THE COURT:  Are you referring to the email from

12    December 3rd?  Because I have some questions about that.

13              MS. MOORE:  Yes, Your Honor.  The --

14              THE COURT:  Okay.  Just so the record is clear, at

15    the last hearing plaintiffs pointed out that during some

16    discussions with regard to an expedited schedule, one of the

17    reasons that it agreed to the government's request was that

18    it had received a December 3rd email from somebody in the

19    government that said it would only take one day to get

20    Component 2 live for employer filing purposes.

21              When you were here last at the March hearing, you

22    couldn't give me any information about that, so you stated

23    to me at the hearing that the person at the EEOC who could

24    provide more information about how much time it would take

25    EEOC to comply if plaintiffs prevailed was out of the office
```

1    when you made this one-day representation to plaintiffs.

2              And so I had some follow-up questions today based

3    on that, but if you have some information, why don't I let

4    you go first.

5              MS. MOORE:  Thank you, Your Honor.

6              So, yes, Your Honor, last December -- well, let me

7    back up.

8              As I was stating, that -- plaintiffs' assertion

9    that they were misled about the EEOC's ability to respond to

10   an adverse decision and their assertion that the EEOC did

11   not timely provide this information, that is not correct,

12   and it certainly was not our intention to mislead anyone.

13             Last December, because of competing deadlines

14   faced by me and my co-counsel, we sought plaintiffs'

15   counsel's consent to an extension to file defendants' cross-

16   motion for summary judgment.  In response to plaintiffs'

17   counsel's questions about how long it would take to respond

18   to an adverse decision, I asked both OMB and the EEOC this

19   question.

20             OMB responded first, and I relayed OMB's response

21   to plaintiffs' counsel.

22             THE COURT:  Which was?

23             MS. MOORE:  Which was that it would take OMB one

24   day to go live.

25             THE COURT:  To get Component 2 live for employer

1    filing purposes.

2              MS. MOORE:  Right.  And Exhibit A, the email that

3    I provided, says at that time my understanding is that the

4    person who has this information for EEOC is not in the

5    office, and I do not have this information right now.

6              At that time I relayed OMB's information, did not

7    have EEOC's information to provide at that moment, but we

8    nevertheless were able to -- or plaintiffs' counsel

9    nevertheless granted her consent to the extension of time.

10             THE COURT:  And granted that consent based on the

11   representation that you made.

12             I mean, Ms. Moore, what is apparent even to me, as

13   a recipient of all the scheduling requests, was that time

14   was and is of the essence in this matter.  And plaintiffs

15   granted the request for extra time based on a representation

16   from you that, if we lose and you win, it won't take long to

17   get this thing underway.

18             That was the essence of it, correct?

19             MS. MOORE:  Your Honor, I -- well, if I have -- if

20   the Court would provide me just a couple of minutes, yes, in

21   response to her -- the email is in the record.  It's

22   Exhibit A.  It states, "OMB says that it would take them one

23   day to go live.  I do not have this information" -- I'm just

24   paraphrasing, but "I do not have this information for EEOC."

25             Shortly after plaintiffs' counsel granted her

1    consent, EEOC agency counsel sent me an email addressing its

2    ability to respond to an adverse decision.  The email

3    outlined the EEOC's plan --

4              THE COURT:  You provided that email to plaintiffs?

5              MS. MOORE:  No, Your Honor, we did not, and that

6    is why I wanted to take this opportunity now.  The email

7    that I was provide -- or the information that I was provided

8    from the EEOC in December expressly stated that the

9    information was very preliminary, rough estimates, and

10   predicted that --

11             THE COURT:  So now you're telling me about an

12   email that you got subsequent to your December 3rd email

13   from the EEOC telling you it was going to take longer.  When

14   did you get that?

15             MS. MOORE:  I got that shortly -- it might have

16   been December 4th.

17             THE COURT:  And why didn't you provide that

18   information at the March hearing?

19             MS. MOORE:  Your Honor, I believe at the March

20   hearing I stated that when this issue came up with respect

21   to plaintiffs' contention that they were misled, that OMB

22   said that it would go -- OMB said that it would take it one

23   day.

24             Defendant EEOC is the agency that is collecting

25   the information, and at the time I didn't have -- not at the

1    time of the hearing, but at the time that I was relaying

2    information to her for the extension of time the only

3    information I had at that time to provide her was OMB's.

4              I subsequently received an email from --

5              THE COURT:  Okay.  I don't mean to cut you off,

6    but I'm not following what you're saying so let me direct

7    you to the transcript.

8              MS. MOORE:  Okay.

9              THE COURT:  We had a -- you said you got an

10   email -- you sent an email to plaintiffs' counsel on

11   December 3rd saying it will take OMB one day to go live with

12   the Component 2 data pay collection, and what you're saying

13   is you hadn't gotten EEOC's position on that because the

14   person who could give you the information was out of the

15   office on December 3rd.  Is that your position?

16             MS. MOORE:  That is correct, Your Honor.

17             THE COURT:  And now you're saying to me that you

18   subsequently received an email from someone at EEOC in

19   December, right?

20             MS. MOORE:  Yes.

21             THE COURT:  Saying actually it's going to take a

22   lot longer than one day, okay?

23             MS. MOORE:  That is correct.

24             THE COURT:  Okay.  My question to you -- and I'm

25   trying to look through the transcript at the same time so

1    this is probably not very efficient, but my question to you,

2    Ms. Moore, is twofold.

3              One, why didn't you share that email with

4    plaintiffs in advance of the March hearing?

5              And if you didn't, you saw their motion for a

6    hearing, so you knew this was an issue.  The email was

7    attached as an exhibit.  All right?  When you came in for

8    the hearing in March, why didn't you tell me about that

9    December email?

10             MS. MOORE:  Your Honor, just to give you some

11   context, at the time that we were exchanging these emails

12   back in December it was in the context of an extension

13   motion on our opening brief.  The subject -- in our opening

14   summary judgment briefs.

15             Shortly after we were -- exchanged emails, and I

16   relayed the information for OMB and as Your Honor --

17   Exhibit A expressly states, the very second sentence says,

18   "I do not have this information for EEOC, and" -- but we

19   nevertheless were able to come to an agreement.  Plaintiffs'

20   counsel gave her consent to our extension.

21             THE COURT:  I got that.  My point is plaintiffs --

22   and maybe we're just talking at cross purposes here, but

23   plaintiffs, in their request for a hearing, said, "Hey,

24   they're taking too long.  They're not complying with your

25   order.  This email, when we were negotiating a briefing

1    schedule, says it would take them one day to go live, so why

2    are they now saying it's taking them" -- and I had you in

3    here in March, so you had the email from the EEOC then to

4    explain to me what you really meant when you said it would

5    take a day to go live.  You didn't have the -- in other

6    words, why am I just hearing about this December email now?

7         MS. MOORE:  Your Honor, maybe I should take a step

8    back.

9         I -- the -- plaintiffs brought this action against

10   the OMB.  They challenged OMB's decision to initiate a stay

11   and review of the pay data collection.  All of their counts,

12   the four counts in their complaint, are focused on OMB's

13   actions and alleging that it's unlawful.

14        When I got the email in December or when I got

15   plaintiffs' counsel's request in the context of our

16   extension motion for our opening summary judgment brief, OMB

17   responded, "It will take us one day."  That's because, as I

18   understand it, OMB grants its approval, but the actual work

19   of doing the collections falls to the various agencies who

20   have sought approval to collect the information.  I also

21   noted in the email to plaintiffs' counsel that was appended

22   to their notice, as you'll see, that at that time I did not

23   have EEOC's information, but we were nevertheless able to

24   come to an agreement about the extension.

25        As I have -- I now am trying to apologize on

1    behalf of my client, on behalf -- and to the extent that

2    this has obviously upset the Court and plaintiffs' counsel,

3    I received information that was characterized as very

4    preliminary and rough and estimated that it would take the

5    EEOC until January 2021.

6         At the time of this Court's hearing, it wasn't

7    even clear to me then that January 2021 was the date, and as

8    Your Honor now knows, based on the submissions that we've

9    submitted, that the EEOC has proposed that it can collect

10   the information by September 30, 2019.

11        So at the time that I had the information, it was

12   very preliminary.  It was rough.  I hadn't had an

13   opportunity to even figure out why it was that they were

14   projecting that it was going to take until January 2021 to

15   be able to collect this information.  And so I wanted to

16   apologize for that -- for my failure to provide that

17   information.  That was -- at the time that was my thought

18   process that this information --

19        THE COURT:  I'm just going to direct you to Page 5

20   of the transcript of the March hearing where it says, Line

21   13, "As the email that plaintiffs' counsel" -- this is you.

22   "As the email that plaintiffs' counsel appended to her

23   notice further states, I was waiting on defendant EEOC to

24   provide me information about how much time it would take it

25   to be able to comply if the Court issued an order vacating

1    the stay."

2            You didn't tell me in March -- and I eventually

3    did get the information.  You said, "I was waiting."

4            And then you go on to say:  "At the time, I did

5    not -- as that email further states, the person who had that

6    information and would be able to provide me that information

7    was out of the office.  So counsel and I went forward with

8    the information that I was able to provide about OMB and

9    agreed to a briefing schedule that we subsequently filed

10   briefs in response to."

11           You didn't tell me -- and this is in March.  You

12   didn't say, "Oh, and by the way, I did get shortly

13   thereafter an email from EEOC and here's what it said."

14           MS. MOORE:  Your Honor, I apologize for not

15   sharing that information with the Court.

16           THE COURT:  Well, it's not that you didn't share

17   it, and I understand you're an officer of the court, but

18   you -- your language to the Court certainly implies that you

19   hadn't gotten that information yet when, in fact, you had.

20           MS. MOORE:  Your Honor, at the time that we were

21   negotiating our extension motion I did not have --

22           THE COURT:  I know.  I'm talking about in March

23   when you made that statement to me in this hearing.  You

24   didn't say, "Oh, and by the way we did get the information

25   from the EEOC, and let me tell you what they said."

```
1              MS. MOORE:  Your Honor, I apologize.  That was --

2     when I was relaying that information, I was relaying the

3     information about the time that we were negotiating the

4     extension motion, and at the time that we had the status

5     conference, I still did not know whether this January 2021

6     date would be the final time.

7              As I have mentioned, I apologize for that.  That

8     was -- they had provided me that information.  I did not

9     have, at the time in December of 2018, and --

10             THE COURT:  Do you have a copy of the email that

11    you got from the EEOC?

12             MS. MOORE:  I don't have it with me.  I apologize.

13             THE COURT:  I'd like you to show it to plaintiffs'

14    counsel within the next couple of days.  Preferably, if you

15    have it today, I'd like them to see it.

16             MS. MOORE:  Your Honor, I'm happy to --

17             THE COURT:  Actually, can I see it?

18             MS. MOORE:  I don't have it with me.  I'm happy to

19    provide it.

20             Your Honor, I wanted to apologize for not

21    providing that information, and I am here to -- I apologize

22    for not providing it.

23             That said, the EEOC has provided this Court with

24    its proposal to collect the data within the three-year

25    approval --
```

1          THE COURT:  Here's my concern, Ms. Moore.  I am

2     concerned that the EEOC or the OMB, which is litigating this

3     case, has been playing -- well, has been providing this

4     Court and the plaintiffs with partial information.  I don't

5     want to cast aspersions on people's motivations, but it is

6     very difficult, in a case where time is of the essence, both

7     for the plaintiffs, the EEOC, and the OMB, and all the

8     employers who are waiting to see what regulations they are

9     going to have to comply with and how quickly, that I'm

10    getting dribs and drabs of information; that OMB apparently

11    used the promise of short compliance -- a short turnaround

12    with compliance, were plaintiffs to win, to extract a

13    briefing schedule that was favorable --

14          MS. MOORE:  Your Honor --

15          THE COURT:  -- and now turns around after

16    plaintiffs have prevailed and said, "We didn't even know" --

17    "we didn't know the EEOC was going to take that long."

18          MS. MOORE:  Your Honor, again, if I can reiterate,

19    one, my apology, but two, the fact that it is difficult to

20    understand how, under these circumstances, OMB is the agency

21    that approves these collections, but the agencies that go

22    forth and collect the information, they do the work.

23          THE COURT:  I understand.

24          MS. MOORE:  And the email to plaintiffs' counsel

25    at the time that we were -- I was trying to negotiate this

1    extension of time stated, "Here's OMB's information" --

2    THE COURT:  I've seen that email.

3    MS. MOORE:  -- "and here's -- I don't have the

4    information for EEOC."

5    My -- if -- well --

6    THE COURT:  I understand all of that.

7    MS. MOORE:  Maybe it's --

8    THE COURT:  What I don't understand is why, when

9    you got more information, you didn't share it with

10   plaintiffs.

11   Could you give me a moment, please.

12   (Pause)

13   THE COURT:  I think, Ms. Moore, we have mined that

14   area sufficiently.  The representation was made.  I'm

15   concerned about the information that was given to the

16   plaintiffs, and subsequently to this Court, regarding the

17   circumstances for that concession; nonetheless, I have

18   ruled.  I did grant summary judgment in favor of the

19   plaintiffs, and now we're here after my March 4th order to

20   determine why nothing has gone forward.  So I think we've

21   spent enough time on that issue.

22   I will note, though, as to your position that

23   it's, you know, EEOC who actually implements the data

24   collection, in plaintiffs' complaint, which is Document 1,

25   Page 34, in their prayer for relief, plaintiffs -- in

1    Paragraph 4 of their prayer for relief plaintiffs request

2    that the Court order EEOC defendants to publish a Federal

3    Register notice announcing this reinstatement or to take

4    other equivalent action necessary to immediately reinstate

5    the pay data collection.

6              I mean, you've been on notice since the beginning

7    that EEOC -- you couldn't just make representations on

8    behalf of yourself.

9              MS. MOORE:  Your Honor -- and I understand that,

10   and that is why we are here today.  I first wanted to

11   apologize, and I understand that we have mined that area,

12   and I appreciate the opportunity to move on.

13             I am here to answer the questions that you raised

14   during the March 19th status conference and in your most

15   recent order, and I will also explain why the EEOC's

16   proposal to collect pay data by September 30, 2019, is

17   responsive to the relief that this Court ordered.

18             THE COURT:  Okay.  Hold on a second, before we get

19   to that.

20             Plaintiff, do you have anything you wanted to add

21   for the record as to that email issue, and did you have a

22   response to the representations in the government's reply

23   submission regarding the EEOC and their authority?

24             MS. THURSTON:  Yes, Your Honor.  Thank you.

25             As to the question of tolling -- I believe that

1    was the second one you raised?

2              THE COURT:  Yes.

3              MS. THURSTON:  -- we appreciate Your Honor's

4    position that it would treat the issue as conceded if the

5    pay data collection were to extend beyond September 30th.

6    One thing that we're concerned about is that we think it

7    would be necessary to effectuate that with a court order, a

8    declaratory judgment, because employer associations have

9    already threatened collateral action, including one of the

10   amici, DirectEmployers Association, posted on its website

11   earlier this week that employer groups may sue EEOC to set

12   aside and stop the pay data reporting application should it

13   ever become final.

14             And so should it proceed beyond September 30th, we

15   think that some codification of the tolling issue would

16   protect --

17             THE COURT:  Well, Ms. Moore says it's not going to

18   happen so -- but I understand your position, and if we are

19   in that -- we are faced with that predicament, I will have

20   to address it in writing, I suppose.

21             MS. THURSTON:  And I'll note also that it doesn't,

22   of course, address the collection of the 2017 calendar year

23   data, which may also implicate the tolling issue, and we

24   would like to protect a remedy.

25             As to the email regarding the one-day

1    representation, we appreciate Your Honor noting that EEOC

2    has always been a named defendant.  We've always sought

3    relief as to the EEOC.

4            THE COURT:  Correct.

5            MS. THURSTON:  And beyond that and what Your Honor

6    has already observed, all I would represent is that if we

7    understood that the EEOC was estimating that the time frame

8    for compliance would be January 2021, if we then understood

9    that in December, it certainly would have impacted our

10   decision-making as to timing and when we raised timing

11   issues with the Court.

12           THE COURT:  Thank you.

13           Ms. Moore, Dr. Haffer -- I'm going to get this

14   wrong every time now.  Dr. Haffer stated in his declaration

15   that he identified concerns with collecting Component 2 data

16   collection when implementing the collection of the 2017

17   Component 1 data.  This was before the spring 2018 data

18   collection and before you made your representation about the

19   timing to plaintiffs in December.  So why didn't you provide

20   that information to the Court and to plaintiffs?

21           MS. MOORE:  I'm sorry, Your Honor, I'm not sure I

22   entirely follow.

23           THE COURT:  In his declaration Dr. Haffer says

24   that he had concerns with collecting Component 2 data

25   collection at the time he was implementing the collection of

1    the 2017 Component 1 data, so it appears that Dr. Haffer had

2    some issues and some concerns back then so I don't see how

3    that squares with your representation to plaintiffs during

4    the briefing schedule.

5          MS. MOORE:  Your Honor, I -- to be perfectly

6    honest, I was not aware that Dr. Haffer existed until after

7    this Court's March 4th order.  I understand now he's the

8    chief data officer, that he was hired in November of 2017,

9    and that he came in to, among other things, assess EEOC's

10   processes and systems and to work to modernize those

11   systems.

12         THE COURT:  Okay.  Let me just tell you how I'm

13   proceeding today in this hearing.  There are some areas I'd

14   like to cover, and we don't have all day, and so I'm going

15   to try and move quickly; but first, I'd like to cover the

16   efforts EEOC has taken to implement the collection of

17   Component 2 pay data, and I'd like to know about efforts at

18   various time periods.

19         First, the time from OMB's approval in September

20   2016 until OMB's stay, okay?  From the time period of the

21   stay through the beginning of this litigation; from the

22   initiation of the litigation until my summary judgment

23   order; and from my summary judgment order until the status

24   conference on March 19th, and between March 19th and today.

25   Those are all discrete periods of time.  And for all these

1          time periods I'd like to know how these -- the efforts

2          affected EEOC's ability to collect Component 2 pay data

3          during these time periods.

4                    The second area I want to consider -- I would like

5          to cover is I'd like information on why the EEOC deleted the

6          link to a recording of a webinar, presentation slides, the

7          then-new EEO-1 form, a fact sheet for small businesses, and

8          a question-and-answer document.  The link to those materials

9          was deleted from the website, and I'd like information on

10         why it has not yet been restored.

11                   Third, I'd like to know how Dr. Haffer's

12         declaration comports with EEOC's efforts to prepare

13         employers for pay data collection.

14                   I'd like to know the role of NORC at University of

15         Chicago.

16                   I want to cover who was involved in developing the

17         proposed timeline that's set forth in Dr. Haffer's

18         declaration.

19                   Sixth, I'd like some more information on some of

20         the security concerns that Dr. Haffer identified and how

21         those comport with prior statements that the EEOC has made

22         about security.

23                   Seventh, I'd like some more information about

24         collecting the 2017 pay data, and finally, whether NORC

25         could conduct the collection of Component 2 data more

1    quickly than September 30, 2019; and if so, what would that

2    take.

3            And so I will consider, Ms. Moore -- I'm going to

4    consider Dr. Haffer's declaration as the government's direct

5    examination of him.  I'm going to ask him some questions,

6    then I will give plaintiffs an opportunity to ask very, very

7    limited questions as follow-up to my questions -- this is

8    not a deposition or a trial so those questions would be

9    limited to topics raised in my questioning and his

10   declaration -- and then I'll give you the opportunity for a

11   brief redirect.

12           The government stated in its notice yesterday that

13   Dr. Mancini has knowledge about OMB's decision to stay and

14   review the EEO-1 collection, so I really don't have any

15   questions for Dr. Mancini relevant to today's hearing

16   because unless he has knowledge that is linked to EEOC's

17   ability to collect Component 2 information, I don't have any

18   questions for him.

19           All of the areas that I've identified, the eight

20   areas I've just identified, and the questions that I'm going

21   to ask were raised or addressed in the parties' pleadings or

22   a part of the April 11th order that I issued about this

23   hearing.  So pursuant to my April 11th order, I do expect

24   Dr. Haffer to have particularized and thorough knowledge of

25   the issues and questions.

```
 1              Is Dr. Haffer in the courtroom?

 2              MS. MOORE:  Yes.

 3              THE COURT:  Yes, please stand.

 4              (To Ms. Moore) You can have a seat.

 5                     SAMUEL C. HAFFER, Sworn

 6              THE COURT:  Good afternoon.

 7              THE WITNESS:  Good afternoon, Your Honor.

 8              THE COURT:  Would you state your name for the

 9    record, please.

10              THE WITNESS:  Samuel C. Haffer.

11              THE COURT:  And how are you employed, Dr. Haffer?

12              THE WITNESS:  I'm employed by the U.S. Equal

13    Employment Opportunity Commission in the role of chief data

14    officer and director of the office of enterprise data and

15    analytics.

16              THE COURT:  All right.  And I'm familiar with the

17    declaration you have submitted, and obviously I assume you

18    are, too, since it's your declaration.  Is that correct?

19              THE WITNESS:  Yes, Your Honor.

20              THE COURT:  All right.  So I want to start with a

21    very general hypothetical.  If I order defendants to inform

22    relevant employers by April 19, 2019, that Component 2 data

23    collection for the 2018 reporting period will resume

24    imminently and that employers should be prepared to submit

25    Component 2 pay data during the current EEO-1 reporting
```

1    period, what harm would that cause to the EEOC?

2              THE WITNESS:  Your Honor, we are or we were in the

3    midst, on March the 4th, of beginning to implement the

4    Component 1 data for the annual EEOC data collection that

5    had been delayed, the opening of which had been delayed due

6    to the government furlough.  We have a very small staff

7    working on the survey.  In-house we have four people, and we

8    have a small business contractor who's responsible for the

9    computer programming of the data intake.  All hands were on

10   deck to begin the stand-up of the Component 1 data.

11             At the point that the notice was given to inform

12   the employers about Component 2, we weren't sure what to

13   inform them of because there were still lots of outstanding

14   questions about different definitions and items and how to

15   report items, and we didn't have the infrastructure in place

16   to be able to handle the thousands of emails and phone calls

17   that we would have gotten.

18             THE COURT:  Let me stop you for a minute, Doctor.

19   You said "at the point that notice was given to inform the

20   employers about Component 2."  What time are we talking

21   about?

22             THE WITNESS:  Was that March the 4th?

23             THE COURT:  When the Court issued its order?

24             THE WITNESS:  Correct.

25             THE COURT:  Uh-huh.  You can finish.

1              THE WITNESS:  We didn't have the infrastructure in

2      place, nor did we have -- we didn't have the infrastructure

3      in place to answer the questions that would have been

4      raised, nor did we have definitive answers to some of the

5      questions that we're sure would have been asked.

6              THE COURT:  By employers.

7              THE WITNESS:  By employers.

8              THE COURT:  And what actions has EEOC taken since

9      that time to deal with those issues?

10             THE WITNESS:  Since March the 4th -- actually,

11     March the 4th in the evening is when we first received the

12     order.  We immediately began to assess timelines and costs

13     of how much -- of how to meet what was in the March the 4th

14     order.  We first went to the contractor who's -- the small

15     business that's currently doing our Component 1 data

16     collection and asked them how fast could you open this data

17     collection.

18             And their response was, "It would take us nine

19     months."  And nine months from March -- the week of March

20     the 4th would have put us beyond the September 30th deadline

21     when the current PRA expires.

22             We then went to NORC at the University of Chicago,

23     who we had under contract for some modernization work we

24     were doing.  They also happen to be experts in data

25     collection.  And we asked them -- we actually asked them two

1    things.  "In an ideal world, were we to be doing this and

2    meeting all of the industry standards for data collection,

3    how long would that take?"  And then we also asked them, "If

4    we had to do it by September 30th" -- and "do it" meaning if

5    we had to have all data collected by September 30, 2019 --

6    "what would that look like and how much that would cost?"

7                    So in that period since March the 4th we've been

8    planning how to do this.

9                    THE COURT:  Okay.  Now, what implementation

10   efforts did EEOC take to prepare for the Component 2 data

11   collection between September 29, 2016 -- that is OMB's

12   initial approval -- and August 2017, which is when OMB

13   ordered the stay?

14                   THE WITNESS:  Your Honor, I did not come on board

15   at the EEOC until November 12th of 2017, so I could offer

16   you my view on what was done during that period --

17                   THE COURT:  Well, you can tell me, if you know.

18   This is not a trial.  You can offer me hearsay.  If you are

19   aware of what those efforts were, you can certainly testify

20   about it.

21                   THE WITNESS:  Sure.  So there was a form designed,

22   a data collection form, sample form, that was designed.

23   There was an instruction -- a couple of pages on

24   instructions on how to collect the data, and also there was

25   a webinar.

1          But, Your Honor, I viewed the webinar and the

2     instructions as basically awareness-building, public-

3     awareness-building.

4          Those instructions in that webinar did not get

5     into the sufficient detail necessary to tell someone how to

6     collect the data in a step-by-step process.

7          THE COURT:  I'm going to come back to that.

8          Let me just ask you, the implementation efforts

9     that you've just described that you've been told about or

10    that you learned about, how do those efforts affect the

11    EEOC's ability to now collect Component 2 data?

12          I mean, so you're not going to be starting from

13    scratch, are you?

14          THE WITNESS:  Yes and no.  There will be a --

15    there will be a basis from which we then craft a revised

16    instruction form that gets into more detail on how to

17    collect the data, and what we're going to do is we're going

18    to try to, to the best of our ability, understand questions

19    that employers would have before we put that instruction

20    manual together.

21          And we could do that through frequently asked --

22    through revising frequently asked questions.  Most likely,

23    given the limited time frame, we're just going to have to

24    really be doing updating of frequently asked questions on

25    the fly to make this work.

1          THE COURT:  So on November 3, 2016 -- which I

2     realize is a year before you got there, but I'm sure you've

3     probably seen these materials -- the EEOC issued a press

4     release for employers.  It provided a link to a recording of

5     a webinar, presentation slides, the then-new EEO-1 form, a

6     fact sheet for small businesses, and a questions and answers

7     document.  I think those are the materials you just talked

8     about.

9          Those materials have been deleted.  Why?

10          THE WITNESS:  My understanding, Your Honor, is

11     that under the Paperwork Reduction Act, if an approved

12     information clearance package does not exist, then we are

13     not able to do anything that would demonstrate that we are

14     asking for data to be collected.

15          THE COURT:  What is an approved information

16     clearance package?

17          THE WITNESS:  That would be the approved -- I

18     think the date that's been -- the date that OMB approved our

19     request.

20          THE COURT:  All I'm saying is you had a link to

21     these materials.  You deleted the link.  Why?

22          THE WITNESS:  Because legally we couldn't keep the

23     link active.

24          THE COURT:  Why?  Because of the stay?

25          THE WITNESS:  Because of the stay; yes, Your

1    Honor.

2              THE COURT:  Okay.  So why hasn't -- now the stay's

3    been lifted.  I ordered it lifted.  Why hasn't that link

4    been restored?

5              THE WITNESS:  Because we're not sure what the data

6    collection is going to look like.

7              THE COURT:  But it would have been a start, right?

8              In other words, had you restored the link --

9    there's nothing improper about the link.  The link would

10   have certainly given businesses and employers a place to

11   start, some information.

12             I mean, you're going to have to provide them with

13   this information.  You had it.  You deleted it.  Why not

14   restore it?

15             THE WITNESS:  Because, Your Honor, as I mentioned

16   a little while ago, we didn't -- we don't have the

17   infrastructure in place right now to handle the added calls

18   and emails that that information would generate.

19             THE COURT:  But you're getting them now anyway,

20   aren't you?  I mean, there's no -- there's no FAQ.  There's

21   no link to the webinar or fact sheet or forms.  So aren't

22   you getting just as many calls as you would without this

23   information, or more?

24             THE WITNESS:  We're not, Your Honor.  We've been

25   monitoring the types of incoming calls and emails since we

1    opened Component 1 to find out what the nature of those

2    were, and it's -- the calls and emails that we're getting

3    are focused on Component 1 issues.

4            THE COURT:  In your declaration you stated that

5    the EEOC -- and I quote -- had not revised its EEO-1

6    instruction manuals and training materials to reflect the

7    2017 data collection requirements and methods for data

8    submission.  That's at Paragraph 10 of your declaration.

9            How does this statement comport with EEOC's prior

10   efforts to prepare employers for Component 2 pay data

11   collection?

12           THE WITNESS:  Your Honor, it comports in that I

13   was attempting to show that the EEOC was not well prepared

14   to collect data -- Component 1 data that they had been

15   collecting for decades, and that the potential of problems

16   in collecting a new source of data that had never been

17   collected before and the volume of data that were to be

18   collected could potentially have overwhelmed the system, and

19   EEOC may not have been prepared to collect the data.

20           THE COURT:  At the time of OMB's stay, which is

21   August 2017, when was the reporting period scheduled to open

22   for the collection period that closed on March 31, 2018?

23           THE WITNESS:  I'm sorry, Your Honor?

24           THE COURT:  Yes, that's -- in other words, when

25   OMB issued the stay in August of 2017, when was the

1      reporting period scheduled to open for the -- there was a

2      collection period that closed March 31, '18.  When was that

3      collection period supposed to open?

4              THE WITNESS:  In January.

5              THE COURT:  Okay.  And at the time of the OMB stay

6      was EEOC scheduled to open the Component 2 data collection

7      on time?

8              THE WITNESS:  Understanding that I wasn't there,

9      to my knowledge it appeared that they had been moving

10     forward in that direction.

11             THE COURT:  Now, did EEOC plan on relying on

12     outside contracting assistance in that regard?

13             THE WITNESS:  The way the EEOC currently collects

14     data and the way that it appeared that trajectory was headed

15     was using a small business concern, and that small business

16     concern is used primarily to program EEOC data systems,

17     which is a very strange set-up.  I've never seen it before

18     that way.

19             Generally, when one contracts out a data

20     collection, they contract out the entire package of data

21     collection activities.

22             But SAGE was responsible for programming the EEOC

23     systems that ingested the data.  The EEOC staff was

24     accountable for all of the other activities surrounding data

25     collection.

1          THE COURT:  Between the time of OMB's stay --

2    again, August 2017 -- and the start of this litigation,

3    which was November of 2017, right when you fortuitously came

4    on board -- talk about drinking from a fire hose -- what

5    actions, if any, did EEOC take to prepare for the collection

6    of Component 2 information?

7          THE WITNESS:  Four major activities, Your Honor.

8    One is that when I came on board I assessed our entire data

9    collection activity identifying where there were

10   opportunities for improvement.  I also began to hire staff

11   with expertise in survey research and in data science and

12   statistics.

13         THE COURT:  And this is all with an eye to

14   Component 2 -- collecting Component 2 information?

15         THE WITNESS:  Not specifically, Your Honor.  This

16   was an eye to improving our overall data collection

17   activities.

18         THE COURT:  All right.  Okay.  You said two, I'm

19   sorry.

20         Three.

21         THE WITNESS:  Three was standing up what is now

22   the EEOC data and analytics modernization program that is

23   detailed more in the declaration, but most importantly the

24   very first project in the program is to do a soup-to-nuts

25   evaluation of all of our EEOC data collection -- EEOC-1 --

1     the EEO-1, 3, 4, and 5, so all the surveys.

2              And then the final -- the final piece is to

3     actually begin to do -- to carry out the evaluation and to

4     begin to understand what we can do better and how quickly we

5     can do it and those types of issues.

6              THE COURT:  Okay.  So that's when you started in

7     November 2017.  How have these four steps affected EEOC's

8     ability to collect component data -- Component 2 data now?

9              THE WITNESS:  Well, it's allowed us to identify a

10    well-known contractor who will be able to help us --

11             THE COURT:  Is this NORC?

12             THE WITNESS:  NORC at the University of Chicago.

13    It has allowed us first to bring on board skilled staff in

14    the area of data collection, survey methods, someone who

15    will be able to oversee the data collection and ensure that

16    we meet our timelines.  And the other is to -- we were able

17    to identify a contractor who was skilled in the area, has

18    lots of experience with federal data collections, and will

19    help us meet our timelines.

20             THE COURT:  All right.  Now, between the time of

21    the start of this litigation, which is, again, around the

22    time you came on board, November 2017, and this Court's

23    order granting summary judgment, which was March 2019, what

24    actions, if any, did EEOC take to prepare for the collection

25    of Component 2 information beyond the -- so you've already

1    talked about the four steps that you've done -- you know,

2    you took and the identification of NORC.  But then going

3    forward to my order, from that time to the order in March

4    what additional steps have you taken to collect -- because,

5    I mean, obviously there was a possibility that plaintiffs

6    might prevail, so what was EEOC doing to prepare for the --

7    you know, in the eventuality that plaintiffs would prevail

8    and the stay would be removed?

9            THE WITNESS:  Well, what we could not do -- and

10    your time period, Your Honor, was between the stay and March

11    4th?

12            THE COURT:  Between the litigation -- between the

13    November 15th filing of this lawsuit and March 4th.

14            THE WITNESS:  We were still subject to the stay,

15    which meant that we could not contact employers directly and

16    make any representation that we were going to begin to

17    collect data or to signal to them that they should begin to

18    collect data.

19            THE COURT:  Right, but you certainly could take

20    steps to make sure, on the technological side, that you

21    would be ready to or you would try and get ready, should

22    plaintiffs prevail, right?

23            I mean, obviously you couldn't tell the employers

24    anything because there was nothing to tell them, but what

25    was EEOC doing internally to prepare for the possibility

1    that plaintiffs might prevail?  Just those four steps that

2    you're talking about?

3                    THE WITNESS:  Yes.

4                    THE COURT:  Okay.  Now, between the time that I

5    granted summary judgment -- that's March of this year, last

6    month -- and the status conference on March 19th, so that's

7    essentially two weeks, in those two weeks what actions, if

8    any, did EEOC take to prepare for the collection of the

9    Component 2 data?

10                   THE WITNESS:  The outreach to the contractors to

11   ascertain a budget and a timeline and to talk through any

12   significant issues, and then we have also begun to draft a

13   statement of work to be able to quickly procure the services

14   of the contractor, and we've explored the regulations that

15   will allow us to sole source this because of urgent and

16   compelling necessity.

17                   So we basically have done all of the background

18   work to make sure that as soon as we're told to go we can

19   go.  That will allow us to meet that September 30th

20   deadline.

21                   THE COURT:  When you say "we're told to go," who

22   is telling you to -- what do you mean by "told to go"?  Was

23   not the order direction to go?  I mean, what do you -- who

24   is going to tell you to go?

25                   You're waiting -- your statement -- you said that

1    "so we basically have done all of the background work to

2    make sure that as soon as we're told to go we can go."  Is

3    that an internal directive that you're waiting for?

4              THE WITNESS:  Yes.

5              THE COURT:  Yes?

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.  And in the interim why hasn't

8    the link with the information for employers been -- wouldn't

9    that help you to be ready to go?

10             THE WITNESS:  Your Honor, it would overwhelm us

11   with emails and telephone calls, and we don't -- once we

12   have the contract in place, part of the contract will be

13   that the contractor sets up a technical assistance telephone

14   line and email box, and they'll have the internal staff

15   capacity to handle the calls once the calls and emails start

16   coming.

17             Prior to that, we're in the middle of the

18   Component 1 data collection, and as I mentioned earlier, we

19   have very limited staff available on this effort, and they

20   are focused on the Component 1 data collection.

21             THE COURT:  The link that was deleted with the

22   webinar and the form and the facts and so on, that was a

23   link providing employers with information.  Did it direct

24   employers to call the EEOC with questions, or was it just

25   here's what you need to know to start getting ready?

1          THE WITNESS:  I believe both.  And even if it

2     didn't specifically say, "Call the EEOC with questions or

3     email the EEOC," they would have.

4          THE COURT:  As part of your -- you said, you know,

5     "We want to be ready to go.  We want to have systems in

6     place so we can go when we get the order to go."  Wouldn't

7     it be more practical for your contractor to have already

8     started giving people sort of information in advance of the

9     order to go?

10         THE WITNESS:  Your Honor, we can't ask the

11    contractor to begin to work on the contract until the

12    contract's in place.

13         THE COURT:  Okay.  And the contract won't be in

14    place until...?

15         THE WITNESS:  As soon as possible.

16         THE COURT:  What's -- I guess you'll have to

17    forgive me if I'm not familiar with how your internal

18    workings operate, but what's stopping the contract from

19    being in place?  What approval is needed?  Who needs to

20    approve the contract with the outside contractor?

21         THE WITNESS:  The chief financial officer and

22    the -- the chief financial officer, and the chief financial

23    officer needs to -- needs to vet it by the acting chair.

24         THE COURT:  And do you know if that contract has

25    been submitted to the chief financial officer and the acting

```
 1    chair?

 2              THE WITNESS:  It has not yet, Your Honor, because

 3    we're still working through the details.

 4              THE COURT:  Let me ask you some questions about

 5    NORC at the University of Chicago.

 6              When did EEOC contact NORC at the University of

 7    Chicago regarding using an existing -- a contract to conduct

 8    the Component 2 data collection?

 9              THE WITNESS:  I reached out to them on either

10    March the 5th or March the 6th.

11              THE COURT:  Okay.  And has EEOC ever used

12    contractors -- you mentioned a small business.  Is that

13    SAGE?

14              THE WITNESS:  Yes.

15              THE COURT:  So have you used contractors other

16    than NORC and SAGE to collect or process information on an

17    expedited basis?

18              THE WITNESS:  Not since I've been at the EEOC.

19              THE COURT:  Do you know if the EEOC ever used NORC

20    to collect information on a nonexpedited basis before?

21              THE WITNESS:  My knowledge is that NORC's first

22    contract with the EEOC was the modernization contract, which

23    we awarded in September of 2018.

24              THE COURT:  All right.  Now, in your declaration

25    you have a proposed timeline.
```

```
 1                    Just a minute.

 2                    (Pause)

 3                    It's on Page 11.  Do you have your declaration

 4    with you?

 5                    THE WITNESS:  I do not.

 6                    THE COURT:  Do you have a copy for him?

 7                    MS. WELLS:  I do.

 8                    THE COURT:  Thank you.

 9                    MS. WELLS:  May I?

10                    THE COURT:  Yes, please.  Thank you.

11                    The witness has been handed a copy of his

12    declaration, which is Document 54-1.

13                    If you could look at Page 11 of your declaration,

14    Doctor.

15                    THE WITNESS:  (Witness complies)

16                    THE COURT:  That's an estimated timeline for the

17    collection of Component 2 data.  Who is involved in

18    developing the proposed timeline in your declaration?

19                    THE WITNESS:  I was, as well as the vice president

20    at NORC.

21                    THE COURT:  All right.  Was -- so you, on behalf

22    of -- anyone else on behalf of the EEOC, or just yourself?

23                    THE WITNESS:  In actually developing the timeline?

24                    THE COURT:  Yes.  Yourself and people from NORC,

25    correct?
```

```
 1            THE WITNESS:  Correct.  And there were two people
 2     on my staff who were assisting me.
 3            THE COURT:  All right.  Was OMB involved in this
 4     effort, too?
 5            THE WITNESS:  No, Your Honor.
 6            THE COURT:  Okay.  And who was it that first
 7     proposed the September timeline?
 8            THE WITNESS:  The September timeline was proposed
 9     because that -- as I mentioned, I first asked NORC what
10     would it take if we were to do this ideally, and they came
11     back January 2021.
12            And then I said, "Well, what if we need to do this
13     before the current -- before the current PRA package expires
14     on September 30th?"
15            THE COURT:  Right.
16            THE WITNESS:  And so that's how that September
17     30th deadline was established.
18            THE COURT:  Okay.  And so is it -- the task of
19     collecting the Component 2 data, is that going to be almost
20     all contracted out to NORC, or is it going to take EEOC
21     person-hours as well?  Because you talked about earlier
22     having a very small staff.
23            THE WITNESS:  The oversight of all of the actual
24     work will be contracted out.  We will have oversight of all
25     the work.
```

1          THE COURT:  Okay.  And do you know how many NORC

2   person-hours the task of collecting the component data --

3   Component 2 data will take?

4          THE WITNESS:  I don't.

5          THE COURT:  Okay.  And so do you have any idea how

6   many additional person-hours it will require of EEOC and

7   NORC to collect the Component 2 pay data by May 31, 2019?

8   Obviously it would require more hours.

9          THE WITNESS:  We could not do it by May 31, 2019.

10         THE COURT:  By "we," you mean NORC?

11         THE WITNESS:  Neither NORC or EEOC.

12         THE COURT:  And did you ever ask NORC, "What is

13   the quickest you can do this project?"

14         THE WITNESS:  I did, Your Honor.

15         THE COURT:  And what did they tell you?

16         THE WITNESS:  They said if it was any faster than

17   September 30th they would walk away because it would not

18   meet anything resembling professional standards for data

19   collection.

20         THE COURT:  Okay.  Now, apart from the EEOC's

21   current belief that there needs to be a pilot study, why was

22   the EEOC's prior work on ensuring data validity and data

23   reliability inadequate?

24         THE WITNESS:  When one wants to collect and test

25   whether data are valid, that gets at the questions that are

1    asked and how that information will be collected.  And there

2    is a lot of evidence, information available, that collecting

3    data, pay data, in pay bands is not a valid way of

4    collecting pay data for purposes of enforcing discrimination

5    laws.

6            So there is a lot of -- and if one were to look at

7    the -- and read the National Academy of Sciences report, the

8    NAS panel said as much.

9            THE COURT:  I was going to ask you a question on

10   that because EEOC claims that the National Academy of

11   Sciences recommended a true pilot study collecting real

12   data, but plaintiffs have asserted that the study did not

13   require real data.  And so what basis do you have for making

14   the assertion that this Sciences report recommended real

15   data as opposed to pay bands?  Just the report itself?

16           THE WITNESS:  Well, the National Academy reports

17   recommendations.  The first two recommendations --

18   Recommendation No. 1 is that EEOC and OFCCP should get

19   together and really figure out what they're going to use the

20   data for because once -- and these are -- I'm paraphrasing

21   the recommendations.  Once you figure out exactly what

22   you're going to use the data for, then you can begin to

23   start asking the questions about, okay, then, how does one

24   go about collecting data?  That will then allow one to

25   validly answer the question or address the need.

```
1            THE COURT:  How does the pilot study that EEOC

2       conducted not comport with the National Academy of Sciences

3       recommendation?  Just because they use bands?

4            THE WITNESS:  No, Your Honor.  The -- what the

5       EEOC purported as a pilot study is not a pilot study.

6            THE COURT:  Why?

7            THE WITNESS:  Because it doesn't meet the

8       definition of a pilot study.

9            A definition of a pilot study is that you

10      implement the data collection that you're proposing to

11      implement on a small scale, a test, if you will, and that

12      way you test all of your processes before you do full-blown

13      implementation to make sure that you don't run into any

14      issues or problems.  It's a way of testing and identifying

15      problems before the fact, before a full-blown implementation

16      goes on.

17           THE COURT:  So --

18           THE WITNESS:  What is in -- I'm sorry.

19           THE COURT:  I'm sorry, finish, please.  I didn't

20      mean to interrupt.

21           THE WITNESS:  What is in the so-called pilot study

22      is simply the author's opinion of the pilot -- of the policy

23      preference that the author would prefer.  There's no -- that

24      thing called a pilot study is just not a pilot study.

25           THE COURT:  So given that opinion, why didn't EEOC
```

1    conduct another one either before or during the stay, a

2    proper pilot study?

3              You said that the thing called a pilot study is

4    just not a pilot study, implying that it was inadequate.

5    Why didn't you do a proper pilot study?

6              THE WITNESS:  We have limited resources, and at

7    that point the stay was in place, and the need for the

8    limited resources was in standing up the Component 1 data

9    collection and ensuring that that was of the highest quality

10   possible.

11             THE COURT:  In its 30-day notice EEOC stated that

12   it has -- and I quote from the 81 Federal Register at

13   45492 -- "EEO stated that it has a comprehensive set of

14   security and privacy controls to protect organizational

15   operations and information system assets against the diverse

16   set of threats."

17             How does this statement comport with your

18   assertion in your declaration that a contributing factor to

19   the delay is a secure collection and storage of Component 2

20   data?

21             THE WITNESS:  The EEOC's systems meet the minimum

22   standards -- the minimum federal standards.

23             THE COURT:  Are those the -- are those minimum

24   federal standards the standards that are in the Federal

25   Register, a comprehensive set of security and privacy

1    controls?

2             THE WITNESS:  It would go beyond that, Your Honor,

3    to comport with the FISMA 2014, which is Federal Information

4    Security Modernization Act of 2014.

5             THE COURT:  So I guess what I'm trying to get at,

6    Dr. Shaffer --

7             THE WITNESS:  Haffer.

8             THE COURT:  Haffer, Haffer.  If EEOC has said it

9    has this comprehensive set of security and privacy controls,

10   I don't understand why security and privacy security in the

11   collection of storage of information is causing a delay

12   since EEOC says they already have those controls in place.

13            THE WITNESS:  I want to ensure that the sensitive

14   information that's coming in is stored on systems that

15   exceed federal standards.

16            THE COURT:  But the sensitive information that's

17   coming in is not individual sort of name and salary data.

18   It's pay bands, right?

19            THE WITNESS:  That's correct.

20            THE COURT:  So it's not like people can hack into

21   that and get people's names and date of birth and all of

22   that, right?

23            THE WITNESS:  It's possible.  I'll give an

24   example.

25            If we were to disclose -- if information were to

1    be disclosed or breached where one could identify very small

2    cell sizes, for instance, someone who is the only Asian

3    female executive in West Virginia who makes above $100,000,

4    you could potentially merge -- use other social media data,

5    perhaps Department of Motor Vehicles data and voter

6    registration data, to reverse-engineer and figure out who

7    that individual person is.

8           THE COURT:  What has changed regarding security

9    and privacy controls at the EEOC between the time of the 30-

10   day notice and today?

11          THE WITNESS:  We have a more secure two-factor

12   authentication system for allowing employers to log in and

13   submit their data into the EEOC systems.

14          THE COURT:  Okay.

15          THE WITNESS:  And, Your Honor, if I may, there's

16   a -- there is a -- so as I mentioned earlier, all of the

17   data that we're collecting is on EEOC servers, and the best

18   practice -- so we have people who are logging in and

19   submitting data that ultimately are on EEOC servers.  A

20   better practice would be to have employers submit data into

21   NORC's system and not have them have any access into EEOC's

22   systems.

23          THE COURT:  Has EEOC ever had a data breach that

24   compromised EEO-1 data?

25          THE WITNESS:  Not since I've been there.

1            THE COURT:  Do you know if they've had one before

2      you were there?

3            THE WITNESS:  I do not know.

4            THE COURT:  Okay.  And why does the storage of

5      aggregate pay-related data make EEOC's security measures

6      less effective?

7            THE WITNESS:  So it doesn't make the mechanisms

8      in place less effective.  My concern about data security is

9      the -- is release -- inadvertently releasing information

10     that could be reverse-engineered to identify an individual

11     person.

12           THE COURT:  Okay.  If EEOC is planning on using

13     NORC to collect Component 2 pay data, what is the source of

14     your concern about EEOC's data security related to

15     collection?

16           THE WITNESS:  I have none.

17           THE COURT:  You have none, okay.

18           And why hasn't EEOC not lifted the stay that was

19     entered in the Federal Register, if you know?

20           THE WITNESS:  I do not know.

21           THE COURT:  Okay.  Just a -- I'm almost done.

22           All right.  Why, specifically, could requiring the

23     2017 pay data, along with the 2018 data, decrease response

24     rate and increase errors in the entire data collection

25     process?

1           THE WITNESS:  So I --

2           THE COURT:  To a greater extent than might be

3    experienced in just collecting 2018 Component 2 data alone?

4           THE WITNESS:  So as Your Honor is aware, this is a

5    brand-new data collection for EEOC and for employers, and we

6    are proposing to do this collection in a very abbreviated

7    period of time, and we believe that both years of data

8    collection would be the equivalent of two separate data

9    collections, and that is because the data that are collected

10   for 2017 may not be exactly the same data that are being

11   collected from the employers' perspective in 2018.

12           And what I mean by that is employers' payroll

13   systems and human resources systems are what is known as

14   transactional systems, and what that means is that on a

15   regular basis --

16           (Pause)

17           THE COURT:  I'm sorry.  Okay.  Go on.

18           THE WITNESS:  On a regular basis, data and

19   information is being put in, and data and information is

20   being -- is coming out of it.  It's not a static or fixed

21   database.  It's constantly changing to meet business needs

22   of the employers.

23           And to meet those business needs throughout the

24   course of a year the database may be changed a number of

25   times to introduce new data elements, to delete data

1     elements that are no longer used, to program a new code to

2     meet a new business need.  And so remember, these data are

3     being collected for certain business purposes, not for --

4     not necessarily for EEOC reporting purposes.

5             And then at the end of a calendar year, those data

6     are archived and put away and -- along with the -- hopefully

7     with the documentation that would explain to someone what

8     data are in which fields and what are the definitions of

9     those data.  And the same thing would have happened for

10    2018.

11            And so now in 2019 the EEOC is saying, "You need

12    to go back to your 2018 data and pull out this information,

13    and you're also going to need to go back to the 2017 data

14    and pull out the information all in a very short period of

15    time.  Here's what we're going to be able to give you in

16    terms of documentation for what we want you to pull, and

17    we'll provide you some technical assistance, the best that

18    we can do, between -- you know, until the data collection

19    period closes."

20            And what happens, Your Honor, is that we believe

21    that by focusing on an individual year of data instead of

22    trying to do two separate collections at the same time is

23    that we have a better likelihood of receiving quality data

24    if we just focused people's attention on one year instead of

25    multiple years of data.

```
 1              THE COURT:  All right.  I'm going to give you a
 2    hypothetical.
 3              Assume, for purposes of the hypothetical only,
 4    that I agree that collecting the 2017 pay data along with
 5    the 2018 pay data would be too risky.  If OMB used its
 6    emergency extension power to allow Component 2 data
 7    collection to be completed after September 30, 2019, and had
 8    the 2017 reporting cycle be replaced by the 2019 data
 9    collection in 2020, would that resolve the risks you
10    identified?
11              That's a lot.  I gave you a lot of dates here.
12    Let me ask again.
13              So if I agree that collecting the 2017 pay data
14    with 2018 would be too risky, if OMB used its emergency
15    extension power to allow Component 2 data to be completed
16    after the September 30th deadline and had the 2017 reporting
17    cycle be replaced by the 2019 data that was collected in
18    2020, would that resolve the problems that you talked about
19    just now?
20              THE WITNESS:  If there was a way to do that, and
21    EEOC was very diligent in how we moved forward in terms of
22    instruction manuals and frequently asked questions, then
23    from a reliability-and-validity-of-the-data perspective, my
24    answer would be yes.
25              THE COURT:  Okay.
```

1          Ms. Thurston, do you have questions?

2          And if you want to speak into the microphone and

3    sit down, you can.

4          MS. THURSTON:  Can you hear me?

5          THE COURT:  I can.

6          Is it on, Mr. Bradley?

7          Okay.  It's the court reporter who has to hear

8    you.

9          (To Dr. Haffer) Almost done.  We have some more

10   questions from Ms. Thurston and then from your own lawyer.

11                        EXAMINATION

12   BY MS. THURSTON:

13   Q.  Thank you for being here, Dr. Haffer.  I appreciate it.

14         Are you aware that the EEOC had put together --

15   this is in the pre-stay period -- a sample spreadsheet of

16   what it would look like for employers to report pay data?

17   A.  Yes.

18         MS. THURSTON:  Your Honor, I have copies of that

19   spreadsheet.  In the interest of time I can either provide

20   them to the Court --

21         THE COURT:  If you want to just mark them as

22   Exhibit 1 and hand one up.  And make sure that opposing

23   counsel gets one.

24         MS. THURSTON:  What I'm going to mark is the

25   first -- it's the link declaration that we submitted in

1    support of our motion for summary judgment --

2                THE COURT:  Oh, okay.

3                MS. THURSTON:  -- with the first --

4                THE COURT:  If it's already in the record, then

5    you can just hand one up to me.

6    Q.  Would you please look at the tab marked E.

7    A.  (Witness complies)

8    Q.  And is this a sample of what the Component 2 pay data

9    reporting spreadsheet was planned to look like in advance of

10   the stay?

11   A.  This is what I saw when I arrived at EEOC, yes.

12   Q.  Is there anything about this spreadsheet that would

13   change for the new Component 2 reporting that's scheduled to

14   occur this summer?

15   A.  Are you talking content or format?

16   Q.  Well, let's start with content.

17   A.  So content, the answer is no.  But format, yes.  This is

18   an unwielding -- an unwieldy instrument for trying to fill

19   out, and what I've discussed with NORC is building a data

20   intake portal that would be much more understandable and

21   customer-friendly than this form.

22   Q.  If the EEOC were to publish this form on its website

23   once again, now, would it provide employers the information

24   about what data they need to begin collecting, in terms of

25   W-2 pay information and FLSA hours worked information?

1    A.  I'm sorry, could ask the question again?  I want to make

2    sure I heard it.

3    Q.  If you were to publish this spreadsheet on the EEOC's

4    website once again, would it still provide the correct

5    information to employers about the data they would be

6    expected to report as part of the Component 2 data

7    collection?

8    A.  So if we were to publish information about reporting the

9    data here that this form purports to gather, we would

10   provide as much information as we can about a step-by-step

11   method of collecting the data that are being requested to be

12   collected.

13   Q.  So the form accurately reveals the data that employers

14   would be expected to report, if not the precise mechanism by

15   which they would report it?

16   A.  It shows the data, but it doesn't provide the

17   definitions of the data.

18   Q.  And so let's talk about the data that will be collected.

19   For example, the pay data is defined by W-2 Box 1 pay

20   information.  Is that one of the definitions that you're

21   saying needs to be clarified?

22   A.  There would be -- I've heard from people on the ground

23   that there would be questions about that data.

24   Q.  There would be questions about what W-2 Box 1 pay data

25   refers to?

1   A.  There would be questions about whether that data was an

2   accurate representation of data that's necessary to meet the

3   goals of the data collection.

4   Q.  So when you're saying there are questions about the

5   definition, am I correct to understand you're not saying

6   that you've heard employers are confused about what data to

7   report, but rather whether that data is useful?

8   A.  That, as well as questions about things like if someone

9   was FLSA-exempt in half the year and FLSA -- and subject to

10  FLSA the other half of the year, how would one report hours

11  worked?

12          Another issue would be if a company is acquired by

13  another company, and the -- or the remaining employees come

14  over to the new company but all of the payroll records and

15  human resources information stays with the other company,

16  how would that situation be handled?

17          So it's a lot of, I guess one would say,

18  clarification and dealing with issues like that.

19  Q.  Okay.  But just the W-2 data itself is clear as to an

20  employee who's been with the company for the entire calendar

21  year?

22  A.  Yes.

23  Q.  And the same would be true for the FLSA hours worked

24  information?

25  A.  Yes, yes, yes.

1    Q.   Okay.  In the pre-stay period, the plaintiffs are aware

2    of what the EEOC has made public about its data preparation,

3    collection preparation efforts, which the Court inquired

4    about.  Are you aware of whether there was any internal work

5    about clarifying the type of questions that you were just

6    referring to?

7    A.   Since which date?

8    Q.   Pre-stay, so pre-August 2017.

9    A.   So ideally that's what a real pilot study would have

10   done, but not to my knowledge.

11   Q.   So you don't know whether EEOC had begun to prepare

12   guidance on how to treat employees who began partway through

13   the calendar year or the other types of uncertainties that

14   you just referenced?

15   A.   So what I do know is that there were, I believe, two

16   webinars held at which time the EEOC announced and, in some

17   respects, reiterated and dispensed down what had been in the

18   60 -- no, the 30-day notice, and then I believe there were

19   some questions, a few questions, raised during those

20   webinars that then went into a frequently asked questions

21   revised document, and that was the extent of it.

22   Q.   And I understand that that's what EEOC did publicly.

23   Was there any internal work about preparing guidance to

24   address these kinds of questions that were arising, or do

25   you know?

1    A.  I wasn't there at the time.  I don't know.

2    Q.  But as far as you know, EEOC was on track to open the

3    Component 2 data collection on time in the pre-stay period?

4    A.  They were on -- they appeared to be on track to open

5    a portal that would have collected pay data that -- you

6    know, that doesn't -- I'm not going to speak to the quality

7    of the data that would have been reported, but they were

8    going to -- they appeared to be on track to open a data

9    collection portal.

10   Q.  And addressing briefly the pilot study, are you aware

11   that EEOC discussed the pilot study in both of its Federal

12   Register notices regarding the pay data collection?

13   A.  I am.

14   Q.  And that in the 60-day notice it discussed why using

15   synthetic data instead of real data was an appropriate

16   choice?

17   A.  Was appropriate or inappropriate?

18             THE COURT:  An appropriate.

19   Q.  An appropriate choice.

20   A.  I read what they wrote, yes.

21   Q.  And that this was the data collection package approved

22   by both EEOC and OMB at the time?

23   A.  That's correct.

24   Q.  When you were -- when the Court was inquiring about the

25   pilot study, I believe you made a statement with regard to

1    the use of pay bands and this not necessarily being a useful

2    mechanism to carry out the purposes of the data collection;

3    is that correct, or am I misremembering your testimony?

4    A.   So the information about the pay bands and whether

5    they're an appropriate way to measure differences in pay for

6    purposes of enforcement is in the National Academy of

7    Sciences report.

8         The quote, pilot study, unquote, that is just

9    simply the author of the report stating their policy

10   preference.  It's devoid of any kind of quantitative

11   analysis at all.  It just does not meet the standard

12   "Introductory Textbook to Research Methods" definition of a

13   pilot study.

14   Q.   I appreciate that that's your view, but are you aware

15   that EEOC determined, during the course of its years-long

16   process in how to collect pay data, that the use of pay

17   bands was its preferred mechanism?

18   A.   Only in terms of what I've read in the 60-day notice and

19   the 30-day notice.

20   Q.   And that this was the information collection package

21   approved by OMB, meaning that it met the standards of the

22   Paperwork Reduction Act?

23   A.   Yes.

24   Q.   Okay.  Once the stay was issued -- and at this point I

25   understand you were at EEOC; is that correct?

1    A.  No.  The stay was issued in August of '17, and I arrived

2    on November the 12th of '17.

3    Q.  In your testimony earlier, am I correct to understand

4    that you were saying that EEOC was somehow legally

5    restricted from taking any action that would suggest that

6    the data collection would continue or otherwise providing

7    information to employers?

8    A.  Yes, in terms of public information that we could

9    release.

10   Q.  Are you aware that as part of the stay OMB also stated

11   that it was reviewing the Component 2 data collection, and,

12   in fact, the memorandum issuing the stay instructed EEOC to

13   submit a new information collection package to OMB for

14   review?

15   A.  I am not aware of that.

16   Q.  Were you involved in any efforts to review the data

17   collection -- the Component 2 data collection as part of

18   OMB's purported review and stay order?

19   A.  Not since I arrived on November the 12th of 2017.

20   Q.  Are you aware of whether anyone else at EEOC took action

21   to respond to OMB's directive to submit a new information

22   collection package for review?

23   A.  I am not aware of that.

24   Q.  Are you aware that during the course of this litigation

25   defendants represented to the Court that the action should

1   not be reviewed because there was an active review within

2   the agencies of whether the Component 2 data collection

3   should continue?

4   A.  I'm sorry, could you say that again.

5   Q.  I'm sorry, that was a -- I used the word "review" a lot.

6           Are you aware that during the course of this

7   litigation defendants' position was that halting the

8   Component 2 data collection was not final because there was

9   an internal government review process that was ongoing?

10  A.  I have no knowledge of any of that.

11  Q.  And I apologize if the Court asked this, but when did

12  you become aware of this lawsuit?

13  A.  Probably two days after I walked in the door.

14  Q.  Were you aware that the plaintiffs have been -- have

15  stated that our preferred outcome is for the Component 2

16  data collection to resume in the current reporting period?

17  A.  I'm only aware of what I've read that's part of the

18  output from the Court.  I'm not sure exactly the right words

19  to use.

20          THE COURT:  The order.

21  A.  The order.

22  Q.  Okay.  So before the Court's summary judgment order, did

23  you have any understanding of what the time frame for

24  implementing the Component 2 data collection would be if

25  plaintiffs were successful?

1    A.   I'm sorry, say that again.

2              THE COURT:  Did you know what plaintiffs had asked

3    for in terms of the time frame for data collection, what

4    they were asking for in their lawsuit?

5              THE WITNESS:  I did not.

6              THE COURT:  Is that --

7              MS. THURSTON:  That's my question, yes.  Thank

8    you, Your Honor.

9    Q.   Were you aware whether EEOC had developed any

10   contingency plans to collect Component 2 data in the event

11   that plaintiffs were successful in the lawsuit?

12   A.   During what time period?

13   Q.   At any point between when you arrived at EEOC and before

14   the Court's summary judgment order.

15   A.   And ask the rest of your question.

16   Q.   Did EEOC do anything to develop a contingency plan in

17   the event that plaintiffs were successful in the lawsuit and

18   Component 2 data collection was reinstated?

19   A.   So we -- I was first made aware of a question in terms

20   of how fast we could do this when Ms. Moore emailed our

21   office of legal counsel, who then emailed me saying

22   essentially how fast --

23             THE COURT:  When was this?

24             THE WITNESS:  December the 4th.

25   Q.   And before that you were not aware of any contingency

1    plan for implementing Component 2?

2    A.  No, not at all.

3    Q.  After that email did you take any action to think about

4    what it would take -- take any action to implement Component

5    2 or develop a plan for doing so if the plaintiffs were

6    successful?

7    A.  We had estimated that to do this ideally, that it would

8    take us until -- we would begin data collection in January

9    of 2021.

10   Q.  Did you understand that if the plaintiffs were

11   successful, that we were seeking to have the data collection

12   begin in March of 2019?

13   A.  No, not at all.

14   Q.  Looking at your declaration and the time frame that the

15   Court pointed to, is there a date certain by which EEOC will

16   notify employers that they are -- will be required to submit

17   Component 2 data as part of -- at some point before

18   September 30, 2019?

19   A.  I'm sorry, say -- ask the question again.

20   Q.  Sure.  Is there a date certain by which EEOC will tell

21   employers they have to submit Component 2 data this year?

22   A.  Yes.  As soon as I'm instructed to move forward.

23   Q.  Who will instruct you to move forward?

24   A.  The acting chair.

25   Q.  And looking at that time frame again, you break out July

1    1st as, I understand it, a date by which initial

2    notification via email and mail to employers will go out?

3    A.  No.  If you look back at the one right before that,

4    under "Data Quality Assurance Step, Preparation Work," we

5    would begin to -- we would create, develop, and deliver the

6    online data collection training to employers.  That would

7    start immediately.  And of course we'd start putting

8    together frequently asked questions.  We'd have a website

9    with information on it.

10           So the notification would begin -- the

11   notification from the contractor to the employers would

12   begin as soon as the contract is awarded.

13   Q.  And what does that notification amount to, the

14   notification from the contractor?

15   A.  Well, we would do email blasts.  We would do snail mail.

16   We would do webinars.  We would work through the stakeholder

17   groups.

18           THE COURT:  You mean to tell the employers you're

19   going to have to start collecting this data?

20           THE WITNESS:  Correct, Your Honor.

21   Q.  So what does the July 1st date refer to?  It's in the

22   second sub --

23   A.  Okay.  So we would -- so in the April-to-June time frame

24   we are creating and developing the how.  This is what, the

25   why, the where, the when, and the, in general, how.

1          Beginning July the 1st we would say, "This is

2     exactly where you're going to go to input the data, and

3     we're going to open that on July the 15th" --

4     Q.  Okay.

5     A.  -- "open the portal on July the 15th.  So that we've

6     spent all these months teaching you how to do it, and now

7     you may go ahead and submit."

8     Q.  Are you aware that July 1st is the same date that the

9     composition of the commission changes?

10    A.  I am not.

11    Q.  And namely that would be the date that the only

12    commissioner representing the minority parties' term

13    expires?

14    A.  I have not heard this before.

15    Q.  In putting together -- in NORC's estimate of its time

16    frame, do you know if that estimate took into account

17    employer burden concerns or employers' estimated -- there's

18    an assertion the employers had made that it would take them

19    some time to comply?

20    A.  It did not.

21          (Pause)

22          THE COURT:  Ms. Thurston?

23          MS. THURSTON:  I'm almost done.

24    Q.  So looking at the September 30th proposed deadline, does

25    that date account for employer delays and compliance?

1   A.  So as is traditional with other federal surveys or

2   information collections, if -- we would stop reaching

3   out to people on September 30th.  However, we would not

4   officially -- if we were to receive information submissions,

5   in general, one to two weeks after the -- after we were no

6   longer able to go out and remind people to send their data

7   in, we would accept those data.

8           But it's important that we do close the

9   information collection officially after the stragglers

10  have -- you know, after just a period of time to allow the

11  stragglers to submit their data.

12  Q.  So does your proposal anticipate stragglers submitting

13  data after September 30th?

14  A.  If we would receive a call on September 29th and someone

15  said, "Hey, we had a fire, and we're just restoring our

16  systems, and could we submit our data on October 1st or

17  2nd?" we would allow them to do that.

18  Q.  Regardless of the PRA expiration deadline of September

19  30th?

20  A.  The way that -- for purposes of data collection, the way

21  that the expiration generally works -- and we did this at

22  our federal agencies that I was part of, another federal

23  agency I was part of -- because the person who was

24  submitting the data made a good faith effort to get the data

25  in, and it may not have been on that particular day, we will

1  still take that data in.  But you only leave that period of

2  time open.

3          Now, you're not -- we're not reaching out to

4  people.  We're not -- after September 30th we're no longer

5  going to nonrespondents and saying, "Hey, send it in.

6  You're missing the deadline," but we would allow for lag --

7  you know, just for just certain things that might happen

8  that would -- we'd try to be accommodating because we know

9  people are putting a lot of effort into collecting these

10 data, and so we would hate not to accept it after -- if it

11 was just a few days late.

12 Q.  Is the same accommodation true for the automatic 30-day

13 extension that EEOC typically offers to reporters?

14 A.  I don't -- this is -- so I just first heard about this

15 automatic 30-day extension yesterday or the day before.

16 That is not a standard practice, nor should it be a standard

17 practice in information collection.

18 Q.  So your post time frame would not allow for any

19 extensions?

20 A.  Any official extensions?

21 Q.  If an employer requests an extension pursuant --

22          THE COURT:  So you mean if somebody calls and

23 said, "We've had a fire, we've had some unexpected problem,"

24 you might make an exception, but you're not just going to

25 give a 30-day extension?

```
1              THE WITNESS:  No blanket exceptions.
2    Q.  But is it your position that EEOC could take no action
3    after September 30th to collect data from nonreporters
4    unless they submitted it voluntarily?
5    A.  If you're asking me if I believe that we could in some
6    way reach out to people after September 30th, the answer is
7    no.
8    Q.  Okay.
9              MS. THURSTON:  No further questions.
10             THE COURT:  Thank you, Ms. Thurston.
11             Ms. Moore.
12             MS. WELLS:  Your Honor, Carlotta Wells on behalf
13   of the defendants.  I'm just going to have a very few
14   questions.  Should I come up to the podium?
15             THE COURT:  You can also direct your questions,
16   but just make sure the microphone is on.
17             MS. WELLS:  Okay.  Thank you.
18             THE COURT:  And that the -- and my court reporter
19   needs to able to hear.  All right.
20             MS. WELLS:  Okay.  Thank you.
21                          EXAMINATION
22   BY MS. WELLS:
23   Q.  Dr. Haffer, you testified earlier in response to
24   questions from the judge that when you came to the EEOC at
25   first that you identified a number of concerns and issues
```

1    relating to the data analytics and the processes for

2    collecting data; is that right?

3    A.  Yes.

4    Q.  And are you aware of whether or not there was any other

5    evaluation of the EEOC's data and analytics issues?

6    A.  Yes.  On the second or third day that -- after I

7    arrived at EEOC, I was asked to come to a meeting by the

8    Office of the Inspector General because they had just

9    started a report -- an evaluation of data and analytics at

10   the EEOC.

11   Q.  And do you know what the OIG, the Office of Inspector

12   General, was investigating?

13   A.  Yes, that the current processes and systems that the

14   agency used for its data and analytics functions were

15   outdated, antiquated, that we weren't getting maximum

16   benefit out of the use of our data, that we weren't

17   exploring the potential of using other data from other

18   federal agencies to meet our agency goals and missions.

19   And so it was basically looking at our whole data and

20   analytics --

21              THE COURT:  Excuse me a minute.

22              Please don't use cell phones in the courtroom.

23              UNIDENTIFIED SPECTATOR:  I'm sorry.

24   Q.  Were you finished?

25   A.  Yes.

1    Q.  Do you know if the OIG was issued a report?

2    A.  Yes.  The OIG did issue a report, and it was issued in

3    the spring of 2018, and it is available on the EEOC website.

4    Q.  And are you familiar with the report and its findings?

5    A.  I am.

6    Q.  And can you just tell us sort of a bird's eye view of

7    what some of the issues or the findings were that are

8    relevant to our conversation here in court today.

9    A.  That how we collect data was outdated, that there were

10   methods and techniques for improving how we collect data,

11   and how we use data was outdated.

12          They provided just evidence, kind of external

13   validity, of what some of the things I myself had been

14   finding.  And, in fact, that's part of what led to the

15   stand-up of the EEOC data and analytics modernization

16   program.

17   Q.  Okay.  Switching gears a little bit, you testified, in

18   response to questions from Judge Chutkan and also in

19   response to questions from Ms. Thurston, about, on Page 11

20   of your declaration, sort of the timeline for responding to

21   the Court's order.

22          Can you explain what role NORC will play in either

23   the data quality assurance or the data quality control

24   aspects of the timeline that are set forth here?

25   A.  So they will be responsible for the entire -- all

1    processes and systems related to Component 2 data

2    collection.  And that is very standard practice in the 21st

3    Century when federal agencies are collecting their data.

4          Because we have limited human resources, and we --

5    and because there are contractors who have decades of

6    experience collecting data, valid and reliable data, they

7    know what they're doing.  They know how to get people to be

8    respondents.  They have the secure systems in place to store

9    the data and do some basic data quality checks of the data;

10   that that whole process would be contracted to NORC, and

11   they would deliver to us, at the end of the process, a clean

12   data set.  And that's very standard practice.

13         And, of course, we maintain over -- we would

14   always be involved in the oversight and operations of this,

15   but the actual boots-on-the-ground data collection work

16   would all be contracted to NORC.

17   Q.  And can you just briefly tell us how that process that

18   NORC intends to use for the Component 2 data is different

19   from the ongoing collection with the Component 1 data that's

20   being undertaken now.

21   A.  Sure.  NORC has the flexibility to be able to pull

22   resources from across their organization to focus on

23   creating a user-friendly data portal that will allow

24   employers to input data at one place, and they have the

25   secure and certified servers on the back end where the

1    security exceeds the federal minimums.

2            I mean, they have all of the processes and

3    mechanisms and systems in place to be able to handle this

4    data collection.

5    Q.  And so I gather from your answer that the processes in

6    place for a Component 1 data are not satisfying those

7    criteria.  Or do they have them?

8    A.  Well, the issue with Component 1 is really twofold.

9    One, as I mentioned earlier, the contractor that we're using

10   is a small business who just does not have the capacity to

11   be able to stand up Component 2.

12           THE COURT:  That's SAGE?

13           THE WITNESS:  That's SAGE; that's correct.

14   A.  And the other is that, as I mentioned earlier, and this

15   might be a little oblique, but over the years the way the

16   Component 1 processes evolved is that the data are entered

17   and stored on EEOC servers, and there is a real concern that

18   by -- if we were to collect Component 2 data using the EEOC

19   servers, that it could result in a compromised response

20   time, a latency issue, really bog the system down if we were

21   to do that.

22           And so the simplest and most straightforward

23   solution is to hire a contractor who has the capacity to do

24   this and knows what they're doing.

25   Q.  Okay.  And there's just one more area that I'd like to

1    cover with you.

2         Ms. Thurston asked you about pay band data and the

3    EEOC's reliance on that with respect to agent salary

4    information.  Do you remember those questions?

5    A.  I do.

6    Q.  And can you tell us like when, in your experience, in

7    what area does EEOC currently collect pay band information?

8    A.  So the EEOC currently collects pay band information on

9    the EEO-4 survey, which is a survey of state and local

10   governments.  It's my understanding that the EEOC has been

11   collecting this information since the 1970s, but it's also

12   my understanding from reading the National Academy of

13   Sciences report that both the Department of Justice as well

14   as a former EEOC commissioner have testified or presented

15   information to the National Academy panel that's documented

16   in the report that pay band data have not been useful, and,

17   in fact, they basically say that those data aren't used at

18   all.

19   Q.  Okay.

20        MS. WELLS:  I have nothing further, Your Honor.

21        THE COURT:  All right.  Thank you, all.

22        It's now six minutes after 4:00.

23        Thank you, Dr. Haffer.  You've had a lot of

24   questions to answer, and thank you for your time.  You can

25   step down.

1          THE WITNESS:  Thank you.

2          THE COURT:  We can have oral argument on this now,

3    or you all can provide me with written submissions.  What's

4    your preference?

5          But it would have to be soon.  If you want to look

6    at the transcript beforehand, that might be more prudent.

7          MS. THURSTON:  We're really open to whichever the

8    Court prefers.  I'd be happy to provide some argument now,

9    although we're also submitting brief -- simultaneous written

10   submissions would be fine.

11         MS. MOORE:  Your Honor, I think for purposes of --

12   or at least for the EEOC's ability to get some resolution to

13   what it is that --

14         THE COURT:  We're going to have to do?

15         MS. MOORE:  Well, how to respond.  As Dr. Haffer

16   mentioned, they have this contract.  I think the concern is

17   whether -- what the parameters of the contract will be.  Are

18   they -- what are the dates, and so that may be the reason

19   that --

20         THE COURT:  We're here.  So, Ms. Thurston,

21   obviously April 12th has come and gone.  You heard Dr.

22   Haffer's testimony with regard to NORC's representation.

23   What is it plaintiffs -- are plaintiffs going to change

24   their request?  I mean, what is it that plaintiffs are

25   asking the Court to do?

1          MS. THURSTON:  Yes, Your Honor.

2          As I said at the last status conference, our

3     primary concern is that the data be collected in a manner

4     that ensures it occurs and that plaintiffs obtain their

5     remedy, and, of course, we are not interested in

6     compromising quality.

7          We haven't had an opportunity to depose NORC.  We

8     don't know the basis for Dr. Haffer's assertion that it

9     could -- from them that it could not occur more quickly.

10         THE COURT:  Well, you know, yes, it's true, you

11    haven't, but you have Dr. Haffer's deposition -- I mean, his

12    testimony.  Given the tightness of the time schedule you're

13    asking for, if I were to allow you to depose NORC, which I'm

14    not at this point inclined to do, that would further delay

15    things.

16         MS. THURSTON:  Yes, which is something that we

17    acutely understand.

18         I think if we had sufficient assurances, which I

19    don't think we have right now, that the data collection

20    would be performed and completed by September 30th,

21    including both years, or that some other provision for the

22    calendar year 2017 data be reached, and that there were an

23    assurance that if there were legs beyond September 30th that

24    either there would be a mandatory emergency extension or

25    that the data collection be tolled -- the expiration would

1      be tolled or ideally both, then I think that that would

2      protect plaintiffs' remedy.

3              I would ask, as part of that, that EEOC notify

4      employers immediately that they have to start pulling this

5      data.  I understand that Dr. Haffer is concerned about the

6      influx of calls they would get.  I think that that could be

7      managed by informing employers that EEOC has limited

8      response capacity in the short run, so -- and I would also

9      request a Federal Register notice lifting the stay as we

10     requested in our complaint.  I think we would also want

11     regular reporting from the EEOC and/or NORC to plaintiffs

12     and the Court about the status of their time frame through

13     the summer.

14             And I guess I'll just note that I appreciate that

15     the data collection is an effort.  I think that Dr. Haffer's

16     testimony as to his disagreement about the utility of

17     certain types of data is really entirely irrelevant to the

18     Court's consideration today.

19             THE COURT:  I agree.

20             MS. THURSTON:  So separating that testimony out, I

21     think also the EEOC's ongoing data modernization efforts

22     have not prevented the agency from conducting its other data

23     collection, so I think that that is really kind of a red

24     herring to whether the Component 2 data collection should be

25     reinstated in a timely manner.

1          Does that respond to Your Honor's questions?

2          THE COURT:  Yes.

3          I'm not trying to hide the ball here.  I found

4     Dr. Haffer's testimony to be very helpful, especially with

5     regard to the role of NORC, which provided me with a great

6     deal more clarity regarding the EEOC's preparation for the

7     collection of this data, but I agree with plaintiff that,

8     you know, opinions regarding the relevancy or the

9     helpfulness of the data is neither here nor there.

10          But Ms. Moore or Ms. Wells, can you respond to

11    plaintiffs' very real concern that -- you know, I understand

12    the representations that have been made here that NORC will

13    complete its collection by September 30th and so, you know,

14    you didn't need to address the tolling issue, but as we all

15    know, with the best intentions things, especially if you're

16    talking about an outside contractor, don't always happen the

17    way one hopes.  And plaintiffs' concern is one -- is that

18    the September 30th deadline will come, the data collection

19    will not be complete, and the government will stand up and

20    say the period is expired, and there's no tolling.  That

21    will be pretty bold given what's happened here today, but

22    not unheard of.

23          So how can you -- how do you respond to that

24    concern?

25          MS. MOORE:  Your Honor, my understanding from

1    Dr. Haffer and his discussions with NORC is that they

2    have -- that NORC has provided its assurance that it can --

3        THE COURT:  NORC isn't before me.  I don't have

4    any jurisdiction over them.  So what I need is a

5    representation by you and/or OMB that in the event that the

6    data collection isn't completed by September 30th, that you

7    have some mechanism in place for completing that shortly

8    thereafter and you're not going to stand up here and say,

9    "Well, the deadline's passed."

10        MS. MOORE:  Your Honor, my understanding is that,

11    just as Dr. Haffer testified, once the collection is open

12    for employers to use, employers will be able to submit their

13    data up to September 30th.  And to the extent that, as he

14    mentioned before, if there are employers that --

15        THE COURT:  I don't think you're understanding my

16    question, Ms. Moore.  I'm just saying what if it's not done?

17    What if there are glitches in the software?  You know,

18    things happen that may not be foreseen right now.

19        I think that Dr. Haffer was testifying that, you

20    know, according to the plan it should be completed, but

21    things happen.  And if it's not completed, not because there

22    are some stragglers but because it didn't go as planned,

23    what's the fall-back position?

24        MS. MOORE:  Your Honor, at that point, I think

25    with enough -- sufficient time and communications between

1    NORC and the EEOC, if that were to be the case, I imagine

2    that in the ordinary course EEOC would reach out to OMB and

3    state that, "Look, here's our" -- "The expiration date's

4    coming.  Would you exercise your authority under the

5    emergency provision to give us sufficient time to complete

6    this for those purposes?"

7        THE COURT:  Okay.  Dr. Haffer also testified that

8    there's a contract.  They've discussed a timeline with NORC.

9    He testified as far as he's aware all that needs to be done

10   is for the acting chair to -- and the chief financial

11   officer to approve the contract.  Why can't that happen?  I

12   mean, what's the hold-up with that?

13       MS. MOORE:  Your Honor, the hold-up, as I alluded

14   to earlier, is the fact that -- the parameters of that

15   contract.  Are they -- as you're aware, at the last status

16   conference there were two dates that we walked away with

17   that were sort of front and foremost.  One was collecting

18   the pay data at the same time that employers were -- are

19   collecting their Component 1 data, and that Component 1 data

20   collection is supposed to close on May 31st.  The other date

21   was the end of the expiration.

22       THE COURT:  But why is that holding up whether the

23   chair approves the contract or not?

24       MS. MOORE:  Your --

25       THE COURT:  You've had the -- I mean, what's the

1      delay there?

2              MS. MOORE:  Your Honor, I do not know what the

3      delay is.  I under -- I think that they are looking for

4      some -- we were brought in because apparently we're not

5      responding to the Court's order quickly enough --

6              THE COURT:  No.

7              MS. MOORE:  -- which we understand, and as you

8      understand now, some of the realities of what the agency --

9              THE COURT:  I understand the realities.  That does

10     not allay my concern that defendants are slow-rolling this

11     process, and that is what I'm trying to avoid here.

12             MS. MOORE:  Okay, Your Honor, and I understand

13     that.

14             The EEOC is ready to move forward, and if the

15     Court -- we will -- I will relay that information to agency

16     counsel, who will then relay it to the acting chair, that

17     the -- you know, to the extent that they are to go forward

18     and collect this pay data, that they will do so.

19             Your Honor, I do think it's important -- if you

20     would just bear with me, there are a couple of things I just

21     wanted to bring to the Court's attention.

22             One, as you're aware, Your Honor, the Court, on

23     March 4th, issued an order in response to plaintiffs'

24     Section 7062 claims that they -- that OMB's decision to stay

25     and review violated the APA and PRA.

1          In response, this Court found that OMB's decision

2     was arbitrary and capricious and unlawful and vacated and

3     set aside OMB's decision and reinstated the prior approval.

4     And here we are today.

5          EEOC, as plaintiffs are aware and as defendants

6     are aware, is a party to this case, but EEOC's exercise of

7     its statutory authority to administer its collections to

8     modify the deadlines, to determine the efficacy of

9     collecting one set of data versus another year's data in

10    response to real concerns, as Dr. Haffer has mentioned, is

11    not anything that plaintiffs have challenged here or

12    anything that this Court has previously addressed, and so,

13    Your Honor, to the extent that --

14          THE COURT:  But, Ms. Moore, I'm going to interrupt

15    you because EEOC can't use those factors to delay the remedy

16    that -- you know, my order.

17          MS. MOORE:  Your Honor, we fully appreciate Your

18    Honor's order.  As Dr. Haffer mentioned, EEOC has been,

19    since March 4th, trying to figure out, "All right.  The pay

20    data collection has been reinstated.  What do we need to do

21    to get this going?"

22          THE COURT:  More -- well, my questions also went

23    to what was being done during -- since this case was filed,

24    because, you know, there was always a possibility that this

25    stay could be lifted.

1          And, you know, I don't doubt Dr. Haffer's

2     testimony that once the order issued that very night they

3     started -- EEOC started trying to figure out how to comply

4     with it, but certainly there should have been efforts made

5     before that time to get ready in case plaintiffs should

6     prevail, and what I've heard and what's been submitted to me

7     hasn't given me much reason to believe that there was

8     anything done.

9          MS. MOORE:  Your Honor, I understand the Court's

10    concerns, and I do -- I know that action -- as Dr. Haffer

11    testified, that they have been trying to modernize their

12    collections generally; and with respect to this specific

13    collection, they have proposed a process and a timeline that

14    is within the three-year approval period.  I just -- I guess

15    the last point I would make, and I just want to be clear

16    that the Court's order -- the relief that the Court -- the

17    relief that plaintiffs requested and the relief that the

18    Court ordered was vacatur or declaration that it was

19    unlawful, to vacate and set aside, and for defendants to

20    reinstate the prior approval.

21         THE COURT:  Are you saying that I don't have

22    equitable power to enforce my order?

23         MS. MOORE:  Your Honor, I'm not -- I'm not saying

24    that.  I would say that some of the relief that plaintiffs

25    have requested in their April 8th filing are outside the

1    scope of -- especially with respect to EEOC and its

2    independent, unchallenged --

3            THE COURT:  I got the message in your reply.

4            MS. MOORE:  That is the only point that I -- those

5    two points.  One, that this is now -- EEOC has responded to

6    the Court's order.  It is exercising its administrative

7    authority to put into place mechanisms and processes to do

8    this collection.  It has made decisions within that --

9    within -- that are responsive to the Court's order, and I'd

10   also just recognize that some of the relief that plaintiffs

11   have requested in their April 8th filing would be -- are

12   essentially ordering the agency to take mandatory action

13   that they wouldn't otherwise be obligated to take under the

14   APA.  And that is the only point that I would raise.

15           THE COURT:  All right.  I'll issue an order.  I'll

16   take this under advisement.

17           MS. THURSTON:  Your Honor, may I make a couple of

18   responsive points?  I will try to be very brief.

19           THE COURT:  Yes.

20           MS. THURSTON:  But in response to Ms. Moore's

21   representations about the agency's authority, the EEOC's

22   authority, the first point is that the EEO and data

23   collection is required to be performed annually by

24   regulation.  It's not an entirely discretionary data

25   collection.  And the reg, 29 CFR 1602.7, refers to the

1    current EEO-1 form.

2            So we read Your Honor's order as reinstating the

3    current EEO-1 form as including Component 2 data collection,

4    so I think the kind of implicit suggestion that if they

5    decide Component 2 no longer has utility and they don't have

6    to collect it is entirely false in light of Your Honor's

7    order.

8            I think Your Honor referenced the Court's inherent

9    equitable authority.  I just want to point to a couple of

10   recent decisions by other judges in this court in APA cases

11   where the courts use that equitable authority following a

12   vacatur to require more than just a remand to the agency and

13   to -- for the agency to respond to the vacatur.

14           In the International Entrepreneurial Rule

15   litigation -- this is *NVCA v. Duke*, Case No. 171912 -- Judge

16   Boasberg ordered discovery to determine if the agency was

17   slow-walking its obligations following the vacatur of the

18   rule delay; and in *Mendoza v. Perez*, 72 F. Supp. 3d 168,

19   after the D.C. Circuit remanded instructing the district

20   court to fashion the APA remedy, Judge Howell vacated

21   challenged guidance letters by the Department of Labor and

22   set a specific time frame for the replacement rule-making.

23   So the Court's equitable authority to ensure that

24   plaintiffs' remedy is realized encompasses things like

25   requiring compliance reports or requiring the agency to take

1    certain steps by certain dates, especially where the time is

2    as limited as it is here.

3          I want to make a point about the September 30th

4    deadline.  I think Your Honor is well aware of our concerns

5    about agency lag and possible delays.  We're also concerned

6    that employers have heard today that the EEOC is going to

7    take no action after September 30th to ensure that they

8    actually submit these legally required reports.

9          THE COURT:  That would be unfortunate, if that

10   were the take-away.

11         MS. THURSTON:  Well, we're aware that members of

12   the employer community are in the audience, have been

13   following this closely, that amici are following the

14   litigation closely and, as I mentioned before, have

15   threatened collateral legal action.  So I think some

16   instruction from the Court or assurance that the EEOC will

17   take seriously the obligation to collect data from employers

18   would help protect plaintiffs' remedy.

19         And then finally I'll mention the 2017 calendar

20   year data.  We still don't have a good plan for how that

21   will be collected by the September 30th deadline.  We would

22   be open to replacing it with 2019 calendar data, calendar

23   year data, which I believe Dr. Haffer said would be entirely

24   feasible by next spring, but, again, we would need some

25   assurance that the PRA expiration of September 30th didn't

1    prevent that from occurring.

2              THE COURT:  All right.  Thank you, all.  I

3    appreciate your briefings and arguments and testimony on

4    this matter, and I will issue an order as soon as I can.

5    Thank you.

6                        (Whereupon the hearing was

7                        concluded at 4:25 p.m.)

8

9              **CERTIFICATE OF OFFICIAL COURT REPORTER**

10

11              I, LISA A. MOREIRA, RDR, CRR, do hereby

12    certify that the above and foregoing constitutes a true and

13    accurate transcript of my stenographic notes and is a full,

14    true and complete transcript of the proceedings to the best

15    of my ability.

16       Dated this 17th day of April, 2019.

17

18                        /s/Lisa A. Moreira, RDR, CRR
                         Official Court Reporter
19                        United States Courthouse
                         Room 6718
20                        333 Constitution Avenue, NW
                         Washington, DC 20001
21

22

23

24

25

# #

**#800** [1] - 1:16

# $

**$100,000** [1] - 51:3

# '

**'17** [2] - 63:1, 63:2
**'18** [1] - 36:2

# /

**/s/Lisa** [1] - 89:18

# 1

**1** [22] - 21:24, 24:17, 25:1, 29:4, 29:10, 30:15, 35:1, 35:3, 35:14, 41:18, 41:20, 47:18, 49:8, 56:22, 58:19, 58:24, 74:19, 75:6, 75:8, 75:16, 82:19
**10** [1] - 35:8
**11** [4] - 1:16, 44:3, 44:13, 73:19
**1100** [1] - 1:20
**11th** [2] - 27:22, 27:23
**12th** [4] - 31:15, 63:2, 63:19, 77:21
**13** [1] - 17:21
**15** [2] - 4:15, 5:21
**15th** [3] - 39:13, 68:3, 68:5
**16** [4] - 1:4, 5:16, 5:18, 5:21
**1602.7** [1] - 86:25
**168** [1] - 87:18
**17-2458** [1] - 3:3
**171912** [1] - 87:15
**17th** [1] - 89:16
**19** [3] - 5:16, 6:10, 28:22
**1970s** [1] - 76:11
**19th** [5] - 5:19, 22:14, 25:24, 40:6
**1:17-cv-02458-TSC** [1] - 1:3
**1st** [5] - 67:1, 67:21, 68:1, 68:8, 69:16

# 2

**2** [59] - 4:14, 4:22, 4:23, 10:20, 11:25, 14:12, 24:15, 24:24, 25:17, 26:2, 26:25, 27:17, 28:22, 28:25,

29:12, 29:20, 31:10, 32:11, 35:10, 36:6, 37:6, 37:14, 38:8, 38:25, 40:9, 43:8, 44:17, 45:19, 46:3, 46:7, 49:19, 52:13, 53:3, 55:6, 55:15, 57:8, 57:13, 58:6, 61:3, 63:11, 63:17, 64:2, 64:8, 64:15, 64:24, 65:10, 65:18, 66:1, 66:5, 66:17, 66:21, 74:1, 74:18, 75:11, 75:18, 79:24, 87:3, 87:5
**20** [2] - 5:16, 6:10
**20001** [2] - 1:24, 89:21
**20005** [1] - 1:21
**20036** [1] - 1:17
**20043** [1] - 1:14
**2014** [2] - 50:3, 50:4
**2016** [3] - 25:20, 31:11, 33:1
**2017** [26] - 4:23, 23:22, 24:16, 25:1, 25:8, 26:24, 31:12, 31:15, 35:7, 35:21, 35:25, 37:2, 37:3, 38:7, 38:22, 52:23, 53:10, 54:13, 55:4, 55:8, 55:13, 55:16, 60:8, 63:19, 78:22, 88:19
**2018** [17] - 6:4, 7:10, 8:6, 9:9, 19:9, 24:17, 28:23, 35:22, 43:23, 52:23, 53:3, 53:11, 54:10, 54:12, 55:5, 55:14, 73:3
**2019** [20] - 1:4, 4:14, 4:15, 8:6, 17:10, 22:16, 27:1, 28:22, 31:5, 38:23, 46:7, 46:9, 54:11, 55:7, 55:8, 55:17, 66:12, 66:18, 88:22, 89:16
**202** [2] - 1:14, 1:21
**202-354-3187** [1] - 1:25
**202-588-5180** [1] - 1:17
**2020** [2] - 55:9, 55:18
**2021** [7] - 17:5, 17:7, 17:14, 19:5, 24:8, 45:11, 66:9
**21st** [1] - 74:2
**25** [1] - 6:10
**28** [1] - 2:4
**29** [2] - 31:11, 86:25
**29th** [1] - 69:14
**2:17** [1] - 1:5

# 2nd

**2nd** [1] - 69:17

# 3

**3** [2] - 33:1, 38:1
**30** [9] - 4:14, 8:6, 17:10, 22:16, 27:1, 31:5, 51:9, 55:7, 66:18
**30-day** [6] - 49:11, 60:18, 62:19, 70:12, 70:15, 70:25
**305-8628** [1] - 1:21
**30th** [27] - 4:22, 23:5, 23:14, 30:20, 31:4, 40:19, 45:14, 45:17, 46:17, 55:16, 68:24, 69:3, 69:13, 69:19, 70:4, 71:3, 71:6, 78:20, 78:23, 80:13, 80:18, 81:6, 81:13, 88:3, 88:7, 88:21, 88:25
**31** [4] - 35:22, 36:2, 46:7, 46:9
**31st** [1] - 82:20
**333** [2] - 1:24, 89:20
**34** [1] - 21:25
**34553** [1] - 1:13
**3d** [1] - 87:18
**3rd** [6] - 4:8, 10:12, 10:18, 13:12, 14:11, 14:15

# 4

**4** [2] - 22:1, 38:1
**448-9090** [1] - 1:14
**45492** [1] - 49:13
**4:00** [1] - 76:22
**4:25** [1] - 89:7
**4th** [15] - 13:16, 21:19, 25:7, 29:3, 29:22, 30:10, 30:11, 30:13, 30:20, 31:7, 39:11, 39:13, 65:24, 83:23, 84:19

# 5

**5** [2] - 17:19, 38:1
**54-1** [1] - 44:12
**56** [1] - 2:4
**5th** [1] - 43:10

# 6

**60** [1] - 60:18
**60-day** [2] - 61:14, 62:18
**6718** [2] - 1:23, 89:20

# 6th

**6th** [1] - 43:10

# 7

**7062** [1] - 83:24
**71** [1] - 2:5
**72** [1] - 87:18

# 8

**81** [1] - 49:12
**8th** [3] - 4:16, 85:25, 86:11

# 9

**9th** [1] - 4:20

# A

**abbreviated** [1] - 53:6
**ability** [10] - 10:9, 11:9, 13:2, 26:2, 27:17, 32:11, 32:18, 38:8, 77:12, 89:15
**able** [23] - 8:24, 9:8, 9:16, 12:8, 15:19, 16:23, 17:15, 17:25, 18:6, 18:8, 29:16, 33:13, 38:10, 38:15, 38:16, 40:13, 54:15, 69:6, 71:19, 74:21, 75:3, 75:11, 81:12
**absence** [1] - 7:25
**Academy** [7] - 47:7, 47:10, 47:16, 48:2, 62:6, 76:12, 76:15
**accept** [2] - 69:7, 70:10
**access** [1] - 51:21
**accommodating** [1] - 70:8
**accommodation** [1] - 70:12
**according** [1] - 81:20
**account** [2] - 68:16, 68:25
**accountable** [1] - 36:24
**accurate** [2] - 59:2, 89:13
**accurately** [1] - 58:13
**acquired** [1] - 59:12
**Act** [3] - 33:11, 50:4, 62:22
**acting** [7] - 4:21, 4:24, 42:23, 42:25, 66:24, 82:10, 83:16
**action** [4] - 16:9, 22:4, 23:9, 63:5, 63:20, 63:25, 66:3,

66:4, 71:2, 85:10, 86:12, 88:7, 88:15
**Action** [1] - 3:3
**actions** [5] - 16:13, 30:8, 37:5, 38:24, 40:7
**active** [2] - 33:23, 64:1
**activities** [4] - 36:21, 36:24, 37:7, 37:17
**activity** [1] - 37:9
**actual** [3] - 16:18, 45:23, 74:15
**acutely** [1] - 78:17
**add** [1] - 22:20
**added** [1] - 34:17
**additional** [3] - 5:3, 39:4, 46:6
**address** [21] - 5:17, 5:19, 6:6, 6:11, 6:18, 6:20, 7:1, 7:3, 7:13, 7:20, 8:17, 8:22, 9:3, 9:20, 9:21, 23:20, 23:22, 47:25, 60:24, 80:14
**addressed** [3] - 8:10, 27:21, 84:12
**addressing** [4] - 8:13, 10:6, 13:1, 61:10
**administer** [1] - 84:7
**administrative** [3] - 4:24, 9:11, 86:6
**advance** [2] - 15:4, 42:8, 57:9
**adverse** [4] - 10:9, 11:10, 11:18, 13:2
**advisement** [1] - 86:16
**affect** [1] - 32:10
**affected** [2] - 26:2, 38:7
**afternoon** [8] - 3:11, 3:14, 3:17, 3:23, 6:24, 6:25, 28:6, 28:7
**agencies** [7] - 8:17, 16:19, 20:21, 64:2, 69:22, 72:18, 74:3
**agency** [22] - 7:21, 9:7, 9:11, 9:13, 9:14, 13:1, 13:24, 20:20, 69:23, 72:14, 72:18, 79:22, 83:8, 83:15, 86:12, 87:12, 87:13, 87:16, 87:25, 88:5
**agency's** [1] - 86:21
**agent** [1] - 76:3
**aggregate** [1] - 52:5
**ago** [1] - 34:16
**agree** [6] - 55:4, 55:13, 79:19, 80:7
**agreed** [2] - 10:17,

18:9
**agreement** [2] - 15:19, 16:24
**ahead** [2] - 10:4, 68:7
**al** [4] - 1:3, 1:6, 3:3, 3:4
**allay** [1] - 83:10
**alleging** [1] - 16:13
**allow** [12] - 5:5, 40:15, 40:19, 47:24, 55:6, 55:15, 69:10, 69:17, 70:6, 70:18, 74:23, 78:13
**allowed** [2] - 38:9, 38:13
**allowing** [1] - 51:12
**alluded** [1] - 82:13
**almost** [3] - 45:19, 52:21, 68:23
**Almost** [1] - 56:9
**alone** [1] - 53:3
**amici** [2] - 23:10, 88:13
**amount** [1] - 67:13
**analysis** [1] - 62:11
**analytics** [8] - 28:15, 37:22, 72:1, 72:5, 72:9, 72:14, 72:20, 73:15
**AND** [1] - 1:6
**announced** [1] - 60:16
**announcing** [1] - 22:3
**annual** [1] - 29:4
**annually** [1] - 86:23
**answer** [9] - 22:13, 26:8, 30:3, 47:25, 55:24, 57:17, 71:6, 75:5, 76:24
**answers** [2] - 30:4, 33:6
**anticipate** [1] - 69:12
**antiquated** [1] - 72:15
**anxious** [2] - 6:8, 7:15
**anyway** [1] - 34:19
**APA** [4] - 83:25, 86:14, 87:10, 87:20
**apart** [1] - 46:20
**apologize** [15] - 3:11, 7:19, 8:12, 8:13, 16:25, 17:16, 18:14, 19:1, 19:7, 19:12, 19:20, 19:21, 22:11, 64:11
**apology** [1] - 20:19
**apparent** [2] - 5:2, 12:12
**APPEARANCES** [1] - 1:11
**appeared** [4] - 36:9, 36:14, 61:4, 61:8

**appended** [2] - 16:21, 17:22
**application** [1] - 23:12
**applied** [1] - 8:17
**appreciate** [8] - 22:12, 23:3, 24:1, 56:13, 62:14, 79:14, 84:17, 89:3
**approach** [1] - 3:5
**approaching** [1] - 5:23
**appropriate** [5] - 61:15, 61:17, 61:18, 61:19, 62:5
**approval** [15] - 4:7, 5:14, 7:11, 7:22, 8:7, 8:16, 16:18, 16:20, 19:25, 25:19, 31:12, 42:19, 84:3, 85:14, 85:20
**approve** [3] - 5:9, 42:20, 82:11
**approved** [6] - 33:11, 33:15, 33:17, 33:18, 61:21, 62:21
**approves** [2] - 20:21, 82:23
**April** [12] - 1:4, 4:8, 4:16, 4:20, 27:22, 27:23, 28:22, 67:23, 77:21, 85:25, 86:11, 89:16
**April-to-June** [1] - 67:23
**arbitrary** [1] - 84:2
**archived** [1] - 54:6
**area** [7] - 21:14, 22:11, 26:4, 38:14, 38:17, 75:25, 76:7
**areas** [3] - 25:13, 27:19, 27:20
**argument** [5] - 6:15, 8:25, 9:4, 77:2, 77:8
**arguments** [1] - 89:3
**arising** [1] - 60:24
**arrived** [5] - 57:11, 63:1, 63:19, 65:13, 72:7
**ascertain** [1] - 40:11
**Asian** [1] - 51:2
**aside** [3] - 23:12, 84:3, 85:19
**aspects** [1] - 73:24
**aspersions** [1] - 20:5
**asserted** [1] - 47:12
**assertion** [7] - 10:8, 11:8, 11:10, 47:14, 49:18, 68:18, 78:8
**assess** [1] - 25:9, 30:12
**assessed** [1] - 37:8

**assets** [1] - 49:15
**assistance** [3] - 36:12, 41:13, 54:17
**assisting** [1] - 45:2
**Association** [1] - 23:10
**associations** [1] - 23:8
**assume** [2] - 28:17, 55:3
**Assurance** [1] - 67:4
**assurance** [5] - 73:23, 78:23, 81:2, 88:16, 88:25
**assurances** [1] - 78:18
**assured** [2] - 6:3, 7:9
**attached** [1] - 15:7
**attempting** [1] - 35:13
**attention** [2] - 54:24, 83:21
**audience** [1] - 88:12
**August** [6] - 31:12, 35:21, 35:25, 37:2, 60:8, 63:1
**authentication** [1] - 51:12
**author** [2] - 48:23, 62:9
**author's** [1] - 48:22
**authority** [11] - 4:24, 9:11, 22:23, 82:4, 84:7, 86:7, 86:21, 86:22, 87:9, 87:11, 87:23
**automatic** [2] - 70:12, 70:15
**available** [3] - 41:19, 47:2, 73:3
**Avenue** [1] - 1:24, 89:20
**avoid** [1] - 83:11
**awarded** [2] - 43:23, 67:12
**aware** [29] - 25:6, 31:19, 53:4, 56:14, 60:1, 60:4, 61:10, 62:14, 63:10, 63:15, 63:20, 63:23, 63:24, 64:6, 64:12, 64:14, 64:17, 65:9, 65:19, 65:25, 68:8, 72:4, 82:9, 82:15, 83:22, 84:5, 84:6, 84:6, 88:11
**awareness** [2] - 32:2, 32:3
**awareness-building** [2] - 32:2, 32:3

## B

**background** [2] - 40:17, 41:1
**ball** [1] - 80:3
**band** [4] - 76:2, 76:7, 76:8, 76:16
**bands** [7] - 47:3, 47:15, 48:3, 50:18, 62:1, 62:4, 62:17
**based** [7] - 7:6, 8:22, 9:17, 11:2, 12:10, 12:15, 17:8
**basic** [1] - 74:9
**basis** [7] - 32:15, 43:17, 43:20, 47:13, 53:15, 53:18, 78:8
**bear** [1] - 83:20
**become** [2] - 23:13, 64:12
**BEFORE** [1] - 1:10
**beforehand** [1] - 77:6
**began** [3] - 30:12, 37:10, 60:12
**begin** [13] - 29:10, 38:3, 38:4, 39:16, 39:17, 42:11, 47:22, 57:24, 66:8, 66:12, 67:5, 67:10, 67:12
**beginning** [4] - 22:6, 25:21, 29:3, 68:1
**begun** [2] - 40:12, 60:11
**behalf** [8] - 3:15, 3:22, 17:1, 22:8, 44:21, 44:22, 71:12
**belief** [1] - 46:21
**benefit** [1] - 72:16
**best** [5] - 32:18, 51:17, 54:17, 80:15, 89:14
**better** [3] - 38:4, 51:20, 54:23
**between** [12] - 25:24, 31:11, 37:1, 38:20, 39:10, 39:12, 40:4, 51:9, 54:18, 65:13, 81:25
**beyond** [7] - 23:5, 23:14, 24:5, 30:20, 38:25, 50:2, 78:23
**bird's** [1] - 73:6
**birth** [1] - 50:21
**bit** [1] - 73:17
**blanket** [1] - 71:1
**blasts** [1] - 67:15
**blown** [3] - 5:7, 48:12, 48:15
**board** [5] - 31:14, 37:4, 37:8, 38:13, 38:22

**Boasberg** [1] - 87:16
**bog** [1] - 75:20
**bold** [1] - 80:21
**boots** [1] - 74:15
**boots-on-the-ground** [1] - 74:15
**bound** [1] - 5:25
**Box** [3] - 1:13, 58:19, 58:24
**box** [1] - 41:14
**Bradley** [1] - 56:6
**brand** [1] - 53:5
**brand-new** [1] - 53:5
**breach** [1] - 51:23
**breached** [1] - 51:1
**break** [1] - 66:23
**brief** [5] - 15:13, 16:16, 27:11, 77:9, 86:18
**briefing** [6] - 6:7, 8:1, 15:25, 18:9, 20:13, 25:4
**briefings** [1] - 89:3
**briefly** [2] - 61:10, 74:17
**briefs** [2] - 15:14, 18:10
**bring** [2] - 38:13, 83:21
**brought** [2] - 16:9, 83:4
**Budget** [1] - 3:4
**budget** [1] - 40:11
**BUDGET** [1] - 1:6
**building** [3] - 32:2, 32:3, 57:19
**burden** [1] - 68:17
**business** [10] - 29:8, 30:15, 36:15, 43:12, 53:21, 53:23, 54:2, 54:3, 75:10
**businesses** [3] - 26:7, 33:6, 34:10
**BY** [2] - 56:12, 71:22

## C

**CA** [1] - 1:3
**calendar** [8] - 23:22, 54:5, 59:20, 60:13, 78:22, 88:19, 88:22
**cannot** [1] - 7:22
**capacity** [4] - 41:15, 75:10, 75:23, 79:8
**capricious** [1] - 84:2
**CARLOTTA** [1] - 1:19
**Carlotta** [1] - 71:12
**Carly** [1] - 3:16
**carry** [2] - 38:3, 62:2
**case** [6] - 20:3, 20:6, 82:1, 84:6, 84:23,

85:5
**Case** [1] - 87:15
**cases** [1] - 87:10
**cast** [1] - 20:5
**causing** [1] - 50:11
**cell** [2] - 51:2, 72:22
**CENTER** [2] - 1:2, 1:16
**Center** [2] - 3:3, 3:10
**Century** [1] - 74:3
**certain** [9] - 4:1, 5:3, 54:3, 66:15, 66:20, 70:7, 79:17, 88:1
**certainly** [7] - 11:12, 18:18, 24:9, 31:19, 34:10, 39:19, 85:4
**CERTIFICATE** [1] - 89:9
**certified** [1] - 74:25
**certify** [1] - 89:12
**CFR** [1] - 86:25
**chair** [6] - 42:23, 43:1, 66:24, 82:10, 82:23, 83:16
**chair's** [2] - 4:21, 4:24
**challenged** [3] - 16:10, 84:11, 87:21
**change** [2] - 57:13, 77:23
**changed** [2] - 51:8, 53:24
**changes** [1] - 68:9
**changing** [1] - 53:21
**characterized** [1] - 17:3
**checks** [1] - 74:9
**Chicago** [5] - 26:15, 30:22, 38:12, 43:5, 43:7
**chief** [7] - 25:8, 28:13, 42:21, 42:22, 42:25, 82:10
**chief's** [1] - 4:9
**choice** [2] - 61:16, 61:19
**Chutkan** [1] - 73:18
**CHUTKAN** [1] - 1:10
**Circle** [1] - 1:16
**Circuit** [1] - 87:19
**circumstances** [2] - 20:20, 21:17
**Civil** [2] - 1:20, 3:2
**claims** [2] - 47:10, 83:24
**clarification** [1] - 59:18
**clarified** [1] - 58:21
**clarify** [1] - 10:7
**clarifying** [1] - 60:5
**clarity** [1] - 80:6
**clean** [1] - 74:11

**clear** [4] - 10:14, 17:7, 59:19, 85:15
**clearance** [2] - 33:12, 33:16
**client** [1] - 17:1
**close** [2] - 69:8, 82:20
**closed** [2] - 35:22, 36:2
**closely** [2] - 88:13, 88:14
**closes** [1] - 54:19
**co** [1] - 11:14
**co-counsel** [1] - 11:14
**code** [1] - 54:1
**codification** [1] - 23:15
**collateral** [2] - 23:9, 88:15
**collect** [37] - 4:14, 8:6, 8:23, 9:9, 16:20, 17:9, 17:15, 19:24, 20:22, 22:16, 26:2, 27:17, 31:24, 32:6, 32:11, 32:17, 35:14, 35:19, 38:8, 39:4, 39:17, 39:18, 43:16, 43:20, 46:7, 46:24, 52:13, 62:16, 65:10, 71:3, 73:9, 73:10, 75:18, 76:7, 83:18, 87:6, 88:17
**collected** [14] - 31:5, 33:14, 35:17, 35:18, 47:1, 53:9, 53:11, 54:3, 55:17, 58:12, 58:18, 61:5, 78:3, 88:21
**collecting** [30] - 4:23, 8:20, 13:24, 24:15, 24:24, 26:24, 35:15, 35:16, 37:14, 45:19, 46:2, 47:2, 47:4, 47:11, 47:24, 51:17, 53:3, 55:4, 55:13, 57:24, 58:11, 67:19, 70:9, 72:2, 74:3, 74:6, 76:11, 82:17, 82:19, 84:9
**collection** [110] - 4:22, 5:11, 6:3, 7:9, 14:12, 16:11, 21:24, 22:5, 23:5, 23:22, 24:16, 24:18, 24:25, 25:16, 26:13, 26:25, 27:14, 28:23, 29:4, 30:16, 30:17, 30:25, 31:2, 31:11, 31:22, 34:6, 35:7, 35:11, 35:22, 36:2, 36:3, 36:6, 36:20, 36:21, 36:25,

37:5, 37:9, 37:16, 37:25, 38:14, 38:15, 38:24, 40:8, 41:18, 41:20, 43:8, 44:17, 46:19, 48:10, 49:9, 49:19, 50:11, 52:15, 52:24, 53:5, 53:6, 53:8, 54:18, 55:7, 55:9, 58:7, 59:3, 60:3, 61:3, 61:9, 61:12, 61:21, 62:2, 62:20, 63:6, 63:11, 63:13, 63:17, 63:22, 64:2, 64:8, 64:16, 64:24, 65:3, 65:18, 66:8, 66:11, 67:6, 69:9, 69:20, 70:17, 74:2, 74:15, 74:19, 75:4, 78:19, 78:25, 79:15, 79:23, 79:24, 80:7, 80:13, 80:18, 81:6, 81:11, 82:20, 84:20, 85:13, 86:8, 86:23, 86:25, 87:3
**collections** [8] - 16:19, 20:21, 38:18, 53:9, 54:22, 69:2, 84:7, 85:12
**collects** [2] - 36:13, 76:8
**COLUMBIA** [1] - 1:1
**coming** [5] - 41:16, 50:14, 50:17, 53:20, 82:4
**commission** [1] - 68:9
**Commission** [1] - 28:13
**commissioner** [2] - 68:12, 76:14
**communications** [1] - 81:25
**community** [1] - 88:12
**company** [5] - 59:12, 59:13, 59:14, 59:15, 59:20
**compelling** [1] - 40:16
**competing** [1] - 11:13
**complaint** [2] - 16:12, 21:24, 79:10
**complete** [5] - 5:8, 80:13, 80:19, 82:5, 89:14
**completed** [6] - 55:7, 55:15, 78:20, 81:6, 81:20, 81:21
**completing** [1] - 81:7
**compliance** [7] - 4:3, 4:18, 20:11, 20:12, 24:8, 68:25, 87:25
**complies** [2] - 44:15,

57:7
**comply** [8] - 7:22, 8:2, 8:15, 10:25, 17:25, 20:9, 68:19, 85:3
**complying** [2] - 6:13, 15:24
**Component** [76] - 4:14, 4:22, 4:23, 10:20, 11:25, 14:12, 24:15, 24:17, 24:24, 25:1, 25:17, 26:2, 26:25, 27:17, 28:22, 28:25, 29:4, 29:10, 29:12, 29:20, 30:15, 31:10, 32:11, 35:1, 35:3, 35:10, 35:14, 36:6, 37:6, 37:14, 38:8, 38:25, 40:9, 41:18, 41:20, 43:8, 44:17, 45:19, 46:3, 46:7, 49:8, 49:19, 52:13, 53:3, 55:6, 55:15, 57:8, 57:13, 58:6, 61:3, 63:11, 63:17, 64:2, 64:8, 64:15, 64:24, 65:10, 65:18, 66:1, 66:4, 66:17, 66:21, 74:1, 74:18, 74:19, 75:6, 75:8, 75:11, 75:16, 75:18, 79:24, 82:19, 87:3, 87:5
**component** [2] - 38:8, 46:2
**comport** [5] - 26:21, 35:9, 48:2, 49:17, 50:3
**comports** [2] - 26:12, 35:12
**composition** [1] - 68:9
**comprehensive** [3] - 49:13, 49:25, 50:9
**compromised** [2] - 51:24, 75:19
**compromising** [1] - 78:6
**computer** [1] - 29:9
**conceded** [3] - 8:25, 9:19, 23:4
**concern** [12] - 20:1, 36:15, 36:16, 52:8, 52:14, 75:17, 77:16, 78:3, 80:11, 80:17, 80:24, 83:10
**concerned** [5] - 5:23, 20:2, 21:15, 23:6, 79:5, 88:5
**concerns** [9] - 24:15, 24:24, 25:2, 26:20, 68:17, 71:25, 84:10,

85:10, 88:4
**concession** [1] - 21:17
**concluded** [1] - 89:7
**conduct** [3] - 26:25, 43:7, 49:1
**conducted** [1] - 48:2
**conducting** [1] - 79:22
**conference** [7] - 3:25, 19:5, 22:14, 25:24, 40:6, 78:2, 82:16
**confused** [1] - 59:6
**consent** [5] - 11:15, 12:9, 12:10, 13:1, 15:20
**consider** [4] - 9:17, 26:4, 27:3, 27:4
**consideration** [1] - 79:18
**consistent** [1] - 4:24
**constantly** [1] - 53:21
**constitutes** [1] - 89:12
**Constitution** [2] - 1:24, 89:20
**contact** [2] - 39:15, 43:6
**content** [3] - 57:15, 57:16, 57:17
**contention** [1] - 13:21
**context** [3] - 15:11, 15:12, 16:15
**contingency** [3] - 65:10, 65:16, 65:25
**continue** [2] - 63:6, 64:3
**contract** [19] - 30:23, 36:20, 41:12, 42:11, 42:13, 42:18, 42:20, 42:24, 43:7, 43:22, 67:12, 77:16, 77:17, 82:8, 82:11, 82:15, 82:23
**contract's** [1] - 42:12
**contracted** [4] - 45:20, 45:24, 74:10, 74:16
**contracting** [1] - 36:12
**contractor** [14] - 29:8, 30:14, 38:10, 38:17, 40:14, 41:13, 42:7, 42:11, 42:20, 67:11, 67:14, 75:9, 75:23, 80:16
**contractors** [4] - 40:10, 43:12, 43:15, 74:5
**contracts** [1] - 36:19
**contributing** [1] - 49:18
**control** [1] - 73:23
**controls** [5] - 49:14, 50:1, 50:9, 50:12,

51:9
**conversation** [1] - 73:8
**copies** [1] - 56:18
**copy** [3] - 19:10, 44:6, 44:11
**correct** [19] - 3:22, 11:11, 12:18, 14:16, 14:23, 24:4, 28:18, 29:24, 44:25, 45:1, 50:19, 58:4, 59:5, 61:23, 62:3, 62:25, 63:3, 67:20, 75:13
**cost** [1] - 31:6
**costs** [1] - 30:12
**counsel** [9] - 3:5, 7:7, 11:14, 11:21, 12:8, 12:25, 13:1, 14:10, 15:20, 16:21, 17:2, 17:21, 17:22, 18:7, 19:14, 20:24, 56:23, 65:21, 83:16
**counsel's** [4] - 3:15, 11:15, 11:17, 16:15
**counts** [2] - 16:11, 16:12
**couple** [6] - 12:20, 19:14, 31:23, 83:20, 86:17, 87:9
**course** [9] - 23:22, 53:24, 62:15, 63:24, 64:6, 67:7, 74:13, 78:5, 82:2
**COURT** [177] - 1:1, 3:11, 3:17, 3:20, 4:12, 6:25, 7:4, 7:16, 7:25, 8:8, 8:21, 9:3, 9:13, 10:2, 10:4, 10:11, 10:14, 11:22, 11:25, 12:10, 13:4, 13:11, 13:17, 14:5, 14:9, 14:17, 14:21, 14:24, 15:21, 17:19, 18:16, 18:22, 19:10, 19:13, 19:17, 20:1, 20:15, 20:23, 21:2, 21:6, 21:8, 21:13, 22:18, 23:2, 23:17, 24:4, 24:12, 24:23, 25:12, 28:3, 28:6, 28:8, 28:11, 28:16, 28:20, 29:18, 29:23, 29:25, 30:6, 30:8, 31:9, 31:17, 32:7, 33:1, 33:15, 33:20, 33:24, 34:2, 34:7, 34:19, 35:4, 35:20, 35:24, 36:5, 36:11, 37:1, 37:13, 37:18, 38:6, 38:11, 38:20,

39:12, 39:19, 40:4, 40:21, 41:5, 41:7, 41:21, 42:4, 42:13, 42:16, 42:24, 43:4, 43:11, 43:15, 43:19, 43:24, 44:6, 44:8, 44:10, 44:16, 44:21, 44:24, 45:3, 45:6, 45:15, 45:18, 46:1, 46:5, 46:10, 46:12, 46:15, 46:20, 47:9, 48:1, 48:6, 48:17, 48:19, 48:25, 49:11, 49:23, 50:5, 50:8, 50:16, 50:20, 51:8, 51:14, 51:23, 52:1, 52:4, 52:12, 52:17, 52:21, 53:2, 53:17, 55:1, 55:25, 56:5, 56:21, 57:2, 57:4, 61:18, 64:20, 65:2, 65:6, 65:23, 67:18, 68:22, 70:22, 71:10, 71:15, 71:18, 72:21, 75:12, 76:21, 77:2, 77:14, 77:20, 78:10, 79:19, 80:2, 81:3, 81:15, 82:7, 82:22, 82:25, 83:6, 83:9, 84:14, 84:22, 85:21, 86:3, 86:15, 86:19, 88:9, 89:2, 89:9
**Court** [36] - 1:22, 1:23, 4:17, 5:5, 8:17, 12:20, 17:2, 17:25, 18:15, 18:18, 19:23, 20:4, 21:16, 22:2, 22:17, 24:11, 24:20, 29:23, 56:20, 60:3, 61:24, 63:25, 64:11, 64:18, 66:15, 77:8, 77:25, 79:12, 83:15, 83:22, 84:1, 84:12, 85:16, 85:18, 88:16, 89:19
**court** [7] - 18:17, 23:7, 56:7, 71:18, 73:8, 87:10, 87:20
**Court's** [18] - 4:3, 5:25, 8:19, 17:6, 25:7, 38:22, 64:22, 65:14, 73:21, 79:18, 83:5, 83:21, 85:9, 85:16, 86:6, 86:9, 87:8, 87:23
**Court).........................
............** [1] - 2:4
**Courthouse** [2] - 1:23, 89:19
**courtroom** [3] - 3:12,

28:1, 72:22
**COURTROOM** [1] - 3:2
**courts** [1] - 87:11
**cover** [5] - 25:14, 25:15, 26:5, 26:16, 76:1
**craft** [1] - 32:15
**create** [1] - 67:5
**creating** [2] - 67:24, 74:23
**criteria** [1] - 75:7
**cross** [2] - 11:15, 15:22
**CRR** [3] - 1:22, 89:11, 89:18
**current** [9] - 28:25, 30:21, 45:13, 46:21, 64:16, 72:13, 87:1, 87:3
**customer** [1] - 57:21
**customer-friendly** [1] - 57:21
**cut** [1] - 14:5
**cycle** [2] - 55:8, 55:17

## D

**D.C** [2] - 1:4, 87:19
**data** [274] - 4:9, 4:15, 4:22, 4:23, 5:11, 6:4, 7:10, 8:6, 8:20, 8:23, 9:8, 9:9, 14:12, 16:11, 19:24, 21:23, 22:5, 22:16, 23:5, 23:12, 23:23, 24:15, 24:17, 24:24, 25:1, 25:8, 25:17, 26:2, 26:13, 26:24, 26:25, 28:13, 28:14, 28:22, 28:25, 29:4, 29:9, 29:10, 30:15, 30:16, 30:24, 31:2, 31:5, 31:10, 31:22, 31:24, 32:6, 32:11, 32:17, 33:14, 34:5, 35:7, 35:10, 35:14, 35:16, 35:17, 35:19, 36:6, 36:14, 36:16, 36:19, 36:20, 36:23, 36:24, 37:8, 37:11, 37:16, 37:22, 37:25, 38:8, 38:14, 38:15, 38:18, 39:17, 39:18, 40:9, 41:18, 41:20, 43:8, 44:17, 45:19, 46:2, 46:3, 46:7, 46:18, 46:22, 46:25, 47:3, 47:4, 47:12, 47:13, 47:15, 47:20, 47:22, 47:24, 48:10, 49:8,

49:20, 50:17, 51:4, 51:5, 51:6, 51:13, 51:17, 51:19, 51:20, 51:23, 51:24, 52:5, 52:8, 52:13, 52:14, 52:23, 52:24, 53:3, 53:5, 53:7, 53:8, 53:9, 53:10, 53:18, 53:19, 53:25, 54:2, 54:5, 54:8, 54:9, 54:12, 54:13, 54:18, 54:21, 54:23, 54:25, 55:4, 55:5, 55:6, 55:8, 55:13, 55:15, 55:17, 55:23, 56:16, 57:8, 57:19, 57:24, 58:5, 58:6, 58:9, 58:11, 58:13, 58:16, 58:17, 58:18, 58:19, 58:23, 58:24, 59:1, 59:2, 59:3, 59:6, 59:7, 59:19, 60:2, 61:3, 61:5, 61:7, 61:8, 61:12, 61:15, 61:21, 62:2, 62:16, 63:6, 63:11, 63:16, 63:17, 64:2, 64:8, 64:16, 64:24, 65:3, 65:10, 65:18, 66:8, 66:11, 66:17, 66:21, 67:6, 67:19, 68:2, 69:6, 69:7, 69:11, 69:13, 69:16, 69:20, 69:24, 70:1, 70:10, 71:3, 72:1, 72:2, 72:5, 72:9, 72:14, 72:16, 72:17, 72:19, 73:9, 73:10, 73:11, 73:15, 73:23, 74:1, 74:3, 74:6, 74:9, 74:12, 74:15, 74:18, 74:19, 74:23, 74:24, 75:4, 75:6, 75:16, 75:18, 76:2, 76:16, 76:17, 78:3, 78:19, 78:22, 78:25, 79:5, 79:15, 79:17, 79:21, 79:22, 79:24, 80:7, 80:9, 80:18, 81:6, 81:13, 82:18, 82:19, 83:18, 84:9, 84:20, 86:22, 86:24, 87:3, 88:17, 88:20, 88:22, 88:23
**Data** [1] - 67:4
**database** [2] - 53:21, 53:24
**date** [14] - 17:7, 19:6, 33:18, 50:21, 60:7, 66:15, 66:20, 67:1, 67:21, 68:8, 68:11,

68:25, 82:20
**date's** [1] - 82:3
**Dated** [1] - 89:16
**dates** [4] - 55:11, 77:18, 82:16, 88:1
**days** [3] - 19:14, 64:13, 70:11
**DC** [5] - 1:14, 1:17, 1:21, 1:24, 89:21
**deadline** [11] - 9:17, 30:20, 40:20, 45:17, 55:16, 68:24, 69:18, 70:6, 80:18, 88:4, 88:21
**deadline's** [1] - 81:9
**deadlines** [3] - 4:19, 11:13, 84:8
**deal** [2] - 30:9, 80:6
**dealing** [1] - 59:18
**decades** [2] - 35:15, 74:5
**December** [18] - 10:12, 10:18, 11:6, 11:13, 13:8, 13:12, 13:16, 14:11, 14:15, 14:19, 15:9, 15:12, 16:6, 16:14, 19:9, 24:9, 24:19, 65:24
**decide** [1] - 87:5
**decision** [10] - 10:9, 11:10, 11:18, 13:2, 16:10, 24:10, 27:13, 83:24, 84:1, 84:3
**decision-making** [1] - 24:10
**decisions** [3] - 4:21, 86:8, 87:10
**deck** [1] - 29:10
**declaration** [24] - 4:9, 9:7, 9:10, 24:14, 24:23, 26:12, 26:18, 27:4, 27:10, 28:17, 28:18, 35:4, 35:8, 37:23, 43:24, 44:3, 44:12, 44:13, 44:18, 49:18, 56:25, 66:14, 73:20, 85:18
**declaratory** [1] - 23:8
**decrease** [1] - 52:23
**defendant** [3] - 13:24, 17:23, 24:2
**Defendants** [2] - 1:7, 1:18
**defendants** [9] - 3:15, 7:13, 22:2, 28:21, 63:25, 71:13, 83:10, 84:5, 85:19
**defendants'** [2] - 11:15, 64:7
**defined** [1] - 58:19

**definition** [4] - 48:8, 48:9, 59:5, 62:12
**definitions** [2] - 29:14, 54:8, 58:17, 58:20
**definitive** [1] - 30:4
**delay** [9] - 3:12, 4:21, 49:19, 50:11, 78:14, 83:1, 83:3, 84:15, 87:18
**delayed** [2] - 29:5
**delays** [2] - 68:25, 88:5
**delete** [1] - 53:25
**deleted** [6] - 26:5, 26:9, 33:9, 33:21, 34:13, 41:21
**deliver** [2] - 67:5, 74:11
**delve** [1] - 6:8
**DEMOCRACY** [1] - 1:13
**demonstrate** [1] - 33:13
**DEPARTMENT** [1] - 1:19
**Department** [3] - 51:5, 76:13, 87:21
**depose** [2] - 78:7, 78:13
**deposition** [2] - 27:8, 78:11
**deputy** [1] - 3:13
**DEPUTY** [1] - 3:2
**described** [1] - 32:9
**designed** [2] - 31:21, 31:22
**detail** [2] - 32:5, 32:16
**detailed** [1] - 37:23
**details** [1] - 43:3
**determine** [3] - 21:20, 84:8, 87:16
**determined** [4] - 8:15, 9:8, 9:11, 62:15
**develop** [3] - 65:16, 66:5, 67:5
**developed** [1] - 65:9
**developing** [4] - 26:16, 44:18, 44:23, 67:24
**devoid** [1] - 62:10
**differences** [1] - 62:5
**different** [2] - 29:14, 74:18
**difficult** [2] - 20:6, 20:19
**diligent** [1] - 55:21
**direct** [5] - 14:6, 17:19, 27:4, 41:23, 71:15
**DirectEmployers** [1] - 23:10

**direction** [2] - 36:10, 40:23
**directive** [2] - 41:3, 63:21
**directly** [1] - 39:15
**director** [1] - 28:14
**disagreement** [1] - 79:16
**disapprove** [1] - 5:9
**disclose** [1] - 50:25
**disclosed** [1] - 51:1
**discovery** [1] - 87:16
**discrete** [1] - 25:25
**discretionary** [1] - 86:24
**discrimination** [1] - 47:4
**discussed** [4] - 57:19, 61:11, 61:14, 82:8
**discussions** [2] - 10:16, 81:1
**dispensed** [1] - 60:17
**dispute** [1] - 5:24
**disputes** [1] - 5:1
**DISTRICT** [3] - 1:1, 1:1, 1:10
**district** [1] - 87:19
**diverse** [1] - 49:15
**Division** [1] - 1:20
**Doctor** [2] - 29:18, 44:14
**document** [3] - 26:8, 33:7, 60:21
**Document** [2] - 21:24, 44:12
**documentation** [2] - 54:7, 54:16
**documented** [1] - 76:15
**done** [12] - 31:16, 39:1, 40:17, 41:1, 52:21, 56:9, 60:10, 68:23, 81:16, 82:9, 84:23, 85:8
**door** [1] - 64:13
**doubt** [1] - 85:1
**down** [4] - 56:3, 60:17, 75:20, 76:25
**Dr** [38] - 4:10, 9:7, 9:10, 24:13, 24:14, 24:23, 25:1, 25:6, 26:11, 26:17, 26:20, 27:4, 27:13, 27:15, 27:24, 28:1, 28:11, 50:6, 56:9, 56:13, 71:23, 76:23, 77:15, 77:21, 78:8, 78:11, 79:5, 79:15, 80:4, 81:1, 81:11, 81:19, 82:7, 84:10, 84:18,

85:1, 85:10, 88:23
**drabs** [1] - 20:10
**draft** [1] - 40:12
**dribs** [1] - 20:10
**drinking** [1] - 37:4
**DUBNER** [1] - 1:12
**Dubner** [1] - 3:9
**due** [1] - 29:5
**duke** [1] - 87:15
**Dupont** [1] - 1:16
**during** [13] - 10:15, 22:14, 25:3, 26:3, 28:25, 31:16, 49:1, 60:19, 62:15, 63:24, 64:6, 65:12, 84:23

---

### E

**EEO** [3] - 4:9, 49:13, 86:22
**EEO-1** [9] - 26:7, 27:14, 28:25, 33:5, 35:5, 38:1, 51:24, 87:1, 87:3
**EEO-4** [1] - 76:9
**EEOC** [141] - 5:25, 8:5, 8:15, 8:18, 9:16, 10:9, 10:23, 10:25, 11:10, 11:18, 12:4, 12:24, 13:1, 13:8, 13:13, 13:24, 14:18, 15:18, 16:3, 17:5, 17:9, 17:23, 18:13, 18:25, 19:11, 19:23, 20:2, 20:7, 20:17, 21:4, 21:23, 22:2, 22:7, 22:23, 23:11, 24:1, 24:3, 24:7, 25:16, 26:5, 26:21, 29:1, 29:4, 30:8, 31:10, 31:15, 33:3, 35:5, 35:13, 35:19, 36:6, 36:11, 36:13, 36:16, 36:22, 36:23, 37:5, 37:22, 37:25, 38:24, 39:6, 39:25, 40:8, 41:24, 42:2, 42:3, 43:6, 43:11, 43:18, 43:19, 43:22, 44:22, 45:20, 46:6, 46:11, 47:10, 47:18, 48:1, 48:5, 48:25, 49:11, 50:8, 50:12, 51:9, 51:13, 51:17, 51:19, 51:23, 52:12, 52:18, 53:5, 54:4, 54:11, 55:21, 56:14, 57:11, 57:22, 60:2, 60:11, 60:16, 60:22, 61:2, 61:11, 61:22, 62:15, 62:25, 63:4,

63:12, 63:20, 65:9, 65:13, 65:16, 66:15, 66:20, 70:13, 71:2, 71:24, 72:7, 72:10, 73:3, 73:15, 75:17, 75:18, 76:7, 76:8, 76:10, 76:14, 79:3, 79:7, 79:11, 82:1, 82:2, 83:14, 84:5, 84:15, 84:18, 85:3, 86:1, 86:5, 88:6, 88:16
**EEOC's** [28] - 10:8, 11:9, 12:7, 13:3, 14:13, 16:23, 22:15, 25:9, 26:2, 26:12, 27:16, 32:11, 35:9, 38:7, 46:20, 46:22, 49:21, 51:21, 52:5, 52:14, 58:3, 72:5, 76:3, 77:12, 79:21, 80:6, 84:6, 86:21
**EEOC-1** [1] - 37:25
**effective** [2] - 52:6, 52:8
**effectuate** [1] - 23:7
**efficacy** [1] - 84:8
**efficient** [1] - 15:1
**effort** [5] - 41:19, 45:4, 69:24, 70:9, 79:15
**efforts** [13] - 25:16, 25:17, 26:1, 26:12, 31:10, 31:19, 32:8, 32:10, 35:10, 60:3, 63:16, 79:21, 85:4
**eight** [1] - 27:19
**either** [5] - 43:9, 49:1, 56:19, 73:22, 78:24
**elements** [2] - 53:25, 54:1
**email** [36] - 10:11, 10:18, 12:2, 12:21, 13:1, 13:2, 13:4, 13:6, 13:12, 14:4, 14:10, 14:18, 15:3, 15:6, 15:9, 15:25, 16:3, 16:6, 16:14, 16:21, 17:21, 17:22, 18:5, 18:13, 19:10, 20:24, 21:2, 22:21, 23:25, 41:14, 42:3, 66:3, 67:2, 67:15
**emailed** [2] - 65:20, 65:21
**emails** [8] - 15:11, 15:15, 29:16, 34:18, 34:25, 35:2, 41:11, 41:15
**emergency** [4] - 55:6, 55:14, 78:24, 82:5

**Emily** [1] - 3:9
**EMILY** [1] - 1:15
**employed** [2] - 28:11, 28:12
**employee** [1] - 59:20
**employees** [2] - 59:13, 60:12
**employer** [8] - 10:20, 11:25, 23:8, 23:11, 68:17, 68:25, 70:21, 88:12
**employers** [44] - 9:9, 20:8, 26:13, 28:22, 28:24, 29:12, 29:20, 30:6, 30:7, 32:19, 33:4, 34:10, 35:10, 39:15, 39:23, 41:8, 41:23, 41:24, 51:12, 51:20, 53:5, 53:22, 56:16, 57:23, 58:5, 58:13, 59:6, 63:7, 66:16, 66:21, 67:2, 67:6, 67:11, 67:18, 68:18, 74:24, 79:4, 79:7, 81:12, 81:14, 82:18, 88:6, 88:7
**employers'** [3] - 53:11, 53:12, 68:17
**Employment** [1] - 28:13
**encompasses** [1] - 87:24
**end** [6] - 8:7, 8:20, 54:5, 74:11, 74:25, 82:21
**ended** [1] - 7:11
**enforce** [1] - 85:22
**enforcement** [1] - 62:6
**enforcing** [1] - 47:4
**engineer** [1] - 51:6
**engineered** [1] - 52:10
**ensure** [4] - 38:15, 50:13, 87:23, 88:7
**ensures** [1] - 78:4
**ensuring** [2] - 46:22, 49:9
**entered** [2] - 52:19, 75:16
**enterprise** [1] - 28:14
**entire** [5] - 36:20, 37:8, 52:24, 59:20, 73:25
**entirely** [5] - 24:22, 79:17, 86:24, 87:6, 88:23
**Entrepreneurial** [1] - 87:14
**Equal** [1] - 28:12
**equitable** [4] - 85:22, 87:9, 87:11, 87:23
**equivalent** [2] - 22:4,

53:8
errors [1] - 52:24
especially [4] - 80:4, 80:15, 86:1, 88:1
ESQ [5] - 1:12, 1:12, 1:15, 1:18, 1:19
essence [3] - 12:14, 12:18, 20:6
essentially [3] - 40:7, 65:22, 86:12
established [1] - 45:17
estimate [2] - 68:15, 68:16
estimated [4] - 17:4, 44:16, 66:7, 68:17
estimates [1] - 13:9
estimating [1] - 24:7
et [4] - 1:3, 1:6, 3:3, 3:4
evaluation [4] - 37:25, 38:3, 72:5, 72:9
evening [1] - 30:11
event [3] - 65:10, 65:17, 81:5
eventuality [1] - 39:7
eventually [1] - 18:2
evidence [2] - 47:2, 73:12
evidentiary [1] - 5:7
evolved [1] - 75:16
exactly [4] - 47:21, 53:10, 64:18, 68:2
examination [1] - 27:5
EXAMINATION [2] - 56:11, 71:21
example [2] - 50:24, 58:19
exceed [1] - 50:15
exceeds [1] - 75:1
exception [1] - 70:24
exceptions [1] - 71:1
exchanged [1] - 15:15
exchanging [1] - 15:11
excuse [1] - 72:21
executive [1] - 51:3
exempt [1] - 59:9
exercise [2] - 82:4, 84:6
exercising [1] - 86:6
Exhibit [4] - 12:2, 12:22, 15:17, 56:22
exhibit [1] - 15:7
exist [1] - 33:12
existed [1] - 25:6
existing [1] - 43:7
expect [1] - 27:23
expected [2] - 58:6, 58:14

expedited [2] - 10:16, 43:17
experience [3] - 38:18, 74:6, 76:6
experienced [1] - 53:3
expertise [1] - 37:11
experts [1] - 30:24
expiration [7] - 5:23, 69:18, 69:21, 78:25, 82:3, 82:21, 88:25
expired [2] - 6:4, 80:20
expires [4] - 8:16, 30:21, 45:13, 68:13
explain [4] - 16:4, 22:15, 54:7, 73:22
explicitly [1] - 8:14
explored [1] - 40:14
exploring [1] - 72:17
expressly [3] - 8:5, 13:8, 15:17
extend [1] - 23:5
extension [17] - 11:15, 12:9, 14:2, 15:12, 15:20, 16:16, 16:24, 18:21, 19:4, 21:1, 55:6, 55:15, 70:13, 70:15, 70:21, 70:25, 78:24
extensions [2] - 70:19, 70:20
extent [6] - 17:1, 53:2, 60:21, 81:13, 83:17, 84:13
external [1] - 73:12
extra [1] - 12:15
extract [1] - 20:12
eye [3] - 37:13, 37:16, 73:6

## F

faced [2] - 11:14, 23:19
fact [10] - 18:19, 20:19, 26:7, 33:6, 34:21, 48:15, 63:12, 73:14, 76:17, 82:14
factor [2] - 49:18, 51:11
factors [1] - 84:15
facts [1] - 41:22
factual [2] - 5:1, 5:4
failure [2] - 8:22, 17:16
faith [1] - 69:24
fall [1] - 81:23
fall-back [1] - 81:23
falls [1] - 16:19
false [1] - 87:6
familiar [3] - 28:16, 42:17, 73:4

FAQ [1] - 34:20
far [2] - 61:2, 82:9
fashion [1] - 87:20
fast [3] - 30:16, 65:20, 65:22
faster [1] - 46:16
favor [2] - 4:4, 21:18
favorable [1] - 20:13
feasible [1] - 88:24
federal [10] - 38:18, 49:22, 49:24, 50:15, 69:1, 69:22, 72:18, 74:3, 75:1
Federal [8] - 1:20, 22:2, 49:12, 49:24, 50:3, 52:19, 61:11, 79:9
female [1] - 51:3
fer [3] - 4:10, 4:11, 4:12
few [3] - 60:19, 70:11, 71:13
fields [1] - 54:8
figure [6] - 17:13, 47:19, 47:21, 51:6, 84:19, 85:3
file [2] - 3:25, 11:15
filed [5] - 4:8, 4:16, 4:20, 18:9, 84:23
filing [5] - 10:20, 12:1, 39:13, 85:25, 86:11
fill [1] - 57:18
final [5] - 19:6, 23:13, 38:2, 64:8
finally [2] - 26:24, 88:19
financial [5] - 42:21, 42:22, 42:25, 82:10
findings [3] - 5:5, 73:4, 73:7
fine [1] - 77:10
finish [2] - 29:25, 48:19
finished [1] - 72:24
fire [3] - 37:4, 69:15, 70:23
first [20] - 3:12, 7:2, 11:4, 11:20, 22:10, 25:15, 30:11, 30:14, 37:24, 38:13, 43:21, 45:6, 45:9, 47:17, 56:25, 57:3, 65:19, 70:14, 71:25, 86:22
First [1] - 25:19
FISMA [1] - 50:3
fixed [1] - 53:20
flexibility [1] - 74:21
FLSA [5] - 57:25, 59:9, 59:10, 59:23
FLSA-exempt [1] -

59:9
fly [1] - 32:25
focus [1] - 74:22
focused [4] - 16:12, 35:3, 41:20, 54:24
focusing [1] - 54:21
follow [3] - 11:2, 24:22, 27:7
follow-up [1] - 11:2, 27:7
following [5] - 14:6, 87:11, 87:17, 88:13
FOR [1] - 1:1
foregoing [1] - 89:12
foremost [1] - 82:17
foreseen [1] - 81:18
forgive [1] - 42:17
forgo [1] - 4:23
form [13] - 26:7, 31:21, 31:22, 32:16, 33:5, 41:22, 57:21, 57:22, 58:9, 58:13, 87:1, 87:3
format [2] - 57:15, 57:17
former [1] - 76:14
forms [1] - 34:21
formulate [1] - 5:8
forth [5] - 9:7, 9:10, 20:22, 26:17, 73:24
fortuitously [1] - 37:3
FORWARD [1] - 1:13
forward [10] - 8:19, 18:7, 21:20, 36:10, 39:3, 55:21, 66:22, 66:23, 83:14, 83:17
FOUNDATION [1] - 1:13
four [6] - 16:12, 29:7, 37:7, 38:7, 39:1, 40:1
frame [11] - 24:7, 32:23, 64:23, 65:3, 66:14, 66:25, 67:23, 68:16, 70:18, 79:12, 87:22
FRANCES [1] - 1:12
frequently [6] - 32:21, 32:22, 32:24, 55:22, 60:20, 67:8
friendly [2] - 57:21, 74:23
front [1] - 82:17
full [4] - 5:7, 48:12, 48:15, 89:13
full-blown [3] - 5:7, 48:12, 48:15
fully [1] - 84:17
functions [1] - 72:14
furlough [1] - 29:6

## G

gather [2] - 58:9, 75:5
gears [1] - 73:17
general [3] - 28:21, 67:25, 69:5
General [2] - 72:8, 72:12
generally [3] - 36:19, 69:21, 85:12
generate [1] - 34:18
given [9] - 21:15, 29:11, 29:19, 32:23, 34:10, 48:25, 78:12, 80:21, 85:7
glitches [1] - 81:17
goals [2] - 59:3, 72:18
government [17] - 4:5, 4:8, 4:13, 4:19, 4:20, 5:13, 6:17, 6:20, 8:1, 8:9, 8:24, 9:18, 10:19, 27:12, 29:6, 64:9, 80:19
government's [7] - 4:2, 4:18, 5:9, 8:22, 10:17, 22:22, 27:4
governments [1] - 76:10
grant [1] - 21:18
granted [5] - 12:9, 12:10, 12:15, 12:25, 40:5
granting [2] - 4:4, 38:23
grants [1] - 16:18
great [1] - 80:5
greater [1] - 53:2
ground [2] - 58:22, 74:15
groups [2] - 23:11, 67:17
guess [5] - 42:16, 50:5, 59:17, 79:14, 85:14
guidance [3] - 60:12, 60:23, 87:21

## H

hack [1] - 50:20
Haf [1] - 4:10
Haf-fer [1] - 4:10
Haffer [28] - 9:7, 24:13, 24:14, 24:23, 25:1, 25:6, 26:20, 27:24, 28:1, 28:10, 28:11, 50:7, 50:8, 56:9, 56:13, 71:23, 76:23, 77:15, 79:5, 81:1, 81:11, 81:19, 82:7,

84:10, 84:18, 85:10,
88:23
**HAFFER** [2] - 2:3, 28:5
**Haffer's** [10] - 9:10,
26:11, 26:17, 27:4,
77:22, 78:8, 78:11,
79:15, 80:4, 85:1
**half** [2] - 59:9, 59:10
**halting** [1] - 64:7
**hand** [2] - 56:22, 57:5
**handed** [1] - 44:11
**handle** [4] - 29:16,
34:17, 41:15, 75:3
**handled** [1] - 59:16
**hands** [1] - 29:9
**happy** [3] - 19:16,
19:18, 77:8
**Harley** [1] - 3:18
**harm** [1] - 29:1
**hate** [1] - 70:10
**Hay** [2] - 4:11, 4:12
**Hay-fer** [2] - 4:11, 4:12
**headed** [1] - 36:14
**hear** [3] - 56:4, 56:7,
71:19
**heard** [8] - 58:2, 58:22,
59:6, 68:14, 70:14,
77:21, 85:6, 88:6
**hearing** [22] - 5:4, 5:7,
5:15, 5:18, 10:15,
10:21, 10:23, 13:18,
13:20, 14:1, 15:4,
15:6, 15:8, 15:23,
16:6, 17:6, 17:20,
18:23, 25:13, 27:15,
27:23, 89:6
**HEARING** [1] - 1:9
**hearsay** [1] - 31:18
**HELD** [1] - 1:10
**held** [1] - 60:16
**help** [4] - 38:10, 38:19,
41:9, 88:18
**helpful** [1] - 80:4
**helpfulness** [1] - 80:9
**hereby** [1] - 89:11
**herring** [1] - 79:24
**hide** [1] - 80:3
**highest** [1] - 49:9
**hire** [2] - 37:10, 75:23
**hired** [1] - 25:8
**hold** [3] - 22:18, 82:12,
82:13
**hold-up** [2] - 82:12,
82:13
**holding** [1] - 82:22
**honest** [1] - 25:6
**Honor** [86] - 3:2, 3:14,
6:1, 6:16, 6:24, 7:6,
7:13, 7:14, 7:19,
7:20, 8:4, 8:12, 9:1,

9:5, 10:6, 10:13,
11:5, 11:6, 12:19,
13:5, 13:19, 14:16,
15:10, 15:16, 16:7,
17:8, 18:14, 18:20,
19:1, 19:16, 19:20,
20:14, 20:18, 22:9,
22:24, 24:1, 24:5,
24:21, 25:5, 28:7,
28:19, 29:2, 31:14,
32:1, 33:10, 34:1,
34:15, 34:24, 35:12,
35:23, 37:7, 37:15,
39:10, 41:10, 42:10,
43:2, 45:5, 46:14,
48:4, 50:2, 51:15,
53:4, 54:20, 56:18,
65:8, 67:20, 71:12,
76:20, 77:11, 78:1,
80:25, 81:10, 81:24,
82:13, 83:2, 83:12,
83:19, 83:22, 84:13,
84:17, 85:9, 85:23,
86:17, 87:8, 88:4
**Honor's** [5] - 23:3,
80:1, 84:18, 87:2,
87:6
**HONORABLE** [1] -
1:10
**hopefully** [1] - 54:6
**hopes** [1] - 80:17
**hose** [1] - 37:4
**hours** [7] - 45:21,
46:2, 46:6, 46:8,
57:25, 59:10, 59:23
**house** [1] - 29:7
**Howell** [1] - 87:20
**human** [3] - 53:13,
59:15, 74:4
**hypothetical** [3] -
28:21, 55:2, 55:3

**I**

**idea** [1] - 46:5
**ideal** [1] - 31:1
**ideally** [4] - 45:10,
60:9, 66:7, 79:1
**identification** [1] -
39:2
**identified** [6] - 24:15,
26:20, 27:19, 27:20,
55:10, 71:25
**identify** [5] - 3:6, 38:9,
38:17, 51:1, 52:10
**identifying** [2] - 37:9,
48:14
**ignored** [2] - 6:17,
6:23
**imagine** [1] - 82:1

**immediately** [4] - 22:4,
30:12, 67:7, 79:4
**imminently** [1] - 28:24
**impacted** [1] - 24:9
**implement** [5] - 25:16,
29:3, 48:10, 48:11,
66:4
**implementation** [4] -
31:9, 32:8, 48:13,
48:15
**implementing** [4] -
24:16, 24:25, 64:24,
66:1
**implements** [1] -
21:23
**implicate** [1] - 23:23
**implicit** [1] - 87:4
**implies** [1] - 18:18
**implying** [1] - 49:4
**important** [2] - 69:8,
83:19
**importantly** [1] - 37:23
**impose** [1] - 4:18
**improper** [1] - 34:9
**improvement** [1] -
37:10
**improving** [2] - 37:16,
73:10
**IN** [1] - 1:1
**in-house** [1] - 29:7
**inadequate** [2] -
46:23, 49:4
**inadvertently** [1] -
52:9
**inappropriate** [1] -
61:17
**inclined** [1] - 78:14
**included** [1] - 4:9
**including** [3] - 23:9,
78:21, 87:3
**incoming** [1] - 34:25
**increase** [1] - 52:24
**independent** [1] - 86:2
**individual** [4] - 50:17,
51:7, 52:10, 54:21
**industry** [1] - 31:2
**influx** [1] - 79:6
**inform** [4] - 28:21,
29:11, 29:13, 29:19
**information** [106] - 4:2,
10:10, 10:22, 10:24,
11:3, 11:11, 12:4,
12:5, 12:6, 12:7,
12:23, 12:24, 13:7,
13:9, 13:18, 13:25,
14:2, 14:3, 14:14,
15:16, 15:18, 16:20,
16:23, 17:3, 17:10,
17:11, 17:15, 17:17,
17:18, 17:24, 18:3,

18:6, 18:8, 18:15,
18:19, 18:24, 19:2,
19:3, 19:8, 19:21,
20:4, 20:10, 20:22,
21:1, 21:4, 21:9,
21:15, 24:20, 26:5,
26:9, 26:19, 26:23,
27:17, 33:12, 33:15,
34:11, 34:13, 34:18,
34:23, 37:6, 37:14,
38:25, 41:8, 41:23,
42:8, 43:16, 43:20,
47:1, 47:2, 49:15,
50:11, 50:14, 50:16,
50:25, 52:9, 53:19,
54:12, 54:14, 57:23,
57:25, 58:5, 58:8,
58:10, 58:20, 59:15,
59:24, 62:4, 62:20,
63:7, 63:8, 63:13,
63:21, 67:9, 69:2,
69:4, 69:9, 70:17,
76:4, 76:7, 76:8,
76:11, 76:15, 83:15
**Information** [1] - 50:3
**informing** [1] - 79:7
**infrastructure** [4] -
29:15, 30:1, 30:2,
34:17
**ingested** [1] - 36:23
**inherent** [1] - 87:8
**initial** [2] - 31:12, 67:1
**initiate** [1] - 16:10
**initiation** [1] - 25:22
**input** [2] - 68:2, 74:24
**inquired** [1] - 60:3
**inquiring** [1] - 61:24
**Inspector** [2] - 72:8,
72:11
**instance** [1] - 51:2
**instead** [3] - 54:21,
54:24, 61:15
**instruct** [1] - 66:23
**instructed** [2] - 63:12,
66:22
**instructing** [1] - 87:19
**instruction** [7] - 8:14,
31:23, 32:16, 32:19,
35:6, 55:22, 88:16
**instructions** [3] -
31:24, 32:2, 32:4
**instrument** [1] - 57:18
**intake** [2] - 29:9, 57:20
**intends** [1] - 74:18
**intention** [1] - 11:12
**intentions** [1] - 80:15
**interest** [1] - 56:19
**interested** [1] - 78:5
**interim** [1] - 41:7
**internal** [6] - 41:3,

41:14, 42:17, 60:4,
60:23, 64:9
**internally** [1] - 39:25
**International** [1] -
87:14
**interrupt** [2] - 48:20,
84:14
**introduce** [1] - 53:25
**Introductory** [1] -
62:12
**investigating** [1] -
72:12
**involved** [5] - 26:16,
44:17, 45:3, 63:16,
74:14
**irrelevant** [1] - 79:17
**issue** [30] - 5:20, 6:6,
6:9, 6:11, 6:12, 7:8,
7:12, 7:14, 7:17,
7:25, 8:11, 8:22,
9:19, 9:20, 10:6,
10:7, 13:20, 15:6,
21:21, 22:21, 23:4,
23:15, 23:23, 59:12,
73:2, 75:8, 75:20,
80:14, 86:15, 89:4
**issued** [11] - 17:25,
27:22, 29:23, 33:3,
35:25, 62:24, 63:1,
73:1, 73:2, 83:23,
85:2
**issues** [13] - 6:1,
24:11, 25:2, 27:25,
30:9, 35:3, 38:5,
40:12, 48:14, 59:18,
71:25, 72:5, 73:7
**issuing** [1] - 63:12
**items** [2] - 29:14,
29:15
**itself** [2] - 47:15, 59:19

**J**

**January** [8] - 17:5,
17:7, 17:14, 19:5,
24:8, 36:4, 45:11,
66:8
**JEFFREY** [1] - 1:12
**Jeffrey** [1] - 3:9
**judge** [1] - 71:24
**JUDGE** [1] - 1:10
**Judge** [3] - 73:18,
87:15, 87:20
**judges** [1] - 87:10
**judgment** [13] - 4:4,
11:16, 15:14, 16:16,
21:18, 23:8, 25:22,
25:23, 38:23, 40:5,
57:1, 64:22, 65:14
**July** [7] - 4:15, 66:25,

67:21, 68:1, 68:3, 68:5, 68:8
**June** [1] - 67:23
**jurisdiction** [1] - 81:4
**JUSTICE** [1] - 1:19
**Justice** [1] - 76:13

## K

**keep** [1] - 33:22
**kind** [5] - 5:9, 62:10, 73:12, 79:23, 87:4
**kinds** [1] - 60:24
**knowledge** [7] - 27:13, 27:16, 27:24, 36:9, 43:21, 60:10, 64:10
**known** [2] - 38:10, 53:13
**knows** [1] - 17:8, 75:24

## L

**Labor** [1] - 87:21
**lag** [2] - 70:6, 88:5
**language** [1] - 18:18
**last** [11] - 3:25, 5:15, 5:18, 10:15, 10:21, 11:6, 11:13, 40:5, 78:2, 82:15, 85:15
**late** [2] - 3:13, 70:11
**latency** [1] - 75:20
**Law** [2] - 3:3, 3:10
**LAW** [2] - 1:2, 1:16
**laws** [1] - 47:5
**lawsuit** [5] - 39:13, 64:12, 65:4, 65:11, 65:17
**lawyer** [1] - 56:10
**lead** [1] - 3:5
**learned** [1] - 32:10
**least** [3] - 6:3, 7:10, 77:12
**leave** [1] - 70:1
**lectern** [1] - 3:5
**led** [1] - 73:14
**legal** [3] - 5:25, 65:21, 88:15
**legally** [3] - 33:22, 63:4, 88:8
**legs** [1] - 78:23
**less** [2] - 52:6, 52:8
**letters** [1] - 87:21
**lifted** [4] - 34:3, 52:18, 84:25
**lifting** [1] - 79:9
**light** [1] - 87:6
**likelihood** [1] - 54:23
**likely** [1] - 32:22
**limited** [10] - 5:6, 27:7,

27:9, 32:23, 41:19, 49:6, 49:8, 74:4, 79:7, 88:2
**Line** [3] - 5:21, 6:10, 17:20
**line** [1] - 41:14
**link** [15] - 26:6, 26:8, 33:4, 33:20, 33:21, 33:23, 34:3, 34:8, 34:9, 34:21, 41:8, 41:21, 41:23, 56:25
**linked** [1] - 27:16
**LISA** [1] - 89:11
**Lisa** [1] - 1:22
**litigating** [1] - 20:2
**litigation** [9] - 25:21, 25:22, 37:2, 38:21, 39:12, 63:24, 64:7, 87:15, 88:14
**live** [7] - 10:20, 11:24, 11:25, 12:23, 14:11, 16:1, 16:5
**local** [1] - 76:9
**log** [1] - 51:12
**logging** [1] - 51:18
**Look** [1] - 82:3
**look** [5] - 5:16, 14:25, 31:6, 34:6, 44:13, 47:6, 56:16, 57:6, 57:9, 67:3, 77:5
**looking** [6] - 66:14, 66:25, 68:24, 72:19, 83:3
**lose** [1] - 12:16

## M

**mail** [2] - 67:2, 67:15
**maintain** [1] - 74:13
**major** [1] - 37:7
**managed** [1] - 79:7
**MANAGEMENT** [1] - 1:6
**Management** [1] - 3:4
**Mancini** [2] - 27:13, 27:15
**mandatory** [2] - 78:24, 86:12
**manner** [2] - 78:3, 79:25
**manual** [1] - 32:20
**manuals** [2] - 35:6, 55:22
**March** [37] - 5:19, 10:21, 13:18, 13:19, 15:4, 15:8, 16:3, 17:20, 18:2, 18:11, 18:22, 21:19, 22:14, 25:7, 25:24, 29:3, 29:22, 30:10, 30:11,

30:13, 30:19, 31:7, 35:22, 36:2, 38:23, 39:3, 39:10, 39:13, 40:5, 40:6, 43:10, 66:12, 83:23, 84:19
**mark** [2] - 56:21, 56:24
**marked** [1] - 57:6
**Martin** [1] - 3:9
**MARTIN** [1] - 1:15
**materials** [6] - 26:8, 33:3, 33:7, 33:9, 33:21, 35:6
**matter** [4] - 7:2, 9:24, 12:14, 89:4
**maximum** [1] - 72:15
**mean** [8] - 8:9, 8:24, 12:12, 14:5, 22:6, 32:12, 34:12, 34:20, 39:5, 39:23, 40:22, 40:23, 46:10, 48:20, 53:12, 67:18, 70:22, 75:2, 77:24, 78:11, 82:12, 82:25
**meaning** [2] - 31:4, 62:21
**means** [1] - 53:14
**meant** [2] - 16:4, 39:15
**measure** [1] - 62:5
**measures** [1] - 52:5
**mechanism** [4] - 58:14, 62:2, 62:17, 81:7
**mechanisms** [3] - 52:7, 75:3, 86:7
**media** [1] - 51:4
**meet** [14] - 9:17, 30:13, 38:16, 38:19, 40:19, 46:18, 48:7, 49:21, 53:21, 53:23, 54:2, 59:2, 62:11, 72:18
**meeting** [2] - 31:2, 72:7
**members** [1] - 88:11
**memorandum** [1] - 63:12
**Mendoza** [1] - 87:18
**mention** [2] - 7:18, 88:19
**mentioned** [14] - 5:12, 19:7, 34:15, 41:18, 43:12, 45:9, 51:16, 75:9, 75:14, 77:16, 81:14, 84:10, 84:18, 88:14
**merge** [1] - 51:4
**message** [1] - 86:3
**met** [1] - 62:21
**method** [1] - 58:11
**Methods** [1] - 62:12
**methods** [3] - 35:7,

38:14, 73:10
**microphone** [2] - 56:2, 71:16
**middle** [1] - 41:17
**midst** [1] - 29:3
**might** [12] - 6:7, 6:15, 7:14, 7:21, 13:15, 39:6, 40:1, 53:2, 70:7, 70:24, 75:15, 77:6
**mined** [2] - 21:13, 22:11
**minimum** [3] - 49:21, 49:22, 49:23
**minimums** [1] - 75:1
**minority** [1] - 68:12
**minute** [3] - 29:18, 44:1, 72:21
**minutes** [2] - 12:20, 76:22
**mislead** [1] - 11:12
**misled** [3] - 10:8, 11:9, 13:21
**misremembering** [1] - 62:3
**missing** [1] - 70:6
**missions** [1] - 72:18
**Modernization** [1] - 50:4
**modernization** [5] - 30:23, 37:22, 43:22, 73:15, 79:21
**modernize** [2] - 25:10, 85:11
**modify** [1] - 84:8
**moment** [2] - 12:7, 21:11
**monitoring** [1] - 34:25
**month** [1] - 40:6
**months** [3] - 30:19, 68:6
**Moore** [20] - 3:15, 3:21, 5:15, 5:19, 6:5, 6:11, 6:22, 12:12, 15:2, 20:1, 21:13, 23:17, 24:13, 27:3, 28:4, 65:20, 71:11, 80:10, 81:16, 84:14
**MOORE** [58] - 1:18, 3:14, 3:19, 4:11, 6:24, 7:1, 7:5, 7:19, 8:4, 8:12, 9:1, 9:5, 10:1, 10:3, 10:5, 10:13, 11:5, 11:23, 12:2, 12:19, 13:5, 13:15, 13:19, 14:16, 14:20, 14:23, 15:10, 16:7, 18:14, 18:20, 19:1, 19:12, 19:16, 19:18, 20:14,

20:18, 20:24, 21:3, 21:7, 22:9, 24:21, 25:5, 28:2, 77:11, 77:15, 80:25, 81:10, 81:24, 82:13, 82:24, 83:2, 83:7, 83:12, 84:17, 85:9, 85:23, 86:4
**Moore's** [1] - 86:20
**MOREIRA** [1] - 89:11
**Moreira** [2] - 1:22, 89:18
**most** [4] - 22:14, 32:22, 37:23, 75:22
**motion** [7] - 11:16, 15:5, 15:13, 16:16, 18:21, 19:4, 57:1
**motivations** [1] - 20:5
**Motor** [1] - 51:5
**move** [5] - 22:12, 25:15, 66:22, 66:23, 83:14
**moved** [1] - 55:21
**moving** [1] - 36:9
**MS** [84] - 3:8, 3:14, 3:19, 4:11, 6:24, 7:1, 7:5, 7:19, 8:4, 8:12, 9:1, 9:5, 10:1, 10:3, 10:5, 10:13, 11:5, 11:23, 12:2, 12:19, 13:5, 13:15, 13:19, 14:8, 14:16, 14:20, 14:23, 15:10, 16:7, 18:14, 18:20, 19:1, 19:12, 19:16, 19:18, 20:14, 20:18, 20:24, 21:3, 21:7, 22:9, 22:24, 23:3, 23:21, 24:5, 24:21, 25:5, 28:2, 44:7, 44:9, 56:4, 56:12, 56:18, 56:24, 57:3, 65:7, 68:23, 71:9, 71:12, 71:17, 71:20, 71:22, 76:20, 77:7, 77:11, 77:15, 78:1, 78:16, 79:20, 80:25, 81:10, 81:24, 82:13, 82:24, 83:2, 83:7, 83:12, 84:17, 85:9, 85:23, 86:4, 86:17, 86:20, 88:11
**multiple** [1] - 54:25

## N

**name** [2] - 28:8, 50:17
**named** [1] - 24:2
**namely** [1] - 68:11
**names** [1] - 50:21
**NAS** [1] - 47:8

**NATIONAL** [2] - 1:2, 1:16
**National** [9] - 3:3, 3:10, 47:7, 47:10, 47:16, 48:2, 62:6, 76:12, 76:15
**nature** [1] - 35:1
**necessarily** [2] - 54:4, 62:1
**necessary** [4] - 22:4, 23:7, 32:5, 59:2
**necessity** [1] - 40:16
**need** [6] - 6:7, 9:21, 41:25, 45:12, 47:25, 49:7, 54:2, 54:11, 54:13, 57:24, 80:14, 81:4, 84:20, 88:24
**needed** [2] - 4:14, 42:19
**needs** [9] - 42:19, 42:23, 46:21, 53:21, 53:23, 58:21, 71:19, 82:9
**negotiate** [1] - 20:25
**negotiating** [3] - 15:25, 18:21, 19:3
**never** [2] - 35:16, 36:17
**nevertheless** [4] - 12:8, 12:9, 15:19, 16:23
**new** [11] - 26:7, 33:5, 35:16, 53:5, 53:25, 54:1, 54:2, 57:13, 59:14, 63:13, 63:21
**next** [2] - 19:14, 88:24
**night** [1] - 85:2
**nine** [2] - 30:18, 30:19
**none** [2] - 52:16, 52:17
**nonetheless** [1] - 21:17
**nonexpedited** [1] - 43:20
**nonreporters** [1] - 71:3
**nonrespondents** [1] - 70:5
**NORC** [36] - 26:14, 26:24, 30:22, 38:11, 38:12, 39:2, 43:5, 43:6, 43:16, 43:19, 44:20, 44:24, 45:9, 45:20, 46:1, 46:7, 46:10, 46:11, 46:12, 52:13, 57:19, 73:22, 74:10, 74:16, 74:18, 74:21, 78:7, 78:13, 79:11, 80:5, 80:12, 81:1, 81:2, 81:3, 82:1, 82:8

**NORC's** [4] - 43:21, 51:21, 68:15, 77:22
**note** [3] - 21:22, 23:21, 79:14
**noted** [2] - 7:8, 16:21
**notes** [1] - 89:13
**nothing** [4] - 21:20, 34:9, 39:24, 76:20
**notice** [14] - 16:22, 17:23, 22:3, 22:6, 27:12, 29:11, 29:19, 49:11, 51:10, 60:18, 61:14, 62:18, 62:19, 79:9
**notices** [1] - 61:12
**notification** [5] - 67:2, 67:10, 67:11, 67:13, 67:14
**notify** [2] - 66:16, 79:3
**noting** [1] - 24:1
**November** [9] - 25:8, 31:15, 33:1, 37:3, 38:7, 38:22, 39:13, 63:2, 63:19
**number** [2] - 53:24, 71:25
**nuts** [1] - 37:24
**NVCA** [1] - 87:15
**NW** [3] - 1:20, 1:24, 89:20

### O

**obligated** [1] - 86:13
**obligation** [1] - 88:17
**obligations** [1] - 87:17
**oblique** [1] - 75:15
**observed** [1] - 24:6
**obtain** [1] - 78:4
**obviously** [6] - 17:2, 28:17, 39:5, 39:23, 46:8, 77:21
**occur** [4] - 6:3, 7:10, 57:14, 78:9
**occurring** [1] - 89:1
**occurs** [1] - 78:4
**October** [1] - 69:16
**OF** [5] - 1:1, 1:6, 1:9, 1:19, 89:9
**OFCCP** [1] - 47:18
**offer** [2] - 31:15, 31:18
**offers** [1] - 70:13
**OFFICE** [1] - 1:6
**Office** [3] - 3:4, 72:8, 72:11
**office** [6] - 10:25, 12:5, 14:15, 18:7, 28:14, 65:21
**officer** [9] - 4:9, 18:17, 25:8, 28:14, 42:21,

42:22, 42:23, 42:25, 82:11
**official** [2] - 70:20, 89:19
**OFFICIAL** [1] - 89:9
**Official** [1] - 1:23
**officially** [2] - 69:4, 69:9
**OIG** [3] - 72:11, 73:1, 73:2
**OMB** [30] - 9:16, 11:18, 11:20, 11:23, 12:22, 13:21, 13:22, 14:11, 15:16, 16:10, 16:16, 16:18, 18:8, 20:2, 20:7, 20:10, 20:20, 31:12, 33:18, 35:25, 36:5, 45:3, 55:5, 55:14, 61:22, 62:21, 63:10, 63:13, 81:5, 82:2
**OMB's** [19] - 4:6, 5:13, 11:20, 12:6, 14:3, 16:10, 16:12, 21:1, 25:19, 25:20, 27:13, 31:11, 35:20, 37:1, 63:18, 63:21, 83:24, 84:1, 84:3
**omission** [1] - 6:19
**ON** [1] - 1:9
**once** [9] - 41:11, 41:15, 47:20, 47:21, 57:23, 58:4, 62:24, 81:11, 85:2
**one** [45] - 6:15, 10:7, 10:16, 10:19, 11:1, 11:23, 12:22, 13:22, 14:11, 14:22, 15:3, 16:1, 16:17, 20:19, 23:1, 23:6, 23:9, 23:25, 36:19, 37:8, 46:24, 47:6, 47:23, 47:24, 49:1, 51:1, 52:1, 54:24, 56:22, 56:23, 57:5, 58:20, 59:10, 59:17, 67:3, 69:5, 74:24, 75:9, 75:25, 80:17, 82:17, 83:22, 84:9, 86:5
**one-day** [2] - 11:1, 23:25
**ongoing** [3] - 64:9, 74:19, 79:21
**online** [1] - 67:6
**open** [14] - 30:16, 35:21, 36:1, 36:3, 36:6, 61:2, 61:4, 61:8, 68:3, 68:5, 70:2, 77:7, 81:11, 88:22

**opened** [1] - 35:1
**opening** [5] - 4:15, 15:13, 16:16, 29:5
**operate** [1] - 42:18
**operations** [2] - 49:15, 74:14
**opinion** [2] - 48:22, 48:25
**opinions** [1] - 80:8
**opportunities** [1] - 37:10
**opportunity** [7] - 10:7, 13:6, 17:13, 22:12, 27:6, 27:10, 78:7
**Opportunity** [1] - 28:13
**opposed** [1] - 47:15
**opposing** [1] - 56:22
**oral** [1] - 77:2
**order** [45] - 4:3, 5:8, 5:25, 6:22, 8:19, 15:25, 17:25, 21:19, 22:2, 22:15, 23:7, 25:7, 25:23, 27:22, 27:23, 28:21, 29:23, 30:12, 30:14, 38:23, 39:3, 40:23, 42:6, 42:9, 63:18, 64:20, 64:21, 64:22, 65:14, 73:21, 83:5, 83:23, 84:16, 84:18, 85:2, 85:16, 85:22, 86:6, 86:9, 86:15, 87:2, 87:7, 89:4
**ordered** [8] - 3:25, 4:5, 5:12, 22:17, 31:13, 34:3, 85:18, 87:16
**ordering** [1] - 86:12
**ordinary** [1] - 82:2
**organization** [1] - 74:22
**organizational** [1] - 49:14
**original** [2] - 4:7, 5:14
**otherwise** [2] - 63:6, 86:13
**outcome** [1] - 64:15
**outdated** [3] - 72:15, 73:9, 73:11
**outlined** [1] - 13:3
**output** [1] - 64:18
**outreach** [1] - 40:10
**outside** [4] - 36:12, 42:20, 80:16, 85:25
**outstanding** [1] - 29:13
**overall** [1] - 37:16
**oversee** [1] - 38:15
**oversight** [3] - 45:23, 45:24, 74:14

**overwhelm** [1] - 41:10
**overwhelmed** [1] - 35:18
**own** [1] - 56:10

### P

**p.m** [2] - 1:5, 89:7
**P.O** [1] - 1:13
**package** [8] - 33:12, 33:16, 36:20, 45:13, 61:21, 62:20, 63:13, 63:22
**Page** [8] - 5:16, 5:18, 5:21, 17:19, 21:25, 44:3, 44:13, 73:19
**PAGE** [1] - 2:3
**pages** [1] - 31:23
**Pages** [2] - 5:16, 6:10
**panel** [2] - 47:8, 76:15
**Paperwork** [1] - 33:11, 62:22
**Paragraph** [2] - 22:1, 35:8
**parameters** [2] - 77:17, 82:14
**paraphrasing** [2] - 12:24, 47:20
**part** [12] - 27:22, 41:12, 42:4, 58:6, 63:10, 63:17, 64:17, 66:17, 69:22, 69:23, 73:14, 79:3
**partial** [1] - 20:4
**particular** [1] - 69:25
**particularized** [1] - 27:24
**parties** [2] - 3:25, 5:5
**parties'** [3] - 5:2, 27:21, 68:12
**partway** [1] - 60:12
**party** [1] - 84:6
**passed** [1] - 81:9
**Pause** [4] - 21:12, 44:2, 53:16, 68:21
**pay** [52] - 4:15, 4:22, 4:23, 8:6, 8:20, 8:23, 9:8, 9:9, 14:12, 16:11, 22:5, 22:16, 23:5, 23:12, 25:17, 26:2, 26:13, 26:24, 28:25, 35:10, 46:7, 47:3, 47:4, 47:15, 50:18, 52:5, 52:13, 52:23, 55:4, 55:5, 55:13, 56:16, 57:8, 57:25, 58:19, 58:24, 61:5, 61:12, 62:1, 62:4, 62:5, 62:16, 76:2, 76:7, 76:8,

76:16, 82:18, 83:18,
84:19
**pay-related** [1] - 52:5
**payroll** [2] - 53:12,
59:14
**people** [13] - 29:7,
42:8, 44:24, 45:1,
50:20, 51:18, 58:22,
69:3, 69:6, 70:4,
70:9, 71:6, 74:7
**people's** [3] - 20:5,
50:21, 54:24
**Perez** [1] - 87:18
**perfectly** [1] - 25:5
**performed** [2] - 78:20,
86:23
**perhaps** [1] - 51:5
**period** [32] - 4:6, 5:14,
5:24, 6:4, 7:11, 7:22,
8:2, 8:7, 8:16, 25:20,
28:23, 29:1, 31:7,
31:16, 35:21, 35:22,
36:1, 36:2, 36:3,
39:10, 53:7, 54:14,
54:19, 56:15, 60:1,
61:3, 64:16, 65:12,
69:10, 70:1, 80:20,
85:14
**periods** [4] - 25:18,
25:25, 26:1, 26:3
**person** [10] - 10:23,
12:4, 14:14, 18:5,
45:21, 46:2, 46:6,
51:7, 52:11, 69:23
**person-hours** [3] -
45:21, 46:2, 46:6
**perspective** [2] -
53:11, 55:23
**phone** [1] - 29:16
**phones** [1] - 72:22
**piece** [1] - 38:2
**pilot** [21] - 46:21,
47:11, 48:1, 48:5,
48:8, 48:9, 48:21,
48:22, 48:24, 49:2,
49:3, 49:4, 49:5,
60:9, 61:10, 61:11,
61:25, 62:8, 62:13
**place** [19] - 29:15,
30:2, 30:3, 34:10,
34:17, 41:12, 42:6,
42:12, 42:14, 42:19,
49:7, 50:12, 52:8,
74:8, 74:24, 75:3,
75:6, 81:7, 86:7
**plaintiff** [4] - 3:7, 8:9,
22:20, 80:7
**Plaintiffs** [2] - 1:3,
1:12
**plaintiffs** [51] - 3:8,

4:4, 4:16, 6:19, 7:7,
10:15, 10:25, 11:1,
12:14, 13:4, 15:4,
15:21, 15:23, 16:9,
20:4, 20:7, 20:12,
20:16, 21:10, 21:16,
21:19, 21:25, 22:1,
24:19, 24:20, 25:3,
27:6, 39:5, 39:7,
39:22, 40:1, 47:12,
60:1, 64:14, 64:25,
65:2, 65:11, 65:17,
66:5, 66:10, 77:23,
77:24, 78:4, 79:11,
84:5, 84:11, 85:5,
85:17, 85:24, 86:10
**plaintiffs'** [26] - 4:19,
6:14, 10:8, 11:8,
11:14, 11:16, 11:21,
12:8, 12:25, 13:21,
14:10, 15:19, 16:15,
16:21, 17:2, 17:21,
17:22, 19:13, 20:24,
21:24, 79:2, 80:11,
80:17, 83:23, 87:24,
88:18
**plan** [9] - 4:18, 5:10,
13:3, 36:11, 65:16,
66:1, 66:5, 81:20,
88:20
**planned** [2] - 57:9,
81:22
**planning** [2] - 31:8,
52:12
**plans** [2] - 4:3, 65:10
**play** [1] - 73:22
**playing** [1] - 20:3
**pleadings** [4] - 5:2,
9:4, 27:21
**podium** [1] - 71:14
**point** [16] - 6:2, 15:21,
29:11, 29:19, 49:7,
62:24, 65:13, 66:17,
78:14, 81:24, 85:15,
86:4, 86:14, 86:22,
87:9, 88:3
**pointed** [4] - 6:19,
8:10, 10:15, 66:15
**points** [2] - 86:5, 86:18
**policy** [2] - 48:22, 62:9
**portal** [5] - 57:20,
61:5, 61:9, 68:5,
74:23
**position** [19] - 4:5,
5:13, 6:6, 6:14, 7:14,
7:23, 9:6, 9:13, 9:14,
9:20, 14:13, 14:15,
21:22, 23:4, 23:18,
64:7, 71:2, 81:23
**possibility** [3] - 39:5,

39:25, 84:24
**possible** [4] - 42:15,
49:10, 50:23, 88:5
**post** [1] - 70:18
**posted** [1] - 23:10
**potential** [2] - 35:15,
72:17
**potentially** [2] - 35:18,
51:4
**power** [3] - 55:6,
55:15, 85:22
**PRA** [5] - 30:21, 45:13,
69:18, 83:25, 88:25
**practical** [1] - 42:7
**practice** [6] - 51:18,
51:20, 70:16, 70:17,
74:2, 74:12
**prayer** [2] - 21:25, 22:1
**pre** [5] - 56:15, 60:1,
60:8, 61:3
**pre-August** [1] - 60:8
**pre-stay** [4] - 56:15,
60:1, 60:8, 61:3
**precise** [1] - 58:14
**predicament** [1] -
23:19
**predicted** [1] - 13:10
**predictions** [1] - 9:14
**prefer** [1] - 48:23
**preferably** [1] - 19:14
**preference** [3] - 48:23,
62:10, 77:4
**preferred** [2] - 62:17,
64:15
**prefers** [1] - 77:8
**preliminary** [5] - 7:2,
9:24, 13:9, 17:4,
17:12
**Preparation** [1] - 67:4
**preparation** [3] - 60:2,
60:3, 80:6
**prepare** [9] - 26:12,
31:10, 35:10, 37:5,
38:24, 39:6, 39:25,
40:8, 60:11
**prepared** [3] - 28:24,
35:13, 35:19
**preparing** [1] - 60:23
**presentation** [1] -
26:6, 33:5
**presented** [1] - 76:14
**president** [1] - 44:19
**press** [1] - 33:3
**pretty** [1] - 80:21
**prevail** [5] - 39:6, 39:7,
39:22, 40:1, 85:6
**prevailed** [1] - 10:25,
20:16
**prevent** [1] - 89:1
**prevented** [1] - 79:22

**previously** [1] - 84:12
**primarily** [1] - 36:16
**primary** [1] - 78:3
**privacy** [5] - 49:14,
49:25, 50:9, 50:10,
51:9
**problem** [1] - 70:23
**problems** [4] - 35:15,
48:14, 48:15, 55:18
**proceed** [1] - 23:14
**proceeding** [1] - 25:13
**proceedings** [1] -
89:14
**process** [12] - 9:8,
17:18, 32:6, 43:16,
52:25, 62:16, 64:9,
74:10, 74:11, 74:17,
83:11, 85:13
**processes** [5] - 25:10,
48:12, 72:1, 72:13,
74:1, 75:2, 75:5,
75:16, 86:7
**procure** [1] - 40:13
**professional** [1] -
46:18
**program** [5] - 36:16,
37:22, 37:24, 54:1,
73:16
**programming** [2] -
29:9, 36:22
**Programs** [1] - 1:20
**project** [2] - 37:24,
46:13
**projecting** [1] - 17:14
**promise** [1] - 20:11
**proper** [2] - 49:2, 49:5
**proposal** [3] - 19:24,
22:16, 69:12
**proposed** [12] - 4:18,
4:19, 5:10, 8:5, 17:9,
26:17, 43:25, 44:18,
45:7, 45:8, 68:24,
85:13
**proposing** [2] - 48:10,
53:6
**protect** [5] - 23:16,
23:24, 49:14, 79:2,
88:18
**provide** [24] - 4:5,
10:10, 10:24, 11:11,
12:7, 12:20, 13:7,
13:17, 14:3, 17:16,
17:24, 18:6, 18:8,
19:19, 24:19, 34:12,
54:17, 56:19, 57:23,
58:4, 58:10, 58:16,
77:3, 77:8
**provided** [9] - 12:3,
13:4, 13:7, 19:8,
19:23, 33:4, 73:12,

80:5, 81:2
**providing** [6] - 8:18,
19:21, 19:22, 20:3,
41:23, 63:6
**provision** [2] - 78:21,
82:5
**prudent** [1] - 77:6
**public** [3] - 32:2, 60:2,
63:8
**publicly** [1] - 60:22
**publish** [4] - 22:2,
57:22, 58:3, 58:8
**pull** [4] - 54:12, 54:14,
54:16, 74:21
**pulling** [1] - 79:4
**purported** [2] - 48:5,
63:18
**purports** [1] - 58:9
**purposes** [12] - 10:20,
12:1, 15:22, 47:4,
54:3, 54:4, 55:3,
62:2, 62:6, 69:20,
77:11, 82:6
**pursuant** [2] - 27:23,
70:21
**put** [6] - 30:20, 32:19,
53:19, 54:6, 56:14,
86:7
**putting** [3] - 67:7,
68:15, 70:9

## Q

**quality** [7] - 49:9,
54:23, 61:6, 73:23,
74:9, 78:6
**Quality** [1] - 67:4
**quantitative** [1] -
62:10
**question-and-
answer** [1] - 26:8
**questioning** [1] - 27:9
**questions** [51] - 4:1,
5:3, 5:6, 10:12, 11:2,
11:17, 22:13, 27:5,
27:7, 27:8, 27:15,
27:18, 27:20, 27:25,
29:14, 30:3, 30:5,
32:18, 32:22, 32:24,
33:6, 41:24, 42:2,
43:4, 46:25, 47:23,
55:22, 56:1, 56:10,
56:23, 58:24, 59:1,
59:4, 59:8, 60:5,
60:19, 60:20, 60:24,
67:8, 71:9, 71:14,
71:15, 71:24, 73:18,
73:19, 76:4, 76:24,
80:1, 84:22
**quickest** [1] - 46:13

**quickly** [7] - 20:9, 25:15, 27:1, 38:4, 40:13, 78:9, 83:5
**quote** [3] - 35:5, 49:12, 62:8

## R

**raise** [2] - 5:3, 86:14
**raised** [8] - 7:7, 22:13, 23:1, 24:10, 27:9, 27:21, 30:4, 60:19
**rate** [1] - 52:24
**rather** [1] - 59:7
**RDR** [3] - 1:22, 89:11, 89:18
**reach** [2] - 71:6, 82:2
**reached** [2] - 43:9, 78:22
**reaching** [2] - 69:2, 70:3
**read** [5] - 47:7, 61:20, 62:18, 64:17, 87:2
**reading** [1] - 76:12
**ready** [7] - 39:21, 41:9, 41:25, 42:5, 83:14, 85:5
**real** [8] - 47:11, 47:13, 47:14, 60:9, 61:15, 75:17, 80:11, 84:10
**realities** [2] - 83:8, 83:9
**reality** [1] - 9:14
**realize** [1] - 33:2
**realized** [1] - 87:24
**really** [9] - 16:4, 27:14, 32:24, 47:19, 75:8, 75:20, 77:7, 79:17, 79:23
**reason** [2] - 77:18, 85:7
**reasons** [3] - 8:7, 9:10, 10:17
**receive** [2] - 69:4, 69:14
**received** [5] - 10:18, 14:4, 14:18, 17:3, 30:11
**receiving** [1] - 54:23
**recent** [2] - 22:15, 87:10
**recipient** [1] - 12:13
**recognize** [1] - 86:10
**Recommendation** [1] - 47:18
**recommendation** [1] - 48:3
**recommendations** [2] - 47:17, 47:21
**recommended** [2] -

47:11, 47:14
**record** [7] - 5:8, 9:18, 10:14, 12:21, 22:21, 28:9, 57:4
**recording** [2] - 26:6, 33:4
**records** [1] - 59:14
**red** [1] - 79:23
**redirect** [1] - 27:11
**Reduction** [2] - 33:11, 62:22
**refer** [1] - 67:21
**referenced** [2] - 60:14, 87:8
**referring** [2] - 10:11, 60:6
**refers** [2] - 58:25, 86:25
**reflect** [1] - 35:6
**reg** [1] - 86:25
**regard** [5] - 10:16, 36:12, 61:25, 77:22, 80:5
**regarding** [9] - 6:14, 21:16, 22:23, 23:25, 43:7, 51:8, 61:12, 80:6, 80:8
**regardless** [1] - 69:18
**Register** [6] - 22:3, 49:12, 49:25, 52:19, 61:12, 79:9
**registration** [1] - 51:6
**regular** [3] - 53:15, 53:18, 79:11
**regulation** [1] - 86:24
**regulations** [2] - 20:8, 40:14
**reinstate** [2] - 22:4, 85:20
**reinstated** [4] - 65:18, 79:25, 84:3, 84:20
**reinstatement** [1] - 22:3
**reinstating** [1] - 87:2
**reiterate** [1] - 20:18
**reiterated** [1] - 60:17
**reject** [1] - 4:17
**related** [3] - 52:5, 52:14, 74:1
**relating** [1] - 72:1
**relay** [2] - 83:15, 83:16
**relayed** [1] - 11:20, 12:6, 15:16
**relaying** [1] - 14:1, 19:2
**release** [3] - 33:4, 52:9, 63:9
**releasing** [1] - 52:9
**relevancy** [1] - 80:8
**relevant** [3] - 27:15,

28:22, 73:8
**reliability** [2] - 46:23, 55:23
**reliability-and-validity-of-the-data** [1] - 55:23
**reliable** [1] - 74:6
**reliance** [1] - 76:3
**relief** [9] - 21:25, 22:1, 22:17, 24:3, 85:16, 85:17, 85:24, 86:10
**relying** [1] - 36:11
**remaining** [1] - 59:13
**remand** [1] - 87:12
**remanded** [1] - 87:19
**remedy** [7] - 23:24, 78:5, 79:2, 84:15, 87:20, 87:24, 88:18
**remember** [2] - 54:2, 76:4
**remind** [1] - 69:6
**removed** [1] - 39:8
**replaced** [2] - 55:8, 55:17
**replacement** [1] - 87:22
**replacing** [1] - 88:22
**reply** [6] - 4:20, 6:21, 8:9, 8:11, 22:22, 86:3
**report** [18] - 29:15, 47:7, 47:14, 47:15, 56:16, 58:6, 58:14, 58:15, 59:7, 59:10, 62:7, 62:9, 72:9, 73:1, 73:2, 73:4, 76:13, 76:16
**reported** [1] - 61:7
**Reporter** [1] - 1:22, 1:23, 89:19
**reporter** [2] - 56:7, 71:18
**REPORTER** [1] - 89:9
**reporters** [1] - 70:13
**reporting** [13] - 23:12, 28:23, 28:25, 35:21, 36:1, 54:4, 55:8, 55:16, 57:9, 57:13, 58:8, 64:16, 79:11
**reports** [3] - 47:16, 87:25, 88:8
**represent** [1] - 24:6
**representation** [12] - 8:23, 11:1, 12:11, 12:15, 21:14, 24:1, 24:18, 25:3, 39:16, 59:2, 77:22, 81:5
**representations** [4] - 22:7, 22:22, 80:12, 86:21

**represented** [1] - 63:25
**representing** [2] - 8:1, 68:12
**request** [10] - 6:17, 6:23, 10:17, 12:15, 15:23, 16:15, 22:1, 33:19, 77:24, 79:9
**requested** [8] - 4:2, 7:13, 9:19, 58:11, 79:10, 85:17, 85:25, 86:11
**requests** [2] - 12:13, 70:21
**require** [4] - 46:6, 46:8, 47:13, 87:12
**required** [3] - 66:16, 86:23, 88:8
**requirements** [1] - 35:7
**requiring** [3] - 52:22, 87:25
**research** [1] - 37:11
**Research** [1] - 62:12
**resembling** [1] - 46:18
**resolution** [1] - 77:12
**resolve** [3] - 6:1, 55:9, 55:18
**resources** [6] - 49:6, 49:8, 53:13, 59:15, 74:4, 74:22
**respect** [6] - 7:5, 7:23, 13:20, 76:3, 85:12, 86:1
**respective** [1] - 3:6
**respects** [1] - 60:17
**respond** [11] - 8:11, 10:9, 11:9, 11:17, 13:2, 63:21, 77:15, 80:1, 80:10, 80:23, 87:13
**responded** [4] - 6:5, 11:20, 16:17, 86:5
**respondents** [1] - 74:8
**responding** [3] - 8:19, 73:20, 83:5
**response** [23] - 4:1, 4:16, 6:20, 7:12, 8:18, 9:23, 11:16, 11:20, 12:21, 18:10, 22:22, 30:18, 52:23, 71:23, 73:18, 73:19, 75:19, 79:8, 83:23, 84:1, 84:10, 86:20
**responsible** [3] - 29:8, 36:22, 73:25
**responsive** [3] - 22:17, 86:9, 86:18
**rest** [1] - 65:15
**restore** [1] - 34:14

**restored** [3] - 26:10, 34:4, 34:8
**restoring** [1] - 69:15
**restricted** [1] - 63:5
**result** [1] - 75:19
**resume** [2] - 28:23, 64:16
**reveals** [1] - 58:13
**reverse** [2] - 51:6, 52:10
**reverse-engineer** [1] - 51:6
**reverse-engineered** [1] - 52:10
**review** [10] - 16:11, 27:14, 63:14, 63:16, 63:18, 63:22, 64:1, 64:5, 64:9, 83:25
**reviewed** [1] - 64:1
**reviewing** [1] - 63:11
**revised** [3] - 32:15, 35:5, 60:21
**revising** [1] - 32:22
**risks** [1] - 55:9
**risky** [2] - 55:5, 55:14
**ROBIN** [1] - 1:12
**Robin** [1] - 3:8
**role** [4] - 26:14, 28:13, 73:22, 80:5
**rolling** [1] - 83:10
**Room** [2] - 1:23, 89:20
**rough** [2] - 13:9, 17:4, 17:12
**Rule** [1] - 87:14
**rule** [3] - 7:16, 87:18, 87:22
**rule-making** [1] - 87:22
**ruled** [1] - 21:18
**run** [2] - 48:13, 79:8
**running** [1] - 6:8

## S

**SAGE** [5] - 36:22, 43:13, 43:16, 75:12, 75:13
**salary** [2] - 50:17, 76:3
**sample** [3] - 31:22, 56:15, 57:8
**SAMUEL** [1] - 28:5
**Samuel** [2] - 4:10, 28:10
**satisfying** [1] - 75:6
**saw** [2] - 15:5, 57:11
**scale** [1] - 48:11
**schedule** [7] - 8:24, 10:16, 16:1, 18:9, 20:13, 25:4, 78:12
**scheduled** [5] - 5:4,

35:21, 36:1, 36:6, 57:13

**scheduling** [1] - 12:13

**science** [1] - 37:11

**Sciences** [6] - 47:7, 47:11, 47:14, 48:2, 62:7, 76:13

**scope** [1] - 86:1

**scratch** [1] - 32:13

**seat** [1] - 28:4

**second** [6] - 15:17, 22:18, 23:1, 26:4, 67:22, 72:6

**Section** [1] - 83:24

**secure** [4] - 49:19, 51:11, 74:8, 74:25

**security** [2] - 26:20, 26:22, 49:14, 49:25, 50:9, 50:10, 51:8, 52:5, 52:8, 52:14, 75:1

**Security** [1] - 50:4

**see** [6] - 9:18, 16:22, 19:15, 19:17, 20:8, 25:2

**seeking** [1] - 66:11

**send** [2] - 69:6, 70:5

**sensitive** [2] - 50:13, 50:16

**sent** [2] - 13:1, 14:10

**sentence** [1] - 15:17

**separate** [2] - 53:8, 54:22

**separating** [1] - 79:20

**September** [41] - 4:14, 4:22, 8:6, 17:10, 22:16, 23:5, 23:14, 25:19, 27:1, 30:20, 31:4, 31:5, 31:11, 40:19, 43:23, 45:7, 45:8, 45:14, 45:16, 46:17, 55:7, 55:16, 66:18, 68:24, 69:3, 69:13, 69:14, 69:18, 70:4, 71:3, 71:6, 78:20, 78:23, 80:13, 80:18, 81:6, 81:13, 88:3, 88:7, 88:21, 88:25

**seriously** [1] - 88:17

**servers** [5] - 51:17, 51:19, 74:25, 75:17, 75:19

**services** [1] - 40:13

**set** [15] - 9:6, 9:10, 23:11, 26:17, 36:17, 49:13, 49:16, 49:25, 50:9, 73:24, 74:12, 84:3, 84:9, 85:19, 87:22

**set-up** [1] - 36:17

**sets** [1] - 41:13

**seventh** [1] - 26:23

**several** [1] - 5:1

**Shaffer** [1] - 50:6

**share** [3] - 15:3, 18:16, 21:9

**sharing** [1] - 18:15

**sheet** [3] - 26:7, 33:6, 34:21

**short** [4] - 20:11, 54:14, 79:8

**shortly** [5] - 12:25, 13:15, 15:15, 18:12, 81:7

**show** [2] - 19:13, 35:13

**shows** [1] - 58:16

**side** [2] - 3:22, 39:20

**signal** [1] - 39:17

**significant** [1] - 40:12

**simpler** [2] - 6:2, 7:9

**simplest** [1] - 75:22

**simply** [2] - 48:22, 62:9

**simultaneous** [1] - 77:9

**sit** [1] - 56:3

**situation** [1] - 59:16

**six** [1] - 76:22

**sixth** [1] - 26:19

**sizes** [1] - 51:2

**skilled** [2] - 38:13, 38:17

**slides** [2] - 26:6, 33:5

**slow** [2] - 83:10, 87:17

**slow-rolling** [1] - 83:10

**slow-walking** [1] - 87:17

**small** [12] - 26:7, 29:6, 29:8, 30:14, 33:6, 36:15, 43:12, 45:22, 48:11, 51:1, 75:10

**snail** [1] - 67:15

**so-called** [1] - 48:21

**social** [1] - 51:4

**software** [1] - 81:17

**sole** [1] - 40:15

**solution** [1] - 75:23

**someone** [7] - 14:18, 32:5, 38:14, 51:2, 54:7, 59:8, 69:14

**sometimes** [1] - 9:15

**soon** [7] - 40:18, 41:2, 42:15, 66:22, 67:12, 77:5, 89:4

**sorry** [16] - 3:13, 3:18, 8:13, 10:5, 24:21, 35:23, 37:19, 48:18,

48:19, 53:17, 58:1, 64:4, 64:5, 65:1, 66:19, 72:23

**sort** [5] - 42:8, 50:17, 73:6, 73:20, 82:17

**sought** [3] - 11:14, 16:20, 24:2

**soup** [1] - 37:24

**soup-to-nuts** [1] - 37:24

**source** [3] - 35:16, 40:15, 52:13

**speaking** [2] - 3:21, 5:22

**specific** [2] - 85:12, 87:22

**specifically** [7] - 4:2, 5:17, 7:8, 8:10, 37:15, 42:2, 52:22

**SPECTATOR** [1] - 72:23

**spent** [2] - 21:21, 68:6

**spreadsheet** [5] - 56:15, 56:19, 57:9, 57:12, 58:3

**spring** [3] - 24:17, 73:3, 88:24

**squares** [1] - 25:3

**staff** [8] - 29:6, 36:23, 37:10, 38:13, 41:14, 41:19, 45:2, 45:22

**stakeholder** [1] - 67:16

**stand** [6] - 28:3, 29:10, 73:15, 75:11, 80:19, 81:8

**stand-up** [1] - 29:10, 73:15

**standard** [5] - 62:11, 70:16, 74:2, 74:12

**standards** [8] - 31:2, 46:18, 49:22, 49:24, 50:15, 62:21

**standing** [3] - 37:21, 49:8

**start** [14] - 5:21, 28:20, 34:7, 34:11, 37:2, 38:21, 41:15, 41:25, 47:23, 57:16, 67:7, 67:19, 79:4

**started** [6] - 10:5, 38:6, 42:8, 72:9, 85:3

**starting** [2] - 3:7, 32:12

**state** [4] - 8:5, 28:8, 76:9, 82:3

**statement** [7] - 7:13, 18:23, 35:9, 40:13, 40:25, 49:17, 61:25

**statements** [1] - 26:21

**STATES** [2] - 1:1, 1:10

**States** [1] - 89:19

**states** [4] - 12:22, 15:17, 17:23, 18:5

**static** [1] - 53:20

**stating** [2] - 11:8, 62:9

**statistics** [1] - 37:12

**status** [8] - 3:25, 19:4, 22:14, 25:23, 40:6, 78:2, 79:12, 82:15

**statutory** [1] - 84:7

**stay** [33] - 4:6, 5:13, 16:10, 18:1, 25:20, 25:21, 27:13, 31:13, 33:24, 33:25, 35:20, 35:25, 36:5, 37:1, 39:8, 39:10, 39:14, 49:1, 49:7, 52:18, 56:15, 57:10, 60:1, 60:8, 61:3, 62:24, 63:1, 63:10, 63:12, 63:18, 79:9, 83:24, 84:25

**stay's** [1] - 34:2

**stays** [1] - 59:15

**stenographic** [1] - 89:13

**Step** [1] - 67:4

**step** [6] - 16:7, 32:6, 58:10, 76:25

**step-by-step** [2] - 32:6, 58:10

**steps** [5] - 38:7, 39:1, 39:4, 39:20, 40:1, 88:1

**still** [8] - 5:25, 19:5, 29:13, 39:14, 43:3, 58:4, 70:1, 88:20

**stop** [3] - 23:12, 29:18, 69:2

**stopping** [1] - 42:18

**storage** [3] - 49:19, 50:11, 52:4

**store** [1] - 74:8

**stored** [2] - 50:14, 75:17

**stragglers** [4] - 69:9, 69:11, 69:12, 81:22

**straightforward** [1] - 75:22

**strange** [1] - 36:17

**Street** [1] - 1:20

**study** [21] - 46:21, 47:11, 47:12, 48:1, 48:5, 48:8, 48:9, 48:21, 48:24, 49:2, 49:3, 49:4, 49:5, 60:9, 61:10, 61:11, 61:25, 62:8, 62:13

**sub** [1] - 67:22

**subject** [3] - 15:13, 39:14, 59:9

**submission** [4] - 4:8, 6:18, 22:23, 35:8

**submissions** [6] - 4:1, 8:4, 17:8, 69:4, 77:3, 77:10

**SUBMISSIONS** [1] - 1:9

**submit** [12] - 28:24, 51:13, 51:20, 63:13, 63:21, 66:16, 66:21, 68:7, 69:11, 69:16, 81:12, 88:8

**submitted** [7] - 8:5, 17:9, 28:17, 42:25, 56:25, 71:4, 85:6

**submitting** [4] - 51:19, 69:12, 69:24, 77:9

**subsequent** [1] - 13:12

**subsequently** [4] - 14:4, 14:18, 18:9, 21:16

**successful** [5] - 64:25, 65:11, 65:17, 66:6, 66:11

**sue** [1] - 23:11

**sufficient** [4] - 32:5, 78:18, 81:25, 82:5

**sufficiently** [1] - 21:14

**suggest** [1] - 63:5

**suggestion** [1] - 87:4

**summary** [12] - 4:4, 11:16, 15:14, 16:16, 21:18, 25:22, 25:23, 38:23, 40:5, 57:1, 64:22, 65:14

**summer** [2] - 57:14, 79:13

**Supp** [1] - 87:18

**support** [1] - 57:1

**suppose** [1] - 23:20

**supposed** [2] - 36:3, 82:20

**surrounding** [1] - 36:24

**survey** [5] - 29:7, 37:11, 38:14, 76:9

**surveys** [2] - 38:1, 69:1

**switching** [1] - 73:17

**Sworn** [1] - 28:5

**synthetic** [1] - 61:15

**system** [5] - 35:18, 49:15, 51:12, 51:21, 75:20

**systems** [17] - 25:10, 25:11, 36:16, 36:23,

42:5, 49:21, 50:14, 51:13, 51:22, 53:13, 53:14, 69:16, 72:13, 74:1, 74:8, 75:3

## T

**tab** [1] - 57:6
**table** [1] - 3:16
**tables** [1] - 3:6
**take-away** [1] - 88:10
**Tamra** [1] - 3:14
**TAMRA** [1] - 1:18
**TANYA** [1] - 1:10
**task** [2] - 45:18, 46:2
**teaching** [1] - 68:6
**technical** [2] - 41:13, 54:17
**techniques** [1] - 73:10
**technological** [1] - 39:20
**tee** [2] - 6:15, 7:17
**telephone** [2] - 41:11, 41:13
**term** [1] - 68:12
**terms** [7] - 54:16, 55:21, 57:24, 62:18, 63:8, 65:3, 65:19
**test** [3] - 46:24, 48:11, 48:12
**testified** [7] - 71:23, 73:17, 76:14, 81:11, 82:7, 82:9, 85:11
**testify** [1] - 31:19
**testifying** [1] - 81:19
**testimony** [9] - 62:3, 63:3, 77:22, 78:12, 79:16, 79:20, 80:4, 85:2, 89:3
**testing** [1] - 48:14
**Textbook** [1] - 62:12
**THE** [269] - 1:1, 1:1, 1:10, 3:2, 3:11, 3:17, 3:20, 4:12, 6:25, 7:4, 7:16, 7:25, 8:8, 8:21, 9:3, 9:13, 10:2, 10:4, 10:11, 10:14, 11:22, 11:25, 12:10, 13:4, 13:11, 13:17, 14:5, 14:9, 14:17, 14:21, 14:24, 15:21, 17:19, 18:16, 18:22, 19:10, 19:13, 19:17, 20:1, 20:15, 20:23, 21:2, 21:6, 21:8, 21:13, 22:18, 23:2, 23:17, 24:4, 24:12, 24:23, 25:12, 28:3, 28:6, 28:7, 28:8, 28:10, 28:11, 28:12, 28:16,

28:19, 28:20, 29:2, 29:18, 29:22, 29:23, 29:24, 29:25, 30:1, 30:6, 30:7, 30:8, 30:10, 31:9, 31:14, 31:17, 31:21, 32:7, 32:14, 33:1, 33:10, 33:15, 33:17, 33:20, 33:22, 33:24, 33:25, 34:2, 34:5, 34:7, 34:15, 34:19, 34:24, 35:4, 35:12, 35:20, 35:23, 35:24, 36:4, 36:5, 36:8, 36:11, 36:13, 37:1, 37:7, 37:13, 37:15, 37:18, 37:21, 38:6, 38:9, 38:11, 38:12, 38:20, 39:9, 39:12, 39:14, 39:19, 40:3, 40:4, 40:10, 40:21, 41:4, 41:5, 41:6, 41:7, 41:10, 41:21, 42:1, 42:4, 42:10, 42:13, 42:15, 42:16, 42:21, 42:24, 43:2, 43:4, 43:9, 43:11, 43:14, 43:15, 43:18, 43:19, 43:21, 43:24, 44:5, 44:6, 44:8, 44:10, 44:15, 44:16, 44:19, 44:21, 44:23, 44:24, 45:1, 45:3, 45:5, 45:6, 45:8, 45:15, 45:16, 45:18, 45:23, 46:1, 46:4, 46:5, 46:9, 46:10, 46:11, 46:12, 46:14, 46:15, 46:16, 46:20, 46:24, 47:9, 47:16, 48:1, 48:4, 48:6, 48:7, 48:17, 48:18, 48:19, 48:21, 48:25, 49:6, 49:11, 49:21, 49:23, 50:2, 50:5, 50:7, 50:8, 50:13, 50:16, 50:19, 50:20, 50:23, 51:8, 51:11, 51:14, 51:15, 51:23, 51:25, 52:1, 52:3, 52:4, 52:7, 52:12, 52:16, 52:17, 52:20, 52:21, 53:1, 53:2, 53:4, 53:17, 53:18, 55:1, 55:20, 55:25, 56:5, 56:21, 57:2, 57:4, 61:18, 64:20, 65:2, 65:5, 65:6, 65:23, 65:24, 67:18, 67:20, 68:22, 70:22, 71:1, 71:10, 71:15, 71:18,

72:21, 75:12, 75:13, 76:21, 77:1, 77:2, 77:14, 77:20, 78:10, 79:19, 80:2, 81:3, 81:15, 82:7, 82:22, 82:25, 83:6, 83:9, 84:14, 84:22, 85:21, 86:3, 86:15, 86:19, 88:9, 89:2
**themselves** [1] - 5:3
**then-new** [1] - 26:7, 33:5
**thereafter** [2] - 18:13, 81:8
**therefore** [1] - 5:3
**they've** [2] - 52:1, 82:8
**third** [2] - 26:11, 72:6
**thorough** [1] - 27:24
**thousands** [1] - 29:16
**threatened** [2] - 23:9, 88:15
**threats** [1] - 49:16
**three** [11] - 4:6, 5:14, 5:24, 7:10, 7:22, 8:2, 8:16, 19:24, 37:20, 37:21, 85:14
**three-year** [9] - 4:6, 5:14, 5:24, 7:10, 7:22, 8:2, 8:16, 19:24, 85:14
**throughout** [1] - 53:23
**THURSTON** [21] - 1:12, 3:8, 22:24, 23:3, 23:21, 24:5, 56:4, 56:12, 56:18, 56:24, 57:3, 65:7, 68:23, 71:9, 77:7, 78:1, 78:16, 79:20, 86:17, 86:20, 88:11
**Thurston** [11] - 3:8, 3:21, 5:22, 9:23, 56:1, 56:10, 68:22, 71:10, 73:19, 76:2, 77:20
**Thurston)................**
**...............** [1] - 2:4
**tightness** [1] - 78:12
**timeline** [13] - 6:13, 26:17, 40:11, 43:25, 44:16, 44:18, 44:23, 45:7, 45:8, 73:20, 73:24, 82:8, 85:13
**timelines** [3] - 30:12, 38:16, 38:19
**timely** [3] - 10:10, 11:11, 79:25
**timing** [3] - 24:10, 24:19
**Title** [1] - 4:25
**today** [11] - 11:2,

19:15, 22:10, 25:13, 25:24, 51:10, 73:8, 79:18, 80:21, 84:4, 88:6
**today's** [1] - 27:15
**together** [5] - 32:20, 47:19, 56:14, 67:8, 68:15
**tolled** [5] - 4:6, 5:14, 6:8, 78:25, 79:1
**tolling** [12] - 6:12, 6:14, 7:8, 7:24, 8:17, 8:25, 9:19, 22:25, 23:15, 23:23, 80:14, 80:20
**took** [3] - 39:2, 63:20, 68:16
**topics** [1] - 27:9
**track** [3] - 61:2, 61:4, 61:8
**traditional** [1] - 69:1
**training** [2] - 35:6, 67:6
**trajectory** [1] - 36:14
**transactional** [1] - 53:14
**transcript** [9] - 5:16, 5:22, 7:6, 14:7, 14:25, 17:20, 77:6, 89:13, 89:14
**TRANSCRIPT** [1] - 1:9
**treat** [2] - 23:4, 60:12
**trial** [2] - 27:8, 31:18
**true** [6] - 47:11, 59:23, 70:12, 78:10, 89:12, 89:14
**try** [5] - 25:15, 32:18, 39:21, 70:8, 86:18
**trying** [1] - 14:25, 16:25, 20:25, 50:5, 54:22, 57:18, 80:3, 83:11, 84:19, 85:3, 85:11
**Tuesday** [1] - 1:4
**turnaround** [1] - 20:11
**turning** [1] - 5:6
**turns** [1] - 20:15
**twice** [1] - 5:15
**two** [15] - 20:19, 30:25, 37:18, 40:7, 45:1, 47:17, 51:11, 53:8, 54:22, 60:15, 64:13, 69:5, 82:16, 86:5
**two-factor** [1] - 51:11
**twofold** [2] - 15:2, 75:8
**type** [1] - 60:5
**types** [4] - 34:25, 38:5, 60:13, 79:17
**typically** [1] - 70:13

**TYREE** [1] - 1:18

## U

**U.S** [3] - 1:19, 1:23, 28:12
**ultimately** [1] - 51:19
**uncertainties** [1] - 60:13
**unchallenged** [1] - 86:2
**under** [9] - 4:25, 20:20, 30:23, 33:11, 67:4, 82:4, 83:3, 86:13, 86:16
**understandable** [1] - 57:20
**understood** [4] - 7:21, 8:14, 24:7, 24:8
**undertaken** [1] - 74:20
**underway** [1] - 12:17
**unexpected** [1] - 70:23
**unfortunate** [1] - 88:9
**unheard** [1] - 80:22
**UNIDENTIFIED** [1] - 72:23
**United** [1] - 89:19
**UNITED** [2] - 1:1, 1:10
**University** [5] - 26:14, 30:22, 38:12, 43:5, 43:6
**unlawful** [3] - 16:13, 84:2, 85:19
**unless** [3] - 6:9, 27:16, 71:4
**unquote** [1] - 62:8
**until..** [1] - 42:14
**unwielding** [1] - 57:18
**unwieldy** [1] - 57:18
**up** [22] - 6:15, 7:17, 11:2, 11:7, 13:20, 27:7, 29:10, 36:17, 37:21, 41:13, 49:8, 56:22, 57:5, 71:14, 73:15, 75:11, 80:19, 81:8, 81:13, 82:12, 82:13, 82:22
**updating** [1] - 32:24
**upset** [1] - 17:2
**urgent** [1] - 40:15
**useful** [3] - 59:7, 62:1, 76:16
**user** [1] - 74:23
**user-friendly** [1] - 74:23
**utility** [2] - 79:16, 87:5

## V

**vacate** [1] - 85:19
**vacated** [2] - 84:2, 87:20
**vacating** [1] - 17:25
**vacatur** [4] - 85:18, 87:12, 87:13, 87:17
**valid** [3] - 46:25, 47:3, 74:6
**validity** [3] - 46:22, 55:23, 73:13
**validly** [1] - 47:25
**various** [2] - 16:19, 25:18
**Vehicles** [1] - 51:5
**versus** [1] - 84:9
**vet** [1] - 42:23
**via** [1] - 67:2
**vice** [1] - 44:19
**view** [3] - 31:16, 62:14, 73:6
**viewed** [1] - 32:1
**VII** [1] - 4:25
**violated** [1] - 83:25
**Virginia** [1] - 51:3
**volume** [1] - 35:17
**voluntarily** [1] - 71:4
**voter** [1] - 51:5
**vs** [2] - 1:5, 3:3

## W

**W-2** [4] - 57:25, 58:19, 58:24, 59:19
**waiting** [5] - 17:23, 18:3, 20:8, 40:25, 41:3
**walk** [1] - 46:17
**walked** [2] - 64:13, 82:16
**walking** [1] - 87:17
**wants** [1] - 46:24
**Washington** [6] - 1:4, 1:14, 1:17, 1:21, 1:24, 89:21
**webinar** [7] - 26:6, 31:25, 32:1, 32:4, 33:5, 34:21, 41:22
**webinars** [3] - 60:16, 60:20, 67:16
**website** [6] - 23:10, 26:9, 57:22, 58:4, 67:8, 73:3
**week** [2] - 23:11, 30:19
**weeks** [3] - 40:7, 69:5
**well-known** [1] - 38:10
**WELLS** [8] - 1:19, 44:7, 44:9, 71:12, 71:17, 71:20, 71:22,

76:20
**Wells** [5] - 3:16, 3:18, 3:19, 71:12, 80:10
**Wells).....................
...........** [1] - 2:5
**West** [1] - 51:3
**whichever** [1] - 77:7
**whole** [2] - 72:19, 74:10
**win** [2] - 12:16, 20:12
**witness** [1] - 44:11
**WITNESS** [91] - 2:3, 28:7, 28:10, 28:12, 28:19, 29:2, 29:22, 29:24, 30:1, 30:7, 30:10, 31:14, 31:21, 32:14, 33:10, 33:17, 33:22, 33:25, 34:5, 34:15, 34:24, 35:12, 35:23, 36:4, 36:8, 36:13, 37:7, 37:15, 37:21, 38:9, 38:12, 39:9, 39:14, 40:3, 40:10, 41:4, 41:6, 41:10, 42:1, 42:10, 42:15, 42:21, 43:2, 43:9, 43:14, 43:18, 43:21, 44:5, 44:15, 44:19, 44:23, 45:1, 45:5, 45:8, 45:16, 45:23, 46:4, 46:9, 46:11, 46:14, 46:16, 46:24, 47:16, 48:4, 48:7, 48:18, 48:21, 49:6, 49:21, 50:2, 50:7, 50:13, 50:19, 50:23, 51:11, 51:15, 51:25, 52:3, 52:7, 52:16, 52:20, 53:1, 53:4, 53:18, 55:20, 65:5, 65:24, 67:20, 71:1, 75:13, 77:1
**Witness** [2] - 44:15, 57:7
**WOMEN'S** [2] - 1:2, 1:16
**Women's** [2] - 3:3, 3:10
**word** [1] - 64:5
**words** [5] - 6:12, 16:6, 34:8, 35:24, 64:18
**workings** [1] - 42:18
**works** [1] - 69:21
**world** [1] - 31:1
**writing** [1] - 23:20
**written** [2] - 77:3, 77:9
**wrote** [1] - 61:20

## Y

**year** [24] - 4:6, 5:14, 5:24, 7:10, 7:22, 8:2, 8:16, 19:24, 23:22, 33:2, 40:5, 53:24, 54:5, 54:21, 54:24, 59:9, 59:10, 59:21, 60:13, 66:21, 78:22, 85:14, 88:20, 88:23
**year's** [1] - 84:9
**years** [5] - 53:7, 54:25, 62:15, 75:15, 78:21
**years-long** [1] - 62:15
**yesterday** [2] - 27:12, 70:15
**yourself** [4] - 3:6, 22:8, 44:22, 44:24