# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL WOMEN'S LAW CENTER, *et al.*, | : | |
| *Plaintiffs*, | : | |
| vs. | : | Civil Action No. 17-2458 (TSC) |
| OFFICE OF MANAGEMENT AND BUDGET, *et al.*, | : | |
| *Defendants*. | : | |

## PLAINTIFFS' POST-HEARING SUMMATION

Pursuant to the Court's Minute Order of April 16, 2019, Plaintiffs hereby submit their written summation on the April 16, 2019 Hearing.

Plaintiffs' primary concern is that the EEO-1 pay data that would have been collected during the period of the unlawful stay actually be collected and that the collection be done in an orderly fashion that does not compromise quality—in other words, nothing more and nothing less than what would have occurred but for Defendants' unlawful actions. As Plaintiffs argued in their Response to Defendants' April 5, 2019 Submission, Dkt. No. 62 ("Response"), Defendants' plan for the data collection does not provide adequate assurances either that the missing data will be collected in full or that the collection will be orderly. Accordingly, Plaintiffs respectfully request that the Court issue the following ancillary declaratory and injunctive relief, consistent with its equitable authority to enforce its orders:

- Declare that the summary judgment opinion and order requires the collection of the missing two years of Component 2 pay data.

- Declare that the unlawful stay tolled the expiration of the three-year Paperwork Reduction Act ("PRA") approval.

- Order the EEOC to immediately take all steps necessary to complete the Component 2 data collections by September 30, 2019 (or to complete a substitute collection of calendar year 2019 data in the 2020 reporting period).

- Order the EEOC to provide notice to employers regarding the Component 2 data collections by April 26, 2019.

- Require the EEOC to provide biweekly compliance reports to Plaintiffs and the Court beginning on May 3, 2019.

- Require Defendants to exercise their emergency extension authorities if the Component 2 data collections are not complete by September 30, 2019.

- And retain jurisdiction over this matter for compliance purposes.

## 1. The Court's Authority to Order the Requested Relief Against Both Defendants.

As a preliminary matter, Defendants have suggested that the Court's authority either to order specific relief to ensure compliance with its summary judgment order in general or to compel compliance by the EEOC in particular is limited. Defs' Reply, Dkt. No. 63 ("Reply"), at 1-2; Apr. 16, 2019 Hr'g Tr., Dkt. No. 66 ("Hr'g Tr.") at 85-86. This suggestion is baseless.

As Plaintiffs noted in their Response and at the Hearing, the Court has inherent equitable authority to order ancillary relief to ensure that Defendants comply with the Court's Order. *See* Response at 13-14 (citing cases). Other Judges in this District recently have exercised this authority in APA cases after the vacatur of unlawful agency action. *See*, *e.g.*, Minute Order, *Nat'l Venture Cap. Ass'n v. Duke*, Civil No. 17-1912 (D.D.C. filed September 19, 2017) (Boasberg, J.), Minute Order, Dkt. No. 45 (granting Plaintiffs' motion for post-judgment

discovery in part) and Hearing Transcript, Dkt. No. 50, at 13-14 (the basis for permitting such discovery was to determine whether Defendants were delaying compliance with vacatur order and stating that the Court "has authority to make sure that my orders are being complied with"); *Mendoza v. Perez*, 72 F. Supp. 3d 168, 171 (D.D.C. 2014) (Howell, J.) (setting timeline for agency to conduct rulemaking to replace vacated guidance letters after the D.C. Circuit instructed the District Court to "craft a remedy to the APA violation" on remand). Thus, the type of ancillary relief requested by Plaintiffs is entirely within the Court's equitable authority to enforce its summary judgment order.

Nor does the EEOC Acting Chair's statutory administrative authority change this conclusion. Whatever discretion or administrative authority an agency has in the first instance, once the agency becomes subject to a Court order, as the EEOC is here, it does not have discretion not to comply with the conduct required by the order. While the EEOC asserted that the unlawful conduct at issue was primarily action taken by OMB, *see*, *e.g.*, Reply at 2, the EEOC is a party to the case; it was named in each of the Counts and the Prayer for Relief, Complaint, Dkt. No. 1 at 31-35; and the Court's summary judgment order vacated action by the EEOC, Mem. Op., Dkt. No. 45 at 41 (vacating the September 15, 2017 Federal Register Notice issued by the EEOC and reinstating the previously approved EEO-1 form). Put simply, as the Court noted at the Hearing, the EEOC cannot invoke its administrative authority as a basis not to comply fully or promptly with the Court's order. *See* Hr'g Tr. at 84 (stating that the EEOC cannot use its administrative authority to "delay the remedy" ordered).

This conclusion is buttressed by the fact that the EEOC's discretion as to the administration of the EEO-1 is limited by its own regulations, which require that employers file the operative version of the EEO-1 form annually. 29 C.F.R. § 1602.7. Per the Court's summary

judgment decision, the current EEO-1 form includes the Component 2 data collection. Neither the regulations nor the PRA itself provide discretion for the Commission to waive this requirement for a reporting year—as the Commission now proposes to do with 2017 calendar year pay data.

### 2. Collection of Two Years of Component 2 Data.

As Plaintiffs stated in their Response, Defendants have implicitly conceded that the vacatur of OMB's stay of the data collection requires the collection of two years' worth of pay data. Response at 13. In Defendants' own words, "[b]ut for OMB's decision to stay the collection of this data, employers would have gathered 2017 Component 2 data during a pay period of their choice between October 1, 2017, and December 31, 2017, and submitted that data to the EEOC on or before March 31, 2018." Defs.' Submission, Dkt. No. 54 ("Submission") at 2 (footnote omitted). Defendants did not did not deny, either in their Reply or at the Hearing, that the Court's order requires that this data be collected—yet they state that the Acting Chair has determined that the EEOC will forego the collection of calendar year 2017 data, purportedly based on her authority to administer the operations of the Commission. Reply at 2. As discussed above, the Acting Chair does not have administrative authority to ignore the requirements of this Court's summary judgment order. Accordingly, Plaintiffs request that the Court explicitly require the EEOC to collect a second calendar year of Component 2 data in addition to calendar year 2018 data.

The EEOC has objected to collecting Component 2 data for calendar year 2017 based on "concerns" that doing so "could decrease response rates and increase errors in the entire data collection process." Submission at 4. Plaintiffs have explained why these "concerns" are speculative and not substantiated. Response at 13. At the Hearing, when questioned by the Court about the stated concerns, the EEOC's Chief Data Officer, Dr. Samuel Haffer, speculated that

employers' databases might have changed in the intervening calendar year and that the EEOC has a better likelihood of receiving quality data by focusing employers' attention on one year of data. Hr'g Tr. at 53-54. Dr. Haffer's testimony did not provide specific reasons why collecting 2017 Component 2 data would not be feasible for the current collection period, nor has the EEOC established that it could not overcome its "concerns" through additional contracting support or by providing employers with brief additional time to comply. *See* Haffer Decl., Dkt. No. 54-1, ¶ 25 (cost of collecting Component 2 data for 2017 would increase EEOC's costs by only 25 percent).

In any event, Dr. Haffer's testimony only concerned the perceived ability to collect data pertaining to a particular year, not to the ability to collect two years of data as a general matter. To the latter point, Dr. Haffer testified that the EEOC would be able to collect Component 2 data for 2019 during the 2020 reporting period without any of the concerns he identified to collection of the 2017 data. Hr'g Tr. at 55. While the EEOC has not established that collecting calendar year 2017 data during the present reporting period is not feasible or that it is not required to do so, Plaintiffs would not object to the collection of 2019 calendar year data during next year's reporting instead, if it were established clearly by the Court that the EEOC is required to do so and that such collection complies with the PRA authorization.

As set forth more specifically below, Plaintiffs request that the Court issue a declaration that its summary judgment order requires collection of two years of Component 2 data, and provide a date certain in the immediate future for the EEOC to determine whether it will collect calendar year 2017 data or calendar year 2019 data, in addition to calendar year 2018 data. Doing so would provide certainty to the EEOC about its legal obligations and the terms of any contract to collect the data and to the reporting community.

**3.      Timing for Collection of Calendar Year 2018 Data.**

Plaintiffs previously requested that the Court require the EEOC to develop a plan to open the Component 2 data collection in advance of the current May 31, 2019 deadline. Dkt. No. 62 at 2. Dr. Haffer testified at the Hearing that the contractor identified by the EEOC to perform the Component 2 pay data collection, NORC at the University of Chicago ("NORC"), informed him that it would refuse to conduct the data collection if it were scheduled to conclude any earlier than September 30, 2019. Hr'g Tr. at 46.

Plaintiffs cannot verify the accuracy or completeness of Dr. Haffer's representation as to the timeframe needed to conduct the Component 2 data collection, because they have not had the opportunity to depose Dr. Haffer or any NORC official, to seek written discovery of the EEOC or NORC, or otherwise to probe the factual basis for NORC's statement as relayed by Dr. Haffer. Nonetheless, Plaintiffs appreciate the Court's cautionary statement that any such discovery, even if granted, would necessarily further delay the matter. Hr'g Tr. at 78. Accordingly, Plaintiffs will assume the accuracy of Dr. Haffer's representations about NORC's view and the time needed to prepare for Component 2 collection, and therefore withdraw their request that the Court order the EEOC to conclude the Component 2 collection earlier than September 30, 2019.

Plaintiffs' decision not to contest Defendants' proposed timeframe, however, makes Plaintiffs' requests that additional assurances as to the completeness of the collection, discussed in more detail below, all the more pressing.

**4.      Post-September 30, 2019 Period.**

The unlawful stay has tolled the expiration of the three-year authorization of the Component 2 data collection, which otherwise would be scheduled to occur on September 30, 2019. Defendants did not oppose Plaintiffs' position on this legal question in their Submission or

Reply, despite the Court's request at the March 19, 2019 hearing that they address the issue. Hr'g Tr. at 5-9. It is therefore appropriate for the Court to treat this issue as conceded. Hr'g Tr. at 8.

The determination that the unlawful stay tolled the three-year authorization period is also legally correct. First, it is consistent with the plain language of the PRA, which only prohibits the Director of OMB from "approv[ing] collections of information for a period in excess of three years." 44 U.S.C. § 3507(g). The statute plainly connects the three-year limitation to *OMB's actions*, not to an external constraint, a fact also reflected in the regulation authorizing stays, which provides that an agency's collection activities will cease "while the submission is pending" review by OMB. 5 C.F.R. § 1320.10(g). Here, OMB exercised its approval authority for the maximum three-year period and subsequently stayed its authority, necessarily staying the running of the three-year period. In contrast, where Congress intends to tie the expiration of a statutory deadline to a fixed, external constraint, it has clearly expressed that intention. *See*, *e.g.*, Federal Advisory Committee Act, 5 U.S.C. app. 1 § 14 (requiring that advisory committees "terminate not later than the expiration of the two-year period *beginning on the date of its establishment*") (emphasis added).

The determination that the unlawful stay tolled the expiration of OMB's authorization is also consistent with the purpose of the PRA. The PRA seeks to minimize the burden to the public of information collection while maximizing the utility of information collected by the government. 29 U.S.C. § 3501. Construing the approval to have paused when the stay was initiated and restarted when the stay was lifted would not increase the burden on filers beyond what was envisioned by the three-year approval and the PRA; the same amount of data would be collected the same number of times as OMB originally approved, and a new approval would be needed to collect data for additional reporting years.

Consistent with the PRA's purpose, OMB regularly reauthorizes information collections after expiration of the existing three-year authorization period, sometimes with changes proposed by the agency based on its experience collecting the information over the prior period. As the EEOC explained in its post-PRA approval supporting statement about the Component 2 data collection before the Court:

> The EEOC will begin collecting pay data as of March 31, 2018, and will be positioned to utilize pay data in its investigations in 2019, after the first pay data collection has been thoroughly reviewed for accuracy. As these investigations may still be ongoing at the time the next information collection request package must be submitted to OMB in late 2019, there will be limited information to evaluate for purposes of that PRA approval process. *Consistent with the PRA requirements and its commitment to assess this collection, however, the agency will consider whether changes may be warranted to increase the practical utility of the data collection or to decrease the burden on EEO-1 filers*. For example, the EEOC may consider the utility and burden of retaining the existing EEO-1 job categories or pay bands as compared to adopting new categories or bands.

Declaration of Benjamin Link, Dkt. No. 22-2 ("Link Decl."), Ex. I, Supporting Statement at 8 (emphasis added). Tolling the running of the authorization period during the unlawful stay would permit the EEOC to conduct and evaluate the information collection as it would in the normal course and then use that information to determine whether or how to propose to modify the collection in any future request to OMB for reauthorization. Both the EEOC and OMB would then have that information to determine how best to maximize the utility of the Component 2 collection and decrease the burden of its collection in future EEO-1 reports.

Because of the paucity of PRA cases and the lack of precedent for OMB's actions here, there is no legal authority of which Plaintiffs are aware that addresses specifically the effect of an OMB stay on the Section 3507(g) time period. That said, it is well established that Courts have authority to authorize a remedy that extends beyond a statutory lapse date. *See*, *e.g.*, *Burr v. Ambach*, 863 F.2d 1071, 1078 (2d Cir. 1988), *vacated*, 492 U.S. 902 (1989), *aff'd on remand sub nom. Burr v. Sobol*, 888 F.2d 258 (2d Cir. 1989) (awarding IDEA plaintiff one and one-half

years of compensatory education, even though that would provide him with education past the

statutory cutoff of age 21); *Connecticut v. Schweiker*, 684 F.2d 979, 997 (D.C. Cir. 1982) ("This

court has repeatedly 'reaffirmed the power of the courts to order that funds be held available

beyond their statutory lapse date if equity so requires.'"); *Andrulis Res. Corp. v. U.S. Small Bus.*

*Admin.*, No. 90-2569, 1990 WL 169318, at *2 (D.D.C. Oct. 19, 1990) (extending expiration date

by which Navy could enter into contract with plaintiff, due to SBA's unlawful activity impeding

the contract; collecting cases); *see also Bell v. Hood*, 327 U.S. 678, 684 (1946) (footnote

omitted) ("[I]t is also well settled that where legal rights have been invaded, and a federal statute

provides for a general right to sue for such invasion, federal courts may use any available remedy

to make good the wrong done.")

The conclusion is buttressed where, as here, the reasons for a post-September 30

collection result entirely from the agencies' actions, including the unlawful stay in the first

instance, both agencies' total failure to engage in any "review" during the stay, the EEOC's

failure to prepare a contingency plan for Component 2 data collection, and the incomplete

information regarding timing for compliance provided during the litigation, Response at 3-4,

Hr'g Tr. at 14. *See Carey v. Klutznick*, 637 F.2d 834, 837 (2d Cir. 1980) ("We see nothing sacred

in the due date of the filing, especially when the work of the Census Bureau, at least as

preliminarily demonstrated below, is incomplete. … It is the Bureau's own fault that the deadline

is not being met."). The record is now clear that the agencies did not undertake any meaningful

review of the Component 2 collection during the stay—OMB's purported reason for the stay in

the first place—despite their representations to the Court that the existence of such a review

should prevent judicial review. *See*, *e.g.*, Dkt. No. 11-1 at 22 ("OMB's decision to review and

stay Component 2 is … the first step in the agency's administrative reconsideration process, a

process that, if the Court permits it to continue, is designed to result in a final approval or disapproval decision by OMB."); Dkt. No. 27-1 at 18 (characterizing the stay as the "first step in OMB's multi-step reconsideration process… [which ]includes consultation with the EEOC to address the concerns raised in the challenged August 2017 memorandum."). Contrary to these representations, as Plaintiffs previously noted, OMB's Director earlier testified that he did not give the pay data collection additional consideration following the stay. Dkt. No. 19 at 5. And Dr. Haffer testified that he was completely unaware of any internal "review" process. Hr'g Tr. at 64. The EEOC did not therefore appear to take any action in response to the Rao Memorandum's directive that it prepare a new information collection package for OMB to review. Rao Memo., Dtk. No. 11-2, at 2. In addition, as Plaintiffs pointed out in their Response and as Dr. Haffer's testimony confirmed, EEOC took no action to prepare to implement the Component 2 collection during the current EEO-1 reporting period in the event that the stay lifted or Plaintiffs succeeded in this litigation. Response at 5-6, Hr'g Tr. at 65-66.

It would be profoundly inequitable for Defendants to prevent the Component 2 data collection from ever occurring by implementing an unlawful stay that ran through the original authorization period (or for enough of the original authorization period that completing the data collection would be impossible before the authorization period expired). The Court has authority to prevent this outcome. *See Burr v. Ambach*, 863 F.2d 1071, 1078 (2d Cir. 1988), *vacated*, 492 U.S. 902 (1989), *aff'd on remand sub nom. Burr v. Sobol*, 888 F.2d 258 (2d Cir. 1989), 888 F.2d 258 (2d Cir. 1989) ("We do not believe that Congress intended to create a right without a remedy. If, in this case, we do not allow an award of compensatory education, then Clifford's right to an education between the ages of three and twenty-one is illusory. Clifford cannot go back to his previous birthdays to recover and obtain the free education to which he was entitled

when he was younger.") (citing *School Comm. of the Town of Burlington v. Dept. of Educ.*, 471 U.S. 359, 374 (1985) ("equitable considerations are relevant in fashioning relief")). Allowing Defendants to forgo the collections or conduct collections of reduced quality due to the expiration of the original three-year authorization would create problematic incentives both in this case and in future cases. It could incentivize Defendants to slow-walk the collections this year, in the hopes that it would be delayed beyond September 30 and thus never occur. It would also incentivize those employers that have objected to the pay data collection to delay reporting in order to avoid having to comply at all. Hr'g Tr. at 69-71. And even more troublingly, it would give the OMB a roadmap to thwarting any collection that it disliked going forward: it could simply stay the collection and run out the clock until it was too late to restore it, knowing that its actions would be irremediable even if (as here) a court found them to be unlawful.

Thus, determining that the expiration date is tolled is the correct conclusion both legally and equitably. This determination would also provide certainty to both the EEOC and the reporting community that the missing Component 2 data collections will in fact occur, even if they are not complete by September 30, 2019. Accordingly, as set forth specifically, below, Plaintiffs request that the Court issue a declaration that expiration of the PRA authorization is tolled. In addition, however, Plaintiffs request that the Court order the agencies to exercise their emergency extension authorities, *see*, *e.g.*, 5 C.F.R. § 1320.13, to extend the current PRA authorization as necessary to complete the collection of two years of pay data. The emergency extension authority is a long-established and recognized power of OMB's, and its use would further protect Plaintiffs' remedy in the event of a post-September 30 data collection.

**5.      The Inadequacies of the EEOC's Plan Remain.**

While Plaintiffs withdraw their challenge to the EEOC's September 30 deadline, it is still the case that the EEOC has not provided assurances that it will complete the Component 2 data

collection in a prompt and orderly manner. *See* Response at 11-12. Neither Dr. Haffer's testimony at the Hearing nor Defendants' counsel's representations have corrected this deficiency. To the contrary, the Court has rightly noted the concern that Defendants are "slow-rolling" implementation of the data collection, Hr'g Tr. at 83, and providing information to Plaintiffs and the Court in "dribs and drabs". Hr'g Tr. at 20. Those tactics, coupled with the serious deficiencies in EEOC's plan, require additional assurances that Defendants will fully comply with the Court's Order and specific ancillary relief to secure that compliance.

First, the EEOC has not finalized the contract with NORC to collect the Component 2 pay data and was not able to state definitively when it would do so or the cause of the delay. Hr'g. Tr. at 42-43; 82-83. Accordingly, Plaintiffs request an order requiring the EEOC to immediately take all steps necessary to complete the Component 2 data collection by September 30, 2019, along with regular intermediate reporting requirements to Plaintiffs and the Court.

Second, the EEOC has not provided a date certain by which it will notify EEO-1 reporters that they must report Component 2 data during the current EEO-1 reporting cycle and has failed to provide any persuasive rationale for why it has not already provided such notification. Hr'g Tr. at 66. Commission staff will not do so until the Acting Chair instructs them to "move forward" with the data collection. *Id*. This is the case even though employers have already relied on the delay in notification to resist compliance with the eventual data collection. Response at 11, n. 15. Nor does Dr. Haffer's testimony that such a notification would result in increased communications from the employer community justify the prolonged delay, Hr'g Tr. at 34-35—at a minimum, the EEOC could notify the employer community that it will establish a process to respond to employer questions as soon as it is able to do so. Finally, the EEOC has not issued, nor even apparently considered issuing, a Federal Register Notice to notify the regulated

community that the stay has been lifted. Hr'g Tr. at 52.  Accordingly, Plaintiffs request a date

certain by which the EEOC must issue such a notification statement on its website and submit

the same for publication in the Federal Register.  Plaintiffs propose April 26, 2019, for this

deadline, which appears entirely feasible based on the testimony provided by Dr. Haffer and

avoids further unnecessary delay.

Third, the EEOC has not adequately explained the decision to remove the prior

Component 2 guidance from its website. Response at 4-5; *see also* Link Decl. ¶¶ 4-10

(describing information, including sample data file specifications, discovered by Plaintiffs on

archived EEOC websites). While Dr. Haffer testified that his understanding was that the EEOC

could not keep the website active as a result of the stay, Hr'g Tr. at 33-34, the regulations

authorizing a stay do not state such a requirement. 5 C.F.R. § 1320.10(g). Rather it would be

consistent with OMB's purported ongoing "review" for the EEOC to continue publishing its

website information regarding the Component 2 data collection so long as the website also

plainly stated that the EEOC was not presently conducting or sponsoring the collection of

information. *Cf.* 5 C.F.R. §§ 1320.5(a), (b).

More importantly for present purposes, EEOC also has not justified its prolonged delay in

restoring this information to its website now that the stay has been lifted, especially given that

the information still accurately describes the data to be collected, as Dr. Haffer acknowledged,

Hr'g Tr. at 58-59, and given his expressed concern that the employer community will have many

questions about the pay data collection. While employers may have additional questions about

special circumstances, *id*. at 59[1], the EEOC previously provided detailed definitions of the data

---

[1] Indeed, EEOC already has guidance on mid-year mergers and acquisitions, one of the scenarios
identified by Dr. Haffer as possibly causing confusion, for the EEO-1 Component 1 data

to be collected, which remain valid and provide clear guidance for most situations. *See*, *e.g*, Link Decl. ¶ 6, Ex. C ("Instruction Booklet") at 4-5 and 5-11 (appendix with six pages of definitions, including "Description of Pay-Related Terminology").

Fourth, the EEOC appears to have abandoned the internal work it did to implement the Component 2 data collection in the period before the unlawful stay. Dr. Haffer testified that he does not know (and apparently has not reviewed) what internal work EEOC had done on employer guidance in the eleven months after OMB approval of Component 2 before the stay was entered in August 2017. Hr'g. Tr. at 60-61. Yet it is reasonable to expect that significant work of this sort was performed, because the EEOC was on track to implement the Component 2 collection on time, by January 2018, before it was stayed. *Id*. at 61. It is inexplicable that the agency would not revisit and review this work once the stay was lifted.

The third and fourth factors thus support Plaintiffs' requests for a date certain by which the EEOC must provide notice regarding Component 2 to employers; and that the EEOC be ordered to immediately take all steps necessary to complete the Component 2 data collection by September 30, 2019 along with regular intermediate reporting requirements.

Fifth, the EEOC does not have a plan for collecting Component 2 pay data after September 30, 2019. Response at 11-12. The agency has refused to state what it will do if there are any delays by either it or NORC in the proposed timeline. *See*, *e.g*., Hr'g Tr. at 80-82. While Defendants' counsel stated that "in the ordinary course" the EEOC and OMB would consult and agree to extend the PRA expiration, neither Defendant has provided a commitment that it would exercise its authority to do so in this case. Hr'g Tr. at 82. Even absent such delays, the EEOC has

---

collection. *See*, *e.g*., EEO-1 Survey User's Guide at 28-29, 79, 119-125, https://www.eeoc.gov/employers/eeo1survey/upload/2018-EEO1-Users-Guide-Version-1-2.pdf.

not provided a plan for how it would act affirmatively to secure compliance by employers that do not submit pay data by September 30. Rather, Dr. Haffer has stated that the EEOC could simply passively accept such data should employers choose to submit it, but the agency will take no steps after September 30, 2019 to solicit this data from employers who failed to provide it. Hr'g Tr. at 70-71.

Accordingly, Plaintiffs request that the Court declare that the expiration of the September 30, 2019 PRA authorization is tolled by the unlawful stay; that it order Defendants to use their emergency extension powers if the collections are not complete by September 30, 2019; and that it specify that the Component 2 data collections will not be deemed complete until the typical number of EEO-1 reporters submit the required Component 2 reports.[2]

Finally, Plaintiffs are concerned that several of the reasons identified by the EEOC for its delay in complying with the Court's Order are unrelated to the feasibility of prompt compliance. For example, the EEOC raised the issue of privacy and data security in its Submission and the Declaration from Dr. Haffer. *See, e.g.*, Haffer Decl. ¶ 21. As Plaintiffs explained in their Response, this issue does not provide a basis for delay. Response at 10; *see also* 30-Day Notice, 81 Fed. Reg. 45479, 45,491 ("The EEOC has successfully protected the confidentiality of EEO-1 data for over 50 years, since this data was first collected."), Link Decl., Ex. H, EEOC Supporting Statement, at 9-10. Dr. Haffer's testimony confirmed the point. *See* Hr'g Tr. at 50 (stating that his goal is to *exceed* federal standards, not questioning that the approved data collection would not meet current federal standards); 51-2 (confirming no known data breach of EEOC systems);

---

[2] Plaintiffs suggest that typicality be defined as the percentage of EEO-1 reporters who have submitted their required Component 2 reports equals or exceeds the mean percentage of EEO-1 reporters that actually submitted EEO-1 reports in each of the past four collection years.

52 (confirming that storage of aggregate pay data does not make EEOC's security measures less effective).[3]

Similarly irrelevant to whether the EEOC should move promptly with collection is Dr. Haffer's view of the utility of the Component 2 data collection, specifically the adequacy of the EEOC's prior pilot study and the decision to use pay bands. Both were thoroughly considered by the agency, the public, and OMB, during the initial PRA approval process. *See*, *e.g.*, 60-Day Notice, 81 Fed. Reg. 5113, 5114-15, & 5116-17, 30-Day Notice, 81 Fed. Reg. 45479, 45489.[4] Plaintiffs are concerned that the EEOC's untimely revisiting of these issues in this proceeding raises questions about its commitment to promptly and fully implementing the Component 2 data collection.

This final factor also supports Plaintiffs' requests for the various ancillary relief sought, including their requests that the Court declare that two years of data are required and that the expiration of the PRA authorization is tolled, and that the Court order the EEOC to take immediate action to complete the Component 2 collection, including providing employer notice by April 26, 2019, and intermediate reporting requirements.

### 6.      Plaintiffs' Requested Ancillary Relief.

For the reasons set forth above, Plaintiffs respectfully request that the Court issue the attached proposed order which contains the following declarations and injunctive requirements:

---

[3] The EEOC already has policies in place to prevent the only specific concern that Dr. Haffer identified—release of information that could be reverse-engineered to identify an individual person—by its policy of not releasing aggregate information derived from small sample sizes. *See* Response at 10, n. 14.

[4] Similarly, Dr. Haffer conflated the questions of whether the measure of pay to be reported (based on IRS W-2 box 1 information) meets the goals of the data collection with whether this measure of pay is clear to employers. Hr'g Tr. at 59. He agreed that the definition itself is clear. *Id*. Nevertheless, his conflation raises the concern that his apparent personal questions about the utility of the approved pay data collection are impacting his view as to whether and how promptly the EEOC should press forward to complete the Component 2 collection.

- The Court's summary judgment opinion and order requires that the EEOC collect Component 2 data for calendar years 2017 and 2018.

- In lieu of collection of Component 2 data for calendar year 2017, the EEOC may satisfy the Court's order requiring two years of data collection by collecting Component 2 data for 2019 during the 2020 EEO-1 reporting period. If the EEOC determines to exercise the option to collect Component 2 data for 2019 instead of 2017, it must so notify the Court and Plaintiffs of that decision by May 3, 2019.

- OMB's unlawful stay of its approval of the revised EEO-1 form tolled the three-year period of that approval for the duration of the stay, *i.e.*, one year and 188 days (553 days). Accordingly, barring further interruptions of the approval or extensions, the PRA approval for OMB Control No. 3046-0007 shall expire no later than April 5, 2021.

- The EEOC must immediately take all steps necessary to complete the Component 2 data collections for calendar years 2017 and 2018 by September 30, 2019 (unless the EEOC exercises its option to collect Component 2 data for 2019 in lieu of 2017, in which case that collection may occur in the 2020 EEO-1 reporting period).

- By April 26, 2019, the EEOC must issue a statement on its website and submit the same for publication in the Federal Register notifying EEO-1 filers of the Court's March 4, 2019 order reinstating the Component 2 data collection and that they should prepare to submit Component 2 data no later than September 30, 2019.

- The EEOC must provide reports to Plaintiffs and the Court beginning on May 3, 2019, and continuing biweekly thereafter, providing notice of all steps taken to implement the Component 2 data collections since the prior report, notice of all steps to be taken during the

ensuing two week period, and indicating whether EEOC is on track to complete the collection by September 30, 2019.

- If the Component 2 data collections for calendar years 2017 and 2018 are not complete by September 30, 2019 or if the EEOC determines to collect calendar year 2019 data in lieu of calendar year 2017 data, Defendants must exercise all authorities to provide for emergency extensions of the September 29, 2016 PRA authorization for the collection (OMB Control Number 3046-0007) until the data collections are complete.

- The Component 2 data collections will not be deemed complete, for the purpose of the preceding paragraphs, until the percentage of EEO-1 reporters that have submitted their required Component 2 reports equals or exceeds the mean percentage of EEO-1 reporters that actually submitted EEO-1 reports in each of the past four reporting years. Until such time as the EEOC reaches completion by that metric, EEOC must exercise its authority to ensure compliance with the reporting requirement as it has in prior years, and Defendants must extend the approval period to the extent necessary and permissible under law to allow such steps.

- The Court will retain jurisdiction over this matter for the purposes of enforcing the March 4, 2019 summary judgment opinion and order as well as any additional orders regarding compliance.


Dated: April 22, 2019                              Respectfully submitted,


                                                   /s/ Robin F. Thurston____

                                                   Robin F. Thurston (DC Bar No. 1531399)
                                                   Javier M. Guzman (DC Bar No. 462679)
                                                   Jeffrey B. Dubner (DC Bar No. 1013399)
                                                   Democracy Forward Foundation
                                                   P.O. Box 34553
                                                   Washington, DC 20043

(202) 448-9090
rthurston@democracyforward.org
jguzman@democracyforward.org
jdubner@democracyforward.org

Fatima Goss Graves (DC Bar No. 481051)
Emily J. Martin (DC Bar No. 991968)
Sunu Chandy (DC Bar No. 1026045)
Maya Raghu (DC Bar No. 1035558)
National Women's Law Center
11 Dupont Circle, NW, Ste 800
Washington, DC 20036
(202) 588-5180
fgraves@nwlc.org
emartin@nwlc.org
schandy@nwlc.org
mraghu@nwlc.org

*Attorneys for Plaintiffs*