**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL WOMEN'S LAW CENTER, et al. | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 17-2458 (TSC) |
| v. | ) |
| | ) |
| OFFICE OF MANAGEMENT AND BUDGET, et al.[1] | ) |
| | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' WRITTEN SUMMATION IN RESPONSE TO
THE COURT'S APRIL 16, 2019 ORDER**

In November 2017, Plaintiffs filed a four-count Complaint challenging the decision of Defendant Office of Management and Budget ("OMB") to issue a stay and review of a previously-approved collection of pay data information ("Component 2 pay data collection") sought by Defendant United States Equal Employment Opportunity Commission ("EEOC").  *See generally* Compl., ECF No. 1 (Nov. 15, 2017).  That Complaint challenged the validity of OMB's stay decision under the Paperwork Reduction Act ("the PRA") and the Administrative Procedure Act ("APA"), *see, e.g., id.* ¶¶ 100-18 (Counts One through Four allege that OMB's stay and review decision is contrary to OMB's regulations and § 3518(e) of the PRA, and also is arbitrary and capricious in violation of § 706(2)(A) of the APA.   And, the Complaint's requested relief seeks to remedy the purported harm derived from OMB's stay decision by requesting that the Court: (i) declare OMB's decision unlawful (Prayer for Relief ¶¶ 1-2), (ii) vacate the challenged decision and set it aside (Prayer for Relief ¶ 3), and

---

[1] Pursuant to Rule 25(d), Paul Ray, in his official capacity as Acting Administrator of the Office of Information and Regulatory Affairs ("OIRA"), is substituted for Neomi Rao, in her former official capacity as Administrator of OIRA.

(iii) reinstate OMB's prior approval of the Component 2 pay data collection (Prayer for Relief ¶¶ 3, 4). [2]

Importantly, the Complaint did not challenge any aspect of the EEOC's underlying data collection nor its planned implementation of the same. The Prayer for Relief did request, as part of the reinstatement of OMB's prior approval, that the Court order "EEOC Defendants to publish a Federal Register Notice announcing this reinstatement or to take equivalent action necessary to immediately reinstate the pay data collection." Prayer for Relief ¶ 4. But that final form of relief was necessary only to restore the EEOC's underlying decision to its status free from the OMB stay and did not concern any separate action or authority by EEOC. *See id*

The Court's March 4, 2019 Memorandum Opinion and Order granted summary judgment in Plaintiffs' favor and provided Plaintiffs with the relief that they had requested. Specifically, the Court's decision and order (i) declares OMB's decision to stay and review the Component 2 pay data collection unlawful, (ii) vacates and set aside OMB's decision, and (iii) reinstates the previously-approved Component 2 pay data collection. *See* Mem. Op. at 40-41, ECF No. 45 (Mar. 4, 2019); *see also* Order at 1, ECF No. 46 (Mar. 4, 2019). There is not merit to Plaintiffs' continued assertion that that they have not received the relief ordered by the Court, and all of the relief to which they are entitled. Plaintiffs challenged an action by OMB—not the EEOC—and the Court has now vacated that OMB action *in toto*, clearing the legal path for the EEOC to proceed with the reinstated collection.

It is for this reason that Defendants respectfully submit that they have complied with the relief that this Court ordered on March 4, 2019. Defendants acknowledge that OMB's stay has been vacated and that the previously-approved Component 2 pay data collection has been reinstated. Defendants

---

[2] Plaintiffs' Prayer for Relief also contains a request for an award of reasonable attorneys' fees and costs and "other such relief as the Court may deem just and proper." Prayer for Relief ¶¶ 5-6. Defendants' written summation addresses only the relief requested in paragraphs 1 through 4 of the Complaint's Prayer for Relief.

are not continuing to treat the Component 2 pay data collection as stayed or otherwise not in effect, and, significantly, Plaintiffs have not identified any evidence suggesting otherwise.  Plaintiffs' claims have thus been vindicated, and they have received all the relief their claims could obtain under § 706(2) of the Administrative Procedure Act ("APA"), the statutory provision upon which Plaintiffs relied in bringing this suit.

Plaintiffs do not argue otherwise but instead object to *the manner* in which the EEOC has chosen to implement the reinstated Component 2 pay data collection—that is, the EEOC's administrative decision to set separate collection deadlines for the collection and submission of Component 1 data and Component 2 pay data to provide the agency sufficient time to prepare for the reinstated pay data collection.  But Plaintiffs' Complaint never challenged any action by the EEOC or any aspect of its authority.  Plaintiffs' quarrel was with OMB's stay.  Consistent with that challenge, this Court's Order focused solely on remedying the purported harm derived from OMB's stay and did not purport to circumscribe the EEOC's exercise of its independent statutory authority in implementing its now-un-stayed Component 2 pay data collection.  There have been a basis for the Court to curtail the EEOC's independent statutory authority, as Plaintiffs never challenged that authority or the EEOC's use of it.  To the contrary, Plaintiffs included EEOC as a party only for purposes of effectuating any relief in the case.  Complaint ¶ 13.

As explained in detail below, pursuant to its independent Title VII authority, the EEOC has taken reasonable and timely steps to respond to the March 4 Opinion and Order in a manner that is consistent not only with that ruling but also with the on-the-ground reality of the EEOC's data and analytics capabilities.  The EEOC has proposed to utilize its Title VII administrative authority to collect 2018 pay data from employers between July 15, 2019, and September 30, 2019.  The EEOC's proposal takes into consideration and appropriately mitigates the practical challenges presented by the reinstatement of the collection, described in both the declaration and testimony of the agency's Chief

Data Officer, Samuel C. Haffer, Ph.D, including (1) the data validity and reliability concerns to which Dr. Haffer testified, and (2) the fact that this is the first time the data will be collected.  The EEOC's proposal to exercise its Title VII authority in this in a manner is both responsive and considered.

In a last ditch effort to convince this Court to order more relief than they are entitled to, Plaintiffs urge the Court to invoke its equitable authority with respect to its March 4 Opinion and Order.  But Plaintiffs' attempt to end run the relief to which they are entitled under § 706(2) by invoking principles of equity for additional relief runs directly into the EEOC's separate and distinct authority to administer its collection in a manner that the agency has determined is reasonable under these particular circumstances.  As this Court has previously observed, equitable authority exists to remediate the specific legal harms that a plaintiff advances and a court identifies.  Here, the only such purported harm that Plaintiffs advance is OMB's decision to stay the Component 2 pay data collection. There is no doubt that the Court has broad authority to ensure that the stay is (and remains) completely inoperative.  But the Court should decline Plaintiffs' invitation to invoke its broad equitable authority to enjoin aspects of the EEOC's independent implementation of the Component 2 data-collection pursuant to EEOC's independent statutory authority—something Plaintiffs never challenged and as to which the Court has not found any legal error.

## ARGUMENT

### I.    Defendants Have Not Violated The Court's March 4, 2019 Memorandum and Opinion.

Plaintiffs' suit concerns OMB's exercise of its authority under the PRA and alleges that OMB's decision to stay and review the Component 2 pay data collection is unlawful.  *See generally* Compl. ¶¶ 100-18.  Put another way, the identified controversy is the extent of OMB's authority in that respect, and the reasonableness of the agency's decision.  *See id.*  That Plaintiffs include the EEOC as a defendant, alleging that the agency is a "necessary party for relief," *see id.* ¶ 13, does not change the fundamental nature of the suit:  it is to ensure that the federal government, including the EEOC,

ceased to give effect to OMB's stay and thus resumed giving effect to EEOC's previously approved collection of Component 2 pay data.

Indeed, that is exactly what Plaintiffs requested and received:  they asked this Court to vacate OMB's decision to stay and review the Component 2 pay data collection under § 706(2) of the APA, and the Court granted that relief.  *See, e.g.*, *Envt'l Def. v. Leavitt*, 329 F. Supp. 3d 55, 64 (D.D.C. 2004) ("When a Court vacates an agency's rule, the vacatur restores the status quo before the invalid rule took effect. . . .") (citing *Indep. U.S. Tanker Owners v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987)). Specifically, the Court vacated OMB's stay decision, set it aside, and reinstated the previously-approved Component 2 pay data collection.

Moreover, the relief that this Court awarded is consistent with the proposed order that accompanies Plaintiffs' summary judgment motion.  To that point, Plaintiffs' proposed order provided that OMB's review and stay of the Component 2 pay data collection, and the Federal Register notice announcing the same, should be vacated so that the previous approval of the revised EEO-1 form shall be in effect.  *See* Text of Pls.' Proposed Order, ECF No. 22-5.  The Court granted relief consistent with Plaintiffs' request, *see* Order, ECF No. 46 (Mar. 4, 2019), and Plaintiffs have obtained the relief sought—OMB's stay is no longer in effect.   Defendants, moreover, have fully complied with that relief – there is no evidence that either OMB or EEOC is treating OMB's stay as still in effect or that either agency is denying the existence of Component 2's reinstatement.

Notwithstanding these facts, Plaintiffs now seek additional relief to require the EEOC to take specified actions to collect the Component 2 pay data under the revised EEO-1 form.  In addition to the practical problems with this request (*see infra* at II.A-B), there is a fundamental legal problem at the threshold:   Plaintiffs' Complaint challenged only OMB's legal authority to issue a stay under the Paperwork Reduction Act and its implementing regulations, and the relief that they sought—namely, that the Court vacate OMB's stay decision, set aside the unlawful decision, and reinstate the

previously-approved Component 2 pay data collection—remedies the harm derived from *OMB's* stay decision.  Perhaps most importantly, this Court's March 4 Opinion and Order remedies the specific harm that Plaintiffs claimed as a result of OMB's stay.

Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995).  Thus, in *PPG Industries*, the D.C. Circuit reversed the district court order that prohibited an agency from reopening its proceedings using new evidence.  The D.C. Circuit reasoned that the decision of whether or how to proceed on remand "is an issue to be decided first by the Secretary—and to be brought to the district court, if at all, only on review under the APA." *Id.* at 366.  This reasoning applies equally here:  Any challenge to the EEOC's actions in response to this Court's order setting aside OMB's stay would be subject to review, if at all, only under the APA, and not in follow-on proceedings in this litigation.

That is because any challenge to the EEOC's actions with respect to the reinstatement of the Component 2 pay data collection present fundamentally different legal questions than were litigated and resolved in this Court's March 4, 2019 Opinion and Order—the focus which involved the validity of OMB's actions under the PRA and its implementing regulations.  Thus, for example, had OMB had never stayed the Component 2 pay data collection in the first place, the EEOC would have had authority under Title VII to adjust the reporting deadlines, which further underscores why any challenge to the EEOC's exercise of its Title VII administrative is a separate and distinct legal issue from that presented in the March 4, 2019 Opinion and Order that vacated and set aside OMB's actions under the PRA.  If Plaintiffs now object to how the EEOC is implementing the Component 2 pay data collection now that it has been reinstated, they must bring a new claim that identifies a legal basis for reviewing and setting aside the EEOC's actions.

Nor may Plaintiffs avoid this conclusion by invoking equitable relief principles. While the "courts have inherent power to enforce their prior orders," *Almaqrami v. Tillerson*, 304 F. Supp. 3d 1, 6 (D.D.C. 2018) (Chutkan, J.), that power is, by definition, limited to the enforcement of the relevant order. *See, e.g.*, *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 29 (D.D.C. 2014). Such orders must "arise[] from and resolve[] a dispute within the court's subject-matter jurisdiction." *Salazar by Salazar v. District of Columbia*, 896 F.3d 489, 491 (D.C. Cir. 2018) (alterations and internal quotation marks omitted). The exercise of the Court's equitable powers is appropriate when "(1) there was a clear and unambiguous court order in place; (2) that order required certain conduct by Defendants; and (3) Defendants failed to comply with that order." *Latney's Funeral Home*, 41 F. Supp. 3d at 29. Under those circumstances, a court may exercise its equitable power to require an agency "to fulfill its obligations under a prior order." *Almaqrami*, 304 F. Supp. 3d at 6.

Plaintiffs have not shown that these three conditions are satisfied here. As previously noted, the March 4, 2019 Opinion and Order concerns the validity of OMB's actions under the PRA, not those of the EEOC under its Title VII authority. In addition, the Court's order vacating OMB's decision to stay and review the Component 2 data collection and reinstating the previously-approved collection has been fully effectuated. Consistent with the reinstatement of the revised EEO-1 form, the EEOC retains its congressionally delegated authority to administer the data collection, including by adjusting the dates on which data must be submitted as appropriate to meet the needs of the agency and the regulated community. As previously discussed, this authority is established by statute, 42 U.S.C. § 2000e-4(a), and has not been called into question in this case.

The cases on which Plaintiffs relied during the April 16 hearing do not compel a different conclusion, and do not support the entry of an order directing the EEOC to take specified actions to administer its data collection in these circumstances. For example, *Mendoza v. Perez*, 72 F. Supp. 3d 168 (D.D.C. 2014), concerned a challenge to the Department of Labor's ("DOL") issuance of Training

and Employment Guidance Letters ("TEGL") without going through notice-and-comment rulemaking.  The court held that notice-and-comment procedures were required, and it remanded to the agency for further proceedings.  The plaintiffs in that case alleged that DOL was not taking measures to promulgate the new TEGLs with appropriate speed, and the court conducted further proceedings to determine what further measures were necessary to enforce its relief *with respect to DOL*.

But the relief ordered with respect to DOL in *Mendoza* is in direct contrast to facts in this case where the underlying challenge involves the validity of OMB's actions, not the EEOC.  Indeed, the question of the court's equitable authority was not squarely at issue in *Mendoza*, as the government chose not to challenge the form of remedial relief requested in that case.  72 F. Supp. 3d at 171. Rather, the only dispute was as to the schedule the court should order, and the court adopted the schedule proposed by the government.  *Id.*

Plaintiffs' reliance on *National Venture Capital Ass'n v. Duke*, No. 17-1912 (D.D.C.), likewise involved an action to enforce the precise relief ordered by the court, with respect to the same agency against which it was initially ordered.  In that case, plaintiff alleged that the Department of Homeland Security ("DHS") was delaying its implementation of the International Entrepreneur Rule.  The court had previously held that DHS was required to implement the rule unless it withdrew it pursuant to notice-and-comment rulemaking.  Plaintiffs alleged that DHS was not acting in good faith to implement the rule and sought discovery with respect to DHS's actions in that respect.  Again, the factual predicate underlying the relief awarded by the court in *National Venture Capital Ass'n* is entirely distinct from the facts underlying Plaintiffs' request for additional relief here—namely, that on top of the relief that Plaintiffs have already obtained as a result of the Court's decision vacating OMB's stay and reinstating the Component 2 collection, the Court should further direct the EEOC take specific actions to implement the Component 2 pay data collection in the manner that Plaintiffs prefer. Neither § 706(2) or principles of equitable relief require such a result.

Finally, Plaintiffs' reliance on 29 C.F.R. § 1602.7 to bolster their assertion that "the EEO and data collection is required to be performed annually by regulation," and is "not an entirely discretionary data collection," *see* April 16, 2019 Hrg. Tr. at 86, lines 20-25, at 87, lines 1-7, misses the mark. By its plain text, the regulation imposes requirements on *employers*, not on the EEOC. ("On or before September 30 of each year, every employer that is subject to title VII of the Civil Rights Act of 1964, as amended, and that has 100 or more employees shall file with the Commission or its delegate executed copies of Standard Form 100, as revised (otherwise known as "Employer Information Report EEO-1") in conformity with the directions set forth in the form and accompanying instructions." (emphasis added)). It does not direct the EEOC to take any action whatsoever with respect to the collection or possible publication of information, and it can in no way be construed to undermine the Acting Chair's established discretion in this respect. In any event, the question whether there are constraints on the Acting Chair's authority is a question for separate proceedings. As already noted, this case has never concerned the lawfulness of the EEOC's actions nor the extent of its authority with respect to the collection of this information, and this Court's Order certainly did not adjudicate a dispute between the parties as to whether the EEOC has authority to modify the reporting deadlines in the manner that it has proposed.

II.   **The EEOC's Proposal to Collect 2018 Component 2 Pay Data From Employers Between July 15, 2019, and September 30, 2019, Is A Considered and Responsive Response.**

A.   **Since mid-2017, the EEOC has been taking critical steps to modernize its data collection processes and systems.**

The EEOC hired Dr. Haffer in November 2017 and completed the hiring of other staff, such as statisticians and data scientists, with expertise in data collection and analytics in December 2018. *See* Haffer Decl. ¶¶ 7, 14-15. The Declaration and April 16 hearing testimony of Dr. Haffer, the EEOC's Chief Data Officer, delineate the bases for his opinion that, as a result of the preliminary assessment and evaluation he conducted after coming on board, the EEOC's existing data collection

processes and systems were deficient in many respects and required modernization.[3]  *See* Haffer Decl. ¶¶ 8-13 (explaining the agency's practice of delaying the closing of Component 1 data collections due to, *inter alia*, insufficient testing prior to the opening of the collection date); *see also* April 16, 2019 Hrg. Tr. 35, lines 12-19.  On Dr. Haffer's recommendation, the EEOC created a Data and Analytics Modernization Program, "a comprehensive evaluation of the collection, analysis, and dissemination of EEOC data," and procured the services of the research organization NORC at the University of Chicago, to implement the Modernization Program under a multi-year contract.  *Id.* ¶¶ 16-18.  During the time between the issuance of OMB's stay decision and the filing of this lawsuit, the EEOC undertook "[f]our major activities" focused on assessing the agency's data collection activity and "standing up" the agency's newly created Modernization Program.  April 16, 2019 Hrg. Tr. at 37, lines 7-25, at 38, lines1-5.  However, as Dr. Haffer explained, "u]ntil th[e] modernization is completed . . . the EEOC must continue using its current [data collection processes and systems] . . . with as many improvements put into place by [EEOC] staff."  Haffer Decl. ¶ 19.

**B.  The EEOC took swift action upon learning that the Court's March 4 decision reinstated the prior approval of the Component 2 pay data collection.**

In the days immediately following this Court's March 4 decision and order reinstating OMB's prior approval of the Component 2 pay data collection, the EEOC published a notice on its website informing employers that it was "working diligently on next steps in the wake of"[4] this Court's decision

---

[3] Many of the deficiencies that Dr. Haffer identified in his written and oral testimony are confirmed by the findings and recommendations in a 2018 Final Report by the EEOC's Office of Inspector General ("OIG"), which conducted an investigation of the agency's reporting and data analytics between November 2017 and February 2018.  *See, e.g.*, Evaluation of the EEOC's Data Analytics Activities Final Report, OIG Report Number 2017-02-EOIG at 2 (finding that the "EEOC lacks key, foundational components of infrastructure to support both reporting and data analytics initiatives"), available at https://oig.eeoc.gov/reports/audit/2017-002-eoig.

[4] During the April 16 hearing, the Court raised concerns about whether the undersigned misled or withheld timely information from Plaintiffs in connection with the undersigned's request for an extension of time to file Defendants' summary judgment brief in early December 2018.  The undersigned submits the attached Declaration and accompanying exhibits to explain the

reinstating the Component 2 pay data.[5]   *See https://www.eeoc.gov/employers/eeo1survey/statement-2018-opening.cfm*.   Given the identified deficiencies in its existing data collection processes and systems, the EEOC also promptly "began to assess timelines and costs" to determine how best to respond to the reinstatement of the Component 2 pay data collection.   April 16, 2019 Hrg. Tr. at 30, lines 12-13 (testimony of Dr. Haffer).   On March 5 or March 6, the EEOC reached out to two contractors, the "small business" contractor "currently doing [the agency's] Component 1 data collection" (*i.e.*, Sage) and a second contractor, "NORC at the University of Chicago," an "expert[] in data collection" and currently under contract for some of the EEOC's "modernization work," to determine "how fast [the contractors] . . . could open th[e] [Component 2 pay data] collection."   *Id.* at 30, lines 14-17, 22-25; *see also id.* at 40, lines 10-12 (referencing the "outreach to the contractors to ascertain budget and a timeline and to talk through any significant issues").   Based on the responses provided by both contractors, the EEOC quickly concluded that NORC was best positioned to provide the data collection processes

circumstances surrounding the failure to provide the EEOC's initial January 2021 estimate in early December or in the days that followed the Court's March 4, 2019 Opinion and Order.  As set forth in detail in the attached Declaration, the undersigned apologizes this failure and regrets to the extent that the failure to communicate this information about the EEOC's initial estimate of when the Component 2 pay data collection could begin has raised concern on the Court's or Plaintiffs' part regarding the good faith of Defendants and their counsel in the conduct of this litigation.  The undersigned has also attached as an exhibit to her Declaration the December 3 to December 4, 2018 email chain between the undersigned and agency counsel as ordered by this Court during the April 16 hearing.

[5] Prior to this Court's March 4 decision and order, the Component 2 pay data collection was subject to OMB's decision to stay and review the collection.  As Dr. Haffer explained, as a result of OMB's August 2017 decision to stay and review the Component 2 pay data collection, the EEOC deactivated links to a webinar, presentation slides, and other written information related to challenged collection to comply with the requirements of the PRA, which do not permit an agency to conduct or sponsor a collection that is not "approved."  *See* [OMB add cite]; *see also* April 16, 2019 Hrg. Tr. at 33, lines 10-14, 20-25, at 34, lines 1 (Dr. Haffer explaining that "we are not able to do anything that would demonstrate that we are asking for data to be collected" and further explaining that "legally we couldn't keep the link live" during the stay).  Shortly after the Court vacated the stay, the EEOC published a notice on its website to inform employers that it was considering "next steps" related to the challenged collection.

and systems necessary to collect Component 2 pay data "by September 30th." *Id.* at 30, lines 22-25; *see also id.* at 31, lines 1-6.

EEOC personnel also began "to draft a statement of work to quickly procure the services of the contractor," NORC, *see id.* at 40, lines 12-13, including "explor[ing] the regulations that would allow [the EEOC] to sole source [the collection of Component 2 pay data] . . . because of urgent and compelling necessity." *Id.* lines 14-16. As Dr. Haffer's testimony makes clear, since the Court issued its March 4 decision and order reinstating the Component 2 pay data collection, the EEOC has worked swiftly and diligently "to make sure" that it "basically ha[s] done all of the background work . . . that will allow [the agency] . . . to meet the September 30th deadline." *Id.* lines 17-20; *see also id.* at 43, lines 9-10 (Dr. Haffer's testimony that he "reached out" to both contractors "on either March the 5th or March the 6th).

In short, NORC is prepared to conduct the collection of the Component 2 pay data on behalf of the EEOC, including providing "a technical assistance telephone line and email box" and "to handle the calls once the calls and emails start coming" from employers, as soon as the EEOC "ha[s] the contract [with NORC] in place," including the terms governing the deadlines with which the contractor must comply to conduct the collection of Component 2 pay data on the EEOC's behalf. *Id.* at 41, lines 11-16; *see also id.* at 42, lines 10-12 ("[W]e can't ask the contractor to begin work on the contract until the contact's in place.").

Accordingly, to ensure that NORC is able to conduct the collection of pay data under the compressed time frame and terms of the collection that the EEOC has proposed, the EEOC must award the contract no later than May 1, 2019. However, as Dr. Haffer testified, the EEOC has not yet entered into a contract with NORC to conduct the Component 2 pay data collection because the agency is "still working through the details." *Id.* at 42, lines 10-12; *id.* at 43, lines 2-3. Those details include whether NORC will collect one year of pay data from employers as the EEOC has proposed,

*see id.* at 53, lines 4-25; *see also id.* at 56, lines 1-25, whether NORC will be required to collect two years' of data, *see, e.g., id.* at 52, lines 21-25 ("The Court:  All right.  Why, specifically, could requiring the 2017 pay data, along with the 2018 data, decrease response rate and increase errors in the entire data collection process?"), and whether NORC conducts the collection between now and September 30, 2019,  as the EEOC has proposed, or some other time frame, *see also id.* at 55, line 1-19 (inquiring whether it would be feasible to collect 2018 and 2019 pay data "[i]f OMB used its emergency action power to allow Component 2 data collection to be completed after September 30, 2019").   Under these circumstances, the EEOC has reasonably determined that it is prudent to do "all of the background work" to prepare for the reinstated Component 2 pay data collection until it is certain that the agency may move forward pursuant to the terms it has proposed and previously agreed to with NORC.  *Id.* at 40, lines17-18.   As previously mentioned, the EEOC 's Chief Financial Officer is prepared to move forward with the agency's contract with NORC once the scope of the collection is determined.  *See id.* at 42, lines 10-12, 21-23; *id.* at 43, lines 2-3.

### C. The EEOC's proposal to collect 2018 pay data between July 15, 2019, and the September 30, 2019 expiration of the revised EEO-1 approval period is reasonable.

As explained in detail in Defendants' April 3 filing, "[b]ut for OMB's decision to stay the collection of Component 2 pay data, employers would have gathered 2017 Component 2 pay data during a pay period of their choice between October 1, 2017,  and December 31, 2017, and submitted that data to the EEOC on or before March 31, 2018.  Employers also would have collected 2018 Component 2 data during one pay period between October 1, 2018, and December 31, 2018, and submitted that data to the EEOC on or before March 31, 2019."  Defs.' Submission in Response to the Court's Questions Raised During the March 19, 2019 Status Conference ("Defendants' April 3 filing") ¶ 2, ECF No. 54 (Apr. 3, 2019).  However, as a result of OMB's stay decision, the EEOC could not conduct or sponsor the collection of, and employers had no legal obligation to gather or

submit, Component 2 pay data between August 29, 2017, and March 4, 2019, when this Court vacated the stay. *See* April 16, 2019 Hrg. Tr. at 39, lines 14-18.

The March 4 reinstatement of the Component 2 pay data collection raised several practical challenges that the EEOC had to resolve in short order: (1) could the agency use its current data collection processes and systems to collect Component 2 pay data from employers, *see* April 16, 2019 Hrg. Tr. at 35, lines 12-19; *see also* Haffer Decl. ¶¶ 9-13, 14, 20-21; (2) given the September 30, 2019 revised EEO-1 approval expiration date, what circumstances would minimize the risk of yielding pay data with significant validity and reliability issues in light of the expedited time frame in which employers had to collect and submit Component 2 pay data that they had never before collected or submitted to the agency, *see* April 16, 2019 Hrg. Tr. at 53-54; *see also* Haffer Decl.. ¶¶ 23-27, 29, 32; and (3) how should the EEOC modify or adjust the missed deadlines for employers to collect and submit retroactively 2017 and 2018 pay data. *See* Defs.' April 3 filing ¶¶ 3-4.

The EEOC resulting proposal reasonably addresses and/or mitigates the practical challenges associated with the March 4 reinstatement of the Component 2 pay data collection. *See generally* Defs.' April 3 filing ¶¶ 3-8; *see also* Haffer Decl. ¶¶ 20-26; April 16, 2019 Hrg. Tr. at 30, lines 10-25; at 31, lines 1-8. As explained in detail in Dr. Haffer's declaration and April 16 hearing testimony, the EEOC quickly determined that "modifying its current processes and systems is not a viable option for collecting Component 2 data from employers," *see* Defs.' April 3 filing ¶ 5, given their deficiencies and the lengthy amount of time that it would take to "make the necessary updates, enhancements, security testing," to cure the same. *See* Haffer Decl. ¶¶ 9-13, 16-19, 20-21; *see also* April 16 Hrg. Tr. at 35, lines 12-19 (Dr. Haffer's testimony explaining "the potential . . . problems in collecting a new source of data that had never been collected before and the volume of data that were to be collected could potentially have overwhelmed the [EEOC's existing] system, and EEOC may not have been prepared to collect the data"). In the process of determining whether a contract for short-term collection of

14

the Component 2 data was feasible, the EEOC explored whether it would be possible to utilize NORC's data collection processes and services to complete the collection of Component 2 pay data by May 31, 2019, but concluded that it would not be feasible to so. *See* April 16, 2019 Hrg. Tr. at 46, lines 5-19 (Dr. Haffer explains that NORC "said if it was any faster than September 30th [the contractor] . . . would walk away because it would not meet anything resembling professional standards for data collection").  Instead, based on the contractor's assessment of what it can reasonably accomplish,  the EEOC has proposed to procure the data collection services of NORC, which "would perform the information collection for 2018 EEO-1 Component 2 pay data, including providing the processes, procedures, and systems to undertake and close the collection by September 30, 2019. . . ." Defs.' April 3 filing ¶ 6; *see also* Haffer Decl. ¶¶ 24-26; April 16, 2019 Hrg. Tr. at 30, lines 22-25, at 31, lines 1-6.   The EEOC would provide "oversight" of NORC's work, including from July 15, 2019, through September 30, 2019, during which employers would submit pay data through NORC's systems.  *See* April 16, 2019 Hrg. Tr. at 45, lines 23-25; *see also* Haffer Decl. ¶¶ 24-26; Defs.' April 3 filing ¶ 6.

The EEOC's proposal also reasonably addresses both the data validity and data reliability concerns implicated by requiring employers retroactively to collect and submit Component 2 pay data in a compressed amount of time and the missed Component 2 collection and submission deadlines as a result of OMB's stay decision.  To increase the likelihood that employers collect and submit pay data that yields valid and reliable data, *see* Haffer Decl. ¶ 32, the EEOC's proposal requires employers to submit only one year of Component 2 pay data, *i.e.*, pay data from one pay period in 2018, during the July 15, 2019, through September 30, 2019 collection window.  *See id.* ¶¶ 22-26, 32; *see also* April 16, 2019 Hrg. Tr. at 53-54; Defs.' April 3 filing ¶¶ 6-8.

The EEOC's proposal to limit employers' obligation to report only 2018 Component 2 pay data is based on several important considerations, including (i) the dynamic and "transactional" nature

of employers' payroll systems, *see* April 16, 2019 Hrg. Tr. at 53, lines 12-15, 18-25; *id.* at 54, lines 1-5; (ii) the fact that employers typically archive payroll data "at the end of the calendar year" sometimes with or without "the documentation that would explain to someone which data are in which fields and what the definitions of those data [are]," *see id.* at 54, lines 5-10; and (iii) the fact that this is a "brand-new data collection for EEOC and for employers" which the agency is "proposing to" collect "in a very abbreviated period of time." *Id.* at 53, lines 4-7.   As Dr. Haffer explained, "by focusing on an individual year of data instead of trying to do two separate collections at the same time" the EEOC has "a better likelihood of receiving quality data if [it] just focused people's attention on one year instead of multiple years of data." *Id.* at 54, lines 20-25.

Finally, the Acting Chair has determined that it is appropriate to exercise her administrative authority to adjust the 2018 pay data collection and submission deadlines to July 15, 2019, through September 30, 2019.  This authority derives from Title VII of the Civil Rights Act of 1964, which authorizes the Acting Chair "to administer the operations of the Commission." *See* 42 U.S.C. § 2000e-4(a); *see also* Defs.' April 3 filing ¶ 3 (explaining that in response to the partial government shutdown, the Acting Chair has previously exercised the agency's administrative authority to modify and adjust the original time periods for approved data collections as appropriate for the orderly administration of the collection).  By proposing to adjust the 2018 missed deadlines in this way, the EEOC's proposal also comports with the reinstated terms of OMB's prior approval of the revised EEO-1 collection, including the September 30, 2019 expiration approval date.

###### D. **There is no need to toll the expiration of the authorized period for collecting Component 2 pay data, and no legal basis for doing so.**

The Court has expressed concern that, if unforeseen issues arise that prevent the collection of Component 2 data on or before September 30, 2019, the agency will argue that it lacks authority to collect the information beyond that point, thereby frustrating the collection.  The court has asked whether OMB's now-vacated stay tolled the approval period for this data collection so as to allow the

collection of information beyond the original September 30 expiration date.  There is no legal basis for concluding that OMB's stay tolled the expiration the authorized period for the data collection. And EEOC and OMB have a number of measures available to them in the event that delays prevent some or all employers from submitting Component 2 data before the authorized collection period expires.

The PRA expressly limits OMB's authority to approve information collections.  "The Director [of OMB] may not approve a collection of information for a period in excess of 3 years." 44 U.S.C. § 3507(g).  Nothing in the PRA provides that the approval period is tolled if OMB stays an approved collection during a period of review.  The fact that the stay may later be set aside does nothing to change that statutory analysis.  Nor is there any basis in equity or otherwise for the Court to order such tolling.  The PRA limits OMB's authority to approve a collection of information for a period of up to three years, and OMB's exercise of that authority identifies a date certain for the expiration of the approval.   We are aware of no authority for the counter-intuitive proposition that OMB can exceed the scope of its statutory authority to approve information collections from third parties by violating its own regulations governing stays of such collections.  Entering a tolling order would be particularly inappropriate in these circumstances because tolling is at odds with the agencies' understanding of the operation of the relevant statutes, is unnecessary to effectuate the collection of data, and because Plaintiffs in any event have no statutory right to the information, as this Court itself recognized, *see* March 4, 2019 Mem. Op. at 12, and thus have no legal basis to seek an order forcing EEOC and OMB to require additional information collection from third-party employers.

If problems were to arise in collecting the Component 2 information before September 30, 2019, the EEOC and OMB have means, consistent with the relevant statutes, to facilitate the collection of Component 2 information that relates to the authorization period.  If circumstances arise whereby the scheduled opening of the Component 2 pay data collection is seriously delayed, the

17

EEOC could request an emergency extension of the EEO-1 PRA approval from OMB in order to allow sufficient time to conduct the collection of pay data from 2018.

### III.     The arguments set forth in Defendants' Motion to Dismiss were made in good faith.

During the course of Plaintiffs' counsel's cross-examination of Dr. Haffer, a series of questions were asked of Dr. Haffer about his awareness of the underlying factual and legal bases of Defendants' argument that OMB's decision to initiate a stay and review of the Component 2 pay data collection was not final agency action as required to maintain an APA claim under § 706(2). *See* April 16, 2019 Hrg. Tr. at 63-64 ("Are you aware of whether anyone else at the EEOC took action to respond to OMB's directive to submit a new information collection package for review?"  "Are you aware that during the course of this litigation defendants represented to the Court that the action should not be reviewed because there was an active review within the agencies of whether the Component 2 data collection should continue?).  In response to these questions, Dr. Haffer generally responded that he was "not aware of that" or "had no knowledge of any of that." *Id.* at 63, line 15; *see also id.* at 64, line 10.

Plaintiffs' insinuations in asking these questions was inappropriate.  As is patently clear from Dr. Haffer's testimony and declaration, he is not an attorney and, during his employment with the EEOC, he has been focused on modernizing out-dated and ineffective data systems and processes rather than on this litigation.  Further, these questions are outside the scope of the Court's April 11, 2019 Order, which required Dr. Haffer's attendance on behalf of the EEOC because he has "particularized and thorough knowledge of the issues addressed and questions raised in the parties' Submissions, ECF Nos. 54, 62, and 63, including all efforts since September 2016 to implement the Component 2 collection.  Order, ECF No. 64 (Apr. 11, 2019).  The questions also disregard this Court's instruction that it would "give plaintiffs an opportunity to ask very, very limited questions as

follow-up to [the Court's] . . . questions," *see* April 16, 2019 Hrg. Tr. at 27, lines 6-7, and its further admonition that "this is not a deposition or a trial so those questions would be limited to topics raised in my questioning and [Dr. Haffer's] declaration," *id.* lines 7-10.  Indeed, none of the questions asked of Dr. Haffer by the Court, nor the statements contained in his declaration raised the factual or legal bases underlying the legal arguments in Defendants' Motion to Dismiss.

The only basis for Plaintiffs to ask these questions of Dr. Haffer is to imply that Defendants did not make their "no final agency action" argument in good faith.   This is unequivocally false, and the undersigned strenuously objects to the implication.  The arguments made in Defendants motion to dismiss were made in good faith, and Plaintiffs' counsel's effort to suggest otherwise by its improper questioning should be categorically rejected.

Dated:  April 22, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

CARLOTTA WELLS
Assistant Branch Director

*/s/ Tamra T. Moore*
Tamra T. Moore
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C.  20005
Tel.:  (202) 305-8628
Fax:  (202) 616-8460
Email:  Tamra.Moore@usdoj.gov